**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

| | |
|---|---|
| **WILHEN HILL BARRIENTOS, MARGARITO VELAZQUEZ GALICIA, and SHOAIB AHMED** individually and on behalf of all others similarly situated,<br><br>         Plaintiffs,<br><br>v.<br><br>**CORECIVIC, INC.,**<br><br>         Defendant. | **Civil Action No. _____**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**<br><br>**CLASS ACTION**<br><br>**JURY DEMAND** |

## PRELIMINARY STATEMENT

1.      Individuals detained at the Stewart Detention Center ("Stewart") in Lumpkin, Georgia work because they have no other meaningful choice.  Defendant CoreCivic, Inc., ("CoreCivic"), the billion-dollar private prison corporation that owns and operates Stewart, maintains a deprivation scheme intended to force detained immigrants[1] to work for nearly free. CoreCivic deprives detained immigrants of basic necessities like food, toothpaste, toilet paper, and soap – and contact with loved ones – so that they have to work in order to purchase those items and costly phone cards at CoreCivic's commissary.  CoreCivic then threatens detained immigrants who refuse to work with serious harm, including the deprivation of privacy and safety in open living quarters, referral for criminal prosecution, and, ultimately, the sensory and

---

[1] This Complaint refers to individuals detained in Stewart as "detained immigrants" with the caveat that there are United States citizens detained in Stewart and in other civil immigration detention centers across the nation.  *See, e.g.*, William Finnegan, *The Deportation Machine*, The New Yorker, Apr. 29, 2013, https://www.newyorker.com/magazine/2013/04/29/the-deportation-machine (reporting on the case of Mark Lyttle, a U.S. Citizen who was wrongfully detained in Stewart and deported to Mexico).

psychological deprivation of their humanity resulting from solitary confinement.  Under these circumstances, no labor is voluntary – it is forced.

2.      CoreCivic's deprivation scheme ensures that the individuals detained in Stewart provide the billion-dollar corporation with a ready supply of available labor needed to operate the facility.  Detained immigrants mop, sweep, and wax floors; scrub toilets and showers; wash dishes; do laundry; clean medical facilities; and cook and prepare food and beverages daily for the nearly 2,000 individuals locked inside Stewart.  For this labor, CoreCivic pays detained immigrants between $1 and $4 per day and occasionally slightly more for double shifts.  When CoreCivic needs "volunteers" to work double shifts in the kitchen or to work more than five days per week, as it often does to run Stewart, it employs a policy of threatening detained immigrants until they comply.  Under no circumstances does CoreCivic pay the detained immigrant workers anything close to the federal minimum wage.

3.      Plaintiffs are current or former detained immigrants who were forced to work for CoreCivic at Stewart.  Individually and on behalf of all others similarly situated, Plaintiffs bring this class action lawsuit to end CoreCivic's forced labor scheme and remedy the unjust enrichment resulting from CoreCivic's illegal labor practices.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Trafficking Victims Protection Act,[2] 18 U.S.C. §§ 1589, 1594, and 1595.

---

[2]  The Trafficking Victims Protection Act was enacted in 2000, *see* Pub. L. No. 106-386, 114 Stat. 1486 (Oct. 28, 2000), and has been amended on three different occasions since then.  *See* Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, 117 Stat. 2878 (Dec. 19, 2003); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044 (Dec. 23, 2008); Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, 129 Stat. 227.

5.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one defendant; there are more than 100 class members; and the aggregate amount in controversy exceeds $5,000,000.

6.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the claims occurred in this District.

7.      This Court has personal jurisdiction over CoreCivic because the corporation regularly conducts business in and has sufficient minimum contacts with the Middle District of Georgia.

8.      Plaintiffs request that this Court exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over their state law claim of unjust enrichment.

## PARTIES

### A.      Plaintiffs

9.      Plaintiff Wilhen Hill Barrientos is currently detained at Stewart.  He has been detained at Stewart intermittently since on or about July 2015.  Mr. Barrientos is a citizen of Guatemala seeking asylum in the United States.  He is currently working for CoreCivic as a kitchen worker and is generally paid between $1 and $4 per day as part of the "Voluntary Work Program."  When CoreCivic requires him to work twelve hours or more in one day, he makes up to $8 per day.

10.     Plaintiff Margarito Velazquez Galicia is currently detained at Stewart.  He has been detained there since on or about January 2018.  Mr. Velazquez is a citizen of Mexico and intends to seek relief from deportation in the form of cancellation of removal.  His wife and two

---

(May 29, 2015).  This complaint refers to the provisions of 18 U.S.C. §§ 1589, 1594, and 1595, including all amendments, as the Trafficking Victims Protection Act ("TVPA").

children are United States citizens.  Mr. Velazquez is currently employed as a kitchen worker and is generally paid between $1 and 4 per day as part of the "Voluntary Work Program."  When CoreCivic requires him to work twelve hours or more in one day, he makes up to $8 per day.

11.    Plaintiff Shoaib Ahmed was detained at Stewart from approximately August 2017 to February 2018.  He is a citizen of Bangladesh who gave up his right to fight his asylum case due to the poor living conditions at Stewart, threats, and retaliation by CoreCivic.  Mr. Shoaib worked for CoreCivic as a kitchen worker and was paid $4 per day.  If he worked twelve hours or more, he was paid an additional $1 per day as part of the "Voluntary Work Program."

### B.    Defendant

12.    Defendant CoreCivic, formerly the Corrections Corporation of America, is a for-profit corporation providing correctional and detention services. CoreCivic is a Maryland corporation operating under federal tax laws as a Real Estate Investment Trust ("REIT"), with its principal office located at 10 Burton Hills Boulevard, Nashville, Tennessee 37215.  CoreCivic owns and operates Stewart, where Plaintiffs were or are detained, located at 146 CCA Road, Lumpkin, Georgia 31815.

13.    At all relevant times, CoreCivic owned and operated Stewart under contract with Stewart County, Georgia ("Stewart County").  Stewart County maintains an Intergovernmental Service Agreement ("IGSA") with U.S. Immigration and Customs Enforcement ("ICE") to detain immigrants on behalf of ICE.

### FACTUAL ALLEGATIONS

### A.    Immigration Detention is Civil – Not Criminal.

14.    Each year, hundreds of thousands of individuals are locked up in civil immigration detention facilities while awaiting immigration or citizenship status determinations.

Those detained include U.S. citizens, lawful permanent residents (green card holders) with longstanding family and community ties, children, pregnant women, asylum seekers, victims of human trafficking, and survivors of torture. Some detained immigrants were brought to the United States as children. And thousands ultimately have their United States citizenship or legal residency affirmed by an immigration court or federal judge.

15.     Immigration violations are civil violations, and immigration detention is civil in nature.[3]  Many detained immigrants have no criminal history at all.

16.     Notwithstanding immigration detention's civil nature and purpose, detained immigrants are subjected to prison-like conditions at Stewart. According to Dora Schriro, former head of ICE's Office of Detention Policy and Planning, most detained immigrants are held – systematically and unnecessarily – under punitive circumstances inappropriate for immigration detention's noncriminal purposes.[4]  Detained immigrants are frequently subjected to punitive and long-term solitary confinement, inadequate medical care, sexual and physical assault, lack of access to counsel, and other harsh conditions of confinement; all without a right to a speedy trial, a jury, a government-appointed lawyer, or a duly-entered conviction.

17.     Many detained immigrants, Plaintiff Ahmed included, accede to deportation simply to escape intolerable conditions of confinement, even when they have valid claims to remain in the United States, including claims for asylum or other discretionary relief.

---

[3] *See, e.g.*, *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984) ("A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry"); *see also Fong Yue Ting v. United States*, 149 U.S. 698, 728-30 (1893) (observing that deportation proceedings have "all the elements of a civil case" and are "in no proper sense a trial or sentence for a crime or offense"); *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952).
[4] Dora Schriro, *Immigration Detention Overview and Recommendations*, U.S. Dep't of Homeland Sec., Immigration and Customs Enforcement 2-3, 21 (Oct. 6, 2009) *available at* https://www.ice.gov/doclib/about/offices/odpp/pdf/ice-detention-rpt.pdf.

**B.**     **The Privatization of Immigration Detention and CoreCivic's Economic Windfall.**

18.     Immigration detention expanded roughly eightfold over the past two decades, from a capacity of 5,532 detention beds in 1994[5] to a current capacity of over 41,000 beds, and climbing.[6]



**Immigration Detention Boom**
IMMIGRATION DETENTION EXPANDED ROUGHLY EIGHTFOLD OVER THE PAST TWO DECADES

**1994**
5,532 DETENTION BEDS*

**2017**
41,000+ DETENTION BEDS**

*Patler C, Golash-Boza TM. The fiscal and human costs of immigrant detention and deportation in the United States. Sociology Compass. 2017;11:e12536.
**https://www.scribd.com/document/373733514/November-2017-ICE-Detention-Facility-Lists#from_embed

19.     During the same period, CoreCivic and other private prison corporations have spent tens of millions of dollars on lobbying efforts.[7]

20.     As immigration detention expanded, private prison corporations, led by CoreCivic,[8] gained a rapidly increasing share of the contracts for new detention beds.[9]

---

[5] Chad C. Haddal & Alison Siskin, Cong. Research Service, RL32369, Immigration-Related Detention: Current Legislative Issues 12 (2010), *available at*
https://digitalcommons.ilr.cornell.edu/cgi/viewcontent.cgi?article=1712 &context=key_workplace.
[6] Jennie Jarvie, *This industry stands to benefit from Trump's crackdown on the border*, L.A. Times, Feb. 14, 2017, http://www.latimes.com/nation/la-na-immigrant-detention-20170214-story.html.
[7] Michael Cohen, *How for-profit prisons have become the biggest lobby no one is talking about*, Wash. Post, Apr. 28, 2015, https://www.washingtonpost.com/posteverything/wp/2015/04/28/ how-for-profit-prisons-have-become-the-biggest-lobby-no-one-is-talking-about/?utmterm=.25de04ae71f9.

21.     CoreCivic's 2017 revenues were approximately $1.765 billion,[10] and its stock is publicly traded on the New York Stock Exchange, with a market capitalization of approximately $2.36 billion[11]

22.     Detention centers for which CoreCivic designated ICE as its "primary customer" accounted for 25% of CoreCivic's total revenues in 2017 ($444.1 million).[12]  CoreCivic officials expect these lucrative immigration detention contracts to account for a significant percentage of the corporation's ongoing revenues.[13]



**Percent of CoreCivic's Revenues from ICE Detention** (2007-2017)
PERCENTAGE OF TOTAL REVENUE

SOURCE: CivicCore Annual Reports
http://ir.corecivic.com/static-files/539b0e92-703b-4ded-a2a9-a710d494f396 (pg 8)
http://ir.corecivic.com/static-files/940963bd-f49c-435b-8910-58fec39c8c8d (pg 10)
http://ir.corecivic.com/static-files/940963bd-f49c-435b-8910-58fec39c8c8d (pg 10)
http://ir.corecivic.com/static-files/f242d017-6ce3-4bb5-ae33-f6888059dc9b (pg 9)

23.     As part of its immigration detention enterprise, CoreCivic owns and operates the Stewart Detention Center.

---

[8] Madison Pauly, *A Brief History of America's Private Prison Industry*, Mother Jones, Jul./Aug. 2016, https://www.motherjones.com/politics/2016/06/history-of-americas-private-prison-industry-timeline.

[9] Bethany Carson & Eleana Diaz, *Payoff: How Congress Ensures Private Prison Profit with an Immigrant Detention Quota*, Grassroots Leadership 6, Chart 1-A[A] (Apr. 2015) https://grassrootsleadership.org/sites/default/files/reports/quota_report_final_digital.pdf.

[10] CoreCivic Inc., Form 10-K FY 2017 at F-4, Sec. Exch. Comm'n, https://www.sec.gov/Archives/edgar/data/1070985/000156459018002898/cxw-10k_20171231.htm. [hereinafter "CoreCivic 10-K"].

[11] CoreCivic Inc. Stocks Overview, Reuters, *available at* https://www.reuters.com/finance/stocks/overview/CXW (last visited Apr. 16, 2018).

[12] CoreCivic10-K, at 32.

[13] *Id.*

24.     With nearly 2,000 beds, Stewart is one of the largest immigration detention centers in the nation.  During fiscal year 2017, more deportation proceedings began in Stewart than any other immigration detention center in the country.[14]

25.     Pursuant to the IGSA between ICE and Stewart County, ICE pays the County $62.03 per detained immigrant per day.[15]  Under its 2006 contract with CoreCivic, however, the County keeps only 85 cents per detained immigrant per day for its "administrative costs."  The rest of the money from ICE goes to CoreCivic.  In 2016, CoreCivic's revenue from Stewart was approximately $38 million.[16]  By contrast, the County's revenue from Stewart was $589,052 for the same year.[17]

26.     CoreCivic's economic windfall, and the profitability of its immigration detention enterprise, arises from its corporate scheme, plan, and pattern of systemically withholding basic necessities from detained immigrants to ensure a readily available, captive labor force that cleans, maintains, and operates its facilities for subminimum wages under threat of solitary confinement, criminal prosecution, and other sanctions.  Without this nearly free labor, CoreCivic's windfall from immigrant detention would be substantially decreased.

---

[14] Transactional Records Access Clearinghouse of Syracuse Univ. ("TRAC"), *Details on Immigration Proceedings by Immigration Court*, http://trac.syr.edu/phptools/immigration/nta/ (last visited Apr. 6, 2018).

[15] TRAC, *Detention Facility Reports: Transfers*, http://trac.syr.edu/immigration/detention/tran.shtml (last visited Apr. 9, 2018).

[16] Robin Urevich, *Deadly Detention: Hell in the Middle of a Pine Forest*, Capital and Main (Mar. 14, 2018), https://capitalandmain.com/deadly-detention-hell-middle-pine-forest-0314.

[17] Stewart County, Georgia, Independent Auditors' Report 59 (2016), http://www.stewartcountyga.gov/PDF-docs/StewartCounty2016Audit.pdf.

C.     **CoreCivic Uses Detained Immigrants to Clean, Maintain, and Operate Stewart.**

27.     CoreCivic operates a so-called Voluntary Work Program ("Work Program") at Stewart.  Through this program, CoreCivic uses detained immigrants to perform work that directly contributes to institutional operations.

28.     The Performance Based National Detention Standards ("PBNDS"), issued as guidance by ICE, delegate the site-specific rules for each Work Program to the "facility administrator" but mandate, *inter alia*, that each Work Program be in compliance with the PBNDS; that all work, other than personal housekeeping, be voluntary and not required; that compensation be "at least $1.00 (USD) per day"; and that work be limited to 8 hours per day, 40 hours per week.[18]

29.     According to CoreCivic's Detainee Orientation Handbook, which it provides to all detained immigrants at Stewart upon entry, the following work assignments may be available through the Work Program:

a.     Administration Porter

b.     Barber

c.     Commissary

d.     Hallway Porter

e.     Intake Worker

f.     Kitchen Worker

g.     Laundry Worker

h.     Library Worker

i.     Medical Porter

---

[18] ICE, Performance-Based National Detention Standards 405-409 (2011), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

      j.        Night Floor Crew

      k.        Pod Porter

      l.        Recreation/Gym Worker

      m.       Sally port/Chemical Porter

      n.        Shower Porter

      o.        Unit Law Library Helper

      p.        Visitation Porter[19]

30.     In the course of their labor for CoreCivic, detained immigrants in the Work Program perform a wide range of work, including but not limited to:

      a.        Scrubbing bathrooms, showers, toilets, and windows;

      b.        Cleaning and maintaining CoreCivic's on-site medical center;

      c.        Cleaning patient rooms and medical staff offices;

      d.        Sweeping, mopping, stripping, and waxing floors;

      e.        Washing detained immigrants' laundry;

      f.        Preparing, cooking, and serving meals;

      g.        Washing dishes;

      h.        Cleaning the kitchen and cafeteria before and after meals;

      i.        Performing clerical work for CoreCivic;

      j.        Providing barber services to detained immigrants;

      k.        Cleaning intake areas and solitary confinement units; and

      l.        Cleaning and maintaining recreational areas.

---

[19] CoreCivic, Detainee Orientation Handbook, Stewart Detention Center 14 (2016) [hereinafter "Stewart Detainee Handbook"].

31.     CoreCivic pays detained immigrants who participate in the Work Program generally between $1 and $4 per day.  CoreCivic occasionally increases the wage rate it pays to kitchen workers to up to $8 per day when it needs workers to work twelve hours or more per day. Under no circumstances does CoreCivic pay the detained immigrants the federal minimum wage of $7.25 per hour, or the Service Contract Act wages governing the jobs they perform.  In fact, the detained immigrants' wages generally are well under $1 per hour.

32.     The Work Program allows CoreCivic to avoid recruiting from the local labor market, paying minimum wages, providing detained immigrants in the Work Program with any benefits, paying the costs of potential unionization, and paying federal and state payroll taxes, like Medicare, thereby reducing operational costs and increasing its own profits.  Further, it reduces the likelihood of former employees acting as whistleblowers regarding the deplorable and unsafe conditions inside Stewart.[20]

33.     Stewart County has the highest poverty rate among all Georgia counties.  With a population of roughly 5,900, nearly 40% of families live below the poverty level.[21]   The County's average unemployment rate in February 2018 was 5.3%, which is a 1.2% higher than the national average of 4.9%.[22]  The median family income is $20,882.[23]  One hundred percent of children in Stewart County public schools are reportedly eligible for free or reduced-price meal programs.[24]

---

[20] *See, e.g.*, Urevich, *supra* note 16.
[21] U.S. Census Bureau, Stewart County, GA, Quick Facts: Income and Poverty, *available at* https://www.census.gov/quickfacts/fact/table/stewartcountygeorgia/IPE120216 (last visited Apr.12, 2018).
[22] Georgia Department of Labor, Georgia Labor Force Estimates 8 (2018), https://dol.georgia.gov/sites/dol.georgia.gov/files/related_files/document/laborforce.pdf
[23] U.S. Census Bureau, *supra* note 21.
[24] Georgia Department of Early Care and Learning, FY2016 Free and Reduced Lunch School Data, Qualitied Schools, 24, http://decal.ga.gov/documents/attachments/16FreeRedQualSchools.pdf.

34.     According to CoreCivic, it employs around 300 people at Stewart, outside of the Work Program,[25] only 96 of whom are Stewart County residents.[26]  CoreCivic fills a substantial number of jobs at Stewart with detained immigrants in the Work Program who work for nearly free.

35.     While CoreCivic profits handsomely from the labor of detained immigrants locked inside Stewart, the company locks out many Stewart County residents from jobs and the economic growth and prosperity that comes with fair-paying work.

**D.      CoreCivic Withholds Necessary Care from Detained Immigrants at Stewart.**

36.     Despite its name, the "Voluntary Work Program" is not "voluntary" in any meaningful sense.  CoreCivic maintains a corporate scheme, plan, and pattern at Stewart of depriving detained immigrants with basic necessities; outside contact with loved ones; and threatening them with serious harm, isolation, and criminal prosecution.  As a result, detained immigrants are forced to submit to CoreCivic's labor scheme in order to buy necessities from the commissary (including food, hygiene products, and phone cards) and to avoid solitary confinement and other sanctions.

37.     CoreCivic owns and operates the commissary inside Stewart.  The commissary is the only place at Stewart where detained immigrants can purchase necessities, including hygiene products, clothes, food, and phone cards.  Pursuant to corporate policy, CoreCivic is required to use any profits or interest earned from the commissary towards welfare expenditures for detained immigrants.

---

[25] Harry Franklin, *Facility to house immigrants Official ink deal to detain inmates to be deported*, Columbus Ledger-Enquirer, Jul. 11, 2006 *available at* 2006 WLNR 11899060; Jeremy Redmon, *Detention center is largest in nation*, Atlanta Journal-Const., Jan. 16, 2011 *available at* 2011 WLNR 930948.
[26] Caleb Bauer, *CoreCivic has history of complaints, violations*, S. Bend Trib., Jan. 17, 2018, https://www.southbendtribune.com/news/local/corecivic-has-history-of-complaints-violations/article_9355aa57-8309-56f6-9072-1e2f8e035a3c.html.

38.     Detained immigrants must use funds from their "inmate fund account" to make purchases at the commissary.  All of the detained immigrants' wages from the Work Program are deposited into this account.

39.     When detained immigrants in the Work Program make purchases at the commissary, they are giving their wages directly back to CoreCivic in a "company store" scenario.  This scenario is compounded by CoreCivic's scheme, plan, and pattern of intentionally depriving detained immigrants of basic necessities, such as hygiene products, that can only be purchased at the commissary.

40.     CoreCivic's scheme of intentionally depriving detained immigrants of basic necessities and its failure to meet federal standards concerning housing, food, and hygiene products is well-documented.[27]

41.     According to the U.S. Department of Homeland Security, Office of the Inspector General (OIG), Stewart has "bathrooms that were in poor condition, including mold and peeling paint on walls, floors, and showers."[28]  Some bathrooms at Stewart lack hot water, while some showers lack cold water.[29]

---

[27] See Ben Norton, *Privatized for-profit immigrant detention centers are a "living nightmare," investigation shows*, Salon (May 16, 2017), https://www.salon.com/2017/05/16/privatized-for-profit-immigrant-detention-centers-are-a-living-nightmare-investigation-shows_partner/; Christie Thompson, *Welcome to Stewart Detention Center, the Black Hole of America's Immigration System*, VICE (Dec. 11, 2016), https://www.vice.com/en_us/article/ypv59j/ welcome-to-stewart-detention-center-the-black-hole-of-the-immigration-system;  S. Poverty Law Ctr., *Shadow Prisons: Immigrant Detention in the South*,  36 (Nov. 2016), https://www.splcenter.org/sites/default/files/ leg_ijp_shadow_prisons_immigrant_detention_report.pdf; ACLU of Ga., *Prisoners of Profit: Immigrants and Detention in Georgia* (May 2012), https://www.acluga.org/sites/default/files/field_documents/prisoners_of_ profit.pdf; Penn. State Law Ctr. For Immigrants' Rights Clinic, *Imprisoned Justice: Inside Two Georgia Immigration Detention Centers* (May 2017), https://pennstatelaw.psu.edu/sites/default/files/pictures/Clinics/Immigrants-Rights/Imprisoned_Justice_Report.pdf [hereinafter "Imprisoned Justice"].
[28] U.S. Dep't of Homeland Sec., Office of the Inspector Gen., OIG-18-32, Concerns about ICE Detainee Treatment at Detention Facilities 7 (2017) *available at* https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf [hereinafter "OIG Report"].

42.     The OIG has also found that Stewart fails to provide "basic hygienic products, such as toilet paper, soap, lotion, and toothpaste . . . promptly or at all when detainees ran out of them."[30]   Officers instruct detained immigrants to buy these necessities from the commissary when they run out.[31]

43.     The same report from the OIG observes that Stewart stores "spoiled, wilted, and moldy produce and other food in kitchen refrigerators, as well as food past its expiration date."[32] Other food safety issues, according to the federal government, include "expired frozen food, including meat, and thawing meat without labels indicating when it had begun thawing or the date by which it must be used."[33]

44.     In addition to depriving detained immigrants of basic necessities like safe and sufficient food and hygienic products, CoreCivic has a scheme, plan, and pattern of depriving detained immigrants of outside contact with loved ones to compel detained immigrants to work in order to purchase costly phone cards from the commissary.

45.     Stewart is geographically isolated and isolating for detained immigrants.  It is outside the town of Lumpkin, Georgia, which has a population of 1,123 (not including the detained immigrants).[34]  It is a two and one-half hour drive from Atlanta, Georgia.  The people who are able to make the trip to the detention center to visit a loved one are limited to non-contact visits.  They must view each other through a plate glass window and speak through a closed-circuit telephone.  These visits are limited to an hour.

---

[29] *Id.*
[30] *Id.* (reporting on Stewart and Hudson County Jail).
[31] *Id.* (reporting on Stewart and Hudson County Jail).
[32] *Id.* at 8 (reporting on Stewart and three other facilities).
[33] *Id.* (reporting on Stewart and three other facilities).
[34] U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates: Lumpkin, Georgia, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/16_5YR/DP05/1600000US1347980 (last visited Apr. 14, 2018).

46.     Talton Communications ("Talton"), the company that provides Stewart's phone service, provides the only way for detained immigrants to call anyone outside the detention center.  Talton takes advantage of this monopoly by charging excessively high rates for detained immigrants to make telephone calls.  Therefore, most detained immigrants are not able to speak with family members for more than a few minutes every week, and at great expense.

47.     Detained immigrants must purchase Talton phone cards at the commissary to make outside calls.  Many detained immigrants submit to the Work Program to purchase these costly phone cards so they can maintain contact with loved ones.[35]

**E.     CoreCivic Threatens to Put Detained Immigrants in Solitary Confinement, Among Other Sanctions, for Refusing to Work.**

48.     CoreCivic maintains a corporate scheme, plan, and pattern at Stewart of threatening detained immigrants who refuse to work, organize a work stoppage, or participate in a work stoppage with "disciplinary segregation" (i.e., solitary confinement), criminal prosecution, downgrading the detained immigrants' housing, and/or revoking access to the commissary, among other sanctions.

49.     CoreCivic's Stewart Detainee Orientation Handbook, which every individual detained at Stewart receives upon entry, categorizes "[e]ncouraging others to participate in a work stoppage or to refuse to work," as a High Offense category, the second-highest offense category.   As a result, encouraging others to participate in a work stoppage is punishable by, *inter alia*:

        a.     "Initiat[ion] [of] criminal proceedings";

        b.     "Disciplinary Segregation (Up to 30 days)";

        c.     "Loss of privileges: commissary, movies, recreation, etc."; and

---

[35] *Imprisoned Justice*, at 30.

      d.    "Chang[ing] housing" or "Restrict[ion] to housing unit."[36]

50.    CoreCivic maintains a corporate scheme, plan, and pattern at Stewart of threatening Plaintiffs and Class Members who refuse to work with "intiat[ing] criminal proceedings" against them, which constitutes a threatened abuse of the legal process.

51.    CoreCivic's overuse of disciplinary measures such as solitary confinement at Stewart is well-documented.[37]

52.    The OIG has expressed "concerns about a lack of professionalism and inappropriate treatment by Detention Center staff, which fostered a culture of disrespect and disregard for detainees' basic rights."[38]  Detained immigrants have been "disciplined, including being segregated or locked down in their cells, without adequate documentation in the detainee's file to justify the disciplinary action."[39]

53.    In June 2017, officials at Stewart held a detained immigrant in solitary confinement for nearly 30 days for allegedly encouraging others to participate in a work stoppage.

---

[36] Stewart Detainee Handbook, at 31-32.

[37] *See* Ben Norton, *Privatized for-profit immigrant detention centers are a "living nightmare," investigation shows*, Salon (May 16, 2017), https://www.salon.com/2017/05/16/privatized-for-profit-immigrant-detention-centers-are-a-living-nightmare-investigation-shows_partner/; S. Poverty Law Ctr., *Shadow Prisons: Immigrant Detention in the South*, 41 (Nov. 2016), https://www.splcenter.org/sites/default/files/leg_ijp_shadow_prisons_immigrant _detention_report.pdf; ACLU of Ga., *Prisoners of Profit: Immigrants and Detention in Georgia*, 67-69 (May 2012), https://www.acluga.org/sites/default/files/field_documents/prisoners_of_profit.pdf; *Imprisoned Justice*, at 36-37; *see also Grae v. Corrections Corporation of America*, No. 3:16-cv-2267, 2017 WL 6442145 at *5-8, 15, 21 (M.D. Tenn. Dec. 18, 2017) (citing numerous instances of CoreCivic placing individuals in administrative segregation in Eden Detention Center for inappropriate reasons).

[38] OIG Report, at 6 (reporting on Stewart and two other facilities); s*ee also* Urevich, *supra note* 16 (former ICE officer and Stewart guard describing physical abuse and verbal mistreatment of detained immigrants at Stewart).

[39] OIG Report, at 6 (reporting on Stewart and two other facilities).

54.     CoreCivic also maintains a corporate scheme, plan, and pattern at Stewart of threatening Plaintiffs and Class Members who refuse to work with "changing housing" to living quarters that are less safe, sanitary, and private.

55.     Detained immigrants who submit to the Work Program are often provided with more favorable living quarters, including "pods" that have private two-person cells, access to a common area, a shared bathroom with one cellmate, and a shower with temperature control.

56.     These smaller pods are in stark contrast to the open dormitories.  The open dormitories house up to 66 people, in 33 bunk beds.  There is no privacy.  The lights in these dorms are on all day and night, requiring some detained immigrants to fold socks over their eyes in order to sleep.  There is one bathroom in these dorms with three to four toilets, three to four urinals, and four sinks.  This shared bathroom is often filthy, to the extent that the pod residents at times gag from the overwhelming and festering stench.  The showers in the open dormitories do not have temperature control and provide only extremely hot water.  The open dormitories are also the site of frequent conflict and even violence.  Indeed, the detained immigrants refer to open dormitories as "El Gallinero," or "the Chicken Coop," for both the conditions and overcrowded living quarters.

57.     CoreCivic maintains a corporate scheme, plan, and pattern at Stewart of threatening Plaintiffs and Class Members with loss of access to the commissary when they refuse to work.

58.     Plaintiffs and Class Members rely on access to the commissary to purchase the basic necessities that CoreCivic does not adequately provide and phone cards to maintain contact with loved ones.

59.    By maintaining this scheme, plan, and pattern of threatening Plaintiffs and Class Members who refuse to work with solitary confinement and other sanctions, CoreCivic ensures an available labor pool of detained immigrants will work for nearly free, thus allowing it to continue operating Stewart at an enormous profit.

60.    CoreCivic knowingly benefitted financially, both by way of reduced labor costs and increased commissary revenue, from participating in a venture CoreCivic knew or should have known forced Plaintiffs and Class Members to work, or attempted to force them to work.

**F.    Plaintiff Barrientos' Labor at Stewart**

61.    Mr. Barrientos has performed work for CoreCivic at Stewart as a result of its unlawful forced labor scheme, plan, and pattern.

62.    As a kitchen worker, Mr. Barrientos washes dishes, serves meals, and prepares food for detained immigrants at Stewart.  He regularly works eight to nine-hour shifts per day, seven days per week.

63.    Prior to March 2018, Mr. Barrientos was paid $4 per day.  If he worked more than twelve hours in one day, he was paid $5 per day.  If Mr. Barrientos worked seven consecutive days in one week, he was compensated with a $5 phone card on top of his weekly wages.

64.    After March 2018, CoreCivic's pay scheme changed.  Currently, Mr. Barrientos is paid $1 per day if he works less than six hours, $4 per day if he works for six hours, $5 per day if he works between eight and eleven hours and fifty-nine minutes, and $8 per day if he works twelve hours or more.  CoreCivic credits these wages to Mr. Barrientos' commissary account.

65.    As a kitchen worker, Mr. Barrientos has been forced to cook and serve spoiled food to detained immigrants after complaining about the expired food to kitchen supervisors.

66.      CoreCivic denies Mr. Barrientos access to basic necessities that he then has to purchase at Stewart's commissary with his wages from the Work Program.  In one instance, Mr. Barrientos ran out of toilet paper and requested another roll from a CoreCivic officer.  The CoreCivic officer told Mr. Barrientos to use his fingers to clean himself.

67.      Mr. Barrientos spends his wages on soap, tooth paste, food, clothes, phone cards, and other necessities from the commissary.

68.      Mr. Barrientos is housed in a pod with private, two-person cells that contain a bathroom to be shared with his cellmate, and he is provided with access to a shower that has both hot and cold water.

69.      Officers at Stewart have threatened to transfer Mr. Barrientos from his pod to the Chicken Coop if he stops working, calls in sick, refuses to change shifts as requested, or encourages others to stop working.

70.      On one occasion, a CoreCivic Officer named Garden[40] woke up Mr. Barrientos and ordered him to work a 2 a.m. shift, even though he was assigned the 10 a.m. shift that day. When Mr. Barrientos refused, the officer told him to pack his bags because he was being moved to another pod.  Mr. Barrientos relented and worked the early shift because he was afraid of being placed back in the Chicken Coop.

71.      Officers at Stewart threatened Mr. Barrientos with denial of access to the commissary if he stopped working, called in sick, or encouraged others to stop working.

72.      Around late 2015, CoreCivic officers threatened to put Mr. Barrientos in solitary confinement on two different occasions because they thought he and other kitchen workers were organizing a work stoppage.

---

[40] Mr. Barrientos is unsure of the precise spelling of this Officer's name and therefore acknowledges that this spelling is an approximation.

73.     Around October 2017, CoreCivic officers put Mr. Barrientos in medical segregation, allegedly for chicken pox, soon after he submitted a grievance against an officer who forced Mr. Barrientos to work while he was sick.  Mr. Barrientos informed the officers that he had chicken pox as a child and was therefore unlikely to contract it again.  CoreCivic detained Mr. Barrientos in medical segregation for two months and, despite a blood test, never informed him whether he had contracted chicken pox so as to justify his segregation.

74.     While in segregation, Mr. Barrientos was in a cell by himself and was denied basic necessities and privileges.  He was not allowed to see his family.  His outdoor yard time was reduced from three to four hours per day to a half hour per day.  As a result of his medical segregation, the immigration court had to reschedule a hearing in his immigration case thereby prolonging resolution of his case.

75.     Mr. Barrientos provides CoreCivic with his labor because of CoreCivic's threats of physical restraint, serious harm, and/or abuse of the legal process; and its scheme, plan, and pattern to threaten or inflict physical restraint and serious harm upon him if he refuses to work.

76.     CoreCivic has retained and currently retains the value of Mr. Barrientos' labor as corporate profits instead of using it to provide for safe, minimally humane living conditions for detained immigrants at Stewart or to compensate Mr. Barrientos fairly.

**G.     Plaintiff Velazquez's Labor at Stewart**

77.     Mr. Velazquez has performed work for CoreCivic at Stewart as a result of its unlawful forced labor scheme, plan, and pattern.

78.     As a kitchen worker, Mr. Velazquez washes dishes and prepares beverages during meal services for other detained immigrants at Stewart.  On average, he works six to eight hours per day, five days per week.

79.     For his labor, Mr. Velazquez is paid $1 per day if he works less than six hours, $4 per day if he works for six hours, $5 per day if he works between eight and eleven hours and fifty-nine minutes, and $8 per day if he works twelve hours or more.  CoreCivic credits these wages to Mr. Velazquez's commissary account.

80.     CoreCivic denies Mr. Velazquez access to basic necessities that he then has to purchase at Stewart's commissary with his wages from the Work Program.  Mr. Velazquez uses his wages to purchase phone cards and food at CoreCivic's commissary, among other necessities.

81.     Mr. Velazquez is housed in a pod with private, two-person cells.  He shares a bathroom with only one other person, his cellmate, and has access to a shower with temperature control.

82.     Mr. Velazquez has witnessed CoreCivic officers threaten to move detained immigrants who decline to work from their small pods like his to the Chicken Coop.

83.     Mr. Velazquez provides CoreCivic forced labor because of its threats of physical restraint, serious harm, and/or abuse of the legal process; and its scheme, plan, and pattern to threaten or inflict physical restraint and serious harm upon him if he does not.

84.     CoreCivic has retained and currently retains the value of Mr. Velazquez's labor as corporate profits instead of using it to provide for safer, more humane living conditions for detained immigrants at Stewart or compensate Mr. Velazquez fairly.

**H.     Plaintiff Ahmed's Labor at Stewart**

85.     Mr. Ahmed was detained at Stewart from approximately August 2016 to February 2018.

86.     As a kitchen worker, Mr. Ahmed prepared, cooked, and served meals, washed dishes, and cleaned the kitchen area.  He worked eight-hour shifts, starting at 2:00 a.m., up to seven days per week.

87.     In return for this labor, Mr. Ahmed was paid $4 per day.  If he worked twelve hours or more, he was paid an additional $1 per day. CoreCivic credited these wages to Mr. Ahmed's commissary account.

88.     CoreCivic denied Mr. Ahmed access to basic necessities that he then had to purchase at Stewart's commissary with his wages from the Work Program.  Mr. Ahmed spent his wages on food and phone cards from the commissary, among other necessities.

89.     Officers at Stewart threatened to put Mr. Ahmed in solitary confinement, if he stopped working or encouraged other detained immigrants to stop working.

90.     In November 2017, officers at Stewart actually put Mr. Ahmed in solitary confinement for threatening a work stoppage after he had not been paid for his work. Specifically, officers at Stewart held Mr. Ahmed in solitary confinement for ten days for allegedly saying "no work tomorrow."[41]

91.     Mr. Ahmed provided CoreCivic forced labor because of its threats of restraint, serious harm, and/or abuse of the legal process; and its scheme, plan, and practice to threaten or inflict restraint and serious harm upon him if he does not.

92.     CoreCivic retained the value of Mr. Ahmed's labor by realizing this value as corporate profits, rather than using it to provide for safer, more humane living conditions for detained immigrants at Stewart.

---

[41] Spencer Woodman, *Private Prison Continues To Send ICE Detainees To Solitary Confinement For Refusing Voluntary Labor*, The Intercept (Jan. 11, 2018), https://theintercept.com/2018/01/11/ice-detention-solitary-confinement.

## CLASS ACTION ALLEGATIONS

93.     Plaintiffs bring this lawsuit as a class action on behalf of themselves individually and all others similarly situated under Federal Rules of Civil Procedure 23(a), (b)(2) for their requests for declaratory and injunctive relief only, and (b)(3) for their requests for damages. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

### A.     <u>Class Definition</u>

94.     Plaintiffs seek to certify the following two classes:

> (a) All civil immigration detainees who performed work for CoreCivic at Stewart in the "Volunteer Work Program" within the past ten years, up to the date the class is certified ("Forced Labor Class").

> (b) All civil immigration detainees who performed work for CoreCivic at Stewart in the "Volunteer Work Program" within the past four years, up to the date the class is certified ("Unjust Enrichment Class").

95.     Excluded from the class definitions are the defendants, their officers, directors, management, employees, subsidiaries, and affiliates, and all federal governmental entities. Plaintiffs reserve the right to revise the class definition based upon information learned subsequent to the filing of this action.

### B.   <u>Class Certification Requirements under Rule 23(a), (b)(2), and (b)(3).</u>

96.     **Numerosity:** The class is so numerous that joinder of all members is impracticable.  Plaintiffs do not know the exact size of the class because that information is within the control of CoreCivic.  However, upon information and belief, the class members number in the thousands.  Membership in the class is readily ascertainable from CoreCivic's detention and Work Program records.

97.     **Commonality:** There are numerous questions of law or fact common to the Class, and those issues predominate over any question affecting only individual class members.   The common legal and factual issues include the following:

a.     Whether CoreCivic's conduct as set forth in Count I violated the forced labor and attempt provisions of the Trafficking Victims Protection Act (18 U.S.C. §§ 1589, 1594, and 1595);

b.     Whether CoreCivic was unjustly enriched by the Work Program;

c.     Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive and declaratory relief; and

d.     Whether Plaintiffs and the Class Members are entitled to damages and other monetary relief and, if so, in what amount.

98.     **Typicality:** The claims asserted by Plaintiffs are typical of the claims of the Class, in that the representative Plaintiffs, like all Class Members, were subject to and impacted by CoreCivic's uniform policy.   Each member of the proposed Class has been similarly injured by CoreCivic's misconduct.

99.     **Adequacy:** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained attorneys experienced in class and complex litigation, including litigation arising under the Trafficking Victims Protection Act.   Plaintiffs and their counsel intend to vigorously prosecute this litigation.   Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other class members.

100.     **Predominance of Common Questions:** The questions of law or fact common to the class, identified above in paragraph 97, predominate over any questions affecting only

individual members.  Specifically, CoreCivic's scheme, plan, and pattern to force labor applies to the class as a whole and has resulted in substantially similar injuries to the class.

101.   **Superiority:** Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of CoreCivic's wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many members of the proposed class who could not individually afford to litigate a claim such as is asserted in this complaint.  Additionally, a class action is superior because the Class is comprised of many individuals who do not speak English as their native language and who are geographically dispersed.  Finally, this class action likely presents no difficulties in management that would preclude maintenance as a class action.

102.   This action satisfies the requirements of Rule 23(b)(2) because CoreCivic has acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class Member.

## CAUSES OF ACTION

### COUNT I

**THE TRAFFICKING VICTIMS PROTECTION ACT**
Forced Labor (18 U.S.C. § 1589)
Or, in the Alternative, Attempt to Commit Forced Labor (18 U.S.C. § 1594(a)).
***On behalf of the Forced Labor Class***

103.   Plaintiffs and Class Members reallege and incorporate by reference herein all allegations above.

104.    Plaintiffs and Forced Labor Class Members are authorized to bring this claim against CoreCivic pursuant to the civil remedies provision of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1595, because CoreCivic violated the forced labor provisions of 18 U.S.C. § 1589 or, in the alternative, the attempt provisions of 18 U.S.C. § 1594(a).

105.    Plaintiffs and Forced Labor Class Members also are authorized to bring this claim under the TVPA, 18 U.S.C. § 1595, because CoreCivic knowingly benefitted financially from participating in a venture which CoreCivic knew or should have known has engaged in violations of the forced labor or, in the alternative, the attempt provisions of 18 U.S.C. § 1594(a).

106.    CoreCivic knowingly obtained the labor or services of Plaintiffs and Forced Labor Class Members by means of physical restraint and threats of physical restraint of Plaintiffs and Members of the Forced Labor Class, in violation of 18 U.S.C. § 1589(a)(1).  Specifically, CoreCivic threatened to or did restrain Plaintiffs and Forced Labor Class Members in solitary confinement when they refused orders to work.

107.    CoreCivic knowingly obtained the labor or services of Plaintiffs and Forced Labor Class Members by means of serious harm and threats of serious harm, in violation of 18 U.S.C. § 1589(a)(2).

108.    The serious harm CoreCivic caused and threatened was physical and non-physical harm, including psychological, financial, and reputational harm.  Specifically,

a.    Withholding of Basic Necessities: CoreCivic withheld or threatened to withhold basic necessities from Plaintiffs and Forced Labor Class Members, thereby forcing them to work for subminimum wages to buy those basic necessities at the commissary and avoid hunger, undernourishment, lack of personal hygiene, and lack of contact with loved ones, among other harms;

     b.  <u>Threatened and Actual Sanctions</u>: When CoreCivic perceived that Plaintiffs and Forced Labor Class members were refusing to provide their labor, organizing a work stoppage, or participating in a work stoppage, CoreCivic

       i.  placed or threatened to place them into solitary confinement;

      ii.  threatened criminal prosecution;

    iii.  threatened to transfer them to unsafe and unsanitary living quarters, where they would be deprived of privacy, safety, and sanitation; and

    iv.  threatened to deny them access to the commissary where they could buy food, hygiene products, and phone cards, thus denying them basic necessities and isolating them from friends and family.

109.    The conduct described in paragraph 108, *supra*, is "serious harm" as defined in 18 U.S.C. § 1589(c)(2) because it is "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances [of Plaintiffs and Forced Labor Class Members] to perform or to continue performing labor or services in order to avoid incurring that harm."

110.    CoreCivic knowingly obtained the labor or services of Plaintiffs and Forced Labor Class Members "by means of a scheme, plan, or pattern [CoreCivic] intended to cause … [Plaintiffs and Forced Labor Class Members] to believe that, if … [Plaintiffs and Forced Labor Class Members] did not perform such labor or services, … [they] would suffer serious harm or physical restraint" as described in paragraphs 105-108, *supra*, in violation of 18 U.S.C. § 1589(a)(4).

111.    CoreCivic knowingly obtained the labor or services of Plaintiffs and Forced Labor Class Members by means of abuse or threatened abuse of legal process, in violation of 18 U.S.C. § 1589(a)(3).  Specifically, CoreCivic threatened to initiate criminal proceedings against

Plaintiffs and Forced Labor Class Members to obtain their labor and to prevent them from refusing to work.

112.    In the alternative, CoreCivic attempted to obtain the labor or services of Plaintiffs and Forced Labor Class Members by the means described paragraphs 105-108, *supra*, in violation of 18 U.S.C. § 1594(a).

113.    Plaintiffs and Forced Labor Class Members have suffered damages in an amount to be determined at trial.

114.    Plaintiffs and Forced Labor Class Members are entitled to recover compensatory and punitive damages.

115.    Plaintiffs and Forced Labor Class Members are entitled to recover mandatory restitution in the full amount of their losses.

116.    Plaintiffs and Forced Labor Class Members are entitled to recover their costs and reasonable attorney's fees.

**COUNT II**
***On behalf of the Unjust Enrichment Class***
**UNJUST ENRICHMENT**
**Georgia Common Law**

117.    Plaintiffs reallege and incorporate by reference herein all allegations above.

118.    CoreCivic materially and significantly reduced its labor costs and expenses, and increased its corporate profits, by obtaining undercompensated labor from Plaintiffs and Unjust Enrichment Class Members.

119.    Plaintiffs and Unjust Enrichment Class Members conferred non-gratuitous benefits upon CoreCivic by performing work for $1 to $4 per day, and up to $8 per day for kitchen workers under certain circumstances, for which CoreCivic would otherwise have had to pay at least the applicable minimum wage or more, thereby significantly and materially

increasing CoreCivic's profits and unjustly enriching CoreCivic at the expense of and detriment to Plaintiffs and Unjust Enrichment Class Members.

120.    CoreCivic's retention of any benefit collected directly and indirectly from this undercompensated labor violated principles of justice, equity, and good conscience.

121.    As a direct and proximate result of CoreCivic's forced labor practices, Plaintiffs and Unjust Enrichment Class Members have suffered concrete harm and injury, including physical and emotional injury, and the unlawful violation of their rights.

122.    Plaintiffs and Unjust Enrichment Class Members are entitled to recover from CoreCivic all amounts that CoreCivic has wrongfully and improperly obtained, and CoreCivic should be required to disgorge to Plaintiffs and Unjust Enrichment Class Members the benefits it has unjustly obtained. Plaintiffs and Class Members are also entitled to recover exemplary damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class, request that the Court:

a.  Certify this action as a class action, with the classes as defined above;

b.  Find that Plaintiffs are proper representatives of the classes, and appoint the undersigned as Class Counsel;

c.  Order CoreCivic to identify and disclose to Plaintiffs all Class Members;

d.  Order CoreCivic to pay for notifying Class Members of the pendency of this suit;

e.  Award declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

f.  Award injunctive relief as is necessary to protect the interests of Plaintiffs and Class Members, including enjoining CoreCivic from continuing to conduct business through the unlawful and unfair practices alleged herein;

g.  Order disgorgement of CoreCivic's unjustly-acquired revenue, profits, and other benefits resulting from its unlawful conduct;

h.  Award Plaintiffs and Class Members monetary damages for CoreCivic's forced labor, or in in the alternative, attempted forced labor, and unjust enrichment in an amount to be determined at trial;

i.  Award Plaintiffs and Class Members their reasonable litigation expenses and attorney's fees; and

j.  Award any further relief that the Court deems just and equitable.


Dated: April 17, 2018

                                        Respectfully Submitted,

                                        /s/ Daniel Werner
                                        Daniel Werner (GA Bar No. 422070)
                                        Laura Rivera (GA Bar No. 143762)
                                        **SOUTHERN POVERTY LAW CENTER**
                                        150 E. Ponce de Leon Avenue, Suite 340
                                        Decatur, GA, 300030
                                        Telephone: (404) 521-6700
                                        Facsimile: (404) 221-5857
                                        daniel.werner@splcenter.org
                                        laura.rivera@splcenter.org

                                        /s/ Meredith B. Stewart
                                        Meredith B. Stewart*
                                        Bryan Lopez*
                                        **SOUTHERN POVERTY LAW CENTER**
                                        201 Saint Charles Avenue, Suite 2000
                                        New Orleans, LA 70170
                                        Telephone: (504) 486-8982
                                        Facsimile: (504) 486-8947
                                        meredith.stewart@splcenter.org
                                        bryan.lopez@splcenter.org

                                        R. Andrew Free*
                                        **LAW OFFICE OF R. ANDREW FREE**
                                        P.O. Box 90568
                                        Nashville, TN 37209
                                        Telephone: (844) 321-3221x1
                                        Facsimile: (615) 829-8959
                                        andrew@immigrantcivilrights.com

Azadeh Shahshahani (GA Bar No. 509008)
Priyanka Bhatt (GA Bar No. 307315)
**PROJECT SOUTH**
9 Gammon Avenue SE
Atlanta, GA 30315
Telephone: (404) 622-0602
Facsimile: (404) 622-4137
azadeh@projectsouth.org

Korey A. Nelson*
Lydia A. Wright*
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765
knelson@burnscharest.com
lwright@burnscharest.com

Warren T. Burns*
Daniel H. Charest*
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
wburns@burnscharest.com
dcharest@burnscharest.com

*Application for admission *pro hac vice* forthcoming.

***Attorneys for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

     I HEREBY CERTIFY that on this date the foregoing and accompanying documents were filed through the Court's CM/ECF filing system, and will be served on the defendants listed below with the summons.  When service is complete a Proof of Service form will be filed with the Court, which Proof of Service will list the date, method, and documents served.

     CoreCivic, Inc.
     10 Burton Hills Blvd.
     Nashville, TN 37215

Dated:  April 17, 2018          /s/ Daniel Werner