IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| WILHEN HILL BARRIENTOS, MARGARITO VELAZQUEZ GALICIA, and SHOAIB AHMED individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>CORECIVIC, INC.,<br><br>    Defendant. | Civil Action No. 4:18-cv-00070-CDL |

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS COMPLAINT

Defendant CoreCivic, Inc. moves to dismiss Plaintiffs' Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6). The Complaint fails to state a claim for the following reasons:

## I.    BACKGROUND

### A.    Factual Allegations

Plaintiffs are current or former immigration detainees detained at the Stewart Detention Center ("SDC") in Lumpkin, Georgia.  (Dkt. 1, ¶¶ 1, 9-10, 14.)  CoreCivic owns and operates SDC and detains immigrants awaiting immigration determinations "on behalf of" the federal government—U.S. Immigration and Customs Enforcement ("ICE")—pursuant to an intergovernmental service agreement.  (Id., ¶¶ 12-13.)  Plaintiff Wilhen Hill Barrientos, a citizen of Guatemala, is seeking asylum in the United States and has been at SDC intermittently since July 2015; Plaintiff Margarito Velazquez Galicia, a citizen of Mexico, is seeking relief from deportation and has been at SDC since January 2018; and Plaintiff Shoaib Ahmed, a citizen of Bangladesh, was at SDC from August 2017 to February 2018.  (Id., ¶¶ 9-11.)

Plaintiffs allege they are or were employed as kitchen workers at SDC and paid between $1 and $4 per day as part of the facility's Voluntary Work Program ("VWP").  (Dkt. 1, ¶¶ 9-11.) ICE requires its contracted facilities to have a VWP.  *See* INS National Detention Standards – Voluntary Work Program (Sept. 28, 2000), https://www.ice.gov/doclib/dro/detention-standards/pdf/work.pdf, and ICE Performance-Based National Detention Standards 2011, § 5.8, at 406 (2016 ed.), https://www.ice.gov/doclib/detention-standards/2011/5-8.pdf.  The purpose of the VWP is to reduce the negative impact of confinement through "decreased idleness, improved morale and fewer disciplinary incidents."  (Id. at 405.)  Detainees who participate in the VWP must "sign a voluntary work program agreement" and are paid "at least $1.00 (USD) per day." (Id. at 407-408.)  Detainees may also volunteer for "temporary work details," which "may involve labor-intensive work."  (Id.)  But once they have volunteered to work, they are required "to be ready to report for work at the required time and may not leave an assignment without permission."[1]  (Id.)  Detainees are also required to "perform all assigned tasks diligently and conscientiously" and "may not evade attendance and performance standards in assigned activities nor encourage others to do so."  (Id. at 408.)  A detainee can be removed from the VWP for "[u]nexcused absences," "unsatisfactory work performance," "disruptive behavior," "threats to security," "physical inability to perform the essential elements of the job," or "a removal sanction imposed by the Institution Disciplinary Panel for an infraction of a facility rule, regulation or policy." (Id. at 407-408.)  Though detainee participation in the VWP is voluntary

---

[1] According to Plaintiffs, participants in the VWP do the following: (a) scrub bathrooms, showers, toilets, and windows; (b) clean and maintain CoreCivic's on-site medical center; (c) clean patient rooms and medical staff offices; (d) sweep, mop, stripe, and wax floors; (e) wash detainees' laundry; (f) preparing, cook, and serve meals; (g) wash dishes; (h) clean the kitchen and cafeteria before and after meals; (i) perform clerical work; (j) provide barber services to detainees; (k) clean intake areas and solitary confinement units; and (l) clean and maintain recreational areas. (Dkt. 1, ¶ 30.)

and a detainee can stop participating at any time, ICE *requires* detainees "to do personal housekeeping." (Id. at 405-06.) CoreCivic is required to enforce these ICE standards.[2] (Id. at 406.)

Plaintiffs maintain, however, that detainee participation is not voluntary, but forced. (Id., ¶¶ 1, 36.) According to Plaintiffs, CoreCivic deprives detainees "basic necessities like food, toothpaste, toilet paper, and soap – and contact with loved ones – so that they have to work in order to purchase those items and costly phone cards at CoreCivic's commissary." (Id., ¶¶ 1, 36-39, 44-47.) They further allege that CoreCivic threatens detainees who refuse to work or organize or participate in a work stoppage with "'disciplinary segregation' (i.e., solitary confinement), criminal prosecution, downgrading the detained immigrants' housing, and/or revoking access to the commissary, among other sanctions." (Id., ¶¶ 1, 48-58.) Plaintiffs allege they have been subjected to similar threats, but none of them allege they have been threatened with criminal prosecution. (Id., ¶¶ 61-92.)

---

[2] This Court may take judicial notice of these publicly available government standards, which Plaintiffs refer to in their Complaint and are central to their claim. (Dkt. 1, ¶¶ 28 & n.18.) *See FAS Capital, LLC v. Carr*, 7 F. Supp. 3d 1259, 1267 (N.D. Ga. 2014) (court may take judicial notice of publicly available information on government website); *Henderson v. Sun Pharm. Indus., Ltd.*, 809 F. Supp. 2d 1373, 1379 n.4 (N.D. Ga. 2011) (same); *Autry Petroleum Co. v. BP Products N. Am., Inc.*, 4:05-CV-113 (CDL), 2006 WL 1174443, at *1 n.1 (M.D. Ga. May 1, 2006) ("The Court notes that, in a motion to dismiss, it may consider as part of the pleadings documents that are central to the plaintiff's claim and have been referred to in the complaint, even if those documents are not attached to the complaint."). And it can do so without converting this Motion into a motion for summary judgment. *See Harris v. Bank of the Ozarks*, CV 212-205, 2013 WL 12205845, at *1 n.1 (S.D. Ga. Aug. 30, 2013) (citing *Universal Express, Inc. v. U.S. Sec. & Exch. Comm'n*, 177 F. App'x 52, 53 (11th Cir. 2006)); *Matthews v. JPMorgan Chase Bank, N.A.*, 112CV03757RWSWEJ, 2013 WL 12106937, at *3 n.3 (N.D. Ga. Jan. 14, 2013), *report and recommendation adopted sub nom. Matthews v. Jp Morgan Chase Bank, N.A.*, 1:12-CV-3757-RWS, 2013 WL 12110528 (N.D. Ga. Feb. 20, 2013); *Autry Petroleum Co.*, 2006 WL 1174443, at *1 n.1.

**B.** **Claims**

Plaintiffs filed their Complaint on behalf of themselves and "all others similarly situated." (Dkt. 1, ¶ 93.) They seek to certify two classes:

> (a) All civil immigration detainees who performed work for CoreCivic at Stewart in the "Volunteer Work Program" within the past ten years, up to the date the class is certified ("Forced Labor Class").

> (b) All civil immigration detainees who performed work for CoreCivic at Stewart in the "Volunteer Work Program" within the past four years, up to the date the class is certified ("Unjust Enrichment Class").

(Id., ¶ 94.) Plaintiffs raise two claims: (1) a violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1589; and (2) unjust enrichment. (Id., ¶¶ 103-122.) They request declarative and injunctive relief, as well as restitution, exemplary, compensatory, and punitive damages, and disgorgement of profits. (Id. ¶¶ 114-115, 122 & at 29-30.)

## II.    STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (1986)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 555, 557) (internal citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678.

A complaint must allege sufficient factual matter that is "plausible on its face." *Iqbal*, 556 U.S. at 678. Plausibility requires more than a "sheer possibility that a defendant has acted

unlawfully." *Id*.  Where a complaint pleads facts that are "merely consistent with" a defendant's

liability, it "stops short of the line between possibility and plausibility of entitlement to relief."

*Id*. (internal quotation marks omitted).  Although in ruling on a Rule 12(b) motion to dismiss the

Court must accept factual allegations in the complaint as true, it is not required to accept a

plaintiff's "legal conclusions" or "unwarranted deductions of fact," nor must it "draw plaintiff's

inference."  *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (citations

omitted).  A complaint must plead "factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

## III. THE COURT SHOULD DISMISS PLAINTIFFS' TVPA CLAIM.

### A. The Trafficking Victims Protection Act

In 2000, Congress enacted the Trafficking Victims Protection Act ("TVPA").  Pub. L.

No. 106-386, § 102(a), 114 Stat. 1488 (2000).  Congress explicitly declared that the purpose of

the TVPA was "to combat *trafficking in persons*, a contemporary manifestation of *slavery* whose

victims are predominantly women and children, to ensure just and effective punishment of

*traffickers*, and to protect their victims."  Pub. L. No. 106-386, § 102(a), 114 Stat. 1488 (2000)

(emphasis added); *accord Johns v. Daniel*, No. CIV.A. H-13-2666, 2014 WL 1882760, at *3

(S.D. Tex. May 12, 2014) ("The TVPA was enacted as 'an Act to combat trafficking of persons,

especially into the sex trade, slavery, and slavery-like conditions, in the United States and

countries around the world through prevention, through prosecution and enforcement against

traffickers, and through protection and assistance to victims of trafficking.'") (quoting H.R.

Conf. Rep. 106–939, at 1 (2000)).

That stated purpose was supported by twenty four (24) congressional findings, all of

which focused on the evils of "trafficking of persons" and "slavery" and punishing those who

participate in the "trafficking scheme." Pub. L. No. 106-386, § 102(b), 114 Stat. 1488 (2000).

For example:

> (b)(1) As the 21st century begins, the degrading institution of *slavery* continues throughout the world. *Trafficking in persons* is a modern form of *slavery*, and it is the largest manifestation of *slavery* today. At least 700,000 persons annually, primarily women and children, are *trafficked within* or across international borders. Approximately 50,000 women and children are *trafficked into* the United States each year.
>
>        \*      \*      \*
>
> (b)(5) *Traffickers* often transport victims from their home communities to unfamiliar destinations, including foreign countries away from family and friends, religious institutions, and other sources of protection and support, leaving the victims defenseless and vulnerable.
>
>        \*      \*      \*
>
> (b)(8) *Trafficking in persons* is increasingly perpetrated by organized, sophisticated criminal enterprises. Such *trafficking* is the fastest growing source of profits for organized criminal enterprises worldwide. Profits from the *trafficking industry* contribute to the expansion of organized crime in the United States and worldwide.
>
>        \*      \*      \*
>
> (b)(12) *Trafficking in persons* substantially affects interstate and foreign commerce. *Trafficking* for such purposes as involuntary servitude, peonage, and other forms of forced labor has an impact on the nationwide employment network and labor market.
>
>        \*      \*      \*
>
> (b)(14) Existing legislation and law enforcement in the United States and other countries are inadequate to *deter trafficking* and bring *traffickers* to justice, failing to reflect the gravity of the offenses involved. No comprehensive law exists in the United States that penalizes the range of offenses involved in the *trafficking scheme*. …
>
>        \*      \*      \*

(b)(24)   *Trafficking in persons* is a transnational crime with national implications. To *deter international trafficking* and bring its perpetrators to justice, nations including the United States must recognize that *trafficking* is a serious offense. This is done by prescribing appropriate punishment, giving priority to the prosecution of *trafficking offenses*, and protecting rather than punishing the victims of such offenses.

*Id.* (emphasis added). The TVPA's purpose and findings are codified at 22 U.S.C. § 7101.

In furtherance of these objectives, and as part of the TVPA, Congress enacted several corresponding criminal statutes, *see* 18 U.S.C. §§ 1581-1594, including 18 U.S.C. § 1589(a), which makes it a crime to:

knowingly provide[] or obtain[] the labor or services of a person by any one of, or by any combination of, the following means--

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

In 2003, Congress enacted the Trafficking Victims Protection Reauthorization Act ("TVPRA"). Pub. L. No. 108-193, 117 Stat. 2875 (2003). Congress determined that "[t]*rafficking in persons* continues to victimize countless men, women, and children in the United States and abroad." Pub. L. No. 108-193, § 2, 117 Stat. 2875 (2003). It also found that, since the enactment of the TVPA, "the United States Government has made significant progress in investigating and prosecuting acts of *trafficking* and in responding to the needs of *victims of*

*trafficking* in the United States and abroad," but that there were still obstacles hindering its efforts "to investigate, prosecute, and convict *traffickers*." *Id*. (emphasis added). As part of the TVPRA, and to "enhanc[e] protection for *trafficking* victims," Congress enacted 18 U.S.C. § 1595, which authorized a civil action for any "individual who is a victim of a violation of section 1589 … against the perpetrator ...." Pub. L. No. 108-193, § 4, 117 Stat. 2875 (2003) (emphasis added). Congress amended § 1595 in 2008 to allow a civil action against "whoever knowingly benefits, financially or by receiving anything of value from participation *in a venture* which that person knew or should have known has engaged in an act in violation of" § 1589. Pub. L. No. 110-457, § 221, 122 Stat. 5044 (2008) (emphasis added).

**B.    The TVPA Does Not Extend to Labor Performed by Immigration Detainees in Lawful Custody of the United States Government.**

Given the TVPA's express purpose to eradicate modern-day slavery and target, prosecute, and deter human traffickers—those who transport persons "across international borders" or take them "from their home communities to unfamiliar destinations" and force them to work—Congress could not have intended the TVPA to apply in the context of labor performed by immigration detainees in lawful custody of the federal agency obligated to detain them.

Where the literal application of a criminal statute "would lead to extreme or absurd results, and where the legislative purpose gathered from the whole act would be satisfied by a more limited interpretation," the "[g]eneral terms descriptive of a class of persons made subject to a criminal statute may and should be limited." *United States v. Katz*, 271 U.S. 354, 362 (1926); *see also Dolan v. U.S. Postal Service*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."); *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("[S]tatutory language cannot be

construed in a vacuum."); *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1529 (11th Cir. 1996) (quoting *United States v. Mendoza,* 565 F.2d 1285, 1288 (5th Cir. 1978)) ("If a literal construction of the words of a statute would lead to an absurd, unjust, or unintended result, the statute must be construed so as to avoid that result.").

Thus, for example, in *United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014), the Sixth Circuit held that the TVPA did not apply in the case of a man who forced children in his care to do household chores.  The criminal defendant made the children clean (including washing the floors, windows, bathrooms, and dishes), do laundry, prepare food, serve food to his guests, iron his clothes, clean his car, and babysit for the women he was dating or for his relatives.  *Id.* at 624-25.  He would beat the children if they misbehaved or failed to follow his rules.  *Id.*  The court held that this did *not* constitute "labor" under the TVPA even though it was "labor" in the "economic sense of the word."  *Id.* at 625.  None of the "labor" performed went beyond what a parent or guardian would "expect from his child," and the fact that the man required the children to perform those chores by means of child abuse did "not change the nature of the work."  *Id.*  In other words, "the extremity of force is … not a determinant of forced labor, one way or the other."  *Id.* at 626.

Even though the man's conduct was reprehensible, the Sixth Circuit refused to "transform a statute passed to implement the Thirteenth Amendment against slavery or involuntary servitude into one that generally makes it a crime for a person *in loco parentis* to require household chores, or makes child abuse a federal crime."  *Id.* at 629.  It explained that absent a clear expression of Congressional intent, the statute should not be literally interpreted to criminalize activity traditionally regulated by the states.  *Id.* at 628 (citing *Bond v. United States*, 134 S. Ct. 2077, 2088 (2014) (declining to extend chemical weapons statute enacted to combat

assassination, terrorism, and acts of mass suffering to criminalize jilted wife's garden-variety assault on her husband's paramour)).

Applying the TVPA in the context of this case would similarly go far beyond Congress's stated (and codified) intent. The purpose of the TVPA is to deter human trafficking, punish human traffickers, and protect victims of human trafficking of slavery. 22 U.S.C. § 7101; *see also United States v. Evans*, 476 F.3d 1176, 1179 (11th Cir. 2007) ("Congress found that trafficking of persons has an aggregate economic impact on interstate and foreign commerce, *id.* § 7101(b)(12), and we cannot say that this finding is irrational."). Neither ICE nor CoreCivic is engaged in a "trafficking scheme" or "criminal enterprise[]" to enslave immigrants. *See Plaintiff A v. Schair*, 2:11-CV-00145-WCO, 2014 WL 12495639, at *2 (N.D. Ga. Sept. 9, 2014) ("The TVPA embodies Congress' recognition that human trafficking is a 'transnational crime with national implications.' The statute operates to deter trafficking on multiple fronts.") (internal citation omitted). ICE "is the federal agency 'responsible for the apprehension and detention of inadmissible and deportable aliens." *Doe v. Neveleff*, A-11-CV-907-LY, 2013 WL 489442, at *1 (W.D. Tex. Feb. 8, 2013), *report and recommendation adopted*, A-11-CV-907-LY, 2013 WL 12098684 (W.D. Tex. Mar. 12, 2013) ("*Doe I*") (quoting *Safety Nat'l Cas. Corp. v. U.S. Dep't of Homeland Sec.*, 711 F. Supp. 2d 697, 703 (S.D. Tex. 2008)); *see also Adras v. Nelson*, 917 F.2d 1552, 1553 (11th Cir. 1990) (Immigration and Naturalization Service responsible for alien detention). Its authority derives from Congress. *See* 8 U.S.C. § 1103(a); 8 C.F.R. Part 236.[3]

_____

[3] Immigration enforcement functions were previously held by the Immigration and Naturalization Service ("INS"), an agency of the Department of Justice, but on March 1, 2003, the INS ceased to exist, and its enforcement functions were transferred to the newly-created Department of Homeland Security, and, specifically, ICE. *See Silva Rosa v. Gonzales*, 490 F.3d 403, 404 n.1 (5th Cir. 2007); *Mortera-Cruz v. Gonzales*, 409 F.3d 246, 248 n.1 (5th Cir. 2005); *United States v. Balogun*, 1:16-CR-00127-AT-LTW, 2018 WL 1147544, at *2 n.3 (N.D. Ga.

Here, ICE was engaged in that statutorily mandated duty.  It did not remove Plaintiffs from their homes and bring them to Georgia.  *Cf. Toviave*, 761 F.3d at 629-30 (recognizing that cases in which forced labor has been found in the household context involved individuals who "were brought to the United States to work and who were subsequently cheated out of the salaries they were promised all while being subjected to intolerable living conditions," "subjected … to more extreme isolation," and "denied almost all contact with the outside world").  Moreover, as Plaintiffs allege, ICE contracted with CoreCivic to "detain immigrants on behalf of ICE."  (Dkt. 1, ¶¶ 13, 25.)   In housing immigration detainees (and Plaintiffs), CoreCivic was "performing a federal function."  *Doe v. United States*, 831 F.3d 309, 316-17 (5th Cir. 2016) ("*Doe II*"); *see also Doe I*, 2013 WL 489442, at *13 ("There is no dispute that CCA carried out purely federal functions at the Hutto facility.").  Like *Toviave*, nothing in the TVPA demonstrates a clear expression of intent by Congress to impinge upon ICE's authority to detain immigration detainees and transform into a federal crime the work performed by federal detainees pursuant to the terms of their detention.  *See Toviave*, 761 F.3d at 628.

Indeed, the labor and services alleged by Plaintiffs—e.g., cleaning the facility, laundry, preparing and serving food, etc.—are the type that courts have found are expected to be performed by detainees in custody.  *See id.*, 761 F.3d at 625.  For example, in *Channer v. Hall*, 112 F.3d 214, 215 (5th Cir. 1997), an immigration detainee alleged federal officials "compel[ed] him to work in the Food Services Department while he was an INS detainee," in violation of the Thirteenth Amendment (involuntary servitude). The detainee alleged he was "intimidated and threatened with solitary confinement if he failed to work."  *Id.* at 218.  The Fifth Circuit held that

---

Jan. 2, 2018), *report and recommendation adopted,* 1:16-CR-0127-AT, 2018 WL 1128263 (N.D. Ga. Feb. 6, 2018); *see generally* Pub. L. No. 107-296, §§ 441, 451, 471, 116 Stat. 2135 (2002).

the detainee was not subjected to involuntary servitude because "the federal government is entitled to require a communal contribution by an INS detainee in the form of housekeeping tasks." *Id*. at 218-19 (citing *United States v. Kozminski*, 487 U.S. 931, 943 (1988)).  The court relied on other cases that exempted housekeeping chores by civil detainees, such as "fixing meals, scrubbing dishes, doing the laundry, and cleaning the building."  *Id*. at 219 (citing *Bayh v. Sonnenburg*, 573 N.E.2d 398 (Ind. 1991); *Jobson v. Henne*, 355 F.2d 129 (2d Cir. 1966)); *see also Owuor v. Courville*, 2:11-CV-926, 2013 WL 7877306, at *4 (W.D. La. Aug. 7, 2013), *report and recommendation adopted*, 2:11-CV-926, 2014 WL 949433 (W.D. La. Mar. 10, 2014) (applying rule in *Channer*); *Hutchinson v. Reese*, 5:07CV181-DCB-MTP, 2008 WL 4857449, at *4 (S.D. Miss. Nov. 7, 2008) (same).

The Fourth, Seventh, and Eighth Circuits have similarly recognized that requiring pretrial detainees to perform "general housekeeping responsibilities" is permissible.  *See Bijeol v. Nelson*, 579 F.2d 423, 424-25 (7th Cir. 1978) (denying pretrial detainee's claim that he was required to perform general housekeeping duties in his cell and community areas "without pay and, when refusing to do so, he was placed in segregation" because "general housekeeping responsibilities are not punitive in nature and for health and safety must be routinely observed in any multiple living unit"); *Hause v. Vaught*, 993 F.2d 1079, 1085 (4th Cir. 1993) (denying pretrial detainee's involuntary servitude claim that alleged no more than "general housekeeping responsibilities" of common areas); *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992) ("Requiring a pretrial detainee to perform general housekeeping chores, on the other hand, is not" punishment); *see also Mendez v. Haugen*, CV 14-4792 ADM/BRT, 2015 WL 5718967, at *5 (D. Minn. Sept. 29, 2015) (recognizing involuntary servitude does not prohibit pretrial detainee from performing general housekeeping chores such as "fixing and distributing meals,

scrubbing dishes, laundering the sheets and clothing of other inmates, cleaning communal bathrooms and shower stalls, removing trash from common areas, and sweeping, mopping, and vacuuming general-use hallways and rooms"). These cases recognize that, in a communal custody setting where thousands of detainees reside and are provided (free) basic necessities (shelter, food, healthcare, programming), detainees are expected to assist in cleaning and maintaining the facility in which they live, prepare the food that they eat, and wash the clothes that they wear.

The Eleventh Circuit recognized this proposition in *Villarreal v. Woodham*, 113 F.3d 202 (11th Cir. 1997). In that case, the court held that a pretrial detainee is not an "employee" for purposes of the Fair Labor Standards Act. *Id.* at 207. It reached that conclusion because pretrial detainees "are in a custodial relationship" and provided "everyday needs such as food, shelter, and clothing." *Id.* at 206. And it quoted *Danneskjold v. Hausrath*, 82 F.3d 37, 43 (2d Cir. 1996), for the proposition that

> [N]o Court of Appeals has ever questioned the power of a correctional institution to compel inmates to perform services of the institution without paying the minimum wage. Prisoners may thus be ordered to cook, staff the library, perform janitorial services, work in the laundry, or carry our [sic] numerous other tasks that serve various institutional missions of the prison, such as recreation, care and maintenance of the facility, or rehabilitation. Such work occupies prisoners' time that might otherwise be filled by mischief; it trains prisoners in the discipline and skills of work; and it is a method of seeing that prisoners bear a cost of their incarceration.

*Id.* at 207. Although *Danneskjold* involved labor by convicted prisoners, the court's holding did not turn on any punitive effect. And the court in *Villarreal* had no problem extending its holding to pretrial detainees. The common thread was the custodial setting. That fact is present here.

There are three additional statutory clues that suggest Congress did not intend to criminalize labor by immigration detainees in lawful custody. First, § 1589(a) only imposes

criminal liability on "[w]hoever" obtains forced labor, and § 1595(a) only provides a cause of action against "whoever" participated in a venture with the perpetrator.  Congress's definition of the word "whoever" does not include the federal government, *see* 1 U.S.C. § 1, and there is no indication in the TVPA or TVPRA that Congress intended otherwise in this context.  *See Mojsilovic v. Oklahoma ex rel. Bd. of Regents for the Univ. of Oklahoma*, 101 F. Supp. 3d 1137, 1142 (W.D. Okla. 2015), *aff'd*, 841 F.3d 1129 (10th Cir. 2016) (holding that there was no indication in the TVPA that Congress intended the word "whoever" to include States or public agencies).  To the contrary, excluding ICE from the reach of the statute is consistent with Congress's decision to delegate the detention of aliens to ICE.  Although the definition of "whoever" includes corporations "unless the context indicates otherwise," 1 U.S.C. § 1, the context indicates otherwise.  CoreCivic is acting at the direction, and for the benefit, of ICE and is "performing a federal function."  (Dkt. 1, ¶¶ 13, 28.)  *See Doe II*, 831 F.3d at 316-17. Moreover, it would be inconsistent (and illogical) to conclude that the statute permits conduct done by the federal government, but criminalizes it when its contractors and local partners engage in the *same* conduct.

The second clue is 8 U.S.C. § 1555(d), which authorizes ICE to pay "allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed."  Congress then set that rate: "not in excess of $1 per day."  Department of Justice Appropriation Act, Pub. L. No. 95-86, 91 Stat. 426 (1978).  Thus, Congress knew (and expected) that immigration detainees in ICE custody performed labor for up to $1 per day *and even for no pay at all*.  *See Alvarado Guevara v. I.N.S.*, 902 F.2d 394, 396 (5th Cir. 1990) ("The amount of payment was set by congressional act.").

The third clue is 28 C.F.R. § 545.23.  That regulation provides:

> (a) Each sentenced inmate who is physically and mentally able is to be assigned to an institutional, industrial, or commissary work program. …
>
> (b) A pretrial inmate may not be required to work in any assignment or area other than housekeeping tasks in the inmate's own cell and in the community living area, unless the pretrial inmate has signed a waiver of his or her right not to work ….

Congress is presumed to have been aware of this regulation at the time it enacted the TVPA.  *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998).  Construing § 1589 to criminalize housekeeping tasks by immigration detainees would also criminalize the same tasks by federal inmates and pretrial detainees.  There is no relevant distinction between the two, but criminalizing the former would effectively abrogate the regulation.  That cannot be what Congress intended.  Nothing in the legislative history suggests it did.

### C.     Plaintiffs Fail to State a Valid TVPA Claim Under § 1589(a)(3).

Plaintiffs' TVPA claim is purportedly based on violations of §§ 1589(a)(1) ("by means of force, threats of force, physical restraint, or threats of physical restraint"), –(a)(2) ("by means of serious harm or threats of serious harm"), –(a)(3) ("by means of the abuse or threatened abuse of law or legal process"), *and* –(a)(4) ("by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint").  (Dkt. 1, ¶ 6.3.)  But Plaintiffs do not allege *facts* showing CoreCivic abused or threatened abuse of their legal process.  *See* 18 U.S.C. § 1589(c)(1) (defining term "abuse or threatened abuse of law or legal process" to mean "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action").

Their threadbare recitals of the elements of the statute is not enough to state a claim. *Iqbal*, 556 U.S. at 678. At a minimum, their TVPA claim should be dismissed to the extent it is based on §§ 1589(a)(3).

> **D.    Plaintiffs Do Not Have a Cause of Action for Conduct Prior to December 23, 2008.**

The provision in § 1595(a) authorizing a civil cause of action against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of" § 1589 did not go into effect until December 23, 2008. Pub. L. No. 110-457, 122 Stat. 5044 (2008). Congress did not give this 2008 Amendment retroactive effect. *Griffin v. Alamo*, 4:14-CV-4065, 2016 WL 7391046, at *3 (W.D. Ark. Dec. 21, 2016); *see also Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 202 (5th Cir. 2017) (holding that "extra-territorial jurisdiction" provision in 18 U.S.C. § 1596, which was enacted at the same time and in the same amendment as the "financial benefit" prong in § 1595(a), did not have retroactive effect). Because Plaintiffs' Complaint alleges CoreCivic is liable under the "financial benefit" prong of § 1595 (Dkt. 1, ¶¶ 60, 105), any liability can only attach to conduct after that effective date. Alleged liability based on conduct before the effective date must be dismissed.

## IV.    THE COURT SHOULD DISMISS PLAINTIFFS' STATE LAW UNJUST ENRICHMENT CLAIM.

Plaintiffs' claim for unjust enrichment is derivative of their TVPA claim; they allege CoreCivic has been unjustly enriched by the benefits of their forced labor. (Dkt. 1, ¶¶ 117-122.) Because survival of their unjust enrichment claim depends on the viability of their TVPA claim, it should likewise be dismissed to the extent the TVPA claim is dismissed.

Plaintiffs' unjust enrichment claim also fails on the merits because it is incorrectly premised on the assumption that the federal minimum wage provisions of the Service Contract

Act ("SCA") and the FLSA apply.  (See Dkt. 1, ¶ 31 ["Under no circumstances does CoreCivic

pay the detained immigrants the federal minimum wage of $7.25 per hour, or the Service

Contract Act wages governing the jobs they perform."].)  They do not.  While the SCA provides

a minimum wage, *see* 41 U.S.C. § 6703(1), it does not provide a private cause of action for non-

compliance; it provides an exclusive administrative remedy which must be followed to determine

whether the SCA covers a particular contract.  *See Dist. Lodge No. 166 v. TWA Servs., Inc.*, 731

F.2d 711, 716 (11th Cir. 1984) (holding the SCA does not provide a private cause of action); *see*

*also Universities Research Ass'n, Inc. v. Coutu*, 450 U.S. 754, 761 n.9 (1981) (noting

Department of Labor determines whether the SCA covers a particular contract); *McCulloch v.*

*PNC Bank Inc.*, 298 F.3d 1217, 1227 (11th Cir. 2002) (noting D.C. Circuit affirmed dismissal of

a RICO claim based on "violations of the Service Contract Act, which had an exclusive

administrative remedy") (citation omitted).

The FLSA also does not apply.  In *Alvarado Guevara v. I.N.S.*, 902 F.2d 394, 396 (5th

Cir. 1990), the Fifth Circuit held that immigration detainees, like Plaintiffs, are not "employees"

for purposes of the FLSA and therefore not entitled to the FLSA minimum wage.  It reasoned:

> It would not be within the legislative purpose of the FLSA to
> protect those in Plaintiffs' situation. The congressional motive for
> enacting the FLSA, found in the declaration of policy at 29 U.S.C.
> § 202(a), was to protect the "standard of living" and "general well-
> being" of the worker in American industry. Because they are
> detainees removed from American industry, Plaintiffs are not
> within the group that Congress sought to protect in enacting the
> FLSA.
>
> While both Plaintiffs and Defendants admit that there are no cases
> dealing directly with factually identical circumstances, several
> cases have held that prison inmates, who are similar to detainees in
> that they have been incarcerated and are under the direct
> supervision and control of a governmental entity should not be
> protected under the FLSA. These prior decisions on the issue have
> recognized imprisoned individuals are not covered under the FLSA
> because they do not fit the statutory definition of employee and

> because the congressional intent of the FLSA was to protect the standard of living and general well-being of the worker in American industry. Those courts have concluded that an extension of the FLSA to the prison inmate situation was not, therefore, legislatively contemplated. Because of the similarity in circumstances between the prison inmates and Plaintiff detainees here, the reasons noted by those courts for not extending the FLSA are applicable in this case.

*Id*. (internal citations omitted); *see also Whyte v. Suffolk County Sheriff's Dep't*, 86 N.E.3d 249, *review denied*, 94 N.E.3d 395 (2017) (applying *Alvarado Guevera* to find that ICE detainee was not an employee for purposes of Massachusetts wage laws).

Relying on *Alvarado Guevera*, the Eleventh Circuit in *Villarreal* similarly held that the FLSA does not apply in a (pretrial detainee) custody setting because the "purpose of the FLSA is to protect the standard of living and general well-being of the American worker" and detainees "are under the supervision and control of a government entity." 113 F.3d at 206-07 (citing *Alvarado Guevera*, 902 F.2d at 396). The "economic reality of the situation … does not bear any indicia of traditional free-market employment contemplated under the FLSA." *Id.*; *see also Sanders v. Hayden*, 544 F.3d 812, 814 (7th Cir. 2008) (civilly committed detainee was not an employee for purposes of the FLSA because "people are not imprisoned for the purpose of enabling them to earn a living. The prison pays for their keep. If it puts them to work, it is to offset some of the cost of keeping them, or to keep them out of mischief, or to ease their transition to the world outside, or to equip them with skills and habits that will make them less likely to return to crime outside. None of these goals is compatible with federal regulation of their wages and hours").

Likewise here, Plaintiffs are immigration detainees in a custodial setting whose living costs are provided for, and the economic reality of their detention does not show the indicia of a free-market employment relationship. *Villarreal*, 113 F.3d at 207. Indeed, Plaintiffs' allegations

that they were forced to work and accept low wages belie any claim of an employment relationship because they were not free to "walk off the job site at the end of the day" or bargain for the exchange of their labor, as would occur "in a true employer-employee relationship." *Id.* Plaintiffs were not "employees" within the meaning of the FLSA and thus not entitled to invoke its minimum wage requirements. *See Alvarado Guevara*, 902 F.2d at 397. Because neither the SCA nor the FLSA applies, CoreCivic cannot be said to have been unjustly enriched for non-compliance with their minimum wage provisions. *See*, *e.g.*, *Malivuk v. Ameripark, LLC*, No. 1:15-CV-2570-WSD, 2016 WL 3999878, at *5 (N.D. Ga. July 26, 2016), *aff'd,* 694 F. App'x 705 (11th Cir. 2017) (dismissing unjust enrichment and other state-law claims based solely on plaintiff's alleged entitlement to tips under the FLSA where the underlying FLSA claim fails).

Even assuming the SCA or the FLSA applies, Plaintiffs' allegations fall short of establishing an unjust enrichment claim. To recover, Plaintiffs must show: (1) they provided valuable services to CoreCivic; (2) CoreCivic requested or knowingly accepted those services; (3) CoreCivic's receipt of those services *without compensation* would be unjust; and (4) Plaintiffs *expected compensation* at the time the services were provided. *See Ekokotu v. Fed. Exp. Corp.*, 408 F. App'x 331, 340 (11th Cir. 2011). Here, Plaintiffs *were* compensated ($1 to $8 per day). (Dkt. 1, ¶¶ 2, 9-11, 31, 63-64, 79, 87, 119.) *See Morris v. Britt*, 620 S.E.2d 422, 424 (Ga. App. 2005) ("The concept of unjust enrichment in law is premised upon the principle that a party cannot induce, accept, or encourage another to furnish or render something of value to such party *and avoid payment* for the value received.") (quotation omitted, emphasis added). And their allegations belie any *expectation* of receiving more. They allege that they were forced to work because they were deprived basic necessities and threatened with solitary confinement if they refused. (Dkt. 1, ¶¶ 36-39, 44-58.) *See Morris*, 620 S.E.2d at 424 ("For unjust enrichment

to apply, the party conferring the labor ... must act with the expectation that the other will be responsible for the cost. Otherwise that party, like one who volunteers to pay the debt of another, has no right to equitable recovery.") (internal quotation and citation omitted).  They do not allege any expectation of receiving more than what they did; rather, their claim is that they were *forced* to work.  Their equitable theory of recovery is incompatible with those allegations.

## V.   CONCLUSION

For these reasons, the Court should dismiss Plaintiffs' Complaint with prejudice.

Dated:  June 21, 2018                    Respectfully submitted,

                                        s/ Daniel P. Struck
                                        Daniel P. Struck *(pro hac vice)*
                                           Lead Counsel
                                        Rachel Love *(pro hac vice)*
                                        Nicholas D. Acedo *(pro hac vice)*
                                        Ashlee B. Hesman *(pro hac vice)*
                                        STRUCK LOVE BOJANOWSKI & ACEDO, PLC
                                        3100 West Ray Road, Suite 300
                                        Chandler, Arizona 85226
                                        Phone: (480) 420-1600
                                        Fax: (480) 420-1695
                                        dstruck@strucklove.com
                                        rlove@strucklove.com
                                        nacedo@strucklove.com
                                        ahesman@strucklove.com

                                        Stephen E. Curry (GA Bar No. 202500)
                                        CURRY LAW FIRM
                                        3508-C Professional Circle
                                        Augusta, Georgia 30907-8232
                                        Phone: (706) 724-0022
                                        Fax:  (866) 337-3859
                                        securry@currylawfirm.com

                                        Attorneys for Defendant CoreCivic, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 21st day of June, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Priyanka Bhatt | priyanka@projectsouth.org |
| Laura Rivera | laura.rivera@splcenter.org |
| Bryan Lopez | bryan.lopez@splcenter.org |
| Daniel Werner | daniel.werner@splcenter.org |
| Meredith B. Stewart | meredith.stewart@splcenter.org |
| Warren T. Burns | wburns@burnscharest.com |
| Daniel H. Charest | dcharest@burnscharest.com |
| Lydia A. Wright | lwright@burnscharest.com |
| Korey A. Nelson | knelson@burnscharest.com |
| R. Andrew Free | andrew@immigrantcivilrights.com |
| Azadeh Shahshahani | azadeh@projectsouth.org |

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

N/A

s/ Daniel P. Struck
Daniel P. Struck