IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| **WILHEN HILL BARRIENTOS, MARGARITO VELAZQUEZ GALICIA, and SHOAIB AHMED** individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>**CORECIVIC, INC.,**<br><br>                    Defendant. | **Civil Action No.  4:18-cv-00070-CDL** |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S RULE 12(b)(6) MOTION TO DISMISS

Plaintiffs Wilhen Hill Barrientos, Margarito Velazquez Galicia, and Shoaib Ahmed (collectively "Plaintiffs") submit this response in opposition to Defendant CoreCivic, Inc.'s ("CoreCivic") Rule 12(b)(6) motion to dismiss for failure to state a claim.  CoreCivic's motion should be denied because Plaintiffs have adequately pleaded facts to support their clams under the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589(a), 1594(a), 1595, and unjust enrichment.  Plaintiffs allege that CoreCivic forced them and the putative class members to work for nearly free by depriving them of basic necessities and threatening them with serious harm, including solitary confinement, if they refused.  This deprivation scheme has resulted in an economic windfall for Defendant.  CoreCivic's assertion that it can never, as a matter of law, be held liable under the TVPA for forced labor finds no support in the plain language or legislative history of the statute, and its argument that it cannot be liable under Georgia's unjust enrichment law is based on a misstatement of the law governing the claim.  Defendant's motion should be denied.

1

## FACTUAL BACKGROUND

This case centers on the conduct of CoreCivic at one of its keystone properties, the Stewart Detention Center ("Stewart").  With some 2,000 beds, Stewart is one of the biggest civil immigration detention centers in the country.  Compl. ¶ 24.  Immigrants detained at Stewart are not serving sentences as punishment for a crime.  *Id.* ¶ 15.  They are not held pending criminal charges.  *Id.*  The only allegations justifying their detention are civil in nature.  *Id.*  Though they simply await the outcome of their cases in immigration court, they are imprisoned just the same.  *Id.* ¶¶ 14, 16.

Stewart is located in Georgia's poorest county, Stewart County ("County"), where 40 percent of families live below the poverty line.  *Id.* ¶ 33.  CoreCivic boasts of bringing value to this under-resourced community.  *Id.* ¶ 34.  But the County's cut of payments from ICE is only 85 cents per day for every person detained there − 1.37 percent of the total per diem that Immigration and Customs Enforcement ("ICE") pays to CoreCivic.  *Id.* ¶ 25.  CoreCivic keeps the rest.  *Id.*  After paying the County its share and deducting operating costs, CoreCivic pocketed approximately $38 million in revenue from Stewart in 2016.  *Id.*

CoreCivic employs only 96 County residents at Stewart, and only 300 or so people in total. *Id.* ¶ 34.  These men and women perform management, security, and transportation services at Stewart for wages set by the Service Contract Act ("SCA").  *Id.* ¶ 31.  The rest of the manual labor that keeps Stewart running is performed by the detained immigrants.  *Id.* ¶ 34.

Stewart is part of CoreCivic's growing portfolio of properties in immigrant detention, serving ICE as its "primary customer."  *Id.* ¶ 22.  The company has bested its competitors in the immigrant detention market, which has boomed over the past 23 years, expanding its capacity eightfold to more than 41,000 beds.  *Id.* ¶¶ 18, 20.  This market has proven enormously

profitable for CoreCivic. *Id.* ¶ 21. Revenues from immigrant detention in 2017 exceeded $444 million, making up a quarter of CoreCivic's total revenue of $1.765 billion. *Id.*

Like any company, CoreCivic maximizes profit by minimizing costs. Unlike many, though, it is entrusted with the care of human beings, and required to comply with federal standards governing safety, food, housing, hygiene, and labor. *Id.* ¶ 40. This, it fails to do. *Id.* CoreCivic shirks its custodial obligations, shortchanging the people in its care, by failing to spend adequately on supplies to meet its mandate. *Id.* ¶¶ 40-43.

Most detained immigrants reside in open dormitories where conflict and violence are commonplace. *Id.* ¶ 56. The dormitories fit up to 66 people whose only personal space is the top or bottom of a bunk bed. *Id.* They share a single bathroom with three to four toilets, three to four urinals, and four sinks. *Id.* These bathrooms are often filthy. *Id.* Sleep eludes many there because the lights are on day and night. *Id.* Some detained immigrants in search of rest resort to blindfolding themselves with socks. *Id.* It is no wonder they have come to call these places "El Gallinero" or "The Chicken Coop." *Id.*

The food in the kitchen is sometimes expired, spoiled, or moldy, as the Department of Homeland Security's Office of Inspector General ("OIG") found. *Id.* ¶¶ 43, 65. It is hard for detainees to maintain personal hygiene because allotments for soap, toothpaste, and toilet paper are scant, and CoreCivic fails to replenish them "promptly, or at all," according to the OIG. *Id.* ¶ 42. Contact with the outside is limited, and few detainees receive visits, due to the long distances between Lumpkin and many of the communities they called home. *Id.* ¶ 45. Amid this isolation, phone calls are a lifeline to family, legal help, and other support. *Id.* ¶ 46. But calls are costly, especially if, as is likely, the person's detention has cut a key source of the household income. *Id.*

All these needs − basic to survival − are contingent at Stewart.  Food, toiletries, and phone cards are available, though, for those who can afford to pay for them.  *Id.* ¶ 37.  CoreCivic sells these products at its company store, the commissary.  *Id.*

Against this backdrop, CoreCivic runs a work program it calls "voluntary."  The program "offers" a range of jobs: barber, commissary, intake, kitchen, laundry, library, night floor crew, recreation, unit law library, and several kinds of porters.  *Id.* ¶ 29.  These workers scrub the toilets, showers, sinks, and floors in all of the housing units.  *Id.* ¶ 30.  They clean the solitary confinement units, intake areas, the kitchen, the cafeteria, medical staff offices, patient rooms, and recreation areas.  *Id.*  They wash the laundry and do the dishes.  *Id.*  They cook meals for some 2,000 people three times a day, every day.  *Id.* ¶ 2.  As the breadth of these tasks demonstrates, CoreCivic outsources the lion's share of the labor that sustains Stewart to the detained immigrants.  *Id.* ¶ 34.

In exchange, workers are paid $1 to $4 a day, and for kitchen staff who work 12 hours or more, up to $8 − far below the federal minimum wage.  *Id.* ¶ 31.  Much of these meager wages are funneled directly back to CoreCivic's coffers at the commissary, where plaintiffs purchase the phone cards that connect them with human beings on the outside, food to quell their hunger, and toiletries to maintain a minimal standard of personal hygiene.  *Id.* ¶¶ 37-39.  CoreCivic also holds out a few "privileges" to entice "volunteers."  *Id.* ¶ 55.  For example, some workers are awarded safer and more private accommodations in the few units with two-person cells, which feature toilets, sinks, and access to showers with both hot and cold water.  *Id.*

Once a worker is in the program, CoreCivic takes coercive measures to ensure its labor force remains compliant.  *Id.* ¶ 48.  Detained immigrants who refuse to work are placed in solitary confinements and/or threatened with sanctions, including solitary confinement, loss of

basic necessities, and loss of safe, sanitary, and private housing. *Id.* As CoreCivic's Stewart Detainee Handbook sets out, "encouraging others to participate in a work stoppage or to refuse to work" is considered a High Offense and is punishable by "initiation [of] criminal proceedings," "disciplinary segregation (up to 30 days)," "loss of privileges – commissary, movies, recreation, etc.," and "chang[ing] housing or restrict[ion] to housing unit." *Id.* ¶ 49. Every person detained at Stewart receives a copy of this handbook upon arrival. *Id.*

These are not idle threats. The named Plaintiffs detail incidents of CoreCivic staff threatening and/or actually punishing them or others for refusing to work. *Id.* ¶¶ 69, 70, 71, 72, 73, 74, 82, 89, 90. To be sure, the Plaintiffs submitted to the work program to access the basic necessities, such as toilet paper and food, which CoreCivic refuses to provide them in adequate and humane quantities. *Id.* ¶¶ 66-67, 80, 88. They remained in the program as a result of CoreCivic's threats of – and actual acts – inflicting serious harm on them and others in its care. *Id.* ¶¶ 75, 83, 91.

## STANDARD OF REVIEW

When adjudicating a motion for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a court must accept the "allegations in the complaint as true and constru[e] them in the light most favorable" to the non-moving party. *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003). A complaint that contains "enough facts to make a claim for relief plausible on its face" is sufficient to survive a motion to dismiss. *See Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012). A claim is plausible on its face if a party has alleged "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Where a party has presented "well-pleaded factual allegations," the court

should "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Barker ex rel. U.S. v. Columbus Reg'l Healthcare Sys., Inc.*, 977 F. Supp. 2d 1341, 1346 (M.D. Ga. 2013) (quoting *Twombly*, 550 U.S. at 556 (internal quotation marks omitted)).

## ARGUMENT

## I.   The TVPA's Forced Labor Provision, 18 U.S.C. § 1589, Applies to CoreCivic.

CoreCivic argues that the TVPA applies only to traffickers and it cannot, as a matter of law, be a trafficker.[1]   As shown below, this circular proposition has been rejected by three federal courts in the context of detained immigrants, and it does not square with the statute's plain text, legislative history, or broader precedent interpreting § 1589 and the TVPA.

### A.   The Plain Language of § 1589 Does Not Exclude Private Prison Companies like CoreCivic from Liability.

CoreCivic urges the Court to look past the plain language of § 1589 to conclude that it, a private corporation, is somehow exempt from the TVPA, but the plain language of § 1589 does not, in any way, limit who it holds liable.   Because the statute's language is unambiguous, the "judicial inquiry is complete." *See Comer v. J.P. Morgan Chase Bank, N.A.*, No. 4:11-CV-88 CDL, 2011 WL 5878400, at *3 (M.D. Ga. Nov. 23, 2011) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) (citations omitted)).

The plain language of § 1589 does not support CoreCivic's proposed limitations.   First, nothing in the plain text of § 1589 limits who may be liable for forced labor.   18 U.S.C. §

---

[1]   Though Plaintiffs have only alleged that Defendant violated the TVPA's "forced labor" provision, Plaintiffs dispute that CoreCivic cannot, as a matter of law, engage in trafficking of detained immigrants in its care under the TVPA's "trafficking" provisions.

1589(a) ("<u>Whoever</u> knowingly . . . obtains [] labor or services . . . by means of physical restraint

. . . threats of serious harm  . . . or threatened abuse of legal process  . . . shall be punished . . . ")

(emphasis added).   Second, the text does not limit liability to only those acts involving

trafficking across international borders.   *See id*.; *see also United States v. Callahan*, 801 F.3d

606, 617 (6th Cir. 2015) (noting the statute's "proscription against the exploitation of the labor or

services of 'a person' by prohibited means encompasses *any person*, no matter her nationality or

place of birth"); *United States v. Norris*, No. 1:05-CR-479-JTC, 2007 WL 9655844, at *8 (N.D.

Ga. June 27, 2007) ("[N]o person could be said not to understand the term 'forced labor.'")

*report and recommendation adopted*, 2007 WL 9657881 (N.D. Ga. Sept. 20, 2007).   Section

1589 does not contain any exceptions, exclusions, or exemptions that would insulate CoreCivic –

or its alleged acts here – from liability.

CoreCivic has raised and lost this argument in a nearly identical case brought by

immigrants formerly incarcerated at its Otay Mesa Detention Center near San Diego, California.

*See Owino v. CoreCivic, Inc.*, No. 17-CV-1112 JLS (NLS), 2018 WL 2193644 (S.D. Cal. May

14, 2018) (denying CoreCivic's motion to dismiss the plaintiffs' TVPA claim).   There, plaintiffs

alleged that CoreCivic forced them and other detained immigrants to work and threatened to

punish those who refused with sanctions, including solitary confinement and deprivation of basic

necessities, in violation of § 1589.   *Id.* at *1.   In response, CoreCivic, as here, contended that the

forced labor statute was only intended to prosecute human traffickers who transport persons

across international borders.   *Id.* at *3.   The court disagreed, holding that the statute's express

terms are not limited to "those who traffic in persons across national borders," nor do they "limit

who constitutes a victim of forced labor."   *Id.* at *4.

Other courts have similarly analyzed the plain language of the statute to reach this same conclusion in lawsuits brought by detained immigrants forced to work by private prison companies. *See, e.g., Novoa v. GEO Grp., Inc.,* No. EDCV-17-2514-JGB(SHKX), 2018 WL 3343494, at *12 (C.D. Cal. June 21, 2018) ("There is no basis for Defendant's proposition that a federal detention center run by a private entity is excluded from the reach of the TVPA."); *Menocal v. GEO Grp., Inc.*, 113 F. Supp. 3d 1125, 1132-33 (D. Colo. 2015) (denying private prison company's motion to dismiss detained immigrants' forced labor claims and rejecting defendant's attempt to narrow the broad language of § 1589). The plain language of § 1589 simply does not support CoreCivic's urged exemption. The Court's inquiry should end there. *See Comer*, 2011 WL 5878400, at *3.

### B. The Legislative History of § 1589 Confirms the TVPA's Broad Reach and Remedial Purpose.

Even if the plain text of the statute were ambiguous, the legislative history of § 1589 makes clear it was intended to *broaden* the TVPA's reach, not codify the arbitrary limitations CoreCivic suggests. Congress enacted § 1589 to make it clear beyond any doubt that the TVPA punished labor coerced by psychological as well as physical threats or injury as a rebuttal to Supreme Court's decision in *United States v. Kozminski*, 487 U.S. 931, 952 (1988). In *Kozminski*, the Court construed "involuntary servitude" under 18 U.S.C. § 1584 narrowly to include only forced labor by means of physical harm or abuse of the legal process. *See id.* In response, Congress enacted § 1589 to broadened significantly the scope of federal protections to "combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in *Kozminski*." *United States v. Kaufman*, 546 F.3d 1242, 1261 (10th Cir. 2008) (quoting H.R. Conf. Rep. No. 106–939, at 101, as reprinted in 2000 U.S.C.C.A.N. 1380, 1393).

Consistent with congressional intent, the jurisprudence on forced labor now extends well beyond sex work, slavery, and trafficking and into a variety of industries and types of labor. *See, e.g.*, *United States v. Calimlim*, 538 F.3d 706, 708-10 (7th Cir. 2008) (domestic worker); *Echon v. Sackett*, No. 14-CV-03420-PAB-NYW, 2017 WL 4181417, at *16 (D. Colo. Sept. 20, 2017), *report and recommendation adopted*, 2017 WL 5013116 (D. Colo. Nov. 1, 2017) (maintenance workers); *David v. Signal Int'l, LLC*, 37 F. Supp. 3d 822, 824 (E.D. La. 2014) (welders); *Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134, 1138 (C.D. Cal. 2011) (teachers). For example, in *Nunag-Tanedo*, the court held that teachers forced to teach high school were covered by the TVPA because the TVPA "not only protects victims from the most heinous human trafficking crimes, but also various additional types of fraud and extortion leading to forced labor." 790 F. Supp. 2d at 1145. The court found it had a "duty . . . to provide a forum for the alleged victims of forced labor, regardless of the severity of the alleged circumstances" because congressional intent "shows the broad reach of the TVPA and the broad class of individuals whom it protects." *Id.* at 1147.

CoreCivic relies on *United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014), a case about child abuse, to argue that applying the plain language of the forced labor statute here would lead to absurd and unintended results, but *Toviave* is distinguishable from this case. In *Toviave*, the defendant was prosecuted for violations of § 1589 where, acting *in loco parentis* of four young relatives, he required the children under his care to do household chores such as cooking, cleaning, and laundry. *Id.* at 623-24. The Sixth Circuit, after a determining that state law exclusively regulates parental rights and child abuse, declined to apply the TVPA because it did not want to "make it a crime for a person acting *in loco parentis* to require household chores, or

make child abuse a federal crime." *Id.* at 629.[2]  Because "household child abuse is quintessential local criminal activity," the court was reluctant to assume that Congress' intent was to make it a federal crime under the TVPA.  *See id.* at 628.

Nothing in *Toviave's* narrow holding supports the sweeping exemption from the TVPA that CoreCivic urges.  Unlike *Toviave*, holding CoreCivic liable under the TVPA would not conflict with an existing legal scheme that regulates the conduct alleged here.  CoreCivic attempts to point to ICE's statutory mandate to detain immigrants as evidence of such a scheme, but CoreCivic fails to explain how holding it liable for its forced labor scheme would "impinge on ICE's authority to detain immigrants" or make those immigrants' work a federal crime.  *See* Doc. 30-1, at 11.  As explained in Plaintiffs' Complaint, it is CoreCivic's forced labor *scheme –* not Plaintiffs' detention or their labor in the abstract – that Plaintiffs challenge here.[3]  *See generally* Compl.

---

[2] Still, the Sixth Circuit noted that under different circumstances, a "parent or guardian can commit forced labor, and is not immunized by that status," and that "the extremity of force is not determinant of forced labor" because such a holding "would undermine the ability to prosecute forced labor by psychological coercion." *Id.* at 626-27.

[3] CoreCivic might argue that ICE's guidance – the Performance-Based National Detention Standards ("PBNDS") – is somehow on par with the comprehensive state criminal scheme regulating child abuse in *Toviave*, but this comparison reaches too far.  First, the PBNDS are agency guidance – not codified law as in *Toviave*.  Second, they do not regulate or remediate the allegations here – i.e., forced labor, sanctions for refusing to work, the payment of subminimum wages (indeed the PBNDS only provides a $1.00 per day wage *floor*), or the requirement that detained immigrants perform work beyond the PBNDS' four enumerated "personal housekeeping tasks."  *See* ICE PBNDS (2011), Section 5.8, at 405-06, https://www.ice.gov/detention-standards/2011.  Even if the PBNDS were relevant to the application of the TVPA to Defendant, Plaintiffs allege CoreCivic fails to comply with these minimum standards, and the OIG has concluded that ICE does not effectively enforce them.  *See* Compl. ¶¶41-43, 52;  DHS-OIG, *ICE's Inspections & Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements*, June 26, 2018, https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf.  Applying the TVPA to CoreCivic and its forced labor scheme would not interfere with these broad and inconsistently followed and enforced standards.  *Cf.  Chen v. Geo Grp., Inc.*, 287 F. Supp. 3d

CoreCivic also urges the Court to consider "clues" supposedly indicative of congressional intent. These "clues" do not support CoreCivic's proposed exemption from the TVPA. First, despite conceding that § 1589 includes corporations, CoreCivic claims it is entitled to an exemption from the TVPA because it is under contract with ICE and is performing a federal function. In support of this proposition, CoreCivic cites to a Tenth Circuit case where the State was deemed exempt from TVPA liability on immunity grounds. *See* Doc. 30-1, at 14 (citing *Mojsilovic v. Okla. ex rel. Bd. of Regents for the Univ. of Okla.*, 101 F. Supp. 3d 1137, 1139 (W.D. Okla. 2015), *aff'd*, 841 F.3d 1129 (10th Cir. 2016)). However, sovereign immunity does not automatically attach to CoreCivic to immunize it – and, by extension, every other federal or state contractor – from liability under the TVPA. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016), *as revised* (Feb. 9, 2016) (denying federal contractor's immunity defense on ground that it "offer[ed] no authority for the notion that private persons performing Government work acquire the Government's embracive immunity"). Tellingly, CoreCivic does not cite a single case to support such a broad expansion of immunity. CoreCivic's role in federal immigrant detention "is not a shield against illegal conduct against those held in detention." *See Owino*, 2018 WL 2193644, at *6; *see also McCullough v. City of Montgomery*, No. 2:15-cv-463, 2017 WL 956362, at *12 (M.D. Ala. Mar. 10, 2017) (denying motion to dismiss incarcerated individuals' forced labor claims against the municipality holding that "the threat of jail to coerce labor is unlawful," even where "plaintiffs were incarcerated already").

Second, CoreCivic points to 8 U.S.C. § 1555(d), which authorizes ICE to pay allowances to immigrants for work performed while detained, and the related Department of Justice Appropriation Act of 1978 ("Appropriation Act"), Pub. L. No 95–86, 91 Stat 419 (1978), where

---

1158, 1165 (W.D. Wash. 2017) ("ICE has not created a regulatory scheme preempting state law through its policies, including the Voluntary Work Program.").

Congress appropriated the payment of these allowances at a rate not in excess of $1 per day, as evidence that Congress knew detained immigrants would work for nearly free.  What Congress expected detained immigrants to be paid has no bearing on Plaintiffs' allegations of forced labor by and unjust enrichment of CoreCivic.  The amount of money owed to Plaintiffs for violation of these laws is a question of damages that is not appropriately before the Court at this stage.

Even if this defense were relevant at this stage, it fails. Congressional silence since 1979 as to the appropriations allotted to ICE for work performed by detained immigrants suggests that Congress has abdicated funding of § 1555(d).  ICE, in place of the Appropriations Act, through the PBNDS, has directed its contractors that they shall pay "monetary compensation for work completed . . . The compensation is *at least $1 (USD) per day*."[4]  ICE provides CoreCivic a floor not a ceiling as to the compensation it pays detained immigrants for their work.  For these reasons, courts have held that neither § 1555(d) nor the PBNDS preclude private prison companies from paying detained immigrants more than $1 per day.  *See*, *e.g*., *Novoa*, 2018 WL 3343494, at *4 ("Congress did not preempt the field of immigration detainee wages."); *Chen v. Geo Grp., Inc.*, 287 F. Supp. 3d 1158, 1166 (W.D. Wash. 2017) (finding that a private prison company had failed to show that Congress and ICE intended to preempt state law with respect to the wages of detained immigrants).  CoreCivic appears to know this as it does not refute Plaintiffs' allegations that it pays them as little as $1 per day *but has paid them up to $8 per day*. *See* Doc. 30-1, at 19.

The canon of constitutional avoidance also forecloses CoreCivic's reliance on § 1555(d) to immunize it against forced labor claims: Because detained immigrants are civil detainees, their labor cannot be obtained involuntarily consistent with the Thirteenth Amendment.  *See Wong*

---

[4] ICE PBNDS, Section 5.8, at 405, https://www.ice.gov/detention-standards/2011.

*Wing v. United States*, 163 U.S. 228, 229 (1896) (An "order of deportation is not a crime," and immigrants awaiting their removal may not be sentenced to hard labor under immigration law). CoreCivic's statutory interpretation of § 1555(d) would put that provision on a collision course with the Thirteenth Amendment and with the Due Process Clause. Where two alternative, plausible readings of a statute exist, the canon of constitutional avoidance requires the Court to adopt the one that does not raise doubts as to the constitutionality of the legislative enactment. *See Pine v. City of W. Palm Beach*, 762 F.3d 1262, 1270 (11th Cir. 2014).

Finally, CoreCivic posits that construing the forced labor statute to criminalize housekeeping tasks by detained immigrants would also criminalize the same tasks by federal pre-trial detainees, who are authorized to perform "housekeeping tasks in the inmate's own cell and community living area." 28 C.F.R. § 545.23. However, Plaintiffs allege they performed work that goes far beyond housekeeping tasks in their own cell or community living area. Plaintiffs and putative class members cook, prepare and distribute food and drinks for up to 2,000 detained immigrants for up to 12 or more hours per day, as well as perform clerical, barber, maintenance, and janitorial tasks across the detention center, among other duties. *See* Compl. ¶¶ 9-11, 30, 62-63, 78-79, 86-88. This work cannot be considered mere housekeeping tasks. *See McGarry v. Pallito*, 687 F.3d 505, 514 (2d Cir. 2012) ("[A] pretrial detainee's compelled work in a laundry for up to 14 hours a day for three days a week doing other inmates' laundry cannot reasonably be construed as personally related housekeeping chores . . . ."). Prohibiting CoreCivic from compelling detained immigrants to perform the overwhelming majority of tasks needed to operate Stewart would have no effect on the Bureau of Prisons ability to require a pretrial inmate to clean his own cell.

**C.      Plaintiffs Have No Duty to Enrich a Private, For-Profit Corporation.**

CoreCivic does not attempt to argue that the work performed by Plaintiffs is not "labor" or "services" under § 1589.[5]  Instead, CoreCivic argues that it should be permitted to force the labor performed by Plaintiffs because such labor is "expected" of detainees in custody.  *See* Doc. 30-1, at 11.  CoreCivic's argument fails because the law does not require Plaintiffs to enrich a private corporation.

CoreCivic relies on a Fifth Circuit case, *Channer v. Hall*, that was decided under the "civic duty exception" to the Thirteenth Amendment.  112 F.3d 214 (5th Cir. 1997).  In *Channer*, a *pro se* detainee of the Immigration and Naturalization Service ("INS"), ICE's predecessor agency, brought an action against the warden of a Bureau of Prisons facility and other federal officials for allegedly failing to deport him expeditiously and reducing him to involuntary servitude by compelling him to work under threat of solitary confinement.  *Id.* at 215.  The *Channer* court relied on *Kozminski* to hold that the federal government may require a communal contribution from an INS detainee and not violate the Thirteenth Amendment's prohibition on involuntary servitude.  *Id.* at 218.  The defect in CoreCivic's argument is that when the Fifth Circuit decided *Channer*, the law upon which Plaintiffs' forced labor claim is based on did not exist.  Because Congress's purpose in enacting § 1589 was to expand the narrow construction in

---

[5] Nor could CoreCivic plausibly make that argument because courts have held repeatedly that labor like that performed by the Plaintiffs is covered under the TVPA.  *See, e.g.*, *Callahan*, 801 F.3d at 613-14 (affirming convictions of defendants who compelled a mentally disabled woman "to clean the apartment, do yardwork, care for their dogs, and run various errands for them"); *United States v. Sabhnani*, 599 F.3d 215, 225 (2d Cir. 2010) (affirming conviction for compelling individual to perform "cooking, cleaning, laundry, and other chores at [appellants'] large three-story residence"); *United States v. Paulin*, 329 F. App'x 232, 233 (11th Cir. 2009) (affirming conviction where the forced labor alleged consisted of "cooking the family's meals and spending the day cleaning the house on her hands and knees"); *Calimlim*, 538 F.3d at 708-10 (affirming convictions of defendants who compelled a domestic worker to "care for [defendants'] household and children, eventually expanding to include the family cars, investment properties, and medical offices").

14

*Kozminski*, CoreCivic's reliance on *Channer* misses the mark.  Indeed, as the *Menocal* court observed:

> Both *Kozminski* and *Channer* interpreted the term "involuntary servitude" (in § 1584 and in the Thirteenth Amendment, respectively), whereas § 1589 reaches "whoever . . . obtains the labor or services of a person by . . . threats of physical restraint." The language at issue here is thus broader than the language at issue in *Kozminski* and *Channer*, and intentionally so.

*Menocal*, 113 F. Supp. 3d at 1132–33.

Moreover, because the legislative reaction to *Kozminski* was to provide a remedial avenue to individuals coerced to perform work by means of serious harm, including psychological harm, CoreCivic's argument would contravene the very purpose of the forced labor statute's enactment.  It has long been recognized that "solitary confinement bears 'a further terror and peculiar mark of infamy.'"  *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (quoting *In re Medley*, 134 U.S. 160, 170 (1890)).  The Eleventh Circuit has noted "the psychological effects of spending extended periods in solitary confinement . . . may impair an inmate's mental capabilities[.]"  *Hutchinson v. Florida*, 677 F.3d 1097, 1106 (11th Cir. 2012); *see also United States v. McNeal*, No. 2:15CR199-MHT, 2018 WL 1811474, at *2 (M.D. Ala. Apr. 17, 2018) ("[E]xtended isolation of prisoners in conditions of solitary confinement poses a substantial risk of psychological harm and decompensation").  Although Congress expressly included psychological harm as means of coercion under § 1589, CoreCivic argues that it may still somehow require work to be compelled under threat of solitary confinement with impunity. It is this conclusion that would lead to absurd, unjust, and unintended results.

Even if *Channer*'s civic duty exception applied here – which it does not – the exception is inapplicable to for-profit, private prison companies like CoreCivic.  The Supreme Court has repeatedly accepted arguments from private prison corporations that they do not become federal

actors subject to liability as a result of contracting with the federal government. *See Minneci v. Pollard*, 565 U.S. 118, 126 (2012) (rejecting the proposition that a private prison-management firm is a federal agent like a federal employee); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) (refusing to imply a *Bivens* remedy against private prison guards); *Richardson v. McKnight*, 521 U.S. 399, 409 (1997) (denying qualified immunity to guards employed by CoreCivic, formerly known as Corrections Corporation of America).

This distinction is critical.  Unlike the federal-run facility in *Channer*, CoreCivic has a profit motive that animates its staffing and management decisions at Stewart.  The forced labor that Plaintiffs allege occurred not at the urging of the federal government, but rather, at the insistence of CoreCivic – a "firm [that] is systematically organized to perform a major administrative task for profit." *Richardson*, 521 U.S. at 409.  In contrast to *Channer*, the performance of involuntary labor in this case profits a private corporation, not a government entity. *See Channer*, 112 F.3d at 119 ("*[T]he federal government* is entitled to require communal contribution by an INS detainee in the form of housekeeping tasks.") (emphasis added); *Jobson v. Henne*, 355 F.2d 129, 132 (2d Cir. 1966) ("[T]he *states* are not [ ] foreclosed from requiring that a lawfully committed inmate perform without compensation certain chores designed to reduce the financial burden placed on a *state* . . . .") (emphasis added).  Thus *Channer* has no persuasive value where, as here, the coercive defendant is a private actor. *See Novoa*, 2018 WL 3343494, at *13 (holding *Channer's* civic duty exception "inapplicable to a claim against a private prison corporation contracting with the federal government to run an immigration detention facility"); *Owino*, 2018 WL 2193644, at *10 (same).[6]

---

[6] CoreCivic also cites multiple, out-of-circuit cases that, like *Channer*, all involve alleged involuntary servitude at *government-run* facilities.  Doc. 30-1, at 12.  Thus, like *Channer*, these cases are all inapplicable here. *See Bijeol v. Nelson*, 579 F.2d 423, 424 (7th Cir. 1978) (pre-trial

CoreCivic's claim that the custodial setting of detained immigrants requires a finding that forced labor is authorized by law also lacks merits. The "custodial relationship" does not insulate CoreCivic from liability for profiteering off Plaintiffs' forced labor. To be sure, the cases it cites to support this notion all involve government-run – *not* for-profit – facilities where courts have found the detainees owe a duty to the *state*. Doc. 30-1, at 12-13; *see supra* at 16 n.5. As stated above, when a private entity receives and profits from the benefit of the labor, as is the case here, detainees cannot *per se* be forced to work in violation of the TVPA.

CoreCivic also relies on *Villarreal v. Woodham*, 113 F.3d 202 (11th Cir. 1997), a Fair Labor Standards Act ("FLSA") case that does not involve a private company or allegations of forced labor. The *Villareal* court's finding that pre-trial detainees are not entitled to receive the minimum wage for safe and voluntary work is irrelevant to Plaintiffs' allegations of coerced labor. Also, contrary to CoreCivic's contention, the case *Villareal* relied on – *Danneskjold v. Hausrath* – did, in fact, base its holding on the penal nature of incarceration. 82 F.3d 37, 43 (2d Cir. 1996) ("Voluntary work serves all of the *penal* functions of forced labor . . . and, therefore, should not have a different legal status under the FLSA.") (emphasis added). No penal function exists here. *See Wong Wing*, 163 U.S. at 229.

Finally, even if the Court finds the "custodial relationship" between Plaintiffs and CoreCivic implicates the application of the TVPA, that finding should not be dispositive at this

---

detainee at federal prison); *Owuor v. Courville,* No. 2:11-CV-926, 2013 WL 7877306 (W.D. La. Aug. 7, 2013) (applying *Channer* to a Thirteenth Amendment claim against a federal correctional institution); *Hutchinson v. Reese*, No. 5:07CV181-DCB-MTP, 2008 WL 4857449 (S.D. Miss. Nov. 7, 2008) (applying *Channer* to a Thirteenth Amendment claim against a federal correctional institution); *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992) (pretrial detainee was placed in federal facility); *Mendez v. Haugen*, No. CV 14-4792 ADM/BRT, 2015 WL 5718967 (D. Minn. Sept. 29, 2015), *aff'd* (Feb. 22, 2016) (pre-trial detainee in federal prison).

stage because a key allegation in this case is that CoreCivic has abrogated its custodial duties vis-à-vis the immigrants detained at Stewart.  *See* Compl. ¶¶ 40-47, 56.

CoreCivic's argument that it is entitled to a blanket exemption from the TVPA lacks merit.  Its motion to dismiss Plaintiffs' TVPA claims therefore should be denied.

## II.     Plaintiffs State a Valid TVPA Claim Under § 1589(a)(3).

CoreCivic appears to concede that absent its argument that it should be exempt from liability under the TVPA, Plaintiffs have stated a valid TVPA claim under § 1589(a)(1), (a)(2) and (a)(4).  CoreCivic contends that Plaintiffs do not allege facts demonstrating how CoreCivic abused or threatened abuse of the legal process under § 1589(a)(3).  Yet Plaintiffs' complaint adequately alleges that CoreCivic's own Detainee Orientation Handbook, received by every individual detained at Stewart upon entry, provides that "[e]ncouraging others to participate in a work stoppage or to refuse to work," is punishable by "[i]nitiat[tion] of criminal proceedings."  Compl. ¶¶ 29, 49, 50, 111.  Plaintiffs further allege they felt compelled to work as result of these threats.  *See id.* ¶¶ 75, 83, 91.  These allegations are sufficient for survival of Plaintiffs' § 1589(a)(3) claim, especially given that "resolution of whether a certain statement amounts to an abuse of the legal process is one that is particularly difficult on the sparse record of a motion to dismiss."  *See Camayo v. John Peroulis & Sons Sheep, Inc.*, No. 10-CV-00772-MSK-MJW, 2012 WL 4359086, at *5 (D. Colo. Sept. 24, 2012), *adhered to on reconsideration*, 2013 WL 3927677 (D. Colo. July 30, 2013).

Alternatively, should the Court hold these allegations are insufficient to plead a completed violation of § 1589(a)(3), Plaintiffs adequately allege that CoreCivic attempted to obtain labor or services under threat of abuse of legal process under 18 U.S.C. § 1594(a).  Compl. ¶ 112.

III.    **Plaintiffs Plausibly Plead Unjust Enrichment.**

CoreCivic's motion to dismiss Plaintiffs' unjust enrichment claim should be denied because it misstates the law governing the claim.   To state a claim for unjust enrichment, Plaintiffs must show that "(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying for it." *Jenkins v. BAC Home Loan Servicing, LP*, 822 F. Supp. 2d 1369, 1377 (M.D. Ga. 2011).   Here, Plaintiffs allege they provided CoreCivic with grossly undercompensated labor, the full value of which CoreCivic retained to materially increase its profits.   Compl. ¶¶ 117-122.   CoreCivic's retention of such labor for anything less than its reasonable value would be inequitable.  *See Reidling v. Holcomb*, 483 S.E. 2d 624, 626 (Ga. Ct. App. 1997) ("The concept of unjust enrichment in law is premised upon the principle that a party cannot induce, accept, or encourage another to furnish or render something of value to such party and avoid payment for the value received . . . .").[7]

CoreCivic asserts that Plaintiffs' claim should be dismissed because they failed to plead expected compensation, but "a claim for unjust enrichment does not require a showing of the anticipation of compensation."   *Yoh v. Daniel*, 497 S.E.2d 392, 394 (Ga. Ct. App. 1998).[8] Similarly, it does not matter that Plaintiffs received *some* compensation because the inquiry is whether CoreCivic "paid for the reasonable value of such work." *Watson v. Sierra Contracting*

---

[7]  The law governing unjust enrichment also makes clear the claim is not "derivative" of Plaintiffs' TVPA claim, as CoreCivic posits.  Indeed, whether CoreCivic forced the Plaintiffs' labor under the TVPA is not dispositive of any of the claim's elements.

[8]  The case CoreCivic cites to support its unjust enrichment theory – *Ekokotu v. Fed. Exp. Corp.* – conflated the elements of a *quantum meruit* claim with those of unjust enrichment.  *See* 408 F. App'x 331, 340 (11th Cir. 2011) (citing the elements of *quantum meruit* from *Artrac Corp. v. Austin Kelley Advert., Inc.*, 399 S.E. 2d 529, 533 (Ga. Ct. App. 1990)).  *Quantum meruit* requires a showing of the expectation of compensation, whereas unjust enrichment does not.  *See id.*

*Corp.*, 485 S.E. 2d 563, 570 (Ga. Ct. App. 1997).  Plaintiffs, who made between $1 and $8 per day, allege that CoreCivic did not.  Compl. ¶ 119.

Finally, CoreCivic incorrectly contends that Plaintiffs' unjust enrichment claim is "premised" on the application of the SCA or the FLSA to the Plaintiffs.  The viability of the unjust enrichment claim does not depend on the Plaintiffs' entitlement to a statutory wage.  Indeed, the reasonable value of Plaintiffs' work goes to damages, not to the *prima facie* case, as CoreCivic suggests.  *See Hollifield v. Monte Vista Biblical Gardens, Inc.*, 553 S.E. 2d 662, 669 (Ga. Ct. App. 2001) (The measure of *damages* under unjust enrichment is "based upon the benefit conferred upon the [recipient] and not the cost to render the service or cost of goods.") (emphasis added).  And whether the SCA or the FLSA provides a basis for calculating the measure of damages is not before the Court at this stage.

Because Plaintiffs adequately allege that CoreCivic received the value of Plaintiffs' labor and did not adequately compensate Plaintiffs for that value, CoreCivic's motion to dismiss Plaintiffs' unjust enrichment claim must be denied.

## CONCLUSION

For all the foregoing reasons, Plaintiffs request the Court deny CoreCivic's Motion to Dismiss Plaintiffs' Complaint.

Dated: July 12, 2018                                      Respectfully submitted,

                                                         s/ Meredith B. Stewart
                                                         _____
                                                         Meredith B. Stewart*
                                                         Bryan Lopez*
                                                         **SOUTHERN POVERTY LAW CENTER**
                                                         201 Saint Charles Avenue, Suite 2000
                                                         New Orleans, LA 70170
                                                         Telephone: (504) 486-8982
                                                         Facsimile: (504) 486-8947
                                                         meredith.stewart@splcenter.org

bryan.lopez@splcenter.org

Daniel Werner (GA Bar No. 422070)
Laura Rivera (GA Bar No. 143762)
**SOUTHERN POVERTY LAW CENTER**
150 E. Ponce de Leon Avenue, Suite 340
Decatur, GA, 300030
Telephone: (404) 521-6700
Facsimile: (404) 221-5857
daniel.werner@splcenter.org
laura.rivera@splcenter.org

R. Andrew Free*
**LAW OFFICE OF R. ANDREW FREE**
P.O. Box 90568
Nashville, TN 37209
Telephone: (844) 321-3221x1
Facsimile: (615) 829-8959
andrew@immigrantcivilrights.com

Azadeh Shahshahani (GA Bar No. 509008)
Priyanka Bhatt (GA Bar No. 307315)
**PROJECT SOUTH**
9 Gammon Avenue SE
Atlanta, GA 30315
Telephone: (404) 622-0602
Facsimile: (404) 622-4137
azadeh@projectsouth.org
priyanka@projectsouth.org

Korey A. Nelson*
Lydia A. Wright*
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765
knelson@burnscharest.com
lwright@burnscharest.com

Warren T. Burns*
Daniel H. Charest*
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550

Facsimile: (469) 444-5002
wburns@burnscharest.com
dcharest@burnscharest.com

*Admitted *pro hac vice*

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date I electronically filed the foregoing document through the Court's CM/ECF filing system, which will send notification of such filing to all counsel of record.

Dated:  July 12, 2018                         s/ Meredith B. Stewart_____