**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | |
|---|---|
| WILHEN HILL BARRIENTOS, MARGARITO VELAZQUEZ GALICIA, and SHOAIB AHMED individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CORECIVIC, INC., <br><br> Defendant. | Civil Action No. 4:18-cv-00070-CDL |

**REPLY IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS COMPLAINT**

**I.   THE COURT SHOULD DISMISS PLAINTIFFS' TVPA CLAIM.**

Plaintiffs concede two things: (1) they do not have a cause of action for conduct prior to December 23, 2008; and (2) the TVPA does not apply to housekeeping tasks in detainee cells or community living areas.  The Response provides no rebuttal to the first point (Dkt. 30-1 at 16), and, in responding to CoreCivic's argument that 28 C.F.R. § 545.23 is evidence that Congress did not intend for the TVPA to apply in the custody setting, they argue only that they "allege they performed work that goes far beyond housekeeping tasks in their own cell or community living area" (Dkt. 34 at 13).  Thus, at a minimum, the Court should dismiss Plaintiffs' TVPA claim to the extent it is based on these allegations.  *See Owino v. CoreCivic, Inc.*, 17-CV-1112 JLS (NLS), 2018 WL 2193644, at ** 6, 10 (S.D. Cal. May 14, 2018) ("If detainees are only forced to make their beds then such conduct likely does not rise to criminal forced labor. … The Court agrees with [CoreCivic] that criminalizing housekeeping tasks in one instance (civil immigration detention) and permitting it in another (pretrial detention) would not be a logical

reading of § 1589."); *Ward v. Georgia Dep't of Human Res.*, 1:04-CV-3424-RLV-CCH, 2005 WL 8154945, at *6 (N.D. Ga. Feb. 28, 2005) (failure to respond to an argument in a motion to dismiss constituted a concession).

Regarding the arguments they do make, Plaintiffs distort the issue and drape it in salacious—but irrelevant—allegations. The issue is not, as Plaintiffs suggest, whether CoreCivic can force them to work without fear of liability. (*See* Dkt. 34 at 14 ["CoreCivic argues that it should be permitted to force the labor performed by Plaintiffs because such labor is 'expected' of detainees in custody."]; *id*. at 15 ["CoreCivic argues that it may still somehow require work to be compelled under threat of solitary confinement with impunity."]; *id*. at 17 ["The 'custodial relationship' does not insulate CoreCivic from liability for profiteering off Plaintiffs' forced labor"].) It is whether CoreCivic can be held liable *under the TVPA* based on the facts alleged in the Complaint. [1] The propriety or availability of *other* theories of liability is not before the Court. Plaintiffs' failure to plead any other theory is not a legitimate basis to find that the TVPA does or must apply. Moreover, Plaintiffs' focus on CoreCivic's purported profiteering and allegations of squalid living conditions (which are also false), have nothing to do with whether the TVPA applies in the detainee-custodial setting.

## A. The TVPA Does Not Extend to Labor Performed by Immigration Detainees in Lawful Custody of the United States Government.

**1.** Relying on the plain language of the statute, Plaintiffs first argue that the TVPA makes no exception for private prison companies like CoreCivic. (Dkt. 34 at 6-8.) But they do not address at all *United States v. Katz*, 271 U.S. 354, 362 (1926), and the undisputed proposition

---

[1] CoreCivic *denies* any allegation that it forces, coerces, or threatens detainees to work. But at this stage, the Court must accept Plaintiffs' allegations as true. *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009).

that the "[t]he general terms descriptive of a class of persons made subject to a criminal statute may and should be limited" if a literal application "would lead to extreme or absurd results[] and where the legislative purpose gathered from the whole act would be satisfied by a more limited interpretation."  CoreCivic's argument is premised on that proposition.  (*See* Dkt. 30-1 at 8-9.)

Plaintiffs' plain-language argument is also misguided because it focuses on the "who" (the perpetrator) and not the "what" (the conduct—"labor or services").  (*See* Dkt. 34 at 6-7 ["First, nothing in the plain text of § 1589 limits *who* may be liable for forced labor."], emphasis added.)  CoreCivic has not argued that the statute cannot apply to private-prison operators.  Its argument is that the statute was not intended to reach "labor or services" performed by detainees in lawful custody of the federal government.  In other words, Congress did not intend for the statute to criminalize labor or services in the custodial setting, irrespective of who has physical custody.  Plaintiffs alternatively contend that the statute "does not limit liability to only those acts involving trafficking across international borders."  (*See* Dkt. 34 at 7.)  But again, CoreCivic has *not* argued that the TVPA is limited to only cases involving international trafficking victims.  The Court need not reach that conclusion to deny Plaintiffs' claim.  CoreCivic's argument is that the purpose of the statute does not support the conclusion that it applies to labor or services in this custodial setting, regardless of the purported victim's origin.

Plaintiffs contend that other courts have relied on the plain language of the statute to reject similar arguments.  But the courts in *Novoa* and *Owino* fell into this same trap and focused on the "who" and/or the definition of "person" (the victim), and not the context of the conduct ("labor or services").  *See Novoa v. GEO Group, Inc.*, EDCV172514JGBSHKX, 2018 WL 3343494, at *12 (C.D. Cal. June 21, 2018) ("The plain language of § 1589 holds no limitation on who it applies to[.]"); *Owino*, 2018 WL 2193644, at *4 ("The statute's express terms do not limit

who constitutes a victim of forced labor. … Similarly, the target of the statute is broad:  section 1589 criminalizes '[w]hoever knowingly provides or obtains the labor or services.' Nor does the statute contain any language limiting application to those who traffic in persons or transport persons across national borders.").[2]  This Court is not bound to follow those decisions.

2.    Plaintiffs next argue that the legislative history reveals that Congress intended to "*broaden* the TVPA's reach."  (Dkt. 34 at 8.)  Specifically, they argue that Congress enacted 18 U.S.C. § 1589 in response to *United States v. Kozminski*, 487 U.S. 931, 948-49 (1988), which held that the Thirteenth Amendment did not prohibit psychological coercion.  CoreCivic does not disagree that Congress enacted § 1589 in response to *Kozminski*, or that § 1589(a)(4) includes a psychological-coercion component.  But that is the extent that Congress broadened it. And psychological coercion is not at issue.  Moreover, *Kozminski* separately concluded that the phrase "involuntary servitude" in 18 U.S.C. § 1584 did *not* prohibit state or federal governments from compelling their citizens to perform certain civic duties (the "civic duty" exception).  *See also Channer v. Hall*, 112 F.3d 214, 215 (5th Cir. 1997) (holding that "the federal government is entitled to require a communal contribution by an INS detainee in the form of housekeeping task") (citing *Kozminski*).  Despite being aware of that exception when it enacted § 1589, Congress did not eradicate it.  *See generally Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (courts "assume that Congress [wa]s aware of existing law when it passe[d] [the] legislation" and "intended to incorporate it").  In other words, Congress enacted § 1589, which incorporated *Kozminski*'s physical and legal coercion components of involuntary servitude, *see* §§ 1589(a)(1)-(a)(3), and did not disturb the "civic duty" exception that accompanied those components.

---

[2] The court in *Menocal v. GEO Group, Inc.*, 113 F. Supp. 3d 1125, 1132-33 (D. Colo. 2015), did not analyze the plain language of the statute.

- 4 -

Though it effectively broadened the definition of involuntary servitude, it did not truncate the judiciary's interpretation of what constitutes labor or services.

**3.**     Plaintiffs next argue that "the jurisprudence on forced labor now extends well beyond sex work, slavery, and trafficking and into a variety of industries and types of labor." (Dkt. 34 at 9.)  But whatever the validity of those decisions, none of them extended the TVPA into the detainee-custodial setting.  Thus, they are inapposite.[3]

**4.**     Plaintiffs next attempt to discount *United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014), because, in that case, there were state statutes that criminalized the child abuse. CoreCivic, however, cited *Toviave* to show that courts interpreting the TVPA will not blindly apply it whenever "labor" is involved and will instead take a common sense approach and consider the context in which it arises.  (Dkt. 30-1 at 9-10.)  Similarly, here, Congress did not intend for the TVPA to apply in the detainee-custodial setting—in which CoreCivic is required to detain immigration detainees and offer and enforce a Voluntary Work Program, at ICE's direction.[4]  (Dkt. 30-1.)

**5.**     In response to CoreCivic's argument that Congress's definition of the word "whoever" in 1 U.S.C. § 1, which excludes the federal government, is evidence that it did not intend to criminalize labor by immigration detainees in lawful custody (Dkt. 30-1 at 13-14), Plaintiffs argue CoreCivic is not entitled to sovereign immunity.  (Dkt. 34 at 11.)  But the

---

[3] *Nunag-Tanedo v. East Baton Rouge Parish School Board*, 790 F. Supp. 2d 1134 (C.D. Cal. 2011), bears little resemblance to this case. There, the plaintiffs were teachers lawfully employed by Louisiana school districts to teach high school math and science. *Id*. at 1138-39. They were tricked into pursuing that employment and forced to continue it under threat of deportation.  *Id*.  Nothing here resembles those facts.

[4] This is required by ICE; it is not merely guidance, as Plaintiffs contend (Dkt. 34 at 10 n.3). *See* https://www.ice.gov/doclib/detention-standards/2011/5-8.pdfm.

argument is not grounded in immunity.  It is grounded in statutory interpretation and common sense.  CoreCivic reasoned: the definition of "whoever" does not include the federal government; CoreCivic is performing a function on behalf of and at the direction of the federal government; the definition of "whoever" in § 1 includes corporations "unless the context indicates otherwise"; here, the context requires that the definition of "whoever" not include corporations performing a federal function because it would be illogical to conclude that the statute permits conduct done by the federal government, but criminalizes it when its contractors engage in the same conduct. Plaintiffs do not have any response to this analysis.

**6.**     In response to CoreCivic's argument that 8 U.S.C. § 1555(d) (authorizing allowances for "work performed") and the 1978 Appropriation Act (authorizing allowance "not in excess of $1 per day") are evidence that Congress did not intend to criminalize labor by immigration detainees in lawful custody (Dkt. 30-1 at 14), Plaintiffs argue that "[t]he amount of money owed to Plaintiffs for violation of the[] [TVPA] is a question of damages that is not appropriately before the Court at this stage."  (Dkt. 34 at 12.)  This argument misses the mark. CoreCivic cited § 1555(d) and the Appropriation Act because they demonstrate Congress's knowledge that—at the time it enacted the TVPA—immigration detainees in ICE custody performed labor for no pay at all, as Plaintiffs allege here.  If it had intended to criminalize that labor it would have amended § 1555(d) or issued an overriding appropriations bill to permit allowances only for "*voluntary* work performed."  But it did not, which suggests that it never intended the TVPA to apply in the detainee-custodial setting.

Plaintiffs alternatively argue that Congress's silence since 1979 by not issuing a new appropriations bill means that it "abdicated funding of § 1555(d)."  (Dkt. 34 at 12.)  But even if

that were so,[5] it would mean only that immigration detainees could not be paid anything for their labor, not that they could not be required to work while detained.[6]

Plaintiffs last argue that, to interpret § 1555(d) as allowing forced labor would violate the Thirteenth Amendment.  (Dkt. 34 at 12-13.)  But CoreCivic has not argued that § 1555(d) authorizes forced labor.  It relied on 1555(d) to show that Congress could not have intended the TVPA to apply in this context.  (Dkt. 30-1 at 14.)

**7.**     Plaintiffs respond to the thrust of CoreCivic's argument—that the TVPA does not apply to "labor or services" provided by detainees in the lawful custody of the federal government—by attempting to distinguish the many cases (*see* Dkt. 30-1 at 12-13) that have found that custodial detainees are expected to perform (even if forced) the same labor they claim they were forced to do.  (Dkt. 34 at 16-17.)  But their distinction is immaterial.  They argue that all of the cases cited involved government-operated facilities and, therefore, those cases do not apply to facilities that are operated by private entities.  They reason that private-facility operators, unlike government operators, profit from forced labor.  This is hardly a basis for refusing to acknowledge that courts expect and require detainees to perform certain labor while in detention.  The distinction is also artificial, as none of those cases mention profit or cost-savings.  Indeed, under Plaintiffs' theory, government-operated facilities equally "profit"

---

[5] Courts after 1978 recognize that the 1978 Appropriations Act is still effective.  *See*, *e.g.*, *Alvarado Guevara v. I.N.S.*, 902 F.2d 394, 396 (5th Cir. 1990); *Guevara v. I.N.S.*, 954 F.2d 733 (Fed. Cir. 1992) (unpublished disposition); *see also Owino*, 2018 WL 2193644, at *20 ("This Court does not foreclose the possibility that Congress intended for the $1 per day ceiling to bind future parties, but does not find a clear and manifest purpose on these facts is not warranted.").

[6] Plaintiffs' discussion about the PBNDS is confusing. They argue that the PBNDS replaced the 1978 Appropriation Act and now sets a floor ("at least $1 (USD) per day") not a ceiling. (Dkt. 34 at 12.) But that argument is inconsistent with Plaintiffs' prior argument that the PBNDS are merely "agency guidelines" with no force. (Dkt. 34 at 10 n.3.) If the PBNDS control, they *require* detainees "to do personal housekeeping." *See* https://www.ice.gov/doclib/detention-standards/2011/5-8.pdf, at 405-406.

because they save money by requiring detainees to perform tasks they would otherwise have to hire others to do.  Moreover, the reason for these holdings is the fact of involuntary confinement, not because the facility operator was the government.  *See*, *e.g.*, *Channer*, 112 F.3d at 218 (relying on cases involving "individuals who are involuntarily confined"); *Bijeol v. Nelson*, 579 F.2d 423, 424 (7th Cir. 1978) ("Daily general housekeeping responsibilities are not punitive in nature and for health and safety must be routinely observed in any multiple living unit.").

Plaintiffs save the Eleventh Circuit's decision in *Villarreal v. Woodham*, 113 F.3d 202 (11th Cir. 1997), for last and argue that its holding that detainees are not entitled to receive minimum wage is "irrelevant."  (Dkt. 34 at 17.)  But Plaintiffs miss (or choose to ignore) the reason for that holding:  because detainees "are in a custodial relationship" and the labor "occupies prisoners' time that might otherwise be filled by mischief; it trains prisoners in the discipline and skills of work; and it is a method of seeing that prisoners bear a cost of their incarceration." *Id*. at 206. And although the case quoted by *Villarreal—Danneskjold v. Hausrath*, 82 F.3d 37 (2d Cir. 1996)—characterized these reasons as "penal functions," *id*. at 43, that does not take away from their application to other custodial settings.

### B.     Plaintiffs Fail to State a Valid TVPA Claim Under § 1589(a)(3).

Plaintiffs argue that they have adequately alleged legal coercion under § 1589(a)(3) by alleging that CoreCivic's Detainee Orientation Handbook "provides that 'encouraging others to participate in a work stoppage or to refuse to work,' is punishable by 'initiation of criminal proceedings.'"  (Dkt. 34 at 18, citing Dkt. 1, ¶¶ 29, 49, 50, 111.)  But that offense merely prohibits one detainee from encouraging other detainees to refuse to work.  It does not prohibit a detainee from refusing to work—e.g., it does not prohibit "encouraging others to participate in a work stoppage *or refusing to work*."  Indeed, this same offense (and sanction) is included in the PBNDS, *see* https://www.ice.gov/doclib/detention-standards/2011/3-1.pdf, at 225 ("Encouraging

others to participate in a work stoppage or to refuse to work"), and the Federal Bureau of

Prison's Inmate Discipline Program, *see* https://www.bop.gov/policy/progstat/5270_009.pdf, at

47 ("Encouraging others to refuse to work, or to participate in a work stoppage").  Plaintiffs also

fail to allege that they actually *read* this portion of the Handbook or were threatened verbally

with its contents.  They have thus failed to allege that CoreCivic misused this provision of the

Handbook to force them to work, or even attempted to.  *See Alvarado v. Universidad Carlos*

*Albizu*, 10-22072-CIV, 2010 WL 3385345, at *3 (S.D. Fla. Aug. 25, 2010) (explaining that

§ 1589(a)(3) requires the "misuse or threatened misuse of law or the legal process, not mere

violation of a regulation").

## II.     THE COURT SHOULD DISMISS PLAINTIFFS' STATE LAW UNJUST ENRICHMENT CLAIM.

      **1.**     Plaintiffs first assert that their unjust enrichment claim is not derivative of their

TVPA claim.  They provide no authority to support that assertion.  Their unjust enrichment

theory of recovery *is* derivative of that claim.  *See, e.g.*, *Malivuk v. Ameripark, LLC*, No. 1:15-

CV-2570-WSD, 2016 WL 3999878, at *5 (N.D. Ga. July 26, 2016), *aff'd,* 694 F. App'x 705

(11th Cir. 2017) (dismissing unjust enrichment claim based solely on plaintiff's alleged

entitlement to tips under the FLSA where the underlying FLSA claim fails).

      **2.**     Plaintiffs next argue that they are not required to show expected compensation.

(Dkt. 34 at 19.)  That is simply not accurate.  *See, e.g.*, *Sitterli v. Csachi*, 811 S.E.2d 454, 457

(Ga. App. 2018); *Morris v. Britt*, 620 S.E.2d 422, 424 (Ga. App. 2005).[7]  Plaintiffs reliance on

---

[7] Plaintiffs contend that the Eleventh Circuit's decision in *Ekokotu v. Federal Express Corporation*, 408 F. App'x 331, 340 (11th Cir. 2011), conflated the elements of a quantum meruit claim. (Dkt. 34 at 19 n.8.) It did not. *See id*. at 340 ("Recovery under a theory of *unjust enrichment, or quantum meruit* requires a claimant to "show … the defendant's receipt of [the

dictum in *Yoh v. Daniel*, 497 S.E.2d 392, 394 (Ga. App. 1998), is misplaced.  Indeed, the Georgia Court of Appeals has rejected that same argument.  *See Sitterli*, 811 S.E.2d at 457 ("We note that *Sitterli*'s reliance on *Yoh v. Daniel* … to support his claim of error is misplaced. As an initial matter, the decision in *Yoh* is non-binding, physical precedent only.  Moreover, the dicta in *Yoh* upon which Sitterli relies is not contrary to the well-settled law on unjust enrichment set out above and cited by the trial court in its final judgment.") (internal citation omitted).

3.      Finally, Plaintiffs argue that their unjust enrichment claim is not based on either the SCA or the FLSA, and is instead simply a measure of damages.  (Dkt. 34 at 20.) This is contrary to the allegations in their Complaint.  (*See* Dkt. 1, ¶¶ 31, 119.)  Nonetheless, to prove a certain amount of damages, a party must necessarily establish that the measure of those damages applies.  By now disclaiming reliance on the SCA and the FLSA, Plaintiffs have not alleged any other measure of damages.  Plaintiffs also do not dispute, and thus concede, that the economic reality of their custodial detention proves the absence of any employment relationship that would entitle them to wages under the FLSA or the SCA.  Without a substantive basis to support their unjust enrichment claim, it fails.  *See Wachovia Ins. Servs., Inc. v. Fallon*, 682 S.E.2d 657, 665 (Ga. App. 2009).

## III.    CONCLUSION

For these reasons and those in the Memorandum, the Court should dismiss Plaintiffs' Complaint with prejudice.

---

benefit conferred] *without payment* would be unjust … and claimant's expectation of compensation at the time of the rendition of the services[.]") (emphasis added).

Dated:  August 2, 2018

Respectfully submitted,

s/ Daniel P. Struck
Daniel P. Struck *(pro hac vice)*
    Lead Counsel
Rachel Love *(pro hac vice)*
Nicholas D. Acedo *(pro hac vice)*
Ashlee B. Hesman *(pro hac vice)*
Jacob B. Lee *(pro hac vice)*
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Phone: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com

Stephen E. Curry (GA Bar No. 202500)
CURRY LAW FIRM
3508-C Professional Circle
Augusta, Georgia 30907-8232
Phone: (706) 724-0022
Fax:  (866) 337-3859
securry@currylawfirm.com

Attorneys for Defendant CoreCivic, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 2nd day of August, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Priyanka Bhatt | priyanka@projectsouth.org |
| Laura Rivera | laura.rivera@splcenter.org |
| Bryan Lopez | bryan.lopez@splcenter.org |
| Daniel Werner | daniel.werner@splcenter.org |
| Meredith B. Stewart | meredith.stewart@splcenter.org |
| Warren T. Burns | wburns@burnscharest.com |
| Daniel H. Charest | dcharest@burnscharest.com |
| Lydia A. Wright | lwright@burnscharest.com |
| Korey A. Nelson | knelson@burnscharest.com |
| R. Andrew Free | andrew@immigrantcivilrights.com |
| Azadeh Shahshahani | azadeh@projectsouth.org |

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

N/A

s/ Daniel P. Struck
Daniel P. Struck