IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

WILHEN HILL BARRIENTOS,              *
MARGARITO VELAZQUEZ-GALICIA,
and SHOAIB AHMED, *individually*    *
*and on behalf of all others*
*similarly situated*,                *

    Plaintiffs,                    *       CASE NO. 4:18-CV-70 (CDL)

vs.                                  *

CORECIVIC, INC.,                     *

    Defendant.                     *

_____

O R D E R

    Stewart Detention Center ("Stewart") is an immigration detention facility in Stewart County, Georgia operated by CoreCivic, Inc.  Plaintiffs Wilhen Barrientos, Margarito Velazquez-Galicia, and Shoaib Ahmed are current and former Stewart detainees.  They bring this class action, asserting claims against CoreCivic under the Trafficking Victims Protection Act ("TVPA"), as amended, 18 U.S.C. §§ 1589, 1594-95, and under Georgia law.  They allege that CoreCivic operates a "deprivation scheme" in which it forces detainees to work through threats of physical violence, solitary confinement, and deprivation of basic necessities.  CoreCivic moved to dismiss the action (ECF No. 30).  For the following reasons, CoreCivic's motion to dismiss is denied.

STANDARD

"To survive a motion to dismiss" under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The complaint must include enough factual allegations "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  In other words, the factual allegations must "raise a reasonable expectation that discovery will reveal evidence of" the plaintiff's claims. *Id.* at 556.  But "Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because 'it strikes a savvy judge that actual proof of those facts is improbable.'" *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 556).

FACTUAL ALLEGATIONS

The Court accepts the allegations in Plaintiffs' Complaint as true for purposes of the pending motion.  Plaintiffs allege the following:

## I.  **Conditions in Stewart Detention Center**

Stewart County, Georgia has an intergovernmental services agreement with United States Immigration and Custom Enforcement to house immigration detainees like Plaintiffs.  Compl. ¶ 13, ECF No. 1.  Stewart County contracts with CoreCivic, a for-profit

corporation, to operate the Stewart Detention Center ("Stewart"). *Id.* ¶ 12. Stewart has nearly 2,000 beds and is one of the largest immigration detention centers in the nation. *Id.* ¶ 24.

Plaintiffs allege that the conditions at Stewart are deplorable. The bathrooms are in poor condition. *Id.* ¶ 41. Some showers have no hot water, while other showers have no cold water. *Id.* The open dormitories house 66 people in bunk beds with no privacy. *Id.* ¶ 56. Each dormitory has one bathroom with several sinks and toilets. *Id.* The showers in the shared bathroom do not have temperature control. *Id.* Conflict and violence occur frequently in the open dormitories. *Id.* Detainees refer to the open dormitories as the "Chicken Coop" because of the unsanitary conditions and overcrowding. *Id.*

CoreCivic does not adequately furnish detainees with basic hygiene products like toilet paper, soap, lotion, or toothpaste. *Id.* ¶ 42. Instead, CoreCivic instructs detainees to buy these basic necessities from the commissary. *Id.* CoreCivic also provides no means for detainees to contact people outside Stewart other than expensive phone cards available for purchase at the commissary. *Id.* ¶¶ 45-47. The commissary is the only place detainees can purchase hygiene products, clothes, or phone cards. *Id.* ¶ 37. Detainees must use funds from their inmate fund accounts to make purchases. *Id.* ¶ 38. Detainees therefore rely on access

to the commissary to purchase basic necessities and phone cards. *Id.* ¶ 58.

## II.  **Stewart's "Voluntary Work Program"**

CoreCivic operates a "voluntary work program" at Stewart. *Id.* ¶ 27.  CoreCivic assigns program participants to various jobs in the facility.  *Id.* ¶ 29.  Responsibilities include scrubbing bathrooms, cleaning the medical center, preparing meals, washing detainees' laundry, and cleaning floors.  *Id.* ¶ 30.  CoreCivic generally pays detainees in the program between $1 and $4 per day. *Id.* ¶ 31.  CoreCivic deposits detainees' wages into their inmate fund accounts so the detainees may purchase items at the commissary.  *Id.* ¶ 38.

Detainees in the voluntary work program are spared from some of Stewart's more unfavorable conditions.  Program participants are not housed in the Chicken Coop.  Instead, they are provided more favorable living quarters with private two-person cells, a shared common area, a bathroom shared with only one other cellmate, and a shower with temperature control.  *Id.* ¶ 55.  But when participants refuse to work, CoreCivic threatens to transfer them back to the Chicken Coop, *id.* ¶ 54, revoke their access to the commissary, *id.* ¶ 57, transfer them to solitary confinement, *id.* ¶ 59, or initiate criminal proceedings against them, *id.* ¶ 50.

Plaintiffs allege that CoreCivic maintains deplorable conditions as part of a "deprivation scheme" that provides

CoreCivic with a cheap supply of labor to operate the facility, thereby enabling CoreCivic to increase its profits. *Id.* ¶¶ 1-2, 59-60. According to Plaintiffs, this scheme operates as follows: (1) CoreCivic deprives detainees of basic necessities, including toothpaste, soap, toilet paper, privacy, safety, and contact with loved ones; (2) detainees must participate in the voluntary work program to move to humane accommodations and to earn money to purchase necessities at the commissary; and (3) once detainees are in the program, CoreCivic threatens to harm or actually harms those who refuse to work. *Id.* ¶ 1. Therefore, according to Plaintiffs, participation in the "voluntary" work program is "not 'voluntary' in any meaningful sense." *Id.* ¶ 36.

## III. Named Plaintiffs

Barrientos, Velazques-Galicia, and Ahmed either are working or previously worked as kitchen workers in the program. *Id.* ¶¶ 62, 78, 86. Specifically, Barrientos alleges CoreCivic threatened to transfer him to the Chicken Coop, *id.* ¶¶ 69-70, revoke his access to the commissary, *id.* ¶ 71, and put him in solitary confinement, *id.* ¶ 72, when he refused to work or when CoreCivic believed he was organizing a work stoppage. Velazquez-Galicia alleges that he witnessed CoreCivic threaten to transfer detainees who decline to work from the preferable two-person cells to the Chicken Coop. *Id.* ¶ 82. Ahmed alleges that CoreCivic threatened to put him in solitary confinement if he stopped working. *Id.* ¶ 89. He also

alleges that CoreCivic actually put him in solitary confinement for ten days for threatening a work stoppage after he had not been paid. *Id*. ¶ 90.   All three allege that they participate (or participated) in the work program because of CoreCivic's threats of harm and because of CoreCivic's deprivation scheme. *Id*. ¶¶ 75, 83, 91.   They bring this action on behalf of themselves and all others similarly situated.   Plaintiffs' proposed classes are limited to detainees who actually participate or participated in the voluntary work program. *Id*.

DISCUSSION

Plaintiffs assert two categories of claims against CoreCivic: (1) civil liability for violations of the TVPA and (2) claims for unjust enrichment under Georgia law.   CoreCivic moved to dismiss all of Plaintiffs' claims.   For the following reasons, CoreCivic's motion is denied.

## I.   TVPA Claims

As to Plaintiffs' TVPA claims, the question presented is whether Plaintiffs have alleged sufficient facts in their Complaint, which if ultimately proven to be true, could subject CoreCivic to civil liability under the TVPA.   The TVPA provides a private cause of action against anyone:

(a)   Who[] knowingly provides or obtains the labor or
      services of a person by any one of, or by any combination
      of, the following means—

      (1)   by means of force, threats of force, physical
            restraint, or threats of physical restraint to that
            person or another person;

      (2)   by means of serious harm or threats of serious harm
            to that person or another person;

      (3)   by means of the abuse or threatened abuse of law or
            legal process; or

      (4)   by means of any scheme . . . intended to cause the
            person to believe that, if that person did not
            perform such labor or services, that person or
            another person would suffer serious harm or
            physical restraint[.]

18 U.S.C. § 1589(a). The TVPA defines "serious harm" as "any harm,
whether physical or nonphysical, including psychological,
financial, or reputational harm, that is sufficiently serious,
under all the surrounding circumstances, to compel a reasonable
person of the same background and in the same circumstances to
perform or to continue performing labor or services in order to
avoid incurring that harm." *Id*. § 1589(c)(2).

     CoreCivic contends that Plaintiffs fail to state a claim under
the TVPA because Congress did not intend the statute to apply to
lawfully held detainees.  In the alternative, CoreCivic argues
that Plaintiffs failed to allege sufficient facts to state a claim
under the "abuse of legal process" prong.  *Id*. § 1589(a)(3).
Finally, CoreCivic contends that Plaintiffs' TVPA claims for

7

conduct prior to December 23, 2008 are barred.  These arguments
are addressed in turn.

A.    Plaintiffs Stated Claims under the Plain Language of the
      TVPA

CoreCivic argues that the TVPA is intended to apply narrowly
to forced labor in the human trafficking context and that applying
it to detainee work programs is "absurd" and contrary to the
intentions of Congress.  CoreCivic's argument has superficial
appeal and some support from the TVPA's legislative history.  But
it ignores the plain language of the statute.  It also
misunderstands "the absurdity doctrine," which is a narrow
exception to the fundamental principle that statutory
interpretation must be anchored to the plain language of the
statute.

CoreCivic points to evidence of congressional intent in
support of its position.  *See* 22 U.S.C. § 7101 (setting forth the
congressional purposes and findings regarding the TVPA); *id*.
§ 7101(a) ("The purposes of this chapter are to combat trafficking
in persons, a contemporary manifestation of slavery whose victims
are predominantly women and children, to ensure just and effective
punishment of traffickers, and to protect their victims.").  But
when interpreting a statute, the Court must presume that Congress
says what it means and means what it says.  *Conn. Nat'l Bank v.
Germain*, 503 U.S. 249, 253-54 (1992).  If Congress intended the

TVPA to apply narrowly to human traffickers or human trafficking-related labor only, it could have easily limited § 1589 or § 1595 to those circumstances by saying so in those sections of the Act. Congress placed no such restriction in the statute but chose instead to broadly prohibit "whoever" from "obtain[ing] labor" by any of the proscribed means.  18 U.S.C. § 1589(a).  The Court thus declines to read an implied exclusion for lawfully confined victims into the statute.  Of course, the lawful force necessary to detain the detainees cannot be the source for the TVPA claims.  But Plaintiffs allege that although they may be lawfully detained, they cannot be forced to labor in violation of the TVPA.[1]

To the extent CoreCivic relies on the "absurdity doctrine" as an exception to the fundamental principle that courts must apply statutes as written, the Court finds that this exception does not apply here.  The "absurdity doctrine" can be traced back to the English common law.  As Blackstone explained in his Commentaries, "[W]here words bear . . . a very absurd signification, if literally understood, we must a little deviate from the received sense of them."  William Blackstone, *Commentaries on the Laws of England* § 2, at 60 (4th ed. 1770).  As understood in the English common law: "[I]n construing . . . all written instruments, the

---

[1] CoreCivic points to other textual "clues" that bolster its position that the statute did not intend to apply to immigrant detainees.  But these textual clues from other statutes do nothing to undermine the plain language of the TVPA.

grammatical and ordinary sense of the words is to be adhered to, unless that would lead to some absurdity, or some repugnance or inconsistency with the rest of the instrument, in which case the grammatical and ordinary sense of the words may be modified so as to avoid that absurdity and inconsistency, but no farther." *Grey v. Pearson,* (1857) 10 Eng. Rep. 1216, 1234; 6 H.L. Cas. 61, 106 (Lord Wensleydale).

The absurdity doctrine, however, does not authorize "judicial revision of public and private texts to make them (in the judge's view) more reasonable." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 237 (2012). To avoid such judicial mischief, the doctrine has two limiting conditions: (1) "[t]he absurdity must consist of a disposition that no reasonable person could intend;" and (2) "[t]he absurdity must be reparable by changing or supplying a particular word or phrase whose inclusion or omission was obviously a technical or ministerial error." *Id*. at 237-38. The drafter's failure to fully appreciate the effect of a plainly written statute does not bring it within the absurdity doctrine. *Id*. at 238.

CoreCivic points to no particular word or phrase in the TVPA that it claims must be corrected. Instead, it argues that the statute does not apply to persons who are held lawfully as detainees by the government. It relies upon no language in the statute for this broad assertion. It simply points to legislative

10

history outlining the motivation for the enactment of the statute. Thus, it asks the Court rewrite the statute by effectively adding a provision stating, "this statute shall not apply to anyone who uses labor of detainees who are lawfully detained pursuant to a contract with a governmental agency."  The absurdity doctrine does not authorize the Court to re-draft a statute.  CoreCivic may find it absurd that Congress drafted the TVPA in such a way that it theoretically reaches the conduct alleged here.  And one can speculate that Congress did not foresee the application of its plain language to these circumstances.  But this Court cannot rewrite statutes to avoid what it may perceive to be an unintended consequence or even an absurd public policy result.  Congress is alone responsible for any such absurdities and lack of legislative foresight.  Moreover, the Constitution gives it the exclusive power to fix them.

The Court's ruling today that Plaintiffs have stated a claim for relief under the TVPA certainly does not mean they will ultimately prevail.  They must of course still prove their allegations.  And in doing so, they will be required to point to evidence that supports the reasonable conclusion that CoreCivic threatened them with a serious risk of harm if they did not persist as laborers.  That burden will be a heavy one.  But they have today

plausibly stated such allegations to overcome CoreCivic's motion to dismiss.[2]

B.  **Plaintiffs Alleged Sufficient Facts to State a Claim under § 1589(a)(3)**

CoreCivic alternatively contends that Plaintiffs have not plausibly alleged that CoreCivic obtained their labor through actual or threatened abuse of the legal process under § 1589(a)(3). Under the statute, "[t]he term 'abuse or threatened abuse of the legal process' means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1). According to the Complaint, CoreCivic provided each detainee with a "detainee orientation handbook," which explains that refusing to work or organizing a work stoppage is punishable by initiation of criminal proceedings. Compl. ¶ 50. And Plaintiffs clearly allege that CoreCivic threatened to

---

[2] CoreCivic does not argue that Plaintiffs have failed to *allege* a sufficient threat of harm under the TVPA. Thus, the Court leaves for another day whether Plaintiffs must prove that the conditions in the Chicken Coop do not meet the constitutional conditions of confinement standard in order to show a serious threat of harm for TVPA purposes. For prison conditions of confinement claims, deprivations must be objectively and sufficiently serious or extreme such that they constitute a denial of the "minimal civilized measure of life's necessities." *Thomas v. Bryant,* 614 F.3d 1288, 1304 (11th Cir. 2010). The same standard applies in the pretrial detainee context. *Keith v. Dekalb Cty.*, 749 F.3d 1034, 1044 n.35 (11th Cir. 2014).

initiate criminal proceedings against detainees when detainees refused to work.  *Id*. ¶ 111.  If discovery reveals that CoreCivic made no such threats, then summary judgment will be proper.  But at this stage, Plaintiffs have plausibly alleged a claim under the "legal process" prong of the TVPA.

C.  Plaintiffs Stated TVPA Claims for Conduct Prior to December 23, 2008

When Congress first enacted the TVPA in 2000, it did not authorize a private right of action for violation of its provisions.  *See generally* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464. Congress amended the TVPA in 2003 to provide a private right of action against "perpetrators" of TVPA violations.  Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, 117 Stat. 2875.  Congress amended the TVPA again in December 2008 to expand the class of individuals against whom a private right of action could be brought.  After the 2008 amendments, a plaintiff could bring a TVPA claim not only against "perpetrators," but also against "whoever knowingly benefits" financially or otherwise from a scheme they knew or should have known violated the TVPA.  William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044.

CoreCivic characterizes Plaintiffs' TVPA claims as arising exclusively under this "financial benefit" prong of the TVPA's

private right of action provision. *See* 18 U.S.C. § 1595(a). Therefore, it contends that Plaintiffs cannot state a TVPA claim for conduct prior to December 23, 2008 (the date Congress expanded the TVPA's private right of action). But Plaintiffs' Complaint arguably alleges a cause of action against CoreCivic as both a perpetrator and as a financial beneficiary. *See* Compl. ¶ 104 ("Plaintiffs are authorized to bring this [TVPA] claim . . . because CoreCivic violated the forced labor provisions of [§ 1589]."); *id*. ¶ 105 ("Plaintiffs . . . *also* are authorized to bring this [TVPA] claim . . . because CoreCivic knowingly benefitted financially" from the deprivation scheme (emphasis added)). Therefore, to the extent Plaintiffs' TVPA claim is premised on CoreCivic actually perpetrating TVPA violations as opposed to only benefitting financially from violations, this claim may encompass conduct as early as 2003, subject to the applicable statute of limitations. But CoreCivic cannot be liable for only knowingly benefitting from the deprivation scheme until after December 23, 2008.[3]

---

[3] The Court notes that Plaintiffs' proposed TVPA class is defined as all participants in the voluntary work program "within the past ten years up to the date the class is certified." Compl. ¶ 94(a). Plaintiffs filed this action on April 17, 2018. And the Court has not yet certified the class. Therefore, unless the class is certified before December 23 of this year, Plaintiffs' TVPA claims will effectively be limited to conduct occurring after the 2008 amendments anyway.

## II.  Unjust Enrichment Claims

Plaintiffs assert claims under Georgia law for unjust enrichment.  "The concept of unjust enrichment in law is premised upon the principle that a party cannot induce, accept, or encourage another to furnish or render something of value to such party and avoid payment for the value received."  *Vernon v. Assurance Forensic Accounting, LLC*, 774 S.E.2d 197, 212 (Ga. Ct. App. 2015) (quoting *Jones v. White*, 717 S.E.2d322, 328 (Ga. Ct. App. 2011)) (explaining that for purposes of an unjust enrichment claim conferring a "benefit" means providing "any form of advantage" even if it was not "earned"); *see also Reynolds v. CB&T,* 805 S.E.2d 472, 478-79 (Ga. Ct. App. 2017) (reversing grant of summary judgment on unjust enrichment claim based upon lender inducing borrower to finish construction of home and nevertheless foreclosing on the home when construction complete).  Although most unjust enrichment claims are based on the party being induced into some transaction with a reasonable expectation of receiving something in return, the Georgia courts have recognized that an unjust enrichment claim can be based on allegations of coercion. *See Estate of Crook v. Foster*, 775 S.E.2d 286, 287-90 (Ga. Ct. App. 2015) (reversing trial court's grant of summary judgment on unjust enrichment claim where plaintiff claimed defendant coerced her into putting defendant's name on deed).

Here, Plaintiffs allege that CoreCivic coerced them to provide labor to CoreCivic, that CoreCivic benefitted from that labor, and that CoreCivic should compensate Plaintiffs for the benefit they conferred on CoreCivic because allowing CoreCivic to keep that benefit would be unjust.   The Court cannot say that Georgia would not recognize an unjust enrichment claim under these circumstances.   Accordingly, CoreCivic's motion to dismiss Plaintiffs' unjust enrichment claims is denied.

CONCLUSION

Based on the foregoing, CoreCivic's motion to dismiss (ECF No. 30) is denied.

CERTIFICATE FOR IMMEDIATE APPEAL

Whether the TVPA applies to work programs in federal immigration detention facilities operated by private for-profit contractors is a controlling question of law as to which there is substantial ground for difference of opinion.   The Court today finds that the TVPA does apply under the circumstances alleged in Plaintiffs' Complaint.   This determination thus allows this litigation to proceed which will not only involve extensive fact discovery but also class certification proceedings.   If the Court's conclusion is wrong and the primary (maybe only) basis for federal jurisdiction is removed, these subsequent proceedings will have been for naught.   Therefore, an immediate appeal may materially advance the ultimate termination of the litigation.   Of course, if

16

today's order is affirmed, these proceedings will have arguably been unnecessarily delayed.  But given the nature of the issue to be decided on appeal and the implications of today's ruling, the undersigned is of the opinion that an immediate appeal is appropriate pursuant to 28 U.S.C. § 1292(b).  All proceedings in this Court are stayed pending resolution of any application for interlocutory appeal.

IT IS SO ORDERED, this 17th day of August, 2018.

S/Clay D. Land
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA