[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-15081
_____

D.C. Docket No. 4:18-cv-00070-CDL


WILHEN HILL BARRIENTOS,
individually and on behalf of all others similarly situated,
MARGARITO VELAZQUEZ-GALICIA,
individually and on behalf of all others similarly situated,
SHOAIB AHMED,
individually and on behalf of all others similarly situated,

Plaintiffs-Appellees,

versus

CORECIVIC, INC.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(February 28, 2020)

Before HULL and MARCUS, Circuit Judges, and ROTHSTEIN,[*] District Judge.

HULL, Circuit Judge:

In this case, Appellees Wilhen Hill Barrientos, Margarito Velazquez-Galicia, and Shoaib Ahmed, current and former alien detainees, brought a class action lawsuit against Appellant CoreCivic, Inc., a private contractor, which owns and operates the Stewart Detention Center in Lumpkin, Georgia ("Stewart"). Stewart is a federal immigration detention facility where aliens are held during the pendency of removal proceedings or for other reasons related to enforcement of the nation's immigration laws. At Stewart, CoreCivic, as a private contractor, is required to operate what is referred to as a "voluntary work program," through which detainees may perform work for compensation.

Appellees' complaint alleged that, far from operating a "voluntary" work program, CoreCivic coerces alien detainees to perform labor at Stewart by, inter alia, the use or threatened use of serious harm, criminal prosecution, solitary confinement, and the withholding of basic necessities. Appellees' complaint asserted that CoreCivic's labor scheme violated, and continues to violate, the forced-labor prohibition in the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589, 1594–95, and Georgia law. The TVPA subjects to criminal and

---

[*]Honorable Barbara J. Rothstein, United States District Judge for the Western District of Washington, sitting by designation.

civil liability "[w]hoever" knowingly obtains the labor or services of a "person" by any one of the prohibited coercive means explicitly listed in the TVPA.  18 U.S.C. §§ 1589(a), 1595.

CoreCivic moved to dismiss the complaint, contending that the TVPA does not apply to a private government contractor or cover labor performed in work programs by alien detainees in lawful custody of the U.S. government.  Although it denied the motion, the district court certified for immediate appeal the narrow, purely legal question of "[w]hether the TVPA applies to work programs in federal immigration detention facilities operated by private for-profit contractors."  See 28 U.S.C. § 1292(b).  We granted CoreCivic's petition for permission to immediately appeal the district court's order.

After review, and with the benefit of oral argument, we conclude that: (1) under the plain language of the statute, the TVPA covers the conduct of private contractors operating federal immigration detention facilities; (2) the TVPA does not bar private contractors from operating the sort of voluntary work programs generally authorized under federal law for aliens held in immigration detention facilities; but (3) private contractors that operate such work programs are not categorically excluded from the TVPA and may be liable if they knowingly obtain or procure the labor or services of a program participant through the illegal coercive means explicitly listed in the TVPA.  Because our review is limited to the

legal question of the TVPA's applicability to private contractors operating federal immigration detention facilities, we do not at this time address whether the factual allegations in the complaint are sufficient to state a TVPA claim.

## I. BACKGROUND

The question certified by the district court concerns the TVPA and work programs in federal immigration detention facilities.  We review the TVPA, the relevant work programs, and then the district court proceedings.

### A. The TVPA

The TVPA prohibits knowingly "obtain[ing] the labor or services of a person" by any one of, or combination of, the following means:

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or
>
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a) (collectively, the "illegal coercive means").  Section 1589(a) applies to "[w]hoever" knowingly provides or obtains such forced labor or services from a "person."  Id.

In turn, § 1595(a) provides a private cause of action for any victim of a violation of § 1589.  18 U.S.C. § 1595(a).  Under § 1595(a), "[a]n individual who is a victim of a violation" of the TVPA "may bring a civil action against the perpetrator," as well as against anyone who "knowingly benefits, financially or by receiving anything of value," from any such violation.  Id.

**B. Work Programs in ICE Detention Facilities**

U.S. Immigration and Customs Enforcement ("ICE") detains certain aliens during the pendency of removal proceedings or for other reasons related to enforcement of the nation's immigration laws.  ICE detains some of those aliens in facilities operated by private contractors.  Appellant CoreCivic is a private contractor that operates several detention centers throughout the country, including the Stewart Detention Center in Lumpkin, Georgia, where Appellees were or are being held.[1]

CoreCivic, as a private contractor operating an ICE detention facility, is subject to, and required to follow, the Performance-Based National Detention Standards ("PBNDS"), the operative version of which was promulgated in 2011 and revised in 2016.  See U.S. Immigration & Customs Enf't, Performance-Based National Detention Standards 2011 (rev. 2016), available at

---

[1]CoreCivic operates the Stewart Detention Center through a contract with Stewart County, Georgia.  The County is a party to an Intergovernmental Service Agreement with ICE, pursuant to which it detains aliens on ICE's behalf.

https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.  The

PBNDS are designed to ensure a safe and secure detention environment that meets

detainees' basic needs and is consistent with applicable legal requirements.

The PBNDS state that detention centers may require all detainees to

"maintain their immediate living areas in a neat and orderly manner" through

certain "personal housekeeping" tasks such as "making their bunk beds daily,"

"stacking loose papers," and "keeping the floor free of debris."  Id. § 5.8(V)(C).

Beyond these basic required tasks, detainees "shall not be required to work," and

all other "[w]ork assignments are voluntary."  Id. §§ 5.8(II)(2), 5.8(V)(C).

As to voluntary work, the PBNDS further state that "[d]etainees shall be

provided the opportunity to participate in a voluntary work program" through

which they may earn monetary compensation.[2]  Id. §§ 5.8(I), 5.8(V)(A) (emphasis

added).  The purpose of such voluntary work programs is to reduce "[t]he negative

impact of confinement . . . through decreased idleness, improved morale and fewer

disciplinary incidents."  Id. § 5.8(II)(4).  However, the facility administrator must

operate the voluntary work program in compliance with the PBNDS, which

regulate the selection of detainees, the hours of work (no more than 8 hours per

day and 40 hours per week), the minimum compensation for completed work (at

---

[2]Since 1950, Congress has authorized ICE and its predecessor agencies to pay detained aliens "for work performed" "while held in custody under the immigration laws."  8 U.S.C. § 1555(d).

least $1.00 per day), the number of work assignments a detainee can perform, and the conditions under which that work occurs.  Id. §§ 5.8(V)(D)–(O).  The PBNDS delegate the site-specific rules for each work program to the "facility administrator."  Id. § 5.8(V)(D).

Detainees may be removed from the voluntary work program for causes such as "unsatisfactory performance" or "disruptive behavior," or as a "sanction imposed . . . for an infraction of a facility rule, regulation or policy."  Id. § 5.8(V)(L).  Additionally, the PBNDS specify that participants in the voluntary work program are "expected to be ready to report for work at the required time," "may not leave an assignment without permission," and "may not evade attendance and performance standards in assigned activities nor encourage others to do so." Id. § 5.8(V)(M).

The PBNDS otherwise provide for disciplinary action against detainees outside the context of the voluntary work program.  See generally id. § 3.1.  The PBNDS identify four categories of offenses and prescribe appropriate sanctions for each category.  Id. §§ 3.1(V)(C), 3.1 app. A.  Those categories are "greatest," "high," "high moderate," and "low moderate."[3]  Id.  According to the PBNDS, all

---

[3]For example, the PBNDS define "[r]efusing to clean assigned living area" as a "high moderate" offense, while "failing to keep self and living area in accordance with posted standards" is a "low moderate" offense.  PBNDS § 3.1 app. A.  While the PBNDS define "[e]ncouraging others to participate in a work stoppage or to refuse to work" as a "high" offense, there is no specific offense prescribed in the PBNDS for a detainee who, after signing up for the voluntary work program, refuses to complete his assigned tasks.  See generally id.

four categories of infractions are punishable by a "[l]oss of privileges"—including "commissary, vending machines, movies, recreation, etc."—and a "[c]hange [in] housing," among other sanctions.  Id. § 3.1 app. A.  Additionally, all but the lowest category of infractions are punishable by the initiation of criminal proceedings and "[d]isciplinary segregation" of varying length based on the severity of the infraction.  Id.

## II. DISTRICT COURT PROCEEDINGS

### A. Complaint

In their complaint, Appellees alleged that the voluntary work program as implemented by CoreCivic was, in fact, anything but voluntary.  Rather, the complaint alleged, aliens detained at Stewart work because they have no other meaningful choice.  The complaint alleged CoreCivic was operating, and continues to operate, a "deprivation scheme" by which it forces detainees to participate in the work program through threats of "serious harm" in the form of deprivation of privacy and safety, threats of referral for criminal prosecution, and threats of solitary confinement; through withholding basic necessities like food, toothpaste, toilet paper, and soap; and through deprivation of outside contact with loved ones.

Appellees' complaint claimed that, by engaging in this alleged forced-labor "scheme," CoreCivic ran afoul of §§ 1589(a)(1), (a)(2), (a)(3), and (a)(4) in that it was knowingly "obtain[ing] . . . labor" by means of: (1) "force, threats of force,

8

physical restraint, or threats of physical restraint"; (2) "serious harm or threats of serious harm"; (3) "the abuse or threatened abuse of the law or legal process"; and (4) a "scheme . . . intended to cause [a] person to believe that, if that person did not perform . . . labor or services, that person . . . would suffer serious harm or physical restraint."  18 U.S.C. §§ 1589(a)(1)–(4).  Appellees' complaint claimed that this forced-labor scheme—which remains ongoing—operates as follows.

The conditions at Stewart are alleged to be poor, particularly in the "open dormitories," which detainees refer to as the "Chicken Coop" due to the unsanitary conditions and overcrowding.  The showers in the Chicken Coop, for example, are said to be moldy and without temperature control.  CoreCivic allegedly does not provide detainees with basic hygiene products, including toilet paper, soap, and toothpaste.  Detainees must purchase these items from the commissary when they run out.  They also must purchase expensive "phone cards" from the commissary if they wish to speak with loved ones who are unable to make the trip to the detention center.

Detainees who participate in CoreCivic's voluntary work program, however, are spared some of Stewart's more unfavorable conditions and—because they are paid between $1.00 and $4.00 per day—are able to purchase necessities from the commissary.  For example, according to Appellees' complaint, work program participants are not housed in the "Chicken Coop," but are provided two-person

cells, a shared common area, a bathroom shared with only one other cellmate, and a shower with temperature control. Appellees' complaint alleged that, once detainees are in the work program, CoreCivic threatens to harm or actually harms those who refuse to work.

In short, Appellees' complaint alleged that CoreCivic subjects detainees to inhumane conditions by depriving them of basic necessities and livable accommodations, detainees join the so-called voluntary work program to alleviate these conditions, and CoreCivic then threatens any program participants who refuse to work. In this way, Appellees claim, CoreCivic effectively forces detainees to continually work and participate in the program. Appellees allege that this provides CoreCivic with a cheap supply of labor to operate the facility with, which enables CoreCivic to increase its profits.

The three named plaintiffs—Barrientos, Velazquez-Galicia, and Ahmed—all either are working or previously worked as kitchen workers as part of the voluntary work program at Stewart. However, they all claimed their participation in the work program was not voluntary in any meaningful sense, as they were subject to the above-described "deprivation scheme." Additionally, all three alleged they were subject to or witnessed threats from CoreCivic employees once they began participating in the work program.

10

Barrientos, a citizen of Guatemala seeking asylum in the United States, earned between $1.00 and $4.00 per day as part of the voluntary work program, though he makes up to $8.00 per day if CoreCivic requires him to work 12 hours or more in one day.  He alleged CoreCivic threatened to transfer him to the Chicken Coop, revoke his access to the commissary, and put him in solitary confinement if he stopped working, called in sick, refused to change shifts, or encouraged others to stop working.

Velazquez-Galicia is a citizen of Mexico who intends to seek relief from deportation and whose wife and two children are U.S. citizens.  He too is employed as a kitchen worker and is paid between $1.00 and $4.00 per day or up to $8.00 per day if he is required to work more than 12 hours in one day.  He alleged he witnessed CoreCivic employees threaten to transfer detainees who declined to work from the preferable two-person cells to the Chicken Coop.

Ahmed is a citizen of Bangladesh who was detained at Stewart until February 2018, when he allegedly opted to give up his asylum case in part due to his desire to escape Stewart's poor conditions.  Ahmed was paid $4.00 per day as a kitchen worker.  Like the other plaintiffs, he earned additional money if he worked 12 hours or more.  He alleged that CoreCivic employees threatened to place him in solitary confinement if he stopped working, and actually did place him in solitary

11

confinement for ten days when he threatened a work stoppage after he was not paid.

## B. District Court's Order

CoreCivic moved to dismiss the complaint, arguing that Appellees' complaint failed to state a claim under the TVPA because Congress did not intend the statute to apply at all to alien detainees in the lawful custody of the U.S. Government or to private contractors operating immigration detention facilities. The district court disagreed, finding "the plain language of the statute" clearly encompassed claims brought by alien detainees held in privately run detention facilities. The district court "decline[d] to read an implied exclusion for lawfully confined victims into the statute."

The district court recognized, however, that "[w]hether the TVPA applies to work programs in federal immigration detention facilities operated by private for-profit contractors is a controlling question of law as to which there is substantial ground for difference of opinion." We agreed, and granted CoreCivic's petition for immediate appeal.

### III. DISCUSSION

## A. Our Limited Review

As an initial matter, we clarify the scope of our review. Although the district court identified a discrete legal question in its order, "appellate jurisdiction

12

[under § 1292(b)] applies to the order certified to the court of appeals, and is not tied to the particular question formulated by the district court." Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 205, 116 S. Ct. 619, 623 (1996).  Thus, while we "may not reach beyond the certified order," we "may address any issue fairly included within the certified order."  Id.  That said, we think it appropriate to limit our review to the discrete and abstract legal issue the district court identified. See McFarlin v. Conseco Servs., LLC, 381 F.3d 1251, 1259 (11th Cir. 2004) ("The legal question must be stated at a high enough level of abstraction to lift the question out of the details of the evidence or facts of a particular case and give it general relevance to other cases in the same area of law.").

Because we limit our review to the discrete and abstract legal issue of the TVPA's applicability to a certain class of cases, we are not concerned with the specific factual allegations in the complaint, apart from the nature of the parties (legally detained immigrants seeking to assert claims against a private, for-profit, government contractor) and, to a lesser extent, the fact that the claims arise out of the operation of a work program required by the PBNDS.  In other words, we do not address whether the complaint in this case sufficiently alleged a violation of the TVPA, assuming it applies to private contractors like CoreCivic.  We also do not offer any opinion on CoreCivic's operation of work programs generally.  Indeed, we decline to address the adequacy of the complaint—or any other fact-intensive

13

inquiry—at this stage in the litigation.  See Mamani v. Berzain, 825 F.3d 1304, 1312–13 (11th Cir. 2016) (declining to address, in an interlocutory appeal, whether a complaint stated a claim for relief under the Torture Victim Protection Act because the issue did not ask the court "to decide a pure or abstract question about the TVPA itself").[4]

## B. Analysis

As to the discrete legal question before us, CoreCivic has not asked us to adopt a construction of the statute that would exempt federal contractors from any and all liability under the TVPA.  Rather, CoreCivic asks us to hold that the TVPA (specifically § 1589) can never apply in the specific context of a "federally mandated voluntary work program in a detention setting," even where the work performed through that program is obtained through, for example, force, physical restraint, or threats of serious harm.  CoreCivic insists that its construction of the

---

[4]We deny Appellees' request to set aside the motions panel's order granting Appellant CoreCivic permission to appeal.  We recognize that, like any decision made by a motions panel, a petition for interlocutory review under § 1292(b) may be improvidently granted.  See 11th Cir. R. 27-1(g); McFarlin, 381 F.3d at 1253.  Appellees insist that CoreCivic essentially asks us to consider fact-driven issues not appropriate for review under § 1292(b) and that, contrary to the district court's conclusion, the unambiguous language of the statute leaves no room for a substantial difference of opinion.

However, we agree with the district court that its order involves a pure question of law that controls at least a substantial part of the case and about which there is substantial ground for a difference of opinion, and that its resolution may well substantially reduce the amount of litigation necessary on remand.  See 28 U.S.C. § 1292(b).  A ruling in favor of CoreCivic on this pure question of law would eliminate Appellees' sole federal claim and leave behind only one state law claim.  And our answer to the legal question presented does not depend on any facts or the factual record below.  In short, this appeal satisfies § 1292(b)'s requirements.

statute would be consistent with the text, structure, and purpose of the TVPA.  In support of its argument, CoreCivic points to: (1) the text of § 1589, particularly the requirement that one "obtain[] the labor or services of a person"; (2) the fact that, when Congress enacted the TVPA, it had long authorized labor by alien detainees; (3) the fact that courts have consistently held that alien detainees can be required to perform labor while in detention; (4) the express purpose of the TVPA, as well as the legislative history leading to its enactment; and (5) the rule of lenity, which CoreCivic argues favors judicial restraint in the construction of this criminal statute.

The question of statutory interpretation is a legal issue we review de novo. Wiersum v. U.S. Bank, N.A., 785 F.3d 483, 485 (11th Cir. 2015).  "The interpretation of a statute begins with its language."  United States v. St. Amour, 886 F.3d 1009, 1013 (11th Cir.), cert. denied, 139 S. Ct. 205 (2018); see also Artis v. District of Columbia, 583 U.S. ___, ___, 138 S. Ct. 594, 603 (2018) ("In determining the meaning of a statutory provision, we look first to its language, giving the words used their ordinary meaning."  (quotation marks omitted)).  We first "determine whether the language at issue has a plain and unambiguous meaning," and, "[i]f so, we need go no further."  St. Amour, 886 F.3d at 1013 (quotation marks omitted).

15

As laid out above, the TVPA creates a cause of action—both criminal and civil—against "[w]hoever knowingly provides or obtains the labor or services of a person" by various illegal coercive means.  18 U.S.C. §§ 1589(a), 1595(a).  We, like the district court, find this language to be "plain and unambiguous."  See St. Amour, 886 F.3d at 1013.  The use of the general terms "[w]hoever" and "person" evinces no intent on the part of Congress to restrict the application of the statute to particular actors or particular victims.  Instead, the clear and unambiguous language of the statute limits liability only by reference to the actions taken by a would-be violator: it applies to anyone who knowingly "obtains the labor or services of a person" through one of the four illegal coercive means explicitly listed in the statute.  No other limiting principle is evident from the plain text.

Indeed, the Dictionary Act—which provides the definition of various terms for courts to use in "determining the meaning of any Act of Congress"—states that the word "whoever" when used in a statute "include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."  1 U.S.C. § 1.  Congress's express inclusion of corporations and companies in the general definition of "whoever" presumptively indicates that a private, for-profit government contractor—like CoreCivic—falls within the meaning of "[w]hoever" for purposes of the TVPA.

Despite the statute's use of general terms to describe its coverage, CoreCivic asks us to read into the statute a limiting principle: that Congress could not have intended alien detainees participating in voluntary work programs to sue and make use of this statute. But "the presumed point of using general words is to produce general coverage—not to leave room for courts to recognize ad hoc exceptions." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 101 (2012). The primary textual argument CoreCivic makes is that the words "obtains the labor or services of a person" do not naturally encompass federally mandated voluntary work programs for alien detainees of the type run by CoreCivic. This is because CoreCivic, like any contractor operating an immigration detention facility on ICE's behalf, is required to provide a voluntary work program for detainees, and thus it cannot illegally "obtain[] the labor" of detainees through such a program. See PBNDS § 5.8(V)(A).

But the fact that the PBNDS require CoreCivic to operate a work program for detainees does not mean that such a program can never be operated in a manner—i.e., by forcing labor through illegal coercive means—that violates the TVPA. If CoreCivic, or any other private for-profit contractor, actually forces detainees to provide labor (whether through a work program or not) through any of the illegal coercive means explicitly proscribed by the TVPA, it has "obtain[ed] the labor or services of a person" in violation of the TVPA. Again, nothing in the text

17

of the statute excludes federal contractors providing immigration detention services from liability under the TVPA, even when that liability might arise out of the operation of a federally mandated work program.  And nothing in the PBNDS permits CoreCivic, or other private contractors operating immigration detention facilities, to force detainees to perform labor (beyond personal housekeeping tasks), and certainly not through the illegal coercive means explicitly listed in the TVPA.

CoreCivic warns us against the unintended consequences of this construction of the statute, implying that this decision could open up criminal liability in any number of custodial settings in which detainees or prisoners are incentivized or required to perform work.  As CoreCivic notes, however, Congress itself has long authorized paid work by detained aliens, and federal courts (including this Court) have long held that such detainees or inmates can be required to perform labor while in detention.  8 U.S.C. § 1555(d); see, e.g., Villarreal v. Woodham, 113 F.3d 202, 207 (11th Cir. 1997) ("[N]o Court of Appeals has ever questioned the power of a correctional institution to compel inmates to perform services for the institution without paying the minimum wage." (quotation marks omitted)).  Our decision here does nothing to call this precedent into question.

To be clear, our opinion should not be read to call into question the legality of voluntary work programs in federal immigration detention facilities, or to call

18

into question longstanding requirements that detainees or inmates be required to perform basic housekeeping tasks.[5]  But the mere fact that CoreCivic—or any other private government contractor—is operating a work program at the behest of the federal government does not, in and of itself, shield CoreCivic from liability under the TVPA if it in fact obtains the forced labor of program participants through the illegal coercive means explicitly proscribed by the TVPA.  18 U.S.C. § 1589(a) (listing specific illegal coercive means).  All we hold today is that the plain language of the TVPA brings within its scope for-profit government contractors operating work programs in federal immigration detention facilities, and such entities are not categorically excluded or shielded from liability under the TVPA.

## C. Purpose and Legislative History

Having concluded that the "language at issue has a plain and unambiguous meaning," "we need go no further."  St. Amour, 886 F.3d at 1013 (quotation marks omitted); see also United States v. Noel, 893 F.3d 1294, 1297 (11th Cir. 2018) ("[I]f the statute's language is clear, there is no need to go beyond the statute's plain language into legislative history." (internal quotation marks omitted)), cert.

---

[5]As discussed above, in the interest of maintaining order in an immigration detention facility, the PBNDS authorize punishments for detainees who, among other things, refuse to complete basic personal housekeeping tasks or organize work stoppages.  See generally PBNDS § 3.1.  Our decision should likewise not be read to imply that these basic disciplinary measures, on their own, give rise to TVPA liability.

denied, 140 S. Ct. 157 (2019).[6]  We do acknowledge CoreCivic's arguments

concerning the purpose and legislative history of the TVPA, but where, as here, the

statutory text is not ambiguous, "[o]nly the most extraordinary showing of contrary

intentions in the legislative history will justify a departure from [the statutory]

language."  United States v. Albertini, 472 U.S. 675, 680, 105 S. Ct. 2897, 2902

(1985) (quotation marks omitted); see also Garcia v. United States, 469 U.S. 70,

75, 105 S. Ct. 479, 482 (1984) ("When we find the terms of a statute unambiguous,

judicial inquiry is complete, except in rare and exceptional circumstances."

(quotation marks omitted)).  We do not find any such extraordinary showing of

contrary intentions here.

As CoreCivic correctly points out, Congress enacted the TVPA as part of the

Victims of Trafficking and Violence Protection Act of 2000 "to combat trafficking

in persons, a contemporary manifestation of slavery whose victims are

predominantly women and children, to ensure just and effective punishment of

traffickers, and to protect their victims."  Victims of Trafficking and Violence

Protection Act of 2000, Pub. L. No. 106-386, § 102(a), 114 Stat. 1464, 1466

(codified at 22 U.S.C. § 7101).  Congress supported that purpose with 24

---

[6]CoreCivic's argument that the rule of lenity weighs in favor of its preferred construction of the statute is similarly foreclosed by our conclusion that the statutory text is unambiguous. See United States v. Maturin, 499 F.3d 1243, 1246 (11th Cir. 2007) ("Because [the statute] is clear, we need discuss neither legislative history nor the rule of lenity." (citing Salinas v. United States, 522 U.S. 52, 66, 118 S. Ct. 469, 478 (1997))).

legislative findings, all of which focus on human trafficking and involuntary servitude.  Id. § 102(b), 114 Stat. at 1466–69.  And the legislative history indicates that § 1589 in particular was "intended to address the increasingly subtle methods of traffickers who place their victims in modern-day slavery."  H.R. Rep. No. 106-939, at 101 (2000) (Conf. Rep.).

We do not find a private government contractor's obtaining forced labor through actual or threatened force, restraint, or serious harm to be so far removed from the purpose Congress identified as to cause us to look beyond the plain statutory language.  Just because Congress may have had in mind a particular narrow objective—here, combatting human trafficking—does not on its own justify a departure from the principle that we should give general terms their general meaning.  See Scalia & Garner, supra, at 103–04 ("The argument most frequently made against giving general terms their general meaning is the one made (and rejected) in the Slaughter-House cases—that those who adopted the provision had in mind a particular narrow objective (equal protection for blacks) though they expressed a more general one (equal protection for 'any person').").  As the Supreme Court has remarked, "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by

21

which we are governed."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75,

79, 118 S. Ct. 998, 1002 (1998).[7]

We also are not persuaded by CoreCivic's resort to Supreme Court decisions

it claims counsel against adopting a construction of a criminal statute, like the

TVPA, that may lead to results disconnected from Congress's purpose.  See

Marinello v. United States, 584 U.S. ___, 138 S. Ct. 1101 (2018); Yates v. United

States, 574 U.S. 528, 135 S. Ct. 1074 (2015); Bond v. United States, 572 U.S. 844,

134 S. Ct. 2077 (2014).  Those cases all involved some disconnect between the

purpose of the statute and the nature of the conduct alleged.  Here, in contrast,

Appellees have alleged that CoreCivic engaged in precisely the type of conduct

prohibited by the TVPA: obtaining labor by the specific illegal coercive means

explicitly set out in the statute.  CoreCivic's argument is not that it is incapable of

carrying out the prohibited conduct; instead, it insists that, even if it—or any other

private contractor operating an immigration detention facility—engaged in the

proscribed conduct, it cannot be the "[w]hoever" envisioned by the statute.  We see

---

[7]What's more, as the government notes in its amicus brief, "Congress has repeatedly emphasized that it seeks to stamp out any use of forced labor by federal contractors."  See Brief for the United States as Amicus Curiae in Support of Neither Party at 7.  Pointing to this history, along with the text and purpose of the TVPA, the government has adopted the position that "the TVPA does not contain an implicit exception for private providers of immigration detention services" and that Appellees "are not categorically barred from bringing a TVPA suit based on the conduct of a contractor or subcontractor that provides immigration detention services to the United States."  Id. at 8.  The government's position reinforces our conclusion that the results here are not wholly disconnected from Congress's purpose in enacting the TVPA.

no reason to read this limiting principle into the statute.  Congress wrote this statute plainly, and it is up to Congress, not us, to rewrite it.

We further note that, while none of our sister circuits has addressed the specific application of the TVPA now before us, they have found § 1589 applicable outside the core human-trafficking context to which CoreCivic would apparently have us limit the statute's reach.  See, e.g., Adia v. Grandeur Mgmt., Inc., 933 F.3d 89, 91 (2d Cir. 2019) (concluding that § 1589(a)'s prohibition against obtaining labor through threats of serious harm applied to "an immigrant lawfully in this country on a temporary guest worker visa alleging that his employers threatened to revoke their sponsorship, thereby subjecting him to deportation"); Bistline v. Parker, 918 F.3d 849, 871 (10th Cir. 2019) (concluding that plaintiffs, all former members of a church, had plausibly alleged violations of the TVPA against the church leader by alleging that they "were threatened with force, kidnapped, physically restrained, [and] threatened with other harms" if they failed to follow orders from church leaders); United States v. Callahan, 801 F.3d 606, 617 (6th Cir. 2015) ("The statute's express terms do not limit its application to immigrant victims or sex workers.  Rather, § 1589(a)'s proscription against the exploitation of the labor or services of 'a person' by prohibited means encompasses any person, no matter her nationality or place of birth.").  To clarify, we are not hereby approving the specific holdings or analyses in these decisions,

23

but cite them to show that federal courts have concluded that § 1589 is not limited to cases of overt human trafficking.

## IV. CONCLUSION

For the reasons stated above, we affirm the district court's denial of CoreCivic's motion to dismiss Appellees' complaint, and hold that the TVPA applies to private for-profit contractors operating federal immigration detention facilities.  We express no opinion on the question of whether the factual allegations in Appellees' complaint, taken as true, are sufficient to establish a violation of the TVPA.

**AFFIRMED.**