# Exhibit 1



Fighting Hate
Teaching Tolerance
Seeking Justice

Southern Poverty Law Center
PO Box 57089
New Orleans, LA 70157
www.splcenter.org

August 28, 2020

Trinity Services Group, Inc.
c/o COGENCY GLOBAL INC.
115 N. Calhoun Street, Ste 4
Tallahassee, FL 32301

**RE: Document Subpoena to Stewart County Related to *Barrientos v. CoreCivic, Inc.*, No. 4:18-cv-00070-CDL, (M.D. Ga.)**

To Whom it May Concern:

Enclosed please find a subpoena for documents being served upon Trinity Services Group, Inc. (Trinity) on behalf of the Plaintiffs in the abovementioned matter. The subpoena seeks records related to the operation by CoreCivic, Inc. of Stewart Detention Center in Lumpkin, Georgia. The subpoena is being served pursuant to Federal Rule of Civil Procedure 45. **Plaintiffs request that Trinity comply with the subpoena within 30 days**.

Please do not hesitate to contact us with any questions at the below telephone numbers and/or email addresses.

Sincerely,

s/ Meredith B. Stewart
Meredith B. Stewart
Southern Poverty Law Center
201 St. Charles Ave., Suite 2000
New Orleans, LA 70170
(334) 531-6807
meredith.stewart@splcenter.org

s/ Caitlin J. Sandley
Caitlin J. Sandley
Southern Poverty Law Center
400 Washington Ave.
Montgomery, AL 36104
(334) 303-6822
cj.sandley@splcenter.org

*Attorneys for Plaintiffs*

1

CC:
*Plaintiffs' Counsel:*
Rebecca M. Cassler
Laura G. Rivera
R. Andrew Free
Priyanka Bhatt
Azadeh N. Shahshahani
John T. Dixon
Emily B. Cooper
Jessica Tseng Hasen
Alan B. Howard
Warren T. Burns
Daniel H. Charest
Korey Arthur Nelson
Lydia Anne Wright

*Defendants' Counsel:*
Nicholas D. Acedo
Stephen E. Curry
Ashlee B. Hesman
Jacob B. Lee
Rachel Love
Jacob D. Massee
David William Bobo Mullens, III
Daniel P. Struck

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Middle District of Georgia

| | |
|---|---|
| WILHEN HILL BARRIENTOS et al. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 4:18-cv-00070-CDL |
| CORECIVIC, INC. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Trinity Services Group, LLC c/o COGENCY GLOBAL INC., 115 N. Calhoun ST., SUITE 4, Tallahasse, FL, 32301

*(Name of person to whom this subpoena is directed)*

☛ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: see Appendix A

| Place: Attn: Meredith B. Stewart, PO Box 158, Lumpkin, GA 31815 or Jessica Tseng Hasen JHasen@perkinscoie.com | Date and Time: 09/28/2020 12:00 pm |
|---|---|

❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 08/28/2020

CLERK OF COURT

OR

_____          _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Plaintiffs Wilhen Hill Barrientos, et al._____ , who issues or requests this subpoena, are:

Meredith B. Stewart, Southern Poverty Law Center, 201 St. Charles Ave, New Orleans, LA 70130, 334.531.6807

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  4:18-cv-00070-CDL

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $  0.00  .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

  **(i)** is a party or a party's officer; or

  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:

 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

 **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

 **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

 **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

 **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

  **(i)** fails to allow a reasonable time to comply;

  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);

  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

  **(iv)** subjects a person to undue burden.

 **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

 **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

 **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

 **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

 **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

 **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

 **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

  **(i)** expressly make the claim; and

  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

 **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**

The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A TO FORM AO88B – SUBPOENA IN A CIVIL CASE

*Wilhen Hill Barrientos et al. v. CoreCivic, Inc.*
Case Number 4:18-cv-00070-CDL
United States District Court for the Middle District of Georgia

In accordance with Fed. R. Civ. P. 45, Plaintiffs Wilhen Hill Barrientos, et al. ("Plaintiffs") by and through their undersigned counsel hereby request and demand that you, Trinity Service Group, Inc. ("Trinity"), produce within thirty (30) days of service hereof all of the documents, electronically stored information (including all metadata described herein), and tangible things in your possession, custody, or control reflecting, evidencing, constituting, supporting, referring, or relating in any way, directly, or indirectly, to those matters addressed below (the "Requests for Production"). Please produce all items in accordance with the Order for Data Preservation and Production, attached hereto as Exhibit 1.  All hard copy documents, electronically stored information, and tangible things in your possession, custody, or control should be produced at the office of the Southern Poverty Law Center, Attn: Meredith B. Stewart, PO Box 158, Lumpkin, GA 31815. In lieu of hard copies, please email the objects to Jessica Tseng Hasen, JHasen@perkinscoie.com.

## DEFINITIONS AND INSTRUCTIONS

A.      All applicable definitions and rules of construction set forth in the Federal Rules of Civil Procedure are hereby incorporated by reference.

B.      "Litigation" shall mean the litigation bearing Civil Action No. 4:18-cv-00070-CDL and pending in the United States District Court for the Middle District of Georgia.

C.      The "Complaint" shall mean the Complaint filed in the Litigation and any amendments thereto. The currently operative Complaint is attached to these Requests for Production as Exhibit 2.

D.      "CoreCivic" shall refer to CoreCivic, Inc., the Defendant in the Litigation. Any

1

reference to CoreCivic is also a reference to CoreCivic's officers, directors, employees, partners, corporate parents, subsidiaries, agents, attorneys, consultants, and affiliates, and any other persons acting for it or on its behalf. Any reference to CoreCivic also encompasses any prior company name or corporate predecessor, including but not limited to Corrections Corporation of America ("CCA"), as well as the officers, directors, employees, partners, corporate parents, subsidiaries, and affiliates of any prior company or corporate predecessor including but not limited to CCA, and any other persons acting for it or on its behalf.

  E.  The term "Stewart County" refers to Stewart County, Georgia, and any entity or agency thereof.

  F.  The term "SDC" refers to Stewart Detention Center, located at 146 CCA Road, Lumpkin, Georgia, 31815, and operated by Defendant pursuant to contracts with U.S. Immigration and Customs Enforcement ("ICE") and/or Stewart County.

  G.  The term "DHS" shall mean the U.S. Department of Homeland Security.

  H.  The term "ICE" shall mean the U.S. Immigration Customs Enforcement.

  I.  The term "Work Program" is defined as any program CoreCivic operates at SDC involving labor performed by detained individuals of any kind that includes tasks other than the four tasks enumerated in Section 5.8.V.C. of the 2011 ICE Performance-Based National Detention Standard ("PBNDS") (rev. 2016).

  J.  The term "Work Program Participant" is defined as any individual who participated or is participating in the Work Program in any way and for any amount of time.

  K.  The term "Detained Individual" means any individual who was or is being detained at SDC.

  L.  "Policies and Procedures" mean each rule, order, directive, procedure, practice,

guideline, guidance, common understanding, or course of conduct, whether formal or informal, written or unwritten, or recognized or unrecognized by Trinity Serviced Group and/or CoreCivic or persons acting or purporting to act on Trinity Services Group and/or CoreCivic's behalf, that has been in effect at any time during the period covered by these Requests. These terms include any changes to Policies and Procedures.

M.      "Relevant Period" means the period from December 23, 2008 through the present for all requests.

N.      "You" and "Your" shall mean Trinity Services Group and any subsidiaries and parent companies, related groups, and divisions, including their agents, attorneys, consultants, advisors, employees, and all other Persons acting or purporting to act on their behalf.

O.      The term "Communication" shall mean the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) by any means, including, but not limited to, any meeting, conversation, discussion, conference, correspondence, message, or other written or oral transmission, exchange, or transfer of information in any form between two or more persons, including in person or by telephone, facsimile, telegraph, text message, instant message, internet posting, letter, electronic mail ("email"), WhatsApp, or other written, verbal, or digital medium.

P.      The term "Document" shall have the broadest meaning possible under the Federal Rules of Civil Procedure, including, but not limited to, all originals, non-identical copies and drafts of any written, printed, handwritten, recorded or graphic matter of any kind, however produced or reproduced, and regardless of where located, including, but not limited to, any work paper, correspondence, memorandum, note, research, checklist, opinion, minutes, inter-office or intra-office communication, email message, text message, instant message,

3

WhatsApp message, report, chart, graph, summary, index, diary, desk or pocket calendar, notebook, any magnetic or other recording tape, computer data (including information or programs stored in a computer, whether or not ever printed out or displayed), photograph, microfiche, microfilm, videotape, video file or motion picture, and electronic, mechanical, or electrical record or representation of any kind, including, but not limited to, tape, cassette, disc, magnetic card or recording. "Document" shall also include the file folders in which said documents are maintained and any table of contents or index thereto; and copies of documents of which the originals have been destroyed pursuant to a document destruction policy or otherwise.

Q.      The terms "relating to" and "referring to" shall be read and applied as interchangeable and shall be construed in the broadest sense to mean discussing, supporting, describing, concerning, relating to, referring to, pertaining to, containing, analyzing, evaluating, studying, recording, memorializing, reporting on, commenting on, reviewed in connection or conjunction with, evidencing, setting forth, contradicting, refuting, considering, recommending, or constituting, in whole or in part.

R.      The words "and" and "or" shall be construed to be either conjunctive or disjunctive as the context requires so that each Request for Production shall be construed broadly rather than narrowly.

S.      Each Request for Production seeks production of each Document in its entirety, without abbreviation or redaction, and all drafts and non-identical copies of each Document.

T.      The plural shall include the singular and the singular shall include the plural as the context requires so that each Request for Production shall be construed broadly rather than narrowly.

U.      The word "including" shall have its ordinary meaning and shall mean "including but not limited to," and shall not indicate limitation to the examples or items mentioned.

V.      If a portion of an otherwise responsive Document contains information subject to a claim of privilege, only that portion of the Document subject to the claim of privilege shall be redacted from the Document and the rest shall be produced.

W.      If you contend that any materials encompassed by this request are subject to privilege, you must comply with the requirements of Fed. R. Civ. P. 45(d) in responding to this subpoena.

X.      All Documents are to be produced in compliance with the requirements of Fed. R. Civ. P. 45(e). The method of production of each category is to be identified at the time of production.

Y.      Each Request for Production shall be deemed continuing so as to require prompt supplemental responses, in accordance with the Federal Rules of Civil Procedure, if you obtain or discover additional Documents between the time of initial production and the time of deposition, settlement or trial.

Z.      All Requests for Production are for Documents, Communications, or information created or in effect during the Relevant Period.

## **DOCUMENT REQUESTS**

**Request 1:**

Please provide any and all DOCUMENTS RELATING TO POLICIES AND PROCEDURES, trainings, orientation materials, and/or videos provided to TRINITY employees at SDC during the RELEVANT PERIOD.

**Request 2:**

Please provide any and all DOCUMENTS and COMMUNICATIONS RELATING TO the WORK PROGRAM at SDC during the RELEVANT PERIOD.

**Request 3:**

Please provide any and all DOCUMENTS and COMMUNICATIONS RELATING to the provision of meal services to DETAINED INDIVIDUALS at SDC during the RELEVANT PERIOD reflecting any nutritional requirements and/or nutritional analysis RELATING TO the food served; meal schedules and menus; complaints about the food served; and POLICIES AND PROCEDURES regarding the distribution, storage, and handling of food.

**Request 4:**

Please provide any and all DOCUMENTS that identify TRINITY employees who worked at SDC during the RELEVANT PERIOD, including payroll records, records of HOURS worked, job descriptions, and job assignments.

**Request 5:**

Please provide any and all DOCUMENTS and COMMUNICATIONS regarding the LITIGATION.

**Request 6:**

Please provide any and all DOCUMENTS and COMMUNICATIONS RELATING TO TRINITY'S contracts with CORECIVIC pertaining to SDC during the RELEVANT PERIOD, including but not limited to negotiation of contract terms, any proposed or actual changes or amendments to contract terms, and the amounts charged to and paid by CORECIVIC.

**Request 7:**

6

Please provide any and all DOCUMENTS and COMMUNICATIONS RELATING

TO disciplinary or corrective action taken against TRINITY employees and/or DETAINED

INDIVIDUALS during the RELEVANT PERIOD for reasons RELATING TO the WORK

PROGRAM.

# EXHIBIT

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

| | |
|---|---|
| WILHEN HILL BARRIENTOS, MARGARITO VELAZQUEZ GALICIA, and SHOAIB AHMED individually and on behalf of all others similarly situated, | Civil Action No. 4:18-cv-00070-CDL |
| Plaintiffs, | |
| v. | |
| CORECIVIC, INC., | |
| Defendant. | |
| CORECIVIC, INC., | |
| Counter-Claimant, | |
| v. | |
| WILHEN HILL BARRIENTOS, MARGARITO VELAZQUEZ GALICIA, and SHOAIB AHMED individually and on behalf of all others similarly situated, | |
| Counter-Defendants. | |

## ORDER FOR DATA PRESERVATION AND PRODUCTION

The parties hereby stipulate to the following provisions regarding the discovery of electronically stored information ("ESI") in this matter. For the purposes of this stipulation, ESI is defined as any type of information that is created, used, and stored in digital form and accessible by digital means, including but not limited to e-mails, text, chat, and instant messages; video, audio, and image files; word processing and spreadsheet files; and other structured and unstructured data contained on any media type, whether computer, mobile device, tape, hard disk drive, cloud storage, or other storage technology.

1

**General Principles**

1.     This Stipulation and Order will govern discovery of ESI in this case as a supplement to the Federal Rules of Civil Procedure, the Court's Local Rules, General Orders, and any other applicable orders issued by this Court or rules promulgated by this Court.

2.     An attorney's zealous representation of a client is not compromised by conducting discovery in a cooperative manner. The failure of counsel or the parties to litigation to cooperate in facilitating and reasonably limiting discovery requests and responses raises litigation costs and contributes to the risk of sanctions. The parties are aware of the importance the Court places on cooperation and commit to cooperate in good faith throughout the litigation consistent with the Court's Local Rules, General Orders, and any other applicable orders issues or rules promulgated by the Court.

3.     To the extent reasonably possible, the production of documents shall be conducted to maximize efficient and quick access to documents and minimize related discovery costs. The terms of this Stipulation and Order shall be construed so as to ensure the prompt, efficient, and cost-effective exchange of information consistent with Fed. R. Civ. P. 1 and any orders issued by the Court.

      a.     Except as specifically limited herein, this Stipulation and Order governs the production of discoverable documents produced by the Parties during the litigation.

      b.     This Stipulation and Order shall not enlarge, reduce, or otherwise affect the scope of discovery in this litigation as imposed by the Federal Rules of Civil Procedure or the Court's orders, or imply that discovery produced under the

terms of this Stipulation and Order is properly discoverable, relevant, or admissible in this or any other action.

c.  All documents that are disclosed or that are responsive to discovery requests and not designated as "privileged" shall be produced in the manner provided herein, subject to any Protective Order which may be entered by the Court. Nothing in this Stipulation and Order shall be interpreted to require disclosure of materials that a Party contends are not discoverable or are protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other privilege that may be applicable. Additionally, nothing in this Stipulation and Order shall be deemed to waive or limit any Party's right to move for an order to compel discovery pursuant to Fed. R. Civ. P. 37(a)(3). Likewise, nothing in this Order shall be deemed to waive or limit any Party's right to object to the production of certain ESI, or to move for an appropriate order pursuant to Fed. R. Civ. P. 26(c), on the ground that sources are not reasonably accessible because of undue burden or cost.

4.      The Parties agree to promptly alert the other Party concerning any technical problems associated with complying with this Stipulation and Order. To the extent compliance with this Stipulation and Order is believed to impose an undue burden with respect to any protocol, source, or search term listed herein, the Parties shall promptly confer in an effort to resolve the issue.

5.      The Parties will attempt to resolve, in person, in writing (including e-mail), or by telephone, disputes regarding the issues set forth herein prior to seeking relief from the Court.  If

the Parties are unable to resolve the dispute after a good faith effort, the Parties may seek the Court's intervention in accordance with the Court's procedures and applicable rules.

**Liaisons**

6.     The Parties will identify liaisons who are and will be knowledgeable about and responsible for discussing their respective ESI. Plaintiffs' liaison is Jessica Hasen. Defendant's liaison is Michael Giardina. Each e-discovery liaison will be, or will have access to, those who are knowledgeable about the technical aspects of e-discovery, including the location, nature, accessibility, format, collection, search methodologies, and production of ESI in this matter. The Parties' liaisons will be present during conferences about ESI, as possible, and will help resolve disputes without Court intervention wherever possible.

**ESI Discovery Procedures**

7.     On-site inspection of electronic media. Such an inspection shall not be required absent a demonstration by the Requesting Party of specific need and good cause or by agreement of the parties.

8.     Time zone. The parties agree that the entirety of each party's ESI should be processed using a single zone, identified as a fielded value in the production database load file.

9.     De-duplication. The parties may de-duplicate their ESI production across custodial and non-custodial data sources based on MD5 or SHA-1 hash values, applied at the family value. Attachments should not be eliminated as duplicates for purposes of production, unless the parent e-mail and all attachments are also duplicates. The duplicate custodian information removed during the de-duplication process must be tracked and produced in a duplicate/other custodian field in the database load file.

10.     Email Threading and Suppression. The parties may use analytics technology to identify email threads and need only produce the unique most inclusive copy and related family members and may exclude lesser inclusive copies. Any party electing to utilize an email threading and suppression workflow in this manner must reasonably ensure that all non-privileged responses, replies, forwards, and blind copies relating to any responsive e-mail have been produced.

11.     Parent-Child Document Relationships. The parties agree to produce full document families (i.e. an email and its attachments) in the same production set, with the parent-child relationship captured in the "BEGATTACH" and "ENDATTACH" fields in the database load file. Full document families will be produced even if a single part of the family, taken out of the family context, may be non-responsive.[1] Parties may withhold privileged documents from otherwise responsive document families by producing a single-page Bates-stamped TIFF image placeholder stating the document has been withheld for privilege. To the extent that the Producing Party believes there is good cause to deviate from this standard, it may also withhold, on a case-by-case basis, non-responsive or privileged parent documents or attachments, which are otherwise production-eligible, by producing a single-page Bates-stamped TIFF image slip-sheet containing the confidential designation and text stating the document has been withheld as privileged or non-responsive. For any document withheld in this manner, the Producing Party shall still provide the applicable metadata fields, subject to modification for privilege, as set forth in Appendix 1 and Paragraph 35.

---

[1] However, the parties agree that 1 kb or zero-length .htm file, which do not contain any recognizable text, but rather which contain only html or xml code, such as mailto instructions in an email signature block may be omitted from the production at ingestion, and need not be produced.

12.     Hard Copy Documents. Hard copy documents should be scanned and produced as single-page, Group IV, 300 DPI TIFF images, with an .opt image cross-reference file and a delimited database load file (i.e., .dat). The database load file should contain the following fields: "BEGBATES," "ENDBATES," "BEGATTACH," "CUSTODIAN," "PGCOUNT," "CDVOL," "DOCTYPE," "CONFIDENTIALITY," and "EXTRACTEDTEXT"[2] as defined in the attached Appendix 1: Metadata and Coding Fields. The documents should be logically unitized (i.e., distinct documents should not be merged into a single record, and a single document should not be split into multiple records) and should be produced in the order in which they are kept in the usual course of business. Scanned documents shall maintain the orientation of the original document. If an original document contains relevant information in color that is necessary to understand the meaning or content of the document, the document should be produced as single-page, 300 DPI with a minimum quality level of 75, 24-bit, color JPG images. To the extent that the Producing party OCR's the document for its own benefit, OCR should also be provided. The OCR software should maximize text quality over process speed. Settings such as "auto-skewing" and "auto-rotation" should be turned on during the OCR process. OCR shall be in a separate searchable ASCII or Unicode text file for each document, and those files will be included in the production deliverable. Each file will be named with a unique Bates Number (e.g., the unique Bates Number of the first page of the corresponding production version of the document followed by its file extension).

**Search Methodology**

13.     Responsive documents that are known to exist (as opposed to documents that would only become known to the Producing Party through an email or system search) will be

---

[2] EXTRACTEDTEXT need not be populated for handwritten notes.

produced in the format(s) set forth in this Stipulation and Order and in the normal course of discovery, i.e., as required under Rules 26 and 34.

14. For documents that would only become known to the Producing Party through an email or system search, the parties shall timely confer to attempt to reach agreement on an iterative search protocol, including appropriate search terms and queries, file type and date restrictions, data sources (including custodians), and other appropriate computer- or technology-aided methodologies, before any such effort is undertaken. The parties shall continue to cooperate in revising the appropriateness of the search methodology.

15. Prior to running searches:

    a. The Producing Party shall disclose the data sources (including custodians), search terms and queries, any file type and date restrictions, and any other methodology that it proposes to use to locate ESI likely to contain responsive and discoverable information. If the Producing Party runs any sample searches, it may provide hit counts for each search query.

    b. The Requesting Party is entitled to, within 14 days of the Producing Party's disclosure, add no more than 10 search terms or queries to those disclosed by the Producing Party absent a showing of good cause or agreement of the parties.

    c. The following provisions apply to search terms / queries of the Requesting Party. Focused terms and queries should be employed; broad terms or queries, such as product and company names, generally should be avoided. A conjunctive combination of multiple words or phrases (e.g., "computer" and "system") narrows the search and shall count as a single search term or query.

A disjunctive combination of multiple words or phrases (e.g., "computer" or "system") broadens the search, and thus each word or phrase shall count as a separate search term or query unless they are variants of the same word. The Producing Party may identify each search term or query return overbroad results, demonstrating the overbroad results and a counter proposal correcting the overbroad search or query.

16. After production: within 21 days of the Producing Party notifying the Receiving Party that it has substantially completed the production of documents responsive to a request, the Receiving Party may request no more than 10 additional search terms or queries consistent with Paragraph 15(c).

17. The mere fact that a document is hit or captured by the application of any search term or query does not mean that such document is necessarily responsive to any propounded discovery request or is otherwise relevant to this litigation. Determinations of discoverability, responsiveness, and privilege shall be made by the Producing Party based upon review of the documents hit or captured by the application of agreed-upon search terms.

18. Upon reasonable request, and subject to the remaining discovery limits, a party shall disclose information relating to network design, the types of databases, database dictionaries, the access control list and security access logs and rights of individuals to access the system and specific files and applications, the ESI document retention policy, organizational chart for information systems personnel, or the backup and systems recovery routines, including, but not limited to, tape rotation and destruction/overwrite policy.

**Form of Production**

19.　　ESI will be produced to the Requesting Party as single-page, Group IV TIFFs at a resolution of 300 DPI or greater. All ESI should be produced with a delimited database load file that contains the metadata fields listed in Appendix 1, attached hereto, to the extent captured at the time of the collection. To the extent metadata does not exist, is not reasonably accessible or available for any documents produced, or would be unduly burdensome to provide, the Parties will meet and confer in good faith, but nothing in this Stipulation and Order shall require any party to engage in any computer or document forensics, or manual review and data entry, to extract, capture, collect, or produce such data. The Parties also agree that certain documents identified and collected as part of a targeted collection, including but not limited to files which originated as ESI, but are sent via e-mail or other means to Producing Counsel, may be produced without metadata fields. The Parties will meet and confer to the extent that one Party disagrees with the identification of certain documents as part of a targeted collection subject to the preceding sentence. TIFF images should show any and all text and images that would be visible to the reader using the native software that created the document. For example, TIFF images of e-mail messages should include the BCC line. Color originals may be produced in black & white TIFF image format only if the loss of color does not detract from the usability or the ability to understand the information imparted in the original is not reduced. Unless otherwise agreed to by the parties, presentation and spreadsheet files produced in TIFF image format should be produced in color. Categorical or wholesale requests by the Requesting Party to reproduce documents in color are deemed invalid, but either Party may request by Bates number(s) a replacement set of images in color.

20.     Unless otherwise agreed to by the parties, files that are not easily converted to image format, such as source code, audio, video, spreadsheet, presentation, database, and drawing files, will be produced in native format. The parties may elect to utilize native redaction software tools such as "Blackout" to apply redactions directly to native files and produce a redacted native file instead of a TIFF image.[3] If a document is produced in native format, a single-page Bates-stamped TIFF image slip-sheet containing the confidential designation and text stating the document has been produced in native format should also be provided. Each native file should be named according to the Bates number it has been assigned, and should be linked directly to its corresponding record in the load file using the NativeLink field. To the extent either Party believes that native files should be produced for a specific document or class of documents not specified in this Stipulation and Order, or to the extent records do not easily conform to native or image format (i.e., structured data), the Parties will meet and confer in good faith regarding the production.

21.     The Producing Party will provide an .opt image cross-reference file for all images. Each document image file shall be named with a unique number (Bates Number). File names should not be more than twenty characters long or contain spaces. When a text-searchable image file is produced, the Producing Party must preserve the integrity of the underlying ESI, i.e., the original formatting, the metadata, and, where applicable, the revision history.

---

[3] The parties may, at their discretion, produce a redacted TIFF image file in lieu of a native file, if redactions are necessary, and individual application may be more efficient. To the extent the Requesting Party believes that any redactions applied render a file insufficiently useable, such documents will be identified by Bates number(s), and the Parties will meet and confer regarding how to implement redactions while ensuring that proper formatting and usability are maintained.

22.     If a document is more than one page, the unitization of the document and any attachments and/or affixed notes shall be maintained as they existed in the original document.

23.     The full text of each electronic document shall be extracted ("Extracted Text") and produced in a text file. The Extracted Text shall be provided in either searchable ASCII or Unicode text format and shall be named with a unique Bates Number corresponding to the first page of the production version of the document.

24.     To the extent a response to a non-objectionable discovery request requires production of discoverable electronic information contained in a database (including but not limited to documents with the following file extensions: .accbd, .accde, .dbf, .nsf, .mdb, .sas, .sas7dbat, and .sql), the Parties will endeavor to extract such data into a single table in .xls, .csv, or text-delimited format, with header-rows. If the Producing Party contends that such data cannot easily be exported into such a format, the Parties will meet and confer to discuss the most appropriate and cost-effective production format, which may include an export of data.

25.     Documents shall be exchanged on DVD-ROMs, CD-ROMS, USB drives, portable hard drives, or through secure file transfer protocols (e.g., FTP) or similar secure transmission. Documents produced by Plaintiffs need only be sent to Michael Giardina, Jacob Lee, and Sherri Wolford. Documents produced by Defendant via FTP need only be sent to: Jessica Hasen. The receiving designees will be responsible for ensuring any other co-counsel has access to the document production. The production media shall be labeled with the Volume Number and the Bates Number range(s) of the materials should be provided in the file name of the volume, on the physical media, and/or in the transmittal documentation (whether by letter or e-mail) for each volume. Any document production that may contain "Confidential Information" (subject to any Protective Order which may be entered by the Court); "non-public personal information" (as

defined in the Gramm-Leach-Bliley Act); or "Confidential Health Information" (as defined and protected under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Privacy Rule, 45 C.F.R., Parts 160 and 164, and/or any other applicable state or federal law or regulation concerning confidential health information) may be produced in encrypted form and the production media shall be labelled "MAY CONTAIN CONFIDENTIAL INFORMATION"; "MAY CONTAIN NON-PUBLIC PERSONAL INFORMATION"; or "MAY CONTAIN CONFIDENTIAL HEALTH INFORMATION" as applicable. If a Producing Party encrypts or "locks" the production, the Producing Party shall send, under separate cover, an explanation of how to decrypt or "unlock" the files.

**Preservation of ESI**

26.     The parties acknowledge that they have a common law obligation, as expressed in Fed. R. Civ. P. 37(e), to take reasonable and proportional steps to preserve discoverable information in the party's possession, custody, or control. With respect to preservation of ESI, the parties agree as follows:

27.     Absent a showing of good cause by the Requesting Party, the parties shall not be required to modify the procedures used by them in the ordinary course of business to back-up and archive data; provided, however, that the parties shall preserve all discoverable ESI in their possession, custody, or control.

28.     The parties will supplement their disclosures in accordance with Fed. R. Civ. P. 26(e) with discoverable ESI responsive to a particular discovery request or mandatory disclosure where that data is created after a disclosure or response is made.

29.     Except as provided below, the Parties agree that the circumstances of this case do not warrant the preservation, collection, review, or production of ESI that is not reasonably

accessible because they anticipate that enough relevant information can be yielded from reasonably accessible sources and, as necessary and appropriate, supplemented with deposition discovery. Moreover, the remote possibility of additional relevant information existing in not reasonably accessible sources may be substantially outweighed by the burden and cost of preservation, collection, review, and production of ESI from sources that are not reasonably accessible. The parties agree that the following categories of ESI are not reasonably accessible and need not be preserved:

  a.   Data retained only on back-up tapes.

  b.   Deleted, shadowed, damaged, residual, slack, fragmented, or other data only accessible by forensics.

  c.   Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system.

  d.   On-line access data such as temporary internet files, history, cache, cookies, and the like.

  e.   Data stored on photocopies, scanners and fax machines.

  f.   Data in metadata fields that are frequently updated automatically, such as last-opened dates (see also Section (E)(5)).

  g.   Back-up data that are duplicative of data that are more accessible elsewhere.

  h.   Workstation, server, system or network logs.

  i.   Data remaining from systems no longer in use that is unintelligible on the systems in use.

  j.   Electronic data (e.g., email, calendars, contact data, and notes) sent to or from mobile devices (e.g., iPhone, iPad, Android devices), provided that a copy of

all such electronic data is automatically saved or synched in real time

elsewhere (such as on a server, laptop, desktop computer, or "cloud" storage).

30.     During the course of this litigation, the Parties may later agree that any of these

categories of ESI is reasonably accessible, and likewise, may also agree that any other category

of ESI is not reasonably accessible, without requiring a formal amendment of this Stipulation and

Order.

31.     Unless otherwise agreed to or ordered by the Court, the parties do not have to

obtain a forensic image of the preserved data if the native files and associated metadata are

preserved.

**Phasing**

32.     The Producing Party will endeavor to produce known and responsive documents

pursuant to Paragraph 13 first. When a production of collected ESI in response to a Request for

Production cannot be completed within the time specified in the request, the Parties will meet and

confer to discuss prioritization for the collection, processing, and review of the production so that

(1) the ESI is produced within a reasonable period of time as required by Fed. R. Civ. P.

34(b)(2)(B), and (2) the ESI that is most relevant and responsive to the subject matter, claims,

issues, and defenses is produced first, in proportion to the relative technical difficulty and resource

burden to conduct such collection, processing, and review. ESI so collected will be produced in

phases, and the Parties will continue to meet and confer regarding the need for, and if necessary,

to prioritize the subsequent order of, later waves of production.

33.     Nothing in this Stipulation shall prevent a party from requesting that any

information or documents identified above be preserved and produced upon demonstrating a

particular need for such evidence that justifies the burden of preservation and retrieval, as provided in Fed. R. Civ. P. 26(b)(2)(B) or otherwise.

**Privilege and Privilege Logs**

34.     A Producing Party shall create a privilege log of all documents fully withheld from production on the basis of a privilege or protection, unless otherwise agreed or excepted by this Stipulation and Order. Privilege logs shall include a unique identification number for each document and the basis for the claim (attorney-client privileged or work-product protection).

35.     For ESI, the privilege log may be generated using available metadata, including author or to/from/cc/bcc names, the subject matter, custodian, date sent/date created (as applicable), date received or date modified (as applicable), filename, custodian, and hashvalue. If the Requesting Party requires further information to assess the claim of privilege, it shall explain in writing the need for such information and identify, by Bates number(s) or other unique identifier, each document for which it seeks this information. Within 10 business days of such a request, the Producing Party must either (1) provide the requested information or (2) challenge the request. If a Party challenges a request for further information, the Parties shall meet and confer to try and reach a mutually agreeable solution. To the extent that the Producing Party believes any metadata field above, if provided, would reveal privileged information, that Party may amend that field to avoid disclosure of privileged information while ensuring that, at minimum, all information required by Fed. R. Civ. P. 26(b)(5) is included. The Producing Party must indicate where such amendment was made by counsel.

36.     Privilege logs will be produced to all other Parties no later than 15 business days after delivering a substantially complete production unless an earlier deadline is agreed to by the Parties.

37. Redactions need not be logged so long as the basis for the redaction is clear on the face of the redacted document.

38. Activities undertaken in compliance with the duty to preserve information are protected from disclosure and discovery under Fed. R. Civ. P. 26(b)(3)(A) and (B) and need not be produced.

39. The Parties agree that the following privileged communications or documents need not be included in a privilege log: (a) any law firm communications internal to a law firm representing any Party; (b) any communications between law firms representing any Party or Parties with common interests; (c) and communications regarding litigation holds or preservation, collection, or review in this or any other litigation or arbitration, including communications to or from outside legal counsel for any Party;

> ADDED BY THE COURT: Given the items above that are exempted from the privilege log, the Court is unconvinced at this time that including other items in the privilege log will be unduly burdensome on Defendant.

40. The Parties agree that an entire family will be treated consistently as privileged, with respect to all attachments and all portions of the email thread, so that the Parties may save time and proceed more expeditiously than redacting each portion of a lengthy e-mail thread, with the exception of any email thread in which non-privileged communications occur subsequent in time to the privileged communications on the thread. In that case, the Party must undertake all efforts, including producing a redacted copy of the e-mail, to ensure that all attachments and messages which are not privileged have been produced.

**Non-Waiver and Clawback**

41.     If information subject to a claim of attorney-client privilege, work product immunity, or any other privilege or immunity is inadvertently or mistakenly produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of privilege or immunity for such information under the law.

42.     If a Party receives a document or information that the Receiving Party knows or has reason to believe may be subject to a claim of attorney-client privilege, work product immunity or any other applicable privilege or immunity, the Receiving Party shall: (1) promptly notify the Producing Party (including non-parties responding to a subpoena duces tecum); (2) immediately cease reading the document; (3) upon request from the Producing Party, promptly and permanently delete all non-placeholder images, native files, and extracted text files, as well as all other subsequent copies generated by the Receiving Party, and any metadata for which the Producing Party has provided a replacement; and (4) certify in writing to the Producing Party that the non-placeholder images, native files, extracted text, subsequently generated copies, and replaced metadata have been properly deleted and/or destroyed.

43.     If a Party (or subpoenaed non-party) discovers that it has inadvertently produced a document or information that is subject to a claim of attorney-client privilege, work product immunity, or any other applicable privilege or immunity, it shall promptly inform the Receiving Party that the document or information is privileged or otherwise protected, and indicate whether or not any of the metadata contains any privileged information. Should the metadata for any such document contain privileged information, a replacement load file for that information, complying with Paragraph 35, should be provided as soon as possible following, if not contemporaneously with, the notice. Upon receiving such notice, the Receiving Party shall: (1) immediately cease

reading the document; (2) promptly and permanently delete all non-placeholder images, native files, and extracted text files, as well as all other subsequent copies generated by the Receiving Party, and any metadata for which the Producing Party has provided a replacement; and (3) certify in writing to the Producing Party that the non-placeholder images, native files, extracted text, subsequently generated copies, and replaced metadata have been properly deleted and/or destroyed.

44.    At any time a Party is notified that a document or information that is subject to a claim of attorney-client privilege, work product immunity, or any other applicable privilege or immunity was inadvertently produced, and the document or information is already part of a filing with the Court, the Filing Party shall either withdraw the document or information or the Parties shall agree to brief the issue for the Court pursuant to applicable law, including the Federal Rules of Civil Procedure, this Court's Local Rules, General Orders, and any other applicable orders issued by this Court or rules promulgated by this Court.

**Third Parties**

45.    A party that issues a subpoena duces tecum to a non-party (the "Issuing Party") shall include a copy of this Stipulation and Order with the subpoena and state that the parties to the litigation have requested that third parties produce documents in accordance with the specifications set forth herein. The Issuing Party shall produce any documents obtained pursuant to a non-party subpoena to the opposing party. If the non-party production is not Bates-stamped, the Issuing Party will brand the non-party production images with unique prefixes and Bates numbers prior to producing to the opposing party, consistent with the technical specifications outlined herein. Nothing in this Stipulation and Order is intended or may be interpreted to narrow, expand, or otherwise affect the rights of the parties or third parties to object to a subpoena.

**Good Faith**

46.     The parties shall make their best efforts to comply with, and resolve any differences concerning compliance with, this Order. If a Producing Party cannot comply with any material aspect of this Order, such party shall inform the Requesting Party as to why compliance with the Order is unreasonable or not possible within fifteen (15) days after so learning. No party may seek relief from the Court concerning compliance with the Order unless it has first conferred in good faith with the other affected party to the action.

**No Effect on Discovery or Admissibility**

47.     This Stipulation and Order does not address, limit, or determine the relevance, discoverability, agreement to produce, or admissibility of ESI. Nothing in this Stipulation and Order shall be construed to affect the admissibility of any document or data produced pursuant to it. All objections to the admissibility of any document or data are preserved and may be asserted at any time.

**Protective Order**

48.     Nothing in this Stipulation and Order shall be deemed to limit, modify, or override any provision of any Protective Order which may be entered by the Court.

**Modification**

49.     This Stipulation and Order may be modified by a further Stipulation and Order of the Parties or by the Court in the interests of justice or for public policy reasons.

IT IS SO ORDERED.

Signed: July 16, _____, 2020.

S/Clay D. Land
_____
CLAY D. LAND
United States District Court Judge

# EXHIBIT 2

Complaint
Barrientos, et al. v. CoreCivic, Inc.

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

| | |
|---|---|
| **WILHEN HILL BARRIENTOS, MARGARITO VELAZQUEZ GALICIA, and SHOAIB AHMED** individually and on behalf of all others similarly situated, | **Civil Action No. _____** |
| Plaintiffs, v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES** |
| **CORECIVIC, INC.,** | **CLASS ACTION** |
| Defendant. | **JURY DEMAND** |

## PRELIMINARY STATEMENT

1.     Individuals detained at the Stewart Detention Center ("Stewart") in Lumpkin, Georgia work because they have no other meaningful choice.  Defendant CoreCivic, Inc., ("CoreCivic"), the billion-dollar private prison corporation that owns and operates Stewart, maintains a deprivation scheme intended to force detained immigrants[1] to work for nearly free. CoreCivic deprives detained immigrants of basic necessities like food, toothpaste, toilet paper, and soap – and contact with loved ones – so that they have to work in order to purchase those items and costly phone cards at CoreCivic's commissary.  CoreCivic then threatens detained immigrants who refuse to work with serious harm, including the deprivation of privacy and safety in open living quarters, referral for criminal prosecution, and, ultimately, the sensory and

---

[1] This Complaint refers to individuals detained in Stewart as "detained immigrants" with the caveat that there are United States citizens detained in Stewart and in other civil immigration detention centers across the nation.  *See, e.g.*, William Finnegan, *The Deportation Machine*, The New Yorker, Apr. 29, 2013, https://www.newyorker.com/magazine/2013/04/29/the-deportation-machine (reporting on the case of Mark Lyttle, a U.S. Citizen who was wrongfully detained in Stewart and deported to Mexico).

psychological deprivation of their humanity resulting from solitary confinement. Under these circumstances, no labor is voluntary – it is forced.

2.      CoreCivic's deprivation scheme ensures that the individuals detained in Stewart provide the billion-dollar corporation with a ready supply of available labor needed to operate the facility. Detained immigrants mop, sweep, and wax floors; scrub toilets and showers; wash dishes; do laundry; clean medical facilities; and cook and prepare food and beverages daily for the nearly 2,000 individuals locked inside Stewart. For this labor, CoreCivic pays detained immigrants between $1 and $4 per day and occasionally slightly more for double shifts. When CoreCivic needs "volunteers" to work double shifts in the kitchen or to work more than five days per week, as it often does to run Stewart, it employs a policy of threatening detained immigrants until they comply. Under no circumstances does CoreCivic pay the detained immigrant workers anything close to the federal minimum wage.

3.      Plaintiffs are current or former detained immigrants who were forced to work for CoreCivic at Stewart. Individually and on behalf of all others similarly situated, Plaintiffs bring this class action lawsuit to end CoreCivic's forced labor scheme and remedy the unjust enrichment resulting from CoreCivic's illegal labor practices.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Trafficking Victims Protection Act,[2] 18 U.S.C. §§ 1589, 1594, and 1595.

---

[2] The Trafficking Victims Protection Act was enacted in 2000, *see* Pub. L. No. 106-386, 114 Stat. 1486 (Oct. 28, 2000), and has been amended on three different occasions since then. *See* Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, 117 Stat. 2878 (Dec. 19, 2003); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044 (Dec. 23, 2008); Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, 129 Stat. 227.

5.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one defendant; there are more than 100 class members; and the aggregate amount in controversy exceeds $5,000,000.

6.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the claims occurred in this District.

7.      This Court has personal jurisdiction over CoreCivic because the corporation regularly conducts business in and has sufficient minimum contacts with the Middle District of Georgia.

8.      Plaintiffs request that this Court exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over their state law claim of unjust enrichment.

## PARTIES

### A.      **Plaintiffs**

9.      Plaintiff Wilhen Hill Barrientos is currently detained at Stewart.  He has been detained at Stewart intermittently since on or about July 2015.  Mr. Barrientos is a citizen of Guatemala seeking asylum in the United States.  He is currently working for CoreCivic as a kitchen worker and is generally paid between $1 and $4 per day as part of the "Voluntary Work Program."  When CoreCivic requires him to work twelve hours or more in one day, he makes up to $8 per day.

10.     Plaintiff Margarito Velazquez Galicia is currently detained at Stewart.  He has been detained there since on or about January 2018.  Mr. Velazquez is a citizen of Mexico and intends to seek relief from deportation in the form of cancellation of removal.  His wife and two

---

(May 29, 2015).  This complaint refers to the provisions of 18 U.S.C. §§ 1589, 1594, and 1595, including all amendments, as the Trafficking Victims Protection Act ("TVPA").

children are United States citizens. Mr. Velazquez is currently employed as a kitchen worker and is generally paid between $1 and 4 per day as part of the "Voluntary Work Program." When CoreCivic requires him to work twelve hours or more in one day, he makes up to $8 per day.

11. Plaintiff Shoaib Ahmed was detained at Stewart from approximately August 2017 to February 2018. He is a citizen of Bangladesh who gave up his right to fight his asylum case due to the poor living conditions at Stewart, threats, and retaliation by CoreCivic. Mr. Shoaib worked for CoreCivic as a kitchen worker and was paid $4 per day. If he worked twelve hours or more, he was paid an additional $1 per day as part of the "Voluntary Work Program."

**B.** **Defendant**

12. Defendant CoreCivic, formerly the Corrections Corporation of America, is a for-profit corporation providing correctional and detention services. CoreCivic is a Maryland corporation operating under federal tax laws as a Real Estate Investment Trust ("REIT"), with its principal office located at 10 Burton Hills Boulevard, Nashville, Tennessee 37215. CoreCivic owns and operates Stewart, where Plaintiffs were or are detained, located at 146 CCA Road, Lumpkin, Georgia 31815.

13. At all relevant times, CoreCivic owned and operated Stewart under contract with Stewart County, Georgia ("Stewart County"). Stewart County maintains an Intergovernmental Service Agreement ("IGSA") with U.S. Immigration and Customs Enforcement ("ICE") to detain immigrants on behalf of ICE.

## FACTUAL ALLEGATIONS

**A.** **Immigration Detention is Civil – Not Criminal.**

14. Each year, hundreds of thousands of individuals are locked up in civil immigration detention facilities while awaiting immigration or citizenship status determinations.

Those detained include U.S. citizens, lawful permanent residents (green card holders) with longstanding family and community ties, children, pregnant women, asylum seekers, victims of human trafficking, and survivors of torture. Some detained immigrants were brought to the United States as children. And thousands ultimately have their United States citizenship or legal residency affirmed by an immigration court or federal judge.

15.     Immigration violations are civil violations, and immigration detention is civil in nature.[3] Many detained immigrants have no criminal history at all.

16.     Notwithstanding immigration detention's civil nature and purpose, detained immigrants are subjected to prison-like conditions at Stewart. According to Dora Schriro, former head of ICE's Office of Detention Policy and Planning, most detained immigrants are held – systematically and unnecessarily – under punitive circumstances inappropriate for immigration detention's noncriminal purposes.[4] Detained immigrants are frequently subjected to punitive and long-term solitary confinement, inadequate medical care, sexual and physical assault, lack of access to counsel, and other harsh conditions of confinement; all without a right to a speedy trial, a jury, a government-appointed lawyer, or a duly-entered conviction.

17.     Many detained immigrants, Plaintiff Ahmed included, accede to deportation simply to escape intolerable conditions of confinement, even when they have valid claims to remain in the United States, including claims for asylum or other discretionary relief.

---

[3] *See, e.g.*, *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984) ("A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry"); *see also Fong Yue Ting v. United States*, 149 U.S. 698, 728-30 (1893) (observing that deportation proceedings have "all the elements of a civil case" and are "in no proper sense a trial or sentence for a crime or offense"); *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952).

[4] Dora Schriro, *Immigration Detention Overview and Recommendations*, U.S. Dep't of Homeland Sec., Immigration and Customs Enforcement 2-3, 21 (Oct. 6, 2009) *available at* https://www.ice.gov/doclib/about/offices/odpp/pdf/ice-detention-rpt.pdf.

**B.** **The Privatization of Immigration Detention and CoreCivic's Economic Windfall.**

18. Immigration detention expanded roughly eightfold over the past two decades, from a capacity of 5,532 detention beds in 1994[5] to a current capacity of over 41,000 beds, and climbing.[6]





19. During the same period, CoreCivic and other private prison corporations have spent tens of millions of dollars on lobbying efforts.[7]

20. As immigration detention expanded, private prison corporations, led by CoreCivic,[8] gained a rapidly increasing share of the contracts for new detention beds.[9]

---

[5] Chad C. Haddal & Alison Siskin, Cong. Research Service, RL32369, Immigration-Related Detention: Current Legislative Issues 12 (2010), *available at* https://digitalcommons.ilr.cornell.edu/cgi/viewcontent.cgi?article=1712 &context=key_workplace.

[6] Jennie Jarvie, *This industry stands to benefit from Trump's crackdown on the border*, L.A. Times, Feb. 14, 2017, http://www.latimes.com/nation/la-na-immigrant-detention-20170214-story.html.

[7] Michael Cohen, *How for-profit prisons have become the biggest lobby no one is talking about*, Wash. Post, Apr. 28, 2015, https://www.washingtonpost.com/posteverything/wp/2015/04/28/ how-for-profit-prisons-have-become-the-biggest-lobby-no-one-is-talking-about/?utmterm=.25de04ae71f9.

21.     CoreCivic's 2017 revenues were approximately $1.765 billion,[10] and its stock is publicly traded on the New York Stock Exchange, with a market capitalization of approximately $2.36 billion[11]

22.     Detention centers for which CoreCivic designated ICE as its "primary customer" accounted for 25% of CoreCivic's total revenues in 2017 ($444.1 million).[12]  CoreCivic officials expect these lucrative immigration detention contracts to account for a significant percentage of the corporation's ongoing revenues.[13]



23.     As part of its immigration detention enterprise, CoreCivic owns and operates the Stewart Detention Center.

---

[8] Madison Pauly, *A Brief History of America's Private Prison Industry*, Mother Jones, Jul./Aug. 2016, https://www.motherjones.com/politics/2016/06/history-of-americas-private-prison-industry-timeline.
[9] Bethany Carson & Eleana Diaz, *Payoff: How Congress Ensures Private Prison Profit with an Immigrant Detention Quota*, Grassroots Leadership 6, Chart 1-A[A] (Apr. 2015) https://grassrootsleadership.org/sites/default/files/reports/quota_report_final_digital.pdf.
[10] CoreCivic Inc., Form 10-K FY 2017 at F-4, Sec. Exch. Comm'n, https://www.sec.gov/Archives/edgar/data/1070985/000156459018002898/cxw-10k_20171231.htm. [hereinafter "CoreCivic 10-K"].
[11] CoreCivic Inc. Stocks Overview, Reuters, *available at* https://www.reuters.com/finance/stocks/overview/CXW (last visited Apr. 16, 2018).
[12] CoreCivic 10-K, at 32.
[13] *Id.*

24.     With nearly 2,000 beds, Stewart is one of the largest immigration detention centers in the nation.  During fiscal year 2017, more deportation proceedings began in Stewart than any other immigration detention center in the country.[14]

25.     Pursuant to the IGSA between ICE and Stewart County, ICE pays the County $62.03 per detained immigrant per day.[15]  Under its 2006 contract with CoreCivic, however, the County keeps only 85 cents per detained immigrant per day for its "administrative costs."  The rest of the money from ICE goes to CoreCivic.  In 2016, CoreCivic's revenue from Stewart was approximately $38 million.[16]  By contrast, the County's revenue from Stewart was $589,052 for the same year.[17]

26.     CoreCivic's economic windfall, and the profitability of its immigration detention enterprise, arises from its corporate scheme, plan, and pattern of systemically withholding basic necessities from detained immigrants to ensure a readily available, captive labor force that cleans, maintains, and operates its facilities for subminimum wages under threat of solitary confinement, criminal prosecution, and other sanctions.  Without this nearly free labor, CoreCivic's windfall from immigrant detention would be substantially decreased.

---

[14] Transactional Records Access Clearinghouse of Syracuse Univ. ("TRAC"), *Details on Immigration Proceedings by Immigration Court*, http://trac.syr.edu/phptools/immigration/nta/ (last visited Apr. 6, 2018).
[15] TRAC, *Detention Facility Reports: Transfers*, http://trac.syr.edu/immigration/detention/tran.shtml (last visited Apr. 9, 2018).
[16] Robin Urevich, *Deadly Detention: Hell in the Middle of a Pine Forest*, Capital and Main (Mar. 14, 2018), https://capitalandmain.com/deadly-detention-hell-middle-pine-forest-0314.
[17] Stewart County, Georgia, Independent Auditors' Report 59 (2016), http://www.stewartcountyga.gov/PDF-docs/StewartCounty2016Audit.pdf.

C. **CoreCivic Uses Detained Immigrants to Clean, Maintain, and Operate Stewart.**

27.     CoreCivic operates a so-called Voluntary Work Program ("Work Program") at Stewart.  Through this program, CoreCivic uses detained immigrants to perform work that directly contributes to institutional operations.

28.     The Performance Based National Detention Standards ("PBNDS"), issued as guidance by ICE, delegate the site-specific rules for each Work Program to the "facility administrator" but mandate, *inter alia*, that each Work Program be in compliance with the PBNDS; that all work, other than personal housekeeping, be voluntary and not required; that compensation be "at least $1.00 (USD) per day"; and that work be limited to 8 hours per day, 40 hours per week.[18]

29.     According to CoreCivic's Detainee Orientation Handbook, which it provides to all detained immigrants at Stewart upon entry, the following work assignments may be available through the Work Program:

    a.     Administration Porter

    b.     Barber

    c.     Commissary

    d.     Hallway Porter

    e.     Intake Worker

    f.     Kitchen Worker

    g.     Laundry Worker

    h.     Library Worker

    i.     Medical Porter

---

[18] ICE, Performance-Based National Detention Standards 405-409 (2011), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

j.      Night Floor Crew

k.      Pod Porter

l.      Recreation/Gym Worker

m.      Sally port/Chemical Porter

n.      Shower Porter

o.      Unit Law Library Helper

p.      Visitation Porter[19]

30.     In the course of their labor for CoreCivic, detained immigrants in the Work Program perform a wide range of work, including but not limited to:

a.      Scrubbing bathrooms, showers, toilets, and windows;

b.      Cleaning and maintaining CoreCivic's on-site medical center;

c.      Cleaning patient rooms and medical staff offices;

d.      Sweeping, mopping, stripping, and waxing floors;

e.      Washing detained immigrants' laundry;

f.      Preparing, cooking, and serving meals;

g.      Washing dishes;

h.      Cleaning the kitchen and cafeteria before and after meals;

i.      Performing clerical work for CoreCivic;

j.      Providing barber services to detained immigrants;

k.      Cleaning intake areas and solitary confinement units; and

l.      Cleaning and maintaining recreational areas.

---

[19] CoreCivic, Detainee Orientation Handbook, Stewart Detention Center 14 (2016) [hereinafter "Stewart Detainee Handbook"].

31.     CoreCivic pays detained immigrants who participate in the Work Program generally between $1 and $4 per day.  CoreCivic occasionally increases the wage rate it pays to kitchen workers to up to $8 per day when it needs workers to work twelve hours or more per day.  Under no circumstances does CoreCivic pay the detained immigrants the federal minimum wage of $7.25 per hour, or the Service Contract Act wages governing the jobs they perform.  In fact, the detained immigrants' wages generally are well under $1 per hour.

32.     The Work Program allows CoreCivic to avoid recruiting from the local labor market, paying minimum wages, providing detained immigrants in the Work Program with any benefits, paying the costs of potential unionization, and paying federal and state payroll taxes, like Medicare, thereby reducing operational costs and increasing its own profits.  Further, it reduces the likelihood of former employees acting as whistleblowers regarding the deplorable and unsafe conditions inside Stewart.[20]

33.     Stewart County has the highest poverty rate among all Georgia counties.  With a population of roughly 5,900, nearly 40% of families live below the poverty level.[21]  The County's average unemployment rate in February 2018 was 5.3%, which is a 1.2% higher than the national average of 4.9%.[22]  The median family income is $20,882.[23]  One hundred percent of children in Stewart County public schools are reportedly eligible for free or reduced-price meal programs.[24]

---

[20] *See, e.g.*, Urevich, *supra* note 16.
[21] U.S. Census Bureau, Stewart County, GA, Quick Facts: Income and Poverty, *available at* https://www.census.gov/quickfacts/fact/table/stewartcountygeorgia/IPE120216 (last visited Apr.12, 2018).
[22] Georgia Department of Labor, Georgia Labor Force Estimates 8 (2018), https://dol.georgia.gov/sites/dol.georgia.gov/files/related_files/document/laborforce.pdf
[23] U.S. Census Bureau, *supra* note 21.
[24] Georgia Department of Early Care and Learning, FY2016 Free and Reduced Lunch School Data, Qualitied Schools, 24, http://decal.ga.gov/documents/attachments/16FreeRedQualSchools.pdf.

34.     According to CoreCivic, it employs around 300 people at Stewart, outside of the Work Program,[25] only 96 of whom are Stewart County residents.[26]  CoreCivic fills a substantial number of jobs at Stewart with detained immigrants in the Work Program who work for nearly free.

35.     While CoreCivic profits handsomely from the labor of detained immigrants locked inside Stewart, the company locks out many Stewart County residents from jobs and the economic growth and prosperity that comes with fair-paying work.

**D.     CoreCivic Withholds Necessary Care from Detained Immigrants at Stewart.**

36.     Despite its name, the "Voluntary Work Program" is not "voluntary" in any meaningful sense.  CoreCivic maintains a corporate scheme, plan, and pattern at Stewart of depriving detained immigrants with basic necessities; outside contact with loved ones; and threatening them with serious harm, isolation, and criminal prosecution.  As a result, detained immigrants are forced to submit to CoreCivic's labor scheme in order to buy necessities from the commissary (including food, hygiene products, and phone cards) and to avoid solitary confinement and other sanctions.

37.     CoreCivic owns and operates the commissary inside Stewart.  The commissary is the only place at Stewart where detained immigrants can purchase necessities, including hygiene products, clothes, food, and phone cards.  Pursuant to corporate policy, CoreCivic is required to use any profits or interest earned from the commissary towards welfare expenditures for detained immigrants.

---

[25] Harry Franklin, *Facility to house immigrants Official ink deal to detain inmates to be deported*, Columbus Ledger-Enquirer, Jul. 11, 2006 *available at* 2006 WLNR 11899060; Jeremy Redmon, *Detention center is largest in nation*, Atlanta Journal-Const., Jan. 16, 2011 *available at* 2011 WLNR 930948.

[26] Caleb Bauer, *CoreCivic has history of complaints, violations*, S. Bend Trib., Jan. 17, 2018, https://www.southbendtribune.com/news/local/corecivic-has-history-of-complaints-violations/article_9355aa57-8309-56f6-9072-1e2f8e035a3c.html.

38.     Detained immigrants must use funds from their "inmate fund account" to make purchases at the commissary.  All of the detained immigrants' wages from the Work Program are deposited into this account.

39.     When detained immigrants in the Work Program make purchases at the commissary, they are giving their wages directly back to CoreCivic in a "company store" scenario.  This scenario is compounded by CoreCivic's scheme, plan, and pattern of intentionally depriving detained immigrants of basic necessities, such as hygiene products, that can only be purchased at the commissary.

40.     CoreCivic's scheme of intentionally depriving detained immigrants of basic necessities and its failure to meet federal standards concerning housing, food, and hygiene products is well-documented.[27]

41.     According to the U.S. Department of Homeland Security, Office of the Inspector General (OIG), Stewart has "bathrooms that were in poor condition, including mold and peeling paint on walls, floors, and showers."[28]  Some bathrooms at Stewart lack hot water, while some showers lack cold water.[29]

---

[27] *See* Ben Norton, *Privatized for-profit immigrant detention centers are a "living nightmare," investigation shows*, Salon (May 16, 2017), https://www.salon.com/2017/05/16/privatized-for-profit-immigrant-detention-centers-are-a-living-nightmare-investigation-shows_partner/; Christie Thompson, *Welcome to Stewart Detention Center, the Black Hole of America's Immigration System*, VICE (Dec. 11, 2016), https://www.vice.com/en_us/article/ypv59j/ welcome-to-stewart-detention-center-the-black-hole-of-the-immigration-system;  S. Poverty Law Ctr., *Shadow Prisons: Immigrant Detention in the South*,  36 (Nov. 2016), https://www.splcenter.org/sites/default/files/ leg_ijp_shadow_prisons_immigrant_detention_report.pdf; ACLU of Ga., *Prisoners of Profit: Immigrants and Detention in Georgia* (May 2012), https://www.acluga.org/sites/default/files/field_documents/prisoners_of_ profit.pdf; Penn. State Law Ctr. For Immigrants' Rights Clinic, *Imprisoned Justice: Inside Two Georgia Immigration Detention Centers* (May 2017), https://pennstatelaw.psu.edu/sites/default/files/pictures/Clinics/Immigrants-Rights/Imprisoned_Justice_Report.pdf [hereinafter "Imprisoned Justice"].
[28] U.S. Dep't of Homeland Sec., Office of the Inspector Gen., OIG-18-32, Concerns about ICE Detainee Treatment at Detention Facilities 7 (2017) *available at* https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf [hereinafter "OIG Report"].

42.     The OIG has also found that Stewart fails to provide "basic hygienic products, such as toilet paper, soap, lotion, and toothpaste . . . promptly or at all when detainees ran out of them."[30]   Officers instruct detained immigrants to buy these necessities from the commissary when they run out.[31]

43.     The same report from the OIG observes that Stewart stores "spoiled, wilted, and moldy produce and other food in kitchen refrigerators, as well as food past its expiration date."[32] Other food safety issues, according to the federal government, include "expired frozen food, including meat, and thawing meat without labels indicating when it had begun thawing or the date by which it must be used."[33]

44.     In addition to depriving detained immigrants of basic necessities like safe and sufficient food and hygienic products, CoreCivic has a scheme, plan, and pattern of depriving detained immigrants of outside contact with loved ones to compel detained immigrants to work in order to purchase costly phone cards from the commissary.

45.     Stewart is geographically isolated and isolating for detained immigrants.  It is outside the town of Lumpkin, Georgia, which has a population of 1,123 (not including the detained immigrants).[34]  It is a two and one-half hour drive from Atlanta, Georgia.  The people who are able to make the trip to the detention center to visit a loved one are limited to non-contact visits.  They must view each other through a plate glass window and speak through a closed-circuit telephone.  These visits are limited to an hour.

---

[29] *Id.*
[30] *Id.* (reporting on Stewart and Hudson County Jail).
[31] *Id.* (reporting on Stewart and Hudson County Jail).
[32] *Id.* at 8 (reporting on Stewart and three other facilities).
[33] *Id.* (reporting on Stewart and three other facilities).
[34] U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates: Lumpkin, Georgia, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/16_5YR/DP05/1600000US1347980 (last visited Apr. 14, 2018).

46.    Talton Communications ("Talton"), the company that provides Stewart's phone service, provides the only way for detained immigrants to call anyone outside the detention center.  Talton takes advantage of this monopoly by charging excessively high rates for detained immigrants to make telephone calls.  Therefore, most detained immigrants are not able to speak with family members for more than a few minutes every week, and at great expense.

47.    Detained immigrants must purchase Talton phone cards at the commissary to make outside calls.  Many detained immigrants submit to the Work Program to purchase these costly phone cards so they can maintain contact with loved ones.[35]

**E.    CoreCivic Threatens to Put Detained Immigrants in Solitary Confinement, Among Other Sanctions, for Refusing to Work.**

48.    CoreCivic maintains a corporate scheme, plan, and pattern at Stewart of threatening detained immigrants who refuse to work, organize a work stoppage, or participate in a work stoppage with "disciplinary segregation" (i.e., solitary confinement), criminal prosecution, downgrading the detained immigrants' housing, and/or revoking access to the commissary, among other sanctions.

49.    CoreCivic's Stewart Detainee Orientation Handbook, which every individual detained at Stewart receives upon entry, categorizes "[e]ncouraging others to participate in a work stoppage or to refuse to work," as a High Offense category, the second-highest offense category.  As a result, encouraging others to participate in a work stoppage is punishable by, *inter alia*:

　　　a.    "Initiat[ion] [of] criminal proceedings";

　　　b.    "Disciplinary Segregation (Up to 30 days)";

　　　c.    "Loss of privileges: commissary, movies, recreation, etc."; and

---

[35] *Imprisoned Justice*, at 30.

      d.   "Chang[ing] housing" or "Restrict[ion] to housing unit."[36]

50.    CoreCivic maintains a corporate scheme, plan, and pattern at Stewart of threatening Plaintiffs and Class Members who refuse to work with "intiat[ing] criminal proceedings" against them, which constitutes a threatened abuse of the legal process.

51.    CoreCivic's overuse of disciplinary measures such as solitary confinement at Stewart is well-documented.[37]

52.    The OIG has expressed "concerns about a lack of professionalism and inappropriate treatment by Detention Center staff, which fostered a culture of disrespect and disregard for detainees' basic rights."[38] Detained immigrants have been "disciplined, including being segregated or locked down in their cells, without adequate documentation in the detainee's file to justify the disciplinary action."[39]

53.    In June 2017, officials at Stewart held a detained immigrant in solitary confinement for nearly 30 days for allegedly encouraging others to participate in a work stoppage.

---

[36] Stewart Detainee Handbook, at 31-32.

[37] *See* Ben Norton, *Privatized for-profit immigrant detention centers are a "living nightmare," investigation shows*, Salon (May 16, 2017), https://www.salon.com/2017/05/16/privatized-for-profit-immigrant-detention-centers-are-a-living-nightmare-investigation-shows_partner/; S. Poverty Law Ctr., *Shadow Prisons: Immigrant Detention in the South*, 41 (Nov. 2016), https://www.splcenter.org/sites/default/files/leg_ijp_shadow_prisons_immigrant _detention_report.pdf; ACLU of Ga., *Prisoners of Profit: Immigrants and Detention in Georgia*, 67-69 (May 2012), https://www.acluga.org/sites/default/files/field_documents/prisoners_of_profit.pdf; *Imprisoned Justice*, at 36-37; *see also Grae v. Corrections Corporation of America*, No. 3:16-cv-2267, 2017 WL 6442145 at *5-8, 15, 21 (M.D. Tenn. Dec. 18, 2017) (citing numerous instances of CoreCivic placing individuals in administrative segregation in Eden Detention Center for inappropriate reasons).

[38] OIG Report, at 6 (reporting on Stewart and two other facilities); s*ee also* Urevich, *supra note* 16 (former ICE officer and Stewart guard describing physical abuse and verbal mistreatment of detained immigrants at Stewart).

[39] OIG Report, at 6 (reporting on Stewart and two other facilities).

54.     CoreCivic also maintains a corporate scheme, plan, and pattern at Stewart of threatening Plaintiffs and Class Members who refuse to work with "changing housing" to living quarters that are less safe, sanitary, and private.

55.     Detained immigrants who submit to the Work Program are often provided with more favorable living quarters, including "pods" that have private two-person cells, access to a common area, a shared bathroom with one cellmate, and a shower with temperature control.

56.     These smaller pods are in stark contrast to the open dormitories.  The open dormitories house up to 66 people, in 33 bunk beds.  There is no privacy.  The lights in these dorms are on all day and night, requiring some detained immigrants to fold socks over their eyes in order to sleep.  There is one bathroom in these dorms with three to four toilets, three to four urinals, and four sinks.  This shared bathroom is often filthy, to the extent that the pod residents at times gag from the overwhelming and festering stench.  The showers in the open dormitories do not have temperature control and provide only extremely hot water.  The open dormitories are also the site of frequent conflict and even violence.  Indeed, the detained immigrants refer to open dormitories as "El Gallinero," or "the Chicken Coop," for both the conditions and overcrowded living quarters.

57.     CoreCivic maintains a corporate scheme, plan, and pattern at Stewart of threatening Plaintiffs and Class Members with loss of access to the commissary when they refuse to work.

58.     Plaintiffs and Class Members rely on access to the commissary to purchase the basic necessities that CoreCivic does not adequately provide and phone cards to maintain contact with loved ones.

59.     By maintaining this scheme, plan, and pattern of threatening Plaintiffs and Class Members who refuse to work with solitary confinement and other sanctions, CoreCivic ensures an available labor pool of detained immigrants will work for nearly free, thus allowing it to continue operating Stewart at an enormous profit.

60.     CoreCivic knowingly benefitted financially, both by way of reduced labor costs and increased commissary revenue, from participating in a venture CoreCivic knew or should have known forced Plaintiffs and Class Members to work, or attempted to force them to work.

**F.      Plaintiff Barrientos' Labor at Stewart**

61.     Mr. Barrientos has performed work for CoreCivic at Stewart as a result of its unlawful forced labor scheme, plan, and pattern.

62.     As a kitchen worker, Mr. Barrientos washes dishes, serves meals, and prepares food for detained immigrants at Stewart.  He regularly works eight to nine-hour shifts per day, seven days per week.

63.     Prior to March 2018, Mr. Barrientos was paid $4 per day.  If he worked more than twelve hours in one day, he was paid $5 per day.  If Mr. Barrientos worked seven consecutive days in one week, he was compensated with a $5 phone card on top of his weekly wages.

64.     After March 2018, CoreCivic's pay scheme changed.  Currently, Mr. Barrientos is paid $1 per day if he works less than six hours, $4 per day if he works for six hours, $5 per day if he works between eight and eleven hours and fifty-nine minutes, and $8 per day if he works twelve hours or more.  CoreCivic credits these wages to Mr. Barrientos' commissary account.

65.     As a kitchen worker, Mr. Barrientos has been forced to cook and serve spoiled food to detained immigrants after complaining about the expired food to kitchen supervisors.

66. CoreCivic denies Mr. Barrientos access to basic necessities that he then has to purchase at Stewart's commissary with his wages from the Work Program. In one instance, Mr. Barrientos ran out of toilet paper and requested another roll from a CoreCivic officer. The CoreCivic officer told Mr. Barrientos to use his fingers to clean himself.

67. Mr. Barrientos spends his wages on soap, tooth paste, food, clothes, phone cards, and other necessities from the commissary.

68. Mr. Barrientos is housed in a pod with private, two-person cells that contain a bathroom to be shared with his cellmate, and he is provided with access to a shower that has both hot and cold water.

69. Officers at Stewart have threatened to transfer Mr. Barrientos from his pod to the Chicken Coop if he stops working, calls in sick, refuses to change shifts as requested, or encourages others to stop working.

70. On one occasion, a CoreCivic Officer named Garden[40] woke up Mr. Barrientos and ordered him to work a 2 a.m. shift, even though he was assigned the 10 a.m. shift that day. When Mr. Barrientos refused, the officer told him to pack his bags because he was being moved to another pod. Mr. Barrientos relented and worked the early shift because he was afraid of being placed back in the Chicken Coop.

71. Officers at Stewart threatened Mr. Barrientos with denial of access to the commissary if he stopped working, called in sick, or encouraged others to stop working.

72. Around late 2015, CoreCivic officers threatened to put Mr. Barrientos in solitary confinement on two different occasions because they thought he and other kitchen workers were organizing a work stoppage.

---

[40] Mr. Barrientos is unsure of the precise spelling of this Officer's name and therefore acknowledges that this spelling is an approximation.

73.     Around October 2017, CoreCivic officers put Mr. Barrientos in medical segregation, allegedly for chicken pox, soon after he submitted a grievance against an officer who forced Mr. Barrientos to work while he was sick.  Mr. Barrientos informed the officers that he had chicken pox as a child and was therefore unlikely to contract it again.  CoreCivic detained Mr. Barrientos in medical segregation for two months and, despite a blood test, never informed him whether he had contracted chicken pox so as to justify his segregation.

74.     While in segregation, Mr. Barrientos was in a cell by himself and was denied basic necessities and privileges.  He was not allowed to see his family.  His outdoor yard time was reduced from three to four hours per day to a half hour per day.  As a result of his medical segregation, the immigration court had to reschedule a hearing in his immigration case thereby prolonging resolution of his case.

75.     Mr. Barrientos provides CoreCivic with his labor because of CoreCivic's threats of physical restraint, serious harm, and/or abuse of the legal process; and its scheme, plan, and pattern to threaten or inflict physical restraint and serious harm upon him if he refuses to work.

76.     CoreCivic has retained and currently retains the value of Mr. Barrientos' labor as corporate profits instead of using it to provide for safe, minimally humane living conditions for detained immigrants at Stewart or to compensate Mr. Barrientos fairly.

### G.     Plaintiff Velazquez's Labor at Stewart

77.     Mr. Velazquez has performed work for CoreCivic at Stewart as a result of its unlawful forced labor scheme, plan, and pattern.

78.     As a kitchen worker, Mr. Velazquez washes dishes and prepares beverages during meal services for other detained immigrants at Stewart.  On average, he works six to eight hours per day, five days per week.

79.     For his labor, Mr. Velazquez is paid $1 per day if he works less than six hours, $4 per day if he works for six hours, $5 per day if he works between eight and eleven hours and fifty-nine minutes, and $8 per day if he works twelve hours or more.  CoreCivic credits these wages to Mr. Velazquez's commissary account.

80.     CoreCivic denies Mr. Velazquez access to basic necessities that he then has to purchase at Stewart's commissary with his wages from the Work Program.  Mr. Velazquez uses his wages to purchase phone cards and food at CoreCivic's commissary, among other necessities.

81.     Mr. Velazquez is housed in a pod with private, two-person cells.  He shares a bathroom with only one other person, his cellmate, and has access to a shower with temperature control.

82.     Mr. Velazquez has witnessed CoreCivic officers threaten to move detained immigrants who decline to work from their small pods like his to the Chicken Coop.

83.     Mr. Velazquez provides CoreCivic forced labor because of its threats of physical restraint, serious harm, and/or abuse of the legal process; and its scheme, plan, and pattern to threaten or inflict physical restraint and serious harm upon him if he does not.

84.     CoreCivic has retained and currently retains the value of Mr. Velazquez's labor as corporate profits instead of using it to provide for safer, more humane living conditions for detained immigrants at Stewart or compensate Mr. Velazquez fairly.

**H.      Plaintiff Ahmed's Labor at Stewart**

85.     Mr. Ahmed was detained at Stewart from approximately August 2016 to February 2018.

86.     As a kitchen worker, Mr. Ahmed prepared, cooked, and served meals, washed dishes, and cleaned the kitchen area.  He worked eight-hour shifts, starting at 2:00 a.m., up to seven days per week.

87.     In return for this labor, Mr. Ahmed was paid $4 per day.  If he worked twelve hours or more, he was paid an additional $1 per day. CoreCivic credited these wages to Mr. Ahmed's commissary account.

88.     CoreCivic denied Mr. Ahmed access to basic necessities that he then had to purchase at Stewart's commissary with his wages from the Work Program.  Mr. Ahmed spent his wages on food and phone cards from the commissary, among other necessities.

89.     Officers at Stewart threatened to put Mr. Ahmed in solitary confinement, if he stopped working or encouraged other detained immigrants to stop working.

90.     In November 2017, officers at Stewart actually put Mr. Ahmed in solitary confinement for threatening a work stoppage after he had not been paid for his work. Specifically, officers at Stewart held Mr. Ahmed in solitary confinement for ten days for allegedly saying "no work tomorrow."[41]

91.     Mr. Ahmed provided CoreCivic forced labor because of its threats of restraint, serious harm, and/or abuse of the legal process; and its scheme, plan, and practice to threaten or inflict restraint and serious harm upon him if he does not.

92.     CoreCivic retained the value of Mr. Ahmed's labor by realizing this value as corporate profits, rather than using it to provide for safer, more humane living conditions for detained immigrants at Stewart.

---

[41] Spencer Woodman, *Private Prison Continues To Send ICE Detainees To Solitary Confinement For Refusing Voluntary Labor*, The Intercept (Jan. 11, 2018), https://theintercept.com/2018/01/11/ice-detention-solitary-confinement.

## CLASS ACTION ALLEGATIONS

93.     Plaintiffs bring this lawsuit as a class action on behalf of themselves individually and all others similarly situated under Federal Rules of Civil Procedure 23(a), (b)(2) for their requests for declaratory and injunctive relief only, and (b)(3) for their requests for damages. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

### A.     <u>Class Definition</u>

94.     Plaintiffs seek to certify the following two classes:

> (a) All civil immigration detainees who performed work for CoreCivic at Stewart in the "Volunteer Work Program" within the past ten years, up to the date the class is certified ("Forced Labor Class").

> (b) All civil immigration detainees who performed work for CoreCivic at Stewart in the "Volunteer Work Program" within the past four years, up to the date the class is certified ("Unjust Enrichment Class").

95.     Excluded from the class definitions are the defendants, their officers, directors, management, employees, subsidiaries, and affiliates, and all federal governmental entities. Plaintiffs reserve the right to revise the class definition based upon information learned subsequent to the filing of this action.

### B.  <u>Class Certification Requirements under Rule 23(a), (b)(2), and (b)(3).</u>

96.     **Numerosity:** The class is so numerous that joinder of all members is impracticable.  Plaintiffs do not know the exact size of the class because that information is within the control of CoreCivic.  However, upon information and belief, the class members number in the thousands.  Membership in the class is readily ascertainable from CoreCivic's detention and Work Program records.

97.     **Commonality:** There are numerous questions of law or fact common to the Class, and those issues predominate over any question affecting only individual class members. The common legal and factual issues include the following:

     a.     Whether CoreCivic's conduct as set forth in Count I violated the forced labor and attempt provisions of the Trafficking Victims Protection Act (18 U.S.C. §§ 1589, 1594, and 1595);

     b.     Whether CoreCivic was unjustly enriched by the Work Program;

     c.     Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive and declaratory relief; and

     d.     Whether Plaintiffs and the Class Members are entitled to damages and other monetary relief and, if so, in what amount.

98.     **Typicality:** The claims asserted by Plaintiffs are typical of the claims of the Class, in that the representative Plaintiffs, like all Class Members, were subject to and impacted by CoreCivic's uniform policy. Each member of the proposed Class has been similarly injured by CoreCivic's misconduct.

99.     **Adequacy:** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained attorneys experienced in class and complex litigation, including litigation arising under the Trafficking Victims Protection Act. Plaintiffs and their counsel intend to vigorously prosecute this litigation. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other class members.

100.     **Predominance of Common Questions:** The questions of law or fact common to the class, identified above in paragraph 97, predominate over any questions affecting only

individual members.  Specifically, CoreCivic's scheme, plan, and pattern to force labor applies to the class as a whole and has resulted in substantially similar injuries to the class.

101.    **Superiority:** Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of CoreCivic's wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many members of the proposed class who could not individually afford to litigate a claim such as is asserted in this complaint.  Additionally, a class action is superior because the Class is comprised of many individuals who do not speak English as their native language and who are geographically dispersed.  Finally, this class action likely presents no difficulties in management that would preclude maintenance as a class action.

102.    This action satisfies the requirements of Rule 23(b)(2) because CoreCivic has acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class Member.

**CAUSES OF ACTION**

**<u>COUNT I</u>**

**THE TRAFFICKING VICTIMS PROTECTION ACT**
Forced Labor (18 U.S.C. § 1589)
Or, in the Alternative, Attempt to Commit Forced Labor (18 U.S.C. § 1594(a)).
***On behalf of the Forced Labor Class***

103.    Plaintiffs and Class Members reallege and incorporate by reference herein all allegations above.

104. Plaintiffs and Forced Labor Class Members are authorized to bring this claim against CoreCivic pursuant to the civil remedies provision of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1595, because CoreCivic violated the forced labor provisions of 18 U.S.C. § 1589 or, in the alternative, the attempt provisions of 18 U.S.C. § 1594(a).

105. Plaintiffs and Forced Labor Class Members also are authorized to bring this claim under the TVPA, 18 U.S.C. § 1595, because CoreCivic knowingly benefitted financially from participating in a venture which CoreCivic knew or should have known has engaged in violations of the forced labor or, in the alternative, the attempt provisions of 18 U.S.C. § 1594(a).

106. CoreCivic knowingly obtained the labor or services of Plaintiffs and Forced Labor Class Members by means of physical restraint and threats of physical restraint of Plaintiffs and Members of the Forced Labor Class, in violation of 18 U.S.C. § 1589(a)(1). Specifically, CoreCivic threatened to or did restrain Plaintiffs and Forced Labor Class Members in solitary confinement when they refused orders to work.

107. CoreCivic knowingly obtained the labor or services of Plaintiffs and Forced Labor Class Members by means of serious harm and threats of serious harm, in violation of 18 U.S.C. § 1589(a)(2).

108. The serious harm CoreCivic caused and threatened was physical and non-physical harm, including psychological, financial, and reputational harm. Specifically,

    a. <u>Withholding of Basic Necessities</u>: CoreCivic withheld or threatened to withhold basic necessities from Plaintiffs and Forced Labor Class Members, thereby forcing them to work for subminimum wages to buy those basic necessities at the commissary and avoid hunger, undernourishment, lack of personal hygiene, and lack of contact with loved ones, among other harms;

      b. <u>Threatened and Actual Sanctions</u>: When CoreCivic perceived that Plaintiffs and Forced Labor Class members were refusing to provide their labor, organizing a work stoppage, or participating in a work stoppage, CoreCivic

        i. placed or threatened to place them into solitary confinement;
        ii. threatened criminal prosecution;
        iii. threatened to transfer them to unsafe and unsanitary living quarters, where they would be deprived of privacy, safety, and sanitation; and
        iv. threatened to deny them access to the commissary where they could buy food, hygiene products, and phone cards, thus denying them basic necessities and isolating them from friends and family.

109. The conduct described in paragraph 108, *supra*, is "serious harm" as defined in 18 U.S.C. § 1589(c)(2) because it is "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances [of Plaintiffs and Forced Labor Class Members] to perform or to continue performing labor or services in order to avoid incurring that harm."

110. CoreCivic knowingly obtained the labor or services of Plaintiffs and Forced Labor Class Members "by means of a scheme, plan, or pattern [CoreCivic] intended to cause … [Plaintiffs and Forced Labor Class Members] to believe that, if … [Plaintiffs and Forced Labor Class Members] did not perform such labor or services, … [they] would suffer serious harm or physical restraint" as described in paragraphs 105-108, *supra*, in violation of 18 U.S.C. § 1589(a)(4).

111. CoreCivic knowingly obtained the labor or services of Plaintiffs and Forced Labor Class Members by means of abuse or threatened abuse of legal process, in violation of 18 U.S.C. § 1589(a)(3). Specifically, CoreCivic threatened to initiate criminal proceedings against

Plaintiffs and Forced Labor Class Members to obtain their labor and to prevent them from refusing to work.

112.　In the alternative, CoreCivic attempted to obtain the labor or services of Plaintiffs and Forced Labor Class Members by the means described paragraphs 105-108, *supra*, in violation of 18 U.S.C. § 1594(a).

113.　Plaintiffs and Forced Labor Class Members have suffered damages in an amount to be determined at trial.

114.　Plaintiffs and Forced Labor Class Members are entitled to recover compensatory and punitive damages.

115.　Plaintiffs and Forced Labor Class Members are entitled to recover mandatory restitution in the full amount of their losses.

116.　Plaintiffs and Forced Labor Class Members are entitled to recover their costs and reasonable attorney's fees.

## COUNT II
### *On behalf of the Unjust Enrichment Class*
### UNJUST ENRICHMENT
### Georgia Common Law

117.　Plaintiffs reallege and incorporate by reference herein all allegations above.

118.　CoreCivic materially and significantly reduced its labor costs and expenses, and increased its corporate profits, by obtaining undercompensated labor from Plaintiffs and Unjust Enrichment Class Members.

119.　Plaintiffs and Unjust Enrichment Class Members conferred non-gratuitous benefits upon CoreCivic by performing work for $1 to $4 per day, and up to $8 per day for kitchen workers under certain circumstances, for which CoreCivic would otherwise have had to pay at least the applicable minimum wage or more, thereby significantly and materially

increasing CoreCivic's profits and unjustly enriching CoreCivic at the expense of and detriment to Plaintiffs and Unjust Enrichment Class Members.

120.    CoreCivic's retention of any benefit collected directly and indirectly from this undercompensated labor violated principles of justice, equity, and good conscience.

121.    As a direct and proximate result of CoreCivic's forced labor practices, Plaintiffs and Unjust Enrichment Class Members have suffered concrete harm and injury, including physical and emotional injury, and the unlawful violation of their rights.

122.    Plaintiffs and Unjust Enrichment Class Members are entitled to recover from CoreCivic all amounts that CoreCivic has wrongfully and improperly obtained, and CoreCivic should be required to disgorge to Plaintiffs and Unjust Enrichment Class Members the benefits it has unjustly obtained. Plaintiffs and Class Members are also entitled to recover exemplary damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class, request that the Court:

a.  Certify this action as a class action, with the classes as defined above;

b.  Find that Plaintiffs are proper representatives of the classes, and appoint the undersigned as Class Counsel;

c.  Order CoreCivic to identify and disclose to Plaintiffs all Class Members;

d.  Order CoreCivic to pay for notifying Class Members of the pendency of this suit;

e.  Award declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

f.  Award injunctive relief as is necessary to protect the interests of Plaintiffs and Class Members, including enjoining CoreCivic from continuing to conduct business through the unlawful and unfair practices alleged herein;

g. Order disgorgement of CoreCivic's unjustly-acquired revenue, profits, and other benefits resulting from its unlawful conduct;

h. Award Plaintiffs and Class Members monetary damages for CoreCivic's forced labor, or in in the alternative, attempted forced labor, and unjust enrichment in an amount to be determined at trial;

i. Award Plaintiffs and Class Members their reasonable litigation expenses and attorney's fees; and

j. Award any further relief that the Court deems just and equitable.

Dated: April 17, 2018

Respectfully Submitted,

/s/ Daniel Werner
Daniel Werner (GA Bar No. 422070)
Laura Rivera (GA Bar No. 143762)
**SOUTHERN POVERTY LAW CENTER**
150 E. Ponce de Leon Avenue, Suite 340
Decatur, GA, 300030
Telephone: (404) 521-6700
Facsimile: (404) 221-5857
daniel.werner@splcenter.org
laura.rivera@splcenter.org

/s/ Meredith B. Stewart
Meredith B. Stewart*
Bryan Lopez*
**SOUTHERN POVERTY LAW CENTER**
201 Saint Charles Avenue, Suite 2000
New Orleans, LA 70170
Telephone: (504) 486-8982
Facsimile: (504) 486-8947
meredith.stewart@splcenter.org
bryan.lopez@splcenter.org

R. Andrew Free*
**LAW OFFICE OF R. ANDREW FREE**
P.O. Box 90568
Nashville, TN 37209
Telephone: (844) 321-3221x1
Facsimile: (615) 829-8959
andrew@immigrantcivilrights.com

Azadeh Shahshahani (GA Bar No. 509008)
Priyanka Bhatt (GA Bar No. 307315)
**PROJECT SOUTH**
9 Gammon Avenue SE
Atlanta, GA 30315
Telephone: (404) 622-0602
Facsimile: (404) 622-4137
azadeh@projectsouth.org

Korey A. Nelson*
Lydia A. Wright*
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765
knelson@burnscharest.com
lwright@burnscharest.com

Warren T. Burns*
Daniel H. Charest*
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
wburns@burnscharest.com
dcharest@burnscharest.com


*Application for admission *pro hac vice*
forthcoming.

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date the foregoing and accompanying documents were filed through the Court's CM/ECF filing system, and will be served on the defendants listed below with the summons. When service is complete a Proof of Service form will be filed with the Court, which Proof of Service will list the date, method, and documents served.

CoreCivic, Inc.
10 Burton Hills Blvd.
Nashville, TN 37215

Dated: April 17, 2018                     /s/ Daniel Werner_____