IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF GEORGIA

COLUMBUS DIVISION

WILHEN HILL BARRIENTOS, et al., )
                                ) CIVIL ACTION NO.
          Plaintiffs,           ) 4:18—CV—00070
                                )
vs.                             ) APRIL 15, 2021
                                )
CORECIVIC, INC.,                ) MOTION HEARING
                                ) VIA ZOOM VIDEOCONFERENCING
          Defendant.            )

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CLAY D. LAND,

UNITED STATES DISTRICT JUDGE

**Proceedings recorded by stenography; transcript produced by computer.**

BETSY J. PETERSON, CRR, RPR, CCR
Federal Official Court Reporter
Post Office Box 2324
Columbus, Georgia  31902
betsy_peterson@bellsouth.net

1                          APPEARANCES

2

3   FOR THE PLAINTIFFS:

4        MEREDITH BLAKE STEWART
         meredith.stewart@splcenter.org
5        Southern Poverty Law Center
         201 St. Charles Avenue
6        Suite 2000
         New Orleans, Louisiana  70170
7        (504) 526-1497

8        CAITLIN JOY SANDLEY
         cj.sandley@splcenter.org
9        VIDHI BAMZAI
         vidhi.bamzai@splcenter.org
10       Southern Poverty Law Center
         400 Washington Avenue
11       Montgomery, Alabama  36104
         (334) 303-6822
12

13       ALAN B. HOWARD
         ahoward@perkinscoie.com
14       Perkins Coie LLP
         1155 Avenue of the Americas
15       Suite 22nd Floor
         New York, New York  10036
16       (212) 261-6870

17       JOHN H. GRAY
         jhgray@perkinscoie.com
18       Perkins Coie LLP
         2901 North Central Avenue
19       Suite 2000
         Phoenix, Arizona  85012
20       (602) 351-8000

21       REBECCA CASSLER
         rebecca.cassler@splcenter.org
22       Southern Poverty Law Center
         150 E. Ponce De Leon Avenue
23       Suite 340
         Decatur, Georgia  30030
24       (404) 521-6700

     Also present:  Elliot Lepe
25

1                         APPEARANCES (CONTINUED)

2

3   FOR THE DEFENDANT/COUNTER CLAIMANT CORECIVIC, INC.:

4        JACOB B. LEE
         jlee@strucklove.com
5        Struck Love Bojanowski & Acedo, PLC
         3100 W. Ray Road
6        Suite 300
         Chandler, Arizona  85226
7        (480) 420-1600

8        JACOB D. MASEE
         jmassee@olivermaner.com
9        Oliver Maner LLP
         218 West State Street
10       Savannah, Georgia  31401
         (912) 236-3311
11

12

13  FOR THE MOVANT TRINITY SERVICES GROUP, INC.:

14       ALEIA M. HORNSBY
         aleia.hornsby@alston.com
15       JONATHAN TURNER EDWARDS
         jonathan.edwards@alston.com
16       Alston & Bird, LLP
         One Atlantic Center
17       1201 West Peachtree Street
         Atlanta, Georgia  30309-3424
18       (404) 881-7000

19

20

21

22  COURT REPORTER:

23       BETSY J. PETERSON, CRR, RPR, CCR
         Federal Official Court Reporter
24       P. O. Box 2324
         Columbus, Georgia  31902
25       betsy_peterson@bellsouth.net

```
 1          (Proceedings on April 15, 2021, commencing at 9:39 a.m.,
 2       as follows:)
 3             THE COURT:  All right.  Welcome.  Appreciate
 4    everybody being available.
 5             We got, really, two motions to take up this morning
 6    in the case.  One is the motion to compel with regard to the
 7    subpoena that was issued to Trinity Services Group, Inc., and
 8    the other is the motion related to the request for a site
 9    inspection.
10             I'm going to take up the matter regarding Trinity
11    first.  And then, when that is done, their lawyers can excuse
12    themselves since they don't have anything to do with the second
13    motion.
14             As I understand it, having read the briefs, there are
15    three requests to which —— (Zoom audio glitch) —— motion to
16    compel or a countermotion to quash.  The first one I want to
17    talk about is the subpoena request with regard to all of these
18    e-mails, where the —— Trinity contends that there are over
19    $10,000 in fees —— (Zoom audio glitch) —— unduly burdensome for
20    them to have to produce them, particularly since they contend
21    the plaintiff —— (Zoom audio glitch) —— much of the same
22    material from —— directly from the party, CoreCivic.
23             Let me ask you this ——
24             Geoffery, is that the construction work that's
25    happening in our chambers?
```

1                THE CLERK:  Yes, Your Honor.

2                THE COURT:  Can you turn your volume down a little

3    bit so that that doesn't come through quite as loud?

4                THE CLERK:  Yes, sir.

5                THE COURT:  Thank you.

6                We've got construction going on in the courthouse

7    right in my chambers and next to the courtroom down there,

8    which is why I'm at a alternative location this morning.

9                In any event, let me ask you this, Ms. Hornsby, on

10   behalf of Trinity.

11               Would it be feasible and far less burdensome for

12   Trinity to print a printout that shows all of the e-mails to

13   and from CoreCivic and Trinity for the relevant time period,

14   along with the dates of those e-mails, without the contents?

15   And, then, the plaintiffs could review that log and compare it

16   to e-mails that they obtained through direct request to

17   CoreCivic and be able to ascertain which ones you've identified

18   that CoreCivic has not produced.  And that would at least save

19   substantial time on behalf of Trinity in having to do — review

20   the contents of the e-mails for privileged materials.  But — I

21   would think that technologically that would be something that

22   could be fairly easily done by Trinity just running a report

23   that shows — whoever the receiver and sender of the e-mail is

24   connected to CoreCivic, send a list of all of those with just

25   the name of the sender and the recipient and the dates.  That,

1   to me, would not be unduly burdensome to do that.

2          Do you know whether that can be done feasibly by

3   Trinity?

4          MS. HORNSBY:  Your Honor, I'd —— I'd like to perhaps

5   speak that over with our review team.  But it sounds like, if

6   it's just a matter of exporting the information, that that is

7   something that could be done.  But, as Your Honor knows, we've

8   already produced all of the nonprivileged or nonwithheld

9   documents to plaintiffs.  So I don't know if that would change

10  anything.  But that's certainly something that we could look

11  into doing.

12         THE COURT:  Well, so is the only issue, then, whether

13  you get paid more money?  You contend that you have produced

14  all of the e-mails that have been requested and that you're not

15  making a claim of undue burden?

16         MS. HORNSBY:  With regards to Phase 1, Your Honor,

17  yes.  Phase 2 was another issue within the Request No. 2

18  that —— that is before the Court.

19         THE COURT:  So the only issue with regard to Phase 1

20  is whether you should be paid additional money?

21         MS. HORNSBY:  From our standpoint it is that we have

22  finished the production, that what we have withheld is properly

23  withheld.  So, yes, correct, Your Honor, that —— that would be

24  the only left issue.

25         THE COURT:  So you've already gone through all of the

1    e-mails and determined which ones are privileged.

2              MS. HORNSBY:  Correct, Your Honor.

3              THE COURT:  And part of the privilege that you are

4    claiming is that it includes information that is personally

5    identifying or is somehow otherwise protected by federal law

6    because it includes dietary restrictions?  Those are the ones

7    that you've also withheld as privileged?

8              MS. HORNSBY:  Yes.  And, Your Honor, if I could just

9    give a — a better background of some of the numbers, it might

10   be more clear.  But, yes, we have produced about 13,034

11   documents that are nonprivileged, aren't withheld for any other

12   reasons.  Of that — and of the entire corpus of documents that

13   had hits to the Phase 1 search, there were 4,886 that — that

14   were withheld either because they were privileged, they

15   contained personal — personally identifiable information or

16   protected health information, or they were withheld on some —

17   some other grounds like customer — other customer information

18   or confidential business information.  So those are the

19   documents that have been withheld.

20             THE COURT:  All right.  Well, how many of those have

21   been withheld that could be nonprotected with the use of a —

22   well, I shouldn't say nonprotected but discoverable — if we

23   had a protective order that protected your production of them

24   by requiring everything to be kept confidential?

25             MS. HORNSBY:  Of those, likely just the items that

1    had the protected — or the PHI and the PII, Your Honor, the

2    inmates' information, birth dates, Social Security numbers,

3    things like that.  But the remainder of the documents, whether

4    or not there is a protective order, we still maintain that

5    they're not relevant for disclosure either way.

6           THE COURT:  Well, I'm not sure that I necessarily

7    agree with that.  I think the privilege issues that you raised

8    can clearly be handled with a — with a proper protective

9    order.

10          What — what records are you claiming are not

11   relevant?  And if — (Zoom audio glitch) —

12          MS. HORNSBY:  Items like vendor, vendor invoices,

13   vendor receipts — purchase orders with Office Depot, for

14   example — those don't go to plaintiffs' claims.  Calendar

15   invitations, things like that.

16          THE COURT:  Okay.  All right.

17          Ms. Stewart, perhaps I was a little bit confused.  I

18   had thought that — I don't know that I was completely aware

19   that Trinity had produced everything with regard to Phase 1

20   except documents they claimed were privileged; in order words,

21   they were not asserting an undue burdensome argument with

22   regard to Phase 1.  Are you contending that they have not

23   produced all of the documents other than those to which they

24   claim a privilege?

25          MS. STEWART:  We are contending that, Your Honor.

1            And I just want to go back to the original agreement
2    that we made with Trinity late last year.  Trinity agreed to
3    search for a set of search terms, search for responsive
4    documents, that they agreed were relevant, and that search
5    pulled up about 10,707 files.  It was our understanding that
6    Trinity would be providing to us those files, other than the
7    ones that were attorney-client privilege, in exchange for
8    $10,000, which is the amount they requested and that we
9    promptly paid to them.  Trinity did not produce all the
10   documents that it said it would as part of that agreement,
11   and — and now it's essentially saying we should get those
12   documents from CoreCivic even though we already paid for them.
13            THE COURT:  See, that's where — that's why I'm
14   confused.  I thought I asked Ms. Hornsby that exact question
15   and she said that they have produced all of the documents that
16   are responsive to the request other than ones that they were
17   claiming there was some privilege.  And yet you're telling me
18   that their response is actually that "We're going to — we're
19   producing all of the documents that we have that we think
20   CoreCivic may not have, and you can get the rest from
21   CoreCivic."  But Ms. Hornsby, I thought, just told me that
22   that's not the case, that they've produced all of them, even if
23   you could get them from CoreCivic also.
24            Am I stating correctly, Ms. Hornsby, Trinity's
25   position?

 1             MS. HORNSBY:  Your Honor, I think there is —— there's

 2  mixing of items specific to Phase 1 production of e-mails and

 3  then other requests.  So, yes, there are other requests, such

 4  as the price term in the CoreCivic contract, which is related

 5  to a different document request.  Yes, those are items ——

 6             THE COURT:  I'm —— I'm focused on this Request No. 2

 7  at the moment ——

 8             MS. HORNSBY:  Correct.

 9             THE COURT:  —— which is documents and communications

10  relating to the work program at Stewart during the relevant

11  time period.  That's what I'm focused on at the moment,

12  Ms. Stewart.

13             Now, with regard to those, as I hear Ms. Hornsby and

14  as I understood her to say earlier, they have produced all of

15  those documents for Phase 1 except those to which they claim

16  there is a privilege or confidentiality issue.

17             Is that correct, Ms. Hornsby?

18             MS. HORNSBY:  That's correct, Your Honor.

19             THE COURT:  With regard to those documents, you have

20  not taken the position that "The plaintiff can get those just

21  as easily from CoreCivic; and, therefore, we're not going to

22  produce them."  Is that true?

23             MS. HORNSBY:  Yes, Your Honor.  It's, in fact, the

24  opposite.  We're saying, "Even though you are able to get these

25  from CoreCivic, in good faith we will produce these to you."

1          THE COURT:  All right.  Well, is —— is there some
2    misunderstanding on your part, Ms. Stewart, or are you saying
3    that Ms. Hornsby is just making this up today?
4          MS. STEWART:  No, Your Honor.  I think it might be
5    helpful if I present our version of the numbers, because
6    they're slightly different than ——
7          THE COURT:  No, no.  I'm going to let you do that.
8    But you need to understand I'm the decision-maker, so you need
9    to help me understand from my perspective.  I want to know the
10   answer to that precise question.
11          Ms. Hornsby said she's produced all the documents
12   that are responsive to Request No. 2 in Phase 1 except for
13   those to which they claim a privilege and that they are not
14   taking the position that just because CoreCivic has those you
15   should get them from CoreCivic.
16          Is that not your understanding of what they are ——
17   have done, Ms. Stewart?
18          MS. STEWART:  That is not, Your Honor.  They have not
19   produced nearly half of the approximately 10,000 files they
20   said they would.  Nearly half of those files are unaccounted
21   for, either not produced or not being withheld on some
22   privilege grounds.
23          THE COURT:  All right.  Let's just get to the bottom
24   of that.
25          Ms. Hornsby, she says you haven't produced them.

1          MS. HORNSBY:  That's inaccurate.  So if I —— if I may

2    run through all the numbers, I certainly would do that for the

3    Court if that's okay.

4          So back in November we —— November of 2020 we

5    informed plaintiffs that our IT personnel had run —— or maybe

6    this was December; I apologize if I get my dates a little

7    off —— but that we had run an initial search and came back with

8    approximately 10,707 documents.  We then decided to hire a

9    review team.  Once that was —— review team was in place and the

10   documents were actually looked at, the entire corpus of

11   documents ended up being approximately 8,372.

12         Of those documents, we initially noticed that there

13   were several that were either calendar invites or the invoices

14   and purchase orders that I had mentioned before.  So from that

15   point we decided we were going to deprioritize those e-mails

16   and produce the ones that were responsive to the search string

17   in Phase 1.

18         We did so on a rolling basis, first starting with

19   perhaps 100 or so and then 700 and then —— and that was —— that

20   was it for the nondepriortized, nonprivileged documents.  We

21   had a privilege log which notated that there were approximately

22   4,886 e-mails that were either withheld on privilege grounds or

23   other confidential grounds.  And to also clarify, those ——

24   those 4,886 did not include family members.  If it did, if we

25   included the families of those privilege documents, we're

1    looking at 7,038 documents that were withheld.

2         Then — what was it — perhaps a week ago we produced

3    an additional 522 documents that were a part of those

4    deprioritized e-mails that — that I had mentioned earlier.  Of

5    the remaining deprioritized e-mails, those were also —

6    they're — they're notated on the privilege log, not

7    necessarily as deprioritized, but they're included in that

8    withheld bunch of 4,886 documents.

9         THE COURT:  Okay.

10        MS. HORNSBY:  So that is the entire world of e-mails

11   at this point.

12        THE COURT:  So how many e-mails have you produced?

13        MS. HORNSBY:  We have produced 1,334 documents.

14        THE COURT:  All right.  Ms. Stewart, let's set aside

15   for the moment the privileged documents to which they claim a

16   privilege or confidentiality, which is a large percentage of

17   these.  What from the rest of those documents is it that you

18   claim they are wrongfully withholding or refusing to produce?

19        MS. STEWART:  So Ms. Hornsby just said a number that

20   I'm hearing for the first time, and that was — I think she's

21   saying the entire corpus of documents was not 10,707, it was

22   actually 8,372.  If that's the case, then that explains some of

23   the discrepancy but not all of it.  And I also note that

24   Trinity has represented to us throughout this process and to

25   the Court in several joint filings that the corpus is 10,707

1   documents.

2           Going from that number or even going from this new

3   number that Ms. Hornsby just stated, the 8,000 ——

4           THE COURT:  Let me —— well, let's —— let's get that

5   straightened out, first of all.

6           How did you get from the 10,000 to the 8,372,

7   Ms. Hornsby?

8           MS. HORNSBY:  Yes, Your Honor.  So the —— the 10,707

9   came when our internal IT personnel ran a basic search.  Once

10  we hired our review team and they got into the documents and

11  either took out duplicatives or —— or however their process is,

12  they began working from a number that was reduced down to

13  8,372.  So, yes ——

14          THE COURT:  So it's —— it's your representation that

15  the universe of documents that are responsive to their request,

16  including ones which you later claim privileged or

17  confidentiality, that universe is actually 8,372 documents.

18          MS. HORNSBY:  Yes, once we hired the review team.

19          THE COURT:  All right.  And then you did a second

20  review that took out calendar invites and certain specific

21  purchase orders, and that got you down to how many?

22          MS. HORNSBY:  Ooh, it —— that I can't give an exact

23  precise number to because we're dealing with families in these

24  document productions.  I think, the original number, there was

25  probably, you know, 500 in total, including the —— and this

1  probably isn't answering your question exactly.  But it was

2  7,000 — it was 4,886 that were withheld in total, including

3  the calendar invitations —

4           THE COURT:  Okay.

5           MS. HORNSBY:  — purchase orders, and also the PHI.

6           THE COURT:  All right.  So the — so the 4,886

7  includes, in addition to the privileged confidential documents,

8  the calendar invites and the purchase orders.

9           MS. HORNSBY:  Yes, Your Honor.

10           THE COURT:  Okay.

11           MS. HORNSBY:  And just if I may just as a particular

12  clarification, if we include families of those withheld, then

13  we're up to 7,038 documents.

14           THE COURT:  Okay.  And do you have a record of how

15  many documents to which you have claimed a privileged or

16  confidentiality?

17           MS. HORNSBY:  Yes, I believe I do.

18           Let's see.  I can — if we do — I do know that

19  approximately 2,173 were — actually, let me take that back.  I

20  think I do have the number.  Bear with me one moment, please.

21           Yes.  2,773 were withheld because they either

22  contained the confidential business information, and then 30

23  were withheld because they contained other customer

24  information.

25           THE COURT:  So 2,773?  Did that also include

1   documents that were withheld because it had personal
2   information regarding the detainee or —
3          MS. HORNSBY:  No, Your Honor.
4          THE COURT:  Okay.  So the 2,773 is confidential
5   business information.
6          MS. HORNSBY:  Yes.  Plus the 30 that's also other
7   customer information.
8          THE COURT:  How many did you withhold because it had
9   private information with regard to the detainees?
10          MS. HORNSBY:  Yes, Your Honor.  2,173 documents
11   contained PII, and 499 contained PHI.
12          THE COURT:  Okay.  All right.  Well, I think the ones
13   that contain the PII and PHI, that can be easily handled with
14   an appropriate protective order.  So that would be 2,173
15   additional documents to be produced based upon a protective
16   order if the current one doesn't cover it.
17          I mean, you agree, Ms. Hornsby, that obviously those
18   protections with regard to confidentiality of that type
19   information — that can be accomplished by the Court with a
20   proper protective order; correct?
21          MS. HORNSBY:  Yes, Your Honor.
22          THE COURT:  Okay.  Have you — have you seen the
23   protective order that has previously been entered in this case
24   and are not comfortable that it covers the situation?
25          MS. HORNSBY:  That's correct, Your Honor.  And I

1    think some of it was because in these documents that contained

2    the PII there are rosters of all inmates, not just inmates

3    relative to the work program.  So I think —

4            THE COURT:  All right.  Well, then — then I'm going

5    to direct that within seven days you provide Ms. Stewart with a

6    proposed protective order that would properly cover this

7    confidential information in these 2,173 documents.

8            And, Ms. Stewart, you review that and confer with

9    Ms. Hornsby and hopefully agree upon a consent protective order

10   with regard to those documents.  And if you cannot agree, then

11   I'll decide the difference — or I'll resolve the disagreement.

12           Now, with regard to the 2,700 — and I will order

13   production of those documents once the protective order is in

14   place.

15           With regard to the 2,773 that you claim are

16   confidential for business reasons, are you also contending that

17   you don't believe those are relevant, Ms. Hornsby?

18           MS. HORNSBY:  That's correct, Your Honor.

19           THE COURT:  Okay.  Do these — do these documents

20   relate in any way to the pricing for meals and the cost of

21   meals and how that is calculated pursuant to the contract

22   between Trinity and CoreCivic?

23           MS. HORNSBY:  Your Honor, I don't believe so.  I have

24   not reviewed all 2,773, but I do know they were flagged because

25   they were mostly vendor invoices that had price terms for

 1    specific items both by — I don't — I don't believe they have
 2    anything to do with price per meals or anything like that.
 3             THE COURT:  So you're just — who made the
 4    determination as to the basis for excluding those 2,773
 5    documents?
 6             MS. HORNSBY:  Our review team, based on a protocol
 7    that we implemented.
 8             THE COURT:  Okay.  With regard to those documents,
 9    I — do you think it would be reasonably easy to — well, let
10    me — would — do you know whether most of those documents are
11    between Trinity and CoreCivic or with — they're with other
12    parties?
13             MS. HORNSBY:  They're with — they're with vendors.
14    As far as the ones that are not calendar invitations, they're
15    with vendors specifically.
16             THE COURT:  So they would be, for example, invoices
17    for purchase of cornmeal or potatoes or whatever —
18             MS. HORNSBY:  Or supplies from Office Depot or —
19    yes, that's exactly it.
20             THE COURT:  Ms. Stewart, I understand that you —
21    that you obviously as part of your claim are trying to
22    determine how CoreCivic profited from the alleged coerced
23    reduced price labor.  But can you not get that information from
24    another source other than going through — do you intend to go
25    through all of their invoices with regard to their cost of

1   goods sold and have someone calculate from scratch a

2   profit-and-loss statement as to what they were making, or do

3   you intend to pursue that by obtaining something in more

4   summary form from the parties based on the price that they were

5   charging in the contract?

6           I mean, are you actually going to go through — is

7   your intention to go through every invoice for every meal for

8   this period of time to determine the cost of the food operation

9   to Trinity and then compare that to the — to the contract?

10          MS. STEWART:  Your Honor, in a nutshell, yes.  We

11  view the — the e-mails that are from food vendors or exchanged

12  with food vendors to be relevant to our claim that CoreCivic,

13  through its agent Trinity, is depriving individuals of adequate

14  food at Stewart Detention Center.  Trinity, according to the

15  contract, purchases the food.  So these are Trinity documents

16  and Trinity e-mails.

17          We had previously discussed this with Trinity.  And

18  they had informed us that, despite their relevance objection,

19  they were willing to produce these documents to us but that

20  they would be deprioritized, so in a later production.  This

21  position they're taking now, whereby they're no longer

22  producing those documents because they're either confidential

23  business information or they're not relevant anymore, is not

24  what we understood our agreement to be.

25          THE COURT:  Well, let me ask you how — your response

 1    was a little different than my question.  How do those invoices

 2    show that your — that the detainees were deprived of food?

 3            MS. STEWART:  Well, one of our allegations is really

 4    as to whether or not CoreCivic provided adequate food to

 5    detained individuals.  And adequacy can involve the amount of

 6    food provided, the quality of the food as it's being made, the

 7    quality of the food as it's purchased.  And so to the extent

 8    that CoreCivic via Trinity was skimping on food service or food

 9    vendor purchases by purchasing less-than-adequate food,

10    quantities that would be less sufficient for the number of

11    detained individuals at Stewart, that information is relevant

12    to that claim.

13            THE COURT:  Okay.  All right.  Ms. Hornsby, I'm going

14    to order that Trinity produce those documents and include in

15    this protective order, that you and Ms. Stewart are hopefully

16    going to agree upon, a section that requires that — a

17    procedure for you designating certain parts of those documents

18    as privileged but nevertheless producing them.  In other words,

19    include your privilege issues for those documents in the

20    protective order so we don't have to have two protective

21    orders.

22            MS. HORNSBY:  Yes, Your Honor.

23            Now, to clarify, Your Honor, is that — and also just

24    stepping back with the PHI and PII documents.  It's that whole

25    world.  It's PHI, PII, the other customer information.  Because

1   I do think — I mean, granted, it's a small number — the other

2   customer information documents, those aren't going to be —

3          THE COURT:   How many are those?

4          MS. HORNSBY:   There's only 30 of those.

5          THE COURT:   Produce those 30 to me *in camera* with a

6   privilege log, and I'll look at them.

7          MS. HORNSBY:   Yes, Your Honor.

8          THE COURT:   Okay.  Ms. Stewart, what other e-mails or

9   documents, other than the ones that have been produced and the

10  ones that I've now ordered produced, are there that's out there

11  that you contend you're entitled to that either you — they

12  haven't produced them or you just don't have adequate

13  confidence that they've produced them yet?

14         MS. STEWART:   Yes, Your Honor.  But — but briefly

15  going back to what you just ordered, with respect to the

16  roughly 2,700 documents that they're withholding because they

17  claim they contain confidential business information, would

18  those also be inclusive in the documents that you're ordering

19  them to produce under a future more robust protective order?

20         THE COURT:   Yes.  I think I just said I was — I was

21  ordering them to produce all of those documents except for the

22  30, which they would produce *in camera* for me to review before

23  I order production of those.

24         MS. STEWART:   Okay.  Thank you for clarifying.  So we

25  can —

1            THE COURT:  They — they should be covered in the
2    same protective order as the PII and PHI information, just so
3    we'll have one protective order.
4            MS. STEWART:  Understood.  Thank you.
5            Then I think with —
6            THE COURT:  Ms. Hornsby is going to get that draft,
7    her proposal, to you within seven days.  The sooner you reach
8    agreement, the sooner all that will be produced.
9            MS. STEWART:  Yes.  Thank you, Your Honor.
10           Then with respect to Phase 1, I think there's only
11   one set of e-mails or files that are outstanding.
12           And going back to the discrepancy between the
13   original number of the corpus, which is 10,707 files, and the
14   new number presented by Ms. Hornsby today, which is 8,372
15   files.
16           Previously, going from the 10,707 number, we had that
17   there were 4,398 files unaccounted for, not produced or not
18   being withheld on any sort of privilege or other ground.  Now,
19   going from the new number, the 8,372, that would still leave
20   2,335 files that are unaccounted for that — that should have
21   been included in the original Phase 1 production.  And we don't
22   know what happened to those files.  But our position is that
23   wherever they are they should be produced pursuant to our
24   original agreement with Trinity.
25           THE COURT:  Ms. Hornsby, do you want to explain

1   the — what appears to be a discrepancy in the math?

2            MS. HORNSBY:  Sure, Your Honor.

3            So I think — and this is one of the points I raised

4   earlier, was the difference of items withheld, where it was the

5   items without family members and then items held with family

6   members.  So if we take all of the documents withheld, despite

7   whatever grounds they were withheld on, that's — if we're

8   including family members, that's 7,038 withheld documents.  And

9   I believe — and I'll check my math right now so I don't

10  embarrass myself, but I believe 7,038 plus 1,334 will get us to

11  that 8,372 number, if I'm correct.  Let's see.

12           MS. STEWART:  It gets us close to that number,

13  Ms. Hornsby.  However, pursuant to the log —

14           THE COURT:  Is the — is the family member

15  information — is that — what is that?  What do you mean by

16  "family member"?

17           MS. HORNSBY:  Your Honor, when — especially when

18  you're dealing with e-mails, you'll have a main e-mail, but

19  either there could be an attachment or a chain of e-mails.  And

20  so that creates these families.  And if you keep the families

21  together, you have a certain number.  And if you start removing

22  family members, like removing —

23           THE COURT:  Okay.

24           MS. HORNSBY:  — attachments or removing things —

25           THE COURT:  All right.  That's — that's an IT term.

1  You're not talking about family members of detainees.

2          MS. HORNSBY:  Correct, Your Honor.

3          THE COURT:  So that's just a matter of preventing

4  duplication.

5          MS. HORNSBY:  Yes, Your Honor.

6          THE COURT:  Okay.  So —

7          MS. HORNSBY:  So in that —

8          THE COURT:  With her explanation, Ms. Stewart, what

9  is it left out there that you think that they have not

10 accounted for?

11         MS. STEWART:  Well, I guess — I agree with

12 Ms. Hornsby that they are withholding a total of 4,899 files.

13 And I think what she's saying is that, if you count e-mail

14 families within those files, then that number expands to 7,034.

15         Based on the log they've produced to us, that's not

16 reflected there.  It is a solid 4,899 e-mails.  E-mail families

17 are already broken out in the log.  And so I'm not sure why

18 that discrepancy is happening.  It's significant enough,

19 though, that I'm concerned that it is —

20         THE COURT:  All right.  I'm going to — I'm going to

21 settle it this way, Ms. Hornsby.  I'm not going to require you

22 to produce duplicate e-mails that are duplicates because of

23 "family members," as you've used that term.  I'm not going to

24 require that.  And if you go back and confirm with your people

25 and you confirm yourself that that's what this discrepancy is,

1   then you need to communicate that in writing to Ms. Stewart.

2           If, however, there are other documents out there that

3   are not accounted for except for this duplication, then those

4   need to be produced.  And if there's some privilege, that can

5   be taken care of with the joint protective order that you're

6   going to provide to me to sign.  So basically, with regard to

7   Phase 1, I'm ordering you to produce them unless they are

8   duplicative as you've described.

9           Now, is there any universe of documents out there,

10  Ms. Hornsby, that I have not ordered produced or that you're

11  not withholding based upon duplication that we've not discussed

12  this morning?

13          MS. HORNSBY:  No.  And — I don't believe so, Your

14  Honor.  But I am confirming that, with regard to the documents

15  that are withheld for attorney-client privilege or work

16  product, those will not be produced regardless of a joint

17  protective order.  Is that correct, Your Honor?

18          THE COURT:  Correct.  But how many of those are

19  there?

20          MS. HORNSBY:  I don't have the number in front of me,

21  but I believe it's less than 50.

22          THE COURT:  Well, I think under the rules you're

23  required to submit a privilege log with regard to those.  And

24  then if Ms. Stewart wants to compel production, she can file a

25  motion for me to review those *in camera*.

1          MS. HORNSBY:  That's correct, Your Honor.  We

2   provided privilege logs that had all of these tabs.

3          THE COURT:  All right.  Ms. Stewart — Ms. Stewart,

4   if you're concerned that they are impermissibly hiding behind

5   attorney—client privilege, you just need to file a motion that

6   you want me to review all those *in camera*.

7          MS. STEWART:  We will do that.  Thank you, Your

8   Honor.  I think it's about 19 files.

9          THE COURT:  Okay.

10          MS. HORNSBY:  That sounds about right.

11          THE COURT:  Well, take a close look.  I mean, I don't

12   want to look at them unless I have to, but I certainly will if

13   you think there's some reason to believe that — that I should,

14   Ms. Stewart.

15          MS. STEWART:  Thank you.

16          THE COURT:  With regard to — Ms. Stewart, is that —

17   are you relatively satisfied with regard to Request No. 2 in

18   Phase 1?

19          MS. STEWART:  Yes, Your Honor, I am.

20          THE COURT:  Okay.  And, Ms. Hornsby, you're clear on

21   your obligations going forward with regard to —

22          MS. HORNSBY:  Yes, Your Honor.

23          THE COURT:  Okay.  The other request was — and I

24   don't know if this — well, Request 4 was, "Documents that

25   identify Trinity employees who worked at Stewart during the

1   relevant period, including payroll records, records of hours
2   worked, job description, and job assignments."
3           Ms. Hornsby, I think those could be relevant to their
4   claim.  And have you produced those?
5           MS. HORNSBY:  No, Your Honor.
6           THE COURT:  Okay.  Is — are you making some argument
7   that that's unduly burdensome?
8           MS. HORNSBY:  Your Honor, our argument is just that
9   we respect the privacy of our employees, especially given this
10  line of work.  And so to produce their personal information,
11  their names, their — their pay, all of that, when there's not
12  a relation that I can see towards the claim, especially given
13  that we've already identified that Trinity employees do not do
14  the same type of work that —
15          THE COURT:  Well, they may be — they may be
16  witnesses.  I mean, I don't see any need to — to provide
17  personal identifying information, such as Social Security
18  number, date of birth, or any of that.  But I do think that
19  producing their — providing their names and their — their
20  payroll records, as far as what their compensation was and the
21  hours they worked and their job descriptions and assignments, I
22  think that is — is relevant.  And, of course, all of that can
23  be produced and be protected under this protective order that
24  you and Ms. Stewart are going to work out.  So I'm going to
25  order those records produced.  But I'm — if you want to redact

1   Social Security numbers and date-of-birth information, I think

2   that would be appropriate.

3           MS. HORNSBY:  Your Honor, if I may, if they are

4   intending to — which I believe they are; and, Ms. Stewart,

5   please correct me if I'm wrong — have a 30(b)(6) witness,

6   would it be possible to redact the names of the employees

7   and — and then still produce the payroll information since

8   there'll be this 30(b)(6) witness later down the road?

9           THE COURT:  Ms. Stewart, do — would you have an

10  objection, at least at this stage, these persons being

11  identified by initials; and then if later on you determine you

12  want to go speak to them because they are witnesses, that

13  information can be expanded?

14          MS. STEWART:  Your Honor, we would like their full

15  names and titles now, mostly because the fact discovery in this

16  case closes at the end of June.  So there isn't a whole lot of

17  time to push out potentially contacting these witnesses.

18          However, we would be okay with their initials with

19  respect to the payroll information, for example, if Trinity

20  wanted to produce the payroll information in a more anonymized

21  format.  But other than that we are seeking their full names

22  and titles at the very least.

23          THE COURT:  All right, Ms. Hornsby.  So with regard

24  to the payroll information, if you want to just identify them

25  by initials, that's fine.  That seems reasonable to me.  Or

1  if — but they need to know the full names of these persons

2  because they are potential witnesses in the case.  They — they

3  want to — they want to talk to them and, I assume, find out

4  what the conditions were there as far as holding back food and

5  the conditions there in the area where they were working.  And

6  the only way for them to be able to do that is to have their

7  names.

8           MS. HORNSBY:  Understood.

9           THE COURT:  So what's a reasonable time period from

10 your perspective, Ms. Hornsby, for — we'll get to when all

11 this needs to be done after we get to the very end.

12          The other request is regarding Trinity's contracts

13 with CoreCivic.  Ms. Stewart, is there some reason that this

14 can't be obtained directly from CoreCivic?

15          MS. STEWART:  Your Honor — and to clarify — we have

16 the contracts between Trinity and CoreCivic.  We are seeking a

17 single pricing term in that contract to be unredacted.  And we

18 initially requested the contracts from CoreCivic, and CoreCivic

19 declined to produce them to us and told us to get them from

20 Trinity.  We have only gotten the most recent 2020 version of

21 the contract from CoreCivic.  Trinity knows this because we

22 then went back to Trinity and Trinity produced us the contract.

23          In terms of who should redact the price-per-meal-rate

24 term, either party could do it.  It's not an issue of burden.

25 And as far as I know, Trinity isn't raising really much or any

1  objection to producing this term.  So it would be just as easy

2  for them to lift the redaction as CoreCivic.

3           THE COURT:  Why is —— CoreCivic's a party to the

4  case.  Why —— why would they not be the ones to redact it or to

5  reveal the term?

6           MS. STEWART:  The issue is that they didn't produce

7  the contract to us initially; Trinity did.  So because we got

8  those contracts from Trinity, it would make more sense for

9  Trinity to lift the redaction.  If CoreCivic would be willing

10  to produce those contracts to us, instead of telling us to get

11  them from Trinity, then we could ask CoreCivic to lift that

12  redaction on that term as well.  But they have refused to

13  provide us a contract except for the 2020 version.

14           THE COURT:  All right, Ms. Hornsby.  Produce the

15  contract without the redaction.

16           MS. HORNSBY:  Your Honor, may I explain some of the

17  number behind —— or some of the reasons —— because we actually

18  have stated numerous times why we object to producing the price

19  term.  Is there room for me to explain that, Your Honor?

20           THE COURT:  There is, although I've read those

21  reasons.  It's clear to me that the price term is relevant to

22  the plaintiffs' claims, and it doesn't appear that it would be

23  unduly burdensome, and any confidentiality objection that

24  you —— that you have could be handled with a protective order.

25  But go ahead.

1          MS. HORNSBY:  Your Honor, it's just that's a key

2    negotiating term.  And I think the fact of the matter is, as

3    you've raised, this is a issue that should be between CoreCivic

4    and Trinity.  Trinity heard plaintiffs' request and initially

5    said, "No, this is — get it from CoreCivic."  But in working

6    in good faith and trying to be helpful, we then produced —

7          THE COURT:  Well, let me ask you — let me — let me

8    ask you a question about that, though, Ms. Hornsby.  You say,

9    "Okay, get it from CoreCivic."  It's going to be the same term,

10   is it not?

11         MS. HORNSBY:  Correct.  But, as Ms. Stewart has

12   pointed out, CoreCivic has also redacted that term.

13         THE COURT:  No, no.  What I'm saying is, if I order

14   CoreCivic to unredact the term, then as far as your interest in

15   keeping it out of the discovery, why does it matter whether I

16   order CoreCivic to unredact it or you unredact it?

17         MS. HORNSBY:  I think simply because CoreCivic is the

18   party, not us.  And so the dispute is all between them.  So

19   that's —

20         THE COURT:  But how — but how does that — how does

21   that relate at all to your argument that your client doesn't

22   want to disclose a negotiating term because there's some

23   economic disadvantage that may occur to them?

24         MS. HORNSBY:  Right.  That's our position.  But if

25   the Court ordered CoreCivic to do it, then we can't — then we

1   can't stop it.  But our position and why we don't want it

2   produced or why we don't want it left unredacted is because

3   it's — it's — it's very sensitive negotiating terms, sales

4   terms, all — all of this that goes into coming up with that

5   number.  It could, you know, impact the competitive advantage,

6   things like that.  And so from our perspective, we don't want

7   to have that number out there.  But, again, if you ordered

8   CoreCivic to do it, there's no — you know, we can't stop that.

9   And it's just — we look at it as a dispute with plaintiffs and

10  CoreCivic.

11          THE COURT:  Mr. Lee, I'm going to order it be

12  unredacted because I think it is relevant to the plaintiffs'

13  claims.  Is there a reason not to order you to have CoreCivic

14  unredact it, as opposed to Trinity?

15          MR. LEE:  Just the — some of the same reasons that

16  Ms. Hornsby had already mentioned, Your Honor.  Typically, when

17  we're producing these contracts, you know, in — in any case

18  involving Trinity, we redact that price term because it is a —

19  we consider it, as Ms. Hornsby mentioned, to be a confidential

20  business term.  It's a key point of negotiation that could be

21  used by competitors to — to undercut.  And so that's sort of

22  the standard practice is to redact that term.

23          You know, obviously if the — if the Court orders it

24  to be produced unredacted, we'll comply with the court order.

25  But that would be — you know, that's typically the position we

 1   take and for the reason that we take it.

 2              THE COURT:  And why has CoreCivic not produced all of

 3   the contracts that have been requested, even with the

 4   redaction?

 5              MR. LEE:  Well, it just –– at the –– at the time that

 6   particular dispute came up, plaintiffs had already served their

 7   subpoena on Trinity and were actively negotiating that response

 8   with Trinity.  So I don't think it was fair to characterize

 9   CoreCivic as absolutely refusing to produce the contracts.  It

10   just seems it's unnecessary to have two parties producing ––

11   have two entities producing the same contract.

12              THE COURT:  All right.  I'm going to –– I'm going to

13   order one or the other of you to produce it unredacted.  How do

14   you want to do it?

15              MR. LEE:  We can produce –– we can do that, Your

16   Honor.

17              THE COURT:  All right.  You're going to produce the

18   contracts that have been requested, unredacted as to the price

19   term.

20              MR. LEE:  Yes, Your Honor.

21              THE COURT:  And if you don't feel that the current

22   protective order in the case is sufficient to protect that

23   information beyond the case and beyond the lawyers and perhaps

24   their experts in the case, at least at this stage, then work

25   with Ms. Stewart on an addendum to the protective order that

1    addresses your concerns.

2              MR. LEE:  Understood, Your Honor.

3              THE COURT:  All right.  And then that will be

4    produced.

5              Does that take care of all the issues with regard to

6    Phase 1, Ms. Stewart?

7              MS. STEWART:  Yes, Your Honor.  All that's remaining

8    is Phase 2.

9              THE COURT:  All right.  With regard to Phase 1, I've

10   already indicated that, Ms. Hornsby, you'll produce the —

11   provide Ms. Stewart with the appropriate proposed protective

12   order within seven days.

13             And then after that order has been agreed to and

14   submitted by me, after I sign the protective order,

15   Ms. Hornsby, how many days do you think it's reasonable for you

16   to comply with the production that I've ordered today?

17   After — after the date that I sign the new protective order.

18   Ms. Hornsby.

19             MS. HORNSBY:  Oh, I'm sorry.  I thought you were

20   asking Ms. Stewart.

21             THE COURT:  No.  You're going to be doing the

22   producing.  So what would be a reasonable time for you to

23   produce the additional documents that I've ordered today that

24   have not been produced after the date that I sign the

25   protective order?

1          MS. HORNSBY:  Is it possible for us to address Phase

2    2 first — because some of what — what we come up with with

3    Phase 2 —

4          THE COURT:  Okay.

5          MS. HORNSBY:  — might impact —

6          THE COURT:  All right.  We can go ahead and address

7    Phase 2 before we decide on the timing.

8          All right.  Ms. Stewart, briefly explain to me what

9    the issues are with regard to Phase 2.

10          MS. STEWART:  Sure.  So Phase 2 seeks production of

11    files that are responsive to a set of search terms relating to

12    work stoppages, grievances, and the provision of food.

13          We had previously agreed with Trinity to table the

14    Phase 2 search once Phase 1 was complete.  But because Phase 1

15    was never completed and it — and it seems like Trinity wasn't

16    going to complete it absent an order compelling it to do so —

17    we no longer had faith that we would ever reach the Phase 2

18    dispute to be able to resolve it.

19          We previously had no visibility into the breadth of

20    the Phase 2 files because Trinity hadn't informed us of, you

21    know, the hit counts or how many files there are responsive to

22    those terms.  Late last night we learned from Trinity for the

23    first time that they did search those terms and it resulted in

24    around 30,000 responsive e-mails.  We don't have any visibility

25    behind that number, again, because Trinity hasn't produced us

1    any hit count reports or any data on which of those terms

2    caused that many hits.

3            We will note that previously Trinity had told us and

4    informed the Court in its briefing that the e-mail account at

5    issue only has a total of 17,489 e-mails in it.  So presumably

6    nearly half of the Phase 2 hit counts that Trinity is reporting

7    as of last night are duplicates.  But, again, we have no way of

8    evaluating those issues because we don't have a report from

9    Trinity.

10           In any event, similar to Phase 1, our position is

11   that these files are responsive and relevant to our claims in

12   this case.

13           THE COURT:  And, Ms. Hornsby, is this the group that

14   you contend, other than 362 of the e-mails, all the rest of

15   them have addresses of folks at CoreCivic and could be obtained

16   from CoreCivic?

17           MS. HORNSBY:  Not necessarily, Your Honor.  I think

18   that was a very — that was an e-mail sent in November prior to

19   getting any search strings at all.  So that was just the

20   general —

21           THE COURT:  Okay.  All right.  What's the concern

22   about these documents in Phase 2?

23           MS. HORNSBY:  So, again, Your Honor, as a nonparty,

24   this — going through this review of these additional

25   documents, it's going to be costly.  We've already — I've

 1    mentioned in our documents at this point just for the review of

 2    Phase 1 Trinity spent over $30,000, not including its legal

 3    fees for representation.  So it's the cost that's building in

 4    this case to do these search terms when — again, as a

 5    nonparty — we presume that there are a good bit of e-mails out

 6    there that plaintiffs can get from CoreCivic.

 7            But to these particular Phase 2 e-mails, a lot of

 8    them we view as not relevant, in addition to the financial

 9    burden.  And, for example, some of the strings involve issues

10    in Request No. 7, which plaintiffs have said they're — they're

11    letting go of Request No. 7.  Yet one of — one or two of the

12    search strings involve disciplinary actions, things like that,

13    things that we've said aren't relevant because Trinity's

14    position in this whole thing, that's a — a matter that's

15    between the parties.  And so that — those are just some of the

16    reasons.

17            And so we got an estimation just off the cuff of this

18    blanket hit of responsive documents, and we're looking at an

19    additional cost of anywhere between 45 and $55,000 to review

20    these documents.  And we can't — it kind of goes back to some

21    of the issues with Phase 1.  There's no way of us knowing what

22    we're going to produce until we get into the review process.

23    So —

24            THE COURT:  Do you have any —

25            MS. HORNSBY:  — (Zoom audio glitch) — asking more

1    funds.

2            THE COURT:  Well, certainly as a third party I think

3    you need to be reasonably compensated for your efforts at

4    production.  That's what the law contemplates.

5            Ms. Stewart, it's — it's your contention that you at

6    least thought the representation was made that they would

7    produce documents responsive to Phase 1 and 2 for just the

8    $10,000 that you previously paid?

9            MS. STEWART:  No, Your Honor.  The $10,000 covered

10   just the Phase 1 production.  Again, the agreement was that we

11   would revisit Phase 2 and discuss it after Phase 1 production

12   was —

13           THE COURT:  Well, have you had a chance to discuss it

14   sufficiently before this morning?

15           MS. STEWART:  No, Your Honor, we have not, because

16   the Phase 1 production was not complete.  So the agreement to

17   discuss Phase 2 after Phase 1 was never triggered.  And, again

18   as I mentioned, just last night we learned from Trinity how

19   many responsive documents its searches of those terms produced.

20           THE COURT:  So it's —

21           MS. STEWART:  We've had no visibility into that

22   search.

23           THE COURT:  So it would be premature for me to rule

24   with regard to Phase 2.  You don't —

25           MS. STEWART:  Well, I think —

1              THE COURT:  — want to pay $45,000, do you?

2              MS. STEWART:  No, we don't.  And we don't think we

3    should have to pay any additional money to Trinity for Phase 2.

4    However, we would request that Trinity be ordered to produce to

5    us some data behind their search so that we can evaluate why

6    some terms produced so many responsive hits and possibly modify

7    those terms.  We'd be willing to remove some terms that seem

8    duplicative or unnecessary after looking at the search.

9              THE COURT:  All right.  Well, let's do —

10             MS. STEWART:  And then we would also want to —

11             THE COURT:  Let's do this.  I think the motion with

12   regard to this Phase 2 is probably premature.

13             Ms. Hornsby and Ms. Stewart, y'all need to confer and

14   determine whether this can be narrowed down and whether you

15   can, Ms. Hornsby, provide Ms. Stewart with some information

16   that can satisfy her that she needs to revise the search terms

17   to narrow this down and give her some estimate as to what the

18   cost would be for you to do that and see if y'all can't get

19   this resolved.  And, if not, I guess we'll have to have another

20   hearing on Phase 2 to resolve it.

21             One thing that I would hope you would consider is,

22   Ms. Hornsby, find out from your IT people what the cost would

23   be for you to produce just a log that shows who these e-mails

24   are to and from and the dates so Ms. Stewart can then see how

25   many are on there that are CoreCivic people.  And I don't know

1   why they couldn't obtain them from CoreCivic other than you —

2   as opposed to you.  But I think you and your IT people can

3   figure out how to narrow this down better than I can at least

4   this morning.

5           MS. HORNSBY:  And, Your Honor, I just want to make

6   sure I'm clear, too.  At this point I think the cost is really

7   what's causing me concern here.  I —

8           THE COURT:  I think — I don't know what

9   Ms. Stewart's rationale is for believing that she's not going

10  to have to pay more money for Phase 2.  I think the law clearly

11  requires that, particularly with regard to a third party,

12  they're entitled to reasonable compensation for their cost of

13  production.  And if there was no agreement that the $10,000 was

14  going to cover everything, then the clock — the cost would

15  start running again with regard to this Phase 2, which I assume

16  is your position, Ms. Hornsby.

17          MS. HORNSBY:  Correct.  I mean, Phase 2 with anything

18  that we are — anything additional from today that we are asked

19  to do —

20          THE COURT:  I think that's correct.

21          MS. HORNSBY:  Yes.

22          THE COURT:  So you and Ms. Stewart need to have a

23  telephone call where you try to give her some estimate as to,

24  "Okay, if we just go back to my IT people and I find out these

25  things that are — that you want to know, this is going to cost

1   this amount, and then if you do the production it's going to be

2   this amount."  But y'all need to get that straightened out on

3   the front end.

4           And if, Ms. Stewart, you think that they're

5   unreasonable in what they're requesting, then you can seek

6   relief from the Court.  But I'm not going to order them to

7   produce all of these additional documents for free.

8           MS. STEWART:  Thank you, Your Honor.  I understand

9   that.

10          THE COURT:  So y'all need —

11          MS. STEWART:  I —

12          THE COURT:  Y'all need to confer.  And if I need to

13  decide it, I will, but after y'all have fully conferred.

14          Okay.  Ms. Hornsby, is that clear?

15          MS. HORNSBY:  Yes, Your Honor.

16          THE COURT:  Okay.  All right.  Are there any other

17  matters with regard to the subpoena, other than when the Phase

18  1 information that I've ordered be produced shall be produced?

19          Any other —

20          MS. STEWART:  Yes —

21          THE COURT:  — Ms. Stewart?

22          MS. STEWART:  Sure.  I just want to respond to

23  another issue that came up in this discussion, and that is

24  whether or not we can get these e-mails from CoreCivic.  And

25  for the record, we have requested electronically stored

 1  information from CoreCivic since August 2020.  And CoreCivic
 2  still has not produced to us the bulk of the ESI that we've
 3  requested from it.  And that is why we've been unable to even
 4  evaluate which of these e-mails could plausibly be in
 5  CoreCivic's custody.  So we might have to come back here to
 6  Your Honor on that issue as well at some point in the future.
 7          THE COURT:  Well, if they — if they haven't produced
 8  them and they — then you need to — and y'all can't reach an
 9  agreement in good faith, then you need to file a motion to
10  compel against them.
11          MS. STEWART:  Yes, Your Honor.  We might have to do
12  that.
13          THE COURT:  If they have no — if they have no
14  justifiable basis for not producing it, then you'll get your
15  costs.  But I'm not in a position to decide that today.
16          MS. STEWART:  I understand that, Your Honor.  I just
17  wanted to raise that in response to some of the conversation
18  about CoreCivic producing the e-mail.
19          And then one last point on the Trinity e-mails.  Our
20  position right now with respect to additional costs for Phase 1
21  is that we need to evaluate the burden on Trinity to even
22  assess whether additional cost would be appropriate because we
23  haven't gotten the information we need from —
24          THE COURT:  Well, I — Ms. Hornsby, I thought this
25  additional cost you were talking about was with regard to Phase

1  2.  At this time you're not — you're not seeking additional

2  cost with regard to Phase 1.

3          MS. HORNSBY:  It's for both, Your Honor, yes, Phase

4  1 —

5          THE COURT:  Well, did you — did you or did you not

6  agree to produce the Phase 1 information for $10,000?

7          MS. HORNSBY:  We did, Your Honor.  But I think — I

8  guess my — my point being there is that we agreed for — to

9  do — to respond to the request.  But I think once we got into

10 having to do this extra production of privileged documents,

11 it's just racking up the — the costs.  So —

12         THE COURT:  I understand that.  But if — if you

13 agreed originally to do the Phase 1 for $10,000 and then you

14 got into it and you realized, "We were way off on our

15 estimate," then the appropriate thing to do at that point was

16 to get together with Ms. Stewart and say, "Look, we're way off

17 on our estimate.  We can't do it for 10.  We can do it for 20

18 or 25."  And then if there's a disagreement, come to the Court

19 and let the Court resolve it.

20         But what it sounds like — and I'm not criticizing

21 anybody for this — but you went ahead and did all the work

22 anyway, and now after the fact you're seeking additional money

23 for Phase 1 when it's contrary to the original agreement.

24         Have I mis — am I misunderstanding what happened,

25 Ms. Hornsby?

1           MS. HORNSBY:  No, Your Honor.  I don't think that's a
2    mischaracterization.  I just — I note that to get — the part
3    of what took so long for this production to get off the ground
4    was that it — it took a substantial amount of time to get to
5    the 10,000 request.  But I understand your point, Your Honor,
6    and we will be sure to have a conferral call with regards to
7    Phase 2 and the pricing that we anticipate having, knowing that
8    there's now three times the amount of documents in the first
9    production.

10          THE COURT:  Okay.  So I'm not — I'm not awarding
11   additional costs, Ms. Stewart, with regard to Phase 1.  But
12   Phase 2 — I mean, I'll be open to any argument that's
13   reasonable, but I think you should understand — and I'm sure
14   you do — that you're going to have to pay for that.

15          MS. STEWART:  Yes, Your Honor —

16          THE COURT:  Okay.

17          MS. STEWART:  — we understand that.  And we will,
18   you know, pay appropriate costs, if necessary, once we
19   understand exactly what it'll take to produce the Phase 2
20   e-mails.

21          THE COURT:  All right.  Anything else except me
22   setting a date for when this production of additional Phase 1
23   material shall be due?  Ms. Stewart?

24          MS. STEWART:  No.  That's all for me, Your Honor.
25   Thank you.

 1          THE COURT:  Ms. Hornsby?

 2          MS. HORNSBY:  That's all for me except for this date.

 3          THE COURT:  All right.  So you're going to provide a

 4  proposed protective order to Ms. Stewart within seven days.

 5  And presumably, Ms. Stewart, you'll be able to review it and

 6  agree to it, hopefully, within seven days.  And then it'll be

 7  submitted to me and I'll sign it.

 8          After I sign it, Ms. Hornsby, what do you think is a

 9  reasonable amount of time for you to produce the material?

10          MS. HORNSBY:  Your Honor, at least three weeks.

11          THE COURT:  21 days?

12          MS. HORNSBY:  Yes, sir.

13          THE COURT:  Okay.  So your production will be 21 days

14  after I sign the protective order.

15          MS. HORNSBY:  Thank you.

16          THE COURT:  Okay.  All right.  Does that take care of

17  everything that we need to decide today with regard to Trinity,

18  Ms. Stewart?

19          MS. STEWART:  Yes.  Thank you, Your Honor.  That's it

20  for us.

21          THE COURT:  Ms. Hornsby, do you have anything else?

22          MS. HORNSBY:  No, Your Honor.  That's all.  Thank

23  you.

24          THE COURT:  All right.  Well —

25          MR. LEE:  Your Honor, if I may —

```
 1              THE COURT:  Yes.
 2              MR. LEE:  — just briefly, since the issue was raised
 3    on the — on CoreCivic's production of ESI, just to clarify the
 4    record.
 5              Any suggestion or implication that CoreCivic is — is
 6    stonewalling or otherwise refusing to produce ESI is simply
 7    incorrect.
 8              THE COURT:  All right.  I'm not going to — I'm not
 9    going to give that any credit.  Ms. Stewart makes that
10    representation, but I don't need to even be bothered with it
11    because there's no motion to compel for me to consider.  So —
12    but you've corrected the record from your perspective.
13              MR. LEE:  Thank you, Your Honor.
14              THE COURT:  All right.  Ms. Hornsby, you and — is it
15    Mr. Edwards? — you are excused.
16              MS. HORNSBY:  Thank you, Your Honor.
17              THE COURT:  Thank you.
18              MR. EDWARDS:  Thank you, Your Honor.
19         (Ms. Hornsby and Mr. Edwards disconnected from
20         videoconference)
21              THE COURT:  Okay.  The next motion is the motion
22    regarding the site inspection at Stewart.  And Ms. — trying to
23    find y'all on the screen.
24              Mr. Sandley, you're going to handle that — or
25    Ms. Sandley.
```

```
1            MS. SANDLEY:  Yes, Your Honor, Ms. Sandley.
2            THE COURT:  Ms. Sandley, you're going to handle that
3   for the plaintiff.
4            And, Mr. Lee, you're going to handle that for the
5   defendant; correct?
6            MR. LEE:  Correct, Your Honor.
7            THE COURT.  Okay.  Ms. Sandley, other than being able
8   to evaluate the smell at the facility and other than doing
9   informal interviews of detainees during a site inspection,
10  other than those two things, why would a virtual tour of the
11  facility not be adequate for you and your experts to obtain the
12  discoverable information you need from a site inspection?
13           MS. SANDLEY:  Yes, Your Honor.  I want to start with
14  Rule 34, which it's clear that the default is an in-person
15  inspection.  It uses the language "entry into land and
16  property"; right?  So that — an in-person —
17           THE COURT:  That's — Ms. Sandley, with all due
18  respect, that was not my question.
19           MS. SANDLEY:  I understand, Your Honor.  To respond
20  directly to your question, a Zoom tour is inadequate.  A
21  CoreCivic employee controls the screen.  Our experts have no
22  ability to turn their heads and observe what is around them
23  to — to see if they are missing something that is not directly
24  in front of them that the CoreCivic employee is — has complete
25  control over.
```

1          Your Honor —

2          THE COURT:  Well, let me — let me ask you this.  And

3    I previously in another case, which I'm not sure if you were

4    involved in or not — I just don't remember all the lawyers in

5    these cases — involving a conditions-of-confinement claim in

6    effect at Stewart, after hearing all the arguments in that

7    case, determined that a virtual tour was appropriate and

8    consistent with the Federal Rules, and understanding that your

9    belief is that I was wrong in making that decision.

10         But assuming that I don't change my mind and conclude

11   that, in concluding then that a virtual tour was adequate in

12   that conditions-of-confinement case, then if I were to be

13   consistent with that decision, what is it that is different in

14   this case that was not present there or was present there that

15   would justify the distinction of me saying virtual tour here is

16   not appropriate and it was in that case, other than this issue

17   that you raise of your expert wants to smell the facility?

18         MS. SANDLEY:  Your Honor, I think the primary

19   difference is that was a year ago at the beginning of the

20   pandemic.  We were — all of us was doing the best we could to

21   protect ourselves, our families, our clients, and digest sort

22   of the constant stream of information about a pandemic we

23   didn't know anything about.

24         It's been a year.  We know now much more about how

25   COVID is transmitted.  All of the people plaintiffs are asking

1  to have enter the facility will be vaccinated.  Half of the

2  people at Stewart have been vaccinated.  We're asking to use

3  the screening protocol and PPE protocol that Stewart has had in

4  place since that case Your Honor is referencing and remains in

5  place today.  To me, the primary difference is what we know now

6  about COVID and the presence of vaccines and that we've seen

7  these inspections happen in at least 12 other cases that

8  plaintiffs cited in their brief —

9        THE COURT:  So is it — is it your position,

10  Ms. Sandley, that the risk of transmission of COVID at Stewart

11  today is substantially less than it was a year ago?

12        MS. SANDLEY:  Your Honor, our position is that we —

13        THE COURT:  Have they — have they — have they

14  improved things that much?

15        MS. SANDLEY:  I can't speak to that, Your Honor.

16  What I can speak to is that we know that seven people who were

17  vaccinated, entering the facility with PPE, social distancing,

18  and the screening that Stewart's using for its own employees

19  does not impose — it imposes minimal, if any, risk of

20  spreading COVID within the facilities.  333 people who are

21  staff at Stewart come and go every day.  Only half of those

22  people are vaccinated.  We're asking for seven people who are

23  vaccinated and will comply with all of the protocols to do an

24  in-person inspection just like they would be able to do before

25  the pandemic.

1          THE COURT:  And how many of that seven includes

2    experts?

3          MS. SANDLEY:  Three.

4          THE COURT:  And who are those experts?

5          MS. SANDLEY:  Your Honor, we haven't made expert

6    disclosures yet.  But we have a mental health expert, a

7    security and operations expert, and a nutrition expert.

8          THE COURT:  And what is it that they need to see

9    there in person that they couldn't see from a virtual tour?

10          MS. SANDLEY:  Your Honor, it's — again — and I

11    don't want to quote from Dr. Venters' report in the Sanchez

12    Martinez case, which was before Your Honor, because it's under

13    seal.  But we refer the Court to that — that report in our

14    brief.  There's some very critical lines there about the limit

15    and the scope, Your Honor.  It's akin to looking at a football

16    field through a hole in a shoebox.  You just can't — you can't

17    see the full scope of —

18          THE COURT:  No, but I — I understand that.  But what

19    I'm trying to understand is whether your experts and you want

20    to in this inspection get a picture of the layout of the

21    facility so that when you're questioning other witnesses about

22    what happened, where, and that type thing, it'll be understood

23    in the context of the layout of the facility, or whether you're

24    trying to get a picture of what it is like on a daily basis at

25    Stewart as far as what these detainees are being subjected to.

1  And if that's the case, then you've got to establish, it seems
2  to me, that the conditions today are the same as they were when
3  these named plaintiffs and putative class members were being —
4  were participating in this work program.  And it's my
5  understanding that the capacity, the number of people at
6  Stewart today, is substantially less than the number of
7  detainees at Stewart back when these plaintiffs were
8  participating in the work program.
9       So is that your understanding, Ms. Sandley, or not?
10       MS. SANDLEY:  Your Honor, that information was
11  provided to us for the first time in CoreCivic's brief
12  yesterday evening, but —
13       THE COURT:  Okay.  That's the first time you saw it
14  was in the footnote in the brief.
15       MS. SANDLEY:  Yes, Your Honor.  But I'll take their
16  word for it.
17       Your Honor, the layout, yes, is important.  But this
18  claim involves an injunctive claim — or this case involves an
19  injunctive claim.  And also there are putative class members at
20  Stewart today in the work program.  CoreCivic's representatives
21  are fewer than there have been at other times, but they are
22  still putative class members.  Current conditions are relevant.
23  Observing the state of the cells in segregation, for example,
24  so that our expert can take that into account in forming an
25  opinion about whether segregation or the threat of it is

1  coercive is relevant, whether or not those cells are occupied

2  right now.  Those are the kinds of things our experts should be

3  able to observe.

4        THE COURT:  And that's what I'm ⸺

5        MS. SANDLEY:  And I might point out ⸺

6        THE COURT:  And that's ⸺ that's what I'm not

7  understanding completely, Ms. Sandley.  If the cells are not

8  occupied, how does your expert looking at them there in

9  person ⸺ how is that materially different than a camera

10 showing the room and the cells unoccupied, as far as the claims

11 that you're making in this case, which is that they were

12 deprived of food and basic necessities and that the conditions

13 were so deplorable at the time that the only way to escape from

14 it was to work in the program and thus they were coerced?  How

15 does ⸺ how does ⸺ is it significantly better for them to just

16 look in there at an empty cell than it is with a camera there?

17        I understand if the ⸺ if the objective is to get a

18 day in the life at Stewart ⸺ well, the best way to do that

19 would be to ⸺ and I'm not suggesting this should be done ⸺ is

20 to have somebody in there that's taking pictures when they

21 don't know they're taking pictures, rather than having the

22 troops come in announced in advance that they're going to be

23 looking around.

24        But, in any event, if the purpose is to get this day

25 in the life at Stewart and the day in the life today is

1  substantially different than it was in the past, I'm just not

2  understanding the probative value of that related to the risk,

3  which you explained is essentially nonexistent.  But to me

4  there is some risk.

5          You — you understand my concern?

6          MS. SANDLEY:  Your Honor, I just want to come back to

7  how routine in-person site inspections are in — in cases about

8  secure facilities because of this, because of the things that

9  you cannot observe through Zoom, things like — again, our

10 experts would be looking through a screen controlled by a

11 CoreCivic employee.  Let's say they're looking at a segregation

12 cell.  Can they tell really how much light is coming into that

13 cell?  Can they — they can't smell it.  They can't tell if it

14 smells like feces or urine or fire.  All of — all of those are

15 common smells in segregation units and indicate various things

16 about what that unit is like.  They can't hear whether there

17 are people screaming in the unit.  They can't hear — they

18 can't tell if the lights are exceptionally bright or not, which

19 is sometimes the case in seg units, or if there's no light at

20 all.  They can't tell if the toilets work or not.  They can't

21 see if there are places obviously present for people to commit

22 suicide from.  All of those are things that our — for example,

23 our mental health expert, our security —

24         THE COURT:  Why can't they tell — why can't they

25 tell that — why can't they tell that with a virtual tour?

1          MS. SANDLEY:  Because, Your Honor, it's a CoreCivic
2    employee controlling the view.  And it's not — they can't know
3    to ask for what they can't see, Your Honor.  They can't say,
4    "Oh, can you point the camera at that right — that top right
5    corner because there's something I want to see," because they
6    can't see it.
7          THE COURT:  Well, one example you gave is they
8    can't — they can't see where someone could commit suicide by
9    hanging themselves.  I don't understand why they can't see that
10   and say, "Point the camera up there."
11         MS. SANDLEY:  Well, for example, what if the
12   CoreCivic employee is standing in the middle of the cell — and
13   I don't want to dwell on — on this point because it's a
14   extreme one, but just to illustrate it.  The CoreCivic employee
15   is — is standing in the middle of the cell, and the sprinkler
16   that could be used to hang someone's self is behind them.  Our
17   expert can't see it.  And then, you know, unless — unless —
18         THE COURT:  Okay.  Okay.
19         MS. SANDLEY:  — unless you're panning the ceiling
20   and every single wall, you're going to miss things.  And those
21   are all relevant to this case.  And CoreCivic hasn't shown an
22   undue burden.  They just haven't.
23         THE COURT:  So in addition to the three — what does
24   the nutrition expert need to be in there for?
25         MS. SANDLEY:  Your Honor, the parties have agreed

1    that inspecting the kitchen in some form or fashion is relevant

2    to the case — we've agreed on that — including the chow hall

3    where people eat, the food storage areas.  And CoreCivic has

4    also agreed — they mentioned this in their brief — that our

5    nutrition expert can observe food service.

6            THE COURT:  Well, that's what I'm — I'm a — I'm a

7    little surprised that, given their agreement on these things,

8    y'all weren't able to reach some final agreement.  Because

9    CoreCivic's not even arguing for the virtual tour that I've

10   suggested.  They just want to cut the — the length of it and

11   the, I think, amount of participants was my understanding of

12   their primary concern.

13           So the nutrition expert needs to see the kitchen to

14   determine whether or not they were actually feeding certain

15   detainees in the work program better than the ones who weren't

16   in the work program?

17           MS. SANDLEY:  No, Your Honor — well, that is a part

18   of it.  But, additionally, plaintiffs have alleged that the

19   food at Stewart is inadequate such that people are compelled to

20   work to supplement their diets, either through the commissary

21   or through double portions because they're working in the

22   kitchen.  So the nutrition expert would also be observing food

23   service and the food storage, food preparation, as a part of

24   forming her opinion about the adequacy of food at Stewart.  So,

25   for example, during a meal service she'd be able to see are

1   they using the right — the right size serving spoon.

2          THE COURT:  So you're treating this like a

3   conditions-of-confinement case that — your — your argument is

4   that the conditions of confinement at Stewart for everyone are

5   so deplorable that the only way to escape those deplorable

6   conditions is to work in the work program so that you can be

7   treated a little better and get better food, and that's

8   coercive.

9          MS. SANDLEY:  That's right, Your Honor.  We've —

10          THE COURT:  And —

11          MS. SANDLEY:  — been a little bit more narrow in

12   which conditions we're alleging coerced people to work.

13          THE COURT:  And — and do you believe that the —

14   that even if the evidence did not rise to the level of being a

15   constitutional violation with regard to conditions of

16   confinement, that you nevertheless could prove a TVPA claim

17   based on conditions of confinement that are constitutional?

18          MS. SANDLEY:  Yes, Your Honor.  This is not a

19   constitutional claim, and —

20          THE COURT:  Well, you have to prove — you have to

21   prove for this claim — setting aside denying someone food,

22   setting that aside, I thought your theory was that the

23   conditions were so deplorable that — that they were coercive

24   in that it was the deplorable conditions that were forcing

25   these people against their will to work.  I thought —

1          MS. SANDLEY:  Yes, Your Honor.

2          THE COURT:  Isn't that part of your TVPA claim?

3          MS. SANDLEY:  Yes, Your Honor.

4          THE COURT:  So — and I'm not saying that this is

5   going to be the case.  But if those deplorable conditions you

6   consider — you contend are so deplorable that they are

7   coercive in that they are — constitute imposing physical harm

8   or the threat of serious harm, if the facts with regard to that

9   show that they are nevertheless constitutional — in other

10  words, the conditions of confinement are not

11  unconstitutional — then I guess your contention is yet they

12  can still be sufficiently deplorable but constitutional to be

13  coercive under the TVPA.

14         MS. SANDLEY:  Yes, Your Honor.  And that'll be for

15  the jury to — to decide —

16         THE COURT:  Or the — that'll be for the — that'll

17  be for the jury to decide or the Eleventh Circuit to decide.

18         MS. SANDLEY:  Your Honor, as an example, you know,

19  is — are the conditions in segregation so horrible that they

20  amount to — or the threat of it even amounts to serious harm

21  and coercive — coupled with coercive actions of threatening

22  and disciplining people, the jury will decide does — does that

23  compel people to work at Stewart.

24         THE COURT:  No, that — you're — I think you're

25  misunderstanding my argument, which is really just theoretical

1  at the moment, and we can move on.  But it presents a

2  interesting issue as to whether for purposes of the TVPA you

3  can nevertheless have liability for a coercive work requirement

4  related to conditions of confinement when those conditions of

5  confinement don't rise to the level of a constitutional

6  violation.  And I'm not deciding that today.  I'm simply — I

7  was just raising the issue.

8           But, Mr. Lee, what exactly have you agreed to with

9  regard to the in-person inspection?

10          MR. LEE:  Well, so, Your Honor, I — I did want to —

11 to clarify something on that.  You had mentioned that it didn't

12 appear that we are arguing for the virtual inspection.  I would

13 refer you to Section 2 of our brief that we filed last night or

14 yesterday afternoon.  We do actually think that a virtual tour

15 is the more appropriate one here.

16          THE COURT:  Well, I want to know what it is that you

17 and Ms. Sandley agreed to before you got to me.

18          MR. LEE:  So we — we agreed to the areas of the

19 facility that would be visited.  We agreed how to handle

20 requests for photographs.

21          THE COURT:  What did you disagree about, I guess,

22 would be better.

23          MR. LEE:  Well, we disagreed about whether it should

24 be in person or virtual.

25          THE COURT:  Okay.  So you never did agree on — I

1  thought —— Ms. Sandley, I thought y'all had agreed on something

2  with —— I thought they had agreed to an in-person but they

3  wanted to limit it to two hours and to a limited number of

4  people.

5          MS. SANDLEY:  CoreCivic offered an in-person with

6  only our attorneys and not our experts that would last for two

7  hours and occur ——

8          THE COURT:  Okay.

9          MS. SANDLEY:  —— at some point after everyone has had

10  the opportunity to be vaccinated.

11          THE COURT:  Okay.  So CoreCivic's offer was only

12  attorneys for two hours after everybody in the facility had an

13  opportunity to be vaccinated, Mr. Lee?

14          MR. LEE:  Yeah.  Well, after —— after everybody at

15  the facility had —— had been vaccinated such that there wasn't

16  going to be a risk from introducing additional people into the

17  facility from COVID-19.

18          THE COURT:  All right.  What is the risk —— and I

19  know you're not a medical doctor, but perhaps you've spoken to

20  medical people with CoreCivic.  If all of the persons who are

21  on the inspection have been vaccinated, then what is the risk,

22  as you understand it, of them transmitting COVID to someone in

23  the facility?

24          MR. LEE:  So my understanding, Your Honor, is that

25  because the —— the vaccine is so new and it's only been

 1   available to the public for a few months there's still a lot

 2   that's unknown about it.  I would point you to Footnote 4 in

 3   the response that we filed ——

 4          THE COURT:  Well, let me —— let me ask you this.

 5   What is the current CDC position?  Do they have one yet on the

 6   risk of a vaccinated person transmitting COVID?

 7          MR. LEE:  Yes, Your Honor.  And that was —— that was

 8   what I was getting at with reference to Footnote 4.  We —— we

 9   provide the link there to the —— to the CDC statement that "The

10   risks of COVID—19 infection in fully vaccinated people cannot

11   be completely eliminated as long as there is continued

12   community transmission of the virus.  Vaccinated people could

13   potentially still get COVID—19 and spread it to others."

14          THE COURT:  Yeah.  Well, that's not really what I'm

15   —— there's always a risk.  I mean, you know, with your people

16   going into the facility, they could have some other type of

17   illness that they could pass on to —— to folks.

18          I guess my question is, that phrase or couple of

19   sentences that you just quoted, is it in a larger context where

20   it says that the current evidence is, or that the CDC currently

21   believes, that vaccinated people —— there's a substantial ——

22   it's substantially unlikely that they're going to pass it on?

23   I understand they can't guarantee it.  But surely they're not

24   recommending all these people get vaccinated if they don't

25   think that it's —— it's going to substantially reduce the

1  transmission of the virus.

2          MR. LEE:  Well, I — I can't speak to the extent of

3  it, Your Honor.  Like you mentioned —

4          THE COURT:  Okay.  You don't — you don't know.

5          Ms. Sandley, do you have any scientific medical

6  evidence as to what the current scientific view is as to the

7  transmission of COVID by persons who have been vaccinated?

8          MS. SANDLEY:  Yes, Your Honor.  The — Footnote 4 in

9  our brief, which is Document 132-1, cites a recent CDC article

10  called, "When You've Been Fully Vaccinated," which says that

11  people who are fully vaccinated can safely interact with

12  unvaccinated people from different households so long as

13  they're wearing masks and maintaining social distancing.

14          THE COURT:  That's the CDC recommendation.

15          MS. SANDLEY:  Yes, Your Honor.

16          MR. LEE:  If I may, Your Honor —

17          THE COURT:  Yes, sir.

18          MR. LEE:  — the difference between the — the

19  facility staff who come in and out of the facility every day

20  and the people who would be involved in this tour is that

21  facility staff are essential to the operation of the facility.

22  If those people don't come and go, the facility can't operate.

23  And so CoreCivic would be unable to work to —

24          THE COURT:  Ms. Sandley — Ms. Sandley would say that

25  Rule 26 and Rule 34 make it clear that site inspections are

1  essential to persons who claim that their legal rights have

2  been denied in their ability to pursue those claims.  Now,

3  maybe they're not essential to the operation of the facility,

4  but they're essential — she's made the argument they're

5  essential to their being able to vindicate what they believe

6  are violations of their legal rights.  Okay.

7         MR. LEE:  And so if — if I may —

8         THE COURT:  Why do you need more than two hours,

9  Ms. Sandley?

10        MS. SANDLEY:  Your Honor, I want to be clear.  We've

11 asked for a full day in part because we're asking for those

12 confidential interviews, which obviously take some amount of

13 time.

14        THE COURT:  If you took those out, how much do you

15 need?

16        MS. SANDLEY:  Four hours.

17        THE COURT:  And you think all three of your experts

18 need to be on the tour.

19        MS. SANDLEY:  Yes, Your Honor.  And we actually

20 limited.  We have four experts, and we — we've limited it to

21 three.

22        And, Your Honor —

23        THE COURT:  And all of them will have been

24 vaccinated.

25        MS. SANDLEY:  Yes, Your Honor.

1            THE COURT:  And they'll be wearing masks.

2            MS. SANDLEY:  Yes.

3            THE COURT:  And they'll subject themselves to the

4    temperature requirements, whatever the facility currently has

5    as their protocols.

6            MS. SANDLEY:  Yes.

7            THE COURT:  All right.  I do think the situation is

8    substantially different today than it was a year ago or

9    whenever it was that I issued that previous order providing for

10   a virtual tour.  And I do think under the rules that in a case

11   such as this one, where the plaintiffs are making allegations

12   about the conditions of the —— of confinement, that it is

13   important for them to be able to see the actual place of

14   confinement.  And if they are all vaccinated and wear masks and

15   otherwise comply with the protocols for reducing COVID

16   transmission, it seems to me that their risk of passing along

17   the virus to the detainees or the prison staff is minimal based

18   on current medical evidence that exists on the subject.

19           So I am going to permit a in-person inspection.  I'm

20   not going to permit the informal interviews.  If the plaintiff

21   wants to depose certain persons from the facility at another

22   time, then they can do so and hopefully work that out by

23   agreement with CoreCivic's counsel, but I'm not going to ——

24   (Zoom audio glitch) —— informal interviews.  I previously

25   explained the rationale in the previous order for that, and I

1   think that rationale does apply here.  Of course, that was in a

2   different case.  I recognize that.  But I think the

3   circumstances supporting that rationale exist here.

4           I am a little concerned about the size of your

5   entourage, Ms. Sandley.  I don't know why you can't have just

6   one lawyer, y'all pick one lawyer to attend.  So I'm going to

7   restrict it to your three — your three experts and one lawyer

8   for the plaintiffs.  And I'm going to restrict it to four

9   hours.

10          So I'm granting the motion for the inspection, to

11  include up to three experts, with one lawyer from the

12  plaintiff, not to exceed four hours and will not include

13  informal interviews with detainees or employees of the

14  defendant.  So that motion is granted to that extent.

15          Anything else from you, Ms. Sandley?

16          MS. SANDLEY:  Your Honor, just one clarification

17  understood on the interviews.  We have also asked that during

18  the inspection our experts and counsel at least have the

19  ability to introduce themselves to our clients, the putative

20  class members, and ask if they would consent to a later

21  interview.  That is really just an efficiency, ask that as

22  we're walking through the kitchen, see kitchen workers, we be

23  able to speak to our clients and — and ask if they would be

24  willing to participate in a confidential interview at a later

25  time.

1          THE COURT:  If that's all that it's — that they will

2   ask, then I don't see a problem with that.  Do you consider

3   everybody that's there a putative class member?

4          MS. SANDLEY:  No, Your Honor, only participants in

5   the work program currently who are people who are — who were

6   participants at some point.

7          THE COURT:  Okay.  I don't see a problem with asking

8   them whether they'll talk to you later.  Then you can work out

9   the logistics of how that's going to happen.

10          So you — your contention is that anybody there that

11   is currently working in the work program is a putative class

12   member.

13          MS. SANDLEY:  Yes, Your Honor.

14          THE COURT:  And do you contend that even before class

15   certification they are clients of yours?

16          MS. SANDLEY:  Yes, Your Honor, to the extent they're

17   — yes, we do.

18          THE COURT:  Okay.  So is it your contention that you

19   would have the right to speak with them privately, if they

20   consent to it, at the appropriate time?

21          MS. SANDLEY:  Yes, Your Honor.  And CoreCivic has —

22   has offered that — I believe they mentioned it in their brief

23   as well — that they — we would be able to use the legal

24   visitation process to speak with those people.

25          THE COURT:  Okay.  All right.  Mr. Lee, is my oral

1    order clear, or do you need any further direction?

2            MR. LEE:  No.  I — I understand the parameters.  I

3    suppose my only clarifying question would be if CoreCivic

4    decided that it needed to have an expert there at the same time

5    looking at the same thing as plaintiffs' experts, you know,

6    just to — to confirm that nothing —

7            THE COURT:  Yes.

8            MR. LEE:  — in this order would prevent that.

9            THE COURT:  Nothing in the order prevents that.  But

10   to be fair, you can't have more than three.

11           MR. LEE:  Understood.  I — I don't think that that

12   many would be necessary on either side, to be honest.

13           THE COURT:  All right.  Well, I'm sure, Ms. Sandley,

14   when they get right down to it, they won't have somebody visit

15   the facility unnecessarily if they determine one of their

16   experts doesn't have to be there.  But the parameters are up to

17   three.

18           Okay.  Well, I don't intend to reduce that to a

19   written order if it is — if it's clear.  You can go back to

20   the transcript.  But if it's unclear, let me know now so I can

21   make sure it's clear.

22           Ms. Sandley?

23           MS. SANDLEY:  Understood, Your Honor.  Thank you.

24           THE COURT:  Mr. Lee?

25           MR. LEE:  I understood, Your Honor.

1        THE COURT:  All right.  I'm assuming that y'all will

2    be able to get together and figure out the time for doing this

3    and I don't need to be involved in that.

4        Okay.  Are there any other matters that are presently

5    pending that need to be decided today from the plaintiffs'

6    perspective, Ms. Sandley or Ms. Stewart?

7        MS. SANDLEY:  No, Your Honor.

8        MS. STEWART:  No.

9        THE COURT:  All right.  Mr. Lee, for the defendant?

10        MR. LEE:  Nothing, Your Honor.

11        THE COURT:  Okay.  Thank y'all, and we are adjourned.

12    Goodbye.

13        (Proceedings concluded at 11:23 a.m.)

14                    CERTIFICATE OF REPORTER

15            I, Betsy J. Peterson, Official Court Reporter of
    the United States District Court, in and for the Middle
16    District of the State of Georgia, Columbus Division, a
    Registered Professional Reporter, do hereby CERTIFY that the
17    foregoing proceedings were reported by me in stenographic
    shorthand and were thereafter transcribed under my direction
18    into typewriting; that the foregoing is a full, complete, and
    true record of said proceedings.

19

20                    This 29th day of April, 2021.

21

22                    s/Betsy J. Peterson
23                    Betsy J. Peterson, CRR, RPR, CCR
                      Federal Official Court Reporter
24

25