**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

WILHEN HILL BARRIENTOS, et al.,

                        Plaintiffs,

v.

CORECIVIC, INC.,

                        Defendant.

Civil Action No. 4:18-cv-00070-CDL

---

**DEFENDANT CORECIVIC'S RESPONSE TO PLAINTIFFS'
MOTION TO COMPEL DEFENDANT CORECIVIC'S RESPONSE TO PLAINTIFFS'
FIRST DISCOVERY REQUESTS**

The discovery sought by Plaintiffs' Motion to Compel Defendant CoreCivic's Response to Plaintiffs' First Discovery Requests ("Motion to Compel") is irrelevant to the claims and defenses at issue, and therefore not proportionate to the needs of the case. *See Edmondson v. Velvet Lifestyles, LLC*, 2016 WL 5682591, at *5 (S.D. Fla. Oct. 3, 2016) ("Proportionality and relevance are 'conjoined' concepts; 'the [lesser] the relevance of the information in issue, the [more] likely its discovery will be found to be disproportionate.'") (quoting *Viagasi v. Solow Mgmt. Corp.*, 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016)); *see also* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."). Plaintiffs' claims in this matter pertain to the administration of the Voluntary Work Program ("VWP") at CoreCivic's Stewart Detention Center ("SDC"). Plaintiffs, however, want to use discovery in this matter to (1) obtain documents and information they can use in other lawsuits against CoreCivic and/or Plaintiffs' counsel's activism efforts against private prisons and detention centers, and (2) force CoreCivic to settle the case in order to avoid incurring the cost (in terms of both time and

expense) of responding to their expansive and burdensome demands. But none of these are a proper purpose for discovery. *See* Fed. R. Civ. P. 1 ("[The Federal Rules] should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."). CoreCivic therefore respectfully requests that the Court deny Plaintiffs' Motion to Compel in its entirety.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Factual Background

At its core, Plaintiffs' Amended Complaint alleges that CoreCivic: (1) violated the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589, 1594, and 1595, by forcing and/or coercing U.S. Immigration and Customs Enforcement ("ICE") detainees at SDC to participate in the VWP, and (2) was unjustly enriched by doing so. (*See, generally,* Doc. 87.) There are no claims that conditions at SDC violate the Fifth, Eighth, or Fourteenth Amendments, or any other constitutional provisions. (Id.) In fact, neither the U.S. Constitution nor any of these amendments is referenced in the Amended Complaint. (Id.) And yet, Plaintiffs demand expansive discovery about every aspect of conditions at SDC as if they were bringing claims for unconstitutional conditions of confinement. (*See* Doc. 139-4, 139-5.)

Plaintiffs did not provide the Court with CoreCivic's most recent supplemental response to their Request for Production of Documents, perhaps because CoreCivic has taken a broad view of relevance and produced (or agreed to produce and is in the process of producing) much of what Plaintiffs demand. (*See* Ex. 1, Dec. of Jacob B. Lee, at ¶ 2.) Specifically, CoreCivic has produced nine volumes of data to date, consisting of 17,793 documents, 151,525 pages, and

5,932 native documents such as spreadsheets, whose total page count if printed would likely number in the tens of thousands. (Id. at ¶ 3.)[1] Included among these documents are:

- current and prior versions (for a period of 13 years subject to availability) of approximately three dozen policies, procedural guidelines, and post orders, as well as attachments and appendices to those documents;[2]
- the Intergovernmental Service Agreement ("IGSA") between CoreCivic, Stewart County, and ICE, and all modifications to the IGSA, including all staffing plans attached to those documents;
- all available audit reports from ICE Enforcement and Removal Operations ("ERO"), the Office of Detention Oversight ("ODO"), and the Nakamoto Group spanning 2008 to 2021, including both reports maintained by CoreCivic and reports available online from ICE's FOIA Library;[3]
- all available monthly invoices from CoreCivic to ICE, coversheets (where complete monthly invoices from CoreCivic to ICE are not available or functioning passwords to them could not be located despite reasonable efforts), and billing summaries from SDC to Stewart County through the end of 2020;

---

[1] The parties are also working to finalize an agreed-upon set of ESI search terms, which will likely result in the production of at least tens of thousands of additional documents and hundreds of thousands of additional pages given the number of custodians (74 facility-level employees, plus certain corporate personnel as needed) whose email accounts will be searched for a period of 13 years. (Ex. 1 at ¶ 5.)

[2] Plaintiffs' discovery overreach is best demonstrated by RFP No. 1, which sought "any and all DOCUMENTS RELATING TO CoreCivic POLICIES AND PROCEDURES … RELATING TO the WORK PROGRAM during the RELEVANT PERIOD." (Doc. 139-4; Ex. 1 at ¶ 7.) In its original response, CoreCivic stated that it believed it had produced all known available iterations of the requested policies, but attached an Index of the complete set of SDC policies and stated it would meet and confer with Plaintiffs regarding any additional policies they believed were relevant and responsive. (Ex. 1 at ¶ 8.) Plaintiffs provided CoreCivic with a highlighted copy of the Index and demanded that CoreCivic produce all the highlighted policies, procedural guidelines, and post orders. (Id.at ¶ 9.) In response, CoreCivic produced the remainder of the approximately three dozen policies, procedural guidelines, and post orders referenced above that it had not already produced, even though they were not strictly related to the VWP. (Id. at ¶ 10.) CoreCivic declined to produce approximately 58 policies, procedural guidelines, and post orders—including the three policies at issue here—as being too far removed from the claims and defenses at issue in this matter, as they covered such topics as Policy Management, General Counsel Office of Investigations/Internal Investigations, Workers' Compensation Benefits, Paid Time Off, Security Threat Group Management, Suicide Prevention/Risk Reduction, and more. (Id. at ¶ 11.) Plaintiffs have limited their challenge in this Motion to only Policies 1-22, 5-1, and 16-100, but even those policies are not relevant, and therefore not subject to discovery, as set forth below.

[3] See Ex. 2, Declaration of Warden Russell Washburn, at ¶¶ 15–19.

- aggregate data reports of purchase orders and invoices for personal hygiene items issued to detainees for the relevant time period;
- aggregate commissary purchase and inventory data for the relevant time period; and
- extracted data from CoreCivic's Offender Management System ("OMS") that details the deposit transactions to SDC detainees for their participation in the VWP.

(Ex. 1 at ¶ 4.) CoreCivic has also agreed to produce available excerpts from over 3,000 detainee files for the relevant time period consisting of disciplinary and grievance documents for certain disciplinary violations and grievance categories selected by Plaintiffs. (Id. at ¶ 6.)

But Plaintiffs still want more, based on the apparent belief that if they have asked for it, it is relevant and must be produced, along with their costs and fees associated with bringing the Motion. For the reasons set forth below, the Court should deny Plaintiffs' Motion to Compel.[4]

## II.     Legal Argument

### A.     Plaintiffs Are Not Entitled to SDC's Complete Financial Information.

Plaintiffs' demand for SDC's complete financial information is a prime example of an attempt to use discovery in this matter to generate evidence for other cases and/or activism efforts. Plaintiffs claim that such information is relevant and discoverable because they are entitled to disgorgement of all profits obtained by CoreCivic at SDC if they prevail on their

---

[4] Section I of Plaintiffs' Motion to Compel regarding "Plaintiffs' Attempts to Obtain Documents from CoreCivic" is irrelevant to the issues actually raised in the Motion. Before filing the Motion, Plaintiffs informed CoreCivic that they intended to move to compel interim production deadlines for the remaining discovery. CoreCivic believed that issue was resolved by the parties' Joint Motion to Extend Discovery Deadlines and Set Interim Production Deadlines (Doc. 138), which the Court granted on May 12, 2021 (Doc. 140). Nevertheless, Plaintiffs thought it was necessary to include their view of the history of discovery in this matter, even though the extended fact discovery deadline of October 25, 2021 will result in a total fact discovery period of only 16 months since the parties submitted their original proposed Scheduling Order and Discovery Plan (Doc. 63), and only 14 months since Plaintiffs served their First Request for Production of Documents and First Set of Interrogatories (Doc. 139-4 and 139-5), in a putative class action involving thousands of detainees housed at SDC over a period of more than 13 years. The Court should therefore disregard Section I of the Motion.

unjust enrichment claim. Plaintiffs fail, however, to cite any authority in support of this outlandish claim, and the cases they do cite do not support their position.

In *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350 (11th Cir. 2021), the plaintiff obtained a jury verdict on its claims for breach of contract under Georgia common law and misappropriation of trade secrets under the Georgia Trade Secrets Act of 1990. *Id*. at 1356–57. The Eleventh Circuit reversed, holding that the district court erred in not granting the defendant's motion for judgment as a matter of law on the misappropriation claim and that the plaintiff failed to prove actual damages on the breach of contract claim, such that it was entitled to nominal damages only. *Id*. at 1367–68. The Eleventh Circuit noted that unjust enrichment was a potential remedy on a statutory misappropriation claim and stated in dicta that "[s]ometimes … the remedy for unjust enrichment gives the plaintiff something … that the plaintiff did not previously possess. This species of restitution is called disgorgement, and it generally allows a plaintiff to recover the defendant's wrongful gain, even if that gain exceeds the plaintiff's provable loss." *Id*. at 1368 (internal citations and quotations omitted).

*AcryliCon*, however, did not involve a claim of failure to pay proper wages for work performed. There, disgorgement of profits makes sense, as that is likely the only value that can be assigned to a misappropriation of a trade secret. This case, however, does not involve misappropriation of a trade secret, but alleged failure to pay the full value of work performed.

In *Yoh v. Daniel*, 497 S.E.2d 392 (Ga. App. 1998), the plaintiffs alleged that the defendants reneged on their contract to sell their house to the plaintiffs after the plaintiffs—with the consent of the defendants—had substantially improved the home in anticipation of the sale by purchasing $2,000 in materials and laboring over 100 hours making improvements to the house, for which the jury awarded the plaintiffs $6,250 for the increased value of the house. *Id*.

at 393. The Georgia Court of Appeals affirmed, holding that the "evidence in toto authorized the jury to award the value of improvements to the house, even if it exceeded the cost of the materials and labor," as "the unjustly enriched party should pay for its gain." *Id.* at 393–94 (internal citations and quotations omitted).

Although there was an element of labor involved in *Yoh*, it did not involve a claim by a purported employee against a purported employer, and this case does not involve a claim of improvements to real estate. There, payment of the increased value of the home makes sense, as the purpose and/or common effect of home renovations is to increase the property's value. Here, however, Plaintiffs have not worked to improve the value of a piece of real estate, but have merely provided services, the value of which is easily determined.

A plaintiff who prevails on a claim of unjust enrichment is entitled to the value of the benefit conferred by the plaintiff on the defendant. *See Sitterli v. Caschi*, 811 S.E.2d 454, 457 (Ga. App. 2018) ("Unjust enrichment is an equitable concept and applies when as a matter of fact there is no legal contract, but when the party sought to be charged *has been conferred a benefit* by the party contending an unjust enrichment *which the benefitted party equitably ought to return or compensate for*.") (internal citations and quotations omitted; emphasis added); *see also Morris v. Britt*, 620 S.E.2d 422, 424 (Ga. App. 2005) (The theory of unjust enrichment is basically an equitable doctrine that the benefitted party equitably ought to either return or compensate for *the conferred benefits* when there was no legal contract to pay. The concept of unjust enrichment in law is premised upon the principle that a party cannot induce, accept, or encourage another to furnish or render something of value to such party and avoid payment *for the value received*.") (internal citations and quotations omitted; emphasis added).

If CoreCivic was unjustly enriched (which it does not concede), it was unjustly enriched in the amount of either: (1) the difference between what CoreCivic paid Plaintiffs for their participation in the VWP and what it would have had to pay Plaintiffs if it had paid them the applicable minimum and/or prevailing wage at the time they performed the work (as determined by Ga. Code Ann. § 34-4-3 and/or the U.S. Department of Labor ("DOL") Wage Determinations incorporated into the IGSA applicable to SDC), or (2) the total amount CoreCivic would have had to pay an actual employee (or employees, as appropriate, and as determined by Ga. Code Ann. § 34-4-3 and/or the DOL Wage Determinations incorporated into the IGSA) to do the work Plaintiffs did. Plaintiffs claim they are entitled to disgorgement of all profits generated by CoreCivic at SDC if they prevail on their unjust enrichment claim, but fail to explain how they were responsible for any profits other than the amounts CoreCivic "saved" by either not paying Plaintiffs the full value of their labor or not paying regular employees to do the work performed by Plaintiffs. Plaintiffs concede as much in ¶ 61 of their Amended Complaint when they allege that "CoreCivic knowingly benefitted financially … by way of reduced labor costs." (Doc. 87.)

SDC's total facility profits are therefore not relevant to Plaintiffs' claims because Plaintiffs are not entitled to disgorgement of CoreCivic's profits related to SDC. *See Edmondson v. Velvet Lifestyles, LLC*, 2016 WL 5682591, at *6 (S.D. Fla. Oct. 3, 2016) ("Because relevance is evaluated as part of a proportionality analysis of the requested discovery, the merits of the claim are considered."); *see also Sumpter v. Metro. Life. Ins. Co.*, 2016 WL 772552, at *4 (S.D. Ind. Feb. 29, 2016) (finding the discovery at issue not proportional to the needs of the case where the claims it related to "appear doomed"). This includes any profits allegedly obtained from the sale of items in the commissary generally, which Plaintiffs concede are required by CoreCivic policy to be used "towards welfare expenditures for detained immigrants" (Doc. 87 at ¶ 37), as

well as profits obtained from the sale of telephone cards in particular. CoreCivic does not sell "exorbitantly priced commissary items" or profit from the sale of commissary items. (Ex. 3, Dec. of L. Mallamas filed in *Owino v. CoreCivic*, No. 3:17-cv-01112-JLS-NLS (S.D. Cal. July 11, 2019).) And as demonstrated below, CoreCivic does not set the price of telephone calls—the telephone service providers do.

CoreCivic has already produced facility-wide information regarding amounts billed to ICE, billing summaries sent to Stewart County, amounts spent to purchase personal hygiene items issued to detainees, amounts spent on commissary inventory, and amounts paid to detainees for participation in the VWP. (Ex. 1 at ¶¶ 3–4, 17–18.) The Court has also already ordered Trinity to provide payroll information for Trinity employees who worked at SDC during the relevant period (Doc. 141 at 26–28), and CoreCivic has already produced payroll information for janitors and maintenance workers it employed at SDC during the relevant period in light of that order (Doc. 139-11; Ex. 1 at ¶ 21). Plaintiffs are also able to access CoreCivic's public financial statements at http://ir.corecivic.com/financial-information/sec-filings (last visited May 31, 2021), and have obtained (or will obtain) additional financial documents from Stewart County, Trinity, and ICE. (Ex. 1 at ¶ 19.) Thus, Plaintiffs should have (or should soon have) all of the information they need to determine their alleged damages on their unjust enrichment claim. No further production is necessary, and the Court should deny Plaintiff's Motion as to SDC's complete financial information.

**B.    Plaintiffs Are Not Entitled to Monthly Staffing Reports.**

Plaintiffs cite to no allegations in their Amended Complaint that would make the monthly staffing reports sought by RFP No. 11 relevant and discoverable. *See Sabal Trail Transmission, LLC v. 3.921 Acres of Land in Lake County, Florida*, 2018 WL 3636687, at *1 (M.D. Fla. July 16, 2018) ("The moving party bears the initial burden of proving that the information sought is

relevant.") (internal citations and quotations omitted); *see also Vision Constr. Ent., Inc. v. Argos Ready Mix, LLC*, 2017 WL 10084359, at *2 (N.D. Fla. June 28, 2017) ("However, when relevancy is not apparent, the burden is on the party seeking discovery to show the relevancy of the discovery request.") (internal citations and quotations omitted); Fed. R. Civ. P. 26, Committee Notes to 2015 Amendment ("A party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them."). Nor can they, as the words "staffing" and "shortage" are nowhere to be found in the Amended Complaint, either separately or together. (Doc. 87.)

Instead, Plaintiffs cite to a news article and a DHS Office of the Inspector General ("OIG") report from 2018 and 2017, respectively, to suggest that staffing shortages at SDC might cause CoreCivic to force detainees to participate in the VWP in order to make up the difference. But Plaintiffs' theory is based on nothing but unsupported speculation. Plaintiffs cite no evidence whatsoever to support their theory. Instead, they use words like "would be" and "may mean"—implicit admissions that they have no basis to believe that the sought-for evidence exists or that it would show that CoreCivic routinely uses VWP participants to make up for facility staff shortages.

The news article and OIG report Plaintiffs cite say nothing about the VWP or staffing shortages among janitorial, maintenance, or kitchen staff. The WABE article is based almost entirely on anonymous sources and references only alleged shortages among security staff, medical staff, and ICE staff. *See* https://www.wabe.org/exclusive-an-ice-detention-centers-struggle-with-chronic-staff-shortages/ (last visited May 31, 2021). The OIG report states only that unidentified staff members reported insufficient intake staff—who perform a security function pertaining to new detainee admissions that is entirely unrelated to the VWP. *See* https://

www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf at 3 (last visited May 31, 2021). The OIG working papers obtained and published by WABE show that the alleged staffing shortages were reported among intake staff, medical/mental health staff, and ICE ERO staff. *See* https://www.wabe.org/wp-content/uploads/2018/05/2018-IGFO-00059_Final-Response_watermark-4.pdf at 5, 12, 17, 19, 34 (last visited May 31, 2021).

Plaintiffs present no evidence—and can present no credible evidence—to show that CoreCivic has ever used detainees to fill such roles, at SDC or elsewhere. CoreCivic does not do so. (Ex. 2 at ¶ 9.) CoreCivic is not responsible for filling ICE ERO positions, but even if it were, any such positions would necessarily be supervisory, and there is not a circumstance in which one detainee would ever be placed in a position of authority or supervision over another detainee. (Id. at ¶ 9.) And it should go without saying that no detainee would ever be placed in charge of another detainee's medical or mental health care.

In fact, the opposite of Plaintiffs' speculated scenario is actually true. The only operational, security, or unit staff who regularly perform cleaning duties are staff assigned to secure areas of the facility where detainees are not permitted to be, such as control pods, the armory, the pharmacy, and podiums in the housing pods. (Id. at ¶ 10.) An absent staff member in one of those areas would be replaced by another staff member, not a detainee—no cleaning in those areas is, has been, or ever will be done by any ICE detainee participants in the VWP. (Id.)

SDC currently employs 2 janitors who are assigned to clean secure areas of the facility occupied by ICE personnel. (Id. at ¶ 11.) Again, detainees are not permitted in those areas, and no ICE detainee participant in the VWP is, has been, or ever will be assigned to fill in for janitorial staff in those areas. (Id.) SDC also employs several maintenance personnel. (Id. at ¶ 12.) Although SDC has previously attempted to identify skilled detainees to assist maintenance

staff within the secure perimeter as part of the VWP, few or no qualified or willing detainees were located. (Id.) If SDC lacked sufficient janitorial or maintenance staff to clean the secure areas of the facility or make necessary repairs, or if a particular repair required a skill set not possessed by maintenance staff, CoreCivic would contract with a third-party company to perform the work, subject to ICE approval of the personnel who would enter the facility. (Id.)

Occasionally, events occur that disrupt normal facility operations, such as lockdowns, or more frequently over the past 15 months, cohorts or quarantines of detainees due to COVID-19 which have disrupted facility operations. (Id. at ¶ 14.) As a result, detainees have either not wanted or been unable to participate in off-unit VWP assignments. (Id.) However, due to the nature of the event, other activities such as visitation, recreation, outside transports, and chow hall feeding may be limited or curtailed, resulting in a surplus of detention officers who do not have detainees to supervise. (Id.) In such situations, security staff may be reassigned to temporarily cover the tasks which would otherwise be completed by detainee participants in the VWP, such as meal preparation, detainee laundry, and certain other cleaning—not the other way around, with VWP participants performing detention officer functions. (Id.)

CoreCivic does not force (or even request) detainees to participate in the VWP in order to make up for staff shortages, and Plaintiffs have failed to show otherwise. Their baseless speculation is not a reason to compel CoreCivic to produce monthly staffing reports. *See Apotex, Inc. v. Mylan Pharms., Inc.*, 2013 WL 8184264, at *6 (S.D. Fla. June 4, 2013) ("[Plaintiffs'] speculation does not establish a minimal showing of relevance and provides no basis to compel the production of the [requested documents]."); *see also Johnson v. Terry*, 2007 WL 1021401, at *5 (M.D. Ga. Apr. 2, 2007) ("[D]iscovery cannot be ordered on the basis of pure hypothesis.")

(quoting *Arthur v. Allen*, 459 F.3d 1310, 1311 (11th Cir. 2006)). The Court should deny Plaintiffs' Motion as to the monthly staffing reports.

###### C.      Policies 1-22, 5-1, and 16-100 Are Irrelevant.

Plaintiffs fail to show that Policies 1-22, 5-1, and 16-100 are relevant and discoverable. *See Sabal Trail Transmission, LLC*, 2018 WL 3636687 at *1; *Vision Constr. Ent., Inc.*, 2017 WL 10084359 at *2; Fed. R. Civ. P. 26, Committee Notes to 2015 Amendment.[5] Policy 1-22, Audits, Inspections, and Corrective Action, describes the internal and external audits and inspections that occur at SDC, as well as procedures for conducting and responding to such audits. (Ex. 2 at ¶ 5.) The policy pertains to all aspects of facility administration; it is not limited to and does not reference the VWP. (Id.) There are no claims in this lawsuit that CoreCivic is violating this policy by not conducting, allowing, or responding to audits, or that Policy 1-22 violates the TVPA, the U.S. Constitution, or any other constitutional or statutory provision or common law.

Policy 5-1 describes the procedures for preparing and reviewing reports of significant incidents, including a description of which reports are subject to oversight by CoreCivic's Office of the General Counsel. (Id. at ¶ 6.) The policy pertains to all significant incidents; it is not limited to and does not reference the VWP. (Id.) There are no claims in this lawsuit that CoreCivic is violating this policy by not properly investigating and reporting significant incidents, or that Policy 5-1 violates the TVPA, the U.S. Constitution, or any other constitutional or statutory provision or common law.

The paragraphs Plaintiffs cite in an attempt to establish the relevance of Policies 1-22 and 5-1 merely state some of the basic requirements for the VWP as established in ICE's

---

[5] If the Court would prefer to review Policies 1-22, 5-1, and 16-100 before ruling on Plaintiffs' Motion, CoreCivic will produce them for in-camera review.

Performance-Based National Detention Standards ("PBNDS") (Doc. 87 at ¶ 28) and allege that CoreCivic forces and/or coerces ICE detainees to participate in the VWP at SDC in various ways (Doc. 87 at ¶¶ 36, 49).[6] None of these paragraphs says anything about facility audits or incident reports. Plaintiffs' argument that CoreCivic must produce "any policies designed to ensure compliance" with the requirements of the PBNDS would make nearly every SDC policy relevant and discoverable—an absurd result in a lawsuit alleging only a violation of the TVPA and a related claim for unjust enrichment that is specifically tied to the VWP. As demonstrated below, none of the audit reports that have been produced and/or are publicly available contain any findings to the effect that CoreCivic is forcing and/or coercing detainees to work in the VWP, and Plaintiffs have not cited to a single incident report to that effect either. Because the audit and incident reports themselves are irrelevant, the policies describing their use are also irrelevant to the claims at issue in this matter, and Plaintiffs have not shown otherwise. Their demand that CoreCivic be required to produce Policies 1-22 and 5-1 should be denied.

Policy 16-100 describes various requirements of the telephone system available to detainees, such as the requirement that all detainees have equal and adequate telephone access, the times that detainees will be permitted to use the telephones, procedures for legal calls, and procedures for monitoring certain telephone calls. (Ex. 2 at ¶ 7.) It does not specify the costs of telephone calls, and is not limited to and does not reference the VWP. (Id.) There are no claims in this lawsuit that CoreCivic is violating this policy by not providing detainees access to the

---

[6] With respect to ¶ 49 of the Amended Complaint in particular, the PBNDS—not CoreCivic—makes "[e]ngaging in or inciting a group demonstration" and "[e]ncouraging others to participate in a work stoppage or to refuse to work" "high"-level offenses, and provides that available sanctions for these violations include but are not limited to initiation of criminal proceedings, disciplinary segregation, change of housing, and loss of privileges (including commissary). *See* https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf at Appendix 3.1.A, Part II (last visited May 31, 2021).

telephone system, or that Policy 16-100 violates the TVPA, the U.S. Constitution, or any other constitutional or statutory provision or common law.

The paragraphs Plaintiffs cite in an attempt to establish the relevance of Policy 16-100 merely allege that CoreCivic forces and/or coerces ICE detainees to participate in the VWP at SDC in various ways, including by making the phone cards "costly." (Doc. 87 at ¶¶ 36–37, 45, 48.) But Policy 16-100 says nothing about telephone rates, and even Plaintiffs acknowledge that "*[o]ther companies* provide phone services for detained immigrants at [SDC]," and that "*[t]he phone companies* … charg[e] excessively high rates for detained immigrants to make telephone calls." (Doc. 87 at ¶ 47) (emphasis added.) Policy 16-100 is not relevant to the claims at issue in this matter, and Plaintiffs have not shown otherwise. Their demand that CoreCivic be required to produce Policy 16-100 should be denied.

Although CoreCivic's primary objection to producing these policies is relevance, Plaintiffs incorrectly claim that CoreCivic has not asserted that it would be unduly burdensome to produce these policies, and that it could not do so in any event. First, CoreCivic did object to burden and proportionality to the extent the requests sought production of documents and information beyond the claims and defenses at issue, and therefore beyond the needs of the case. (Doc. 139-6.) Second, Plaintiffs' demand is not just for current versions of these policies, but also for all versions from 2008 to the present—a period of 13 years—that are in CoreCivic's possession. (Doc. 139-4.) Finally, where, as here, the requested documents are not relevant to the case, *any* burden associated with their production is necessarily disproportionate to the needs of the case, taking them outside the scope of discovery. *See Edmondson*, 2016 WL 5682591 at *5 ("Proportionality and relevance are 'conjoined' concepts; 'the [lesser] the relevance of the information in issue, the [more] likely its discovery will be found to be disproportionate.'")

(quoting *Viagasi*, 2016 WL 616386 at *14). "Proportionality requires counsel and the court to consider whether relevant information is discoverable in view of the needs of the case. … In order to frame the discovery on this issue, it is essential to determine what the purpose of the discovery is. … Then, of course, it is the Court's responsibility, using all the information provided by the parties, to consider these and all the other factors in reaching a case-specific determination of the appropriate scope of discovery." *Sabal Trail Transmission, LLC*, 2018 WL 3636687 at *1–*2 (internal citations, quotations, and alterations omitted).

Plaintiffs have failed to demonstrate the relevance of the policies, or to provide the Court with a valid reason to require CoreCivic to produce them, and CoreCivic has provided evidence demonstrating that the policies are not relevant to the claims and defenses at issue in this case. On the evidence before it, the Court should deny Plaintiffs' Motion as to Policies 1-22, 5-1, and 16-100.

**D.**   **Audit and Inspection Reports Are Irrelevant.**

Plaintiffs fail to show that the audit and inspection reports are relevant and therefore discoverable. *See Sabal Trail Transmission, LLC*, 2018 WL 3636687 at *1; *Vision Construction Ent., Inc.*, 2017 WL 10084359 at *2; Fed. R. Civ. P. 26, Committee Notes to 2015 Amendment. As with the policies, the paragraphs Plaintiffs cite from the Amended Complaint make no allegations regarding audits and inspections of SDC. Instead, they merely allege that CoreCivic forced and/or coerced detainees to participate in the VWP through various means, such as by threatening to place them in segregation. (Doc. 87 at ¶ 119.)

/ / /

/ / /

According to Plaintiffs, this makes any and all evidence regarding conditions at the facility in general, and in the Restricted Housing Unit ("RHU")[7] in particular, fair game. But again, nowhere in the Amended Complaint do Plaintiffs allege that conditions in the RHU—or anywhere else in SDC—are unconstitutional. (Doc. 87.) Although ¶¶ 36–48 contain some one-off allegations regarding conditions at SDC, Plaintiffs fail to explain how those allegations, if true, force and/or coerce detainees to participate in the VWP. Audit and inspection reports are therefore irrelevant and outside the scope of discovery in this case.[8]

But even if the reports are relevant and discoverable, Plaintiffs concede that CoreCivic produced two reports in response to RFP No. 13—a 2019 Nakamoto Group report and a 2019 ODO report—but fail to acknowledge that CoreCivic also stated that it would supplement the response with additional reports. (Doc. 139-6; Ex. 1 at ¶ 12.) On May 12, 2021, CoreCivic did so, and produced copies of reports from ERO/Nakamoto Group, ERO/Creative Corrections, and ODO from 2008, 2012, 2015, 2017, 2018, 2019, and 2020—a date necessitated not by the Motion to Compel, but by time required to prepare the reports and the other documents produced

---

[7] Plaintiffs' position ignores the fact that the PBNDS, which Plaintiffs claim CoreCivic is required to follow, authorize restricted housing as one of many potential sanctions for a wide array of disciplinary violations. *See* https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf at § 3.1 (last visited May 31, 2021).

[8] The cases Plaintiffs cite are all distinguishable. *Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445 (E.D. Va. 2015), was an order granting the plaintiff's Motion for Default Judgment, and did not rule either that reports regarding general conditions at the plaintiff's residence were relevant and discoverable or that the defendants were required to produce them. *Id.* at 453. *David v. Signal Int'l*, 2012 WL 10759668 (E.D. La. Jan. 4, 2012), was an order on a motion for class certification against a company alleged to have tricked foreign workers into coming to the United States with promises of green cards and permanent residency. *Id.* at *10. What Plaintiffs leave out of their citation is that the court was merely reciting the plaintiffs' allegations, not ruling that they were relevant to the claim, let alone that they provided a basis for burdensome discovery. *Id. E.E.O.C. v. Hill Country Farms*, 899 F. Supp. 2d 827 (S.D. Iowa 2012), is the least helpful to Plaintiffs, as it did not even involve the TVPA, but was an action for discrimination against disabled employees under the Americans with Disabilities Act. *Id.* at 828.

with them for production. (Ex. 1 at ¶ 12.) On May 31, 2021, CoreCivic did so again, and produced another set of reports, comprising the rest of the ICE/ERO/Nakamoto/ODO reports in its possession. (Id. at ¶ 14.) Specifically, the production includes 12 reports from ERO/Nakamoto and ODO for various years between 2012 and 2021. (Id. at ¶ 15.)[9] CoreCivic is not in possession of any additional ICE/ERO/Nakamoto/ODO reports, such that there is nothing more to compel as to those reports. (Id. at ¶ 16.)[10]

CoreCivic produced these reports because they involved detainee interviews during which detainees could express any concerns they might have.[11] The same cannot be said about

---

[9] CoreCivic does not have a complete set of reports for 2008–2021, in part due to its records retention policy and in part due to the fact that ICE does not always timely provide CoreCivic with copies of the final reports, or sometimes at all. (Ex. 2 at ¶¶ 15–19.)

[10] Plaintiffs also fail to acknowledge the reports available online at https://www.ice.gov/detain/facility-inspections (last visited May 31, 2021), the reports available online at https://www.ice.gov/foia/library (last visited May 31, 2021), and any reports they may have received as a result of their subpoenas duces tecum to Nakamoto and ICE (Ex. 1 at ¶ 13.)

[11] The Nakamoto reports are available at https://www.ice.gov/detain/facility-inspections. The September 2020 Nakamoto report noted only five detainee complaints—none pertained to the VWP, and all five were found to be unsubstantiated. September 2020 Cover Letter at 2–3. The May 2019 Nakamoto report noted two complaints that food portions were too small, but determined that the food portions were analyzed, certified, and approved by a registered dietician, found no merit to the complaints, and noted that detainees were "generally satisfied with living conditions [and] food service." May 2019 Nakamoto Cover Letter at 2. The May 2018 Nakamoto report noted that detainees were "generally satisfied with living conditions [and] food service." May 2018 Cover Letter at 3. None of the detainees in these reports complained that they were forced to participate in the VWP or that they felt compelled to do so because of a lack of food, hygiene items, or other materials.

The ERO Detention Facility Reviews and Audits and ODO Detention Facility Compliance Inspections are available at https://www.ice.gov/foia/library. The May 2008 and May 2012 reports grade the VWP as "acceptable" and/or "meets standards." And although the August 2017, April 2019, September 2020, and February 2021 ODO Detention Facility Compliance Inspections found no deficiencies associated with the VWP. The April 2019 report, however, noted that one detainee complained that he was unable to make his shift in the VWP because it overlapped with his scheduled law library time, but that facility staff agreed to change his work assignment and issued him back pay for the times his pay was reduced due to the conflict. April 2019 ODO Detention Facility Compliance Inspection at 7.

CoreCivic's internal audits, which do not involve detainee interviews. Plaintiffs have provided no evidence to support their demand that CoreCivic be compelled to produce any additional audit reports, including any reason to believe CoreCivic's internal audits would reveal anything more than the reports already available to Plaintiffs. The Court should deny their Motion as to the audit and inspection reports.

**E.    Plaintiffs Are Not Entitled to Fees and Costs.**

Rule 37(a)(5)(A) provides that the Court must not order payment of Plaintiffs' reasonable expenses incurred in bringing the Motion to Compel, including attorney fees, if (1) Plaintiffs filed the Motion before attempting in good faith to obtain the discovery without court action, (2) CoreCivic's responses and objections were substantially justified, or (3) other circumstances make an award of expenses unjust. The cases cited by Plaintiffs in support of their request for fees and costs involved egregious violations of the Federal Rules, as opposed to simple differences of opinion, as is the case here.

The documents at issue here are not "indisputably relevant," as Plaintiffs claim; rather, genuine disputes exist as to whether the documents are relevant and discoverable, and reasonable people could differ as to the appropriateness of CoreCivic's objections. *See Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Other circumstances also make an award of expenses unjust, including: CoreCivic's production to date of over 17,000 documents consisting of over 150,000 pages; CoreCivic's complete production of the ERO/Nakamoto and ODO audit reports in its possession, including its original response to RFP No. 13 stating that it would do so; Plaintiffs' failure to support some of their requests with any legal authority, and to support other requests with applicable legal authority; and Plaintiff's failure to cite to any of the over 17,000 documents produced by CoreCivic as providing a factual basis to believe that further document production is necessary and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

Plaintiffs made a similar request for fees and costs in their Motion to Compel Rule 34 Site Inspection. (Doc. 132.) The Court did not grant it there and should not grant it here.

## III.   Conclusion

The Court should deny Plaintiffs' Motion to Compel in its entirety, as Plaintiffs have failed to show that CoreCivic should be compelled to produce the documents at issue or pay Plaintiffs' fees and costs incurred in bringing the Motion. Should Plaintiffs attempt to do so in their reply brief by introducing evidence and argument that they could have raised in the original Motion, the Court should disregard them. *See Murphy v. Farmer*, 176 F. Supp. 3d 1325, 1342 (N.D. Ga. 2016) ("It is common practice for the Court not to hear arguments raised for the first time in a reply brief.") (citing cases); *see also Howard v. Metro. Atlanta Rapid Transit Auth.*, 2016 WL 10988790, at *7 (N.D. Ga. July 14, 2016) ("Also, not considering this argument raised for the first time in reply is a matter of fairness—Defendant has not gotten a chance to respond to the arguments first raised by Plaintiff in the reply brief.").

/ / /

/ / /

/ / /

/ / /

/ / /

Dated: June 1, 2021

Respectfully submitted,

s/ Jacob B. Lee
Daniel P. Struck *(pro hac vice)*
   Lead Counsel
Rachel Love *(pro hac vice)*
Nicholas D. Acedo *(pro hac vice)*
Ashlee B. Hesman *(pro hac vice)*
Jacob B. Lee *(pro hac vice)*
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Phone: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com


Jacob D. Massee (GA Bar No. 551890)
David Bobo Mullens (GA Bar No. 258029)
OLIVER MANER LLP
PO Box 10186
Savannah, Georgia 31412
Phone: (912) 236-3311
Fax: (912) 236-8725
jmassee@olivermaner.com
dbmullens@olivermaner.com

Attorneys for Defendant CoreCivic, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of June, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Priyanka Bhatt | priyanka@projectsouth.org |
| Meredith B. Stewart | meredith.stewart@splcenter.org |
| Rebecca M. Cassler | rebecca.cassler@splcenter.org |
| Caitlin J. Sandley | cj.sandley@splcenter.org |
| Vidhi Bamzai | vidhi.bamzai@splcenter.org |
| Daniel H. Charest | dcharest@burnscharest.com |
| R. Andrew Free | andrew@immigrantcivilrights.com |
| Azadeh Shahshahani | azadeh@projectsouth.org |
| Jessica Hasen | jhasen@perkinscoie.com |
| Emily B. Cooper | ecooper@perkinscoie.com |
| John T. Dixon | johndixon@perkinscoie.com |
| Alan B. Howard | ahoward@perkinscoie.com |
| John H. Gray | jhgray@perkinscoie.com |
| Jessica L. Everett-Garcia | jeverettgarcia@perkinscoie.com |

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

N/A

s/ Jacob B. Lee