**EXHIBIT 2**

**2d Declaration of Warden Russell Washburn**

**2d Declaration of Warden Russell Washburn**

**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| WILHEN HILL BARRIENTOS, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>CORECIVIC, INC.,<br><br>    Defendant. | Civil Action No. 4:18-cv-00070-CDL |

## SECOND DECLARATION OF WARDEN RUSSELL WASHBURN

I, Warden Russell Washburn, state the following:

1. I am over the age of 18 years and competent to testify to the matters set forth in this Declaration. I have personal knowledge of the facts set forth in this Second Declaration, and if called as a witness, could competently testify to these facts. I provide this Declaration in support of CoreCivic's Response to Plaintiffs' Motion to Compel Defendant CoreCivic's Response to Plaintiffs' First Discovery Requests in the above-referenced matter.

2. I have been employed by CoreCivic, Inc. ("CoreCivic") since 1996. For the past 12 years, I have held the position of Warden at several CoreCivic facilities. On August 17, 2020, I was appointed the president of the North American Association of Wardens & Superintendents ("NAAWS").

3. Effective April 1, 2020, I became Warden of the Stewart Detention Center ("SDC"), in Lumpkin, GA. SDC is owned and operated by CoreCivic as the service provider for an Intergovernmental Service Agreement ("IGSA") between Stewart County, Georgia and U.S. Immigration and Customs Enforcement ("ICE").

4. I understand that Plaintiffs' Motion to Compel seeks, among other things, CoreCivic Policies 1-22, Audits, Inspections, and Corrective Action; 5-1, Incident Reporting; and 16-100, Access to Telephones. None of these policies have any relationship to the Voluntary Work Program ("VWP") at SDC.

5. Policy 1-22 relates to internal and external audit reports (including partner audit reports), including procedures for conducting and responding to such audits, and provides that such reports are confidential and proprietary and not to be distributed without prior written consent of CoreCivic's Office of the General Counsel. It further provides that CoreCivic's Quality Assurance Division is established under the Office of the General Counsel, and that Corrective Action Plans are developed under the direction of the Office of the General Counsel. This policy is not related to the VWP.

6. Policy 5-1 relates to preparation and review of reports of significant incidents, which are to be prepared and submitted to CoreCivic's Office of the General Counsel. It also specifies that excluding requests by contracting agencies, incident reports contain privileged information and must be kept confidential and are not to be released without the approval of the Office of the General Counsel. This policy is not related to the VWP.

7. Policy 16-100 relates to Access to Telephones and provides that each detainee will have equal and adequate telephone access. It further provides that times when detainees will be permitted to use the telephones will be posted, describes procedures for legal calls, requires telephone system maintenance, and describes procedures for monitoring of certain telephone calls. This policy does not detail the specific costs of telephone calls and does not have any relation to the VWP.

8.  I further understand that Plaintiffs' Motion to Compel seeks production of staffing reports based on the theory that CoreCivic uses ICE detainees at SDC to cover for staff shortages. Nothing could be further from the truth.

9.  The primary responsibility of a Detention Officer at SDC is to provide supervision related to the safety and security of detainees who have been entrusted to the facility. It is a fundamental principle of sound correctional and detention facility management that no inmate or detainee be placed in a position of influence or control over any other inmate or detainee. In all my years in corrections, I am not aware of any instances in which a detainee—ICE or otherwise—has been used to supervise other detainees to cover for a Detention Officer.

10. No operational, security, or unit management personnel at SDC have a primary responsibility for cleaning the facility. Although Detention Officers are responsible for maintaining their immediate individual work areas in a neat and orderly fashion, including secure areas of the facility where detainees are not permitted to be, such as control pods, the armory, the pharmacy, and even podiums in the housing pods, which contain restricted materials, their primary responsibility is to provide for the safety and security of the facility, as stated above. It is my understanding and belief based on my experience that no cleaning in those areas is, has been, or ever will be done by any ICE detainee participant in the VWP.

11. SDC does currently employ one full-time and one-part time Janitor. Both individuals are assigned to clean in secure areas of the facility where detainees are not permitted, including the ICE administration building. It is my understanding and belief based on my experience that no cleaning in those areas is, has been, or ever will be done by any ICE detainee participant in the VWP.

12. SDC also currently employees several individuals in its Maintenance Department, including Maintenance Workers, an Assistant Maintenance Supervisor, and a Maintenance Supervisor. It is my understanding that at various times attempts have been made to identify skilled detainees to assist the Maintenance Workers, but often there are no qualified or willing detainees for such jobs. Further, while detainees can assist with certain maintenance-related tasks inside the facility, detainees would never be permitted to work outside of the secure perimeter, engage in repairs to locking mechanisms of the facility, work on the facility roof, or handle "Class A" tools, such as ladders, which could be used to facilitate an escape from the facility.

13. If there were a shortage of maintenance or janitorial staff at SDC, or a project which maintenance employees were not qualified to complete, SDC would simply contact with an outside company to provide the service, subject to ICE approval of the personnel who would need to enter the facility.

14. Occasionally there are events which disrupt normal facility operations, such as lockdowns, or more frequently over the past 15 months, cohorts or quarantines of detainees due to COVID-19 which have disrupted facility operations. As a result, detainees have either not wanted to or been unable to participate in off-unit VWP assignments. However, due to the nature of the event, other activities such as visitation, recreation, outside transports, and chow hall feeding have been limited if not curtailed, resulting in a surplus of facility Detention Officers who, due to changes in operations, do not have detainees to supervise. In such situations, security staff may be reassigned to temporarily cover the tasks which would otherwise be completed by detainee participants in the VWP, such as meal preparation, detainee laundry, and certain other cleaning.

15. I further understand that Plaintiffs' Motion to Compel seeks production of inspection reports generated by CoreCivic or third parties such as the U.S. Department of Homeland Security ("DHS"), ICE, ICE Enforcement and Removal Operations ("ERO"), the ICE Office of Detention Oversight ("ODO"), and the Office for Civil Rights and Civil Liberties ("CRCL").

16. Under the ICE compliance inspection process, ICE periodically audits SDC to verify CoreCivic's compliance with the IGSA and applicable standards and regulations. While ICE audit teams generally hold "out-briefings" with the facility at the conclusions of the audits, they do not provide audit reports directly to the facility. Rather, their reports are submitted to ICE personnel, and upon approval and completion, it is my understanding that certain reports are directed to local ICE Field Office personnel for distribution to the facility. It is my understanding that reports are not typically complete until approximately 60 days after an inspection.

17. Recently, I had an encounter with a PREA-Compliance Inspector where it was determined that the prior year's report was never provided to any CoreCivic employee at SDC. Based upon communications from a long-time employee at SDC, it is my understanding and belief that there have been multiple past years where local ICE personnel did not disseminate ICE compliance inspections to CoreCivic personnel at SDC. Further, in years where inspection or audit reports were received from ERO or ODO, there was often a significant delay in receiving the report after the inspection.

18. Since my arrival at SDC, I have participated in several virtual and/or in-person inspections of the facility by ICE and DHS, including inspections conducted by the Nakamoto Group (under contract with ERO), ODO, and CRCL, which always include interviews of detainees. At no point during any out-briefing have I been advised of any concerns or claims that

the VWP at SDC is not being administered in full compliance with the PBNDS; that detainees feel forced to participate in the VWP through use or threats of force, segregation, or anything else; or that detainees feel coerced to participate in the VWP by being denied basic necessities such as food, clothing, or hygiene materials.

19. To my knowledge, neither SDC nor CoreCivic has not received any final report following any inspection of SDC by CRCL from ICE or DHS.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of June 2021 in Lumpkin, GA.

*Russell Washburn*
Warden R. Washburn