**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

| | |
|---|---|
| **WILHEN HILL BARRIENTOS, et al**,<br><br>        **Plaintiffs,**<br>v.<br><br>**CORECIVIC, INC.,**<br><br>        **Defendant.** | Civil Action No.  4:18-cv-00070-CDL |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO COMPEL DEFENDANT CORECIVIC'S RESPONSE TO PLAINTIFFS' FIRST DISCOVERY REQUESTS**

On May 11, 2021, Plaintiffs filed a motion to compel production of four categories of documents from CoreCivic: (1) financial documents, (2) monthly staffing reports, (3) three Stewart Detention Center (SDC) policies, and (4) internal and external inspections and audits of SDC.

Rather than carrying its "heavy burden of showing why discovery should be denied," *Williams v. Art Institute of Atlanta*, No. 1:06-CV-0285-CC/AJB, 2006 WL 3694649, at *7 (N.D. Ga. Sep. 1, 2006) (citation omitted), CoreCivic tosses out vague, baseless accusations about Plaintiffs' "activism" and attempts to "force CoreCivic to settle," Doc. 142 at 1, 4. CoreCivic's efforts to prematurely litigate the merits of Plaintiffs' claims, including through two self-serving declarations from CoreCivic employees, show exactly why the discovery Plaintiffs seek is relevant and necessary. Plaintiffs are not required to take CoreCivic's "word for it" at the discovery stage. Order at 4, *A.S.M. v. Donahue*, No. 7:20-CV-62 (CDL) (M.D. Ga. Apr. 10, 2020), ECF No. 50. Plaintiffs have shown that the disputed documents are relevant to their claims, and CoreCivic has not carried its heavy burden of showing that discovery should be denied. The Court should grant Plaintiffs' Motion to Compel.

1

**I.      CORECIVIC'S FINANCIAL DOCUMENTS ARE RELEVANT AND NECESSARY**

The financial documents Plaintiffs seek are relevant to the merits of Plaintiffs' claims and damages calculations. As to the merits, the profit CoreCivic generates from SDC is evidence that it knowingly benefits from forced labor, 18 U.S.C. § 1589(b), and the profits also establish CoreCivic's motivation to obtain forced labor under 18 U.S.C. § 1589(a). *See* Doc. 87 ¶¶ 21-23, 27, 32, 35, 60, 61. Through the Work Program, CoreCivic not only saves substantially in labor costs, but it also receives the benefit of the detained workers' services and purchases, which keep SDC in business while padding CoreCivic's pockets.

Plaintiffs allege that CoreCivic compels people to work in part by depriving them of basic necessities and then benefits doubly when the detained workers purchase those necessities in the one place they can – the CoreCivic owned and operated SDC commissary. *See* Doc. 87 ¶ 36, 37, 39, 40, 43, 61. The inflated prices that detained individuals must pay at the commissary, and CoreCivic's resulting commissary profits, are therefore part and parcel of CoreCivic's lucrative forced labor scheme. CoreCivic makes hay about its policy of placing commissary profits in an "Inmate Welfare Fund" after commissary staff salaries and operating costs are paid. *See* Doc. 142 at 7-8; Doc. 142-8 ¶¶ 14-17. But the relevance of these profits lies in the fact that CoreCivic operates a "company store" for detained workers and uses the profits from that store to offset its total operating costs, regardless of how the profits are ultimately spent.[1] According to the 2019 declaration of CoreCivic's Director of Commissary, CoreCivic's company stores generally benefit from a 30% profit margin. Doc. 142-8 ¶ 5. At SDC, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 1 (2020 Commissary Sales) at CCBVA0000106586. Thus,

---

[1] CoreCivic has quoted its policy but has offered no evidence of how the SDC commissary profits are actually spent. *See* Doc. 142-7; Doc. 142-8.

CoreCivic's profits from the necessities that detained workers must purchase at the commissary are relevant to Plaintiffs' allegations that CoreCivic knowingly benefitted from its deprivation scheme.

CoreCivic's profit from phone contracts is similarly relevant to the merits of Plaintiffs' forced labor claim, notwithstanding CoreCivic's argument that it "does not set the price of telephone calls." Doc. 142 at 8. Private companies operate the phones at SDC, and they are the only means for detained people to call their loved ones and attorneys. *See* Doc. 87 ¶ 47. Until ▌, CoreCivic contracted with Securus Technologies to provide phone services at SDC. The contract included ▌ the contract between ICE and the current provider, Talton Communications. *Compare* Ex. 2 (Securus Rate Sheet) at SECURUS_000094 (▌), *with* Ex. 3 (▌ Talton Contract) at ICE-Barrientos-0006 (▌). Under the Securus contract, ▌. Ex. 4 (Securus Contract) at SECURUS_000149-50. Thus, the total profits CoreCivic received under the Securus contract are relevant to Plaintiffs' allegations that CoreCivic knowingly benefitted from offering phone services at exorbitant rates that compelled people to work so they could afford phone calls. *See* Doc. 87 ¶¶ 36-37, 45, 47-48.

CoreCivic's financial documents are also relevant to Plaintiffs' damages calculations. CoreCivic depends on forced labor to operate SDC, so all the profits generated from SDC during the relevant period are at issue. *Id.* ¶¶ 29-30 (alleging the jobs and tasks performed by detained workers). Plaintiffs have always sought profit disgorgement in this case. *See* Doc. 1 at 29-30; Doc. 87 at 32-33. CoreCivic cannot circumvent the motion to dismiss and summary judgment standards by attempting now to contest the propriety of disgorgement as a remedy for the first time in the

context of this Motion. Even if it could, CoreCivic's misreading of *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350 (11th Cir. 2021) fails to provide support for its argument. In *AcryliCon*, the Eleventh Circuit simply did not say, as CoreCivic posits, that disgorgement is only proper when there is no other measure of damages. *See* Doc. 142 at 5. The court stated that disgorgement allows a plaintiff to recover a defendant's wrongful gain, which is entirely consistent with Plaintiffs' claim for disgorgement here. *See AcryliCon*, 985 F.3d at 1367.

This case is very similar to *Yoh v. Daniel*, where a jury awarded potential buyers of a home the value of improvements they made to the home, and not merely the cost of labor and materials. 497 S.E. 2d 392 (Ga. Ct. App. 1998). Here, detained workers make SDC valuable to CoreCivic through: food service, barbering, laundry work, cleaning, floor polishing, and even skilled labor[2] like plumbing, electrical, carpentry, and landscaping work that maintains and potentially increases the value of SDC as real estate. Ex. 5 (Feb. 27, 2019 Unit 5 Townhall Meeting Minutes) at CCBVA0000149686; Doc. 142-7 at ¶ 12. As to cleaning work, even CoreCivic represents that the **only** parts of the facility that are **not** cleaned by detained workers are secure areas—"control pods, the armory, the pharmacy, and podiums in the housing pods." Doc. 142 at 10. CoreCivic's labor savings[3] are just one aspect of the profit CoreCivic obtained as a result of detained people keeping SDC operating and in a habitable condition through their work in the Work Program. All such

---

[2] Although Warden Washburn states that "often there are no qualified or willing detainees" for skilled labor jobs, Plaintiffs have no insight into what "often" means because they do not yet know how frequently CoreCivic has sought such skilled labor. Doc. 142-7 at ¶ 12. Moreover, Warden Washburn lacks personal knowledge of most of the class period since he has only been employed at SDC since April 1, 2020. *Id.* at ¶ 3.

[3] CoreCivic's labor savings are determined by the fair market value CoreCivic would have paid for the labor performed by detained workers, less what CoreCivic actually paid for that labor. CoreCivic appears to agree with this principle, *see* Doc. 142 at 7, but the parties disagree about which wage statute should be used to calculate the fair market value. This question is not before the Court at this time and Plaintiffs anticipate it will be a subject of later merits briefing.

profit is relevant to Plaintiffs' damages calculations and therefore discoverable.

CoreCivic also argues that *Yoh* is inapplicable because that case "did not involve a claim by a purported employee against a purported employer." Doc. 142 at 7. This distinction is inapposite because Plaintiffs' unjust enrichment claim is based on the theory that CoreCivic coerced them to provide valuable labor, not that Plaintiffs were CoreCivic employees.

Finally, the financial documents Plaintiffs have are insufficient. The documents available on CoreCivic's website do not show expenditures and revenue for SDC specifically. *See CoreCivic*, http://ir.corecivic.com/financial-information/sec-filings (last visited June 10, 2021). The financial documents produced thus far by CoreCivic and third parties do not show every expenditure or the total thereof—in short, they give no direct or indirect indication of the profits generated from SDC. The best evidence is the consolidated financial data CoreCivic maintains. The revenue and expenditure information Plaintiffs seek is relevant to the merits of their claims and the damages they seek and should therefore be produced.

## II.   THE MONTHLY STAFFING REPORTS ARE RELEVANT AND NECESSARY

CoreCivic's monthly staffing reports may show that CoreCivic does not employ sufficient janitorial and maintenance staff, increasing its dependence on detained workers, including the skilled detained workers CoreCivic admits it solicited. The day after Plaintiffs filed their opening brief, CoreCivic produced a 2017 ICE Office of Detention Oversight Compliance Inspection Report finding that CoreCivic's non-compliance with ICE security staffing requirements was a "**repeat deficiency.**" Ex. 6 (2017 ODO Compliance Inspection Report) at CCBVA0000150249 (emphasis original). The monthly staffing reports may also be evidence that CoreCivic does not employ sufficient security staff. *See* Doc. 139 at 6-7. Given that CoreCivic represents that when detained workers do not work, CoreCivic shifts security staff around the facility to fill in for those workers, repeat shortages of security staff could show CoreCivic's dependency on forced labor.

Doc. 142 at 11. The connection between CoreCivic staffing and the Work Program, made explicit by CoreCivic's employee's own declaration, is far beyond "unsupported speculation." *See id.* at 9.

CoreCivic claims it produced all staffing plans attached to the IGSAs, but CoreCivic has only produced one unredacted plan and one heavily redacted plan, with no privilege log. Thus, Plaintiffs have very little insight into what the CoreCivic staffing at SDC is expected to be. *See* Ex. 7 (Feb. 8, 2018 IGSA Mod.) at CCBVA0000105883-86; Ex. 8 (Apr. 24, 2019 IGSA Mod.) at CCBVA0000149754-57. The monthly staffing reports will show if CoreCivic is meeting staffing expectations and whether it has, in fact, ever employed enough security staff to do the work of ▄▄▄ workers, if needed. Ex. 9 (2020 SDC Work Program Guidelines) at CCBVA0000004648.

CoreCivic will have opportunities at summary judgment and trial to refute Plaintiffs' contention that janitor, maintenance worker, and officer understaffing at SDC motivates CoreCivic to force detained people to work to keep SDC running, but such arguments do not carry CoreCivic's heavy burden of showing such evidence is not relevant. *See Dunkin Donuts, Inc. v. Mary's Donuts, Inc.*, No. 01-0392-CIV-GOLD, 2001 WL 34079319, at *2 (S.D. Fla. Nov. 1, 2001) ("Courts have long held that relevance for discovery purposes is much broader than relevance for trial purposes."). Plaintiffs have shown the staffing reports are relevant and necessary; CoreCivic should be ordered to produce them.

### III. THE DISPUTED POLICIES AND CORECIVIC'S INTERNAL AUDIT REPORTS ARE RELEVANT AND NECESSARY

The three policies Plaintiffs seek are relevant to their claims even if they do not explicitly reference the Work Program, as are CoreCivic's internal audit reports.

**A. Policy 5-1, Incident Reporting**

CoreCivic's claim that, because the incident reporting policy does not mention the Work

6

Program explicitly, it is not discoverable lacks merit. The incident reporting policy will likely lead to the discovery of other relevant information. *See* Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment (stating that discovery into "the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter" is "deeply entrenched in practice that it is no longer necessary to clutter the long text of Rule 26 with these examples").[4] Plaintiffs expect the policy to indicate the types of incidents for which reports are supposed to be generated. And, the absence of any explicit mention of the Work Program in the policy could be telling in and of itself, suggesting that CoreCivic's policy may not require written documentation of incidents like work stoppages, strikes, refusals to work, or worker shortages. Either way, the policy will indicate the types of incidents that CoreCivic deems important enough to document, which goes both to CoreCivic's liability and to the existence of other discoverable documents.

### B. Policy 16-100, Phones

SDC's phone policy is relevant and should be produced even if Warden Washburn's representation that the policy "does not detail the specific costs of telephone calls" is true. Doc. 142-7 ¶ 7. He states that the policy "provides that each detainee will have equal and adequate telephone access." *Id.* Plaintiff Urbina Rojas specifically alleges CoreCivic punished detained workers by denying phone access when they refused to work. Doc. 87 ¶ 99. Plaintiffs are entitled to test the veracity of Warden Washburn's declaration and determine whether the punishment Mr. Urbina Rojas witnessed is even consistent with CoreCivic's own written telephone access policy.

### C. Policy 1-22, Internal Auditing and CoreCivic's Internal Audit Reports

As an initial matter, Plaintiffs' Motion to Compel sought both internal *and* external audits

---

[4] For the same reasons, a policy can be relevant for discovery purposes even if its lawfulness is not at issue, contrary to CoreCivic's assertions. *See* Doc. 142 at 12-14.

of SDC because CoreCivic refused to produce both, positing that "audits that broadly discuss topics such as segregation without reference to its use to force detainees into participating in the VWP are not relevant to the claims at issue." Doc. 139-11 at 5. On May 12 and 31, after Plaintiffs filed the Motion, CoreCivic purportedly produced all the external audits in its possession. Doc. 142 at 16-17. Without waiving the right to seek any other external audits should CoreCivic possess them, Plaintiffs withdraw their request to compel production of external audits at this time.

CoreCivic's internal audits are still at issue and should be produced. CoreCivic performs its own audits of virtually every aspect of the operations and conditions at SDC. Some of those audits .[5] *See, e.g.*, Ex. 10 (CCA ▮▮▮▮) at TRINITY-00031580-83; Ex. 11 (CCA ▮▮▮▮) at TRINITY-00014888-89, 4966-70, 5002-19, 5023-24, 5032, 5041; Ex. 12 (CoreCivic ▮▮▮▮) at TRINITY-008778-79, 8786-90, 8815-16, 8817-18, 8808, 8854-56, 8884-87. Thus, the policy governing how audits are conducted and the audit findings are relevant.

CoreCivic's rationale for producing external audits but not internal audits is illogical. First,

---

[5] CoreCivic cites no case law in support of its repeated contentions that Plaintiffs' discovery should be limited because they have not brought a constitutional challenge to the conditions of confinement at SDC. *See* Doc. 142 at 2, 12, 14, 16. Despite CoreCivic's fixation on this argument, it is simply not the case that the Constitution is the only law under which people confined in prisons, jails, and detention centers can challenge the conditions of their confinement. *See Barrientos v. CoreCivic*, 951 F.3d 1269, 1280 (11th Cir. 2020) (holding "the TVPA applies to private for-profit contractors operating federal immigration detention facilities"); *see also, e.g.*, *Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 213 (1998) (holding that the Americans with Disabilities Act applies to state prisons); *Fraihat v. U.S. Immigration & Customs Enforcement*, 445 F. Supp. 3d 709, 747-48 (C.D. Cal. 2020) (recognizing the Rehabilitation Act of 1973 applies in immigration detention). Here, as set out in Plaintiffs' Amended Complaint, certain conditions at SDC compel people to work. *See* Doc. 87. Plaintiffs are entitled to discovery about those conditions.

CoreCivic states that it produced external audit reports "because they involved detainee interviews during which detainees could express any concerns they might have." Doc. 142 at 17. If CoreCivic's internal audits do not seek this type of input from detained people, that may bear on their reliability, or lack thereof, but this is not a reason not to produce them. CoreCivic also argues that Plaintiffs have no "reason to believe CoreCivic's internal audits would reveal anything more than the [ERO/ODO] reports already available to Plaintiffs." Doc. 142 at 18. Plaintiffs do not have CoreCivic's internal audit policy or any internal audits; but, Plaintiffs would assume the internal audit findings are not identical to those in the external audit report, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, *see* Ex. 10 (CCA ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇), the audits are conducted by entirely different people, and, based on CoreCivic's implications, the internal audits do not include open-ended interviews with detained people.

In its response brief, CoreCivic points to specific findings in the external audits as proof of its own position on the merits. Doc. 142 at 17 n.11. Thus, even CoreCivic concedes the external audit reports are relevant. The same is true for CoreCivic's own internal audit reports.

## IV.   CORECIVIC HAS NOT SHOWN THAT PRODUCTION OF THE DISPUTED DOCUMENTS WILL BE UNDULY BURDENSOME

CoreCivic fails to carry its heavy burden of showing that the production of the three disputed policies would be unduly burdensome and makes no argument about the specific burden of producing the internal audits, staffing reports, or financials. *See* Doc. 142 at 4-12, 15-18. CoreCivic offers no specifics about the number of documents or pages at issue or the work involved in collecting and reviewing them. *Id.*; *see Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1558-59 (11th Cir. 1985) (requiring the party resisting discovery to show <u>specifically</u> why discovery is overly broad, burdensome, or oppressive and finding the resisting party's recitation of expense and burdensomeness to be "merely conclusory"). Instead, CoreCivic hangs its hat on

9

its argument that Plaintiffs seek irrelevant documents, therefore their production is necessarily unduly burdensome. *See* Doc. 142 at 14-15. But as Plaintiffs have shown, the disputed documents are relevant and necessary. Merely alleging that production would be burdensome is not enough.

## V. THE COURT SHOULD AWARD PLAINTIFFS FEES AND COSTS

For the reasons set forth above, CoreCivic's objections are not substantially justified. *Hall v. Gov't Emps. Ins. Co.*, No. 5:07–CV–332 (HL), 2008 WL 2373808, at *2 (M.D. Ga. June 6, 2008); Fed. R. Civ. P. 37(a)(5)(A)(ii). Also, production of these four categories of documents is not unjust simply because CoreCivic has produced over 17,000 documents. *See* Doc. 142 at 18-19. As CoreCivic points out several times, this case spans a period of 13 years. *Id.* at 3, 4, 14 & n. 1. The discovery volume is necessarily large, but that does not make production of the contested documents unjust. Many of the documents were gathered and reviewed for another lawsuit before they were produced to Plaintiffs, and many documents were only produced after nearly a year of Plaintiffs' relentless efforts to obtain documents from CoreCivic. *See* Doc. 139-1 at 1-4.

The Court should at least award a portion of Plaintiffs' fees and costs because CoreCivic, after previously agreeing to produce all external audits in its possession, changed its position and declined to produce reports that did not reference the Work Program. But after Plaintiffs filed their Motion, CoreCivic produced all the external audit reports it claims to possess. *See* Doc. 142 at 16-17. CoreCivic's about-face caused Plaintiffs to waste resources on briefing the external audit issue.

## CONCLUSION

For the reasons set forth herein and in Plaintiffs' opening brief, Plaintiffs respectfully request the Court order production of the documents that CoreCivic is withholding and award the reasonable expenses, including attorney's fees, incurred in pursuing the outstanding discovery, including, but not limited to, this Motion.

10

Dated: June 10, 2021                                        Respectfully submitted,

/s/ Meredith B. Stewart
Meredith B. Stewart*
**SOUTHERN POVERTY LAW CENTER**
201 Saint Charles Avenue, Suite 2000
New Orleans, LA 70170
Telephone: (504) 486-8982
Facsimile: (504) 486-8947
meredith.stewart@splcenter.org

Caitlin J. Sandley (GA Bar No. 610130)
**SOUTHERN POVERTY LAW CENTER**
400 Washington Ave.
Montgomery, AL 36104
Telephone: (334) 303-6822
Facsimile: (334) 956-8481
cj.sandley@splcenter.org

Vidhi Bamzai*
**SOUTHERN POVERTY LAW CENTER**
111 East Capitol St., Suite 280
Jackson, MS 39201
Telephone: (601) 948-8882
Facsimile: (601) 948-8885
vidhi.bamzai@splcenter.org

R. Andrew Free*
**LAW OFFICE OF R. ANDREW FREE**
P.O. Box 90568
Nashville, TN 37209
Telephone: (844) 321-3221x1
Facsimile: (615) 829-8959
andrew@immigrantcivilrights.com

Azadeh Shahshahani (GA Bar No. 509008)
Priyanka Bhatt (GA Bar No. 307315)
**PROJECT SOUTH**
9 Gammon Avenue SE
Atlanta, A 30315
Telephone: (404) 622-0602
Facsimile: (404) 622-4137
azadeh@projectsouth.org
priyanka@projectsouth.org

Rebecca M. Cassler (GA Bar No. 487886)
**SOUTHERN POVERTY LAW CENTER**
150 E. Ponce de Leon Avenue, Suite 340
Decatur, GA, 30030
Telephone: (404) 521-6700
Facsimile: (404) 221-5857
rebecca.cassler@splcenter.org

Alan B. Howard*
John T. Dixon*
Emily B. Cooper*
**PERKINS COIE LLP**
1155 Avenue of the Americas
22nd Floor
New York, NY 10036-2711
Telephone: (212) 262-6900
Facsimile: (212) 977-1649
AHoward@perkinscoie.com
JohnDixon@perkinscoie.com
ECooper@perkinscoie.com

Jessica L. Everett-Garcia**
John H. Gray**
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
Telephone: (602) 351-8000
Facsimile: (602) 648-7000
jeverettgarcia@perkinscoie.com
jhgray@perkinscoie.com

Jessica Tseng Hasen*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Telephone: (206) 359-3293
Facsimile: (206) 359-9000
jhasen@perkinscoie.com

Daniel H. Charest*
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
dcharest@burnscharest.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*