**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

| | |
|---|---|
| **WILHEN HILL BARRIENTOS, et al.,** | |
| **Plaintiffs,** | |
| v. | |
| **CORECIVIC, INC.,** | **Civil Action No.  4:18-cv-00070-CDL** |
| **Defendant.** | **(REDACTED)** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION\***

\*This is a redacted, publicly available version of the restricted document filed at ECF No. 213-1.

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 2

    I. Overview of CoreCivic, SDC, and the Work Program ................................... 2

        A.   CoreCivic's Operation of SDC .................................................................. 2

        B.   CoreCivic's Policies and Procedures Governing the Work Program at SDC ... 4

        C.   CoreCivic's Scheme to Use Detained Workers to Maximize Its Profits and Perform Essential Tasks ....................................................... 5

        D.   CoreCivic's Recruitment Scheme and Disregard of ICE Requirements for the Work Program .............................................................. 8

    II. CoreCivic's Policies and Practices Compel Participation in the Work Program by Means or Threats of Serious Harm ................................................... 11

        A.   CoreCivic Deprives Detained People of Basic Necessities ............................. 11

        B.   CoreCivic Punishes People for Refusing to Work or Engaging in a Work Stoppage ........................................................................ 16

        C.   CoreCivic Revokes Housing Incentives for Those Who Refuse to Work ...... 19

    III. CoreCivic's Policies and Practices Compel Involvement in the Work Program by Means or Threats of Physical Restraint and Abuse of Legal Process ............................. 20

        A.   Physical Restraint .................................................................................... 20

        B.   Abuse of Legal Process .......................................................................... 20

    IV. The Named Plaintiffs ..................................................................................... 21

LEGAL STANDARD ................................................................................................ 22

ARGUMENT .............................................................................................................. 24

    I.  The Requirements of Federal Rule of Civil Procedure 23(a) Are Satisfied ................ 24

        A.   The Class Representatives Have Standing ...................................................... 24

        B.   The Proposed Classes Are So Numerous that Joinder Would Be Impracticable .................................................................. 25

        C.   Common Questions of Law and Fact Exist ...................................................... 26

        D.   Plaintiffs' Claims Are Typical of the Class Claims ......................................... 28

        E.   Plaintiffs Will Fairly and Adequately Protect the Interests of All Class Members ................................................................. 29

    II. Certification Is Proper under Federal Rule of Civil Procedure 23(b)(3) .................................................................. 29

        A.   Common Issues of Law and Fact Predominate Over Plaintiffs' TVPA Claim 30

        B.   Common Issues of Law and Fact Predominate Over Plaintiffs' Unjust Enrichment Claim .................................................. 36

        C.   Class Certification Is Superior to Other Methods of Adjudication ................ 36

i

III.  The Proposed Classes Satisfy the Requirements for Certification under Rule 23(b)(2) .................................................................................................................. 37

IV. Counsel    of    Record    Should    Be    Appointed    as    Class    Counsel .................................................................................................................. 39

CONCLUSION ....................................................................................................... 40

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)............................................................................................37, 38

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)............................................................................................23, 24

*Anderson v. Garner*,
  22 F. Supp. 2d 1379 (N.D. Ga. 1997) .......................................................................37

*Ault v. Walt Disney World Co.*,
  692 F.3d 1212 (11th Cir. 2012) .................................................................................28

*Ault v. Walt Disney World Co.*,
  No. 6:07-cv-1785-Orl-31KRS, 2008 WL 11436773 (M.D. Fla. Dec. 12, 2008) ...................38

*Babineau v. Fed. Express Corp.*,
  576 F.3d 1183 (11th Cir. 2009) .................................................................................24

*Baker v. State Farm Mut. Auto. Ins. Co.*,
  No. 4:19-cv-14-CDL, 2021 WL 4006124 (M.D. Ga. Sept. 2, 2021), *appeal
  filed*, No. 21-14197 (11th Cir. Dec. 2, 2021) .........................................................23

*Barrientos v. CoreCivic, Inc.*,
  332 F. Supp. 3d 1305 (M.D. Ga. 2018), *aff'd*, 951 F.3d 1269 (11th Cir. 2020) ................1, 27

*Bonner v. City of Prichard*,
  661 F.2d 1206 (11th Cir. 1981) (en banc) ...............................................................23

*Braggs v. Dunn*,
  No. 2:14cv601-MHT, 2020 WL 2395987 (M.D. Ala. May 12, 2020) ...................................38

*Brown v. Electrolux Home Prods., Inc.*,
  817 F.3d 1225 (11th Cir. 2016) .................................................................................30

*Busby v. JRHBW Realty, Inc.*,
  513 F.3d 1314 (11th Cir. 2008) .................................................................................29

*Carriulo v. Gen. Motors Co.*,
  823 F.3d 977 (11th Cir. 2016) ...................................................................................30

*In re Checking Acct. Overdraft Litig.*,
  286 F.R.D. 645 (S.D. Fla. 2012).................................................................................26

*Cox v. Am. Cast Iron Pipe Co.*,
    784 F.2d 1546 (11th Cir. 1986) .........................................................................25

*Dunn v. Dunn*,
    318 F.R.D. 652 (M.D. Ala. 2016) .......................................................................38

*Focus on the Fam. v. Pinellas Suncoast Transit Auth.*,
    344 F.3d 1263 (11th Cir. 2003) ....................................................................24, 25

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)............................................................................................24

*Gardner v. Westinghouse Broad. Co.*,
    437 U.S. 478 (1978)............................................................................................23

*Gazzara v. Pulte Home Corp.*,
    No. 6:16-CV-657-Orl-31TBS, 2016 WL 4529526 (M.D. Fla. Aug. 30, 2016)......................28

*Groover v. Michelin N. Am., Inc.*,
    187 F.R.D. 662 (M.D. Ala. 1999) ..................................................................24, 26

*Groover v. Prisoner Transp. Servs., LLC*,
    No. 15-cv-61902, 2018 WL 6831119 (S.D. Fla. Dec. 26, 2018)............................................23

*Harris v. Ga. Dep't of Corrs.*,
    No. 5:18-cv-00365-TES, 2021 WL 6197108 (M.D. Ga. Dec. 28, 2021) .........................38, 39

*In re HealthSouth Corp. Sec. Litig.*,
    257 F.R.D. 260 (N.D. Ala. 2009).........................................................................24

*Holmes v. Cont'l Can Co.*,
    706 F.2d 1144 (11th Cir. 1983) ..........................................................................38

*Kilgo v. Bowman Transp., Inc.*,
    789 F.2d 859 (11th Cir. 1986) ............................................................................25

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004) ..............................................................30, 36, 37

*Kornberg v. Carnival Cruise Lines, Inc.*,
    741 F.2d 1332 (11th Cir. 1984) ..........................................................................28

*Lagasan v. Al-Ghasel*,
    92 F. Supp. 3d 445 (E.D. Va. 2015) ....................................................................30

*McCullough v. City of Montgomery*,
    No. 2:15-cv-463-RCL, 2020 WL 3803045 (M.D. Ala. July 7, 2020) ....................................33

*Menocal v. GEO Grp., Inc.*,
   320 F.R.D. 258 (D. Colo. 2017), *aff'd*, 882 F.3d 905 (10th Cir. 2018)......................29, 32, 34

*Menocal v. GEO Grp., Inc.*,
   882 F.3d 905 (10th Cir. 2018) ......................................................................................29, 37

*Murray v. Auslander*,
   244 F.3d 807 (11th Cir. 2001) ...............................................................................................26

*Novoa v. GEO Grp., Inc.*,
   No. EDCV 17-2514, 2021 WL 4913286, at *5 (C.D. Cal. Sept. 30, 2021)
   ....................................................................................................................28, 34, 37, 38

*Nuñag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*,
   No. LA CV10-01172-JAK (MLGx), 2011 WL 7095434, at *7 (C.D. Cal. Dec.
   12, 2011) ...........................................................................................................................33, 34

*Owino v. CoreCivic, Inc.*,
   No. 17-CV-1112 JLS (NLS), 2020 WL 1550218 (S.D. Cal. Apr. 1, 2020),
   *reconsideration denied*, No. 17-CV-1112 JLS (NLS), 2021 WL 120874 (S.D.
   Cal. Jan. 13, 2021), *aff'd*, No. 21-55221, 2022 WL 1815825 (9th Cir. June 3,
   2022) ...........................................................................................................28, 31, 33, 34

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) ...................................................................................................38

*Prado-Steiman ex rel. Prado v. Bush*,
   221 F.3d 1266 (11th Cir. 2000) .....................................................................................22, 26, 28

*Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*,
   601 F.3d 1159 (11th Cir. 2010) .....................................................................................24, 30

*Silva–Arriaga v. Tex. Express, Inc.*,
   222 F.R.D. 684 (M.D. Fla. 2004)...........................................................................................37

*In re Theragenics Corp. Sec. Litig.*,
   205 F.R.D. 687 (N.D. Ga. 2002)............................................................................................29

*United States v. Dann*,
   652 F.3d 1160 (9th Cir. 2011) .........................................................................................31, 33

*Upshaw v. Ga. (GA) Catalog Sales, Inc.*,
   206 F.R.D. 694 (M.D. Ga. 2002) .............................................................................22, 30, 37

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)..............................................................................................................28, 38

*Williams v. Mowhawk Indus., Inc.*,
   568 F.3d 1350 (11th Cir. 2009) ...........................................................................................26

**Statutes**

8 U.S.C. § 1589(c)(2)................................................................................................33

18 U.S.C. § 1589................................................................................................ *passim*

18 U.S.C. § 1593(a) ...............................................................................................30

18 U.S.C. § 1594(a) ...............................................................................................26

18 U.S.C. § 1595(a) ...........................................................................................26, 27

Trafficking Victims Protection Act, 18 U.S.C. §§ 1589(a), 1589(b), 1594(a), 1595 ........... *passim*

**Other Authorities**

Fed. R. Civ. P. 23 ............................................................................................. *passim*

Fed. R. Civ. P. 23(a)(1)...........................................................................................25

Fed. R. Civ. P. 23(a)(4)...........................................................................................29

Fed. R. Civ. P. 23(b) ......................................................................................... *passim*

Fed. R. Civ. P. 23(g)(1)(A).............................................................................23, 24, 39

Rules 23(b)(2) and 23(b)(3) ....................................................................................40

## INTRODUCTION

This action arises from Defendant CoreCivic, Inc.'s (hereinafter "CoreCivic") exploitation of the labor of people in U.S. Immigration and Customs Enforcement (ICE) custody who are detained at Steward Detention Center (SDC). Plaintiffs allege, on behalf of themselves and two putative classes, that CoreCivic forced and attempted to force them and the putative class members to work for between $1 and $4 per day by depriving them of basic necessities and threatening them with physical restraint, serious harm, and abuse of legal process if they refused and that CoreCivic knowingly benefits from a venture that does the same. CoreCivic depends on this captive workforce to maintain SDC and carry out essential operations such as food service and sanitation, and CoreCivic has profited enormously from relying on detained workers as opposed to employees whom CoreCivic would have had to pay at least minimum wage. Plaintiffs assert class claims for violations of the Trafficking Victims Protection Act (TVPA), 18 U.S.C. §§ 1589(a), 1589(b), 1594(a), 1595, and unjust enrichment under Georgia law, and seek certification of two classes, (hereinafter "the Proposed Classes"):

1. All civil immigration detainees who performed work for CoreCivic at Stewart in the "Volunteer Work Program" starting ten years prior[1] to the date the original complaint was filed (April 17, 2018) until the date of final judgment in this matter (the "Forced Labor Class").
2. All civil immigration detainees who performed work for CoreCivic at Stewart in the "Volunteer Work Program" starting four years prior to the date the original complaint was filed (April 17, 2018) until the date of final judgment in this matter (the "Unjust Enrichment Class").

---

[1] The Court previously held that CoreCivic cannot be liable under the TVPA for "knowingly benefitting financially" for conduct occurring prior to December 23, 2008, the date relevant amendments to the TVPA were enacted. *Barrientos v. CoreCivic, Inc.*, 332 F. Supp. 3d 1305, 1312 (M.D. Ga. 2018), *aff'd*, 951 F.3d 1269 (11th Cir. 2020). The Court also held that CoreCivic's liability as a perpetrator under the TVPA is limited only by the statute of limitations, which is ten years. *Id.*

For the reasons set forth below, Plaintiffs move for certification of the Proposed Classes. Plaintiffs also respectfully request that the Court designate them as class representatives for both classes, appoint undersigned counsel as class counsel, and order that notice of this action be provided to the classes.

## STATEMENT OF FACTS

### I.    Overview of CoreCivic, SDC, and the Work Program

### A.  CoreCivic's Operation of SDC

CoreCivic owns and operates prisons, jails, detention centers, and residential re-entry centers and provides "government real estate solutions." *See generally* Ex. 1 at 10. In 2006, CoreCivic, then known as Corrections Corporation of America (CCA), contracted with Stewart County, Georgia, to own and operate SDC[2] pursuant to an Inter-Governmental Service Agreement (IGSA) between Stewart County and ICE.[3] Ex. 2; Ex. 3 at 2-7. Under the SDC IGSA, CoreCivic is paid a fixed per diem rate for each person detained at SDC. The per diem rate, also referred to as the bed day rate, does not depend on the amount of money CoreCivic actually spends to operate the facility. *See* Ex. 3 at 3; Ex. 4 at 33:11-14. In other words, to increase its profit from SDC, CoreCivic must decrease expenses since its revenue from ICE is fixed. Ex. 4 at 59:10-19; Ex. 5 at 108:20-109:18. In 2016, the IGSA was modified to guarantee CoreCivic payment for at least 1,600 beds, whether or not that many people were actually detained at SDC. Ex. 3 at 20-21; Ex. 4 at 38:11-22.

CoreCivic operates SDC at a 28 percent profit margin. Ex. 5 at 74:20-75:6. SDC's

---

[2] SDC has a design capacity of 1,752 detained people and has confined as many as 2,000 people at a time during the class periods. Ex. 6 at 30:6-11; Ex. 7 at 61:9-12.
[3] ICE pays CoreCivic, via payment that passes through Stewart County, to detain people in civil immigration detention. Ex. 4 at 29:16-30:4. Ms. Brazier's last name changed from Norman to Brazier during the class periods, thus some evidence cited will refer to her as Bethany Norman. *Id.* at 8:17-19.

2

operating budget is set and overseen by CoreCivic's Facility Support Center (FSC), or headquarters. Ex. 4 at 61:13-17, 65:16-18, 67:11-17, 75:22-76:7, 91:22-25. ███████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████. *See* Ex. 8 at 5, 30. CoreCivic's annual corporate revenue has increased from $1.5 billion in 2008 to nearly $2 billion in 2020. Ex. 1 at 72, 205.

Under the IGSA, CoreCivic is required to comply with ICE's national detention standards.[4] *See* Ex. 3 at 2, 8, 25. In addition to the ICE detention standards, CoreCivic has its own set of policies that apply equally to all staff and detained people at SDC. *See* Ex. 5 at 257:18-258:5, 268:7-9; Ex. 9 at 359:14-21. ██████████████████████████████████████

████████████████████████████████████ *See* Ex. 10 at 55:14-56:9; Ex. 11. The CoreCivic policies incorporate ICE detention standards' language and set forth additional requirements where the ICE detention standards are silent or leave room for CoreCivic's discretion. *See* Ex. 5 at 257:18-258:5; Ex. 9 at 359:14-361:2; Ex. 10 at 62:18-63:24.

SDC operates in virtually every way as a criminal punishment prison, from the physical plant to the facility schedule to the restrictions on movement within the facility to the staff chain of command. *See* Ex. 14 ¶ 24; Ex. 15 ¶¶ 52-53; Ex. 16 ¶¶ 6-19. SDC is supervised by the Warden, who reports directly to a CoreCivic Managing Director in the FSC. *See* Ex. 5 at 54:3-18. ████

████████████████████████. *See* Ex. 17 at 2. ████████████████████

████████████████████████████████████. *See id.* at 3. Unit Managers play a critical role in ████████████████████████████████████████,



---

[4] There have been four iterations of those standards in effect at SDC during the class periods; the currently operative Performance-Based National Detention Standards (hereinafter "PBNDS") were revised in 2016. Ex. 12 at 2-3, 11-12, 19-21; Ex. 13.

moving people who refuse to work to a different housing unit, ███████████████

██████████ *See, e.g.*, Ex. 18 at 2; Ex. 19 at 2-3; Ex. 20 at 55:24-56:8; Ex. 21 at 190:9-11. ███

████████████████████████████ Ex. 17 at 4. Throughout the class periods,

individuals in these positions of power implemented policies and practices that compel work by

means or threats of serious harm, *infra* Facts § II, and means or threats of physical restraint and

abuse of legal process, *infra* Facts § III. *See* Ex. 22.

CoreCivic contracts with a third-party vendor, Trinity Services Group[5] (hereinafter

"Trinity"), to provide food service. Ex. 23; Ex. 24. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████. *See* Ex. 25 at 2; Ex. 26 at 232:20-233:7, 244:6-21. ████████████████

████████. Ex. 26 at 64:10-68:20.

At times, CoreCivic has also contracted out phone services. From January 1, 2009, to June

29, 2017, CoreCivic contracted with Securus Technologies to provide phone services at SDC. *See*

Ex. 27; Ex. 28. ████████████████████████████████████████

████████████████████████████████████████████████. Ex.

27 at 56-57; *see also* Ex. 29 at 2. The FSC determined the commission rate. Ex. 4 at 172:15-173:3.

**B.  CoreCivic's Policies and Procedures Governing the Work Program at SDC**

All iterations of the ICE detention standards in effect at SDC since December 2008 have

required CoreCivic to offer a voluntary work program (hereinafter "Work Program") at SDC. *See,*

---

[5] ████████████████████████████████████████████. Ex.
23 at 2. ████████████████████████████████. Ex. 26 at 38:24-39:8.

*e.g.*, Ex. 12 at 13-18, 22-27.[6] Among other things, ICE's detention standards require CoreCivic to pay detained workers *at least* $1.00 per day, limit detained workers' schedules to 8 hours daily and 40 hours weekly, prohibit CoreCivic from scheduling detained workers for more than one work detail per day, and ban CoreCivic from assigning high-custody detained workers to posts outside their housing units. *See id.*; Ex. 13 at 67-68.

The ICE detention standards leave much to CoreCivic's discretion in terms of Work Program operations and treatment of detained workers, including:

- whether to pay detained workers more than $1 per day,
- how many unexcused absences justify removal from the Work Program,
- what constitutes an unexcused absence,
- how many detained workers to enlist,
- which jobs to have detained workers perform,
- whether to offer "incentives" to encourage people to work,
- detained workers' schedules, and
- when a detained worker commits an offense that merits discipline.

Ex. 5 at 204:17-23, 212:14-214:25. Various written CoreCivic policies set forth additional requirements for the Work Program or impact its operation.[7] *See, e.g.*, Ex. 32; Ex. 33; Ex. 34; Ex. 35; Ex. 36; Ex. 37; Ex. 38. All written policies relating to the Work Program apply to every detained worker, regardless of which job they perform. Ex. 39 at 36:13-19; Ex. 40 at 20:10-12.

### C. CoreCivic's Scheme to Use Detained Workers to Maximize Its Profits and Perform Essential Tasks

CoreCivic depends on detained workers to perform essential functions at SDC. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[6] Prior to December 2008, CoreCivic was permitted but not required to operate a Work Program at SDC, and it chose to do so. Ex. 12 at 4-10; *see also, e.g.*, Ex. 30 at 44 (indicating there was a Work Program at SDC); Ex. 31 at 2-3 (████).

[7] CoreCivic revised the SDC policies during the class periods. For ease and consistency, Plaintiffs cite the most recent version of each policy herein and note that the cited portions are not substantially different in earlier versions of the policies.

███████████████████. *See, e.g.*, Ex. 35 at 5; Ex. 41 at 2; Ex. 5 at 225:6-11. ████████████████

████████████████████████████████████████████████████████████████████

████. Ex. 3 at 33. Throughout the class periods, SDC has been plagued by understaffing. *See* Ex.

15 ¶¶ 109-18. Thus, CoreCivic effectively relies on the Work Program to double its work force at

SDC. *See* Ex. 7 at 113:25-114:5 (former Warden Charlie Peterson testifying that CoreCivic would

have had to hire more employees if there was no Work Program).

████████████████████████████████████████████████████████████████

████████████████. *See, e.g.*, Ex. 35 at 5; Ex. 41 at 5. Trinity employs only ten staff at SDC to

"supervise" the detained workers in food service. Ex. 42[8] at 292:9-19, 295:8-10. The price per

meal rate that Trinity charges CoreCivic does not incorporate the cost of non-supervisory kitchen

workers because it assumes in its calculation that CoreCivic will provide the kitchen workers, at

no cost to Trinity. Ex. 26 at 243:21-245:16. Under the contract, CoreCivic is required to provide

█████ detained workers to the kitchen ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████Ex. 5

at 245:10-17; Ex. 23 at 9, 12-13, 24; Ex. 24 at 10-11; Ex. 25 at 2; Ex. 43 at 3. ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████

Elsewhere in the facility, the other half of the detained work force staffs the commissary,

performs the barbering for the detained population, launders clothing and linens, ████████████

████████████████████, and performs maintenance tasks, such as plumbing, electrical, ████████

---

[8] Ms. Crawford's last name changed from Lyles to Crawford during the class periods, thus some
evidence cited will refer to her as Marquita Lyles. Ex. 42 at 287:2-9.

work. *See, e.g.*, Ex. 20 at 93:19-94:6; Ex. 40 at 198:8-16; Ex. 44 at 90:3-95:4; Ex. 45 at 2; Ex. 46 at 199:5-19; Ex. 47 at 3. ███████████████████████████████████████████

██████. *See, e.g.*, Ex. 46 at 203:19-205:9; Ex. 48 at 2.

CoreCivic is required by contract to perform the very duties it assigns to detained workers. *See* Ex. 13 at 6, 8-9, 17-18, 20-21, 37-60, 62-63, 65 (operative ICE detention standards, incorporated into IGSA, requiring provision of food service, cleaning, maintenance, laundry, and barbering). Throughout the class periods, CoreCivic got by with only one part-time CoreCivic-employed janitor position, ████████████████████████████████████████

████, and four maintenance workers ██████████████████████. *See* Ex. 5 at 125:23-127:2, 128:10-15, 133:12-19, 144:6-17. This tiny number of paid CoreCivic employees whose jobs are dedicated to cleaning and maintaining ████████████ ██████ demonstrates CoreCivic's utter dependence on detained workers. *See* Ex. 49 at 3. Notably, CoreCivic relies on detained workers to clean ████████████████ at SDC to prepare for ████████ inspections. *See, e.g.*, Ex. 50 at 2; Ex. 51 at 2; Ex. 52 at 2; Ex. 53 ¶ 27.

Without the virtually free labor of the Work Program, CoreCivic staff would have to ████

██████████████████████████████████████████████████████████████

████████████████████████████ or leave the tasks undone, which could ultimately cause CoreCivic to lose the SDC contract. *See, e.g.,* Ex. 54 at 2; Ex. 26 at 161:12-21; Ex. 44 at 95:5-96:12; Ex. 5 at 249:5-10. ████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

Ex. 32 at 4, 6, 12, 14-15, 19, 25-26. CoreCivic is so dependent on detained workers that it has

ignored ICE's requirement to suspend food service and other Work Program positions that do not afford social distancing during the COVID-19 pandemic. *See* Ex. 5 at 232:17-19, 234:8-14, 235:15-236:4; Ex. 55 at 20.

The financial benefit CoreCivic reaps from forcing detained people to work is clear. CoreCivic pays most detained workers at SDC between $1 and $4 per day, depending on the job. Ex. 5 at 216:4-8; Ex. 35 at 5; Ex. 41 at 5. This payment is deposited directly into detained workers' accounts at SDC. ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ *See* Ex. 4 at 145:12-17.

An analysis of available data from CoreCivic estimates that in the relevant time period, Forced Labor Class members provided 5,532,204 hours of labor to CoreCivic, at an estimated hourly pay of $0.41, and Unjust Enrichment class members provided the company 3,264,180 hours of labor at an estimated hourly pay of $0.44. A class-wide analysis of the jobs completed by class members and a comparison with applicable minimum wage and benefits requirements under federal law (the amounts that CoreCivic would have been required to expend if a civilian workforce completed the essential tasks performed by detained workers) estimates that the value to CoreCivic of the labor performed by purported class members, less the amounts actually paid to them, totals between **$43.9 million** and **$58.9 million** for the Forced Labor Class and between **$28.1 million** and **$40.0 million** for the Unjust Enrichment Class. Ex. 56 ¶¶ 12, 73-86.

### D. CoreCivic's Recruitment Scheme and Disregard of ICE Requirements for the Work Program

Detained worker staffing shortages, particularly in the kitchen, have been common at SDC throughout the class period. Kitchen worker shortages result in meals being served late, ████████ ████████████████████, detained workers working double shifts, and CoreCivic officers

being pulled from their regular posts to assist with food service. *See, e.g.*, Ex. 42 at 335:21-336:5 (Trinity Food Service Director ("FSD") testifying that she has reported kitchen worker shortages to CoreCivic in real time with the goal of getting more detained workers and preventing delays in meal service); Ex. 57 at 2 ████████████████████████████████████████

████████████████████████████████); Ex. 58 at 2; Ex. 59 at 2; Ex. 20 at 103:25-104:9; Ex. 40 at 52:8-13, 57:12-14, 71:20-72:21; Ex. 21 at 132:10-15; Ex. 60 ¶ 19.

Rather than hiring more paid employees,████████████████████████████████████

████████████████████████████████████████████████████████. *See, e.g.*, Ex. 61 at 119:13-21 (████████████████████████████████████████████████

████████████████s); Ex. 7 at 158:4-6 (testifying that he did not ask CoreCivic to hire more paid employees); Ex. 6 at 137:5-12 (████████████████████████████

████████████████████████████████████████████████████████████

████████████████████); Ex. 62 at 2 (████████████████████████████

████████████████); Ex. 63 at 2; Ex. 64 at 3; Ex. 65 at 2-3; Ex. 66 at 2. CoreCivic has also resorted to increasing the pool of available workers to those who would otherwise not be eligible for specific jobs. For example, ██████, CoreCivic sought and received an ICE waiver of the prohibition on allowing high-custody detained workers to work in the kitchen. Ex. 67 at 2-5; Ex. 68 at 54:20-55:3, 56:2-6; Ex. 44 at 100:23-101:2, 101:16-25, 102:17-20.

To maintain a steady supply of detained workers, CoreCivic has a policy of offering non-monetary compensation, which CoreCivic refers to as "incentives." CoreCivic routinely offers detained workers phone cards with an assigned cash value in lieu of or in addition to wages. *See, e.g.*, Ex. 6 at 128:14-24; Ex. 69 at 2. Phone cards—particularly valuable because they are "worth more than a person could make in a day"—have been used to "incentivize" work ████████████████

████████████████████████████████████████████. Ex. 21 at 133:9-14,

133:25-134:4; *see also, e.g.*, Ex. 70 at 2; Ex. 44 at 110:5-13,140:17-141:3; Ex. 71 at 2.[9] CoreCivic

has at times offered a variety of other "incentives," including private and safe housing, extra food,

██████████████, and access to more televisions and video games. *See, e.g.*, Ex. 72 at 2-4;

Ex. 74 at 2; Ex. 53 ¶ 12-13; Ex. 75 ¶¶ 10, 19-20; Ex. 44 at 110:5-13. CoreCivic has also maintained

a practice of housing Work Program participants in designated units that offer more privacy than

other units with open dorms. *See*  Ex. 76 at 2; Ex. 53 ¶¶ 10-11, 13-14. Kitchen workers have also

been rewarded with additional food or double portions. Ex. 21 at 135:23-136:15; Ex. 5 at 251:24-

252:14; Ex. 53 ¶ 7; Ex. 42 at 360:21-24.

While constantly striving to maximize the number of detained workers, CoreCivic

routinely violates ICE detention standards relating to the Work Program; for example, when it:

1. Pays detained workers solely with phone cards and when it provides food to detained workers as a reward. Ex. 15 ¶ 83; Ex. 13 at 38, 68 (requiring that "[f]ood shall never be used for reward or punishment" and that detained workers "shall receive monetary compensation");

2. Fails to pay detained workers on time, in violation of the ICE detention standards. *See, e.g.*, Ex. 77 at 2-3; Ex. 78 at 2; Ex. 79 at 2; Ex. 21 at 127:14-17; Ex. 53 ¶ 29; Ex. 75 ¶ 28; Ex. 15 ¶¶ 80, 82, 84.

3. Relies on detained workers to work more than one shift per day and more than five days per week—both practices that violate ICE detention standards. *See* Ex. 13 at 68; *see also, e.g.*, Ex. 53 ¶ 28; Ex. 60 ¶¶ 19-22; Ex. 75 ¶ 27; Ex. 80 at 2-3; Ex. 81 at 2; Ex. 82 at 2; Ex. 83 at 2; Ex. 20 at 195:23-196:6; Ex. 84 at 3-4; Ex. 85 at 3; Ex. 5 at 175:11-17; Ex. 4 at 143:21-144:8.

4. "[R]eport[s] individuals awaiting sick call as refusing to work," Ex. 15 ¶¶ 60, 68;

5. Does not comply with restrictions on who can work in which Work Program positions based on classification level, Ex. 15 ¶¶ 88-92; Ex. 86 at 2-3; Ex. 87 at 2;

6. Flouts ICE's requirement that food service and other Work Program positions that do not afford social distancing be suspended during the COVID-19 pandemic, Ex. 15 ¶¶ 93-97; Ex. 5 at 232:17-19, 234:8-14, 235:5-236:4; and,

7. "[M]isuses the discipline process to punish or threaten to punish individuals who refuse to work." Ex. 15 ¶ 60.

---

[9] CoreCivic officers often use the term "volunteer" to refer to detained people who work on their scheduled day off. *See* Ex. 20 at 192:10-193:15.

## II.   CoreCivic's Policies and Practices Compel Participation in the Work Program by Means or Threats of Serious Harm

### A.   CoreCivic Deprives Detained People of Basic Necessities

CoreCivic compels and attempts to compel detained people to join the Work Program by systematically depriving them of basic necessities, including food, hygiene items, clothing, and phone access. Detained people, who by reason of their detention must rely on CoreCivic to fulfill their basic needs, have little choice but to find independent ways to supplement their diets, keep clean, and remain in touch with loved ones. The commissary, also operated by CoreCivic, offers a range of items, including undershirts, socks, better quality toiletries than are issued by the facility, and a variety of food products. CoreCivic policy requires that items sold in the SDC commissary be sold at a profit margin as high as thirty percent. Ex. 15 ¶ 28; Ex. 88 at 3. ███████████

███████████████████████████████████████████████████

███████████████████████████ [10] *See* Ex. 89; Ex. 90; Ex. 91; Ex. 92; Ex. 93; Ex. 94 ███████████████ ).

For those without access to outside funds, enlisting in the Work Program is the only way to earn money and purchase basic necessities. SDC staff widely acknowledge that detained people participate in the Work Program for the purpose of gaining funds to make commissary purchases or earning phone time. *See, e.g.*, Ex. 39 at 50:8-51:11; Ex. 20 at 161:5-10, 188:13-18, 189:3-5; Ex. 21 at 73:11-20; *see also* Ex. 53 ¶ 7 ("I signed up to join the Work Program immediately so I could get extra food and purchase those items at the commissary."); *id.* ¶¶ 20, 33; Ex. 60 ¶ 23; Ex. 75 ¶¶ 17-19.

---



[10] ████████████████████████████████████████████████ Ex. 4 at 215:19-216:9. █████████ ████████████████████████████████████████████████ █████████████████ *Id.* at 208:17-20, 212:14-213:2.

***Food.*** CoreCivic has a policy and practice of serving food that is of poor nutritional value, of poor quality, and insufficient in amount. Ex. 95 ¶¶ 2, 16-17, 82; *see also, e.g.*, Ex. 75 ¶ 14. Because detained people cannot freely access alternative food sources, they "are faced with a choice at every meal: eat nutritionally inadequate, unsafe, and/or unpalatable food, or eat very little or nothing at all." Ex. 95 ¶ 2, 82. As a result, detained people at SDC are persistently hungry. Ex. 95 ¶¶ 2, 16, 20-24; *see also* Ex. 53 ¶¶ 15, 19-20; Ex. 60 ¶ 12; Ex. 14 ¶¶ 74-76, 83; Ex. 75 ¶¶ 12-13, 16. This widespread hunger compels detained people to work. Ex. 53 ¶20 ("I joined the Work Program, first and foremost, to prevent hunger."); Ex. 14 ¶¶ 71, 76; Ex. 75 ¶17.

CoreCivic's policy and practice of food deprivation are memorialized in its ███████ ██████████████████████████████████████████. Ex. 96; Ex. 24; Ex. 97; Ex. 25 at 3-7; Ex. 95 ¶ 27. The SDC population's diet is prescribed by rotating menus that CoreCivic approves, and in fact, helps create. Ex. 26 at 230:1-231:9; Ex. 98 ¶ 17-18. For example, CoreCivic is required to provide a nutritionally adequate diet that is reviewed at least annually by a qualified nutritionist or dietitian. *See* Ex. 13 at 37, 43; Ex. 96 at 5. In practice, a Trinity dietitian conducts cursory yearly reviews and certifies that the menus meet nutritional guidelines, even though they do not. *See* Ex. 98 ¶ 27; Ex. 26 at 235:7-20; Ex. 95 ¶ 40-50 (SDC menus exhibit a "deficiency in virtually every nutrient, with a significant deficiency in fiber"). There is no evidence that any of the entities that audit the food service program conduct independent reviews to ensure the nutritional adequacy of the menus; they simply check to see ██████████████████████████ Ex. 95 ¶75. Furthermore, all or most of the audits are pre-announced and do not meaningfully assess food adequacy. *Id.* ¶¶74-75. This results in nutritionally deficient menus being approved, prepared, and served year after year.

In addition to failing to analyze nutritional adequacy, CoreCivic does not meaningfully oversee or monitor food service operation. Ex. 95 ¶¶70-81. ████████████████████████

12



. Ex. 96 at 25; Ex. 99 at 2.

Ex. 96 at 25.

Ex. 95 ¶ 72. Furthermore, throughout the class period, there is evidence that CoreCivic's day-to-day monitoring of the food service operation is not being done well, even based on the inadequate monitoring mechanisms CoreCivic has in place. *See, e.g.*, Ex. 100 at 5 (                                    ); Ex. 46 at 218:16-18 (testifying that no one was in charge of reviewing meal monitoring forms); Ex. 95 ¶¶ 70-73.

Both CoreCivic and Trinity are aware that complaints relating to the quantity and quality of food are commonplace. Complaints are numerous and remarkably consistent throughout the class periods, including complaints of expired or spoiled food,                                    . *See, e.g.*, Ex. 101 at 2; Ex. 102 at 3-6; Ex. 31 at 3; Ex. 103 at 3; Ex. 104 at 2-3, 5; Ex. 105 at 2; Ex. 106 at 2, 6-7, 9, 12-15, 19-20, 31, 33-34; Ex. 133 at 2-4; Ex. 60 ¶¶ 10-11; Ex. 75 ¶¶ 14-15. Additionally, in 2017, the Department of Homeland Security (DHS) Office of the Inspector General (OIG) noted unsafe food handling practices at four detention centers, including SDC. Ex. 107 at 6, 12; Ex. 108 at 2, 5-6. The FSD, who has been employed at SDC for almost 13 years, testified that the OIG finding was incorrect because SDC is not required to track expiration dates, so no corrective action was taken. Ex. 42 at 495:15-496:7; *see* Ex. 108 at 2.                                    . *See, e.g.*, Ex. 31; 103.

CoreCivic is aware that there is pervasive hunger among the population at SDC. *See, e.g.*,

Ex. 109 at 2; Ex. 21 at 235:8-236:15, 236:21-237:9; Ex. 110 at 2, 12-13 (collection of food service incident reports emailed among FSC personnel). CoreCivic, as matter of policy, marks up the prices of items sold in the SDC commissary as much as 30 percent, ███████████████████████ ██████████████████████████████████████. Ex. 88 at 3; Ex. 89; Ex. 90; Ex. 91; Ex. 92; Ex. 93; Ex. 94. CoreCivic's failure to provide sufficient, edible food gives rise to the need to satiate hunger, compelling detained people to enlist in the Work Program to receive food-related "incentives" and wages with which to buy additional food.

*Hygiene Items and Clothing.* CoreCivic has a policy and practice of depriving detained people of adequate hygiene items and clothing. CoreCivic confiscates detained people's clothing and personal belongings upon arrival. Ex. 38 at 6. CoreCivic provides detained people with basic hygiene items at intake, including soap, shampoo, toothpaste, and a toothbrush. Ex. 111 at 15; Ex. 5 at 363:20-364:18. The toiletries provided are "travel-sized, only large enough to last several days, and the products themselves are inferior; that is, the soap, shampoo, and toothpaste do not work well so that it requires more of the product to achieve the intended result." Ex. 15 ¶ 136; *see also* Ex. 53 ¶ 5; Ex. 60 ¶ 4; Ex. 75 ¶ 4. CoreCivic is required by ICE standards to replenish personal hygiene items on an as-needed basis. Ex. 13 at 63. Although CoreCivic claims that items are available on demand, evidence demonstrates that CoreCivic, as a practice, fails to replenish personal hygiene items as required, to minimize costs. *See* Ex. 6 at 169:22-170:4; Ex. 112 at 2 ████████████████████████████████████████████████████████████ ██); Ex. 113 at 2; Ex. 114 at 2; Ex. 115 at 3; Ex. 60 ¶ 6.

ICE standards also obligate CoreCivic to issue "clean, laundered, indoor/outdoor temperature-appropriate, size appropriate, presentable clothing," including two uniform shirts, two uniform pants, two pairs of socks, two pairs of underwear, and one pair of footwear. Ex. 13 at 62-63. ████████████████████████████████████████████████████

███████ Ex. 111 at 13-14. CoreCivic issues used, thread-bare clothing, including, as recently as 2020, used underwear and socks. Ex. 9 at 361:11-362:12; Ex. 15 ¶ 136; Ex. 60 ¶ 5. Under ███ ICE standards ████████████, clothing and bedding must be exchanged and laundered twice weekly, except for socks and underwear, which must be washed daily. Ex. 13 at 65; Ex. 111 at 21.



. *See* Ex. 116 at 2.

███ Ex. 117 at 3 (

).

CoreCivic's failure to provide hygiene supplies and clothing in sufficient quantities and of minimally acceptable quality gives rise to the need to purchase from the commissary additional and higher quality items that better serve their intended function, coercing detained people to work. *See* Ex. 15  ¶¶ 132-33, 136, 140; Ex. 38 at 9; Ex. 107 at 11 (DHS OIG finding that SDC was not providing basic hygiene supplies "promptly or at all when detainees ran out of them," and that one interviewee reported "when they used up their initial supply of certain personal care items, such as toothpaste, they were advised to purchase more at the facility commissary"). Because CoreCivic runs the commissary, ███████████████████████

████████████. *See generally* Ex. 88; Ex. 89 at 5; Ex. 90 at 4; Ex. 91 at 4; Ex, 92 at 4; Ex. 93 at 4; Ex. 94 at 4.

***Phone Access.*** CoreCivic has a policy and practice of depriving detained people of access to phone calls to their loved ones. Although CoreCivic provides detained people with access to phones, the phone system is expensive and, at times during the class period, has been profit-generating for CoreCivic. Because of SDC's rural location and the limited visitation schedule, detained people must rely on phone access to maintain social ties with loved ones, and the failure

to maintain that bond can cause psychological distress. Ex. 18 ¶ 68; *see* Ex. 75 ¶ 22.

Phone calls under the Securus contract were expensive. 

CoreCivic has continued

offering phone time as an incentive or bonus to detained workers. *See, e.g.*, Ex. 44 at 111:4-7.

### B.  CoreCivic Punishes People for Refusing to Work or Engaging in a Work Stoppage

CoreCivic has a policy and practice of using its disciplinary system to punish detained people who refuse to work. The threat or actual imposition of punishment up to and including segregation creates a coercive environment that compels detained people to work and causes serious harm. *See* Ex. 14 ¶ 36.

CoreCivic's disciplinary policy is implemented uniformly across the facility. Ex. 5 at 267:7-13. The policy allows use of the disciplinary process to punish conduct perceived to be a refusal to work. *See* Ex. 33; Ex. 119. All individuals detained at SDC are aware that disciplinary action can result from failing to comply with any one of SDC's many rules. At intake, CoreCivic provides every detained person a handbook that immediately warns, "You will be held accountable

16

for your actions while in custody at this facility. Therefore, it is each detainee's responsibility to become familiar with the contents of the handbook." Ex. 38 at 2. Under "Basic Detainee Responsibilities," detained people are again reminded that "any [rule] violation may result in sanctions imposed against you." *Id.* at 4. The handbook includes a lengthy list of "prohibited acts," which are also posted in each dorm's bulletin board, categorized into four offense categories: 1) "greatest," 2) "high," 3) "high moderate," and 4) "low moderate" *Id.* at 33-36; Ex. 60 ¶ 3. The handbook also lists the possible sanctions that may be imposed in relation to each offense category, ranging from warnings and loss of privileges to disciplinary segregation and initiation of criminal proceedings. Ex. 38 at 33-36. The lists of "prohibited acts" and possible sanctions are taken from ICE's detention standards, but those standards do not define the terms used or require imposition of any specific sanction for any specific offense—interpretation and decision-making are left to CoreCivic. *See* Ex. 13 at 25-35. Every detained person is expected to review and understand the handbook, and the facility rules are also communicated orally at intake and in regular daily interactions. Ex. 5 at 254:12-25; Ex. 44 at 166:8-12; *see* Ex. 53 ¶¶ 3-4, 9; Ex. 75 ¶ 3.

CoreCivic's uniform discipline policy allows segregation as a possible ultimate consequence for *every* disciplinary infraction. Ex. 38 at 34-36, 38. CoreCivic uses the uniform policy to punish people who refuse to work with disciplinary sanctions, including segregation. For example, CoreCivic punishes detained workers with segregation for undefined offenses such as "encouraging others to participate in a work stoppage or to refuse to work" and "refusing to obey a staff member/officer's order." Ex. 38 at 34; *see, e.g.*, Ex. 15 ¶¶ 64-66 (█████████████ ████████████████████████████████████████████████ ██████████████); Ex. 68 at 148:18-149:8 (explaining that a "work stoppage" occurs when even "one single person . . . stops working"); Ex. 7 at 235:24-236:25 (████████████ ████████████████████████████████████████████████



); Ex. 14 ¶ 43. The result is an overarching threat of segregation for being perceived as stepping out of line. *See, e.g.*, Ex. 21 at 192:7-10 (

); Ex. 53 ¶ 9; Ex. 75 ¶ 6; Ex. 120 at 2; Ex. 20 at 238:14-19.

CoreCivic staff understand that having detained people refuse to work could threaten daily operations, and they use the disciplinary process accordingly. *See, e.g.*, Ex. 121 at 2 (

); Ex. 68 at 164:12-25.

Ex. 37 at 2; Ex. 24 at 10; Ex. 23 at 9.

Ex. 126. Trinity staff also take an active role in disciplinary proceedings. *See, e.g.*, Ex. 122 at 2-3; Ex. 123 at 2; Ex. 124 at 2; Ex. 125 at 2; Ex. 42 at 410:2-23; Ex. 61 at 201:6-14.

Ultimately, at SDC, segregation is freely threatened and used—and detained people witness it being threatened and used—to punish behavior that is perceived to amount to a refusal to work. *See, e.g.,* Ex. 75 ¶¶ 34-36, 40-41, 43-44; Ex. 60 ¶¶ 7, 13, 28-31, 34-36; Ex. 53 ¶ 37; Ex. 21 at 214:3-7 (testifying that he thinks it is generally understood that "immediate segregation could be a consequence of a walkout"); Ex. 127 at 2-3; Ex. 128 at 2-3; Ex. 129 at 2-3. Even being suspected of engaging in prohibited acts can lead to placement in "administrative" segregation, which does not differ in character from "disciplinary" segregation, giving CoreCivic the ability to punish detained workers even if the charges are ultimately not sustained. Ex. 119 at 5-6; Ex. 6 at

18

195:7-16; Ex. 20 at 226:23-227:4; Ex. 21 at 196:17-198:4; Ex. 14 ¶ 38. In short, SDC is a "coercive environment, where the threat of psychological and psychiatric harm looms large for most disciplinary actions, including refusal to work." Ex. 14 ¶ 36.

### C. CoreCivic Revokes Housing Incentives for Those Who Refuse to Work

CoreCivic has a policy and practice of revoking incentives, including private and safe housing, when detained people refuse to work. The threat of losing these "incentives" ensures that detained people stay in the Work Program.

CoreCivic has a policy and practice of transferring or threatening to transfer detained people who refuse to work to less favorable or safe housing. These housing transfers pose a risk of serious harm. Ex. 14 ¶¶ 22, 55-60. At SDC, non-segregation, or general population, housing units feature either celled housing or large open dormitories. Ex. 9 at 366:13-367:24, 368:20-369:16; Ex. 130 at 2. The open dormitories can house over sixty people and are referred to as "the chicken coop" by detained people because of how crowded and loud they are. Ex. 75 ¶ 8. In contrast, the celled units (or "pods") afford relatively more privacy; each cell houses two people and has its own toilet and sink. Ex. 9 at 369:17-21. In addition, CoreCivic has housed detained workers together in a housing unit with amenities not offered to the rest of the population, such as access to video games or extra televisions in communal areas. Ex. 15 ¶¶ 86, 129; Ex. 21 at 72:9-19; Ex. 73 at 2-3; Ex. 72. Housing in this unit is explicitly predicated on continued involvement in the Work Program. Ex. 40 at 230:10-13; Ex. 68 at 83:10-84:3.

CoreCivic's prompt re-housing of detained people who no longer want to work, and threats to do so, ensure that the threat of loss of private and safe housing looms large. *See* Ex. 9 at 387:24-388:13; Ex.53 ¶ 14; Ex. 75 ¶ 11; Ex. 129 at 2-3; Ex. 72 at 3; Ex. 131 at 2. CoreCivic's policy of threatening punitive housing transfers for those who decline to work coerces purported class members to stay in the Work Program and causes serious harm to putative class members.

## III. CoreCivic's Policies and Practices Compel Involvement in the Work Program by Means or Threats of Physical Restraint and Abuse of Legal Process

### A. Physical Restraint

As described in Facts § II.B, CoreCivic has a policy and practice of physically restraining or threatening to physically restrain detained people who refuse to work using segregation. Conditions in SDC's segregation unit mirror those in jails and prisons. Ex. 14 ¶ 24. It is beyond credible dispute that placement in segregation is severely detrimental to a person's wellbeing. Ex. 14 ¶¶ 24-35. "The explicit purpose of disciplinary segregation at SDC is to punish—in other words, segregation is inflicted because it is punitive, painful, and causes suffering." Ex. 14 ¶ 37; *see also* Ex. 60 ¶¶ 35-36; Ex. 75 ¶ 35. ███████████████████████

████████████

████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
███████████████████

Ex. 21 at 188:16-189:2.

CoreCivic also physically restrains individuals who participate in work stoppages with pod or unit-wide lockdowns, and FSC personnel are made aware of such lockdowns. *See, e.g.*, Ex. 75 ¶¶ 37-39; Ex. 60 ¶ 33; Ex. 132 at 2-3; Ex. 133 at 2-3. During lockdowns, detained individuals are not allowed to leave their bed, can only use the restroom with permission, are not given access to recreation, and have no access to phones or commissary. Ex, 75 ¶¶ 37-39; Ex. 60 ¶ 33; Ex. 20 at 240:17-21, 243:2-16, 244:9-25.

### B. Abuse of Legal Process

CoreCivic has a policy and practice of threatening detained people who refuse to work with abuses of legal process. Under the SDC handbook, given to every detained person, criminal

prosecution is a possible punishment for refusing to obey an officer or engaging in a work stoppage. Ex. 38 at 34-35. At SDC, CoreCivic can, at its discretion, refer a matter to an "outside prosecutor" and "outside law enforcement." Ex. 68 at 144:23-145:10. As explained above, *supra* at Facts § II.B., the handbook does not define these infractions, nor does it explain what types of conduct would justify referral for criminal prosecution other than stating simply that either offense could be prosecuted criminally. Ex. 38 at 34-35; *see also* Ex. 15 ¶¶ 64-66.

Other CoreCivic policies and practices leverage the immigration status of people detained at SDC to compel them to work. Every person detained at SDC wears a colored uniform, with the color indicating their classification level. A person's classification level, and thus uniform color, can change when they are subject to institutional disciplinary action at SDC. Detained people at SDC must wear their colored uniforms to proceedings before Immigration Judges. Ex. 15 ¶¶ 70-71; Ex. 9 at 373:9-374:25. Thus, detained people facing the threat of disciplinary action for refusing to work are also facing the threat of having to wear a uniform color indicating a higher level of "dangerousness" in front of an Immigration Judge.

Finally, the futures for people detained at SDC are dependent on the outcomes of their immigration proceedings, and everyone at SDC—the detained people and the CoreCivic employees who oversee them—knows this. *See, e.g.*, Ex. 133 at 2-4; Ex. 134 at 2. CoreCivic maintains a practice of telling detained people that refusing to work will impact their immigration proceedings. Ex. 60 ¶ 29; Ex. 75 ¶ 42; *see also* Ex. 15 ¶ 56.

## IV.    The Named Plaintiffs

Mr. Hill Barrientos was detained at SDC intermittently between July 2015 and June 2018, including at the time when the original Complaint in this action was filed. *See* ECF No. 1; Ex. 60 ¶ 2. Mr. Hill Barrientos was a kitchen worker in the Work Program. *Id.* ¶¶ 20-21. Mr. Hill Barrientos did not volunteer for the Work Program; he was told if he did not join, he would be put

in segregation. *Id.* ¶ 7. He used his earnings to purchase necessities such as hygiene products, underwear and socks, warm clothes, food, postage stamps, and phone cards. *Id.* ¶¶ 5, 23.

Plaintiff Gonzalo Bermudez Gutiérrez was detained at SDC from May 2019 to January 2020. Ex. 53 ¶ 2. Mr. Bermudez Gutiérrez was a kitchen worker in the Work Program. *Id.* ¶¶ 26, 28. Mr. Bermudez Gutiérrez worked to buy food, hygiene products, stamps, and phone cards. *Id.* ¶¶ 20-21. He witnessed CoreCivic officers threaten to transfer detained workers who refused to work to open dorms that did not have the incentives of the kitchen worker housing unit or to segregation and to revoke commissary access. *Id.* ¶¶ 35-36.

Plaintiff Keysler Ramón Urbina Rojas was detained at SDC between May 2015 and June 2016. Ex. 75 ¶ 2. Mr. Urbina Rojas was a kitchen worker in the Work Program. *Id.* ¶¶ 27-28. Mr. Urbina Rojas witnessed CoreCivic staff send a detained worker to segregation for refusing to work or perform a task. *Id.* ¶ 40. CoreCivic sent Mr. Urbina Rojas to segregation for allegedly refusing to complete tasks that went beyond his usual work assignment. *Id.* ¶¶ 34-35. CoreCivic placed Mr. Urbina Rojas's housing unit on lockdown on several occasions when he and other detained workers did not report to work, cutting off their phone access, requiring them to stay on their beds, and threatening them with pepper spray. *Id.* ¶ 37. Mr. Urbina Rojas used his Work Program earnings to buy food, hygiene items, and phone cards. *Id.* ¶¶ 14-15, 17, 20, 22-23, 45.

## LEGAL STANDARD

"In addition to promoting the efficiency and economy of litigation, the class-action device also provides a key to the courthouse for parties with legitimate claims whose access to justice may be slammed shut because the individual amounts of their claims make it economically infeasible to pursue them on an individual basis." *Upshaw v. Ga. (GA) Catalog Sales, Inc.*, 206 F.R.D. 694, 697 (M.D. Ga. 2002) (citing *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980)). At least one named class representative must establish Article III standing to raise each

22

class subclaim. *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000).

Next, courts analyze if Federal Rule of Civil Procedure 23 is satisfied. First, under Rule 23(a) every putative class must satisfy numerosity, commonality, typicality, and adequacy of representation. *Baker v. State Farm Mut. Auto. Ins. Co.*, No. 4:19-cv-14-CDL, 2021 WL 4006124, at *1 (M.D. Ga. Sept. 2, 2021), *appeal filed*, No. 21-14197 (11th Cir. Dec. 2, 2021). These prerequisites "must be read liberally in the context of civil rights suits." *Groover v. Prisoner Transp. Servs., LLC*, No. 15-cv-61902, 2018 WL 6831119, at *8 (S.D. Fla. Dec. 26, 2018) (quoting *Jones v. Diamond*, 519 F.2d 1090, 1099 (5th Cir. 1975), *abrogated on other grounds by*, *Gardner v. Westinghouse Broad. Co.*, 437 U.S. 478 (1978)).[11]

After satisfying Rule 23(a), a proposed class must fall within one of the three categories established in Rule 23(b). Here, Plaintiffs seek certification of the Proposed Classes under Rule 23(b)(2) and (3). Rule 23(b)(2) permits class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(3) permits class certification where "the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466, 468 (2013) (emphasizing that "the focus of Rule 23(b)(3) is on the predominance of common *questions*" and that plaintiffs need not prove at the class certification stage "that the predominating question will be answered in their favor").

---

[11] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1210 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit cases submitted or decided prior to October 1, 1981.

Finally, Rule 23(g) requires adequate class counsel. Adequacy is determined by considering factors such as "the work counsel has done in identifying or investigating potential claims in the action; counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; counsel's knowledge of the applicable law; and the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

District courts have "broad discretion" regarding class certification. *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1169 (11th Cir. 2010); *Groover v. Michelin N. Am., Inc.*, 187 F.R.D. 662, 664 (M.D. Ala. 1999). Courts may look beyond the pleadings, analyzing the parties' claims, defenses, and evidence, to determine whether class certification is appropriate. *See Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1190 (11th Cir. 2009); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 271–72 (N.D. Ala. 2009). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 568 U.S. at 466. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* Thus, "[a]n evaluation of the probable outcome on the merits is not properly part of the certification decision." *Id.* (citation omitted).

## ARGUMENT

For the reasons set forth herein, Plaintiffs satisfy Rule 23's standards for class certification. The Court should exercise its broad discretion to certify the Forced Labor and Unjust Enrichment Classes under Rule 23(b)(2) and (b)(3).

## I.    The Requirements of Federal Rule of Civil Procedure 23(a) Are Satisfied

### A.  The Class Representatives Have Standing

Plaintiffs have standing to litigate both the TVPA and unjust enrichment claims and can thus serve as class representatives in this matter. Standing is determined based on the situation at

the time a complaint is filed. *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003); *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (listing Article III's standing requirements: injury, traceability, and redressability). Injunctive relief requires "a 'real and immediate threat' of future injury." *Focus on the Fam.*, 344 F.3d at 1272.

Plaintiffs Hill Barrientos, Bermudez Gutiérrez, and Urbina Rojas were detained at SDC and labored in the Work Program. Ex. 75 ¶¶ 2, 20; Ex. 60 ¶¶ 2, 7; Ex. 53 ¶ 2, 17. During their detention, Plaintiffs suffered an injury in fact—their labor was unlawfully forced by CoreCivic, who unjustly benefited from it. This injury is more than "fairly traceable" to CoreCivic's conduct, as it occurred pursuant to CoreCivic policy and practice. Finally, Plaintiffs' claim for relief will provide them redress, as damages will compensate them for their injury. Thus, Plaintiffs have standing to pursue their claims for damages.

Plaintiff Hill Barrientos also has standing to pursue injunctive relief on behalf of the Proposed Classes. He was detained and participating in the Work Program at the time the original complaint was filed in April 2018. ECF No. 1 at 3. *See Focus on the Fam.*, 344 F.3d at 1275. Plaintiff Hill Barrientos has suffered an injury in fact that is fairly traceable to CoreCivic, and injunctive and declaratory relief will address the "real and immediate threat" that CoreCivic's Work Program will continue to operate daily in violation of the TVPA and Georgia law.

### B.  The Proposed Classes Are So Numerous that Joinder Would Be Impracticable

The Proposed Classes are so "numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity is presumptively satisfied in this case where, based on payment data provided by CoreCivic, there are over 32,000 individuals in the Forced Labor Class and nearly 13,800 in the Unjust Enrichment Class. Ex. 56 ¶¶ 75, 81. *See Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (noting that generally, "more than forty [is] adequate"). The

Proposed Classes include individuals who are no longer detained at SDC and are dispersed throughout the country (and internationally), making joinder more difficult. *Kilgo v. Bowman Transp., Inc*., 789 F.2d 859, 878 (11th Cir. 1986). Given the Proposed Classes' size and geographic dispersion, joinder is impracticable, if not impossible, and Rule 23(a) numerosity is satisfied.

### C.  Common Questions of Law and Fact Exist

Rule 23(a)(2)'s commonality requirement is satisfied here, where there is "at least one issue whose resolution will affect all or a significant number of the putative class members." *Williams v. Mowhawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009) (quoting *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982)). Traditionally, the Rule asks whether the disputed questions are capable of class-wide proof or resolution. *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001). Claims need not be identical to satisfy this requirement, and variations within the class are permissible. *Prado-Steinman*, 221 F.3d at 1279 n.14. The threshold for satisfying the commonality requirement is "not high." *Groover*, 187 F.R.D. at 666 (citation omitted); *In re Checking Acct. Overdraft Litig.*, 286 F.R.D. 645, 652 (S.D. Fla. 2012) (citation omitted).

**The Forced Labor Class:** The TVPA provides a private cause of action against anyone who "knowingly . . . obtains the labor or services of a person," or attempts to do so, "by any one of, or by any combination of" the following:

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> (2) by means of serious harm or threats of serious harm to that person or another person;
> (3) by means of the abuse or threatened abuse of law or legal process; or
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a); *see* 18 U.S.C. § 1594(a) (governing an attempt to violate § 1589); 18 U.S.C. § 1595(a) (creating private cause of action). CoreCivic may separately be liable for "knowingly

benefit[ting], financially or by receiving anything of value, from participation in a venture" with other entities, such as Trinity and Securus, "which has engaged in the providing or obtaining of labor or services by any of the means described in [§ 1589(a)]," or attempting to do so, if CoreCivic knew or recklessly disregarded the fact that such means were used. §§ 1589(b), 1594(a), 1595(a).

Resolution of Plaintiffs' claims alleging a violation of these TVPA provisions will turn on questions of law or fact that are common to the class. Common questions include:

1. Whether CoreCivic obtains and has obtained detained persons' labor at SDC via force, threats of force, physical restraint, or threats of physical restraint;
2. Whether CoreCivic obtains and has obtained detained persons' labor at SDC via serious harm or threats of serious harm;
3. Whether CoreCivic obtains and has obtained detained persons' labor at SDC via abuse or threatened abuse of law or legal process;
4. Whether CoreCivic obtains and has obtained detained persons' labor at SDC via a scheme, plan, or pattern intended to cause the person to believe that, if he or she did not perform such labor or services, he or she would suffer serious harm or physical restraint;
5. Whether CoreCivic obtains and has obtained detained persons' labor at SDC through any combination of the unlawful means lists in § 1589(a)(1)-(4);
6. Whether CoreCivic has knowingly benefitted, financially or otherwise, from participating in a venture, or attempting to participate in a venture, that CoreCivic knew or should have known forced detained people to work; and
7. Whether CoreCivic has attempted to obtain detained persons' labor at SDC through any of the unlawful means listed out in § 1589(a)(1)–(4) and § 1589(b).

**The Unjust Enrichment Class:** To establish a claim of unjust enrichment under Georgia law, Plaintiffs must show that "CoreCivic coerced them to provide labor to CoreCivic, that CoreCivic benefitted from that labor, and that CoreCivic should compensate Plaintiffs . . . because allowing CoreCivic to keep that benefit would be unjust." *Barrientos*, 332 F. Supp. 3d at 1313. Resolution of Plaintiffs' claims alleging unjust enrichment will turn on questions of law or fact that are common to the class. Common questions include:

1. Whether CoreCivic has coerced class members to provide labor to CoreCivic;
2. Whether CoreCivic has benefitted from that labor;
3. Whether CoreCivic should compensate Plaintiffs and class members for the benefit conferred on CoreCivic, because CoreCivic retaining the benefit would be unjust;

As discussed further in Argument § II, common evidence will provide a common answer

27

to these and other questions relating to the TVPA and unjust enrichment claims. Resolution of any of these common issues will serve as the "glue" uniting the Proposed Classes' factual and legal claims and will provide "a common answer to the crucial question[s]" of whether CoreCivic unlawfully obtained class members' labor in violation of the TVPA and whether CoreCivic has been unjustly enriched by that labor. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352-53 (2011), fulfilling Rule 23(a)'s commonality requirement. And, here, where Plaintiffs can point to CoreCivic policies and practices that apply to all class members, "[c]ommonality is necessarily established." *Owino v. CoreCivic*, No. 21-55221, 2022 WL 1815825, at *5 (9th Cir. June 3, 2022).

### D.  Plaintiffs' Claims Are Typical of the Class Claims

Plaintiffs' claims are typical of the class claims because their claims and those of the Proposed Class members "arise from the same event or pattern or practice and are based on the same legal theory." *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012) (citation omitted). Typicality "does not require identical claims or defenses." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). Rather, "typicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." *Prado-Steiman*, 221 F.3d at 1279. "[T]he threshold for typicality is low." *Gazzara v. Pulte Home Corp.*, No. 6:16-CV-657-Orl-31TBS, 2016 WL 4529526, at *4 (M.D. Fla. Aug. 30, 2016).

Plaintiffs and the Proposed Class members have suffered the same injury—CoreCivic has unlawfully coerced or attempted to coerce their labor, for CoreCivic's benefit. Plaintiffs were all detained at SDC, where they were subjected to CoreCivic's scheme of deprivation of basic necessities. This deprivation forced them to enlist in the Work Program to earn meager wages to purchase additional basic necessities and to receive non-wage benefits to satisfy their basic needs, such as extra food and phone cards. *See Novoa v. GEO Grp., Inc.*, No. EDCV 17-2514 JGB (SHKx), 2019 WL 7195331, at *13 (C.D. Cal. Nov. 26, 2019) ("Plaintiffs allege a facility-wide

custom of providing insufficient daily necessities. The Court therefore finds the typicality requirement satisfied for each named Plaintiff."). Plaintiffs remained in the Work Program under threat or actual imposition of segregation and other punishments, and under threat of adverse legal action. *See Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 917 (10th Cir. 2018); *Menocal v. GEO Grp., Inc.*, 320 F.R.D. 258, 265 (D. Colo. 2017), *aff'd*, 882 F.3d 905 (10th Cir. 2018).

Resolution of Plaintiffs' claims depends on the resolution of the legality of CoreCivic's facility-wide conduct. Because these claims rest on the same legal theories as the claims of the Proposed Classes, Plaintiffs satisfy Rule 23(a)'s typicality requirement.

### E.  Plaintiffs Will Fairly and Adequately Protect the Interests of All Class Members

Plaintiffs "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1323 (11th Cir. 2008) (quoting *Valley Drug Co. v. Geneva Pharms.*, 350 F.3d 1181, 1189 (11th Cir. 2003)).

There is no substantial conflict of interest between Plaintiffs and the Proposed Classes, all of whom share an interest in compensation for their injuries on account of being forced to work and in ensuring CoreCivic's unlawful conduct ceases. Plaintiffs have a clear understanding of the case and their role as representatives for Proposed Class members. Ex. 53 ¶ 38; Ex. 60 ¶¶ 37; Ex. 75 ¶ 46. And Plaintiffs are actively involved in the litigation; for example, they each personally responded to CoreCivic's numerous discovery requests. Thus, Rule 23(a)'s adequacy requirement is satisfied.

## II.    Certification Is Proper under Federal Rule of Civil Procedure 23(b)(3)

A damages class may be maintained if Rule 23(a)'s requirements are met and common questions of law or fact predominate over questions affecting only individual members. Fed. R.

Civ. P. 23(b)(3); *In re Theragenics Corp. Sec. Litig.*, 205 F.R.D. 687, 697 (N.D. Ga. 2002) (citing *Cox*, 784 F.2d at 1557) (explaining that only some, and not all, questions need be common under Rule 23(b)(3)). Common issues predominate if they have "a direct impact on every class member's effort to establish liability that is more substantial than the impact of individualized issues in resolving the claim or claims of each class member." *Sacred Heart Health Sys.*, 601 F.3d at 1170 (quoting *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1270 (11th Cir. 2009)). Furthermore, courts are required to "assess predominance with its overarching purpose in mind—namely, ensuring that 'a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1235 (11th Cir. 2016) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)).

Here, common issues of law and fact predominate over individualized issues,[12] and common evidence will show that CoreCivic's conduct was and is "substantially the same with respect to all members of" the Proposed Classes. *Upshaw*, 206 F.R.D. at 700.

### A.  Common Issues of Law and Fact Predominate Over Plaintiffs' TVPA Claim

CoreCivic is liable for violating the TVPA under multiple theories, *see* Argument § I.C, each of which presents common issues of law and fact that predominate over any individualized

---

[12] To the extent any individualized determinations may be needed to allocate damages to class members, "individualized damages calculations are insufficient to foreclose the possibility of class certification." *Carriulo v. Gen. Motors Co.*, 823 F.3d 977, 988 (11th Cir. 2016). Plaintiffs have "come forward with plausible statistical or economic methodologies to demonstrate impact on a class-wide basis," and damages are easily amenable to calculation based on a formula, such that any individual calculations pose "no impediment to class certification." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259-60 (11th Cir. 2004) (citation omitted); *see generally* Ex. 56 (explaining Plaintiffs' damages methodology); *see also, e.g.*, *Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 457 (E.D. Va. 2015) (awarding compensatory damages for TVPA claims equal to FLSA damages—unpaid wages plus liquidated damages—because under 18 U.S.C. § 1593(a) victims are entitled to "at a minimum, compensation for the value of [their] services as guaranteed under the FLSA").

inquiries, as set forth below. "[T]he[se] question[s are] appropriate for class-wide resolution because either CoreCivic's company-wide policies and practices violated the law and the rights of the class members, or they didn't." *Owino*, 2022 WL 1815825, at *5 (citing *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014)); *see id.* (holding that "whether CoreCivic utilized threats of discipline to compel detainees to clean its California facilities in violation of state and federal human trafficking statutes" is a "quintessential" common question).

### 1.   Common Evidence Will Prove CoreCivic Violates, or Attempts to Violate, § 1589(a)(1)-(4)

Common evidence will prove CoreCivic knowingly obtains, or attempts to obtain, class members' labor through physical restraint, serious harm, abuse of legal process, and threats thereof, and/or through a scheme, pattern, or plan intended to cause class members to believe that, if they did not perform such labor, they would suffer serious harm or physical restraint. 18 U.S.C. §§ 1589(a)(1)–(4), 1594(a).

***Knowingly.*** Common evidence will show that CoreCivic knowingly obtained, or attempted to obtain, class members' forced labor. *See United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011) (noting that "the linchpin" of the § 1589 analysis is the defendant's intent). Throughout the class periods, CoreCivic has uniformly offered access to basic necessities otherwise not provided in adequate quantity and quality as a Work Program recruitment tool—referring to them as "incentives"—demonstrating awareness that detained people at SDC work in order to obtain basic necessities. Facts § II.A. CoreCivic also knows that detained workers primarily use their limited wages to purchase food and other necessities in the SDC commissary. Facts § II.A. CoreCivic ensures detained workers' continued labor through uniform policies and practices—well-known to and implemented by CoreCivic staff at all levels—leading to punishment and abuse of legal process for refusing to work. Facts §§ I.B.-C, II.B-C, III.A-B.

31

*Serious harm.* Common evidence will show that CoreCivic has a uniform policy and practice of obtaining, or attempting to obtain, class members' labor through inflicting and threatening serious harm for refusal to work. Facts. § II. That serious harm includes (a) deprivation and threatened deprivation of basic necessities, Facts § II.A; Ex. 23; Ex. 24; Ex. 27; Ex. 101; Ex. 97; Ex. 38 at 9, 30; Ex. 88 at 3; (b) threat and infliction of punishment, including segregation, Facts, § II.B; Ex. 38 at 2, 33-36, 38; Ex. 33; Ex. 119; and (c) transfers and threatened transfers out of safe and private housing, Facts, § II.C; Ex. 130.

*Physical Restraint.* Common evidence will show CoreCivic has a uniform policy and practice of obtaining, or attempting to obtain, class members' labor through use and threats of physical restraint, in the form of segregation or lockdown of entire housing pods. Facts §§ II.B., III.A; Ex. 38 at 2, 33-36, 38; Ex. 33; Ex. 119.

*Abuse of Legal Process.* Common evidence will show CoreCivic has a uniform policy and practice of obtaining, or attempting to obtain, class members' labor through actual and threatened abuse of legal process, in the form of referral for criminal prosecution, increased classification level, and threats of impacts to immigration proceedings. Facts § III.B; Ex. 38 at 9-10, 33-36; Ex. 33; Ex. 119.

*Scheme, Pattern, or Plan.* Common evidence will show that CoreCivic obtained, or attempted to obtain, class members' labor through a scheme intended to cause them to believe that, if they did not work, they would suffer serious harm or physical restraint.[13] This scheme is documented in CoreCivic's various written policies, communicated to all detained people, which result in deprivation of basic necessities and permitting punishment and physical restraint for refusal to work. Facts §§ I.C-D, II. Detained people are subject to, and witness CoreCivic

---

[13] A "scheme, plan, or pattern" can be improper means without a determination of which specific part of the scheme motivated the laborer. 18 U.S.C. § 1589; *Menocal*, 320 F.R.D. at 264 n.2.

subjecting others to, these policies. *Id.* CoreCivic's intent behind the scheme—to maximize profit by minimizing costs through forced labor—is clear from its profit model and utter dependence on the Work Program, as well as voluminous documentary evidence showing that CoreCivic knows that both basic necessities and punishment, or threats thereof, will guarantee the captive work force that CoreCivic needs to keep SDC operating and generating a substantial profit. Facts § I.

*Any Combination of Unlawful Means.* The same common evidence described above will show on a class-wide basis that CoreCivic obtained, or attempted to obtain, class members' labor through a combination of the unlawful means listed in 18 U.S.C. §§ 1589(a)(1)–(4).

*Causation and Attempt: An Objective Inquiry.* Plaintiffs can show that CoreCivic's uniform policies and practices would have compelled a reasonable purported class member to work, and amount to an attempt to compel their work, through common evidence such as:

- CoreCivic's commissary purchase data and implementation of "incentive" programs showing that detained people worked in order to obtain basic necessities, Facts § II.A.;
- Plaintiffs' testimony about why they enlisted and remained in the Work Program, Ex 60, Ex. 75, Ex. 53;
- Documentary evidence showing that Proposed Class members worked for the same reasons, Facts §§ II-III;
- Plaintiffs' expert reports detailing the harmful and coercive nature of CoreCivic's uniform policies and practices regarding deprivation, discipline, and housing, Facts §§ II.B, III.A; and
- Circumstantial evidence such as the sheer number of people who joined the Work Program, Argument § I.B.

With regard to CoreCivic's imposition and threats of serious harm, the TVPA calls for an objective inquiry that turns on whether the harm threatened or imposed is "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances" to work. 8 U.S.C. § 1589(c)(2). Such an inquiry is particularly susceptible to class-wide proof. *See Owino*, 2022 WL 1815825, at *5; *Nuñag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, No. LA CV10-01172 JAK (MLGx), 2011 WL 7095434, at *7 (C.D. Cal.

Dec. 12, 2011); *McCullough v. City of Montgomery*, No. 2:15-cv-463-RCL, 2020 WL 3803045, at *8 (M.D. Ala. July 7, 2020); *Dann*, 652 F.3d at 1169–70. Courts addressing the TVPA's "serious harm" prong have found predominance where uniform policies are at issue and "the class members share a large number of common attributes . . . allowing the fact-finder to use a common 'reasonable person' standard for all class members." *Owino v. CoreCivic, Inc.*, No. 17-CV-1112 JLS (NLS), 2020 WL 1550218, at *28 (S.D. Cal. Apr. 1, 2020), *reconsideration denied,* No. 17-CV-1112 JLS (NLS), 2021 WL 120874 (S.D. Cal. Jan. 13, 2021), *aff'd,* No. 21-55221, 2022 WL 1815825 (9th Cir. June 3, 2022); *see also Novoa v. GEO Grp., Inc.*, No. EDCV 17-2514 JGB (SHKx), 2021 WL 4913286, at *5 (C.D. Cal. Sept. 30, 2021).

Here, all the Proposed Class members are detained at SDC (or were at the time they were subjected to forced labor at SDC). They are all noncitizens subject to immigration removal proceedings and to "universal" policies and practices "under uniform conditions" at SDC, *Menocal*, 320 F.R.D. at 266, the material aspects of which remained unchanged over the course of the class periods. Facts, § I; *see also* Ex. 16 ¶¶ 6-19 (explaining the concept of "total institution" as it applies to SDC). Given the similarities in purported class members' backgrounds and circumstances, the question whether a reasonable person in their position would feel compelled to work when faced with serious harm and threats thereof may be resolved on a class-wide basis. *See Nuñag-Tanedo*, 2011 WL 7095434, at *8; *Menocal*, 320 F.R.D. at 266.

### 2. Common Evidence Will Prove CoreCivic Knowingly Benefits from Participation in a Venture That Has Obtained Detained Workers' Forced Labor

Common evidence will show that CoreCivic knowingly benefits from participation in a venture that has obtained putative class members' labor through unlawful means. § 1589(b).

***Venture.*** Common evidence will show that CoreCivic participates in a venture with other entities, namely Trinity and Securus, to deprive detained people of basic necessities and, in

Trinity's case, to punish people who refuse to work. Facts §§ I.A., II.A; Ex. 23; Ex. 24; Ex. 27. CoreCivic and Trinity contract to provide food at the lowest cost and highest profit to each entity, well-aware that the chronic deficiencies in the food served at SDC result in a hungry population. CoreCivic and Trinity also work together to punish and threaten to punish detained people who refused to work. Facts §§ I.A., II.A.1; Ex. 37. ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████. Facts §§ I.A., II.A.4; Ex. 27.

*Knowing Benefit*. Common evidence will demonstrate that CoreCivic knowingly benefits from the venture. Common evidence shows that putative class members' labor, obtained well below market rates, enables SDC to satisfy the operational functions required by CoreCivic's contract with ICE—the only source of revenue for SDC other than the commissary ██████

████████. Facts §§ I.A., D. Common evidence also demonstrates that CoreCivic profits enormously from the ICE contract. Facts § I.A. CoreCivic's contract with Trinity further establishes the venture's benefit by *requiring* that CoreCivic provide detained kitchen workers and setting an extremely low price per meal on the assumption that detained rather than employed workers will be used, Facts §§ I.B, II.A.1. Finally, common evidence shows that CoreCivic makes hundreds of thousands of dollars in profit from the sale of basic necessities to purported class members at its commissary. Facts § II.A.

*Knowingly or in Reckless Disregard*. As discussed above, common evidence will show CoreCivic obtains class members' labor through means violating §§ 1589(a)(1)–(4), either knowingly or in reckless disregard. Argument § II.A. Such evidence includes: (i) ███████████

██████████████████████████████████████████████████ (ii) communications between facility staff and FSC about the use of segregation, lockdowns, and other forms of discipline to address refusals to work, (iii) ████████████████████████████

███████████████████████████████, (iv) failure to audit specifically whether the Work Program is voluntary, (v) failure to ensure compliance with various ICE detention standards requirements for the Work Program, (vi) indifference to a repetitive body of grievances from detained people and OIG findings about the quality of the food at SDC, and (vii) ██████

████████████████████████████████████████████████████████████

████████████████████████ Facts § II.A.

**Causation.** As discussed above, Argument § II.A, causation is a common question that may resolved on the basis of common evidence.

### B. Common Issues of Law and Fact Predominate Over Plaintiffs' Unjust Enrichment Claim

With respect to the Unjust Enrichment Class, common issues of law and fact predominate over any individualized issues. As discussed above, common evidence will show that CoreCivic knowingly benefits enormously from the Work Program at SDC. Facts §§ I.A., C; Argument § II.A. Common evidence will also show that CoreCivic's retention of the benefit is unjust because CoreCivic coerces detained people to work, through the means outlined above that are also unlawful under the TVPA. Argument § II.A.

### C. Class Certification Is Superior to Other Methods of Adjudication

Rule 23(b)(3)'s superiority analysis focuses on "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Klay*, 382 F.3d at 1269. Courts consider four non-exhaustive factors when assessing superiority:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

As to (A) and (B), Plaintiffs and their counsel are aware of no class members interested in individually controlling separate actions regarding the issues at stake in this litigation. *See Klay*, 382 F.3d at 1269. Many putative class members fear retaliation or adverse immigration consequences, making them less likely to pursue individual legal actions against CoreCivic. *See* Facts § III.B. (discussing CoreCivic's threatened abuse of the immigration legal process). And many other class members likely reside in other countries, contributing to the unlikelihood of their bringing individual actions against CoreCivic. *See Silva–Arriaga v. Tex. Express, Inc.*, 222 F.R.D. 684, 691 (M.D. Fla. 2004); *Menocal*, 882 F.3d at 915; *Novoa*, 2019 WL 7195331, at *19.

As to (C), litigating the class members' claims individually "would be costly, inefficient, and would burden the court system by forcing individual plaintiffs to repeatedly prove the same facts and make the same legal arguments" about their experience in the Work Program. *Klay*, 382 F.3d at 1270. Further, the cost of litigating each individual's claims would outweigh the potential damages a single class member could recover. *Id.* at 1270-71; *Amchem*, 521 U.S. at 617. Judicial economy also counsels in favor of continuing to concentrate this litigation in this Court because it "has already handled several preliminary matters." *Klay*, 382 F.3d at 1271

As to (D), this action presents no manageability problems. *See Klay*, 382 F.3d at 1272. The alternatives to a class action here are either no recourse for thousands of current and formerly detained people or "a multiplicity of suits raising essentially the same claims." *Upshaw*, 206 F.R.D. at 702. For all these reasons, the superiority requirement is satisfied.

## III.   The Proposed Classes Satisfy the Requirements for Certification under Rule 23(b)(2)

Rule 23(b)(2) permits certification of a class seeking declaratory or injunctive relief where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the

class as a whole." Fed. R. Civ. P. 23(b)(2). "The term 'generally applicable' does not require 'that the party opposing the class . . . act directly against each member of the class.'" *Anderson v. Garner*, 22 F. Supp. 2d 1379, 1386 (N.D. Ga. 1997) (citations omitted). Rather, when the "claims rest[] on the same grounds and apply[] more or less equally to all members of the class," Rule 23(b)(2) is satisfied. *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1155 (11th Cir. 1983).

Lawsuits brought for injunctive relief alleging civil rights violations are precisely the type of suit for which Rule 23(b)(2) was intended. *See Amchem*, 521 U.S. at 613-14; *Harris v. Ga. Dep't of Corrs.*, No. 5:18-cv-00365-TES, 2021 WL 6197108, at *13 (M.D. Ga. Dec. 28, 2021). Where "the problems of which [plaintiffs] complain and the remedies they seek are systemic," some courts "have gone so far as to say that the rule's requirements are 'almost automatically satisfied in actions primarily seeking injunctive relief.'" *Dunn v. Dunn*, 318 F.R.D. 652, 667–68 (M.D. Ala. 2016) (quoting *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994)), *modified sub nom. Braggs v. Dunn*, No. 2:14cv601-MHT, 2020 WL 2395987 (M.D. Ala. May 12, 2020); *see also Parsons*, 754 F.3d at 689 (holding Rule 23(b)(2) was satisfied where department of corrections policies and practices placed "every inmate in custody in peril" and all class members sought essentially the same relief); *Novoa*, 2019 WL 7195331, at *19 (certifying a Rule 23(b)(2) class of people in immigration detention alleging the work program violates the TVPA ).

This case satisfies Rule 23(b)(2), as the requested declaration and injunction "would provide relief to each member of the class." *Dukes*, 564 U.S. at 360. All putative class members who are currently or will in the future be detained face the same harm—forced labor.[14] An order

---

[14] Plaintiffs' proposed class definitions seek certification of classes through "the date of final judgment in this matter," which Plaintiffs interpret to mean a final judgment terminating any injunctive relief. However, if the Court finds that "final judgment" does not clearly include future class members for purposes of injunctive relief, Plaintiffs request that the Court modify the

declaring CoreCivic's conduct unlawful and enjoining CoreCivic from compelling people detained at SDC to work would remedy this ongoing harm. *See Harris*, 2021 WL 6197108, at *13 (certifying Rule 23(b)(2) class of incarcerated individuals because injunction of defendants' unlawful policies and practices would resolve class-wide grievances). Because the putative class members' claims rest on the same polices and practices and can be resolved through the same declaratory and injunctive relief, the requirements of Rule 23(b)(2) are met.

## IV.     Counsel of Record Should Be Appointed as Class Counsel

Plaintiffs are represented by experienced civil rights and class action litigators who will adequately and skillfully represent the interests of the Proposed Classes. *See* Fed. R. Civ. P. 23(g)(1)(A) (enumerating the factors the court must consider in appointing class counsel). Counsel of record have vigorously pursued the interests of the Proposed Classes for over four years, including by propounding and responding to written discovery, preparing for and attending seventeen depositions, and retaining four experts. As described in the attached Declaration of Meredith B. Stewart, the attorneys of record in this case and their firms have successfully handled complex class action litigation as well as litigated TVPA claims. They have uniquely relevant experience representing people in immigration detention and bringing complex claims involving prisons and immigration detention facilities. Many of the attorneys and the staff with whom they work speak languages other than English, making it easier for them to communicate with many

---

proposed class definitions for purposes of certifying the classes under Fed. R. Civ. P. 23(b)(2) to include, "All civil immigration detainees who performed work, or will perform work in the future, for CoreCivic at Stewart in the 'Voluntary Work Program.'" Such a modification is within the Court's discretion. *Ault v. Walt Disney World Co.*, No. 6:07-cv-1785-Orl-31KRS, 2008 WL 11436773, at *2 (M.D. Fla. Dec. 12, 2008) ("District Courts are permitted to limit or modify class definitions to provide necessary precision.") (citing *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007); *In re Monumental Life Ins.*, 365 F.3d 408, 414 (5th Cir. 2004)). And such a modification will not expand the scope of Plaintiffs' claims, as Plaintiffs have always pleaded claims for injunctive relief. ECF No. 1 ¶¶ 93, 97, 102, Prayer for Relief; ECF No. 87 ¶¶ 104, 108, 112-123, Prayer for Relief.

members of the Proposed Classes. Furthermore, counsel have and will continue to dedicate considerable means and staff to represent the interests of Plaintiffs and the Proposed Classes.

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court certify the Forced Labor Class and Unjust Enrichment Class under Rules 23(b)(2) and 23(b)(3). Plaintiffs further request that the Court designate them as class representatives, appoint the undersigned as class counsel, and order that notice of this action be provided to the classes.

Dated: June 17, 2022                        Respectfully Submitted:

/s/ Meredith B. Stewart
Meredith B. Stewart*
Rebecca M. Cassler (GA Bar No. 487886)
SOUTHERN POVERTY LAW CENTER
201 Saint Charles Avenue, Suite 2000
New Orleans, LA 70170
Telephone: (504) 486-8982
Facsimile: (504) 486-8947
meredith.stewart@splcenter.org
rebecca.cassler@splcenter.org

Caitlin J. Sandley (GA Bar No. 610130)
Jaqueline Aranda Osorno*
SOUTHERN POVERTY LAW CENTER
400 Washington Ave.
Montgomery, AL 36104
Telephone: (334) 303-6822
Facsimile: (334) 956-8481
cj.sandley@splcenter.org
jackie.aranda@splcenter.org

Vidhi Bamzai*
SOUTHERN POVERTY LAW CENTER
111 East Capitol St., Suite 280
Jackson, MS 39201
Telephone: (601) 948-8882
Facsimile: (601) 948-8885
vidhi.bamzai@splcenter.org

Azadeh Shahshahani
(GA Bar No. 509008)

Alan B. Howard*
John T. Dixon*
Emily B. Cooper*
PERKINS COIE LLP
1155 Avenue of the Americas
22nd Floor
New York, NY 10036-2711
Telephone: (212) 262-6900
Facsimile: (212) 977-1649
AHoward@perkinscoie.com
JohnDixon@perkinscoie.com
ECooper@perkinscoie.com

Jessica L. Everett-Garcia*
John H. Gray*
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
Telephone: (602) 351-8000
Facsimile: (602) 648-7000
jeverettgarcia@perkinscoie.com
jhgray@perkinscoie.com

Jessica Tseng Hasen*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Telephone: (206) 359-3293
Facsimile: (206) 359-9000
jhasen@perkinscoie.com

40

Priyanka Bhatt (GA Bar No. 307315)
PROJECT SOUTH                                  Daniel H. Charest*
9 Gammon Avenue SE                             BURNS CHAREST LLP
Atlanta, GA 30315                              900 Jackson St., Suite 500
Telephone: (404) 622-0602                      Dallas, TX 75202
Facsimile: (404) 622-4137                      Telephone: (469) 904-4550
azadeh@projectsouth.org                        Facsimile: (469) 444-5002
priyanka@projectsouth.org                      dcharest@burnscharest.com

*Admitted pro hac vice

*Attorneys for Plaintiffs*

41