# Exhibit 4

# (REDACTED)

This Exhibit contains the specific pages of the deposition Plaintiffs are referencing. The entire deposition was separately filed in the record pursuant to LR 5.1 and the M.D. Ga. CM/ECF Administrative Procedures Manual.

1

2            IN THE UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF GEORGIA
3                  COLUMBUS DIVISION

4
    WILHEN HILL BARRIENTOS,    )
5   ET AL.,                    )
                               )
6                 Plaintiffs,  )
                               ) CIVIL ACTION NO.
7            v.                )
                               ) 4:18-cv-00070-CDL
8   CORECIVIC, INC.,           )
                               )
9                 Defendant.   )

10

11

12

13

14            DEPOSITION OF BETHANY BRAZIER

15               ATLANTA, GEORGIA

16           THURSDAY, NOVEMBER 18, 2021

17

18               (Reported Remotely)

19

20

21

22

23   REPORTED BY:  TANYA L. VERHOVEN-PAGE,
                   CCR-B-1790
24

25   JOB NO. 201901

1

2          November 18, 2021

3             9:01 a.m.

4

5          Deposition of

6   BETHANY BRAZIER, held in Atlanta,

7   Georgia before Tanya L. Verhoven-Page,

8   Certified Court Reporter and Notary Public

9   of the State of Georgia.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                  APPEARANCES OF COUNSEL

3

4  On behalf of the Plaintiffs:

5        SOUTHERN POVERTY LAW CENTER

6        400 Washington Avenue

7        Montgomery, Alabama 36104

8        BY: CAITLIN SANDLEY, ESQ.

9           MEREDITH STEWART, ESQ.

10          VIDHI BAMZAI, ESQ.

11

12

13  On behalf of the Defendant:

14       STRUCK LOVE BOJANOWSKI & ACEDO

15       3100 West Ray Road

16       Chandler, Arizona 85226

17       BY: DANA KEENE, ESQ.

18

19

20

21

22

23

24

25

1                          B. BRAZIER

2          ATLANTA, GEORGIA; THURSDAY, NOVEMBER 18, 2021

3                          9:01 A.M.

4

5    Thereupon --

6                     BETHANY BRAZIER,

7    called as a witness, having been first duly sworn,

8    was examined and testified as follows:

9

10                          EXAMINATION

11   BY MS. SANDLEY:

12        Q     Good morning, Ms. Brazier.

13        A     Good morning.

14        Q     Could you please state your full name for

15   the record.

16        A     Bethany Leanne Brazier.

17        Q     And did you formerly go by Bethany

18   Norman?

19        A     I did, yes.

20        Q     All right.  Well, we're here this morning

21   to take your deposition.

22              MS. SANDLEY:  First I'm going to

23         ask your attorney, Ms. Keene, can we

24         agree that all objections should be

25         reserved except to form and

```
 1                         B. BRAZIER
 2         A     Not -- other than just sending in
 3   information that was requested.
 4         Q     Again, I don't want to get into the
 5   details, just the when.  Okay.  All right.
 6               Well, Ms. Brazier, who's your current
 7   employer?
 8         A     I work for Mercer University now.
 9         Q     Okay.  What's your job title?
10         A     Associate director of finance and
11   operations.
12         Q     Are you based in Macon?
13         A     No, I'm based in Columbus.
14         Q     Okay.  Great.  And when did you start
15   that job?
16         A     October 13th.
17         Q     Well, we appreciate you being available
18   today.  I know it's hard to make yourself available
19   for a deposition when you just started a new job, so
20   thank you.
21         A     Yes.
22         Q     And you worked for CoreCivic previously,
23   right?
24         A     Yes.
25         Q     What were the dates that you worked for
```

1                          B. BRAZIER

2       CoreCivic?

3            A      I started there in January of 2007 and I

4       left in October of 2021.

5            Q      And what was -- and did you work at

6       Stewart Detention Center?

7            A      Yes.

8            Q      Did you work at any other CoreCivic

9       facility?

10            A      No.

11            Q      What was your job title at Stewart?

12            A      Business manager.

13            Q      And counsel for your former employer,

14       CoreCivic, is representing you today for this

15       deposition, right?

16            A      Yes.

17            Q      What were your job duties as business

18       manager?

19            A      Mostly purchasing, budgeting, accounting,

20       everything.  Buying stuff we needed, like organizing

21       meetings.  Just, you know, general business task.

22            Q      Who was your direct supervisor?

23            A      The warden, which there were several

24       different wardens while I was there.  So whoever the

25       warden was at the time would have been my supervisor.

```
 1                      B. BRAZIER
 2   payment to the County as set forth in the IGSA.
 3              And it goes on to say:  To the extent
 4   allowed under the IGSA, CCA will be designated payee
 5   and funds due pursuant to the IGSA will be paid
 6   directly to CCA.
 7              Do you see that?
 8        A    Yes.
 9        Q    Okay.  Was CoreCivic designated as the
10   payee under this contract?
11              MS. KEENE:  Foundation.
12              You can answer.
13              THE WITNESS:  Okay.  Sorry.
14              MS. KEENE:  If you know.
15              THE WITNESS:  I'm not really sure,
16        to be honest.  There was a bank account
17        that the funds went to -- that ICE sent
18        the money to and then Stewart County sent
19        it to us.  So that's all I know really.
20   BY MS. SANDLEY:
21        Q    Okay.  So ICE sent the money to a bank
22   account?
23        A    Uh-huh.
24        Q    Right?  Did that bank account belong to
25   Stewart County?
```

```
 1                      B. BRAZIER
 2          A      Yes.
 3          Q      And then Stewart County paid CoreCivic?
 4          A      Yes.
 5          Q      When Stewart County paid CoreCivic, did
 6   CoreCivic subtract out its 85 cents per inmate per
 7   day?
 8          A      Yes.
 9          Q      Let's look at Paragraph 6.
10                 During any month in which the average
11   daily population for that month is between one and
12   35, CCA will pay the county an additional sum of
13   $1,700 to cover the County's administrative costs.
14                 Do you recall whether the daily
15   population at Stewart was ever between one and 35
16   detained people?
17          A      Not while I was there, no.
18          Q      But under this agreement, if the daily
19   population at Stewart was 36 people or higher,
20   Stewart County received 85 cents per detained person
21   per day, right?
22                 MS. KEENE:  Foundation.
23                 THE WITNESS:  Yes.
24   BY MS. SANDLEY:
25          Q      And if the population had been 35 people
```

```
 1                    B. BRAZIER
 2         THE WITNESS:  I wasn't the business
 3     manager then, so I don't know.
 4  BY MS. SANDLEY:
 5     Q     Okay.  Was the per diem rate different
 6  when you started as business manager at Stewart?
 7     A     I don't remember.
 8     Q     Generally, the IGSA in its amendment to
 9  modification set a per diem rate, right?
10     A     Yes.
11     Q     And that per diem rate is the amount that
12  ICE pays per detained person per day at Stewart
13  Detention Center, right?
14     A     Yes.
15     Q     And under that CoreCivic, Stewart County
16  agreement we just looked at, Stewart County, at least
17  under the first iteration of that agreement, would
18  subtract out 85 cents per inmate per day from that
19  per diem rate, right?
20     A     Yes.
21     Q     And then the rest would go to CoreCivic?
22     A     Yes.
23         MS. KEENE:  Foundation.
24  BY MS. SANDLEY:
25     Q     And you know that because you were the
```

1                          B. BRAZIER

2    of 45 cents per day, tiered pricing and a guaranteed

3    minimum amount of 1,600 in exchange for the service.

4               What was the supplemental agreement that

5    this is talking about?

6               MS. KEENE:  Foundation.

7               THE WITNESS:  I'm -- I mean, I'm --

8          I don't know.  I guess there was a

9          supplemental agreement attached to this.

10   BY MS. SANDLEY:

11        Q    Can you explain the guaranteed minimum

12   amount of 1,600?

13               MS. KEENE:  Foundation.

14               THE WITNESS:  That would just be

15          the minimum amount we would ever bill for

16          in a month.

17   BY MS. SANDLEY:

18        Q    So after this IGSA modification,

19   CoreCivic billed for at least 1,600 detained people

20   per day, no matter what the population was, correct?

21               MS. KEENE:  Foundation and form.

22               THE WITNESS:  Yes.

23   BY MS. SANDLEY:

24        Q    How many times after this bed minimum was

25   implemented through this IGSA modification did

```
 1                    B. BRAZIER

 2            MS. SANDLEY:  Back on the record.

 3   BY MS. SANDLEY:

 4       Q    Ms. Brazier, we're about to look at some

 5   budget documents and I just wanted to say I'm not a

 6   numbers person like you, so let's -- I want to be

 7   sure that record is clear.  If I get the math wrong

 8   or if I'm misunderstanding, please correct me, okay?

 9       A    Okay.

10       Q    All right.  Do you agree that CoreCivic

11   is a for-profit business?

12       A    Yes.

13       Q    And as a general matter, profits are

14   determined by the amount of the business' revenues

15   minus the business' expenses, right?

16       A    Yes.

17       Q    Do you agree that Stewart is operated to

18   make profits for CoreCivic?

19       A    Yes.

20            MS. KEENE:  Foundation and form.

21   BY MS. SANDLEY:

22       Q    Was it your understanding that CoreCivic

23   wants Stewart to be profitable?

24       A    Yes.

25       Q    Was it your understanding that management
```

```
 1                      B. BRAZIER

 2              MS. KEENE:  Form.

 3              THE WITNESS:  Yes.

 4   BY MS. SANDLEY:

 5         Q     Why are budgets important?

 6         A     Because it keeps you on track, it keeps

 7   you -- I mean, budgeting keeps you -- like, you set

 8   your goals and you know where you're going to go and

 9   how much you're expected to spend, and it let's you

10   know if anything is out of, you know, range.  So

11   it's -- you know, if you're -- that's how you keep up

12   with what you're spending.

13         Q     Did you have a role in setting the budget

14   for Stewart?

15         A     I would receive the budget already from

16   FSC, so I didn't make the budget.  I could request

17   changes to it, but it came to me already prepared.

18         Q     Do you have an understanding of how FSC

19   developed the budget for Stewart?

20         A     For certain parts of it, yes.

21         Q     What was that process?

22         A     It would usually -- the -- for the

23   expense accounts, it would be whatever we had spent

24   over the last 12 months.  Like there would be a per

25   man day expense and they would multiply it out over
```

```
 1                          B. BRAZIER
 2    talking about.  Like, yes, I did send out -- if --
 3    for certain things, like that other departments were
 4    dealing with, like detainee pay, I would send out a
 5    -- you know, showing them where they were for the
 6    month or whatever.
 7                But it just depended on what it was, not
 8    for everything.  And I would -- if we were over
 9    budget, I would let -- you know, I would do
10    explanations for that to our corporate office, but --
11         Q     Did you provide monthly budget reports to
12    FSC?
13         A     No, because they could see -- I mean,
14    they could see it in the system.  They didn't need me
15    to send it.
16         Q     Did FSC ever ask you questions about the
17    budget at Stewart?
18         A     Sometimes, yes.
19         Q     What kind of questions would they ask?
20         A     If something was like really low or
21    really high, they would just ask, hey, is something
22    going on, you know, why is this like this.  But
23    that's about it.  I mean, it wouldn't be -- I can't
24    recall anything specific, but it mostly would just be
25    if something was really out of -- out of the
```

1                              B. BRAZIER

2

1                         B. BRAZIER

2

1                              B. BRAZIER



1                                    B. BRAZIER

1                          B. BRAZIER

1                          B. BRAZIER

1                          B. BRAZIER

1                              B. BRAZIER

1                          B. BRAZIER

1                              B. BRAZIER

1                           B. BRAZIER



```
 1                      B. BRAZIER

 2   the rates were, but the way it -- like, with the

 3   phone cards, when we were with Securus, there was a

 4   five-dollar phone card or like a 20-dollar phone

 5   card, I think.

 6              With the -- when we changed to Telmate,

 7   it was just sold by the dollar.  So you could get one

 8   dollar, two dollar, three dollars, however you

 9   wanted.  Because there wasn't actually a card, it was

10   actually just five dollars or two dollars or three

11   dollars or whatever worth of phone time.

12              That -- I hope I'm explaining that

13   correctly.  I'm sorry if I'm not.

14        Q    No, that's okay.

15              And under the Securus contract, CoreCivic

16   got a commission on the phone time that was sold,

17   correct?

18              MS. KEENE:  Foundation.

19              THE WITNESS:  Right.

20   BY MS. SANDLEY:

21        Q    And that included commission on the phone

22   cards that were sold?

23        A    As I -- as we talked about earlier, I

24   don't know how that commission was calculated.  It

25   all went through FSC.  So I'm not sure like what all
```

1                      B. BRAZIER

2    was taken into consideration when that commission was

3    sent to FSC.  I have no idea.

4         Q     Okay.  Did the detained worker pay budget

5    include phone cards?

6         A     No.

7         Q     We were talking earlier about the

8    batching and pay process for detained workers.

9         A     Uh-huh.

10        Q     Are you -- could you have paid a detained

11   worker for two different jobs done in the same day?

12        A     Yes, it's possible.

13        Q     So there was nothing in OMS that

14   prevented you -- your office from posting pay for a

15   single worker for two different jobs done in the same

16   day?

17        A     No, there would be nothing -- no way for

18   us to even really know unless we went into each

19   individual detainee's account and looked at what they

20   had already been posted for that day, which would --

21   with the number of -- you know, 300 some detainee

22   workers every day, that would be -- just delay pay

23   getting posted.

24              So there really was nothing that would --

25   like they wouldn't flag it or give you an error

```
 1                        B. BRAZIER
```

17          What were -- in your recollection, what
18     were the top selling commissary items at Stewart?
19          A    The ramen noodles were one of the tops.
20     Always the top selling item.  Let's see.  The snack
21     cake, like the honeybuns and the little Danish
22     things, those were big sellers.  The rice, the -- I
23     can't remember, the Velveeta cheesy rice was a big
24     one.  Like the tortilla chips, those were always a
25     big seller.  I'm trying to think.  Popcorn, popcorn

1                              B. BRAZIER

1                              B. BRAZIER

1                              B. BRAZIER

1                              B. BRAZIER

1

2                    D I S C L O S U R E

3

4    STATE OF GEORGIA      )   DEPOSITION OF:

5

6    FULTON COUNTY         )   BETHANY BRAZIER

7

8         Pursuant to Article 8.B of the Rules and
     Regulations of the Board of Court Reporting of the
9    Judicial Council of Georgia, I make the following
     disclosure:
10
          I am a Georgia Certified Court Reporter.  I am
11   here as a representative of TSG Reporting.

12        TSG Reporting was contacted by the offices of
     Southern Poverty Law Center to provide court
13   reporting services for this deposition.  TSG
     Reporting will not be taking this deposition under
14   any contract that is prohibited by O.C.G.A. 15-14-37
     (a) and (b).
15
          TSG Reporting has no contract or agreement to
16   provide court reporting services with any party to
     the case, or any reporter or reporting agency from
17   whom a referral might have been made to cover the
     deposition.
18
          TSG Reporting will charge its usual and
19   customary rates to all parties in the case, and a
     financial discount will not be given to any party in
20   this litigation.

21

22

23        _____
24              Tanya L. Verhoven-Page,
                Certified Court Reporter,
25              B-1790.

1

2                   C E R T I F I C A T E

3

4    STATE OF GEORGIA:

5    FULTON COUNTY:

6

7            I hereby certify that the foregoing

8        deposition was reported, as stated in the

9        caption, and the questions and answers

10       thereto were reduced to written page

11       under my direction, that the preceding

12       pages represent a true and correct

13       transcript of the evidence given by said

14       witness.

15           I further certify that I am not of

16       kin or counsel to the parties in the

17       case, am not in the regular employ of

18       counsel for any of said parties, nor am I

19       in any way financially interested in the

20       result of said case.

21           Dated this 22nd day of November,

22       2021.

23       _____

24       Tanya L. Verhoven-Page,
         Certified Court Reporter,
25       B-1790.