# Exhibit 5

# (REDACTED)

This Exhibit contains the specific pages of the deposition Plaintiffs are referencing. The entire deposition was separately filed in the record pursuant to LR 5.1 and the M.D. Ga. CM/ECF Administrative Procedures Manual.

1

2               IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF GEORGIA
3                      COLUMBUS DIVISION

4          Civil Action File No. 4:18-cv-00070-CDL

5   _____

6   WILHEN HILL BARRIENTOS, et al.,

7               Plaintiffs,

8        vs.

9   CORECIVIC, INC.,

10              Defendant.
    _____

11

12

13

14                REMOTE DEPOSITION OF
                    RUSSELL WASHBURN
15

16                   Lumpkin, Georgia

17           Wednesday, December 1, 2021

18

19

20

21

22

23

24   Court Reporter:  Michelle M. Boudreaux-Phillips, RPR

25                  TSG Job No. 201678

1

2

3

4

5

6                     December 1, 2021

7                     10:01 a.m.

8

9

10      Remote deposition of RUSSELL WASHBURN,

11 conducted at the location of the witness in

12 Lumpkin, Georgia, pursuant to Agreement,

13 before Michelle M. Boudreaux-Phillips, a

14 Registered Professional Reporter in the State

15 of Georgia.

16

17

18

19

20

21

22

23

24

25

1

2                          APPEARANCES

3                          (Via Zoom)

4

5   On behalf of the Plaintiffs:

6         ALAN HOWARD, Esq.
          Perkins Coie LLP
7         1155 Avenue of the Americas
          22nd Floor
8         New York, New York 10036

9

10        CAITLIN SANDLEY, Esq.
          Southern Poverty Law Center
11        400 Washington Avenue
          Montgomery, Alabama 36104
12

13

14  On behalf of the Defendant:

15        JACOB B. LEE, Esq.
          Struck Love Bojanowski & Acedo
16        3100 West Ray Road
          Suite 300
17        Chandler, Arizona 85226

18

19
    Also Present:  Jackie Aranda Osorno, Esq.
20                 Meredith Stewart, Esq.

21

22

23

24

25

```
 1                    RUSSELL WASHBURN

 2       A    Understood.

 3       Q    A question we ask of all witnesses, are you

 4  taking any medication or is there any other reason you

 5  can't give your best testimony today?

 6       A    No, there's no reason.

 7       Q    Terrific.

 8            So you understand you're here to give

 9  testimony on behalf of CoreCivic as CoreCivic's

10  designated witness on a variety of topics relating to a

11  lawsuit filed against CoreCivic in April 2018 relating

12  to detainees at the Stewart Detention Center in a

13  voluntary work program, correct?

14       A    Yes, sir.

15       Q    When did you first learn about the lawsuit

16  itself?

17       A    Let's see.  I arrived in April of 2020,

18  April 1st.  I can't pinpoint the exact date.  It would

19  have been sometime shortly thereafter, but to recall a

20  specific date, I really can't.  I know it probably came

21  by way of a request for documents, but even that, it

22  would be specification.  I suspect that's probably when

23  I became aware, when there was a request for documents

24  pertaining to this specific case

25       Q    And that was after you'd already started as
```

```
 1                    RUSSELL WASHBURN

 2    warden at Stewart in April of 2020?

 3         A    Yes, sir.

 4         Q    Did you have any conversation, as part of the

 5    onboarding process coming in as the warden at Stewart,

 6    with anyone about the lawsuit?

 7         A    No, not prior to the request for documents.

 8         Q    Other than the request for documents, did you

 9    have any conversations -- and I'm not going to ask for

10    content yet -- with anyone about the lawsuit?

11         A    Outside of my lawyers or attorneys?

12         Q    Well, put aside -- outside of your

13    preparation for this deposition, from the time you

14    joined Stewart, you came onboard as warden at Stewart

15    in April of 2020, up until you started preparing for

16    this deposition, did you have any conversations with

17    anyone about the lawsuit?

18         A    Yeah, I was -- I had conversations with the

19    attorneys as they were requesting specific documents,

20    and that conversation would have been more specifically

21    to the types of documents that they were requesting for

22    this lawsuit.

23         Q    Other than the lawyers requesting documents

24    for the lawsuit, did you have any substantive

25    conversations with anyone about the allegations in the
```

1                    RUSSELL WASHBURN

2    Center in April of 2020.  And I hope I --

3         Q     And to whom do you report now as warden of

4    Stewart Detention Center?

5         A     Charles Keeton, K-E-E-T-O-N.  He is the

6    managing director.

7         Q     Managing director for what?

8         A     Our Division II.

9         Q     And what does Division II comprise?

10        A     I believe there's seven facilities -- or six

11   now, six total facilities.

12        Q     Those are all ICE detention centers?

13        A     Yes, I do think that some of them are ICE and

14   house marshals; and one of them, I know for sure, maybe

15   two of them, have a little small county jail attached

16   to them as well.

17        Q     And is Mr. Keeton at the FSC?

18        A     Yes.

19        Q     By the way, just to again complete the

20   record, what is your educational background?  You have

21   a background in corrections?

22        A     Yes.  I went through high school, and then I

23   went through the accredited academy in the state of

24   Florida, so I'm a certified officer in the state of

25   Florida.  Assumed some college credits through that

1          RUSSELL WASHBURN

2    CoreCivic would not enter into a contract with

3    financial terms where you would lose money or break

4    even, correct?

5         A    Not that I'm aware of, no.

6         Q    And what I'd like to know is -- scrolling

7    back -- for the Tier 2, for beds 1601 to 1750, at that

8    bed day rate of 61.85 or net $61, what is the profit

9    margin to CoreCivic from that bed rate?

10        A    At that time -- I don't know what it would

11   have been at that particular period of time.

12        Q    All right, so we'll get to the rates that are

13   in effect now, and I'll be asking the same question.

14             Same thing, for the $40 rate, that tier, do

15   you know what the profit margin is there?

16        A    Yes.  I think it averages about 28 percent.

17        Q    That $40 rate for beds 1751 and above is

18   still in effect today, correct?

19        A    Yes.

20        Q    And you're telling me that at that $40 rate,

21   which is net $39 per detainee per day to CoreCivic, you

22   have a 28 percent profit margin?

23        A    Again, I have not been to that number, just

24   by budget projections, which is established on that

25   1600.  So I'd have to get the budget sheet and then

1                    RUSSELL WASHBURN

2    look at those numbers and how they would adjust.  I can

3    only answer for what the current budget has in place.

4         Q    Okay.  And it would be 28 percent profit

5    margin?

6         A    I believe that's what we're averaging, yes.

7              MR. HOWARD:  Well, let's take a look at

8         the current modification so we can talk in

9         terms of the current numbers.  And if we

10        could pull up STEW0050, the September 2020

11        modification.

12             THE WITNESS:  And I don't need it now,

13        but maybe in the next 15 minutes or so for a

14        restroom break.

15             MR. HOWARD:  Why don't we do it now

16        while she's pulling up the document.

17             THE WITNESS:  I'm good.  I just don't

18        want to interrupt the train of thought, so...

19             (Exhibit 4 marked for identification.)

20        Q    (By Mr. Howard)  All right, so I'm showing

21   you now Exhibit 4.  This is another modification of the

22   ICE contract.  And, again, the date of this is -- I'm

23   sorry, it's not -- up there -- we can scroll down.  I

24   believe it's September 25th, 2020.  Yeah, that's the

25   date it was signed by Joseph Williams.  By the way, do

1                    RUSSELL WASHBURN

2        Q     And those will increase if you can reduce

3   costs or increase revenues, simple accounting?

4        A     Yeah, I think it's simple business.  Yes.

5        Q     Okay.  And as part of the budgeting process,

6   does CoreCivic look to identify areas where it can, you

7   know, improve its bottom line, that is, make more

8   money?

9             MR. LEE:  Object to form.  Beyond the

10            scope.

11            THE WITNESS:  The answer, I mean, for us

12            to -- as a business practice, do we look for

13            opportunities to be able to provide the same

14            level of service without compromising safety

15            and security and still yield a savings, the

16            answer to that question would be yes, but it

17            would not be at the compromise of the safety

18            and security of the facility.

19            MR. HOWARD:  Absolutely.

20        Q     (By Mr. Howard)  And the -- certainly the

21   revenue, at least in this time when you're perpetually

22   below the 1600 minimum, is pretty much tapped, there

23   aren't going to be ways for you to really increase your

24   revenue, correct?

25        A     Yeah, no, not to increase it, that's correct.

                    RUSSELL WASHBURN

1

2       Q     So there would be focus to improve your net

3   earnings on cost items, correct?

4              MR. LEE:  Object to form.  Beyond the

5       scope.

6              THE WITNESS:  Again, I think I -- I

7       mean, kind of the same --

8              MR. HOWARD:  Same answer, right?

9              THE WITNESS:  Yeah, I think -- yeah.

10      Q     (By Mr. Howard)  If you can reduce your costs

11   while maintaining the security and safety and the

12   conditions of the facility, you'll do that because it

13   will mean more money for CoreCivic?

14             MR. LEE:  Object to form, asked and

15      answered, beyond the scope.

16      Q     (By Mr. Howard)  You can answer again.  I'm

17   sorry.

18      A     I'm sorry.  Same answer.  Sorry.

19      Q     Okay.  Now, when you get the budget from FSC,

20   who at CoreCivic, at Stewart, examines the line items

21   to determine "this is too high, this is too low, or

22   maybe we can save money here," does that kind of line

23   item inspection, if anyone?

24      A     We do.  It would be, of course, the business

25   manager here at the facility, the assistant warden,

```
 1                    RUSSELL WASHBURN

 2       Q    Okay.  Let's look at page 5 of this document.

 3            All right, so according to Mr. House's email,

 4  this is the staffing plan proposed by CoreCivic for

 5  Stewart in 2017, and we're going to look at the "Type

 6  of Position" and "Number of Position" columns.  Do you

 7  see those?

 8       A    I do.

 9       Q    Okay.  Do you see the "Detention Officer"

10  row?

11       A    I do, yes, ma'am.

12       Q    Okay.  So in March 2017, CoreCivic, according

13  to this document, proposed 271 detention officers at

14  Stewart?

15       A    Yes, I see that.

16       Q    Do you have any idea how many detention

17  officers were employed at Stewart before 2017?

18       A    Without looking at the records, no.

19       Q    Okay.  And then scrolling down a little bit

20  to "Senior Detention Officer," CoreCivic proposed 18.

21  Do you see that?

22       A    I do, yes, ma'am.

23       Q    Okay.  And then -- we're jumping around, I

24  apologize -- janitors, CoreCivic proposed 0.5.  Do you

25  see that?
```

1                    RUSSELL WASHBURN

2         A    I do, yes, ma'am.

3         Q    And do you read that to mean one half-time

4    janitor?

5         A    Yes, part time.

6         Q    Okay.  Stewart -- is one part-time janitor

7    enough to clean the whole facility of Stewart?

8         A    Again, this is not a typical -- I mean, this

9    is a budgetary review.  It depends on how many days

10   you're covering because that .5, you know, if you're

11   covering seven days a week, you know, for 40 hours,

12   that 0.5 could be more than.

13             I suspect, just based off of this, it's

14   probably one person part time, but -- based on the

15   overall salary, I would suggest that, but we actually

16   have -- the janitor service is really provided for the

17   outside building where ICE -- the construction.  So the

18   janitorial services that are being provided primarily

19   are over in that particular location.  So in that case,

20   yes.

21        Q    Okay.  So the janitors paid by CoreCivic

22   primarily only clean the portion of the facility that

23   is the ICE offices and ICE courtroom; is that right?

24        A    Right, outside of the secured parameters.

25   Now, they do also clean and have been cleaning, since

1              RUSSELL WASHBURN

2    COVID, other areas in addition to, but -- but yes.

3        Q    Prior to COVID, the rest of the facility was

4    cleaned almost entirely by detained workers, right?

5        A    I'm sorry, you broke up.

6        Q    Prior to COVID, the rest of the facility was

7    cleaned almost entirely by detained workers?

8             MR. LEE:  Object to form.

9             THE WITNESS:  No, I would say, I mean,

10        staff -- staff and detainee workers would

11        have been providing that service.  Example, a

12        control room, a detainee is not able to go

13        inside of a control room, so that service

14        would have been provided and cleaned by the

15        actual officers that are assigned.

16             So I won't say exclusively.  There were

17        certainly janitorial services being performed

18        by detainees, but not exclusively.

19             MS. SANDLEY:  Okay.

20        Q    (By Ms. Sandley)  This staffing plan, if you

21    know, is -- is it based on a 1600 population?

22        A    As part of the contract -- again, what is the

23    date on this email?

24             MS. SANDLEY:  Let's look at page 2,

25        Jackie.

```
 1                    RUSSELL WASHBURN

 2          THE WITNESS:  I see the 2017.

 3          MS. SANDLEY:  Yeah.

 4          THE WITNESS:  So I believe the 1600 or

 5      the expansion was in 2016, so I think it's

 6      safe to say that, yes, this would be based

 7      off of a 1600 guarantee.

 8          MS. SANDLEY:  Okay.  And let's go back

 9      to page 5.

10      Q    (By Ms. Sandley)  All right, so looking at

11   "Maintenance," this staffing pattern allows for one

12   maintenance supervisor.  Do you see that?

13      A    Yes, I do.

14      Q    And four maintenance workers?

15      A    I do.

16      Q    Do you see any food-service staff included in

17   this staffing plan?

18      A    No, because they're contracted, so they would

19   be under a separate contract for us.  They would not be

20   on our staffing plan.  They would be through the

21   contract between us and Trinity.

22      Q    Okay.  All right.

23          Do you know if this specific staffing plan

24   was incorporated into the Stewart IGSA?

25      A    Based off of the documents I reviewed in this
```

1                           RUSSELL WASHBURN

2

1                    RUSSELL WASHBURN

2        the higher and greater band, but it's not

3        captured into that per diem rate because the

4        1600 contract is the one that we actually are

5        paid for.

6        Q    (By Ms. Sandley)  Generally, comparing the

7    1600 to 1752 staffing plans, where are the differences?

8    So, for example, are there more detention officers in

9    the 1752?

10       A    There is.  I'd have to go back and look at

11   the number.  That's the biggest variance, is in the

12   detention officers.  And like an example, you saw there

13   was only a maintenance supervisor and four workers.  We

14   have an assistant maintenance supervisor as well that's

15   not captured in there.  So there's a few others, but

16   primarily in security is where you're going to see the

17   big difference.

18       Q    Okay.  And are there more supervisor-level

19   positions in the 1752?

20       A    I believe so in medical.  There might be one

21   additional clinical supervisor that's not captured and

22   maybe even one assistant because we have two assistant

23   HSAs.  I'd have to go back and again look at the

24   staffing pattern, but -- to see if it calls for two or

25   one, but we actually have two.  For some reason, I

1                    RUSSELL WASHBURN

2        Q     Is this form used at Stewart?

3        A     Yes, I believe it is.

4        Q     Okay.  And here it says, "Compensation will

5    be from $1 to $3 per day."

6              Stewart currently pays people up to $4 per

7    day, right?

8        A     Yes, ma'am.  For a few positions, yes.

9        Q     Okay.  So fair to -- has this form been

10   modified over time?

11       A     It does not appear it's been updated.

12       Q     Well, it's possible this is an out-of-date

13   form, so I think I'm asking do you know if there's a

14   more recent form?

15       A     I don't know, but it's equally possible it

16   just hasn't been updated to reflect that new rate.

17       Q     Okay.  This form does not mention the PBNDS

18   limit to one work detail per day, does it?

19       A     It does not.

20       Q     Okay.  And let's take this form down.

21             How -- are detained workers at Stewart

22   informed of how to quit the work program?

23       A     I'm not sure if it's referenced in the

24   detainee handbook or not.  I believe it is, but I'm

25   not -- I can't remember off the top of my head.  I'd

```
 1                    RUSSELL WASHBURN

 2        Q    Okay.  That was my next question.  Can we

 3   call them the PRR for short?

 4        A    Yes, we can.

 5        Q    All right.  And what are the PRR?

 6             MR. LEE:  Object to form.  Exceeds the

 7        scope of the notice.

 8             THE WITNESS:  It's ICE's pandemic

 9        response requirements for the COVID -- due to

10        COVID-19.

11        Q    (By Ms. Sandley)  And there have been several

12   versions of the PRR released since the beginning of the

13   pandemic, correct?

14        A    Yes, ma'am.

15             MR. LEE:  Object to form.  Exceeds the

16        scope.

17        Q    (By Ms. Sandley)  Is Stewart expected to

18   comply with PRR?

19        A    Yes, we are required to comply --

20             MR. LEE:  Object to form.  Exceeds the

21        scope.  Counsel, there's nothing in the

22        notice about the PRR.

23             MS. SANDLEY:  There is something in the

24        notice about ICE policies relating to the

25        work program and policies in effect at
```

1                        RUSSELL WASHBURN

2    "Facilities are encouraged to prohibit or, at a

3    minimum, significantly adopt restricted visitation

4    programs, and to suspend all volunteer work assignments

5    for detainees assigned to food service, and other

6    assignments where applicable."  Do you see that?

7         A    I do see it.

8         Q    Did Stewart suspend all volunteer work

9    assignments for detained people assigned to food

10   service?

11        A    We did not.

12        Q    Did Stewart suspend work assignments for

13   other detained worker assignments at Stewart?

14        A    We did not.

15        Q    Okay.  And then let's go to the next exhibit.

16             (Exhibit 25 marked for identification.)

17        Q    (By Ms. Sandley)  This is actually going to

18   be PRR Version 7.  And while we pull this up, do you

19   know which version of the PRR is currently in effect?

20        A    10/19, the one dated 10/19, I believe.

21        Q    All right.  And this is Exhibit 25.  Let's

22   scroll down so you can see the date.  So this is the

23   10/19/2021 version of the PRR?

24        A    Yes, ma'am.

25        Q    And this is currently in effect at Stewart?

```
 1                      RUSSELL WASHBURN

 2        A     Yes, ma'am.

 3        Q     Okay, let's go to PDF page 37.

 4              Warden, do you see where we've highlighted

 5    it says, "Facilities are required to suspend all

 6    volunteer work program assignments for detainees

 7    assigned to food service and other VWP assignments,

 8    where applicable, that require individuals to interact

 9    with each other at distances of less than six feet.

10    Any detainee participating in a VWP assignment is

11    required to wear appropriate PPE for the position at

12    all times (e.g., disposable gloves, masks, goggles).

13    Detainees in isolation or quarantine may not be

14    assigned to a VWP detail"?

15              Are people -- are detained people at Stewart

16    currently working in the kitchen?

17        A     Yes.

18        Q     Are detained people at Stewart currently

19    working in jobs that require interaction at less than 6

20    feet?

21        A     I mean, I would say at times they're probably

22    less than 6 feet.

23        Q     Who's been doing the barbering at Stewart

24    since April 2020?

25        A     Detainees.
```

Page 236

```
 1                    RUSSELL WASHBURN
 2        Q     And would you agree that barbering requires
 3    interaction at less than 6 feet?
 4        A     Yes.  And I will say, too, that the detainee
 5    barber and the detainee receiving the barbering service
 6    wear applicable and required PPE.
 7        Q     Okay.
 8              MS. SANDLEY:  Let's take this exhibit
 9    down.
10        Q     (By Ms. Sandley)  Is the typical kitchen
11    shift at Stewart between 6 and 10 hours?
12        A     Between 6 a.m. and 10 p.m. or --
13        Q     No, between 6 and 10 hours long.
14        A     As far as the shifts?
15        Q     Uh-huh.
16        A     We don't have any shifts that go into 10
17    hours.
18        Q     How long are shifts in the kitchen typically?
19        A     I think they're scheduled, I believe -- and I
20    have to look back at the schedule -- I believe eight
21    hours.  Certainly less than eight hours.  Eight hours
22    or less.
23        Q     Okay.  And do you know how long kitchen
24    shifts were prior to your time at Stewart?
25        A     Not without looking at the record.
```

1                        RUSSELL WASHBURN

2          down.

3          Q    (By Ms. Sandley)   Warden, are you familiar

4     with the Trinity contract?

5          A    I won't say I'm fluent.   I have seen it, yes,

6     but I won't say I'm fluent.

7          Q    Did you review it in preparing for this

8     deposition?

9          A    Briefly, yeah.

10         Q    The Trinity contract requires CoreCivic to

11    provide a specific number of kitchen workers in the

12    kitchen, correct?

13         A    I believe so, yes.

14         Q    Okay.   And then CoreCivic in turn sets the

15    number of kitchen workers in that Policy 18-100CC that

16    we looked at earlier, correct?

17         A    Yes, ma'am.

18              MR. LEE:   Object to form.

19              THE WITNESS:   Sorry.

20         Q    (By Ms. Sandley)   And does CoreCivic set that

21    number of kitchen workers in Policy 18-100CC to help

22    ensure that it meets the number of kitchen workers it's

23    required to provide under the Trinity contract?

24              MR. LEE:   Object to form.

25              THE WITNESS:   That's factored in.   I

1                    RUSSELL WASHBURN

2          facility to fall to that level.  So I can't

3          answer that question because I wouldn't allow

4          it to get there.

5          Q    (By Ms. Sandley)  And if CoreCivic fell below

6     those cleanliness and sanitation standards that it's

7     required to comply with per its contract, it could be

8     found in violation of its contract, correct?

9          A    That's correct, if it fell below the

10    standard, yes.

11         Q    Okay.  Is there any portion of PBNDS that

12    prohibits CoreCivic staff from performing barbering?

13         A    I don't believe so.

14         Q    Have CoreCivic staff ever barbered at

15    Stewart?

16              MR. LEE:  Object to form.

17              THE WITNESS:  Not since I've been here.

18    I don't recall ever reading of such.

19              MS. SANDLEY:  Okay.

20         Q    (By Ms. Sandley)  CoreCivic has in the past

21    paid detained workers to assist other detained people

22    with disabilities at Stewart, correct?

23         A    I don't know if that's correct or not.  I

24    believe we have a process in place, but I don't know

25    whether we have or -- actually have or have not.  I'd

```
 1                    RUSSELL WASHBURN

 2       Q    Okay.  One of the witnesses in this case

 3  previously testified that the FSC sets detained worker

 4  wages at Stewart.  Is that correct?

 5            MR. LEE:  Object to form.

 6            THE WITNESS:  I don't know where that

 7       came from.  No.

 8            MS. SANDLEY:  Okay.

 9       Q    (By Ms. Sandley)  So that's left up to

10  Stewart staff?

11       A    Correct.  Typically -- I mean, obviously if

12  we're going to increase, I would have a discussion with

13  the managing director, in my case now, Charles Keeton,

14  and that's really more of an FYI, make sure that he

15  understood why we were doing what we were doing and

16  moving that process, but there's no requirement for

17  approval that I'm aware of.

18       Q    Okay.  But if, in the course of that

19  conversation with a managing director, he didn't agree

20  with that, he could tell you not to do it, correct?

21       A    Yeah, I mean, as my supervisor, he certainly

22  could.  I've never experienced that, but he certainly

23  could.

24       Q    Okay.  Are you aware that CoreCivic has in

25  the past provided incentives other than daily pay to
```

1                    RUSSELL WASHBURN

2    detained workers?

3              MR. LEE:  Object to form.

4              THE WITNESS:  Provided in place of or in

5        addition to?

6              MS. SANDLEY:  Let's start with in

7        addition to.

8              THE WITNESS:  Am I aware that that has

9        been provided in the past in addition to,

10        yes.

11              MS. SANDLEY:  Okay.

12        Q    (By Ms. Sandley)  And those other incentives

13    have included extra food?

14        A    Yes.

15        Q    And they've included phone time?

16        A    I was not aware until earlier in the day you

17    said that -- I think it was Mr. Swinton testified

18    during his time, that's what he did, so...

19        Q    And they've included extra video games and

20    movies in the designated worker housing units, correct?

21        A    I would say yes.  I mean, that's pretty

22    standard, yeah, so...

23        Q    And the practice of offering incentives, that

24    you're aware of, applied generally to all the detained

25    workers at Stewart?

```
 1                    RUSSELL WASHBURN

 2   anything that's not applicable to or from the PBNDS

 3   standards.

 4        Q    So PBNDS sets out specific disciplinary

 5   offenses, correct?

 6        A    Correct, yes.

 7        Q    And those are -- are there -- I just want to

 8   be sure I understand your testimony.  You're not aware

 9   of any other rules at Stewart for which people could be

10   disciplined apart from what's in the PBNDS, correct?

11        A    Correct.

12        Q    Okay.  And are the rules at Stewart

13   communicated to detained people?

14        A    Yes.

15        Q    How?

16        A    That is in the detainee handbook.

17        Q    Any other way they're informed about the

18   rules?

19        A    Verbally, you know, through staff during the

20   intake process, the unit team's interactions on a, you

21   know, regular basis with the detainees.  Because part

22   of that process, especially if there's somebody who's

23   limited in English proficiency, of course the handbook

24   is provided in the appropriate language, but through

25   interactions with staff as well.
```

1                    RUSSELL WASHBURN

2        Q    Disciplinary reports -- you referred to those

3   just now -- are those also called write-ups?

4        A    Yeah, disciplinary reports, write-ups, DRs,

5   yes, ma'am.

6        Q    Okay.  And you referred to both restrictive

7   housing and segregation.  Are those terms

8   interchangeable at Stewart?

9        A    Really, restrictive housing is the term that

10  we have.  It's bad habits of segregation, but

11  restrictive housing.

12       Q    People used to call it segregation, right?

13       A    Yes, ma'am.

14       Q    And sometimes people still call it that,

15  right?

16       A    Old habits are hard to kick, but yes.

17       Q    Yeah.

18            Okay.  Stewart has a disciplinary policy,

19  correct?

20       A    Correct.

21       Q    It's Policy 15-100?

22       A    Yes, ma'am.

23       Q    That's a CoreCivic policy?

24       A    Correct.

25       Q    And that policy is created by the FSC?

Page 258

```
 1                    RUSSELL WASHBURN

 2        A     Correct.

 3        Q     And it applies to all CoreCivic staff at

 4   Stewart?

 5        A     It does, yes.

 6        Q     Does CoreCivic have to notify ICE of the

 7   results of disciplinary proceedings?

 8        A     Not the results, no.

 9        Q     Does CoreCivic have to notify ICE if someone

10   is sent to disciplinary segregation?

11        A     Yes.

12        Q     Is that notification to ICE required just

13   once, or is there a periodic notification as long as

14   that person is in segregation?

15        A     We make notification, but they actually

16   participate in the weekly restrictive housing committee

17   reviews.  So they go through every person that's

18   currently residing in restrictive housing, discuss them

19   individually, and then are part of the discussion about

20   what's the appropriate method for either releasing the

21   person, continuing them in restrictive housing, as well

22   as mental health is involved with that committee as

23   well.  So we're evaluating them exclusively not only

24   for security side, but the medical side, and having ICE

25   involved in that conversation, and that happens every
```

```
1                    RUSSELL WASHBURN

2        training.  And, like I said, it's a highlight

3        of the curriculum, the policies, and the

4        standards, but not specific to every

5        scenario, no.

6             MS. SANDLEY:  Okay.

7        Q    (By Ms. Sandley)  And CoreCivic staff are

8    expected to implement the discipline policy uniformly

9    across the facility, right?

10       A    That's correct.

11       Q    And as far as CoreCivic knows, that's what's

12   happening at Stewart; is that right?

13       A    That's correct.
```

11      this exhibit down.

12          Q    (By Ms. Sandley)  Are you aware that there

13   have been instances at Stewart when detained people

14   were disciplined for refusing to work?

15              MR. LEE:  Object to form.

16              THE WITNESS:  In what period of time?

17              MS. SANDLEY:  During the relevant period

18      for this case.

19              THE WITNESS:  Without seeing the

20      document, no.

21          Q    (By Ms. Sandley)  You're not aware?

22          A    No.

23          Q    Okay.  Are you aware that people detained at

24   Stewart have been disciplined for asking for the pay

25   they were promised?

1                    RUSSELL WASHBURN

2    the number of quarantine pods, cohort pods, and the

3    requirement to keep everybody separated and still

4    access those yards.

5         Q    Before COVID, would two hours per day of

6    recreation time five days a week have been less than

7    what is offered in general population?

8         A    Yes, it would have been less than.

9         Q    Okay.  And the property that people detained

10   in segregation are allowed to have is limited, correct?

11        A    For disciplinary, yes.  For administrative,

12   no.

13        Q    The items people in segregation can purchase

14   in commissary are limited, correct?

15        A    Again, for administrative, I don't believe

16   so.  Disciplinary, yes, but not for administrative.

17        Q    And phone access in segregation is limited,

18   correct?

19        A    For disciplinary.

20        Q    Okay, so it's less than what they would have

21   in the general population, correct?

22        A    Correct.

23        Q    And what is law library access in segregation

24   like at Stewart?

25        A    Well, we have a law library in restrictive

1

2                    C E R T I F I C A T E

3

4    STATE OF GEORGIA

5    COUNTY OF COBB

6

7         I, MICHELLE M. BOUDREAUX-PHILLIPS, do hereby

8    certify that RUSSELL WASHBURN, the witness whose

9    deposition is hereinbefore set forth, was duly sworn by

10   me and that such deposition is a true record of the

11   testimony given by such witness.

12

13        I further certify that I am not related to

14   any of the parties to this action by blood or marriage

15   and that I am in no way interested in the outcome of

16   this matter.

17

18        IN WITNESS WHEREOF, I have hereunto set my

19   hand this 13th day of December 2021.

20

21   _____

        MICHELLE M. BOUDREAUX-PHILLIPS, RPR

22

23

24

25