# Exhibit 6

(REDACTED)

This Exhibit contains the specific pages of the deposition Plaintiffs are referencing. The entire deposition was separately filed in the record pursuant to LR 5.1 and the M.D. Ga. CM/ECF Administrative Procedures Manual.

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF GEORGIA

COLUMBUS DIVISION

---------------------------------)
WILHEN HILL BARRIENTOS, et al., )
)
Plaintiff, )
) CASE NO. 4:18-cv-00070-CDL
v. )
)
CORECIVIC, INC., )
)
Defendant. )
---------------------------------)

REMOTE VIDEOCONFERENCE DEPOSITION OF

MICHAEL SWINTON

Tuesday, November 2, 2021

10:00 a.m.

Reported by: Goldy Gold, RPR

Job No. 201429

Date: November 2, 2021

Time: 10:00 a.m.

REMOTE DEPOSITION OF MICHAEL SWINTON, taken by Counsel for Plaintiffs, in the above-titled matter, on November 2, 2021, commencing at 10:00 a.m., and reported by Goldy Gold, a Registered Professional Reporter and a Notary Public within and for the State of Maryland.

A P P E A R A N C E S (appearing via Zoom):

On Behalf of the Plaintiffs:

BY: ALAN HOWARD, ESQUIRE
PERKINS COIE
1155 Avenue of the Americas
New York, New York 10036

On Behalf of the Defendant:

BY: JACOB LEE, ESQUIRE
STRUCK LOVE BOJANOWSKI & ACEDO
3100 West Way Road
Chandler, Arizona 85226

ALSO PRESENT (appearing via Zoom):

Jackie Aranda, Esq.
Caitlin Sandley, Esq.
Rebecca Cassler
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, Alabama, 36104

we maintain the operations of getting folks from point A to point B. Security and safety.

Q. Now, to whom do you report?

A. I report to Kirk Sullivan. He's the president of the company.

Q. Am I correct that TransCor has employees on location at various facilities? For example, including Stewart?

A. Yes, sir.

Q. And do those people on location report to you or to someone who, in turn, reports to you?

A. They report to a supervisor on site, and then that supervisor has a director over them, and then the directors report to me.

Q. When did you start at TransCor?

A. November 2012.

Q. And what was your position just before starting at TransCor?

A. I was a warden at Stewart.

Q. When you moved from being the warden at Stewart to TransCor in November 2012, did you physically leave Georgia and go to Nashville or somewhere else?

MICHAEL SWINTON

A. Yes. I -- I left Georgia to go to Nashville.

Q. So you were warden at Stewart until November 2012. When did you start as warden at Stewart?

A. I first started at Stewart in April of 2007 as the assistant warden. And then I was promoted to warden -- I want to say October 2008 timeframe, give or take.

Q. And then you remained warden for that entire period, roughly 2008 until November 2012, when you left to TransCor?

A. Yes.

Q. How did your responsibilities change from the time you get promoted from assistant warden to warden of SDC?

A. Well, as assistant warden, you're involved in the various areas that you may either be on the security side of the house or the program side of the house, and your -- your focus is in that area as an assistant warden. When you're as a warden, you know, you're looking at the big picture, the overall operations of the facility, secure and safe operations.

So I guess your -- your overall view is larger versus -- as an assistant warden, you're focused in one area.

Q. I missed what you said, the last sentence. Were you saying security and operational?

A. No. It was a -- there's a security and a program side of the house. Operations and security is one and the same for me.

Q. Okay. Which one were you overseeing as assistant warden?

A. I want to say when I first came aboard, I was on the program side of the house, and then I went into probably security for a little bit before I got promoted up. And I can't remember the exact dates on that.

Q. And what's involved in the program side of the house?

A. The unit management program, work program, you know, safety program, religious program.

Q. So all of that was under your watch as assistant warden?

A. Yes.

A. Yes, sir. I believe so, yes.

Q. Do you know what the design capacity was for Stewart Detention Center?

A. Not off the top of my head, no.

Q. If the CoreCivic 2011 annual report were to state that the Stewart Detention Center had a design capacity of 1,752 detainees, would you have any reason to disagree with that?

A. If that's what they have in their paperwork, no. No.

Q. All right. I'm happy to show that to you if you want to see it.

My question would be, as a practical matter, if you have a detainee capacity for a facility that's 1,752, how were you able to house 1,924 detainees?

MR. LEE: Form and foundation.

THE WITNESS: It was authorized to do that, and I would say ICE would be involved in that -- that determination as well.

BY MR. HOWARD:

Q. Well, first of all, before we get into the process for getting approvals or whatnot

dollar per day, what other incentives do you recall being provided to workers -- to detainees to participate in the work program while you were warden?

A. I'm trying to think. I know at one time there might have been special occasions where phone cards were given out, and I can't think if there's anything else, other stuff given out, like -- I don't know. Maybe popcorn machine or something in the unit or something like that, or that might have just been for the unit. I can't remember, sir.

Q. When you say phone cards, you're talking about cards with an amount of phone time or money applicable to phone time put on the card, so that the detainees could -- I guess basically their phone calls to loved ones paid for?

A. Yes.

Q. And there were times when workers were given these phone cards as incentive to work?

A. Yes, sir.

Q. Do you recall whether any

detainees -- for example, those who work in the kitchen -- were given extra food as an incentive to work?

A. There may have been times, yes, sir.

Q. And was it the case as a general rule that detainees were provided whatever food was given to them at each meal, and they were not allowed to go up and get seconds, for example?

A. Are you talking about workers?

Q. No, I'm talking about general population.

A. Oh. Yeah. No, sir, they wasn't authorized. No, sir.

Q. They were not authorized to get seconds, is what you're saying?

A. Yes, sir.

Q. They get to go through the line once, and whatever food is put on their tray, that's what they got to eat?

A. Yes, sir.

Q. Who made that policy?

MR. LEE: Foundation.

THE WITNESS: I don't know, sir.

That's the way it was when I was there. I

MICHAEL SWINTON

[redacted]

see this back-and-forth that there's discussion about -- hold on. Stop there.

There's a follow-up inquiry about the two rolls of toilet paper from -- if you scroll up to the name -- Kelly Stressinger.

Do you know who that was?

A. No recollection, sir.

Q. Okay. If we keep going up, I think you'll find that CoreCivic was saying that, you know -- here, stop there -- from you, there's the information on the last two bullet points, issued one roll during intake, and then issued as needed at unit, no cost to detainee.

Do you recall why CoreCivic was only giving one roll of toilet paper when the government was suggesting two rolls of toilet paper given to ICE detainees?

MR. LEE: Form and foundation.

THE WITNESS: No, sir.

BY MR. HOWARD:

Q. I mean, to me. It would seem to be just a cost issue. But as the warden, was there any other consideration, other than cost, as to why you might not want to give your detainees at

MICHAEL SWINTON

Stewart two rolls of toilet paper instead of one?

MR. LEE: Object to form.

THE WITNESS: No, sir.

[redacted]

administrative segregation is people who are pending investigation or hearing of prohibited acts.

Do you see that?

A. Yes, sir.

Q. So I think I'd asked you about this earlier and then said we'd come back to it when we start talking about segregation. But is it consistent with your recollection that detainees suspected of engaging in prohibited acts, pending an investigation and even a hearing about whether they actually engaged in those prohibited acts, could be placed in administrative segregation?

A. Yes, sir. Situation-dependent, yes, sir.

Q. And other than the reason for being put in segregation, was there any functional difference, as far as the conditions for the detainee, between administrative segregation and disciplinary segregation?

A. I cannot recall what the differences are now, sir.

Q. Or if there were any?

A. I'm sure there were some

CERTIFICATE OF REPORTER/NOTARY PUBLIC

I, Goldy Gold, a Notary Public within and for the State of Maryland, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to the law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor in any way interested in the outcome of this action.

As witness my hand and notarial seal this 15th day of November, 2021.

Goldy Gold

GOLDY GOLD, RPR
Notary Public

My Commission Expires: April 24, 2025