# Exhibit 13



# Performance-Based National Detention Standards 2011



U.S. Immigration
and Customs
Enforcement

CCBVA0000003317

# Preface

In keeping with our commitment to transform the immigration detention system, U.S. Immigration and Customs Enforcement (ICE) has revised its detention standards. These new standards, known as the Performance-Based National Detention Standards 2011 (PBNDS 2011), are an important step in detention reform.

ICE is charged with removing aliens who lack lawful status in the United States and focuses its resources on removing criminals, recent border entrants, immigration fugitives, and recidivists. Detention is an important and necessary part of immigration enforcement. Because ICE exercises significant authority when it detains people, ICE must do so in the most humane manner possible with a focus on providing sound conditions and care. ICE detains people for no purpose other than to secure their presence both for immigration proceedings and their removal, with a special focus on those who represent a risk to public safety, or for whom detention is mandatory by law.

The PBNDS 2011 reflect ICE's ongoing effort to tailor the conditions of immigration detention to its unique purpose. The PBNDS 2011 are crafted to improve medical and mental health services, increase access to legal services and religious opportunities, improve communication with detainees with no or limited English proficiency, improve the process for reporting and responding to complaints, and increase recreation and visitation.

The PBNDS 2011 are also drafted to include a range of compliance, from minimal to optimal. As such, these standards can be implemented widely, while also forecasting our new direction and laying the groundwork for future changes.

In closing, I would like to thank the ICE employees and stakeholders who provided significant input and dedicated many hours to revising these standards. I appreciate the collaboration and support in this important mission - reforming the immigration detention system to ensure it comports with our national expectations. The PBNDS 2011 are an important step in a multiyear process and I look forward to continued collaboration within ICE, with state and local governments, nongovernmental organizations, Congress, and all of our stakeholders as we move forward in reforming our detention system.

John Morton
Director

CCBVA0000003318

# Table of Contents

1. SAFETY ......................................... 1
1.1 Emergency Plans.......................................1
1.2 Environmental Health and Safety ............................. 20
1.3 Transportation (by Land) ........................... 38
2. SECURITY ....................................... 51
2.1 Admission and Release ................................. 51
2.2 Custody Classification System.................................... 62
2.3 Contraband.......................................... 80
2.4 Facility Security and Control ............................. 84
2.5 Funds and Personal Property.................................... 94
2.6 Hold Rooms in Detention Facilities ....................... 104
2.7 Key and Lock Control .................................. 109
2.8 Population Counts ................................... 117
2.9 Post Orders............................................ 121
2.10 Searches of Detainees................................. 124
2.11 Sexual Abuse and Assault Prevention and
Intervention ....................................... 134
2.12 Special Management Units ........................... 181
2.13 Staff-Detainee Communication.................................. 199
2.14 Tool Control.......................................... 203
2.15 Use of Force and Restraints .......................... 211
3. ORDER .......................................... 226
3.1 Disciplinary System.................................... 226
4. CARE ............................................ 241
4.1 Food Service ......................................... 241
4.2 Hunger Strikes ....................................... 268
4.3 Medical Care.......................................... 272

4.4 Medical Care (Women)............................................ 322
4.5 Personal Hygiene ......................................... 327
4.6 Significant Self-harm and Suicide Prevention and
Intervention ........................................... 331
4.7 Terminal Illness, Advance Directives and Death .....338
4.8 Disability Identification, Assessment, and
Accommodation ......................................... 344
5. ACTIVITIES........................................ 358
5.1 Correspondence and Other Mail............................ 358
5.2 Trips for Non-Medical Emergencies ....................... 365
5.3 Marriage Requests .......................................... 368
5.4 Recreation ................................................ 371
5.5 Religious Practices ........................................ 376
5.6 Telephone Access .......................................... 386
5.7 Visitation ................................................. 393
5.8 Voluntary Work Program...................................... 407
6. JUSTICE.......................................... 412
6.1 Detainee Handbook.......................................... 412
6.2 Grievance System .......................................... 416
6.3 Law Libraries and Legal Materials.......................... 424
6.4 Legal Rights Group Presentations .......................... 438
7. ADMINISTRATION AND MANAGEMENT .........445
7.1 Detention Files .......................................... 445
7.2 Interview and Tours .......................................... 449
7.3 Staff Training ............................................. 457
7.4 Detainee Transfers .......................................... 461
7.5 Definitions................................................. 468

CCBVA0000003319

# Acronyms and Abbreviations

AFOD: Assistant Field Office Director

BIA: DOJ Board of Immigration Appeals

CBP: DHS Customs and Border Protection

CD: Clinical Director

CDC: Center for Disease Control, Department of Health and Human Services

CDF: Contract Detention Facility

CMA: Clinical Medical Authority

COR: Contracting Officer's Representative

CRCL: DHS Civil Rights and Civil Liberties

DHS: Department of Homeland Security

DOJ: Department of Justice

DRIL: ICE ERO Detention and Reporting Information Line

DSCU: ICE ERO Detention Standards Compliance Unit

EOIR: DOJ Executive Office for Immigration Review

ERO: ICE Enforcement and Removal Operations

FOD: Field Office Director

FSA: Food Service Administrator

GAB: Grievance Appeals Board

GO: Grievance Officer

HSA: Health Services Administrator

IAO: ICE Air Operations

IDP: Institution Disciplinary Panel

IGSA: Intergovernmental Service Agreement

IHSC: ICE Health Services Corps

JIC: DHS Joint Intake Center

LEP: Limited English Proficiency

LOP: Legal Orientation Program

LPR: Legal Permanent Resident

MDR: Multi-Drug Resistant

MOU: Memorandum of Understanding

MSDS: Material Safety Data Sheet

NCCHC: National Commission on Correctional Health Care

NCIC: National Crime Information Center, Federal Bureau of Investigation

NIC: DOJ National Institute of Corrections

OIC: Officer in Charge

OIG: DHS Office of the Inspector General

OPLA: ICE Office of the Principal Legal Advisor

OPR: ICE Office of Professional Responsibility

ORR: Office of Refugee Resettlement, Department of Health and Human Services

OSHA: Occupational Safety and Health Administration, Department of Labor

PBNDS: Performance-Based National Detention Standards

PII: Personally Identifiable Information

PREA: Prison Rape Elimination Act

SAFE: Sexual Assault Forensic Examiner

SANE: Sexual Assault Nurse Examiner

SART: Sexual Assault Response Team

SIR: Significant Incident Report

SMI: Serious Mental Illness

SMU: Special Management Unit

SPC: Service Processing Center

SRT: Situation Response Team

SRT: Special Response Team

CCBVA0000003320

# 1.2 Environmental Health and Safety

## I. Purpose and Scope

This detention standard protects detainees, staff, volunteers and contractors from injury and illness by maintaining high facility standards of cleanliness and sanitation, safe work practices and control of hazardous substances and equipment.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Facility cleanliness and sanitation shall be maintained at the highest level.

2. Compliance with all applicable federal, state and local safety and sanitation laws shall be ensured by documented internal and external inspections, and by corrective action when indicated.

3. Compliance with all applicable fire safety codes

and fire safety performance requirements for facility furnishings shall be ensured.

4. Flammable, poisonous, toxic and caustic materials shall be controlled and used in a safe manner.

5. Compliance with fire prevention regulations, inspection requirements and other practices, including periodic fire drills, shall ensure the safety of detainees, staff and visitors.

6. Staff shall be knowledgeable about procedures and responsibilities during emergency situations, including those that require evacuation, in accordance with a written plan and with training at least annually.

7. The facility shall have a written plan for immediate release of detainees from locked areas, and provisions for a back-up system.

8. A sufficient number of properly positioned emergency exits, clear from obstruction, shall be distinctly and permanently marked.

9. Plans shall include procedures for assisting detainees with special needs during an emergency or evacuation.

10. Preventive maintenance and regular inspections shall be performed to ensure timely emergency repairs or replacement and to prevent dangerous and life-threatening situations.

11. Potential disease transfer shall be minimized through proper sanitization of barbering equipment and supplies.

12. Pests and vermin shall be controlled and eliminated.

13. Safe, potable water shall be available throughout the facility.

14. Emergency lighting and life-sustaining equipment shall be maintained and periodically tested.

15. Disposal of garbage and hazardous waste shall be in compliance with applicable government

CCBVA0000003339

16. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Environmental Health and Safety" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-1A-01, 1A-02, 1A-03, 1A-07, 1A-14, 1A-15, 1A-16, 1A-17, 1A-18, 1A-19, 1A-20,1C-01, 1C-02, 1C-03, 1C-04, 1C-05, IC-07, 1C-08, 1C-09, 1C-10, 1C-11, 1C-12, 1C-13, 1C-14, 1C-15, 4B-07, 4C-18.

Occupational Safety and Health Administration

(OSHA) Regulations.

NFPA Standards.

U.S. Public Health Service Report on Carcinogens.

## V. Expected Practices

### A. Environmental Health and Safety

#### 1. General Environmental Health

Environmental health conditions shall be maintained at a level that meets recognized standards of hygiene, including those from the:

a. American Correctional Association;

b. Occupational Safety and Health Administration;

c. Environmental Protection Agency;

d. Food and Drug Administration;

e. National Fire Protection Association's Life Safety Code; and

f. National Center for Disease Control and Prevention.

The facility administrator designee for environmental health is responsible for developing and implementing policies, procedures and guidelines for the environmental health program that are intended to identify and eliminate or control as necessary, sources of injuries and modes of transmission of agents or vectors of communicable diseases.

The facility administrator designee shall:

a. conduct special safety investigations and comprehensive surveys of environmental health conditions; and

b. provide advisory, consultative, inspection and training services regarding environmental health conditions.

For the medical clinic, the health services administrator or equivalent is responsible for:

a. implementing a program that assists in

CCBVA0000003340

maintaining a high level of environmental sanitation; and

b.  providing recommendations to the facility administrator concerning environmental health conditions, in consultation with the environmental health designee.

## 2. Staff and Detainee Safety

The facility administrator shall ensure that adequate provisions are made for staff and detainee safety, in accordance with these detention standards and applicable law. Standard "7.3 Staff Training" further addresses employee training-related issues. Standard "5.8 Voluntary Work Program" addresses detainee training issues for workers. Detainees shall receive safety instruction as necessary for living area-related assignments, such as working with cleaning products to clean general use areas.

Detainee living area safety shall be emphasized to staff and detainees to include providing, as noted in the standards, a housekeeping plan. For example, when there are safety concerns with a detainee sleeping in a top bunk that is not along a wall and that has no bed rail, accommodations shall be made to ensure safety. (Because of the potential safety risk they pose, bed rails are not common in detention settings except for medical housing units.) In locations where ladders are unavailable, alternate accommodations, such as the use of bottom bunks or the addition of a ladder or step, shall be made for detainees on a case-by-case basis. Detainees who have medical or physical problems that may be aggravated by sleeping on a top bunk shall be referred to the medical unit for consideration of a lower bunk permit.

## 3. General Housekeeping

The facility administrator shall ensure that staff and detainees maintain a high standard of facility sanitation and general cleanliness. When possible, the use of non-toxic cleaning supplies is recommended.

a.  All horizontal surfaces shall be dampdusted daily

with an approved germicidal solution used according to the manufacturer's directions.

b.  Windows, window frames and windowsills shall be cleaned on a weekly schedule.

c.  Furniture and fixtures shall be cleaned daily.

d.  Floors shall be mopped daily and when soiled, using the double-bucket mopping technique and with a hospital disinfectant-detergent solution mixed according to the manufacturer's directions.

e.  A clean mop head shall be used each time the floors are mopped.

f.  Waste containers shall weigh less than 50 lbs., be non-porous and lined with plastic bags; the liner shall be changed daily.

g.  Waste containers shall be washed weekly at a minimum, or as needed when they become soiled.

h.  Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.

## 4. Pests and Vermin

The facility administrator shall contract with licensed pest-control professionals to perform monthly inspections to identify and eradicate rodents, insects and other vermin. The contract shall include a preventive spraying program for indigenous insects and a provision for callback services as necessary. Doors to the outside should be tight fitting and door sweeps should be installed to prevent the entry of vermin from outside.

## 5. Certification of Facility Water Supply

At least annually, a state laboratory shall test samples of drinking and wastewater to ensure compliance with applicable standards. A copy of the testing and safety certification shall be maintained on site.

## 6. Emergency Electrical Power Generator

At least every two weeks, emergency power generators shall be tested for one hour, and the oil,

CCBVA0000003341

water, hoses and belts of these generators shall be inspected for mechanical readiness to perform in an emergency situation.

Power generators are to be inspected weekly and load-tested quarterly at a minimum, or in accordance with the manufacturer's recommendations and instruction manual. Technicians shall check starting battery voltage, generator voltage and amperage output at a minimum, and shall perform all other necessary checks as well.

Other emergency equipment and systems shall be tested quarterly, and all necessary follow-up repairs or replacement shall be performed as soon as feasible.

### 7. Garbage and Refuse

a. Garbage and refuse includes all trash, rubbish and other putrescible and non-putrescible solid waste, except the solid and liquid waste discharged into the sanitary sewer system of the facility.

b. Garbage and refuse shall be collected and removed from common areas at least daily to maintain sanitary conditions and to avoid creating health hazards.

c. Facilities shall comply with all federal, state and local environmental regulations and requirements governing methods for handling and disposing of refuse.

### B. Hazardous Materials

Every facility shall establish a system for storing, issuing, using and maintaining inventories of and accountability for hazardous materials. The facility program shall be supervised by an individual trained in accordance with OSHA standards. The effectiveness of any such system depends not only on written policies, procedures and precautions, but also on adequate supervision and responsible behavior of staff and detainees, including following instructions precisely, taking prescribed precautions

and using safety equipment properly.

A list of common flammable, toxic and caustic substances is included at the end of this detention standard as "Appendix 1.2.A: Common Flammable, Toxic and Caustic Substances."

### 1. Personal Responsibility

Every individual who uses a hazardous substance must:

a. be trained in accordance with OSHA standards;

b. be knowledgeable about and follow all prescribed precautions;

c. wear personal protective equipment when indicated; and

d. promptly report hazards or spills to the designated authority.

### 2. Protective Equipment

a. Protective eye, face, and other appropriate equipment (such as footwear, gloves, gowns, and/or aprons) is required where there is a reasonable probability of injury preventable by such equipment. Areas of the facility where such injuries can occur shall be conspicuously marked with eye-hazard warning signs.

b. Eyewash stations that meet OSHA standards shall be installed in designated areas throughout the facility, and all employees and detainees in those areas shall be instructed in their use.

### 3. Inventories

Every area shall maintain a current inventory of the hazardous substances (e.g., flammable, toxic or caustic) used and stored there. Inventory records shall be maintained separately for each substance. Entries for each shall be logged on a separate card (or equivalent), and filed alphabetically by substance. The entries shall contain relevant data, including purchase dates and quantities, use dates and quantities and quantities on hand.

### 4. Material Safety Data Sheet Files

CCBVA0000003342

a. Every department or other area of the facility using hazardous substances shall maintain a file of Material Safety Data Sheets (MSDS) that includes a list of the locations where hazardous substances are stored, along with a diagram and legend of these locations. Designated staff from each department or area shall provide a copy of each file to the maintenance supervisor.

b. MSDS are produced by manufacturers and provide vital information on individual hazardous substances, including instructions on safe handling, storage and disposal; prohibited interactions; etc.

c. Staff and detainees shall have ready and continuous access to the MSDS for the substances with which they are working. Staff and detainees who do not read English shall not be authorized to work with these materials.

d. Because changes in MSDS occur often and without notice, staff must:

   1) review the latest issuance from the manufacturers of the relevant substances;

   2) update the MSDS files as necessary; and

   3) forward any changes to the maintenance supervisor, so that the copy is kept current.

5. Master Index

The maintenance supervisor or facility administrator designee shall compile:

a. a master index of all hazardous substances in the facility and their locations;

b. a master file of MSDS; and

c. a comprehensive, up-to-date list of emergency phone numbers (e.g., fire department, poison control center, etc.).

The maintenance supervisor shall maintain this information in the safety office (or equivalent) and ensure that a copy is sent to the local fire department.

6. General Guidelines Regarding Hazardous Substances

a. Issuance
Flammable, caustic and toxic substances (hazardous substances) shall be issued (i.e., drawn from supply points to canisters or dispensed) only under the supervision of the designated officer.

b. Amounts
Hazardous substances shall be issued in single-day increments (the amount needed for one day's work).

c. Supervision
Qualified staff shall closely monitor detainees working with hazardous substances.

d. Accountability
Inventory records for a hazardous substance must be kept current before, during and after each use.

7. Flammable and Combustible Liquids

a. As required by the Federal Hazardous Substances Labeling Act, any liquid or aerosol labeled "flammable" or "combustible" must be stored and used as prescribed on the label.

b. Lighting fixtures and electrical equipment installed in flammable liquid storage rooms must meet National Electrical Code requirements in hazardous locations.

c. Every hazardous material storage room shall:

   1) be of fire-resistant construction and properly secured;

   2) have self-closing fire doors at each opening;

   3) be constructed with either a four-inch sill or a four-inch depressed floor; and

   4) have a ventilation system (mechanical or gravity flow), which provides at least six air changes per hour, within 12 inches of the floor.

d. Every storage cabinet shall:

CCBVA0000003343

1) be constructed according to the applicable code and securely locked at all times;

2) be clear of open passageways, stairways and other emergency exit areas;

3) be conspicuously labeled: "Flammable—Keep Fire Away"; and

4) contain not more than 60 gallons of Class I or Class II liquids, or more than 120 gallons of Class III liquids.

e. Storage rooms and cabinets may be entered only under secure conditions and under the supervision of authorized staff.

f. Any portable container that is not the original shipping container must be designated as an approved safety canister, and must be listed or labeled by a nationally recognized testing laboratory. Each container shall bear a legible label that identifies its contents.

g. Excess liquids shall remain in original containers, tightly closed, in the storage room or cabinet.

h. The MSDS shall govern use of particular flammable or combustible liquids.

i. Only authorized staff may dispense flammable and combustible liquids, using acceptable methods for drawing from or transferring these liquids.

j. Drawing from or transferring any of these liquids into containers indoors is prohibited except:

1) through a closed piping system;

2) from a safety can;

3) by a device drawing through the top; or

4) by gravity, through an approved self-closing system.

An approved grounding and bonding system must be used when liquids are dispensed from drums.

k. Without exception, cleaning liquids must have a flash point at or above 100º F (e.g., Stoddard solvents, kerosene). Cleaning operations must be in an approved parts-cleaner or dip tank, fitted with a fusible link lid with a 160 degree F melting-temperature link.

l. Staff shall follow MSDS directions:

1) when disposing of excess flammable or combustible liquids; or

2) after a chemical spill.

8. Toxic and Caustic Substances

a. All toxic and caustic materials must be stored in secure areas, in their original containers, with the manufacturer's label intact on each container.

b. Only authorized staff shall draw/dispense these substances, in accordance with the applicable MSDS.

c. Staff shall either return unused amounts to the original container(s) or, under certain circumstances, to another suitable, clearly labeled container within the storage area.

d. MSDS directions shall determine the disposal and spill procedures for toxic and caustic materials used in the facility.

9. Poisonous Substances

Poisonous substances or chemicals (e.g., methyl alcohol, sulfuric acid, muriatic acid, caustic soda or tannic acid, etc.) pose a very high (Class I) caustic hazard due to their toxicity.

Methyl alcohol, variously referred to as wood alcohol and methanol, is commonly found in industrial applications (e.g., shellac thinner, paint solvent, duplicating fluid, solvents for leather cements and dyes, flushing fluid for hydraulic brake systems).

a. If ingested, methyl alcohol can cause permanent blindness or death.

b. Staff must directly supervise the use of any product containing methyl alcohol. Products that

CCBVA0000003344

contain methyl alcohol in highly diluted amounts (e.g., shoe dye) may be issued to detainees, but only in the smallest workable quantities.

c.  Immediate medical attention is vital any time methyl alcohol poisoning is suspected.

### 10. Other Toxic Substances

a.  Permanent antifreeze containing ethylene glycol shall be stored in a locked area and dispensed only by authorized staff.

b.  Typewriter cleaner containing carbon tetrachloride or trichlorochane shall be dispensed in small quantities and used under direct staff supervision.

c.  Cleaning fluids containing carbon tetrachloride or tetrachloride or trichlorochane shall be strictly controlled.

d.  Glues of every type may contain hazardous chemicals. Toxic glues must be stored in a locked location, for use only by authorized staff. When use of a nontoxic product is not possible, staff must closely supervise all stages of handling.

e.  The use of dyes and cements for leather requires close supervision. Nonflammable types shall be used whenever possible.

f.  Ethyl alcohol, isopropyl alcohol and other antiseptic products shall be stored and used only in the medical department and only under close supervision. To the extent practical, such chemicals shall be diluted and issued in small quantities to prevent any injuries or lethal accumulation.

g.  Pesticides not currently approved by the Environmental Protection Agency, such as DDT and 1080 (sodium fluoroacetate) are prohibited. The maintenance supervisor is responsible for purchasing, storing (in a locked area) and dispensing all pesticides used in the facility.

h.  The maintenance supervisor or other staff members responsible for herbicides must hold a current state license as a certified private applicator. Persons applying herbicides must wear proper clothing and protective gear.

i.  Lyes may be used only in dye solutions and only under the direct supervision of staff.

### 11. Labeling of Chemicals, Solvents and Other Hazardous Materials

The facility administrator shall individually assign the following responsibilities associated with the labeling procedure:

a.  identifying the nature of potentially hazardous materials adopted for use;

b.  overseeing the use of properly labeled containers for hazardous materials, including any and all miscellaneous containers into which employees might transfer materials;

c.  instructing staff in the meaning of the classification code and the MSDS, including the safe handling procedures for each material;

d.  working with staff to ensure that containers are properly labeled; and

e.  correctly labeling all smaller containers to correspond to the manufacturer-affixed labels on larger shipping containers.

### 12. Controlled Hazardous Materials

Certain substances require special treatment and careful planning and precautions before use. These controlled materials are classified according to the type of hazard and the nature of the restrictions imposed for their safe use, as specified in OSHA regulations.

a.  Class I: Industrial Solvents
Industrial solvents and chemicals used as paint thinners, degreasers and cleaning agents may have toxic properties and low flash points, making them dangerous fire hazards.

b.  Class II: Restricted Materials
Beryllium and its alloys and compounds, and

CCBVA0000003345

silver solder containing cadmium, pose a danger to workers, for whom special precautions must be taken.

c. Class III: Recognized Carcinogens
OSHA-listed carcinogens are governed by the OSHA regulations provided in 29 CFR 1910.1000.

Although asbestos appears on the OSHA list, it is exempt from the regulation when:

1) no asbestos fibers shall be released into the air during handling and use; and

2) the asbestos consists of firmly bound fibers contained in a product such as a transit pipe, wallboard, or tile (except when being sawed or otherwise handled in a way that releases fibers into the air).

d. Class IV: Suspected Carcinogenic, Teratogenic and Mutagenic Materials
Chemical agents, substances, mixtures and exposures are listed in the biennial *Report on Carcinogens* issued by the U.S. Public Health Service, in accordance with the Public Health Service Act. The maintenance supervisor shall ensure that the facility has copies of the report and that there is compliance with the provisions of the latest edition.

## C. Fire Prevention and Control

### 1. Fire Safety Codes

Every facility shall comply with standards and regulations issued by:

a. OSHA;

b. the American Correctional Association "mandatory" Expected Practices [Mandatory ACA Expected Practice 4-ALDF-1C-07 requires that the facility conform to applicable federal, state and/or local fire safety codes, and that of the authority having jurisdiction over document compliance. A fire alarm and automatic detection system are required (or else there must be a plan

for addressing these or other deficiencies within a reasonable time period), as approved by the authority having jurisdiction. If the authority approves any variance, exceptions or equivalencies, they must not constitute a serious life-safety threat to the occupants of the facility.];

c. local and national fire safety codes; and

d. applicable standards of the American Society for Testing and Materials, American National Standards Institute and Underwriters' Laboratories or Factory Mutual Engineering Corporation.

New construction, alterations and renovations, shall comply with:

a. the latest revision or update of the International Council Codes;

b. the Uniform Building Code; or

c. the Standard Building Code, in accordance with 40 U.S.C. § 619 and local law.

If the local government does not mandate adherence to a particular code, construction must conform to the International Council Codes.

In addition, construction shall comply with the latest edition of the National Fire Protection Association (NFPA)'s 101, Life Safety Code and National Fire Codes (NFCs). If the fire protection and life safety requirements of a local building code differ from NFPA 101 or the NFCs, the requirements of NFPA 101 and the NFCs shall take precedence and be recognized as equivalent to those of the local building code.

### 2. Inspections

a. A qualified departmental staff member shall conduct weekly fire and safety inspections.

b. Facility maintenance (safety) staff shall conduct monthly inspections.

c. Written reports of the inspections shall be forwarded to the facility administrator for review and, if necessary, corrective action determinations.

CCBVA0000003346

The maintenance supervisor shall maintain inspection reports and records of corrective action in the safety office. Fire safety deficiencies shall be promptly addressed.

### 3. Fire Prevention, Control and Evacuation Plan

Every facility shall develop a written fire prevention, control and evacuation plan that includes the following:

a. control of ignition sources;

b. control of combustible and flammable fuel load sources;

c. provisions for occupant protection from fire and smoke;

d. inspection, testing and maintenance of fire protection equipment, in accordance with NFPA codes, etc.;

e. monthly fire inspections;

f. installation of fire protection equipment throughout the facility, in accordance with NFPA codes;

g. accessible, current floor plans (including all buildings and rooms); prominently posted evacuation maps/plans; and exit signs and directional arrows for traffic flow, with a copy of each revision filed with the local fire department; and

h. exit diagrams that shall be conspicuously posted throughout the facility.

### 4. Fire Drills

Fire drills shall be conducted and documented at least quarterly in all facility locations including administrative areas.

a. Fire drills in housing units, medical clinics and other areas occupied or staffed during non-working hours shall be timed so that employees on each shift participate in an annual drill.

b. Detainees shall be evacuated during fire drills, except:

　1) in areas where security would be jeopardized;

　2) in medical areas where patient health could be jeopardized; or

　3) in individual cases when the evacuation of patients or detainees is logistically not feasible.

　Staff shall simulate drills in areas where detainees are not evacuated.

c. Emergency-key drills shall be included in each fire drill, and timed. Emergency keys shall be drawn and used by the appropriate staff to unlock one set of emergency exit doors not in daily use. NFPA recommends a limit of four and one-half minutes for drawing keys and unlocking emergency doors. However, when conducting fire drills, emphasis shall be placed on safe and orderly evacuation rather than speed.

### 5. Exit Diagram

In addition to a general area diagram, the following information must be provided on signs:

a. instructions in English, Spanish and the next most prevalent language at the facility;

b. "You are here" markers on exit maps; and

c. emergency equipment locations.

"Areas of Safe Refuge" shall be identified and explained on diagrams. Diagram posting shall be in accordance with applicable fire safety regulations of the jurisdiction.

## D. Medical Operation

The medical department will develop and implement an exposure control plan for the medical clinic that addresses the management of potentially sharp objects (sharps), standard and transmission-based precautions, post-exposure prophylaxis and management, bloodborne pathogens and other potentially infectious materials, disposal of medical and hazardous waste, and cleaning and disinfection.

CCBVA0000003347

Only sharps and medical waste generated within the medical department or by medical staff shall be managed in accordance with the medical department's exposure control plan.

### 1. Needles and Other Sharp Objects

A mandatory, uniform procedure shall be established for the safe handling and disposal of used needles and other sharps to prevent both mechanical injury and the percutaneous transmission of infectious disease organisms, such as the hepatitis B virus (HBV) and human immunodeficiency virus (HIV). Sharps are defined as all disposable or discarded items derived from detainee care that could potentially transmit disease via direct subdermal inoculation. Items included are: hypodermic needles and syringes, scalpel blades, glass vials or ampules containing materials deemed to be infectious, burrs, glass cartridges and lancets.

Accidental injuries from sharp objects are common in health care programs; most are from needle sticks caused by staff attempting to recap hypodermic needles. A uniform procedure for used needles and other disposable sharps is necessary to reduce the number of such injuries by preventing the secondary handling of needles and other dangerous sharp objects used in the delivery of medical care.

### 2. Standard Precautions (includes "Universal Precautions")

Staff shall frequently wash their hands and take additional routine precautions to prevent contact with blood or other body fluids.

a.  Gloves shall be worn: prior to touching blood and body fluids, mucous membranes, or non intact skin of all patients; prior to handling items or surfaces soiled with blood or body fluids; and prior to performing venipuncture and other vascular access procedures.

b.  Gloves shall be changed after contact with each detainee.

c.  Masks and protective eyewear or face shields shall be worn during procedures that are likely to generate droplets of blood or other body fluids.

d.  Gowns and/or aprons shall be worn during procedures that are likely to generate splashes of blood or other body fluids.

e.  Hands and other skin surfaces shall be washed immediately and thoroughly if contaminated with blood or other body fluids. Hands shall be washed immediately after gloves are removed.

f.  All health-care workers shall take precautions to prevent injuries caused by needles, scalpels and other sharp instruments or devices during procedures, especially at the following times: when cleaning used instruments, during disposal of used needles and when handling sharp instruments after procedures. Instruments and drugs shall be maintained in a secure and sanitary condition.

g.  To prevent needle-stick injuries, needles shall not be recapped, purposely bent or broken, removed from disposable syringes, or otherwise manipulated by hand. After use, disposable syringes and needles, scalpel blades and other sharp items shall be placed in puncture-resistant containers for disposal.

h.  Large-bore reusable needles shall be placed in a puncture-resistant container for transport to the reprocessing area.

i.  To minimize the need for emergency mouth-to-mouth resuscitation, mouthpieces, resuscitation bags or other ventilation devices shall be available for use in areas in which the need for resuscitation is foreseeable.

j.  Health-care workers who have exudative lesions or weeping dermatitis shall refrain from all direct patient care and from handling patient care equipment until the condition resolves.

k.  Pregnant health-care workers shall strictly adhere to precautions to minimize the risk to the fetus of perinatal transmission of HIV.

CCBVA0000003348

l. Isolation precautions shall be used as necessary if associated conditions, such as infectious diarrhea or tuberculosis, are diagnosed or suspected. Implementation of standard blood and body fluid precautions for all detainees eliminates the need for the use of the isolation category of "blood and body fluid precautions" previously recommended by the Centers for Disease Control for individuals known or suspected to be infected with blood-borne pathogens.

Staff shall encourage detainees to wash their hands frequently and to take additional routine precautions to prevent contact with blood or other body fluids.

### 3. Accidental Needle Sticks

Any employee or detainee who receives a needle stick or who is cut while handling potentially contaminated sharps shall be counseled regarding baseline testing for HBV and HIV, and referred to his/her usual source of health care. If the injury also involves a person who is a known source of possible infection, that person shall also be tested for HBV and HIV. The incident shall be reported as an occupational injury and documented in accordance with applicable regulations for commissioned officers and civil service employees, respectively.

The leading health service provider's exposure-control plan shall be followed in the event of a needle stick.

### 4. Inventory

Items that pose a security risk, such as sharp instruments, syringes, needles and scissors, shall be inventoried and checked weekly by an individual designated by the medical facility's Health Service Administrator (HSA) or equivalent.

### 5. Handling

Without removing the needles or replacing the needle covers, staff shall place used (disposable) syringes in a plastic disposal box or container.

a. Disposal Containers

1) Use only commercially available, biohazardous-waste sharps containers approved by the National Institute of Safety and Health (e.g., a "Winfield Sharps Container").

2) Do not use milk cartons or plastic milk jugs or other plastic containers of similar thickness.

3) Use containers with a two-gallon capacity (approximate).

4) Under no circumstances shall an item be removed from the Winfield Sharps Container (Sharps Container).

b. Location
Sharps Containers shall be located on top of counters or, if on the wall, at least five feet above ground. Sharps Containers shall never sit on the floor.

c. Disposal
When the disposal box is one-half to two-thirds full, the lid shall be closed and locked, and tape shall be placed over the top of the lid to indicate that it is ready for disposal. The Sharps Container shall be labeled with the words "infectious waste" or with the universal biohazard symbol, and placed in the proper area for removal and disposal.

Sharps are considered infectious waste, and final disposal of the Sharps Container and contents shall be through a commercial contractor that handles disposal of infectious waste in accordance with all local and federal regulations.

The HSA shall make arrangements for disposal with an approved contractor and is responsible for validating that the contractor's disposal methods are in accordance with all infectious and hazardous waste disposal laws and regulations. Arrangements shall be made with local hospitals, when possible, for disposal with the hospitals' own infectious waste.

### 6. Environmental Health in Medical Operations

While many of the following considerations,

CCBVA0000003349

precautions and specific procedures apply to situations that typically arise in medical operations, in many cases they have general application to all facility operations.

a. General Housekeeping
Environmental cleanliness shall reduce, control and prevent nosocomial infections due to contaminated environmental surfaces. The HSA or designee is responsible for ensuring the cleanliness of the medical facility.

Using an acceptable health agency standard as a model, the HSA shall establish:

1) the cleaning equipment, cleansers, disinfectants and detergents to be used;

2) the methods of cleaning; and

3) the frequency of cleaning and inspections.

The HSA or designee shall make a daily visual inspection of the medical facility, noting the condition of floors, walls, windows, horizontal surfaces and equipment.

All surfaces touched by detainees or staff shall be cleaned using fresh solutions of appropriate disinfectant products, applied with clean cloths, mops or wipes. Cleaned surfaces need not be monitored microbiologically since the results of such tests have been shown not to correlate with infection risk. Floors, walls, beds, tables and other surfaces that usually come in contact with intact skin require low-level disinfection

Horizontal surfaces in detainee care areas are cleaned on a regular basis, when soiling or spills occur. Additionally, short-stay units are cleaned when a detainee is discharged. Cleaning of walls, blinds or curtains is required only when visibly soiled.

The Chief Nurse (or equivalent) is responsible for training all staff and detainees in using proper housekeeping procedures and proper handling of hazardous materials and chemicals.

1) General Cleaning

a) All horizontal surfaces shall be damp dusted daily with an approved germicidal solution.

b) Windows, window frames and windowsills shall be cleaned on a regular schedule, but do not require daily cleaning.

c) Furniture and fixtures shall be cleaned daily.

d) Floors shall be mopped daily and when soiled using the double bucket mopping technique. The cleaning solution shall be a hospital disinfectant-detergent solution mixed according to the manufacturer's directions. A clean mop head shall be used each time the floors are mopped.

e) Waste containers shall be lined with plastic bags and the liner shall be changed daily. The container itself shall be washed at least weekly, or as needed when it becomes soiled.

f) Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.

2) Isolation Cleaning

a) An approved germicidal detergent solution shall be freshly prepared in accordance with the manufacturer's specifications for each cleaning.

b) After cleaning the isolation room, mops and cleaning cloths shall be laundered before being reused.

c) Dirty water and used disinfecting solutions shall be discarded and the buckets and basins disinfected before being refilled. Items used in cleaning a contaminated isolation room shall never be taken into another area.

d) Linens shall be carefully removed from the

CCBVA0000003350

bed and double-bagged for transport.

e) All waste materials shall be double-bagged and disposed of as contaminated waste.

3) Terminal Cleaning

a) Every item in the room must be cleaned with an approved hospital germicidal solution.

b) When applicable, linen shall be stripped from the bed, with care taken not to shake the linen. Linen shall be folded away from the person and folded inward into a bundle, then removed with minimal agitation.

c) When applicable, all reusable receptacles (e.g., drainage bottles, urinals, bedpans, water pitchers) shall be emptied and rinsed with germicidal solutions.

d) All equipment that is not to be discarded (e.g., IV poles, respirators, suction machines) shall be washed with an approved germicidal solution following manufacturer's guidelines for cleaning the specific piece of equipment.

e) When applicable, mattresses and pillows covered with durable plastic covers shall be washed thoroughly with the approved germicidal solution.

f) When applicable, beds shall be washed thoroughly, using a small brush soaked in germicidal solution to gain access to small holes and crevices, to areas between the springs and to the casters.

g) All furniture shall be washed with a germicidal detergent solution. Use a small brush if necessary. Outside and underside as well as legs and casters must also be washed.

h) Wastebaskets shall be thoroughly washed with a germicidal solution after trash and liner have been removed.

i) Telephones shall be thoroughly cleaned with a clean cloth soaked in the germicidal solution. The earpiece and mouthpiece shall be unscrewed, scrubbed, dried and replaced.

j) Walls and ceilings need not be washed entirely, but areas that are soiled shall be washed with germicidal solution.

4) Choice of Disinfecting Materials
Hospital-grade disinfectant detergent formulations registered by the Environmental Protection Agency (EPA) may be used for environmental surface cleaning, but the physical removal of microorganisms by scrubbing is as imperative as any antimicrobial effect of the cleaning agent used.

Cost, safety and acceptance by staff shall be the criteria for selecting any such registered agent. The manufacturer's instructions for use shall be followed exactly.

b. Blood and Body Fluid Clean-up
Spills of blood and body fluids shall be cleaned up and the surface decontaminated in such a manner as to minimize the possibility of workers becoming exposed to infectious organisms, including HIV and HBV. A suitable cleanup kit shall be maintained for use in cases of spills of blood and body fluids. Cleanup kits may be obtained from commercial sources, or may be compiled by Health Services Department (HSD) staff or the designated health care provider.

1) Compiling a Cleanup Kit

To prepare a cleanup kit for blood and body fluid spills, package the following materials in a 12" x 15" clear zip-lock bag:

a) gloves, rubber or vinyl, household-type (2 pair);

b) clean absorbent rags (4);

c) absorbent paper towels (15);

CCBVA0000003351

d) disposable bag marked "contaminated" size 23"x10"x39", minimum thickness 1.5 mils.;

e) Clear plastic bag 13"x10"x39", minimum thickness 1.5 mils.; and

f) Bottle of "hospital disinfectant" (containing quaternary ammonium chlorides in at least 0.8% dilution), or a bottle of household bleach such as "Clorox" or "Purex" (5.25% sodium hypochlorite).

2) Selection of Disinfectants
Dilute solutions of sodium hypochlorite are reported extremely effective against both HIV and the Hepatitis B virus and therefore have been recommended for use in environmental decontamination procedures. Quaternary ammonium compounds are less effective against Hepatitis B. Chlorine in solution inactivates viruses quickly and efficiently, but must reach the virus particles to do so.

Proteinaceous materials may interfere with the ability of the appropriate disinfectant solution to reach the virus particles. Since quaternary disinfecting compounds may act as a detergent as well as a disinfectant, these compounds may be used for cleaning and removal of proteinaceous materials from surfaces. However, when using such a compound to clean a surface, it shall be necessary to follow with the use of chlorine solution for final disinfection.

Most blood or fluids shall be removed from the surface during routine medical cleaning procedures before application of the disinfectant; in such cases, use of sodium hypochlorite solution shall be sufficient.

3) Selection of Gloves
Household or industrial rubber gloves are recommended for use rather than surgical rubber gloves, as surgical gloves are somewhat porous and are less resistant to mechanical damage and punctures during clean-up procedures.

4) Assignment of Cleaning Duties to Detainees in Medical Facilities
Detainee workers may be assigned duties cleaning the medical facility. Detainees are permitted to clean floors and walls and to remove trash, but are not permitted to clean medical equipment.

5) Instructions for Use of Clean-Up Kit

a) Open the bag and remove the supplies.

b) Put on one pair of gloves.

c) Depending on the type of disinfectant in the kit, take out bottle of "hospital disinfectant," or prepare a dilute solution of sodium hypochlorite. To prepare a 1:10 dilution of 5.25% sodium hypochlorite, mix 1 part of 5.25% sodium hypochlorite (common household bleach) with 10 parts water.

d) Open the large clear plastic bag and the large bag marked "contaminated." Place them next to each other.

e) Use paper towels to absorb as much of the spilled fluid as possible; then place soiled paper towels in the large clear plastic bag.

f) Pour the solution carefully onto the spill area. Dispose of the empty bottle in the large, clear plastic bag. Leave disinfectant in place for 15 minutes.

g) Use the rags to clean the area, and place rags in the large clear plastic bag.

h) Tie off the clear plastic bag and place it inside the large plastic bag marked "Contaminated."

i) Remove gloves carefully and place them in the plastic bag marked "Contaminated."

CCBVA0000003352

j) Put on the second pair of gloves and tie the "Contaminated" trash bag closed.

k) Properly dispose of the "Contaminated" trash bag in a contaminated-waste receptacle.

l) Properly dispose of the second pair of gloves in the contaminated-waste receptacle.

m) Wash your hands.

n) Prepare a new clean-up kit.

NOTE: Do not place linen or non-disposable articles in the "Contaminated" trash bag.

c. Hazardous and Infectious Waste Disposal
Infectious and hazardous waste generated at a medical facility shall be stored and disposed of safely and in accordance with all applicable federal and state regulations.

For identified wastes that represent sufficient risk of causing infection or injury during handling and disposal, the following precautions shall be applied.

1) Definitions
Hazardous or infectious waste is defined as: microbiology laboratory waste; human blood and blood products; sharps; laboratory and other chemicals; or certain drugs such as antineoplastic.

Miscellaneous biomedical waste is defined as waste materials that are not specifically defined as infectious waste. Such waste includes bandages, dressings, casts, catheters and disposable pads.

Waste from detainees in isolation is not considered to be infectious waste unless it falls within the specific definition of infectious waste as stated above.

2) Collection and Storage
Infectious waste must be separated from the general waste stream and clearly labeled as infectious, adhering to the following practices:

a) Infectious waste shall be double-bagged and tied and labeled "Infectious Waste."

b) The bags used must be impermeable, commercially supplied red bags intended specifically for biohazardous waste storage.

c) Miscellaneous biomedical waste shall be double-bagged and tied but need not be labeled as infectious.

3) Treatment and Disposal
Blood products and designated body fluids shall be poured slowly and carefully down a toilet to prevent splash. Compacting of untreated infectious waste is prohibited. The waste disposal contractor must meet all state and local requirements for transportation and disposal.

E. Barber Operations

Sanitation in barber operations is imperative because of the possible transfer of diseases through direct contact or by towels, combs and clippers. Towels shall not be reused by other detainees until sanitized. Instruments such as combs and clippers shall not be used successively on detainees without proper cleaning and disinfecting.

1. For sanitation reasons, it is preferable that barbering operations be located in a room that is not used for any other purpose. The room must have sufficient light, and be supplied with hot and cold running water. The floors, walls and ceilings shall be smooth, nonabsorbent and easily cleaned.

2. Each barbershop shall have all equipment and facilities necessary for maintaining sanitary procedures for hair care, including covered metal containers for waste, disinfectants, dispensable headrest covers, laundered towels and haircloths.

3. After each detainee visit, all hair care tools that

CCBVA0000003353

came in contact with the detainee shall be cleaned and effectively disinfected. Ultraviolet lights are not appropriate for sterilization but may be used for maintaining tools that have already been properly sterilized.

4. Detailed hair care sanitation regulations shall be conspicuously posted in each barbershop for the use of all hair care personnel and detainees. Cotton pads, absorbent cotton and other single or dispensable toilet articles may not be reused, and shall be placed in a proper waste receptacle

immediately after use. The common use of brushes, neck dusters, shaving mugs and shaving brushes is prohibited.

5. Barbers or beauticians shall not provide service to any detainee when the skin of the detainee's face, neck or scalp is inflamed, or when there is scaling, pus or other skin eruptions, unless service of such detainee is performed in accordance with the specific authorization of the chief medical officer. No person who is infested with head lice shall be served.

CCBVA0000003354

# Appendix 1.2.A: Common Flammable, Toxic and Caustic Substances

## Class I Liquids

Gasoline

Benzene (Petroleum ether)

Acetine

Hexane

Lacquer

Lacquer thinner

Denatured alcohol

Ethyl alcohol

Xylene (Xylol)

Contact cement (flammable)

Toudi (Toluene)

Methyl ethyl ether

Methyl ethyl ketone

Naphtha Y, M and P

## Class II Liquids

Diesel fuel

Motor fuel

Kerosene

Cleaning solvents

Mineral spirits

Agitene

## Class III Liquids

Paint (oil base)

Linseed oil

Mineral oil

Neat's-foot oil

Sunray conditioner

Guardian fluid

## Toxic Substances

Ammonia

Chlorine

Antifreeze

Duplicating fluid

Methyl alcohol

Defoliants

Herbicides

Pesticides

## Caustic Substances

Lye

Muriatic acid

Caustic soda

Sulfuric acid

Tannic acid

CCBVA0000003355

# 3.1 Disciplinary System

## I. Purpose and Scope

This detention standard promotes a safe and orderly living environment for detainees by establishing a fair and equitable disciplinary system, requiring detainees to comply with facility rules and regulations, and imposing disciplinary sanctions to those who do not comply.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees shall be informed of facility rules and regulations, prohibited acts, disciplinary sanctions that may be imposed, their rights in the disciplinary system and the procedure for appealing disciplinary findings.

2. Each facility shall have graduated severity scales of prohibited acts and disciplinary consequences.

3. Disciplinary segregation shall only be ordered when alternative dispositions may inadequately regulate the detainee's behavior.

4. Where permitted by facility policy, staff shall informally settle minor transgressions through mutual consent, whenever possible.

5. Staff who have reason to suspect that a detainee has engaged in a prohibited act or who witness a prohibited act that cannot or should not be resolved informally, shall prepare a clear, concise and complete Incident Report.

6. Each Incident Report shall be objectively and impartially investigated and reported, ordinarily by a person of supervisory rank.

7. A serious incident that may constitute a criminal act shall be referred to the proper investigative agency as appropriate, and administrative investigations shall be suspended pending the outcome of that referral.

8. At each step of the disciplinary and appeal process, the detainee shall be advised in writing of his/her rights in a language he/she understands, and translation or interpretation services shall be provided as needed.

9. When a detainee has a diagnosed mental illness or mental disability, or demonstrates symptoms of mental illness or mental disability, a mental health professional, preferably the treating clinician, shall be consulted to provide input as to the detainee's competence to participate in the disciplinary hearing, any impact the detainee's mental illness may have had on his or her responsibility for the charged behavior, and information about any known mitigating factors in regard to the behavior.

10. A Unit Disciplinary Committee (UDC) shall further investigate and adjudicate the incident and may impose minor sanctions or refer the matter to a higher level disciplinary panel.

11. An Institution Disciplinary Panel (IDP) shall

CCBVA0000003534

conduct formal hearings on Incident Reports referred from investigations or UDCs and may impose higher level sanctions for "greatest" and "high" level prohibited acts.

12. Detainees before the IDP shall be afforded a staff representative, upon request, or automatically if the detainee is illiterate, has limited English language skills or otherwise needs special assistance.

13. Actions of the IDP shall be reviewed by the facility administrator, who may concur with the findings and sanctions or modify them.

14. At all steps in the disciplinary process, any sanctions imposed shall be commensurate with the severity of the committed prohibited act and intended to encourage the detainee to conform with rules and regulations in the future.

15. All steps of the disciplinary process shall be performed within the required time limits.

16. At all steps of the disciplinary process, accurate and complete records shall be maintained. The detainee shall receive copies of all reports, exhibits and other documents considered or generated in the hearing process, except insofar as the disclosure of such documents may pose an imminent threat to the safety, security and orderly conduct of the facility staff or other detainees, or if the document or other evidence is otherwise protected from disclosure.

17. If a detainee is found not guilty at any stage of the disciplinary process, the incident records shall not be placed or retained in the detainee's file, even if these records are retained elsewhere for statistical or historical purposes.

18. Detainees shall be allowed to appeal disciplinary decisions through a formal grievance system. No staff member shall harass, discipline, punish or otherwise retaliate against any detainee for filing a complaint or grievance.

19. Detainees shall be afforded rights including, but not limited to, the following: the right to protection from abuse; the right to freedom from discrimination; the right to pursue a grievance; the right to correspond with persons or organizations; and the right to due process.

20. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Disciplinary Policy" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-3A-01, 3A-02, 6B-05, 6C-01 through 6C-19.

CCBVA0000003535

# V. Expected Practices

## A. Guidelines

1. Detainees with limited English proficiency (LEP) shall receive translation or interpretation services, and detainees with disabilities shall receive appropriate accommodations in order to meaningfully participate in the investigative, disciplinary, and appeal process.

2. Each facility holding ICE/ERO detainees in custody shall have a detainee disciplinary system with progressive levels of reviews, appeals, procedures and documentation procedures. Written disciplinary policy and procedures shall clearly define detainee rights and responsibilities. The policy, procedures and rules shall be reviewed annually at a minimum.

3. Disciplinary action may not be capricious or retaliatory nor based on race, religion, national origin, gender, sexual orientation, disability or political beliefs.

4. At all steps in the disciplinary process, any sanctions imposed shall be commensurate with the severity of the committed prohibited act and intended to encourage the detainee to conform with rules and regulations in the future.

5. Staff may not impose or allow imposition of the following sanctions: corporal punishment; deprivation of food services, to include use of Nutraloaf or "food loaf"; deprivation of clothing, bedding or items of personal hygiene; deprivation of correspondence privileges; deprivation of legal access and legal materials; or deprivation of indoor or outdoor recreation, unless such activity would create a documented unsafe condition within the facility. Any sanction imposed shall be approved by the facility administrator and reviewed by the Field Office Director.

6. When a detainee has a diagnosed mental illness or mental disability, or demonstrates symptoms of mental illness or mental disability, a mental health professional, preferably the treating clinician, shall be consulted to provide input as to the detainee's competence to participate in the disciplinary hearing, any impact the detainee's mental illness may have had on his or her responsibility for the charged behavior, and information about any known mitigating factors in regard to the behavior.

7. The facility shall not hold a detainee accountable for his/her conduct if a medical authority finds him/her mentally incompetent. For purposes of these standards, a mentally incompetent individual is defined as an individual who is unable to appreciate the difference between appropriate and inappropriate behavior, or between "right" and "wrong." Such an individual is not capable of acting in accordance with those norms and therefore, cannot be held responsible for his/her "wrongful" actions.

8. If a detainee has a mental disability or mental illness but is competent, the disciplinary process shall consider whether the detainee's mental disabilities or mental illness contributed to his or her behavior when determining what type of sanction, if any, should be imposed. A mental health professional should also be consulted as to whether certain types of sanctions, (e.g., placement in disciplinary segregation, loss of visits, or loss of phone calls) may be inappropriate because they would interfere with supports that are a part of the detainee's treatment or recovery plan.

9. A person who cannot assist in his/her own defense because he/she lacks the ability to understand the nature of the disciplinary proceedings, as determined by a medical authority, shall be considered incompetent. Disciplinary proceedings against such a detainee shall be postponed until such time as the detainee is able to understand the nature of the disciplinary proceedings and to assist in his/her

CCBVA0000003536

own defense. If the detainee's mental status does not improve within a reasonable amount of time, the officer must find the detainee incompetent to assist in his/her own defense, and note such finding on the Incident Report.

## B. Notice to Detainees

The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of the facility's rules of conduct and prohibited acts, the sanctions imposed for violations of the rules, the disciplinary severity scale, the disciplinary process and the procedure for appealing disciplinary findings. Detainees shall have the following rights and shall receive notice of them in the handbook:

1. The right to protection from personal abuse, corporal punishment, unnecessary or excessive use of force, personal injury, disease, property damage and harassment;

2. The right of freedom from discrimination based on race, religion, national origin, gender, sexual orientation, physical or mental ability, or political beliefs;

3. The right to pursue a grievance in accordance with procedures provided in the detainee handbook, without fear of retaliation;

4. The right to pursue a grievance in accordance with standard"6.2 Grievance System" and procedures provided in the detainee handbook.

5. The right to correspond with persons or organizations, consistent with safety, security and the orderly operation of the facility; and

6. The right to due process, including the prompt resolution of a disciplinary matter.

Copies of the rules of conduct, rights and disciplinary sanctions shall be provided to all detainees and posted in English, Spanish, and other languages spoken by significant segments of the population with limited English proficiency. Copies to be provided and posted are as follows:

1. Disciplinary Severity Scale;

2. Prohibited Acts; and

3. Sanctions.

## C. Disciplinary Severity Scale and Prohibited Acts

All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section.

*Prohibited acts are divided into four categories: "greatest," "high," "moderate" and "low moderate." The sanctions authorized for each category shall be imposed only if the detainee is found to have committed a prohibited act (see "Appendix 3.1.A: Offense Categories").*

### 1. Greatest Offenses

*The IDP shall impose and execute at least one sanction in the 1 through 5 range. Additional sanctions may be imposed and either executed or suspended, at the discretion of the panel.*

### 2. High Offenses

*The IDP shall impose and execute at least one sanction in the 1 through 12 range. Additional sanctions (1 through 12) may be imposed or may be suspended at the discretion of the panel.*

### 3. High Moderate Offenses

*The IDP shall impose at least one sanction in the 1 through 13 range, but may suspend any or all, once imposed. Similarly, the UDC shall impose at least one sanction in the 7 through 13 range, but may suspend any or all, once imposed.*

### 4. Low Moderate Offenses

*The IDP shall impose at least one sanction in the 1 through 9 range, but may suspend any or all, once imposed. Similarly, the UDC shall impose at least one sanction in the 3 through 9 range, but may suspend any or all, once imposed.*

## D. Incident Report

CCBVA0000003537

Officers who witness a prohibited act, or have reason to suspect one has been committed, shall immediately prepare and submit an Incident Report. All Incident Reports must state facts clearly, precisely and concisely, omitting no details that may prove significant. Reports also shall identify the officer(s), the detainee(s) and all witnesses to the incident.

Minor transgressions shall be settled informally and by mutual consent whenever possible.  If, however, the officer involved thinks an informal resolution is inappropriate or unattainable, he or she shall prepare an Incident Report and submit it to the appropriate supervisor before the end of the assigned shift.

ICE/ERO pre-approval is required for use of ICE Incident Report forms in CDFs and IGSA facilities.

*The Incident Report shall cite the relevant rule or standard without quoting it in its entirety. (For example, in the event of destruction of government property, the report shall cite, briefly, "Code 218— Destroying Government Property," specify the exact manner in which the detainee is alleged to have violated the cited rule or standard, and include all relevant facts such as time, dates and places.)*

*If the officer observes anything unusual in the detainee's behavior or demeanor, he/she shall so note in the report. The reporting officer shall also list all staff, contract officers, and/or detainee witnesses to the incident and the disposition of any physical evidence (e.g., weapons, property, etc.) relating to the incident. The reporting officer shall sign the report and include title, date and time the report was signed. The shift supervisor shall review all Incident Reports before going off duty.*

## E. Investigations

All facilities shall have procedures in place to ensure that all Incident Reports are investigated within 24 hours of the incident.

The investigating officer must have supervisory rank or higher (unless prevented by personnel shortages) and shall have had no prior involvement in the incident, as either witness or officer at the scene. If an officer below supervisory rank conducts the investigation, the shift supervisor shall review his/her report(s) for accuracy and completeness and sign them.

The investigating officer shall:

1. Commence the investigation within 24 hours of receipt of the Incident Report.

2. Advise the detainee of his/her right to remain silent at every stage of the disciplinary process, and ensure that he/she has a complete listing of detainee rights.

3. Complete the investigation within 72 hours of receipt of the Incident Report, barring exceptional circumstances.

4. Provide the detainee a copy of the Incident Report and notice of charges immediately after the conclusion of the investigation..

5. Terminate the administrative investigation, if the incident is under investigation on different grounds (i.e., the prohibited act is under criminal investigation), unless and until the agency with primary jurisdiction concludes its investigation or indicates it shall not pursue the matter.

   Contraband that may be evidence in connection with a violation of a criminal statute shall be preserved, inventoried, controlled and stored so as to maintain and document the chain of custody. Contraband shall be reported to the appropriate law enforcement authority for action and possible seizure and prosecution. See "Preservation of Evidence" in standard "2.10 Searches of Detainees."

6. Advise the detainee in writing of his/her due process rights before the UDC, or before the IDP if the case is being referred directly to the IDP, as provided in this standard.

7. Record personal observances and other potentially material information.

CCBVA0000003538

8. Prepare a factual report of the investigation, including the location or disposition of any physical evidence.

9. Forward to the UDC or directly to the IDP all reports relevant to the disciplinary hearing—..

## F. Unit Disciplinary Committee (UDC)

All facilities shall establish an intermediate level of investigation/adjudication process to adjudicate low or moderate infractions. They shall also ensure that the detainee is afforded all the UDC rights listed below.

The UDC administering unit discipline shall comprise up to three members, at least one of whom is a supervisor. The UDC shall not include the reporting officer, the investigating officer, or an officer who witnessed or was directly involved in the incident, except in the unlikely event that every available officer witnessed or was directly involved in the incident.

The UDC shall conduct hearings and, to the best extent possible, shall informally resolve cases involving high moderate or low moderate charges in accordance with the list of charges and related sanctions noted as "Appendix 3.1.A: Offense Categories." Unresolved cases and cases involving serious charges are forwarded to the institution disciplinary panel, and may be referred to the IDP without a hearing.

The UDC shall have authority to:

1. conduct hearings and resolve incidents involving high moderate or low moderate charges;

2. consider written reports, statements and physical evidence;

3. hear pleadings on the part of the detainee;

4. make findings that a detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence; and

5. impose minor sanctions in accordance with the table of prohibited acts and associated sanctions later in this document; minor sanctions are those listed sanctions other than initiation of criminal proceedings, recommended disciplinary transfer, disciplinary segregation, or monetary restitution.

The detainee in UDC proceedings shall have the right to due process, which includes the rights to:

1. remain silent at any stage of the disciplinary process;

2. have a UDC hearing within 24 hours after the conclusion of the investigation, unless the detainee:

   a. waives the notification period and requests an immediate hearing, or

   b. requests more time to gather evidence or otherwise prepare a defense;

3. attend the entire hearing (excluding committee deliberations), or waive the right to appear.

   If security considerations prevent detainee attendance, the committee must document the security considerations and, to the extent possible, facilitate the detainee's participation in the process via telephonic testimony, document submission, written statements or questions to be asked of witnesses;

4. Present statements and evidence, including witness testimony on his/her own behalf; and

5. Appeal the committee's determination through the detainee grievance process.

The UDC shall:

1. verify that the detainee has been advised of and afforded his/her due process rights, as provided above in this standard;

2. refer to the IDP any incident involving a serious violation that may result in the following sanctions: initiation of criminal proceedings, recommended disciplinary transfer, disciplinary

CCBVA0000003539

==segregation, or monetary restitution. This includes all code violations in the "greatest" and "high" categories (100s and 200s), and must include code violations in the "high moderate" category (300s) in order for any of the sanctions listed above to be imposed;==

3. serve the detainee with:

   a. a copy of the UDC decision which must contain the reason for the disposition and sanctions imposed; or

   b. written notification of charges and hearing before the IDP; and

4. if the detainee's case is being referred to the IDP, advise the detainee, in writing, of his/her due process rights as provided in this standard.

## G. Staff Representation for the IDP

The facility administrator shall upon the detainee's request, assign a staff representative to help prepare a defense prior to the commencement of the IDP. This help shall be automatically provided for detainees who are illiterate, have limited English-language skills, or who are without means of collecting and presenting essential evidence. Detainees shall also have the option of receiving assistance from another detainee of their selection rather than a staff representative, subject to approval from the facility administrator.

1. *A staff representative must be a full-time employee.*

2. *Because of the potential conflict of interest, the facility administrator, members of the IDP and of the UDC initially involved in the case, eyewitnesses, the reporting and investigating officers and anyone else with a stake in the outcome shall not act as staff representative.*

3. *The detainee may select his/her staff representative, barring those identified in paragraph 2 above.*

4. *The IDP shall arrange for the presence of the staff representative selected by the detainee. If that staff member declines or is unavailable, the detainee may:*

   a. *select a different representative;*

   b. *wait for the unavailable staff member to become available (within a reasonable period); or*

   c. *proceed without a staff representative.*

5. *A staff member who declines to serve must state the reason on the staff representative form.*

6. *If several staff decline, the facility administrator shall assign one.*

7. *The staff representative shall be free to speak to witnesses and to present evidence on the detainee's behalf, including evidence of any mitigating circumstances. The staff representative must act in good faith on behalf of the charged detainee, and interview witnesses and obtain documentary evidence as requested by the detainee or as otherwise reasonably seen as relevant to the defense of the charges or in mitigation of the charges.*

8. *The IDP shall allow the staff representative enough time to speak with the detainee and interview witnesses prior to commencement of the proceeding. The IDP may grant a request for extension of time if required for an adequate defense.*

9. *The IDP shall establish the reliability of information provided by a confidential source before considering it in the disciplinary proceedings.*

10. *The IDP may withhold the confidential source's identity from the staff representative. While the staff representative may challenge the substance of any confidential information the IDP discloses, he/she may not question its reliability (which is pre-established by the IDP).*

CCBVA0000003540

*11. In the event that a detainee cannot effectively present his/her own case, the facility administrator shall appoint a staff representative, even if not requested by the detainee.*

## H. Institution Disciplinary Panel (IDP)

All facilities that house ICE/ERO detainees shall have a higher level disciplinary panel to adjudicate detainee Incident Reports. Only the disciplinary panel may place a detainee in disciplinary segregation.

The term "Institution Disciplinary Panel" or "IDP" refers either to a three-person panel appointed by the facility administrator, or a one-person disciplinary hearing officer, depending on the practice at the facility.

The panel may not include the reporting officer, the investigating officer, any member of the referring UDC, or anyone who witnessed or was directly involved in the incident. Exceptions may occur only if the number of officers required for the panel cannot be filled due their direct involvement in the incident.

The IDP may receive incident reports following a referral from the UDC or directly from the investigative officer following the conclusion of the investigation.

The IDP shall have authority to:

1. conduct hearings on all charges and allegations referred by the UDC or sent directly from the investigating officer;

2. call witnesses to testify;

3. consider written reports, statements, physical evidence and oral testimony;

4. hear pleadings by detainee and staff representative;

5. make findings that the detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence; and

6. impose sanctions as listed and authorized in each category.

The detainee in IDP proceedings shall have the right to due process, which includes the rights to:

1. remain silent at any stage of the disciplinary process;

2. have an IDP hearing within 48 hours after the conclusion of the investigation or the conclusion of the UDC hearing, unless the detainee:

   a. waives the notification period and requests an immediate hearing, or

   b. requests more time to gather evidence or otherwise prepare a defense;

3. attend the entire hearing (excluding committee deliberations), or waive the right to appear.

   If security considerations prevent the detainee's attendance, the committee must document the security considerations and, to the extent possible, facilitate the detainee's participation in the process by telephonic testimony, the submission of documents, written statements or questions to be asked of witnesses;

4. present statements and evidence, including witness testimony, on his/her behalf;

5. have a staff representative; and

6. appeal the committee's determination through the detainee grievance process.

The IDP shall:

1. verify that the detainee has been advised of and afforded his/her due process rights, as provided above in this standard;

2. remind the detainee of his/her right to a staff representative, provide one if requested and verify that a staff representative has been assigned when a representative is requested;

3. advise the detainee of his/her right to waive the

CCBVA0000003541

hearing and admit having committed the offense;

4. conduct the hearing within 48 hours after the conclusion of the investigation or the conclusion of the UDC hearing, unless the detainee requests more time to gather evidence or otherwise prepare a defense. In cases where a hearing is delayed, the reason(s) must be documented (e.g., a continuing investigation of facts, unavailability of one or more essential witnesses, etc.) and, unless the detainee has requested the delay, approved by the facility administrator. If the detainee is being held in segregation, the delay shall not exceed 72 hours, barring an emergency;

5. prepare a written record of any hearing. This record must show that the detainee was advised of his/her rights. It must also document the evidence considered by the Panel and subsequent findings and the decision and sanctions imposed, along with a brief explanation;

6. forward the entire record to the facility administrator, who may (a) concur, (b) terminate the proceedings or (c) impose more severe or more lenient sanctions; and

7. serve the detainee with written notification of the decision, which must contain the reason for the decision.

## I. Confidential Information

When a decision relies on information from a confidential source, the UDC or IDP shall disclose as much confidential information as may be disclosed without jeopardizing the safety and security of facility staff and other persons, and shall include in the hearing record the factual basis for finding the information reliable.

## J. Postponement of Disciplinary Proceedings

All facilities shall permit hearing postponements or continuances under certain circumstances.

Circumstances justifying the postponement or continuance of a hearing might include, but are not limited to: defense preparation, physical or mental illness, security, escape, disciplinary transfer or pending criminal prosecution.

An uncooperative detainee may also cause a delay in the proceedings, either because of inappropriate behavior during the hearing process or a refusal to participate in a productive manner.

## K. Duration of Sanctions

The duration of sanctions shall be within established limits. Neither the panel recommending sanctions nor the facility administrator making the final decision shall impose sanctions arbitrarily, beyond these limits.

1. Sanctions range from the withholding of privilege(s) to segregation. Disciplinary segregation shall only be ordered when alternative dispositions may inadequately regulate the detainee's behavior.

2. Time in segregation or the withholding of privileges after a hearing shall generally not exceed 30 days per incident, except in extraordinary circumstances, such as violations of offenses 100 through 109 listed in the "Greatest" offense category in Appendix 3.1.A.

3. While a detainee may be charged with multiple prohibited acts and may receive multiple sanctions for one incident, sanctions arising from a single incident shall run concurrently.

4. Time served in segregation pending the outcome of the proceedings shall be credited to the number of days to be spent in the segregation unit after an adverse decision is announced.

5. The detainee's good behavior subsequent to the rule violation or prohibited act should be given consideration when determining the appropriate penalty.

6. The disciplinary report and accompanying documents are not placed in the file of a detainee

CCBVA0000003542

who is found not guilty. The facility, however, may retain the material in its own files for Institution statistical or historical purposes.

## L. Documents

All documents relevant to the incident, subsequent investigation and hearing(s) shall be completed and distributed in accordance with facility procedures.

### 1. Incident Report/Notice of Charges

The officer shall prepare an Incident Report and submit it to the supervisor immediately after the incident takes place. If the incident is resolved informally, the officer shall so note on the original report, which shall then be forwarded to the Chief of Security.

*If the UDC is to be involved, the supervisor shall serve the detainee with a copy of the Notice of Charges upon completion of the investigation, no less than 24 hours before the UDC hearing.*

*The UDC receives the original copy.*

*If the UDC hears the matter, the ranking member of that committee shall serve the detainee with a copy of the Incident Report/Notice of Charges indicating their decision. The UDC, upon conclusion of its proceedings, shall forward the entire record to either the Chief of Security or the IDP, as appropriate.*

### 2. Investigation Report

*The original shall be submitted to the UDC.*

*The detainee does not receive a copy.*

### 3. UDC Report of Findings and Action

*The original shall be served on the detainee after the committee issues its findings.*

*A copy shall be included in the detainee detention file (guilty finding only).*

### 4. Notice of IDP Hearing

*The original shall be served on the detainee after the committee issues its findings.*

*A copy shall be included in the detainee detention file.*

### 5. Detainee Rights at IDP Hearing

*The original shall be served on the detainee after the committee issues its findings.*

*A copy shall be included in the facility detention file.*

### 6. IDP Report

*The original shall be included in the detainee detention file.*

*A copy shall be provided to the detainee.*

## M. Criminal Prosecution

Facilities, in coordination with the Field Office Director, shall work with prosecutors and other law enforcement officials to ensure that detainees who engage in serious criminal activity, including violence against staff and other detainees, face criminal prosecution when appropriate.

CCBVA0000003543

# Appendix 3.1.A: Offense Categories

## I. "Greatest" Offense Category

### A. Prohibited Acts

| | |
|---|---|
| 100 | Killing |
| 101 | Assaulting any person (includes sexual assault) |
| 102 | Escape from escort; escape from a secure facility |
| 103 | Setting a fire (charged with this act in this category only when found to pose a threat to life or a threat of serious bodily harm or in furtherance of a prohibited act of greatest severity [e.g., a riot or an escape]; otherwise the charge is classified as Code 222, 223 or 322)) |
| 104 | Possession or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous chemical, explosive, escape tool, device or ammunition |
| 105 | Rioting |
| 106 | Inciting others to riot |
| 107 | Hostage-taking |
| 108 | Assaulting a staff member or any law enforcement officer |
| 109 | Threatening a staff member or any law enforcement office with bodily harm |
| *198 | Interfering with a staff member in the performance of duties (conduct must be of the greatest severity; this charge is to be used only if another charge of greatest severity is not applicable) |
| *199 | Conduct that disrupts or interferes with the security or orderly running of the facility (conduct must be of the greatest severity; this charge is to be used only if another charge of greatest severity is not applicable) |

### B. Sanctions

| | |
|---|---|
| 1. | Initiate criminal proceedings |
| 2. | Disciplinary transfer (recommend) |
| 3. | Disciplinary segregation (up to 60 days) |
| 4. | Make monetary restitution, if funds are available |
| 5. | Loss of privileges (e.g., commissary, vending machines, movies, recreation, etc.) |

## II. "High" Offense Category

### A. Prohibited Acts

| | |
|---|---|
| 200 | Escape from unescorted activities open or secure facility, proceeding without violence |
| 201 | Fighting, boxing, wrestling, sparring and any other form of physical encounter, including horseplay, that causes or could cause injury to another person, except when part of an approved recreational or athletic activity |
| 202 | Possession or introduction of an unauthorized tool |
| 203 | Loss, misplacement or damage of any restricted tool |
| 204 | Threatening another with bodily harm |
| 205 | Extortion, blackmail, protection and demanding or receiving money or anything of value in return for protection against others, avoiding bodily harm or avoiding a threat of being informed against |
| 206 | Engaging in sexual acts |
| 207 | Making sexual proposals or threats |
| 208 | Wearing a disguise or mask |
| 209 | Tampering with or blocking any lock device |
| 210 | Adulterating of food or drink |
| 211 | Possessing, introducing, or using narcotics, narcotic paraphernalia or drugs not prescribed for the individual by the medical |

CCBVA0000003544

staff

| 212 | Possessing an officer's or staff member's clothing |

| 213 | Engaging in or inciting a group demonstration |

| 214 | Encouraging others to participate in a work stoppage or to refuse to work |

| 215 | Refusing to provide a urine sample or otherwise cooperate in a drug test |

| 216 | Introducing alcohol into the facility |

| 217 | Giving or offering an official or staff member a bribe or anything of value |

| 218 | Giving money to, or receiving money from, any person for an illegal or prohibited purpose (e.g., introducing/conveying contraband) |

| 219 | Destroying, altering, or damaging property (government or another person's) worth more than $100 |

| 220 | Being found guilty of any combination of three or more high moderate or low moderate offenses within 90 days |

| 222 | Possessing or introducing an incendiary device (e.g., matches, lighter, etc.) |

| 223 | Engaging in any act that could endanger person(s) and/or property |

| *298 | Interfering with a staff member in the performance of duties (conduct must be of highest severity; this charge is to be used only when no other charge of highest severity is applicable) |

| *299 | Conduct that disrupts or interferes with the security or orderly operation of the facility (conduct must be of highest severity; this charge is to be used only when no other charge of highest severity is applicable) |

**B. Sanctions**

1. Initiate criminal proceedings

2. Disciplinary transfer (recommend)

3. Disciplinary segregation (up to 30 days)

4. Make monetary restitution, if funds are available

5. Loss of privileges (e.g., commissary, vending machines, movies, recreation, etc.)

6. Change housing

7. Remove from program and/or group activity

8. Loss of job

9. Impound and store detainee's personal property

10. Confiscate contraband

11. Restrict to housing unit

12. Warning

### III. "High Moderate" Offense Category

**A. Prohibited Acts**

| 300 | Indecent exposure |

| 301 | Stealing (theft) |

| 302 | Misusing authorized medication |

| 303 | Loss, misplacement or damage of a less restricted tool |

| 304 | Lending property or other item of value for profit/increased return |

| 305 | Possessing item(s) not authorized for receipt or retention and not issued through regular channels |

| 306 | Refusing to clean assigned living area |

| 307 | Refusing to obey the order of a staff member or officer (may be categorized and charged as a greater or lesser offense, depending on the kind of disobedience: continuing to riot is Code 105—Rioting; continuing to fight Code 201—Fighting; refusing to provide a urine sample, Code 215—Refusing to provide a urine sample or otherwise |

CCBVA0000003545

308   Insolence toward a staff member

309   Lying or providing false statement to staff

310   Counterfeiting, forging or other unauthorized reproduction of money proceedings or other official document or item (e.g., security document, identification card, etc.); may be categorized as greater or lesser offense, depending on the nature and purpose of the reproduction (e.g., counterfeiting release papers to effect escape—Code 102 or 200).

311   Participating in an unauthorized meeting or gathering

312   Being in an unauthorized area

313   Failing to stand count

314   Interfering with count

315   Making, possessing, or using intoxicant(s)

316   Refusing a breathalyzer test or other test of alcohol consumption

317   Gambling

318   Preparing or conducting a gambling pool

319   Possessing gambling paraphernalia

320   Unauthorized contact with the public

321   Giving money or another item of value to, or accepting money or another item of value from, anyone, including another detainee, without staff authorization

322   Destroying, altering, or damaging property (government or another person's) worth equal to or less than $100

323   Signing, preparing, circulating, or soliciting support for group petitions that threaten the security or orderly operation of the facility.

*398   Interfering with a staff member in the performance of duties (offense must be of high moderate severity; this charge to be used only when no other charge in this category is applicable)

*399   Conduct that disrupts or interferes with the security or orderly running of the facility (offense must be of high moderate severity; this charge is to be used only when no other charge in this category is applicable)

NOTE: Any combination of high moderate and low moderate offenses during a 90-day period shall constitute a high offense.

**B. Sanctions**

1.   Initiate criminal proceedings

2.   Disciplinary transfer (recommend)

3.   Disciplinary segregation (up to 72 hours)

4.   Make monetary restitution, if funds are available

5.   Loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.)

6.   Change housing

7.   Remove from program and/or group activity

8.   Loss of job

9.   Impound and store detainee's personal property

10.   Confiscate contraband

11.   Restrict to housing unit

12.   Reprimand

13.   Warning

## IV. "Low Moderate" Offense Category

**A. Prohibited Acts**

400   Possessing property belonging to another person

401   Possessing unauthorized clothing

402   Malingering; feigning illness

403   Smoking where prohibited

cooperate in a drug test).

CCBVA0000003546

404    Using abusive or obscene language

405    Tattooing, body piercing or self-mutilation

406    Unauthorized use of mail or telephone (with restriction or temporary suspension of the abused privileges often the appropriate sanction)

407    Conduct with a visitor in violation of rules and regulations (with restriction or temporary suspension of visiting privileges often the appropriate sanction)

408    Conducting a business

409    Possessing money or currency, unless specifically authorized

410    Failing to follow safety or sanitation regulations

411    Unauthorized use of equipment or machinery

412    Using equipment or machinery contrary to posted safety standards

413    Being unsanitary or untidy; failing to keep self and living area in accordance with posted standards

*498    Interfering with a staff member in the performance of duties (offense must be of low moderate severity; this charge is to be used only when no other charge in this category is applicable)

*499    Conduct that disrupts or interferes with the security or orderly running of the facility (offense must be of low moderate severity; this charge is to be used only when no other charge in this category is applicable)

**B. Sanctions**

1. Loss of privileges, commissary, vending machines, movies, recreation, etc.

2. Change housing

3. Remove from program and/or group activity

4. Loss of job

5. Impound and store detainee's personal property

6. Confiscate contraband

7. Restrict to housing unit

8. Reprimand

9. Warning

CCBVA0000003547

# 4.1 Food Service

## I. Purpose and Scope

This detention standard ensures that detainees are provided a nutritionally balanced diet that is prepared and presented in a sanitary and hygienic food service operation.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs and CDFs.* IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. All detainees shall be provided nutritionally balanced diets that are reviewed at least quarterly by food service personnel and at least annually by a qualified nutritionist or dietitian.

2. Detainees, staff and others shall be protected from harm, and facility order shall be maintained, by the application of sound security practices in all aspects of food service and dining room operations.

3. Detainees, staff and others shall be protected from injury and illness by adequate food service training and the application of sound safety and sanitation practices in all aspects of food service and dining room operations.

4. Dining room facilities and operating procedures shall provide sufficient space and time for detainees to eat meals in a relatively relaxed, unregimented atmosphere.

5. Food service facilities and equipment shall meet established governmental health and safety codes, as documented in independent, outside sources.

6. Detainees, staff and others shall be protected from health-related harm by advance medical screening and clearance before any detainee is assigned to work in food service operations.

7. Food service areas shall be continuously inspected by food service staff and other assigned personnel on schedules determined by the food service administrator and by applicable policy requirements.

8. Stored food goods shall be maintained in accordance with required conditions and temperatures.

9. Food service personnel shall provide nutritious and appetizing meals. Nutritional needs are diverse because of differences in age, activity, physical condition, gender, religious preference and medical considerations. Food service personnel shall accommodate the ethnic and religious diversity of the facility's detainee population when developing menu cycles. While each facility must meet all ICE/ERO standards and follow required procedures, individuality in menu planning is encouraged.

10. Therapeutic medical diets and supplemental food shall be provided as prescribed by appropriate clinicians.

CCBVA0000003548

11. Special diets and ceremonial meals shall be provided for detainees whose religious beliefs require adherence to religious dietary laws.

12. Detainees shall receive a religious or special diet free of any personal cost.

13. Food shall never be used for reward or punishment.

14. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Food Service" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ADLF-4A-01 through 4A-18. (Five of those Expected Practices are mandatory for accreditation: 4A-07, 4A-11, 4A-13, 4A-15 and 4A-16.)

ICE/ERO *Performance-based National Detention Standards 2011:*

- "2.7 Key and Lock Control"; and
- "2.14 Tool Control."

FDA Public Health Services Food Code.

## V. Expected Practices

### A. Administration

#### 1. Food Service Administrator or Equivalent

The food service program shall be under the direct supervision of an experienced food service administrator (FSA) who is responsible for the following:

a. Planning, controlling, directing and evaluating food service;

b. Training and developing cook foremen (CF);

c. Managing budget resources;

d. Establishing standards of sanitation, safety and security;

e. Developing nutritionally adequate menus and evaluating detainee acceptance of them;

f. Developing specifications for procurement of food, equipment and supplies; and

g. Establishing a training program that ensures operational efficiency and a high quality food service program.

The food service department shall also be staffed by one or more cook supervisors (CS) and CF, although the organizational structure may differ among facilities, particularly when food service is provided by a food service contractor. Therefore, references to the CS and CF in this detention standard describe

CCBVA0000003549

typical duties for those positions, although the functions may be performed by others, depending on the organizational structure.

## B. Security

### 1. Custody and Security

The facility's custody and security policy and procedures shall address the following:

a. buildings or portions of buildings housing the food service department;

b. all types of detainee traffic in and out of the department;

c. detainee behavior;

d. control of repairs;

e. control of utensils with a custodial hazard potential (e.g., knives, cleavers, saws, tableware);

f. official counts and census;

g. area searches; and

h. any other matters having a direct or indirect bearing on custody and security.

The facility's training officer shall devise training curricula and provide appropriate training to all food service personnel in detainee custodial issues. Among other topics, this training shall cover ICE/ERO's current detention standards.

### 2. Knife Control

The knife cabinet must be equipped with an approved locking device. The on-duty CF, under direct supervision of the CS, shall maintain control of the key that locks the cabinet..

Knives must be physically secured to workstations for use outside a secure cutting room. Any detainee using a knife outside a secure area must receive direct staff supervision. Knives shall be inventoried and stored in accordance with standard "2.14 Tool Control."

*To be authorized for use in the food service*

*department, a knife must have a steel tang through which a metal cable can be mounted. The facility's tool control officer is responsible for mounting the cable to the knife through the steel tang.*

*The FSA/CS shall monitor the condition of knives and other food service utensils, disposing of items not in good working order and ordering replacements. If a knife is misplaced or lost, staff shall immediately notify the FSA and Chief of Security, and shall hold detainees who may have had access to the missing knife in the area until a thorough search is conducted. The responsible CS shall provide the details of the loss in a written report to the Chief of Security.*

The knife cabinet shall meet the tool-control standards of the Occupational Safety and Health Administration, as well as any site-specific standards developed by the facility.

### 3. Key Control

Keys shall be inventoried and stored in accordance with standard "2.7 Key and Lock Control."

*The control room officer shall issue keys only in exchange for a name chit from receiving staff. Under no circumstances shall detainees have access to facility keys.*

*The CS shall return the keys to the control room before going off duty. At no time may anyone carry facility keys outside the facility.*

### 4. Controlled Food Items/Hot Items

All facilities shall have procedures for handling food items that pose a security threat.

a. Yeast and Yeast Products
All yeast must be stored in an area with no detainee access, preferably in a locked metal yeast cabinet for which the food service department has only one key. The locked yeast cabinet shall be maintained in a secure area.

Until the yeast is thoroughly incorporated as an ingredient in a food item being prepared, only

CCBVA0000003550

one member of the food service staff, closely supervised, may handle and dispense it.

Staff shall keep a record of the yeast inventory (in pounds and ounces), indicating receipt and issue, balance on hand and the record-keeper's initials.

b. Other Food Items
Mace, nutmeg, cloves, sugar and alcohol-based flavorings also require special handling and storage.

1) The purchase order for any of these items shall specify the special-handling requirements for delivery.

2) Staff shall store and inventory these items in a secure area in the food service department.

3) Staff shall directly supervise use of these items.

## 5. Work Area Searches

All facilities must establish daily searches of detainee work areas (e.g., trash) as standard operating procedures, paying particular attention to trash receptacles.

Searches of detainees leaving certain work areas (e.g., bakery, vegetable preparation, dining room, warehouse) are required to reduce the possibility that hot food or contraband can leave the restricted area. Unless otherwise directed by facility policy or special instructions, staff shall prevent detainees from leaving the food service department with any food item.

Food service personnel as well as facility detention staff shall conduct food service area searches.

## 6. Counts

The FSA shall establish procedures for informing staff of the local counting procedures, and shall establish measures to ensure that the procedures are followed.

Staff must be able to account for detainees at all times.

The counting officer must have a staff observer/backup during each count. Detainees shall be assembled in one section of the dining room and be required to remain seated until their names are called, and shall then move to another section of the dining room.

## C. Detainee Workers

### 1. Detainee Workforce

Detainees may volunteer for work in accordance with standard "5.8 Voluntary Work Program" and must work in accordance with standard "2.2 Custody Classification System."

The number of detainees assigned to the food service department shall be based on a quota developed by the FSA and approved by the facility administrator. The quota shall provide staffing according to actual needs, and shall eliminate any bias toward over- or understaffing.

### 2. Detainee Job Descriptions

The FSA shall review detainee job descriptions annually to ensure accuracy and specific requirements. Before starting work in the department, the detainee shall sign for receipt of the applicable job description. A copy of the detainee's job description shall remain on file for as long as the detainee remains assigned to the food service department.

### 3. Detainee Orientation and Training

To ensure a quality food service program and instill good work habits, each CS shall instruct newly assigned detainee workers in the rules and procedures of the food service department. During the orientation and training session(s), the CS shall explain and demonstrate safe work practices and methods and shall identify the safety features of individual products and equipment.

Training shall also include workplace-hazard recognition and deterrence, including the safe handling of hazardous materials. Detainees shall learn

CCBVA0000003551

to use and understand protective devices and clothing and to report any malfunctions or other safety-related problems to their supervisors.

The CS must document all training in each detainee's detention file.

### 4. Detainee Work Hours and Pay

Detainee volunteers shall work and be paid in accordance with standard "5.8 Voluntary Work Program."

### 5. Meals for Food Service Workers

The FSA shall establish the meal schedules for detainee food service workers.

Detainee workers shall receive the same fare as other detainees. The CS shall not allow detainees to prepare "special" dishes or condiments for their own or other detainees' consumption.

Detainee workers assigned to the staff dining room may be allowed to eat in that area. All others shall eat in the main dining room, or, if the facility has no main dining room, the FSA shall designate an area for workers to eat.

### 6. Detainee Clothing

Detainees assigned to the food service department shall have a neat and clean appearance.

*Unless the facility administrator establishes other policy, the detainee food worker uniform shall consist of the following: white, short-sleeved, summer-type uniform shirts and pants; safety work shoes; and a white paper hat or white cap. White aprons or smocks of either cloth or disposable plastic may be part of the uniform.*

a. Detainees with hair shoulder-length or longer shall be required to wear a hair net under their hats or caps.

b. Detainees with facial hair shall be required to wear beard guards when working in the food preparation or food serving areas.

c. Detainees working in the garbage room, dish

machine room, pan-washing area, etc., shall be required to wear rubber or plastic aprons suited to the task and rubber boots, if required, for sanitation or safety.

d. Detainees working in refrigerated and freezer areas shall be provided appropriately insulated clothing.

### 7. Use of Tobacco

Tobacco in all its forms is prohibited in the food service department.

## D. Food Service Dining Room/Satellite Meals Operations

### 1. General Policy

Ordinarily detainees shall be served three meals every day, at least two of which shall be hot meals; however, the facility administrator may approve variations in the food service schedule during religious and civic holidays, provided that basic nutritional goals are met. The dining room schedule must allow no more than 14 hours between the evening meal and breakfast.

Clean, potable drinking water must be available.

Meals shall always be prepared, delivered and served under staff (or contractor) supervision.

Meals shall be served in as unregimented a manner as possible. The FSA's table arrangement should facilitate ease of movement and ready supervision. The dining room shall have the capacity to allow each detainee a minimum of 20 minutes dining time for each meal.

### 2. Display and Service

The following procedures apply to the display, service and transportation of food to main and satellite food service areas:

a. Before and during the meal, the CS in charge shall inspect the food service line to ensure:

1) all menu items are ready for consumption;

CCBVA0000003552

2) food is appropriately presented; and

3) sanitary guidelines are observed, with hot foods maintained at a temperature of at least 140 F degrees (120 F degrees in food trays) and foods that require refrigeration maintained at 41 F degrees or below.

b. Every open food item and beverage shall be protected from contaminants by easily cleaned sneeze-guards, cabinets, display cases or other such equipment.

c. Servers must wear food-grade plastic gloves and hair nets whenever there is direct contact with a food or beverage. Servers must use tongs, forks, spoons, ladles or other such utensils to serve any food or beverage. Serving food without use of utensils is strictly prohibited.

d. Servers shall use scoops, tongs or other approved utensils when handling or dispensing ice for consumption. The FSA shall consider the practicability of purchasing automatic ice-dispensing equipment.

e. Utensils shall be sanitized:

1) as often as necessary to prevent cross-contamination and other food-handling hazards during food preparation and service;

2) after every food preparation/service session; and

3) again, if necessary, immediately before being used.

f. Sugar, condiments, seasonings and dressings available for self-service shall be provided in individual packages, closed dispensers, or automated condiment-dispensing systems. Salad dressings may be served in open containers if the serving ladle extends beyond the top edge of the container.

g. If the facility does not have sufficient equipment to maintain the minimum or maximum temperature required for food safety, the affected items (e.g., salad bar staples such as lettuce, meat, eggs, cheese) must be removed and discarded after two hours at room temperature.

Food shall be delivered from one place to another in covered containers. These may be individual containers, such as pots with lids, or larger conveyances that can move objects in bulk, such as enclosed, satellite-meals carts.

In any facility, if food carts are delivered to housing units by detainees, they must be locked unless they are under constant supervision of staff.

All food-safety procedures (e.g., sanitation, safe-handling, storage, etc.) apply without exception to food in transit.

h. Soiled equipment and utensils must be transported to the appropriate receptacles in closed containers.

i. A member of the food service staff shall oversee the loading of satellite meal carts. Staff shall inspect all food carts before allowing their removal from the food service area.

### 3. Dining Room Workers

The CF in charge shall train dining room workers in the requirements of the job, including how to perform specific tasks. A basic task common to all dining room workers is to keep the tables and floors clean during the meal service. Once the meal service is over and the detainees have left the room, the workers can undertake major cleaning tasks.

### 4. Serving Lines

The serving counter shall be designed and constructed to separate and insulate the hot foods on the one hand and the cold foods on the other. A transparent "sneeze guard" is required.

### 5. Salad Bars and Hot Bars

Food items at salad bars and hot bars shall be arranged for logical and efficient service. A

CCBVA0000003553

transparent "sneeze guard" is required.

### 6. Beverage Counter/Bar

Self-service beverage-and-ice stations shall be designed for quick and easy access. These stations shall be designed for sanitary and efficient service, including traffic flow.

### 7. Staff Dining Room

*The FSA shall have jurisdiction over the staff dining room. The staff dining room shall offer the same food items as the detainee dining room.*

### 8. Meal tickets

The facility may establish a meal ticket program for employees and guests.

*Examples of persons who may receive meals gratis include advisors, guest speakers, technicians/others rendering a service without charge, equipment demonstrators, athletic teams, entertainers, foreign visitors, volunteers and others whose service to the facility is in the best interest of the government.*

*Individuals receiving government reimbursement for their services (e.g., contract employees, per-diem-status personnel) are ineligible for guest meals provided free of charge.*

## E. Menu Planning

### 1. General Policy

The FSA shall base menu selections on the best nutritional program the facility can afford meeting U.S. minimum daily allowances. The ICE/ERO standard menu cycle is 35 days.

The food service program significantly influences morale and attitudes of detainees and staff, and creates a climate for good public relations between the facility and the community.

The overall goal of a quality food service program is to provide nutritious and appetizing meals efficiently and within constraints of the existing budget, personnel resources, equipment and physical layout

of the facility. Nutritional needs are diverse because of differences in age, activity, physical condition, gender, religious preference and medical considerations.

The FSA shall accommodate the ethnic and religious diversity of the facility's detainee population when developing menu cycles. While each facility must meet all ICE/ERO standards and follow required procedures, individuality in menu planning is encouraged. Institutions geographically near one another shall consider the benefits of coordinating their menus and the cost-reductions to be achieved through joint purchasing.

The FSA is solely responsible for food service program planning and resource allocation and use.

### 2. Nutritional Analysis

A registered dietitian shall conduct a complete nutritional analysis that meets U.S. Recommended Daily Allowances (RDA), at least yearly, of every master-cycle menu planned by the FSA. The dietitian must certify menus before they are incorporated into the food service program. If necessary, the FSA shall modify the menu in response to the nutritional analysis to ensure nutritional adequacy. In such cases, the menu shall be revised and re-certified by the registered dietician.

If the master-cycle menus change significantly during the year, the cycle shall be reevaluated to ensure nutritional values are maintained.

## F. Food Preparation

### 1. General Policy

The CS or equivalent is responsible for ensuring that all items on the master-cycle menu are prepared and presented according to approved recipes. This responsibility includes assessing the availability and condition of ingredients required by particular recipes, and communicating supply needs to the FSA. For this reason, the CS shall review upcoming menu items as much in advance as possible.

CCBVA0000003554

The CS or equivalent has the authority to change menu items when necessary. Every such change or substitution must be documented and forwarded to the FSA. The CS shall exercise this menu-changing authority as infrequently as possible.

Knowledge of ingredients, quantities and food preparation techniques and procedures is essential for producing quality products.

## 2. Preparation Guidelines

Food shall be prepared with minimal manual contact. Food service workers shall thoroughly wash fruits and vegetables with fresh water before cooking or serving raw.

A worker shall test-taste with a clean fork or spoon only; using a soiled food preparation utensil is prohibited. Test-tasting utensils, unless disposable, must be washed after every usage. Disposable test-tasting utensils shall be discarded after a single use.

Any food cooked at a lower temperature than provided below constitutes a food safety hazard and shall not be served. Food service staff and detainee workers involved in cooking shall ensure that the following foods are cooked at the required temperatures:

a. Raw eggs, fish, meat and foods containing these items—145 F degrees or higher

b. Game animals, comminuted (ground) fish and meats, injected meats and eggs not intended for immediate consumption—155 F degrees or higher

c. Stuffing containing fish, meat, or poultry—165 F degrees or higher

d. Roast beef and corned beef—145 F degrees or higher

Potentially hazardous foods that have been cooked and then refrigerated shall be quickly and thoroughly reheated at a minimum of 165 F degrees before being served. Steam tables, warmers and similar hot food holding equipment are prohibited

for the rapid reheating of these foods.

After being reheated at 165 F degrees, the food may be maintained at 140 F degrees on a heated steam line or equivalent warming equipment.

The facility shall obtain pasteurized milk and milk products from approved facilities only. Manufactured milk products shall meet federal standards for quality.

The facility may use reconstituted dry milk and dry milk products for cooking and baking purposes, in instant desserts and in whipped items. If reconstituted in-house, the dry milk and milk products shall be used for cooking purposes only. Powdered milk reconstituted in an approved milk-dispensing machine or "mechanical cow" may be used for drinking purposes. To ensure wholesomeness, an approved laboratory shall test milk produced in the mechanical cow twice monthly for presence of bacteria. The mechanical cow shall be disassembled, cleaned and sanitized before and after each use.

Powdered milkshake or ice cream mix, reconstituted in an approved ice cream machine, may be used. An approved laboratory shall test dairy-based products produced in the machine for the presence of bacteria monthly. The ice cream machine shall be disassembled, cleaned and sanitized before and after each use.

Liquid, frozen and dry eggs and egg products are pasteurized at temperatures high enough to destroy pathogenic organisms that might be present; however, because of the possibility of contamination or recontamination after opening, thawing or reconstitution, these products shall be primarily used in cooking and baking.

Nondairy creaming, whitening or whipping agents may be reconstituted in-house only if immediately stored in sanitized, covered containers not larger than one gallon, and cooled to 41 F degrees or lower within four hours of preparation.

CCBVA0000003555

The CF shall use thermometers to ensure the attainment and maintenance of proper internal cooking, holding or refrigeration temperatures of all potentially hazardous foods.

To prevent cross-contamination, separate cutting boards must be used for raw and cooked foods. The cutting boards must be washed, rinsed and sanitized between every use.

The FSA may require use of color-coded cutting boards, which reduce the risk of cross-contamination during food preparation.

## 3. Food Cooling

Potentially hazardous food must be cooled from 140 to 70 F degrees within two hours of cooking, and from 70 to 41 F degrees or below within four hours. Foods prepared from ingredients at ambient temperature, such as reconstituted foods and canned tuna, must be cooled to 41 F degrees within two hours of cooking/preparation.

The food service department can meet time-and-temperature requirements for cooling by using any or all of the following techniques, which expedite cooling:

a. placing the food in shallow pans;

b. separating food into smaller or thinner portions;

c. using rapid cooling equipment;

d. stirring the food in a container placed in an ice water bath;

e. using containers that facilitate heat transfer;

f. adding ice as an ingredient; and/or

g. using a commercial blast-chiller.

During cooling, the food containers shall be arranged in cooling or cold-holding equipment in a way that maximizes heat transfer through the walls of the containers.

Food protected from overhead contamination shall be left uncovered during the cooling period. If the risk of overhead contamination exists, the food must be loosely covered to facilitate heat transfer from the surface of the food.

## 4. Food Thawing

Potentially hazardous food shall be thawed according to one of the following procedures:

a. under refrigeration that maintains the food at 41 F degrees or below;

b. submerged in running water;

　　1) at a water temperature of 70 F degrees or below;

　　2) with sufficient water velocity to agitate and float off loose particles in an overflow; and

　　3) for a period that does not allow thawed portions of ready-to-eat or raw animal foods to rise above 41 F degrees; also

　　4) the allowed periods for thawing include the time the food is exposed to the running water, the time to prepare food for cooking, and/or the time it takes under refrigeration to cool the food to 41 F degrees; or

c. as part of a cooking process, provided there is continuous cooking throughout the process.

## 5. Food Protection—General Requirements

Food and ice shall be protected from dust, insects and rodents, unclean utensils and work surfaces, unnecessary handling, coughs and sneezes, flooding, drainage, overhead leakage and other sources of contamination. Protection shall be continuous, whether the food is in storage, in preparation, on display or in transit.

All food storage units must be equipped with accurate easy-to-read thermometers. New heating and/or refrigeration equipment purchases shall include a zone-type thermometer with temperature graduations. Refrigeration equipment shall be designed and operated to maintain a temperature of 41 F degrees or below.

CCBVA0000003556

### 6. Hermetically Sealed Foods

Canned food that has abnormal color, taste or appearance, or which is contained in cans that show abnormalities such as bulging at ends, swelling or leakage, shall not be served. Unsuitable canned food shall be surveyed, reported and destroyed.

### 7. Potentially Hazardous Foods

Potentially hazardous foods are those foods that provide a good medium for bacteria growth. They include any perishable food that consists in whole or part of milk, milk products, eggs, meat, poultry, fish or shellfish or other high-protein foods.

Potentially hazardous foods shall be prepared with minimal manual contact. Such products shall be prepared from chilled ingredients whenever feasible. The surfaces of equipment, containers, cutting boards and utensils used for preparation and subsequent storage of potentially hazardous food shall be cleaned effectively after each use.

Potentially hazardous food shall be prepared as close to serving time as practicable. Potentially hazardous raw frozen food shall be cooked from the frozen state whenever practical. Tempering shall be accomplished by refrigeration at 40 F degrees or below or, with potable running water, at 70 F degrees or below. The potable water technique may be used only if the product is sealed in its original container. At no time shall potentially hazardous food thaw at room temperature.

All precooked, potentially hazardous, refrigerated or frozen food intended for reheating hall be heated rapidly to a temperature above 165 F degrees.

### 8. Leftovers

Prepared food items that have not been placed on the serving line may be retained for no more than 24 hours. Leftovers offered for service a second time shall not be retained for later use, but shall be discarded immediately after offering. All leftovers shall be labeled to identify the product, preparation date and time.

## G. Religious/Special Diets

### 1. General Policy

All facilities shall provide detainees requesting a religious diet a reasonable and equitable opportunity to observe their religious dietary practice, within the constraints of budget limitations and the security and orderly running of the facility, by offering a common fare menu. While each request for religious diet accommodation is to be determined on a case-by-case basis, ICE anticipates that facilities will grant these requests unless an articulable reason exists to disqualify someone for religious accommodation or the detainee's practice poses a significant threat to the secure and orderly operation of the facility. Information about the availability of religious and special diets shall be provided to detainees in a language or manner that they can understand.

"Common Fare" refers to a no-flesh protein option provided whenever an entrée containing flesh is offered as part of a meal. Likewise, a "Common Fare" meal offers vegetables, starches and other foods that are not seasoned with flesh. This diet is designed as the foundation from which modifications can be made to accommodate the religious diets of various faiths.

When considering denying a request by a detainee to participate in the religious diet program, or removal of a detainee from the religious diet program, the facility administrator, or his/her designee, shall consult with the local FOD prior to denying the request or prior to removing a detainee from the program. To participate in the common fare program, a detainee shall initiate an "Authorization for Common Fare Participation" form (Appendix 4.1.A) for consideration by the chaplain (or FSA). On the form, the detainee shall provide a written statement articulating the religious motivation for participation in the common fare program. Oral interpretation or written assistance

CCBVA0000003557

shall be provided to illiterate or limited-English proficient detainees as necessary in completing this form. If participation is approved, the chaplain or FSA shall forward a copy of the form for inclusion in the detainee's detention file.

Detainees whose religious beliefs require adherence to particular dietary laws or generally accepted religious guidelines and practices shall be referred to the chaplain. The chaplain shall verify the religious diet requirement by reviewing files and consulting with religious representatives. In the case of an unorthodox request, the chaplain or religious services coordinator is encouraged to consult established clergy contacts in the community to determine whether a request pertaining to a particular faith is appropriate. Facilities may employ different mechanisms to determine if a detainee's request should be granted; however, the determination may not impose a substantial burden on a detainee's religious exercise or necessitate lengthy questionnaires or numerous interviews. Response to the request for a religious diet must be provided in a timely manner, and documented. Absent an articulable reason to deny the request, the presumption must be that the detainee's request constitutes a legitimate exercise of religious belief and practice.

The chaplain or religious services coordinator and FSA shall issue specific written instructions for the implementation of the diet as soon as practicable and within 10 business days of verification.

*Once a religious diet has been approved, the FSA shall issue, in duplicate, a special-diet identification card.*

*This diet-identification card shall contain the following information:*

*a. detainee name and A-number;*

*b. type of religious diet prescribed;*

*c. expiration date, within 90 days; and*

*d. signature of the FSA.*

*The FSA shall contact the appropriate individual or department to obtain a photo of the detainee, and shall attach the photo to the identification card. The FSA shall ensure that the food service department receives one copy of the special-diet identification card. The second identification card shall be issued to the detainee who, at every meal, must present the card to the CS on duty. The second copy of the consultation sheet shall be filed in the detainee's detention file.*

*Any time a detainee on a religious diet refuses a meal and/or accepts the regular mainline meal in place of the religious meal, the cook on duty shall notify the FSA in writing.*

**2. Standard Common Fare Menu (Religious Diet)**

Common fare is intended to accommodate detainees whose religious dietary needs cannot be met on the mainline. The common fare menu is based on a 14-day cycle, with special menus for the ten federal holidays. The menus must be certified as exceeding minimum daily nutritional requirements and meeting RDAs. Beverages shall be selected from the regular menu.

**3. Changes to the standard Common Fare Menu**

Modifications to the standard common fare menu may be made at the local level for various reasons. For example, seasonal variations affect the availability of fresh produce in different locations, making menu modifications inevitable. Modifications may also be made to meet the requirements of various faith groups (e.g., for the inclusion of kosher and/or halal flesh-food options).

With the facility administrator's concurrence, the FSA may make temporary, nutritionally equal substitutions for fresh seasonal produce that violates no religious dietary requirements. The chaplain or local religious representatives shall be consulted if technical questions arise. The Chaplain shall escort other clergy to the common fare preparation area for

CCBVA0000003558

frequent, random monitoring of compliance with religious dietary requirements.

### 4. Hot Entree Availability

To the extent practicable, a hot flesh-food entree shall be available to accommodate detainees' religious dietary needs. Hot entrees shall be offered daily and shall be purchased, prepared and served in a manner that does not violate the religious requirements of any faith group.

### 5. Kosher Requirements

With the exception of fresh fruits and vegetables, the facility's kosher-food frozen entrees shall be purchased precooked in a sealed container, heated and served hot. Other kosher-food purchases shall be fully prepared, ready-to-use and bearing the symbol of a recognized kosher-certification agency. Any item containing pork or a pork product is prohibited. Only bread and margarine labeled "pareve" or "parve" shall be purchased for the kosher tray.

### 6. Plates and Utensils

Kosher trays shall be served with disposable plates and utensils, except when a supply of reusable plates and utensils has been set aside for kosher-food service only. Separate cutting boards, knives, food scoops, food inserts and other such tools, appliances and utensils shall be used to prepare kosher-foods, and shall be identified accordingly. Meat and dairy food items and the service utensils used with each group shall be stored in areas separate from each other. A separate dishpan shall be provided for cleaning these items, if a separate or three-compartment sink is not available.

### 7. Religious Requirements

If a facility has a no-pork menu, in order to alleviate any confusion for those who observe no-pork diets for religious reasons, the above information, within "Section G," shall be included in the facility's handbook and the facility orientation. If the facility has a chaplain, he/she shall also be made aware of the policy.

### 8. Nutritional Requirements

Common fare menus shall meet RDAs. A detainee who chooses the common fare menu shall select beverages only from the regular menu.

### 9. Instant Food and Beverages

The food service shall provide a hot-water urn for reconstituting instant beverages and foods for use by detainees.

### 10. Plates and Utensils

Common Fare meals shall be served with disposable plates and utensils, except when a supply of reusable plates and utensils has been set aside for common fare service only. Separate cutting boards, knives, food scoops, food inserts and other such tools, appliances and utensils shall be used to prepare common fare foods, and shall be identified accordingly. Meat and dairy food items and the preparation and service utensils used with each group shall be stored in areas separate from each other. A separate dishpan shall be provided for cleaning these items, if a separate or three-compartment sink is not available.

The chaplain shall escort other clergy to the common fare preparation area for frequent, random monitoring of compliance with religious dietary requirements.

### 11. Application and Removal

The facility administrator, in consultation with the chaplain, shall be the approving official for a detainee's removal from the common fare program. The facility administrator or chaplain is required to consult with the local FOD prior to denying any request for a religious diet.  In addition, once a detainee has been approved for a religious diet program, he or she may not be removed from the program without prior consultation with and concurrence from the FOD.  Denial or removal from a religious diet must be documented with the

CCBVA0000003559

date and reason, and must be approved by the facility administrator.  The documentation should also include the date of FOD concurrence.

Food service staff shall refer to the daily roster to identify detainees in the common fare program. Staff shall not use this information to disparage a detainee's religion or religious views or to attempt to dissuade him/her from participating in the program.

a.  The FSA shall monitor the food selections of all detainees participating in the common fare program to ensure the legitimacy of their participation.

b.  Staff shall train and supervise all detainees with common fare assignments.

c.  A detainee's temporary adoption of a medically prescribed diet or placement in a Special Management Unit (SMU) shall not affect his/her access to common fare meals. However, if a prescribed medical diet conflicts with the common fare diet, the medical diet takes precedence.

d.  A detainee who has been approved for a common fare menu must notify the chaplain, in writing, if he/she wishes to withdraw from the religious diet.  Oral interpretation or written assistance shall be provided to illiterate or limited-English proficient detainees as necessary in providing written notice of withdrawal from a religious diet.

The Chaplain may recommend withdrawal from a religious diet if the detainee is documented as being in violation of the terms of the religious diet program to which the detainee has agreed in writing. If a detainee refuses five consecutive common fare meals, the chaplain may recommend in writing that the facility administrator remove the detainee from the program. Detainees participating in the common fare program may also consume items for sale through the facility's commissary program without risk of being removed from the

program, as long as such purchases are consistent with the common fare program. However, purchase of foods items inconsistent with the common fare program may be grounds for removal from the program.

To preserve the integrity and orderly operation of the religious diet program and to prevent fraud, detainees who withdraw or are removed may not be immediately re-established back into the program.

The process of re-approving a religious diet for a detainee who voluntarily withdraws or who is removed ordinarily may take up to ten days. However, repeated withdrawals, voluntary or otherwise, may result in a waiting period of up to one month before the re-approval request is decided. The decision to remove and/or reinstate a detainee rests with the facility administrator, in consultation with the chaplain and/or local religious representatives, if necessary.

## 12. Annual Ceremonial Meals

The chaplain, in consultation with local religious leaders as necessary, shall develop the ceremonial meal schedule for the subsequent calendar year and shall provide this schedule to the facility administrator. The schedule shall include the date, religious group, estimated number of participants and special foods required. Ceremonial and commemorative meals shall be served in the food service facility, unless otherwise approved by the facility administrator.

The food service department shall be the only source of procurement for food items. To maintain equity in menu design, all meals shall be limited to food items on the facility's master-cycle menu. To facilitate food preparation, consultations between the FSA and local religious representative(s) concerning appropriate menus shall occur six to eight weeks in advance of the scheduled observance. The religious provider may, through the food service department, procure the ritual observance food items (in minimal quantities). Such items shall not generally constitute

CCBVA0000003560

the main entree for the ceremonial meal.

**13. Religious Fasts and Seasonal Observances**

The common fare program shall accommodate detainees abstaining from particular foods or fasting for religious purposes at prescribed times of year, including, but not limited to:

a. Ramadan
During Ramadan, Muslims participating in the fast shall receive the approved meals after sundown for consumption in the food service department or SMU.

During the December fast, vegetarian or hot fish dishes shall replace meat entrees. Fasters shall receive both noon and evening meals after sundown.

Detainees not participating in the common fare program, but electing to observe Ramadan or the December fast shall be served the main meal after sundown. If the main menu does not meet religious requirements, the detainee may participate in the common fare program during the period in question.

Each facility may provide a bag breakfast or allow detainees to go to the food service department for breakfast before dawn. Bag breakfasts shall contain nonperishable items such as ultra-high pasteurized milk, fresh fruit, peanut butter, dry cereal, etc. The menu for the common fare program cannot be used for a bag breakfast.

b. Passover
The facility shall have the standard Kosher-for-Passover foods available for Jewish detainees during the eight-day holiday. The food service department shall be prepared to provide Passover meals to new arrivals.

All Jewish detainees observing Passover shall be served the same Kosher-for-Passover meals, whether or not they are participating in the common fare program.

c. Lent
During the Christian season of Lent, a meatless meal (lunch and dinner) shall be served on the food service line on Fridays and on Ash Wednesday.

**14. Common Fare Recordkeeping and Costs**

The FSA shall estimate quarterly costs for the common fare program and include this figure in the quarterly budget. The FSA shall maintain a record of the actual costs of both edible and non-edible items.

## H. Medical Diets

**1. Therapeutic Diets**

Detainees with certain conditions—chronic or temporary; medical, dental, and/or psychological—shall be prescribed special diets as appropriate.

Special (therapeutic) diets shall be authorized by the clinical director (CD) on Form IHSC-819, or equivalent, detainee special need(s). The form shall specify the type of therapeutic diets to be prescribed and, if necessary, renewed, in 90-day increments. Once prescribed, the diet shall be made available to the detainee by the next business day.

*The cook on duty shall notify the FSA and/or CS in writing any time a detainee on a therapeutic diet refuses the special meal or accepts the regular meal from the main food service line.*

**2. Snacks or Supplemental Meals**

The physician may order snacks or supplemental meals for such reasons as:

a. insulin-dependent diabetes;

b. a need to increase protein or calories for pregnancy, cancer, AIDS, etc.; and/or

c. a need to take prescribed medication with food.

## I. Specialized Food Service Programs

**1. Satellite Meals**

"Satellite meals" refers to food prepared in one

CCBVA0000003561

location for consumption elsewhere (e.g., general housing units, the SMU, remote housing areas, etc.).

The sanitary standards required in the food service department, from preparation to actual delivery, also apply to satellite meals. Satellite meals and microwave instructions (if applicable) shall be posted where satellite meals are served.

Foods shall be kept sufficiently hot or cold to arrest or destroy the growth of infectious organisms. The FSA shall ensure that staff members understand the special handling required with potentially hazardous foods, such as meat, cream or egg dishes. Staff must understand the critical importance of time and temperature in delivering safe food.

To prevent bacteria growth, food must be prepared and held at the proper temperatures until served. Satellite tray meals must be delivered and served within two hours of food being plated.

Foods in the potentially hazardous category shall remain under refrigeration until cooking time and, after cooking, maintained at or above 140 F degrees. Hot foods must be placed in a heated serving line during tray assembly. Thermal bags and carts, refrigerated carts, thermal compartment trays, etc., shall be used for satellite meals.

Outside foods prepared in bulk for transportation to a remote housing unit or other location shall be transported in thermal containers that maintain cold items at temperatures below 41 F degrees and/or hot items at temperatures above 140 F degrees, excluding items served within the two-hour window for meal service.

## 2. Weekend and Holiday Meal Schedule

When weekend and/or holiday meal schedules differ from the weekday schedule, detainees in the SMU shall receive a continental breakfast or regular breakfast items. Brunch service shall conform to the breakfast meal pattern, and dinner service to the noon or evening meal pattern.

## 3. Selection of Menu Courses

Care must be taken to ensure that culturally diverse meals are provided in such portions as to be nutritionally adequate.

## 4. Segregation Unit Food Rations

Food items in excess of the normal prescribed ration shall not be given to detainees in segregation units as a reward for good behavior, nor shall food rations be reduced or changed or otherwise used as a disciplinary tool.

## 5. Segregation Unit Sack Lunches

Detainees in segregation units shall receive sack meals only with the facility administrator's written authorization. The medical department shall be consulted when necessary.

## 6. Sack Meals

All meals shall be served from established menus in the dining room or housing units. In some circumstances, detainees may be provided sack meals.

Sack meals shall be provided for detainees being transported from the facility, detainees arriving or departing between scheduled meal hours, and detainees in the SMU, as provided above.

a.   Quality
     Sack meals shall be of the same nutritional quality as other meals prepared by the food service.

b.   Preparation
     Members of the food service staff shall prepare sack meals for detainees who are being transported to/from other locations by bus or air service. While detainee volunteers assigned to the food service department shall not be involved in preparing meals for transportation, they may prepare sack meals for on-site consumption.

A designated member of the transportation by land or plane crew shall pick up all sack meals prepared for detainee transportation from the food service department. Before departing, this crew member shall inspect the sacks for:

CCBVA0000003562

1) quality of contents;

2) proper wrapping; and

3) correct individual counts.

c. Contents

For any detainee who shall be transported by the ICE Air Operations (IAO), the sack lunch must comply with IAO criteria. Otherwise, the following requirements are applicable:

Each sack shall contain at least two sandwiches, of which at least one shall be meat (non-pork). Commercial bread or rolls may be preferable because they include preservatives. To ensure freshness, fresh, facility-made bread may be used only if made on the day of lunch preparation. Sandwiches shall be individually wrapped or bagged in a secure fashion to prevent the food from spoiling. Meats, cheeses, etc., shall be freshly sliced the day of sandwich preparation. Leftover cooked meats shall not be used after 24 hours.

In addition, each sack shall include:

1) one piece of fresh fruit, or properly packaged canned fruit (or paper cup with lid), complete with a plastic spoon;

2) one ration of a dessert item, like cookies, doughnuts and fruit bars; and

3) such extras as:

   a) properly packaged fresh vegetables, like celery sticks and carrot sticks; or

   b) commercially packaged "snack foods," such as peanut butter crackers, cheese crackers and individual bags of potato chips.

These items enhance the overall acceptance of the lunches.

Extremely perishable items such as fruit pie, cream pie and other items made with milk, cream or other dairy ingredients shall be excluded.

d. Packaging

Whenever possible, the food service department shall pack sack meals intended for bus or air service in disposable "snack boxes" that are designed for proper placement of contents and to afford maximum protection during handling, packaging and transporting.

If necessary, paper bags may be used.

These lunches shall be stored in a secured, refrigerated area until pickup.

## J. Safety and Sanitation

### 1. General Policy

All food service employees are responsible for maintaining a high level of sanitation in the food service department. An effective food sanitation program prevents health problems, creates a positive environment and encourages a feeling of pride and cooperation among detainees.

Food service staff shall teach detainee workers personal cleanliness and hygiene; sanitary methods of preparing, storing and serving food; and the sanitary operation, care and maintenance of equipment, including automatic dishwashers and pot and pan washers.

### 2. Personal Hygiene of Staff and Detainees

a. All food service personnel shall wear clean garments, maintain a high level of personal cleanliness and practice good hygiene at all times. They shall wash hands thoroughly with soap or detergent before starting work and as often as necessary during the shift to remove soil or other contaminants.

b. Staff and detainees shall not resume work after visiting the toilet facility without first washing their hands with soap or detergent. The FSA shall post signs to this effect.

c. Neither staff nor detainees shall use tobacco in a food service work area. If they use tobacco in a smoking-permitted area, they shall wash their hands before resuming work.

CCBVA0000003563

d. All staff and detainees working in the food preparation and service area(s) shall use effective hair restraints. Personnel with hair that cannot be adequately restrained shall be prohibited from food service operations. Head coverings, gloves and beard guards are encouraged, but not required, when staff members are distributing covered serving trays.

e. Detainee food service workers shall be provided with and required to use clean white uniforms while working in a food preparation area or on the serving line.

f. All food service personnel working in the food service department shall be provided with and required to use approved rubber-soled safety shoes.

g. To prevent cross-contamination, staff and detainees who prepare or serve food shall not be assigned to clean latrines, garbage cans, sewers, drains or grease traps, or other such duties, during the period of food preparation.

h. Only authorized food service personnel shall be tasked with preparing and serving food.

i. Authorization is based on approval from the facility's health services department.

j. Only authorized personnel shall be allowed in the food preparation, storage or utensil-cleaning areas of the food service area.

### 3. Medical Examination

The facility administrator shall document that food service personnel have received a pre-employment medical examination to identify communicable diseases that may contraindicate food service work.

The medical department shall document detainees' clearance for food service work prior to their assuming food service duties. The food service department shall refer to the medical department detainees that have been absent from work for reasons of communicable illness, for a determination

of medical clearance prior to resuming food service work.

### 4. Daily Health Checks

The CF or detention staff assigned to food service shall inspect all detainee food service workers on a daily basis at the start of each work period. Detainees who exhibit signs of illness, skin disease, diarrhea (admitted or suspected) or infected cuts or boils shall be removed from the work assignment and immediately referred to health services for determination of fitness for duty. The detainees shall return to work only after the FSA has received written clearance from health services staff.

### 5. Environmental Sanitation and Safety

All facilities shall meet the following environmental standards:

a. Facilities must be clean and well-lit, and must display orderly work and storage areas.

b. Overhead pipes must be removed or covered to eliminate the food-safety hazard posed by leaking or dusty pipes.

c. Walls, floors and ceilings in all areas must be cleaned routinely.

d. Facilities must employ ventilation hoods to prevent grease buildup and wall/ceiling condensation that can drip into food or onto food contact surfaces. Filters or other grease-extracting equipment shall be readily removable for cleaning and replacement.

e. The area underneath sprinkler deflectors must have at least an 18-inch clearance.

f. Facilities must possess hazard-free storage areas:

   1) Bags, containers, bundles, etc., shall be stored in tiers and stacked, blocked, interlocked and limited in height for stability and security against sliding or collapsing.

   2) No flammable material, loose cords, debris or other obvious hazards may be present.

CCBVA0000003564

3) No pests or infestations may be present.

g. ==Aisles and passageways shall be kept clear and in good repair, with no obstruction that may create a hazard or hamper egress.==

h. ==To prevent cross-contamination, kitchenware and food-contact surfaces shall be washed, rinsed and sanitized after each use and after any interruption of operations during which contamination may occur.==

i. Facilities must possess a ready supply of hot water (105-120 F degrees).

j. ==Garbage and other trash shall be collected and removed as often as possible. Garbage/refuse containers shall have sufficient capacity for the volume and shall be kept covered, insect- and rodent-proof and frequently cleaned. The facility shall comply with all applicable regulations (local, state and federal) on refuse handling and disposal and standard "1.2 Environmental Health and Safety."==

k. ==The premises shall be maintained in a condition that prevents the feeding or nesting of insects and rodents. Outside openings shall be protected by tight-fitting screens, windows, controlled air curtains and self-closing doors.==

## 6. Equipment Sanitation

Information about the operation, cleaning and care of equipment shall be obtained from manufacturers or local distributors. A file of such reference material shall be maintained in the food service department and used in developing equipment cleaning procedures for training. Sanitation shall be a primary consideration in the purchase and placement of equipment.

Equipment shall be installed for ease of cleaning, including the removal of soil, food materials and other debris that collects between pieces of equipment or between the equipment and walls or floor. Older facilities that may not have the advantage of the latest designs and equipment can

meet sanitation standards through careful planning, training and supervision.

==The FSA shall develop a schedule for the routine cleaning of equipment.==

## 7. Equipment and Utensils

a. Information
All food service equipment and utensils shall meet the National Sanitation Foundation International (NSF) standards or equivalent standards of other agencies.

b. Materials

1) Materials used in the construction or repair of multi-use equipment and utensils shall:

a) be non-toxic, non-corrosive, non-absorbent, durable under normal use, smooth and easily cleaned;

b) impart no odors, colors or tastes; and

c) retain their original properties under repeated use, creating no risk of food-adulteration as they deteriorate.

2) Paint is prohibited on any surface that may come into contact with food.

3) Milk-dispensing tubes shall be cut diagonally about two inches from the cutoff valve. Bulk milk dispensers shall be equipped with thermometers.

c. Design and Fabrication

1) All food service equipment and utensils (including plastic ware) shall be designed and fabricated for durability under normal use.

a) Such equipment shall be readily accessible, easily cleaned and resistant to denting, buckling, pitting, chipping and cracking.

2) Equipment surfaces not intended for contact with food, but located in places exposed to splatters, spills, etc., require frequent cleaning. Therefore, they shall be reasonably smooth,

CCBVA0000003565

washable, free of unnecessary ridges, ledges, projections and crevices. Upkeep of equipment surfaces shall contribute to cleanliness and sanitation.

d.  Installation

1)  Equipment shall be installed in accordance with the manufacturer's instructions and good engineering practices.

2)  Installers shall allow enough space between pieces of equipment and between equipment and walls to facilitate routine cleaning. Adjacent pieces may be butted together if the gap between them is sealed.

e.  General Cleaning Procedures

1)  Moist cloths for wiping food spills on kitchenware and food-contact surfaces on equipment shall be clean, rinsed frequently in sanitizing solution and used solely for wiping food spills. These cloths shall soak in the sanitizing solution between uses.

2)  Moist cloths used for non-food-contact surfaces like counters, dining table tops and shelves shall be cleaned, rinsed and stored in the same way as the moist cloths used on food-contact surfaces. They shall be used on non-food-contact surfaces only.

3)  Detergents and sanitizers must have Food and Drug Administration approval for food service uses.

f.  Manual Cleaning and Sanitizing

1)  A sink with at least three labeled compartments is required for manually washing, rinsing and sanitizing utensils and equipment. Each compartment shall have the capacity to accommodate the items to be cleaned. Each shall be supplied with hot and cold water.

2)  Drain-boards and/or easily movable dish-tables shall be provided for utensils and equipment both before and after cleaning.

3)  Equipment and utensils shall be pre-flushed, pre-scraped and, when necessary, pre-soaked to remove gross food particles. A fourth sink compartment with a garbage-disposal is useful for these purposes and shall be included in plans for facilities being built or renovated.

4)  Except for fixed equipment and utensils too large to be cleaned in sink compartments, the following procedures apply to cleaning equipment and utensils:

a)  Wash in the first sink compartment, using a hot detergent solution changed frequently to keep it free from soil and grease.

b)  Rinse in or under hot water in the second compartment, changing the rinse water frequently. This compartment shall be kept empty, and a sprayer shall be used for rinsing to prevent rinse water from becoming soapy or contaminated.

c)  Sanitize in the third compartment using one of the following methods:

i.   Immerse for at least 30 seconds in clean water at a constant temperature of 171 F degrees that is maintained with a heating device and frequently checked with a thermometer. Use dish baskets to immerse items completely.

ii.  Immerse for at least 60 seconds in a sanitizing solution containing at least 50 parts per million (ppm) chlorine at a temperature of at least 75 F degrees.

iii. Immerse for at least 60 seconds in a sanitizing solution containing at least 12.5 ppm iodine, with a pH not higher than 5.0 and a temperature of at least 75 F degrees.

iv.  Immerse in a sanitizing solution containing an equivalent sanitizing

CCBVA0000003566

chemical at strengths recommended by the U.S. Public Health Service.

v. Periodically check and adjust as necessary the chemical concentrations in a sanitizing solution, using a test kit.

vi. Air dry utensils and equipment after sanitizing.

vii. Steam clean oversized equipment, provided the steam can be confined to the piece of equipment. Alternatively, rinse, spray or swab with a chemical sanitizing solution mixed to at least twice the strength required for immersion sanitizing.

g. Mechanical Cleaning and Sanitizing

Spray or immersion dishwashers or devices, including automatic dispensers for detergents, wetting agents and liquid sanitizer, shall be maintained in good repair. Utensils and equipment placed in the machine must be exposed to all cycles.

1) The pressure of the final rinse water must be between 15 and 25 pounds per square inch (psi) in the water line immediately adjacent to the final-rinse control valve.

2) Machine- or water line-mounted thermometers must be installed to check water temperature in each dishwasher tank, including the final rinse water.

Baffles, curtains, etc., must be used to prevent wash water from entering the rinse water tank(s) and time conveyors to ensure adequate exposure during each cycle.

Equipment and utensils must be placed on conveyors or in racks, trays and baskets to expose all food-contact surfaces to detergent, washing and rinsing without obstruction and to facilitate free draining.

3) The following temperatures must be maintained for hot-water sanitizing:

a) Single-tank, stationary rack, dual-temperature machine: wash temperature of 150 F degrees; final rinse, 180 F degrees.

b) Single-tank, stationary rack, single-temperature machine: wash and rinse temperature of 165 F degrees.

c) Multi tank, conveyor machine: wash temperature of 150 F degrees; pumped rinse, 160 F degrees; final rinse, 180 F degrees.

d) Single-tank, pot/pan/utensil washer (stationary or moving rack): wash temperature of 140 F degrees; final rinse, 180 F degrees.

i. When using a chemical spray in a single-tank, stationary rack, glass-washer, maintain a wash temperature of at least 120 F degrees, unless otherwise specified by the manufacturer.

ii. Air-dry all equipment and utensils after sanitizing, by means of drain boards, mobile dish tables and/ or carts.

h. Equipment and Utensil Storage. Eating utensils shall be picked up by their bases or handles only. Utensils shall be stored in perforated pans only.

Glasses, tumblers and cups shall be inverted before storing. Other tableware and utensils may be either covered or inverted.

## 8. Storage of Clothing and Personal Belongings

Clothes and other personal belongings (e.g., jackets, shoes) shall be stored in designated areas, apart from:

a. areas for the preparation, storage and serving of food; and

b. areas for the washing and storing of utensils.

The FSA shall identify space for storing detainee belongings.

CCBVA0000003567

## 9. Lavatories

Adequate and conveniently located toilet facilities shall be provided for all food service staff and detainee workers.

a. Toilet fixtures shall be of sanitary design and readily cleaned.

b. Toilet rooms and fixtures shall be kept clean and in good repair.

c. Signs shall be prominently displayed.

d. Lavatories shall have readily available hot and cold water.

e. Soap or detergent and paper towels or a hand-drying device providing heated air, shall be available at all times in each lavatory.

f. Waste receptacles shall be conveniently placed near the hand-washing facilities.

## 10. Pest Control

Good sanitation practices are essential to an effective pest control program. The FSA is responsible for pest control in the food service department, including contracting the services of an outside exterminator as necessary.

To protect against insects and other pests, air curtains or comparable devices shall be used on outside doors where food is prepared, stored or served.

## 11. Hazardous Materials

Only those toxic and caustic materials required for sanitary maintenance of the facility, equipment and utensils shall be used in the food service department.

a. All food service staff shall know where and how much toxic, flammable or caustic material is on hand, and shall be aware that their use must be controlled and accounted for daily.

b. Detainee-type combination locks shall not be used to secure such material.

c. All containers of toxic, flammable or caustic

materials shall be prominently and distinctively labeled for easy content identification.

d. All toxic, flammable and caustic materials shall be segregated from food products and stored in a locked and labeled cabinet or room.

e. Cleaning and sanitizing compounds shall be stored apart from food products.

f. Toxic, flammable and caustic materials shall not be used in a manner that may contaminate food, equipment or utensils or may pose a hazard to personnel or detainees working with or consuming food service products.

g. A system for intermediate storage of received hazardous substances shall secure the materials from time of receipt to time of issue.

The FSA shall obtain and file for reference Material Safety Data Sheets (MSDSs) on all flammable, toxic and caustic substances used in the facility as required by standard "1.2 Environmental Health and Safety."

## 12. General Safety Guidelines

a. Extension cords shall be UL-listed and UL-labeled and may not be used in tandem.

b. All steam lines within seven feet of the floor or working surface, and with which a worker may come in contact, shall be insulated or covered with a heat-resistant material or otherwise be guarded from contact.  Inaccessible steam lines, guarded by location, need not be protected from contact.

c. Machines shall be guarded in compliance with OSHA standards:

1) Fans within seven feet of the floor or work surface shall have blade guard openings no larger than two inches.

2) Protective eye and face equipment shall be used, as appropriate, to avert risk of injury. Dangerous areas presenting such risks shall be conspicuously marked with eye-hazard

CCBVA0000003568

warning signs.

3) Safety shoes shall be worn in FSA-designated foot hazard areas.

4) Meat saws, slicers and grinders shall be equipped with anti-restart devices.

5) The maintenance manager shall provide ground fault protection wherever needed in the food service department, and shall document this protection for the FSA.

d.  Light fixtures, vent covers, wall-mounted fans, decorative materials and similar equipment and materials attached to walls or ceilings shall be maintained in good repair.

e.  Lights in food production areas, utensil and equipment washing areas, and other areas displaying or storing food, equipment, or utensils shall be equipped with protective shielding.

f.  An approved, fixed fire-suppression system shall be installed in ventilation hoods over all grills, deep fryers and open flame devices. A qualified contractor shall inspect the system every six months. The fire-suppression system shall be equipped with a locally audible alarm and connected to the control room's annunciator panel.

g.  Hood systems shall be cleaned after each use to prevent grease build-up, which constitutes a fire risk. All deep fryers and grills shall be equipped with automatic fuel or energy shut-off controls.

**13. Mandatory Inspection**

The facility administrator shall implement written procedures requiring the food service administrator or designee to conduct the weekly inspections of all food service areas, including dining, storage, equipment and food-preparation areas.

All of the food service department equipment (e.g., ranges, ovens, refrigerators, mixers, dishwashers, garbage disposal) require frequent inspection to ensure their sanitary and operable condition. Staff

shall check refrigerator and water temperatures daily and record the results. The FSA or designee shall verify and document requirements of food and equipment temperatures.

The FSA or CS shall inspect food service areas at least weekly.

An independent, external inspector shall conduct annual inspections to ensure that the food service facilities and equipment meet governmental health and safety codes.

Personnel inspecting the food service department shall note any recommended corrective actions in a written report to the facility administrator. The facility administrator shall establish the date by which identified problems shall be corrected.

Checks of equipment temperatures shall follow this schedule:

a.  dishwashers: every meal;

b.  pot and pan washers: daily, if water in the third compartment of a three-compartment sink is used for sanitation and the required minimum temperature is 180 F degrees; and

c.  refrigeration/freezer equipment (walk-in units): site-specific schedule, established by the FSA.

All temperature-check documentation shall be filed and accessible.

The FSA shall develop a cleaning schedule for each food service area and post it for easy reference. All areas (e.g., walls, windows, vent hoods) and equipment (e.g., chairs, tables, fryers, ovens) shall be grouped by frequency of cleaning (e.g., after every use, daily, weekly, monthly, semiannually or annually).

## K. Food Storage, Receiving and Inventory

### 1. General Policy

Since control and location of subsistence supplies are site-specific, each FSA shall establish procedures for storing, receiving and inventorying food.

CCBVA0000003569

On the purchase request for potentially dangerous items (e.g., knives, mace, yeast, nutmeg, cloves and other items considered contraband if found in a detainee's possession), the FSA shall mark them "hot," signaling the need for special handling.

## 2. Receiving

The first step in receiving food is matching incoming items with the invoice, purchase order and control specifications. Weekly deliveries of fresh produce, meats and other perishable items shall be inspected for freshness, quality and general appearance. Staff shall supplement their inspections of perishables with random checks of weight, count, size, etc.

Receiving staff shall examine deliveries promptly to determine acceptability both for quantity and quality, consistent with the contract. If immediate examination is not practical upon delivery because inspection shall involve time-consuming tests, the vendor shall receive a receipt confirming delivery of a particular number/gross weight of containers in good condition (or, if not, noting exceptions).

## 3. Food Receipt and Storage

The following procedures apply when receiving or storing food:

a. Inspect the incoming shipment for damage, contamination and pest infestation. Rats, mice or insects may be hiding in the middle of a pallet.

b. Promptly remove damaged pallets and broken containers of food. Separate damaged food containers from other food and store separately for disposal. Take special care in handling flour, cereal, nuts, sugar, chocolate and other such products highly susceptible to contamination.

c. Upon finding that an incoming food shipment has been contaminated, contact the FSA/CS for instructions on the next course of action.

d. Store all food item products at least six inches from the floor and sufficiently far from walls to facilitate pest-control measures. A painted line may guide pallet placement. Wooden pallets may be used to store canned goods and other non-absorbent containers, but not to store dairy products or fresh produce.

e. Store perishables at 35-40 F degrees to prevent spoilage and other bacterial action, and maintain frozen foods at or below zero degrees.

f. Prevent cross-contamination by storing foods requiring washing or cooking separately from those that do not.

g. For rapid cooling, use shallow pans (depth not to exceed four inches). Cover or otherwise shield refrigerated food from contamination.

h. Do not store food in locker rooms, toilet rooms, dressing rooms, garbage rooms or mechanical rooms, or under sewer lines, potentially leaking water lines, open stairwells or other sources of contamination.

## 4. Inventory

Determining inventory levels and properly receiving, storing and issuing goods are critical to controlling costs and maintaining quality. While the FSA shall base inventory levels on facility needs, each facility shall always stock a 15-day food supply at a minimum.

Procedures for checking the quality and quantity of food and other supplies and their distribution to the point of use shall comply with industry-established policies and financial management practices.

Food service inventory represents significant financial resources converted into goods in the form of food, supplies and equipment. All food service personnel must be aware of the value of the inventory and of his/her responsibility for the security of these goods upon receipt.

The master-cycle menus offer guidance to managers planning inventory levels.

Inventory levels shall be established, monitored and periodically adjusted to correct excesses or shortages.

CCBVA0000003570

## 5. Stock Rotation

Each facility shall establish a written stock rotation schedule.

## 6. Perpetual Inventory

"Perpetual Inventory" is the process of recording all food service purchases and food distribution. Although details may vary, the information recorded always includes the quantity on hand, quantity received, quantity issued and unit cost for each food and supply item.

Perpetual inventory records are important because they provide the FSA with up-to-date information on product usage, and act as a guide for further purchases.

For accurate accounting of all food and supplies, a perpetual inventory record is insufficient. An official inventory of stores on hand must be conducted annually.

All food service departments shall complete a physical inventory of the warehouse quarterly.

## 7. The Dry Storeroom

Proper care and control of the dry storeroom involves the following:

a.  keeping the storeroom dry and cool (45-80 F degrees) to prevent swelling of canned goods and general spoilage;

b.  sealing or otherwise making impenetrable all wall, ceiling and floor openings to prevent entry of dirt, water, pests, etc.;

c.  vigilant housekeeping to keep the room clean and free from rodents and vermin (a drain for flushing is desirable); and

d.  securing the storeroom under lock and key to prevent pilferage—the FSA is responsible for key distribution.

## 8. Refrigerators

Butter, milk, eggs and cream shall be separated from foods having strong odors. Eggs shall not be subjected to freezing temperatures.

Refrigeration units shall be kept under lock and key when not in use. Walk-in boxes shall be equipped with safety locks that require no more than 15 pounds of pressure to open easily from the inside. If latches and locks are incorporated in the door's design and operation, the interior release mechanism must open the door with the same amount of pressure even when locks or bars are in place.

Whether new or used, the inside lever of a hasp-type lock must be able to disengage locking devices and provide egress. The FSA, along with the Safety Manager, shall review the walk-in freezer(s) and refrigerator(s) to ensure that they operate properly.

CCBVA0000003571

# Appendix 4.1.A: Authorization for Common Fare Participation

Name of detainee:

_____ A-number: _____

I hereby request authorization to participate in the Common Fare Program. I agree to comply with the program requirements. I understand that if I am observed consuming mainline foods or violating other program requirements, I may be removed from program participation and will not be eligible for immediate reinstatement. Repeated program violations may result in removal from the program for up to one year. I further understand that the same conditions for reinstatement may apply if I voluntarily withdraw from the program for any reason.

I understand that I must have a recorded religious preference in order to be eligible for the program and that I must provide a written reason for requesting to participate in the religious diet program.

Religious preference: _____

Specific reason for wanting to participate in the Common Fare Religious Diet Program:

Signature of detainee:

_____ A-number: _____

Date: _____

Signature of Chaplain:

_____

Date: _____

Record Copy—Detainee Detention File; Copy - Chaplaincy File; Copy—Detainee

CCBVA0000003572

# 4.5 Personal Hygiene

## I. Purpose and Scope

This detention standard ensures that each detainee is able to maintain acceptable personal hygiene practices through the provision of adequate bathing facilities and the issuance and exchange of clean clothing, bedding, linens, towels and personal hygiene items.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Each facility shall maintain an inventory of clothing, bedding, linens, towels and personal hygiene items that is sufficient to meet the needs of detainees;

2. Each detainee shall have suitable, clean bedding, linens, blankets and towels;

3. Each detainee shall have sufficient clean clothing that is properly fitted; climatically suitable, durable and presentable;

4. Detainees shall be held accountable for clothing, bedding, linens and towels assigned to them; and

5. Detainees, including those with disabilities and special needs, shall be able to maintain acceptable personal hygiene practices.

6. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate

## III. Standards Affected

This detention standard replaces the standard on "Personal Hygiene" dated 12/2/2008.

CCBVA0000003623

# IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-4B-01 through 4B-09, 6A-08, 6B-05 through 6B-08.

"*Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities*," 79 Fed. Reg. 13100 (Mar. 7, 2014).

# V. Expected Practices

## A. Supply of Clothing, Bedding, Linen, Towel and Personal Hygiene Items

Each detention facility shall have written policy and procedures for the regular issuance and exchange of clothing, bedding, linens, towels and personal hygiene items. The supply of these items shall exceed the minimum required for the number of detainees to prevent delay in replacing the items.

To be prepared for unforeseen circumstances, it is a good practice for a detention facility to maintain an excess clothing inventory that is at least 200 percent of the maximum funded detainee capacity.

Each SPC and CDF shall have available, at all times, more clothing, bedding, linen and towels than needed to supply the maximum funded detainee capacity. This excess will allow for the immediate replacement of items that are lost, destroyed, or worn out.

Clothing or shoes that are lost, unserviceable, indelibly stained, or bear offensive or otherwise unauthorized markings shall be discarded and replaced as soon as practicable.

## B. Issuance of Clothing

At no cost to the detainee, all new detainees shall be issued clean, laundered, indoor/outdoor temperature-appropriate, size appropriate, presentable clothing during intake.

The standard issue of clothing is at least two uniform shirts and two pairs of uniform pants or two jumpsuits; two pairs of socks; two pairs of underwear; two brassieres, as appropriate; and one pair of facility-issued footwear. Additional clothing shall be issued as necessary for changing weather conditions or as seasonally appropriate. Footwear that is worn out or damaged shall be replaced at no cost to the detainee.

For both males and females, personal items of clothing, including undergarments, are not permitted.

Clothing issued at release shall be in accordance with standard "2.1 Admission and Release."

## C. Special Uniforms and Protective Equipment

Each detainee assigned to a special work area shall be clothed in accordance with the requirements of the job and, when appropriate, provided protective clothing and equipment in accordance with safety and security considerations.

## D. Personal Hygiene Items

Staff shall directly supervise the issuance of personal hygiene items to male and female detainees appropriate for their gender and shall replenish supplies as needed. Distribution of hygiene items shall not be used as reward or punishment.

Each detainee shall receive, at a minimum, the following items:

1. one bar of bath soap, or equivalent;

2. one comb;

3. one tube of toothpaste;

4. one toothbrush;

5. one bottle of shampoo, or equivalent; and

6. one container of skin lotion.

The facility administrator may modify this list as needed (e.g., to accommodate the use of bulk liquid soap and shampoo dispensers).

CCBVA0000003624

The distribution of razors must be strictly controlled. Disposable razors shall be provided to detainees on a daily basis. Razors shall be issued and collected daily by staff. Detainees shall not be permitted to share razors.

Female detainees shall be issued and may retain sufficient feminine hygiene items, including sanitary pads or tampons, for use during the menstrual cycle, and may be permitted unbreakable brushes with soft, synthetic bristles to replace combs. Cosmetics are prohibited, as are electric rollers, curling irons, hair dryers and similar appliances.

The responsible housing unit officer shall replenish personal hygiene items on an as-needed basis, in accordance with written facility procedures. The facility administrator may establish an empty container exchange system.

*If the facility has no detainee commissary, personal hygiene items from sources other than the issuing officer(s) may be permitted into the housing units only with the approval of the health services staff and the Chief of Security.*

## E. Bathing and Toilet Facilities

Detainees shall be provided:

1. an adequate number of toilets, 24 hours per day, which can be used without staff assistance when detainees are confined to their cells or sleeping areas.

   ACA Expected Practice 4-ALDF-4B-08 requires that toilets be provided at a minimum ratio of one for every 12 male detainees or one for every 8 female detainees. For males, urinals may be substituted for up to one-half of the toilets. All housing units with three or more detainees must have at least two toilets.

2. an adequate number of washbasins with temperature controlled hot and cold running water 24 hours per day.

   ACA Expected Practice 4-ALDF-4B-08 requires one

washbasin for every 12 detainees.

3. operable showers that are thermostatically controlled to temperatures between 100 and 120 F degrees, to ensure safety and promote hygienic practices.

   ACA Expected Practice 4-ALDF-4B-09 requires a minimum ratio of one shower for every 12 detainees.

Inspections of housing units shall periodically measure and document water temperature in the daily log.

Detainees shall be provided with a reasonably private environment in accordance with safety and security needs. Detainees shall be able to shower, perform bodily functions, and change clothing without being viewed by staff of the opposite gender, except in exigent circumstances or when such viewing is incidental to routine cell checks or is otherwise appropriate in connection with a medical examination or monitored bowel movement. Staff of the opposite gender shall announce their presence when entering an area where detainees are likely to be showering, performing bodily functions, or changing clothing.

When operationally feasible, transgender and intersex detainees shall be given the opportunity to shower separately from other detainees.

Detainees with disabilities shall be provided the facilities and support needed for self-care and personal hygiene in a reasonably private environment in which the individual can maintain dignity. When necessary, assistance to detainees with disabilities who cannot perform basic life functions shall be provided by individuals who are trained and qualified to assist persons with physical and/or mental impairments. Such training may be provided by the health services authority and may involve the expertise of relevant community organizations and government agencies. Discrimination on the basis of disability is prohibited.

CCBVA0000003625

## F. Hair Care

Detainees are allowed freedom in personal grooming unless a valid safety, security, or medical concern requires an exception that is fully justified and documented.

Detainees shall be provided hair care services in a manner and environment that promotes sanitation and safety, in accordance with the requirements for "Barber Operations" in standard "1.2 Environmental Health and Safety" and requirements in standard "5.5 Religious Practices."

## G. Issuance of Bedding, Linen and Towels

All detainees shall be issued clean bedding, linens and a towel and be held accountable for those items.

The standard issues shall be, at a minimum:

1. bedding: one mattress, one blanket and one pillow (additional blankets shall be issued, based on local indoor-outdoor temperatures);

2. linens: two sheets and one pillowcase; and

3. towel: one towel.

## H. Exchange Requirements

Detainees shall be provided with clean clothing, linen and towels on the following basis:

1. a daily change of socks and undergarments; an additional exchange of undergarments shall be made available to detainees if necessary for health or sanitation reasons;

2. at least twice weekly exchange of outer garments (with a maximum of 72 hours between changes) at a minimum;

3. weekly exchange of sheets, towels and pillowcases at a minimum; and

4. an additional exchange of bedding, linens, towels or outer garments shall be made available to detainees if necessary for health or sanitation reasons, and more frequent exchanges of outer garments may be appropriate, especially in hot and humid climates.

Volunteer detainee workers may require exchanges of outer garments more frequently than every 72 hours; and

Volunteer food service workers shall exchange outer garments daily.

*Clothing exchanges shall generally be on a one-for-one basis to prevent hoarding and to ensure an adequate supply.*

*Detainees are not permitted to wash clothing, bedding, linens, tennis shoes, or other items in the living units, unless proper washing and drying equipment is available and the facility has written policy and procedures for their use. Any washing and drying policies and procedures shall be posted in the washing area and shall be included in the detainee handbook.*

CCBVA0000003626

# 5.8 Voluntary Work Program

## I. Purpose and Scope

This detention standard provides detainees opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of the safety, security and good order of the facility.

While not legally required to do so, ICE/ ERO affords working detainees basic Occupational Safety and Health Administration (OSHA) protections.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees may have opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of the safety, security and good order of the facility.

2. Detainees shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping.

3. Essential operations and services shall be enhanced through detainee productivity.

4. The negative impact of confinement shall be reduced through decreased idleness, improved morale and fewer disciplinary incidents.

5. Detainee working conditions shall comply with all applicable federal, state and local work safety laws and regulations.

6. There shall be no discrimination regarding voluntary work program access based on any detainee's race, religion, national origin, gender, sexual orientation or disability.

7. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or

CCBVA0000003701

who is illiterate.

# III. Standards Affected

This detention standard replaces "Voluntary Work Program" dated 12/2/2008.

This detention standard incorporates the requirements regarding detainees' assigned to work outside of a facility's secure perimeter originally communicated via a memorandum to all Field Office Directors from the Acting Director of U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) (11/2/2004).

# IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-5C-06, 5C-08, 5C-11(M), 6B-02.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "1.2 Environmental Health and Safety"; and
- "4.1 Food Service."

# V. Expected Practices

## A. Voluntary Work Program

Detainees shall be provided the opportunity to participate in a voluntary work program. The detainee's classification level shall determine the type of work assignment for which he/she is eligible. Generally, high custody detainees shall not be given work opportunities outside their housing units/living areas. Non-dedicated IGSAs will have discretion on whether or not they will allow detainees to participate in the voluntary work program.

## B. Work Outside the Secure Perimeter

ICE detainees may not work outside the secure

perimeter of non-dedicated IGSA facilities.

*In SPCs, CDFs, and dedicated IGSAs, low custody detainees may work outside the secure perimeter on facility grounds. They must be directly supervised at a ratio of no less than one staff member to four detainees. The detainees shall be within sight and sound of that staff member at all times.*

## C. Personal Housekeeping Required

Work assignments are voluntary; however, all detainees are responsible for personal housekeeping.

*Detainees are required to maintain their immediate living areas in a neat and orderly manner by:*

1. *making their bunk beds daily;*

2. *stacking loose papers;*

3. *keeping the floor free of debris and dividers free of clutter; and*

4. *refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.*

## D. Detainee Selection

The facility administrator shall develop site-specific rules for selecting work detail volunteers. These site-specific rules shall be recorded in a facility procedure that shall include a voluntary work program agreement. The voluntary work program agreement shall document the facility's program and shall be in compliance with this detention standard.

*The primary factors in hiring a detainee as a worker shall be his/her classification level and the specific requirements of the job.*

1. *Staff shall present the detainee's name to the shift supervisor or the requesting department head.*

2. *The shift supervisor or department head shall review the detainee's classification and other relevant documents in the detainee's detention file.*

3. *The shift supervisor or department head shall*

CCBVA0000003702

*assess the detainee's language skills because these skills affect the detainee's ability to perform the specific requirements of the job under supervision. To the extent possible, work opportunities shall be provided to detainees who are able to communicate with supervising staff effectively and in a manner that does not compromise safety and security.*

4. *Inquiries to staff about the detainee's attitude and behavior may be used as a factor in the supervisor's selection.*

*Staff shall explain the rules and regulations as well as privileges relating to the detainee worker's status. The detainee shall be required to sign a voluntary work program agreement before commencing each new assignment. Completed agreements shall be filed in the detainee's detention file.*

## E. Special Details

Detainees may volunteer for temporary work details that occasionally arise. The work, which generally lasts from several hours to several days, may involve labor-intensive work.

## F. Discrimination in Hiring Prohibited

Detainees shall not be denied voluntary work opportunities on the basis of such factors as a detainee's race, religion, national origin, gender, sexual orientation or disability.

## G. Detainees with Disabilities

The facility shall allow, where possible, detainees with disabilities to participate in the voluntary work program in appropriate work assignments. Consistent with the procedures outlined in Standard 4.8 "Disability Identification, Assessment, and Accommodation," the facility shall provide reasonable accommodations and modifications to its policies, practices, and/or procedures to ensure that detainees with disabilities have an equal opportunity to access, participate in, and benefit from the voluntary work programs.

## H. Hours of Work

Detainees who participate in the volunteer work program are required to work according to a schedule.

The normal scheduled workday for a detainee employed full time is a maximum of 8 hours. Detainees shall not be permitted to work in excess of 8 hours daily, 40 hours weekly.

Unexcused absences from work or unsatisfactory work performance may result in removal from the voluntary work program.

## I. Number of Details in One Day

The facility administrator may restrict the number of work details permitted a detainee during one day.

*In SPCs, CDFs, and dedicated IGSAs a detainee may participate in only one work detail per day.*

## J. Establishing Detainee Classification Level

If the facility cannot establish the classification level in which the detainee belongs, the detainee shall be ineligible for the voluntary work program.

## K. Compensation

Detainees shall receive monetary compensation for work completed in accordance with the facility's standard policy.

The compensation is at least $1.00 (USD) per day. The facility shall have an established system that ensures detainees receive the pay owed them before being transferred or released.

## L. Removal of Detainee from Work Detail

A detainee may be removed from a work detail for such causes as:

1. unsatisfactory performance;

2. disruptive behavior, threats to security, etc.;

3. physical inability to perform the essential

CCBVA0000003703

elements of the job due to a medical condition or lack of strength;

4. prevention of injuries to the detainee; and/or

5. a removal sanction imposed by the Institution Disciplinary Panel for an infraction of a facility rule, regulation or policy.

When a detainee is removed from a work detail, the facility administrator shall place written documentation of the circumstances and reasons in the detainee detention file.

Detainees may file a grievance to the local Field Office Director or facility administrator if they believe they were unfairly removed from work, in accordance with standard "6.2 Grievance System."

## M. Detainee Responsibility

The facility administrator shall establish procedures for informing detainee volunteers about on-the-job responsibilities and reporting procedures.

The detainee is expected to be ready to report for work at the required time and may not leave an assignment without permission.

1. The detainee shall perform all assigned tasks diligently and conscientiously.

2. The detainee may not evade attendance and performance standards in assigned activities nor encourage others to do so.

3. The detainee shall exercise care in performing assigned work, using safety equipment and taking other precautions in accordance with the work supervisor's instructions.

4. In the event of a work-related injury, the detainee shall notify the work supervisor, who shall immediately implement injury-response procedures.

## N. Detainee Training and Safety

All detention facilities shall comply with all applicable health and safety regulations and standards.

The facility administrator shall ensure that all department heads, in collaboration with the facility's safety/training officer, develop and institute appropriate training for all detainee workers.

1. The voluntary work program shall operate in compliance with the following codes and regulations:

    a. Occupational Safety and Health Administration (OSHA) regulations;

    b. National Fire Protection Association 101 Life Safety Code; and

    c. International Council Codes (ICC).

    Each facility administrator's designee is responsible for providing access to complete and current versions of the documents listed above.

    The facility administrator shall ensure that the facility operates in compliance with all applicable standards.

2. Upon a detainee's assignment to a job or detail, the supervisor shall provide thorough instructions regarding safe work methods and, if relevant, hazardous materials, including:

    a. safety features and practices demonstrated by the supervisor; and

    b. recognition of hazards in the workplace, including the purpose for protective devices and clothing provided, reporting deficiencies to their supervisors (staff and detainees who do not read nor understand English shall not be authorized to work with hazardous materials).

    A detainee shall not undertake any assignment before signing a voluntary work program agreement that, among other things, confirms that the detainee has received and understood training from the supervisor about the work assignment.

CCBVA0000003704

The voluntary work program agreement, which each detainee is required to sign prior to commencing each new assignment, shall be placed in the detainee's detention file.

3. For a food service assignment, medical staff, in conjunction with the U.S. Public Health Service, shall ensure that detainees are medically screened and certified before undertaking the assignment.

4. The facility shall provide detainees with safety equipment that meets OSHA and other standards associated with the task performed.

5. The facility administrator shall ensure that the facility operates in compliance with all applicable standards.

## O. Detainee Injury and Reporting Procedures

The facility administrator shall implement procedures for immediately and appropriately responding to on-the-job injuries, including immediate notification of ICE/ERO.

If a detainee is injured while performing his/her work assignment:

1. The work supervisor shall immediately notify facility medical staff. In the event the accident occurs in a facility that does not provide 24-hour medical care, the supervisor shall contact the on-call medical officer for instructions.

2. First aid shall be administered as necessary.

3. Medical staff shall determine what treatment is necessary and where that treatment shall take place.

4. The work supervisor shall complete a detainee accident report and submit it to the facility administrator for review and processing and file it in the detainee's detention file and A-file.

CCBVA0000003705