# Exhibit 14

# (REDACTED)

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| **WILHEN HILL BARRIENTOS, GONZALO BERMUDEZ GUTIÉRREZ, and KEYSLER RAMÓN URBINA ROJAS individually and on behalf of all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**CORECIVIC, INC.,**<br><br>**Defendant.** | Civil Action No.  4:18-cv-00070-CDL |

## OPENING EXPERT REPORT OF PLAINTIFF'S EXPERT DR. PABLO STEWART

### I.  Introduction

1. My name is Pablo Stewart. I have been retained by Plaintiffs' counsel as an expert in this matter to express opinions related to the conditions, policies, and practices in place at CoreCivic's Stewart Detention Center ("SDC") located in Lumpkin, Georgia over the proposed class period, including with respect to the disciplinary process and the provision of basic necessities to detained individuals. I have also been asked to opine on the impact of those conditions, practices, and policies on individuals detained at SDC, and, in particular, individuals who participate in the Voluntary Work Program ("Work Program"). My opinions are based on my review of documents and testimony provided in the above-captioned case, interviews with individuals currently and formerly detained at SDC, and my onsite inspection of SDC. Additionally, my opinions are based on my years of experience working as a clinical psychiatrist with a focus on correctional psychiatry and my particular knowledge of mental health issues related to segregation and solitary confinement.

2. If called upon to do so, I am prepared to testify as to my opinions, analyses, and conclusions included in and related to this Report. I reserve the right to supplement my opinions should additional evidence or other information become available.

### II.  Summary of Qualifications, Education, and Other Professional Experience

3. In 1973, I earned a Bachelor of Science Degree at the United States Naval Academy in Annapolis, Maryland. In 1982, I received my Doctor of Medicine from the University of California San Francisco (UCSF), School of Medicine. In 1985, I received the Mead-Johnson American Psychiatric Association Fellowship for demonstrated commitment to public sector psychiatry and was selected as the Outstanding Psychiatric Resident by the graduating class of

the UCSF, School of Medicine. In 1985-1986, I served as the Chief Resident of the UCSF Department of Psychiatry at San Francisco General Hospital and was responsible for direct clinical supervision of seven psychiatric residents and three to six medical students.

4. Throughout my professional career, I have had extensive clinical, research, and academic experience in the diagnosis, treatment, and prevention of mental illnesses in correctional and other institutional contexts. In my work, I have specialized in community and correctional treatment programs for individuals with chronic and severe mental illnesses, as well as substance abuse and related disorders.

5. I also served as the mental health expert on psychiatric care of individuals with severe mental illness in sheltered treatment programs in institutional contexts, such as the Mental Health Unit currently operating in the Maricopa County Jail (MCJ).

6. I also have extensive experience managing, monitoring, and reforming correctional mental health systems. Between 1986 and 1990, I was the Senior Attending Psychiatrist for the Forensic Unit of the University of California, San Francisco, which was located at San Francisco General Hospital. In that capacity, I had administrative and clinical responsibility for a 12-bed maximum-security psychiatric ward and worked as the liaison with the Jail Psychiatric Services of the City and County of San Francisco. My duties in that position included advising the San Francisco City Attorney on issues pertaining to forensic psychiatry.

7. Between August 1988 and December 1989, I served as the Director of Forensic Psychiatric Services for the City and County of San Francisco. In that capacity, I had administrative and clinical oversight responsibility for the psychiatric care provided to the inmate population in San Francisco at both the county jails and in the 12-bed locked inpatient treatment unit at the San Francisco General Hospital.

8. I have also served as a psychiatric expert or consultant to various federal courts or other organizations implementing remedial decrees covering the provision of mental health care in correctional institutions. For ten years, between April 1990 and February of 2000, I served as a court-appointed medical and psychiatric expert for the Court in the consent decree case *Gates v. Deukmejian*, E.D. Cal. Case No. CIV S-87-1636. Among other things, that case involved the provision of adequate psychiatric care to incarcerated people with mental illness at the California Medical Facility (CMF) in Vacaville, California.

9. Between October 1996 and July 1997, I served as a psychiatric expert for the United States District Court for the Northern District of California in the case of *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Ca. 1995), an omnibus case involving psychiatric care and other issues at Pelican Bay State Prison in Crescent City, California. In my work on the *Madrid* case, I gained first-hand knowledge concerning the severe impact of prolonged isolation in segregation units on mentally ill inmates, as well as additional concrete understanding of the need for constant monitoring of both non-mentally ill and mentally ill inmates in segregation units in order to prevent any further decompensating, since housing in these units by itself sometimes causes, contributes to and/or intensifies psychiatric instability.

2

10. Between July 1998 and February 2004, I served as a psychiatric consultant to the National Council on Crime and Delinquency (NCCD) and subsequently for the Institute on Crime, Justice and Corrections at Washington University (when it took over monitoring responsibilities from NCCD) in their efforts to monitor juvenile detention and treatment facilities operated by the State of Georgia. In that case, I monitored the mental health and medical aspects of an Agreement between the United States Department of Justice (USDOJ) and the State of Georgia designed to improve the quality of care in its juvenile detention facilities. The Agreement encompassed mental health care, medical care, educational services, and treatment programs.

11. Between June of 2003 and December of 2004, I was hired by the State of New Mexico as a defense expert for the implementation phase of the psychiatric sections of the "Ayers Agreement" covering the New Mexico Corrections Department (NMCD). The Agreement was a settlement between a class of New Mexico prisoners and the NMCD concerning the provision of adequate psychiatric care for inmates in New Mexico's highest security facility. The Ayers Agreement concerned a mental health treatment program in a disciplinary detention unit similar to the SMU and MCJ. The treatment program implemented in the unit was based in part on the treatment standards for the Psychiatric Security Unit (PSU) mental health care programs in California. New Mexico implemented the new treatment program with an acknowledgement that they needed to maintain minimum clinical staff-to-inmate ratios given the severe nature of the housing conditions in the locked-down unit, and the potential for mental decompensating.

12. Between March of 2003 and the summer of 2006, I worked as an expert for the USDOJ in connection with inspections to identify and remedy various problems at the Maxey Training School, a youth facility with large medical and mental health treatment programs in Whitmore Lake, Michigan. The case involved the adequacy of medical and mental health care provided at the facility. The case included an investigation of excessive lock downs of suicidal youths.

13. In 2007 and 2008, I prepared expert statements and testified before the United States district court and the three-judge panel in the *Coleman* and *Plata* litigation concerning overcrowding and inadequate mental health care in California Department of Corrections and Rehabilitation prisons. My expert report in that case was cited twice in the United States Supreme Court's decision in *Plata* upholding the three-judge panel's imposition of an order requiring California to reduce overcrowding.

14. Between 1986 and 2018, I held academic appointments as Clinical Instructor, Assistant Clinical Professor, Associate Clinical Professor, and Clinical Professor in the Department of Psychiatry, University of California, San Francisco, School of Medicine. I received the Henry J. Kaiser Award for Excellence in Teaching in 1987 and was selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic years 1988-1989, 1990-1991, and 1994-1995. I also coordinated a course on Prisoner Health at University of California San Francisco School of Medicine between January 2002 and January 2004.

15. From May 2016 to the present, I have been serving as the federal court-appointed monitor overseeing all aspects of the settlement agreement in *Rasho v. Baldwin*, covering a range of

issues affecting people with mental illness incarcerated in the Illinois Department of Corrections.

16. From 2018 to the present, I have been working as a Clinical Professor in the Department of Psychiatry at the John A. Burns School of Medicine, University of Hawaii. My duties include but are not limited to supervising psychiatric residents in the care of mentally ill patients in the emergency Department and Inpatient Psychiatric Unit at the Queens Medical Center. I also supervise psychiatric residents in their care of mentally ill inmates at the Oahu Community Corrections Center. OCCC, as it is called, is the referral center for all mentally ill inmates in the State of Hawaii. I also teach a seminar of the various aspects of forensic psychiatry. I received the Excellence in Teaching Award for the academic year 2019-20.  Finally, I continue to perform forensic oversight to the Illinois Department of Corrections in their delivery of psychiatric services to the inmate population of Illinois.

17. My resume, detailing my educational and professional background, my related publications, and my work as an expert witness in other matters, is attached hereto as **Appendix A**.

## III.     Prior Testimony and Current Compensation

18. In the previous four years, I have testified as an expert at trial or deposition in the cases attached hereto as **Appendix B**.

19. I am providing my expert services at the rate of $ 350.00 per hour. For deposition testimony, court testimony, and facility inspections, I compensated at $2400.00 per day.  Attorneys for Plaintiffs have also agreed to pay reasonable expenses related to preparing this report and testifying in this case, such as travel expenses.

## IV.     Materials Reviewed

20. A list of materials I reviewed to prepare this report is attached hereto as **Appendix C**. In preparing this Report, I also conducted interviews with putative class members currently detained at Stewart on June 17 and 18, 2021, who worked in the kitchen and as porters cleaning the housing units, hallway, and administrative office areas, and I reviewed the sworn declarations of the Named Plaintiffs in this matter. *See* **Appendix C**, Attachments 1-3 and **Appendix D**.

## V.     Summary of Opinions

21. It is my opinion that the conditions, policies, and practices in place at SDC related to discipline and provision of basic necessities, both individually and in totality, cause and threaten to cause serious psychological and psychiatric harm to detained individuals. While complete isolation and deprivation of basic human necessities would likely have a harmful effect on a person's mental health when not confined, the profoundly restrictive and controlling nature of detention magnifies the harm. CoreCivic's policies and practices at SDC likely have a coercive effect on detained individuals, who can reasonably be expected to join and remain in the Work Program to avoid the psychological and psychiatric harm caused by segregation, housing transfers, food insecurity and hunger, loss of access to loved ones, and inability to meet one's basic human needs.

22. It is my opinion that CoreCivic uses discipline and the disciplinary process in a manner that causes and threatens to cause psychological and psychiatric harm to detained individuals in the Work Program. CoreCivic uses discipline, including segregation and housing transfers, to punish detained individuals who refuse to work or are perceived to be encouraging others to refuse to work. Segregation is uniquely harmful and poses a significant risk of serious psychological and psychiatric harm. Housing transfers at SDC, which threaten to deprive individuals of safety, privacy, community, and "privileges," such as additional food and activities, also pose a risk of causing psychological and psychiatric harm. CoreCivic ensures the detained population is aware of the potential consequences for discplinary infractions, including refusing to work. Thus, these policies and practices are likely to have a coercive effect on detained individuals in the Work Program, who can reasonably be expected to work to avoid the harm resulting from these severe punishments.

23. It is my opinion that CoreCivic's failure to provide detained individuals with adequate necessities, such as affordable access to loved ones, food, and personal hygiene items, cause and threaten to cause psychological and psychiatric harm to detained individuals. This practice likely coerces detained individuals into joining, and remaining in, the Work Program to be able to obtain those items in the commissary or via "incentives" to avoid the harm caused by social isolation, food insecurity and hunger, and inability to meet one's basic human needs.

## VI.    Reasons and Basis for Opinions

### A.    The Threatened and Actual Use of Disciplinary Measures, Including Segregation and Housing Transfers, Causes and Threatens to Cause Psychological and Psychiatric Harm, and Likely Has a Coercive Effect on Detained Individuals.

24. Based on the documents I have reviewed, my observations during the site inspection at SDC, and my interviews with people currently and previously detained at SDC, it is my opinion that CoreCivic uses discipline and the disciplinary process in a manner that causes and threatens to cause psychological and psychiatric harm to detained individuals. CoreCivic's use of discipline and the disciplinary process likely has a coercive effect on detained individuals in the Work Program, who can reasonably be expected to work to avoid these severe sanctions and the attendant harms.

a.    Segregation, as Used at SDC, Poses a Substantial Risk of Psychological and Psychiatric Harm.

Segregation at SDC, whether labeled "disciplinary" or "administrative," is not meaningfully different from housing termed "solitary confinement" or "restrictive housing," in other types of carceral settings such as prisons and jails.[1] The key characteristics of segregation at SDC match the characteristics of solitary confinement as that term is used in academic literature. Those characteristics include: the detained person is removed from his or her housing unit and is placed into a small cell without any contact with other detainees, with a near-total absence of social interaction, and without positive environmental stimuli.

---

[1] This report uses the terms "segregation" and "solitary confinement" interchangeably, as "segregation" is the term used to refer to the practice of solitary confinement at SDC.

Individuals in segregation at SDC generally remain in their cells all day, with the exception of one to two hours of recreation per day, and showers three times per week, and they are deprived of opportunities for normal human interaction. Individuals in disciplinary segregation have extremely limited access to personal phone calls.[2]

Photos of the segregation cells at SDC are below:



---

[2] *See* Urbina Rojas Decl. at ¶ 35; *see also Reassessing Solitary Confinement: The Human Rights, Fiscal, and Public Safety Consequences: Hearing Before the Subcomm. on Constitution, Civil Rights & Human Rights of the S. Comm. on the Judiciary*, 112th Cong. 75, 77 (2012) (prepared statement of Dr. Craig Haney, Professor of Psychology, University of California, Santa Cruz) (explaining that while in solitary confinement, prisoners "sleep, eat, and defecate . . . in spaces that are no more than a few feet apart"; that people housed in solitary confinement "are confined on an average 23 hours a day in typically windowless or nearly windowless cells that commonly range in dimension from 60 to 80 square feet" containing "a bunk, a toilet and sink"; and that people in solitary confinement typically have "literally nothing meaningful to do"); Craig Haney, *Restricting the Use of Solitary Confinement*, 1 Ann. Rev. Criminology 285, 286-87 (2018) (similarly defining "solitary confinement").

25. There is an overwhelming scientific and legal consensus that segregation is uniquely harmful and poses a significant risk of serious psychological harm.[3] Social interaction and environmental stimulation are necessary for human wellbeing.[4] Indeed, basic executive function and physical health depend on adequate exposure to positive environmental stimuli, whereas "deprived of a sufficient level of environmental and social stimulation, individuals will soon become incapable of maintaining an adequate state of alertness and attention to the environment."[5] Without environmental stimulation or social interaction, people confined in segregation endure a condition that "can be as clinically distressing as physical torture,"[6] and is, in fact, "frequently used as a component of torture."[7] Even the Department of Homeland Security Office of Inspector General has recognized that "[n]umerous studies have found that any time spent in segregation can be detrimental to a person's health and that individuals in solitary confinement may experience negative psychological and physical effects even after being released."[8]

26. Psychological injuries stemming from segregation will affect a majority of individuals held in segregation, and it is "typically impossible to determine at the outset of a [person's] exposure whether and how he or she will survive and at what psychological cost."[9] Thus, there is a substantial risk of psychological and psychiatric harm to all people held in segregation.[10]

27. Solitary confinement can induce, even in individuals who did not have a pre-existing mental health conditions, the onset of mental illnesses such as: psychotic disorders, anxiety disorders, mood disorders, and cognitive disorders. Psychological injuries resulting from segregation

---

[3] Haney, *supra* note 2, at 286, 289, 298-99; Craig Haney, *The Psychological Effects of Solitary Confinement: A Systematic Critique*, 47 Crime & Just. 367 (2018) ("Much of the important research [on solitary confinement] is qualitative, but there is a substantial amount of it and the findings are robust. They can also be 'triangulated,' that is, studied through a range of methods and in settings sometimes similar but not necessarily identical to solitary confinement. Numerous literature reviews have noted that scientists from diverse disciplinary backgrounds, working independently and across several continents, and over many decades, have reached almost identical conclusions about the negative effects of isolation in general and solitary confinement in particular. Those robust findings are also theoretically coherent. That is, they are consistent with and explained by a rapidly growing literature on the importance of meaningful social contact for maintenance of mental and physical health." (citations omitted)).

[4] Haney, *supra* note 2, at 290, 298.

[5] Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 330 (2006); Haney, *supra* note 3, at 374–75.

[6] Jeffrey L. Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. Am. Acad. Psychiatry & L. 104, 104 (2010).

[7] Haney, *supra* note 3, at 373; *see also* Haney, *supra* note 2, at 295.

[8] Dep't of Homeland Security Office of Inspector General, ICE Needs to Improve Its Oversight of Segregation Use in Detention Facilities, OIG-22-01, 11 (2021), https://www.oig.dhs.gov/sites/default/files/assets/2021-10/OIG-22-01-Oct21.pdf (citations omitted).

[9] Haney, *supra* note 2, at 289, 291; Grassian, *supra* note 5, at 332 (noting that while individuals with more stable personalities, greater ability to modulate their emotion expression and behavior, and/or, with stronger cognitive functioning are "less severely affected" by segregation than others, "all of these individuals will still experience a degree of stupor, difficulty with thinking and concentration, obsessional thinking, agitation, irritability, and difficulty tolerating external stimuli"); *id.* at 352-53 (similar).

[10] Because of ethical limitations on study design, the scientific literature generally cannot state that every single person who is subjected to segregation definitively experiences psychological harm. Nor does the literature support the conclusion that there are some people who definitively do not experience psychological harm as a result of segregation. In my experience, every individual I have observed or interacted with who has experienced segregation has experienced psychological and psychiatric harm.

commonly include cognitive dysfunction, such as difficulties with thinking, concentration, and memory; perceptual changes; affective disturbances; disturbances of thought content (specifically, intrusive obsessional thoughts, psychotic thought content, and hallucinations); chronic insomnia and other sleep disturbances; severe depression; anxiety; paranoia; social withdrawal; panic; stimuli hypersensitivity; loss of emotional control; lethargy and debilitation; and problems with impulse control (including, for example, self-harm).[11] Indeed, self-injurious behavior (such as cutting oneself, or pulling out one's eyelashes, hair, or teeth) and suicidal ideation are characteristic of individuals held in segregation.[12]

28. For individuals with pre-existing mental illness, segregation will exacerbate the severity of the illness, in addition to the other negative effects described above. "[M]entally ill prisoners are more likely to deteriorate and decompensate when they are subjected to the harshness, stress, and deprivations of solitary confinement."[13] Based on my interviews with Work Program participants at SDC conducted in 2021, the existence of underlying mental health conditions, and particularly Major Depressive Disorder and Posttraumatic Stress Disorder, appears to be widespread among the population detained there. The overwhelming majority of individuals interviewed exhibited signs and reported symptoms of one or both of these conditions. These signs and symptoms consisted of, but were not limited to, depressed mood, subdued affect, emotional lability, poor sleep, decreased appetite, intrusive negative thoughts of traumatic experiences, as well as reporting symptoms of hyper-arousal. The likely prevalence of these conditions at SDC increases the already grave risks of psychological and psychiatric harm associated with the use of segregation at the facility. Indeed, there have been two reported suicides at SDC of individuals who were in segregation for less than 30 days.[14]

29. The perceived intent of segregation is yet another factor that contributes to a person's response to segregation: "an individual who receives clues which cause him to experience the isolation situation as potentially threatening is far more likely to develop adverse psychiatric reactions to the isolation experience" when compared to isolation perceived to be imposed for a benign

---

[11] Grassian, *supra* note 5, at 335–38, 349, 370–71; Haney*, supra* note 3, at 367-68, 370-75; Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 Crime & Just. 441, 489-93 (2006); *Reassessing Solitary Confinement: The Human Rights, Fiscal, and Public Safety Consequences: Hearing Before the Subcomm. on Constitution, Civil Rights & Human Rights of the S. Comm. on the Judiciary*, 112th Cong. 81-82 (2012) (prepared statement of Dr. Craig Haney, Professor of Psychology, University of California, Santa Cruz); Haney, *supra* note 2, at 290-91.

[12] Grassian, *supra* note 5, at 336, 349; *Reassessing Solitary Confinement: The Human Rights, Fiscal, and Public Safety Consequences: Hearing Before the Subcomm. on Constitution, Civil Rights & Human Rights of the S. Comm. on the Judiciary*, 112th Cong. 80–81 (2012) (prepared statement of Dr. Craig Haney, Professor of Psychology, University of California, Santa Cruz).

[13] Haney, *supra* note 2, at 293.

[14] José Olivares, *ICE Review of Immigrant's Suicide Finds Falsified Documents, Neglect, and Improper Confinement*, The Intercept, https://theintercept.com/2021/10/23/ice-review-neglect-stewart-suicide-corecivic/ (Oct. 23, 2021); Erin Donaghue, *ICE review found failures in care of mentally ill detainee who died by suicide*, CBS News, https://www.cbsnews.com/news/jean-carlos-jimenez-joseph-ice-review-documented-failures-in-care-of-mentally-ill-detainee-who-died-by-suicide/ (Aug. 22, 2019).

reason.[15] For example, when segregation is experienced as the product of "an arbitrary exercise of power and intimidation," greater psychological harm is likely to result.[16]

30. Furthermore, segregation causes "social pathologies," linked to sustained deprivation of social contact, such as the inability to initiate or control one's own behavior; discomfort with even small amounts of freedom; a pervasive feeling of unreality; an undermined sense of self; a disconnection of experience from meaning; and an "intolerable level of frustration" that may turn into anger or "uncontrollable and sudden outbursts of rage."[17] By transforming a person's emotions, personality, and cognition, segregation may render a person permanently ill-suited to life in a less restrictive environment.[18]

31. Even when a person can overcome the psychological trauma of segregation, they will likely find themselves suffering from a host of serious physiological injuries, including hypertension, heart palpitations and increased pulse, gastrointestinal disorders, headaches, loss of appetite, dizziness, fainting, and pains in the abdomen, neck, back, and chest.[19] Social isolation—a defining component of segregation—also "increase[s] activation of the brain's stress systems,"[20] which eventually kills brain cells and "rewire[s]" the brain.[21] These physiological changes can affect the hippocampus, a brain area important for emotion regulation and memory, and it can also increase the size of the amygdala, which makes the brain more susceptible to stress, creating a vicious cycle.[22]

32. Not only are these psychological and physical injuries devastating in their own right, studies have also consistently shown that they are also more severe than the injuries associated with ordinary imprisonment. For instance, one study in Denmark found that prisoners who spent more than four weeks in solitary confinement were twenty times more likely to require psychiatric hospitalization than general population prisoners.[23] Other studies have similarly concluded that prisoners "in solitary confinement suffered significantly more both physically

[15] Grassian, *supra* note 5, at 347.

[16] Grassian, *supra* note 5, at 354; Haney, *supra* note 3, at 375 ("The involuntary, coercive, hostile, and demeaning aspects of solitary confinement are likely to exacerbate the negative effects of social isolation that have repeatedly been documented in more benign contexts.").

[17] *Reassessing Solitary Confinement: The Human Rights, Fiscal, and Public Safety Consequences: Hearing Before the Subcomm. on Constitution, Civil Rights & Human Rights of the S. Comm. on the Judiciary*, 112th Cong. 82-83 (2012) (prepared statement of Dr. Craig Haney, Professor of Psychology, University of California, Santa Cruz).

[18] Grassian, *supra* note 5, at 332-33, 353-54; Craig Haney, *Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement*, 49 Crime & Delinquency 124, 137-41 (2003); Haney, *supra* note 2, at 296-98.

[19] Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 Crime & Just. 441, 488–90 (2006); Brie A. Williams, et al., *The Cardiovascular Health Burdens of Solitary Confinement*, 34 J. Gen. Internal Medicine 1977 (2019).

[20] John T. Cacioppo & Stephanie Ortigue, *Social Neuroscience: How a Multidisciplinary Field Is Uncovering the Biology of Human Interactions*, Cerebrum (Dec. 2011), https://www ncbi nlm nih.gov/pmc/articles/PMC3574807/.

[21] *See* Carol Schaeffer, *"Isolation Devastates the Brain": The Neuroscience of Solitary Confinement*, Solitary Watch (May 11, 2016), https://solitarywatch.org/2016/05/11/isolation-devastates-the-brain-the-neuroscience-of-solitary-confinement/.

[22] *See* Dana G. Smith, *Neuroscientists Make a Case Against Solitary Confinement*, Sci. Am. (Nov. 9, 2018), https://www.scientificamerican.com/article/neuroscientists-make-a-case-against-solitary- confinement/; Bruce S. McEwen et al., *Stress Effects on Neuronal Structure: Hippocampus, Amygdala, and Prefrontal Cortex*, 41 Neuropsychopharmacology 3, 12–14 (2016).

[23] Haney, *supra* note 18, at 144 (citing Dorte Maria Sestoft et al., *Impact of Solitary Confinement on Hospitalization Among Danish Prisoners in Custody*, 21 Int'l J.L. & Psychiatry 99, 103, 105 (1998))).

and psychologically than the prisoners in the [general population] control group."[24] For example, rates of self-mutilation and suicide are far higher for prisoners in solitary confinement.[25] Although prisoners in solitary confinement comprise less than 10% of the United States prison population, they generally account for 50% of all prisoner suicides.[26]

33. Moreover, while long-term segregation lasting many months or years is associated with some more particularly lasting consequences, an individual need not be in segregation for months or years to realize these psychological and physiological injuries. The onset of adverse symptoms is almost immediate. Within days of placement in segregation, brain scans may reflect "abnormal pattern[s] characteristic of stupor and delirium."[27]

[28]

34. This overwhelming scientific evidence shows that the psychological and physical harms associated with segregation are often irreversible and are so severe that they can be debilitating or fatal.

35. Based on my review of segregation practices at SDC, my review of relevant academic literature, and my professional expertise, segregation as used at SDC poses a substantial risk of psychological and psychiatric harm to detained individuals who are subjected to it.

b. The Use of Discipline at SDC Creates a Near-Constant Threat of Psychological and Psychiatric Harm to Detained Individuals for Failure to Comply, Including Failure to Work.

---

[24] Smith, *supra* note 19, at 477.

[25] Grassian, *supra* note 5, at 336, 349; Haney, *supra* note 2, at 294; Fatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 Am. J. Pub. Health 442, 445–47 (2014) (finding that inmates in solitary confinement were about 6.9 times as likely to commit acts of self-harm).

[26] *See* Stuart Grassian & Terry Kupers, *The Colorado Study vs. The Reality of Supermax Confinement*, 13 Corr. Mental Health Rep. 1, 9 (2011); *accord* Lauren Brinkley-Rubinstein et al., *Association of Restrictive Housing During Incarceration With Mortality After Release*, JAMA Network Open, Oct. 4, 2019, at 1, 5–6, 9, https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2752350 (studying more than 225,000 prisoners in North Carolina and finding "[c]ompared with individuals who were incarcerated and not placed in restrictive housing, those who spent time in restrictive housing were more likely to die in the first year after release," including a 78% higher likelihood of death by suicide).

[27] *See, e.g.*, Grassian, *supra* note 5, at 331 (noting measurable harm within days of solitary confinement); U.N. Human Rights Council, *U.N. Special Rapporteur, Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, at 9, U.N. Doc. A/66/268 (Aug. 5, 2011) (concluding that "harmful psychological effects of isolation can become irreversible" after only 15 days of solitary confinement); Craig Haney & Mona Lynch, Regulating Prisons of the Future: *A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 500 (1997) (negative effects of solitary can begin as soon as after 10 days in confinement).

[28] CCBVA0000003799,                at 31 CCBVA0000106456.            , at 2 (            Freddie Hood Dep. Tr. (Oct. 22, 2021) at 192:1-192:17 ("The detainee may be even worse when he come out . . . he maybe more active and may get into more trouble . . . [t]hey may not react well to it."); Troy Pollock Dep. Tr. (Sept. 30, 2021) at 141:20-143:5 ("I am aware that [segregation] can cause harm, yes."); *see also* Michael Swinton Dep. Tr. (Nov. 2, 2021) at 214:10-214:25, 231:1-234:20.

36. Discipline at SDC is used to control the actions of detained individuals, including controlling the detained workforce. The discipline used at SDC manifests in two interrelated ways in regards to the Work Program. First, the written disciplinary policies in place at SDC permit, and indeed encourage, the use of disciplinary measures to coerce compliance among detained individuals under threat of psychological and psychiatric harm, given that the use of segregation is on the table as the potential sanction in most disciplinary actions. At SDC, these policies have been interpreted to permit disciplinary action, including threats and actual imposition of segregation, when a detained individual refuses to work. Second, SDC's on-the-ground practices implementing the disciplinary system—the cornerstone of its efforts to exert maximum control over the actions of detained individuals—give rise to a coercive environment marked by intimidation and a culture of fear of psychological and psychiatric harm, often meted out in a cruel and arbitrary manner. This overarching coercive environment, where the threat of psychological and psychiatric harm looms large for most disciplinary actions, including refusal to work, likely compels detained individuals to work.

   *i.   CoreCivic's Written Policies at SDC.*

37. Segregation is used at SDC as a punishment for behavior deemed to be in violation of facility rules. The explicit purpose of disciplinary segregation at SDC is to punish—in other words, segregation is inflicted because it is punitive, painful, and causes suffering.[29]

38. While "administrative," as opposed to "disciplinary", segregation is sometimes used at SDC for reasons unrelated to the disciplinary process, ███████████████████████████████ ███████████████████████████████████████████[0] Thus, an individual may be charged with an offense, placed in "administrative" segregation similar in nature to disciplinary segregation, and either released a few days later after a disciplinary proceeding in which the charges are dropped, or sentenced to a period of disciplinary segregation at the conclusion of disciplinary proceedings. For purposes of this report, administrative segregation used as part of the disciplinary process, but imposed before segregation may technically be considered "disciplinary" under applicable rules, is considered an element of the use of discipline that gives rise to psychological and psychiatric harm. According to SDC's Detainee Handbook, administrative segregation may also be used when a detained person "needs medical observation," is "pending a transfer or release within [24] hours," is a "security risk," or is in "protective custody." In addition, SDC's policy on segregation ███████████████████████ ███████████████████████████████████████████████████████████████████

---

[29] Kenneth L. Appelbaum, *American Psychiatry Should Join the Call to Abolish Solitary Confinement*, 43 J. Am. Acad. Psychiatry & L. 406, 410 (2015) (noting that among other reasons for the use of solitary confinement in carceral institutions, "[t]he psychological distress and suffering caused by solitary confinement is [one] reason for doing it, not an unintended side effect.").

[30] Charlie Peterson Dep. Tr. (Oct. 18, 2021) at 237:14-238:2.

████████████████████████████[31] CoreCivic policy████████████
████████████████████████████.[32]

39. CoreCivic also uses cells in the segregation unit and medical isolation cells in the medical unit at SDC for "medical segregation," including for suspected infectious disease isolation.[33] Based on my inspection of SDC and the documents and testimony I reviewed, there is no meaningful difference between the cells used for "medical segregation" and those used for "disciplinary segregation."[34]

40. The fact that CoreCivic's disciplinary system incorporates segregation, and the threat that segregation could be the end result when a disciplinary process is initiated, makes the use of disciplinary measures writ large particularly coercive because of the psychological and psychiatric harm caused by the practice, as described above. Under SDC policy, the threat of segregation is always present whenever disciplinary proceedings are initiated, even for low-level rule violations. Thus, there is a close link between the threat of segregation and the use of other, less serious disciplinary measures.

41. SDC's explicit disciplinary policies in effect during the class period give rise to a near-constant threat of psychological and psychiatric harm, in the form of segregation, for even arguably minor "infractions." And, many of the "offenses" for which segregation may be imposed are defined so broadly and vaguely that they could be used to punish refusal to work. According to these policies, segregation may be imposed for prohibited acts categorized as "greatest" (for up to 60 days); "high (for up to 30 days); or "high moderate" (for 72 hours). Below is a listing of the types of offenses that could be considered broad enough to permit discipline for refusal to work:

| Category[35] | Offense Code & Description |
|---|---|
| "greatest" offenses (segregation authorized for up to 60 days) | • 105: "rioting"<br>• 106: "inciting others to riot"<br>• 198: "interfering with a staff member in the performance of duties (conduct must be of the greatest severity). This charge is to be used only if another charge of greatest severity is not applicable"<br>• 199: "conduct that disrupts or interferes with the security or orderly operation of the facility (conduct must be of the greatest severity). This charge is to be used only if another charge of greatest severity is not applicable" |
| "high" offenses (segregation authorized for up to 30 days) | • 213: "engaging in or inciting a group demonstration"<br>• 214: "encouraging others to participate in a work stoppage or to refuse to work" |

[31] CCBVA0000003799, ███████████, at 6 ████████████████████████████);
Swinton Dep. at 217:7-220:18; Droudred Blackmon Dep. Tr. (Oct. 14, 2021) at 207:18-211:10.
[32] *See* CCBVA0000289498.████████████████).
[33] Pollock Dep. at 36:5-22, 166:15-22.
[34] *See* Hill Barrientos Decl. at ¶¶ 34-35; Urbina Rojas Decl. at ¶¶ 34-36; Pollock Dep. at 166:15-22.
[35] The information in this chart is pulled from all available versions of the SDC Detainee Handbook produced in discovery, covering years 2010-2020.

| | |
|---|---|
| | • 220: "being found guilty of any combination of three or more high moderate or low moderate offenses within 90 days" <br> • 223: "any act that could endanger person(s) and/or property" <br> • 298: "interfering with a staff member in the performance of duties" (with a severity level comparable to other "high" offenses) <br> • 299: "conduct that disrupts or interferes with the security or orderly operation of the facility" (with a severity level comparable to other "high" offenses) |
| "high moderate" offenses (segregation authorized for up to 72 hours) | • 306: "refusal to clean assigned living area" <br> • 307: "refusing to obey a staff member/officer's order"—an offense that "may be categorized and charged as a greater or lesser offense" depending on the nature of the conduct <br> • 308: "insolence toward a staff member" <br> • 311: "participating in an unauthorized meeting or gathering" <br> • 323: "signing, preparing, circulating, or soliciting support for prohibited group petitions"[36] <br> • 398: "interfering with a staff member in the performance of duties" (with a severity level comparable to other "high moderate" offenses) <br> • 399: "conduct that disrupts or interferes with the security or orderly operation of the facility" (with a severity level comparable to other "high moderate" offenses) |
| "low moderate" offenses (segregation not directly authorized, but multiple "low moderate" offenses during a 90-day period can together constitute a higher-level, segregation-eligible offense) | • 402: "malingering, feigning illness" <br> • 410: "failure to follow safety or sanitation regulations" <br> • 413: "being unsanitary or untidy, failing to keep self and living area in accordance with posted standards" <br> • 498: "interfering with a staff member in the performance of duties" (with a severity level comparable to other "low moderate" offenses) <br> • 499: "conduct that disrupts or interferes with the security or orderly operation of the facility" (with a severity level comparable to other "low moderate" offenses) |

42. In addition to permitting disciplinary segregation as a formal sanction following a hearing, versions of SDC's Detainee Handbook dated prior to April 2014 also permitted disciplinary segregation in the event an individual "[p]ose[d] a serious disruption to general population" or "[r]equire[d] additional physical confines."[37]

43. Of particular note is the "high" offense of "encouraging others to participate in a work stoppage or refuse to work." SDC's Assistant Warden of Operations from February 2016 to February 2019, Troy Pollock, defined "work stoppage" as used here to mean: "[w]hen a detainee or

---

[36] In the 2013 and earlier versions of the SDC Detainee Handbook, "signing preparing, circulating, or soliciting support for prohibited group petitions" was a "high" offense, code 221, punishable by up to 30 days of segregation.
[37] *See also* Swinton Dep. at 249:14-251:25.

group of detainees refuse to go to work, stop working," including even when "a single detainee stops working."[38] And, former SDC Warden Charlie Peterson testified that encouraging others to engage in a work stoppage or refuse to work could include ███████████████████████████████████████████████████████████████████████████████████████████████████████ "[39] Droudred Blackmon, who was SDC Chief of Security and Chief of Unit Manager from 2009 to 2019, defined a "work stoppage" as "one or -- or several offenders encouraging others, telling them that they -- they cannot -- that we're not going to work."[40] The inconsistent definitions of what constitutes a "work stoppage" appear to render it an offense that is arbitrarily assigned to a variety of conduct at SDC, all of which can be punished by segregation pursuant to CoreCivic's discipline policies.

44. First, some of these segregation-eligible offenses target perceived or actual group activity, such as "rioting" (greatest), "inciting others to riot" (greatest), "engaging in or inciting a group demonstration" (high), "encouraging others to participate in a work stoppage or to refuse to work" (high), "participating in an unauthorized meeting or gathering" (high moderate), and "signing, preparing, circulating, or soliciting support for prohibited group petitions" (high moderate). These categories of offenses are flexible and broad enough to cover instances where more than one person is perceived to be or is actually planning not to work; is perceived to be or is actually refusing to work; is perceived to be or is actually discussing not working with at least one other person; and/or is perceived to be or is actually voicing concerns about any issue at SDC that may be related to the Work Program.

45. Second, some of these segregation-eligible offenses target perceived or actual refusal to comply with SDC's efforts to control detained individuals, such as "refusing to obey a staff member/officer's order" (high moderate) and "insolence toward a staff member" (high moderate). Neither of these offenses requires that the staff member or officer be acting in a manner that is permissible or reasonable, nor do they require that orders a staff member or officer give be permitted under applicable rules.[41] In the context of the Work Program, if a staff member or officer orders a detained individual to complete a task or to report to work, "refusing to obey" or "insolence" in response could, under this policy, lead to segregation.

46. Third, some of these segregation eligible offenses target a broad, vague category of activity that might interfere in some way with operations at the facility, such as "any act that could endanger person(s) and/or property" (high), "interfering with a staff member in the performance of duties" (available charge in all four categories), and "conduct that disrupts or interferes with the security or orderly operation of the facility" (available charge in all four categories). For CoreCivic, running of the Work Program is considered essential to facility operations; ██████████████████████████████████████████████████████████████████████████[42]

---

[38] Pollock Dep. at 148:18-149:8.
[39] Peterson Dep. at 235:25-236:25.
[40] Blackmon Dep. at 43:12-44:6.
[41] Swinton Dep. at 191:2-7.
[42] Matthew Moye Dep. Tr. (Oct. 21, 2021) at 39:7-18; CCBVA0000264625, Email; CCBVA0000223664, Email.

Thus, these categories of offenses are flexible enough to, on paper, permit segregation for refusal to work.

47. In addition to the categories detailed above, some of these segregation-eligible offenses target other types of perceived or actual actions by detained individuals that amount to a refusal to work, such as "refusal to clean assigned living area" (high moderate), "malingering, feigning illness" (low moderate), "failure to follow safety or sanitation regulations" (low moderate), and "being unsanitary or untidy, failing to keep self and living area in accordance with posted standards" (low moderate). Malingering or feigning illness could encompass refusing to report to a Work Program post based on a worker's assertion that he or she was sick or did not feel well. Refusal to clean and failure to maintain safety, sanitation, and tidiness could apply to non-Work Program tasks, such as the requirement that detained individuals make their beds. But on the face of the policy, these offenses could also apply when an individual refuses to perform cleaning that is encompassed within the Work Program.

48. Thus, while the Work Program at SDC is supposed to be "voluntary," in a number of ways SDC's written disciplinary policies permit segregation as a possible ultimate punishment for refusing to work. These policies are distributed to all detained individuals in the Detainee Handbook, and the types of sanctions available are also posted in the housing units at SDC.[43] As a result, detained individuals in the Work Program are aware of the ever-present threat of segregation for refusal to work.

   ii.   *CoreCivic's Implementation of Discipline and the Underlying Threat of Segregation at SDC.*

49. The possibility of threats or actual segregation for refusal to work at SDC is not merely theoretical. The way that the disciplinary process has been implemented at SDC has in fact created an environment where refusal to work is met with the threat of psychological and psychiatric harm in the form of disciplinary action that could, in nearly all circumstances, culminate in segregation. The implementation of the disciplinary process has led to the actual segregation of detained individuals enrolled in the Work Program when they did not want to or could not, for medical or other reasons, work.[44]

50. Detained individuals at SDC are not only aware that segregation is a consequence of discipline, they are also generally aware of the conditions in segregation, either through direct experience

---

[43] Blackmon Dep. at 42:7-44:23, Peterson Dep. at 213:20-214:20, 217:22-218:14; *see also* Moye Dep. at 176:22-177:24 (communicating to detainees that segregation was a possibility "on more than a few occasions"), 183:6-185:14, 192:7-10.

[44] *See* Bermudez Gutiérrez Decl. at ¶ 36; Urbina Rojas Decl. at ¶ 34; CCBVA0000283036, Disciplinary Report. I reviewed some documents indicating ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ CCBVA0000264081, Disciplinary Report (████████████████████████ ████████████████████ ICE Barrientos 0019533, Email; Freddie Hood Dep. Tr. (Oct. 22, 2021) at 192:1-192:17.

or word of mouth. All three Plaintiffs spent time in segregation units at SDC.  Further, Plaintiff Wilhen Hill Barrientos stated he was aware of the individual who died by suicide in segregation at SDC, and that knowledge contributed to his fear of being placed in segregation.[45]  The fear of segregation, and its restrictive conditions, thus likely looms large in the minds of the detained population.

51. Disciplinary actions at SDC are initiated with the writing of a "Disciplinary Report" (DR). CoreCivic's documents demonstrate a practice of requiring, as part of staff members' job duties, the initiation of disciplinary proceedings whenever a perceived or actual disciplinary offense occurs.[46] Thus, a detained individual at SDC would know based from the experience of living at the facility that a DR is possible, for example, whenever he or she refuses to comply with a staff member's command. The pressure on SDC staff to exert disciplinary control over detained individuals regularly manifests as verbal threats of segregation for failure to complete an ordered task or comply with a facility rule. A review of grievances from detained individuals at SDC reveals ▓▓▓▓▓▓▓▓▓▓.[47] Additionally, in my interviews with currently and previously detained individuals, many of them stated that they received threats of segregation if they quit their Work Program jobs. In numerous documented instances,▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓.[48] There are also documented instances of ▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓[49]

52. Furthermore, grievances from SDC and statements from currently and previously detained individuals demonstrate that detained individuals experience SDC's use of the disciplinary process to be arbitrary, unfair, punitive, and cruel. As discussed above, *supra* ¶ 29, when segregation is perceived to be punitive and/or arbitrary, a person housed in segregation is more likely to suffer serious psychological harm as a result.[50]

53. According to CoreCivic's documents and witness testimony, ▓▓▓▓▓▓▓▓▓▓▓▓▓



---

[45] Bermudez Gutiérrez Decl. at ¶ 6; Hill Barrientos Decl. at ¶¶ 34-36; Urbina Rojas Decl. at ¶ 34.

[46] Calvin Blue Dep. Tr. (Nov. 10, 2021) at 221:3-14; Pollock Dep. at 122:23-128:3 (process for submitting disciplinary reports). CCBVA0001152449, Email; CCBVA0000261048, Email; CCBVA0000249997, Meeting Minutes; CCBVA0000301957, Meeting Minutes.

[47] CCBVA0000196218, Email; CCBVA000024688, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓; CCBVA0000061998, Grievance; CCBVA0000244074, Grievance; CCBVA0000245706, Grievance; *see also* Moye Dep. at 176: 22-177:24, 192:7-10 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Email; CCBVA0000247102, Email.

[48] CCBVA0000196218, Email; CCBVA0000223524, Email (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ CCBVA0000152449, Email; CCBVA0000196364, Email; CCBVA0000283036, Disciplinary Report.

[49] Bermudez Gutiérrez Decl. at ¶ 36; CCBVA0000196322, Email; *see also* Swinton Dep. at 206:19-207:20 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓); Blackmon Dep. at 207:18-211:10.

[50] Urbina Rojas Decl. at ¶ 44; CCBVA0000238915, Disciplinary Report.

████████████████.[51]

54. The threats of discipline for refusal to work, up to and including segregation, are not only made against individuals. On numerous occasions, ██████████████████████████████ ████████████████████████████████████████████████[52] In a confined environment like SDC, this type of incident makes known to the detained workforce that if they refuse to work, they face the possibility of psychological and psychiatric harm. The ability to initiate disciplinary proceedings, threats of segregation as a means to instill compliance, the power differential between SDC staff and detained individuals, and demonstrated instances of threats or actual discipline for refusal to work create a culture of fear at SDC that likely coerces continued participation in the Work Program. This effect is particularly likely when segregation, which as discussed above gives rise to a substantial risk of psychological and psychiatric harm, is a possible consequence for most disciplinary infractions.

    c. <u>CoreCivic's Use of Housing Transfers Threatens to Cause Psychological and Psychiatric Harm, and Likely Has a Coercive Effect on Detained Individuals.</u>

55. In addition to the underlying threat of segregation inherent in the application of the disciplinary process at SDC, the manipulation of housing assignments at SDC also likely has a coercive effect on detained individuals in the Work Program. Based on my interviews of currently and formerly detained individuals, my observations during the site inspection, my review of documents and testimony, and my professional expertise, it is my opinion that SDC uses the threat of a housing transfer as a punishment for refusing to work. Such transfers contribute to the totality of circumstances in which SDC threatens or inflicts psychological and psychiatric harm upon detained individuals who refuse to work.

56. Under SDC disciplinary policies, a housing transfer is considered a type of punishment.[53] SDC's punitive use of housing assignments in relation to the Work Program has manifested in a number of ways over the relevant period. At times SDC has housed all workers and/or just kitchen workers (who make up the majority of Work Program participants) together in the same housing pod(s).[54] This practice, when in place, has included various "incentives" that go along with assignment to the worker housing pod(s). These incentives have included things

---

[51] Moye Dep. at 151:9-152:17; CCBVA0000223671, Email; CCBVA0000223524, Email; CCBVA0000279919, Email; *see also* Blue Dep. at 233:8-12 ████████████████████████████████████ ████████ CCBVA0000230127, Meeting Minutes.

[52] Urbina Rojas Decl. at ¶¶ 37-39; Hill Barrientos Decl. at ¶ 33; CCBVA0000060146, Disciplinary Report; CCBVA0000180751, Disciplinary Report CCBVA0000198703, Email; CCBVA0000247102, Email; CCBVA0000196322, Email; Blackmon Dep. at 187:9-189:20.

[53] CCBVA0000202739, 2020 SDC Handbook, at 31-35.

[54] CCBVA0000118613, ██████████████ at 3, 4; CCBVA0000006287, ██████████████, at 3, 4; CCBVA0000230007, ████████████████████; Bermudez Gutiérrez Decl. ¶ 11; Hill Barrientos Decl. at ¶¶ 7, 25, 28; Urbina Rojas Decl. at ¶ 10; Terrance Lane Dep. Tr. (Oct. 5, 2021) at 61:5–13, 62:2-6.

like: the ability to stay up late on Friday nights, the ability to order takeout to the facility, pizza nights, extra TVs, movies, and video games.[55]

57. Moreover, there are three types of housing at SDC: segregation cells, open dorms (referred to colloquially by some detained individuals as the "gallinero," or "chicken coop"), and two-man cells. The open dorms consist of approximately 30 bunk beds, close together in an open room. *See photo below.* The bathrooms in the open dorms are shared.



The pods with two-man cells contain individual cells with one bunk bed, a toilet/sink, and a door that closes and locks, housing up to two people per cell. At times workers have been intentionally housed in housing pods with more private two-man cells, which afford some degree of privacy, quiet, and physical separation from others in the housing pod who may threaten their safety or well-being, as opposed to the much less private and louder open dorms.[56]

58. When a detained worker considers leaving the Work Program or is perceived to be encouraging others not to work, they face a threat of transfer or actual transfer to a different, inferior housing pod.[57] In addition, the threat or imposition of segregation for refusal to work is a type of housing transfer that results in psychological and psychiatric harm, as explained above.

59. In the context of a detention center, like a jail or prison, housing assignments have a major effect day-to-day on well-being and mental health of detained individuals. This is especially true at SDC where some housing provides benefits that other housing lacks. The scheme of

---

[55] Urbina Rojas Decl. at ¶ 9; CCBVA0000230006-07, ███████████████████████; Peterson Dep. at 157:11-18; Blackmon Dep. at 108:10-17, 112:6-24, 113:21-115:22; Lane Dep. 61:5-62:13; CoreCivic 30(b)(6) Designee Russell Washburn Dep. Tr. (Dec. 21, 2021) at 241:24-253:2.

[56] Lane Dep. at 62:14-63:7.

[57] Peterson Dep. at 184:20-25; Lane Dep. 63:8-25; Bermudez Gutiérrez Decl. at ¶¶ 14, 25, 35, 37; Urbina Rojas Decl. at ¶ 11; CCBVA0000230007, ██████████████████; CCBVA0000260873, Email; CCBVA0000198882, Email.

housing transfers used in relation to the Work Program at SDC thus appears designed to increase psychological distress for individuals who refuse to work.

60. The factors that could cause a housing transfer to increase psychological distress in this context include the following. First, the open dorms are inherently less private, less quiet, and lack the ability to create physical separation from potential safety threats in the housing pod. All of these issues potentially give rise to significant worsening in psychological well-being upon a move out of worker housing in the two-man cell pods. Second, worker housing, whether in the open dorms or two-man cells, is often quieter during the nighttime hours than non-worker housing, due to the fact that many Work Program participants work shifts starting early in the morning and thus cannot stay up late and make noise. Thus, worker housing is an environment more conducive to a normal sleep schedule—an essential element of both physical and mental well-being. Third, the harm caused by the loss of the additional so-called "incentives" associated with worker housing cannot be understated and is self-evident given that CoreCivic uses them to incentivize participation in the Work Program.  The Named Plaintiffs all report working to avoid some or all of the above harms posed by CoreCivic's punitive housing transfers.[58]

**B. The Deprivation of Basic Necessities at SDC Likely Coerces Detained Individuals to Work to Avoid Serious Harm Resulting from Inability to Meet Basic Human Needs.**

61. CoreCivic's failure to satisfy the basic needs of detained individuals for food, hygiene items, clothing, and social contact gives rise to serious harms to physical and mental health. Each of these items, however, can be purchased from the SDC commissary. It is my opinion that CoreCivic's failure to provide basic necessities to detained individuals likely coerces their participation in the Work Program in order to earn money to purchase items, or to obtain them as "incentives" for work, to meet their basic human needs.

a. Deprivation of contact with loved ones.

62. Social ties are essential to mental health and well-being, and inversely, social isolation gives rise to serious harm to physical and mental health. However, access to friends, family, and community is significantly curtailed for individuals at SDC. Beyond the mere fact that they are detained in a rural area, detained individuals' ability to maintain contact with loved ones outside of SDC is made much more difficult because non-legal phone calls are not free of charge and, in fact, are expensive. The limited ability to maintain social ties increases, by design, when a person participates in the Work Program and is thus able to purchase phone time. In other words, the degree of harm caused by social isolation that a detained person will suffer can be lessened by participation in the Work Program. Thus, it is my opinion that CoreCivic's deprivation of contact with loved ones threatens to cause individuals psychological and psychiatric harm and therefore is likely to coerce individuals to work to avoid that harm.

63. For purposes of this report, "objective social isolation" is defined to mean "objective lack of interactions with others or the wider community," while "perceived social isolation," also

---

[58] Bermudez Gutiérrez Decl. at ¶ 14; *see* Hill Barrientos Decl. at ¶¶ 7, 28, 30; Urbina Rojas Decl. at ¶ 11.

called "loneliness" in the academic literature, is defined to mean "the subjective feeling of the absence of a social network or a companion."[59] The more general term "social isolation" is used in this report to refer to both objective and perceived social isolation.

64. In addition to the extreme form of social isolation imposed in segregation, *see supra* ¶ 31, there is a growing body of evidence that social isolation more broadly causes a host of physical and mental health harms. The effects are particularly acute with regard to perceived social isolation, which is informed by one's objective experience of social isolation.[60]

65. Objective and perceived social isolation predict adverse physiological effects, and particularly increased risks to cardiovascular health.[61] Overall, "the effect of [perceived social isolation] on risk of mortality is comparable to the impact of well-known risk factors such as obesity, and has a similar influence as cigarette smoking."[62]

66. As for mental health, "perceived social isolation consistently predicts worsening of depressive symptoms in all age groups."[63] Perceived social isolation also predicts cognitive decline and risk for Alzheimer's disease.[64] In addition, perceived social isolation is associated with anxiety, psychological distress, a risk of delusions, and paranoia.[65]

67. Overall, the scientific evidence gathered to date establishes that social isolation gives rise to psychological and psychiatric harm.

68. Based on the documents I have reviewed, my observations during the site inspection at SDC, and my interviews with people currently and previously detained at SDC, it is my understanding that one's ability to maintain social ties while detained at SDC is significantly hindered by the facility's rural location, in combination with the high price of personal phone calls.[66] Both objective and perceived social isolation are inherent in the detained experience at SDC. Those whom I interviewed exhibited a strong degree of psychological distress over their inability to maintain meaningful contact with their loved ones outside of detention. Furthermore, Plaintiff Keysler Urbina Rojas described feeling distressed after his phone privileges were revoked when his pod was placed on lockdown, apparently as a punishment for refusing to work.[67] It is my opinion that the fact that objective social isolation is externally imposed by the structures in place at SDC, rather than individually chosen as a matter of

---

[59] Nicholas Leigh-Hunt et al., *An overview of systematic reviews on the public health consequences of social isolation and loneliness*, 152 Public Health 157, 158 (2017). There is a dearth of research on social isolation, outside of research on solitary confinement, in the carceral context. Based on my professional experience, I believe the general research on social isolation can be extrapolated to the civil detention context.

[60] John T. Cacioppo et al., *Social Isolation*, Annals of the N.Y. Acad. Sci., at 18 (2011).

[61] *Id.*; Laurie Hare Duke, *The Importance of Social Ties in Mental Health*, 21 Mental Health & Social Inclusion 264, 266 (2017); Leigh-Hunt, *supra* note 59, at 160.

[62] Duke, *supra* note 61, at 266; *see also* Leigh-Hunt, *supra* note 59, at 160 (noting strong evidence that both social isolation and loneliness are associated with increased all-cause mortality).

[63] Duke, *supra* note 61, at 266; *see also* Leigh-Hunt, *supra* note 59, at 166 (meta-analysis concluding that there is strong evidence linking objective social isolation with depression).

[64] Cacioppo, *supra* note 60, at 18; Duke, *supra* note 61, at 266.

[65] *Id.*

[66] *See, e.g.*, Bermudez Gutiérrez Decl. at ¶¶ 22-23; Hill Barrientos Decl. at ¶ 23; Urbina Rojas Decl. at ¶¶ 21-22.

[67] Urbina Rojas Decl. at ¶¶ 37-39.

==highlight==personal preference, serves to increase the degree of perceived social isolation a detained individual is likely to feel.==

69. Participating in the Work Program provides detained individuals with access to phone time that they would not otherwise have. The Work Program provides funds that can be spent on phone cards at SDC's commissary.[68] My interviews and review of documents reveal that a desire to purchase phone cards is one main reason why people participate in the Work Program.[69] In addition, based on the documents I reviewed, it is clear that at times SDC has provided additional phone cards to Work Program participants, often in addition to their pay, to "incentivize" their work.[70]

70. Thus, it is my opinion that the social isolation at SDC and attendant harms experienced by detained individuals likely coerces their participation in the Work Program.

   b.   Lack of Adequate Food.

71. ==highlight==Lack of adequate food—both in terms of quantity and nutritional quality—gives rise to serious harms to a person's health. Based on my professional expertise, the documents I have reviewed, my observations during the site inspection at SDC, and my interviews with people currently and previously detained at SDC, and the report of Leonora Renda, RD, it is my understanding that CoreCivic does not provide individuals detained at SDC with adequate food, causing them to experience food insecurity, which can cause psychological and physical harm. A detained person's access to food at SDC increases, by design, when he or she participates in the Work Program. Thus, it is my opinion that the inadequate food and resulting food insecurity likely coerces individuals to join and stay in the Work Program.==

72. For purposes of this report, "food security" refers to "the assured ability to acquire nutritionally adequate and safe food that meets cultural needs and acquired in a socially acceptable way." Conversely, "food insecurity" refers to a lack of food security.[71]

73. In addition to the well-documented harms to physical health caused by inadequate nutrition, a wealth of studies have found an association between food insecurity and depression, anxiety,

---

[68] Peterson Dep. at 96:16-22 ("A number of the detainees didn't have the funds or have the funds coming into the facility or had an opportunity to have funds. So what we did was we would provide jobs that would give them some type of funds to purchase commissary, extra things that we didn't – things that we may not provide to detainees."); *id.* at 188:8-11 (███████████████████████████████); Moye Dep. at 73:11-24.

[69] Bermudez Gutiérrez Decl. at ¶ 23; Hill Barrientos Decl. at ¶ 23; Urbina Rojas Decl. at ¶ 22; Hood Dep. at 43:8-15; CCBVA0000106584, ████████████████ at 1.

[70] Bethany Brazier Dep. Tr. (Nov. 18, 2021) at 166:22-167:4, 168:23-170:24; Hood Dep. at 109:22-112:17, 119:2-121:16; CCBVA0000198558, Email.

[71] Ali Pourmotabbed, et al., *Food Insecurity & Mental Health: A Systematic Review and Meta-Analysis*, 23 Public Health Nutrition 1778, 1778 (2020). Other literature cited in this section uses functionally similar definitions. *See, e.g.*, Daniel J. Arenas, et al., *A Systematic Review and Meta-analysis of Depression, Anxiety, and Sleep Disorders in US Adults with Food Insecurity*, 34 J. Gen. Intern. Med. 2874, 2874 (2019) (defining "food security" as "the basic ability to purchase food with nutritional value for oneself and/or one's family"); Candice A. Myers, *Food Insecurity and Psychological Distress: a Review of the Recent Literature*, 9 Current Nutrition Reports 107, 107 (2020) (defining "food insecurity" as existing "when people do not have adequate physical, social, and economic access to sufficient, safe, and nutritious food, which meets their dietary needs and food preferences for an active and healthy life").

and sleep disorders.[72] Food insecurity also increases stress, which in turn leads to its own mental and physical health harms, as noted above, *see supra* ¶ 31.[73] Thus, in addition to the serious harm to one's physical health caused by lack of adequate food, food insecurity is also associated with psychological and psychiatric harm.

74. Based on my review of the evidence in this case, people detained at SDC experience a lack of adequate food amounting to food insecurity, as that concept is discussed in peer-reviewed academic literature. For example, people detained at SDC routinely report that they are hungry and that they do not have enough to eat.[74] In each of my interviews of individuals currently or formerly detained at SDC, every person had at least one complaint related to food adequacy. Based on those interviews and the documents I reviewed, the complaints about food at SDC are remarkably consistent across the years, including, that detained individuals did not receive enough food, that the food served made them feel sick, that the food was so bad that it was inedible, that the food was of a very poor quality and lacking in nutritional value, and/or that the food was spoiled, rotten, or contained foreign objects. Furthermore, according to the report of Leonora Renda, RD, detained people at SDC lack access to food of sufficient nutritional value.[75]

75. Participating in the Work Program provides detained individuals with access to supplemental food that they would not otherwise have. The Work Program provides funds, though meager, that can be spent on supplemental food items at SDC's commissary.[76] In my interviews with currently detained individuals at SDC, they consistently reported a need to purchase food as a central reason why they participated in the Work Program.[77] Deposition testimony from current and former CoreCivic employees also supports my conclusion that access to commissary food is a core motivating factor for participation in the Work Program.[78] In addition, based on the documents I reviewed, CoreCivic has, at times, provided additional food for free to Work Program participants, in addition to their pay and also in addition to the food given to the SDC

---

[72] *See, e.g.*, Pourmotabbed, *supra* note 71, at 1780, 1784, 1786-87 (meta-analysis finding a strong association between food insecurity and depression and an association in North America between food insecurity and anxiety); Arenas, *supra* note 71, at 2874, 2878-79 (systematic review and meta-analysis of relevant studies finding a strong association between food insecurity and depression, anxiety, and sleep disorders); Andrew D. Jones, *Food Insecurity and Mental Health Status: A Global Analysis of 149 Countries*, 53 Am. J. Preventative Med. 264, 272 (2017) (finding an association between food insecurity and poorer mental health outcomes "across all global regions, independent of socio-economic factors"); Myers, *supra* note 71, at 115 (reviewing recent studies and concluding they "establish[ ] a significant and positive association between food insecurity and psychological distress"); Jason M. Nagata, et al*., Food Insecurity Is Associated with Poorer Mental Health and Sleep Outcomes in Young Adults*, 65 J. Adolesc. Health 805 (2019) (finding an association between food insecurity and depression, anxiety, suicidal ideation, and sleep outcomes such as trouble falling and staying asleep).

[73] *See, e.g.*, Pourmotabbed, *supra* note 71, at 1784 (meta-analysis of relevant studies concluding that food insecurity significantly increased stress in adults).

[74] Bermudez Gutiérrez Decl. at ¶ 20, 21; Hill Barrientos Decl. at ¶ 12; Urbina Rojas Decl. at ¶ 12, 14; Hood Dep. at 198:15-199:3; Washburn Dep. at 297:9-300:13; CCBVA0000219995-96, Email; CCBVA0000266526, Email; TRINITY-00015126, Email; CCBVA0000247357, Grievance; DHSOIG0000063, DHS Complaint.

[75] *See generally* Leonora Renda, RD, Expert Report, December 22, 2021.

[76] Peterson Dep. at 108:16-20 ("There were a number of detainees who . . . didn't have funds, they had no way of getting funds from family members or anyone from outside, so they wanted a job."), 188:8-15 ██████████████████████████████████████████████████████████ Brazier Dep. at 199:23-200:5, 208:16-209:8; CCBVA0000106584, ██████████████████ t.

[77] Bermudez Gutiérrez Decl. at ¶ 15, 16, 20; Hill Barrientos Decl. at ¶ 23; Urbina Rojas Decl. at ¶ 15, 17.

[78] Blackmon Dep. at 50:19-51:10; Hood Dep. 43:8-15; Lane Dep. at 71:10-21; Moye Dep. 73:11-24.

population writ large, to "incentivize" their work.[79] For a detained person without access to outside resources, the choice is clear: participate in the Work Program, or go to bed hungry.

76. Thus, it is my opinion that the pervasive threat of hunger at SDC, and the promise of access to additional food, likely coerces detained individuals to work. Detained individuals have a very clear reason to join the Work Program: gaining access to more food and thereby lessening the serious psychological harm they face due to food insecurity and hunger. This increased access to food also serves as a central reason why they remain in the Work Program.

c.  Deprivation of other basic necessities available at commissary.

77. SDC's inadequate provision of basic necessities does not end with food. Based on my interviews with currently and formerly detained individuals and my review of documents, I understand that SDC also provides below the bare minimum when it comes to appropriate clothing and hygiene items such as soap, shampoo, toothpaste, and toothbrushes.[80]

78. For example, detained individuals need to purchase basic clothing items like undershirts at the commissary, and in some cases SDC provides used underwear, leaving the detained individual to make the choice between spending money on new clothing or underwear, or the indignity of wearing previously worn clothing or underwear.[81] Detained individuals also regularly end up ██████████████████████████████████████████████.[82]

79. In terms of hygiene items, the commissary sells recognizable brands of soap, shampoo, deodorant, and the like, whereas the free versions provided by SDC pursuant to applicable policies are reported to be nearly unrecognizable as hygiene products and do not tend to work as intended. Detained individuals regularly report, for example, that the soap and shampoo provided do not leave them feeling clean, and that they are unable to properly brush their teeth with the toothpaste they are given.[83]

80. Beyond that, despite written policies requiring prompt replenishment of hygiene and clothing items that need replacement, detained individuals at SDC have reported issues with implementation of these policies.[84]

81. Being and feeling clean are tied to a person's sense of self and well-being. Similarly, feeling adequately clothed, in the most basic sense, also contributes to one's well-being. The deprivation of adequate clothing and hygiene items at SDC contributes to the psychological distress that detained individuals experience there. And, as with food and social contact,

---

[79] Bermudez Gutiérrez Decl. at ¶¶ 7, 33; Urbina Rojas Decl. ¶¶ 19, 45; Hood Dep. at 26:5-27:17 (providing food as rewards); Moye Dep. at 135:23-136:15; Washburn Dep. at 251:24-252:14, 290:20-291:25; CCBVA0000106024, Food Service Operations Policy No. 11-1.

[80] *See* Dr. Dora Schriro, Expert Report, December 22, 2021, at ¶ 136; CCBVA0000251638, Grievance ██████ ████████████████ l); CCBVA0000232778, Grievance; CCBVA0000196014, Email.

[81] Hill Barrientos Decl. at ¶ 5; Urbina Rojas Decl. at ¶ 17; CCBVA0000271366, Email.

[82] CCBVA0000106584.████████████████████████, at 4.

[83] Urbina Rojas Decl. at ¶ 4; *see also* Hood Dep. at 208:18-209:3, 209:25-210:7; Pollock Dep. at 217:6-13 (alternatives to free versions of hygiene products only provided if medically required).

[84] Hill Barrientos Decl. at ¶ 6; CCBVA0000232776, Grievance; CCBVA0000206703, Memorandum.

additional hygiene and clothing items may be purchased at the commissary, but are unaffordable for detained individuals without access to ample outside resources. Thus, the distress cause by the deprivation of proper hygiene and clothing items contributes to the coercive nature of the environment, in which participation in the Work Program is a way to avoid psychological harm by earning money to make commissary purchases.

## V. Conclusion

82. CoreCivic's policies and practices regarding discipline and the provision of basic necessities cause and threaten to cause detained individuals psychological and psychiatric harm. CoreCivic uses discipline, including segregation and housing transfers, to punish detained individuals who refuse to work or are perceived to be encouraging others to refuse to work. Segregation is uniquely harmful and poses a significant risk of serious psychological and psychiatric harm. Housing transfers at SDC, which threaten to deprive individuals of safety, privacy, community, and "privileges," such as additional food and activities, also pose a risk of causing psychological and psychiatric harm. CoreCivic ensures the detained population is aware of the potential consequences for disciplinary infractions, including refusing to work. Thus, these policies and practices are likely to have a coercive effect on detained individuals in the Work Program, who can reasonably be expected to work to avoid the harm resulting from these severe punishments.

83. CoreCivic's failure to provide adequate and affordable items essential to basic human needs also causes and threatens to cause detained individuals psychological and psychiatric harm. Detained individuals can reasonably be expected to join and remain in the Work Program to purchase those items from the commissary, and to gain access to those necessities in the form of "incentives" such as phone cards and extra food, in order to avoid the harm resulting from social isolation, food insecurity and hunger, and inability to meet basic human needs.

84. While any one element of the coercive policies described in the previous sections would likely have a harmful effect on a person's mental health when not confined, the characteristics of detention in totality, including the lack of bodily freedom and autonomy; the power differential between detained people and staff; constant surveillance and lack of privacy; the persistent threat or possibility of physical force; and a complete and utter lack of programming at the facility, magnify the harm that these policies pose to detained individuals.

Respectfully submitted this 15th day of April, 2022.

Pablo Stewart, M.D.

# Appendix A

<u>CURRICULUM VITAE</u>

***PABLO STEWART, M.D.***
**3021 La Pietra Circle**
**Honolulu, HI 96815**
**(808) 352-8074**
**(415) 264-0237**
**e-mail: pablo.stewart.md@gmail.com**
**(Updated July 2021)**

<u>Personal Statement:</u>    As evidenced in my CV, my psychiatric career is based on several guiding principles. These include but are not limited to a commitment to diversity at all levels of medical education, including medical students, residents and faculty members. Also, I have always believed that health care is a right and not a privilege. I have demonstrated this fact by my passion for social justice and health equity for everyone.

<u>Language Competency:</u>    Fluent in both Spanish and English.

<u>EDUCATION:</u>    University of California, San Francisco, Teaching Certificate in General Medical Education, 2017

University of California, San Francisco, School of Medicine, Department of Psychiatry, Psychiatric Residency Program, 1986

University of California, San Francisco, School of Medicine, M.D., 1982

United States Naval Academy, Annapolis, MD, B.S. 1973, Major: Chemistry

<u>LICENSURE:</u>    California Medical License #GO50899
Hawai'i Medical License #MD-11784
Federal Drug Enforcement Administration #BS0546981
Hawaii Controlled Substances Certificate of Registration #E14341
Diplomate in Psychiatry, American Board of
Psychiatry and Neurology, Certificate #32564

<u>ACADEMIC APPOINTMENTS:</u>

July 1, 2019-
Present
<u>Academic Appointment:</u> Clinical Professor/Psychiatrist, University Health Partners (UHP), University of Hawaii, John A. Burns School of Medicine.

February 22, 2018-
February 22, 2019
<u>Academic Appointment:</u> Clinical Professor, Department of Psychiatry, University of Hawaii, John A. Burns School of Medicine.

| | |
|---|---|
| September 2006-<br>Present | <u>Academic Appointment:</u> Clinical Professor, Department of Psychiatry, University of California, San Francisco.<br>School of Medicine. |
| July 1995 -<br>August 2006 | <u>Academic Appointment:</u>  Associate Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1989 -<br>June 1995 | <u>Academic Appointment:</u>  Assistant Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1986 -<br>July 1989 | <u>Academic Appointment:</u>  Clinical Instructor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

<u>EMPLOYMENT:</u>

| | |
|---|---|
| July 2019-<br>Present | Attending Psychiatrist John A. Burns School of Medicine, Department of Psychiatry, University of Hawaii. Current duties include supervising psychiatric residents in their provision of acute and chronic care to the mentally ill inmate population housed at the Oahu Community Correctional Center. In this capacity I was also involved with local agencies in formulating the jail's response to Covid-19. I present a lecture series to the psychiatric residents regarding Forensic Psychiatry. I also serve as an Attending Psychiatrist in the Emergency Department and the Psychiatric Inpatient Unit at the Queens Medical Center. |
| December 1996-<br>Present | <u>Psychiatric Consultant</u><br>Provide consultation to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues, extensive experience in all phases of capital litigation and correctional psychiatry. |
| January 1997-<br>September 1998 | <u>Director of Clinical Services, San Francisco Target Cities</u><br><u>Project</u>.  Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court   Also responsible for providing clinical in-service trainings for the staff of the Project and community agencies that requested technical assistance. |
| February 1996 -<br>November 1996 | <u>Medical Director, Comprehensive Homeless Center,</u><br><u>Department of Veterans Affairs Medical Center, San Francisco.</u><br>Overall responsibility for the medical and psychiatric services at the Homeless Center. |
| March 1995 -<br>January 1996 | <u>Chief, Intensive Psychiatric Community Care Program,</u><br><u>(IPCC) Department of Veterans Affairs Medical Center, San</u><br><u>Francisco.</u>  Overall clinical/administrative responsibility for the IPCC, a community-based case management program.  Duties also |

include medical/psychiatric consultation to Veteran Comprehensive Homeless Center.  This is a social work managed program that provides comprehensive social services to homeless veterans.

April 1991 -
February 1995

Chief, Substance Abuse Inpatient Unit, (SAIU), Department of Veterans Affairs Medical Center, San Francisco.
Overall clinical/administrative responsibility for SAIU.

September 1990 -
March 1991

Psychiatrist, Substance Abuse Inpatient Unit, Veterans Affairs Medical Center, San Francisco.  Clinical responsibility for patients admitted to SAIU.  Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues.

August 1988 -
December 1989

Director, Forensic Psychiatric Services, City and County of San Francisco.  Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco.  Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital.

July 1986 -
August 1990

Senior Attending Psychiatrist, Forensic Unit, University of California, San Francisco General Hospital.  Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward.  Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward. Liaison with Jail Psychiatric Services, City and County of San Francisco.  Advise San Francisco City Attorney on issues pertaining to forensic psychiatry.

July 1985
June 1986

Chief Resident, Department of Psychiatry, University of California San Francisco General Hospital.  Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatry course for UCSF second-year medical students.

July 1984 -
March 1987

Physician Specialist, Westside Crisis Center, San Francisco, CA.  Responsibility for Crisis Center operations during assigned shifts, admitting privileges at Mount Zion Hospital.  Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested.

April 1984 -
July 1985

Psychiatric Consultant, Marin Alternative Treatment, (ACT).
Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues.

August 1983 -

Physician Specialist, Mission Mental Health Crisis Center,

3

| | |
|---|---|
| November 1984 | <u>San Francisco, CA.</u>   Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982-<br>July 1985 | <u>Psychiatric Resident, University of California, San Francisco.</u><br>Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 -<br>July 1978 | <u>Infantry Officer - United States Marine Corps.</u><br>Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Officer in Charge of a Vietnamese Refugee Camp. Received an Honorable Discharge.  Highest rank attained was Captain. |

<u>HONORS AND AWARDS:</u>

| | |
|---|---|
| June 2020 | Recognized by the Department of Psychiatry, John A. Burns School of Medicine, University of Hawaii as the recipient ot the 2019-2020 Excellence in Teaching Award-Psychiatry. |
| June 2015 | Recognized by the Psychiatry Residents Association of the University of California, San Francisco, School of Medicine, Department of Psychiatry for "Excellence in Teaching" for the academic year 2014-2015. |
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |

| | |
|---|---|
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award for Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident.  The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship.  One of sixteen nationwide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry.   Made presentation at Annual Hospital and Community Psychiatry Meeting in Montreal, Canada, in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome." |

MEMBERSHIPS:

| | |
|---|---|
| June 2000-<br>May 2008 | California Association of Drug Court Professionals. |
| July 1997-<br>June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 -<br>June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 -<br>April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 -<br>June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 -<br>June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

PUBLIC SERVICE:

| | |
|---|---|
| June 1992 | Examiner, American Board of Psychiatry and Neurology, Inc. |
| November 1992 - January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000- April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report.* |
| May 2001- September 2010 | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002- June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003- April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003- January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |
| February 2004- June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004- January 2006; February 2017- October 2018 | Member of Human Services Commission, City and County of San Francisco. |
| February 2006- January 2007; April 2013- January 2015 | Vice President, Human Services Commission, City and County of San Francisco. |
| February 2007- March 2013; February 2015- 2017 | President, Human Services Commission, City and County of San Francisco. |

UNIVERSITY SERVICE:

| | |
|---|---|
| June 2020- Present | Member of the John A. Burns School of Medicine, University of Hawaii Scholarship Committee. |
| June 2020- Present | Member of the resident selection committee for the Department of Psychiatry, John A. Burns School of Medicine, University of Hawaii. |

| | |
|---|---|
| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing.  Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine.  Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee.<br>Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |
| September 1983 -<br>June 1989 | Admissions Committee, University of California, School of Medicine.  Duties included screening applications and interviewing candidates for medical school. |
| October 1978 -<br>December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic. Provided free instruction to the public on proper methods of exercise and preventative health measures. |

TEACHING RESPONSIBILITIES:

| | |
|---|---|
| July 2019-<br>present | Present a lecture series to the psychiatric residents of the Department of Psychiatriy, JABSOM, University of Hawaii on forensic psychiatry. Psychotherapy supervisor Department of Psychiatriy, JABSOM, University of Hawaii. |

| | |
|---|---|
| December 2018-<br>May 2019 | Lecturer, Department of Psychiatry, JABSOM, University of Hawaii. |
| September 2016-<br>June 2018 | Evidence-Based Inquiry Facilitator for the *Bridges Curriculum*, University of California, San Francisco, School of Medicine. |
| August 2014-<br>June 2018 | Small Group Facilitator, Foundations of Patient Care, University of California, San Francisco, School of Medicine. |
| July 2003-<br>June 2018 | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
| January 2002-<br>January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health." This is a 1-unit course, which covers the unique health needs of prisoners. |
| September 2001-<br>June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| April 1999-<br>April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998-<br>June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 -<br>November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| September 1990-<br>December 2002 | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 -<br>June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse." This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 -<br>February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Supervise 4th Year medical students in the care of dual diagnostic patients. |
| February 1994 -<br>February 2006 | Consultant, Napa State Hospital Chemical Dependency Program Monthly Conference. |
| July 1992 -<br>June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric Aspects of Medicine," University of California, San Francisco, School of Medicine. |
| July 1991-<br>Present | Group and individual psychotherapy supervisor, Outpatient Clinic, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

| | |
|---|---|
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 - February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - November 1996 | Off ward supervisor, PGY II psychiatric residents, Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU), San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans Affairs Medical Center. |
| September 1989 - November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 - June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 - Present | Tavistock Organizational Consultant. Extensive experience as a consultant in numerous Tavistock conferences. |
| September 1987 - December 1993 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine.  Designed, planned and taught course, Psychiatry 170.02, "Alcoholism".  This is a 1-unit course offered to medical students, which covers alcoholism with special emphasis on the health professional.  This course is offered fall quarter each academic year. |
| July 1987- June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco General Hospital and Veterans Affairs Medical Center. |
| July 1986 - June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |
| July 1986 - August 1990 | Clinical supervisor, Psychology interns/fellows, San Francisco General Hospital. |
| July 1986 - August 1990 | Clinical supervisor PGY I psychiatric residents, San Francisco General Hospital |
| July 1986 - August 1990 | Coordinator of Medical Student Education, University of California, San Francisco General Hospital,  Department of Psychiatry.  Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric |

Clerkship 110 and Advanced Clinical Clerkship in Psychiatry 141.01.

July 1985 –
August 1990

Psychiatric Consultant to the General Medical Clinic, University of California, San Francisco General Hospital.  Teach and supervise medical residents in interviewing and communication skills.  Provide instruction to the clinic on the psychiatric aspects of ambulatory medical care.

COMMUNITY SERVICE AND PRISON CONDITIONS EXPERT WORK:

May 2016-
Present

Court-appointed monitor in *Ashoor Rasho, et al. v. Director John R. Baldwin, et al.*, No.:1:07-CV-1298-MMM-JEH (District Court, Peoria, Illinois.) This case involves the provision of constitutional mental health care to the inmate population of the Illinois Department of Corrections.

June 2015-
May 2017

Senior Fellow, University of California, Criminal Justice & Health Consortium.

April 2014-
Ocotber 2018

Plaintiffs' expert in *Hernandez, et al. v. County of Monterey, et al.*, No.: CV 13 2354 PSG. This case involves the provision of unconstitutional mental health and medical services to the inmate population of Monterey County Jail.

January-December 2014

Federal Bureau of Prisons: Special Housing Unit Review and Assessment. This was a year-long review of the quality of mental health services in the segregated housing units of the BOP.

August 2012-present

Plaintiffs' expert in *Parsons et al. v. Ryan* et al., (District Court, Phoenix, Arizona.)  This case involves the provision of unconstitutional mental health and medical services to the inmate population of the Arizona Department of Corrections.

October 2007-
Present

Plaintiffs' expert in 2007-2010 overcrowding litigation and in opposing current efforts by defendants to terminate the injunctive relief in *Coleman v. Brown,* United States District Court, Eastern District of California, Case No. 2:90-cv-00520-LKK-JFM. The litigation involves plaintiffs' claim that overcrowding is causing unconstitutional medical and mental health care in the California state prison system. Plaintiffs won an order requiring the state to reduce its population by approximately 45,000 state prisoners.  My expert opinion was cited several times in the landmark United States Supreme Court decision upholding the prison population reduction order.  *See Brown v. Plata,* ___ U.S. ___, 131 S. Ct. 1910, 1933 n.6, 1935, 179 L.Ed.2d 969, 992 n.6, 994 (2011).

July/August 2008-Present

Plaintiff psychiatric expert in the case of Fred Graves, et al., plaintiffs v. Joseph Arpaio, et al., defendants (District Court, Phoenix, Arizona.)  This case involved Federal oversight of the mental health treatment provided to pre-trial detainees in the Maricopa County Jails.

| | |
|---|---|
| February 2006-<br>December 2009 | Board of Directors, Physician Foundation at California Pacific<br>Medical Center. |
| June 2004-<br>September 2012 | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003-<br>June 2008 | Organizational/Psychiatric Consultant, State of Hawaii,<br>Department of Human Services. |
| June 2003-<br>December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement,"<br>New Mexico Corrections Department (NMCD).   This is a<br>settlement arrived at between plaintiffs and the NMCD regarding<br>the provision of constitutionally mandated psychiatric services for<br>inmates placed within the Department's "Supermax" unit. |
| October 2002-<br>August 2006 | Juvenile Mental Health and Medical Consultant, United<br>States Department of Justice, Civil Rights Division, Special<br>Litigation Section. |
| July 1998-<br>June 2000 | Psychiatric Consultant to the Pacific Research and Training<br>Alliance's Alcohol and Drug Disability Technical Assistance<br>Project.   This Project provides assistance to programs and<br>communities that will have long lasting impact and permanently<br>improve the quality of alcohol and other drug services available to<br>individuals with disabilities. |
| July 1998-<br>February 2004 | Psychiatric Consultant to the National Council on Crime and<br>Delinquency (NCCD) in its monitoring of the State of Georgia's<br>secure juvenile detention and treatment facilities.  NCCD is acting<br>as the monitor of the agreement between the United States and<br>Georgia to improve the quality of the juvenile justice facilities,<br>critical mental health, medical and educational services, and<br>treatment programs.  NCCD ceased to be the monitoring agency<br>for this project in June 1999.  At that time, the Institute of Crime,<br>Justice and Corrections at the George Washington University<br>became the monitoring agency.  The work remained unchanged. |
| July 1998-<br>July 2001 | Psychiatric Consultant to the San Francisco Campaign<br>Against Drug Abuse (SF CADA). |
| March 1997-<br>Present | Technical Assistance Consultant, Center for Substance<br>Abuse Treatment, Substance Abuse and Mental Health Services<br>Administration, Department of Health and Human Services. |
| January 1996-<br>June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer<br>Center (ATTC), University of California, San Diego. |
| December 1992 -<br>December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc.<br>Review all research protocols for the clinic per Department of<br>Health and Human Services guidelines. |

| | |
|---|---|
| June 1991-<br>February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic.<br>Overall responsibility for psychiatric services at the clinic. |
| December 1990 -<br>June 1991 | Medical Director, Haight Ashbury Free Clinic,<br>Drug Detoxification and Aftercare Project. Responsible for directing all medical and psychiatric care at the clinic. |
| October 1996-July 1997 | Psychiatric Expert for the U.S. District Court, Northern District of California, in the case of Madrid v. Gomez, No. C90-3094-TEH. Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
| April 1990 –January 2000 | Psychiatric Expert for the U.S. District Court, Eastern District of California, in the case of Gates v. Deukmejian, No. C1V S-87-1636 LKK-JFM.  Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville). |
| January 1984 -<br>December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic,<br>Drug Detoxification and Aftercare Project.  Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues. Special emphasis on dual diagnostic patients. |
| July 1981-<br>December 1981 | Medical/Psychiatric Consultant, Youth Services,<br>Hospitality House, San Francisco, CA.  Advised youth services staff on client management.  Provided training on various topics related to adolescents. Facilitated weekly client support groups. |

## SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| | |
|---|---|
| January 1996 -<br>June 2002 | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| September 1994 -<br>June 2002 | Soccer Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| June 1991-<br>June 1994 | Board of Directors, Pacific Primary School,<br>San Francisco, CA. |
| April 1989 -<br>July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 -<br>May 1995 | Numerous presentations on Mental Health/Substance Abuse issues to the student body, Hidden Valley Elementary School and Santa Rosa Jr. High School, Santa Rosa, CA. |

PRESENTATIONS:

1.  San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1.   (10/12/1990).   "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2.  Grand Rounds.   Department of Psychiatry, University of California, San Francisco, School of Medicine.  (12/5/1990).  "Advances in the Field of Dual Diagnosis."

3.  Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference, Napa, California.   (3/3/1991).   "Planning a Satisfying Life in Medicine."

4.  24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California, San Mateo, California. (9/11/1991).  "The Chronically Ill Substance Abuser."

5.  Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics.  (11/26/91).  "Mentoring as an Art."

6.  Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine.  (4/25/1992).  "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7.  First International Conference of Mental Health and Leisure.   University of Utah. (7/9/1992).  "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8.  American Group Psychotherapy Association Annual Meeting, San Francisco, California. (2/20/1993).  "Inpatient Groups in Initial-Stage Addiction Treatment."

9.  Grand Rounds.  Department of Child Psychiatry, Stanford University School of Medicine.  (3/17/93, 9/11/96).  "Issues in Adolescent Substance Abuse."

10. University of California, Extension.   Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97).  "Dual Diagnosis."

11. American Psychiatric Association Annual Meeting.   (5/26/1993).   "Issues in the Treatment of the Dual Diagnosis Patient."

12. Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis.  (6/23/1993).  "Dual Diagnosis Treatment Issues."

13. Utah Medical Association Annual Meeting, Salt Lake City, Utah.  (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14. Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993).  "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15. Haight Ashbury Free Clinic's 27th Anniversary Conference.   (6/10/94).   "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16. University of California, San Diego.  Addiction Technology Transfer Center Annual Summer Clinical Institute:  (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98).  "Treating Multiple Disorders."

17. National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists.  (9/10/94).  "Psychiatry, Homelessness, and Serious Mental Illness."

18. Value Behavioral Health/American Psychiatry Management Seminar.  (12/1/1994).  "Substance Abuse/Dual Diagnosis in the Work Setting."

19. Grand Rounds.  Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry.  (1/24/1995).  "Models of Addiction."

20. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project.  (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01).  "Demystifying Dual Diagnosis."

21. First Annual Conference on the Dually Disordered.  (3/10/1995).  "Assessment of Substance Abuse."  Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22. Delta Memorial Hospital, Antioch, California, Medical Staff Conference.  (3/28/1995).  "Dealing with the Alcohol and Drug Dependent Patient."  Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23. Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada.  (11/23/95).  "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24. The Labor and Employment Section of the State Bar of California.  (1/19/96).  "Understanding Alcoholism and its Impact on the Legal Profession."  MCCE Conference, San Francisco, CA.

25. American Group Psychotherapy Association, Annual Training Institute.  (2/13-2/14/96), National Instructor - Designate training group.

26. American Group Psychotherapy Association, Annual Meeting.  (2/10/96).  "The Process Group at Work."

27. Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28. International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29. Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client".  (11/14/96)

30. Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery".  (11/22/96)

31.    Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32.    Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33.    DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California.  (7/31/97)

34.    The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender".  Wilsonville, Oregon. (8/1/97)

35.    The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children." Newport Beach, California. (2/12/98)

36.    American Group Psychotherapy Association, Annual Training Institute, Chicago, Illinois. (2/16-2/28/1998), Intermediate Level Process Group Leader.

37.    "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience."  The Haight Ashbury Free Clinics Inc., sponsored this seminar in conjunction with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis.  San Francisco, California.  (3/6-3/8/1998)

38.    "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection."  The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39.    Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women." (6/11/1998)

40.    Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient." (6/17/1998)

41.    Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems." (6/19/1998)

42.    "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer." The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference.  San Rafael, California.  (6/20/1998)

43.    "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44.     Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse." (7/15/1998)

45.     "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii. (9/2/98)

46.     9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco. "Care Issues and Pain Management for Chemically Dependent Patients." San Francisco, CA. (9/10/98)

47.     Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000." "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA. (9/18/98)

48.     Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder." Napa, CA. (9/23/98)

49.     "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA. (9/30/98)

50.     "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA. (10/13/98)

51.     California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient." Concord, CA. (10/15/98)

52.     California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel. (10/15/98)

53.     Northwest GTA Health Corporation, Peel Memorial Hospital, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada. (10/23/98)

54.     1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders." Sacramento, CA. (12/11/98)

55.     "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA. (1/7/99)

56.     Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder." (1/19/99)

57.     "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA. (1/22/99 & 2/5/99)

58.     Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High-Risk Offender." (2/17/99)

59.     American Group Psychotherapy Association, Annual Training Institute, Houston, Texas. (2/22-2/24/1999).  Entry Level Process Group Leader.

60.     "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii.  (3/5 & 3/6/99)

61.     "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA.  (3/10/99)

62.     "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA.  (3/11/99)

63.     "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA.  (3/17/99)

64.     Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i.  Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies.  Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility.  (4/2-4/9/99)

65.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA.  (4/14/99)

66.     "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA.  (4/21/99)

67.     California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California.  (4/29/99)

68.     "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i.  (4/30/99)

69.     State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital."  Honolulu, Hawai'i.  (4/30/99)

70.     "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i.  (4/30/99)

71.     11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Concord, California.  (5/6/99)

72.     The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Escondido, California.  (5/7/99)

73.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California.  (5/13/99)

74.     "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", third annual conference presented by the Southern California Mental Health Directors Association.  Anaheim, California.  (5/21/99)

75.     15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder." Boise State University, Boise, Idaho.  (5/25/99)

76.     "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California.  (6/3/99)

77.     "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan.  (6/14/99)

78.     "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan.  (6/17/99)

79.     "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan. (6/22/99)

80.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan.  (6/26/99)

81.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California.  (7/13/99)

82.     "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California.  (7/15/99)

83.     "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California. (7/22/99)

84.     1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry.  Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness.  What's Really Happening to your Patient?" "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering."  La Jolla, California.  (8/3/99)

85.     "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center. Kahului, Maui.  (8/23/99)

86.     "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California.  (9/13/99)

87.     "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California.  (9/14/99)

88.     "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California.  (9/16/99)

89.     "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California.  (9/23/99)

90.     "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona.  (9/28/99)

91.     "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i.  (10/8-10/10/99)

92.     "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California.  (10/12/99)

93.     "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California.  (10/14/99)

94.     "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California.  (10/21/99)

95.     "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California.  (1/27/00)

96.     "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California.  (3/6/00)

97.     "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California.  (3/16/00)

98.     "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California.  (3/17/00)

99.     "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California.  (4/3/00)

100.    "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California.  (4/4-4/5/00)

101.    "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California.  (5/15/00)

102.    National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California.  "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103.    "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California.  (6/9/00)

104.    "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunder Road Adolescent Treatment Centers, Inc., Oakland, California.   (6/29 & 7/27/00)

105.    "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California.  (9/8/00)

106.     "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California.  (9/9/00)

107.    Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey.   "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108.    "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service.   (11/1/00, 3/13/01)

109.    "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California. (11/12-11/17/00)

110.    "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California.  (12/5/00)

111.    "Wasn't One Problem Enough?"  Mental Health and Substance Abuse Issues.  2001 California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California. (3/2/01)

112.    "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process."  County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California.  (3/8 & 4/5/01)

113.    "Assessment of the Patient with Substance Abuse and Mental Health Issues."  San Mateo County General Hospital Grand Rounds.  San Mateo, California.  (3/13/01)

114.    "Dual Diagnosis-Assessment and Treatment Issues."  Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California.  (5/8/01)

115.    Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California.  (5/10/01)

116.    National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice."   I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol.  New Orleans, LA.  (6/1-6/2/01)

117.    Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders."  San Jose, California.  (6/15/01)

118.    Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser."  Olympia, Washington.  (11/15/01)

119.    San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis."  (1/14/02)

120. First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas."  El Centro, California.  (1/28/02)

121. The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California.  (4/25/02)

122. Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

123. 3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System."  (6/5/02)

124. New Mexico Department of Corrections, "Group Psychotherapy Training."  Santa Fe, New Mexico.  (8/5/02)

125. Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California.  (8/15/02)

126. California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California.  (8/22/02)

127. Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128. Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129. "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service.  (10/1/03), (12/3/03)

130. "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California.  (10/18/03)

131. "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Pasadena, California.  (4/2/04)

132. Lecture tour of Japan (4/8-4/18/04).  "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis."  (9/9/04)

134. "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section.  Sacramento, California.  (4/8/05)

135. "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University.  San Francisco, California. (8/13/05)

136. Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse."  San Francisco, California. (10/24/05)

137. Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse."  Woodland, California. (1/25/06), (6/23/06)

138. "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139. Lecture tour of Japan (4/13-4/23/06).  "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness."  Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140. "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference.  Sacramento, California. (4/25/06)

141. "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142. "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference.  Sacramento, California. (4/27/07)

143. "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network.  Medford, Oregon.  (5/10/07)

144. "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar.  San Francisco, California.  (8/2/07)

145. "Capital Punishment," Human Writes 2007 Conference.  London, England.  (10/6/07)

146. "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California.  (10/30/07)

147. "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference.  San Diego, California. (12/13/07)

148. "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada.  (4/10/08)

149. "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program.  Chelan, Washington.  (6/3/08)

150. "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference.  Burlingame, California.  (6/19/08)

151.    Mental Health and Substance Abuse Training, Wyoming Department of Health, "Diagnosis and Treatment of Co-occurring Mental Health and Substance Abuse." Buffalo, Wyoming. (10/6/09)

152.    2010 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th & 5th, 2010)

153.    Facilitating Offender Re-entry to Reduce Recidivism: A Workshop for Teams, Menlo Park, CA.  This conference was designed to assist Federal Courts to reduce recidivism. "The Mentally-Ill Offender in Reentry Courts," (9/15/2010)

154.    Juvenile Delinquency Orientation, "Adolescent Substance Abuse." This was part of the "Primary Assignment Orientations" for newly appointed Juvenile Court Judges presented by The Center for Judicial Education and Research of the Administrative Office of the Court.  San Francisco, California. (1/12/2011, 1/25/12, 2/27/13 & 1/8/14)

155.    2011 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th, 2011)

156.    2012 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 2nd, 2012)

157.    Mexican Capital Legal Assistance Program Meeting, "Issues Related to Mental Illness in Mexican Nationals." Santa Fe, New Mexico (10/12/12); Houston, Texas (4/23/13)

158.    Los Angeles County Public Defender's Capital Case Seminar, "Mental Illness and Substance Abuse." Los Angeles, California. (9/27/13)

159.    "Perspectives on Race and Ethnicity for Capital and Non-Capital Defense Lawyers," conference sponsored by the Administrative Office of the US Courts, New York, NY., September 18-20, 2015.

160.    San Francisco Collaborative Courts, Superior Court of California, County of San Francisco sponsored training, "Personality Disorders," February 19, 2016.

161.    Administrative Office of the United States Courts, Federal Death Penalty Resource Counsel Projects, 2016 Strategy Session: "Ethnocultural Competency Issues in Working with Experts;" "Understanding Drug Use and Abuse by our Clients and Strategies for Effectively Incorporating this Information into the Mitigation Narrative." Denver, Colorado, November 17-19, 2016.

162.    "Evaluating the mentally ill and substance abusing client." Idaho Association of Criminal Defense Lawyers, Sun Valley, Idaho, March 10, 2017.

163.    Mental Health & Death Penalty Training, Community Legal Aid Institute (LBH Masyarakat), Jakarta, Indonesia, February 12 -16, 2019.

<u>PUBLICATIONS:</u>

1)   Kanas, N., Stewart, P. and Haney, K. (1988). *Content and Outcome in a Short-Term Therapy Group for Schizophrenic Outpatients*. <u>Hospital and Community Psychiatry,</u> 39, 437-439.

2)   Kanas, N., Stewart, P. (1989*). Group Process in Short-Term Outpatient Therapy Groups for Schizophrenics.* <u>Group,</u> Volume 13, Number 2, Summer 1989, 67-73.

3)   Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.* <u>Journal of Psychoactive Drugs,</u> Vol. 23(4), Oct.-Dec. 1991, 387-395.

4)   Banys, P., Clark, H.W., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal*. <u>Journal of Substance Abuse Treatment,</u> Vol. 11(1), 9-15.

5)   Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, H.W., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.* <u>The Journal of Nervous and Mental Disease,</u> Vol. 182(10), 570-575.

6)   Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W.O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trial Of Tyrosine for Cocaine Dependence.* <u>Journal of Psychoactive Drugs</u>, Vol. 28(3), pages 305-309, July-September 1996.

7)   Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* <u>Prevention,</u> (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999.

8)   Stewart, P. (1999).   <u>*New Approaches and Future Strategies Toward Understanding Substance Abuse*</u>.   Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9)   Stewart, P. (2002).    *Treatment Is A Right, Not A Privilege.* Chapter in the book, <u>*Understanding Addictions-From Illness to Recovery and Rebirth,*</u> ed. by Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10)  Stewart, P., Inaba, D.S., and Cohen, W.E.  (2004). *Mental Health & Drugs.*  Chapter in the book, <u>*Uppers, Downers, All Arounders, Fifth Edition*</u>, CNS Publications, Inc., Ashland, Oregon.

11)  James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices.* <u>National Institute of Corrections,</u> Accession Number 019468.

12)  Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as <u>AMICUS CURIAE in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*</u>

13)   Stewart, P., Inaba, D.S., and Cohen, W.E. (2007). *Mental Health & Drugs.* Chapter in the book, <u>*Uppers, Downers, All Arounders, Sixth Edition*</u>, CNS Publications, Inc., Ashland, Oregon.

14)   Stewart, P., Inaba, D.S. and Cohen, W.E. (2011). *Mental Health & Drugs.* Chapter 10 in the book, <u>*Uppers, Downers, All Arounders, Seventh Edition,*</u> CNS Publications, Inc., Ashland, Oregon.

15)   Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D., Hans Toch, Ph.D. (2015) Brief of Amici Curiae Professors and Practitioners of Psychiatry and Psychology in Support of Petitioner: Alfredo Prieto v. Harold C. Clarke, et al., On Petition For A Writ of Certiorari To The United States Court of Appeals For The Fourth Circuit, In The Supreme Court of the United States, No. 15-31.

16)   Brief of Medical and Other Scientific and Health-Related Professionals as Amici Curiae in Support of Respondents and Affirmance: Ahmer Iqbal Abbasi, et al., Respondents v. James W. Ziglar, John D. Ashcroft, et al., and Dennis Hasty, et al. Petitioners, On Writs of Certiorari to the United States Court of Appeals for the Second Circuit, In the Supreme Court of the United States, Nos. 15-1358, 15-1359 and 15-1363.

17)   Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine as Amici Curiae in Support of Plaintiff-Appellant Eric Joseph Depaola, Denis Rivera & Luis Velazquez, Plaintiffs v. Virginia Department of Corrections, et al., External Review Team, et al., Defendants. On appeal from the United States District Court for the Western District of Virginia, Case No. 7:14-cv-00692 in the United States Court of Appeals for the Fourth Circuit, No. 16-7358.

*18)*   Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine in support of Petitioner Shawn T. Walker v. Michael A. Farnan, et al., Respondents on petition for Writ of Certiorari to the United States Court of Appeals for the Third Circuit in the Supreme Court of the United States, No. 17-53.

*19)*   Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine in support of Plaintiff-Appellant Edgar Quintanilla v. Homer Bryson, Commissioner, State of Georgia's Department of Corrections, et al., On appeal from the United States District Court for the Southern District of Georgia, Case No. 6:17-cv-00004-JRH-RSB in the United States Court of Appeals for the Eleventh Circuit, No. 17-14141.

# Appendix B

*PABLO STEWART, M.D.*
**Psychiatric Consultant**
**3021 La Pietra Circle**
**Honolulu, HI 96815**
**808-352-8074**
**pablo.stewart.md@gmail.com**

---

## TESTIMONY/DEPOSITIONS January 2000-Present

1. People versus Juan Duarte Gonzales (Lincoln County, Washington, January 2000)
2. People versus Jerry Lane Davis (Stanislaus County, California, September 2000)
3. James Andrew Melton versus Arthur Calderon, et al. (United States District Court, Los Angeles, California, December 2000)
4. Fremont Unified School District versus James Parks (Deposition taken in San Francisco, California, April 2001)
5. People versus Pablo Lomeli (Douglas County, Arizona, August 2001)
6. Dunlap versus County of Mendocino (Deposition taken in Oakland California, September 2001)
7. Maxwell Hoffman versus A.J. Arave, Warden, et al. (Deposition taken in San Francisco, October 2001)
8. People versus Michelle Michaud (Alameda County, California, April 2002)
9. People versus David Attias (Santa Barbara County, California, May/June 2002)
10. People versus Larry Christopher Graham (Contra Costa County, California, October 2002)
11. People versus Miguel Enrique Diaz (San Mateo County, California, November/December 2002)
12. United States versus Eugene Frederick Boyce, III (District Court, Honolulu, Hawai'i December 2002)
13. People versus Robert Daniel Weston (Stanislaus County, California, April/July 2003)
14. People versus Vincent Sanchez (Ventura County, California, August 2003)
15. Armstrong Petition JW01-6450 (San Francisco Juvenile Court, December 2003)
16. People versus Daniel Mugnolo (San Francisco City and County, December 2003)
17. Brandon Astor Jones versus Frederick Head, Warden (Deposition taken in San Francisco, January 2004)
18. David Perkins versus Frederick Head, Warden (Deposition taken in San Francisco, March 2004)
19. People versus Marino Hernandez (San Mateo County, California, June 2004)
20. Raphael Camargo versus Larry Norris, Director, Arkansas Department of Correction (Deposition taken in San Francisco, July 2004)
21. People versus Ronald Mathews (King County, Washington, August 2004)
22. People versus Huberto Mendoza (Stanislaus County, California, December 2004)
23. People versus James Essick (San Diego County, California, June 2005)

24. People versus Jesse Ignacio Sanchez Gomez (Ada County, Idaho, July/August 2005)
25. People versus Adrian Camacho (San Diego County, California, October 2005)
26. People versus Huberto Mendoza (Stanislaus County, California, November 2005)
27. People versus Paul Speer (Maricopa County, Arizona, January 2006)
28. People versus Mark Thigpen (San Mateo County, California, January 2006)
29. United States versus Tommy Ray Elam (District Court, Los Angeles, California, February 2006)
30. Enrique Arevalo versus Frederick Head, Warden (Deposition taken in San Francisco, March 2006)
31. United States versus Danny Lee Jones (District Court, Phoenix, Arizona, March 2006)
32. People versus Omar Dent, III (Los Angeles County, California, May 2006)
33. People versus Delaney Marks (Alameda County, California, May 2006)
34. People versus Angel Maturino Resendiz (Harris County, Texas, June 2006)
35. People versus Antonio Nicolosi (San Mateo County, California, July 2006)
36. Gregory Paul Lawler versus Frederick Head, Warden (Deposition taken in San Francisco, July 2006)
37. United States versus Todd Sarver (District Court, San Francisco, California, August 2006)
38. United States versus Eugene Frederick Boyce, III (United States District Court, Honolulu, Hawaii, October 2006)
39. Arthur Torlucci versus W.A. Duncan, (District Court, Santa Ana, California, November 2006)
40. Joaquin Enrique Arevalo versus William Terry, Warden, (Butts County, Georgia, December 2006)
41. People versus Jerry Cabonce, (San Mateo County, California, January 2007)
42. People versus Rodrigo Paniagua, (Santa Clara County, California, February 2007)
43. Gregory Paul Lawler versus William Terry, Warden, (Butts County, Georgia, February 2007)
44. United States versus Francisco Rodriguez, (District Court, Santa Ana, California, April 2007)
45. People versus O'Neal Durgin, (San Mateo County, California, June 2007)
46. Sepulveda versus Beard et al., (Bartonsville, Pennsylvania, June 2007)
47. Webster versus Ayers et al., (District Court, Sacramento, California, September 2007)
48. Ronald Deere versus Jeanne Woodford, et al., (District Court, Los Angeles, California, October 2007)
49. People versus Eric V. Hall (Ada County, Idaho, October 2007)
50. Rickey Dale Newman versus Larry Norris, Director, Arkansas Department of Correction (District Court, Fort Smith, Arkansas, November 2007
51. Ralph Coleman, et al. versus Arnold Schwarzenegger, et al. (Deposition taken in Sacramento, December 2007)
52. People versus Matthew Cunningham (Maricopa County, Arizona, January & February 2008)
53. People versus Alfredo Prieto (Fairfax County, Virginia, February 2008)

54. People versus Edward Gutierrez (Santa Clara County, California, May 2008)
55. Fred Graves, et al., Plaintiffs v. Joseph Arpaio, et al., Defendants. (Deposition taken in Phoenix, Arizona, July 2008). A supplemental deposition was also taken in July 2008 approximately 2 weeks after the initial deposition.
56. Fred Graves, et al., Plaintiffs v. Joseph Arpaio, et al., Defendants (District Court, Phoenix, Arizona, August 2008)
57. Ralph Coleman, et al. versus Arnold Schwarzenegger, et al. (Deposition taken in Sacramento, California, September 2008)
58. United States versus Naeem Williams (District Court, Honolulu, Hawaii, November 2008)
59. Ralph Coleman, et al. versus Arnold Schwarzenegger, et al. (Three Judge Panel, District Court, San Francisco, California, December 2008)
60. United States versus Michael Behenna (United States Army Court Marshall, Fort Campbell, Kentucky, February 2009)
61. United States versus Steven Green (District Court, Paducah, Kentucky, May 2009)
62. People versus Francisco Merino (San Mateo County, California, July 2009)
63. Milton Lewis versus State of California (District Court, Sacramento, California, October 2009)
64. People versus Adrian Sedano (San Mateo County, California, November 2009)
65. United States versus Noshir S. Gowadia (District Court, Honolulu, Hawaii, November 2009)
66. Johnny A. Johnson versus State of Missouri (St. Louis, Missouri, December 2009)
67. Martin Kipp versus State of California (District Court, Los Angeles, California, December 2009)
68. David Welch versus State of California (Martinez, California, September 2010)
69. State of Arizona versus Eddy Rose (Phoenix, Arizona, September 2010)
70. State of Delaware versus Gary Ploof (Dover, Delaware, October 2010)
71. State of Arizona versus Steven Ray Newell (Phoenix, Arizona, March 2011)
72. State of Arkansas versus Ricky Lee Newman (Fort Smith, Arkansas, March 2011)
73. People versus Kerri Livingston (San Mateo County, California, March 2011)
74. People versus Alexander Youshock (San Mateo County, California, April 2011)
75. United States versus Francisco Rodriguez (District Court, Santa Ana, California, May 2011)
76. State of Connecticut versus Robert Breton (Hartford, Connecticut, July 2011)
77. United States versus Billie Allen (St. Louis, Missouri, December 2011)
78. People versus Mohammed Ali (San Mateo County, California, February 2012)
79. Clemency Hearing re: Robert Towery (Florence, Arizona, March 2012)
80. United States versus Danny John, Jr. (Prescott, Arizona, March 2012)
81. State of Ohio versus Abdul H. Awkal (Cleveland, Ohio, June 2012)
82. People versus Monica McCarrick (Solano County, California, June 2012)
83. People versus Robert Hall (Ada County, Idaho, October 2012)
84. People versus Alamoti Finau (San Mateo County, California, November 2012)
85. United States versus Merrell Hobbs (District Court, Philadelphia, Pennsylvania, November 2012)

86. Ex Parte Juan Lizcano, W05-59563-S(A) (Dallas, Texas, November 2012)
87. People versus David Vanalstine (San Mateo County, California, December 2012)
88. Sinisterra versus the United States (District Court, Kansas City, Missouri, January 2013)
89. People versus Jing Hua Wu (San Jose, California, February & March 2013)
90. Coleman versus Brown (Deposition taken in San Francisco, California, March 2013)
91.  Coleman versus Brown (District Court, Sacramento, CA, June 2013)
92.  Tate versus Humphrey (Deposition taken in San Francisco, California, June 2013)
93. Coleman versus Brown (District Court, Sacramento, CA, October 2013)
94. People versus Alegria (Tucson, Arizona, October 2013)
95. Commonwealth v. Michael Pruitt (Reading, PA, November 2013)
96. Coleman versus Brown (District Court, Sacramento, CA, December 2013)
97. Fred Graves, et al., Plaintiffs v. Joseph Arpaio, et al., Defendants (District Court, Phoenix, Arizona, March 2014)
98. Deposition taken in Parsons, et al v. Ryan. March 28, 2014, San Francisco, CA.
99. Evidentiary hearing in State of Arizona v. Albert Martinez Carreon. Phoenix Arizona, April 21 & 22, 2014.
100.  United States v. Naeem Williams, (District Court, Honolulu, HI, April 29 & 30, and June 3, 2014
101.  Deposition taken in Hernandez v. County of Monterey, San Francisco, CA, July 8, 2014
102.  United States v. Thomas Steven Sanders, (District Court, Alexandria, LA, September 22 & 23, 2014)
103.  Deposition taken in Kurian David, et al., plaintiffs v. Signal International, LLC, defendant, San Francisco, California, October 2014)
104.  People v. Dennis McGraw (Vallejo, California, November 2014)
105.  People v. Leticia Serna (San Jose, California, December 2014)
106.  Wilridge v. Marshall, (District Court, San Francisco, California, February 2015)
107.  People v. Hugo Munguia-Hernandez (Redwood City, California, July 2015)
108.  Deposition taken in Goddard v. State of California, et al., San Mateo, California, September 2015.
109.  People v. Bryan Thomas (Redwood City, California, October 2015)
110.  Carlos Gutierrez v. E.K. McDaniel, Warden, et al. (Reno, Nevada, January 2016)
111.  State of Arkansas v. Rickey Dale Newman (Fort Smith, Arkansas, January 2016)
112.  Deposition taken in Roscoe Walker v. Ford Motor Company, et al., San Mateo, California, February 2016.
113.  People v. Philip Law (Boise, Idaho, May 2016)
114.  United States v. Joel Manuel Taylor, (District Court, San Francisco, CA, March 18, April 25 & May 25, 2016)
115.  United States v. Henry Cervantes, et al, (District Court, Oakland, CA, June 28, 2016)

116. Manual Camacho v. State of Arkansas, (District Court, Fort Smith, Arkansas, November 8, 2016)

117. The People of Guam vs. Mark Anthony Torre, Jr. (Superior Court of Guam, Agana, Guam, February 22, 2017)

118. Kevin Webb, et. al., v. Brad Livingston, et. al. (civil action no. 4:14-cv-03302). Deposition taken in San Francisco, California, June 2, 2017)

119. State of Missouri v. Marvin Rice (11DE-CR00590-2), video deposition taken in Honolulu, HI, July 20, 2017.

120. Ashoor Rasho et al. v. Director John Baldwin, (District Court, Peoria, Illinois, December 18 & 19, 2017)

121. United States v. Nna Alpha Onuoha, (District Court, Riverside, California, January 24, 2018)

122. Ashoor Rasho et al. v. Director John Baldwin, (District Court, Peoria, Illinois, February 27 & 28, March 1, and August 27-30, 2018)

123. United States v. Alfonso Rodriguez, Jr. Deposition taken in Honolulu, HI, September 6, 2018.

124. People v. Omar Pettigen (Superior Court, Alameda County, CA, July 22, 2019)

125. United States v. Roger Trent Skaggs (District Court, Cincinnati, Ohio, July 25, 2019)

126. Parsons, et al v. Shin (District Court, Phoenix, AZ, November 3, 2021)

# Appendix C

| Document Description | Document Number/Beginning Bates |
|---|---|
| | CCBVA0000174457 |
| | CCBVA0000196645 |
| | CCBVA0000198558 |
| | CCBVA0000262661 |
| | CCBVA0000196209 |
| | CCBVA0000198559 |
| | CCBVA0000243796 |
| | CCBVA0000191615 |
| | CCBVA0000263419 |
| | CCBVA0000197467 |
| | CCBVA0000204050 |
| | CCBVA0000204052 |
| | CCBVA0000257824 |
| | CCBVA0000262468 |
| | CCBVA0000189920 |
| | CCBVA0000197109 |
| | CCBVA0000189934 |
| | CCBVA0000244574 |
| | CCBVA0000256311 |
| | CCBVA0000256312 |
| | CCBVA0000197359 |
| | CCBVA0000190045 |
| | CCBVA0000262671 |
| | CCBVA0000256314 |
| | CCBVA0000204245 |
| | CCBVA0000197128 |
| | CCBVA0000197367 |
| | CCBVA0000205491 |
| | CCBVA0000197030 |
| | CCBVA0000205779 |
| | CCBVA0000189948 |
| | CCBVA0000189950 |
| | CCBVA0000197130 |
| | CCBVA0000255017 |

| | |
|---|---|
| ███████████████████████ | CCBVA0000197463 |
| | CCBVA0000220465 |
| | CCBVA0000196208 |
| | CCBVA0000220504 |
| 2010 Detainee Handbook | CCBVA0000243357 |
| 2011 Detainee Handbook | CCBVA0000274588 |
| ████████████ | CCBVA0000274977 |
| 2013 Detainee Handbook | CCBVA0000179925 |
| 2014 Detainee Handbook | CCBVA0000000029 |
| 2015 Detainee Handbook | TRINITY-00011743 |
| 2016 Detainee Handbook | CCBVA0000000069 |
| 2017 Detainee Handbook | CCBVA0000000110 |
| 2017 OIG Inspection Report | PLS_0000786 |
| 2018 Detainee Handbook | CCBVA0000000152 |
| 2019 Detainee Handbook | CCBVA0000000244 |
| 2020 Detainee Handbook | CCBVA0000202739 |
| Agreement Between Stewart County adn Corrections Corporation of America | CCBVA0000001317 |
| Ali Pourmotabbed, et al., *Food insecurity and mental health: a systematic review and meta-analysis* , Public Health Nutrition: 23(10), 1778-1790. | |
| Amendment of Solicitation/Modification of Contract, Dated 6/30/2006 | CCBVA0000105880 |
| Amendment of Solicitation/Modification of Contract, Dated 6/30/2006 | CCBVA0000244533 |
| Amendment to the Agreement Between Stewart County and Corrections Corporation of America | CCBVA0000001321 |
| ███████████████████ | CCBVA0000150628 |
| Andrew D. Jones, *Food Insecurity and Mental Health Status: A Global Analysis of 149 Countries* , 53 Am. J. Preventative Med. 264 (2017). | |
| ███████n | CCBVA0000196130 |
| ████████████████████ | ICE Barrientos 0024518 |
| | CCBVA0000196218 |
| ████████████ | ICE Barrientos 0022946 |
| Brie A. Williams, et al., *The Cardiovascular Health Burdens of Solitary Confinement* , 34 J. Gen. Internal Medicine 1977 (2019). | |
| Bruce A. Arrigo & Jennifer Leslie Bullock, *The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units* , 52 Int'l J. Offender Therapy & Comp. Criminology 622 (2008). | |

| | |
|---|---|
| Bruce S. McEwen et al., *Stress Effects on Neuronal Structure: Hippocampus, Amygdala, and Prefrontal Cortex* , 41 Neuropsychopharmacology 3, 12–14 (2016). | |
| Candice A. Myers, *Food Insecurity and Psychological Distress: a Review of the Recent Literature* , 9 Current Nutrition Reports 107, (2020). | |
| ▮▮▮▮▮▮▮▮▮▮▮ | CCBVA0000106052 |
| Chapter 19, Resident Work Program, August 16, 2017 | CCBVA0000003947 |
| CoreCivic Policy 14-5 | CCBVA0000106211 |
| CoreCivic Policy 14-6 | CCBVA0000106342 |
| ▮▮▮▮▮▮▮▮▮▮ | CCBVA0000105921 |
| CoreCivic Second Supplemental Disclosures | |
| ▮▮▮▮▮▮▮▮▮▮▮ | CCBVA0000149608 |
| ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | CCBVA0000258428 |
| ▮▮▮▮▮▮▮▮▮▮▮▮▮ | SECURUS_000095 |
| Craig Haney, *Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement* , 49 Crime & Delinquency 124, (2003). | |
| Craig Haney, *Restricting the Use of Solitary Confinement* , 1 Annual Rev. of Criminology 285, (2018). | |
| Craig Haney*, The Psychological Effects of Solitary Confinement: A Systematic Critique* , 47 Crime & Just. 365, 374–75 (2018). | |
| Dana G. Smith, *Neuroscientists Make a Case Against Solitary Confinement* , Sci. Am. (Nov. 9, 2018), https://www.scientificamerican.com/article/neuroscientists-make-a-case-against-solitary- confinement/. | |
| Daniel J. Arenas, et al., *A Systematic Review and Meta-analysis of Depression, Anxiety, and Sleep Disorders in US Adults with Food Insecurity* , 34 J. Gen. Intern. Med. 2874 (2019). | |
| Declaration of Gonzalo Bermudez Gutiérrez, December 21, 2021 | Attachment 1 |
| Declaration of Keysler Urbina Rojas, December 21, 2021 | Attachment 2 |
| Declaration of Wilhen Hill Barrientos, December 19, 2021 | Attachment 3 |
| Deposition of Calvin Blue | |
| Deposition of Charlie Peterson | |
| Deposition of CoreCivic (30(b)(6)) | |
| Deposition of Droudred Blackmon | |
| Deposition of Freddie Hood | |

| | |
|---|---|
| Deposition of Harrell Gray | |
| Deposition of Jacqueline Norman | |
| Deposition of Juliette Drew | |
| Deposition of Mac Moye | |
| Deposition of Michael Swinton | |
| Deposition of Terrence Lane | |
| Deposition of Trinity (30(b)(6)) | |
| Deposition of Troy Pollock | |
| Deposition Transcript and Exhibits: Bethany Brazier | |
| ███████████████████████████ | CCBVA0000246960 |
| ███████████████████████████ | CCBVA0000246961 |
| ███████████████████████████ | CCBVA0000246972 |
| ███████████████████████████ | ICE Barrientos 0023709 |
| ███████████████████████████ | CCBVA0000232792 |
| Detainee Voluntary Work Program Agreement, 11/1/2012 | CCBVA0000004627 |
| DHS complaint, special diet, denied commisaary | DHSOIG0000063 |
| Disciplinary | CCBVA0000060146 |
| Disciplinary | CCBVA0000180741 |
| Disciplinary | CCBVA0000180751 |
| Disciplinary | CCBVA0000180762 |
| Disciplinary | CCBVA0000180774 |
| Disciplinary | CCBVA0000180793 |
| Disciplinary | CCBVA0000180805 |
| Disciplinary | CCBVA0000181831 |
| Disciplinary | CCBVA0000181839 |
| Disciplinary | CCBVA0000182330 |
| Disciplinary | CCBVA0000182345 |
| Disciplinary | CCBVA0000182430 |
| Disciplinary | CCBVA0000182440 |
| Disciplinary | CCBVA0000182449 |
| Disciplinary | CCBVA0000182457 |
| Disciplinary | CCBVA0000182466 |
| Disciplinary | CCBVA0000182474 |
| Disciplinary | CCBVA0000182485 |
| Disciplinary | CCBVA0000182500 |
| Disciplinary | CCBVA0000182514 |

| | |
|---|---|
| Disciplinary | CCBVA0000182529 |
| Disciplinary | CCBVA0000182580 |
| Disciplinary | CCBVA0000182590 |
| Disciplinary | CCBVA0000182600 |
| Disciplinary | CCBVA0000182612 |
| Disciplinary | CCBVA0000217899 |
| Disciplinary | CCBVA0000224967 |
| Disciplinary | CCBVA0000230585 |
| Disciplinary | CCBVA0000232921 |
| Disciplinary | CCBVA0000233146 |
| Disciplinary | CCBVA0000233931 |
| Disciplinary | CCBVA0000238915 |
| Disciplinary | CCBVA0000238934 |
| Disciplinary | CCBVA0000238966 |
| Disciplinary | CCBVA0000239326 |
| Disciplinary | CCBVA0000261235 |
| Disciplinary | CCBVA0000262095 |
| Disciplinary | CCBVA0000264081 |
| Disciplinary | CCBVA0000264099 |
| Disciplinary | CCBVA0000267154 |
| Disciplinary | CCBVA0000267288 |
| Disciplinary | CCBVA0000267351 |
| Disciplinary | CCBVA0000271681 |
| Disciplinary | CCBVA0000271700 |
| Disciplinary | CCBVA0000271732 |
| Disciplinary | CCBVA0000271932 |
| Disciplinary | CCBVA0000271944 |
| Disciplinary | CCBVA0000282823 |
| Disciplinary | CCBVA0000282830 |
| Disciplinary | CCBVA0000282839 |
| Disciplinary | CCBVA0000282847 |
| Disciplinary | CCBVA0000282856 |
| Disciplinary | CCBVA0000282865 |
| Disciplinary | CCBVA0000282874 |
| Disciplinary | CCBVA0000282882 |
| Disciplinary | CCBVA0000282890 |

| | |
|---|---|
| Disciplinary | CCBVA0000282898 |
| Disciplinary | CCBVA0000282905 |
| Disciplinary | CCBVA0000282914 |
| Disciplinary | CCBVA0000282922 |
| Disciplinary | CCBVA0000282931 |
| Disciplinary | CCBVA0000282940 |
| Disciplinary | CCBVA0000282948 |
| Disciplinary | CCBVA0000282957 |
| Disciplinary | CCBVA0000282965 |
| Disciplinary | CCBVA0000282969 |
| Disciplinary | CCBVA0000282973 |
| Disciplinary | CCBVA0000282982 |
| Disciplinary | CCBVA0000282991 |
| Disciplinary | CCBVA0000282998 |
| Disciplinary | CCBVA0000283002 |
| Disciplinary | CCBVA0000283009 |
| Disciplinary | CCBVA0000283013 |
| Disciplinary | CCBVA0000283017 |
| Disciplinary | CCBVA0000283023 |
| Disciplinary | CCBVA0000283032 |
| Disciplinary | CCBVA0000283036 |
| Disciplinary | CCBVA0000283040 |
| Disciplinary | CCBVA0000283048 |
| Disciplinary | CCBVA0000283052 |
| Disciplinary | CCBVA0000283056 |
| Disciplinary | CCBVA0000283065 |
| Disciplinary | CCBVA0000283069 |
| Disciplinary | CCBVA0000283076 |
| Disciplinary | CCBVA0000283084 |
| Disciplinary | CCBVA0000283092 |
| Disciplinary | CCBVA0000283097 |
| Disciplinary | CCBVA0000283101 |
| Disciplinary | CCBVA0000283108 |
| Disciplinary | CCBVA0000283113 |
| Disciplinary | CCBVA0000283118 |
| Disciplinary | CCBVA0000283122 |

| | |
|---|---|
| Disciplinary | CCBVA0000283126 |
| Disciplinary | CCBVA0000283136 |
| Disciplinary | CCBVA0000283140 |
| Disciplinary | CCBVA0000283144 |
| Disciplinary | CCBVA0000283148 |
| Disciplinary | CCBVA0000283152 |
| Disciplinary | CCBVA0000283156 |
| Disciplinary | CCBVA0000283164 |
| Disciplinary | CCBVA0000283169 |
| Disciplinary | CCBVA0000283177 |
| Disciplinary | CCBVA0000283185 |
| Disciplinary | CCBVA0000283193 |
| Disciplinary | CCBVA0000283201 |
| Disciplinary | CCBVA0000283208 |
| Disciplinary | CCBVA0000283217 |
| Disciplinary | CCBVA0000283225 |
| Disciplinary | CCBVA0000283231 |
| Disciplinary | CCBVA0000283239 |
| Disciplinary | CCBVA0000283245 |
| Disciplinary | CCBVA0000283253 |
| Disciplinary | CCBVA0000283261 |
| Disciplinary | CCBVA0000283269 |
| Disciplinary | CCBVA0000283277 |
| Disciplinary | CCBVA0000283285 |
| Disciplinary | CCBVA0000283293 |
| Disciplinary | CCBVA0000283301 |
| Disciplinary | CCBVA0000283309 |
| Disciplinary | CCBVA0000283320 |
| Disciplinary | CCBVA0000283329 |
| Disciplinary | CCBVA0000283341 |
| Disciplinary | CCBVA0000283350 |
| Disciplinary | CCBVA0000283360 |
| Disciplinary | CCBVA0000283368 |
| Disciplinary | CCBVA0000283376 |
| Disciplinary | CCBVA0000283384 |
| Disciplinary | CCBVA0000283393 |

| | |
|---|---|
| Disciplinary | CCBVA0000283402 |
| Disciplinary | CCBVA0000283410 |
| Disciplinary | CCBVA0000283418 |
| Disciplinary | CCBVA0000283426 |
| Disciplinary | CCBVA0000283434 |
| Disciplinary | CCBVA0000283443 |
| Disciplinary | CCBVA0000283452 |
| Disciplinary | CCBVA0000283460 |
| Disciplinary | CCBVA0000283468 |
| Disciplinary | CCBVA0000283477 |
| Disciplinary | CCBVA0000283486 |
| Disciplinary | CCBVA0000283495 |
| Disciplinary | CCBVA0000283503 |
| Disciplinary | CCBVA0000283519 |
| Disciplinary | CCBVA0000283527 |
| Disciplinary | CCBVA0000283535 |
| Disciplinary | CCBVA0000283543 |
| Disciplinary | CCBVA0000283551 |
| Disciplinary | CCBVA0000283560 |
| Disciplinary | CCBVA0000283569 |
| Disciplinary | CCBVA0000283576 |
| Disciplinary | CCBVA0000283584 |
| Disciplinary | CCBVA0000283591 |
| Disciplinary | CCBVA0000283599 |
| Disciplinary | CCBVA0000283607 |
| Disciplinary | CCBVA0000283625 |
| Disciplinary | CCBVA0000283633 |
| Disciplinary | CCBVA0000283643 |
| Disciplinary | CCBVA0000283652 |
| Disciplinary | CCBVA0000283661 |
| Disciplinary | CCBVA0000283669 |
| Disciplinary | CCBVA0000283677 |
| Disciplinary | CCBVA0000283686 |
| Disciplinary | CCBVA0000283694 |
| Disciplinary | CCBVA0000283701 |
| Disciplinary | CCBVA0000283712 |

| | |
|---|---|
| Disciplinary | CCBVA0000283722 |
| Disciplinary | CCBVA0000283731 |
| Disciplinary | CCBVA0000283739 |
| Disciplinary | CCBVA0000283751 |
| Disciplinary | CCBVA0000283759 |
| Disciplinary | CCBVA0000283769 |
| Disciplinary | CCBVA0000283776 |
| Disciplinary | CCBVA0000283784 |
| Disciplinary | CCBVA0000283791 |
| Disciplinary | CCBVA0000283799 |
| Disciplinary | CCBVA0000283806 |
| Disciplinary | CCBVA0000283814 |
| Disciplinary | CCBVA0000283822 |
| Disciplinary | CCBVA0000283831 |
| Disciplinary | CCBVA0000283840 |
| Disciplinary | CCBVA0000283850 |
| Disciplinary | CCBVA0000283859 |
| Disciplinary | CCBVA0000283868 |
| Disciplinary | CCBVA0000283876 |
| Disciplinary | CCBVA0000283886 |
| Disciplinary | CCBVA0000283902 |
| Disciplinary | CCBVA0000283909 |
| Disciplinary | CCBVA0000283917 |
| Disciplinary | CCBVA0000283925 |
| Disciplinary | CCBVA0000283935 |
| Disciplinary | CCBVA0000283944 |
| Disciplinary | CCBVA0000283954 |
| Disciplinary | CCBVA0000283962 |
| Disciplinary | CCBVA0000283970 |
| Disciplinary | CCBVA0000283979 |
| Disciplinary | CCBVA0000283988 |
| Disciplinary | CCBVA0000283997 |
| Disciplinary | CCBVA0000284005 |
| Disciplinary | CCBVA0000284013 |
| Disciplinary | CCBVA0000284021 |
| Disciplinary | CCBVA0000284030 |

| | |
|---|---|
| Disciplinary | CCBVA0000284038 |
| Disciplinary | CCBVA0000284046 |
| Disciplinary | CCBVA0000284056 |
| Disciplinary | CCBVA0000284064 |
| Disciplinary | CCBVA0000284073 |
| Disciplinary | CCBVA0000284080 |
| Disciplinary | CCBVA0000284087 |
| Disciplinary | CCBVA0000284095 |
| Disciplinary | CCBVA0000284103 |
| Disciplinary | CCBVA0000284110 |
| Disciplinary | CCBVA0000284118 |
| Disciplinary | CCBVA0000284130 |
| Disciplinary | CCBVA0000284138 |
| Disciplinary | CCBVA0000284147 |
| Disciplinary | CCBVA0000284155 |
| Disciplinary | CCBVA0000284162 |
| Disciplinary | CCBVA0000284170 |
| Disciplinary | CCBVA0000284177 |
| Disciplinary | CCBVA0000284184 |
| Disciplinary | CCBVA0000284192 |
| Disciplinary | CCBVA0000284200 |
| Disciplinary | CCBVA0000284204 |
| Disciplinary | CCBVA0000284212 |
| Disciplinary | CCBVA0000284222 |
| Disciplinary | CCBVA0000284232 |
| Disciplinary | CCBVA0000284243 |
| Disciplinary | CCBVA0000284250 |
| Disciplinary | CCBVA0000284258 |
| Disciplinary | CCBVA0000284266 |
| Disciplinary | CCBVA0000284274 |
| Disciplinary | CCBVA0000284282 |
| Disciplinary | CCBVA0000284290 |
| Disciplinary | CCBVA0000284298 |
| Disciplinary | CCBVA0000284305 |
| Disciplinary | CCBVA0000284315 |
| Disciplinary | CCBVA0000284323 |

| | |
|---|---|
| Disciplinary | CCBVA0000284331 |
| Disciplinary | CCBVA0000284339 |
| Disciplinary | CCBVA0000284349 |
| Disciplinary | CCBVA0000284359 |
| Disciplinary | CCBVA0000284369 |
| Disciplinary | CCBVA0000284381 |
| Disciplinary | CCBVA0000284391 |
| Disciplinary | CCBVA0000284402 |
| Disciplinary | CCBVA0000284415 |
| Disciplinary | CCBVA0000284433 |
| Disciplinary | CCBVA0000284446 |
| Disciplinary | CCBVA0000284455 |
| Disciplinary | CCBVA0000284464 |
| Disciplinary | CCBVA0000284474 |
| Disciplinary | CCBVA0000284482 |
| Disciplinary | CCBVA0000284491 |
| Disciplinary | CCBVA0000284503 |
| Disciplinary | CCBVA0000284511 |
| Disciplinary | CCBVA0000284520 |
| Disciplinary | CCBVA0000284528 |
| Disciplinary | CCBVA0000284536 |
| Disciplinary | CCBVA0000284544 |
| Disciplinary | CCBVA0000284552 |
| Disciplinary | CCBVA0000284560 |
| Disciplinary | CCBVA0000284568 |
| Disciplinary | CCBVA0000284576 |
| Disciplinary | CCBVA0000284584 |
| Disciplinary | CCBVA0000284592 |
| Disciplinary | CCBVA0000284600 |
| Disciplinary | CCBVA0000284608 |
| Disciplinary | CCBVA0000284616 |
| Disciplinary | CCBVA0000284624 |
| Disciplinary | CCBVA0000284632 |
| Disciplinary | CCBVA0000284640 |
| Disciplinary | CCBVA0000284648 |
| Disciplinary | CCBVA0000284655 |

| | |
|---|---|
| Disciplinary | CCBVA0000284663 |
| Disciplinary | CCBVA0000284671 |
| Disciplinary | CCBVA0000284679 |
| Disciplinary | CCBVA0000284687 |
| Disciplinary | CCBVA0000284695 |
| Disciplinary | CCBVA0000284703 |
| Disciplinary | CCBVA0000284711 |
| Disciplinary | CCBVA0000284719 |
| Disciplinary | CCBVA0000284727 |
| Disciplinary | CCBVA0000284735 |
| Disciplinary | CCBVA0000284743 |
| Disciplinary | CCBVA0000284755 |
| Disciplinary | CCBVA0000284762 |
| Disciplinary | CCBVA0000284769 |
| Disciplinary | CCBVA0000284776 |
| Disciplinary | CCBVA0000284783 |
| Disciplinary | CCBVA0000284790 |
| Disciplinary | CCBVA0000284797 |
| Disciplinary | CCBVA0000284804 |
| Disciplinary | CCBVA0000284811 |
| Disciplinary | CCBVA0000284818 |
| Disciplinary | CCBVA0000284825 |
| Disciplinary | CCBVA0000284832 |
| Disciplinary | CCBVA0000284841 |
| Disciplinary | CCBVA0000284848 |
| Disciplinary | CCBVA0000284855 |
| Disciplinary | CCBVA0000284862 |
| Disciplinary | CCBVA0000284869 |
| Disciplinary | CCBVA0000284876 |
| Disciplinary | CCBVA0000284883 |
| Disciplinary | CCBVA0000284892 |
| Disciplinary | CCBVA0000284899 |
| Disciplinary | CCBVA0000284906 |
| Disciplinary | CCBVA0000284913 |
| Disciplinary | CCBVA0000284920 |
| Disciplinary | CCBVA0000284927 |

| | |
|---|---|
| Disciplinary | CCBVA0000284934 |
| Disciplinary | CCBVA0000284941 |
| Disciplinary | CCBVA0000284948 |
| Disciplinary | CCBVA0000284955 |
| Disciplinary | CCBVA0000284962 |
| Disciplinary | CCBVA0000284969 |
| Disciplinary | CCBVA0000284976 |
| Disciplinary | CCBVA0000284983 |
| Disciplinary | CCBVA0000284990 |
| Disciplinary | CCBVA0000284997 |
| Disciplinary | CCBVA0000285004 |
| Disciplinary | CCBVA0000285011 |
| Disciplinary | CCBVA0000285018 |
| Disciplinary | CCBVA0000285025 |
| Disciplinary | CCBVA0000285032 |
| Disciplinary | CCBVA0000285039 |
| Disciplinary | CCBVA0000285046 |
| Disciplinary | CCBVA0000285053 |
| Disciplinary | CCBVA0000285061 |
| Disciplinary | CCBVA0000285069 |
| Disciplinary | CCBVA0000285079 |
| Disciplinary | CCBVA0000285087 |
| Disciplinary | CCBVA0000285095 |
| Disciplinary | CCBVA0000285107 |
| Disciplinary | CCBVA0000285121 |
| Disciplinary | CCBVA0000285133 |
| Disciplinary | CCBVA0000285141 |
| Disciplinary | CCBVA0000285151 |
| Disciplinary | CCBVA0000285159 |
| Disciplinary | CCBVA0000285167 |
| Disciplinary | CCBVA0000285175 |
| Disciplinary | CCBVA0000285184 |
| Disciplinary | CCBVA0000285192 |
| Disciplinary | CCBVA0000285200 |
| Disciplinary | CCBVA0000285209 |
| Disciplinary | CCBVA0000285218 |

| | |
|---|---|
| Disciplinary | CCBVA0000285227 |
| Disciplinary | CCBVA0000285240 |
| Disciplinary | CCBVA0000285248 |
| Disciplinary | CCBVA0000285257 |
| Disciplinary | CCBVA0000285266 |
| Disciplinary | CCBVA0000285274 |
| Disciplinary | CCBVA0000285287 |
| Disciplinary | CCBVA0000285295 |
| Disciplinary | CCBVA0000285303 |
| Disciplinary | CCBVA0000285311 |
| Disciplinary | CCBVA0000285319 |
| Disciplinary | CCBVA0000285328 |
| Disciplinary | CCBVA0000285337 |
| Disciplinary | CCBVA0000285342 |
| Disciplinary | CCBVA0000285348 |
| Disciplinary | CCBVA0000285358 |
| Disciplinary | CCBVA0000285367 |
| Disciplinary | CCBVA0000285375 |
| Disciplinary | CCBVA0000285383 |
| Disciplinary | CCBVA0000285399 |
| Disciplinary | CCBVA0000285407 |
| Disciplinary | CCBVA0000285415 |
| Disciplinary | CCBVA0000285425 |
| Disciplinary | CCBVA0000285433 |
| Disciplinary | CCBVA0000285441 |
| Disciplinary | CCBVA0000285449 |
| Disciplinary | CCBVA0000285457 |
| Disciplinary | CCBVA0000285467 |
| Disciplinary | CCBVA0000285477 |
| Disciplinary | CCBVA0000285488 |
| Disciplinary | CCBVA0000285498 |
| Disciplinary | CCBVA0000285512 |
| Disciplinary | CCBVA0000285523 |
| Disciplinary | CCBVA0000285532 |
| Disciplinary | CCBVA0000285543 |
| Disciplinary | CCBVA0000285554 |

| | |
|---|---|
| Disciplinary | CCBVA0000285567 |
| Disciplinary | CCBVA0000285574 |
| Disciplinary | CCBVA0000285585 |
| Disciplinary | CCBVA0000285593 |
| Disciplinary | ICE Barrientos 0022702 |
| Disciplinary Log | CCBVA0000201924 |
| DROIGSA-06-0003 Inter-Govermental Service Agreement | CCBVA0000000340 |
| Elizabeth Bennion, *Banning the Bing: Why Extreme Solitary Confinement is Cruel and Far Too Usual Punishment*, 90 Ind. L.J. 741 (2015). | |
| Email | CCBVA0000189815 |
| Email | CCBVA0000189928 |
| Email | CCBVA0000189981 |
| Email | CCBVA0000190006 |
| Email | CCBVA0000196252 |
| Email | CCBVA0000196263 |
| Email | CCBVA0000196584 |
| Email | CCBVA0000196772 |
| Email | CCBVA0000196773 |
| Email | CCBVA0000196825 |
| Email | CCBVA0000196953 |
| Email | CCBVA0000197053 |
| Email | CCBVA0000197392 |
| Email | CCBVA0000197394 |
| Email | CCBVA0000197396 |
| Email | CCBVA0000197401 |
| Email | CCBVA0000197406 |
| Email | CCBVA0000197414 |
| Email | CCBVA0000197415 |
| Email | CCBVA0000197549 |
| Email | CCBVA0000197940 |
| Email | CCBVA0000197998 |
| Email | CCBVA0000198113 |
| Email | CCBVA0000198260 |
| Email | CCBVA0000198545 |
| Email | CCBVA0000198930 |
| Email | CCBVA0000223239 |

| Email | CCBVA0000223671 |
|---|---|
| Email | CCBVA0000230127 |
| Email | CCBVA0000234973 |
| Email | CCBVA0000260399 |
| Email | CCBVA0000261506 |
| Email | CCBVA0000262705 |
| Email | CCBVA0000278698 |
| Email | CCBVA0000279919 |
| Email | CCBVA0000280147 |
| Email | CCBVA0000197890 |
| Email | CCBVA0000198787 |
| Email | CCBVA0000223664 |
| Email | CCBVA0000264625 |
| Email | CCBVA0000152449 |
| Email | CCBVA0000249997 |
| Email | CCBVA0000261048 |
| Email | CCBVA0000301957 |
| Email | CCBVA0000223524 |
| Email | CCBVA0000243293 |
| Email | CCBVA0000204059 |
| Email | CCBVA0000204067 |
| Email - ███████████████████ | CCBVA0000246964 |
| Email █ | CCBVA0000196386 |
| Email █ | ICE-Barrientos 0012201 |
| Email █ | CCBVA0000260873 |
| ████████████████ | CCBVA0000262444 |
| | CCBVA0000246925 |
| | CCBVA0000218703 |
| | CCBVA0000218192 |
| | CCBVA0000266526 |
| | CCBVA0000260736 |
| | CCBVA0000232778 |
| | CCBVA0000201920 |
| | CCBVA0000223326 |

| | |
|---|---|
| ▬ | CCBVA0000197242 |
| | CCBVA0000226399 |
| | CCBVA0000196934 |
| | CCBVA0000196014 |
| | CCBVA0000198882 |
| | CCBVA0000246883 |
| Expert Report of Craig Haney at 81, *Ashker* v. *Brown*, No. 4:09-cv-05796-CW (N.D. Cal. Mar. 12, 2015) (available at https://ccrjustice.org/sites/default/files/attach/2015/07/Redacted_Haney%20Expert%20Report.pdf). | |
| ▬ | CCBVA0000202792 |
| Fatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 Am. J. Pub. Health 442, 445–47 (2014). | |
| Fiona H. Biggam and Kevin G. Power, *Social Support and Psychological Distress in a Group of Incarcerated Young Offenders.* | |
| ▬ | CCBVA0000106496 |
| | CCBVA0000106479 |
| | CCBVA0000104422 |
| | CCBVA0000106478 |
| | CCBVA0000104457 |
| | CCBVA0000000070313 |
| Giada Pietrabissa & Susan G. Simpson, *Psychological Consequences of Social Isolation During COVID-19 Outbreak*, 11 Frontiers in Psychology (2020). | |
| Grievance | CCBVA0000118216 |
| Grievance | CCBVA0000061998 |
| Grievance | CCBVA0000118053 |
| Grievance | CCBVA0000203805 |
| Grievance | CCBVA0000217504 |
| Grievance | CCBVA0000232776 |
| Grievance | CCBVA0000234297 |
| Grievance | CCBVA0000244074 |
| Grievance | CCBVA0000245187 |
| Grievance | CCBVA0000245706 |
| Grievance | CCBVA0000245760 |
| Grievance | CCBVA0000246038 |
| Grievance | CCBVA0000247357 |

| | |
|---|---|
| Grievance ██████████████████████ | CCBVA0000256175 |
| | CCBVA0000150697 |
| Ichiro Kawachi & Lisa F. Berkman, *Social Ties & Mental Health* , 78 J. of Urben Health: Bulletin of the NY Academy of Medicine 458 (2001). | |
| Incident Report ████████ | CCBVA0000232819 |
| | CCBVA0000241168 |
| Inmate/Resident Grievance | PLS_0001625 |
| ████████████████████ | ICE Barrientos 0013238 |
| | CCBVA0000005577 |
| Jason M. Nagata, et al., *Food Insecurity Is Associated with Poorer Mental Health and Sleep Outcomes in Young Adults* , 65 J. Adolesc. Health 805 (2019). | |
| Jeffrey L. Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics* , 38 J. Am. Acad. Psychiatry & L. 104, 104 (2010). | |
| John T. Cacioppo & Stephanie Ortigue, *Social Neuroscience: How a Multidisciplinary Field Is Uncovering the Biology of Human Interactions* , Cerebrum (Dec. 2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3574807/. | |
| John T. Cacioppo et al., *Social Isolation* , Annals of the N.Y. Acad. Sci., 17-22 (2011). | |
| Joshua C. Cochran & Daniel P. Mears, *Social Isolation and Inmate Behavior: A Conceptual Framework for Theorizing Prison Visitation and Guiding and Assessing Research* , 41 J. of Crim. Justice 252 (2013). | |
| Karen De Claire & Louise Dixon, *The Effects of Prison Visits from Family Members on Prisoners' Well-Being, Prison Rule Breaking, and Recidivisim: A Review of Research Since 1991* , Trauma Violence & Abust (2015). | |
| Kenneth L. Appelbaum, *American Psychiatry Should Join the Call to Abolish Solitary Confinement* , 43 J. Am. Acad. Psychiatry & L. 406 (2015). | |
| Lauren Brinkley-Rubinstein et al., *Association of Restrictive Housing During Incarceration With Mortality After Release* , JAMA Network Open, Oct. 4, 2019, at 1, 5–6, 9, https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2752350. | |
| Laurie Hare Duke, *The Importance of Social Ties in Mental Health* , 21 Mental Health & Social Inclusion 264 (2017). | |
| ████████████████████ | CCBVA0000207174 |

| | |
|---|---|
| ██████████████████████ | CCBVA0000006060 |
| | CCBVA0000196534 |
| █████████████████████ | CCBVA0000004714 |
| | CCBVA0000006239 |
| Nicholas Leigh-Hunt et al., *An overview of systematic reviews on the public health consequences of social isolation and loneliness* , 152 Public Health 157 (2017). | |
| Nicholas Rohde et al., *Estimating the Mental Health Effects of Social Isolation* , Applied Research in Quality of Life (2015). | |
| Nicole Branan, *Stress Kills Brain Cells Off* , 18 Sci. Am. 10 (June 2007). | |
| OIG Report, 16-047-ISP-ICE, 2/10/2017 | WABE-FOIA00000027 |
| OIG Report, 16-047-ISP-ICE, 2/21/2017 | WABE-FOIA00000029 |
| OIG Report, 16-047-ISP-ICE, 2/21/2017 | WABE-FOIA00000077 |
| OIG Report, 16-047-ISP-ICE, 2/22/2017 | WABE-FOIA00000004 |
| P00021 - Amendment of Solicitation/Modification of Contract | CCBVA0000000439 |
| P00042 - Amendment of Solicitation/Modification of Contract | STEW0000050 |
| PBNDS 2011 | CCBVA0000003317 |
| Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature* , 34 Crime & Just. 441, 488–90 (2006). | |
| Photo of Hygiene Items | CCBVA0000005462 |
| Photo of Personal Property | CCBVA0000005461 |
| Queja De Residente ████████ | CCBVA0000118271 |
| *Reassessing Solitary Confinement: The Human Rights, Fiscal, and Public Safety Consequences: Hearing Before the Subcomm. on the Constitution, Civil Rights, & Human Rights of the S. Comm. on the Jud-ciary* , 112th Cong. (2012) (prepared statement of Dr. Craig Haney, Professor of Psychology, University of California, Santa Cruz). | |
| Reference Policy 19-100 - Detainee Job Request | CCBVA0000004676 |
| SDC Policy 19.100 | CCBVA0000003932 |
| SDC, 24 Hour Routine for General Population, 3/6/19 | CCBVA0000004652 |
| *See* Carol Schaeffer, *"Isolation Devastates the Brain": The Neuroscience of Solitary Confinement* , Solitary Watch (May 11, 2016), https://solitarywatch.org/2016/05/11/isolation-devastates-the-brain-the-neuroscience-of-solitary-confinement. | |
| Site Inspection Photo | CCBVA0000195804 |

| | |
|---|---|
| Site Inspection Photo | CCBVA0000195805 |
| Site Inspection Photo | CCBVA0000195806 |
| Site Inspection Photo | CCBVA0000195807 |
| Site Inspection Photo | CCBVA0000195808 |
| Site Inspection Photo | CCBVA0000195809 |
| Site Inspection Photo | CCBVA0000195810 |
| Site Inspection Photo | CCBVA0000195811 |
| Site Inspection Photo | CCBVA0000195812 |
| Site Inspection Photo | CCBVA0000195813 |
| Site Inspection Photo | CCBVA0000195814 |
| Site Inspection Photo | CCBVA0000195815 |
| Site Inspection Photo | CCBVA0000195816 |
| Site Inspection Photo | CCBVA0000195817 |
| Site Inspection Photo | CCBVA0000195818 |
| Site Inspection Photo | CCBVA0000195819 |
| Site Inspection Photo | CCBVA0000195820 |
| Site Inspection Photo | CCBVA0000195821 |
| Site Inspection Photo | CCBVA0000195822 |
| Site Inspection Photo | CCBVA0000195823 |
| Site Inspection Photo | CCBVA0000195824 |
| Site Inspection Photo | CCBVA0000195825 |
| Site Inspection Photo | CCBVA0000195826 |
| Site Inspection Photo | CCBVA0000195827 |
| Site Inspection Photo | CCBVA0000195828 |
| Site Inspection Photo | CCBVA0000195829 |
| Site Inspection Photo | CCBVA0000195830 |
| Site Inspection Photo | CCBVA0000195831 |
| Site Inspection Photo | CCBVA0000195832 |
| Site Inspection Photo | CCBVA0000195833 |
| Site Inspection Photo | CCBVA0000195834 |
| Site Inspection Photo | CCBVA0000195835 |
| Site Inspection Photo | CCBVA0000195836 |
| Site Inspection Photo | CCBVA0000195837 |
| Site Inspection Photo | CCBVA0000195838 |
| Site Inspection Photo | CCBVA0000195839 |
| Site Inspection Photo | CCBVA0000195840 |

| | |
|---|---|
| Site Inspection Photo | CCBVA0000195841 |
| Site Inspection Photo | CCBVA0000195842 |
| Site Inspection Photo | CCBVA0000195843 |
| Site Inspection Photo | CCBVA0000195844 |
| Site Inspection Photo | CCBVA0000195845 |
| Site Inspection Photo | CCBVA0000195846 |
| Site Inspection Photo | CCBVA0000195847 |
| Site Inspection Photo | CCBVA0000195848 |
| Site Inspection Photo | CCBVA0000195849 |
| Site Inspection Photo | CCBVA0000195850 |
| Site Inspection Photo | CCBVA0000195851 |
| Site Inspection Photo | CCBVA0000195852 |
| Site Inspection Photo | CCBVA0000195853 |
| Site Inspection Photo | CCBVA0000195854 |
| Site Inspection Photo | CCBVA0000195855 |
| Site Inspection Photo | CCBVA0000195856 |
| Site Inspection Photo | CCBVA0000195857 |
| Site Inspection Photo | CCBVA0000195858 |
| Site Inspection Photo | CCBVA0000195859 |
| Site Inspection Photo | CCBVA0000195860 |
| Site Inspection Photo | CCBVA0000195861 |
| Site Inspection Photo | CCBVA0000195862 |
| Site Inspection Photo | CCBVA0000195863 |
| Site Inspection Photo | CCBVA0000195864 |
| Site Inspection Photo | CCBVA0000195865 |
| Site Inspection Photo | CCBVA0000195866 |
| Site Inspection Photo | CCBVA0000195867 |
| Site Inspection Photo | CCBVA0000195868 |
| Site Inspection Photo | CCBVA0000195869 |
| Site Inspection Photo | CCBVA0000195870 |
| Site Inspection Photo | CCBVA0000195871 |
| Site Inspection Photo | CCBVA0000195872 |
| Site Inspection Photo | CCBVA0000195873 |
| Site Inspection Photo | CCBVA0000195874 |
| Site Inspection Photo | CCBVA0000195875 |
| Site Inspection Photo | CCBVA0000195876 |

| | |
|---|---|
| Site Inspection Photo | CCBVA0000195877 |
| Site Inspection Photo | CCBVA0000195878 |
| Site Inspection Photo | CCBVA0000195879 |
| Site Inspection Photo | CCBVA0000195880 |
| Site Inspection Photo | CCBVA0000195881 |
| Site Inspection Photo | CCBVA0000195882 |
| Site Inspection Photo | CCBVA0000195883 |
| Site Inspection Photo | CCBVA0000195884 |
| Site Inspection Photo | CCBVA0000195885 |
| Site Inspection Photo | CCBVA0000195886 |
| Site Inspection Photo | CCBVA0000195887 |
| Site Inspection Photo | CCBVA0000195888 |
| Site Inspection Photo | CCBVA0000195889 |
| Site Inspection Photo | CCBVA0000195890 |
| Site Inspection Photo | CCBVA0000195891 |
| Site Inspection Photo | CCBVA0000195892 |
| Site Inspection Photo | CCBVA0000195893 |
| Site Inspection Photo | CCBVA0000195894 |
| Site Inspection Photo | CCBVA0000195895 |
| Site Inspection Photo | CCBVA0000195896 |
| Site Inspection Photo | CCBVA0000195897 |
| Site Inspection Photo | CCBVA0000195898 |
| Site Inspection Photo | CCBVA0000195899 |
| Site Inspection Photo | CCBVA0000195900 |
| Site Inspection Photo | CCBVA0000195901 |
| Site Inspection Photo | CCBVA0000195902 |
| Site Inspection Photo | CCBVA0000195903 |
| Site Inspection Photo | CCBVA0000195904 |
| Site Inspection Photo | CCBVA0000195905 |
| Spreadsheet | CCBVA0000280792 |
| Stewart CCA Original Contract | CCBVA0000001317 |
| ███████████████████ | CCBVA0000280509 |
| ███████████████████ | CCBVA0000106584 |
| ███████████████████ | CCBVA0000118618 |
| ███████████████████ | CCBVA0000182571 |

Stuart Grassian & Terry Kupers, *The Colorado Study vs. The Reality of Supermax Confinement* , 13 Corr. Mental Health Rep. 1, 9 (2011).

Stuart Grassian, *Psychiatric Effects of Solitary Confinement* , 22 Wash. U. J.L. & Pol'y 325, 330 (2006).

Stuart Grassian, *Psychopathological Effects of Solitary Confinement* , 140 Am. J. Psychiatry 1450, 1453 (1983).

| | |
|---|---|
| | CCBVA0000118642 |
| | CCBVA0000118647 |
| | CCBVA0000118425 |

U.N. Human Rights Council, *U.N. Special Rapporteur, Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* , at 9, U.N. Doc. A/66/268 (Aug. 5, 2011) (concluding that "harmful psychological effects of isolation can become irreversible" after only 15 days of solitary confinement).

| | |
|---|---|
| | CCBVA0000003953 |
| | CCBVA0000003964 |
| | CCBVA0000004102 |
| | CCBVA0000003965 |
| | CCBVA0000004117 |
| | CCBVA0000003977 |
| | CCBVA0000004011 |
| | CCBVA0000004101 |
| | CCBVA0000004127 |

| | |
|---|---|
| | CCBVA0000106501 |
| | CCBVA0000106502 |
| | CCBVA0000106527 |
| | CCBVA0000003844 |
| | CCBVA0000003854 |
| | CCBVA0000003864 |
| | CCBVA0000003874 |
| | CCBVA0000003884 |
| | CCBVA0000006287 |
| | CCBVA0000118613 |
| | CCBVA0000249311 |
| | CCBVA0000277598 |
| | CCBVA0000003785 |
| | CCBVA0000003799 |
| | CCBVA0000289498 |
| Dep't of Homeland Security Office of Inspector General, ICE Needs to Improve Its Oversight of Segregation Use in Detention Facilities, OIG-22-01, 11 (2021), https://www.oig.dhs.gov/sites/default/files/assets/2021-10/OIG-22-01-Oct21.pdf | |
| José Olivares, ICE Review of Immigrant's Suicide Finds Falsified Documents, Neglect, and Improper Confinement, The Intercept, https://theintercept.com/2021/10/23/ice-review-neglect-stewart-suicide-corecivic/ (Oct. 23, 2021) | |
| Erin Donaghue, ICE review found failures in care of mentally ill detainee who died by suicide, CBS News, https://www.cbsnews.com/news/jean-carlos-jimenez-joseph-ice-review-documented-failures-in-care-of-mentally-illdetainee-who-died-by-suicide/ (Aug. 22, 2019). | |
| Craig Haney & Mona Lynch, Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement, 23 N.Y.U. Rev. L. & Soc. Change 477, 500 (1997) | |
| | CCBVA0000106456 |
| Email | ICE Barrientos 0019533 |
| Email | CCBVA0000247102 |
| Email | CCBVA0000196364 |
| Email | CCBVA0000196322 |

| | |
|---|---|
| Email | CCBVA0000198703 |
| Email | CCBVA0000230006 |
| Email | TRINITY-0015126 |
| Leonora Renda, RD, Expert Report, December 22, 2021. | |
| Policy | CCBVA0000106584 |
| Dr. Dora Schriro, Expert Report, December 22, 2021, | |
| Email | CCBVA0000271366 |
| Memo | CCBVA0000206703 |

# ATTACHMENT 1

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

**WILHEN HILL BARRIENTOS,**
**GONZALO BERMUDEZ GUTIÉRREZ,**
**and KEYSLER RAMÓN URBINA**
**ROJAS,** individually and on behalf of all
others similarly situated,

                    Plaintiffs,

v.

**CORECIVIC, INC.,**

                    Defendant.

**Civil Action No.  4:18-cv-00070-CDL**

**DECLARATION OF GONZALO BERMUDEZ GUTIÉRREZ**

I, Gonzalo Bermudez Gutiérrez, hereby declare and state as follows:

1.  My name is Gonzalo Bermudez Gutiérrez.  I am over the age of 18. I am a named

    Plaintiff in this case. I am prepared to testify about the matters discussed in this

    declaration.

2.  I was detained in Stewart Detention Center (SDC), in Lumpkin, Georgia, from May 2019

    to January 2020.

3.  When I arrived at SDC, I went through the intake process.  During that process, I

    received a copy of the detainee handbook in English and Spanish.

4.  My understanding was that the detainee handbook included all of the rules of SDC and

    informed you of how to behave while you were detained there. I also understood from the

1

handbook that if I broke any of the listed rules, I could be isolated and separated from the other people detained at SDC.

5.   At intake I was provided with some basic necessities, like one bottle of combined shampoo and soap, and toothpaste. The items were in very small quantities and of poor quality. I was also provided with: two sheet covers; one blanket; two pillowcases; three pairs of pants, shirts, and socks; two pairs of underwear; one pair of sneakers; and one pair of shower shoes.

6.   Following intake, I was housed in segregation for a few days until I was transferred to my first housing unit, Unit 7.

7.   About five days after I was processed into Unit 7, I was told about the Voluntary Work Program ("Work Program"). I was told that I could work in the kitchen and receive extra food and also make some money to buy necessities like phone time, food, and personal hygiene items in the commissary. I signed up to join the Work Program immediately so I could get extra food and purchase those items at the commissary.

8.   After only a few days at SDC, I understood completely that CoreCivic was controlling every aspect of the lives of detained people in SDC. CoreCivic controlled the temperature of the pods and the water in the showers. Detention officers woke us up at 4:30-5:00 a.m. to go to breakfast and then they told us when we could go to lunch and dinner over the course of the day. Because CoreCivic controlled what times the phones started working and stopped working, I could only call my family when CoreCivic allowed it. I was well aware that CoreCivic was in full control of everybody detained at SDC.

9.   I obeyed the rules because I feared being sent to segregation. While housed on Unit 4, I learned of several people who were sent to segregation for breaking a rule. I feared

segregation because I believed I would lose food and contact with my family. I also
understood that CoreCivic could report any misbehavior to ICE.

10. During my time at SDC, I was housed in a pod with two-person cells.  I was housed in
Unit 4A.  I think these units housed up to 88 people per pod.  Each cell had a toilet that
we shared with our cellmate. All of the people detained on the pod shared showers.

11. A majority of the people in my pod were kitchen workers in the Work Program. Most of
the people who did not work in the kitchen worked in other departments of the Work
Program.

12. Because we were in a kitchen workers' pod, we had several incentives. Our pod had four
TVs – three for TV and movies and one for video games. If we worked late hours in the
kitchen, detention officers would allow us to stay up later to shower and call our families.

13. The kitchen workers' pod was an closed cell pod and I considered this to be a benefit of
working in the kitchen. I experienced first-hand how loud and disorganized the open cell
pods were when I delivered food to those pods. I was motivated to continue working in
order to stay in the closed cell pod because I believed it was safer and I wanted my
personal belongings and case-related items kept safe. This would not have been possible
in the open cell pods. I also believed that the open cell pods were unsafe and I wanted to
remain in the closed cell pods for my own safety.

14. If workers in my pod were removed from the work program, they would be moved to a
different housing pod. I witnessed this happen multiple times. I viewed this as a
punishment and as a disciplinary action.

15. CoreCivic did not provide me with enough food at SDC. I was always trying to stave off
hunger while I was there. The portion sizes were small, the food was bad and repetitive,

3

and the meals were too spread out.  As a result, I lost a significant amount of weight while I was at SDC. Detention officers would often wake us up for meals but we would either have to wait a long time or eat after everyone else had eaten because we had either been called to eat too early or too late. We could only eat at the times that they told us we could eat. I regularly purchased extra food from the commissary to avoid hunger.

16. The meals at SDC were very spread out.  They served us breakfast between 4:30 and 6:30 a.m.; lunch between 10:30 a.m. and 12:00 p.m.; and dinner between 4:30 and 6:00 p.m. Because of this, I was often hungry between meals.

17. There was a weekly menu that changed, but the food items and meals were often the same. Because of this, and the spread-out nature of meals, I would supplement my diet with oatmeal, tortilla chips, crackers, ramen noodles, and other snacks that I would buy at the commissary. I would regularly spend anywhere from $10 to over $40 at the commissary.

18. We only received fresh fruit on special occasions. I craved fresh fruit because it is one of the only natural and nutritionally adequate foods that I believed to be healthy.

19. I lost over 20 pounds while at SDC due to how little I ate and how poor the food was. I was always trying to prevent hunger.

20. I participated in the Work Program at SDC. I joined the Work Program, first and foremost, to prevent hunger. I also joined the Work Program to get money to buy items I needed at the commissary, such as food, phone cards, stamps, deodorant, shampoo, soap, toothpaste, and shirts.  If I wasn't so concerned about preventing hunger, or if I didn't have to buy those items, I would not have joined the Work Program.

21. Being able to purchase and receive extra food was very important.  If I did not have access to the commissary food, like ramen, I am not sure I would have survived there. Because I was always unsure of when our next meal would be, I was desperate for extra food.

22. During my time at SDC, I only received one visit from family and friends because the detention center is in a rural area.  My nephews from Tennessee were able to visit me, but my wife and children were never able to visit me because they lived in Arizona. I felt very isolated in SDC.

23. I needed money to buy phone cards and stamps because that was my primary way of contacting my loved ones, most of whom lived in Arizona.

24. Family members occasionally put money on my account, but it wasn't enough to buy food, phone time, and other necessities because those items in the commissary were expensive.  I had to use my Work Program wages to buy those items.

25. I was able to join the Work Program easily soon after I arrived at SDC.  It is not hard to get in because they need detained people to work.  A detention officer in my pod told me about the program and he had me sign a form in English to join.  The officer told me the form was to work in the kitchen, and if I didn't work in the kitchen, I would be moved from the kitchen pod.  I translated this document for a lot of Work Program workers who came after me because I speak English and Spanish. When I translated the document and the detention officer's instructions, I was also instructed to inform detained people that they would be moved from the kitchen pod if they decided not to work.

26. I worked in the SDC kitchen during my entire time at SDC.  I cooked, washed dishes, scrubbed the stove, cleaned the kitchen and the chow hall, and served food on the line.  It

was difficult work that required heavy lifting.  For example, when we made lasagna or casseroles, I had to carry very large and heavy pots and pans, which were used to cook for an average of 1,500 people. I believed we needed more staff for the kitchen to function more efficiently.

27. As a kitchen worker, I also had to deep clean the kitchen before inspections.  During inspections, the area had to be cleared out.  We could not be working while the inspectors were present.

28. I generally worked seven days per week for about six hours per day.  My pay rate was $4 per day.

29. CoreCivic was supposed to pay me for every day I worked, but I did not always receive my pay on time. Sometimes, up to 10 days passed before I was paid for a shift.  When a missing pay issue was rectified, my pay was deposited into my commissary account.

30. My regular shift began at 3 p.m. in the afternoon and ended between 8 and 9 p.m.

31. In the kitchen, I was supervised by Trinity employees, Ms. Horsley, Ms. Patterson, Ms. King, and others whose names I do not remember.

32. The Trinity supervisors mistreated us.

33. Sometimes, Trinity supervisors would give us extra food at the end of a shift, like an apple.  Other times they would allow us to search among the leftovers to serve ourselves more.

34. The Trinity supervisors also threatened us with discipline if we did not complete our work or perform work beyond our regular duties.

35. I witnessed CoreCivic officers discipline detained immigrants who declined to work by moving them to different housing units, or threatening to do so, and threatening to revoke

their commissary access. Sometimes, these people would be moved the very next day after a missed day of work.

36. Based on my experiences and the statements and actions of CoreCivic and Trinity employees towards other workers, and the detainee handbook, it was my understanding that it was CoreCivic's policy at SDC to punish us if we did not work, by either cutting off our access to commissary or relocating us to another pod. I believed, based on conversations I had with others, that being relocated from the kitchen pod often included being sent to segregation while CoreCivic determined where to relocate detained people.

37. I continued to work in the work program because, if I refused, I understood I could be punished with a transfer to another, less safe and less private housing unit, and also time in segregation. Additionally, if I stopped working, I wouldn't have enough money to purchase food, phone time, and other basic necessities in the commissary. I don't think I would have survived in SDC without being able to purchase those items.

38. It is important for me to be a named Plaintiff in this case because CoreCivic had so much control over when and how I could access food and communicate with my family, that they exploited our labor. It is very important to me to be able to make sure people can get the things that they need and I want to make sure no one else is treated the way I was.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 21st day of December, 2021 in Phoenix, Arizona.

Gonzalo Bermudez Gutiérrez

8

# ATTACHMENT 2

**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

|  |  |
|---|---|
| **WILHEN HILL BARRIENTOS, GONZALO BERMUDEZ GUTIÉRREZ,** and **KEYSLER RAMÓN URBINA ROJAS,** individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**CORECIVIC, INC.,**<br><br>Defendant. | **Civil Action No.  4:18-cv-00070-CDL** |

**DECLARATION OF KEYSLER RAMÓN URBINA ROJAS**

I, Keysler Ramón Urbina Rojas, hereby declare and state as follows:

1.  My name is Keysler Ramón Urbina Rojas.  I am over the age of 18. I am a named Plaintiff in this case. I am prepared to testify about the matters discussed in this declaration.

2.  I was detained in Stewart Detention Center (SDC), in Lumpkin, Georgia from May 2015 to June 2016.

3.  When I arrived at SDC, I went through the intake process.  During that process, I received a copy of the detainee handbook in Spanish. It is a blue book that tells you the laws of the detention center and what is prohibited.

4.  At intake I was provided with some basic necessities, like shampoo, soap, and toothpaste. The items came in very small quantities.  The quality of these items also was not good.

1

The toothpaste and shampoo were of such poor quality they did not clean my teeth or hair and scalp.

5. Once inside SDC, I and the other detained people understood that CoreCivic had complete control over us.  They controlled all of our movements – when and where we slept, ate, worked, and talked to the outside world.  We understood that we had to obey the rules, and if we did not obey them, we would be punished.

6. It was widely known that segregation was one form of discipline, which could and would be imposed on us.  We all understood this because, in addition to the handbook, the CoreCivic officers made it known to us all the time.

7. During my time at SDC, I was housed in an open dormitory.  I was housed in Units 1 and 2.  This dormitory had bunk beds.  I think it housed 60 to 70 people.  It had three bathrooms that we all shared.

8. We called the open dormitories "el gallinero," which means "chicken coop" in Spanish. We were packed in the dorms like chickens.  There were so many people living in each room, it was hard to sleep at night with all the noise.  We all worked different shifts, so people were coming and going from work while others were sleeping.  Sometimes fights broke out about the noise and people's inability to sleep.

9. All of the people in my pod were kitchen workers in the Work Program.

10. Because we were in a kitchen workers' pod, we got two TVs – one for movies and one for video games.  The other pods only had one TV.  The officers told us we had two TVs as a benefit of being kitchen workers.

11. If workers in my pod were removed from the Work Program, they would be moved to a different housing pod. The officers also told me that if I didn't work in the kitchen, I

would be moved from my pod.  Even though my pod was crowded and noisy, it was a little better than the other open dorm pods without kitchen workers, and my friends were there so I wanted to stay there.

12. CoreCivic did not provide me with enough food at SDC. I often felt hungry while I was there. The portion sizes were rationed, the food was bad, and the meals were too spread out.  As a result, I was hungry all the time.

13. They served us dinner at 4 p.m. in the afternoon.  By 9 p.m., there was a line at the microwave of people wanting to heat up ramen noodles they bought at the commissary because we couldn't wait until 5 a.m. the next morning for breakfast.

14. The food was also often inedible.  I saw food being served that was spoiled and looked like vomit.  There was something that I think was supposed to be meat – we called it "monkey brains" because it looked and tasted disgusting.  Some of the food was too spicy.  A lot of the food ended up in the trash because people did not want to eat it. People would buy ramen at the commissary instead. If I didn't have money in commissary, I would be forced to eat the food because I was hungry.

15. There was a weekly menu that changed, but the food items and meals were often the same.  If the menus included meals I knew were going to be inedible, I would buy myself ramen noodles at the commissary.  We also did not get fresh fruit at SDC.  Only the diabetics received fruit, like an apple or an orange.

16. I lost 20 pounds while at SDC due to gastrointestinal issues. I believe that the gastrointestinal issues were due to how little food I ate and the quality of the food.  I also think the spoiled food caused me to get a bacterial infection, for which I had to seek medical treatment.

3

17. I participated in the Work Program at SDC. I joined the Work Program to earn money to buy items I needed at the commissary, such as food, phone cards, stamps, deodorant, shampoo, soap, toothpaste, sock, boxers, and shirts.  I bought boxers and shirts because the ones CoreCivic gave us were used, and I did not think it was hygienic to wear used clothing.

18. If I didn't have to buy those items, I would not have joined the Work Program.  I would have done other things, like played soccer and gone to the recreation center.

19. I also joined the Work Program because CoreCivic would provide detained people who worked extra food. I wanted to work in the kitchen specifically so I could serve myself more food. Based on my conversations with other kitchen workers, access to extra food was also a reason they joined the Work Program.

20.  Being able to purchase and receive extra food was very important.  If I did not have access to the commissary food, like soup, I am not sure I would have survived there.

21. During my year at SDC, I only received three visits from family and friends because the detention center is in a remote area.  I felt very isolated in SDC.

22. I needed money to buy phone cards because that was my primary way of contacting loved ones.  Phone cards to make calls to my family in Nicaragua were especially costly. For example, I would have to pay about $5 for a two-minute phone call with my grandma.

23. Family members occasionally put money on my account, but it wasn't enough to buy food, phone time, and other necessities because those items in the commissary were expensive.  I had to use my Work Program wages to buy those items.

24. I was able to join the Work Program easily right after I arrived at SDC.  It was not hard to get in because they need detainees to work.  An officer in my pod told me about the program and he had me sign a form in English to join.  I could not read the form because I don't speak English.  The officer told me the form was to work in the kitchen.

25. I worked in the kitchen during my entire time at SDC.  I cooked, washed dishes, scrubbed the stove, cleaned the kitchen and the chow hall, and served food on the line.  It was heavy work.  For example, when pancakes were on the menu for breakfast, I had to make three pancakes per person for over 1,000 people.  I had to move very fast next to a hot grill.  I felt a lot of pressure.

26. As a kitchen worker, I also had to deep clean the kitchen before inspections.  During inspections, the area had to be cleared out.  We could not be working while the inspectors were present.

27. I generally worked seven days per week for about 8 hours per day.  My pay rate was $3 per day.  At some point that rate was raised to $4 per day.

28. CoreCivic was supposed to pay me for every day I worked, but I did not always receive my pay.  My pay was deposited into my commissary account.  Sometimes I could tell that CoreCivic did not pay me for every day that I worked because my account balance was too low.

29. For most of my time at SDC, my regular shift began at 2 a.m. in the morning.  The CoreCivic officers would come into our dormitory to wake us up and get us out of bed.  If we did not wake up fast enough, the officers would pull the covers off us and bang on the mattresses to get us up.

30. My shift started so early, and the work was so exhausting, that I was often too tired to go to recreation in the afternoon.  I slept instead.

31. In the kitchen, I was supervised by Trinity employees, Ms. Lyles, Ms. Gaines, and Mr. Marrero, and others whose names I do not remember.

32. The Trinity supervisors mistreated us.  They would yell at us and call us names.

33. The Trinity supervisors also threatened us with discipline if we did not complete our work or perform work beyond our regular duties.

34. I was placed in segregation for refusing to perform a work task beyond my regular tasks. One of my jobs was to fill the drink containers with Kool Aid.  Once I finished I should have been able to take a break. Trinity supervisor Mr. Marrero ordered me to clean the tables.  I told him I had finished my work and did not have to do the additional task.  He then called a CoreCivic officer to put me in segregation.  He did this in front of a couple of other workers.  One of the workers who saw this was from El Salvador.  I think his name was Santa Maria.  A CoreCivic officer then came and took me to segregation.  I was put in segregation without a hearing or any sort of disciplinary process.

35. I was in segregation for approximately one day.  I was totally isolated during this time. They put me in a single-person cell with no window so you cannot see outside.  In segregation, they also provided me with less food than the normal rations, which already were not enough. I also could not access the commissary or go to recreation.  I was not able to make phone calls.  After this incident, I wanted to avoid being sent to segregation again.

6

36. I was also placed in medical segregation two or three times for medical issues. Those units are in a different location, near the medical area, but the conditions are the same as regular segregation.

37. On two or three occasions, the workers in my pod refused to go to work. On those occasions, CoreCivic put us all on lockdown in response. During the lockdowns we were not allowed to move around freely within the pod. We had to ask permission to use the restroom. We were prohibited from using the TV or the phone. We also lost access to the commissary. We could not mail letters to people. If we moved when we were not supposed to, the officers threatened us with pepper spray.

38. The lockdowns lasted until we agreed to work, usually two to four days. We had to go back to work in order to get more food, to call our families, and to access the commissary. We had to give in out of necessity.

39. The lockdowns were oppressive. I felt depressed during them. I could not even call my mother to tell her I was okay. She would worry about me when I didn't call.

40. I also saw another detained worker from Honduras get sent to segregation while we were working in the kitchen. I think his name is Dilmer Galeas. I believe he was sent there because he refused to work or perform a task.

41. It was my understanding that we could be sent straight to segregation without any process because that is what I witnessed and experienced.

42. CoreCivic and Trinity employees also informed us that if we refused to work, that refusal would be put on our "record." I understood this to mean they would use this information to harm our immigration case or file a criminal case against us. CoreCivic and Trinity employees would also tell us we could serve time in federal prison.

7

43. Based on my experiences and the statements and actions of CoreCivic and Trinity employees towards other workers, it was my understanding that it was CoreCivic's policy at SDC to punish us if we did not work, including by sending us to segregation.

44. I continued to work in the Work Program because, if I refused, I understood I could be and, actually was, punished with lockdowns and segregation.  The restrictions in lockdown and segregation were stressful and caused me to feel depressed.  I could not take the isolation or the loss of commissary, phone access, and commissary privileges.  It affected me physically and psychologically.

45. Also, if I stopped working, I wouldn't have access to more food in the kitchen or have enough money to purchase food, phone time, and other necessities in the commissary. I don't think I would have survived the whole year in SDC without being able to purchase those items.

46. It is important for me to be a named Plaintiff in this case because I feel that CoreCivic deprived us of the things we needed, like food, used us for our labor, and then made money off us in the commissary because we had to buy food and other necessities there. I don't want other detained people to be treated like I and my fellow detained people were at SDC.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 9th day of December, 2021 in New Orleans, Louisiana.

Keysler Ramón Urbina Rojas

<u>INTERPRETER AFFIDAVIT</u>

I, Meredith Stewart¸ swear and certify under penalty of perjury under the law of the United States that I am fluent in both the Spanish and English languages and that I read the preceding Declaration in Spanish with Plaintiff Keysler Urbina Rojas, who affirmed the truth of its contents.


Signed this 21st day of December, 2021


_____

Meredith Stewart

# ATTACHMENT 3

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | |
|---|---|
| **WILHEN HILL BARRIENTOS, GONZALO BERMUDEZ GUTIÉRREZ, and KEYSLER RAMÓN URBINA ROJAS,** individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br><br>v.<br><br>**CORECIVIC, INC.,**<br><br>              Defendant. | **Civil Action No.  4:18-cv-00070-CDL** |

## DECLARATION OF WILHEN HILL BARRIENTOS

I, Wilhen Hill Barrientos, hereby declare and state as follows:

1. My name is Wilhen Hill Barrientos.  I am over the age of 18. I am a named plaintiff in this lawsuit.

2. I was detained in Stewart Detention Center (SDC), in Lumpkin, Georgia from July 2015 to May 2016 and September 2017 to June 2018.

3. I was aware of the rules of the facility because they were posted on the housing unit walls at Stewart in English and Spanish.

4. At intake, I was provided with some hygiene supplies like soap, shampoo, toothbrush, toothpaste, and toilet paper, but the quantities were small and the items were of poor quality. I bought toothbrushes, toothpaste, soap, and shampoo from the commissary because the quantities were so small.

5. At intake, I was provided clothes, but all of the clothing was used. Some of the boxers they gave us were stained, and the socks were discolored. Even though they were washed I felt like it was not hygienic to wear those, so I bought boxers and socks from the commissary. I also bought undershirts and long-sleeve shirts from the commissary to keep me warm because it was cold all the time at Stewart. We were provided sandals at Stewart, and I had to buy talcum powder from the commissary to keep the sandals from smelling bad.

6. One time, I ran out of toilet paper. When I asked for another roll, a CoreCivic officer told me to use my fingers to clean myself.

7. When I arrived at Stewart, I was not asked whether I wanted to work. I was assigned to a housing unit for kitchen workers and told that if I did not work, I would be sent to segregation where I would not be allowed to interact with others or go to recreation.

8. In the kitchen, I washed dishes, cleaned tables, prepared food, worked on the serving line, took the trash out, worked in the food storage area, and cleaned the bathrooms in the kitchen.

9. I did not receive any training about how to cook or clean in the kitchen from Trinity or CoreCivic.

10. I was forced to cook and serve spoiled food even after I told kitchen supervisors the food was expired. If I dropped food on the floor, the kitchen supervisors told me to serve it anyway.

11. I did not like the food at Stewart because it did not have enough flavor. As an example, when we made beans, the kitchen supervisors told us to add so much water that they did not have any flavor, and the kitchen staff added so much water to the powdered milk that it tasted like water, not milk.

12. I was hungry often. The serving sizes at Stewart were not enough to fill me up.

13. I and other detained people in my housing unit were assigned to early work shifts, and the officers would wake us up, pulling our toes. The officers would pull my small toe and bend it until it hurt to wake me up. The officers also banged on the bed frames with their walkie talkies. The officers told us if we did not go to work, we would go to segregation.

14. I would have upcoming immigration court dates, but the Trinity kitchen supervisors and CoreCivic officer would tell me I had to work and would not let me go to the law library to prepare for my court dates until I finished work.

15. When my family came to visit, the Trinity kitchen supervisors and CoreCivic officer would not let me visit with them because I was at work, and they told me that I had to work first before the visit.

16. Many times I burned my arms preparing food, and the kitchen supervisors did not let me go to medical immediately. They would tell me, "You're not going to die just because you burned yourself." I still have marks on my arms from this.

17. I saw many detained people report to work while sick. They were forced to work even though they would complain they had thrown up or felt weak.

18. I tried not to miss work to go to sick call, visitation, and the law library for fear of punishment or that it would impact my immigration proceedings.

19. It was common for there not to be enough kitchen workers. When this happened, the supervisors made me work a second shift.

20. I was generally paid $4 per day for working in the kitchen. Sometimes when I worked a double-shift, I was paid $5 or $8. After March 2018, I was paid $1 per day if I worked

3

fewer than six hours, $4 per day if I worked for six hours, $5 per day if I worked eight hours but less than twelve hours, and $8 per day if I worked twelve hours or more.

21. If we worked six full days in a week, the case manager in our unit would give me a $5 phone card in addition to my regular pay.

22. I regularly worked eight-to-nine-hour shifts per day, seven days per week.

23. I used the money I earned from working in the kitchen to buy telephone time so I could call my loved ones to buy items from the commissary like food, stamps, clothing, and hygiene items. Phone calls to my family in Guatemala were especially expensive..

24. I was never told that I could withdraw or how to withdraw from the work program. The CoreCivic staff promised that if I worked, it would help me with my case with ICE.

25. During the time I was at Stewart, the kitchen worker units changed from open dorm units to two-bed celled units, and back to open dorm units.

26. For a while I lived in an open dorm housing unit that I and other detained people called "el Gallinero," or the "Chicken Coop." In the Chicken Coop, all the detained people were in one place, the beds were on top of each other, and the lights were always on. The bathrooms were next to beds just separated by a half-wall. When one person went to the bathroom, the smell spread throughout the room. The Chicken Coop was dangerous. There were often fights.

27. I also lived in a celled housing unit with two-bed cells for a while. Each cell in the unit had its own toilet.

28. While I was housed in a celled kitchen worker unit, officers threatened to transfer me to segregation if I stopped working, called in sick, refused to change shifts as requested, or encouraged others to stop working.

29. One time a CoreCivic officer woke me up to work the 2 a.m. shift, even though I was assigned the 10 a.m. shift that day. When I refused to work the 2 a.m. shift, the officer told me to pack my bags but would not tell me where I was being taken. I worked the early shift that day because I was afraid of my immigration case being negatively affected and of being moved to segregation.

30. Other detained people and I were told that if we did not follow officers' orders, we would be placed in segregation. Officers threatened to move us to segregation if we did not work.

31. Around late 2015, CoreCivic officers threatened to put me in segregation on two different occasions because they thought I was organizing a work stoppage.

32. Officers also threatened to take away our commissary privileges if we stopped working, called in sick, or encouraged others to stop workings.

33. Sometimes my pod was placed on lockdown when detained people refused to work. When we were on lockdown, we had to stay in our beds the entire day, and we could only use the bathroom with permission from an officer.

34. Around October 2017, after I submitted a grievance about an officer who forced me to work when I was sick, I was sent to medical segregation at Stewart. I was in the same unit where people go for disciplinary segregation. The officers told me I was in segregation because I had been exposed to chicken pox, even though I told them I had chicken pox when I was a child.

35. I was in segregation for one month. In segregation, I was in my cell for about 23 hours per day. I was not allowed to see my family, my recreation time was reduced from three to four hours per day to a half hour per day. Segregation was the worst. Twenty-three hours locked

in a room without knowing what time it is, without distractions was very bad. I thought about suicide many times when I was in segregation.

36. When I was in segregation, I learned that another detained person died by suicide in segregation at Stewart, and this made me even more afraid stay in segregation longer.

37. It is important to me to be a named plaintiff in this case because I do not want people at Stewart to be forced to work. I do not want detained people to be misled that their immigration case will be affected or that they will be sent to segregation if they refuse to work. I do not want detained people to be intimidated into working, and I want them to know the tactics the officers use to intimidate people. I want to tell people what happens inside Stewart and how the officers treat detained people there, and I want to put an end to the mistreatment.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 15th day of December, 2021 in Atlanta, Georgia.

Wilhen Hill Barrientos

## INTERPRETER AFFIDAVIT

I, Elliot Lepe, swear and affirm under penalty of perjury of the laws of the United States of America that I am fluent in both the Spanish and English languages and that I read the preceding Declaration in Spanish to Plaintiff Wilhen Hill Barrientos, who affirmed the truth of its contents.


_____                    12-19-21
Signature                                           _____
                                                    Date

# Appendix D

**CONFIDENTIAL**

## Appendix D

**Putative Class Members Interviewed on June 17-18, 2021 at Stewart Detention Center**



| First | Last | A No. |
|-------|------|-------|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |