# Exhibit 15

## (REDACTED)

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| **WILHEN HILL BARRIENTOS,**<br>**GONZALO BERMUDEZ GUTIÉRREZ,**<br>**and KEYSLER RAMÓN URBINA ROJAS**<br>**individually and on behalf of all others**<br>**similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**CORECIVIC, INC.,**<br><br>**Defendant.** | Civil Action No.  4:18-cv-00070-CDL |

## <u>OPENING EXPERT REPORT OF PLAINTIFF'S EXPERT DR. DORA SCHRIRO</u>

### Summary of Expertise and Expert Opinion

1. My name is Dr. Dora Schriro, Ed.D., J.D. I have been retained as an expert in this matter to provide opinions regarding CoreCivic's Voluntary Work Program (VWP) at Stewart Detention Center (SDC) in Lumpkin, Georgia over the proposed class period. As discussed in more detail herein, my opinions regarding the VWP at SDC are as follows.

2. **It is my opinion that CoreCivic's VWP at SDC violates operative policies and standards designed to ensure its voluntariness.** People in immigration detention cannot be forced to work. CoreCivic's policies violate a key tenant of its Agreement with U.S. Immigration and Customs Enforcement (ICE), to comply with ICE's detention standards, including the prohibition on compelling people in its custody to work. CoreCivic persists in these practices because ICE's oversight of CoreCivic is inadequate.

3. **It is my opinion that CoreCivic relies on detainee labor to perform essential operations at SDC.**

4. **It is my opinion that CoreCivic's policy is to deprive detained individuals of basic necessities, which is a practice that helps to ensure the maximum number of participants in SDC's VWP.**

5. If called upon to do so, I am prepared to testify as to my opinions, analyses, and conclusions included in and related to this Report. I reserve the right to supplement my opinions should additional evidence or other information become available.

**Summary of Qualifications, Education, Publications, and Other Professional Experience**

6. Based on my education, research, and experience, I am an expert in secured facility administration.

7. I am a career public servant who has served as an executive-level administrator, policy maker, and homeland security advisor. I have led three state and two city criminal justice agencies and a federal office in the U.S. Department of Homeland Security (DHS), ICE.

8. I was the Commissioner of the Connecticut Department of Emergency Services and Public Protection consisting of six state agencies including the Connecticut State Police and Homeland Security and Emergency Management, from 2014 through 2018. I served concurrently as Connecticut's Homeland Security Advisor from 2016 through 2018. My DHS security clearance was Top Secret.

9. I was the Commissioner of two city jail systems, the St. Louis City Division of Corrections from 2001 to 2003, and the New York City (NYC) Department of Correction from 2009 to 2014. Previously, I served as Warden of a city jail in St. Louis City, Missouri, from 1989 to 1993, and Assistant Commissioner for Program Services in the NYC Department of Correction from 1985 to 1989. As Warden, I administered the jail's work program, and as Assistant Commissioner, the Department's work release program.

10. I was the Director of two state correctional systems, the Missouri Department of Corrections from 1993 to 2001, and the Arizona Department of Corrections from 2003 to 2009. Both state systems offered job training programs, work programs, and work release. During my tenure as Director of the Missouri Department of Corrections, I also served as Vice Chair of the state's Sentencing Commission. During my tenure in Missouri, I received the Association of Correctional Administrators' Award for Outstanding Leadership. During my tenure in Arizona, ours was the first correctional system in the country to receive the Innovations in American Government award for a prison-based reform. We received the award for *Getting Ready*, a systemwide pre-release preparation initiative imbued with norms and values mirroring those of the community, in which all inmates participated from the first to last day of their incarceration.

11. I was Senior Advisor to DHS Secretary Janet Napolitano on ICE Detention and Removal, and the founding Director of the ICE Office of Detention Policy and Planning in 2009.

During my tenure I authored the 2009 *Report on ICE Detention Policies and Practices: A Recommended Course of Action for Systems Reform*, focusing on seven key areas of operation: population, detention, and programs management, alternatives to detention, health care, special populations, and accountability.[1] The recommended reforms were aimed at decriminalizing ICE detention and realigning ICE activities with immigration case law establishing immigration infractions as civil, not criminal. DHS adopted my report in its entirety as its template for immigration detention reform.

12. I was a member of the adjunct faculties of University of Missouri-St. Louis Department of Criminology from 1990 to 1998, St. Louis University School of Law from 2000 to 2002, and Arizona State University Sandra Day O'Connor School of Law from 2005 to 2008.

13. I am knowledgeable about the case law impacting pre-trial and sentenced populations and civil detainees, and the American Correctional Association (ACA) and ICE Performance-Based and National Detention Standards (PBNDS). I participated in the development of the American Bar Association (ABA)'s professional standards for state and local correctional systems and federal immigration detention.

14. I am knowledgeable about the operation of criminal pre-trial and sentenced correctional facilities and immigration detention centers and the people in the custody of both systems.

15. I have served as a Corrections and Immigration Detention expert and consultant, working with the California Department of Justice; the Hampton County, Massachusetts, Sheriff's Department; Disability Rights California; and Human Rights First. I am currently engaged by the California Department of Justice, St. Louis University School of Law Clinic, and the Southern Poverty Law Center.

16. A complete and correct Résumé, which includes a list of my publications from the last ten years, and related professional affiliations and recognition, is attached as Appendix A.

**Prior Testimony and Current Compensation**

17. In the previous four years, I have testified as an expert by deposition in the matters of *Endicott v. Hurley et al.*, No. 2:14-CV-107 DDN (E.D. Mo.) in 2020, and *Doe v. Senger et al.*, No. 20-cv-3217-DPR (W.D. Mo.) in 2021.

---

[1] Dora Schriro, Dep't of Homeland Sec., Immigr. and Customs Enf't, *Immigration Detention Overview and Recommendations* (Oct. 6, 2009), *available at* https://www.ice.gov/doclib/about/offices/odpp/pdf/ice-detention-rpt.pdf.

18. I am providing my expert services in this matter at the rate of $225 per hour for research, telephone conferences, report writing, preparing for testimony, and at the rate of $1,500 per day for court and deposition testimony, and facility inspections and travel. Attorneys for Plaintiffs have also agreed to pay reasonable expenses related to preparing this report and testifying in this case, such as travel expenses.

### Reasons and Basis for Opinion

19. In preparing this Report, I reviewed the documents listed in Appendix B, including transcripts of the depositions taken in this matter, toured SDC on June 17, 2021, conducted interviews with putative class members, listed in Appendix C, who were currently detained at SDC on June 17 and 18, 2021, and reviewed the sworn declarations of Named Plaintiffs Wilhen Hill Barrientos, Gonzalo Bermudez Gutiérrez, and Keysler Urbina Rojas, attached hereto in Appendix B.

20. My analysis is ongoing, and my conclusions are based on information currently available to me. If any additional information or testimony—including from any of the other experts in this matter—becomes available to me, I reserve the right to consider such information and to supplement this report and my opinions, as appropriate. I also reserve the right to supplement my report in light of any additional fact discovery, opinions by other experts, and/or trial testimony, and to respond to other experts and the testimony of any fact witnesses.

## I.   Overview

21. ICE has more people in its custody annually than any correctional system in the United States. In 2019, ICE booked-in over 500,000 detainees and by early 2020, detained approximately 50,000 people daily. Since the onset of the COVID-19 pandemic and subsequent actions by ICE pursuant to Centers for Disease Control and Prevention (CDC) Guidance and court orders, ICE's overall census has dropped considerably and only recently has begun to rise. In 2021, ICE booked-in fewer than 200,000 detainees, and its average daily population, about 21,500, was less than half than the year before.[2] Unlike correctional systems, however, ICE does not operate any of the facilities used to detain the people in its custody; instead, it secures most of the space and all the detention staff and services from the private sector by means of contracts and from state and local government through

---

[2] Dep't of Homeland Sec., Immigr. and Customs Enf't, *Detention Management*, https://www.ice.gov/detain/detention-management (providing ICE detention statistics for FFY 2019 through 2022).

intergovernmental service agreements (IGSA). Currently, ICE utilizes 142 facilities nationwide, including 20 dedicated (ICE-only) and 122 non-dedicated (shared use) facilities.[3]

22. ICE secures detention beds by means of multi-year agreements with its providers, with provisions for both fixed and marginal expenses. ██████████████████████



23. SDC is a dedicated (ICE-only) facility, owned and operated by CoreCivic, a private corporation. With a current operating capacity of 1,966 beds,[6] SDC is ICE's second largest adult detention center. Before the COVID-19 pandemic, SDC's average daily population (ADP) was 1,911 all male detainees and its average length of stay (ALOS) was 50 days in Federal Fiscal Year (FFY) 2019.[7] Since the onset of the pandemic, SDC continues to be one of ICE's most utilized facilities albeit on a much smaller scale. In FFY 2020, its ADP was 1,351 detainees[8] and its ALOS, 51 days. In FFY 2021, SDC's ADP continued to fall to 778 detainees, including 160 females, and its ALOS continued to rise to 60 days.[9] In FFY 2022, its ADP more than doubled to 1,159 detainees, including 387 females, as of December 6, 2021, while its ALOS, nearly halved to 38 days, as of December 6, 2021.[10]

---

[3] *Id.*
[4] ██████████████████ (CCBVA0000000446) at 3.
[5] ████████████████ (CCBVA0000149758) at 2.
[6] SDC's capacity was 1,524 beds in 2006. In 2008, CoreCivic and ICE modified the agreement expanding the facility by 400 beds, raising the capacity to 1,924. By 2018, CoreCivic had increased SDC's capacity to 1,966 beds.
[7] Dep't of Homeland Sec., Immigr. and Customs Enf't, *Detention Management*, https://www.ice.gov/detain/detention-management (providing ICE detention statistics for FY 2019 through 2022).
[8] *Id.*
[9] *Id.*
[10] *Id.* (FY 2022 data last updated Dec. 6, 2021).

Table 1: SDC Avg. Length of Stay and Avg. Daily Population

Sources: CCBVA0000006060, 117672, 149956, 150032, 150206, 150254, 150395, 150466, 150547, 150628, 150847, 150860, 150870, 177470, 177758, 177897, 178342, 180301; ICE Barrientos 1891, 6135



Table 1: ████████████████████████████████████████████████
████████████████████████████████████████████ Note, most years'
data reflects the ADP and ALOS at the time in the FFY when those reports were published. No ALOS data was
produced for 2010, 2014, or 2021.

24. In 2006, ICE contracted for use of SDC by means of an Inter-Governmental Service
Agreement (IGSA) with Stewart County, Georgia, thereby bypassing the competitive bidding
process, which the federal government requires when procuring goods or services from
nongovernmental entities.[11] Stewart County contracts with CoreCivic for the use and
operation of SDC. ████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████ █████████ ████████████
████████████████████████████████████████████████

---

[11] Jun. 3, 2006 Inter-Governmental Service Agreement, Stewart County, GA (CCBVA0000000340).
[12] ████████████████████ (CCBVA0000149842) at 2.

██████████ [13] For example, ICE paid Stewart County $665,610 in 2017, $666,834 in 2018, and ████████████, for its "administrative activities."[14]

25. SDC is one of 47 facilities protected by ICE's "guaranteed minimum" provision. SDC is guaranteed payment for 1,600 beds each day, whether or not those beds are filled. SDC's maximum capacity is 1,966 detainees.

26. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████.[15]
█████████████████████████████████████████ current warden Russell Washburn testified that CoreCivic staffs SDC at a level estimated to be 430-435 FTE positions to house 1,752 detainees at a cost to ICE not exceeding CoreCivic's contractual agreement to house 1,600 detainees.[16]

27. CoreCivic subcontracts with Trinity Services Group, Inc. (Trinity) to provide food service at a number of CoreCivic facilities, including SDC. Trinity's staff at SDC consists of ten FTE positions, including a Food Service Director (FSD), an Assistant Food Service Director (AFSD), and eight Food Service Workers (FSWs) whose job is to direct the activities of 140 detainees who are assigned to prepare and serve all the meals. ████████████████
████████████████████████████████████ ███████████████████████
████████████████████████████████████████.[17] Although according to Trinity, it is not their practice to bill SDC for failing to do so,[18] CoreCivic nevertheless goes to extraordinary lengths to ensure there are enough detainee kitchen workers because they perform 90 percent of all the kitchen work.[19]

---

[13] ██████████████████████████████████████████████████████████████
(CCBVA0000001321).
[14] 2017 CoreCivic Monthly Billing Summaries (PLS_0000155); Stewart County, Georgia, Independent Auditor's Report for the Year Ending December 31, 2018, *available* http://www.stewartcountyga.gov/PDF-docs/StewartCounty2018Audit.pdf; ████████████████████████████ (STEW0000139).
[15] Jun. 3, 2006 IGSA (CCBVA0000000340) (referencing "[t]he number of employees needed to directly engage in the housing and detention of detainees").
[16] CoreCivic 30(b)(6) Designee Russell Washburn Deposition Transcript (Dec. 1, 2021) at 57:5-20, 62:24-63:9, 118:24-119:12; *see, e.g.* ████████████ (CCBVA0000280787) (████████████████████████
██████).
[17] ████████████████████████████ (TRINITY00000396) at 11-12; ████████████████
████████████(CCBVA0000117636) at 10.
[18] Trinity 30(b)(6) Designee Susan Huffman Deposition Transcript (July 14, 2021) at 91:14-16.
[19] *Id.* at 89:22-25.

28. CoreCivic operates a commissary at SDC. █████████████████████████
█████████████████████████████████████████████ CoreCivic marks up
the prices of all the commissary items as high as 30 percent,[20] except postage stamps which
must be sold at face value and telephone calls which cannot exceed FCC's rate for inmate
telephone service.[21] CoreCivic pays for the commissary overhead (e.g., commissary
inventory, supplies, and staff's salaries) with commissary profits. Any residual profits are
deposited into a detainee welfare fund with which recreation equipment, religious supplies,
cable service, movies, video game consoles, ice coolers, and the like are funded. CoreCivic
also uses the welfare fund to purchase the incentives offered in the detained workers' housing
units, including additional televisions, video games, movies, and popcorn.[22] ████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
█████████████████████████.[23]

29. All told, CoreCivic depends on detainee labor in four essential areas of its operation at SDC:
Food Service, Environmental Health and Safety, Personal Hygiene, and Commissary. ████
████████████████████████████████████████████████████████████████
████████████████████████████████████████ CoreCivic also staffs Special
Projects with detainee workers, primarily, paint crews, crews that wax and buff floors, and
work on maintenance and repair projects throughout the facility. There have been occasions
when SDC had appreciably more workers than its plan allowed. ███████████████████
████████████████████████████████████████████████████████████████████
█████████████████████.[24]

30. In 2006, CoreCivic, as operator of SDC, was required to comply with ICE's National
Detention Standards (NDS).[25] In 2008, ICE introduced PBNDS, which CoreCivic was

[20] CoreCivic Policy 2.6, Inmate/Resident Commissary Operations, Nov. 1. 2013 (CCBVA0000003777) at 2.
[21] Apr. 27, 2017 IGSA Mod. (CCBVA0000000945) at 3.
[22] Bethany Brazier Deposition Transcript (Nov. 18, 2021) at 84:21-87:24, 201:6-17; Washburn Dep. Tr. (Dec. 1,
2021) at 315:12-317:4; *see also* ████████████████████ (CCBVA0000280509).
[23] *See* 2009 – 2021 SDC Budget (CCBVA0000280509); Feb. 9, 2016 IGSA Mod. (CCBVA0000000439) (███████
███████████████).
[24] ███████████████████████ (CCBVA0000006060) at 148.
[25] 2000 National Detention Standards Operations Manual (CCBVA0000000340); Jun. 3, 2006 IGSA
(CCBVA0000000340) at 1 (requiring compliance with "the most current edition[] of ICE Detention
Requirements").

required to comply with pursuant to the original IGSA.[26] In 2011, ICE promulgated PBNDS 2011, and modified its agreement with Stewart County, requiring CoreCivic to comply with PBNDS 2011.[27] ICE revised PBNDS 2011 in 2016, ██████████████████████████ ██████████████.[28] Chief among the criteria that ICE uses to assess CoreCivic's performance is the extent to which operations at SDC complied with NDS and PBNDS 2008 and 2011 and now, 2011 (2016 rev.).[29]

31. PBNDS 5.8 Voluntary Work Program,[30] previously, PBNDS 33 Voluntary Work Program,[31] requires CoreCivic to operate a *voluntary* work program for the benefit of the detained population. The VWP's purpose and scope are to provide detainees with opportunities to work and earn money while detained to spend, save, or send home, subject to the number of opportunities available and within the constraints of the safety, security and good order of the facility. When the work program operates as intended, essential facility operations and services are enhanced through detainee productivity, and the negative impact of detention is reduced through decreased idleness, improved morale, and fewer disciplinary incidents.[32] ICE's only qualification as to the voluntary nature of detainees' work is the expectation that all detainees shall maintain the *immediate* area around their bed.[33] ICE made no substantive changes to the PBNDS 5.8 Voluntary Work Program when it introduced performance-based standards in 2008 or updated some of them in 2011, but it did make two revisions to PBNDS 5.8 in 2016, one allowing detainees to grieve their loss of a work assignment and the other, accommodating disabled and limited English proficient (LEP) detainees so that they could participate in the work program, too. *See* Appendix D, Table 7, comparing the 2008, 2011 and 2016 versions of PBNDS 5.8.

---

[26] 2008 Operations Manual ICE Performance-Based National Detention Standards (CCBVA0000001968), *full text available at* https://www.ice.gov/detention-standards/2008; Jun. 3, 2006 IGSA (CCBVA0000000340) at 1 (requiring compliance with "the most current edition[] of ICE Detention Requirements).

[27] 2011 Performance-Based National Detention Standards Operations Manual (CCBVA0000002851); Jun. 12, 2013 IGSA Mod. (CCBVA0000000368).

[28] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317); ██████████ ██████████ (CCBVA0000000449).

[29] Hereinafter, "ICE detention standards" refers to all applicable versions of NDS and PBNDS.

[30] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 385 (5.8 Voluntary Work Program).

[31] 2008 IRO/DRO Detention Standard, Voluntary Work Program (CCBVA0000002364).

[32] *See* 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 385 (5.8 Voluntary Work Program); 2008 IRO/DRO Detention Standard, Voluntary Work Program (CCBVA0000002364).

[33] This is limited to four tasks: 1. making one's bed daily; 2. stacking loose papers; 3. keeping the floor around their bed free of debris and dividers free of clutter; and 4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from the bed, overhead lighting fixtures or other furniture. *See* 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 386.

32. When SDC opened in 2006, CoreCivic issued Policy 19-100, Inmate/Resident Work Program to implement ICE's VWP.[34] CoreCivic has reissued Policy 19-100 four times since then in 2010,[35] 2012,[36] 2013,[37] and 2017,[38] primarily to update detainee worker wages. Initially, detainees' pay was set at $1 per day from October 1, 2006, to October 31, 2012,[39] and then $1 to $3 per day from November 1, 2012, to August 15, 2017,[40] and at least $1 per day from August 16, 2017[41] to date. Intermittently, CoreCivic has also compensated some detainee workers at SDC with pre-paid phone cards or phone time, both in addition to and in lieu of wages.[42]

33. When CoreCivic contracted to detain people in ICE custody at SDC, it became bound to comply with ICE detention standards.[43] CoreCivic has consistently failed to do so. As discussed further herein, CoreCivic at SDC does not comply with either PBNDS 5.8 Voluntary Work Program or other detention standards that establish parameters for the VWP, ███████████████████████████████████████████████████████ ████████████████.[44]

## II.      The Plaintiffs

34. The three Named Plaintiffs and class representatives in this matter are Messrs. Wilhen Hill Barrientos, Gonzalo Bermudez Gutiérrez, and Keysler Ramón Urbina Rojas. All three men participated in SDC's VWP without many of the protections that PBNDS promises, most fundamentally, that VWP participation is always voluntary, and no one may be asked or agree to perform or be punished for refusing to do any work that ICE policies prohibit.

---

[34] Oct. 1, 2006 SDC, Policy 19-100, Inmate/Resident Work Programs (CCBVA0000003929).
[35] Apr. 25, 2010 SDC, Policy 19-100, Inmate/Resident Work Programs (CCBVA0000003932).
[36] Nov. 1, 2012 SDC, Policy 19-100, Inmate/Resident Work Programs (CCBVA0000003937).
[37] Mar. 13, 2013 SDC, Policy 19-100, Inmate/Resident Work Programs (CCBVA0000003942).
[38] Aug. 16, 2017 SDC, Policy 19-100, Inmate/Resident Work Programs (CCBVA0000003947).
[39] Oct. 1, 2006 SDC, Policy 19-100, Inmate/Resident Work Programs (CCBVA0000003929); April 25, 2010 SDC, Policy 19-100, Inmate/Resident Work Programs (CCBVA0000003932).
[40] Nov. 1, 2012 SDC, Policy 19-100, Inmate/Resident Work Programs (CCBVA0000003937).
[41] Aug. 16, 2017 SDC, Policy 19-100, Inmate/Resident Work Programs (CCBVA0000003947).
[42] Nov. 6, 2017 Email from S. Walton re: Phone Time (CCBVA0000152098); Jan. 6, 2014 Email from S. Richardson re: Four $5 phone cards; Freddie Hood Deposition Transcript (Oct. 22, 2021) at 109:25-112:14; Decl. of Wilhen Hill Barrientos at ¶21.
[43] Jun. 3, 2006 IGSA (CCBVA0000000340) at 1 (requiring compliance with "the most current edition[] of ICE Detention Requirements); *see also* 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 385 (noting that all Voluntary Work Program provisions apply to IGSA facilities, including italicized provisions, which apply to dedicated IGSA facilities).
[44] *See* █████████████████████ (CCBVA0000274977).

35. Mr. Wilhen Hill Barrientos, a low-custody detainee, was detained intermittently at SDC between July 2015 and June 2018.[45]

36. Mr. Hill Barrientos worked in the kitchen, preparing meals, washing dishes, and dispensing meal trays on the serving line.[46] He did not volunteer to participate in the VWP; he was told that if he did not do so, he would be put in segregation.[47] Mr. Hill Barrientos often worked as many as seven days a week.[48] Prior to March 2018, Mr. Hill Barrientos received $4 a day, and when he worked 12 hours, he received $5.[49] When he worked six days in a week, he received a $5 pre-paid phone card in addition to his pay.[50] After March 2018, he was paid $1 when he worked less than six hours a day, $4 when he worked six hours, $5 when he worked eight or more but less than 12 hours, and $8 when he worked 12 or more hours.[51]

37. All his earnings were deposited into his commissary account. Mr. Hill Barrientos used his wages to purchase necessities – hygiene products, serviceable underwear and socks and warm clothes,[52] food, postage stamps and phone cards from the commissary, his only option – most of which was marked up 30 percent, the most that ICE allowed, and much of which CoreCivic was obligated to provide at no cost to detainees.[53] PBNDS 4.1 Food Service promises all detainees are provided a nutritionally balanced diet,[54] and PBNDS 4.5 Personal Hygiene assures all detainees can maintain acceptable personal hygiene practices by replacing depleted personal hygiene items.[55] CoreCivic did neither.[56] Mr. Hill Barrientos was hungry much of the time and could not make do with the sample-sized toiletries he was issued.[57] CoreCivic even refused to provide Mr. Hill Barrientos toilet paper. On one occasion, an officer told him to use his fingers to clean himself.[58]

38. ███████████████████████████████████████
    ███████████████████████████████████████

---

[45] Hill Barrientos Decl. at ¶ 2.
[46] *Id.* at ¶ 8.
[47] *Id.* at ¶7.
[48] *Id.* at ¶ 22.
[49] *Id.* at ¶ 20.
[50] *Id.* at ¶ 21.
[51] *Id.* at ¶ 20.
[52] *Id.* at ¶5.
[53] *Id.* at 23.
[54] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 232 (PBNDS 4.1 Food Service).
[55] *Id.* at 307 (PBNDS 4.5 Personal Hygiene).
[56] Hill Barrientos Decl. at ¶¶ 5, 10-12.
[57] *Id.* at ¶¶ 4, 12.
[58] *Id.* at ¶ 6.

██████████████████████████████████████████████████.[59] On one occasion, shortly after he filed a grievance about being forced to work when ill, he was moved to "medical" segregation for two months, purportedly for chicken pox which he had already had and could not contract again.[60]

39. Mr. Hill Barrientos was denied access to the law library to prepare for his court appearances, visits with his family, and medical care and forced to work instead.[61] CoreCivic officers threatened him with segregation and loss of commissary privileges if he did not go to work.[62]

40. CoreCivic violated PBNDS 5.8 for threatening to punish Mr. Hill Barrientos for refusing to work and PBNDS 2.2 Custody Classification System for █████████████████████ ██████████████████████████.[63] And CoreCivic may have violated PBNDS 6.2 Grievance System for retaliating against him when he complained and filed a grievance.[64]

41. According to Mr. Hill Barrientos' testimony, he was not a voluntary participant in the SDC VWP. He worked to pay for basic necessities that CoreCivic refused to provide. CoreCivic further ensured his participation with threats of physical restraint, serious harm, and violation of ICE detention standards.[65]

42. Mr. Gonzalo Bermudez Gutiérrez, a medium-custody detainee, was detained at SDC from May 2019 to January 2020.[66] During his time at SDC, Mr. Bermudez Gutiérrez worked in Food Service, washing dishes, serving meals, and cleaning the chow hall and the kitchen.[67] During his detention, he usually worked six-hour shifts every day, seven days every week. CoreCivic paid Mr. Bermudez Gutiérrez $4 a day.[68] All his earnings were deposited into his commissary account.[69]

---

[59] ████████████████████████; (CCBVA0000173966); █████████████████████ (CCBVA0000152247).
[60] Barrientos Decl. at ¶ 34.
[61] *Id.* at ¶¶ 14-16.
[62] *Id.* at ¶¶ 13, 28-32.
[63] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 64 (PBNDS 2.2 Custody Classification System) (prohibiting commingling of high custody detainees with low custody detainees); *see also* █████████████████████ (CCBVA0000173966); █████████████████████ (CCBVA0000152247).
[64] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 394 (PBNDS 6.2 Grievance System).
[65] Barrientos Decl. at ¶¶ 7, 13-19, 28-33, 36.
[66] Decl. of Gonzalo Bermudez Gutiérrez at ¶2.
[67] *Id.* at ¶26.
[68] *Id.* at ¶28.
[69] *See id.* at ¶29.

43. Mr. Bermudez Gutiérrez lost about 20 pounds during his detention and was frequently hungry.[70] Mr. Bermudez Gutiérrez bought food items like ramen noodles to stave off his hunger, as well as hygiene products, postage stamps, and prepaid phone cards from the commissary.[71]

44. Mr. Bermudez Gutiérrez was assigned to a celled workers' housing unit that provided incentives such as an extra television and later bedtimes.[72] There, he witnessed detention officers move detainees who were removed from the work program to regular housing units.[73]

45. According to Mr. Bermudez Gutiérrez's testimony, he worked to pay for basic necessities that CoreCivic denied him.[74] And he witnessed CoreCivic threaten to transfer detainees who refused to work to open dorms or segregation and revoke their commissary access,[75] contrary to ICE detention standards.

46. Mr. Keysler Ramón Urbina Rojas, also a low-custody detainee, was detained at SDC between 2015 and 2016.[76] During his time at the facility, Mr. Urbina Rojas worked in Food Service.[77] Generally, he worked seven days a week, about eight hours every day.[78] Mr. Urbina Rojas was supposed to be paid $3 or $4 a day but there were days when he worked and was not paid anything.[79]

47. As a participant in the SDC VWP, Mr. Urbina Rojas was mistreated by Trinity staff and detention officers assigned to Food Service.[80] He also witnessed another detainee be sent to segregation for refusing to work or perform a task.[81] Trinity staff yelled at Mr. Urbina Rojas and called him names, contrary to PBNDS 2.13 Staff-Detainee Communication.[82] ■■■■■■

---

[70] *Id.* at ¶19.
[71] *Id.* at ¶¶20-21.
[72] *Id.* at ¶11.
[73] *Id.* at ¶¶14, 25.
[74] *Id.* at ¶¶20-21.
[75] *Id.* at ¶¶35-36.
[76] Decl. of Keysler Urbina Rojas at ¶2.
[77] *Id.* at ¶25.
[78] *Id.* at ¶27.
[79] *Id.* at ¶¶27-28.
[80] *Id.* at ¶¶31-34.
[81] *Id.* at ¶40.
[82] *Id.* at ¶32; 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 192 (PBNDS 2.13 Staff-Detainee Communication) (requiring detention officers and supervisors to interact informally and formally with detainees in the housing units and other areas of the facility about their living and working conditions).

███████████████████████████████████████████████
███████     ████████████████████████████

48. Mr. Urbina Rojas and the other detainee workers were also threatened with time in
    segregation, lock-down in their housing units, and revocation of phone and commissary
    privileges if they refused to work.[85] Mr. Urbina Rojas was put in disciplinary segregation for
    about one day on one occasion when he refused to complete tasks that went beyond his usual
    assignment, a misunderstanding on his part, an opportunity for counseling but not an
    occasion for punishment.[86] And, while he was in segregation, he got smaller servings of food
    than the portions detainees are served in the chow hall,[87] although both PBNDS 4.1 Food
    Service[88] and PBNDS 2.12 Special Management Unit[89] state emphatically food shall never
    be used as a form of punishment and ordinarily, the general and special populations' menu is
    the same.

49. On several occasions, when Mr. Urbina Rojas and other detainees did not go to work,
    CoreCivic locked down their housing unit, cut off their phone access, required everyone to
    remain on their beds, and threatened to disperse pepper spray if they failed to comply, a form
    of excessive force PBNDS 2.15 Use of Force and Restraints permits only when "escalating
    tension makes such action unavoidable."[90] The lockdowns usually remained in effect for two
    to four days.[91] CoreCivic apparently imposed lockdowns as a form of punishment without
    due process, in violation of PBNDS 3.1.[92]

50. While detained at SDC, Mr. Urbina Rojas lost about 20 pounds and was often hungry.[93] He
    lacked basic hygiene items and other necessities. He needed the money he earned working in

---

[83] ████████████████████████████████████████████ (CCBVA0000152053).
[84] ████████████████████████████ (CCBVA0000151705).
[85] Urbina Rojas Decl. at ¶¶42, 44-45.
[86] *Id.* at ¶¶34-35; 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 387-88 (PBNDS 5.8 Voluntary Work Program).
[87] Urbina Rojas Decl. at ¶35.
[88] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 232 (PBNDS 4.1 Food Service).
[89] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 187 (PBNDS 2.12 Special Management Unit).
[90] Urbina Rojas Decl. at ¶37; 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 204 (2.15 Use of Force and Restraints); *see also id.* at 209 ("Physical force shall only be used, when both necessary and reasonable.").
[91] Urbina Rojas Decl. at ¶38.
[92] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 218 (PBNDS 3.1, Discipline System).
[93] Urbina Rojas Decl. at ¶¶12, 16.

the kitchen to purchase food, hygiene products, and phone cards from the commissary; most of these items the facility should have provided at no cost.[94]

51. Mr. Urbina Rojas worked to pay for basic necessities that CoreCivic was obligated to provide and to avoid punishment.[95]

### III.   CoreCivic's VWP at SDC Violates Operative Policies and Standards Designed to Ensure Its Voluntariness

### A.   People in immigration detention cannot be forced to work.

52. Immigration detention may not operate as criminal jails and prisons. There is a tendency to conflate people in the civil immigration system with the criminal population, largely due to ICE's and private prison companies', such as CoreCivic's, decisions to detain people in immigration proceedings in jails and prisons, facilities whose design and construction, staffing plans, and population management strategies are premised on the criminal justice system's principles of command and control. It is not only my opinion but also a matter of law that immigration detention should be unlike criminal incarceration.

53. CoreCivic, which operates pre-trial and post-conviction criminal jails and prisons as well as immigration detention centers, implements a number of its corporate policies uniformly across all types of facilities.[96] This blurring of the civil and criminal systems, and conflation of the people in civil and criminal custody, the purpose for their confinement pending a civil or criminal outcome, and the policies by which each is guided, result in a high degree of restrictiveness in most immigration detention facilities, including SDC, which in my opinion and experience, is unfounded.

54. Whereas the majority of pre-trial and sentenced prisoners are quite familiar with the criminal justice system and have been previously incarcerated, the majority of immigration detainees have no or minor criminal histories, only the minority charged or convicted of serious crimes, and many have had no prior contact with ICE. In FFY 2021, 54 percent of SDC's average

---

[94] *Id.* at ¶¶14-15, 17, 20, 23, 45.
[95] Urbina Rojas Decl. at ¶¶44-45.
[96] *See* Washburn Dep. Tr. (Dec. 1, 2021) at 188:20-189:8, 239:6-12; Washburn Dep. Tr. (Dec. 2, 2021) at 359:22-360:20, 363:12-364:23; ███████████████████████████████████); *see also, e.g.*, Inmate Resident Commissary Operations, Policy 2-6 (CCBVA0000003772) (referring to people as "inmates" and "residents"); █████████████████████████████████ ██████████████ (CCBVA0000003799) (████████████████████████████████████████████ ███████████).

daily population (416 of 769 detainees) had no criminal charges or convictions. An additional 17 percent (130 of 769) had minor charges or convictions some time ago. Just 29 percent (223 of 769) have had more recent or more serious charges or convictions.[97]

55. In my experience with detainees during my work at DHS, as an expert and consultant, and as a member of the ABA Commission on Immigration, most detainees with whom I have spoken who have a criminal record readily admit fault and accept responsibility. They are forthcoming about their past and are clear that time they served in criminal prison was the punishment for their crime. Having completed their sentence prior to being detained by ICE, they are also quick to point out that immigration detention is not supposed to be punitive but overall, their time in ICE's custody is appreciably harsher than was their incarceration.

56. Most of those who have had no prior encounters with law enforcement know little about our criminal justice system and fewer still are knowledgeable about immigration proceedings. In immigration proceedings, counsel is not provided to those who do not have the means to secure representation and limited English language proficiency often further impedes immigrants' ability to navigate our civil immigration system.

57. As SDC only houses people who are detained for alleged violations of civil immigration law, compelling detained people to work at SDC is unlawful. The administration of a work program in prisons, jails, and immigration detention centers must be consistent with the Thirteenth Amendment to the U.S. Constitution, which generally prohibits slavery except "as punishment for crime whereof the party shall have been duly convicted." Thus, secured facility administrators, including those at SDC, cannot compel people who are detained pretrial or pending an outcome in civil immigration proceedings to work.

**B. CoreCivic's policy at SDC violates a key tenant of its Agreement with ICE to comply with ICE's detention standards including the prohibition on compelling people in its custody to work.**

58. As written, CoreCivic's Resident Work Program Policy 19-100[98] and the SDC Detainee Handbook Supplement[99] appear to be consistent with PBNDS 5.8 Voluntary Work Program. As a matter of practice, however, neither CoreCivic's policy nor the SDC Detainee

---

[97] Dep't of Homeland Sec., Immigr. and Customs Enf't, Detention Management, https://www.ice.gov/detain/detention-management (providing ICE detention statistics for FY 2021).
[98] *See* August 16, 2017 SDC, Policy 19-100, Inmate/Resident Work Programs (CCBVA0000003947).
[99] *See* SDC Detainee Handbook Supplement (CCBVA0000000244).

Handbook Supplement conforms with ICE detention standards and CoreCivic's contractual requirements. [100]

59. ICE's VWP is intended to be a voluntary. CoreCivic's policies and practices have led to a VWP that, in my opinion, does not comply with ICE detention standards' requirement of voluntariness. Whereas ICE requires that CoreCivic shall provide detainees the opportunity to participate in a VWP,[101] CoreCivic is operating SDC and the VWP in a way that likely compels detainees to work.

### 1. *CoreCivic Violates ICE's Prohibition on Punishing Detainees for Refusal to Work*

60. PBNDS 3.1 Disciplinary System requires a disciplinary system that promotes a fair and equitable system of justice.[102] Based on my review of documents and testimony provided in this case, it appears that CoreCivic routinely disregards PBNDS 5.8 Voluntary Work Program and 3.1 Disciplinary System because CoreCivic misuses the discipline process to punish or threaten to punish individuals who refuse to work. These violations manifest in CoreCivic's apparently arbitrary application of certain offense codes, including 214; CoreCivic's failure to ensure a detained individual's right to due process is met; CoreCivic's use and threatened use of segregation; and CoreCivic's practice of reporting individuals awaiting sick call as refusing to work.

61. SDC staff routinely threaten to punish detainee workers who are unwilling to work double shifts and days off or are unable to work their scheduled shift due to fatigue or illness. These threats have included being sent to segregation.[103]

62. CoreCivic staff also threaten to withhold privileges, including commissary, phone calls, visitation, and outdoor recreation, apparently without the requisite due process embodied in PBNDS 3.1[104] and even when the privilege withheld bears no relationship to the alleged

---

[100] In addition to violating ICE's work program-related detention standards at Stewart, CoreCivic also violates ACA standards for Adult Local Detention Facilities (ADLF), which CoreCivic is required to comply with pursuant to the Stewart IGSA unless an ACA provision conflicts with ICE detention standards in which case, the ICE detention standards always prevails. For the reasons discussed herein, CoreCivic also fails to comply with the ACA's requirement that civil immigration detainees are not required to work. Am. Corr. Ass'n, *Performance-Based Standards for Adult Local Detention Facilities* (4th ed.), Jun. 2006, and 2016 Standards Supplement, 4-ALDF-5C-08.

[101] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 386 (PBNDS 5.8 Voluntary Work Program).

[102] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 218 (PBNDS 3.1 Disciplinary Policy).

[103] *See, e.g.*, Hill Barrientos Decl. at ¶¶7, 13, 28-31; Urbina Rojas Decl. at ¶¶6, 40-44; Bermudez Gutierrez Decl. at ¶¶36-37.

[104] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 218 (PBNDS 3.1 Disciplinary Policy).

misconduct.[105] ████████████████████████████████████
████████████████████████████████████████████
████████████████████████.[106]

63. These practices violate the PBNDS because a detainee worker may only be disciplined for infractions of the disciplinary code, and not for refusing to work or for poor work performance.[107] In my experience, performance deficiencies that cannot be corrected with counseling should be addressed by removing the worker from that detail, but not punishment.

64. CoreCivic abuses the disciplinary charge, 214. Encouraging Others to Participate in a Work Stoppage or Refuse to Work, designated by ICE as a "high" category offense for which detainees may be sentenced to as many as 30 days in segregation.[108] CoreCivic also cites detainees who refuse to work with other violation codes, such as 307 – Refusal to Obey.[109]

65. 

[105] *See, e.g.*, Hill Barrientos Decl. at ¶¶32-33; Urbina Rojas Decl. at ¶¶37, 44; Bermudez Gutierrez Decl at ¶¶35-36.
[106] ██████████████████████████████████ (CCBVA0000230006).
[107] ███████████████████████████ (CCBVA0000189779).
[108] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 228 (listing "high" level offenses and possible penalties, including segregation, loss of privileges (e.g., commissary, recreation, etc.), change in housing, removal from the work program, and loss of job).
[109] *See, e.g.*, ████████████████████████████ (CCBVA0000283036) ████████████████████████████████████████ ██████████████).
[110] █████████████████████████ (CCBVA0000180751).
[111] ██████████████████████ (CCBVA0000058153).
[112] ███████████████████████████ (CCBVA0000190048).

66. It is my opinion that offenses involving punishment as severe as segregation, housing transfer, loss of privileges, and criminal prosecution should be clearly defined and uniformly applied. That does not appear to be the case at SDC with regard to violation 214 for "work stoppage or refusal to work" or 307 for "refusal to obey," likely resulting in disciplinary charges against detainees who simply refuse to work.[113]

67. Based on my review of the documents and testimony provided in this matter, there appears to be no mechanism for detainees to "resign," and there is no termination in good standing. The absence of a process by which to quit the VWP likely results in more detainees being disciplined for refusing to work. Detainees are also not informed whether they may request reassignment, how to withdraw from the program in good standing,[114] or the bases for their removal. PBNDS 5.8 provides a detainee may be removed from a work *detail* but not the work program for cause, specifically unsatisfactory performance, disruptive behavior, threats to security, etc., physical inability to perform essential elements due to a medical condition or lack of strength, prevention of injuries to the detainee, and/or a removal sanction imposed by the disciplinary panel for an infraction of a related facility rule, regulation or policy.[115] Effective December 2016, ICE amended PBNDS 5.8 adding that a detainee may grieve to the local ICE Field Office Director (FOD) or the Facility Administrator his removal from the program if he believes it was unfairly decided in violation of PBNDS 6.2 Grievance System.[116] ▮▮▮▮▮▮▮▮.[117] And neither SDC's Detainee Voluntary Work Program Agreement, Detainee Job Request Form, nor its Voluntary Kitchen Work Program form,[118] informs detainees of their right to appeal, nor does the ICE Detainee Handbook or SDC's Supplemental Handbook address requests for work reassignments, resignations in good standing or the reasons for removal from a work detail.

---

[113] Troy Pollock Deposition Transcript (Sept. 30, 2021) at 148:18-149:8 (defining "work stoppage" as, "When a detainee or group of detainees refuse to go to work, stop working," including even when "a single detainee stops working."); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Droudred Blackmon Deposition Transcript (Oct. 14, 2021) at 43:14-44:6 (defining "work stoppage" as "one or – or several offenders encouraging others, telling them that they – they cannot – that we're not going to go working").

[114] *See* Hill Barrientos Decl. at ¶24.

[115] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 388 (PBNDS 5.8 Voluntary Work Program).

[116] *Id.* at 394 (PBNDS 6.2 Grievance System).

[117] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (CCBVA0000195784).

[118] Detainee Job Request Form (CCBVA0000004676); Detainee Voluntary Work Program Agreement (CCBVA0000190452).

68. ==I also reviewed documents showing that CoreCivic staff reports detainees waiting for sick call as having refused to work.[119] Detainees have the right to request healthcare and SDC has the responsibility to provide it. Misrepresenting detainees' access to care to which they are entitled as refusals to work is a violation of PBNDS 4.3 Medical Care.[120]==

69.  PBNDS 2.2 Custody Classification System requires all security assessments shall be based on objective, verifiable information, not personal opinion.[122]

70. CoreCivic's abuse of the disciplinary process to compel work also impacts, or threatens to impact, detainees' conditions of detention and their immigration proceedings by driving up their custody classification level. Each sustained disciplinary infraction in detention involving violence or behavior representing a threat to the facility adds two points to detainee's custody score.[123]

71. A low custody detainee may have no more than a total score of two points; a medium-low custody detainee, a total of three to five points; a medium-high custody detainee, no arrests or convictions for a violent offense and a total score of six to 11 points or an arrest or conviction for a violent offense and a total score of zero to six points; and a high custody detainee, no arrests or convictions for a violent offense and a total score of 12 or more points or an arrest or conviction for a violent offense and a total score of seven or more points.

---

[119] ████████████████████████████ (CCBVA0000189988); *see also* Hill Barrientos at ¶¶17, 18.

[120] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 261 (PBNDS 4.3 Medical Care) ("This detention standard ensures that detainees have access to appropriate and necessary medical, dental and mental health care, including emergency services . . . Detainees shall be able to request health services on a daily basis and shall receive timely follow-up.").

[121] ████████████████████████ (CCBVA0000151705).

[122] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 66 (PBNDS 2.2 Custody Classification System) ("Staff shall reference facts and other objective, credible evidence documented in the detainee's A-file, work-folders, ICE automated records systems, criminal history checks, or other objective sources of information. Relevant considerations include any current criminal offense(s), past criminal offense(s), escape(s), institutional disciplinary history, documented violent episode(s) and/or incident(s), medical information or a history of victimization. Personal opinion, including opinions based on profiling, familiarity or personal experience, may not be considered in detainee classification.").

[123] *Id.* at 71-73 (PBNDS 2.2, Appendix 2.2.A: ICE Custody Classification Worksheet).



72. Over time, SDC erroneously charged a number of detainees who did not report to work with fomenting a work stoppage including those who had a court date, were waiting for sick call, had not been paid for days they had worked, or were too tired after working more than PBNDS 5.8 allows. The change in their designation and custody classification caused them to suffer comparable deprivations.

73. In sum, it is my opinion that CoreCivic misuses the discipline process to punish or threaten to punish individuals who refuse to work by means such as arbitrarily applying certain offense codes, including 214; failing to ensure a detained individual's right to due process is met; using and threatening to use segregation and loss of privileges; and reporting individuals awaiting sick call as refusing to work.

*2. CoreCivic Does Not Comply with ICE's Requirements Regarding VWP Hours, Schedules, and Pay*

74. Based on my review of documents and testimony provided in this case, it appears that CoreCivic routinely violates ICE's detention standards limiting the number of hours and days detainees can work and setting parameters on when and how detainees are paid. It is my opinion that such violations contribute to the involuntary nature of the VWP at SDC because they create an environment where there are virtually no limits on the use of detainee labor.

75. SDC VWP participants frequently work more than a "normal" workday and workweek. Whereas ICE mandates no VWP participant shall work more than eight hours a day and five days a week, many SDC participants routinely work more than one detail a day, double shifts, and six or seven days per week.[125]

---

[124] ███████████████████████████████ (CCBVA0000190048).
[125] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 387 (PBNDS 5.8 Voluntary Work Program).



76. █████████████████████████████████

███████████████████████████████ ████ ███████

77. ICE detention standards require CoreCivic staff at SDC to adhere detainees' work schedules.[127] Based on my review of the documents and testimony provided in this matter, it appears that they often do not. ████████████████████

███████████████████████████████████

███████████████████████████████████████.[128]

78. Trinity staff also fails to adhere to detainee work schedules, in violation of ICE detention standards. ███████████████████████████████

███████████████████████████████.[129]

███████████████████████████████████

██████████████████.[130] ███████████████████

████████████████████████████████

███████████████████████.[131] CoreCivic is frequently unable to provide Trinity with as many detainee workers as it committed. ████████████

███████████████████████████.[132]

███████████████████████████████

██████ ██ █████████████████████

██████ ██ █████████████████████

█████"[133] This practice violates PBNDS 5.8.

79. █████████████████████████████████

████████████████████████████████████

████████████████████████████████

[126] ████ ██████ █████ ███ ██████████ (CCBVA0000190326); ███ ██████ █████ ███ ██████ (CCBVA0000190338).

[127] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 387 (PBNDS 5.8 Voluntary Work Program).

[128] *Id.*; ██████████████████████████████████ (CCBVA0000189928); ████████████████████████████████ (CCBVA0000189905); F████████████████████ ████████████████ CCBVA0000190037); ████████████████████████ (CCBVA0000189749).

[129] ████████████████████████████ (CCBVA0000189770).

[130] ██████████████████████████████████ (CCBVA0000190040).

[131] ████████████████████████████████ (CCBVA0000189855).

[132] *See, e.g.,* ██████████████████████████████████ (CCBVA0000269230).

[133] █████████████████████ █ ████████████████ (CCBVA0000189798).

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
██████████ [134] ████████████████████
████████████████████████████████████████████ [135]

80. CoreCivic does not consistently pay all VWP participants. ICE requires detainees receive monetary compensation for work performed, at least $1 per day. PBNDS 5.8 notes the customary practice is to pay detainees at the end of each workday.[136] CoreCivic's practice is to pay detained workers a day or two after they have completed a shift, and sometimes even later when there is an intervening weekend or holiday.

81. CoreCivic not only requires detainees to work in excess of 40 hours weekly, but it does not pay them all the money they should have earned. ████████████████████████

████████████████████████████████████████████

██████ [137] ████████████████████████████████

████████████████████████████████████████

██████ [138]

82. Additionally, CoreCivic does not pay detainees all the money they earned before they are discharged. PBNDS 5.8 requires every facility ensure all detainee workers are paid in full before their departure.[139] ███████████████████████████



_____

[134] ████████████████████████████████████ (CCBVA0000232829).
[135] ████████
[136] Apr. 2016 ICE ERO, National Detainee Handbook (CCBVA0000000001) at 12.
[137] ████████████████████████ (CCBVA0000196177); *see also* Washburn Dep. Tr. (Dec. 1, 2021) at 250:17-25.
[138] ████████████████████████ (CCBVA0000190040).
[139] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 387 (5.8 Voluntary Work Program).
[140] ████████████████████████ (CCBVA0000198559).



83. CoreCivic improperly compensates some detainee workers with pre-paid phone cards or phone time. ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████.[146] Using pre-paid cards contravenes PBNDS 5.8 which requires detainees' wages are monetary and posted to their accounts timely, affording detainees the opportunity to spend their wages on anything sold in the commissary, send them home, or save them for their release. The phone cards issued at SDC expire in 90 days and cannot be used for anything else at SDC or anywhere other than SDC.

84. CoreCivic also does not timely pay detainee workers. ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████[147]

85. SDC custody staff fail to complete the paperwork so that every detainee is credited for all the shifts or assignments they work and paid in full and on time. ████████████ ████████████████████████████████████ ██████████████████████████████.[149] ████████████████████████████████████████ ████████████████████████████████"[150]

86. CoreCivic also improperly compensates kitchen workers with amenities that are not provided to other workers or the general population. The amenities that only some detainee workers



141 ██████████████████████ (CCBVA0000174272).
142 ████████████████ (CCBVA0000174233).
143 ██████████████████ (CCBVA0000191057).
144 ████████████████████ (CCBVA0000196090).
145 ██████████████████████████ (CCBVA0000118618).
146 ██████████████████ (CCBVA0000152088).
147 *See, e.g.,* ████████████████████████████████ (CCBVA0000197130); ████████████████
████████████████████ (CCBVA0000189950); ██████████████████████████ (CCBVA0000205491).
(CCBVA0000197367); ██████████████████████████████████ (CCBVA0000189967).
148 ████████████████████████████ ██ ████████ (CCBVA0000189967).
149 ████████████████████████████ (CCBVA0000189923).
150 ████████████████████████████████ (CCBVA0000197851).

24

have had include video games, additional televisions (TVs), movies and passive recreation activities – puzzles, cards, board games, and art supplies, keeping the TVs on during count, and the opportunity occasionally to order take-out food with funds from their individual commissary accounts.[151] In my experience, ordinarily, if amenities such as these are available, anyone whose institutional conduct is good or who participates in programming would have access to them. Enrollment in the VWP, much less an assignment to Food Service only, should not be the basis for eligibility. It is my opinion that good institutional conduct –which in the context of immigration detention is maintaining one's immediate space around their bed, good hygiene with adequate supplies, and complying with facility rules –should be the basis to partake in amenities facility-wide, not participation in the VWP.

87. These violations of ICE's requirements that detainee workers be paid monetarily and timely, that they not be permitted to work 40 hours per week, and that their work schedules be set and adhered to contribute to the involuntary nature of the VWP at SDC.

*3. CoreCivic Does Not Comply with ICE's Limitations on the VWP Eligibility Based on Classification Level*

88. To help ensure the maximum number of detainee workers, CoreCivic uses higher custody detainees at SDC to fill labor shortages despite ICE classification restrictions. ICE established custody classification and the specific job requirements as the primary factors in hiring a detainee as a worker. PBNDS 5.8 states, "Generally, higher custody detainees shall not be given work opportunities outside their housing unit."[152] PBNDS 2.2 Custody Classification System is more direct and restrictive, "High custody detainees shall not be assigned work duties outside their assigned living areas."[153] PBNDS 2.2 states explicitly high custody detainees are considered high-risk, require medium- to maximum-security housing, must always be monitored and escorted, and may not be co-mingled with low custody detainees.[154]

---

[151] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (CCBVA0000189876); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (CCBVA0000189801); Washburn Dep. Tr. (Dec. 1, 2021) at 251:24-253:2; Hood Dep. Tr. (Oct. 22, 2021) at 26:20-27:17; Terrance Lane Deposition Transcript (Oct. 5, 2021) at 59:7-22, 61:21-24.
[152] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 386 (5.8 Voluntary Work Program).
[153] *Id.* at 68-69 (2.2 Custody Classification System).
[154] *Id.*

| Table 2. SDC ADP by Custody Classification & ALOS, FFY 2019, FFY 2020, FFY2021[155] | | | | | |
|---|---|---|---|---|---|
| **FFY2019** | | **FFY2020** | | **FFY2021** | |
| **Average Length of Stay (ALOS) in days** | | | | | |
| 45 days | | 51 days | | 60 days | |
| **Average Daily Population (ADP) by Custody Classification** | | | | | |
| 1,150 low custody (60%) | 1,46 5 (77 %) | 613 low custody (45%) | 869 (64 %) | 389 low custody (51%) | 487 (64%) |
| 315 low-medium (17%) | | 256 medium-low (19%) | | 98 low-medium (13%) | |
| 238 medium-high (12%) | 446 (23 %) | 254 medium-high (19%) | 482 (36 %) | 131 medium-high (17%) | 281 (36%) |
| 208 high (11%) | | 228 high (17%) | | 150 high (19%) | |
| 1,911  (100%) | | 1,351 (100%) | | 768 (100%) | |

Table 2: The darker shaded areas highlight the numbers and percentages of lower risk detainees. The lighter shaded areas highlight the numbers and percentages of higher risk detainees. Ordinarily, ICE only allows lower custody detainees to work outside their housing units.

89. CoreCivic depends on higher custody detainees to fill many of its work slots regardless. As Table 2 illustrates, SDC's census and distribution of detainees by custody classification varies over time, impacting both the population's overall average length of stay and the availability of lower custody detainees to work outside their housing units, and especially in Food Service.

90.  Current conditions increase the likelihood that CoreCivic will continue to comingle lower and higher custody detainee workers. Although there are fewer eligible workers available now than before due to a population decrease at SDC,[156] CoreCivic still depends upon detainees to do its work.



[155] Dep't of Homeland Sec., Immigr. and Customs Enf't, *Detention Management*, https://www.ice.gov/detain/detention-management (providing ICE detention statistics for FY 2019 through 2022).
[156] *See supra* Table 1.
[157]                                                    (CCBVA0000179848).
[158]
(CCBVA0000217508).
[159]                                                  (CCBVA0000230006).

91. 

92. In my opinion, CoreCivic violates ICE's limitations on VWP eligibility based on classification level. With a waiver from ICE permitting high-custody detainees to work in the kitchen, CoreCivic continued to violate ICE standards by comingling detainees of varied custody levels. These violations help to guarantee the maximum number of detainee workers at SDC.

### *4. CoreCivic Does Not Comply with ICE's COVID-19 Restrictions on the VWP*

93. CoreCivic has also failed to comply with ICE's limitations on the VWP during COVID-19. Early in March 2020, the World Health Organization declared SARS-CoV-2, also known as COVID-19, a global pandemic. Later that month, the CDC issued its first Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (CDC Guidance).[167] In April 2020, ICE issued its Pandemic Response Requirements (PRR), Version 1.0, to implement the CDC Guidance. ICE issued its most recent version, Version 7.0, in October 2021. According to the PRR, SDC, a dedicated detention facility, must comply fully with PBNDS 2011 (rev. 2016) and CDC's Guidance. CoreCivic admits it has failed to comply with the PRR's modifications to PBNDS 5.8 at SDC.[168]



---

[160] ████████████████████ (CCBVA0000240744).

[161] ████████████████████ (CCBVA0000247234).

[162] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 196 (PBNDS 2.14 Tool Control).

[163] ████████████████████ (CCBVA0000190347); *see also* ████████████ (CCBVA0000326945) (████████

[164] ████████████ (CCBVA0000118690) at 4.

[165] ████████████ (CCBVA0000118634) at 4.

[166] ████████████ (CCBVA0000271041)

[167] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[168] Washburn Dep. Tr. (Dec. 1, 2021) at 232:23-236:6.

94. ICE/ERO Pandemic Response Requirements Version 1.0.[169] In April 2020, ICE suspended Voluntary Work Assignments for detainees assigned to food service. 

.[170]

95. ICE/ERO Pandemic Response Requirements Version 2.0.[171] In June 2020, ICE suspended any other VWP assignment that could not be performed with the requisite six feet of social distancing and directed all detainee workers wear appropriate PPE during work hours. ICE also prohibited detainees in medical isolation or quarantine from participating in the VWP.



96. ICE/ERO Pandemic Response Requirements Versions 3.0 through 7.0 were released between July 2020 and October 2021. Each version of the PRR has provided that the previous provisions concerning the VWP remain in full force and effect.[177] Version 7.0 remains in effect. CoreCivic has continued to disregard ICE's instruction.



[169] ICE ERO PRR, Ver. 1, Apr. 10, 2020 (PLS_0005022).

[170] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (CCBVA0000197242); *see also* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (CCBVA0000189927) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

[171] ICE ERO, *COVID-19 Pandemic Response Requirements*, Ver. 2 (Jun. 22, 2020,), *available at* https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v2.pdf.

[172] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (CCBVA0000263419).

[173] *See* Appendix D, Table 3 (SDC Detainee VWP Assignments).

[174] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (CCBVA0000204245); *see also* ▓▓▓▓▓▓▓ (CCBVA0000204245).

[175] ▓▓▓▓▓▓▓▓ (CCBVA0000197463).

[176] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (CCBVA0000197242); ▓▓▓▓▓▓▓ (CCBVA0000262444).

[177] ICE ERO PRR, Ver. 7, Oct. 19, 2021 (PLS_0005040). All versions of ICE's PRR available at https://www.ice.gov/coronavirus/prr.

**Table 3. SDC Detainee VWP Assignments**

| | Number Detainee Worker Positions by Date | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ▋ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▋ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▋ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▋ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▋ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▋ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▋ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▋ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▋ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▋ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▋ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▋ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▋ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▋ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▋ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▋ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▋ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |



| ███ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
|---|---|---|---|---|---|---|---|---|
| ███ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ███ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ███ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ███ | | | | | | | | |
| ███ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |

Table 3: ████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

97. SDC has had the sixth greatest number of detainees with confirmed cases of COVID-19 – 1,077 – and suffered four deaths, more detainee deaths than any other facility to date.[187] ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████.[188] ███████████████████████████████████████ CoreCivic's inability to operate a viable VWP preceded COVID-19, and it will continue to plague CoreCivic and the people in their custody unless substantive changes to the program are made.

98. In sum, at SDC CoreCivic repeatedly violates ICE's requirements related to the VWP. CoreCivic's continual failure to remedy these requirements, intended to ensure the voluntariness of the VWP, strongly suggests the program is run in a manner that is not voluntary, but rather is compulsive. These issues also amount to violation of CoreCivic's agreement with ICE and its obligation to all the detainee workers in its custody.

## C. CoreCivic persists in these practices because ICE's oversight of SDC's activities and outcomes is inadequate.



[184] ██████████████████████

[185] ████████████████████████████████

[186] ████████████████████████████████████████████████

[187] ICE, COVID-19 ICE Detainee Statistics by Facility, Dec. 16, 2021, https://www.ice.gov/coronavirus#detStat.

[188] ███████████████████████████████████████████ (TRINITY00000396) at 11-12; ██████████████████████████████████ (CCBVA0000117636) at 10.

99. Based on my review of past SDC audits and experience at DHS evaluating ICE's oversight mechanisms, including Nakamoto and ODO audits, ICE's oversight of CoreCivic is deficient. CoreCivic is well aware of the deficiencies in ICE's oversight, which provides them the confidence to violate ICE detention standards.

100.   ICE monitors the majority of detention facilities for compliance with its detention standards by several means; primarily (a) a cursory annual inspection of facilities with a daily average of ten or more detainees by the Nakamoto Group, Inc. (Nakamoto), a private firm with which ICE contracts on behalf of ERO, (b) on-site agency monitors assigned by the Office of Detention Oversight (ODO), another office within ICE but outside of ERO, to its largest facilities and itinerant monitors to some of the others, and (c) more in-depth inspections also by the ODO. Individually and collectively, these measures do not suffice.

101.   Nakamoto conducts what appears to be a cursory review of an unidentified portion of some detention standards and rarely identifies any deficiencies. ███████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████.[189] In 2020, Nakamoto did not identify any components that did not meet the standards.[190] In 2021, it identified just one deficiency in Correspondence and Other Mail, which it failed to discuss.[191] In each of these three years, Nakamoto merely concluded SDC "Meet Standards." Members of Congress have expressed concern about Nakamoto's apparent misrepresentation of conditions and underreporting of violations and continue to monitor its activities. A number of U.S. Senators corresponded with Nakamoto,[192] and the House Committee on Homeland Security convened several hearings about ICE's oversight, one of which concerned Nakamoto.[193] Based on my review of Nakamoto's audit reports, Nakamoto's audit tools do not look at CoreCivic's compliance in practice with ICE detention standards as they relate to

---

[189] ██████████████████████████████████ (CCBVA0000150721); ███████████████████████ (CCBVA0000150227) at 3.

[190] 2020 Nakamoto Audit (ICE-Barrientos-0534).

[191] 2021 Nakamoto Audit Cover Letter, *available at* https://www.ice.gov/doclib/facilityInspections/StewartDetCtrGA_CL_05-06-2021.pdf; 2021 Nakamoto Detention Review Summary Form, *available at* https://www.ice.gov/doclib/facilityInspections/StewartDetCtrGA_SIS_05-06-2021.pdf.

[192] Correspondence, Members of U.S. Senate to Jennifer Nakamoto, Nov. 15, 2018, https://www.warren.senate.gov/imo/media/doc/2018-11-16%20Letter%20to%20Nakamoto%20Group%20re%20ICE%20Detention%20Facility%20Inspections.pdf.

[193] U.S. House of Representatives Homeland Security, Oversight, Management and Accountability Subcommittee, Hearing on Oversight of ICE Detention Facilities: Is DHS Doing Enough? Sep. 26, 2019, https://homeland.house.gov/oversight-of-ice-detention-facilities-is-dhs-doing-enough.

the VWP. Rather, the audit tools look at whether CoreCivic has policies that on their face comply with ICE detention standards.[194]

102.    In contrast, ODO has developed a reputation for much better assessments of facilities and identification of substantive deficiencies, each of which is described in some detail. In 2019, ODO identified 29 deficiencies at SDC including two concerning food service, two about environmental health and safety, one concerning personal hygiene, one concerning staff-detainee communication, and one regarding the grievance system, two about detainee funds and personal property, and one about its special management units. In 2020, ODO identified four deficiencies, two concerning admission and release practices, and two concerning SDC's use of custody classification.[195] █████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████.[196] Still, in many instances, ODO does not go far enough, confirming many but not all components of standards are incorporated in providers' policies and not checking to ascertain the extent to which they are faithfully executed. Additionally, ICE allocated just enough staff to inspect most facilities once every three years since its inception in 2009. Only recently has ODO been able to return to at-risk facilities, including SDC, the following year. ODO's number of onsite monitors is still too limited, however, to ensure all deficiencies are detected and every facility makes all the changes they committed to make. ICE also fails to follow-up on identified deficiencies and to hold its Field Offices and detention facilities accountable for correcting them.

103.    In 2014, the U.S. Government Accountability Office (GAO) analyzed ICE's inspection reports and concluded Nakamoto's results differed appreciably from those of the ODO.[197] ICE acknowledged that it had not considered the differences in their findings and admitted it did not know how reliable the information was it had collected.[198] The GAO urged ICE to assess the information it had collected. ICE continues to produce inexplicably uneven outcomes.

104.    In 2018, the DHS Office of Inspector General (OIG) revisited the efficacy of ICE's oversight and concluded that despite the addition of ODO's on-site monitors, conditions of

---

[194] *See, e.g.*, 2019 Nakamoto Audit Report (CCBVA0000006060) at 26, 146-48.
[195] 2020 ODO Audit Report (CCBVA0000150206) at 6.
[196] ████████████████████ (CCBVA0000150947) at 6.
[197] Gov't Accountability Office, *Immigration Detention, Additional Actions Needed to Strengthen Management and Oversight of Facility Costs and Standards, GAO-15-153* (Oct. 2014), *available at* https://www.gao.gov/assets/gao-15-153.pdf.
[198] *Id.*

detention had not improved materially, with some deficiencies remaining unaddressed for years.[199]

105.    In 2019, the OIG followed up with another report, and concluded ICE failed to use contracting tools to hold facility providers accountable for their unacceptably poor performance.[200] The OIG noted in particular that ICE repeatedly failed to include a Quality Assurance Surveillance Plan (QASP) in most of its detention contracts, requiring facilities to meet performance standards or be penalized. At the time, SDC was only one of 28 contracts with a QASP, a provision ICE could have used to deduct as much as 20 percent each of SDC's monthly invoice for non-compliance with safety, security, and care provisions in PBNDS, and as much as 10 percent each for non-compliance with order, activities, justice, administration and management, workforce integrity, and detainee discrimination provisions; all told, 100 percent of the monthly invoice.[201] Between October 1, 2015, and June 30, 2018, ICE imposed financial penalties on only two occasions, despite ODO documenting thousands of instances of facilities' failures to comply with detention standards. Instead, the OIG concluded, rather than holding facilities such as SDC accountable by imposing financial penalties, ICE issued waivers to ameliorate deficient conditions, as when ICE issued SDC a waiver to use higher custody detainees as workers several years after the fact. The OIG also noted ICE had failed to put in place a formal policy and procedures to govern its waiver process, so it continues to operate today without checks and balances, allowing officials without clear authority to grant waivers to continue to do so and once in place, operate indefinitely without any periodic review.[202] ███████████████████████████████ ████████████████████████████████████████ [203] ████████████████████.

106.    In 2021, the GAO prepared a Report to the House of Representatives' Committee on Homeland Security, at the Chair's request, assessing in part, the extent to which ICE had overseen and enforced the terms and conditions of detention facility contracts and

---

[199] DHS Office of Inspector Gen'l, *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements* (Jun. 26, 2018), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf.

[200] DHS Office of Inspector Gen'l, *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards* (Jan. 29, 2019), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf.

[201] June 12, 2013 IGSA Mod. with Quality Assurance Surveillance Plan with Performance Requirements (CCBVA000000368) at 4-12.

[202] DHS Office of Inspector Gen'l, *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards* (Jan. 29, 2019), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf.

[203] ██████████████████████████████████████████████████████████████████ (CCBVA0000217508).

agreements.[204] ICE relies on Contracting Officer's Representatives (CORs), its purchasing agents, to oversee detention contracts and agreements. The CORs, of which there are relatively few, are assigned to some of ICE's 24 Field Offices and report to that Field Office Director, not to ICE Headquarters, thereby curtailing their independence, which is necessary for effective oversight. The GAO identified numerous occasions when a FOD bypassed the COR thereby limiting their ability to use contract enforcement tools. Sometime before, in 2014, the GAO had recommended ICE develop protocols to guide CORs in issuing discrepancy reports and imposing appropriate financial provisions where those providers' contracts allow, but ICE has not followed through on those recommendations.[205]

107.    ICE is comprised primarily of law enforcement personnel with extensive expertise performing removal functions, but not in the day-to-day administration of detention facilities.[206] ICE prefers removal to relief and relies on detention as the most expeditious way to remove the people in its custody. In my opinion, based on my experience and review of past audits, CoreCivic is well aware of the deficiencies in ICE's oversight, which provides them the confidence to engage in violations of ICE detention standards, ensuring maximum participation in the VWP.

## IV.    CoreCivic Relies on Detainee Labor to Perform Essential Operations at SDC

108.    CoreCivic relies on detainee labor to perform essential operations at SDC. CoreCivic's staffing policies and practices are evidence that CoreCivic structures the VWP in such a way to ensure low labor costs and maximum profit. These policies and practices include chronic understaffing, lengthy staff vacancy periods, employing almost as many detainees as detention staff, failure to train and adequately supervise and oversee detainee workers, and structuring the VWP to ensure detainees are performing the majority of the non-custodial tasks necessary to operate the facility.

109.     ,[207]

---

[204] Gov't Accountability Office, *Immigration Detention: Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts* (Jan. 2021), *available at* https://www.gao.gov/assets/gao-21-149.pdf.

[205] Gov't Accountability Office, *Standards for Internal Control in the Federal Government* (Sep. 2014), *available at* https://www.gao.gov/assets/gao-14-704g.pdf.

[206] Dora Schriro, Dep't of Homeland Sec., Immigr. and Customs Enf't, *Immigration Detention Overview and Recommendations* (Oct. 6, 2009), *available at* https://www.ice.gov/doclib/about/offices/odpp/pdf/ice-detention-rpt.pdf.

[207] ▮▮▮▮▮▮▮▮▮▮▮ (CCBVA0000105880).



110.

111.

112.



[208] *Id.*
[209] ████████████ (ICE-Barrientos-6429).
[210] ████████████ (ICE-Barrientos-6428).
[211] ████████████ (ICE-Barrientos-6426).
[212] ████████████ (CCBVA0000280787- CCBVA0000280801).



**Table 4. SDC's Staffing Plan[213]**

113. ████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████

114. ████████████████████████████████████████████████
████████████████████████.[218]████████████████████
████████████████████████████████████████████████

[213] ████████████████████████████████ (CCBVA0000105880) at 4-7.

[214] ████████████████████████████████████████████

[215] The four Warehouse Supervisor and Warehouse/Commissary workers are CoreCivic employees. CoreCivic pays their salaries with commissary profits. *See* Brazier Dep. Tr. at 232:23-233:4.

[216] All food service staff are Trinity personnel.

[217] For a portion of the class period, ICE Health Services Corps provided medical services and medical staffing at SDC. CoreCivic began providing medical services and staffing at SDC around 2018. *See* Washburn Dep. Tr. (Dec. 1, 2021) at 82:2-18.

[218] ████████████████████████████████████ (CCBVA0000105880) at 4-7.



115.   CoreCivic has not adequately addressed SDC's requisite staffing levels, even though options exist to do so.  CoreCivic sited SDC in a remote location with a limited eligible workforce,[219]

[220] [221]

CoreCivic chooses not to pay more than the minimum.

SDC cannot compete with other employers in the area, certainly not for the most qualified candidates.

116.   CoreCivic could close the gap with recruitment efforts such as incentives and higher wages

[223]

---

[219] *See* Feb. 13, 2017 DHS OIG Detention Oversight 16-047-ISP-ICE (PLS_0004625) (noting that "Stewart has challenges due to isolated location, which affects a host of issues –understaffing in the ranks of CoreCivic staff, understaffing and turnover amount ICE ERO staff, and long distance for outside medical care").
[220]
[221]

[222]
[223] .
[224] *See* (CCBVA0000258428, CCBVA0000258432).

117.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮

118.  CoreCivic's staffing policies and practices also indicate a systemic failure to oversee the
VWP and reveal just how much labor CoreCivic expects from the detainee workforce as
compared to staff. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

119.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮[225]



| Table 5. Overview, SDC's Detainee VWP[226] | | | | |
|---|---|---|---|---|
| **Detainee Work Assignments** | **Slots** | **Work locations** | **Designated Wk. Supervisors**[227] | **Dedicated DOs** |
| ▮▮▮▮▮▮▮ | ▮ | ▮▮▮▮▮▮▮▮▮ | ▮▮▮▮▮▮▮▮▮▮ | ▮ |
| ▮▮▮▮▮ | ▮ | ▮▮▮▮▮ | ▮▮▮▮ | ▮▮▮ |
| ▮▮▮▮▮▮ | ▮ | ▮▮▮▮ | ▮▮ | ▮ |
| ▮▮▮ | ▮ | ▮▮▮ | ▮ | ▮▮▮ |
| ▮▮▮ | ▮ | ▮ | ▮ | |
| ▮▮ | ▮ | ▮▮ | | ▮▮▮ |

Table 5: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[225] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 64 (PBNDS 2.2 Custody Classification System).
[226] SDC Classification Housing, Work, and Program Plan, Policy 18-100 (CCBVA0000003918).
[227] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (CCBVA0000105880) at 4-7.

120.   ████████████████████████████████████████████
████████████████████████████████████████
██████████ .

121.   ███████████████████████████████████████
████████████████████████████████████████
███████████████████████████

122.   CoreCivic's selection, training, and supervision of detainee workers do not suffice. There is too much activity, too little oversight, and no opportunity for quality control. ████████
████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████ ²²⁸ ███████████████████████████
█████████████████████████████████████████████████
███████████████████████████ ²²⁹

123.   The consequences are measurable, substantive, and reoccurring. The GAO, OIG, and ODO all documented SDC's failure to sustain a smoothly operating, safe and sanitary facility.

124.   CoreCivic supplants SDC's civilian workforce as well as that of Trinity's with detainee workers, further lowering CoreCivic's overall fixed costs. ICE leaves the overall number and positions filled by VWP to CoreCivic's discretion. CoreCivic, in turn, structures the VWP to ensure detainee workers are fulfilling the vast majority of the tasks required to operate the facility. For example:

   a.   ████████████████████████████████████████████

   b.   Detainee porters perform all of SDC's routine cleaning and sanitation facility-wide, except a few areas such as ICE offices, ████████████████████████████████
████████████

   c.   Detainee commissary workers unload the trucks, stock the shelves, and fill detainee orders. Proceeds from detainees' commissary purchases are used to pay the salaries and benefits of SDC's three civilian commissary/warehouse workers.

   d.   Detainee "barbers" cut all the detainees' hair.

   e.   Detainee laundry workers staff SDC's laundry.

---

²²⁸ ███████████████████████████████████████ (CCBVA0000197851).
²²⁹ ███████████████████████████████████████ (CCBVA0000189907).

     f.   Special Details of detainee workers periodically wax and buff the floors, paint SDC's interior, and perform scheduled and emergency maintenance and repairs.

125.    Warden Washburn, SDC's current warden and CoreCivic's Fed. R. Civ. P. 30(b)(6) deposition designee, acknowledged that CoreCivic took detainee labor into consideration when negotiating the SDC contract, confirming that CoreCivic's evaluation of the profitability of SDC factored in the VWP as a labor source.[230]

126.    CoreCivic's dependence on the VWP to staff SDC is exemplified in its efforts to recruit kitchen workers. ███████████████████████████████████████████
████████████████████████████████████████████████ PBNDS 4.1 Food Service requires the number of detainees assigned to the food service department shall be based on a quota developed by the FSA (i.e., the FSD) and approved by SDC's Facility Administrator. The quota shall provide staffing according to *actual* needs and shall eliminate any bias toward over- or understaffing.[231] ████████████████████████████████
███████████████████████████████."[232]

127.    Food Service detainee work assignments are often some of the most difficult jobs to fill. The first shift begins before dawn and the second shift ends after dark with first shift kitchen workers expected to rise at 2 a.m. and the second shift not expected to return to their housing unit before 6 p.m. The day is long especially for those who work a double shift or on their days off, the kitchen is hot, and there is little downtime during workday. Their meal is the same as the main line, a diet designed for sedentary adults, and they must wait to the end of their shift to eat after everyone else was fed.

128.    Overall, the civilians and custody staff assigned to Food Service at SDC appear ill-suited for their assignments. ██████████████████████████████████████
██████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████████████████████████████.[233]

---

[230] Washburn Dep. Tr. (Dec. 1, 2012) at 39:15-23.

[231] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 255 (PBNDS 4.1 Food Service).

[232] ████████████████████████████████████████(CCBVA0000057548).

[233] ████████████████████████████(CCBVA0000058153); ████████████████████████
████████████████████(CCBVA0000060146).

129.    In an effort to attract and retain detainees under these conditions, CoreCivic set aside designated housing units for kitchen workers with some amenities not available to other workers or the rest of the population, amenities purchased with detainee commissary profits. Remaining in that housing unit is conditioned upon continuing to work in Food Service, as many hours a day and days a week as directed.

130.    To be clear, CoreCivic, not SDC's detainee workers, is the beneficiary of SDC's VWP, especially with regard to Food Service where its labor costs are significant. ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ .[234]

131.    In sum, it is my opinion that CoreCivic created an inordinately large VWP at SDC as a substitute for adequate staffing.

## V.    It Is CoreCivic's Policy to Deprive Detained Individuals of Basic Necessities, Which Is a Practice that Helps to Ensure the Maximum Number of Participants in SDC's VWP

132.    ICE does not require detention facilities to operate a commissary[235] and has not issued a detention standard to guide commissary operations.[236] The only instruction ICE has given with regard to these activities, is to detainees, "You do not have to buy anything if you do not want to."[237] Based on my review of the documents and testimony provided in this litigation, ICE's instruction is not in practice at SDC. CoreCivic's failure to provide affordable and adequate necessities likely contributes to the VWP's lack of voluntariness.

133.    Detainees cannot count on CoreCivic to provide them with all the items that ICE requires each facility issue to every detainee at intake and thereafter, on an as needed basis throughout their detention, notably, serviceable clothing, timely replacement of hygiene items, adequate food, and basic medical supplies. It is also important to note, detainees have no other means to obtain these necessities directly from family and friends or by mail order. Whereas many correctional systems allow inmates to purchase items from a mail order company that meets requisite security practices to prevent the introduction of contraband and will also accept

---

[234] ████████████████████████████████████████ (TRINITY00000396) at 11-12; ████████ ████████████████████ (CCBVA0000117636) at 10.
[235] *See* Apr. 2016 ICE ERO, National Detainee Handbook (CCBVA0000000001).
[236] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 342 (PBNDS 5.1 Correspondence and Other Mail).
[237] Apr. 2016 ICE ERO, National Detainee Handbook (CCBVA0000000001) at 12.

changes of clothes and shoes for court appearances, CoreCivic has made no provision for detainees to receive packages other than legal mail.[238] Thus, absent a commissary, detainees cannot acquire any of these items by any other means.

134.    Both Trinity and CoreCivic benefit from minimizing food service costs. Trinity's cost to prepare a meal has two components, the food and its preparation. ███████████████████████████████████████████████████████████████████████████████████████████████████████[239]█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[240]███████████████████████████████████████████ Cost saving measures, especially detainee labor, matter. ████████████████████████,[241]████████████.[242]

135.    Nearly every detainee I spoke with during the site inspection and the Named Plaintiffs report experiencing hunger at SDC.[243] ███████████████████████████████████████████████████████████████████████████████████████████████.[244]

---

[238] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 337 (PBNDS 5.1 Correspondence and Other Mail); Apr. 2016 ICE ERO, National Detainee Handbook (CCBVA0000000001) at 10; SDC Detainee Handbook Supplement (CCBVA0000000244) at 29-30.
[239] ███████████████████████ (CCBVA0000149722).
[240] ████████████████████ (ICE-Barrientos 0012201); █████████████ (CCBVA00000196386).
[241] █████████████████████ (CCBVA0000117636) at 5.
[242] *Id.* at 24 (████████████████████████████████████████████████████").
[243] *See* Hill Barrientos Decl. at ¶3; Bermudez Gutiérrez Decl. at ¶¶15, 19, 20; Urbina Rojas Decl. at ¶12.
[244] ████████████████████████████ (CCBVA0000106555, CCBVA0000106561, CCBVA0000106566, CCBVA0000106572, CCBVA0000106578, CCBVA0000106584).

136.  ███████████████████████████████████████████████████████████
██████[245] PBNDS 4.5 Personal Hygiene requires in part, all newly admitted detainees shall
be issued clean indoor and outdoor, temperature appropriate, size appropriate, presentable
clothing during in-processing at no cost to the detainee. The standard issue of clothing is at
least two uniform shirts and two pair of uniform pants or two jumpsuits, two pairs of socks,
two pairs of underwear, and one pair of facility-issued footwear. Additional clothing shall be
issued as necessary for changing weather conditions or as seasonally appropriate.[246] Staff
shall also provide detainees personal hygiene items appropriate for their gender including at a
minimum one bar of bath soap (or equivalent), a comb, tube of toothpaste, toothbrush, bottle
of shampoo (or equivalent), and a container of skin lotion, and shall replenish supplies as
needed. ICE also admonishes that the distribution of hygiene items shall not be used as
reward or punishment.[247] In fact, the clothes that CoreCivic issues detainees at SDC are not
serviceable. Most articles are worn, the fabric is threadbare, and elastic waistbands have lost
their elasticity.[248] Moreover, CoreCivic does not issue t-shirts or jackets, and the facility is
kept quite cool. Toiletries are travel-sized, only large enough to last several days, and the
products themselves are inferior; that is, the soap, shampoo, and toothpaste do not work well
so that it requires more of the product to achieve the intended result.

137.  Detainees also must pay just to speak to loved ones while at SDC. Collect calls are an
option if the recipient is willing and able to accept the call. ███████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
███████████████████.[249] A detainee who earns $2 a day, as most workers do, would have to
work an entire 5-day week to speak with someone on the phone for several minutes.

138.  The commissary purchases are evidence that CoreCivic is not supplying these basic
necessities in adequate quantities or in serviceable forms. ████████████████████████
██████████[250] ███████[251] ██████████████████████████.

[245] ████████████████████████████████████████████ (CCBVA0000106555, CCBVA0000106561,
CCBVA0000106566, CCBVA0000106572, CCBVA0000106578, CCBVA0000106584).
[246] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 308 (PBNDS
4.5 Personal Hygiene).
[247] Id. at 308-09.
[248] Washburn Dep. Tr. (Dec. 2, 2021) at 362:4-21 (testifying that CoreCivic only recently stopped issued used
underwear and socks at SDC).
[249] ████████████████████████████████████████████████████ (SECURUS _000094).
[250] ██████████████████████████████████ (CCBVA0000106584).
[251] Id.

| Table 6: 3-Month Snapshot, SDC Detainee Salaries, January – March 2016[252] | | | | | | |
|---|---|---|---|---|---|---|
| Wages, detainee work assignments | Laundry | Commissary | kitchen | Subtotal, food service, laundry commissary | Subtotal, all other wages | All detainee wages |
| | | | | | | |
| ███ | ███ | ███ | ███ | ███ ███ | ███ | ███ ███ |
| | | | | | | |
| ███ | ███ | ███ | ███ | ███ ███ | ███ | ███ ███ |
| | | | | | | |
| ███ | ███ | ███ | ███ | ███ ███ | ███ | ███ ███ |
| | | | | | | |
| ███ | ███ ███ | ██████ | ███ ███ | ███ | ███ | ███ |

Table 6: ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████

139.   Detainees are not permitted to purchase anything online, and no one outside of SDC is allowed to drop off or mail anything to the facility for detainees other than certain documents by their legal advisor. Detainees' only recourse is the Commissary where all the items that ICE requires SDC provide detainees at no cost, are marked up to 30 percent,[253] the residual proceeds of which, if any, are supposed to be applied to the facility's detainee welfare fund.[254] ████████████████████████████████████████
████████████████████████████████████████████.[255]

140.   In sum, most detainees have no choice but to work to earn enough to purchase essential items available to them only at SDC's commissary.

---

[252] ████████████████████ (CCBVA0000191616) at 9, 14, 15, 17.
[253] Nov. 1, 2013 CoreCivic Inmate/Resident Commissary Operations, Policy 2-6 (CCBVA0000003777) at 2. Stamps are sold at cost. *See* ████████████████████ (CCBVA0000106584).
[254] Nov. 1, 2013 CoreCivic Inmate/Resident Commissary Operations, Policy 2-6 (CCBVA0000003777) at 2.
[255] ████████████████████ (CCBVA0000105880) at 4-7.

## Conclusion

141.    Because CoreCivic fails to operate SDC as ICE intended, it does not achieve the VWP's intended outcomes. Essential facility operations and services are not enhanced. The negative impact of detention is not diminished. There are more disciplinary incidents, most of them arbitrarily imposed, contrary to ICE policy.

142.    Two-thirds of SDC's population is lower custody and has no work restrictions.[256] Ordinarily, facilities cannot create enough jobs to employ all the detainees who would like to work. Instead, CoreCivic created an inordinately large VWP at SDC as a substitute for adequate staffing. It pays more per day, as "much" as $4, more than do most other facilities, to fill many of these slots and offers incentives to some detained workers like extra food, phone time, and dedicated housing units. And still, CoreCivic cannot consistently find and keep enough voluntary workers to fill all its slots. The punitive conditions under which detainees work are so pervasive as to outweigh any of the "incentives" that SDC offers.

143.    Instead of scaling back the number of work slots to the number of eligible volunteers who are interested, and increasing SDC's and Trinity's staffing levels, CoreCivic secured a waiver from ICE allowing high custody detainees to fill VWP slots prohibited by ICE policy and contrary to prevailing safety and security practices. And still, CoreCivic cannot consistently enroll enough volunteers to fill all its detainee work slots.

144.    CoreCivic's policies and practices indicate that it improperly withholds basic necessities, threatens penalties, and imposes punishment. Detainees' workdays and workweeks are long, many of them longer than permitted, their work schedules are continually changing, the work is arduous, the supervisors are overbearing, the threat of punishment is ever present, penalties are imposed with impunity, and the wages are too low to compensate for CoreCivic's failure to provide essential goods and services notably, personal hygiene items, adequate nutrition, and climate appropriate clothes, and to afford phone calls and postage stamps. For now, detainees' only recourse is to continue to purchase these items from the Commissary with the little money they earn.

145.    It is my opinion that CoreCivic operates the SDC contrary to law, ICE detention standards, and its contract with ICE.  Regrettably, this has been all about more "beds," more "bodies," more "bucks."

---

[256] See *supra* Table 1.

I swear under penalty of perjury that the foregoing is true and correct.

Respectfully submitted this 22nd day of December 2021.

_____

Dr. Dora B. Schriro Ed.D., J.D.

# Appendix A

Appendix A

## DORA B. SCHRIRO, Ed.D.  J.D.
### EXECUTIVE EXPERIENCE

*State of Connecticut,* Middletown CT (2014–2018)
**Commissioner,** Department of Emergency Services & Public Protection (2014–2018)
**CT Homeland Security Advisor** (2016–2018), DHS clearance, Top Secret, appointed by Gov. Dannel Malloy
- Responsible for CT State Police, Emergency Management & Homeland Security, Scientific Services, Fire Prevention & Control, Police Officer Standards & Training, Statewide Telecommunications
- FY2018 operating budget, $185M; federal grants, $348M; bond funding, $79M; 1817 employees
- Public Safety & Service, Homeland Security, and Emergency Response, Recovery & Resiliency
- Accomplishments: A Comprehensive Procedural Justice Initiative with body-worn cameras for state police on patrol, a civilian complaint process, 21st century curricula for state & local police, annual reports of uses of force, traffic stops & police pursuits, an investigative protocol for officer-involved shootings, and an ICE-interface protocol; Drug Intervention & Enforcement, equipping all troopers and training first responders to administer naloxone, and convening a dark-web opioid taskforce; and Other Harm Reduction Efforts including a statewide cybersecurity investigative unit and comprehensive gun control

*City of New York,* New York, New York (2009–2014)
**Commissioner,** New York City Department of Correction, appointed by Mayor Michael Bloomberg
- Responsible for adult detention, prisoner processing, and operation of criminal court pens, an average of 12,000 inmates daily and 100,000 pretrial and city-sentenced inmate admissions annually
- FY2014 operating budget, $1.065B, capital budget, $691.9M; 10,440 employees
- Focus: Special Populations; Intake, Classification and Discharge Planning; Staff Accountability; Alternatives to Disciplinary Segregation; Alternatives to Detention
- Accomplishments: 1st U.S. Social Impact Bond funded program, adolescent pre-release initiative; Justice Reinvestment funded pre-release preparation for adults; pre-trial & post-plea diversion for the mentally ill; comprehensive reform of disciplinary segregation with clinical alternatives for special populations; centralized intake with risk & needs classification, gang identification, and discharge planning

*US Department of Homeland Security,* Washington DC (2009–2009)
**Senior Advisor to Secretary on ICE Detention and Removal,** appointed by DHS Sec. Janet Napolitano
**Director, ICE Office of Detention Policy and Planning,** appointed by ICE Asst. Sec. John Morton
- Focus: Design a civil, civil detention system meeting all its health and safety needs and legal requirements
- Authored, *2009 Report on ICE Detention Policies and Practices: A Recommended Course of Action for Systems Reform,* DHS' template to transform immigration detention and alternatives to detention
- Opened the Office of Detention Oversight and within the first 100 days, deployed detention experts to the field, reassigned facility inspections to occur outside of ERO, brought online the detainee locator and death notification systems, undertook review of IHSC, detention standards, and risk assessment, and reduced family detention to under 100 beds

*State of Arizona,* Phoenix, Arizona (2003–2009)
**Department Director,** Arizona Department of Corrections, appointed by Gov. Janet Napolitano
- Responsible for adult corrections and community supervision including 39,000 inmates and 7,200 parolees daily and 55,000 felons annually (21,000 admissions/11,500 case openings)
- FY2009 operating budget, $1.23B; 9,750 employees
- Focus: Systems reform, re-entry, victim services, strategic planning, privatization oversight
- Winner, 2008 Innovations in American Government, and its first prison-based reform awards recipient

*City of St. Louis*, St. Louis, Missouri (2001–2003)
**Commissioner of Corrections**, St. Louis City Division of Corrections, appointed by Mayor Francis Slay
- Responsible for adult detention, prisoner processing, and city probation and parole including 1,500 jail inmates and 2,000 offenders on supervision daily (9,000 admissions/63,000 bookings annually)
- FY2003 operating budget, $68M; 615 employees
- Focus: Population management, alternative sentencing initiatives, staff development
- Opened and operated the city's first combined police prisoner processing and detention center

*State of Missouri*, Jefferson City, Missouri (1993–2001)
**Department Director**, Missouri Department of Corrections, appointed by Gov. Mel Carnahan
- Responsible for adult corrections and probation and parole services including 28,000 prisoners and 65,000 offenders on community supervision daily, 35,000 admissions/72,000 case openings annually
- FY2002 operating budget, $500M; 11,000 employees
- Focus: Systems and sentencing reform, litigation reduction, restorative justice, capital construction
- Winner, Council of State Governments Innovations award program, and Innovations in American Government 1997 Finalist and 1998, 1999 and 2000 Semi-Finalist

*City of St. Louis*, St. Louis Missouri (1989–1993)
**Correctional Superintendent**, St. Louis City Division of Correction, appointed by Mayor Vince Schoemehl
- Responsible for 600 pre-trial and city sentenced inmates, 4,000 admissions annually
- FY1993 operating budget, $26M; 210 employees
- Focus: Court oversight, overcrowding, certified juveniles, community relations

*City of New York*, New York, New York (1984–1989)
**Assistant Commissioner**, New York City Department of Correction, appointed by Mayor Ed Koch
- Responsible for design and delivery of inmate programs services, programs development, grants
- Services provided to 100,000 pre-trial and city sentenced inmates annually by 200 employees
- Focus: Public-funded and accredited education, school-aged inmates; contracts management
**Assistant Deputy Director**, Office of the Mayor, Coordinator of Criminal Justice
- Grants administration, federal and state funded systems reforms, $189M annually
- Focus: Alternatives to detention, intermediate sanctions, policy analysis, applied research

## CONSULTING SERVICES

Dora B. Schriro Consulting Services, LLC (est. 2013), Expert, Corrections and Immigration innovation, evaluation, and advocacy. Clients include the California Department of Justice, Sheriff's Department, Hampton County, Massachusetts, American Civil Liberties Union, Southern Poverty Law Center, Human Rights First, Disabilities Rights California, and St. Louis University School of Law Clinic.

## EDUCATION

St. Louis University, St. Louis, Missouri, Juris Doctorate, School of Law (2002)
Columbia University, New York, New York, Doctor of Education, Teachers College (1984)
University of Massachusetts at Boston, Massachusetts, Master of Education (1980)
Northeastern University, Boston, Massachusetts, Bachelor of Arts cum laude (1972)

## MANAGERIAL PROGRAMS

Council of State Governments, Toll Fellowship (2018)
Harvard University, JFK School of Government, Innovations in Governance (2005)
Harvard University, JFK School of Government, Strategic Public Sector Negotiations (1996)
Harvard University, JFK School of Government, Senior Executives in State and Local Government (1992)

## HONORS AND AWARDS, INNOVATIONS

Innovations in American Government, 2008 Winner, Getting Ready: Keeping Communities Safe
Innovations in American Government, 2000 Semi-finalist, Correcting Corrections
Innovations in American Government, 1999 Semi-finalist, Constituent Services
Innovations in American Government, 1998 Semi-finalist, Pre-Promotional Training
Innovations in American Government, 1997 Finalist, Constituent Services
Council of State Governments, 1998 Innovations Award Winner, Waste Tire to Energy
Council of State Governments, 1997 Innovations Award Regional Finalist, Pre-Promotional Training
Council of State Governments, 1996 Innovations Award Finalist, Constituent Services

## OTHER HONORS AND AWARDS

U.S. Department of Justice, Office for Victims of Crime, Allied Professional Award, 2012
Florida Immigrant Advocacy Center, American Justice Award, 2011
Hofstra University (Hempstead, New York) Presidential Medal, 2010
National Governors Association, Distinguished Service to State Government Award, 2006
Arizona Parents of Murdered Children, Filling Empty Shoes, 2006 Honoree
Farmingdale Public Schools (Farmingdale, New York), Wall of Fame, 2001 Inductee
St. Louis Forum, Trailblazer Award, 2000
Association of Correctional Administrators, Michael Francke Award for Outstanding Leadership, 1999
Jefferson City (Missouri) Ten Most Influential Women, 1998
Missouri Governor Award for Quality and Productivity, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000
Missouri Governor Torch of Excellence Gold Award, 1999
Missouri Governor Torch of Excellence Award, 1997
International Association of Correctional Training Personnel Award, Pre-Promotional Training, 1996
Women's Self-Help Center, Twenty Distinguished Women, 1996
St. Louis (Missouri) YWCA Special Leadership Award for a Government Official, 1995
Jefferson City (Missouri) News Tribune Statesman of the Month, June 1995

## PUBLICATIONS, IMMIGRATION DETENTION REFORM

*On the Other Side of the Looking Glass: COVID-19 Care in Immigration Detention*, MDPI, Soc. Sci. 2021, 10(10)
*Access to Counsel in Immigration Detention in the Time of COVID-19*, ABA Commission on Immigration (2020)
*Weeping in the Playtime of Others: The Obama Administration's Reform of ICE Family Detention Practices,* in Journal on Migration and Human Security, The Law that Begot the Modern U.S. immigration Enforcement System: IIRIRA 20 Years Later (December 2018)
*Women and Children First: An Inside Look at the Impediments to Reforming Family Detention in the U.S.,* in Challenging Immigration Detention, ed. by Flynn and Flynn. Edward Elgar Publishing (September 2017)
*Afterword, Intimate Economies, Anomie and Moral Ambiguity,* in Intimate Economies of Immigration Detention: Critical Perspectives, ed. by Conlon and Hiemstra. Routledge Publishers (2016)
*Improving Conditions of Confinement for Immigrant Detainees: Guideposts toward a Civil System of Civil Detention* in The New Deportation Delirium, ed. by Kanstroom and Lykes. NYU Press (2015)
*Family Immigration Detention: The Past Cannot be Prologue*, ABA Commission on Immigration (2015)

*Envisioning a Civil System of Civil Detention: Our Opportunity, Our Challenge* (Foreword), in Outside Justice, ed. by Brotherton, Stageman and Leyro. Springer Press (2013)
Improving Conditions of Confinement for Criminal Inmates and Immigrant Detainees, American Criminal Law Review, Georgetown University Law Center (Fall 2010)
The 2009 Report on ICE Detention Policies and Practices: A Recommended Course of Action for Systems Reform, U.S. Department of Homeland Security (October 2009)
Rethinking Civil Detention and Supervision, Arizona Attorney (July–August 2009)

PUBLICATIONS, CORRECTIONS REFORM

*Smart and Safe: Making the Most of Adolescents' Time in Detention, the Physical Plant, Our Workforce, and the "What Works' Literature,* in The State of Criminal Justice, American Bar Association (2013)
*Corrections: The Justice-Involved Mentally Ill, A Practitioner's Perspective,* in The State of Criminal Justice, American Bar Association (2012)
*Good Science, Good Sense: Making Meaningful Change Happen – A Practitioner's Perspective,* Criminology & Public Policy, Vol. 11, No. 1, Special Issue (February 2012)
*Is Good Time a Good Idea?* Federal Sentencing Reporter, Vol. 21, No. 3 (February 2009)
*Correcting Corrections: The Arizona Plan: Creating Conditions for Positive Change in Corrections,* Confronting Confinement: A Report of the Commission on Safety and Abuse in American Prisons (2006)
*Missouri's Parallel Universe: Blueprint for Effective Prison Management,* Corrections Today (April 2001)
*Correcting Corrections: Missouri's Parallel Universe,* Papers from the Executive Sessions on Sentencing and Corrections, U.S. Department of Justice, Office of Justice Programs (May 2000)
*Avoiding Inmate Litigation: The 'Show-Me' State Shows How,* Sheriff's Magazine, (March–April 1999)
*Best Practices: Excellence in Corrections,* American Correctional Association (August 1998)
*Reducing Inmate Litigation,* Corrections Today (August 1998)
Corrections Management Quarterly, Issue Editor, Aspen Publications (1997)
Currents, Leadership St. Louis, Danforth Foundation (1992)
*What Makes Correctional Education Educational,* Journal of Correctional Education (September 1986)
Safe Schools, Sound Schools, ERIC Clearinghouse on Urban Education (January 1985)
*What Works with Serious Juvenile Offenders: US Experience,* Juvenile Delinquency in Australia (1984)
What Makes Correctional Education Educational: Ethnography of an Instructionally Effective School, University Microfilm (1983)


STANDARDS, SENTENCING AND RELATED CIVIL-CRIMINAL JUSTICE REFORM ACTIVITIES
Women's Refugee Commission, Commissioner (2012–2021)
American Bar Association, Commission on Immigration, Special Advisor (2019–2021)
American Bar Association, Commission on Immigration, Advisory Board Member (2017–2019)
American Bar Association, Commission on Immigration, Standards for the Custody, Placement and Care; Legal Representation, and Adjudication of Unaccompanied Alien Children in the United States (2018)
U.S. Dept. of Homeland Security, DHS Family Residential Ctr. Advisory Committee, member (2015–2016)
American Bar Association, Commission on Immigration, Commissioner (2014–2016)
American Bar Association, Commission on Immigration, Co-chair, Standing Subcommittee on Punitive Segregation, (2012–2014)
American Bar Association, Commission on Immigration, Civil Detention Standards Task Force (2011–2012)
American Bar Association, Criminal Justice Standards Subcommittee, ACA representative (2005–2008)

Arizona State University School of Law, Sentencing Policy Seminar (2004–2005)
Arizona Attorney General Sentencing Advisory Committee (2004–2008)
St. Louis University School of Law, Instructor, Sentencing Policy Seminar (2000–2002)
Missouri Sentencing Advisory Commission, Vice Chair (1994–2001)
U.S. Department of Justice Executive Sessions on Sentencing and Corrections, in conjunction with Harvard
University JFK School of Government and University of Minnesota Law School (1997–2000)
Partnership for Criminal Justice Workshop, Institute on Criminal Justice, University of Minnesota Law
School, State Partner (1997–2000)
State Sentencing and Corrections Program, Vera Institute of Justice, National Associate (1999–2002)
U.S. Dept. of Justice, Bureau of Justice Assist., Discretionary Grant Program, Peer Reviewer (1994–2002)

## PRE-DOCTORAL EMPLOYMENT, LECTURING AND RELATED EXPERIENCE

Employment
- Executive Director, Planned Parenthood of Bergen County, Hackensack, New Jersey (1983–1984)
- Director, Correctional Education Consortium, Long Island City, New York (1982–1983)
- Supervising Social Worker, Franklin Public Schools, Franklin, Massachusetts (1978–1981)
- Director, Adult and Continuing Education, Franklin Public Schools, Franklin, MA (1978–1981)
- Director, Staff Development, Wrentham State School, Wrentham, Massachusetts (1977–1978)
- Program Administrator, Medfield-Norfolk Prison Project, Medfield, Massachusetts (1974–1976)

Academic Experience
- Instructor, Arizona State University School of Law, Corrections Law Seminar (2005–2008)
- Instructor, St. Louis University School of Law, Sentencing Policy (2000–2002)
- Senior Policy Fellow, Public Policy Research Center, University of Missouri-St. Louis (2001)
- Visiting Lecturer, Strategic Planning, National Institute of Corrections (1998–2002)
- Adjunct Professor, Criminal Justice, University of Missouri-St. Louis (1990–1998)
- Adjunct Professor, Criminal Justice, Long Island University at CW Post (1986–1988)
- Instructor, Innovation, Open Center of New York City (1987)
- Teaching Assistant, Field Research Methodology, Administrative Intern to the School Superintendent, Franklin Public Schools, Franklin, Massachusetts (1979)
- Visiting Lecturer, Special Education, Framingham State College, Framingham, Massachusetts (1979)
- Adjunct Professor, Psychology, Fischer Junior College, Boston, Massachusetts (1978)

Related Activities
- Institutional Research Board, St. Louis University (2002–2003)
- Institutional Research Board, University of Missouri-St. Louis (2001–2003)

**Contact information**:

611 King Avenue
City Island, NY 10464
917-710-7029
dora.schriro@gmail.com

Professional References available upon request

# Appendix B

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000000001 | |
| CCBVA0000000029 | |
| CCBVA0000000069 | |
| CCBVA0000000110 | |
| CCBVA0000000152 | |
| CCBVA0000000199 | |
| CCBVA0000000244 | |
| CCBVA0000000286 | |
| CCBVA0000000340 | |
| CCBVA0000000346 | |
| CCBVA0000000349 | |
| CCBVA0000000350 | |
| CCBVA0000000353 | |
| CCBVA0000000354 | |
| CCBVA0000000356 | |
| CCBVA0000000357 | |
| CCBVA0000000361 | |
| CCBVA0000000362 | |
| CCBVA0000000364 | |
| CCBVA0000000367 | |
| CCBVA0000000368 | |
| CCBVA0000000380 | |
| CCBVA0000000392 | |
| CCBVA0000000397 | |
| CCBVA0000000402 | |
| CCBVA0000000405 | |
| CCBVA0000000433 | |
| CCBVA0000000437 | |
| CCBVA0000000438 | |
| CCBVA0000000439 | |
| CCBVA0000000444 | |
| CCBVA0000000446 | |
| CCBVA0000000927 | |
| CCBVA0000000931 | |
| CCBVA0000000945 | |
| CCBVA0000000949 | |
| CCBVA0000001317 | |
| CCBVA0000001321 | |
| CCBVA0000001322 | |
| CCBVA0000003772 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000003777 | |
| CCBVA0000003782 | |
| CCBVA0000003785 | |
| CCBVA0000003799 | |
| CCBVA0000003836 | |
| CCBVA0000003840 | |
| CCBVA0000003844 | |
| CCBVA0000003854 | |
| CCBVA0000003864 | |
| CCBVA0000003874 | |
| CCBVA0000003884 | |
| CCBVA0000003898 | |
| CCBVA0000003906 | |
| CCBVA0000003918 | |
| CCBVA0000003929 | |
| CCBVA0000003932 | |
| CCBVA0000003937 | |
| CCBVA0000003942 | |
| CCBVA0000003947 | |
| CCBVA0000003953 | |
| CCBVA0000003964 | |
| CCBVA0000003965 | |
| CCBVA0000003977 | |
| CCBVA0000004011 | |
| CCBVA0000004101 | |
| CCBVA0000004102 | |
| CCBVA0000004117 | |
| CCBVA0000004127 | |
| CCBVA0000004308 | |
| CCBVA0000004349 | |
| CCBVA0000004350 | |
| CCBVA0000004351 | |
| CCBVA0000004355 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000004358 | |
| CCBVA0000004398 | |
| CCBVA0000004527 | |
| CCBVA0000004528 | |
| CCBVA0000004529 | |
| CCBVA0000004550 | |
| CCBVA0000004560 | |
| CCBVA0000004617 | |
| CCBVA0000004623 | |
| CCBVA0000004627 | |
| CCBVA0000004631 | |
| CCBVA0000004638 | |
| CCBVA0000004645 | |
| CCBVA0000004649 | |
| CCBVA0000004652 | |
| CCBVA0000004676 | |
| CCBVA0000004685 | |
| CCBVA0000004717 | |
| CCBVA0000004857 | |
| CCBVA0000004974 | |
| CCBVA0000005097 | |
| CCBVA0000005216 | |
| CCBVA0000005461 | |
| CCBVA0000005462 | |
| CCBVA0000005675 | |
| CCBVA0000005820 | |
| CCBVA0000005999 | |
| CCBVA0000006001 | |
| CCBVA0000006060 | |
| CCBVA0000006239 | |
| CCBVA0000006257 | |
| CCBVA0000006258 | |
| CCBVA0000006259 | |
| CCBVA0000006265 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000006266 | |
| CCBVA0000006272 | |
| CCBVA0000006273 | |
| CCBVA0000006284 | |
| CCBVA0000006285 | |
| CCBVA0000006286 | |
| CCBVA0000006287 | |
| CCBVA0000006392 | |
| CCBVA0000006393 | |
| CCBVA0000006399 | |
| CCBVA0000006400 | |
| CCBVA0000006401 | |
| CCBVA0000006402 | |
| CCBVA0000006403 | |
| CCBVA0000006404 | |
| CCBVA0000006405 | |
| CCBVA0000006406 | |
| CCBVA0000006407 | |
| CCBVA0000006408 | |
| CCBVA0000006409 | |
| CCBVA0000006410 | |
| CCBVA0000006411 | |
| CCBVA0000006412 | |
| CCBVA0000006413 | |
| CCBVA0000006414 | |
| CCBVA0000006415 | |
| CCBVA0000006416 | |
| CCBVA0000006417 | |
| CCBVA0000006418 | |
| CCBVA0000006420 | |
| CCBVA0000006420 | |
| CCBVA0000006431 | |
| CCBVA0000006465 | |
| CCBVA0000060884 | |
| CCBVA0000104422 | |
| CCBVA0000104457 | |
| CCBVA0000104599 | |
| CCBVA0000105880 | |
| CCBVA0000105887 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000105893 | |
| CCBVA0000105894 | |
| CCBVA0000105899 | |
| CCBVA0000105900 | |
| CCBVA0000105908 | |
| CCBVA0000105910 | |
| CCBVA0000105912 | |
| CCBVA0000105913 | |
| CCBVA0000105914 | |
| CCBVA0000105921 | |
| CCBVA0000105930 | |
| CCBVA0000105938 | |
| CCBVA0000105946 | |
| CCBVA0000105953 | |
| CCBVA0000105958 | |
| CCBVA0000105959 | |
| CCBVA0000105966 | |
| CCBVA0000105969 | |
| CCBVA0000105974 | |
| CCBVA0000105975 | |
| CCBVA0000105976 | |
| CCBVA0000105980 | |
| CCBVA0000106017 | |
| CCBVA0000106018 | |
| CCBVA0000106019 | |
| CCBVA0000106020 | |
| CCBVA0000106024 | |
| CCBVA0000106051 | |
| CCBVA0000106052 | |
| CCBVA0000106077 | |
| CCBVA0000106079 | |
| CCBVA0000106102 | |
| CCBVA0000106103 | |
| CCBVA0000106118 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000106121 | |
| CCBVA0000106122 | |
| CCBVA0000106126 | |
| CCBVA0000106126 | |
| CCBVA0000106126 | |
| CCBVA0000106127 | |
| CCBVA0000106129 | |
| CCBVA0000106131 | |
| CCBVA0000106132 | |
| CCBVA0000106133 | |
| CCBVA0000106134 | |
| CCBVA0000106134 | |
| CCBVA0000106135 | |
| CCBVA0000106168 | |
| CCBVA0000106172 | |
| CCBVA0000106173 | |
| CCBVA0000106176 | |
| CCBVA0000106178 | |
| CCBVA0000106180 | |
| CCBVA0000106183 | |
| CCBVA0000106185 | |
| CCBVA0000106186 | |
| CCBVA0000106187 | |
| CCBVA0000106190 | |
| CCBVA0000106191 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000106195 | |
| CCBVA0000106196 | |
| CCBVA0000106197 | |
| CCBVA0000106201 | |
| CCBVA0000106207 | |
| CCBVA0000106210 | |
| CCBVA0000106211 | |
| CCBVA0000106229 | |
| CCBVA0000106232 | |
| CCBVA0000106234 | |
| CCBVA0000106251 | |
| CCBVA0000106252 | |
| CCBVA0000106266 | |
| CCBVA0000106280 | |
| CCBVA0000106294 | |
| CCBVA0000106307 | |
| CCBVA0000106308 | |
| CCBVA0000106342 | |
| CCBVA0000106369 | |
| CCBVA0000106381 | |
| CCBVA0000106383 | |
| CCBVA0000106383 | |
| CCBVA0000106385 | |
| CCBVA0000106386 | |
| CCBVA0000106387 | |
| CCBVA0000106388 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000106389 | |
| CCBVA0000106397 | |
| CCBVA0000106404 | |
| CCBVA0000106408 | |
| CCBVA0000106409 | |
| CCBVA0000106421 | |
| CCBVA0000106427 | |
| CCBVA0000106433 | |
| CCBVA0000106437 | |
| CCBVA0000106438 | |
| CCBVA0000106442 | |
| CCBVA0000106445 | |
| CCBVA0000106449 | |
| CCBVA0000106452 | |
| CCBVA0000106454 | |
| CCBVA0000106454 | |
| CCBVA0000106456 | |
| CCBVA0000106467 | |
| CCBVA0000106478 | |
| CCBVA0000106479 | |
| CCBVA0000106496 | |
| CCBVA0000106501 | |
| CCBVA0000106502 | |
| CCBVA0000106527 | |
| CCBVA0000106546 | |
| CCBVA0000106551 | |
| CCBVA0000106552 | |
| CCBVA0000106555 | |
| CCBVA0000106561 | |
| CCBVA0000106566 | |
| CCBVA0000106572 | |
| CCBVA0000106578 | |
| CCBVA0000106584 | |
| CCBVA0000106590 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000106591 | |
| CCBVA0000106973 | |
| CCBVA0000108352 | |
| CCBVA0000108353 | |
| CCBVA0000117636 | |
| CCBVA0000117670 | |
| CCBVA0000117671 | |
| CCBVA0000117672 | |
| CCBVA0000117685 | |
| CCBVA0000117689 | |
| CCBVA0000117882 | |
| CCBVA0000117884 | |
| CCBVA0000117886 | |
| CCBVA0000117892 | |
| CCBVA0000117894 | |
| CCBVA0000117898 | |
| CCBVA0000117900 | |
| CCBVA0000117920 | |
| CCBVA0000118049-CCBVA0000118338 | |
| CCBVA0000118412 | |
| CCBVA0000118422 | |
| CCBVA0000118425 | |
| CCBVA0000118602 | |
| CCBVA0000118618 | |
| CCBVA0000118622 | |
| CCBVA0000118627 | |
| CCBVA0000118631 | |
| CCBVA0000118634 | |
| CCBVA0000118639 | |
| CCBVA0000118642 | |
| CCBVA0000118647 | |
| CCBVA0000118650 | |
| CCBVA0000118653 | |
| CCBVA0000118657 | |
| CCBVA0000118661 | |
| CCBVA0000118663 | |
| CCBVA0000118666 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000118690 | |
| CCBVA0000118695 | |
| CCBVA0000149566 | |
| CCBVA0000149587 | |
| CCBVA0000149608 | |
| CCBVA0000149629 | |
| CCBVA0000149648 | |
| CCBVA0000149667 | |
| CCBVA0000149686 | |
| CCBVA0000149688 | |
| CCBVA0000149722 | |
| CCBVA0000149723 | |
| CCBVA0000149724 | |
| CCBVA0000149727 | |
| CCBVA0000149741 | |
| CCBVA0000149745 | |
| CCBVA0000149750 | |
| CCBVA0000149752 | |
| CCBVA0000149758 | |
| CCBVA0000149795 | |
| CCBVA0000149817 | |
| CCBVA0000149820 | |
| CCBVA0000149822 | |
| CCBVA0000149828 | |
| CCBVA0000149842 | |
| CCBVA0000149845 | |
| CCBVA0000149847 | |
| CCBVA0000149850 | |
| CCBVA0000149852 | |
| CCBVA0000149856 | |
| CCBVA0000149860 | |
| CCBVA0000149864 | |
| CCBVA0000149869 | |
| CCBVA0000149873 | |
| CCBVA0000149876 | |
| CCBVA0000149880 | |
| CCBVA0000149884 | |
| CCBVA0000149888 | |
| CCBVA0000149892 | |
| CCBVA0000149897 | |
| CCBVA0000149901 | |
| CCBVA0000149910 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000149913 | |
| CCBVA0000149922 | |
| CCBVA0000149932 | |
| CCBVA0000149934 | |
| CCBVA0000149937 | |
| CCBVA0000149940 | |
| CCBVA0000149944 | |
| CCBVA0000149948 | |
| CCBVA0000149951 | |
| CCBVA0000149956 | |
| CCBVA0000150032 | |
| CCBVA0000150184 | |
| CCBVA0000150206 | |
| CCBVA0000150215 | |
| CCBVA0000150219 | |
| CCBVA0000150224 | |
| CCBVA0000150227 | |
| CCBVA0000150233 | |
| CCBVA0000150241 | |
| CCBVA0000150254 | |
| CCBVA0000150269 | |
| CCBVA0000150355 | |
| CCBVA0000150356 | |
| CCBVA0000150358 | |
| CCBVA0000150359 | |
| CCBVA0000150360 | |
| CCBVA0000150361 | |
| CCBVA0000150362 | |
| CCBVA0000150363 | |
| CCBVA0000150364 | |
| CCBVA0000150395 | |
| CCBVA0000150466 | |
| CCBVA0000150547 | |
| CCBVA0000150628 | |
| CCBVA0000150697 | |
| CCBVA0000150947 | |
| CCBVA0000151529 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000151537 | |
| CCBVA0000151693 | |
| CCBVA0000151698 | |
| CCBVA0000151699 | |
| CCBVA0000151705 | |
| CCBVA0000151709 | |
| CCBVA0000151801 | |
| CCBVA0000151815 | |
| CCBVA0000151850 | |
| CCBVA0000151919 | |
| CCBVA0000151953 | |
| CCBVA0000152007 | |
| CCBVA0000152053 | |
| CCBVA0000152087 | |
| CCBVA0000152088 | |
| CCBVA0000152098 | |
| CCBVA0000152103 | |
| CCBVA0000152246 | |
| CCBVA0000152449 | |
| CCBVA0000152450 | |
| CCBVA0000152458 | |
| CCBVA0000152462 | |
| CCBVA0000152964 | |
| CCBVA0000152989 | |
| CCBVA0000159889 | |
| CCBVA0000160046 | |
| CCBVA0000160083 | |
| CCBVA0000160084 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000160244 | |
| CCBVA0000162819 | |
| CCBVA0000163117 | |
| CCBVA0000165416 | |
| CCBVA0000165418 | |
| CCBVA0000171160 | |
| CCBVA0000173259 | |
| CCBVA0000173260 | |
| CCBVA0000173262 | |
| CCBVA0000173959 | |
| CCBVA0000173960 | |
| CCBVA0000173964 | |
| CCBVA0000173970 | |
| CCBVA0000173971 | |
| CCBVA0000173972 | |
| CCBVA0000173973 | |
| CCBVA0000174233 | |
| CCBVA0000174272 | |
| CCBVA0000175959 | |
| CCBVA0000177897 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000178342 | |
| CCBVA0000179829 | |
| CCBVA0000179837 | |
| CCBVA0000179840 | |
| CCBVA0000179848 | |
| CCBVA0000179925 | |
| CCBVA0000180281 | |
| CCBVA0000180283 | |
| CCBVA0000180283 | |
| CCBVA0000180288 | |
| CCBVA0000180288 | |
| CCBVA0000180289 | |
| CCBVA0000180289 | |
| CCBVA0000180301 | |
| CCBVA0000180306 | |
| CCBVA0000180422 | |
| CCBVA0000180427 | |
| CCBVA0000180430 | |
| CCBVA0000180727 | |
| CCBVA0000180730 | |
| CCBVA0000180741 | |
| CCBVA0000180751 | |
| CCBVA0000180762 | |
| CCBVA0000180774 | |
| CCBVA0000180793 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
| --- | --- |
| CCBVA0000180803 | |
| CCBVA0000181390 | |
| CCBVA0000181583 | |
| CCBVA0000181595 | |
| CCBVA0000181731 | |
| CCBVA0000181736 | |
| CCBVA0000181742 | |
| CCBVA0000181746 | |
| CCBVA0000181748 | |
| CCBVA0000181754 | |
| CCBVA0000181769 | |
| CCBVA0000181776 | |
| CCBVA0000181798 | |
| CCBVA0000181803 | |
| CCBVA0000181807 | |
| CCBVA0000181809 | |
| CCBVA0000181812 | |
| CCBVA0000181816 | |
| CCBVA0000181822 | |
| CCBVA0000181823 | |
| CCBVA0000181830 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000181831 | |
| CCBVA0000181839 | |
| CCBVA0000181851 | |
| CCBVA0000182197 | |
| CCBVA0000182254 | |
| CCBVA0000182274 | |
| CCBVA0000182289 | |
| CCBVA0000182305 | |
| CCBVA0000182307 | |
| CCBVA0000182330 | |
| CCBVA0000182345 | |
| CCBVA0000182358 | |
| CCBVA0000182360 | |
| CCBVA0000182430 | |
| CCBVA0000182440 | |
| CCBVA0000182449 | |
| CCBVA0000182457 | |
| CCBVA0000182466 | |
| CCBVA0000182474 | |
| CCBVA0000182485 | |
| CCBVA0000182500 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000182514 | |
| CCBVA0000182529 | |
| CCBVA0000182546 | |
| CCBVA0000182549 | |
| CCBVA0000182552 | |
| CCBVA0000182558 | |
| CCBVA0000182561 | |
| CCBVA0000182561 | |
| CCBVA0000182564 | |
| CCBVA0000182564 | |
| CCBVA0000182571 | |
| CCBVA0000182572 | |
| CCBVA0000182574 | |
| CCBVA0000182580 | |
| CCBVA0000182590 | |
| CCBVA0000182600 | |
| CCBVA0000182612 | |
| CCBVA0000182622 | |
| CCBVA0000182625 | |
| CCBVA0000182627 | |
| CCBVA0000182629 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA00001826352 | |
| CCBVA0000182781 | |
| CCBVA0000182782 | |
| CCBVA0000182783 | |
| CCBVA0000189749 | |
| CCBVA0000189751 | |
| CCBVA0000189756 | |
| CCBVA0000189765 | |
| CCBVA0000189770 | |
| CCBVA0000189771 | |
| CCBVA0000189772 | |
| CCBVA0000189774 | |
| CCBVA0000189777 | |
| CCBVA0000189779 | |
| CCBVA0000189788 | |
| CCBVA0000189790 | |
| CCBVA0000189792 | |
| CCBVA0000189794 | |
| CCBVA0000189797 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000189798 | |
| CCBVA0000189801 | |
| CCBVA0000189805 | |
| CCBVA0000189807 | |
| CCBVA0000189813 | |
| CCBVA0000189815 | |
| CCBVA0000189819 | |
| CCBVA0000189824 | |
| CCBVA0000189828 | |
| CCBVA0000189838 | |
| CCBVA0000189855 | |
| CCBVA0000189859 | |
| CCBVA0000189874 | |
| CCBVA0000189876 | |
| CCBVA0000189888 | |
| CCBVA0000189893 | |
| CCBVA0000189903 | |
| CCBVA0000189905 | |
| CCBVA0000189907 | |
| CCBVA0000189908 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000189918 | |
| CCBVA0000189920 | |
| CCBVA0000189923 | |
| CCBVA0000189924 | |
| CCBVA0000189927 | |
| CCBVA0000189928 | |
| CCBVA0000189938 | |
| CCBVA0000189966 | |
| CCBVA0000189988 | |
| CCBVA0000189994 | |
| CCBVA0000190007 | |
| CCBVA0000190017 | |
| CCBVA0000190020 | |
| CCBVA0000190025 | |
| CCBVA0000190028 | |
| CCBVA0000190030 | |
| CCBVA0000190032 | |
| CCBVA0000190037 | |
| CCBVA0000190040 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000190042 | |
| CCBVA0000190045 | |
| CCBVA0000190048 | |
| CCBVA0000190139 | |
| CCBVA0000190326 | |
| CCBVA0000190327 | |
| CCBVA0000190337 | |
| CCBVA0000190338 | |
| CCBVA0000190343 | |
| CCBVA0000190345 | |
| CCBVA0000190347 | |
| CCBVA0000190452 | |
| CCBVA0000190734 | |
| CCBVA0000191036 | |
| CCBVA0000191040 | |
| CCBVA0000191049 | |
| CCBVA0000191053 | |
| CCBVA0000191057 | |
| CCBVA0000191062 | |
| CCBVA0000191088 | |
| CCBVA0000191101 | |
| CCBVA0000191615 | |
| CCBVA0000191634 | |
| CCBVA0000191637 | |
| CCBVA0000191638 | |
| CCBVA0000191639 | |
| CCBVA0000191641 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000191652 | |
| CCBVA0000191657 | |
| CCBVA0000191663 | |
| CCBVA0000191668 | |
| CCBVA0000192138 | |
| CCBVA0000192152 | |
| CCBVA0000193337 | |
| CCBVA0000193717 | |
| CCBVA0000195731 | |
| CCBVA0000195744 | |
| CCBVA0000195756 | |
| CCBVA0000195759 | |
| CCBVA0000195784 | |
| CCBVA0000195797 | |
| CCBVA0000195804-CCBVA0000195905 | |
| CCBVA0000196177 | |
| CCBVA0000198559 | |
| CCBVA0000198798 | |
| CCBVA0000200200 | |
| CCBVA0000201264 | |
| CCBVA0000202739 | |
| CCBVA0000202846 | |
| CCBVA0000202875 | |
| CCBVA0000205626 | |
| CCBVA0000205792 | |
| CCBVA0000205855 | |
| CCBVA0000208419 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000209119 | |
| CCBVA0000223420 | |
| CCBVA0000223421 | |
| CCBVA0000223560 | |
| CCBVA0000223562 | |
| CCBVA0000223616 | |
| CCBVA0000223617 | |
| CCBVA0000223646 | |
| CCBVA0000223647 | |
| CCBVA0000223706 | |
| CCBVA0000223707 | |
| CCBVA0000223735 | |
| CCBVA0000223736 | |
| CCBVA0000223753 | |
| CCBVA0000223754 | |
| CCBVA0000223770 | |
| CCBVA0000223803 | |
| CCBVA0000223824 | |
| CCBVA0000223841 | |
| CCBVA0000223865 | |
| CCBVA0000223905 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000223927 | |
| CCBVA0000223949 | |
| CCBVA0000223971 | |
| CCBVA0000223993 | |
| CCBVA0000229903 | |
| CCBVA0000230133 | |
| CCBVA0000230383 | |
| CCBVA0000230465 | |
| CCBVA0000233981 | |
| CCBVA0000238482 | |
| CCBVA0000238483 | |
| CCBVA0000238745 | |
| CCBVA0000238746 | |
| CCBVA0000243357 | |
| CCBVA0000244160 | |
| CCBVA0000244165 | |
| CCBVA0000244179 | |
| CCBVA0000244181 | |
| CCBVA0000244182 | |
| CCBVA0000244183 | |
| CCBVA0000244184 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000244185 | |
| CCBVA0000244186 | |
| CCBVA0000244197 | |
| CCBVA0000244202 | |
| CCBVA0000244208 | |
| CCBVA0000244213 | |
| CCBVA0000244214 | |
| CCBVA0000244217 | |
| CCBVA0000244223 | |
| CCBVA0000244233 | |
| CCBVA0000244242 | |
| CCBVA0000244249 | |
| CCBVA0000244251 | |
| CCBVA0000244253 | |
| CCBVA0000244268 | |
| CCBVA0000244269 | |
| CCBVA0000244270 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000244275 | |
| CCBVA0000244278 | |
| CCBVA0000244284 | |
| CCBVA0000244286 | |
| CCBVA0000244539 | |
| CCBVA0000244544 | |
| CCBVA0000248465 | |
| CCBVA0000248465 | |
| CCBVA0000248469 | |
| CCBVA0000248472 | |
| CCBVA0000248474 | |
| CCBVA0000248494 | |
| CCBVA0000248502 | |
| CCBVA0000248511 | |
| CCBVA0000248513 | |
| CCBVA0000248514 | |
| CCBVA0000248541 | |
| CCBVA0000248551 | |
| CCBVA0000248555 | |
| CCBVA0000248562 | |
| CCBVA0000248565 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000248573 | |
| CCBVA0000248575 | |
| CCBVA0000248576 | |
| CCBVA0000248578 | |
| CCBVA0000248592 | |
| CCBVA0000248624 | |
| CCBVA0000248629 | |
| CCBVA0000248659 | |
| CCBVA0000248930 | |
| CCBVA0000248936 | |
| CCBVA0000248937 | |
| CCBVA0000248968 | |
| CCBVA0000249213 | |
| CCBVA0000249311 | |
| CCBVA0000249338 | |
| CCBVA0000249342 | |
| CCBVA0000249354 | |
| CCBVA0000249379 | |
| CCBVA0000249390 | |
| CCBVA0000249402 | |
| CCBVA0000251730 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000256203 | |
| CCBVA0000257365 | |
| CCBVA0000257367 | |
| CCBVA0000257368 | |
| CCBVA0000258428 | |
| CCBVA0000258432 | |
| CCBVA0000260462 | |
| CCBVA0000260463 | |
| CCBVA0000260736 | |
| CCBVA0000261051 | |
| CCBVA0000261052 | |
| CCBVA0000261176 | |
| CCBVA0000261177 | |
| CCBVA0000264485 | |
| CCBVA0000269751 | |
| CCBVA0000269752 | |
| CCBVA0000274578 | |
| CCBVA0000274588 | |
| CCBVA0000274755-CCBVA0000274889 | |
| CCBVA0000274977 | |
| CCBVA0000275205 | |
| CCBVA0000275216 | |
| CCBVA0000275221 | |
| CCBVA0000275236 | |
| CCBVA0000275429 | |
| CCBVA0000275795 | |
| CCBVA0000275849 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000276024 | |
| CCBVA0000276200 | |
| CCBVA0000276368 | |
| CCBVA0000276375 | |
| CCBVA0000276377 | |
| CCBVA0000276379 | |
| CCBVA0000276379 | |
| CCBVA0000276395 | |
| CCBVA0000276572 | |
| CCBVA0000277486 | |
| CCBVA0000277528 | |
| CCBVA0000277528 | |
| CCBVA0000277598 | |
| CCBVA0000277716 | |
| CCBVA0000277793 | |
| CCBVA0000277798 | |
| CCBVA0000277801 | |
| CCBVA0000277803 | |
| CCBVA0000277806 | |
| CCBVA0000277817 | |
| CCBVA0000277818 | |
| CCBVA0000277862 | |
| CCBVA0000277863 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
| --- | --- |
| CCBVA0000277865 | |
| CCBVA0000277866 | |
| CCBVA0000278158 | |
| CCBVA0000278178 | |
| CCBVA0000278346 | |
| CCBVA0000278368 | |
| CCBVA0000278370 | |
| CCBVA0000278388 | |
| CCBVA0000278447 | |
| CCBVA0000278481 | |
| CCBVA0000278539 | |
| CCBVA0000278540 | |
| CCBVA0000278599 | |
| CCBVA0000278602 | |
| CCBVA0000278603 | |
| CCBVA0000278647 | |
| CCBVA0000278701 | |
| CCBVA0000278710 | |
| CCBVA0000278735 | |
| CCBVA0000278738 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000278747 | |
| CCBVA0000278772 | |
| CCBVA0000278911 | |
| CCBVA0000278912 | |
| CCBVA0000279917 | |
| CCBVA0000279924 | |
| CCBVA0000279938 | |
| CCBVA0000279948 | |
| CCBVA0000279950 | |
| CCBVA0000279952 | |
| CCBVA0000279961 | |
| CCBVA0000279962 | |
| CCBVA0000279967 | |
| CCBVA0000279981 | |
| CCBVA0000280283 | |
| CCBVA0000280294 | |
| CCBVA0000280469 | |
| CCBVA0000280509 | |
| CCBVA0000280544 | |
| CCBVA0000280554 | |
| CCBVA0000280566 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000280579 | |
| CCBVA0000280593 | |
| CCBVA0000280610 | |
| CCBVA0000280627 | |
| CCBVA0000280637 | |
| CCBVA0000280646 | |
| CCBVA0000280651 | |
| CCBVA0000280668 | |
| CCBVA0000280677 | |
| CCBVA0000280681 | |
| CCBVA0000280699 | |
| CCBVA0000280721 | |
| CCBVA0000280739 | |
| CCBVA0000280756 | |
| CCBVA0000280787 | |
| CCBVA0000280788 | |
| CCBVA0000280789 | |
| CCBVA0000280790 | |
| CCBVA0000280791 | |
| CCBVA0000280792 | |
| CCBVA0000280793 | |
| CCBVA0000280794 | |
| CCBVA0000280795 | |
| CCBVA0000280796 | |
| CCBVA0000280797 | |
| CCBVA0000280798 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000280799 | |
| CCBVA0000280800 | |
| CCBVA0000280801 | |
| CCBVA0000280802-CCBVA0000282819 | |
| CCBVA0000282823-CCBVA0000285593 | |
| PLS_0000155 | 2016-2018 Billing Summaries |
| PLS_0000452 | Stewart Co. Revenue Share Summaries |
| PLS_0000673 | ICE emails about VWP |
| DHSCRCL000001 | |
| DHSCRCL000004 | |
| DHSCRCL000009 | |
| ICE - Barrientos - 4420 | |
| ICE - Barrientos - 4577 | |
| ICE - Barrientos - 4659 | |
| ICE - Barrientos - 4791 | |
| ICE - Barrientos - 4945 | |
| ICE - Barrientos - 5029 | |
| ICE - Barrientos - 5110 | |
| ICE - Barrientos - 5191 | |
| ICE - Barrientos - 5272 | |
| ICE - Barrientos - 5435 | |
| ICE - Barrientos - 6126 | |
| ICE - Barrientos - 6361 | |
| ICE Barrientos 0024518 | |
| ICE-Barrientos-0256 | |
| ICE-Barrientos-1891 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| Nakamoto--00001 | |
| CCBVA0000326946 | |
| CCBVA0000326949 | |
| CCBVA0000326947 | |
| CCBVA0000326948 | |
| CCBVA0000326950 | |
| CCBVA0000326953 | |
| CCBVA0000326951 | |
| CCBVA0000326952 | |
| CCBVA0000326954 | |
| CCBVA0000326955 | |
| CCBVA0000326956 | |
| CCBVA0000326957 | |
| CCBVA0000326959 | |
| CCBVA0000326958 | |
| CCBVA0000326961 | |
| PLS_0000052 | |
| STEW0000139 | |
| STEW0000151 | |
| STEW0000159 | |
| SECURUS_000094 | |
| SECURUS_000095 | |
| TRINITY00000001 | |
| TRINITY00000006 | |
| TRINITY00000011 | |
| TRINITY00000016 | |
| TRINITY00000021 | |
| TRINITY00000032 | |
| TRINITY00000080 | |
| TRINITY00000169 | |
| TRINITY00000230 | |
| TRINITY00000267 | |
| TRINITY00000396 | |
| TRINITY00000552 | |
| TRINITY00000558 | |
| TRINITY00000564 | |
| TRINITY00000570 | |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| TRINITY00000588 | |
| TRINITY00000594 | |
| TRINITY00000600 | |
| TRINITY00000618 | |
| TRINITY00000636 | |
| TRINITY00000654 | |
| TRINITY00000666 | |
| TRINITY00000678 | |
| TRINITY00000690 | |
| TRINITY00000704 | |
| TRINITY00001338 | |
| TRINITY00001608 | |
| TRINITY00001613 | |
| TRINITY00001618 | |
| TRINITY00001653 | |
| TRINITY-00001664 | |
| TRINITY-00001665 | |
| TRINITY-00002538 | |
| TRINITY-00002540 | |
| TRINITY-00003176 | |
| TRINITY-00003181 | |
| TRINITY-00003188 | |
| TRINITY-00011743 | |
| CCBVA0000326945 | |
| | Dora Schriro, Dep't of Homeland Sec., Immigr. and Customs Enf't, Immigration Detention Overview and Recommendations (Oct. 6, 2009), available at https://www.ice.gov/doclib/about/offices/odpp/pdf/ice-detention-rpt.pdf. |
| | 2008 Operations Manual ICE Performance-Based National Detention Standards (CCBVA0000001968), full text available at https://www.ice.gov/detention-standards/2008; Jun. 3, 2006 IGSA (CCBVA0000000340) at 1 (requiring compliance with "the most current edition[] of ICE Detention Requirements). |

Appendix B:
Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
| --- | --- |
| | 2021 Nakamoto Audit Cover Letter, available at https://www.ice.gov/doclib/facilityInspections/StewartDetCtrGA_CL_05-06-2021.pdf |
| | 2021 Nakamoto Detention Review Summary Form, available at https://www.ice.gov/doclib/facilityInspections/StewartDetCtrGA_SIS_05-06-2021.pdf. |
| | Gov't Accountability Office, Immigration Detention, Additional Actions Needed to Strengthen Management and Oversight of Facility Costs and Standards, GAO-15-153 (Oct. 2014), available at https://www.gao.gov/assets/gao-15-153.pdf. |
| | DHS Office of Inspector Gen'l, ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements (Jun. 26, 2018), available at https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf. |
| | DHS Office of Inspector Gen'l, ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards (Jan. 29, 2019), available at https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf. |
| | Gov't Accountability Office, Standards for Internal Control in the Federal Government (Sep. 2014), available at https://www.gao.gov/assets/gao-14-704g.pdf. |
| | Correspondence, Members of U.S. Senate to Jennifer Nakamoto, Nov. 15, 2018, https://www.warren.senate.gov/imo/media/doc/2018-11-16%20Letter%20to%20Nakamoto%20Group%20re%20ICE%20Detention%20Facility%20Inspections.pdf. |

Appendix B:

Documents Reviewed

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| | U.S. House of Representatives Homeland Security, Oversight, Management and Accountability Subcommittee,  Hearing on Oversight of ICE Detention Facilities: Is DHS Doing Enough? Sep. 26, 2019, https://homeland.house.gov/oversight-of-ice-detention-facilities-is-dhs-doing-enough. |
| | Stewart County, Georgia, Independent Auditor's Report for the Year Ending December 31, 2018, available http://www.stewartcountyga.gov/PDF-docs/StewartCounty2018Audit.pdf |
| | Bethany Brazier Nov. 18, 2021  Deposition Transcript and Exhibits |
| | Calvin Blue Nov. 10, 2021 Deposition Transcript and Exhibits |
| | Charlie Peterson Oct. 18, 2021 Deposition Transcript and Exhibits |
| | CoreCivic 30(b)(6) Dec. 1 & 2, 2021 Deposition Transcript and Exhibits |
| | Droudred Blackmon Oct. 14, 2021 Deposition Transcript and Exhibits |
| | Freddie Hood Oct. 22, 2021 Deposition Transcript and Exhibts |
| | Harrell Gray Oct. 27, 2021 Deposition Transcript and Exhibits |
| | Juliette Drew Dec. 3, 2021 Deposition Transcript and Exhibits |
| | Jacqueline Norman Nov. 15, 2021 Deposition Transcript and Exhibits |
| | Matthew Moye Oct. 21, 2021 Deposition Transcript and Exhibits |
| | Michael Swinton Nov. 2, 2021 Deposition Transcript and Exhibits |
| | Terrance Lane Oct. 5, 2021 Deposition Transcript and Exhibits |
| | Troy Pollock Sept. 30, 2021 Deposition Transcript and Exhibits |
| | Trinity 30(b)(6) July 14 & Aug. 23, 2021 Deposition Transcript and Exhibits |

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | |
|---|---|
| **WILHEN HILL BARRIENTOS, GONZALO BERMUDEZ GUTIÉRREZ, and KEYSLER RAMÓN URBINA ROJAS,** individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>**CORECIVIC, INC.,**<br><br>　　　　　Defendant. | **Civil Action No.  4:18-cv-00070-CDL** |

## <u>DECLARATION OF GONZALO BERMUDEZ GUTIÉRREZ</u>

I, Gonzalo Bermudez Gutiérrez, hereby declare and state as follows:

1. My name is Gonzalo Bermudez Gutiérrez.  I am over the age of 18. I am a named Plaintiff in this case. I am prepared to testify about the matters discussed in this declaration.

2. I was detained in Stewart Detention Center (SDC), in Lumpkin, Georgia, from May 2019 to January 2020.

3. When I arrived at SDC, I went through the intake process.  During that process, I received a copy of the detainee handbook in English and Spanish.

4. My understanding was that the detainee handbook included all of the rules of SDC and informed you of how to behave while you were detained there. I also understood from the

handbook that if I broke any of the listed rules, I could be isolated and separated from the other people detained at SDC.

5.  At intake I was provided with some basic necessities, like one bottle of combined shampoo and soap, and toothpaste. The items were in very small quantities and of poor quality. I was also provided with: two sheet covers; one blanket; two pillowcases; three pairs of pants, shirts, and socks; two pairs of underwear; one pair of sneakers; and one pair of shower shoes.

6.  Following intake, I was housed in segregation for a few days until I was transferred to my first housing unit, Unit 7.

7.  About five days after I was processed into Unit 7, I was told about the Voluntary Work Program ("Work Program"). I was told that I could work in the kitchen and receive extra food and also make some money to buy necessities like phone time, food, and personal hygiene items in the commissary. I signed up to join the Work Program immediately so I could get extra food and purchase those items at the commissary.

8.  After only a few days at SDC, I understood completely that CoreCivic was controlling every aspect of the lives of detained people in SDC. CoreCivic controlled the temperature of the pods and the water in the showers. Detention officers woke us up at 4:30-5:00 a.m. to go to breakfast and then they told us when we could go to lunch and dinner over the course of the day. Because CoreCivic controlled what times the phones started working and stopped working, I could only call my family when CoreCivic allowed it. I was well aware that CoreCivic was in full control of everybody detained at SDC.

9.  I obeyed the rules because I feared being sent to segregation. While housed on Unit 4, I learned of several people who were sent to segregation for breaking a rule. I feared

segregation because I believed I would lose food and contact with my family. I also understood that CoreCivic could report any misbehavior to ICE.

10. During my time at SDC, I was housed in a pod with two-person cells.  I was housed in Unit 4A.  I think these units housed up to 88 people per pod.  Each cell had a toilet that we shared with our cellmate. All of the people detained on the pod shared showers.

11. A majority of the people in my pod were kitchen workers in the Work Program. Most of the people who did not work in the kitchen worked in other departments of the Work Program.

12. Because we were in a kitchen workers' pod, we had several incentives. Our pod had four TVs – three for TV and movies and one for video games. If we worked late hours in the kitchen, detention officers would allow us to stay up later to shower and call our families.

13. The kitchen workers' pod was an closed cell pod and I considered this to be a benefit of working in the kitchen. I experienced first-hand how loud and disorganized the open cell pods were when I delivered food to those pods. I was motivated to continue working in order to stay in the closed cell pod because I believed it was safer and I wanted my personal belongings and case-related items kept safe. This would not have been possible in the open cell pods. I also believed that the open cell pods were unsafe and I wanted to remain in the closed cell pods for my own safety.

14. If workers in my pod were removed from the work program, they would be moved to a different housing pod. I witnessed this happen multiple times. I viewed this as a punishment and as a disciplinary action.

15. CoreCivic did not provide me with enough food at SDC. I was always trying to stave off hunger while I was there. The portion sizes were small, the food was bad and repetitive,

and the meals were too spread out.  As a result, I lost a significant amount of weight while I was at SDC. Detention officers would often wake us up for meals but we would either have to wait a long time or eat after everyone else had eaten because we had either been called to eat too early or too late. We could only eat at the times that they told us we could eat. I regularly purchased extra food from the commissary to avoid hunger.

16. The meals at SDC were very spread out.  They served us breakfast between 4:30 and 6:30 a.m.; lunch between 10:30 a.m. and 12:00 p.m.; and dinner between 4:30 and 6:00 p.m. Because of this, I was often hungry between meals.

17. There was a weekly menu that changed, but the food items and meals were often the same. Because of this, and the spread-out nature of meals, I would supplement my diet with oatmeal, tortilla chips, crackers, ramen noodles, and other snacks that I would buy at the commissary. I would regularly spend anywhere from $10 to over $40 at the commissary.

18. We only received fresh fruit on special occasions. I craved fresh fruit because it is one of the only natural and nutritionally adequate foods that I believed to be healthy.

19. I lost over 20 pounds while at SDC due to how little I ate and how poor the food was. I was always trying to prevent hunger.

20. I participated in the Work Program at SDC. I joined the Work Program, first and foremost, to prevent hunger. I also joined the Work Program to get money to buy items I needed at the commissary, such as food, phone cards, stamps, deodorant, shampoo, soap, toothpaste, and shirts.  If I wasn't so concerned about preventing hunger, or if I didn't have to buy those items, I would not have joined the Work Program.

21. Being able to purchase and receive extra food was very important.  If I did not have access to the commissary food, like ramen, I am not sure I would have survived there.  Because I was always unsure of when our next meal would be, I was desperate for extra food.

22. During my time at SDC, I only received one visit from family and friends because the detention center is in a rural area.  My nephews from Tennessee were able to visit me, but my wife and children were never able to visit me because they lived in Arizona. I felt very isolated in SDC.

23. I needed money to buy phone cards and stamps because that was my primary way of contacting my loved ones, most of whom lived in Arizona.

24. Family members occasionally put money on my account, but it wasn't enough to buy food, phone time, and other necessities because those items in the commissary were expensive.  I had to use my Work Program wages to buy those items.

25. I was able to join the Work Program easily soon after I arrived at SDC.  It is not hard to get in because they need detained people to work.  A detention officer in my pod told me about the program and he had me sign a form in English to join.  The officer told me the form was to work in the kitchen, and if I didn't work in the kitchen, I would be moved from the kitchen pod.  I translated this document for a lot of Work Program workers who came after me because I speak English and Spanish. When I translated the document and the detention officer's instructions, I was also instructed to inform detained people that they would be moved from the kitchen pod if they decided not to work.

26. I worked in the SDC kitchen during my entire time at SDC.  I cooked, washed dishes, scrubbed the stove, cleaned the kitchen and the chow hall, and served food on the line.  It

was difficult work that required heavy lifting.  For example, when we made lasagna or casseroles, I had to carry very large and heavy pots and pans, which were used to cook for an average of 1,500 people. I believed we needed more staff for the kitchen to function more efficiently.

27. As a kitchen worker, I also had to deep clean the kitchen before inspections.  During inspections, the area had to be cleared out.  We could not be working while the inspectors were present.

28. I generally worked seven days per week for about six hours per day.  My pay rate was $4 per day.

29. CoreCivic was supposed to pay me for every day I worked, but I did not always receive my pay on time. Sometimes, up to 10 days passed before I was paid for a shift.  When a missing pay issue was rectified, my pay was deposited into my commissary account.

30. My regular shift began at 3 p.m. in the afternoon and ended between 8 and 9 p.m.

31. In the kitchen, I was supervised by Trinity employees, Ms. Horsley, Ms. Patterson, Ms. King, and others whose names I do not remember.

32. The Trinity supervisors mistreated us.

33. Sometimes, Trinity supervisors would give us extra food at the end of a shift, like an apple.  Other times they would allow us to search among the leftovers to serve ourselves more.

34. The Trinity supervisors also threatened us with discipline if we did not complete our work or perform work beyond our regular duties.

35. I witnessed CoreCivic officers discipline detained immigrants who declined to work by moving them to different housing units, or threatening to do so, and threatening to revoke

their commissary access. Sometimes, these people would be moved the very next day after a missed day of work.

36. Based on my experiences and the statements and actions of CoreCivic and Trinity employees towards other workers, and the detainee handbook, it was my understanding that it was CoreCivic's policy at SDC to punish us if we did not work, by either cutting off our access to commissary or relocating us to another pod. I believed, based on conversations I had with others, that being relocated from the kitchen pod often included being sent to segregation while CoreCivic determined where to relocate detained people.

37. I continued to work in the work program because, if I refused, I understood I could be punished with a transfer to another, less safe and less private housing unit, and also time in segregation. Additionally, if I stopped working, I wouldn't have enough money to purchase food, phone time, and other basic necessities in the commissary. I don't think I would have survived in SDC without being able to purchase those items.

38. It is important for me to be a named Plaintiff in this case because CoreCivic had so much control over when and how I could access food and communicate with my family, that they exploited our labor. It is very important to me to be able to make sure people can get the things that they need and I want to make sure no one else is treated the way I was.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 21st day of December, 2021 in Phoenix, Arizona.

Gonzalo Bermudez Gutiérrez

**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

|  |  |
|---|---|
| **WILHEN HILL BARRIENTOS, GONZALO BERMUDEZ GUTIÉRREZ, and KEYSLER RAMÓN URBINA ROJAS,** individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | **Civil Action No.  4:18-cv-00070-CDL** |
| **CORECIVIC, INC.,** | |
| Defendant. | |

**DECLARATION OF KEYSLER RAMÓN URBINA ROJAS**

I, Keysler Ramón Urbina Rojas, hereby declare and state as follows:

1. My name is Keysler Ramón Urbina Rojas.  I am over the age of 18. I am a named Plaintiff in this case. I am prepared to testify about the matters discussed in this declaration.

2. I was detained in Stewart Detention Center (SDC), in Lumpkin, Georgia from May 2015 to June 2016.

3. When I arrived at SDC, I went through the intake process.  During that process, I received a copy of the detainee handbook in Spanish. It is a blue book that tells you the laws of the detention center and what is prohibited.

4. At intake I was provided with some basic necessities, like shampoo, soap, and toothpaste. The items came in very small quantities.  The quality of these items also was not good.

The toothpaste and shampoo were of such poor quality they did not clean my teeth or hair and scalp.

5. Once inside SDC, I and the other detained people understood that CoreCivic had complete control over us.  They controlled all of our movements – when and where we slept, ate, worked, and talked to the outside world.  We understood that we had to obey the rules, and if we did not obey them, we would be punished.

6. It was widely known that segregation was one form of discipline, which could and would be imposed on us.  We all understood this because, in addition to the handbook, the CoreCivic officers made it known to us all the time.

7. During my time at SDC, I was housed in an open dormitory.  I was housed in Units 1 and 2.  This dormitory had bunk beds.  I think it housed 60 to 70 people.  It had three bathrooms that we all shared.

8. We called the open dormitories "el gallinero," which means "chicken coop" in Spanish. We were packed in the dorms like chickens.  There were so many people living in each room, it was hard to sleep at night with all the noise.  We all worked different shifts, so people were coming and going from work while others were sleeping.  Sometimes fights broke out about the noise and people's inability to sleep.

9. All of the people in my pod were kitchen workers in the Work Program.

10. Because we were in a kitchen workers' pod, we got two TVs – one for movies and one for video games.  The other pods only had one TV.  The officers told us we had two TVs as a benefit of being kitchen workers.

11. If workers in my pod were removed from the Work Program, they would be moved to a different housing pod. The officers also told me that if I didn't work in the kitchen, I

would be moved from my pod.  Even though my pod was crowded and noisy, it was a little better than the other open dorm pods without kitchen workers, and my friends were there so I wanted to stay there.

12. CoreCivic did not provide me with enough food at SDC. I often felt hungry while I was there. The portion sizes were rationed, the food was bad, and the meals were too spread out.  As a result, I was hungry all the time.

13. They served us dinner at 4 p.m. in the afternoon.  By 9 p.m., there was a line at the microwave of people wanting to heat up ramen noodles they bought at the commissary because we couldn't wait until 5 a.m. the next morning for breakfast.

14. The food was also often inedible.  I saw food being served that was spoiled and looked like vomit.  There was something that I think was supposed to be meat – we called it "monkey brains" because it looked and tasted disgusting.  Some of the food was too spicy.  A lot of the food ended up in the trash because people did not want to eat it. People would buy ramen at the commissary instead. If I didn't have money in commissary, I would be forced to eat the food because I was hungry.

15. There was a weekly menu that changed, but the food items and meals were often the same.  If the menus included meals I knew were going to be inedible, I would buy myself ramen noodles at the commissary.  We also did not get fresh fruit at SDC.  Only the diabetics received fruit, like an apple or an orange.

16. I lost 20 pounds while at SDC due to gastrointestinal issues. I believe that the gastrointestinal issues were due to how little food I ate and the quality of the food.  I also think the spoiled food caused me to get a bacterial infection, for which I had to seek medical treatment.

17. I participated in the Work Program at SDC. I joined the Work Program to earn money to buy items I needed at the commissary, such as food, phone cards, stamps, deodorant, shampoo, soap, toothpaste, sock, boxers, and shirts.  I bought boxers and shirts because the ones CoreCivic gave us were used, and I did not think it was hygienic to wear used clothing.

18. If I didn't have to buy those items, I would not have joined the Work Program.  I would have done other things, like played soccer and gone to the recreation center.

19. I also joined the Work Program because CoreCivic would provide detained people who worked extra food. I wanted to work in the kitchen specifically so I could serve myself more food. Based on my conversations with other kitchen workers, access to extra food was also a reason they joined the Work Program.

20.  Being able to purchase and receive extra food was very important.  If I did not have access to the commissary food, like soup, I am not sure I would have survived there.

21. During my year at SDC, I only received three visits from family and friends because the detention center is in a remote area.  I felt very isolated in SDC.

22. I needed money to buy phone cards because that was my primary way of contacting loved ones.  Phone cards to make calls to my family in Nicaragua were especially costly. For example, I would have to pay about $5 for a two-minute phone call with my grandma.

23. Family members occasionally put money on my account, but it wasn't enough to buy food, phone time, and other necessities because those items in the commissary were expensive.  I had to use my Work Program wages to buy those items.

24. I was able to join the Work Program easily right after I arrived at SDC. It was not hard to get in because they need detainees to work. An officer in my pod told me about the program and he had me sign a form in English to join. I could not read the form because I don't speak English. The officer told me the form was to work in the kitchen.

25. I worked in the kitchen during my entire time at SDC. I cooked, washed dishes, scrubbed the stove, cleaned the kitchen and the chow hall, and served food on the line. It was heavy work. For example, when pancakes were on the menu for breakfast, I had to make three pancakes per person for over 1,000 people. I had to move very fast next to a hot grill. I felt a lot of pressure.

26. As a kitchen worker, I also had to deep clean the kitchen before inspections. During inspections, the area had to be cleared out. We could not be working while the inspectors were present.

27. I generally worked seven days per week for about 8 hours per day. My pay rate was $3 per day. At some point that rate was raised to $4 per day.

28. CoreCivic was supposed to pay me for every day I worked, but I did not always receive my pay. My pay was deposited into my commissary account. Sometimes I could tell that CoreCivic did not pay me for every day that I worked because my account balance was too low.

29. For most of my time at SDC, my regular shift began at 2 a.m. in the morning. The CoreCivic officers would come into our dormitory to wake us up and get us out of bed. If we did not wake up fast enough, the officers would pull the covers off us and bang on the mattresses to get us up.

30. My shift started so early, and the work was so exhausting, that I was often too tired to go to recreation in the afternoon.  I slept instead.

31. In the kitchen, I was supervised by Trinity employees, Ms. Lyles, Ms. Gaines, and Mr. Marrero, and others whose names I do not remember.

32. The Trinity supervisors mistreated us.  They would yell at us and call us names.

33. The Trinity supervisors also threatened us with discipline if we did not complete our work or perform work beyond our regular duties.

34. I was placed in segregation for refusing to perform a work task beyond my regular tasks.  One of my jobs was to fill the drink containers with Kool Aid.  Once I finished I should have been able to take a break. Trinity supervisor Mr. Marrero ordered me to clean the tables.  I told him I had finished my work and did not have to do the additional task.  He then called a CoreCivic officer to put me in segregation.  He did this in front of a couple of other workers.  One of the workers who saw this was from El Salvador.  I think his name was Santa Maria.  A CoreCivic officer then came and took me to segregation.  I was put in segregation without a hearing or any sort of disciplinary process.

35. I was in segregation for approximately one day.  I was totally isolated during this time.  They put me in a single-person cell with no window so you cannot see outside.  In segregation, they also provided me with less food than the normal rations, which already were not enough. I also could not access the commissary or go to recreation.  I was not able to make phone calls.  After this incident, I wanted to avoid being sent to segregation again.

36. I was also placed in medical segregation two or three times for medical issues. Those units are in a different location, near the medical area, but the conditions are the same as regular segregation.

37. On two or three occasions, the workers in my pod refused to go to work. On those occasions, CoreCivic put us all on lockdown in response. During the lockdowns we were not allowed to move around freely within the pod. We had to ask permission to use the restroom. We were prohibited from using the TV or the phone. We also lost access to the commissary. We could not mail letters to people. If we moved when we were not supposed to, the officers threatened us with pepper spray.

38. The lockdowns lasted until we agreed to work, usually two to four days. We had to go back to work in order to get more food, to call our families, and to access the commissary. We had to give in out of necessity.

39. The lockdowns were oppressive. I felt depressed during them. I could not even call my mother to tell her I was okay. She would worry about me when I didn't call.

40. I also saw another detained worker from Honduras get sent to segregation while we were working in the kitchen. I think his name is Dilmer Galeas. I believe he was sent there because he refused to work or perform a task.

41. It was my understanding that we could be sent straight to segregation without any process because that is what I witnessed and experienced.

42. CoreCivic and Trinity employees also informed us that if we refused to work, that refusal would be put on our "record." I understood this to mean they would use this information to harm our immigration case or file a criminal case against us. CoreCivic and Trinity employees would also tell us we could serve time in federal prison.

43. Based on my experiences and the statements and actions of CoreCivic and Trinity employees towards other workers, it was my understanding that it was CoreCivic's policy at SDC to punish us if we did not work, including by sending us to segregation.

44. I continued to work in the Work Program because, if I refused, I understood I could be and, actually was, punished with lockdowns and segregation.  The restrictions in lockdown and segregation were stressful and caused me to feel depressed.  I could not take the isolation or the loss of commissary, phone access, and commissary privileges.  It affected me physically and psychologically.

45. Also, if I stopped working, I wouldn't have access to more food in the kitchen or have enough money to purchase food, phone time, and other necessities in the commissary. I don't think I would have survived the whole year in SDC without being able to purchase those items.

46. It is important for me to be a named Plaintiff in this case because I feel that CoreCivic deprived us of the things we needed, like food, used us for our labor, and then made money off us in the commissary because we had to buy food and other necessities there. I don't want other detained people to be treated like I and my fellow detained people were at SDC.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 9 th day of December, 2021 in New Orleans, Louisiana.

Keysler Ramón Urbina Rojas

## INTERPRETER AFFIDAVIT

I, Meredith Stewart¸ swear and certify under penalty of perjury under the law of the United States that I am fluent in both the Spanish and English languages and that I read the preceding Declaration in Spanish with Plaintiff Keysler Urbina Rojas, who affirmed the truth of its contents.


Signed this 21st day of December, 2021


_____

Meredith Stewart

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| **WILHEN HILL BARRIENTOS, GONZALO BERMUDEZ GUTIÉRREZ, and KEYSLER RAMÓN URBINA ROJAS,** individually and on behalf of all others similarly situated, | |
| Plaintiffs, | **Civil Action No.  4:18-cv-00070-CDL** |
| v. | |
| **CORECIVIC, INC.,** | |
| Defendant. | |

## DECLARATION OF WILHEN HILL BARRIENTOS

I, Wilhen Hill Barrientos, hereby declare and state as follows:

1. My name is Wilhen Hill Barrientos.  I am over the age of 18. I am a named plaintiff in this lawsuit.

2. I was detained in Stewart Detention Center (SDC), in Lumpkin, Georgia from July 2015 to May 2016 and September 2017 to June 2018.

3. I was aware of the rules of the facility because they were posted on the housing unit walls at Stewart in English and Spanish.

4. At intake, I was provided with some hygiene supplies like soap, shampoo, toothbrush, toothpaste, and toilet paper, but the quantities were small and the items were of poor quality. I bought toothbrushes, toothpaste, soap, and shampoo from the commissary because the quantities were so small.

5. At intake, I was provided clothes, but all of the clothing was used. Some of the boxers they gave us were stained, and the socks were discolored. Even though they were washed I felt like it was not hygienic to wear those, so I bought boxers and socks from the commissary. I also bought undershirts and long-sleeve shirts from the commissary to keep me warm because it was cold all the time at Stewart. We were provided sandals at Stewart, and I had to buy talcum powder from the commissary to keep the sandals from smelling bad.

6. One time, I ran out of toilet paper. When I asked for another roll, a CoreCivic officer told me to use my fingers to clean myself.

7. When I arrived at Stewart, I was not asked whether I wanted to work. I was assigned to a housing unit for kitchen workers and told that if I did not work, I would be sent to segregation where I would not be allowed to interact with others or go to recreation.

8. In the kitchen, I washed dishes, cleaned tables, prepared food, worked on the serving line, took the trash out, worked in the food storage area, and cleaned the bathrooms in the kitchen.

9. I did not receive any training about how to cook or clean in the kitchen from Trinity or CoreCivic.

10. I was forced to cook and serve spoiled food even after I told kitchen supervisors the food was expired. If I dropped food on the floor, the kitchen supervisors told me to serve it anyway.

11. I did not like the food at Stewart because it did not have enough flavor. As an example, when we made beans, the kitchen supervisors told us to add so much water that they did not have any flavor, and the kitchen staff added so much water to the powdered milk that it tasted like water, not milk.

12. I was hungry often. The serving sizes at Stewart were not enough to fill me up.

13. I and other detained people in my housing unit were assigned to early work shifts, and the officers would wake us up, pulling our toes. The officers would pull my small toe and bend it until it hurt to wake me up. The officers also banged on the bed frames with their walkie talkies. The officers told us if we did not go to work, we would go to segregation.

14. I would have upcoming immigration court dates, but the Trinity kitchen supervisors and CoreCivic officer would tell me I had to work and would not let me go to the law library to prepare for my court dates until I finished work.

15. When my family came to visit, the Trinity kitchen supervisors and CoreCivic officer would not let me visit with them because I was at work, and they told me that I had to work first before the visit.

16. Many times I burned my arms preparing food, and the kitchen supervisors did not let me go to medical immediately. They would tell me, "You're not going to die just because you burned yourself." I still have marks on my arms from this.

17. I saw many detained people report to work while sick. They were forced to work even though they would complain they had thrown up or felt weak.

18. I tried not to miss work to go to sick call, visitation, and the law library for fear of punishment or that it would impact my immigration proceedings.

19. It was common for there not to be enough kitchen workers. When this happened, the supervisors made me work a second shift.

20. I was generally paid $4 per day for working in the kitchen. Sometimes when I worked a double-shift, I was paid $5 or $8. After March 2018, I was paid $1 per day if I worked

fewer than six hours, $4 per day if I worked for six hours, $5 per day if I worked eight hours but less than twelve hours, and $8 per day if I worked twelve hours or more.

21. If we worked six full days in a week, the case manager in our unit would give me a $5 phone card in addition to my regular pay.

22. I regularly worked eight-to-nine-hour shifts per day, seven days per week.

23. I used the money I earned from working in the kitchen to buy telephone time so I could call my loved ones to buy items from the commissary like food, stamps, clothing, and hygiene items. Phone calls to my family in Guatemala were especially expensive..

24. I was never told that I could withdraw or how to withdraw from the work program. The CoreCivic staff promised that if I worked, it would help me with my case with ICE.

25. During the time I was at Stewart, the kitchen worker units changed from open dorm units to two-bed celled units, and back to open dorm units.

26. For a while I lived in an open dorm housing unit that I and other detained people called "el Gallinero," or the "Chicken Coop." In the Chicken Coop, all the detained people were in one place, the beds were on top of each other, and the lights were always on. The bathrooms were next to beds just separated by a half-wall. When one person went to the bathroom, the smell spread throughout the room. The Chicken Coop was dangerous. There were often fights.

27. I also lived in a celled housing unit with two-bed cells for a while. Each cell in the unit had its own toilet.

28. While I was housed in a celled kitchen worker unit, officers threatened to transfer me to segregation if I stopped working, called in sick, refused to change shifts as requested, or encouraged others to stop working.

29. One time a CoreCivic officer woke me up to work the 2 a.m. shift, even though I was assigned the 10 a.m. shift that day. When I refused to work the 2 a.m. shift, the officer told me to pack my bags but would not tell me where I was being taken. I worked the early shift that day because I was afraid of my immigration case being negatively affected and of being moved to segregation.

30. Other detained people and I were told that if we did not follow officers' orders, we would be placed in segregation. Officers threatened to move us to segregation if we did not work.

31. Around late 2015, CoreCivic officers threatened to put me in segregation on two different occasions because they thought I was organizing a work stoppage.

32. Officers also threatened to take away our commissary privileges if we stopped working, called in sick, or encouraged others to stop workings.

33. Sometimes my pod was placed on lockdown when detained people refused to work. When we were on lockdown, we had to stay in our beds the entire day, and we could only use the bathroom with permission from an officer.

34. Around October 2017, after I submitted a grievance about an officer who forced me to work when I was sick, I was sent to medical segregation at Stewart. I was in the same unit where people go for disciplinary segregation. The officers told me I was in segregation because I had been exposed to chicken pox, even though I told them I had chicken pox when I was a child.

35. I was in segregation for one month. In segregation, I was in my cell for about 23 hours per day. I was not allowed to see my family, my recreation time was reduced from three to four hours per day to a half hour per day. Segregation was the worst. Twenty-three hours locked

in a room without knowing what time it is, without distractions was very bad. I thought about suicide many times when I was in segregation.

36. When I was in segregation, I learned that another detained person died by suicide in segregation at Stewart, and this made me even more afraid stay in segregation longer.

37. It is important to me to be a named plaintiff in this case because I do not want people at Stewart to be forced to work. I do not want detained people to be misled that their immigration case will be affected or that they will be sent to segregation if they refuse to work. I do not want detained people to be intimidated into working, and I want them to know the tactics the officers use to intimidate people. I want to tell people what happens inside Stewart and how the officers treat detained people there, and I want to put an end to the mistreatment.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 15th day of December, 2021 in Atlanta, Georgia.

Wilhen Hill Barrientos

## INTERPRETER AFFIDAVIT

I, Elliot Lepe, swear and affirm under penalty of perjury of the laws of the United States of America that I am fluent in both the Spanish and English languages and that I read the preceding Declaration in Spanish to Plaintiff Wilhen Hill Barrientos, who affirmed the truth of its contents.


_____                    12-19-21
Signature                                           _____
                                                    Date

# Appendix C

## Appendix C

**Putative Class Members Interviewed on June 17-18, 2021 at Stewart Detention Center**

| First | Last | A No. |
|-------|------|-------|
| ███ | ██ | ████ |
| ████ | ███ | ████ |
| ███ | ██ | ████ |
| ██ | ██ | ████ |
| ████ | ███ | ████ |
| ██ | ████ | ████ |
| ███ | █████ | ████ |
| ██ | ████ | ████ |
| ███ | █████ | ████ |
| ███ | ████ | ████ |
| ███ | █████ | ████ |
| ██ | █████ | ████ |
| ███ | █████ | ████ |
| ███ | ███ | ████ |
| ███ | ████ | ████ |
| ███ | ██ | ████ |

# Appendix D

**Appendix D**
**Tables**

Table 1: SDC Avg. Length of Stay and Avg. Daily Population

Sources: CCEVA000006060, 117872, 149936, 150032, 150206, 150234, 159395, 150466, 150547, 150628, 150947, 150960, 150979, 177470, 177758, 177897, 178342, 180301, ICE-Barrientos-1891, 6133



Table 1: ███████████████████████████████████████████████████

███████████. Note, most years' data reflects the ADP and ALOS at the time in the FFY when those reports were published. No ALOS data was produced for 2010, 2014, or 2021.

| Table 2. SDC ADP by Custody Classification & ALOS, FFY 2019, FFY 2020, FFY2021[1] | | | | | |
|---|---|---|---|---|---|
| **FFY2019** | | **FFY2020** | | **FFY2021** | |
| **Average Length of Stay (ALOS) in days** | | | | | |
| 45 days | | 51 days | | 60 days | |
| **Average Daily Population (ADP) by Custody Classification** | | | | | |
| 1,150 low custody    (60%) | 1,465 (77%) | 613 low custody    (45%) | 869 (64%) | 389 low custody    (51%) | 487 (64%) |
| 315 low-medium    (17%) | | 256 medium-low    (19%) | | 98 low-medium    (13%) | |
| 238 medium-high    (12%) | 446 (23%) | 254 medium-high    (19%) | 482 (36%) | 131 medium-high  (17%) | 281 (36%) |
| 208 high    (11%) | | 228 high    (17%) | | 150 high    (19%) | |
| 1,911 (100%) | | 1,351 (100%) | | 768 (100%) | |

Table 2: The darker shaded areas highlight the numbers and percentages of lower risk detainees. The lighter shaded areas highlight the numbers and percentages of higher risk detainees. Ordinarily, ICE only allows lower custody detainees to work outside their housing units.

---

[1] Dep't of Homeland Sec., Immigr. and Customs Enf't, *Detention Management*, https://www.ice.gov/detain/detention-management (providing ICE detention statistics for FY 2019 through 2022).

| Table 3. SDC Detainee VWP Assignments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Number Detainee Worker Positions by Date** | | | | | | | | |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ████ ████ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ████ ████ ██ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ████ ▮ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ██████ ████ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ████ ███ ██ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ████ ████ ████ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ███ ███ | ■ | ■ | ■ | ■ | ▮ | ▮ | ▮ | ▮ |
| ███ ███ ███ | ▮ | ▮ | ▮ | ▮ | ■ | ■ | ■ | ■ |
| ████ | ■ | ■ | ■ | ■ | ■■ | ■■ | ■■ | ■■ |
| ███ █████ ▮ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ███ ███ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ███ ██ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| █████ ██ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |







| Table 4. SDC's Staffing Plan[11] | | Custody | Civilian | Totals |
|---|---|---|---|---|
| **Scope of work** | **Description** | **Custody** | **Civilian** | **Totals** |

[11] ███████████████████████████████ (CCBVA0000105880) at 4-7.

[12] ████████████████████████████████████████

[13] The four Warehouse Supervisor and Warehouse/Commissary workers are CoreCivic employees. CoreCivic pays their salaries with commissary profits. *See* Brazier Dep. Tr. at 232:23-233:4.

[14] All food service staff are Trinity personnel.

[15] For a portion of the class period, ICE Health Services Corps provided medical services and medical staffing at SDC. CoreCivic began providing medical services and staffing at SDC around 2018. *See* Washburn Dep. Tr. (Dec. 1, 2021) at 82:2-18.

| Table 5. Overview, SDC's Detainee VWP[16] | | | | |
|---|---|---|---|---|
| Detainee Work Assignments | Slots | Work locations | Designated Wk. Supervisors[17] | Dedicated DOs |
| ██████████ | ██ | ████████████ ██████ | ████████████ ████████████ | █ |
| ██████████ | █ | ████████████ | ██████████ | ███ █ ████ |
| █████████ | █ | █████████ | ██████████ | █ |
| █████████ | █ | █████████ | ████████████ | ███ █ ████ |
| █████████ | █ | ██████ | ██████ | █ |
| ████████ | █ | | | ████████████ |

Table 5: ██████████████ ██ ████████████████ ██

██████████████████████

[16] SDC Classification Housing, Work, and Program Plan, Policy 18-100 (CCBVA0000003918).
[17] ████████████████████████ (CCBVA0000105880) at 4-7.

| Wages, detainee work assignments | Laundry | Commissary | kitchen | Subtotal, food service, laundry, commissary | Subtotal, all other wages | All detainee wages |
|---|---|---|---|---|---|---|
| **Table 6: 3-Month Snapshot, SDC Detainee Salaries, January – March 2016[18]** | | | | | | |
| | | | | | | |
| ■■■■ | ■■■ | ■■■ | ■■■ | ■■■■ ■■ | ■■■ | ■■■■ ■■ |
| | | | | | | |
| ■■■■ | ■■■ | ■■■ | ■■■ | ■■■■ ■■ | ■■■ | ■■■■ ■■ |
| | | | | | | |
| ■■■■ | ■■■ | ■■■ | ■■■ | ■■■■ ■■ | ■■■ | ■■■■ ■■ |
| | | | | | | |
| ■■■ | ■■■ ■■■ | ■■■ ■■■ | ■■■ ■■■ | ■■■ ■■■ | ■■■ ■■■ | ■■■ ■■■ |

Table 6: ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

---

[18] ■■■■■■■■■■■■■■■■■■■ (CCBVA0000191616) at 9, 14, 15, 17.

**Table 7**

**Comparison of 2008, 2011, and 2016 PBNDS Voluntary Work Program Requirements**

All provisions of PBNDS 3.3 and 5.8 are applicable to SDC.

| Purpose & Scope | | |
| --- | --- | --- |
| *2008 ICE/DRO PBNDS* | *2011 ICE PBNDS* | *2011 ICE PBNDS (rev. 2016)* |
| 3.3 Voluntary Work Program | 5.8 Voluntary Work Program | 5.8 Voluntary Work Program |
| To provide detainees opportunities to work and earn money, subject to the number of work opportunities available and within the constraints of safety, security and good order. Although not legally required, ICE/DRO affords working detainees basic OSHA protections. | New. This detention standard replaces "Voluntary Work Program" dated Dec. 12, 2008, and incorporates requirements enacted on Nov. 2, 2004, regarding detainees assigned to work outside of a facility's secure perimeter. | same |
| **Expected Outcomes** | | |
| Availability. Opportunities to work and earn money, subject to the number of work opportunities available and within the constraints of safety, security, and good order. | same | same |
| Voluntary. Able to volunteer for work assignments but otherwise not required to work, except to do personal housekeeping. | same | same |
| Facility Benefits. Essential operations and services enhanced through productivity from detainees. | same | same |
| Detainee Benefits. Reduce negative impact of confinement through less idleness, improved morale, and fewer disciplinary incidents. | same | same |
| Compliance with all applicable laws. Detainee working conditions will comply with all applicable federal, state, and local work safety laws and regulations. | same | same |
| Protection against Discrimination. There will be no discrimination regarding VWP access based on any detainee's race, religion, national origin, gender, sexual orientation, or disability. | same | same |
| Language Accessibility. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner which the detainee can understand. | same | New: The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their |

| | | |
|---|---|---|
| | | English proficiency (LEP). The facility will provide a) auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, devices for hearing impaired persons (TTYs), interpreters, and note-takers, as needed; and b) language assistance, including<br><br>bilingual staff or professional interpretation/translation services.<br><br>Generally, all written materials will be translated into Spanish. When possible, written translation shall be made for other significant groups of LEP detainees. Oral interpretation or assistance shall be provided<br><br>to any detainee who speaks another language when written material has not been translated, or   is illiterate. |
| **Expected Practices** | | |
| <u>Voluntary Work Program</u>. Detainees who are physically and mentally able to work shall be provided the opportunity to participate in any voluntary work program. Their classification level shall determine the type of work assignment for which s/he is eligible. Level 3 (highest level) detainees shall not work outside their housing units. | Revised: Generally, high custody detainees (Level 3) shall not be given work opportunities outside their housing units/living areas. | same |
| <u>Work Outside the CDF Secure Perimeter</u>. Only Level 1 detainees  may work outside the secure perimeter on facility grounds. They must be directly supervised at a ratio NGT 1 DO: 4 detainees. Detainees  shall be within sight and sound of the DO at all times. | same | same |
| <u>Personal Housekeeping Required</u>. Work assignments are voluntary; however, all detainees are responsible for personal housekeeping. CDF detainees shall  maintain their immediate living areas in a neat and orderly manner by a) making their bunk beds daily, b) stacking loose papers, c) keeping the floor free of debris and dividers free of clutter, and d) not hanging or draping clothes, | same | same |

| | | |
|---|---|---|
| pictures, keepsakes, or other objects from beds, other furniture, or overhead light fixtures. | | |
| <u>Detainee Selection</u>. The facility administrator shall develop site-specific rules for selecting work detail volunteers, and record in a procedure that includes a voluntary work program agreement documenting the facility's program and its compliance with this standard. The primary factors in *hiring* a detainee as a worker shall be his or her classification level and the specific requirements of the job.<br><br>Inquiries to staff about the detainee's attitude/behavior may be used as a factor in their selection. Additionally, the shift supervisor or department head shall assess the detainee's language skills as it affects the detainee's ability to perform the specific requirements of the job under supervision. To the extent possible, work opportunities should be provided to detainees who are able to communicate with supervising staff effectively and in a manner that does not compromise safety and security. Staff shall explain the rules and regulations as well as privileges relating to the detainee worker's status. The detainee shall be required to sign a VWP agreement before starting each new assignment. Completed agreements shall be filed in the detainee's detention file. | same | same |
| <u>Special Details</u>. Detainees may volunteer for temporary work details that occasionally arise. The work, generally lasting from several hours to several days, may involve such tasks as digging trenches, removing topsoil and other labor-intensive work. | same | same |
| <u>Discrimination in Hiring Prohibited</u>.<br><br>Detainees shall not be denied VW opportunities on the basis of such factors as a detainee's race, religion, national origin, gender, sexual orientation or disability. | same | same |
| <u>Physically and Mentally Challenged Detainees</u>. While medical or mental health restrictions may prevent some physically or mentally challenged detainees from working, those with less severe disabilities shall have the opportunity to participate in the VWP program in appropriate work assignments: a) the selecting official must consider the precise limitations of a disabled individual before rejecting him/her for selected | same | Revised. <u>Detainees with Disabilities</u>. The facility shall allow, where possible, detainees with disabilities to participate in the VWP in appropriate work assignments. Consistent with the procedures outlined in Standard 4.8 "Disability Identification, Assessment, and |

| | | |
|---|---|---|
| work assignments; b) expediency or convenience is insufficient to reject or stereotype a detainee who, with reasonable accommodation, can perform essential functions of the work assignment; and c) in disputed cases, the selecting official shall consult medical staff to determine their  suitability for a given project. | | Accommodation," the facility shall provide reasonable accommodations and modifications to its policies, practices, and/or procedures to ensure  they have an equal opportunity to access, participate in, and benefit from the VWP. |
| <u>Hours of Work</u>. Participants in the VWP are required to work according to a fixed schedule. The normal scheduled workday for a full time VWP participant is 8 hrs. maximum. Detainees shall not be permitted to work in excess of 8 hours daily, 40 hours weekly. Unexcused absences from work or unsatisfactory work performance may result in removal from the voluntary work program. | same | same |
| <u>Number of Details in One Day</u>.  A  detainee may participate in only one work detail per day. | | same |
| <u>Facilities That Detain Criminal Aliens</u>. If the facility cannot establish the classification level in which the detainee belongs, the detainee shall be ineligible for the VWP. | New title. <u>Establishing Detainee Classification Level</u>. | same |
| <u>Compensation</u>. Detainees shall receive monetary compensation for work completed. The compensation at CDFs is $1/day. Ordinarily, it is to be paid daily, unless the facility has a system in place that *ensures* workers receive the pay owed them *before* being transferred or released. | Revised. Detainees shall receive monetary compensation for work completed in accordance with the facility's standard policy. The compensation is at least $1/ day. The facility shall have an established system that ensures detainees receive the pay owed them before being transferred or released. | same |
| <u>Removal of Detainee from Work Detail</u>. A detainee may be removed from a work detail for such causes as a) unsatisfactory performance, b) disruptive behavior, threats to security, etc.; c) physical inability to perform all functions required by the job, whether because of a lack of strength or a medical condition; d) prevention of injuries to the worker; or e) a removal sanction imposed by the facility's Disciplinary Panel for an infraction of a facility rule, policy, or regulation. When a detainee is removed from a work detail, the facility administrator shall document the circumstances and reasons in his/her detention file. | same | Revised. Detainees may file a grievance to the local Field Office Director or facility administrator if they believe they were unfairly removed from work, in accordance with standard 6.2 Grievance System. |

| | | |
|---|---|---|
| Detainee Responsibility. The facility administrator shall establish procedures for informing detainee volunteers about on-the-job responsibilities and reporting procedures. The detainee is expected to be ready to report for work at the required time and may not leave an assignment without permission: a) the detainee shall perform all assigned tasks diligently and conscientiously; b) the detainee may not evade attendance and performance standards in assigned activities or encourage others to do so; c) the detainee shall exercise care in performing assigned work, using safety equipment and taking other precautions in accordance with the work supervisor's instructions; and d) in the event of a work-related injury, the detainee shall notify the work supervisor who shall implement immediately injury response procedures. | same | same |
| Detainee Training and Safety. All facilities shall comply with all applicable health and safety regulations and standards. The facility administrator shall ensure that all department heads develop and institute, in collaboration with the facility's safety/training officer, appropriate training for all detainee workers. 1. The VWP shall operate in compliance with: a) OSHA regs, b) Nat'l. Fire Protection Assoc. 101 Life Safety Code, c) ACA standards for ADLF, current ed., and d) Int'l Council Codes (ICC). 2. Upon a detainee's assignment to a job or detail, the supervisor shall provide thorough instructions regarding safe work methods and, if relevant, hazardous materials including a) safety features and practices demonstrated by the supervisor, and b) recognition of hazards in the workplace, including the purpose for protective devices and clothing provided, reporting deficiencies to their supervisors. Anyone who does not read English will not be authorized to work with hazardous materials; c) a detainee shall not undertake any assignment before signing a VWP agreement that, among other things, confirms s/he has received and understood training from the supervisor about the work assignment. The VWP agreement shall be placed in the detainee's detention file. 3. For a food service assignment, medical staff, in conjunction with the IHSC, shall ensure that detainees are medically screened and certified before undertaking the assignment. 4. The facility shall provide detainees with safety equipment that meets OSHA and other standards | Revised. The VWP program agreement, which each detainee is required to sign prior to beginning each new assignment, will be placed in the detainee's detention file. | same |

| | | |
|---|---|---|
| associated with the task performed. 5. The facility administrator shall ensure that the facility operates in compliance with all applicable standards. | | |
| <u>Detainee Injury and Reporting Procedures</u>. The facility administrator shall implement procedures for immediately and appropriately responding to on-the-job injuries, including immediate notification of ICE/DRO. If a detainee is injured while performing their work assignment a) the work supervisor shall immediately notify the facility medical staff. In the event that the accident occurs in a facility that does not provide 24-hour medical care, the supervisor shall contact the on-call medical officer for instructions; b) first aid shall be administered when necessary; c) medical staff shall determine what treatment is necessary and where that treatment shall take place; and d) the work supervisor shall complete a detainee accident report and submit it to the facility administrator for review and processing, and file it in the detainee's detention file and A-file. | same | same |

| Table 8. SDC Detainee VWP Assignments | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Number Detainee Worker Positions by Date** | | | | | | | | **Days/ Shifts** | **Pay/ Day** |
| | ▅ | ▅ | ▅ | ▅ | ▅ | ▅ | ▅ | ▅ | | |
| █████ ████ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▅ | ▅ |
| ████ ██████████ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▅ | ▪ |
| ████ ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▅▪ ▪ | ▅ |
| ██████ ███ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▅▪ ▪ | ▪ |
| ████████ ██ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▅ ▅█ | █▪ |
| █████████ ██ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▅▪ ▪ | ▅ |
| ████████ ██ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▅▪ ▪ | ▅ |
| ███████ ██ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▅▪ ▪ | ▪ |
| ██████████ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▅▪ ▪ | ▅▪ ▪ |
| ████ █████ ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▅▪ ▪ ██ | ▅ |
| █████████ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▅ | ▅ |
| █████ █████ ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ | ▅▪ ▪ | ▅ |



