# Exhibit 16

# (REDACTED)

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| WILHEN HILL BARRIENTOS, GONZALO BERMUDEZ GUTIÉRREZ, and KEYSLER RAMÓN URBINA ROJAS individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CORECIVIC, INC.,<br><br>Defendant. | Civil Action No. 4:18-cv-00070-CDL |

## REBUTTAL EXPERT REPORT OF PLAINTIFFS' EXPERT DR. DORA SCHRIRO

### I.   Introduction

1. On December 22, 2021, I submitted an expert report regarding CoreCivic's Voluntary Work Program (VWP) at Stewart Detention Center (SDC) in Lumpkin, Georgia over the proposed class period. The report included, but was not limited to, the following conclusions:

2. It is my opinion that CoreCivic's VWP at SDC violates operative standards and policies designed to ensure its voluntariness. People in immigration detention cannot be forced to work. CoreCivic's policies violate a key tenant of its Agreement with U.S. Immigration and Customs Enforcement (ICE), to comply with ICE's detention standards, including the prohibition on compelling people in its custody to work. CoreCivic persists in these practices because ICE's oversight of CoreCivic is inadequate.

3. It is my opinion that CoreCivic relies on detainee labor to perform essential operations at SDC.

4. It is my opinion that CoreCivic's policy is to deprive detained individuals of basic necessities, a practice that helps to ensure the maximum number of detained participants in SDC's VWP.

5. Defendant CoreCivic's expert, Joseph V. Penn, MD, submitted a report on February 2, 2022, in which he addressed whether there is "evidence that detainees at SDC are or were subject to coercion through forced labor or any other custodial circumstances at SDC," and stated,

1

"[H]ad SDC [been] found to have been coercing detainees or forcing them to work, deficiencies would have been noted in the [inspection] reports."[1]

## II. Dr. Penn Implies the Principles of Command and Control Are Not at Work at SDC, a Secure Detention Facility Where Detainees Have No Voice or Vote

6. Secure facilities are unlike any other in the fields of health and safety. Custody staff and healthcare professionals who work in fortified facilities such as jails, prisons, and detention centers premise their interactions with prisoners, patients, and the people in ICE's custody, on the principles of command and control. These dynamics are most often discussed in the context of the "total institution" construct, a foundational theory about the keeper and the kept, widely recognized and highly regarded by social scientists here and abroad. Dr. Penn does not appear to be familiar with its principles or correctional practices, or he would not be so quick to assume that those in the custody of the government say nothing because they have nothing to say.

7. The total institution is a key construct critical to the analysis of facilities that leverage complete control but not always for the same reason.[2] When first put forward, correctional and psychiatric facilities, the military, and certain religious orders were its primary focus, and more recently, immigration detention commands its attention as well. All of these settings are places of residence and work, places where a large number of similarly situated individuals, cut off from the community at-large for a considerable amount of time, sometimes voluntarily and other times not, live under tightly controlled and formally administered conditions.[3] Each in its own way, all of them are institutions whose encompassing or total character is symbolized by its inhabitants' physical and psychological barriers to social exchanges, both within and beyond the facility's perimeter — in the case of correctional and immigration facilities, by means of electrified fences, rolls of razor ribbon, roving patrols, guard towers, uniformed staff of every rank and the like — as well as by strategies just as compelling and readily recognizable within its walls, such as the cellblocks and locked dormitories in which everyone is housed and the jumpsuits they wear. Until recently, correctional facilities had been among the most widely recognized example of the total institution. ICE's virtually exclusive use of jails and prisons to over-detain civilly held individuals has led many in the community to conclude however, that those in civil detention also deserve to be punished. Although, as a matter of law, immigration detention facilities are not supposed to serve any punitive purpose whatsoever.[4] From this follow certain important implications.

---

[1] Report of Joseph V. Penn at 98.
[2] *See* Erving Goffman, *On the Characteristics of Total Institutions* (1961).
[3] *See id.*
[4] *See* Report of Dora Schriro at ¶57; *see also* Anil Kalhan, *Rethinking Immigration Detention*, 110 Colum. L. Rev. Sidebar 42 (2010)

8. First, within the total institution there is a fundamental divide between the large group being moved and managed — immigration detainees in this case — and a much smaller number of staff who supervise them — at SDC, these are primarily CoreCivic detention staff.

9. At SDC, the CoreCivic workforce is primarily custody staff organized by rank. Still, any employee's standing is greater than that of every detainee in their custody. As such, every CoreCivic employee, uniformed staff and civilians alike, including those of a subcontractor such as Trinity Services Group, Inc.(the facility's food service provider) enjoys standing superior to that of detainees. These employees can and do issue orders to detainees, and discipline those who fail to follow their directions. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

10. As is the case with all total institutions, detainees' access to those beyond the fence line is severely restricted. The detained population is surveilled all day, every day. Their mail, phone calls, and visits are scrutinized; their movement is regulated. Should they leave the facility for any reason, they come and go in restraints and under armed escort. Most days, all day, and regardless of their custody level, SDC secures detainees in their housing unit except for those whose work assignments are in the kitchen, laundry, or medical unit. In comparison, detention staff and administrators enter and exit and move about the facility freely and return home every day at the end of their shift.

11. The disparity in treatment of keepers and the kept also promotes stereotypes. Staff is suspicious of detainees, and detainees are apprehensive about staff. These dynamics empower detention personnel and disenfranchise detainees. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

12. Interaction of any kind between staff and detainees is also severely restricted. CoreCivic regulates conversation between the detained population vis-à-vis lines painted around officers' workstations, which detainees must not cross, and forms that detainees must fill out in order to ask a question, lodge a complaint, contest a disciplinary action, air a grievance, or request reconsideration of their custody level, housing unit, or upper/lower bunk. And just as conversation and movement are constrained, so, too, is the exchange of information. Rarely

---

[5] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (ICE-Barrientos-0534).
[6] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (TRINITY00000080-TRINITY00000168).
[7] Bud Allen & Diana Bosta, *Games Criminals Play: How You Can Profit by Knowing Them* (1981).
[8] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (TRINITY00000080) at TRINITY00000118.

do detainees receive the information, explanation, or outcomes they are seeking, and even less frequently, is it timely, correct and complete.

13. Another major implication of the total institution relates to work.

    a. In the free world, work is the primary means by which one earns wages to care for him or herself and their family.

    b. Work is also an opportunity for personal expression, to engage in an activity one enjoys, to create value, and to contribute to the community.

    c. In the free world, the authority of the workplace stops when the worker receives his or her paycheck, at which point, the where, how, with whom, and on what they spend their wages are personal matters. That is not the case, however, for those held in a secure facility. Because the total institution assumes complete control of everyone in its custody, the law requires the facility also provide for all the population's basic needs – food, shelter, clothing, health care, personal hygiene, prescription glasses and other adaptive devices, and the like. Thus, the nominal wages that detainees at SDC receive in exchange for their labor — at no more than several dollars a day basically a ceremonial payment for their participation in the facility's work program — should be theirs to spend, save, or send home as they see fit. But at SDC, detainee workers must spend their wages on basic necessities because the care that CoreCivic provides SDC's detainees fails to meet ICE's minimum standards, as discussed in my opening report.

    d. It is my opinion that detainees at SDC likely work, neither enticed by a desire to be active, a means of self-expression, nor for reward, but by the threat or actual imposition of punishment or the withholding of a reward, often entailing reclassification to a higher custody level resulting in reassignment to more restrictive housing, and/or a write-up and transfer to disciplinary segregation, known as "the hole." However, not all punishment comes with paperwork, thus leaving no paper trail per se. All too often, punishment entails greater curtailment of the detainee's already severely limited movement or involves other forms of alienation, such as transfer to larger, noisier, more chaotic housing in the facility, units occupied by gang members, units notorious for higher rates of violence such as one that detainees at SDC call "El Gallinero" ("the chicken coop"), or to dormitories where there are no other detainees who speak the same languages as do they, or are not of the same race, ethnicity, and/or religion.

14. To ensure compliance from the onset, the total institution inducts new arrivals vis-à-vis a series of debasements, degradations, and humiliations.[9] Its admissions process is an experience as harsh as criminal incarceration. So it is, SDC's intake is much more than a trimming of detainees' identity as they come off the bus; it is a series of obedience tests: the

---

[9] Gresham M. Sykes, *The Society of Captives* 63-83 (1958).

exchange of street clothes for a jumpsuit and street shoes with shoelaces for slip-on sneakers or plastic shower shoes; detainees' surrender of all their other personal property, including any cash and checks they may have had on their person and jewelry they may have been wearing; the issuance of an "A" (alien) number by which each new arrival will be known for the duration of their immigration proceedings and corresponding ID card or armband that must be displayed at all times; a handbook full of minor rules with major consequences; and assignment to housing units based on the facility's cursory assessment of risk, not their physical, psychological, and emotional needs.

15. Likewise, all the communication in total institutions is top-down, and SDC is no exception. Facility staff, uniformed and civilians alike, demand absolute obedience — in attitude as well as in actions — of all detainees, all of the time. There is a process to voice complaints and advance grievances, but it is largely illusory. Complaints, once lodged, label the complainant a troublemaker, not a problem solver. And staff's surveillance is continual. Dr. Penn's assertion that few grievances signify there are few complaints is simply wrong, another indicia of his unfamiliarity with the conditions under which CoreCivic detains people at SDC.

16. And finally, the institution's "house rules" are exacting. The rewards are few and infrequent, the punishments far-reaching and ongoing. SDC's is a privilege system that features both the temporary and permanent withdrawal of benefits and includes even the loss of the right to try to earn any privileges. The total institution is especially adept at leveraging the limited privileges it doles out to only some in the population, and only some of the time, such as relatively better (which is to say, less awful) places where SDC assigns detainees to work and sleep in the facility, to reward those who are compliant and to punish those who are not, such as with a bit more or less food. At SDC, detainees have no voice or vote.

17. Dr. Penn, whose only exposure to people pending immigration proceedings appears to be jail inmates with ICE detainers and people he may have encountered during NCCHC inspections and consultation at three immigration detention centers,[10] thus is misguided when he says that through his clinical and administrative work he maintains a "real world" perspective of the challenges in the provision of services to incarcerated individuals.[11] When the vast majority of detainees do not want to speak with, or voice a complaint to, strangers who are there at the behest of ICE, or they only tell that stranger what they believe that stranger wants to hear, it is not because detainees do not have anything to say. It is because the cost of doing so is too dear.

18. Dr. Penn did not consider any of the reports produced by the Government Accountability Office (GAO) and the Department of Homeland Security Office of Inspector General (DHS OIG), all of them highly critical of practices in place at SDC, nor did he compare the ODO's

---

[10] *See* Report of Joseph V. Penn.
[11] *Id*. at 21.

5

detailed reports with the superficial summaries that Nakamoto produced. And none of the Nakamoto reports Dr. Penn considered identify the many violations of detention standards that the ODO discovered. While the circumstances in which immigration detainees find themselves are difficult and disorienting, I have found, in my experience working at ICE and continuing to inspect immigration detention centers in my capacity as an expert, that the vast majority of detainees are highly motivated to pursue relief and remain in the U.S., and if they cannot stay in this country, they are resolved to return to their home country without incident. That is why so few file grievances. And when they undertake a hunger strike or refuse to work, it is likely because the conditions are unbearable.

19. In sum, it is my experience that the people in ICE's custody are reliable witnesses. That which they report, they do so with considerable care and at great personal cost. Based on my experience, it is my opinion that Dr. Penn is wrong to presume that the absence of formal complaints from people detained at SDC means coercion is not taking place. It is also my opinion that Dr. Penn's belief that "[i]t is likely that many ICE detainees might have believed that drawing attention to medical or mental health issues or distress might have a favorable impact or outcome regarding their pending deportation proceedings" is both cynical and unfounded.[12]

### III. Dr. Penn Assigns Too Much Weight to the Audit and Inspection Reports He Reviewed

20. Dr. Penn claims no expertise in the ICE detention standards applicable at SDC or familiarity with the origin of and ICE's misapplication of its inspection instruments or the reports issued by the executive and legislative branches' oversight authorities critical of ICE's efforts at accountability.

21. Likewise, though Dr. Penn has experience providing healthcare in correctional settings, he claims no expertise in the various non-health-related American Corrections Association (ACA) standards that apply at SDC or in the ACA's accreditation process at ICE facilities.

22. Perhaps because of his lack of familiarity with the standards and the various entities that assess SDC's compliance with them, Dr. Penn gives undue weight to ICE and ACA inspections and audits, and he presumes that the fact that inspectors and auditors did not cite forced labor at SDC in their reports means there is in fact no forced labor at SDC. This presumption is erroneous.

23. I discuss ICE's inadequate oversight of SDC at length in my opening report.[13] In sum, it is my opinion based on my experience and review of past audits, that the annual inspections

---

[12] *Id.* at 89.
[13] Report of Dora Schriro at 30-34.

conducted by Nakamoto on behalf of ICE are cursory. The Nakamoto audits claim to assess most of the PBNDS standards and find that SDC always "Meet Standards," regardless of the several and always unspecified, deficient component findings, including repeat deficiencies, in most of its inspections. Nakamoto's reports give little to no detail about what was examined or found in the course of concluding that ICE's policies are faithfully executed at SDC.

24. None of Nakamoto's inspections cited by Dr. Penn address the VWP at SDC specifically, and if they mention the VWP at all, they do so only in passing. Similarly, ODO and ACA inspections, which Dr. Penn also discusses, compare SDC's policy with PBNDS's work program standards but not its practices. There is no indication in any of the inspection reports cited by Dr. Penn that auditors specifically looked at whether people detained at SDC are being forced to work.

25. The only ODO report Dr. Penn summarized to any extent is ODO's 2021 report, stating, "As the compliance indicators, forms, and means of inspection evolved over time, I only focused on this level of detail for the most recent inspection."[14] He is wrong about that. Neither the ODO nor Nakamoto worksheets have changed substantively. The ODO's worksheets are quite detailed; Nakamoto's are not. The ODO reports are also quite detailed; Nakamoto's are not. Dr. Penn also failed to note the appreciably greater number of negative findings in ODO reports, especially as contrasted to just a couple of minor mistakes Nakamoto cites in its cursory reviews. Further, Dr. Penn failed to note SDC's exceptionally poor performance in 2009 and 2018, triggering what he characterized as merely "a follow-up" compliance inspection by the ODO in 2010 and 2019.

26. A notable oversight report that Dr. Penn did not consider is DHS OIG's 2017 report regarding the treatment and care of ICE detainees at four immigration facilities, one of which was SDC.[15] The OIG selected six facilities based on complaints to its confidential hotline, open source reporting, and reports from non-governmental organizations —a source that Dr. Penn disparaged. Unlike Nakamoto, ODO, ACA, and NCCHC, OIG's inspections are unannounced. In preparing the 2017 report, the OIG examined the medical units, the kitchen including food preparation and storage and equipment cleaning areas, intake and out-processing areas, Special Management Units, and housing units including individual cells at each facility. The OIG also analyzed grievance procedures, evaluated staff-detainee communication practices, and conducted interviews with detainees, ICE staff, and facility management staff. The OIG followed up on identified issues with further file review and

---

[14] Report of Joseph V. Penn at 27, 47.

[15] Dep't of Homeland Sec., Office of Inspector Gen'l, *Concerns about ICE Detainee Treatment and Care at Detention Facilities* (CCBVA0000203436); *see* Report of Joseph V. Penn at 140-45 (listing "Documents Provided for Consideration").

review of documents. The inspections of five of the six facilities raised concerns about treatment and care of ICE detainees; four were addressed in this report, including SDC. Of these four facilities, the OIG stated, "Overall, the problems we identified undermine the protection of detainees' rights, their humane treatment, and provision of a safe and healthy environment."[16] The OIG specifically noted deficiencies at SDC in the following areas, which, in my opinion, provide evidence of CoreCivic's violation of operative policies and standards designed to ensure the voluntariness of the VWP at SDC.

    a. Insufficient Protection of Detainees' Basic Rights

        i. *Difficulties Resolving Issues through the Grievance System and Other Channels*. The PBNDS establish procedures for detainees to file formal grievances, which are designed to protect detainees' rights and ensure detainees are treated fairly. Resolution, however, depends on facility staff properly handling and addressing grievances without deterrents, which the OIG identified to be an issue at several facilities including SDC. Specifically, detainees reported that staff obstructed or delayed their grievances or intimidated them through threat of retaliation into not complaining. These deterrents prevented detainees from filing grievances about serious concerns that should be addressed and resolved. At SDC, the OIG reviewed a sample of grievances and found "an inconsistent and insufficiently documented grievance resolution process."[17] The OIG noted that "[m]any serious complaints from the sample at this facility included only cursory and uninformative explanations of the resolution."[18] Detainees are also supposed to have access to telephones and be able to make free calls to the DHS OIG. At SDC, when OIG staff called the OIG Hotline, they received a recorded message that the number was "restricted." The OIG noted, "Without an effective, compliant grievance process and access to ICE and other channels, facilities risk escalating or ignoring problems, which may lead to a failure to protect detainees' rights."[19]

        ii. *Improper Treatment of Detainees by Detention Staff*. The OIG stated it had concerns about a lack of professionalism and inappropriate treatment of detainees by facility staff, which fostered a culture of disrespect and disregard for detainees' basic rights.[20] At all four facilities, detainees confided in their

---

[16] Dep't of Homeland Sec., Office of Inspector Gen'l, *Concerns about ICE Detainee Treatment and Care at Detention Facilities* (CCBVA0000203436) at CCBVA0000203441.
[17] *Id.* at CCBVA0000203443.
[18] *Id.*
[19] *Id.*
[20] *Id.* at CCBVA0000203444.

8

        interviews that staff mistreated them, citing detention staff yelling at detainees, as well as using disrespectful and inappropriate language. Some detainees at SDC also reported staff interrupted and delayed Muslim prayer.

    iii. *Potential Misuse of Segregation.* Facility staff may separate detainees from the general population and place them in either disciplinary segregation or administrative segregation for a number of reasons, including violations of facility rules, risk of violence, or to protect them from other detainees. The OIG determined three of the four facilities including SDC violated the PBNDS in their administration, justification, and documentation of segregation and lock-down of detainees. Staff did not always tell detainees why they were being segregated, nor did they always communicate detainees' rights in writing or provide appeal forms for those put in punitive-lockdown or placed in administrative segregation. In multiple instances, the OIG found detainees were disciplined, including being segregated or locked down in their cells, without adequate documentation in the detainees' files to justify the disciplinary action. The OIG also identified detainees who were held in administrative segregation for extended periods of time without the documented, periodic reviews that are required to justify continued segregation. Some detainees were locked down in their cells for violations of minor rules without required written notification of reasons for lock-down and appeal applications. Documentation of daily medical visits and meal records for detainees being held in segregation was also missing or incomplete.

  b. Problems with Detainee Care and Facility Conditions

    i. *Delay in Accessing and Inadequate Documentation of Medical Care.* Some detainees at SDC, including of detainees with painful conditions, reported long waits for care. Additionally, not all medical requests that detainees reported submitting, or the outcomes, were documented in detainee files or facility medical records. Relatedly, through my records review, I identified detainee workers who refused to work because they were waiting for sick call and were subsequently singled out by CoreCivic staff.[21] [22]

---

[21] *E.g.*, ▮▮▮▮▮ (CCBVA0000189988); ▮▮▮▮▮ (CCBVA0000151709); *see also* Decl. of Wilhen Hill-Barrientos at ¶¶ 17, 18.

[22] ▮▮▮▮▮ (CCBVA0000189792) at CCBVA0000189795.

9

      ii. *Lack of Cleanliness and Limited Hygienic Supplies*. Although the PBNDS require maintaining "high facility standards of cleanliness and sanitation," the OIG observed at SDC and another facility detainee bathrooms that were in poor condition, including mold and peeling paint on the walls, floors, and showers. At SDC, some detainee bathrooms had no hot water and some showers lacked cold water. Detainees reported water leaks in some housing units.[23] Multiple detainees at SDC and another facility also reported some of the basic hygienic supplies such as toilet paper, shampoo, soap, body lotion, and toothpaste, were not provided promptly or at all when detainees ran out of them. According to one detainee, when detainees used up their initial supply of certain personal care items, such as toothpaste, they were told to purchase their own at the facility's commissary. This is contrary to the PBNDS, which specify that personal hygiene items shall be replenished as needed.[24]

      iii. *Potentially Unsafe Food Handling*. The OIG also observed problems with food handling and safety at all four facilities including SDC, some of which did not comply with the PBNDS for food operations and could endanger the health of detainees.[25] The OIG observed spoiled, wilted, and moldy produce and other food in kitchen refrigerators, as well as food past its expiration date. The OIG also found expired frozen food, including meat, and thawing meat without labels to indicate when it had begun to thaw, or the date by which it must be used. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[26]

27. Dr. Penn does not appear to be familiar with the development and processes of the various oversight entities that inspect and assess SDC. Dr. Penn is correct that Nakamoto, ICE ERO, ICE ODO, ACA, and NCCHC inspectors did not cite forced labor at SDC. That is because the audit tools they use are not designed to uncover forced labor. The absence of any findings in those entities' audit and accreditation reports relating to forced labor at SDC is not evidence that forced labor is not happening.

## IV. Dr. Penn's Opinions Regarding Discipline and Segregation at SDC Are Misguided

28. Dr. Penn stated, "The hypothetical conditions of segregation (and the housing units) which Dr. Stewart opines are inhumane and coercive, in fact and practice, do not exist at SDC,"[27] without a single citation to substantiate his claim. To the contrary, the OIG released another

---

[23] Dep't. of Homeland Sec., Office of Inspector Gen'l., *Concerns about ICE Detainee Treatment and Care at Detention Facilities* (CCBVA0000203436) at CCBVA0000203445.
[24] *Id.*
[25] *Id.* at CCBVA0000203446.
[26] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (CCBVA0000217504).
[27] Report of Joseph V. Penn at 39.

report just several months ago in October 2021 concerning ICE's inadequate oversight of its facilities' use of segregation.[28] The OIG concluded, "Numerous studies have found any time spent in segregation can be detrimental to a person's health and that individuals in solitary confinement may experience negative psychological and physical effects even after being released. Without adequate oversight, clear policies, and comprehensive data, ICE does not accurately capture or report the full extent of detention facilities' use of segregation." [29]  SDC is not exempt from this conclusion.

29. I observed the segregation unit at SDC during the site inspection I conducted for this case. It is physically and functionally equivalent to segregation units I have observed in countless jails, prisons, and ICE detention centers throughout the country throughout the course of my career. Dr. Penn, who acknowledged having very little firsthand experience with immigration detention centers and has never been to SDC, opined that there are no similarities in the criminal and civil systems' special management units.[30] In fact, ICE's Special Housing Units encompass Administrative and Disciplinary Segregation units as do those in correctional agencies. At SDC, Administrative Segregation includes Protective Custody and sometimes it is also used improperly to "medically isolate" detainees as CoreCivic asserts was the case for Mr. Hill-Barrientos. These placements are often indefinite in duration, and pursuant to PBNDS, they may only be employed if there is not a designated Medical Unit, which is not the case at SDC.[31] Even the threat of disciplinary segregation, whether or not it entails several days in pre-disciplinary detention about which Dr. Penn makes light, and/or a sentence to disciplinary segregation, likely has a coercive effect, especially for people who are seeking immigration relief and hope to remain in the United States. The disciplinary process at SDC is punitive in and of itself, something Dr. Penn never addresses.

30. The threat of segregation, and discipline more generally, looms large at SDC at all times. The disciplinary process at SDC is overwhelmingly punitive. ████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████[32] Whether or not a

---

[28] See Dep't of Homeland Sec., Office of Inspector Gen'l, *ICE Needs to Improve Its Oversight of Segregation Use in Detention Facilities*, OIG-22-01 (Oct. 13, 2021) (PLS_0009126).
[29] *Id.* at PLS_0009138 (citing Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. U. J. L. & POL'Y 325 (2006); Kaba F, Lewis A, et al. *Solitary confinement and risk of self-harm among jail inmates*, Am. J. Public Health. 2014 Mar;104(3):442–7; *Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment*, U.N. Doc. A/66/268 (Aug. 5, 2011) (by Juan E. Mendez)).
[30] Report of Joseph V. Penn at 94.
[31] Dep't of Homeland Sec., Office of Inspector Gen'l, *ICE Needs to Improve Its Oversight of Segregation Use in Detention Facilities*, OIG-22-01 (Oct. 13, 2021) (PLS_0009126) at PLS_0009146.
[32] ████████████████ (CCBVA0000006272, CCBVA0000006273, CCBVA0000006284, CCBVA0000006285, CCBVA0000006286).

detainee is sent to segregation, his or her custody classification score may be raised by as much as six points, causing their custody level to rise to medium-high or high custody. This alters the conditions of detention for the duration of their time in ICE's custody and affects their appearance during immigration proceedings when he or she appears before the court in a red jumpsuit signifying higher custody, instead of an orange jumpsuit signifying lower custody. Reclassification from lower to higher custody is a highly likely disciplinary outcome for any action CoreCivic staff deems to be a threat to the facility, including the refusal to obey a direct order, such as to report to work.[33]

### V.   Summary and Conclusions

31. In sum, in forming opinions about whether there is evidence that people detained at SDC are forced to work, Dr. Penn gives no regard to the fact that SDC is a total institution with all the power dynamics at play in such a setting. Dr. Penn's opinion that CoreCivic staff are to be believed always and detainees never, despite all the evidence provided by CoreCivic and others to the contrary, is simply wrong.

32. Dr. Penn assigns too much weight to certain audit and inspection reports over which ICE exercises considerable control, especially Nakamoto with which ICE contracts for annual reviews of most its facilities and other entities whose audits and assessments are always prescheduled. Dr. Penn disregards the findings of highly credible government offices outside of ICE, notably the DHS OIG, the GAO, and Congressional committees. The numerous deficiencies in CoreCivic's operation of SDC's VWP are not found because none of the inspections in which ICE is involved looks for them.

33. Dr. Penn's opinions regarding discipline and segregation at SDC are misguided. He did not tour the facility, review detainees' disciplinary files, or speak with any of the detainees in SDC's Special Management Units. Instead, he argues SDC's conditions of segregation are not inhumane and coercive, without a single citation to substantiate his claim. As recently as October 2021, the OIG found otherwise.

I swear under penalty of perjury that the foregoing is true and correct.

Respectfully submitted this 22nd day of February 2022.

_____
Dr. Dora B. Schriro Ed.D., J.D.

---

[33] 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 71-73 (PBNDS 2.2, Appendix 2.2.A: ICE Custody Classification Worksheet).