# **Exhibit 20**

# (REDACTED)

This Exhibit contains the specific pages of the deposition Plaintiffs are referencing. The entire deposition was separately filed in the record pursuant to LR 5.1 and the M.D. Ga. CM/ECF Administrative Procedures Manual.

1

2          IN THE UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF GEORGIA
3                  COLUMBUS DIVISION

4             CASE No. 4:18-CV-00070-CDL

5

WILHEN HILL BARRIENTOS, et al.,
6
              Plaintiffs,
7
-vs-
8
CORECIVIC, INC.,
9
              Defendant.
10   _____/

11

12

13

14

15            DEPOSITION OF TERRENCE LANE

16

17            Tuesday, October 5, 2021
                1:39 p.m. - 8:13 p.m.
18
                 Conducted Virtually
19

20

21

22   Stenographically Reported By
     Pamela J. Pelino, RPR, FPR, CLR
23   Notary Public, State of Florida
     TSG REPORTING
24
                     -   -   -
25

1

2    APPEARANCES:

3    On behalf of the Plaintiffs:

4         REBECCA CASSLER, ESQ.
          MEREDITH STEWART, ESQ.
5         CJ SANDLEY, ESQ.
          SOUTHERN POVERTY LAW CENTER
6         400 Washington Avenue
          Montgomery, Alabama
7

8

9    On behalf of the Defendant:

10        JACOB LEE, ESQ.
          STRUCK LOVE BOJANOWSKI & ACEDO
11        3100 West Ray Road
          Chandler, Arizona 85226
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    Terrence Lane

 2        Q.    Was there anybody else on the line when you

 3   talked to Mr. Lee?

 4        A.    To my knowledge, no, ma'am.

 5        Q.    Okay.  And when was that call?

 6        A.    We took -- we had a phone conversation

 7   yesterday.

 8        Q.    Okay.  When did you first find out about this

 9   deposition?

10        A.    I first found out about this deposition

11   probably, I want to say maybe about -- maybe two weeks

12   ago.

13        Q.    And did you review any documents to prepare

14   for the deposition?

15        A.    No, ma'am.

16        Q.    Okay.  Did you talk to anyone else about the

17   deposition other than your lawyer?

18        A.    No, ma'am, I have not.

19        Q.    So let's talk about your job.  Who is your

20   current employer?

21        A.    My current employer is Stewart Detention

22   Center in Lumpkin, Georgia.

23        Q.    And what is your current job title?

24        A.    My current job title is assistant chief of

25   security.
```

1                    Terrence Lane

2        Q.      And counsel for your current employer for

3    CoreCivic is representing you in this deposition today;

4    right?

5        A.      Yes, ma'am.

6        Q.      How long have you been assistant chief of

7    security?

8        A.      I was promoted to assistant chief of security

9    on July 4th of this year.

10       Q.      Congratulations.

11       A.      Thank you.

12       Q.      And what was your job title before that?

13       A.      Before promotion to assistant chief of

14   security, I was -- I had the title unit manager.

15       Q.      Okay.  And how long were you the unit

16   manager?

17       A.      I want to say I've been the unit manager for

18   approximately about six years at Stewart Detention

19   Center.

20       Q.      Do you remember the year that you became a

21   unit manager?

22       A.      Not off the top of my head, no, ma'am, I do

23   not.

24       Q.      My sense is that it was likely 2014.  Does

25   that sound right to you?

```
 1                      Terrence Lane

 2          A.    That would be a pretty guesstimation.

 3                (Discussion held off the record.)

 4     BY MS. CASSLER:

 5          Q.    All right.  So you became a unit manager most

 6     likely sometime in 2014; is that right?

 7                MR. LEE:  Objection to the form.

 8                THE WITNESS:  That would be a good guess.  I

 9          won't -- I can't really say exactly, because off

10          the top of my head, ma'am, I'm not sure of the

11          exact time period.

12     BY MS. CASSLER:

13          Q.    Okay.  Before you were a unit manager, what

14     was your job title?

15          A.    Before being promoted -- advanced to a unit

16     manager, I was an assistant shift supervisor.

17          Q.    Assistant?

18          A.    My mistake.  I was a shift supervisor.

19          Q.    And do you remember the approximate dates

20     that you were a shift supervisor?

21          A.    I can tell you -- I can tell you I was a

22     shift supervisor for four -- approximately five years.

23          Q.    And over all that time, was it -- were you

24     employed at Stewart as a shift supervisor?

25          A.    Yes, ma'am.  At Stewart Detention center.
```

1                    Terrence Lane

2     Yes, ma'am.

3          Q.    And before that, did you work at Stewart?

4          A.    Yes, ma'am.

5          Q.    And what was your title?

6          A.    Before shift supervisor I was an assistant

7     shift supervisor, ma'am.

8          Q.    And how long were you in that position?

9          A.    As a shift -- an assistant shift supervisor

10    at Stewart Detention Center, I served in that position

11    approximately three years.

12         Q.    Okay.  What year did you first start working

13    at Stewart?

14         A.    My employment started at Stewart Detention

15    Center, was August 6th, 2006.

16         Q.    And was assistant shift supervisor your first

17    job title?

18         A.    No, ma'am.  My initial hire at Stewart

19    Detention Center, I was hired as an officer in

20    August 6th, 2006.

21         Q.    And when did --

22               (Simultaneous speakers.)

23    BY MS. CASSLER:

24         Q.    Oh, go ahead.

25         A.    My first -- I became the senior detention

1                  Terrence Lane

2    center, shortly after or before the end of training and

3    responsible for armory and key control.

4        Q.    And after that was your next -- go ahead.

5        A.    And after a year, rough estimate of a year

6    and a half as a senior detention officer, I was then

7    promoted to assistant shift supervisor.

8              (Reporter clarifies.)

9    BY MS. CASSLER:

10       Q.    "UM" is a common abbreviation of unit

11   manager; is that right?

12       A.    UM, yes, ma'am.

13       Q.    And what does "COUM" mean?

14       A.    Ma'am, COUM is the abbreviation for chief of

15   unit management.

16       Q.    You never held that position, did you?

17       A.    No, ma'am, I've never held that position.

18       Q.    So let's talk about your duties and

19   responsibilities as a unit manager.  What units were you

20   the manager of and for what dates?

21       A.    If you'll excuse me, dates tend to -- they

22   tend to escape me a lot of times.  But as a unit manager

23   at Stewart Detention Center, I've been a unit manager

24   for roughly three different units at four -- five

25   different locations.  Initially my first unit as a unit

1                       Terrence Lane

2          security, there may be a requirement to relocate

3          somebody, to -- it can be any reason why his

4          housing assignment is changed.

5    BY MS. CASSLER:

6          Q.    Other than a threat, could you give me some

7    more examples?

8          A.    Detainee A has been identified as a thief

9    inside the pod.  Now, for that individual's safety, we

10   can't leave him in that pod.  Because to keep him safe,

11   we're probably going to have to relocate him out.

12         Q.    Are there any other reasons you can think of

13   why a housing assignment would change?

14         A.    An individual might be -- have been

15   identified as this pod that he's in right here, it might

16   not be the best fit for him.  He might need to move

17   someplace else.  He might be a total fit over here,

18   might not be a total fit over there.

19               Sometimes it's very, very different.  And

20   it's usually a case-by-case basis that people are moved

21   from unit to unit or from pod to pod.

22               (Reporter clarifies.)

23   BY MS. CASSLER:

24         Q.    So a unit -- does a unit team have discretion

25   to move people between housing units?

1                     Terrence Lane

2          A.     The unit manager has pretty much the

3     discretion required that he may need to ensure the safe

4     operation of his unit, ma'am.

5          Q.     And that could include changing someone's

6     housing unit; right?

7          A.     Yes, ma'am.  That could include changing

8     someone to another housing unit.

9          Q.     Are there housing units at Stewart designated

10    for detained workers?

11               MR. LEE:  Object to form.

12               THE WITNESS:  As far as -- you mean those

13          individuals that are under the voluntary work

14          program?

15    BY MS. CASSLER:

16         Q.     Correct.

17         A.     I know we were -- we've always tried to keep

18    our workers housed individually together as -- specially

19    our kitchen workers, housed together.

20         Q.     Uh-huh.  So at times is it the case that

21    there have been units -- or excuse me, pods that have

22    been designated as for kitchen workers?

23               MR. LEE:  Object to form.  Foundation.

24    BY MS. CASSLER:

25         Q.     You can answer.

1             Terrence Lane

2    barber; is that right?

3         A.    Yes, ma'am.

4         Q.    And a unit manager would know if a barber was

5    performing poorly; right?

6         A.    Yes, ma'am.

7               MR. LEE:  Object to form.

8    BY MS. CASSLER:

9         Q.    Because that -- that work happens in the

10   unit; is that right?

11        A.    The unit manager would probably get a couple

12   of detainees that would tell him the barbers are not

13   doing a good job.  So, yes, ma'am, he would know.

14        Q.    And he would see their hair?

15        A.    Yes, ma'am.

16        Q.    So if there aren't any barbers -- or there

17   aren't enough barbers volunteering to do that work, who

18   would do it?

19        A.    If we had no barbers cutting hair, ma'am?

20   There would be no hair cuts.

21        Q.    So would there not be CoreCivic staff

22   stepping in do those hair cuts?

23        A.    Not for that, ma'am.

24        Q.    How do you know?

25        A.    As a unit -- as a unit manager, I've had

1                    Terrence Lane

2    elsewhere I did not have a barber.  They brought a

3    barber up in that unit.  And for that time period, until

4    we got a qualified barber to volunteer, we did not open

5    the barber shop.  We had no barber for the operation.

6    Staff cannot do that.

7         Q.    Why didn't Stewart hire somebody from the

8    outside, like a contractor or hire an employee to just

9    serve as barber?

10              MR. LEE:  Form and foundation.

11              THE WITNESS:  I can't answer that question,

12         ma'am.

13   BY MS. CASSLER:

14        Q.    Did you ever hear of that possibility being

15   discussed?

16        A.    I've never heard of that being discussed,

17   ma'am.

18        Q.    Is it a problem if there aren't hair cuts

19   getting done?

20              MR. LEE:  Object to form.

21              THE WITNESS:  I've never had it become a

22         major issue, but over time, depending on how long

23         it can go, become an issue, yes, ma'am.

24   BY MS. CASSLER:

25        Q.    When you say "become an issue," what do you

1                        Terrence Lane

2    to -- I'm guessing now.

3        Q.    You know, we don't have to get into this if

4    you don't know.   That's okay.

5             So right now there are three shifts per day

6    of kitchen workers; is that right?

7        A.    Yes, ma'am.

8        Q.    And does the number of shifts vary based on

9    the population of the facility?

10       A.    No, ma'am.   Those shifts say the same.

11       Q.    But you said there were two shifts before and

12   now there are three?

13       A.    Yes, ma'am.

14       Q.    Why is that?

15       A.    Well, with the different shifts, what we did

16   was, under Chief Blackmon, as to break down the number

17   of hours that they were working, to keep the

18   possibility, try to remove that element of them having

19   to work -- getting stuck on eight hours and then their

20   jobs aren't finished, we broke them down to a

21   three-shift method that actually takes them to where

22   they're actually -- before the end of the shift, they're

23   finished within -- they may work, like I said, about

24   five hours a day.

25       Q.    Okay.   And if kitchen workers -- if there

 1                    Terrence Lane

 2    weren't enough kitchen workers, who would perform the

 3    work that they performed?

 4         A.    Stewart Detention Center officers, ma'am.

 5         Q.    Has that ever happened to your recollection?

 6         A.    Yes, ma'am.

 7         Q.    Getting paid their normal pay and benefits?

 8         A.    Yes, ma'am.  I've been in the kitchen myself,

 9    fixing trays.

10         Q.    Uh-huh.  So there's a number of positions

11    left.  I think we probably don't need to cover all of

12    these.  But I would like to know which other positions

13    left on this list are jobs that happen inside the unit.

14               Can you take --

15         A.    Inside?

16         Q.    Yes, inside the unit.

17         A.    Yes, ma'am.

18               Inside the unit, your biggest inside-the-unit

19    jobs would be your shower porters and your pod porters.

20    Those are inside-unit jobs.  And, you know, your barber

21    shop.

22         Q.    Okay.  So what does the pod porter do?

23         A.    Pod porter is basically responsible for the

24    general cleaning and the sanitation of the pod itself.

25    From sweeping the floor, to mopping the floor, wiping

```
 1                    Terrence Lane
 2           detainee.  That $4 is probably just as important to
 3           him as my paycheck is to me.
 4      BY MS. CASSLER:
 5           Q.     Uh-huh.  And to your knowledge, do detained
 6      workers use their paychecks to buy food?
 7                  (Reporter clarifies.)
 8                  MR. LEE:  Foundation.
 9                  THE WITNESS:  Some of them use it to buy
10           food.  Some of them use it to buy phone time, yes,
11           ma'am.
12      BY MS. CASSLER:
13
18           Q.     What do you take that to mean?
19                  MR. LEE:  Foundation.
20                  THE WITNESS:  The detainee doesn't want to
21           participate in a voluntary work program because he
22           doesn't feel like he's getting enough money.
23      BY MS. CASSLER:
24
```

```
 1                    Terrence Lane

 2   where I make $5 an hour, that $5 to me is just as

 3   important as to someone making $40 or $50 an hour.

 4   So, yes, ma'am.

 5   BY MS. CASSLER:

 6        Q.    And detained workers might use their

 7   wages to buy things at the commissary, right?

 8               MR. LEE:  Foundation.

 9   BY THE WITNESS:

10        A.    Yes, ma'am, probably one of many

11   things.

12   BY MS. CASSLER:

13        Q.    And another thing they might use

14   their wages for is to buy phone time to call

15   people outside of detention, right?

16               MR. LEE:  Foundation.

17   BY THE WITNESS:

18        A.    Yes.  Yes, ma'am.

19   BY MS. CASSLER:

20        Q.     Is there anything else that they

21   might use their wages to pay for?

22               MR. LEE:  Foundation.

23   BY THE WITNESS:

24        A.    Some of them may send their wages

25   home to their family, ma'am.
```

Page 189

1                    Terrence Lane

2    BY MS. CASSLER:

3         Q.     Can they use their wages to buy

4    personal hygiene items at the commissary?

5         A.     Yes, ma'am.

6

1                    Terrence Lane

2          A.     No, ma'am.

3          Q.     Sometimes phone cards were used to

4    incentivize extra work beyond 40 hours in the

5    kitchen, right?

6                 MR. LEE:  Form.

7    BY THE WITNESS:

8          A.     Yes, ma'am, it was.

9    BY MS. CASSLER:

10         Q.     And that happened when you needed --

11   or when the facility needed people to work a sixth

12   or even seventh shift in a week, is that right?

13                MR. LEE:  Object to form.

14   BY THE WITNESS:

15         A.     That has happened, yes, ma'am.

16   BY MS. CASSLER:

17         Q.     So can you tell me the mechanics of

18   how that would happen?

19         A.     If a detainee decided he wanted to

20   order -- or they needed overtime detainees to

21   work, they would be -- they would be given the

22   opportunity to work that overtime and as payment

23   they would pay them that additional $5 worth of

24   phone time or something of that nature for leading

25   that task.

1              Terrence Lane

2        Q.      Would they also get paid their

3    normal daily shift day, which I think was $4 on

4    top of the phone card for that extra day?

5        A.      Yes, ma'am, they would.

6        Q.      And workers who did that were often

7    referred to as volunteer kitchen workers, right?

8        A.      Yes, ma'am, but actually all of them

9    were volunteers.

10        Q.      All right.  But just in terms of

11    when we're reading documents and there's a

12    reference to volunteers for extra shifts that

13    means people who are working beyond their

14    scheduled shifts, right?

15        A.      Yes, ma'am.  Yes, ma'am.

16        Q.      All right.  I'm trying to skip

17    things so we can move more quickly.  Let's pull up

18    the next exhibit.  It will be marked as 14.

19                (Document marked as Deposition

20                Exhibit No. 14 for

21                identification.)

22    BY MS. CASSLER:

23    ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

1                          Terrence Lane

 1                    Terrence Lane

 7         Q.      Okay.  We can take that exhibit

 8    down.  We're going to shift gears a little bit and

 9    talk about food.

10                       Are you familiar with the food

11    service at Stewart?

12         A.      Yes, ma'am.

13         Q.      As a unit manager, did you have any

14    duties related to food service?

15         A.      Not per se, no, ma'am.  My only

16    duties for food service would be to check quality

17    and actually talk to the detainees when I dealt

18    with them if they had any issues.

19         Q.      When you say check quality, what do

20    you mean?

21         A.      I would actually go to the unit, go

22    to the chow hall with my detainees and I would

23    grab a tray off the line and sit down and have

24    lunch with them.

25         Q.      So you monitored meal quality as a

1                        Terrence Lane

2    restricted housing for 200 code violations.  It's

3    not necessarily you're going to end up in

4    restricted housing as a result of a 300 code

5    violation.

6         Q.    Thank you for clarifying.  Is there

7    a limit on how long someone can be placed in

8    disciplinary segregation?

9         A.    If you go by policy, ma'am, a 100

10   code can get an individual up to 60 days in

11   restricted housing, a 200 code can get an

12   individual up to 30 days in restricted housing, a

13   300 code carries about 72 hours in restricted

14   housing.  We don't typically leave individuals in

15   restricted housing for 60 days for -- even for a

16   100 code.

17        Q.    So there are times when people are

18   placed in segregation before they have been found

19   guilty of any violation, is that right?

20        A.    Yes, ma'am.

21        Q.    And is that administrative

22   segregation?

23        A.    All detainees enter segregation

24   under disciplinary actions.  They're not

25   considered disciplinary -- restricted disciplinary

```
 1                    Terrence Lane
 2    segregation detainees until after the completion
 3    of their hearing.  They are administrative seg,
 4    yes, ma'am.
 5         Q.    And is there a time limit for how
 6    long someone can be placed in administrative seg?
 7         A.    Anything -- that can vary, ma'am.
 8    Depending on the circumstances or situation, an
 9    individual can be extended on administrative seg
10    with the authorization of the ADO staff.
11         Q.    And can that be indefinite?
12         A.    I'm not going to say indefinite, but
13    it can be extended, ma'am.
14         Q.    Okay.  So are you aware of any hard
15    stop, any limit on that, on the extensions that
16    could be given for that?
17         A.    I don't know -- I don't know of a
18    stop time, ma'am.
19         Q.    Mm-hmm.  And are administrative
20    segregation placements documented?
21         A.    Yes, ma'am, they are.
22         Q.    Is it fair to say that placement in
23    seg is the harshest sanction that can be imposed?
24               MR. LEE:  Object to form.
25
```

```
 1                    Terrence Lane
 2  professionalism, feel some type of rapport and
 3  show them some type of an example to follow.
 4        Q.    Isn't it true that refusing to obey
 5  a staff command is also actually a disciplinary
 6  infraction?
 7        A.    Yes, ma'am, it is a 300 charge
 8  violation.
 9        Q.    So -- okay.  It's a 300 charge
10  violation.  So that means it's theoretically
11  possible for a person to be sent to segregation as
12  a result of that disciplinary infraction, right?
13        A.    Yes, ma'am, it is.
14        Q.    Mm-hmm.  Have you ever heard a
15  CoreCivic staff person tell a detained person that
16  they could get sent to segregation if they don't
17  comply with an order?
18        A.    I have heard that before, yes,
19  ma'am, I have.
20        Q.    Have you ever said that to a
21  detained person?
22        A.    No, ma'am, I have not.
23        Q.    Do you think that mentioning
24  segregation as a possible consequence is a useful
25  way to encourage compliance with staff leaders?
```

```
 1                    Terrence Lane

 2   BY MS. CASSLER:

 3        Q.      Have you ever personally sent a

 4   detained person to segregation?

 5        A.      Yes, ma'am, I have.

 6        Q.      And how often have you done that?

 7        A.      Over the years, ma'am, I've been a

 8   shift supervisor and I've been at that level for

 9   almost 11 years.  So to tell you how often I've

10   done that, I couldn't even begin to grab a hold of

11   it.

12        Q.      Mm-hmm.  So it's a large number?

13              MR. LEE:  Object to form.

14   BY THE WITNESS:

15        A.      It's probably quite a bit.

16   BY MS. CASSLER:

17        Q.      What does the term lockdown refer

18   to?

19        A.      The term lockdown would be the

20   actual securing of whether it be an entire POD or

21   an entire unit.

22        Q.      When you say securing the POD or the

23   unit, what do you mean?

24        A.      That would be if it's in a closed

25   POD with cells, all detainees are inside in their
```

```
 1                    Terrence Lane

 2           Q.      Mm-hmm.  When a disciplinary

 3   lockdown is in place, can detained individuals use

 4   the phones?

 5           A.      Not initially, no, ma'am.

 6           Q.      What do you mean when you say not

 7   initially?

 8           A.      The initial lockdown process they

 9   may not be able to use a phone, but eventually we

10   do go to a process where we start to -- start to

11   come back to normal where we start to let

12   different groups out one or two people at a time

13   to come do stuff like use the phone, go to the

14   bathroom, take a shower, take showers and stuff of

15   that nature depending on how long the lockdown is

16   instituted.

17           Q.      So you just said that you might --

18   there might be a time when the lockdown is winding

19   down when people might be allowed to use the

20   bathroom?

21           A.      Well, if you look at -- yes, ma'am.

22   If you look at a closed unit, closed units have

23   bathrooms inside.  So there's no need to worry

24   about bathroom facilities and stuff.  But when you

25   start looking at detainees being able to take
```

```
 1                    Terrence Lane

 2   showers, they don't have showers inside.  So when

 3   they start -- when you start walking it back to

 4   get to normal, then, yes, they can -- we'll

 5   actually start maybe two at a time going to take

 6   showers.  A lot -- a lot of everything -- the

 7   questions you're asking me depend on the incident

 8   itself.

 9        Q.      That makes sense.  So you said in

10   disciplinary lockdown people in an open bay POD

11   are allowed to go to the bathroom.

12                      Do they need to get permission

13   first?

14        A.      What happens -- it's not matter of

15   getting permission, but what happens is when we

16   don't have some type of control or some type of

17   control point instead of one person getting up off

18   the bed to go to the bathroom, six people get up

19   off the bed to go to the bathroom.  Then it

20   becomes a running joke like how many people can

21   get up and go to the bathroom before someone says

22   something to them.  So does it get to the point

23   where, okay, yeah, stay on your bunk, get the

24   officer's attention before you go to the bathroom?

25   Yes, ma'am, it does come to that point.
```

1                    Terrence Lane

2    STATE OF ILLINOIS     )
                           )  SS.
3    COUNTY OF COOK        )

4

5         I, Steven Brickey, Certified Shorthand

6    Reporter, do hereby certify that on the 5th day of

7    October, A.D., 2021, the deposition of the

8    witness, TERRENCE LANE, called by the Plaintiff,

9    was taken before me, reported stenographically,

10   and was thereafter reduced to typewriting under my

11   direction.

12        The said deposition was taken remotely via

13   Zoom and there were present counsel as previously

14   set forth.

15        The said witness, TERRENCE LANE, was first

16   duly sworn to tell the truth, the whole truth, and

17   nothing but the truth, and was then examined upon

18   oral interrogatories.

19        I further certify that the foregoing is a

20   true, accurate, and complete record of the

21   questions asked of and answers made by the said

22   witness, TERRENCE LANE, at the time and place

23   hereinabove referred to.

24        The signature of the witness, TERRENCE LANE,

25   was reserved by agreement.

Page 281

1                    Terrence Lane

2        The undersigned is not interested in the

3   within case, nor of kin or counsel to any of the

4   parties.

5        Witness my official signature in and for

6   Cook County, Illinois, on this 16th day of

7   October, A.D., 2021.

8

9

10

11                    *Steven Brickey*

12   _____

13   STEVEN BRICKEY, CSR, RMR, CRR
     8 West Monroe Street
     Suite 2007
14   Chicago, Illinois 60603
     Phone:  (312) 419-9292
15   CSR No. 084-004675

16

17

18

19

20

21

22

23

24

25

1                        Terrence Lane

2                          CERTIFICATE OF OATH

3      THE STATE OF FLORIDA

4      COUNTY OF PALM BEACH

5

6

7            I, the undersigned authority, certify that

8      TERRENCE LANE personally appeared before me and was duly

9      sworn.

10

11           Dated this 16th day of October, 2021.

12

13

14

15      _____

16      Pamela J. Pelino, RPR, FPR
        Notary Public - State of Florida
17      My Commission No.:  GG 225932
        My Commission Expires:  June 7, 2022
18

19

20

21

22

23

24

25

1          Terrence Lane

2               C E R T I F I C A T E

3   THE STATE OF FLORIDA

4   COUNTY OF PALM BEACH

5

6          I, Pamela J. Pelino, Registered Professional
    Court Reporter and Notary Public in and for the State of
7   Florida at large, do hereby certify that I was
    authorized to and did report said deposition in
8   stenotype; and that the foregoing pages are a true and
    correct transcription of my shorthand notes of said
9   deposition.

10          I further certify that said deposition was
    taken at the time and place hereinabove set forth and
11  that the taking of said deposition was commenced and
    completed as hereinabove set out.

12

13          I further certify that I am not attorney or
    counsel of any of the parties, nor am I a relative or
    employee of any attorney or counsel of party connected
14  with the action, nor am I financially interested in the
    action.

15

16          The foregoing certification of this transcript
    does not apply to any reproduction of the same by any
    means unless under the direct control and/or direction
17  of the certifying reporter.

18          Dated this 16th day of October, 2021.

19

20

21

22  _____
    Pamela J. Pelino, RPR, FPR

23

24

25