# Exhibit 39

This Exhibit contains the specific pages of the deposition Plaintiffs are referencing. The entire deposition was separately filed in the record pursuant to LR 5.1 and the M.D. Ga. CM/ECF Administrative Procedures Manual.

Page 1

```
IN THE UNITED STATES DISTRICT COURT

            MIDDLE DISTRICT OF GEORGIA

                COLUMBUS DIVISION
---------------------------------
WILHEN HILL BARRIENTOS, et al.,

              Plaintiff,

v.

CORECIVIC, INC.,

              Defendant.
---------------------------------


      REMOTE VIDEOCONFERENCE DEPOSITION OF

                DROUDRED BLACKMON

                    Georgia

            Thursday, October 14, 2021

                   9:00 a.m.




Reported by:  Goldy Gold, RPR

Job No.  200481
```

Page 2

1

2          Date: October 14, 2021

3          Time:  9:00 a.m.

4

5

6      REMOTE DEPOSITION OF DROUDRED

7  BLACKMON, taken by Counsel for Plaintiffs,

8  in the above-titled matter, on

9  October 14, 2021, commencing at 9:00 a.m.,

10 and reported by Goldy Gold, a Registered

11 Professional Reporter and a Notary Public

12 within and for the State of Maryland.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2   A P P E A R A N C E S (appearing via Zoom):

 3

 4    On Behalf of the Plaintiffs:

 5       BY:  ALAN HOWARD, ESQUIRE
          PERKINS COIE
 6       1155 Avenue of the Americas
          New York, New York 10036
 7

 8

 9
      On Behalf of the Defendant:
10
         BY:  JACOB LEE, ESQUIRE
11       STRUCK LOVE BOJANOWSKI & ACEDO
         3100 West Way Road
12       Chandler, Arizona 85226

13

14

15    ALSO PRESENT (appearing via Zoom):

16       Vidhi Bamzai, SPLC
         Meredith B. Stewart, SPLC
17       Rebecca M. Cassler, SPLC
         Emily Cooper, Perkins Coie
18

19

20

21

22

23

24

25
```

```
                                                          Page 12
 1                      D. BLACKMON
 2         Q.    Do you know what it said about the
 3   case, if anything?
 4         A.    Actually, no, sir.  It just said
 5   don't -- don't destroy any documents.
 6         Q.    And you don't know when you got that
 7   e-mail?
 8         A.    No, sir.
 9         Q.    What was your position at the time
10   you received that e-mail?
11         A.    I was the chief of unit management.
12         Q.    And do I understand you correctly,
13   you are no longer chief of unit management at the
14   Stewart Detention Center today?
15         A.    That is correct.
16         Q.    When did you leave that position?
17         A.    In 2018 [audio distortion] --
18               MR. HOWARD:  Hold on.  We're getting
19         a lot of feedback.  Mr. Blackmon, let me
20         stop you.
21               Mr. Blackmon, we lost your audio
22         there and you've frozen on the phone.
23         Now you're back?
24               THE WITNESS:  Hello?
25               MR. HOWARD:  Yeah, now it's better.
```

Page 13

```
 1                    D. BLACKMON
 2         Hopefully we won't have this all morning.
 3   BY MR. HOWARD:
 4         Q.    But you said it was in 2018, and
 5   then we lost you.  So do you recall the month you
 6   changed positions?
 7         A.    I want to say it was in November of
 8   2018, I went chief of security.  I did a lateral
 9   transfer to chief of security.
10         Q.    At Stewart Detention Center?
11         A.    At Stewart.  Yes, sir.
12         Q.    Okay.  And I'm going to use SDC --
13   "Steven-David-Charlie" -- as an abbreviation for
14   Stewart interchangeably.
15               Is that okay?
16         A.    Yes, sir.
17         Q.    And how long did you stay as chief
18   of security at SDC?
19         A.    Until July the 1st, I was -- I
20   transferred to Jenkins Correctional Center.
21         Q.    And this is July the 1st of this
22   year, 2021?
23         A.    2019.
24         Q.    Oh, I'm sorry.
25               And what position did you take at
```

```
 1                     D. BLACKMON
 2         A.     Yes, sir.
 3         Q.     When you laterally transferred to
 4   chief of security, did you then become
 5   responsible for restricted housing?
 6         A.     Yes, sir.
 7         Q.     By the way, restricted housing, is
 8   that also known as segregation?
 9         A.     Yes, sir.
10         Q.     You also hear it referred to
11   informally as "the hole"?
12                MR. LEE:  Object to form.
13                THE WITNESS:  No, sir.
14   BY MR. HOWARD:
15         Q.     You never saw that in any e-mails
16   you received or sent?
17         A.     No.  I don't recall that, sir.
18         Q.     Do you recall any other names, other
19   than segregation or restricted housing, that were
20   applied to that unit?
21         A.     That's it, sir.
22         Q.     When you were chief of unit
23   management -- by the way, when did you get that
24   position at Stewart?
25         A.     In 2011 or '12.  Yeah, 2011.
```

Page 22

```
 1                      D. BLACKMON
 2         Q.     Okay.  And were you at -- were you a
 3   CoreCivic employee before that?
 4         A.     Yes, sir.
 5         Q.     For how long?
 6         A.     I became a CoreCivic employee in
 7   2006, on August the 14th.
 8         Q.     What position did you get?
 9         A.     When I came on, I was the shift
10   supervisor.
11         Q.     Had you had any prior experience in
12   any detention or correctional facilities?
13         A.     Yes, sir.
14         Q.     Where were you coming from?
15         A.     Calhoun State Prison.
16         Q.     That is not a CoreCivic facility,
17   though, right?
18         A.     No, sir.
19         Q.     What was your job at Calhoun?
20         A.     I started out as an officer.  I
21   worked in security.
22         Q.     Do you have educational training as
23   a security officer?
24         A.     Excuse me?
25         Q.     What training do you have as a
```

```
 1                    D. BLACKMON
 2   Because you told me you joined -- you became head
 3   of unit management in 2011 or 2012?
 4          A.    No.
 5          Q.    That -- that day must be wrong.
 6          A.    No, no, no.  I joined CoreCivic in
 7   2006, August the 14th.
 8          Q.    Okay.  In what position?
 9          A.    As a shift supervisor.
10          Q.    2006, got it.
11                And then in 2011 -- what positions
12   did you have between 2006 and 2011 or '12 when
13   you became chief of unit management?
14          A.    Well, shift supervisor first;
15   operation director, second; and then third,
16   assistant chief of security; and then finally the
17   chief of unit management.
18          Q.    For what years were you assistant
19   chief of security?
20          A.    2009 to -- until May 2011.
21          Q.    Now, I want to focus on the period
22   of time when you were chief of unit management.
23                You said one of your
24   responsibilities was overseeing unit managers.
25   What did that entail?  Like, what were generally
```

Page 36

```
 1                    D. BLACKMON
 2    activities," and it includes the work programs,
 3    right?
 4          A.    Yes.
 5          Q.    And it also includes, you know, food
 6    service, number 7, right?
 7          A.    Yes.
 8          Q.    It also includes 10, discipline,
 9    correct?
10          A.    Yes.
11                MR. LEE:  Object to form.
12    BY MR. HOWARD:
13          Q.    So all of these things, 1 through
14    13, including work programs, including food
15    service, including discipline, the grievance
16    procedures and due process proceedings, those
17    apply equally across the board to all detainees
18    at Stewart Detention Center, correct?
19          A.    Yes, sir.
20          Q.    Now let's go to page 7.  Kind of up
21    a little bit.  There.
22                "Inspections of persons and
23    properties."  The way I read this, routine
24    unscheduled searches of the facility, detainees'
25    persons and property, will be conducted as deemed
```

Page 50

```
 1                    D. BLACKMON
 2    CoreCivic hired off the street to come into the
 3    facility and do jobs made a lot more than a
 4    dollar to $4 a day, right?
 5               MR. LEE:  Object to form.
 6               THE WITNESS:  Yes, sir.
 7    BY MR. HOWARD:
 8         Q.    Do you think there was any benefit
 9    to CoreCivic financially from having detainees do
10    jobs for a dollar to $4 a day, that CoreCivic
11    would otherwise have to pay people a lot more
12    than that to do?
13               MR. LEE:  Object to form and
14         foundation.
15               THE WITNESS:  No.  I think it is a
16         disadvantage.
17    BY MR. HOWARD:
18         Q.    Disadvantage financially?  Why?
19         A.    Because if you brought someone in to
20    work, then the detainees wouldn't have money to
21    go to the commissary to buy the stuff they need,
22    according to the policy.  They won't have that
23    money.  So it was a -- it was a program designed
24    to actually put money in -- in an offender's -- I
25    mean -- I'm sorry -- a detainee's account, where
```

Page 51

```
 1                      D. BLACKMON
 2    he can go to the commissary and do those things
 3    he wanted, buy or purchase phone calls so he can
 4    talk to his family.
 5           Q.     Okay.  So you're explaining to me
 6    why having the work program available to
 7    detainees would be a benefit to them:  So they
 8    can go to the commissary to buy things they
 9    needed, like phone cards to talk to their family,
10    right?
11           A.     Yes, sir.
12           Q.     All right.  But now I want to know,
13    was there also a financial benefit to CoreCivic
14    that these detainees were doing jobs that if the
15    detainees were not doing, you would need to hire
16    people and pay them a lot more than $4 a day to
17    do those jobs?
18                  MR. LEE:  Object to form and
19           foundation.
20                  THE WITNESS:  I can't answer the
21           question for the company.  I don't -- I
22           don't -- I don't see the money like that,
23           their -- their budget.  I don't [audio
24           distortion] do with that.
25    BY MR. HOWARD:
```

Page 216

1    CERTIFICATE OF REPORTER/NOTARY PUBLIC

2

3        I, Goldy Gold, a Notary Public within and
4   for the State of Maryland, do hereby certify that the
5   within-named witness personally appeared before me at
6   the time and place herein set out, and after having
7   been duly sworn by me, according to the law, was
8   examined by counsel.
9        I further certify that the examination was
10  recorded stenographically by me and this transcript
11  is a true record of the proceedings.
12       I further certify that I am not of counsel
13  to any of the parties, nor in any way interested in
14  the outcome of this action.
15       As witness my hand and notarial seal this
16  27th day of October, 2021.

17

18

19       *[signature: Goldy Gold]*

20       _____

21            GOLDY GOLD, RPR

22            Notary Public

23

24  My Commission Expires:  April 24, 2025

25