# Exhibit 44

# (REDACTED)

This Exhibit contains the specific pages of the deposition Plaintiffs are referencing. The entire deposition was separately filed in the record pursuant to LR 5.1 and the M.D. Ga. CM/ECF Administrative Procedures Manual.

```
 1

 2          IN THE UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF GEORGIA
 3                 COLUMBUS DIVISION

 4
    WILHEN HILL BARRIENTOS,      )
 5  ET AL.,                      )
                                 )
 6                Plaintiffs,    )
                                 ) CIVIL ACTION FILE
 7          vs.                  )
                                 ) NO: 4:18-CV-00070-CDL
 8  CORECIVIC, INC.,             )
                                 )
 9                Defendant.     )

10

11

12

13

14          DEPOSITION OF FREDDIE HOOD

15              ATLANTA, GEORGIA

16            FRIDAY, OCTOBER 22, 2021

17

18              (Reported Remotely)

19

20

21

22

23  REPORTED BY:  TANYA L. VERHOVEN-PAGE,
                  CCR-B-1790
24

25  JOB NO.  200838
```

1

2                  October 22, 2021

3                     9:00 a.m.

4

5                  Deposition of

6    FREDDIE HOOD, held in Atlanta,

7    Georgia before Tanya L. Verhoven-Page,

8    Certified Court Reporter and Notary Public

9    of the State of Georgia.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    APPEARANCES OF COUNSEL

2

3

4   On behalf of the Plaintiffs:

5         SOUTHERN POVERTY LAW CENTER

6         400 Washington Avenue

7         Montgomery, Alabama 36104

8         BY: CAITLIN SANDLEY, ESQ.

9             REBECCA CASSLER, ESQ.

10

11

12

13  On behalf of the Defendant:

14        STRUCK LOVE BOJANOWSKI & ACEDO

15        3100 West Ray Road

16        Chandler, Arizona 85226

17        BY: JACOB LEE, ESQ.

18

19

20

21

22

23

24

25

```
 1                      F. HOOD
 2   BY MS. SANDLEY:
 3        Q     Mr. Hood, do you -- do you recall this
 4   account now, looking at it?
 5        A     Yes, ma'am.
 6        Q     Is this a fair and accurate depiction of
 7   your LinkedIn account profile?
 8        A     Yes, ma'am.
 9        Q     Do you maintain this account?
10        A     I haven't been on it in a while, but yes,
11   it's my account.
12        Q     So you created it, right?
13        A     Yes, ma'am.
14        Q     And did you input the information into
15   the profile?
16        A     Yes, ma'am.
17        Q     Well, let's walk through your positions
18   at CoreCivic.
19             MS. SANDLEY:  Rebecca, can you
20        scroll down.  So let's start, actually,
21        at the bottom, at Detention Officer.
22   BY MS. SANDLEY:
23        Q     Okay.  So you started as CoreCivic in
24   July 2007; isn't that right?
25        A     Yes, ma'am.
```

```
 1                          F. HOOD

 2        Q     I want you to take a look at what you

 3   listed here as your duties as a detention officer.

 4              Does this list reflect your job duties as

 5   a detention officer?

 6        A     It reflects some of the duties, yes,

 7   ma'am.

 8        Q     What other duties did you have that

 9   aren't listed here?

10        A     Basically, any other jobs that was asked

11   of me to perform by my supervisor.

12        Q     Who was your supervisor when you were a

13   detention officer?

14        A     Ma'am, that was 2007.  I can't even

15   remember, to be honest.

16        Q     Do you recall what their title was, what

17   their position was?

18        A     It was a captain.  We worked for the

19   captains and the lieutenants, yes, ma'am.

20        Q     And so then in March 2009, is that right,

21   you were promoted to shift lieutenant?

22        A     Yes, ma'am.

23        Q     And take a look at these duties.  Does

24   this list of duties reflect all of your

25   responsibilities as a shift lieutenant at Stewart?
```

```
 1                       F. HOOD
 2        A     Yes, and any other duty that was asked of
 3   me by a supervisor.
 4        Q     And who was your supervisor when you were
 5   a shift lieutenant?
 6        A     Again, 2009, you know, we had different
 7   captains on different shifts.  So I can remember
 8   probably maybe one or two, but I can't remember all.
 9   We had six captains.
10        Q     Okay.  But you reported to the captains?
11        A     Yes, ma'am.  The lieutenant worked with
12   the captain.
13        Q     And then going up, in April 2011 you were
14   promoted to shift captain?
15        A     Yes, ma'am.
16        Q     Now take a look at these duties.  Does
17   this list include all of your responsibilities as a
18   shift captain?
19        A     The majority of the responsibility.
20   Again, like I say, any other assignment that was
21   tasked to me by -- you know, by my superior, but
22   yeah, this lists some of the job responsibilities.
23        Q     Okay.  When you were a shift captain, who
24   did you report to?
25        A     The assistant chief of security.
```

```
 1                         F. HOOD
 2         Q     All right.  So let's scroll up.
 3               So then you were -- then you became a
 4    unit manager in August 2013, right?
 5         A     Yes, ma'am.
 6         Q     Was that a promotion?
 7         A     Like a lateral promotion.  It wasn't a
 8    pay increase.  It was, basically I went from the
 9    security side to basically the unit management side
10    of the house.
11         Q     Okay.  And does this list of
12    responsibilities reflect all of your job duties when
13    you were a unit manager?
14         A     It reflects some of the job duties.
15    Again, if I placed all of the job responsibilities in
16    there, I would probably have four or five pages, but
17    it reflects some of the duties and responsibilities
18    as a unit manager.
19         Q     Who did you report to when you were a
20    unit manager?
21         A     The chief of unit management.
22         Q     Do you recall who that was?
23         A     Droydred Blackmon.
24         Q     And did you supervise anyone else when
25    you were a unit manager?
```

```
 1                         F. HOOD
 2   detainees, the only thing they were responsible for
 3   cleaning was their room, per the handbook.  That's
 4   the only thing that they had to clean if they weren't
 5   a part of the voluntary work program, their living
 6   area.
 7         Q    What types of rewards would you give?
 8         A    Like I said, we would do pizza parties
 9   for the whole pod.  We would bring in like items --
10   ice cream, things of that nature, popcorn.
11         Q    Okay.  Was it always food items?
12         A    Yes, ma'am.  Mostly, you know, video --
13   we did video games, movies, movie nights, things like
14   that, but mostly -- it was mostly food items.  They
15   would request things that -- you know, that they
16   couldn't get on the inside, from the outside we would
17   try to get that to them.
18         Q    All right.  And then going to the top,
19   May 2015 you became assistant chief of security; is
20   that right?
21         A    Yes, ma'am.
22         Q    And you were in that position for about
23   five years?
24         A    Yes, ma'am.
25         Q    And does this list of job duties
```

```
 1                         F. HOOD
 2   been difficult to make meal service on time if no
 3   kitchen workers had showed up?
 4               MR. LEE:  Form and foundation.
 5               THE WITNESS:  No, ma'am.  Again,
 6          with the voluntary work program, you know
 7          we -- the facility would -- would
 8          function.  Like I said, we had times when
 9          we were low on numbers with detainees and
10          staff members would have to go to the
11          kitchen and prepare the meals.
12               So the facility is going to be on
13          schedule.
14   BY MS. SANDLEY:
15       Q    Was the number of detained workers
16   available to work in the kitchen a concern of yours?
17               MR. LEE:  Object to form.
18               THE WITNESS:  Could you repeat
19          that?
20   BY MS. SANDLEY:
21       Q    Was the number of detained workers
22   available to work in the kitchen a concern of yours?
23               MR. LEE:  Object to form.
24               THE WITNESS:  When you say detained
25          workers, the detainees weren't detained
```

1                              F. HOOD

1                              F. HOOD

1                              F. HOOD



23        Q    Let's go to the next exhibit.  This will

1                          F. HOOD

1                                F. HOOD

1                              F. HOOD

1                                F. HOOD

1                              F. HOOD

1                        F. HOOD

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

 5        Q     Are all the tasks we just discussed

 6    necessary to maintain the safety and cleanliness of

 7    Stewart?

 8        A     Yes, ma'am.

 9        Q     And do they contribute to the general

10    upkeep of the Stewart facility?

11        A     Yes, ma'am.

12        Q     Would it be a problem if these jobs

13    didn't get done?

14             MR. LEE:  Object to form.

15             THE WITNESS:  It wouldn't be a

16        problem.  Are you referring to if a

17        detainee didn't clean them?

18    BY MS. SANDLEY:

19        Q     No, if anyone didn't clean them.  Would

20    that be a problem?

21             MR. LEE:  Objection to form.

22             THE WITNESS:  I wouldn't think it

23        would be a problem.  It would be an

24        issue.  It would show a lack of

25        leadership, you know, sanitation and

```
 1                        F. HOOD

 2          things of that nature.

 3               General cleanliness says a lot

 4          about a facility.  If you come into an

 5          area and the area is looking good, you

 6          know, you think the facility is looking

 7          good.  But if you go into an area and

 8          it's dusty or dirty, then, you know, your

 9          mind says the whole facility looks the

10          same.

11               So it wouldn't be a problem.  It

12          would be an issue.

13  BY MS. SANDLEY:

14          Q    So, for example, if the medical unit was

15  dirty, would the warden be concerned about that?

16               MR. LEE:  Form and foundation.

17               THE WITNESS:  Yeah, that's a

18          question that you have to ask the warden.

19          I wouldn't be able to know that.  I

20          wouldn't be able to answer that for the

21          warden.

22  BY MS. SANDLEY:

23          Q    When you were assistant chief of

24  security, did you work to make sure the medical unit

25  was clean?
```

1                              F. HOOD

15       Q    All right.  We can take this down.  We're

16   going to do a couple more exhibits and then let's

17   take a break, all right?

18       A    Okay.

19       Q    CoreCivic was required to get written

20   waivers from ICE when it -- in order to depart from

21   the PBNDS requirements, right?

22            MR. LEE:  Form and foundation.

23            THE WITNESS:  Stewart Detention

24        Center got a waiver to assist with

25        kitchen workers when the population

1                            F. HOOD

2        change started.

3   BY MS. SANDLEY:

4        Q     Uh-huh.  Yeah, so that waiver was from

5   ICE, right?

6        A     Yeah, Stewart Detention Center, not

7   CoreCivic.

8        Q     Okay.  But CoreCivic owns and operates

9   Stewart Detention Center, right?

10        A     Yes, but CoreCivic had multiple

11   facilities, you know, across the United States.  So

12   I'm only aware of Stewart and their waiver.  I can't

13   say CoreCivic, that that would apply to all CoreCivic

14   facilities.  I don't know about all the CoreCivic

15   facilities.

16        Q     Understood.  So at Stewart, when the

17   staff needed to depart from the PBNDS, the staff had

18   to get a waiver from ICE, right?

19             MR. LEE:  Object to form.

20             THE WITNESS:  Not staff.  The

21        facility, due to the population change,

22        when more high custody detainees came in

23        as opposed to low custody detainees, then

24        yes, a waiver was asked to assist with

25        the workers in the facility.

```
 1                          F. HOOD

 2        change started.

 3   BY MS. SANDLEY:

 4        Q     Uh-huh.  Yeah, so that waiver was from

 5   ICE, right?

 6        A     Yeah, Stewart Detention Center, not

 7   CoreCivic.

 8        Q     Okay.  But CoreCivic owns and operates

 9   Stewart Detention Center, right?

10        A     Yes, but CoreCivic had multiple

11   facilities, you know, across the United States.  So

12   I'm only aware of Stewart and their waiver.  I can't

13   say CoreCivic, that that would apply to all CoreCivic

14   facilities.  I don't know about all the CoreCivic

15   facilities.

16        Q     Understood.  So at Stewart, when the

17   staff needed to depart from the PBNDS, the staff had

18   to get a waiver from ICE, right?

19                   MR. LEE:  Object to form.

20                   THE WITNESS:  Not staff.  The

21             facility, due to the population change,

22             when more high custody detainees came in

23             as opposed to low custody detainees, then

24             yes, a waiver was asked to assist with

25             the workers in the facility.
```

```
 1                        F. HOOD
 2   BY MS. SANDLEY:
 3        Q     Were you involved in requesting that
 4   waiver?
 5        A     I had -- I remember having knowledge.  I
 6   wouldn't say involved.  I never spoke to ICE because
 7   that was above my pay grade.
 8        Q     Were you involved in any conversations
 9   about the need for that waiver?
10        A     Yes.
11        Q     Okay.  And what -- who did you talk to
12   about that waiver?
13        A     Probably the chief of unit management,
14   the AW.  I think that was who.  Maybe the chief and
15   the AW, we sat down and talked, and to include the
16   warden at the time.
17        Q     Did you agree that y'all needed that
18   waiver in order to staff the kitchen?
19        A     I agree we needed the waiver to staff
20   multiple positions, not just the kitchen position,
21   but, you know, multiple positions throughout the
22   facility.
23        Q     What other positions were you able to
24   staff after you got that waiver?
25        A     Hallway details.
```

```
1                          F. HOOD
```

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████

```
14        Q     Okay.  Help me understand that.

15              So the workers who would have -- who

16   waxed and buffed the hallways were in the voluntary

17   work program, right?

18        A     Yes.

19        Q     And were they working during the day --

20   were they working other jobs during the day?

21        A     Some might have been.  They may have been

22   a trash detail worker, meaning they may come out for

23   15 to 30 minutes to take out trash.  They weren't

24   working a full eight hours, but by them being already

25   assigned to a work detail, you weren't able to pay
```

```
 1                      F. HOOD
 2   them twice.
 3        Q     All right.
 4        A     So you can only pay them one time a day.
 5   So to compensate them for their voluntary work
 6   program, we allow them to choose whether they want a
 7   commissary item, an extra tray or phone time.
 8             The only workers that worked the full
 9   eight hours were kitchen workers because they were on
10   a shift.  All the other work detail workers may have
11   worked two, three hours a day.
12        Q     Okay.  So in that scenario you just gave,
13   somebody is signed up as a -- in the voluntary work
14   program as a trash --
15        A     As a trash detail, yes, ma'am.
16        Q     Right.  And so when they worked taking
17   out the trash, money is deposited in their account as
18   the payment for their job as a trash worker, right?
19        A     Yes, ma'am.
20        Q     And then if that worker also waxes and
21   buffs the hallways --
22        A     Right.
23        Q     -- they get to choose what their payment
24   is, right?
25        A     Well, they -- yeah, they could choose
```

1                              F. HOOD

```
 1                          F. HOOD


███████████████████████████████████████████████

██████████████████████████

 4        Q    Okay.  Do you know why detainees wanted

 5   phone cards?

 6                MR. LEE:  Foundation.

 7                THE WITNESS:  No, I can't speak on

 8        why a detainee would want phone time.

 9        That's something that you'd have to ask

10        the detainee.

11   BY MS. SANDLEY:

12        Q    Do you know why these detainees wanted to

13   work in the kitchen instead of the laundry?

14                MR. LEE:  Objection.

15                THE WITNESS:  Yeah, that's another

16        question you'd have to ask the detainee.

17   BY MS. SANDLEY:

18        Q    Did the kitchen pay more than the

19   laundry?

20        A    Yes.

21        Q    Let's take this exhibit down, and let's

22   look at the next exhibit.  We'll mark it No. 17, and

23   it's CCBVA 238482.

24                (Hood Deposition Exhibit No. 17 was

25        marked for the record.)
```

1                          F. HOOD

2          more than an hour and a half, for sure,

3          and it may be closer to an hour.

4                THE WITNESS:  We could power

5          through it.

6                     (Brief pause.)

7     BY MS. SANDLEY:

8          Q     All right, Mr. Hood.  At Stewart, are

9     detainees expected to follow staff's orders?

10         A     They are expected to follow the rules and

11    regulations of the detainee handbook, which are

12    enforced by the staff.

13         Q     And is failure to obey a punishable

14    offense in the handbook?

15         A     Yeah.

16         Q     What are the possible consequences of

17    failure to obey?

18                MR. LEE:  Object to form.

19                THE WITNESS:  Could you repeat?

20    BY MS. SANDLEY:

21         Q     What are the possible consequences of

22    failure to obey?

23                MR. LEE:  Form.

24                THE WITNESS:  Failure to obey, it

25         basically depends on the situation.  You

```
 1
 2                C E R T I F I C A T E
 3
 4   STATE OF GEORGIA:
 5   FULTON COUNTY:
 6
 7              I hereby certify that the foregoing
 8         deposition was reported, as stated in the
 9         caption, and the questions and answers
10         thereto were reduced to written page
11         under my direction, that the preceding
12         pages represent a true and correct
13         transcript of the evidence given by said
14         witness.
15              I further certify that I am not of
16         kin or counsel to the parties in the
17         case, am not in the regular employ of
18         counsel for any of said parties, nor am I
19         in any way financially interested in the
20         result of said case.
21              Dated this 4th day of November,
22         2021.
23
24         _____
25         Tanya L. Verhoven-Page,
           Certified Court Reporter,
           B-1790.
```