# Exhibit 53

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| **WILHEN HILL BARRIENTOS, GONZALO BERMUDEZ GUTIÉRREZ, and KEYSLER RAMÓN URBINA ROJAS,** individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>**CORECIVIC, INC.,**<br><br>    Defendant. | Civil Action No.  4:18-cv-00070-CDL |

### DECLARATION OF GONZALO BERMUDEZ GUTIÉRREZ

I, Gonzalo Bermudez Gutiérrez, hereby declare and state as follows:

1. My name is Gonzalo Bermudez Gutiérrez. I am over the age of 18. I am a named Plaintiff in this case. I am prepared to testify about the matters discussed in this declaration.

2. I was detained in Stewart Detention Center (SDC), in Lumpkin, Georgia, from May 2019 to January 2020.

3. When I arrived at SDC, I went through the intake process. During that process, I received a copy of the detainee handbook in English and Spanish.

4. My understanding was that the detainee handbook included all of the rules of SDC and informed you of how to behave while you were detained there. I also understood from the

1

handbook that if I broke any of the listed rules, I could be isolated and separated from the other people detained at SDC.

5. At intake I was provided with some basic necessities, like one bottle of combined shampoo and soap, and toothpaste. The items were in very small quantities and of poor quality. I was also provided with: two sheet covers; one blanket; two pillowcases; three pairs of pants, shirts, and socks; two pairs of underwear; one pair of sneakers; and one pair of shower shoes.

6. Following intake, I was housed in segregation for a few days until I was transferred to my first housing unit, Unit 7.

7. About five days after I was processed into Unit 7, I was told about the Voluntary Work Program ("Work Program"). I was told that I could work in the kitchen and receive extra food and also make some money to buy necessities like phone time, food, and personal hygiene items in the commissary. I signed up to join the Work Program immediately so I could get extra food and purchase those items at the commissary.

8. After only a few days at SDC, I understood completely that CoreCivic was controlling every aspect of the lives of detained people in SDC. CoreCivic controlled the temperature of the pods and the water in the showers. Detention officers woke us up at 4:30-5:00 a.m. to go to breakfast and then they told us when we could go to lunch and dinner over the course of the day. Because CoreCivic controlled what times the phones started working and stopped working, I could only call my family when CoreCivic allowed it. I was well aware that CoreCivic was in full control of everybody detained at SDC.

9. I obeyed the rules because I feared being sent to segregation. While housed on Unit 4, I learned of several people who were sent to segregation for breaking a rule. I feared

segregation because I believed I would lose food and contact with my family. I also understood that CoreCivic could report any misbehavior to ICE.

10. During my time at SDC, I was housed in a pod with two-person cells. I was housed in Unit 4A. I think these units housed up to 88 people per pod. Each cell had a toilet that we shared with our cellmate. All of the people detained on the pod shared showers.

11. A majority of the people in my pod were kitchen workers in the Work Program. Most of the people who did not work in the kitchen worked in other departments of the Work Program.

12. Because we were in a kitchen workers' pod, we had several incentives. Our pod had four TVs – three for TV and movies and one for video games. If we worked late hours in the kitchen, detention officers would allow us to stay up later to shower and call our families.

13. The kitchen workers' pod was an closed cell pod and I considered this to be a benefit of working in the kitchen. I experienced first-hand how loud and disorganized the open cell pods were when I delivered food to those pods. I was motivated to continue working in order to stay in the closed cell pod because I believed it was safer and I wanted my personal belongings and case-related items kept safe. This would not have been possible in the open cell pods. I also believed that the open cell pods were unsafe and I wanted to remain in the closed cell pods for my own safety.

14. If workers in my pod were removed from the work program, they would be moved to a different housing pod. I witnessed this happen multiple times. I viewed this as a punishment and as a disciplinary action.

15. CoreCivic did not provide me with enough food at SDC. I was always trying to stave off hunger while I was there. The portion sizes were small, the food was bad and repetitive,

and the meals were too spread out.  As a result, I lost a significant amount of weight while I was at SDC. Detention officers would often wake us up for meals but we would either have to wait a long time or eat after everyone else had eaten because we had either been called to eat too early or too late. We could only eat at the times that they told us we could eat. I regularly purchased extra food from the commissary to avoid hunger.

16. The meals at SDC were very spread out.  They served us breakfast between 4:30 and 6:30 a.m.; lunch between 10:30 a.m. and 12:00 p.m.; and dinner between 4:30 and 6:00 p.m. Because of this, I was often hungry between meals.

17. There was a weekly menu that changed, but the food items and meals were often the same. Because of this, and the spread-out nature of meals, I would supplement my diet with oatmeal, tortilla chips, crackers, ramen noodles, and other snacks that I would buy at the commissary. I would regularly spend anywhere from $10 to over $40 at the commissary.

18. We only received fresh fruit on special occasions. I craved fresh fruit because it is one of the only natural and nutritionally adequate foods that I believed to be healthy.

19. I lost over 20 pounds while at SDC due to how little I ate and how poor the food was. I was always trying to prevent hunger.

20. I participated in the Work Program at SDC. I joined the Work Program, first and foremost, to prevent hunger. I also joined the Work Program to get money to buy items I needed at the commissary, such as food, phone cards, stamps, deodorant, shampoo, soap, toothpaste, and shirts.  If I wasn't so concerned about preventing hunger, or if I didn't have to buy those items, I would not have joined the Work Program.

4

21. Being able to purchase and receive extra food was very important. If I did not have access to the commissary food, like ramen, I am not sure I would have survived there. Because I was always unsure of when our next meal would be, I was desperate for extra food.

22. During my time at SDC, I only received one visit from family and friends because the detention center is in a rural area. My nephews from Tennessee were able to visit me, but my wife and children were never able to visit me because they lived in Arizona. I felt very isolated in SDC.

23. I needed money to buy phone cards and stamps because that was my primary way of contacting my loved ones, most of whom lived in Arizona.

24. Family members occasionally put money on my account, but it wasn't enough to buy food, phone time, and other necessities because those items in the commissary were expensive. I had to use my Work Program wages to buy those items.

25. I was able to join the Work Program easily soon after I arrived at SDC. It is not hard to get in because they need detained people to work. A detention officer in my pod told me about the program and he had me sign a form in English to join. The officer told me the form was to work in the kitchen, and if I didn't work in the kitchen, I would be moved from the kitchen pod. I translated this document for a lot of Work Program workers who came after me because I speak English and Spanish. When I translated the document and the detention officer's instructions, I was also instructed to inform detained people that they would be moved from the kitchen pod if they decided not to work.

26. I worked in the SDC kitchen during my entire time at SDC. I cooked, washed dishes, scrubbed the stove, cleaned the kitchen and the chow hall, and served food on the line. It

was difficult work that required heavy lifting. For example, when we made lasagna or casseroles, I had to carry very large and heavy pots and pans, which were used to cook for an average of 1,500 people. I believed we needed more staff for the kitchen to function more efficiently.

27. As a kitchen worker, I also had to deep clean the kitchen before inspections. During inspections, the area had to be cleared out. We could not be working while the inspectors were present.

28. I generally worked seven days per week for about six hours per day. My pay rate was $4 per day.

29. CoreCivic was supposed to pay me for every day I worked, but I did not always receive my pay on time. Sometimes, up to 10 days passed before I was paid for a shift. When a missing pay issue was rectified, my pay was deposited into my commissary account.

30. My regular shift began at 3 p.m. in the afternoon and ended between 8 and 9 p.m.

31. In the kitchen, I was supervised by Trinity employees, Ms. Horsley, Ms. Patterson, Ms. King, and others whose names I do not remember.

32. The Trinity supervisors mistreated us.

33. Sometimes, Trinity supervisors would give us extra food at the end of a shift, like an apple. Other times they would allow us to search among the leftovers to serve ourselves more.

34. The Trinity supervisors also threatened us with discipline if we did not complete our work or perform work beyond our regular duties.

35. I witnessed CoreCivic officers discipline detained immigrants who declined to work by moving them to different housing units, or threatening to do so, and threatening to revoke

their commissary access. Sometimes, these people would be moved the very next day after a missed day of work.

36. Based on my experiences and the statements and actions of CoreCivic and Trinity employees towards other workers, and the detainee handbook, it was my understanding that it was CoreCivic's policy at SDC to punish us if we did not work, by either cutting off our access to commissary or relocating us to another pod. I believed, based on conversations I had with others, that being relocated from the kitchen pod often included being sent to segregation while CoreCivic determined where to relocate detained people.

37. I continued to work in the work program because, if I refused, I understood I could be punished with a transfer to another, less safe and less private housing unit, and also time in segregation. Additionally, if I stopped working, I wouldn't have enough money to purchase food, phone time, and other basic necessities in the commissary. I don't think I would have survived in SDC without being able to purchase those items.

38. It is important for me to be a named Plaintiff in this case because CoreCivic had so much control over when and how I could access food and communicate with my family, that they exploited our labor. It is very important to me to be able to make sure people can get the things that they need and I want to make sure no one else is treated the way I was.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 21st day of December, 2021 in Phoenix, Arizona.

_____
Gonzalo Bermudez Gutiérrez