# Exhibit 60

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

**WILHEN HILL BARRIENTOS, GONZALO BERMUDEZ GUTIÉRREZ, and KEYSLER RAMÓN URBINA ROJAS,** individually and on behalf of all others similarly situated,

Plaintiffs,

v.

**CORECIVIC, INC.,**

Defendant.

Civil Action No. 4:18-cv-00070-CDL

## DECLARATION OF WILHEN HILL BARRIENTOS

I, Wilhen Hill Barrientos, hereby declare and state as follows:

1. My name is Wilhen Hill Barrientos. I am over the age of 18. I am a named plaintiff in this lawsuit.

2. I was detained in Stewart Detention Center (SDC), in Lumpkin, Georgia from July 2015 to May 2016 and September 2017 to June 2018.

3. I was aware of the rules of the facility because they were posted on the housing unit walls at Stewart in English and Spanish.

4. At intake, I was provided with some hygiene supplies like soap, shampoo, toothbrush, toothpaste, and toilet paper, but the quantities were small and the items were of poor quality. I bought toothbrushes, toothpaste, soap, and shampoo from the commissary because the quantities were so small.

1

5. At intake, I was provided clothes, but all of the clothing was used. Some of the boxers they gave us were stained, and the socks were discolored. Even though they were washed I felt like it was not hygienic to wear those, so I bought boxers and socks from the commissary. I also bought undershirts and long-sleeve shirts from the commissary to keep me warm because it was cold all the time at Stewart. We were provided sandals at Stewart, and I had to buy talcum powder from the commissary to keep the sandals from smelling bad.

6. One time, I ran out of toilet paper. When I asked for another roll, a CoreCivic officer told me to use my fingers to clean myself.

7. When I arrived at Stewart, I was not asked whether I wanted to work. I was assigned to a housing unit for kitchen workers and told that if I did not work, I would be sent to segregation where I would not be allowed to interact with others or go to recreation.

8. In the kitchen, I washed dishes, cleaned tables, prepared food, worked on the serving line, took the trash out, worked in the food storage area, and cleaned the bathrooms in the kitchen.

9. I did not receive any training about how to cook or clean in the kitchen from Trinity or CoreCivic.

10. I was forced to cook and serve spoiled food even after I told kitchen supervisors the food was expired. If I dropped food on the floor, the kitchen supervisors told me to serve it anyway.

11. I did not like the food at Stewart because it did not have enough flavor. As an example, when we made beans, the kitchen supervisors told us to add so much water that they did not have any flavor, and the kitchen staff added so much water to the powdered milk that it tasted like water, not milk.

12. I was hungry often. The serving sizes at Stewart were not enough to fill me up.

13. I and other detained people in my housing unit were assigned to early work shifts, and the officers would wake us up, pulling our toes. The officers would pull my small toe and bend it until it hurt to wake me up. The officers also banged on the bed frames with their walkie talkies. The officers told us if we did not go to work, we would go to segregation.

14. I would have upcoming immigration court dates, but the Trinity kitchen supervisors and CoreCivic officer would tell me I had to work and would not let me go to the law library to prepare for my court dates until I finished work.

15. When my family came to visit, the Trinity kitchen supervisors and CoreCivic officer would not let me visit with them because I was at work, and they told me that I had to work first before the visit.

16. Many times I burned my arms preparing food, and the kitchen supervisors did not let me go to medical immediately. They would tell me, "You're not going to die just because you burned yourself." I still have marks on my arms from this.

17. I saw many detained people report to work while sick. They were forced to work even though they would complain they had thrown up or felt weak.

18. I tried not to miss work to go to sick call, visitation, and the law library for fear of punishment or that it would impact my immigration proceedings.

19. It was common for there not to be enough kitchen workers. When this happened, the supervisors made me work a second shift.

20. I was generally paid $4 per day for working in the kitchen. Sometimes when I worked a double-shift, I was paid $5 or $8. After March 2018, I was paid $1 per day if I worked

3

fewer than six hours, $4 per day if I worked for six hours, $5 per day if I worked eight hours but less than twelve hours, and $8 per day if I worked twelve hours or more.

21. If we worked six full days in a week, the case manager in our unit would give me a $5 phone card in addition to my regular pay.

22. I regularly worked eight-to-nine-hour shifts per day, seven days per week.

23. I used the money I earned from working in the kitchen to buy telephone time so I could call my loved ones to buy items from the commissary like food, stamps, clothing, and hygiene items. Phone calls to my family in Guatemala were especially expensive..

24. I was never told that I could withdraw or how to withdraw from the work program. The CoreCivic staff promised that if I worked, it would help me with my case with ICE.

25. During the time I was at Stewart, the kitchen worker units changed from open dorm units to two-bed celled units, and back to open dorm units.

26. For a while I lived in an open dorm housing unit that I and other detained people called "el Gallinero," or the "Chicken Coop." In the Chicken Coop, all the detained people were in one place, the beds were on top of each other, and the lights were always on. The bathrooms were next to beds just separated by a half-wall. When one person went to the bathroom, the smell spread throughout the room. The Chicken Coop was dangerous. There were often fights.

27. I also lived in a celled housing unit with two-bed cells for a while. Each cell in the unit had its own toilet.

28. While I was housed in a celled kitchen worker unit, officers threatened to transfer me to segregation if I stopped working, called in sick, refused to change shifts as requested, or encouraged others to stop working.

29. One time a CoreCivic officer woke me up to work the 2 a.m. shift, even though I was assigned the 10 a.m. shift that day. When I refused to work the 2 a.m. shift, the officer told me to pack my bags but would not tell me where I was being taken. I worked the early shift that day because I was afraid of my immigration case being negatively affected and of being moved to segregation.

30. Other detained people and I were told that if we did not follow officers' orders, we would be placed in segregation. Officers threatened to move us to segregation if we did not work.

31. Around late 2015, CoreCivic officers threatened to put me in segregation on two different occasions because they thought I was organizing a work stoppage.

32. Officers also threatened to take away our commissary privileges if we stopped working, called in sick, or encouraged others to stop workings.

33. Sometimes my pod was placed on lockdown when detained people refused to work. When we were on lockdown, we had to stay in our beds the entire day, and we could only use the bathroom with permission from an officer.

34. Around October 2017, after I submitted a grievance about an officer who forced me to work when I was sick, I was sent to medical segregation at Stewart. I was in the same unit where people go for disciplinary segregation. The officers told me I was in segregation because I had been exposed to chicken pox, even though I told them I had chicken pox when I was a child.

35. I was in segregation for one month. In segregation, I was in my cell for about 23 hours per day. I was not allowed to see my family, my recreation time was reduced from three to four hours per day to a half hour per day. Segregation was the worst. Twenty-three hours locked

in a room without knowing what time it is, without distractions was very bad. I thought about suicide many times when I was in segregation.

36. When I was in segregation, I learned that another detained person died by suicide in segregation at Stewart, and this made me even more afraid stay in segregation longer.

37. It is important to me to be a named plaintiff in this case because I do not want people at Stewart to be forced to work. I do not want detained people to be misled that their immigration case will be affected or that they will be sent to segregation if they refuse to work. I do not want detained people to be intimidated into working, and I want them to know the tactics the officers use to intimidate people. I want to tell people what happens inside Stewart and how the officers treat detained people there, and I want to put an end to the mistreatment.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 15th day of December, 2021 in Atlanta, Georgia.

_Wilhen Hill Barrientos_
Wilhen Hill Barrientos

7

## INTERPRETER AFFIDAVIT

I, Elliot Lepe, swear and affirm under penalty of perjury of the laws of the United States of America that I am fluent in both the Spanish and English languages and that I read the preceding Declaration in Spanish to Plaintiff Wilhen Hill Barrientos, who affirmed the truth of its contents.

_____  
Signature

12-19-21  
Date

8