# Exhibit 95

(REDACTED)

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

WILHEN HILL BARRIENTOS,
GONZALO BERMUDEZ GUTIÉRREZ,
and KEYSLER RAMÓN URBINA ROJAS
individually and on behalf of all others
similarly situated,

Plaintiffs,

v.

CORECIVIC, INC.,

Defendant.

Civil Action No.  4:18-cv-00070-CDL

## OPENING EXPERT REPORT OF PLAINTIFFS' EXPERT LEONORA RENDA

### I.   SUMMARY OF EXPERTISE AND EXPERT OPINION

1.  My name is Leonora Renda. I have been retained as an expert in this matter to provide opinions regarding the nutritional adequacy of the food served at Stewart Detention Center (SDC).

2.  It is my opinion that the food served at SDC is nutritionally inadequate. The food menus at SDC are nutritionally deficient on their face. Additionally, inadequate menu design and revision, poor food safety and sanitation practices, and lack of meaningful oversight and corrective action contribute to the provision of food that is insufficient in amount, of poor nutritional value, and/or of poor quality. Because of this, detained people at SDC, who cannot freely access alternative food sources, are faced with a choice at every meal: eat nutritionally inadequate, unsafe, and/or unpalatable food, or eat very little or nothing at all. As a result, detained people experience or are at risk of experiencing physical and physiological harm, including hunger, gastrointestinal pain, and weight loss.

3.  If called upon to do so, I am prepared to testify as to my opinions, analyses, and conclusions included in and related to this Report. I reserve the right to supplement my opinions should additional evidence or other information become available.

### II.  SUMMARY OF QUALIFICATIONS, EDUCATION, AND OTHER PROFESSIONAL EXPERIENCE

4.  Based on my education, research, and experience, I am an expert in nutrition.

1

5.  I am a Registered Dietitian registered by the Academy of Nutrition and Dietetics. I received a bachelor's degree in dietetics from Illinois State University, and a master's degree in nutrition from Arizona State University.

6.  I am the manager of nutritional services at Dignity Health in Chandler, Arizona. I am responsible for maintaining and administering dietary and nutrition services and providing for the operational needs of all patient services positions. I oversee clinical dietitian care planning, rounds, and test trays in the kitchen. I maintain regulatory compliance and infection control practices for the kitchen. I communicate with customers regarding the level of services they receive from nutrition services staff to promote patient satisfaction with nutritional services. I am responsible for maintaining adequate staffing to reflect changing priorities in daily operations. I also actively collaborate in the process of menu development for patient, cafeteria, and catering services.

7.  I began my career as a food service manager in an Illinois public high school, where I was responsible for developing and implementing a diverse menu and service plan and managing and training a staff of thirteen. After six years in this role, I transitioned to the role of food service director, where I was responsible for administering the federal and state lunch program for nineteen schools and 12,000 students. Later in my career, from 2007 to 2009, I served as a nutrition specialist and nutrition director for the Arizona Department of Education. In these positions, my responsibilities included creating a state-legislated nutrition program, developing nutrition standards in Arizona K-12 schools, managing and auditing contracted nutrition services for multiple state and federal nutrition programs, grant writing, analyzing data, and providing nutrition technical assistance to the state legislature In all, I have eighteen years of experience in the administration of federal and state school lunch programs.

8.  From 1998 to 2007, I worked at the Arizona Department of Health Services in various capacities. During my time there, I oversaw a grant awarded by the CDC for obesity and chronic disease prevention. My duties included developing a model for primary prevention for cardiovascular disease, diabetes, osteoporosis, and cancer by focusing on science-based interventions that promote healthy eating, aim to eliminate disparities in diet, increase physical activity, and fight obesity among disadvantaged population groups.  I was also tasked with creating a folic acid education and distribution program to low-income women in Arizona.  My responsibilities included analyzing regular diets to see if there were adequate stores of dietary folate.

9.  I was an outpatient oncology dietitian from 2009-2016. As an oncology dietitian, I conducted nutrition assessments based on the patient's needs and provided nutritional education to patients receiving chemotherapy and radiation to minimize nutrition impact symptoms. My duties included coordinating the nutrition care service needs for patients in an outpatient setting and facilitating patient/family/caregiver/client active participation in establishing nutrition-related goals and objectives.

10. A comprehensive list of my professional qualifications, including related professional affiliations and recognition, is set forth in the curriculum vitae, attached as Appendix A to this Report.

## III.   PRIOR TESTIMONY AND CURRENT COMPENSATION

11. I have never testified as an expert at trial or deposition.

12. I am providing my expert services at the rate of $100.00 per hour for research, telephone conferences, report writing, preparing for testimony, and travel time and $150.00 per hour for court and deposition testimony and facility inspections. Attorneys for Plaintiffs have also agreed to pay reasonable expenses related to preparing this report and testifying in this case, such as travel expenses.

## IV.   METHODOLOGY

13. In forming my opinion, I reviewed and analyzed documents and information produced in this litigation, transcripts of depositions taken in this matter, scientific literature, and the sworn declarations of the Named Plaintiffs. A detailed list of the documents and information I considered is attached as Appendix B to this report.

14. As part of my work, I also traveled to Georgia in June 2021 to perform a site visit at SDC. During this site visit, I had the opportunity to view the kitchen, dining hall, pods, and outdoor recreational center and ask limited questions of the staff regarding the basic operation of the detention center. My ability to speak with detained people was severely restricted during the tour itself. Nevertheless, I did have the opportunity to conduct a number of confidential interviews with detained people, whose names are provided in Appendix C.

15. My opinions and analyses presented in this Report are based on currently available information. I understand that discovery in this matter is ongoing and that additional documents and information may be produced by the parties. I reserve the right to review and analyze any new information presented by the parties or other experts and supplement this Report as appropriate.

## V.   REASONS AND BASIS FOR OPINION

16. It is my opinion that the food provided at SDC is nutritionally inadequate because it is of poor nutritional value, of poor quality, and/or insufficient in amount. As a result, detained people suffer or are at risk of suffering physical and physiological harm, including hunger, gastrointestinal pain, and weight loss. The nutritional inadequacy results from a variety of factors including:
    a. Menus that do not meet recommended daily allowances;
    b. Deficiencies in menu planning, revision and implementation;
    c. Poor food safety and sanitation practices; and
    d. Lack of meaningful oversight and corrective action.

17. In preparing this report, I saw evidence showing that detained people at SDC routinely attempt to obtain additional food from the commissary and through incentives provided for participation in the work program.[1] This evidence and my interviews with detained people support my ultimate opinion that the food provided at SDC is of poor nutritional value, of poor quality, and/or insufficient in amount, and this systemic inadequacy is contributing to widespread food deprivation at SDC.

18. CoreCivic is contractually obligated to comply with the Performance Based National Detention Standards (PBNDS) Standard 4.1 ("Food Service"), which provides that CoreCivic must provide a "nutritionally balanced diet that is prepared and presented in a sanitary and hygienic food service operation."[2] PBNDS 4.1 also states that the menu selections must meet U.S. minimum daily allowances, that the food be appetizing, and that the ethnic and religious diversity of the population be accommodated. Individuality in meal planning is encouraged.

19. CoreCivic contracts with a third-party vendor, Trinity Services Group ("Trinity"), to meet its food service obligations. ████████████████████████████████████████ ████████████████████████[3]

20. CoreCivic and Trinity fail to provide a nutritionally adequate diet to people detained at SDC, who have no choice but to eat the food that is served. Detained people at SDC consistently report that they feel hungry or unwell because of the food. The experiences of the Named Plaintiffs, whose sworn declarations are included in Appendix B as attachments 1-3, are illustrative of the pervasive hunger suffered by detained people at SDC.

21. Named Plaintiff Keysler Ramón Urbina Rojas was detained at SDC for over a year.[4] Mr. Urbina Rojas experienced constant hunger while detained because the food was rationed and the meals were spread out with dinner being served at 4 p.m., leaving him with a six-

---

[1] Declaration of Gonzalo Bermudez Gutiérrez at ¶¶16, 17, 20; Declaration of Wilhen Hill Barrientos at ¶¶12, 23; Declaration of Keysler Urbina Rojas at ¶¶12-15, 17, 19-20, 45; ████████ ████████████████████████████████ (CCBVA0000106555, CCBVA0000106561, CCBVA0000106566, CCBVA0000106572, CCBVA0000106578, CCBVA0000106584); CoreCivic 30(b)(6) Designee Russell Washburn Deposition Transcript (Dec. 1, 2021) at 251:24-252:14.

[2] Jun. 3, 2006 IGSA (CCBVA0000000340) at 1 (requiring compliance with "the most current edition[] of ICE Detention Requirements"); Jun. 12, 2013 IGSA Mod. (CCBVA0000000368) (requiring compliance with 2011 PBNDS); Feb 13, 2017 IGSA Mod. (CCBVA0000000449) (requiring compliance with 2011 PBNDS, rev. 2016); 2011 Performance-Based National Detention Standards, 2016 Revisions (CCBVA0000003317) at 232 (PBNDS 4.1 Food Service).

[3] *See* ████████████████████████████████████ (TRINITY00000396); ████████████████████████████████████████ (CCBVA0000117636).

[4] Urbina Rojas Decl. at ¶2.

to-seven-hour wake window without food.[5] Mr. Urbina Rojas was also hungry because he was often unable to eat the food served because he found it inedible. For example, he was at times served a meat-like dish that he and other detained people called "monkey brains" because it looked and tasted disgusting.[6] During his time at SDC, Mr. Urbina Rojas lost 20 pounds because of how little he ate, as well as because of gastrointestinal issues he suffered (for which he had to seek medical attention).[7] To satiate his hunger, Mr. Urbina Rojas supplemented his diet with commissary purchases when he was able. He also worked in the kitchen because he was given access to extra food.[8]

22. Named Plaintiff Wilhen Hill Barrientos was detained at SDC for over a year and a half.[9] He was often hungry because the serving sizes of his meals did not fill him up.[10] He did not like the food because it lacked flavor. As a kitchen worker, he saw poor cooking practices firsthand. For example, he was instructed to add so much water to beans that they did not have any flavor.[11] He was forced to cook and serve spoiled food.[12] Mr. Hill Barrientos supplemented his diet with commissary purchases he made with wages from the work program.[13]

23. Named Plaintiff Bermudez Gutiérrez was detained at SDC from May 2019 to January 2020.[14] Mr. Bermudez Gutiérrez was not provided enough food during his time at SDC and as result, he lost over 20 pounds.[15] The food was bad and repetitive, very little fresh fruit was served, and the portions were too small.[16] Additionally, because the meals were too spread out, he was often hungry between meals.[17] To stave off constant hunger, supplemented his diet with food and snacks purchased at the commissary.[18] Mr. Bermudez Gutierrez signed up to join the work program after being told he could work in the kitchen to receive extra food and make some money to buy necessities in the commissary.[19]

24. The Named Plaintiffs' accounts mirrored the accounts I heard from detained people during my site inspection. Nearly every detained person I interviewed during my site visit said they were hungry because they did not get enough to eat, and they thought the food was

---

[5] Urbina Rojas Decl. at ¶¶12, 13; CCBVA0000196062 ███████████
████████ ; CCBVA0000274192 ████████████
[6] *Id.* at 14.
[7] *Id.* at 16.
[8] *Id.* at 13-15, 17, 19.
[9] Hill Barrientos Decl. at ¶2.
[10] *Id.* at ¶12.
[11] *Id.* at ¶11.
[12] *Id.* at 10.
[13] *Id.* at ¶23.
[14] Bermudez Gutiérrez Decl. at ¶2.
[15] *Id.* at ¶19.
[16] *Id.* at ¶¶15, 17, 18.
[17] *Id.* at ¶¶16, 17.
[18] *Id.* at ¶17.
[19] *Id.* at ¶¶20, 21, 33.

tasteless and of poor quality. Reoccurring themes included: small portions, food that is too spicy and too salty, rice that is either raw or soggy; no chicken or meat on the menu, and unrecognizable meat; breakfast that is comprised of the same items every day; food that is either bland or very spicy; commissary food that is not healthy and is very expensive. Detained people also reported hunger between dinner and breakfast because dinner is served so early. Finally, detained people reported that they participated in the Work Program in large part to gain access to more food because they were hungry. They reported purchasing food with Work Program wages in the commissary or receiving extra food as a "privilege" of working in the kitchen. What was reported to me by detained people was generally consistent with the evidence I reviewed in the course of forming my opinion and writing this report.

25.   Complaints regarding the sufficiency and adequacy of the food are well-documented. Detained people have communicated numerous complaints to CoreCivic, Trinity, and ICE regarding the poor quality and insufficiency of the food at SDC. In preparing my Report, I saw complaints relating to the following:

    a.   **Spoiled or Unsafe Food.** Detained people at SDC have complained about serving or receiving spoiled food.[20] I saw multiple complaints relating to moldy bread, ████████████████████████████████████████████████████████████.[21]

    b.   **Foreign Objects in the Food.** Detained people at SDC have complained about foreign objects in their food. Detained people have found ████████████, ██████████, roaches ██████████, rubber in meals, and ████████████.[22] ███████████████████████████████ In another instance, a detained person bit into his serving of beans and bit into something hard that resulted in a broken tooth.[24]

---

[20] See  e.g., Nov 27, 2019 Email from Amilcar Valencia re Medical Care  for Three Individuals Detained at Stewart Detention Center (DHSCRCL0000085) (complaint on behalf of three people, all regarding food and medical conditions, one person complained of moldy food); 2017 OIG Working Papers (PLS_0004612) at 6.

[21] ██████████████████ (CCBVA0000247854).

[22] DHSOIG0000082 (complaint regarding rubber in food); ███████████████████████ ████████████████ (ICE Barrientos 0020426) ████████████████████ █ ███████████ ███████████████████████████████ (ICE Barrientos 0020418) ██████████████ ; Case Summary Report (DHSOIG0000093) (roaches coming out of kitchen).

[23] DHSOIG0000082 (complaint regarding rubber in food).

[24] Grievance (PLS_0003257).

c. **Insufficient Portions.**[25] Detained people at SDC have complained about incomplete meals that did not reflect the posted menu ███████.[26] This was particularly common for detained people classified for special meals. ████████████████████████████████████████████.[27]

d. **Insufficient Nutritional Value.** Detained people at SDC have complained of the nutritional inadequacy of the food they are served. Of particular concern was the lack of nutritional diversity on trays, including complaints over the ██████████ ███, overabundance of potatoes, and little or no protein on trays.[28]

e. **Medical, Religious, or Cultural Issues.** Detained people at SDC have raised complaints relating to special diets and cultural inadequacy. For example, detained people at SDC complained about ████████████████



_____

[25] ████████████████████████████████████████████████ (CCBVA0000117636) ████████████████████████████████████████

[26] See, e.g., ██████████ (CCBVA0000217451) ███████████████████████; ███████ (CCBVA0000274217) ███████████████ 2017 OIG Working Papers (PLS_0004612) at 9 ("we often do not get what is listed on the menu.")

[27] *See e.g.,* ████████ (CCBVA0000118265) ████████ (CCBVA0000219637) ████████████; ██████ (CCBVA0000118286);

[28] ██████ (CCBVA0000118288) ████████████ (CCBVA0000118271), ████████████; ICE Barrientos 0020482; CCBVA0000196441 ████████████████ DHSCRCL0000085 (complaint on behalf of three people, all regarding food and medical conditions, two people with serious medical conditions not receiving adequate food and losing significant weight); DHSOIG0000084 (overabundance of potatoes).

[29] ████ (CCBVA0000118273) ████████ (CCBVA0000118284) ██████████ (CCBVA0000118265) ████████ (CCBVA0000219637) ██████████

[30] ████ (CCBVA0000118269) ████████████

[REDACTED].[31]

26. The complaints described in the paragraphs above are consistent with the inadequacies and deficiencies I identified: (1) menus that do not meet recommended daily allowances; (2) deficiencies in menu planning, revision, and implementation; (3) poor food safety and sanitation practices; and (4) lack of meaningful oversight and corrective action. These four factors contribute to the ongoing provision of food that is insufficient in amount or inedible. I will discuss each contributing factor in more depth in the sections below.

### A.  The food menus at SDC do not provide for a nutritionally adequate diet

27. The food menus at SDC do not provide for a nutritionally adequate diet. Because the menus should be implemented facility-wide, the nutritional deficiencies, by definition, affect every detained individual who receives that diet.

28. An adequate diet should provide the recommended nutrient levels without being excessive. The SDC menus serve mostly non-complex carbohydrate-heavy meals largely consisting of a combination of bread, biscuits, white pasta, white rice, and potatoes. The meals are high in salt and sugar with little or no fresh fruits, fresh vegetables, quality grains, or quality proteins, and thus, is a diet low in naturally occurring vitamins and minerals. Given this combination of foods, it is almost impossible to meet nutritionally adequate intake levels for specific nutrients without exceeding adequate caloric intake.

### i.  Basic Principles of Nutrition and Group Diet Planning

29. To understand how and why the SDC menus are inadequate—and what harms result—it is necessary to review basic principles of nutrition and group diet planning.

30. Nutrition refers to the study of nutrients found in food, how the body uses nutrients, and the relationship between diet, health, and disease. Nutrients found in food support growth, maintenance, and repair of the body. Food is often viewed as fuel for a body in the form of calories that derive from the 3 major macronutrients—protein, fat, and carbohydrates. But an adequate diet must do more than provide sufficient calories. In addition to the major nutrients, the body needs micronutrients, (such as vitamins, minerals, and other natural occurring micronutrients) to support cardiac health, bone health, lean body mass and other body functions. Micronutrients are vital to healthy development, disease prevention and overall physical wellbeing. To achieve sufficient intake of macro and micronutrients, meals must also be composed of a combination of food products of adequate quality and balance between various food groups.

---



[31] [REDACTED] (CCBVA0000118286) [REDACTED]; [REDACTED] (CCBVA0000118118) (CCBVA0000217451) [REDACTED] (CCBVA0000196403) [REDACTED]

31. With the exception of Vitamin D, micronutrients are not produced in the body and must be obtained from the diet. Micronutrients are found in fruits, vegetables, and protein foods. When consumed, humans store micronutrients in their tissues. When a micronutrient is absent from the diet, the body stores gradually deplete the nutrient store. Eventually, none of the micronutrient remains and the specific metabolic function that depended upon the nutrient can no longer occur. It is at this point that the body shows signs and symptoms indicating the deficiency. Unlike protein, carbohydrate, and fat deficiencies, micronutrient deficiencies have no direct impact on overall body mass or growth, but they can have detrimental consequences. Complications of micronutrient deficiencies can include type 2 diabetes, metabolic syndrome, heart disease, osteoporosis, suppressed immune system, temporary or permanent eye damage, megaloblastic anemia, bone loss, muscle weakness, increased risk of fractures, weight gain, shortness of breath, increased heart rate, fatigue, and impaired brain function.

32. In the United States, the U.S. Department of Agriculture (USDA) and the U.S. Department of Health and Human Services (HHS) publish *Dietary Guidelines for Americans* ("Guidelines"), the most authoritative set of nutrition-based recommendations in the United States. These guidelines, which have been regularly reviewed and updated since the first edition was published in 1980, provide science-based advice on what to eat and drink to meet nutrient needs, promote health, and reduce the risk of chronic disease.   The Guidelines are the foundation of federal food, nutrition and health policies and programs, such as the national school lunch program or other USDA meal programs. They are intended to be and are widely used by health professionals and nutrition program administrators to create healthy and nutritionally adequate diets.

33. The *Guidelines* themselves do not establish recommended intake values for any given food or nutrient, although they are designed to meet various dietary measures. The various measures used are established independently by the National Academies of Sciences, Engineering, and Medicine. The most commonly referenced values, especially amongst the public, are the Recommended Dietary Allowances (RDA),[32]  which are recommended daily dietary nutrient intake levels.

34. The RDA are not the sole measure of nutritional adequacy and have not been used as the sole reference point in evaluating nutritional adequacy in several decades.  Since 1994, nutrition professionals have adopted a more comprehensive framework: Dietary Reference Intakes (DRI). The DRI are a common set of nutrient-based reference values, including

---

[32] The Recommended Dietary Allowances (RDA) are the estimated amount of a nutrient (or calories) per day considered necessary for the maintenance of good health. The RDA is set by the Food and Nutrition Board of the National Research Council/ National Academy of Sciences and is updated periodically to reflect new knowledge. It is popularly called the "recommended daily allowance." The RDA consists of a single recommended daily intake amount for a broad age and sex group and gives little guidance or information to determine when the intake of an individual or population group would be considered inadequate or excessive.

RDA and four additional values:  Estimated Average Requirement (EAR),[33] Adequate Intake (AI),[34] Tolerable Upper Intake Level (UL),[35] and Acceptable Macronutrient Dietary Ranges (AMDR).[36] The new DRI framework was grounded in the need to address multiple users and meet multiple needs, such as assessing the adequacy of diets for specific population groups. Use of the DRI framework is now well-established in the field of nutrition, including for planning and evaluating group diets and food programs.

35. Since 2015, the *Guidelines* also have focused their recommendations on not just specific intakes, but on dietary patterns, also known as meal patterns.[37] Recognizing that food is not consumed in isolation but in combination, scientific research on diet and health has shown important synergistic connections between patterns of foods. A dietary pattern represents the totality of what an individual eats and drinks. The *Guidelines* recommend dietary patterns that contain nutrient-dense foods[38] in recommended amounts, and—importantly—within calorie limits.  Each food group (and subgroup) provides an array of nutrients. The major food groups include vegetables,[39] fruits, grains, dairy (and fortified soy alternatives), protein foods,[40] and oils.

36. Planning diets for groups is a complex process that involves several steps: identifying nutritional goals, determining how to achieve those goals, and assessing if the goals are achieved. Importantly, menus planned for institutionalized settings should consider that the group members cannot freely access other sources of food or nutrients.

---

[33] The Estimated Average Requirement (EAR) is the average daily nutrient intake level estimated to meet the requirement of half the healthy individuals in a particular life stage and gender group.

[34] Adequate Intake (AI) is a level that is assumed to provide enough of that nutrient. AI is used when there is not enough scientific data to establish an average nutrient requirement.

[35] The Tolerable Upper Intake Level (UL) is the maximum daily amount of a vitamin and mineral that you can safely take without risk of an overdose or serious side effects.

[36] The Acceptable Macronutrient Dietary Range (AMDR) is the calculated range of how much energy from the major nutrients (protein, carbohydrates, and fats) is needed for a healthy diet. People who do not reach their target increase their risk of developing health complications. The Institute of Medicine (IOM) has calculated an acceptable macronutrient distribution range for carbohydrate (45%-65% of energy), protein (10%-35% of energy), and fat (20%-35% of energy; limit saturated and trans fats).

[37] Although the use of meal patterns was not formally incorporated into the Guidelines until 2015, meal patterns have been used by nutritional experts since at least the late 1980s.

[38] Nutrient density refers to the ratio of the amount of nutrients in foods to the energy (calories) provided by the foods.

[39] Vegetables include five subgroups: dark green; red and orange; beans, peas, and lentils; starchy; and other.

[40] Protein foods include foods from animal and plant sources in various subgroups: meats, poultry, and eggs; seafood; and beans (e.g., lentils, black beans, garbanzo beans, peas, soybeans and derived products such as tofu and tempeh), nuts, and seeds. Dark leafy greens are also a powerful source of protein.

37. There are several frameworks that can be applied in planning diets for groups. A recommended approach for planning group diets in institutional settings is to plan for a target usual distribution. First, an initial goal for the nutrient content of the menu must be established for the target population (the "target nutrient distribution."). After establishing the target nutrient distribution, a menu planner must determine what foods to offer that will result in a distribution of usual nutrient intake that meets that target ("target usual nutrient intake"). In other words, the planners should consider what food people will actually eat. Finally, a planner must determine what quantities of foods to purchase, offer, and serve.

38. Determining the usual nutrient intake distribution requires recording and analyzing how much the group is eating.[41]  If all individuals in a group consume exactly what they are offered in a group-feeding situation, then the average variance of meals eaten is zero and the amount offered would equal the planners' nutrient intake goal. However, individuals in a group seldom consume exactly what is offered. Some individuals in a group will eat less than what is offered, and others may need to supplement what is offered with foods from other sources. After the target usual nutrient intake distribution is set, the planner must determine a measure to use for planning that is set in relation to the EAR. This ensures that the group as a whole is getting sufficient nutrients to meet their needs.

39. Even after a final menu is created, actual intake monitoring should periodically be assessed to ensure ongoing adequate nutrient intake. This should be done yearly before the menu is certified as adequate. Actual intake data may warrant menu or recipe revisions.

### ii.   Analysis of Food Menus at SDC

40. It is my opinion that Trinity's menus at SDC do not meet the Dietary Reference Intakes for a menu appropriate for the SDC population. Because the SDC population is in an institutionalized setting without free access to additional nutritional sources, the food provided by SDC should meet all the nutritional needs of the detained population within 2-3%. It does not.

41. Pursuant to PBNDS 4.1, a Trinity registered dietitian certifies annually that the food menus are nutritionally adequate. ████████████████████████████████████████ ██████████████████████████████████████[42] As described below, these certifications are not based on sufficient data.

---

[41] Where data relating to the entire population is not attainable, intake can be measured with a three-day plate study with a subgroup of the population.
[42] In preparing this report, I was provided with adequacy statements for 2015-2020. *See* █████ ████████████████ (TRINITY00000026-31).

42. To complete the annual certification, the Trinity dietician reviews only menus and a nutritional analysis created with the use of the CBORD NetMenu software. The NetMenu analysis measures the quantities of certain nutrients provided against a stated intake goal.

43. [43] It is not clear how Trinity sets goal intakes for each nutrient. Based on my review, the goal intakes on these NetMenu analyses are generally consistent with RDAs for a 2,400-calorie diet, with the notable exception of fiber. The appropriate intake goal for fiber is 35 grams; Trinity's intake goal was only ████████ ████.[44] This is a critical deficiency. The lack of adequate dietary fiber affects the functioning of the gastrointestinal system and has an impact on satiety. A high fiber diet takes longer to digest in the stomach and slows down the drop in glucose which results in feeling fuller longer.

44. Based on the NetMenu analyses provided, the menus appear on paper to meet the stated intake goals (which, again, are inadequate for fiber). However, Trinity is only able to meet these intake goals because it designs menus that (again, on paper) provide, on average, █ ███████████████.[45] The addition of largely empty calories to boost overall nutrient levels is inappropriate and can have serious consequences. In the short term, consuming empty calories can result in feelings of hunger. This is because foods high in fat and calories cause a spike in blood sugar and cholesterol. The ensuing quick drop in blood sugar can result in feelings of hunger.

45. When analyzing the nutritional adequacy of a menu, the nutrient intake goals should correspond to the average caloric content of a menu. At SDC, the average caloric content of a menu is ████████, so to conduct an adequate menu analysis, the intake goals should increase to reflect the higher caloric range. A chart illustrating the comparison in Trinity's intake goals and a ████████t[46] is listed below. As demonstrated in the chart, when analyzed with the increased intake goals corresponding to the higher calorie diet, the Trinity menus are deficient in virtually every nutrient, with a significant deficiency in fiber.

---

[43] See e.g., Trinity00001607 ████████████████████████████████

[44] *Id*. ████████████████████
(TRINITY00001554-59 ████████ TRINITY00001560-65 ████; TRINITY00001566-77 ████
TRINITY00001578-95 ████████

[45] ████████████████ (TRINITY00001559 ████
TRINITY00001565 ████████ TRINITY00001577 ███; TRINITY000015795 ████████
TRINITY00001607 ████████

[46] My analysis is based on ████████████████████████████.
(TRINITY00001607).

| Nutrient | Amount provided by Stewart menu | DRI for ██ calorie diet[47] | Difference |
|---|---|---|---|
| Fat | ██ | ██ | ██ |
| Sodium | ██ | ██ | ██ |
| Protein | ██ | ██ | |
| Dietary Fiber | ██ | ██ | |
| Carbohydrate | ██ | ██ | ██ |

46. Additionally, the Trinity menus at SDC are not nutritionally balanced, meaning that they do not provide for a sufficiently varied diet across food groups. PBNDS 4.1 provides that detained people should "be provided a nutritionally balanced diet." A comparison between a week of Trinity's menu at SDC[48] and the USDA recommended intake amounts for Healthy US-style patterns[49] shows a clear imbalance as compared to both a 2,400-calorie diet (the appropriate caloric goal) and a ██-calorie diet (what Trinity's menus provide for).

| Food Group | Recommended Amount per week for ██ calorie diet | Amount per week - Trinity menu | Difference |
|---|---|---|---|
| Dark green vegetables | ██ | ██ | ██ |
| Red orange vegetables | ██ | ██ | ██ |
| Starchy vegetables | ██ | ██ | ██ |
| Other vegetables | ██ | ██ | ██ |
| Fruit | ██ | ██ | ██ |
| Beans and lentils | ██ | ██ | ██ |

| Food Group | Recommended Amount per week for 2,400-calorie diet | Amount per week - Trinity menu | Difference |
|---|---|---|---|
| Dark green vegetables | ██ | ██ | ██ |
| Red orange vegetables | ██ | ██ | ██ |
| Starchy vegetables | ██ | ██ | ██ |
| Other vegetables | ██ | ██ | ██ |
| Fruit | ██ | ██ | ██ |
| Beans and lentils | ██ | ██ | ██ |

---

[47] Estimated DRIs according to USDA's DRI calculator, *available at* https://www.nal.usda.gov/legacy/fnic/dri-calculator/.
[48] ████████████████ (CCBVA0000118425).
[49] USDA Healthy US-style Patterns, *available at* https://fns-prod.azureedge.net/sites/default/files/usda_food_patterns/HealthyUS-StylePattern-RecommendedIntakeAmounts.pdf

47. As shown in the charts above, Trinity's menu at SDC has a clear lack of dark green and red orange vegetables and fruit.[50] The deficiency in fruits and non-starchy vegetables,[51] which are nutrient-dense foods, directly impacts the micronutrient intake and is a reason why the SDC menu cannot meet the intake goals without the addition of largely empty calories.

48. Trinity analyzes nutritional adequacy solely by examining the menus and a nutritional analysis created by the CBORD NetMenu software. With that software, Trinity analyzes intakes for only ███████████ ████████████████████████████████. The amount of nutrients provided in a diet are created by inputting food purchases into the system with major nutrients and some micronutrients listed.

49. In my opinion, the sole use of the CBORD NetMenu software to determine nutritional adequacy is not adequate. The NetMenu software package was developed in 1993.  This software package offers a range of solutions for all aspects of the food service operation, including purchasing, menu planning and recipe scaling, and food production.  Its strength is in the purchasing, menu costing, recipe scaling and allowing individual special diets to be calculated. The NetMenu analyses fail to measure intake for many important micronutrients such as magnesium, phosphorus, potassium, and zinc.  It is my understanding that the software does not have the capability of taking additional measures into consideration, such as Adequate Intake (AI) and Tolerable Upper Intake Levels (UL). As a result, it is impossible to engage in the more robust analysis that is necessary to determine nutritional adequacy using this tool alone.

50. In sum, after reviewing Trinity's nutritional adequacy statement—which are based solely on review of menus and NetMenu analyses—it is my opinion that the Trinity's menus at SDC do not provide for a nutritionally adequate diet. On their face, the menus are deficient in fiber and ████████████ calories (which are largely empty). As discussed below, the nutritional inadequacy of the menus is in part the result of poor menu planning.

### B. Poor menu planning, revision, and implementation contribute to the provision of nutritionally inadequate food.

51. CoreCivic and Trinity do not have structures in place that would allow for a menu to be designed, revised, and implemented to ensure nutritional adequacy.

---

[50] The deficiencies are unsurprising considering Trinity's failure to consider a meal pattern in formulating a menu in the first place. The Trinity dietitian stated that compliance with a meal pattern is not required. CITE. It is true that the PBNDS and CoreCivic policies do not explicitly require adherence to a meal pattern. However, Comparing Trinity's menu with the USDA meal patterns illustrates the lack of nutritional balance that is required by PBNDS 4.1.

[51] Starchy vegetables are carbohydrate-heavy and less nutrient dense than other vegetables and fruit.

52. PBDNS 4.1 specifies that a food service administrator is responsible for developing nutritionally adequate menus. The standard also requires the food service administrator to "accommodate the ethnic and religious diversity of the facility's detainee population when developing menu cycles," and encourages "individuality in menu planning." As described in Section V.A.i, designing a food menu begins with examining usual nutrient intake distribution, then designing menus to meet those goals.

53. It is not clear how Trinity's menus at SDC were developed. Trinity's dietitian, Maggie Giunta, testified as a corporate representative that the Trinity menus at SDC were based on menus provided by CoreCivic.[52] Susan Huffman, Trinity's Regional Vice President, testified as a corporate representative that she was involved in menu planning when the SDC menu was created and that no one else at Trinity is involved in menu planning, except for the dietitian, who reviews the menus.[53]

54. Ensuring a diet is nutritionally adequate necessarily involves more than conducting a single analysis of nutrients once a menu is developed; it is an ongoing process that requires examining usual intake when designing recipes and overall menus, feedback from the consumer, and periodic and meaningful review.

55. It is my opinion that Trinity cannot ensure nutritional adequacy of its menus if the dietitian who certifies nutritional adequacy of a diet is not involved in designing and revising the menus. In my experience, a registered dietician is involved in the development of the recipes using their expertise to ensure the recipes meet the nutritional goals. This way, recipes can be developed and chosen based on nutrient goals, and recipes can be revised when non-compliant. But Ms. Giunta has no role in menu or recipe development or in ensuring the prepared meals track the approved menus. She also is not physically present at the site to observe meal service (which would provide her with an opportunity to observe, for example, population demographics and trends in food waste). By her own admission, she considers no information specific to SDC other than the facility's name, the date of the menu, and the population group (adults over the age of 18).[54]

56. Under PBDNS 4.1, the food service director is also responsible for evaluating detainee acceptance of the meals. Ms. Giunta stated that the Trinity menu recipes take into consideration food texture, appearance, and palatability—all important factors in meal acceptance. She further testified that "recipes were developed in the Trinity test kitchen and also tested in the facility with feedback from the Administrative, food service, and detained person population." I saw no evidence of recipes being tested by detained people. In general, it is not clear where data relating to food texture, appearance or palatability comes from, who reviews it, or how it is taken into consideration.

---

[52] Maggie Giunta Written Deposition Responses (Oct. 14, 2021) at ¶17.
[53] Susan Huffman Deposition Transcript (July 14, 2021) at 233:13-25.
[54] Giunta Dep. (Oct. 12, 2021) at ¶¶24, 46.

57. Neither Trinity nor CoreCivic track food waste in any way.[55] Tracking food waste is not explicitly required by PBNDS; however, tracking food waste is one of the only ways to measure food acceptance in a qualitative fashion. It is also a way to measure usual food intake.

58. There is considerable evidence documenting a consistent rejection of the food served at SDC. For example, Mr. Urbina Rojas, who was detained for over a year, noted that a lot of the food ended up in the trash because people did not want to eat it. And complaints about the food being tasteless, spoiled, too spicy, repetitive, and/or not culturally/religiously appropriate were commonly raised.[56]

59. I reviewed evidence suggesting that CoreCivic has collected feedback from detained people at SDC relating to food, such as ████████████████████ or surveys.[58] However, there practices are not written into CoreCivic's Food Policy, indicating that such feedback mechanisms are informal and not systematic.

60. I reviewed evidence documenting that CoreCivic gave Trinity feedback relating to the menu, but it is unclear what caused CoreCivic to give that feedback to Trinity because, as mentioned above, there are no policy requirements relating to such a process. It is also unclear whether this feedback actually resulted in any menu or recipe revisions, but the persistence and general consistency of complaints over the course of years suggests the menus have not been meaningfully adjusted.████████████████████

### C. Inadequate food handling, food storage, and general sanitation practices contribute to the provision of nutritionally inadequate food.

61. Detained workers at SDC who work in the kitchen perform essentially every job duty needed to run a food service operation, including storing, preparing, cooking and serving food, washing dishes, cleaning the kitchen, and taking out the trash. If these jobs are not performed under safe and sanitary conditions, the food prepared can be nutritionally inadequate and unsafe.

---

[55] Trinity 30(b)(6) Designee Marquita Crawford Deposition Transcript (Aug. 23, 2021) at 440:22-441:1.
[56] *See e.g.*, CCBVA 265078 ████████████████████ *See also*, *supra*, nn. 28-32.
[57] *See e.g.*, CCBVA 265078 ████████████████ .
[58] Harrell Gray Deposition Transcript (Oct. 27, 2021) at 228:11-230:9.
[59] ████████████████████ (CCBVA0000118425).

62. Under PBNDS 4.1, CoreCivic and Trinity are required to provide detained workers with training relating to food safety. In my opinion, detained workers at SDC are not adequately trained, especially those who handle food.[60] Neither PBNDS 4.1 nor the Food Service Policy explicitly require training relating to cooking, or hands-on training in general, which are both necessary which is are both necessary components of an adequate training program.[61]

63. People preparing food should be well trained in how to prepare food as poor cooking procedures can result in a loss of nutrients. In addition to altering the nutrient content, the taste and texture of food can be also be drastically altered from incorrect processing and cooking procedures. For example, Mr. Hill Barrientos was instructed to add so much water to beans that they did not have any flavor.[62] Similarly, so much water was added to powdered milk that it tasted like water instead of milk.[63] Practices such as these decrease the nutrient density and palatability of the final food product and can result in detained persons rejecting the food altogether and going hungry. It is an example of a way in which the nutritional content of a recipe may be nutritionally adequate in theory, but nutritionally deficient in practice.

64. Detained workers at SDC also appear to lack adequate training on or instructions to follow proper food safety and sanitation practices, which increases the likelihood of preparation of unsafe or inedible food. Anytime the food is mishandled it can result in contamination and can cause disease. A good food service operation should ensure that people working in the kitchen are educated in food hygiene issues and adhere to basic rules of kitchen safety and sanitation. The kitchen is the most critical part of the food chain because it is where food is stored and prepared, and because it is a breeding ground for foodborne illness. Mr. Hill Barrientos was forced to cook and serve spoiled food even after notifying the kitchen supervisors that the food was expired.[64] If food was dropped on the floor, the supervisor instructed him to serve it anyway.[65] I saw similar accounts reflected in grievances, including an instance where ███████████████████████████████████

---

[60] A food handler is a person who has direct or indirect contact with food during its various stages, including storage, preparation, and service.

[61] *See* PBNDS 4.1 at 231 (requiring only explanations and demonstrations of safe work practices); ███████████████████████████ ███████████████████████ *See also* Hill Barrientos Decl. at ¶9 (stating he did not receive any training on how to cook or clean the kitchen)

[62] Hill Barrientos Decl. at ¶11.

[63] *Id.*

[64] *Id.* at ¶10. Similarly, the OIG working papers document an interview with a detained kitchen worker who reported that he was at times ordered to serve expired or moldy food. He also reported that food was removed from original packing with expiration dates. 2017 OIG Working Papers (PLS_0004612) at 6.

[65] Hill Barrientos Decl. at ¶10.

[REDACTED] [66] These practices are clearly unsanitary, unsafe, and can result in the preparation of food that will be rejected when served.

65. As previously noted, I toured the facility in June 2021. I was not allowed to observe food service. Notwithstanding those limitations, my tour of the kitchen revealed multiple deficiencies relating to food safety and sanitation. At the time of my tour, there were no time and temperature logs, dishwashing temperature/chemical sanitation logs, sanitation buckets logs, or records of delivery inspection posted anywhere in the kitchen. Several holding units were not working, and the steam table equipment dials were not marked with the temperature. The drain underneath the steamtable was uncovered. The knobs of the steamtable had no indication for on or off as well as no temperature range. The closest refrigerators were not working which meant that the holding temperatures of the cold food were at risk of being in the temperature danger zone during serving. The nearest refrigerated section was across the kitchen. These deficiencies are all indicators that the food being served could be unsafe and inedible.

66. Ensuring food adequacy requires managing food inventory. Inventory standards require that first in and first out (FIFO) is followed for inventory stocking. During my site visit, I observed lunch meat pulled from the freezer and placed in the walk-in cooler to thaw. One of the cases of lunch meat had a "date received" indicating it was received in August 2020. This suggested to me that FIFO was not being followed because I would expect product dated August 2020 to have been rotated to the front of the freezer for use before June 2021. If FIFO was in fact being followed, which is possible, this reflects that product is being ordered almost a year in advance, which is also an issue. Failing to adhere to FIFO procedures further suggests the food served could be unsafe and inedible.

67. Food expiration dates should be used and followed to ensure foods are safe to serve as well as nutritionally adequate. The SDC food service director testified unequivocally that expiration dates "are not a requirement for Stewart."[67] It is unsurprising, then, that food products used SDC have sometimes become spoiled or nutritionally deficient.

68. It cannot be emphasized enough that food safety is an important part of food adequacy. The safe handling of the food effects not only the safety of the consumer but the quality of the food. The five most critical risk factors leading to foodborne illness are improper holding temperatures, inadequate cooking, contaminated equipment, unsafe sources, and poor personal hygiene. Exposure (or perceived exposure) to the risk of foodborne illness can cause hesitancy to eat served food and can also contribute to food rejection.

---

[66] CCBVA0000217501 [REDACTED]

[67] Crawford Dep. Tr. at 495:17-496:7. The 2017 OIG working papers specifically found that SDC did not have a mechanism for tracking how long frozen foods are left out to thaw because the facility did not track expiration dates. 2017 OIG Working Papers (PLS_0004612) at 5. Despite the deficiency being identified, the practice persists years later.

69. In sum, persistent food handling issues are an additional indicator that the food served at SDC is inadequate. These issues, as with the systemic nutritional and menu planning deficiencies discussed above, contribute to the overall occurrence of food deprivation at SDC.

**D. Lack of meaningful oversight and corrective action when food quality issues are identified contributes to the provision of nutritionally inadequate food.**

70. Neither CoreCivic nor Trinity adequately monitor the food service operation at SDC, nor does the facility have an effective grievance system in place that would allow detained people who have experienced or identified food-related issues to have their concerns addressed. As described above, food related concerns have been brought to Trinity and CoreCivic's attention through a variety of ways, including grievances and audits, but the issues identified are not consistently and meaningfully corrected.

71.  [68] At the facility level, the assistant warden of operations is responsible for overseeing the provision of food services at SDC.[70]

72. The primary way CoreCivic monitors the adequacy of the food served is through meal monitoring,[71] which at SDC consists of observing meal service, evaluating a prepared tray, and documenting findings on a meal monitoring form. [72] The form documents portion sizes, temperatures, and taste.[73] [74] Documenting meal service observations using the meal monitoring form alone is not an adequate way of monitoring meal quality where there is no action associated with any identified deficiencies

73. According to Harrell Gray, Assistant Warden of Support from 2014 to 2019, the meal monitoring includes inspecting a sample tray to ensure the food and portion sizes match the menu. The food is also tasted for flavor and quality.[75] He testified he reviewed the meal monitoring forms but also testified that he was not officially charged with reviewing

---

[68] ████████████████ (CCBVA0000106024) at 18.

[69] *Id.* at 24.

[70] Gray Dep. Tr. (Oct. 27, 2021) at 24:16-22, 25:23-26:12.

[71] Trinity also monitors the food by providing and sampling a tray at every meal. Crawford Dep. Tr. (Aug. 23, 2021) at 436:17-12.

[72] *Id.* at 215:5-216:17; *see also id.* at 222:12-224:10 (testifying there was no requirement that CoreCivic monitor food waste and that he did not know if CoreCivic did that at SDC).

[73] *Id.* at 217:14-22; ████████████████ (CCBVA0000218199).

[74] *See* ████████████████ (CCBVA0000218199); Gray Dep. Tr. (Oct. 27, 2021) at 219:10-222:3.

[75] Gray Dep. Tr. (Oct. 27, 2021) at 215:15-216:22.

them.[76] As to how issues could be corrected if identified through these inspections, he testified that corrections were made on the spot or that he followed up by "eating in the kitchen every day and looking at the meal monitoring forms."[77] Warden Russell Washburn testified that sometimes food incident reports are generated and require corrective action, but testified finding a foreign object in food would not necessarily justify a food service incident, which is a serious safety issue.[78] This is not a meaningful way of ensuring corrective action is taken.

74. SDC's food service is audited by various entities, including ICE's Enforcement and Removal Operations (ERO), which contracts with a company called Nakamoto Group to perform auditing; ICE's Office of Detention Oversight (ODO); and the American Correctional Association (ACA).[79] Based on the audits I reviewed, it is my opinion that these audits do not meaningfully assess food adequacy.

75. In the audits I reviewed, the menu is taken at face value and the nutritional adequacy of the menu is not independently evaluated; the audits only check ███████████████████ ███████.[80] In my experience auditing food service programs, the following steps are completed to ensure nutritional adequacy

   a. The nutrient analysis of the menu is recalculated to ensure that the correct food items used to complete the analysis are the products ordered are used at the site. After the analysis is completed, the menu requirements are reviewed to ensure the nutrient requirements of the people served are met.

   b. At the site review, the auditor ensures that the products listed in the menu are in stock and used in production. Standardized recipes, cooking practices, production sheets and meal counts are reviewed and compared to the products delivered to ensure adequate portion sizes were provided.

   c. Staff is observed during serving to ensure that proper food handling and portion sizes were provided.

   d. Food safety training education are documented and reviewed for all staff.

   e. Equipment is examined to ensure that it is in good working order.

76. For some of the audits, there is not sufficient documentation to determine whether meal service was meaningfully observed.[81] Based on my experience auditing food service

---

[76] *Id.* at 218:5-25.

[77] *Id.* at 222:4-11.

[78] Washburn Dep. Tr. (Dec. 1, 2021) at 282:24-285:11.

[79] *See* Washburn Dep. Tr. (Dec. 1, 2021) at 101:5-14.

[80] *See, e.g.,* █████████████████████ (CCBVA0000117689) at 84-85 ████ ██████████ (CCBVA0000150628) at 32 ████████

[81] *See id.* at 83-91 ███████████████████████ (CCBVA0000150233) at 8 ██

programs, the flow of product through the food service program must be observed from start to finish (delivery, storage, preparation, cooking, holding, serving, cooling and reheating) to ensure food safety and adequacy.

77. An additional problem is that all or most audits and inspections are pre-announced.[82] Pre-announcing inspections allows for staff to modify current practices to ensure compliance at the time of the inspection. When Mr. Urbina Rojas worked in the kitchen, he was instructed to deep clean the kitchen before inspections.[83] During my interviews, multiple detained people reported that staff were informed about the local health inspections, and they were instructed to clean and sanitize the kitchen so they could pass the inspection. After the inspections, the cleaning schedule was not maintained. Detained people who worked in the kitchen reported to me in those interviews that they were not present during inspections, suggesting no production or serving of the meals is observed during the health inspections.[84]

78. SDC has a formal grievance process in place through which, theoretically, food-related issues can be raised.[85] I reviewed many grievances about the food at Stewart that were responded to with stock language about the Trinity dietician's review of the menus or were found to be about non-grievable issues.[86] Based on my review, grievances were generally not well investigated.[87]

79. To the extent food-related issues was determined to be grievable, there was conflicting testimony over how food-related grievances were investigated and addressed. ███████████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████[88] Mr.

---

████████████████████████████████████████████████████████████████████ "); ████████ ████████ (CCBVA0000150628) at 32.

[82] Washburn Dep. Tr. (Dec. 1, 2021) at 156:16-23 ████████████████████████████████████ ████████████), 168:19-169:1 (testifying that CoreCivic receives "about the same" amount of notice for Nakamoto audits as ODO audits), 184:12-21 (testifying that CoreCivic receives three to five months' advanced notice of ACA audits).

[83] Urbina Rojas Decl. at ¶26.

[84] *See also id.*

[85] *See* 14-5 Inmate Resident Grievance Procedures (CCBVA0000106211).

[86] *See, e.g.,* ████████████████████ (CCBVA0000118271); July 23, 2014 Grievance (PLS_0001625); ████████████████████ (CCBVA0000118265); Oct. 17, 2013 Grievance (PLS_0001918); *see also* Washburn Dep. Tr. (Dec. 1, 2021) at 303:23-304:9.

[87] For example, I was also surprised to see a ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████████ (CCBVA0000268067).

[88] Troy Pollock Deposition Transcript (Sept. 30, 2021) at 197:18-198:9.

Gray in turn testified unequivocally that he had no involvement in people's grievances about food.[89] It is unclear whether anyone at CoreCivic ensured that serious food-related issues were corrected and the Trinity food service director testified that there is no record of any corrective action that Trinity takes with respect to food-related grievances at all.[90]

80. Every position I have held has had some mechanism for consumer feedback on food service, whether in writing or verbal.  Extensive customer service training is a standard training for all employees. Focus groups as well as written surveys are tools used to gather feedback to address complaints. As a part of performance improvement plans of the organization the areas that receive the most comments regarding issues are tracked quarterly with an action plan. The goal is to resolve the issue.  Repeated complaints in the same areas are a sign that the complaints have not been resolved.  In my experience, when one person complains about a food service issue, there are other people who feel the same way.

81. In reviewing the grievances and other documents, it was apparent that neither CoreCivic nor Trinity have a real interest in receiving any feedback relating to the meals they served, nor a willingness to investigate and address food-related issues. Ultimately, even if a nutritionally adequate menu is designed, the food that ends up on a plate may be very different in taste and quality if food is not handled adequately. Without systems in place to adequately identify and correct issues as they arise, CoreCivic cannot ensure that the food they serve is consistently nutritionally adequate.

## VI.   Conclusion

82. CoreCivic's failure to provide the detained population at SDC with nutritionally adequate food—both in amount and in quality—is widespread. Nutritionally deficient menus together with systemic deficiencies in menu planning, poor safety and sanitation practices, and a lack of meaningful oversight and corrective action result in detained people experiencing or being at risk of experiencing physical and physiological harm, including hunger, gastrointestinal pain, and weight loss. Because of this, detained people at SDC, who cannot freely access alternative food sources, are faced with a choice at every meal: eat nutritionally inadequate, unsafe, and/or unpalatable food, or eat very little or nothing at all.

---

[89] Gray Dep. Tr. (Oct. 27, 2021) at 232:18-21.

[90] Crawford Dep. Tr. (Aug. 23, 2021) at 486:25-487:7. The food service director also testified she was unaware of a number of food-related grievances lodged with government agencies. *Id.* at 480:17-485:17.

I swear under penalty of perjury that the foregoing is true and correct.

Submitted this 22nd day of December, 2021.

*Leonora Renda MS RDN*

Leonora Renda, MS, RDN

23

# Appendix A

**Leonora R. Renda**
1843 N. 79th Pl
Scottsdale, AZ 85257
602-690-0808
leonorarenda@gmail.com

**DIETITIAN** with over 20 yours of diverse experience in developing, motivating, and leading personnel to provide technical assistance, quality assurance and strategic planning to achieve desired objectives. Proven ability to:

- Achieve program goals by utilizing proven strategic planning techniques
- Organize daily operations to enhance efficiency and promote open communication
- Promote major changes by motivating and empowering others to become involved
- Quickly identify, analyze and implement positive solutions to operational changes

**QUALIFICATIONS:** A personable, multi-dimensional professional offering relevant experience encompassing:

| | |
|---|---|
| Partner Development | Team Leadership/Coordination |
| Organizing/Planning operations | Crisis Management |
| Developing & Motivating Staff | Regulatory Policies and Procedures |
| Exceptional Computer Skills | Independent Project Management |

**SELECTED ACHIEVEMENTS**

**Trained and mentored food service staff** to maintain high food safety and quality standards that improved operating procedures.
**Researched, designed and implemented nutrition procedures** for interdisciplinary glycemic management of inpatient diabetic patients for two hospitals.
**Researched, designed and implemented coordination of nutrition services** for interdisciplinary rounding and treatment of inpatient heart failure patients for two hospitals.
**Researched, designed and implemented outpatient nutrition** services for new inpatient and outpatient bariatric clinic.
**Participates in Division Dietitians meetings** regarding electronic health records, menu development, screening and assessment policies, and patient services training.
**Developed food and nutrition policies** for Arizona region.
**Developed online learning modules** for the Nutrition Care Process for Registered Dietitians and diets for patient services staff.
**Demonstrated management expertise** by piloting new computer programs and providing feedback to fine tune the programs in the field.
**Participating in clinical trial NCT02046187 Ketogenic Diet With Radiation and Chemotherapy for Newly Diagnosed Glioblastoma** and developed classic 4/1 ketogenic diet and nutrition research protocols for the trial.
**Developed, trained and implemented** a nutrition screening program based on cancer side effects for the Radiation and Outpatient Infusion Centers nurses.
**Researched, designed and implemented** Prostate Cancer nutrition protocol for the pretreatment diet.
**Researched and designed** Cancer Cachexia protocol for Radiation Oncology Center.

**Designed and implemented** St. Joseph's Hospital and Medical Center Employee Health Nutrition Counseling program.

C**ontributed to compliance with federal regulations** by establishing agency policy and procedures and developed a training program for employees.

**Researched, developed and implemented** nutrition education training for public health nutritionists statewide.

**Coordinated Agency efforts to provide** technical assistance and evidence based research for the Arizona State Legislation regarding the treatment of metabolic patients and the insurance reimbursement of medical foods.

**Designed, purchased and opened new production kitchens** at two new schools completing the projects smoothly and on time.

**Developed, trained and implemented a statewide Folic Acid Education and Vitamin Distribution Program** with a budget of $800 000 with a reach of over 25,000 women of childbearing age.

**Developed and implemented statewide** folic acid train the trainer distance learning education.

**Developed and implemented** a Lifestyle Management Class for Cancer Survivors focusing on nutrition, physical activity and stress management.

**Exhibited strong ability to "go the extra mile"** and gain the cooperative teamwork of staff that lead to an increase of focus in CRS clinics for special needs nutrition clinical services.

Participated as a volunteer for AFHK in leadership position as chair-person.


**PROFESSIONAL EXPERIENCE:** Excellent background in **Program Management** developed in leadership positions including: **NSLP Nutrition Director and School Health and Nutrition Specialist,** Arizona Department of Education: School **Team Leader of MCH Nutritionists and Nutrition Consultant for Special Needs children**, Arizona Department of Health Services; **Food Service Director and Manager**, Sodexo Services.


**EXPANDED PROFESSIONAL EXPERIENCE**

Dignity Health

Chandler Regional Medical Center

**Manager of Nutritional Services 2016-Present**

**Responsible** for managing staff and processes related to patient services and clinical nutrition services to ensure high standards of quality. **Develop and implement** Dignity Health system wide patient menu to meet nutritional standards for all disease states. **Manages** staff to include completing employee performance appraisals; establishing and setting goals for employees to promote growth and personal accomplishments; scheduling employees; developing and reviewing job descriptions; and ensuring performance standards are met in area of responsibility. **Assists in planning and implementation of programs and procedures** to improve patient experiences, preparation efficiency and maintain quality of patient services and clinical nutrition services and therapeutic meals. **Adheres with and supports** departmental policies, procedures, and goals. **Fully complies** with state, federal, JCAHO, and OSHA standards.


Aramark

**Outpatient Oncology Dietitian 2013-2016**

**Maintains** a high degree of professional autonomy and independent practice, **Provides** case management skills, **Utilizes** advanced health assessment skills, decision-making skills, and diagnostic reasoning skills, **Maintains** nonclinical advanced practice skills (business, communications, computer skills, insurance), **Meets** recognized advanced clinical competencies,  **Plans, implements, and evaluates** programs and Medical Nutrition Therapy protocol, **Built strong relationship** with

Neurology, Thoracic, GYN physicians and community medical oncologists. **C**ommunication with Radiation Oncology Medical team. **Counsel** adult and pediatric patients and their families. **Assist in prioritizing care plans** for patients and their families, with a large class load in a fast paced medical environment. D**eveloping** a multi ethnic, healthy cookbook based on culturally acceptable foods for Susan B Koman grant to reduce the risk of overweight and obesity.

St Joseph's Hospital and Medical Center
**Outpatient Oncology Dietitian 2009-2013**
 **Maintains** a high degree of professional autonomy and independent practice, **Provides** case management skills, **Utilizes** advanced health assessment skills, decision-making skills, and diagnostic reasoning skills, **Maintains** nonclinical advanced practice skills (business, communications, computer skills, insurance), **Meets** recognized advanced clinical competencies,  **Plans, implements, and evaluates** programs and Medical Nutrition Therapy protocol, **Built strong relationship** with Neurology, Thoracic, GYN physicians and community medical oncologists. **C**ommunication with Radiation Oncology Medical team. **Counsel** adult and pediatric patients and their families. **Assist in prioritizing care plans** for patients and their families, with a large class load in a fast paced medical environment. D**eveloping** a multi ethnic, healthy cookbook based on culturally acceptable foods for Susan B Koman grant to reduce the risk of overweight and obesity.

Arizona Department of Education
**National School Lunch Program Nutrition Director 2008-2009**
**Provided strategic planning, development and implementation** for 8 different NSLP programs for the State of Arizona. Responsible for developing, administering and justifying a 10M budget. **Responsible** for interpreting federal and state guidelines for national program. **Planning, coordinating and conducting** quality assurance audits at statewide sites.
**School Health and Nutrition Specialist 2007-2008**
**Developing, organizing and presenting** at statewide conferences on wellness. **Provided quality assurance audits** for school food authorities including school policies and improvement plans. **Responsible for providing technical assistance** and the implementation of School Wellness policies and Arizona Nutrition Standards for the State of Arizona.  **Researched and wrote t**he CDC funded Coordinated School Health Grant.

Arizona Department of Health Services.
**Team Leader for Maternal Child Health Nutrition 2001-2007**
**Provided** strategic planning, development and implementation **f**or MCH nutrition, Special Needs nutrition and Breastfeeding. **Developed strategic plans** to meet federal and state regulations, **Developed and implemented** MCH breastfeeding outreach social marketing plans. **Facilitated the cross bureau** breastfeeding provider education training. **Researched, wrote and coordinated** the CDC funded Nutrition and Physical Activity Grant. **Using project management skills,** d**eveloped, managed, trained online and implemented** the State Wide Folic Acid Education and Vitamin Distribution Program. **Provided capacity building assistance** to the legislature, health agency partners and community stakeholders.

**Nutrition Consultant for Special Needs Children 1998-2001**
**Provided statewide technical assistance and quality assurance** for 4 regional statewide CRS clinics and ten state wide Early Intervention Services. **Contract development and audit nutrition services** for 4 regional statewide CRS clinic **Planned and organized** statewide continuing educations trainings for health care providers. **Wrote and developed publications** dealing with nutrition for special health care needs. **WIC State Nutrition Coordinator** Coordinated WIC Statewide Nutrition Audits

**Sodexo Services**
**Food Service Director 1987-1998**
**Managed** multiple National School Lunch Program K -12 school sites with a staff of 50.
**Administered** a budget of over 2M. **Piloted** SSMARTS operational software. **Implemented** the SNAP register and meal counting computer system. **Developed, organized and trained** staff of food safety, federal regulations and customer service skill**s. Developed** the national six week menu cycle to meet national school nutrition standards.  **Increased** sales revenue by 10%. **Provided presentations** to the School Boards, Parent Teacher Associations, Teachers, and Students.

**Food Service Manager 1982-1987**
**Managed** a high school kitchen with a staff of 13 employees. **Trained and implemented** a diverse menu and service plan that increased participation by 20%. **Developed and implemented** a staff cross training program. **Decreased** food cost by 1.5% each year.  **Coordinated Health Fair** for Fresh and Sophomore classes with School Nurse director and local Hospital.


**EDUCATION & CERTIFICATION**

Certification of Weight Management - Academy of Nutrition and Dietetics - 2018
Arizona State University – Tempe, AZ –MS, Nutrition - 2017
Illinois State University - Normal, IL – BS, Dietetics – 1980
ADHS Leadership Academy Certificate Program1 year training program 2002-2003
Registered by the Commission of Dietetics Registration – 2007

**HONORS AND AFFILIATIONS**
NET Nutrition Award – 1994
Arizona Dietetics Association, member since 2005
President - Central Arizona Academy of Nutrition and Dietetics 2019-2022

# Appendix B

**Appendix B**
**Documents Reviewed**

| BEGINNING BATES / CONTROL NO. | DESCRIPTION |
|---|---|
| CCBVA0000003840 | ███████████████████ |
| CCBVA0000003836 | ████████████ |
| CCBVA0000003777 | ████████████████████████ |
| CCBVA0000003772 | █████████████████ |
| CCBVA0000003932 | █████████ |
| CCBVA0000003937 | ██ |
| CCBVA0000003942 | █████████ |
| CCBVA0000003947 | ██ |
| CCBVA0000003965 | ████████████████ |
| CCBVA0000004117 | ████████████████ |
| CCBVA0000004355 | ██████████████ |
| CCBVA0000004550 | █████████████ |
| CCBVA0000004617 | ███ |
| CCBVA0000004623 | ████ |
| CCBVA0000004627 | ███████████ Volunteer ██ █████ram Agreement |
| CCBVA0000004631 | ███ |
| CCBVA0000004638 | ████████████████ lunteer █████ ██ ram Agreement |
| CCBVA0000004645 | ████ |
| CCBVA0000004676 | ████████████ |
| CCBVA0000004685 | ██████████████ |
| CCBVA0000005675 | ██████████ |
| CCBVA0000005820 | █████████████████ |
| CCBVA0000005999 | ██████████████ |
| CCBVA0000006001 | ████████████████ |
| CCBVA0000006060 | ███████████ |
| CCBVA0000006239 | ██████ |
| CCBVA0000006420 | ██████████████████████ |
| CCBVA0000006431 | ████████████ |
| CCBVA0000006465 | █████████████ |
| CCBVA0000105969 | █████████████████ |
| CCBVA0000105974 | ███████████████████ |
| CCBVA0000105975 | ███████████████████ |
| CCBVA0000106024 | ██████████ |
| CCBVA0000106051 | ████████████████ |
| CCBVA0000106052 | ████████████████ |
| CCBVA0000106077 | ████████████████ |
| CCBVA0000106079 | ████████████████ |
| CCBVA0000106102 | ████████████████ |
| CCBVA0000106103 | ████████████████ |
| CCBVA0000106118 | ██████████████ |
| CCBVA0000106121 | ███████████████ |

**Appendix B**
**Documents Reviewed**

| Document | |
|---|---|
| CCBVA0000106122 | |
| CCBVA0000106126 | |
| CCBVA0000106127 | |
| CCBVA0000106129 | |
| CCBVA0000106131 | |
| CCBVA0000106132 | |
| CCBVA0000106133 | |
| CCBVA0000106134 | |
| CCBVA0000106135 | |
| CCBVA0000106168 | |
| CCBVA0000106172 | |
| CCBVA0000106173 | |
| CCBVA0000106176 | |
| CCBVA0000106178 | |
| CCBVA0000106180 | |
| CCBVA0000106183 | |
| CCBVA0000106185 | |
| CCBVA0000106186 | |
| CCBVA0000106187 | |
| CCBVA0000106190 | |
| CCBVA0000106191 | |
| CCBVA0000106229 | |
| CCBVA0000106232 | |
| CCBVA0000106234 | |
| CCBVA0000106251 | |
| CCBVA0000106252 | |
| CCBVA0000106266 | |
| CCBVA0000106280 | |
| CCBVA0000106294 | |
| CCBVA0000106307 | |
| CCBVA0000106421 | |
| CCBVA0000106496 | |
| CCBVA0000106527 | |
| CCBVA0000106555 | |
| CCBVA0000106561 | |
| CCBVA0000106566 | |
| CCBVA0000106572 | |
| CCBVA0000106578 | |
| CCBVA0000106584 | |
| CCBVA0000106589 | |
| CCBVA0000106590 | |
| CCBVA0000106973 | |
| CCBVA0000117672 | |
| CCBVA0000117685 | |

**Appendix B**
**Documents Reviewed**

| | |
|---|---|
| CCBVA0000117689 | ▆ |
| CCBVA0000117882 | ▆ |
| CCBVA0000117884 | ▆ |
| CCBVA0000117886 | ▆ |
| CCBVA0000117888 | ▆ |
| CCBVA0000117890 | ▆ |
| CCBVA0000118118 | ▆ |
| CCBVA0000118121 | ▆ |
| CCBVA0000118216 | ▆ |
| CCBVA0000118265 | ▆ |
| CCBVA0000118269 | ▆ |
| CCBVA0000118271 | ▆ |
| CCBVA0000118273 | ▆ |
| CCBVA0000118284 | ▆ |
| CCBVA0000118286 | ▆ |
| CCBVA0000118288 | ▆ |
| CCBVA0000118412 | ▆ |
| CCBVA0000118425 | ▆ ▆ ▆ Nutrition Adequacy Statement ▆ Kosher |
| CCBVA0000118430 | Menu |
| CCBVA0000118431 | ▆ |
| CCBVA0000118433 | ▆ |
| CCBVA0000118435 | ▆ |
| CCBVA0000118532 | ▆ |
| CCBVA0000118602 | ▆ |
| CCBVA0000118695 | ▆ |
| CCBVA0000149688 | ▆ |
| CCBVA0000149722 | ▆ |
| CCBVA0000149723 | ▆ |
| CCBVA0000149956 | ▆ |
| CCBVA0000150032 | ▆ |
| CCBVA0000150184 | ▆ |
| CCBVA0000150206 | ▆ |
| CCBVA0000150215 | ▆ |
| CCBVA0000150219 | ▆ |
| CCBVA0000150224 | ▆ |
| CCBVA0000150227 | ▆ |
| CCBVA0000150233 | ▆ |
| CCBVA0000150241 | ▆ |
| CCBVA0000150254 | ▆ |
| CCBVA0000150547 | ▆ |
| CCBVA0000177758 | ▆ |
| CCBVA0000189770 | ▆ ▆ Email ▆ Blackmon RE ,Kitchen |
| CCBVA0000189828 | ▆ |

**Appendix B**
**Documents Reviewed**

| | | |
|---|---|---|
| CCBVA0000189876 | April █, 2015, Email from C. Foster RE: KITCHEN | |
| CCBVA0000189908 | ████████████████████████████████ | |
| CCBVA0000195759 | ████████████████████ | |
| CCBVA0000195804 | ███████ | |
| CCBVA0000195805 | ███████ | |
| CCBVA0000195806 | ███████ | |
| CCBVA0000195807 | ███████ | |
| CCBVA0000195808 | ███████ | |
| CCBVA0000195809 | ███████ | |
| CCBVA0000195810 | ███████ | |
| CCBVA0000195811 | ███████ | |
| CCBVA0000195812 | ███████ | |
| CCBVA0000195813 | ███████ | |
| CCBVA0000195814 | ███████ | |
| CCBVA0000195815 | ███████ | |
| CCBVA0000195816 | ███████ | |
| CCBVA0000195817 | ███████ | |
| CCBVA0000195818 | ███████ | |
| CCBVA0000195819 | ███████ | |
| CCBVA0000195820 | ███████ | |
| CCBVA0000195821 | ███████ | |
| CCBVA0000195822 | ███████ | |
| CCBVA0000195823 | ███████ | |
| CCBVA0000195824 | ███████ | |
| CCBVA0000195825 | ███████ | |
| CCBVA0000195826 | ███████ | |
| CCBVA0000195827 | ███████ | |
| CCBVA0000195828 | ███████ | |
| CCBVA0000195829 | ███████ | |
| CCBVA0000195830 | ███████ | |
| CCBVA0000195831 | ███████ | |
| CCBVA0000195832 | ███████ | |
| CCBVA0000195833 | ███████ | |
| CCBVA0000195834 | ███████ | |
| CCBVA0000195835 | ███████ | |
| CCBVA0000195836 | ███████ | |
| CCBVA0000195837 | ███████ | |
| CCBVA0000195838 | ███████ | |
| CCBVA0000195839 | ███████ | |
| CCBVA0000195840 | ███████ | |
| CCBVA0000195841 | ███████ | |
| CCBVA0000195842 | ███████ | |
| CCBVA0000195843 | ███████ | |

**Appendix B**
**Documents Reviewed**

| | | |
|---|---|---|
| CCBVA0000195844 | ███████████ | |
| CCBVA0000195845 | ███████████ | |
| CCBVA0000195846 | ███████████ | |
| CCBVA0000195847 | ███████████ | |
| CCBVA0000195848 | ███████████ | |
| CCBVA0000195849 | ███████████ | |
| CCBVA0000195850 | ███████████ | |
| CCBVA0000195851 | ███████████ | |
| CCBVA0000195852 | ███████████ | |
| CCBVA0000195853 | ███████████ | |
| CCBVA0000195854 | ███████████ | |
| CCBVA0000195855 | ███████████ | |
| CCBVA0000195856 | ███████████ | |
| CCBVA0000195857 | ███████████ | |
| CCBVA0000195858 | ███████████ | |
| CCBVA0000195859 | ███████████ | |
| CCBVA0000195860 | ███████████ | |
| CCBVA0000195861 | ███████████ | |
| CCBVA0000195862 | ███████████ | |
| CCBVA0000195863 | ███████████ | |
| CCBVA0000195864 | ███████████ | |
| CCBVA0000195865 | ███████████ | |
| CCBVA0000195866 | ███████████ | |
| CCBVA0000195867 | ███████████ | |
| CCBVA0000195868 | ███████████ | |
| CCBVA0000195869 | ███████████ | |
| CCBVA0000195870 | ███████████ | |
| CCBVA0000195871 | ███████████ | |
| CCBVA0000195872 | ███████████ | |
| CCBVA0000195873 | ███████████ | |
| CCBVA0000195874 | ███████████ | |
| CCBVA0000195875 | ███████████ | |
| CCBVA0000195876 | ███████████ | |
| CCBVA0000195877 | ███████████ | |
| CCBVA0000195878 | ███████████ | |
| CCBVA0000195879 | ███████████ | |
| CCBVA0000195880 | ███████████ | |
| CCBVA0000195881 | ███████████ | |
| CCBVA0000195882 | ███████████ | |
| CCBVA0000195883 | ███████████ | |
| CCBVA0000195884 | ███████████ | |
| CCBVA0000195885 | ███████████ | |
| CCBVA0000195886 | ███████████ | |
| CCBVA0000195887 | ███████████ | |

**Appendix B**
**Documents Reviewed**

| |
|---|
| CCBVA0000195888 |
| CCBVA0000195889 |
| CCBVA0000195890 |
| CCBVA0000195891 |
| CCBVA0000195892 |
| CCBVA0000195893 |
| CCBVA0000195894 |
| CCBVA0000195895 |
| CCBVA0000195896 |
| CCBVA0000195897 |
| CCBVA0000195898 |
| CCBVA0000195899 |
| CCBVA0000195900 |
| CCBVA0000195901 |
| CCBVA0000195902 |
| CCBVA0000195903 |
| CCBVA0000195904 |
| CCBVA0000195905 |
| CCBVA0000196048 |
| CCBVA0000196062 |
| CCBVA0000196134 |
| CCBVA0000196304 |
| CCBVA0000196386 |
| CCBVA0000196403 |
| CCBVA0000196441 |
| CCBVA0000196483 |
| CCBVA0000196505 |
| CCBVA0000196591 |
| CCBVA0000196596 |
| CCBVA0000196607 |
| CCBVA0000196679 |
| CCBVA0000196784 |
| CCBVA0000197000 |
| CCBVA0000197119 |
| CCBVA0000197703 |

**Appendix B**
**Documents Reviewed**

| |
|---|
| CCBVA0000197890 |
| CCBVA0000197928 |
| CCBVA0000198155 |
| CCBVA0000201977 |
| CCBVA0000208517 |
| CCBVA0000217449 |
| CCBVA0000217451 |
| CCBVA0000218192 |
| CCBVA0000218211 |
| CCBVA0000219637 |
| CCBVA0000219638 |
| CCBVA0000219639 |
| CCBVA0000219646 |
| CCBVA0000224926 |
| CCBVA0000224932 |
| CCBVA0000231907 |
| CCBVA0000237866 |
| CCBVA0000238571 |
| CCBVA0000241363 |
| CCBVA0000241364 |
| CCBVA0000241368 |
| CCBVA0000241415 |
| CCBVA0000243274 |
| CCBVA0000244754 |
| CCBVA0000245717 |
| CCBVA0000246884 |
| CCBVA0000246886 |
| CCBVA0000246887 |
| CCBVA0000246888 |
| CCBVA0000246889 |
| CCBVA0000246890 |
| CCBVA0000246929 |
| CCBVA0000246930 |
| CCBVA0000246931 |
| CCBVA0000246933 |
| CCBVA0000246934 |
| CCBVA0000246936 |
| CCBVA0000246937 |

**Appendix B**
**Documents Reviewed**

| | |
|---|---|
| CCBVA0000246940 | |
| CCBVA0000246941 | |
| CCBVA0000246960 | |
| CCBVA0000246961 | |
| CCBVA0000246964 | |
| CCBVA0000246965 | |
| CCBVA0000246972 | |
| CCBVA0000247041 | |
| CCBVA0000247052 | |
| CCBVA0000247357 | |
| CCBVA0000247363 | |
| CCBVA0000247857 | |
| CCBVA0000247867 | |
| CCBVA0000247868 | |
| CCBVA0000247869 | |
| CCBVA0000247873 | |
| CCBVA0000247904 | |
| CCBVA0000247913 | |
| CCBVA0000251073 | |
| CCBVA0000255039 | |
| CCBVA0000255040 | |
| CCBVA0000256175 | |
| CCBVA0000258668 | |
| CCBVA0000259798 | |
| CCBVA0000262068 | |
| CCBVA0000262664 | |
| CCBVA0000265078 | |
| CCBVA0000265079 | |
| CCBVA0000265174 | |
| CCBVA0000265521 | |
| CCBVA0000266526 | |
| CCBVA0000269371 | |
| CCBVA0000269372 | |
| CCBVA0000269374 | |

**Appendix B**
**Documents Reviewed**

| |
|---|
| CCBVA0000269375 |
| CCBVA0000269804 |
| CCBVA0000270011 |
| CCBVA0000270012 |
| CCBVA0000271193 |
| CCBVA0000271199 |
| CCBVA0000271326 |
| CCBVA0000271327 |
| CCBVA0000271333 |
| CCBVA0000271334 |
| CCBVA0000271339 |
| CCBVA0000271345 |
| CCBVA0000271346 |
| CCBVA0000274192 |
| CCBVA0000274217 |
| CCBVA0000274233 |
| CCBVA0000275216 |
| CTRL0000002 |
| CCWBAR0000013 |
| DHSCRCL0000079 |
| DHSCRCL0000085 |
| DHSCRCL0000142 |
| DHSOIG0000001_00041 |
| DHS-OIG-FOIA-0003152 |
| DHS-OIG-FOIA-0003329 |
| DHSOIG0000084 |
| DHS-OIG-FOIA-0003447 |
| DHSOIG0000115 |
| ICE Barrientos 0014300 |
| ICE Barrientos 0017307 |
| ICE Barrientos 0020418 |

**Appendix B**
**Documents Reviewed**

| | |
|---|---|
| ICE Barrientos 0020422 | |
| ICE Barrientos 0020425 | |
| ICE Barrientos 0020426 | |
| ICE Barrientos 0020482 | |
| ICE Barrientos 0021750 | |
| ICE Barrientos 0022702 | |
| ICE-Barrientos0008630 | |
| ICE-Barrientos0012201 | |
| PLS_0001003 | Grievance |
| PLS_0001009 | Grievance |
| PLS_0001288 | Grievance |
| PLS_0001294 | Grievance |
| PLS_0001326 | Grievance |
| PLS_0001444 | Grievance |
| PLS_0001452 | Grievance |
| PLS_0001583 | Grievance |
| PLS_0001625 | Grievance |
| PLS_0001918 | Grievance |
| PLS_0001922 | Grievance |
| PLS_0002085 | Grievance |
| PLS_0002087 | Grievance |
| PLS_0002113 | Grievance |
| PLS_0002115 | Grievance |
| PLS_0002843 | Grievance |
| PLS_0003180 | Grievance |
| PLS_0003188 | Grievance |
| PLS_0003206 | Grievance |
| PLS_0003209 | Grievance |
| PLS_0003212 | Grievance |
| PLS_0003215 | Grievance |
| PLS_0003254 | Grievance |
| PLS_0003397 | Grievance |
| PLS_0003567 | Grievance |
| PLS_0002278 | Grievance |
| PLS_0002340 | Grievance |
| PLS_0002541 | Grievance |
| PLS_0002565 | Grievance |
| PLS_0002608 | Grievance |

**Appendix B**
**Documents Reviewed**

| | |
|---|---|
| CCBVA0000006287 | |
| DHSCRCL000004 | |
| DHSCRCL000009 | |
| DHSCRCL000001 | |
| TRINITY00000654 | |
| TRINITY 000449 | |
| TRINITY-00001664 | |
| TRINITY-00001665 | |
| TRINITY-00001675 | |
| TRINITY-00001676 | |
| TRINITY-00001679 | |
| TRINITY-00001681 | |
| TRINITY-00001683 | |
| TRINITY-00001773 | |
| TRINITY-00001799 | |
| TRINITY-00001969 | |
| TRINITY-00002137 | |
| TRINITY-00002138 | |
| TRINITY-00002139 | |
| TRINITY-00002217 | |
| TRINITY-00002218 | |
| TRINITY-00002219 | |
| TRINITY-00002219 | |
| TRINITY-00002538 | |
| TRINITY-00002540 | |
| TRINITY-00002950 | |
| TRINITY-00002952 | |
| TRINITY-00003127 | |
| TRINITY-00003129 | |
| TRINITY-00003169 | |
| TRINITY-00003170 | |
| TRINITY-00003176 | |
| TRINITY-00003181 | |
| TRINITY-00010299 | |
| TRINITY-00010312 | |
| TRINITY-00010813 | |
| TRINITY-00011099 | |
| TRINITY-00011124 | |
| TRINITY-00011473 | |

**Appendix B**
**Documents Reviewed**

| |
|---|
| TRINITY-00011513 |
| TRINITY-00012050 |
| TRINITY-00012051 |
| TRINITY-00012052 |
| TRINITY-00012133 |
| TRINITY-00012221 |
| TRINITY-00012301 |
| TRINITY-00012438 |
| TRINITY-00012632 |
| TRINITY-00012926 |
| TRINITY-00012928 |
| TRINITY-00012935 |
| TRINITY-00035336 |
| TRINITY-00036296 |
| TRINITY-00036308 |
| TRINITY-00041121 |
| TRINITY00000001 |
| TRINITY00000006 |
| TRINITY00000011 |
| TRINITY00000016 |
| TRINITY00000021 |
| TRINITY00000026 |
| TRINITY00000027 |
| TRINITY00000028 |
| TRINITY00000029 |
| TRINITY00000030 |
| TRINITY00000031 |
| TRINITY00000032 |
| TRINITY00000080 |
| TRINITY00000169 |
| TRINITY00000230 |
| TRINITY00000267 |
| TRINITY00000552 |
| TRINITY00000558 |
| TRINITY00000564 |
| TRINITY00000570 |

**Appendix B**
**Documents Reviewed**

| | |
|---|---|
| TRINITY00000588 | |
| TRINITY00000594 | |
| TRINITY00000600 | |
| TRINITY00000618 | |
| TRINITY00000636 | |
| TRINITY00000666 | |
| TRINITY00000678 | |
| TRINITY00000690 | |
| TRINITY00000704 | |
| TRINITY00000938 | |
| TRINITY00001554 | |
| TRINITY00001560 | |
| TRINITY00001566 | |
| TRINITY00001578 | |
| TRINITY00001596 | |
| TRINITY00001608 | |
| TRINITY00001613 | |
| TRINITY00001618 | |
| TRINITY00001622 | |
| TRINITY00001653 | |
| TRINITY00001663 | |
| TRINITY00001663 | |
| CCBVA0000203805 | |
| CCBVA0000208385 | |
| CCBVA0000247148 | |
| CCBVA0000206703 | |
| Barrientos - CRCL w-ICE & OIG Equities - 0089 | |
| CCBVA0000246929 | |
| CCBVA0000251638 | |
| CCBVA0000246930 | |
| CCBVA0000258668 | |
| DHSOIG0000063 | |
| DHSOIG0000093 | |
| DHSOIG0000082 | |
| | Bethany Brazier Nov. 18, 2021  Deposition Transcript and Exhibits |
| | Exhibits |
| | Charlie Peterson Oct. 18, 2021 Deposition Transcript and Exhibits |
| | CoreCivic 30(b)(6) Dec. 1, 2021 Deposition Transcript and Exhibits |

**Appendix B**
**Documents Reviewed**

| | |
|---|---|
| | Droudred Blackmon Oct. 14, 2021 Deposition Transcript and Exhibits |
| | Exhibts |
| | Exhibits |
| | Matthew Moye Oct. 21, 2021 Deposition Transcript and Exhibits |
| | Michael Swinton Nov. 2, 2021 Deposition Transcript and Exhibits |
| | Exhibits |
| | Exhibits |
| | Trinity 30(b)(6) July 14 & Aug. 23, 2021 Deposition Transcript and Exhibits |
| | 2014 NCCHC Prison Health - Medical Diet Standard |
| | 2018 NCCHC Prison Health - Healthy Lifestyle Promotion |
| | 2018 NCCHC Prison Health - Medical Diet |
| | ACA Adult Local Detention Facilities - Food Service Standard |
| | Trinity Regional Dietician Job Post - Georgia |
| | Dromer, Carole, Ghirmai Yiehdego, *et al* . (2017) *Health Care In Detention* . Ebook. Geneva: ICRC. |
| | Health care in Detention, International Committee of the Red Cross  (January 2017) |
| | Alain Mourey (2008) Nutrition Manual For Humanitarian Action. Geneva: ICRC. |
| | Dietary References Intakes: Applications in Dietary Assessment. (2000) |
| | Table E3.1.A4z Nutritional goals for each age/sex group used I. Assessing adequate of USDA Food Patterns at various calorie levels |
| | Eating behind bars: On punishment, resistance, policy, and applied folkloristics. Michael Owens Jones. Winter 2017, Joirnal of American Folklore (Vol. 130, Issue 515) |
| | A proposed nutrient density score that includes food groups and nutrients to better align with dietary guidance.,Adam Drewnowski, Johanna Dwyer, Janet C king, and Connie M. Weaver. Nutrition Reviews Vol 77(6)404-416 |
| | Nutrient density: principles and evaluation tops, A. Drewnowski and V. L.Fumgoni, III. |
| | Dietary Requirements of Adults. J. Dwtyer, J. Mayer, US Department of Agriculture, |
| | Human Nutrition Research Center on Aging at Tuffs University, Boston. MA, USA. |
| | Eating behind bars: ending the Hidden Punishment of Food in Prison. Impact Justice, 12/2020. |

**Appendix B**
**Documents Reviewed**

| | |
|---|---|
| | P. Stanikowski, M, Michalak-Majewska, D. Domagala, E. Jablonska-Rys, & A. Slawinska. A. Implementation For Dietary References Intake Standards in Prison Menus in Poland. January 30, 2020. |
| | Berkaik-Kloosteman, J., McCain, M., Hoekstra, J., & Berhagen, H. Vitamins and minerals: issues associated with too low and too high populations intakes. Food Nutr Res 2012, 56: 10.3402/he.v5610.5728z |
| | Institute of Medicine 2003. Dietary Reference Intakes. Applications in Dietary Planning. Washington, DC: The National Academies Press. https://doi.org/10.17226/10609 |
| | Airín D. Martínez (2013) Reconsidering acculturation in dietary change research among Latino immigrants: challenging the preconditions of US migration, Ethnicity & Health, 18:2, 115-135, |
| | Georgia Department of Public Health, Environmental Health Section, Rules and Regulations, Food Service, Chapter 511-6-1 (Revised 09/16/2020) |
| | Federal Register, Vol 77 No 17, January 26, 2012. Part II., 7 CFR Parts 210 and 220. |

# Attachment 1

**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

| | |
|---|---|
| **WILHEN HILL BARRIENTOS, GONZALO BERMUDEZ GUTIÉRREZ, and KEYSLER RAMÓN URBINA ROJAS,** individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> **CORECIVIC, INC.,** <br><br> Defendant. | **Civil Action No.  4:18-cv-00070-CDL** |

<u>**DECLARATION OF GONZALO BERMUDEZ GUTIÉRREZ**</u>

I, Gonzalo Bermudez Gutiérrez, hereby declare and state as follows:

1. My name is Gonzalo Bermudez Gutiérrez.  I am over the age of 18. I am a named Plaintiff in this case. I am prepared to testify about the matters discussed in this declaration.

2. I was detained in Stewart Detention Center (SDC), in Lumpkin, Georgia, from May 2019 to January 2020.

3. When I arrived at SDC, I went through the intake process.  During that process, I received a copy of the detainee handbook in English and Spanish.

4. My understanding was that the detainee handbook included all of the rules of SDC and informed you of how to behave while you were detained there. I also understood from the

1

handbook that if I broke any of the listed rules, I could be isolated and separated from the other people detained at SDC.

5.  At intake I was provided with some basic necessities, like one bottle of combined shampoo and soap, and toothpaste. The items were in very small quantities and of poor quality. I was also provided with: two sheet covers; one blanket; two pillowcases; three pairs of pants, shirts, and socks; two pairs of underwear; one pair of sneakers; and one pair of shower shoes.

6.  Following intake, I was housed in segregation for a few days until I was transferred to my first housing unit, Unit 7.

7.  About five days after I was processed into Unit 7, I was told about the Voluntary Work Program ("Work Program"). I was told that I could work in the kitchen and receive extra food and also make some money to buy necessities like phone time, food, and personal hygiene items in the commissary. I signed up to join the Work Program immediately so I could get extra food and purchase those items at the commissary.

8.  After only a few days at SDC, I understood completely that CoreCivic was controlling every aspect of the lives of detained people in SDC. CoreCivic controlled the temperature of the pods and the water in the showers. Detention officers woke us up at 4:30-5:00 a.m. to go to breakfast and then they told us when we could go to lunch and dinner over the course of the day. Because CoreCivic controlled what times the phones started working and stopped working, I could only call my family when CoreCivic allowed it. I was well aware that CoreCivic was in full control of everybody detained at SDC.

9.  I obeyed the rules because I feared being sent to segregation. While housed on Unit 4, I learned of several people who were sent to segregation for breaking a rule. I feared

segregation because I believed I would lose food and contact with my family. I also understood that CoreCivic could report any misbehavior to ICE.

10. During my time at SDC, I was housed in a pod with two-person cells.  I was housed in Unit 4A.  I think these units housed up to 88 people per pod.  Each cell had a toilet that we shared with our cellmate. All of the people detained on the pod shared showers.

11. A majority of the people in my pod were kitchen workers in the Work Program. Most of the people who did not work in the kitchen worked in other departments of the Work Program.

12. Because we were in a kitchen workers' pod, we had several incentives. Our pod had four TVs – three for TV and movies and one for video games. If we worked late hours in the kitchen, detention officers would allow us to stay up later to shower and call our families.

13. The kitchen workers' pod was an closed cell pod and I considered this to be a benefit of working in the kitchen. I experienced first-hand how loud and disorganized the open cell pods were when I delivered food to those pods. I was motivated to continue working in order to stay in the closed cell pod because I believed it was safer and I wanted my personal belongings and case-related items kept safe. This would not have been possible in the open cell pods. I also believed that the open cell pods were unsafe and I wanted to remain in the closed cell pods for my own safety.

14. If workers in my pod were removed from the work program, they would be moved to a different housing pod. I witnessed this happen multiple times. I viewed this as a punishment and as a disciplinary action.

15. CoreCivic did not provide me with enough food at SDC. I was always trying to stave off hunger while I was there. The portion sizes were small, the food was bad and repetitive,

3

and the meals were too spread out.  As a result, I lost a significant amount of weight while I was at SDC. Detention officers would often wake us up for meals but we would either have to wait a long time or eat after everyone else had eaten because we had either been called to eat too early or too late. We could only eat at the times that they told us we could eat. I regularly purchased extra food from the commissary to avoid hunger.

16. The meals at SDC were very spread out.  They served us breakfast between 4:30 and 6:30 a.m.; lunch between 10:30 a.m. and 12:00 p.m.; and dinner between 4:30 and 6:00 p.m. Because of this, I was often hungry between meals.

17. There was a weekly menu that changed, but the food items and meals were often the same. Because of this, and the spread-out nature of meals, I would supplement my diet with oatmeal, tortilla chips, crackers, ramen noodles, and other snacks that I would buy at the commissary. I would regularly spend anywhere from $10 to over $40 at the commissary.

18. We only received fresh fruit on special occasions. I craved fresh fruit because it is one of the only natural and nutritionally adequate foods that I believed to be healthy.

19. I lost over 20 pounds while at SDC due to how little I ate and how poor the food was. I was always trying to prevent hunger.

20. I participated in the Work Program at SDC. I joined the Work Program, first and foremost, to prevent hunger. I also joined the Work Program to get money to buy items I needed at the commissary, such as food, phone cards, stamps, deodorant, shampoo, soap, toothpaste, and shirts.  If I wasn't so concerned about preventing hunger, or if I didn't have to buy those items, I would not have joined the Work Program.

21. Being able to purchase and receive extra food was very important.  If I did not have access to the commissary food, like ramen, I am not sure I would have survived there. Because I was always unsure of when our next meal would be, I was desperate for extra food.

22. During my time at SDC, I only received one visit from family and friends because the detention center is in a rural area.  My nephews from Tennessee were able to visit me, but my wife and children were never able to visit me because they lived in Arizona. I felt very isolated in SDC.

23. I needed money to buy phone cards and stamps because that was my primary way of contacting my loved ones, most of whom lived in Arizona.

24. Family members occasionally put money on my account, but it wasn't enough to buy food, phone time, and other necessities because those items in the commissary were expensive.  I had to use my Work Program wages to buy those items.

25. I was able to join the Work Program easily soon after I arrived at SDC.  It is not hard to get in because they need detained people to work.  A detention officer in my pod told me about the program and he had me sign a form in English to join.  The officer told me the form was to work in the kitchen, and if I didn't work in the kitchen, I would be moved from the kitchen pod.  I translated this document for a lot of Work Program workers who came after me because I speak English and Spanish. When I translated the document and the detention officer's instructions, I was also instructed to inform detained people that they would be moved from the kitchen pod if they decided not to work.

26. I worked in the SDC kitchen during my entire time at SDC.  I cooked, washed dishes, scrubbed the stove, cleaned the kitchen and the chow hall, and served food on the line.  It

was difficult work that required heavy lifting.  For example, when we made lasagna or casseroles, I had to carry very large and heavy pots and pans, which were used to cook for an average of 1,500 people. I believed we needed more staff for the kitchen to function more efficiently.

27. As a kitchen worker, I also had to deep clean the kitchen before inspections.  During inspections, the area had to be cleared out.  We could not be working while the inspectors were present.

28. I generally worked seven days per week for about six hours per day.  My pay rate was $4 per day.

29. CoreCivic was supposed to pay me for every day I worked, but I did not always receive my pay on time. Sometimes, up to 10 days passed before I was paid for a shift.  When a missing pay issue was rectified, my pay was deposited into my commissary account.

30. My regular shift began at 3 p.m. in the afternoon and ended between 8 and 9 p.m.

31. In the kitchen, I was supervised by Trinity employees, Ms. Horsley, Ms. Patterson, Ms. King, and others whose names I do not remember.

32. The Trinity supervisors mistreated us.

33. Sometimes, Trinity supervisors would give us extra food at the end of a shift, like an apple.  Other times they would allow us to search among the leftovers to serve ourselves more.

34. The Trinity supervisors also threatened us with discipline if we did not complete our work or perform work beyond our regular duties.

35. I witnessed CoreCivic officers discipline detained immigrants who declined to work by moving them to different housing units, or threatening to do so, and threatening to revoke

6

their commissary access. Sometimes, these people would be moved the very next day after a missed day of work.

36. Based on my experiences and the statements and actions of CoreCivic and Trinity employees towards other workers, and the detainee handbook, it was my understanding that it was CoreCivic's policy at SDC to punish us if we did not work, by either cutting off our access to commissary or relocating us to another pod. I believed, based on conversations I had with others, that being relocated from the kitchen pod often included being sent to segregation while CoreCivic determined where to relocate detained people.

37. I continued to work in the work program because, if I refused, I understood I could be punished with a transfer to another, less safe and less private housing unit, and also time in segregation. Additionally, if I stopped working, I wouldn't have enough money to purchase food, phone time, and other basic necessities in the commissary. I don't think I would have survived in SDC without being able to purchase those items.

38. It is important for me to be a named Plaintiff in this case because CoreCivic had so much control over when and how I could access food and communicate with my family, that they exploited our labor. It is very important to me to be able to make sure people can get the things that they need and I want to make sure no one else is treated the way I was.

7

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 21st day of December, 2021 in Phoenix, Arizona.


Gonzalo Bermudez Gutiérrez

**Attachment 2**

**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

| | |
|---|---|
| **WILHEN HILL BARRIENTOS, GONZALO BERMUDEZ GUTIÉRREZ,** and **KEYSLER RAMÓN URBINA ROJAS,** individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br>v.<br><br>**CORECIVIC, INC.,**<br><br>                    Defendant. | **Civil Action No.  4:18-cv-00070-CDL** |

## <u>DECLARATION OF WILHEN HILL BARRIENTOS</u>

I, Wilhen Hill Barrientos, hereby declare and state as follows:

1. My name is Wilhen Hill Barrientos.  I am over the age of 18. I am a named plaintiff in this lawsuit.

2. I was detained in Stewart Detention Center (SDC), in Lumpkin, Georgia from July 2015 to May 2016 and September 2017 to June 2018.

3. I was aware of the rules of the facility because they were posted on the housing unit walls at Stewart in English and Spanish.

4. At intake, I was provided with some hygiene supplies like soap, shampoo, toothbrush, toothpaste, and toilet paper, but the quantities were small and the items were of poor quality. I bought toothbrushes, toothpaste, soap, and shampoo from the commissary because the quantities were so small.

5. At intake, I was provided clothes, but all of the clothing was used. Some of the boxers they gave us were stained, and the socks were discolored. Even though they were washed I felt like it was not hygienic to wear those, so I bought boxers and socks from the commissary. I also bought undershirts and long-sleeve shirts from the commissary to keep me warm because it was cold all the time at Stewart. We were provided sandals at Stewart, and I had to buy talcum powder from the commissary to keep the sandals from smelling bad.

6. One time, I ran out of toilet paper. When I asked for another roll, a CoreCivic officer told me to use my fingers to clean myself.

7. When I arrived at Stewart, I was not asked whether I wanted to work. I was assigned to a housing unit for kitchen workers and told that if I did not work, I would be sent to segregation where I would not be allowed to interact with others or go to recreation.

8. In the kitchen, I washed dishes, cleaned tables, prepared food, worked on the serving line, took the trash out, worked in the food storage area, and cleaned the bathrooms in the kitchen.

9. I did not receive any training about how to cook or clean in the kitchen from Trinity or CoreCivic.

10. I was forced to cook and serve spoiled food even after I told kitchen supervisors the food was expired. If I dropped food on the floor, the kitchen supervisors told me to serve it anyway.

11. I did not like the food at Stewart because it did not have enough flavor. As an example, when we made beans, the kitchen supervisors told us to add so much water that they did not have any flavor, and the kitchen staff added so much water to the powdered milk that it tasted like water, not milk.

12. I was hungry often. The serving sizes at Stewart were not enough to fill me up.

13. I and other detained people in my housing unit were assigned to early work shifts, and the officers would wake us up, pulling our toes. The officers would pull my small toe and bend it until it hurt to wake me up. The officers also banged on the bed frames with their walkie talkies. The officers told us if we did not go to work, we would go to segregation.

14. I would have upcoming immigration court dates, but the Trinity kitchen supervisors and CoreCivic officer would tell me I had to work and would not let me go to the law library to prepare for my court dates until I finished work.

15. When my family came to visit, the Trinity kitchen supervisors and CoreCivic officer would not let me visit with them because I was at work, and they told me that I had to work first before the visit.

16. Many times I burned my arms preparing food, and the kitchen supervisors did not let me go to medical immediately. They would tell me, "You're not going to die just because you burned yourself." I still have marks on my arms from this.

17. I saw many detained people report to work while sick. They were forced to work even though they would complain they had thrown up or felt weak.

18. I tried not to miss work to go to sick call, visitation, and the law library for fear of punishment or that it would impact my immigration proceedings.

19. It was common for there not to be enough kitchen workers. When this happened, the supervisors made me work a second shift.

20. I was generally paid $4 per day for working in the kitchen. Sometimes when I worked a double-shift, I was paid $5 or $8. After March 2018, I was paid $1 per day if I worked

fewer than six hours, $4 per day if I worked for six hours, $5 per day if I worked eight hours but less than twelve hours, and $8 per day if I worked twelve hours or more.

21. If we worked six full days in a week, the case manager in our unit would give me a $5 phone card in addition to my regular pay.

22. I regularly worked eight-to-nine-hour shifts per day, seven days per week.

23. I used the money I earned from working in the kitchen to buy telephone time so I could call my loved ones to buy items from the commissary like food, stamps, clothing, and hygiene items. Phone calls to my family in Guatemala were especially expensive..

24. I was never told that I could withdraw or how to withdraw from the work program. The CoreCivic staff promised that if I worked, it would help me with my case with ICE.

25. During the time I was at Stewart, the kitchen worker units changed from open dorm units to two-bed celled units, and back to open dorm units.

26. For a while I lived in an open dorm housing unit that I and other detained people called "el Gallinero," or the "Chicken Coop." In the Chicken Coop, all the detained people were in one place, the beds were on top of each other, and the lights were always on. The bathrooms were next to beds just separated by a half-wall. When one person went to the bathroom, the smell spread throughout the room. The Chicken Coop was dangerous. There were often fights.

27. I also lived in a celled housing unit with two-bed cells for a while. Each cell in the unit had its own toilet.

28. While I was housed in a celled kitchen worker unit, officers threatened to transfer me to segregation if I stopped working, called in sick, refused to change shifts as requested, or encouraged others to stop working.

29. One time a CoreCivic officer woke me up to work the 2 a.m. shift, even though I was assigned the 10 a.m. shift that day. When I refused to work the 2 a.m. shift, the officer told me to pack my bags but would not tell me where I was being taken. I worked the early shift that day because I was afraid of my immigration case being negatively affected and of being moved to segregation.

30. Other detained people and I were told that if we did not follow officers' orders, we would be placed in segregation. Officers threatened to move us to segregation if we did not work.

31. Around late 2015, CoreCivic officers threatened to put me in segregation on two different occasions because they thought I was organizing a work stoppage.

32. Officers also threatened to take away our commissary privileges if we stopped working, called in sick, or encouraged others to stop workings.

33. Sometimes my pod was placed on lockdown when detained people refused to work. When we were on lockdown, we had to stay in our beds the entire day, and we could only use the bathroom with permission from an officer.

34. Around October 2017, after I submitted a grievance about an officer who forced me to work when I was sick, I was sent to medical segregation at Stewart. I was in the same unit where people go for disciplinary segregation. The officers told me I was in segregation because I had been exposed to chicken pox, even though I told them I had chicken pox when I was a child.

35. I was in segregation for one month. In segregation, I was in my cell for about 23 hours per day. I was not allowed to see my family, my recreation time was reduced from three to four hours per day to a half hour per day. Segregation was the worst. Twenty-three hours locked

in a room without knowing what time it is, without distractions was very bad. I thought about suicide many times when I was in segregation.

36. When I was in segregation, I learned that another detained person died by suicide in segregation at Stewart, and this made me even more afraid stay in segregation longer.

37. It is important to me to be a named plaintiff in this case because I do not want people at Stewart to be forced to work. I do not want detained people to be misled that their immigration case will be affected or that they will be sent to segregation if they refuse to work. I do not want detained people to be intimidated into working, and I want them to know the tactics the officers use to intimidate people. I want to tell people what happens inside Stewart and how the officers treat detained people there, and I want to put an end to the mistreatment.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 15th day of December, 2021 in Atlanta, Georgia.

Wilhen Hill Barrientos

## INTERPRETER AFFIDAVIT

I, Elliot Lepe, swear and affirm under penalty of perjury of the laws of the United States of America that I am fluent in both the Spanish and English languages and that I read the preceding Declaration in Spanish to Plaintiff Wilhen Hill Barrientos, who affirmed the truth of its contents.


_____                    12-19-21
Signature                                          _____
                                                        Date

# Attachment 3

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

|  |  |
|---|---|
| **WILHEN HILL BARRIENTOS, GONZALO BERMUDEZ GUTIÉRREZ, and KEYSLER RAMÓN URBINA ROJAS,** individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>**CORECIVIC, INC.,**<br><br>   Defendant. | **Civil Action No.  4:18-cv-00070-CDL** |

## DECLARATION OF KEYSLER RAMÓN URBINA ROJAS

I, Keysler Ramón Urbina Rojas, hereby declare and state as follows:

1. My name is Keysler Ramón Urbina Rojas.  I am over the age of 18. I am a named Plaintiff in this case. I am prepared to testify about the matters discussed in this declaration.

2. I was detained in Stewart Detention Center (SDC), in Lumpkin, Georgia from May 2015 to June 2016.

3. When I arrived at SDC, I went through the intake process.  During that process, I received a copy of the detainee handbook in Spanish. It is a blue book that tells you the laws of the detention center and what is prohibited.

4. At intake I was provided with some basic necessities, like shampoo, soap, and toothpaste. The items came in very small quantities.  The quality of these items also was not good.

The toothpaste and shampoo were of such poor quality they did not clean my teeth or hair and scalp.

5. Once inside SDC, I and the other detained people understood that CoreCivic had complete control over us.  They controlled all of our movements – when and where we slept, ate, worked, and talked to the outside world.  We understood that we had to obey the rules, and if we did not obey them, we would be punished.

6. It was widely known that segregation was one form of discipline, which could and would be imposed on us.  We all understood this because, in addition to the handbook, the CoreCivic officers made it known to us all the time.

7. During my time at SDC, I was housed in an open dormitory.  I was housed in Units 1 and 2.  This dormitory had bunk beds.  I think it housed 60 to 70 people.  It had three bathrooms that we all shared.

8. We called the open dormitories "el gallinero," which means "chicken coop" in Spanish. We were packed in the dorms like chickens.  There were so many people living in each room, it was hard to sleep at night with all the noise.  We all worked different shifts, so people were coming and going from work while others were sleeping.  Sometimes fights broke out about the noise and people's inability to sleep.

9. All of the people in my pod were kitchen workers in the Work Program.

10. Because we were in a kitchen workers' pod, we got two TVs – one for movies and one for video games.  The other pods only had one TV.  The officers told us we had two TVs as a benefit of being kitchen workers.

11. If workers in my pod were removed from the Work Program, they would be moved to a different housing pod. The officers also told me that if I didn't work in the kitchen, I

would be moved from my pod.  Even though my pod was crowded and noisy, it was a little better than the other open dorm pods without kitchen workers, and my friends were there so I wanted to stay there.

12. CoreCivic did not provide me with enough food at SDC. I often felt hungry while I was there. The portion sizes were rationed, the food was bad, and the meals were too spread out.  As a result, I was hungry all the time.

13. They served us dinner at 4 p.m. in the afternoon.  By 9 p.m., there was a line at the microwave of people wanting to heat up ramen noodles they bought at the commissary because we couldn't wait until 5 a.m. the next morning for breakfast.

14. The food was also often inedible.  I saw food being served that was spoiled and looked like vomit.  There was something that I think was supposed to be meat – we called it "monkey brains" because it looked and tasted disgusting.  Some of the food was too spicy.  A lot of the food ended up in the trash because people did not want to eat it. People would buy ramen at the commissary instead. If I didn't have money in commissary, I would be forced to eat the food because I was hungry.

15. There was a weekly menu that changed, but the food items and meals were often the same.  If the menus included meals I knew were going to be inedible, I would buy myself ramen noodles at the commissary.  We also did not get fresh fruit at SDC.  Only the diabetics received fruit, like an apple or an orange.

16. I lost 20 pounds while at SDC due to gastrointestinal issues. I believe that the gastrointestinal issues were due to how little food I ate and the quality of the food.  I also think the spoiled food caused me to get a bacterial infection, for which I had to seek medical treatment.

17. I participated in the Work Program at SDC. I joined the Work Program to earn money to buy items I needed at the commissary, such as food, phone cards, stamps, deodorant, shampoo, soap, toothpaste, sock, boxers, and shirts.  I bought boxers and shirts because the ones CoreCivic gave us were used, and I did not think it was hygienic to wear used clothing.

18. If I didn't have to buy those items, I would not have joined the Work Program.  I would have done other things, like played soccer and gone to the recreation center.

19. I also joined the Work Program because CoreCivic would provide detained people who worked extra food. I wanted to work in the kitchen specifically so I could serve myself more food. Based on my conversations with other kitchen workers, access to extra food was also a reason they joined the Work Program.

20.  Being able to purchase and receive extra food was very important.  If I did not have access to the commissary food, like soup, I am not sure I would have survived there.

21. During my year at SDC, I only received three visits from family and friends because the detention center is in a remote area.  I felt very isolated in SDC.

22. I needed money to buy phone cards because that was my primary way of contacting loved ones.  Phone cards to make calls to my family in Nicaragua were especially costly. For example, I would have to pay about $5 for a two-minute phone call with my grandma.

23. Family members occasionally put money on my account, but it wasn't enough to buy food, phone time, and other necessities because those items in the commissary were expensive.  I had to use my Work Program wages to buy those items.

24. I was able to join the Work Program easily right after I arrived at SDC.  It was not hard to get in because they need detainees to work.  An officer in my pod told me about the program and he had me sign a form in English to join.  I could not read the form because I don't speak English.  The officer told me the form was to work in the kitchen.

25. I worked in the kitchen during my entire time at SDC.  I cooked, washed dishes, scrubbed the stove, cleaned the kitchen and the chow hall, and served food on the line.  It was heavy work.  For example, when pancakes were on the menu for breakfast, I had to make three pancakes per person for over 1,000 people.  I had to move very fast next to a hot grill.  I felt a lot of pressure.

26. As a kitchen worker, I also had to deep clean the kitchen before inspections.  During inspections, the area had to be cleared out.  We could not be working while the inspectors were present.

27. I generally worked seven days per week for about 8 hours per day.  My pay rate was $3 per day.  At some point that rate was raised to $4 per day.

28. CoreCivic was supposed to pay me for every day I worked, but I did not always receive my pay.  My pay was deposited into my commissary account.  Sometimes I could tell that CoreCivic did not pay me for every day that I worked because my account balance was too low.

29. For most of my time at SDC, my regular shift began at 2 a.m. in the morning.  The CoreCivic officers would come into our dormitory to wake us up and get us out of bed. If we did not wake up fast enough, the officers would pull the covers off us and bang on the mattresses to get us up.

30. My shift started so early, and the work was so exhausting, that I was often too tired to go to recreation in the afternoon.  I slept instead.

31. In the kitchen, I was supervised by Trinity employees, Ms. Lyles, Ms. Gaines, and Mr. Marrero, and others whose names I do not remember.

32. The Trinity supervisors mistreated us.  They would yell at us and call us names.

33. The Trinity supervisors also threatened us with discipline if we did not complete our work or perform work beyond our regular duties.

34. I was placed in segregation for refusing to perform a work task beyond my regular tasks. One of my jobs was to fill the drink containers with Kool Aid.  Once I finished I should have been able to take a break. Trinity supervisor Mr. Marrero ordered me to clean the tables.  I told him I had finished my work and did not have to do the additional task.  He then called a CoreCivic officer to put me in segregation.  He did this in front of a couple of other workers.  One of the workers who saw this was from El Salvador.  I think his name was Santa Maria.  A CoreCivic officer then came and took me to segregation.  I was put in segregation without a hearing or any sort of disciplinary process.

35. I was in segregation for approximately one day.  I was totally isolated during this time. They put me in a single-person cell with no window so you cannot see outside.  In segregation, they also provided me with less food than the normal rations, which already were not enough. I also could not access the commissary or go to recreation.  I was not able to make phone calls.  After this incident, I wanted to avoid being sent to segregation again.

36. I was also placed in medical segregation two or three times for medical issues. Those units are in a different location, near the medical area, but the conditions are the same as regular segregation.

37. On two or three occasions, the workers in my pod refused to go to work. On those occasions, CoreCivic put us all on lockdown in response. During the lockdowns we were not allowed to move around freely within the pod. We had to ask permission to use the restroom. We were prohibited from using the TV or the phone. We also lost access to the commissary. We could not mail letters to people. If we moved when we were not supposed to, the officers threatened us with pepper spray.

38. The lockdowns lasted until we agreed to work, usually two to four days. We had to go back to work in order to get more food, to call our families, and to access the commissary. We had to give in out of necessity.

39. The lockdowns were oppressive. I felt depressed during them. I could not even call my mother to tell her I was okay. She would worry about me when I didn't call.

40. I also saw another detained worker from Honduras get sent to segregation while we were working in the kitchen. I think his name is Dilmer Galeas. I believe he was sent there because he refused to work or perform a task.

41. It was my understanding that we could be sent straight to segregation without any process because that is what I witnessed and experienced.

42. CoreCivic and Trinity employees also informed us that if we refused to work, that refusal would be put on our "record." I understood this to mean they would use this information to harm our immigration case or file a criminal case against us. CoreCivic and Trinity employees would also tell us we could serve time in federal prison.

43. Based on my experiences and the statements and actions of CoreCivic and Trinity employees towards other workers, it was my understanding that it was CoreCivic's policy at SDC to punish us if we did not work, including by sending us to segregation.

44. I continued to work in the Work Program because, if I refused, I understood I could be and, actually was, punished with lockdowns and segregation. The restrictions in lockdown and segregation were stressful and caused me to feel depressed. I could not take the isolation or the loss of commissary, phone access, and commissary privileges. It affected me physically and psychologically.

45. Also, if I stopped working, I wouldn't have access to more food in the kitchen or have enough money to purchase food, phone time, and other necessities in the commissary. I don't think I would have survived the whole year in SDC without being able to purchase those items.

46. It is important for me to be a named Plaintiff in this case because I feel that CoreCivic deprived us of the things we needed, like food, used us for our labor, and then made money off us in the commissary because we had to buy food and other necessities there. I don't want other detained people to be treated like I and my fellow detained people were at SDC.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 14 th day of December, 2021 in New Orleans, Louisiana.

Keysler Ramón Urbina Rojas

## INTERPRETER AFFIDAVIT

I, Meredith Stewart¸ swear and certify under penalty of perjury under the law of the United States that I am fluent in both the Spanish and English languages and that I read the preceding Declaration in Spanish with Plaintiff Keysler Urbina Rojas, who affirmed the truth of its contents.

Signed this 21st day of December, 2021

Meredith Stewart

# Attachment 4

# Appendix C

**CONFIDENTIAL**

**Appendix C**

**Putative Class Members Interviewed on June 17-18, 2021 at Stewart Detention Center**



| First | Last | A No. |
|-------|------|-------|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |