**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

WILHEN HILL BARRIENTOS, et al.,

                Plaintiffs,

v.

CORECIVIC, INC.,

                Defendant.

Civil Action No. 4:18-cv-00070-CDL

**<u>DEFENDANT'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>**

# TABLE OF CONTENTS

**Page**

I.  Relevant Facts ............................................................................................................... 1

    A.  Federal Immigration Detention and ICE Standards ........................................ 1

        1.  Voluntary Work Program .................................................................... 2

        2.  Disciplinary Code ............................................................................... 3

        3.  Classification ...................................................................................... 5

        4.  Hygiene, Clothing, and Nutrition ...................................................... 5

    B.  CoreCivic and Its Operation of the Stewart Detention Facility ...................... 6

        1.  Housing & Classification .................................................................... 7

        2.  Voluntary Work Program .................................................................... 7

        3.  Disciplinary Code ............................................................................... 9

        4.  Hygiene & Clothing ............................................................................ 9

        5.  Nutrition ............................................................................................ 10

        6.  Commissary ...................................................................................... 11

        7.  Telephone Access ............................................................................. 12

        8.  Ice Oversight .................................................................................... 13

    C.  Plaintiffs, Their Allegations, and the Class Claims ...................................... 13

II.  The Court Should Not Certify Either Putative Class .................................................. 16

    A.  Class Certification - Elements, Burden of Proof, and Review ...................... 16

    B.  The Proposed Classes Are Overbroad and Impermissibly Go Beyond the Scope of the Amended Complaint ................................................................. 18

    C.  Plaintiffs Have Failed to Establish Numerosity ........................................... 19

    D.  The Named Plaintiffs' Claims Are Not Typical of the Classes' Claims .............. 20

    E.  Plaintiffs Have Not Provided "Significant Proof" that the Alleged Classwide Policies and Practices Exist ......................................................... 21

        1.  Deprivation of Basic Necessities ..................................................... 22

        2.  Segregation for Refusing to Work ................................................... 24

3.      Revoking Housing Incentives ................................................26

4.      Threatening an Abuse of Legal Process................................28

F.     Individual Questions Predominate Any Common Questions ..............................29

G.    Certification Is Not a Superior Method ....................................38

H.     The Classes Cannot Be Certified Under Rule 23(B)(2)........................................39

III.    Conclusion ........................................................................40

Plaintiffs allege that CoreCivic is operating a slave-labor camp under the guise of immigration detention and with the imprimatur of the federal government. This allegation is repugnant, false, and unsupported. Fortunately for Plaintiffs, they are not required to prove their claims at this stage, but they still must present "significant proof" of this alleged scheme to certify a class. They have woefully failed to do so and further failed to establish Rule 23's other elements, which are designed to safeguard defendants from the very type of sweeping, individualized claims presented here. The Court should deny class certification.

## I.   Relevant Facts.

### A.   Federal Immigration Detention and ICE Standards.

U.S. Immigration and Customs Enforcement ("ICE") is the federal agency responsible for the detention of aliens "during the pendency of removal proceedings or for other reasons related to the enforcement of the nation's immigration laws." *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1272 (11th Cir. 2020). In 2003, ICE adopted the 2000 National Detention Standards ("NDS"), which "established consistent conditions of confinement, program operations and management expectations within [its] detention system." https://www.ice.gov/factsheets/facilities-pbnds. In 2008, ICE revised those standards "to improve safety, security and conditions of confinement for detainees." *Id*. Those standards became known as the Performance-Based National Detention Standards ("PBNDS"). *Id*. ICE revised the PBNDS in 2011 "with the input of many ICE personnel across the nation, as well as the perspectives of nongovernmental organizations." *Id*. The PBNDS were revised again in 2016 "to ensure consistency with federal legal and regulatory requirements." *Id*.

These standards have morphed over time with each iteration. (Ex. 1, ¶¶ 8–35.) For example, detainees in 2017 were subject to different standards than detainees in 2013, and

detainees in 2013 were subject to different standards than detainees in 2008.  (*Id*.)  The varying differences are explained in the declaration of CoreCivic's Managing Director of Operations, Jason Ellis.  (*Id*.)  The standards are publicly available on ICE's website: https://www.ice.gov/detain/detention-management/2000 ("2000 NDS"); https://www.ice.gov/detain/detention-management/2008 ("2008 PBNDS"); https://www.ice.gov/doclib/detention-standards/2011/pbnds2011.pdf ("2011 PBNDS"); https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf ("2016 PBNDS").

1.      **Voluntary Work Program.**

Pursuant to congressional authority, *see* 8 U.S.C. § 1555 (authorizing the "payment of allowances to aliens, while held in custody under the immigration laws, for work performed"), the 2000 NDS and all versions of the PBNDS have *required* ICE facilities to operate a Voluntary Work Program ("VWP").  (Ex. 1, ¶¶ 12, 21, 30, 35; Ex. 53 at 11.)  The purpose of the VWP is to reduce the negative impact of confinement through "decreased idleness, improved morale and fewer disciplinary incidents."[1]  (Ex. 1, ¶¶ 15, 30, 50.)  The VWP also gives detainees a chance to "be active, break up their day, leave their unit, gain skills and training, and earn money to purchase luxury items in the commissary."  (*Id*., ¶¶ 14, 21, 50.)

Participation in the VWP is purely voluntary.  (*Id*., ¶¶ 12, 14, 21, 30, 35, 49, 52, 54.)  VWP participants may not work more than 8 hours a day or 40 hours per week.  (*Id*., ¶¶ 12, 54.)  Under the 2000 NDS and 2008 PBNDS, VWP participants could not be paid more than $1.00 per

---

[1] *See Villarreal v. Woodham*, 113 F.3d 202, 207 (11th Cir. 1997) ("[W]ork occupies prisoners' time that might otherwise be filled by mischief[.]") (citation omitted).

day for their participation.  (*Id.*, ¶¶ 12, 14, 21, 54.)  The 2011 and 2016 PBNDS provide that VWP participants must be paid "at least $1.00 (USD) per day."[2]  (*Id.*, ¶ 54.)

If a detainee volunteers to participate in the VWP, he must "perform all assigned tasks diligently and conscientiously."  (*Id.*, ¶ 21.)  He must "be ready to report for work at the required time and  … may not evade attendance … nor encourage others to do so."  (*Id.*, ¶ 30.)  A detainee can be removed from the VWP for "[u]nexcused absences," "unsatisfactory work performance," "disruptive behavior," "threats to security," and "physical inability to perform the essential elements of the job."  (*Id.*, ¶¶ 12, 30, 58.)

### 2.    Disciplinary Code.

The 2000 NDS and PBNDS (collectively, "PBNDS") set forth a disciplinary system to "promote[] a safe and orderly living environment for detainees."  (Exhibit 6, CCBVA.3534; Exhibit 53 at 2.)  Prohibited acts are divided into four categories: Greatest, High, High Moderate, and Low Moderate.  (Ex. 1, ¶¶ 16, 19, 22, 41–47.)  The Greatest offense category includes those offenses that are likely to present significant risks to health and safety, if not death, e.g., murder, escape, arson, assault, rioting, or hostage taking.  (*Id.*, ¶ 40.)  The High offense category includes those offenses that may result in injury or death or disrupt the orderly operation of the facility, e.g., fighting, threats, extortion, and engaging in sexual acts.  (*Id.*, ¶¶ 41, 45.)

ICE designates "[e]ncouraging others to participate in a work stoppage or to refuse to work" (Code 214) a High offense.  (*Id.*, ¶ 42.)  Historically, detainee work stoppages escalate into larger disturbances that can result in assaults, hostage taking, and even attempts at facility destruction.  (Ex. 1, ¶ 42; Ex. 2, ¶ 62.)  Code 214 is limited to those detainees who actively

---

[2] The Department of Justice Appropriation Act, Pub. L. No. 95-86, 91 Stat. 426 (1978), authorizes an allowance "not in excess of $1 per day."

encourage *other* detainees to refuse to work.  (Ex. 1, ¶ 43.)  It does not apply to detainees who decide not to report to a work assignment.  (*Id*.)  In addition to deterring dangerous disturbances, Code 214 protects detainees from undue pressure from other detainees who may be seeking to exert influence or extort them.  (*Id*.)

ICE designates "[r]efusing to obey the order of a staff member" (Code 307) a High Moderate offense.  (*Id*., ¶¶ 45–46).  Code 307 applies to any detainee who refuses a staff order, which may be given to protect the welfare of the detainees, for the orderly operation of the facility where delays could lead to greater incidents, or to deter detainees from engaging in other acts that threaten the safety of the facility.  (*Id*.)

High and High Moderate offenses are subject to a range of discipline, including a warning, disciplinary segregation, and even a referral for criminal prosecution.  (Ex. 1, ¶¶ 41, 45; Ex. 6, CCVBA.3544–46.)  However, the PBNDS require that "any sanctions imposed shall be commensurate with the severity of the committed prohibited act."  (Ex. 6, CCBVA.3535, § 3.1(II)(14).)  It further instructs that the "initiation of criminal proceedings" is reserved for "serious incident[s] that may constitute a criminal act," and that "[d]isciplinary segregation shall only be ordered when alternative dispositions may inadequately regulate the detainee's behavior."  (*Id*., CCBVA.3534, § 3.1(II)(3), (7).)

The 2011 PBNDS capped disciplinary segregation at 30 days per violation for High and High Moderate offenses and directed that only the "Institutional Disciplinary Panel" can impose segregation "and only when alternative dispositions may inadequately regulate the detainees' behavior."  (Ex. 1, ¶ 26.) The 2016 PBNDS direct that disciplinary segregation for multiple offenses arising out of the same incident are to be served concurrently (no more than 30 days total), and it requires notification to ICE of any segregation placement.  (*Id*., ¶ 33.)  ICE has

- 4 -

consistently specified that the maximum amount of segregation time for a High Moderate offense (like Code 307) is 72 hours.  (*Id.*, ¶ 45.)

ICE's National Detainee Handbook instructs detainees to "follow all the facility's rules, regulations, and instructions" and "[c]ooperate with the staff," and admonishes: "If you do not follow the facility's rules, you may be subject to discipline."  (Ex. 54 at CCBVA.4.)  The PBNDS also require facilities to provide detainees a copy of ICE's Handbook and a facility supplemental handbook that sets forth ICE's disciplinary code and sanctions.  (Ex. 1, ¶¶ 12, 16, 19, 22, 27, 31, 34, 35.)  It further states: "Detainees are expected to behave in accordance with the rules set down in the handbook and will be held accountable for violations.  Therefore, the facility staff will advise every detainee to become familiar with the handbook."  (*Id.*, ¶ 12.)

### 3. Classification.

The PBNDS also prescribe a classification system.  (Ex. 1, ¶¶ 11, 18, 23, 25, 35.)  The classification system has three levels with corresponding color-coded uniforms: Level 1 (dark blue) for the lowest threat; Level 2 (bright orange) for medium threat; and Level 3 (dark red) for the highest threat.  (*Id.*)  A detainee's classification is determined by his criminal and institutional history.  (*Id.*)  Housing and work assignments are dictated by classification levels.  (*Id.*)  ICE recommends a classification for all detainees received at a facility.  (*Id.*)  Since 2013, only disciplinary infractions for Great or High offenses result in reclassification.  (*Id.*)

### 4. Hygiene, Clothing, and Nutrition.

The PBNDS prescribe the personal hygiene items (soap, comb, toothpaste, toothbrush, shampoo, lotion) and clothing (shirts, pants, jumpsuits, socks, underwear, footwear) that detainees must be provided.  (Ex. 1, ¶¶ 10, 13, 20, 29, 35.)  Hygiene items must be replenished as needed (*id.*, ¶¶ 20), and detainees may exchange underwear and socks daily, but outer garments

may only be exchanged twice a week (*id*., ¶¶ 13, 20).  The PBNDS contemplate that facilities offer additional items through the facility's commissary.  (*Id*., ¶¶ 10, 29, 35.)

The 2011 and 2016 PBNDS require that menu selections are based "on the best nutritional program the facility can afford meeting U.S. minimum daily allowances."  (*Id*., ¶¶ 28, 35.)  A registered dietician must complete a "nutritional analysis that meets U.S. Recommended Daily Allowances (RDA), at least yearly" and certify the menus before implementation.  (*Id*.)

### B.   CoreCivic and Its Operation of the Stewart Detention Facility.

On June 30, 2006, ICE entered into an Intergovernmental Service Agreement ("IGSA") with Stewart County, Georgia and CoreCivic for the detention and care of ICE detainees at the Stewart Detention Center ("SDC").[3]  (Ex. 2, ¶ 7.)  The IGSA requires CoreCivic to comply with the American Correctional Association ("ACA") and National Commission on Correctional Health Care ("NCCHC") standards.  (*Id*.)  SDC must also comply with *all* PBNDS standards.[4]  (Ex. 1, ¶¶ 19, 21, 26, 27, 30, 31, 36, 49; Ex. 2, ¶¶ 7, 13, 15, 19, 55, 70.)

SDC has a design capacity to house 1,916 general population detainees.  (Ex. 2, ¶ 34.)  All detainee assignments, transfers, and release determinations are made exclusively by ICE.  (*Id*., ¶ 31.)  Population levels fluctuate daily, and detainees include individuals who were apprehended attempting to enter the United States, arrested on an immigration charge and awaiting removal proceedings, or completed a prison sentence and are awaiting removal.  (*Id*.,

---

[3] Plaintiffs' allegations of profit-mongering and cost-cutting are refuted in Exhibit 2, ¶¶ 8–12, 14, 16–18, 20, 22–30, 50–55, 63–69. Because those allegations are not relevant to their Motion, they are not discussed in this Response. One fact worth mentioning: the IGSA authorizes ICE to increase the per diem rate to adjust for increased costs. (Ex. 2, ¶ 9.)

[4] At SDC, the 2000 NDS were effective July 1, 2006–January 27, 2010, the 2008 PBNDS were effective in 2010, the 2011 PBNDS were effective in 2013, and the 2016 PBNDS became effective on July 1, 2017.  (Ex. 1, ¶¶ 8–9, 17, 23, 32.)

¶¶ 32–33, 39–40.)  Between December 23, 2008 and December 20, 2020, there were more than 155,882 ICE detainees booked into SDC.  (*Id*., ¶ 35.)  Lengths of stay vary greatly, from as little as one day to more than a year.  (*Id*., ¶ 36.)

### 1.  Housing & Classification.

Housing Units 1, 2, and 3 are open dormitory-style units with multiple bunkbeds in a single common space.  (Ex. 2, ¶ 41.)  Housing Units 4, 5, and 6 have double-bunked secure cells.  (*Id*.)  ICE's custody classification standards dictate which detainee populations can be housed together.  (*Id*., ¶ 44.)  Only Level 1 and Level 2-Low classified detainees may be housed together, and only Level 2-High and Level 3 classified detainees may be housed together.  (*Id*.)  Detainees who have convictions for violent felonies are classified as Level 3. (*Id*., ¶ 43.)  Because ICE requires that Level 3 detainees be assigned to medium- or maximum-security housing, they may not be housed in Units 1, 2, or 3, which are low-security housing.  (*Id*., ¶ 44.)  Units 4, 5, and 6 are considered medium- and maximum-security housing.  (*Id*.)

### 2.  Voluntary Work Program.

SDC's VWP is outlined in Policy 19-100 and complies with the PBNDS in all respects.[5]  (Ex. 1, ¶¶ 52, 54, 56; Ex. 2, ¶ 56.)  The VWP is explained to detainees during intake, and it is documented in ICE's Handbook and CoreCivic's Detainee Handbook Supplement.  (Ex. 1, ¶ 51; Ex. 7 at CCBVA.259; Ex. 54 at CCBVA.12.)  Participation is completely voluntary, and participants are free to resign their positions or request a new position at any time.  (Ex. 1, ¶¶ 49, 52.)  Allowances differ based upon the amount of time and skill that the assignment requires (e.g., kitchen worker, porter), ranging between $1.00 to $4.00 per day.  (*Id*., ¶ 54.)  SDC will also

---

[5] All SDC policies are approved by ICE prior to implementation. (Ex. 2, ¶ 49.)

offer incentives to detainees who provide exceptional job performance or have perfect attendance.[6]  (Ex. 2, ¶¶ 108, 110.)  Incentives may include commissary items, phone cards, or additional bonus pay deposited into detainees' trust accounts.  (*Id*.)

SDC has on occasion clustered VWP participants in particular housing unit pods to minimize the disruption to other detainees when they come and go to/from their work assignment, particularly kitchen workers who leave in the early morning hours to report to the kitchen.  (*Id*., ¶¶ 111–112, 116.)  Additional recreational devices are generally made available in those worker pods so that VWP participants who return after a shift can use them.  (*Id*., ¶ 117.)  Those designated pods have changed or closed over time to accommodate operational needs and classification profiles.  (*Id*., ¶¶ 111–112.)  In November 2017, SDC began using Unit 4 to house VWP participants, but in April 2018 all Level 1 VWP participants were removed from that Unit because the risk to their safety was too great.  (Ex. 2, ¶¶ 112–113; Ex. 31, 32.)  Since COVID-19, there has been no designated worker pod at SDC.  (Ex. 2, ¶ 114.)

Between December 23, 2008 and December 20, 2020, only 20% (32,054) of all detainees participated in the VWP at SDC.[7]  (Ex. 2, ¶ 37.)

---

[6] The PBNDS do not prohibit SDC from offering incentives to encourage detainees to participate in the VWP.  (Ex. 1, ¶ 52.)

[7] Contrary to Plaintiffs' belief, the VWP does not require a minimum number of participants to maintain facility operations, nor does SDC depend on VWP participants. (Ex. 1, ¶ 55; Ex. 2, ¶¶ 59–60.)  If a detainee does not show up for work or refuses to work, SDC staff fill in and accomplish the task (generally more efficiently). (*Id*.) If CoreCivic staff and/or contracted vendors were performing VWP tasks on a regular basis, CoreCivic would seek an upward contract adjustment to cover any increased costs, which not only is contemplated by the language of the contract but has been demonstrated throughout the history of the contract. (Ex. 1, ¶ 56.) In every instance where either labor costs or the staffing pattern have increased, ICE has adjusted the bed-day rate to cover the costs. (*Id*.) Moreover, the IGSA does not permit CoreCivic to increase its profit by falling below the facility staffing plan or using detainees as a substitute for CoreCivic staff.  (*Id*., ¶ 57.)

### 3.    Disciplinary Code.

As required by the PBNDS, SDC gives every detainee a copy of ICE's Handbook as well as a copy of CoreCivic's Detainee Handbook Supplement.  (Ex. 1, ¶ 37; Dkt. 217, pgs. 28–29; Dkt. 222, pgs. 213–214.)  As also required by the PBNDS, CoreCivic's Handbook sets forth ICE's disciplinary code verbatim.  (Ex. 1, ¶ 37; Ex. 7 at CCBVA.275–78.)  SDC's disciplinary policies, and implementation thereof, comply with the PBNDS.  (Ex. 1, ¶ 48.)

Detainees are not threatened with or subject to segregation if they refuse to work or no longer want to participate in the VWP; they are only subject to segregation if they encourage *others* to refuse to work or participate in a work stoppage, which is mandated by the PBNDS.  (Ex. 1, ¶¶ 53, 58; Ex. 2, ¶¶ 73–77, 82.)  Segregation is not imposed as a sanction for refusing to obey an order except under extreme circumstances.  (Ex. 2, ¶ 78.)  Refusing an order to return to work is not punishable by segregation; rather, the detainee is simply warned that he will be terminated from the VWP, as required by the PBNDS.  (Ex. 2, ¶¶ 79–80.)  Only if a detainee's conduct rises to the level of a felony criminal act will SDC staff report the incident to law enforcement authorities for investigation.  (Ex. 1, ¶ 39.)

### 4.    Hygiene & Clothing.

SDC provides hygiene items and clothing in accordance with the PBNDS.  (Ex. 1, ¶ 60; Ex. 2, ¶ 94, 102.)  In fact, the clothing issued at intake exceeds PBNDS standards.  (Ex. 2, ¶¶ 102–103.)  Clothing is washed twice a week, and clean laundry is returned the same day.  (*Id.*)  Worn-out clothing is replaced on request and removed from redistribution if returned in unacceptable condition at discharge.  (*Id.*)  Hygiene items are issued to detainees twice a week; however, if a detainee runs out of a hygiene item between distributions, they can ask for a replacement, and it will be provided free of charge.  (Ex. 1, ¶ 61; Ex. 2, ¶¶ 96–97.)

5.      **Nutrition.**

CoreCivic contracts with Trinity Services Group, Inc. to provide food services at SDC. (Dkt. 213-28 at 2–7, 9–13, 21; Dkt. 214-27 at 2–54; Dkt. 233 at pg. 38.)  CoreCivic does not profit based upon the number of VWP participants available to work in the kitchen.   (*Id.*) Trinity, an independent contractor, does not have the authority to discipline VWP participants. (*Id.*)  If a VWP kitchen worker chooses not to work or has poor work performance, the only "discipline" is that he can be removed from the VWP.[8]  (Dkt. 233-1 at pgs. 418–419.)  Even then, Trinity staff do not participate in detainee discipline.  (Dkt. 233 at pg. 147.)  Trinity may only report rule infractions to SDC correctional staff.  (Dkt. 233 at pgs. 147–148, 166; Dkt. 233-1 at pgs. 385–387, 397, 409–410.)

CoreCivic's Food Services Policy requires extensive daily monitoring of food service. (Ex. 2, ¶ 87.)  Food preparation is monitored for each meal to ensure safe handling, and the Administrative Duty Officer samples a random meal and evaluates it for quality, portion size, and taste at least once a week.  (Ex. 2, ¶ 87; Ex. 46, ¶ 46.)  Trinity also conducts an annual nutritional analysis, and reviews, approves, and certifies that the menus are nutritionally adequate.  (Ex. 46, ¶¶ 7–8.)  The food provided at SDC meets or exceeds the recommended nutrient amounts as specified by the Recommended Daily Allowances from the National Academies of Sciences and as set by the National Institute of Health.[9]  (*Id.*, ¶¶ 9–11, 18, 23.) Menu items are also taste-tested and analyzed using the NetMenu Nutritional Analysis program to ensure they are nutritionally adequate for incarcerated individuals.  (*Id.*, ¶¶ 11–15.)

---

[8] If Trinity is short VWP kitchen workers, it replaces them with its own employees. (Dkt. 233-1 at pg. 295.) For example, during the COVID-19 pandemic, there was a reduced number of detainee workers, which Trinity employees covered.  (*Id.* at pg. 299.)

[9] SDC's menus also meet ACA and NCCHC standards.  (*Id.*, ¶ 16.)

SDC offers detainees three meals each day.  (Ex. 2, ¶ 93; Ex. 46, ¶ 19.)  Menus are developed and provided on a five-week cycle, each one providing a variety of nutritionally and calorically sufficient foods.  (Ex. 46, ¶¶ 22, 25.)  Menus include breakfast options such as: hot and cold cereal; pancakes and syrup; scrambled, Spanish, chorizo, or rancheros eggs; grilled potatoes; biscuits; turkey ham; sausage; coffee cake; and milk, coffee, and juice.  (*Id*., ¶¶ 26–28.)  Lunch and dinner menus include: beef roast; vegetable soup; salad; burritos and tacos; Spanish rice; hamburgers and hot dogs; macaroni and cheese; chili con carne; jalapeno cornbread; mashed potatoes and gravy; au gratin potatoes; lasagna, spaghetti, and pasta alfredo with ham; garlic bread; menudo soup; tamales; enchiladas; pizza; mixed vegetables; rice pilaf; jambalaya; and brownies.  (*Id*.)  SDC also offers therapeutic, medical, and religious diet meal plans, and holiday meals on Thanksgiving, Christmas, and New Year's Day.  (*Id*., ¶¶ 35–41.)

### 6.    Commissary.

SDC's commissary offers detainees a comprehensive lineup of soda, candy, snacks, personal hobby and craft materials, and supplemental luxury hygiene items and clothing at fair prices.  (Ex. 1, ¶¶ 62, 68; Ex. 2, ¶ 98.)  CoreCivic generally uses a 30% profit margin when setting prices for commissary items, which is standard for detention facilities.[10]  (Ex. 1, ¶ 64.)  However, CoreCivic does not retain any profit from commissary sales.  (*Id*., ¶ 63.)  All proceeds are used to pay for detainee welfare expenses, replenish commissary inventory, or cover the salaries of employees whose sole responsibility is to operate the commissary.  (*Id*., ¶¶ 63, 73.)

---

[10] The Director of Commissary conducts a market-based pricing survey every two years, comparing the prices of items offered in the commissary to the prices of identical (or at least similar) items at local convenience stores. (Ex. 1, ¶¶ 65–71.)

The use of commissary proceeds is strictly controlled, and all remaining profits are placed in the Inmate Welfare Fund.  (*Id.*, ¶¶ 72, 74.)

### 7.    Telephone Access.

In June 2017, Talton Communications became the exclusive provider of telephone services at SDC.  (Ex. 2, ¶ 21.)  Under the terms of that contract, CoreCivic does not have any control over the rates for telephone calls and does not receive any proceeds from the sale of phone cards or calls.  (Ex. 2, ¶ 21; Dkt. 221 at pg. 211.)  Since COVID-19, Talton has provided detainees with a monthly allocation of free telephone calls, which SDC occasionally did before COVID-19.  (Dkt. 225 at pgs. 151–152, 348–349.)

Before Talton, CoreCivic contracted with Securus for telephone services, which offered collect, debit card, and pre-paid calls.[11]   (Dkt. 213-31 at SECURUS.95, 147.)   The rates established by this agreement (effective January 1, 2009) were $0.15/minute for all collect calls, and $0.10/minute for all debit and prepaid calls (Dkt. 213-31); however, in response to a discovery request, Securus reported that on December 23, 2008—prior to the effective date of the agreement—prepaid rates were $0.135/minute for local calls, $0.19/minute for intrastate long-distance calls, and $0.41/minute for interstate long-distance calls.  (Dkt. 213-32.)

In 2013, the Federal Communications Commission ("FCC") issued an interim order requiring that detainee phone rates be cost-based and capped the interstate rates for collect calls at $0.25/minute and $0.21/minute for debit card and prepaid calls.  *2013 FCC Order*, 28 FCC Rcd. 14107, at 14132, ¶¶ 47–50, 14147, ¶ 73. Notably, the FCC did not find that site

---

[11] Collect and prepaid calls are paid for by the party called, whereas debit card calls are paid for by the detainee. *In the Matter of Rates for Interstate Inmate Calling Services*, 28 FCC Rcd. 14107, 2013 WL 5738782, at 14119–14120, ¶¶ 22–24 (2013) ("*2013 FCC Order*").

commissions paid by phone providers were unjust. *Id*. at 14125, ¶ 34; *see also Id.*, 30 FCC Rcd. 12763, at 12824–25, ¶ 127 (2015); *Id.*, 31 FCC Rcd. 9300, at 9319, ¶ 35 (2016).

### 8.    ICE Oversight

ICE is heavily involved in overseeing facility operations at SDC, including CoreCivic's policies, disciplinary processes, and administration of the VWP.   (Ex. 1, ¶ 77.)  ICE has a field office at SDC and maintains a significant presence, including regular interactions with both staff and detainees.  (Ex. 1, ¶ 77; Ex. 2, ¶ 47.)  ICE staff have full access to the facility and routinely visit the housing units.  (Ex. 2, ¶ 47.)  In addition to utilizing SDC's grievance process, detainees may submit requests and complaints directly to ICE, including appeals of grievance decisions from SDC with which they disagree.  (Ex. 1, ¶ 78.)  ICE and the Department of Homeland Security also regularly audit SDC for compliance with the PBNDS.  (*Id.*, ¶ 79.)

### C.    Plaintiffs, Their Allegations, and the Class Claims.

Plaintiff Hill Barrientos was detained at SDC on four occasions:  July 10, 2015 to May 1, 2016; May 26–27, 2016; September 14–19, 2016; and September 16, 2017 to June 19, 2018. (Ex. 2, ¶ 118.)  He participated in the VWP as a kitchen worker during only two of those visits and received a total allowance of $1,313.  (Ex. 2, ¶¶ 119, 121; Ex. 37–39.)   Most of his commissary purchases were for name-brand hygiene/hair products ($96.56); cookies, chips, soda, and other treats ($883.39); phone cards ($350); a radio/batteries ($55.84); and hot sauce, ramen noodles, condiments, and other food items (approx. $570).  (Ex. 2, ¶ 122; Ex. 40–41.)

Plaintiff Bermudez Gutiérrez was detained at SDC from May 2, 2019 to January 10, 2020, and he participated in the VWP as a kitchen worker.  (Ex. 2, ¶¶ 123–124.)  He received $932 in allowances.  (Ex. 2, ¶ 125; Ex. 42.)  His commissary purchases consisted of hygiene

items ($12.10); a t-shirt ($3.90); phone cards ($127.00); cookies, chips, and cakes ($122.38); and hot sauce, jelly, Nutella and other food items (approx. $230).  (Ex. 2, ¶ 126; Ex. 43.)

Plaintiff Urbina Rojas was detained at SDC from May 27, 2015 to June 15, 2016, and he participated in the VWP as a kitchen worker.  (Ex. 2, ¶¶ 127–128.)  He received $1,072 in allowances.  (Ex. 2, ¶ 129; Ex. 44.)  His commissary purchases consisted of name-brand hygiene/hair products ($101.21); cookies, pork rings, candy, soda, chips, and other treats ($515.67); shirts and socks ($57.54); phone cards ($190); radio and batteries ($66.94), and ramen noodles, sardines, hot sauce, and other food items (approx. $630).  (Ex. 2, ¶ 130; Ex. 45.)

On April 17, 2018, Plaintiffs filed a class-action complaint alleging that CoreCivic's operation of the VWP at SDC violated the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589, because it forced detainees to participate through coercion or force.  (Dkt. 1.)  The Eleventh Circuit upheld this Court's ruling that private contractors such as CoreCivic are not per se exempt from liability under the TVPA.  *Barrientos*, 951 F.3d at 1271.  However, it recognized that CoreCivic is "required" to comply with the PBNDS and held that "the TVPA does not bar private contractors from operating the" VWP.  *Id*. at 1271–1272.  It further recognized that, "in the interest of maintaining order in an immigration detention facility, the PBNDS authorize punishments for detainees who, among other things, refuse to complete basic personal housekeeping tasks or organize work stoppages," and stressed that its opinion "should … not be read to imply that these basic disciplinary measures, on their own, give rise to TVPA liability."[12]  *Id*. at 1278 n.5 (citation omitted).

---

[12] In *Gonzalez v. CoreCivic, Inc.*, 986 F.3d 536, 537 (5th Cir. 2021), the Fifth Circuit agreed with this Court (and the Eleventh Circuit) that CoreCivic does not "fall outside the reach of" the TVPA. But in dissenting from the panel's decision to avoid deciding whether the allegations in the complaint adequately stated a TVPA claim, Judge Oldham stated that conduct

In reaching these conclusions, the Eleventh Circuit relied on an amicus brief filed by the United States. *Id.* at 1279 n.7. The United States agreed that the TVPA does not contain an implicit exception for private contractors providing immigration detention services (Ex. 53 at 6–8), but it strenuously maintained that a contractor's enforcement of the PBNDS's disciplinary code does not and cannot amount to a TVPA violation (*id.* at 8–14). "Immigration detention, like any other detention setting, requires that a facility be able to maintain order and discipline among the detainee population. The PBNDS reflect this basic reality. … In enacting the TVPA, Congress did not undermine the ability of detention facilities to take basic measures designed to ensure order." (*Id.* at 11, internal citation omitted); *see also id.* at 8–9, 13–14 (the PBNDS's "disciplinary measures, on their own, likewise do not give rise to TVPA liability, as there is no basis for concluding that Congress intended to prevent detention facilities from taking basic steps to ensure order and discipline … Nothing supports reading the TVPA to preclude such basic disciplinary measures for all detainees. A facility may take legitimate steps consistent with the PBNDS to maintain order in the facility, and those steps do not give rise to liability under the TVPA, even if they relate to labor performed by detainees."). The United States also stressed that a TVPA violation cannot be based on the allegation "that conditions for detainees who participate in the Program are better than conditions for those who do not participate. It is of course true that an individual who works is generally materially better off than someone who

---

in compliance with the PBNDS does not violate the TVPA. *Id.* at 542–47. He did "not understand how we could affirm on the certified question where we're convinced that a second, uncertified one would require reversal." *Id.* at 543. Like the panel in *Barrientos* and Judge Oldham in *Gonzalez*, this Court has also recognized: "Of course, the lawful force necessary to detain the detainees cannot be the source for the TVPA claims." (Dkt. 38 at 9.)

does not, and that disparity alone cannot give rise to liability.  And an employer or other party may surely encourage an employee to work by providing other benefits without rising to the level of coercion prohibited by the statute."  (*Id*. at 10, internal citation omitted.)

On remand, Plaintiffs amended their complaint, again raising claims under the TVPA and for unjust enrichment.  (Dkt. 87.)  The amended complaint seeks to certify two classes:

> **Forced Labor Class**: "All civil immigration detainees who performed work for CoreCivic at Stewart in the 'Volunteer Work Program' starting ten years prior to the date the original complaint was filed (April 17, 2018) until the date of final judgment in this matter[.]"

> **Unjust Enrichment Class**: "All civil immigration detainees who performed work for CoreCivic at Stewart in the 'Volunteer Work Program' starting four years prior to the date the original complaint was filed (April 17, 2018) until the date of final judgment in this matter[.]"

(*Id*., ¶ 105.)  Plaintiffs raises multiple theories under the TVPA, alleging that CoreCivic forces SDC detainees to participate in the VWP by: (1) depriving them of basic necessities, including hygiene items, food, clothing, phone (serious harm); (2) threatening segregation if they refuse to work or engage in a work stoppage (serious harm/physical restraint); (3) revoking or threatening to revoke housing incentives if they refuse to work (serious harm); (4) threatening to initiate criminal proceedings if they refuse to work (abuse of legal process); (5) engaging in any of the foregoing as part of a scheme, plan, or pattern intended to cause them to believe that, if they do not work, they will suffer serious harm or physical restraint; and (6) knowingly benefitting financially from participating in a venture engaged in the foregoing.  (*Id*., ¶¶ 116–123.)

## II.     The Court Should Not Certify Either Putative Class.

### A.     Class Certification – Elements, Burden of Proof, and Review.

Plaintiffs have a tough row to hoe.  "As an initial matter, a plaintiff seeking to represent a proposed class must demonstrate that the class is 'adequately defined and clearly ascertainable.'"

*Sellers v. Rushmore Loan Mgmt. Servs., LLC*, 941 F.3d 1031, 1039 (11th Cir. 2019) (citation omitted). "If the proposed class is adequately defined and clearly ascertainable, the class representative must then satisfy Rule 23(a) by demonstrating (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims of the representative parties are typical of the claims of the class; and (4) the class representatives will fairly and adequately protect the interests of the class. *Id*. (citing Fed. R. Civ. P. 23(a)). "In addition to meeting these requirements, the plaintiff must show that the proposed class satisfies at least one of the class types under Rule 23(b)." *Id*.

Plaintiffs bear the burden of proof. *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003). And it is just that: "a burden of *proof*, not a burden of pleading." *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("Rule 23 does not set forth a mere pleading standard."). Plaintiffs "must actually prove—not simply plead—that their proposed class[es] satisf[y] each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014); *accord Wal-Mart*, 564 U.S. at 350 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule."); *Sher v. Raytheon Co.*, 419 F. App'x 887, 890–91 (11th Cir. 2011) ("The Plaintiffs are required to prove, at the class certification stage, more than just a prima facie case, i.e., more than just a 'pretty good case.'").

It is the Court's role to ensure that Plaintiffs comply with these standards by conducting a "rigorous analysis of the Rule 23 prerequisites before certifying a class." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009) (citation omitted). That analysis is neither "generous [n]or forgiving." *Id*. at 1269. "Although the [Court] should not determine the merits of the plaintiffs' claim at the class certification stage, the [Court] can and should consider the merits of

the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Valley Drug*, 350 F.3d at 1188 n.15.  In doing so, the Court cannot simply accept as true Plaintiffs' proffered facts or construe those facts in Plaintiffs' favor.  *Brown*, 817 F.3d at 1234.  It must also resolve conflicting evidence and rule on *Daubert* challenges to expert testimony.  *Sher*, 419 F. App'x at 890–91.

Finally, because there is a "presumption … against class certification," if the Court "has doubts about whether the requirements of Rule 23 have been met [it] should refuse certification." *Brown*, 817 F.3d at 1233–1234 (citations and internal quotations omitted); *see also id.* at 1233 ("[I]f doubts remain about whether the standard is satisfied, the party with the burden of proof loses.") (citation and internal quotations omitted).[13]

### B.    The Proposed Classes Are Overbroad and Impermissibly Go Beyond the Scope of the Amended Complaint.

"Ascertainability is an implied prerequisite of Rule 23."  *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021).  "Class representatives bear the burden to establish that their proposed class is "adequately defined and clearly ascertainable." *Id.* (internal quotations and citation omitted).  A class definition is defectively overinclusive if it potentially includes class members with no claim.  *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1276 (11th Cir. 2019); *AA*

---

[13] This presumption exists because "class actions are an exception to our constitutional tradition of individual litigation." *Brown*, 817 F.3d at 1233 (quoting *Comcast v. Behrend*, 569 U.S. 27, 33 (1979)). Plaintiffs cite *Groover v. Prisoner Transportation Servs., LLC*, 2018 WL 6831119, at *8 (S.D. Fla. Dec. 26, 2018), for the proposition that Rule 23(a) "must be read liberally in the context of civil rights suits." But Rule 23(a) contains no such exception. Moreover, for that proposition *Groover* quoted *Jones v. Diamond*, 519 F.2d 1090, 1099 (5th Cir. 1975), which cited *Rodriguez v. E. Texas Motor Freight*, 505 F.2d 40, 50 (5th Cir. 1974). But the Supreme Court subsequently vacated *Rodriguez*, see *E. Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 406 (1977), and *Wal-Mart* rejected a watered-down standard, 564 U.S. at 350–51.

- 18 -

*Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, 938 F.3d 1170, 1178 (11th Cir. 2019); *Bussey v. Macon Cnty. Greyhound Park, Inc.*, 562 F. App'x 782, 788 (11th Cir. 2014).

Both Proposed Classes are defined to include "[a]ll civil immigration detainees who performed work for CoreCivic at Stewart in the 'Volunteer Work Program.'" Surely, even Plaintiffs would agree that not *every* VWP participant has a viable TVPA or unjust enrichment claim. For example, Hill Barrientos and Bermudez Gutiérrez do not allege that they worked because CoreCivic threatened an abuse of legal process. (Dkt. 213-64, 213-57.) Only those who allege (and prove) that they were forced to work through unlawful means have a viable claim. As proposed, the Class definitions undoubtedly include putative class members with no claim.

The Classes also pursue a theory of liability that was not alleged in the amended complaint: that CoreCivic maintains a policy or practice—abuse of legal process—by threatening to impact detainees' immigration proceedings either directly or by forcing them to wear colored uniforms that correspond to their classification. (Dkt. 213-1 at 28.) Plaintiffs "cannot … expand the scope of the proposed class at the certification stage to include … theories of liability that are not encompassed within the … Amended Complaint. To do so would amount to an eleventh-hour amendment of the pleadings far beyond the … deadline to amend that comes well after the close of discovery." *Bouton v. Ocean Props., Ltd*, 322 F.R.D. 683, 693–94 (S.D. Fla. 2017); *accord Ohio State Troopers Ass'n, Inc. v. Point Blank Enters., Inc.*, 347 F. Supp. 3d 1207, 1232 n.12 (S.D. Fla. 2018).

### C. Plaintiffs Have Failed to Establish Numerosity.

Rule 23(a)(1) requires Plaintiffs to establish that "the class is so numerous that joinder of all members is impracticable." Although they "need not show the precise number of members in the class," "mere allegations of numerosity are insufficient to meet this prerequisite." *Vega*, 564

F.3d at 1267 (citation omitted).  They must at least make "some showing, affording the district court the means to make a supported factual finding, that *the class actually certified* meets the numerosity requirement."  *Id.* (emphasis added).

Plaintiffs argue that numerosity is "presumptively satisfied" because "over 32,000" detainees participated in the VWP during the Forced Labor Class period and "nearly 13,800" detainees participated in the VWP during the Unjust Enrichment Class period.  (Dkt. 213-1 at 32.)  But as just discussed, the number of VWP participants grossly overstates the number of putative class members with viable claims.  Other than themselves, Plaintiffs make no attempt to establish the number of other detainees who allege they were forced or coerced into working in the VWP.  Having failed to do so, they have not met their burden under Rule 23(a)(1).

### D.  The Named Plaintiffs' Claims Are Not Typical of the Classes' Claims.

Rule 23(a)(3) requires Plaintiffs to establish that the class representatives' claims are "typical" of the class claims they seek to represent.  "[T]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000).  "A sufficient nexus is established if the claims … of the class and the class representative arise from the same event or pattern or practice *and are based on the same legal theory*."  *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984) (emphasis added).

Typicality also requires that the class representative is "part of the class."  *Prado-Steiman*, 221 F.3d at 1279 (citation omitted).  "One may not represent a class of which he is not a part." *Wells v. Ramsay, Scarlett and Co.*, 506 F.2d 436, 438 (5th Cir. 1975).  Thus, for example, if a class representative does not have standing or his claim is time-barred, he cannot represent the class.  *See Vega*, 564 F.3d at 1265 (citation omitted); *accord Franze v. Equitable Assurance*,

296 F.3d 1250, 1254 (11th Cir. 2002); *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1347 (11th Cir. 2001); *Prado-Steiman*, 221 F.3d at 1279–80.

Hill Barrientos does not allege that he was compelled to work, and he makes no allegations regarding the deprivation of basic necessities, a threat of losing favorable housing, or the threatened abuse of legal process.  (Dkt. 213-64.)  Bermudez Gutiérrez does not allege that he worked because of the threatened abuse of legal process.  (Dkt. 213-57 at 8, ¶ 37.)  Urbina Rojas does not allege that he worked because of a threat of losing favorable housing.  (Dkt. 213-79 at 9, ¶¶ 44–45.)  These Plaintiffs cannot represent the Classes to the extent their claims are based on those theories.  Furthermore, no Plaintiff alleges that he worked because of the color of the uniform he was required to wear.  (Dkt. 231-57, 231-64, 213-79.)  Consequently, no Class should be certified based on that unsupported theory.

### E.     Plaintiffs Have Not Provided "Significant Proof" that the Alleged Classwide Policies and Practices Exist.

Plaintiffs' claims are grounded in their assertion that CoreCivic has a "policy and practice" of forcing detainees to work.  (Dkt. 213-1 at 19, 21, 22, 23, 26, 27, 28.)  But they cannot point to a single written policy (corporate or facility) that says, e.g., "deprive basic necessities" or "threaten detainees who refuse to work with segregation."  There are no such written policies.  Plaintiffs' claims are really based on an alleged *practice* of forcing detainees to work.  Although they rely on ICE's disciplinary code to establish that detainees *can* be disciplined for *certain* conduct (but not for refusing to work), that code, standing alone, does nothing to prove their claim.[14]

---

[14] As noted above, the disciplinary code's prohibition of encouraging *others* to refuse to work is a security standard required by the PBNDS and does not run afoul of the TVPA. *Barrientos*, 951 F.3d at 1278 n.5.

To protect defendants against specious allegations of a systemwide unlawful practice, Rule 23(a)(2) requires Plaintiffs to present "significant proof" that the practice in fact exists, that it was implemented in the way they allege, and that all class members were exposed to it. *Wal-Mart*, 564 U.S. at 353; *see also Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890, 901 (3d Cir. 2022) ("Before certifying the proposed class, the District Court must answer … whether plaintiffs have significant proof that Ollie's corporate policies, procedures, or practices in fact cause discrimination by stores nationwide.  Posing a hypothetical common question is not enough to satisfy plaintiffs' burden of proof."); *Ellis v. Costco Wholesale*, 657 F.3d 970, 983 (9th Cir. 2011) ("If there is no evidence that the entire class was subject to the same allegedly discriminatory practice, there is no question common to the class.").  When you strip away Plaintiffs' conclusory contentions, dig through the multiple layers of record citations, and expose their proffered "evidence," it clearly falls short of that threshold.

### 1.    Deprivation of Basic Necessities.

Plaintiffs assert that CoreCivic has a practice of depriving detainees hygiene items, clothing, food, and phone access to force them to work in the VWP and earn money to purchase these items through the commissary.  (Dkt. 213-1 at 18–23.)  Notably, Plaintiffs do not allege that CoreCivic's provision of these items falls below constitutional minimums or even violates the PBNDS.  Instead, they rely on their own declarations and anecdotal, subjective, and sporadic complaints of other detainees that do not amount to anything.

**Hygiene**:  Plaintiffs' evidence consists of: their retained corrections expert's opinion that hygiene toiletries are "travel-sized" and "inferior" (Dkt. 213-19 at 44, ¶ 136); and their own declarations avowing that hygiene items were "small" and "not good" or of "poor quality" (Dkt. 213-57 at 3, ¶ 5; Dkt. 213-64 at 2, ¶ 4; Dkt. 213-79 at 2–3, ¶ 4).  They also submit: a January 25,

2017 grievance complaining that a detainee's cell was searched and hygiene products were taken following "an incident (Dkt 213-118 at 2); and the December 11, 2017 OIG Report, which found that "[m]ultiple detainees at the Hudson County Jail and Stewart Detention Center also complained that some of the basic hygienic supplies … were not provided promptly or at all when detainees ran out of them" (Dkt. 213-111 at 11).[15]

**Clothing**:  Plaintiffs' evidence consists of: the avowals of Hill Barrientos and Urbina Rojas that they were issued "used" clothing (Dkt. 213-64 at 3, ¶ 5; Dkt. 213-79 at 5, ¶ 17);[16] Warden Russell Washburn's testimony that detainees are provided either new clothing or used clothing "[a]s long as they're serviceable and appropriate condition," and that, since 2020, SDC issues only new socks and underwear (Dkt. 213-13 at 7–8; *see also* Dkt. 213-19 at 44, ¶ 136); a March 20, 2014 email from an ICE official informing SDC staff that socks and underwear must be exchanged daily (Dkt. 213-120 at 2); and a November 2, 2016 email from a CoreCivic staff member stating that "laundry is chaotic on a daily basis" (Dkt. 213-121 at 3).

**Food**:  Plaintiffs' evidence consists of their three declarations and various complaints by other detainees, who alleged that the food was "inedible," "bad," "not good," "not up to par," "did not have enough flavor," "repetitive," "undercooked," "spoiled," moldy, or tainted.[17]  They

---

[15] Plaintiffs also submit a May 2018 detainee grievance alleging that an officer "don't want to give" shampoo and toilet paper (Dkt. 213-116 at 2), and a June 2016 detainee grievance alleging that he was denied personal hygiene items (Dkt. 213-119 at 3). Neither allegation was substantiated following investigations. The May 2018 detainee was caught on video stealing supplies while the officer attempted to distribute them, and the June 2016 detainee had requested supplies after they had already been distributed and he was advised that he would receive them. (Dkt. 213-116 at 3; Dkt. 213-119 at 4.)

[16] Bermuda Gutiérrez does not criticize the clothing he was issued. (Dkt. 213-57.)

[17] *See* Dkt. 213-1 at 19–21 (citing Dkt. 213-35 at 3 [5/15/08 Minutes]; Dkt. 213-57, ¶ 15 [Bermudez Gutiérrez Decl.]; Dkt. 213-64, ¶ 11 [Hill Barrientos Decl.]; Dkt. 213-79, ¶ 14 [Urbina Rojas Decl.]; Dkt. 213-105 at 2 [10/10/15 Email]; Dkt. 213-106 at 3–6 [9/5/15 Email]; Dkt. 213-

also submit their retained nutritionist expert's opinion that the food portions are "inadequate" and "insufficient," and that "most" of the 12 detainees whom she interviewed told her that they "did not get enough to eat." (Dkt. 213-99 at 4–7, ¶¶ 16–17, 21–24.)

**Telephone**:  Plaintiffs point to the fact that, between December 23, 2008, and February 11, 2014, an interstate long-distance telephone call cost $0.41 per minute.[18]

### 2.    Segregation for Refusing to Work.

Plaintiffs assert that CoreCivic has a practice of threatening segregation if detainees refuse to participate in the VWP.  (Dkt. 213-1 at 23–26.)  That allegation is primarily supported by the three Named Plaintiffs' declarations.  Hill Barrientos alleges that, when he arrived at SDC, he was "told that if I did not work, I would be sent to segregation."  (Dkt. 213-64 at 3, ¶¶ 7, 28.)  He further alleges that he "was never told that [he] could withdraw or how to withdraw from the work program" (*id*. at 5, ¶ 24); however, his records show that he only participated in the VWP during two of his four stays at SDC.  (Ex. 1, ¶¶ 119–120.)  Bermudez Gutiérrez alleges that he voluntarily agreed to participate in the VWP (Dkt. 213-57 at 3, ¶ 7 & at 6, ¶ 25), but that, over time, "based on conversations [he] had with others," he believed that if he stopped working, he could be "sent to segregation while CoreCivic determined where to relocate" him (*id*. at 8, ¶ 36).  Urbina Rojas alleges that he was sent to segregation for a day after

_____

107 at 3 [1/11/16 Email]; Dkt. 213-108 at 2–3 [4/26/18 Email]; Dkt. 213-109 at 2 [12/3/16 Email]; Dkt. 213-10 [Log recording complaints between 5/5/12 and 3/11/20]). Plaintiffs also cite two OIG Reports that involved food handling and tracking systems. (Dkt. 213-111 at 12 [12/11/17 Report]; Dkt. 213-122 at 2 [2/7/16 Report].)

[18] Plaintiffs assert that, beginning in 2017, the cost of a telephone call has been "between 7 and 11 cents per minute," and that CoreCivic no longer sets the price. (Dkt. 213-1 at 23.) This is tantamount to a concession that CoreCivic has not had a practice of depriving detainees of affordable phone calls since 2017.

refusing to do a task in the kitchen, and that he saw another detainee sent to segregation for refusing to perform a task.  (Dkt. 213-79 at 7, ¶¶ 34–35, & at 8, ¶ 40.)

Plaintiffs' remaining evidence does not corroborate their self-serving testimony or otherwise establish a systemwide practice.  Plaintiffs cite to ICE's disciplinary code and CoreCivic's disciplinary and segregation policies, but nothing in the code or those policies prohibits the refusal to work, threatens segregation if a detainee refuses to work, or mandates participation in the VWP.  (Dkt. 213-37, 213-123.)  As discussed above, detainees are subject to segregation only if they encourage *others* to refuse to work or participate in a work stoppage, or refuse to obey a staff order, which are measures necessary for the safety and security of the facility, mandated by the PBNDS, and consistent with the TVPA.[19]

Plaintiffs cite CoreCivic's Detainee Handbook Supplement, but nothing in the Supplement warns that detainees will be disciplined with segregation if they refuse to participate in the VWP or otherwise work; indeed, the failure to participate in the VWP or the refusal to work are not listed infractions.  (Dkt. 213-42.)  Plaintiffs also submit evidence that facility rules are communicated to detainees orally at intake and on a regular basis, but that is not evidence that staff inform detainees they must participate in the VWP or will be sent to segregation if they refuse.  (Dkt. 213-9 at 28; Dkt. 213-48 at 29.)

Plaintiffs cite: two incident reports (June 18, 2017 and November 20, 2017) resulting in segregation for detainees who encouraged *others* to participate in a work stoppage (Ex. 22, 23);

---

[19] Plaintiffs and their experts misstate the deposition testimony of T█ Pollack, Charlie Peterson, D█████ Blackmon, and M█████ Moye. These witnesses consistently testified that a detainee can be disciplined with segregation for encouraging *others* to participate in a work stoppage, not for refusing to participate in the VWP or show up for work. (Dkt. 213-11 at 13–14; Dkt. 213-72 at 12; Dkt. 213-131 at 2; Dkt. 218 at pg. 43.)

and an incident report (April 20, 2017) for a detainee who refused to show up for a job that resulted in a warning that he would be released from the VWP if he failed to show up again (Ex. 24). (*See* Dkt. 213-19 at 19–20, ¶¶ 64–66.) The PBNDS required these actions.

Plaintiffs cite: a May 15, 2015 email noting that a staff member threatened a group of detainees with segregation "for inciting others not to work" (Dkt. 213-133 at 2); and a December 1, 2017 email noting that a detainee was placed in segregation "for Encouraging others to participate in a work stoppage" (Dkt. 213-131 at 2). The PBNDS required these actions.

Plaintiffs cite a Food Service Post Order with an effective date of March 31, 2017, that states: "Disciplinary action may be taken for absences and tardiness." (Dkt. 231-41 at 2.) However, the Post Order goes on to state that the VWP is "voluntary" and that "removal from the detail" is the only "disciplinary action" that may be taken. (Dkt. 231-41 at 3; Ex. 2, ¶ 82.) Plaintiffs cite three emails (June 18, 2014, June 19, 2016, and June 21, 2016), two from the same employee, that say staff may "write a disciplinary report" if a detainee does not report to work or leave work early. (Dkt. 213-126 at 3; Dkt. 213-128 at 2; Dkt. 213-130 at 2.) But the only "discipline" that can be imposed is release from the VWP. Finally, Plaintiffs cite a September 21, 2020 email stating that staff "wrote a 5-1C on" two detainees who refused to work. (Dkt. 213-127 at 2.) A 5-1C is a form titled "Incident Statement" that merely reports what a staff member saw or heard a detainee do or say. (Ex. 2, ¶ 83.) It is not a disciplinary report. (*Id*.)

### 3.   Revoking Housing Incentives.

Plaintiffs allege that CoreCivic has a practice of "revoking incentives," including transferring detainees to "less favorable" housing if they refuse to work. (Dkt. 213-1 at 26.) Plaintiffs cite their own declarations.

Bermudez Gutiérrez alleges that kitchen workers were housed in a pod that had "four TVs" and were allowed to "stay up later to shower and call our families," which he considered to be a "benefit," and he was "motivated to continue working in order to stay in the closed cell pod." (Dkt. 213-57 at 4, ¶¶ 10–13.) He further alleges that he "witnessed" detainees transferred out of the kitchen workers pod once they were removed from the VWP, which he "viewed … as a punishment." (*Id*., ¶ 14.) Urbina Rojas alleges that the "open dormitory" has only "one TV," it is "packed" with detainees, it is "hard to sleep at night with all the noise," and "[s]ometimes fights broke out about the noise and people's inability to sleep." (Dkt. 213-79 at 3, ¶¶ 7–8, 10.) He further alleges that, although the "kitchen workers' pod" was still "crowded and noisy, it was a little better than the other open dorm pods," his "friends were there so [he] wanted to stay there," and there were "two TVs," instead of one. (*Id*. at 3–4, ¶¶ 10–11.) Finally, he alleges that "officers … told [him] that if [he] didn't work in the kitchen, [he] would be moved from [the kitchen worker's pod]." (*Id*.) Hill Barrientos alleges that the "open dorm housing unit" had bunk beds, "the lights were always on," the "bathrooms were next to beds just separated by a half-wall," and there "were often fights"; comparatively, the "celled housing unit" had "two-bed-cells" and each cell "had its own toilet." (Dkt. 213-64 at 5, ¶¶ 26–27.) He does not allege that staff threatened to transfer him from his "two-bed-cell" to the "open dorm housing unit" if he left the VWP.

Plaintiffs also cite their retained mental health expert's opinion that, whereas the open dorm pods are "inherently less private, less quiet, and lack the ability to create physical separation," the kitchen workers pod "afford[s] some degree of privacy, quiet, and physical separation from others." (Dkt. 213-18 at 19, ¶ 57.) Finally, Plaintiffs cite the testimony of ███ Norman, T██ Pollack, and Warden Washburn (Dkt. 213-18 at 19, ¶ 58), who simply

confirmed that only kitchen workers were housed in the kitchen workers' pod.  (Dkt. 213-13 at 18; Dkt. 213-44 at 8; Dkt. 213-72 at 7.)

### 4.      Threatening an Abuse of Legal Process.

Plaintiffs allege that CoreCivic has a practice of threatening detainees who refuse to work with abuses of legal process.  (Dkt. 213-1 at 27–28.)

**Criminal prosecution**: Citing CoreCivic's Detainee Handbook Supplement (Dkt. 213-42), Plaintiffs contend that "criminal prosecution is a possible punishment for refusing to obey an officer or engaging in a work stoppage," and that CoreCivic can "at its discretion" refer a matter to an outside law enforcement agency.  (Dkt. 213-1 at 27–28.)  Plaintiffs further contend that the Handbook does not "explain what types of conduct would justify referral for criminal prosecution."  (*Id*.)

**Colored uniforms**:  Plaintiffs assert that detainees wear uniforms that have different colors depending on their classification, and that they must wear their uniforms to their immigration proceedings which indicates to the immigration judge their "level of 'dangerousness.'"  (*Id*.)

**Immigration proceedings**:  Plaintiffs assert that CoreCivic has a practice "of telling detained people that refusing to work will impact their immigration proceedings."  (Dkt. 213-1 at 28.)  As proof, Hill Barrientos alleges that, on one occasion, he "worked the early shift that day because [he] was afraid of my immigration case being negatively affected and of being moved to segregation" (Dkt. 213-64 at 6, ¶ 29), and Urbina Rojas alleges that staff "informed us that if we refused to work, that refusal would be put on our 'record.' I understood this to mean they would use this information to harm our immigration case."  (Dkt. 213-79 at 8, ¶ 42.)

\*      \*      \*

- 28 -

The above is not "significant proof" that CoreCivic had a practice of forcing detainees to work at any time during the Class periods, much less at all times.  Plaintiffs' personal complaints about the quality or quantity of hygiene items, clothing, or food, or of the cost of phone calls, is not proof of a systemwide practice of knowingly depriving detainees for the purpose of forcing them to participate in the VWP.  Nor are their own avowals that they believed they could be sent to segregation, transferred to a less desirable housing unit, or criminally prosecuted if they refused to work.  Their three declarations do not establish that *every* detainee who participated in the VWP—from 2008 to the present (the Forced Labor Class period)—did so because of a systemwide practice of coercion, and none of the other anecdotal evidence supports one.[20]  *See Wal-Mart*, 564 U.S. at 358 (submission of "120 affidavits reporting experiences of discrimination—about 1 for every 12,500 class members—relating to only some 235 out of Wal–Mart's 3,400 stores" did not establish significant proof of a uniform policy).  Indeed, Plaintiffs acknowledge that their allegations are based on discretionary decisions by staff.  (Dkt. 213-1 at 10, 12, 28.)  That alone is fatal to class certification.  *See Wal-Mart*, 564 U.S. at 355 (holding that discretionary decision-making "is just the opposite of a uniform ... practice that would provide the commonality needed for a class action"); *Allen*, 37 F.4th at 901–02 ("[A]llowing … discretion is … not evidence of a common corporate-wide injury.").

### F.      Individual Questions Predominate Any Common Questions.

Rule 23(a)(2) requires Plaintiffs to establish that "there are questions of law or fact common to the class."  It is not "not sufficient" to simply allege that class members "have all

---

[20] In *Owino v. CoreCivic, Inc.*, 36 F.4th 839, 845 (9th Cir. 2022) (pet. for reh'g pending), the court affirmed a class that alleged forced labor based on a written sanitation policy. Plaintiffs do not rely on CoreCivic's sanitation policy here.

suffered a violation of the same provision of law" or that they seek the same relief. *See Wal-Mart*, 564 U.S. at 349–50. Such contentions "give[] no cause to believe that all their claims can productively be litigated at once." *Id*. A qualifying common question must be able to generate an answer that "resolve[s] an issue that is central to the validity of each" class member's claim "in one stroke." *Id*. Dissimilarities within a proposed class potentially impede the generation of common answers.[21] *Id*.

Rule 23's predominance requirement is "far more demanding" than commonality, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997), and requires Plaintiffs to establish that common questions "predominate" over individual ones.[22] Fed. R. Civ. P. 23(b)(3). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized,

---

[21] Plaintiffs cite *Groover v. Michelin North America, Inc.*, 187 F.R.D. 662 (M.D. Ala. 1999), for the proposition that the commonality requirement is "not high." (Dkt. 213-1 at 33.) But *Groover* quoted *Morris v. Transouth Financial Corporation*, 175 F.R.D. 694, 697 (M.D. Ala. 1997), and both *Groover* and *Morris* were decided decades before *Wal-Mart*. Similarly, *In re Checking Account Overdraft Litigation*, 286 F.R.D. 645, 652 (S.D. Fla. 2012), quoted *Duhaime v. John Hancock Mutual Life Insurance Company*, 177 F.R.D. 54, 63 (D. Mass. 1997), which also predates *Wal-Mart*. Because *Wal-Mart* "changed the landscape" of commonality review, *D.L. v. D.C.*, 713 F.3d 120, 126 (D.C. Cir. 2013), its heightened standard controls.

[22] The Eleventh Circuit has consistently declined to certify claims where individual questions predominated. *See, e.g., Ohio State Troopers Ass'n, Inc. v. Point Blank Enters., Inc.*, No. 20-13588, 2021 WL 4427772, at *2 (11th Cir. Sept. 27, 2021); *Truesdell v. Thomas*, 889 F.3d 719, 725–26 (11th Cir. 2018); *Brown*, 817 F.3d at 1235–37; *Webber v. Esquire Deposition Servs., LLC*, 439 F. App'x 849, 851 (11th Cir. 2011); *Babineau v. Fed. Exp. Corp.*, 576 F.3d 1183, 1191–95 (11th Cir. 2009); *Vega*, 564 F.3d at 1272; *Moore v. Am. Fed'n of Television & Radio Artists*, 216 F.3d 1236, 1242–43 (11th Cir. 2000); *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1235–36 (11th Cir. 2000); *Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1558 (11th Cir. 1989); *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1006 (11th Cir. 1997).

class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted); *accord Brown*, 817 F.3d at 1234.

Common questions predominate only if they "'have a direct impact on every class member's effort to establish liability' *that is more substantial than* the impact of individualized issues in resolving the claim or claims of each class member." *Vega*, 564 F.3d at 1270 (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004)) (emphasis added). "Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)." *Id*. (quoting *Klay*, 382 F.3d at 1255); *see also Babineau*, 576 F.3d at 1191 ("[C]ommon issues will not predominate over individual questions if, 'as a practical matter, the resolution of an overarching common issue breaks down into an unmanageable variety of individual legal and factual issues.'") (citation omitted).

"Because there is considerable overlap between Rule 23(a)'s commonality requirement and Rule 23(b)(3)'s predominance requirement, courts often address them together." *Just. v. Rheem Mfg. Co.*, 318 F.R.D. 687, 695 (S.D. Fla. 2016). The starting point for this analysis is the elements of the causes of action. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011); *see also Rutstein*, 211 F.3d at 1234 ("Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action.").

The Forced Labor Class brings claims under 18 U.S.C. §§ 1589(a) and 1595(a), which authorizes civil recovery for a "victim" against "[w]hoever knowingly … obtains the labor or services of a person … (1) by means of force, threats of force, physical restraint, or threats of

physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." *See also* 18 U.S.C. § 1589(b) (authorizing recovery against "[w]hoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a)").

The Unjust Enrichment Class brings an unjust enrichment claim. Under Georgia law, "[a] claim for unjust enrichment exists where a plaintiff asserts that the defendant induced or encouraged the plaintiff to provide something of value to the defendant; that the plaintiff provided a benefit to the defendant with the expectation that the defendant would be responsible for the cost thereof; and that the defendant knew of the benefit being bestowed upon it by the plaintiff and either affirmatively chose to accept the benefit or failed to reject it." *Campbell v. Ailion*, 790 S.E.2d 68, 73 (Ga. App. 2016). "The concept of unjust enrichment in law is premised upon the principle that a party cannot induce, accept, or encourage another to furnish or render something of value to such party and avoid payment for the value received." *Morris v. Britt*, 620 S.E.2d 422, 424 (Ga. App. 2005) (citation omitted).

Plaintiffs recite seven questions that they contend are common to the Forced Labor Class. (Dkt. 213-1 at 34.) But they are really just iterations of the same question: whether "CoreCivic obtains and has obtained" or "attempted to obtain" "detained persons' labor at SDC" "via" or "through" any of the means prohibited under the statute. That question does nothing to advance a TVPA claim on a classwide basis. Even if CoreCivic coerced labor from one or two detainees,

it says nothing about whether CoreCivic coerced every putative class member to provide labor. Moreover, simply asking "[w]hether CoreCivic has knowingly benefitted, financially or otherwise, from participating in a venture, or attempting to participate in a venture, that CoreCivic knew or should have known forced detained people to work" (*id.* at 34) is "not sufficient" under *Wal-Mart*, 564 U.S. at 349–50.[23]

To determine whether a putative class member was the "victim" of a TVPA violation will require the finder of fact to ask and answer a multitude of fact-specific, individualized questions, none of which are susceptible to classwide proof.

**1.** Was the detainee: deprived of a basic necessity, threatened with a deprivation of a basic necessity; threatened with segregation if he refused to work or placed in segregation for refusing to work; threatened with a housing transfer if he refused to work or transferred for refusing to work; threatened with criminal prosecution; or threatened with sabotaging his immigration proceeding? **2.** Did the detainee believe that, if he refused to work, he would be sent to segregation, transferred, or criminally prosecuted, or that his immigration proceeding would be impacted? **3.** Did the detainee believe that, if he refused to work, it would impact his classification or immigration proceeding, or that his uniform color could impact his immigration proceeding? **4.** Did the threat or discipline violate the PBNDS? **5.** Did CoreCivic knowingly or intentionally deprive the basic necessity or threaten the detainee? **6.** Did the deprivation or threat constitute "serious harm"? **7.** Did the threat constitute "physical restraint"? **8.** Did the threat constitute an "abuse of law or legal process"? **9.** Did the detainee participate in the VWP because of the deprivation or threat?

---

[23] Plaintiffs' three questions that they contend are common to the Unjust Enrichment Class (Dkt. 213-1 at 34) are flawed for the same reasons.

A detainee is not the "victim" of forced labor and, therefore, has no TVPA or unjust enrichment claim, if: he was not deprived of a necessity or threatened in any way (or if he was threatened but did not believe the threat to be real), or if he did not believe that refusing to work could impact his classification or immigration proceeding; if any deprivation or threat complied with the PBNDS and ICE's disciplinary code; if CoreCivic did not *knowingly* or *intentionally* deprive or threaten the detainee for refusing to work; if the deprivation or threat did not amount to "serious harm" or "abuse of law or legal process," as those terms are defined by the TVPA, *see* 18 U.S.C. § 1589(c), or constitute "physical restraint; or if the detainee participated in the VWP, not because of any deprivation or threat, but because he wanted to, for example, break up his day, earn extra money, socialize, or do a good deed.[24]

These questions cannot be answered "yes" or "no" in one stroke as to every one of the putative class members. Rather, they must be asked of each class member to determine whether they have a viable TVPA and unjust enrichment claim. As discussed above, Plaintiffs' classwide "proof" is nothing more than scant, temporally isolated anecdotal evidence. The individualized inquiries surrounding each allegation—e.g., taste preferences, appetites, self-care routines, social tolerances, circumstances, motivations, and mens rea—necessarily destroy commonality. *See Smith v. Warden, Hardee Corr. Inst.*, 597 F. App'x 1027, 1030 (11th Cir. 2015) (holding that "uncommon issues predominated over the class-wide issues of whether the prison was heated adequately and whether all inmates were supplied adequate clothing"). The permutations of the varying circumstances and evolving conditions are endless, and no two detainees' circumstances are the same.

---

[24] Plaintiffs' "scheme" and "venture" theories turn on these underlying questions as well.

Plaintiffs argue that some of these inquires are objective inquiries, not subjective ones, that remove individual scrutiny.  But for that proposition, they rely on the definition of "serious harm," which merely defines the *degree* of harm that must be employed by the conduct to constitute "serious" harm.  *See* 18 U.S.C. § 1589(c)(2).  As many courts have acknowledged, a TVPA claim includes both an objective *and* subjective inquiry.  *See Prunty v. Arnold & Itkin LLP*, 753 F. App'x 731, 737 (11th Cir. 2018) (forced labor claim failed "because the complaint does not allege that Mr. Morgan subjected Mr. Prunty to any type of compulsory service at all"); *Arreguin v. Sanchez*, 398 F. Supp. 3d 1314, 1325 (S.D. Ga. 2019) ("In assessing a claim of forced labor under the TVPRA, the vulnerabilities and characteristics of the specific victim become extremely important because one individual could be impervious to some types of coercion that cause another to acquiesce in providing forced labor.") (citation and internal quotations omitted); *see also Dinsay v. RN Staff Inc.*, 2022 WL 581033, at *5 (S.D. Ind. Feb. 25, 2022); *Prunty v. Itkin*, 2018 WL 691647, at *5 (M.D. Fla. Feb. 2, 2018); *Menocal v. GEO Grp., Inc.*, 320 F.R.D. 258, 266–67 (D. Colo. 2017); *Dlamini v. Babb*, 2014 WL 5761118, at *6 (N.D. Ga. Nov. 5, 2014); *David v. Signal Int'l, LLC*, 2012 WL 10759668, at *21 (E.D. La. Jan. 4, 2012); *United States v. Peterson*, 627 F. Supp. 2d 1359, 1371 (M.D. Ga. 2008).

The subjective inquiry derives from the statute's causation element—"by means of."  *See Roman v. Tyco Simplex Grinnell*, 732 F. App'x 813, 817 (11th Cir. 2018) (TVPA claim failed because plaintiff "did not explain how Tyco's threats led to his forced labor" and therefore did not establish "by means of" element).  "[T]he phrase 'by means of' refers to familiar principles of causation and requires a proximate causal link between one or more of the unlawful means enumerated in § 1589(a) and the labor actually obtained."  *Martinez-Rodriguez v. Giles*, 31 F.4th 1139, 1155 (9th Cir. 2022).  In other words, the coercion must have "caused the Plaintiff to

provide the labor that [the defendant] obtained." *Id.* at 1150.  Thus, if a person performed labor, not *because of* a threat of serious harm but because he chose to do so freely and voluntarily, there is no cause to impose criminal liability.  *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1179–80 (9th Cir. 2012).  This is an inherently subjective inquiry that requires delving into each class member's state of mind.  (Dkt. 246-1, ¶¶ 40, 57–60.)

Employing a purely objective standard effectively writes out the causation element of § 1589(a) and would impose criminal liability for obtaining labor from someone who did not feel compelled to do so as long as a "reasonable person" would have felt so compelled.  And a person or entity could be sued under the same circumstances by someone who was not a "victim" of any crime.  These conclusions are contrary to the plain language and purpose of the statute and standing, causation, and actus reus principles.[25]  *See Cordoba*, 942 F.3d at 1273 (certification requires a showing of causation and injury, that each class member suffered an injury traceable to the defendant's misconduct).  Nonetheless, even the definition of "serious harm" requires consideration of "all the surrounding circumstances," including the victim's "background" and "circumstances."  18 U.S.C. § 1589(c)(2).  In this case, the circumstances surrounding each allegation undoubtedly vary, and whether a deprivation, threat, or combination amounts to "serious harm" (or "physical restraint" or an "abuse of law or legal process") turns on unique idiosyncrasies and case-specific facts.  (Ex. 53 at 10–11, 14.)

---

[25] Plaintiffs' interpretation also ignores the fact that the term "serious harm" is included only in §§ 1589(a)(2) and (4). The objective definition has no application to §§ 1589(a)(1) or (3), but those Subsections still require that the labor was obtained "by means of" physical restraint or abuse of law or legal process.

In addition to predominating liability questions, computing damages "will be so complex, fact-specific, and difficult" that any common questions do not survive.[26] *Brown*, 817 F.3d at 1240.   Each class member will have to "jump through a series of hoops to establish an individualized entitlement to damages."   *AA Suncoast*, 938 F.3d at 1175.   That exercise is compounded by the consideration of "any benefits [CoreCivic] provided to [the detainee] beyond basic necessities that it provided to other detainees who did not participate in the [VWP]."   (Dkt. 126 at 5 n.1.)   As explained in CoreCivic's accompanying Motion to Exclude Steven Schwartz's Classwide Damages Model (Dkt. 248), there is no reliable classwide methodology by which to compute each class member's alleged damages.   *See Roberts v. The Scott Fetzer Co.*, 2010 WL 3937312, at *11 (M.D. Ga. Sept. 30, 2010) (predominance lacking where plaintiffs' counsel failed to prove damages through common proof "using any traditional measure of damages, but instead they have constructed a theory, using experts and reliance on antitrust law, to try to fit the proverbial square peg in the round hole"); *see generally Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1179 (11th Cir. 2010) ("It was a clear error of judgment to brush [issues of ratification and waiver] aside as mere 'damages' issues.").

Finally, and at a minimum, because equitable claims require a court to "examine the particular circumstances of an individual case and assure itself that, without a remedy, inequity would result or persist," the Eleventh Circuit has found "unjust enrichment claims inappropriate

---

[26] In the Eleventh Circuit, individual damages determinations can defeat certification, either under the predominance or superiority prong. *AA Suncoast*, 938 F.3d at 1174–75; *Brown*, 817 F.3d at 1240; *Bussey*, 562 F. App'x at 790–91; *Wallace v. NCL (Bahamas) Ltd.*, 733 F.3d 1093, 1096 n.1 (11th Cir. 2013); *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1305 (11th Cir. 2012); *Rutstein*, 211 F.3d at 1240 (11th Cir. 2000); *see generally Murray v. Auslander*, 244 F.3d 807, 812 (11th Cir. 2001) (recognizing that assessing emotional damages "compels an inquiry into each class member's individual circumstance").

for class action treatment." *See Vega*, 564 F.3d at 1274 ("In short, common questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts."); *accord Webber*, 439 F. App'x at 851.

### G.   Certification Is Not a Superior Method.

Rule 23(b)(3) also requires Plaintiffs to establish that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Relevant considerations include "the extent and nature of any litigation concerning the controversy already begun by or against class members" and "the likely difficulties in managing the class." Fed. R. Civ. P. 23(b)(3)(A)–(D). The predominating individualized liability and damages issues defeating commonality, and the fact that Plaintiffs are raising multiple theories of liability, over an extended period of time, and implicating various versions of the PBNDS "pose[] serious challenges to the efficiency and manageability of" this case. *Vega*, 564 F.3d at 1278–79.

There are also significant administrative feasibility problems. *See Cherry*, 986 F.3d at 1304 (administrative feasibility is a factor in "the manageability criterion of Rule 23(b)(3)(D)"). Administrative feasibility refers to the method—and corresponding difficulty—for ascertaining the identity of class members. *Karhu v. Vital Pharms., Inc.*, 621 F. App'x 945, 947 (11th Cir. 2015). Here, determining whether a detainee is a member of a properly defined class will require a threshold determination that he was forced or coerced into participating in the VWP. As discussed above, that determination can only be made after asking a progression of individual questions to each and every class member. It is not efficient to do so. *See Cordoba*, 942 F.3d at 1275 (recognizing that "if it will be extraordinarily difficult to identify" class members then "these individualized determinations might overwhelm issues common to the class"). The Court

will also have to determine—and exclude—those class members who are also members of the certified class in the *Owino* litigation.  (*See* Dkt. 50 at 9–12.)

Relatedly, Plaintiffs have a standing problem. *See Cordoba*, 942 F.3d at 1273 ("[U]nnamed class members' standing poses a powerful problem under Rule 23(b)(3)'s predominance factor.").  To certify a damages class, Plaintiffs must establish that every putative member has standing. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021) ("Every class member must have Article III standing in order to recover individual damages."); *Drazen v. Pinto*, 41 F.4th 1354 (11th Cir. 2022) (a "class definition must be limited to those individuals who have Article III standing").  That is because federal courts "do not adjudicate hypothetical or abstract disputes … possess a roving commission to publicly opine on every legal question … exercise general legal oversight of the Legislative and Executive Branches, or of private entities .... [or] issue advisory opinions." *Id*. at 2203.  Certifying a class that includes unharmed members violates not only Article III but "infringes on the Executive Branch's Article II authority." *Id*. at 2207.  Furthermore, "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *Id*. at 2208.

 "[A]t some time in the course of the litigation the [Court] will have to determine whether each of the absent class members has standing before they could be granted any relief." *Cordoba*, 942 F.3d at 1273.  That will be no easy task here, but instead will involve asking and answering a litany of questions of each class member.  Doing so in a class action will not be an efficient method of adjudicating their claims.

### H.     The Classes Cannot Be Certified Under Rule 23(b)(2).

Certification of claims for prospective relief are appropriate under Rule 23(b)(2), *AA Suncoast*, 938 F.3d at 1174, but Plaintiffs must first establish that CoreCivic "acted or refused to

act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Class certification under Rule 23(b)(2) is inappropriate if members of the putative class have no claim to injunctive or declaratory relief, *Wal-Mart*, 564 U.S. at 365, or must prove individual entitlement to such relief, *Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1344–45 (11th Cir. 2006). Here, each class member must prove their individual TVPA claim; if they don't or can't, they will be afforded prospective relief that they are not entitled to.

Furthermore, "[i]n a class action, the claim of the named plaintiff, who seeks to represent the class, must be live both at the time he brings suit *and* when the district court determines whether to certify the putative class." *Tucker v. Phyfer*, 819 F.2d 1030, 1033 (11th Cir. 1987) (emphasis added).  "If the plaintiff's claim is not live, the court lacks a justiciable controversy and must dismiss the claim as moot." *Tucker*, 819 F.2d at 1033; *see also O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.").  Here, all the Named Plaintiffs have been released from SDC.  Therefore, they have no claim for injunctive relief, *Spears v. Thigpen*, 846 F.2d 1327, 1328 (11th Cir.1988), and cannot pursue prospective relief on behalf of the Classes. Furthermore, because the Court has not yet certified any Class, the Classes have not "acquired a legal status separate from the interest asserted by" Plaintiffs.  *Sosna v. Iowa*, 419 U.S. 393, 399 (1975).  The deadline to amend has also expired.

## III.   Conclusion.

For these reasons, the Court should deny Plaintiffs' Motion for Class Certification.

Dated:  August 17, 2022

Respectfully submitted,

s/ Nicholas D. Acedo
Daniel P. Struck *(pro hac vice)*
  Lead Counsel
Rachel Love *(pro hac vice)*
Nicholas D. Acedo *(pro hac vice)*
Ashlee B. Hesman *(pro hac vice)*
Jacob B. Lee *(pro hac vice)*
Eden G. Cohen *(pro hac vice)*
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Phone: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
ecohen@strucklove.com

Jacob D. Massee (GA Bar No. 551890)
David Bobo Mullens (GA Bar No. 258029)
OLIVER MANER LLP
PO Box 10186
Savannah, Georgia 31412
Phone: (912) 236-3311
Fax: (912) 236-8725
jmassee@olivermaner.com
dbmullens@olivermaner.com

Attorneys for Defendant CoreCivic, Inc.