IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| WILHEN HILL BARRIENTOS, *et al.*, * | |
| Plaintiffs, * | |
| vs. * | CASE NO. 4:18-CV-70 (CDL) |
| CORECIVIC, INC., * | |
| Defendant. * | |

O R D E R

The Court has spent too much time considering the pending motion for class certification, partly because it has been vacillating on whether the claims in this case are appropriate for class resolution. Vacillation typically means that the party with the burden of carrying the issue has failed to do so. And that is the case here. The Court finds that Plaintiffs have failed to carry their burden of establishing that this case should be certified for class action purposes. Their motion (ECF Nos. 213 & 238) is therefore denied.

DISCUSSION

A class action may only be certified if the party seeking class certification satisfies, "through evidentiary proof," all the requirements specified in Federal Rule of Civil Procedure 23(a) plus at least one of the requirements set forth in Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *accord* Fed. R.

Civ. P. 23. Plaintiffs must also "demonstrate that the class is 'adequately defined and clearly ascertainable.'" *Sellers v. Rushmore Loan Mgmt. Servs., LLC*, 941 F.3d 1031, 1039 (11th Cir. 2019) (quoting *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012)). Plaintiffs have the burden to prove that the class certification requirements are met. *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016). With these standards in mind, the Court analyzes Plaintiffs' motion for class certification, starting with some factual background.

I.  **Factual Background**[1]

United States Immigration and Customs Enforcement ("ICE") detains certain aliens while their removal proceedings are pending "or for other reasons related to enforcement of the nation's immigration laws." *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1272 (11th Cir. 2020). Stewart County, Georgia detains aliens on ICE's behalf at Stewart Detention Center ("Stewart"), which is operated by CoreCivic, Inc.

Plaintiffs claim that CoreCivic enlists detainees in a "voluntary work program" to provide cheap labor for operating Stewart, which enables CoreCivic to increase its profits. Plaintiffs further assert that CoreCivic uses coercive tactics to

---

[1] The Court spent considerable time studying the parties' briefing, which contains extensive factual details. The Court also carefully considered the voluminous exhibits that the parties submitted. In this Order, the Court has attempted to distill the facts to include only those that are truly material.

2

force the detainees to keep working, including (1) a "deprivation scheme" which threatens work program participants with serious harm if they refuse to work and (2) a practice of physically restraining work program participants who refuse to work. The Court will describe the voluntary work program, the "deprivation scheme," and the work program discipline policies.

CoreCivic must provide Stewart detainees an opportunity to participate in a voluntary work program. Pls.' Mot. Class Certification Ex. 13, 2016 ICE Detention Standards § 5.8(V)(A), ECF No. 213-17 ("2016 ICE Standards"). Stewart work program participants serve as kitchen workers, laundry workers, barbers, commissary workers, and in various other jobs. Pls.' Mot. Class Certification Ex. 35, Stewart Detention Center Work/Program Plan Guidelines at CCBVA0000118621, ECF No. 213-39. The three named Plaintiffs——Wilhen Hill Barrientos, Keysler Ramon Urbina Rojas, and Gonzalo Bermudez Gutierrez—served as kitchen workers. Most detainees at Stewart do *not* participate in the work program. In 2021, there were approximately 326 job openings for detainee workers at Stewart, which has a design capacity of about 1,700 detainees. *Id.* Between December 2008 and December 2020, approximately 32,000 detainees—nearly twenty percent of the total population during that period—participated in the program. Washburn Decl. ¶ 37, ECF No. 250-4.

3

In keeping with ICE's rules, Stewart work program participants are paid at least $1 per day. Their earnings are deposited into their trust accounts. Detainees may save the money, spend it in the commissary, or send it to friends or family. The Stewart commissary offers phone cards, soft drinks, snacks, condiments, limited groceries like tuna and ramen, personal care items like shampoo and toothpaste, limited clothing like t-shirts and underwear, and other items. *See, e.g.,* Pls.' Mot. Class Certification Ex. 89, 2015 Inventory Sales Report, ECF No. 213-93. To purchase items, a detainee must have money in his detainee trust fund. Detainees may receive funds from outside sources or may earn money in the work program.[2]

Plaintiffs contend that the food, clothing, and hygiene items Stewart provides to its detainees are so inadequate that detainees would suffer serious harm if they could not earn funds through the work program and purchase necessities from the commissary. Plaintiffs also allege that detainee workers are assigned to safer housing than non-workers. Under these circumstances, Plaintiffs argue that some detainees are coerced to join the work program and then become trapped in it. Plaintiffs pointed to evidence of

---

[2] Two of the named Plaintiffs received significant funds from outside sources in addition to their work program earnings. Washburn Decl. ¶ 121 (stating that Hill Barrientos received $675 from outside sources and $1,313 in work program earnings); *id.* ¶ 129 (stating that Urbina Rojas received $1,580 from outside sources and $1,072 in work program earnings).

4

common practices at Stewart which would permit a factfinder to conclude that the food at Stewart was inadequate in both nutritional value and amount. They also submitted evidence of Stewart's practices regarding the provision of clothing and hygiene items, laundering of clothes, and housing assignments, though this evidence does not strongly support an inference that detainees were exposed to serious harm based on these practices.

Plaintiffs assert that after detainees join the work program, they are coerced to remain in the program because they are subject to physical restraint if they refuse to work. Work program participants are "expected to be ready to report for work at the required time and may not leave an assignment without permission." 2016 ICE Standards § 5.8(V)(M). They "may not evade attendance and performance standards [or] encourage others to do so." *Id.* Detainees may be removed from the work program because of unexcused absences. Pls.' Mot. Class Certification Ex. 36, Stewart Detainee Voluntary Work Program Policy § 19-100.4(H)(3), ECF No. 213-40; Trinity Servs. Grp. 30(b)(6) Dep. 419:3-5, ECF No. 233-1. Detainees who are removed from the work program can no longer earn money to purchase items at Stewart's commissary.

Refusal to work may result in discipline in addition to removal from the work program, including "lockdown" or "segregation," for refusing to work. *See* Pls.' Mot. Class Certification Ex. 38, SDC Detainee Handbook 35, ECF No. 213-42

5

(permitting lockdown for even the lowest category of offenses, like "malingering"); *id.* at 33-34 (allowing disciplinary segregation for offenses like "encouraging others to participate in a work stoppage or to refuse to work" and "refusing to obey the order of a staff member or officer"); *see also* Pollock Dep. 148:23-149:8, ECF No. 229 (assistant warden stating that when a single detainee stopped working, that was a "work stoppage" that could warrant discipline); Peterson Dep. 235:24-236:25, ECF No. 232 (explaining that a detainee saying "no work tomorrow" would not be a "work stoppage" if the detainee just said it "to himself" but might be a "work stoppage depending on the detainee and "who's around"). Both lockdown and segregation are forms of physical restraint. *See* Hill Barrientos Decl. ¶ 33, ECF No. 213-64 (explaining that detainees in lockdown are restricted to their beds and must receive permission to use the bathroom); Pls.' Mot. Class Certification Ex. 119, Special Mgmt. Resident Policy § 10-100.4(F), ECF No. 213-123 (describing segregation as restrictive housing where detainees have very limited time outside their cells).[3]

---

[3] Stewart policies also permit CoreCivic to initiate criminal proceedings against work program participants for offenses like encouraging a work stoppage. Plaintiffs did not, however, clearly point to any evidence that CoreCivic had a practice of initiating or threatening to initiate legal proceedings for work stoppages. Plaintiffs also argue that detainees who refuse to work might be reclassified as a higher security risk—with a corresponding change in uniform color that would give an immigration judge a visual cue about CoreCivic's evaluation of the detainee's security risk. But Plaintiffs did not point to any evidence

6

The named Plaintiffs joined the work program to get extra food, and they remained in the program to keep getting extra food and to avoid discipline. Urbina Rojas Decl. ¶¶ 17-19, 44, ECF No. 213-79; Bermudez Gutierrez Decl. ¶¶ 20, 37, ECF No. 213-57; Hill Barrientos Decl. ¶¶ 12, 31.

**II. Analysis**

Plaintiffs seek to certify two classes pursuant to Rule 23(b)(2) and Rule 23(b)(3): a Forced Labor Class and an Unjust Enrichment Class. Both classes include all civil immigration detainees who participated in Stewart's "volunteer work program." The Forced Labor Class's claims are under the Trafficking Victims Protection Act ("TVPA",) 18 U.S.C. § 1589 *et seq.*, and the Unjust Enrichment Class's claims are under Georgia unjust enrichment law. All the claims are based on Plaintiffs' assertion that the work program is not voluntary—that CoreCivic coerces detainees to perform labor at Stewart by using or threatening serious harm and physical restraint if work program participants refuse to work. CoreCivic, on the other hand, contends that Plaintiffs cannot establish causation on a class-wide basis, which would defeat ascertainability, numerosity, commonality, and typicality.

---

that any Stewart detainee was ever reclassified to a higher security risk category (or threatened with reclassification) based on refusal to work. For these reasons, Plaintiffs did not establish that detainees were subjected to a common practice under which they were threatened with criminal legal action or harm to their immigration proceedings if they refused to work in the work program.

7

Notwithstanding the complexity of the briefing, the issue is relatively simple. Are the claims of the putative class members sufficiently common and typical such that litigating them together as a certified class is appropriate under Federal Rule of Civil Procedure 23? When all the rhetoric and hyperbole is peeled away, the essence of Plaintiffs' claims is that CoreCivic created an environment which had the effect of coercing putative class members to participate in the work program, and then, upon signing up for the program, the putative class members were trapped in the program and unable to escape it. While policies and practices may have existed that applied to every putative class member who chose to participate in the program, Plaintiffs fail to recognize that not every putative class member is similarly situated with other class members.

Before certifying a class, the Court must consider "how the class will prove causation" and whether the elements of the plaintiffs' claims "will be subject to class-wide proof." *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1273 (11th Cir. 2019) (quoting *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1358) (11th Cir. 2009)). If Plaintiffs cannot prove causation using class-wide evidence, then that creates problems with ascertainability, typicality, numerosity, and superiority (because it is not possible to tell which putative class members suffered an injury and thus have standing absent an individualized inquiry) and

8

predominance (because individualized questions of causation predominate over common issues).

Plaintiffs have not established that the critical issue of causation is susceptible to class-wide proof under the circumstances presented here. There is no dispute that the TVPA's forced labor provision requires a plaintiff to prove causation—that the defendant knowingly procured labor "by means of" physical restraint, serious harm, threats of physical restraint or serious harm, or a scheme intended to threaten serious harm or physical restraint. 18 U.S.C. § 1589(a). Plaintiffs' unjust enrichment claims are based on their contention that all work program participants were *coerced* to participate. So, at its core, this action is about whether the worker detainees decided to participate and remain in the work program *because* CoreCivic would subject them to some type of harm if they did not work. Plaintiffs contend that class-wide evidence should be sufficient to prove that CoreCivic knowingly established a scheme intended to coerce detainees to participate in the work program, so class-wide evidence can also prove that CoreCivic obtained the labor of all detainee work program participants "by means of" that scheme. The Court is not convinced.

Plaintiffs simply did not point to sufficient evidence from which the Court could reasonably conclude that every putative class member agreed to participate in the Stewart work program because

9

he was coerced to do so—or that this issue is capable of class-wide resolution. While each putative member may have been subjected do the same conditions of confinement, the Court cannot find based on the current record that all putative class members perceived the conditions of confinement the same way or that those conditions were the motivating factor for the putative class member's decision to join the work program. The record in fact indicates that 80% of the detainees chose not to participate in the work program even though they were presumably subjected to the same conditions as those who chose to participate in the program. And two out of the three named Plaintiffs had sufficient personal funds in their detainee trust accounts to purchase food at the commissary, which belies counsel's contention that they were coerced to join the work program because it was their only means for purchasing food or other essential items from the commissary. Accordingly, the Court cannot conclude that every reasonable detainee would have felt coerced to participate in the program. Some may have felt that way and some may not have perceived the conditions as coercive. Those who found the conditions coercive may have an individual claim, and those who did not may not have such a claim. That determination requires an individualized assessment of each detainee's situation, with individual issues predominating over common ones.

The claim that detainees were trapped in the work program once they signed up for it suffers from the same commonality, typicality, and predominance problems.  There are several reasons why some putative class members may have wished to remain in the program voluntarily—including earning funds to buy non-essential items from the commissary and earning funds to save for use upon release from the detention facility.  The Court cannot find based on the current record that no reasonable detainee would have remained in the program voluntarily or even that most reasonable detainees continued to participate in the program because they felt they had no choice given the conditions of confinement and the potential discipline for refusal to work.  Evaluating these issues requires an individualized assessment of each detainee's situation.  The Plaintiffs failed to carry their burden on these issues.[4]

This case is different than a conditions of confinement case in which the challenged conditions of confinement apply in the same manner to each detainee and where causation can be inferred from common class-wide evidence, with no individualized evidence

---

[4] Plaintiffs point out that it is a violation of the TVPA to *attempt* to procure labor by means of serious harm, physical restraint, or threats of serious harm and physical restraint, so even if a detainee was not subjectively coerced to provide labor, CoreCivic still *attempted* to obtain his labor by coercive means.  18 U.S.C. § 1594(a).  But 18 U.S.C. § 1595(a) only provides a civil remedy for an "individual who is a victim of a violation" of the TVPA.  18 U.S.C. § 1595(a).  Plaintiffs did not point to any authority that a person who is impervious to attempted coercion is nonetheless a "victim" within the meaning of § 1595(a).

that could otherwise explain the class members' conduct.  In *Menocal v. GEO Group, Inc.*, for example, the Tenth Circuit found that the detainees were subjected to a uniform policy under which detainees were threatened with physical restraint or serious harm if they refused to perform mandatory unpaid cleaning assignments. 882 F.3d 905, 916-17 (10th Cir. 2018).  The Tenth Circuit further concluded that because the class members received notice of the sanitation policy's terms (including possible sanctions for refusing to clean) and performed work when they were assigned to do so, a clear inference was that the sanitation policy *caused* the detainees to work.  *Id.* at 919-920.  Significantly, the defendant in *Menocal* did not point to any evidence to rebut the common inference of causation.  *Id.* at 921; *see also Owino v. CoreCivic, Inc.*, 60 F.4th 437, 446 (9th Cir. 2022) (considering sanitation policy similar to the one in *Menocal* and finding no abuse of discretion where the district court concluded "that a factfinder could reasonably draw a class-wide causation inference" from the uniform policy).  In contrast, here, Plaintiffs did not demonstrate that the work program policies are uniformly coercive, such that no reasonable detainee would join or remain in the Stewart work program voluntarily, absent the potential for serious harm or physical restraint.[5]  Thus, this is not a case like *Menocal* or

---

[5] To rescue their motion for class certification, Plaintiffs may argue that they are willing to assume the burden of proving at trial that the

12

*Owino* where there is no other reasonable explanation for the labor other than coercion. For these reasons, the claims asserted in this action are best suited for individual and not class treatment. The Court denies the motion for class certification.

### THE OTHER PENDING MOTIONS

**I.  Plaintiffs' Motion for Spoliation Sanctions**

In addition to their class certification motion, Plaintiffs filed a motion for spoliation sanctions because a CoreCivic employee destroyed the detention files of Urbina Rojas and an unknown number of other putative class members, even though CoreCivic understood that it had an obligation to preserve such documents. As a sanction, Plaintiffs seek an adverse inference jury instruction requiring the jury to presume that Urbina Rojas's testimony about his experience at Stewart is uncontroverted, plus attorneys' fees associated with the sanctions motion.

Spoliation is "the destruction or failure to preserve evidence that is necessary to contemplated or pending litigation." *Bath v. Int'l Paper Co.*, 807 S.E.2d 64, 68 (Ga. Ct. App. 2017) (quoting *Baxley v. Hakiel Indus., Inc.*, 647 S.E.2d 29, 30 (Ga. 2007)). In this circuit, "federal law governs the imposition of

---

conditions of confinement and the conditions of continued participation are so coercive that no reasonable detainee could resist the coercion. But Plaintiffs did not rebut the evidence that through the years approximately 80% of the detainees have chosen not to participate in the program. This evidence contradicts the assertion that no reasonable detainee could resist the coercion caused by conditions of confinement at Stewart.

13

spoliation sanctions," although Georgia law provides guidance that the Court may consider. *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005). Spoliation sanctions "are intended to prevent unfair prejudice to litigants and to insure the integrity of the discovery process." *Id.* The Court has "broad discretion" to impose sanctions for spoliation of evidence. *Id.* The most severe sanctions, like adverse inference instructions to the jury, "are reserved for exceptional cases, generally only those in which the party lost or destroyed material evidence intentionally in bad faith and thereby prejudiced the opposing party in an uncurable way." *Cooper Tire & Rubber Co. v. Koch*, 812 S.E.2d 256, 261 (Ga. 2018) (internal quotation marks omitted) (quoting *Phillips v. Harmon*, 774 S.E.2d 596, 606 (Ga. 2015)).

In determining whether a sanction is warranted for spoliation, the Court may consider whether Plaintiffs were prejudiced because of the destruction of the detention files, whether the prejudice can be cured, the practical importance of the evidence, whether CoreCivic acted in bad faith, and the potential for abuse if sanctions are not granted. *Flury*, 427 F.3d at 945. Here, CoreCivic admits that its employee deleted Urbina Rojas's detention file (and others) despite a litigation hold. The record suggests that CoreCivic did not take adequate measures to ensure that all relevant document custodians were aware of the litigation hold and its requirements. Plaintiffs contend that

14

Urbina Rojas's detention file is central to his claim that he was coerced to work in the Stewart work program because it should contain evidence to corroborate his testimony that he was placed in segregation when he refused to do work outside of his regular duties. CoreCivic's discipline log does not include this segregation placement. If the discipline record were the only evidence of Urbina Rojas's segregation placement, Plaintiffs might have a good argument for some type of spoliation sanction. But Urbina Rojas presented testimony that he was placed in segregation for refusing to complete certain tasks. It is difficult to see how CoreCivic's failure to preserve the detention file will result in uncurable prejudice to Urbina Rojas, which suggests that the practical importance of the evidence is low. So, even if CoreCivic did wrongfully fail to preserve the detention file, the Court is not convinced that the sanctions Urbina Rojas seeks are warranted at this time. The Court thus declines to impose spoliation sanctions based on the destruction of Urbina Rojas's detention file. The Court notes that if CoreCivic tries to suggest that Urbina Rojas was not placed in segregation by pointing to the discipline log, then the Court would likely permit the factfinder to consider the fact that CoreCivic destroyed the detention file, which would have contained documentation regarding any segregation placement.

Plaintiffs also did not establish how they were prejudiced by CoreCivic's failure to preserve the other detention files. There is no contention that Plaintiffs would be able to establish the class certification requirements if they had access to the files. Plaintiffs' chief concern is that CoreCivic's motion to exclude one of their experts rested in part on his failure to consider enough detainee grievances and disciplinary reports. But, as discussed below, the motions to exclude the experts are moot, and the Court declines to impose spoliation sanctions based on the failure to preserve the other detention files.

**II. The Parties' Motions to Exclude Experts**

The parties also filed motions to strike the proposed testimony of three experts under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 590 U.S. 579 (1993).

First, CoreCivic seeks to strike Plaintiffs' psychiatrist expert, Dr. Pablo Stewart. The Court reviewed the portions of Dr. Stewart's report that Plaintiffs rely on in their motion for class certification. In those portions of his report, Dr. Stewart opines that Stewart's food practices might coerce some detained individuals to work, that segregation can cause psychological harm, and that the transfer from worker housing to non-worker housing could potentially result in harm. The Court finds that even if it were to admit Dr. Stewart's opinions over CoreCivic's objections, his opinions do not demonstrate that causation can be

16

established on a class-wide basis using common evidence or that common issues predominate over individual ones. The Court terminates the motion to exclude Dr. Stewart (ECF Nos. 247 & 253)

Second, CoreCivic moves to strike Plaintiffs' economist expert, Steven Schwartz. Plaintiffs rely on Dr. Schwartz to establish a class-wide damages model. Because the Court concludes that the issue of causation cannot be determined on a class-wide basis, the Court finds that it need not consider whether Dr. Schwartz class-wide damages model reliably measures the damages suffered by the putative class members. The Court terminates the motion to exclude Dr. Schwartz (ECF Nos. 248 & 254).

Finally, Plaintiffs move to strike CoreCivic's psychiatric expert, Dr. Joseph Penn. The Court did not consider Dr. Penn's opinion in ruling on the motion for class certification, so the Court terminates the motion to exclude Dr. Penn (ECF Nos. 215 & 239) as moot.

## CONCLUSION

For the reasons set forth above, the Court finds that Plaintiffs did not meet their burden to prove that the class certification requirements are met for the two classes they seek to certify. Accordingly, the Court denies Plaintiffs' motion for class certification (ECF Nos. 213 & 238). The Court also denies Plaintiffs' motion for spoliation sanctions (ECF Nos. 263 & 265). The motions to exclude experts (ECF Nos. 215, 239, 247, 248, 253,

254) are terminated as moot. Given the Court's ruling on class certification, the only claims remaining in this action are the individual claims of the named Plaintiffs.

IT IS SO ORDERED, this 28th day of March, 2023.

s/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA
