IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| **WILHEN HILL BARRIENTOS, et al.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**CORECIVIC, INC.,**<br><br>**Defendant.** | **Civil Action No. 4:18-cv-00070-CDL** |

### PLAINTIFFS' MOTION TO UNSEAL RESTRICTED DOCUMENTS

A large number of documents have been filed in this case with restricted access in support of various motions filed by the parties. Plaintiffs respectfully move for the unsealing, with certain narrow redactions, of these documents. This Motion covers two groups of restricted documents. First, the parties and third-party documents producers have agreed that the vast majority of restricted documents ("the Undisputed Documents") may be unsealed with narrow, agreed-upon redactions. Second, a small subset of documents ("the Disputed Documents") contain two categories of information—select financial and purportedly security-related information—over which Plaintiffs and CoreCivic disagree. Because CoreCivic has not demonstrated good cause to shield this information from the public, Plaintiffs move to unseal the Disputed Documents.

### ARGUMENT

**I.    LEGAL STANDARD**

It is well-established that there is a general right to inspect and copy public records and documents, including judicial records and documents. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S.

1

589, 597 (1978); *Newman v. Graddick*, 696 F.2d 796 (11th Cir. 1983) (extending *Nixon*, a case about the common law right of access to records in criminal cases, to civil cases). The common law right of access creates "a general presumption that criminal and civil actions should be conducted publicly." *FTC v. AbbVie Prods. LLC*, 713 F.3d 54, 62 (11th Cir. 2013). This presumption applies to "judicial records"—i.e., any material filed in connection with any substantive pretrial motion. *Callahan v. United Network for Organ Sharing*, 17 F.4th 1356, 1361-62 (11th Cir. 2021).

The presumption in favor of public access can only be overcome by a showing of good cause, which requires "balancing the asserted right of access against the other party's interest in keeping the information confidential." *Romero v. Drummond Co.*, 480 F.3d 1234, 1246 (11th Cir. 2007); *Chi. Trib. Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1312 (11th Cir. 2001). In other words, under the public's presumptive right to open records, the Court must determine "whether there is good cause to deny the public the right to access[.]" *FTC*, 713 F.3d at 62. Relevant factors to consider include "[1] whether allowing access would impair court functions or harm legitimate privacy interests, [2] the degree of and likelihood of injury if made public, [3] the reliability of the information, [4] whether there will be an opportunity to respond to the information, [5] whether the information concerns public officials or public concerns, and [6] the availability of a less onerous alternative sealing the documents." *Callahan*, 17 F.4th at 1363 (quoting *Romero*, 480 F.3d at 1246). The Court "must keep in mind the rights of a third party—the public, if the public is to appreciate fully the often-significant events at issue in public litigation and the workings of the legal system." *Wilson v. Am. Motors Corp.*, 759 F.2d 1568 (11th Cir. 1985) (citing *Newman*, 696 F.2d at 803). The common-law right of access to judicial proceedings is instrumental in securing the integrity of the process. *Chi. Trib.*, 263 F.3d at 1310.

To seal court records, a party must—for each document it seeks to seal—provide *specific* facts demonstrating *specific* harm that will result if the document is not kept secret. *See Chi. Trib.*, 263 F.3d at 1315 (requiring factual findings as to the nature and character of the specific information in question to justify a decision to unseal or not). Court records may not be sealed on the basis of hypothesis or conjecture, and conclusory assertions of harm are not enough. *Romero*, 480 F.3d at 1248 (finding it was an abuse of discretion to seal documents based on reasons that were "conclusory and speculative"). Simply showing that the information would "harm a party's reputation" is not sufficient to overcome the strong common law presumption in favor of public access. *Smith v. Lockheed-Martin Corp.*, No. 1:06-CV-1774-BBM-ECS, 2008 WL 11338279, at *1 (N.D. Ga. Aug. 26, 2008) (quoting *Wilson*, 759 F.2d at 1571).

## II.   THE RESTRICTED DOCUMENTS SHOULD BE UNSEALED

### A. The Undisputed Documents Should Be Unsealed

Many documents that were designated "Confidential" in discovery in this matter have been filed with restricted access in relation to Plaintiffs' Motion for Class Certification, *see* Docs. 213, 250, 264 and attachments, the parties' motions to exclude expert testimony, Docs. 215, 246, 247, 248, 268 and attachments, and Plaintiffs' Motion for Spoliation Sanctions, Docs. 263, 272 and attachments; *see also* Docs. 214, 249 (the parties' certificates of need to file discovery documents in support of these motions); Docs. 216, 217, 218, 219, 220, 221, 222, 223, 224, 225, 228, 229, 230, 231, 232, 233, 251 and attachments (documents filed pursuant to these certificates). The parties filed the documents with restricted access pursuant to two protective orders entered by the Court early in the discovery process in this case, Docs. 67, 137, and subsequent Court orders granting motions to file with restricted access invoking the Protective Orders, Docs. 208, 209, 243,

261.[1] *See Chi. Trib.*, 263 F.3d at 1307-08 (noting that it has become commonplace in federal courts for the parties to stipulate to a protective order at the beginning of litigation, which "replaces the need to litigate the claim to protection document by document, and postpones the necessary showing of 'good cause' required for entry of a protective order until the confidential designation is challenged"). Because they were filed in support of dispositive motions, these documents are now judicial records and are subject to a presumption of public access. *Callahan*, 17 F.4th at 1361-62.

Plaintiffs have conferred with the entities that produced the restricted documents—CoreCivic and several third parties—and have reached agreement regarding unsealing of most of the documents. Plaintiffs and the document producers have agreed upon narrow redactions to protect against the disclosure of genuinely security-sensitive information, information that ICE asserts is subject to one or more governmental privileges, personally identifying information of certain third parties whose identity is irrelevant to this action and of non-party detained individuals, personal contact information of CoreCivic and third-party employees, and genuine trade secrets.[2] *See* Decl. of Rebecca M. Cassler ¶¶ 3, 6-7, 9-10, 14, 17-23. Given that no party or third party seeks to shield these documents from the public, there is no good cause to do so. Therefore, the Undisputed Documents should be unsealed.

### B. There Is No Good Cause to Seal the Disputed Documents

Only a few areas of dispute remain, regarding two categories of information found in a handful of Disputed Documents: (1) select financial information which CoreCivic asserts

---

[1] The parties filed public versions of the restricted motions and related briefing shortly after filing the restricted versions, but those public versions simply contain placeholders for documents that had been designated confidential, rather than the tailored redactions of genuinely confidential information proposed in this Motion.

[2] Cassler Decl. ¶ 3 (listing the Disputed and Undisputed Documents). Plaintiffs will file the Undisputed Documents with the agreed-upon redactions after the granting of this Motion.

4

constitutes trade secrets, and (2) certain photos and staffing numbers that CoreCivic claims would pose a security threat if made public. Under the common law right of access, the public is entitled to access the Disputed Documents because CoreCivic has not established good cause to keep them sealed.

### A. Financial Information

The parties have a narrow set of disputes about financial information consisting of (1) the commission rate CoreCivic received from Securus (listed in Doc. 213-33); (2) the unit and total prices in a set of supplier invoices (Doc. 221-29); and (3) SDC-specific annual expenses, revenue, and net income (Doc. 250-4 ¶¶ 52, 54) and select lines in a SDC-specific quarterly expense-revenue spreadsheet (Docs. 213-22, 221-10) related to revenues, commissary expenditures, inmate welfare and recreational expenditures, expenditures on basic necessities, expenditures on "Inmate Wages," total expenses, and net income.

To demonstrate good cause to redact information on the basis of asserted trade secrets, courts engage in a two-part inquiry. First, the party seeking to retain the seal must demonstrate that the information in question genuinely meets the definition of a trade secret. To do so, a party must show that it "[1] consistently treated the information as closely guarded secrets, [2] that the information represents substantial value to [the party], [3] that it would be valuable to [the party's] competitors, and [4] that it derives its value by virtue of the effort of its creation and lack of dissemination." *Chi. Trib.*, 263 F.3d at 1313-14. Second, if the court determines that the documents in question do in fact contain trade secrets, it must balance the producing party's interest in keeping the information confidential against the interests weighing in favor of disclosure. *Id.* at 1314-15. Here, the information CoreCivic seeks to seal does not constitute trade secrets, and even if it does, the public's interest in disclosure outweighs CoreCivic's interest in secrecy.

First, with regard to the Securus commission rate, *see* Doc. 213-33 at 1, CoreCivic asserts that it is contractually bound to object to the public disclosure of this figure. Even though the other party to the contract in question—Securus—does not object to this information being unsealed. Cassler Decl. ¶ 19. This information is also not confidential; Plaintiffs independently obtained it from ICE in a non-confidential document. *See* Ex. 1. Therefore, the same information in Doc. 213-33 should be unsealed.

Second, with regard to prices in supplier invoices, *see* Doc. 221-29, CoreCivic has not explained why this information should be redacted. In a conferral on March 29, 2023, CoreCivic asserted that this document should be redacted because there is a security risk posed by the public knowing the identity of CoreCivic's vendors at Stewart Detention Center ("SDC"). However, as Plaintiffs' counsel pointed out at the time, CoreCivic's proposed redactions to the document did not redact the vendor name but instead included redaction of financial figures. In the same conferral, CoreCivic's counsel asserted that the figures should be redacted based on a general belief that any financial information should be sealed. Plaintiffs asked CoreCivic to provide a more specific explanation of why there was good cause to seal this information. CoreCivic stated in the conferral that it would send new proposed redactions. Cassler Decl. ¶ 14(c). CoreCivic later stated in an email that it would provide its response to Plaintiffs' outstanding requests the week of April 3. *Id.* ¶¶ 12-13. CoreCivic never sent new proposed redactions, nor did it provide an explanation of its basis for sealing this information.[3] *Id.* ¶ 14(c). CoreCivic has not satisfied its burden of demonstrating that this information should be redacted. *Callahan*, 17 F.4th at 1364.

---

[3] To the extent CoreCivic raises a new position in its opposition to this Motion as to this or any other document, Plaintiffs reserve the right to respond in their Reply.

6

Third, CoreCivic seeks to redact SDC-specific expenses, revenue, and net income information from a declaration it filed (Doc. 250-4 ¶¶ 52, 54) and all data from its Stewart County Quarterly Statements, Q1 2009 through Q2 2021 (Docs. 213-12, 221-10). Plaintiffs agree to accept most of the redactions to the Quarterly Statements but assert that select lines from that spreadsheet, *see* Cassler Decl. ¶ 12 (listing the disputed lines of data), and the information in Doc. 250-4 ¶¶ 52, 54, should not be redacted for lack of good cause, as follows:

*1. Revenues*:[4] CoreCivic's revenues at SDC consist of three principal revenue streams: payments from the federal government, commissary sales, and phone commissions. CoreCivic's federal revenues cannot constitute a trade secret because documentation of payments ICE made to CoreCivic for the operation of SDC is available from Stewart County and ICE through public records requests. *See, e.g.*, Exs. 2, 3 (documents obtained from Stewart County through a public records request documenting CoreCivic's billing to ICE); IGSA Contract – Stewart County GA, https://www.documentcloud.org/documents/1681329-stewart-county-ga-igsa-contract (last visited April 20, 2023) (documents obtained through FOIA containing various task order documents pursuant to the SDC inter-governmental service agreement (IGSA) documenting allocation of funds). As for commissary sales data, CoreCivic already agreed that comprehensive, detailed commissary sales data may be made public in full. Cassler Decl. ¶ 8. Commissary sales data is not a trade secret for the additional reason that under CoreCivic's own written policy, net proceeds from the commissary must be spent on "inmate/resident welfare expenditures." Ex. 4 at 4. Commissary sales data thus do not relate to CoreCivic's profits or competitive advantage. As for phone commission revenues, CoreCivic stopped receiving them when its contract with Securus

---

[4] This covers lines in the spreadsheet for Federal Revenues; Commissary Sales (Regular, Special, Phone, and Vending); Phone Commissions; and Total Revenues.

ended in approximately 2017, when Talton became the phone service provider for calls by detained individuals at SDC. Ex. 1 (showing Securus contract expired in mid-2017); Ex. 5 at 2, 4 (showing Talton became the phone service provider on June 1, 2017). And as noted above, the Securus commission rate is already public. *Supra* at 6; Ex. 1. Old data showing a revenue stream that ended more than five years ago could not give CoreCivic's competitors a strategic advantage.

2. *Commissary, inmate welfare, and recreational expenditures*:[5] Just as commissary sales data is not a trade secret, CoreCivic's commissary and inmate welfare expenses, paid for through commissary proceeds, *see* Ex. 4, are unrelated to CoreCivic's profits or competitive advantage.

3. *Expenditures on basic necessities*:[6] CoreCivic's overall expenditures by broad category of basic necessities do not reveal information that could be used to give CoreCivic's competitors an advantage. CoreCivic's contract at SDC was not the result of a competitive bidding process to begin with—ICE signed an IGSA with Stewart County. IGSAs are not competitively awarded. Now that SDC is in operation, it is unclear how CoreCivic's expenditures on basic necessities (which ICE requires it to provide) at this specific facility could be used by a competitor to gain a competitive advantage, given that there is no competitive process in place under which, for example, CoreCivic would need to compete against other bidders in order to retain the SDC contract.[7]

---

[5] This covers lines in the spreadsheet for: Commissary Inventory Gain/; Commissary Damaged Merch; Inmate Welfare (Cable, Recr, Movies, Faith Based, Games, Ed Exp, and Other); Commissary Salaries; Commissary Inmate Labor; Commissary Supplies; Commissary Sales Tax; Commissary Welfare Pay; Commissary; Inmate Welfare Expense; and Recreational Supplies.

[6] This covers lines in the spreadsheet for: Food- Inmate Meals; Food Service Supplies; Resident Clothing; Personal Care Supplies; and Laundry Supplies.

[7] Most ICE detention facilities, including SDC, are contracted through IGSAs, which are exempt from the statutory provisions governing most government contracts that require that a contract be competitively awarded. U.S. GAO, "Immigration Detention: Actions Needed to Improve

8

*4. Inmate wages*: This information is not a trade secret. CoreCivic has itself publicly filed information related to detained worker pay in this case, including rates of pay and number of positions available. Doc. 255-16 at 5. CoreCivic has also agreed to unseal documents filed on the docket that include additional detail regarding detained worker pay, such as Deposit Batch Reports documenting pay to detained workers. Cassler Decl. ¶ 8.

*5. Total expenses and net income*: In light of the fact that CoreCivic does not compete against other bidders with regard to the SDC contract, CoreCivic's total expenses and net income from operating SDC are not trade secrets.

Furthermore, even if any of the data in dispute could be considered a trade secret, the public interest in disclosure outweighs CoreCivic's interest in maintaining redactions. CoreCivic is a public company operating SDC on behalf of the federal government and based on a contract to which Stewart County is also a party.[8] The public has a strong interest in understanding the conditions in such a facility and the extent to which CoreCivic is profiting from low-paid detained labor, in harsh conditions, to carry out ICE detention. The information is accurate—it was provided by CoreCivic itself—and there is no element of undue surprise. In addition, the data that Plaintiffs seek to unseal is highly relevant to this case: as for the revenue, expense, and income data in the declaration (Doc. 250-4 ¶¶ 52, 54), CoreCivic itself opted to include this data in a declaration drafted for this case. CoreCivic's commissary costs and revenues, and its expenditures for the purpose of the welfare of detained individuals are also highly relevant, given the case's focus on deprivation of basic necessities and commissary. The relevance of pay to detained workers is self-

---

Planning, Documentation, and Oversight of Detention Facility Contracts," GAO-21-149, at 2, 11, 18 & n.19, 19-20 (PDF pagination) (2021) https://www.gao.gov/assets/720/711798.pdf.
[8] When CoreCivic is in "discussions with ICE regarding developing a facility specific plan for [SDC] to address implementation of . . . operational changes," CoreCivic "speak[s] on behalf of the County." Ex. 3 at 15.

evident. And CoreCivic's revenues and net income both demonstrate the degree to which CoreCivic profits from the forced labor scheme Plaintiffs allege.

### B. Purportedly Security-Related Information

CoreCivic has asserted two categories of information that should be redacted from public documents due to purported security concerns: photographs of the segregation cells at SDC found in the report of one of Plaintiffs' experts (Docs. 213-18, 224-9, 251-1, 247-1) and information regarding CoreCivic's staffing numbers. Both categories of information should be unsealed.

As to the photos of the segregation cells, CoreCivic has provided Plaintiffs with no explanation of the reason why such images might create a security risk. Cassler Decl. ¶ 14(d). Nor do these images contain confidential information: they are the prototypical segregation cells, containing a bed, sink, and no windows. People placed in segregation at SDC see the cells every day. The images do not depict or reveal any information about the layout of SDC. The DHS Office of Inspector General and the U.S. Government Accountability Office recently published nearly identical segregation cell photos from other immigration detention centers, demonstrating that the U.S. government does not believe that the publication of such images poses a security risk.[9] The images are reliable—CoreCivic personnel took them during Plaintiffs' site inspection—and they relate to a matter of public concern, namely, the conditions in a civil detention facility housing people on behalf of the federal government. In addition, the nature of segregation at SDC, which the images depict, is highly relevant to Plaintiffs' allegations that threats and use of segregation forced them to work. Thus, there is no good cause to redact these images.

---

[9] DHS OIG, "ICE Needs to Improve Its Oversight of Segregation Use in Detention Facilities," at 2, OIG-22-01 (2022), https://www.oig.dhs.gov/sites/default/files/assets/2021-10/OIG-22-01-Oct21.pdf; U.S. GAO, "Immigration Detention: Actions Needed to Collect Consistent Information for Segregated Housing Oversight," GAO-23-105366 (2022), https://www.gao.gov/products/gao-23-105366.

With regard to staffing information, CoreCivic has not articulated a specific reason why this information creates a security risk. The documents in question consist of two old staffing plans and one current staffing plan attached to modifications to the IGSA.[10] These staffing plans list the number of positions by shift for each job title as well as facility-wide staff ratios if there were 1,600 beds filled. The staffing information in dispute also includes the staffing figures and ratios listed in a contract discrepancy report regarding understaffing in 2015 (Doc. 250-22 at 2-3); the total number of staff employed at SDC at the time of an ICE audit in 2019 (Doc. 225-15 at 7); and statements in an expert report showing the number of full-time equivalent positions (custody or civilian, and broken down by broad categories ) ICE required or requires SDC to fill based on the staffing plans mentioned above (Doc. 213-19 ¶ 26, figures in first sentence; figures in ¶ 112 Table 4; the staff figures in ¶ 118, and the staff figure below table 5 in ¶ 119).

The staffing plan information at issue is notable for what it does not include: current actual staffing numbers. The data does include years-old snapshots of actual total staffing numbers in 2015 (Doc. 250-22 at 2-3) and 2019 (Doc. 225-15 at 7). But the figures CoreCivic seeks to redact do not represent CoreCivic's actual staffing levels in place today. Moreover, ICE provided some information about past actual staffing levels at SDC which it has agreed to unseal. Cassler Decl. ¶¶ 21-22; *see, e.g.*, Doc. 213-19 ¶ 110 (information from ICE documents to be unsealed by agreement documenting CoreCivic's actual staffing levels in 2014 and 2015). This information is similar in character to the information CoreCivic wishes to redact. It also demonstrates that a plan is just a plan: CoreCivic's actual staffing levels do not necessarily match the numbers in a staffing

---

[10] *See* Doc. 250-20 at 84-87 (period of performance through August 2020, authorizing a plan for a temporary staffing increase for twelve months); Docs. 225-10, 213-7 at 27-33, and 250-20 at 95-101 (period of performance through August 2020); and Docs. 225-11 and 250-20 at 128-133 (period of performance through 2025).

11

plan. *See* Ex. 6 at 2-5 (contract discrepancy report documenting "critically low staffing" at SDC because more than 1/3 of security staff positions were unfilled at the time). CoreCivic's 30(b)(6) witness also testified, in testimony that is not confidential, that in December 2021 CoreCivic's budget—which set the number of positions available—was not based on the staffing plans attached to the IGSA at all. Ex. 7 at 59:4-15 (explaining that there are "two separate staffing patterns," the contracted staffing amount and the staffing pattern that is used operationally). He also testified to the number of FTE positions available at SDC under the budgeted staffing pattern in place (as opposed to the IGSA staffing pattern) and to the approximate number of those positions that were filled at the time, and that information is already public. *Id.* at 62:11-63:6; Doc. 238-19 ¶ 26.

With this in mind, it is not clear what security implications might arise from the staffing plans incorporated into the IGSA—which demonstrate a minimum contract requirement but not a reality on the ground. Additionally, not all of the information CoreCivic proposed redacting is confidential at all; Plaintiffs have also obtained other non-confidential sources that overlap with the staffing information in dispute. *See, e.g.*, Ex 6 at 3 (non-confidential contract discrepancy report containing most of the figures CoreCivic seeks to redact in Doc. 250-22).

Even claims that actual current staffing levels give rise to security concerns would be highly questionable (and no actual current staffing data is actually at issue) because this information is hardly confidential: "the [detained individuals] can see how many guards are present in different sensitive areas of the [facility]." *Braggs v. Dunn*, 382 F.Supp.3d 1267, 1275 (M.D. Ala. 2019). As one prison official recently explained: "It's not rocket science to see if you only have 60 officers assigned at [ a facility], and you've got four shifts, where those officers are located. Publishing this information just confirms that fact." *Id.* And because it is CoreCivic's burden to show good cause to redact this information, CoreCivic must explain with specificity

what security risk might be posed by the publication of theoretical staffing plans and years-old actual staffing levels. *See id.* at 1276 ("The mere *possibility* of prison violence is not sufficient to justify keeping judicial records confidential." (emphasis added)).

On the other hand, detention at SDC, paid for with tax-payer dollars and operated on behalf of ICE and Stewart County, *see supra* at 9 & n.8, is clearly a matter of public concern, and there is no concern present regarding accuracy of the information or unfair surprise. CoreCivic's pattern of understaffing, which the disputed staffing data helps to demonstrate, is also relevant to Plaintiffs' allegations that detained people's low-paid forced labor provides a benefit to CoreCivic by allowing SDC to continue to operate, and profit, while understaffed. In light of CoreCivic's nonexistent security concerns, there is no good cause to retain CoreCivic's proposed redactions of these staffing figures. As such, the information regarding CoreCivic's staffing numbers should be unsealed.

## CONCLUSION

The public has a right to access the information contained in both the Undisputed Documents and the Disputed Documents, with narrow agreed-upon redactions, and there is no good cause to redact the information in dispute in the Disputed Documents. . Accordingly, Plaintiffs respectfully request that the Court order that the Undisputed Documents and the Disputed Documents be unsealed.

Dated: April 21, 2023                    Respectfully Submitted:

s/Rebecca M. Cassler
Rebecca M. Cassler (GA Bar No. 487886)
**SOUTHERN POVERTY LAW CENTER**
1101 17th St. NW, Ste. 705
Washington, D.C. 20036
Telephone: 404-521-6700
Facsimile: 877-349-7039
rebecca.cassler@splcenter.org

Meredith B. Stewart*
**SOUTHERN POVERTY LAW CENTER**
201 Saint Charles Avenue, Suite 2000
New Orleans, LA 70170
Telephone: (504) 486-8982
Facsimile: (504) 486-8947
meredith.stewart@splcenter.org

Sharada Jambulapati (GA Bar No. 413477)
Cassandra Charles**
**SOUTHERN POVERTY LAW CENTER**
150 E. Ponce de Leon Avenue, Suite 340
Decatur, GA 30030
Tel.: (404) 521-6700
sharada.jambulapati@splcenter.org
cassandra.charles@splcenter.org

Azadeh Shahshahani (GA Bar No. 509008)
Priyanka Bhatt (GA Bar No. 307315)
**PROJECT SOUTH**
9 Gammon Avenue SE
Atlanta, GA 30315
Telephone: (404) 622-0602
Facsimile: (404) 622-4137
azadeh@projectsouth.org
priyanka@projectsouth.org

*Admitted *pro hac vice*
**Motion for admission *pro hac vice* forthcoming

***Attorneys for Plaintiffs***

Alan B. Howard*
Emily B. Cooper*
**PERKINS COIE LLP**
1155 Avenue of the Americas
22nd Floor
New York, NY 10036-2711
Telephone: (212) 262-6900
Facsimile: (212) 977-1649
AHoward@perkinscoie.com
ECooper@perkinscoie.com

Jessica L. Everett-Garcia*
John H. Gray*
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
Telephone: (602) 351-8000
Facsimile: (602) 648-7000
jeverettgarcia@perkinscoie.com
jhgray@perkinscoie.com

Jessica Tseng Hasen*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Telephone: (206) 359-3293
Facsimile: (206) 359-9000
jhasen@perkinscoie.com