IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| **WILHEN HILL BARRIENTOS, et al.,**<br><br>    Plaintiffs,<br><br>        v.<br><br>**CORECIVIC, INC.,**<br><br>    Defendant. | Civil Action No. 4:18-cv-00070-CDL |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO UNSEAL RESTRICTED DOCUMENTS**

Plaintiffs respectfully submit this Reply Brief in support of their Motion to Unseal Restricted Documents. CoreCivic has failed to establish good cause to redact certain facility-specific financial and staffing-related documents. CoreCivic relies on speculative and vague arguments to assert this information is a trade secret and a security concern, respectively, but simply categorizing this information as such without specifying the actual risk of disclosure does not automatically give that identity to the material. The Court should therefore grant Plaintiffs' Motion to Unseal Restricted Documents.

**I.    SDC's Financial Information Is Not a Trade Secret**

CoreCivic seeks to conceal a large category of financial information that is subject to the common law right of access on the theory that this information represents trade secrets.[1]

---

[1] "Because trade secret status is the only basis [CoreCivic] provides for nondisclosure [of the financial documents], should the [C]ourt conclude that [CoreCivic's] documents do not fall within this category, good cause does not support the protective order, and the documents may be unsealed." *Chicago Trib. Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1314 (11th Cir. 2001). And because the parties stipulated to a protective order, as was the case in *Chicago Tribune*, they "postpone[d] the necessary showing of 'good cause' required for entry of a protective order until" Plaintiffs challenged the confidentiality designation through filing of their motion to unseal. *Id.* at 1307. Thus, CoreCivic's reliance on the protective order in the production of documents does not itself constitute good cause to maintain their secrecy now that certain produced documents are judicial records. *See generally id.*

1

CoreCivic's arguments that any of the financial information in dispute is a trade secret because it could be used by a competitor fails to demonstrate an actual risk that this competition will likely occur. *See* Doc. 293 at 4-5.

To support its broad request, CoreCivic relies on a single affidavit from a CoreCivic executive to overcome the strong presumption in favor of access to these records. *See* Doc. 293-2 (Defendant's Ex. 2, Tipton Declaration). This self-serving testimony is not enough. "[A] party's calling a document confidential… 'does not make it so' when it comes to filing a document with the Court." *BASF Corp.v. SNF Holding Co.*, No, 4:17-CV-251, 2019 WL 3554699 (S.D. Ga. Aug. 5, 2019) (citing *In re Estate of Martin Luther King, Jr., Inc. v. CBS, Inc.*, 184 F. Supp. 2d 1353 (N.D. Ga. 2002)). CoreCivic argues in a very generalized manner that the release of the financial information in question *could*, *might* or *may* lead to the likelihood of injury from its competitors; however, CoreCivic never demonstrates that any of these possibilities are at all likely. The conclusions that CoreCivic arrives at are all speculative, and speculation does not meet the good cause standard. *Raher v. Fed. Bureau of Prisons*, 749 F. Supp. 2d 1148 (D. Or. 2010) ("Disclosure of the contractor's overall bid price from a past or existing contract would not provide an adequate basis to predict future bids without information showing how the contractor arrived at the overall price… Without evidence and explanation of the process by which the competitor could use specific information to gain such a competitive advantage, [] the alleged harm remains theoretical.").

**A. SDC's Total Revenues and Net Income and Total Operating Expenses and Total Expenses Should Be Unsealed**

SDC is publicly funded. The sound and lawful administration of its revenues and income are matters of public concern. *Braggs v. Dunn*, 382 F. Supp. 3d 1267 (M.D. Ala. 2019). "With public money comes a public concern about how that money is spent. Such a public interest

cannot be swatted away by calling it a desire for 'public spectacle,' or a form of 'private spite,' or any of the other labels that [CoreCivic] offers." *Kelly v. Wengler*, 979 F. Supp. 2d 1243, 1246 (D. Idaho 2013); *see also News-Press v. U.S. Dep't of Homeland Sec.*, 489 F.3d 1173, 1196 (11th Cir. 2007) ("[T]he public interest in determining whether [the defendant] has been a proper steward of billions of taxpayer dollars is undeniable and powerful.").

CoreCivic's arguments regarding Total Revenues, Net Income, Total Operating Expenses, Total Expense, in the quarterly spreadsheet (Docs. 213-12, 221-10) and Warden Washburn's Declaration (Doc. 250-4 ¶¶ 52, 54), hinge on the theory that (1) CoreCivic never publicizes facility-specific revenues and income, and (2) this data could be used by competitors to undercut CoreCivic's efforts in future competitive bidding processes and thus "hamper its ability to conduct business at SDC," in the event ICE were to "terminate, rebid, or decide not to renew" the SDC IGSA. Doc. 293 at 5; *see generally id.* at 4-9. Neither argument holds water.[2]

According to CoreCivic's Annual Reports, the notion that CoreCivic does not share facility-level revenues or income is a stretch at best. CoreCivic's Annual Reports include select facility-level financials, including in some instances when there is a risk the facility's contract could end.[3] These disclosures are not much different than here, where CoreCivic argues that

---

[2] CoreCivic further argues that "[t]he quarterly spreadsheet *can also* be misinterpreted" [emphasis added], if unsealed. Doc. 293 at 8 n.3. Possible misinterpretation does not overcome the right of access. *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F. 2d 653 (3d Cir. 1991) (denying motion to stay unsealing material and holding that company's potential embarrassment and purported harm based on outdated affidavits, failed to outweigh the public's right to access the material filed in the case).

[3] *See, e.g.*, *2022 Annual Report on Form 10-K* , CoreCivic, https://ir.corecivic.com/static-files/2786ec23-1bb7-4e6e-a445-8692ac0f4a24 at 46, 80 (reporting annual revenues for South Texas Family Residential Center ("STFRC") for the last three years; reporting revenue and net facility operating loss of the Northwest New Mexico Correctional Center in 2021) (last visited June 22, 2023); *see, e.g.*, *2021 Annual Report on 10-K*, CoreCivic, https://ir.corecivic.com/static-

unsealing SDC's Total Revenues, Net Income, Total Operating Expenses, and Total Expenses would be harmful in the event ICE were to "terminate, rebid, or decide not to renew" the IGSA. Doc. 293 at 5. In fact, CoreCivic's reporting practices suggest that it often shares facility-specific revenue and/or net income figures in cases where there is an *actual* risk of termination, rebidding, or non-renewal.[4] CoreCivic also reports similar information after contracts are not renewed and it is actively formulating bids for new contracts.[5] CoreCivic also reports expected annualized revenue for new facilities.[6] The Court should not countenance CoreCivic's misrepresentation that this type of facility-level information is never made public.

In light of the fact that CoreCivic reports facility-specific financial figures when a contract is at risk and when it is actively searching for new contracts, its argument that unsealing such information could harm future bidding efforts is preposterous. And, given that CoreCivic agrees that federal revenue—the figure comprising the great bulk of overall revenue at SDC—may be unsealed, it is a mystery how unsealing any of the other miniscule components of its revenue or its total revenue could affect a bid. *See* Doc. 213-12 (showing federal revenue as the overriding component of total revenue for all years).[7]

---

files/d3f1752e-87b8-4256-99ed-f3803c5817f8 at 46 (reporting STFRC annual revenues for the last three years; 2021 net operating income for Cimarron Correctional Facility) (last visited June 22, 2023).

[4] *See* CoreCivic 2022 Annual Report, *supra* note 4, at 46 (reporting annual revenues at STFRC for the last three years to demonstrate the magnitude of the risk to CoreCivic's "cash flows, financial condition, and results of operations" were STFRC to close).

[5] *See, e.g.*, CoreCivic 2021 Annual Report, *supra* note 4, at 78 (explaining that CoreCivic was "actively marking" two facilities where contracts had ended in late 2021 and reporting the revenue and net operating income for each facility for 2020 and 2021).

[6] *See id.* at 78 (reporting the anticipated annualized revenue at a facility with a new ICE contract).

[7] Upon further consideration, Plaintiffs withdraw their motion to unseal the following Expenses lines of the quarterly spreadsheet, Doc. 213-12 and 221-10: Food-Inmate Meals; Food Service

### B. Commissary and Inmate Welfare Revenue and Expenses Are Not Confidential

CoreCivic claims that Plaintiffs "fail to show that [the commissary revenues and expenses] should be unsealed," Doc. 293 at 9, but "it is [Defendant's] burden to show that the material is sealable, not Plaintiffs' burden to prove that it is not." *In re Google Location History Litigation*, 514 F. Supp. 3d 1147 (N.D. Cal. 2021). CoreCivic fails to meet that burden.

CoreCivic claims that SDC's commissary and inmate welfare revenues and expenses, (select lines in Docs. 213-22, 221-10; Docs. 213-92 through 213-98) are trade secrets and that "as part of SDC's overall financial picture, the information could be used by a competitor to secure lower pricing for commissary supplies." CoreCivic's argument is meritless.[8] CoreCivic does not explain how this information could create a competitive advantage, given that, as CoreCivic asserts, to the extent commissary expenses and commissary revenue do not cancel each other out, the remainder is to be spent only on Inmate Welfare, and segregated in a separate fund that reverts to ICE if a contract ends. Doc. 293 at 8 n.3. Thus, per CoreCivic's own description of the commissary and inmate welfare expenses and revenues, this information would not have any competitive value to CoreCivic. CoreCivic further asserts that these made-up scenarios could "presumably be attractive to ICE in deciding what company to partner with." This presumption is not supported by any concrete example or authority; it is mere conjecture, and it should not be considered by this Court.

Moreover, much of this information is already public. The range of CoreCivic's

---

Supplies; Resident Clothing; Personal Care Supplies; Laundry Supplies; Recreational Supplies; and the unit price and total price in the vendor invoice, Doc. 221-29.

[8] CoreCivic receives taxpayer and government funds to run SDC; therefore, the disclosure of the conditions of detention and welfare of detained people are of great public interest. *Skinner v. Uphoff*, No. 02-CV-033-B, 2005 WL 4089333 at *3 (D. Wyo. Sept. 27, 2005) ("The public has a right, and even a responsibility…to monitor the activities and performances of their own government and use this information to implement change if needed.").

percentage markup of commissary items is already public. Doc. 238-92 at 3. The price of goods sold to detained individuals is also already public. Ex. 1, SDC Inventory Item Listing for Inmates/Detainees. Indeed, during the months of conferrals leading up to the filing of this Motion, CoreCivic consistently took the position that its commissary sales data, Doc. 213-92 through 213-98, could be unsealed. *See* Doc. 293 at 9; Doc. 293-1 at 3, 27, 28; Decl. of Rebecca M. Cassler ("Cassler Decl.") at ¶ 3. It is unclear what changed from then to now that has mysteriously qualified this information as trade secrets. Simply put, CoreCivic has not treated any of this information as a closely guarded secret. Suddenly treating this information as confidential is yet another smoke screen CoreCivic has erected.

### C. CoreCivic Cannot Argue for the Sealing of the Securus Commission Rates and Associated Revenues

As a threshold matter, CoreCivic did not produce the Securus redacted contract and rate sheet records (Docs. 213-31, 213-32, 225-13); therefore, it cannot prove that they are proprietary, as is necessary to support a finding that the records are trade secrets belonging to CoreCivic. *See Chicago Trib. Co.*, 263 F.3d at 1313-14 (requiring that, in order to establish trade secrets, a movant must show that it maintains secrecy over its own proprietary information). Only Securus – the producing party – could make that showing, and it has not done so.

Initially, Securus agreed to unseal these documents; however, it later changed its position, the same day CoreCivic filed its opposition to Plaintiffs' motion to unseal. Despite this pivot, which CoreCivic relies on, Securus chose not to oppose Plaintiffs' motion to unseal notwithstanding Plaintiffs' offer to extend the briefing schedule to allow Securus to do so.[9] *See*

---

[9] Securus's counsel's email explaining its new position does not demonstrate good cause to seal the Securus documents. The entirety of Securus's new "position" consists of this conclusory

Cassler Decl. at ¶ ¶ 7-8; Ex. 2, Email Exchange Between Plaintiffs and Securus. Securus has not only failed to consistently maintain that its records should be under seal, but its utter passivity in protecting these records from disclosure when faced with a motion to unseal far from establishes they contain trade secrets. Even if CoreCivic did have the necessary proprietary interest to assert the Securus records are trade secrets, it has failed to do so. CoreCivic asserts that unsealing the contract and rate sheet would be a breach of contract because the contract and rate sheet have "CONFIDENTIAL" tags. Doc. 293 at 10. The rate sheet is not part of the contract; the potential breach argument is irrelevant and misleading as to that document. Doc. 213-32. Moreover, the rate sheet is already public, as these rates were made known to all individuals detained in SDC. *See* Doc. 286-3. As for the actual contract, the speculative breach argument also lacks merit because the now-expired contract is almost entirely redacted except for the commission rates, which are already public. *Id.* The breach of contract theory appears to be a subterfuge for CoreCivic's attempt to conceal information that it finds embarrassing.[10]

CoreCivic also fails to establish that the additional document listing the Securus

---

statement: "I thought the two documents you raised to my attention at the beginning of April 2023 had been disclosed to the Georgia Public Service Commission along with the calling rates, but upon review they had not." *See* Ex. A. Securus never mentioned the Georgia Public Service Commission in its conferral with Plaintiffs, and Plaintiffs do not know why that Commission would be relevant to this matter. CoreCivic cannot rely on Securus's email to satisfy the elements of the Eleventh Circuit's trade secrets standard where Securus's email does not track that standard whatsoever.

[10] CoreCivic also argues that because the contract was produced as confidential in various pending legal proceedings, pursuant to the respective protective orders, it should remain sealed here. *See* Doc. 293 at 11. That is not the legal standard. The Court must determine whether good cause exists to keep a document sealed. *Comm'r, Alabama Dept. of Corr. v. Advance Loc. Media, LLC*, 918 F.3d 1161 (11th Cir. 2019). Filing documents as confidential *in other cases* does not meet that burden, and it goes without saying that Plaintiffs and the Court are not parties to protective orders in other cases. The Court should not consider this argument against unsealing.

7

commission rate (Doc. 213-33) and associated revenue (line in Docs. 213-22, 221-10) are trade secrets for the reasons stated in Plaintiffs' motion. Doc. 286 at 6-8.

### D. CoreCivic's Vendor Information is Already Public

CoreCivic argues that publication of the identities of its vendor, visible in Doc. 221-29, could lead to public pressure for this vendor to stop doing business with CoreCivic. *See* Doc. 293 at 12. This argument is baseless because CoreCivic's relationship with numerous vendors, including the vendor whose identity CoreCivic seeks to conceal, is already public knowledge.[11] Even if the vendor identities were not already public, CoreCivic's "desire to keep indiscreet communications out of the public eye … is not enough to satisfy [the court's] standard for good cause." *OJ Com., LLC v. Kidcraft, Inc.*, 34 F. 4th 1232 (11th Cir. 2022). "The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the courts to seal its records." *Kamakana v. City and Cnty. of Honolulu*, 447 F.3d 1172 (9th Cir. 2006) (citing *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122 (9th Cir. 2003)). For these reasons, the vendor names should be unsealed.

## II. The Staffing Plans Should Be Unsealed

CoreCivic claims the contract staffing plans,[12] if made public, will present a safety threat

---

[11] *See CCA Contract with Nashville*, Prison Legal News, https://www.prisonlegalnews.org/media/publications/CCA%20Contract%20w%20Nashville%2C%20TN%202015.pdf (Feb. 1, 2015) (page 42 of a Contract Purchase Agreement between CoreCivic and the Metropolitan Government of Nashville and Davidson County details a comprehensive list of all CoreCivic's subcontractors relevant to the agreement).

[12] The parties' dispute during conferrals did not pertain to the entire staffing plans incorporated into the IGSAs. CoreCivic only sought to redact staffing patterns regarding security staff – i.e., the "Security Operations" staff and any other "Detention Officer" positions. Cassler Decl. at ¶ 9; Doc. 293 at 17 (explaining that it is the security positions that CoreCivic sought to keep under seal). However, CoreCivic did not cite to any of these IGSA staffing plans in its Opposition, *see* Doc. 293 at 12-17.

to the employees and detained individuals at SDC because "[d]etention facilities are inherently dangerous environments." Doc. 293 at 15. Putting aside that this assertion is completely unsupported, and far from includes the requisite specificity to justify sealing, it is also belied by the fact that CoreCivic's state partners put contract staffing patterns for CoreCivic's *criminal* facilities online, or otherwise make them public.[13] Clearly, if CoreCivic allows staffing patterns for criminal facilities to be published, it cannot justify sealing staffing patterns for SDC, a *civil* detention facility. If the publication of these staffing patterns had led to genuine safety problems, presumably CoreCivic would have made light of those problems as a basis for sealing the similar staffing patterns here, but CoreCivic did not do so.

Additionally, contractual staffing minimums have much more general information than actual staffing data, which Plaintiffs are not requesting be made public, thereby refuting CoreCivic's assertion that publishing the staffing minimums presents a security threat. *See* Doc. 293 at 15. Indeed, to support its claim that the staffing plans should remain sealed, CoreCivic uses a bizarre, unsupported example of a missing clipboard with shift rosters that occurred at another facility several years ago. *Id.* Rather than focus on the recklessness of the staff member who left the clipboard unattended, CoreCivic haphazardly concludes that the missing shift

---

[13] *See e.g.*,
(https://cor.mt.gov/DataStatsContractsPoliciesProcedures/DataDocumentsandLinks/Contracts/CCA-Op-Mgmt-combined-thru-Amd-17.pdf, last visited on June 7, 2023) (pages 27-29,  55-57, 61-63, 124-127, 133-136, 148-150, 178-189, 237-239, 259-261, 322-325, and 331-33 of Contract Amendment for Operation Amendment and Management Services between Montana Department of Corrections and CoreCivic, Inc.);
(https://procure.ohio.gov/static/RevisedContract/CSP901412_RC.pdf, last visited June 7, 2023) (page 22 of Ohio Department of Administrative Services Mandatory Use Contract for Operation, Management and Purchase of Correctional Facilities);
(https://www.prisonlegalnews.org/media/publications/State%20of%20California%20-%20Corrections%20Corporation%20of%20America%20Contract%2C%202008.pdf, last accessed June 7, 2023) (pages 418-440 of State of California Standard Agreement between California Department of Corrections and Rehabilitation and CCA).

rosters, which were later found, were taken by detained individuals as a means to achieve some sinister master plan. CoreCivic does not confirm that the rosters were taken by detained people, nor does it confirm that any activities, such as "introducing contraband into the facility, assaulting staff or other detainees, etc." followed as a result of the missing rosters. *Id*. The example is misleading and distracting.

Finally, the staffing patterns Plaintiffs seek to unseal are not currently applicable at the facility. *See* Doc. 286 at 11. This fact nullifies the speculative safety issues that CoreCivic posits. However, Plaintiffs are amenable to narrow redactions consistent with *Braggs* and *Raher* to remove references to "the specific number of guards in a specific location at a specific time." *Braggs*, 382 F. Supp. 3d 1267; *Raher*, 749 F. Supp. 2d 1148. Likewise, to accomplish this end the Court could order redaction of (1) the "Post/Assignment," "1st Shift," "2nd Shift," "3rd Shift," "Days Covered," and "Relief Factor" columns within the "Security Operations" section, (2) the same columns for Detention Officers within the "Unit Management" section, and (3) the lines showing unit names and number of beds within the "Unit Management" section of the staffing plans. These specific redactions would ameliorate any hypothetical safety concerns while also upholding the public's right to access this information. The remaining documents containing disputed staffing information (Docs. 250-22 at 2-3; 225-15 at 7; 213-19 ¶¶ 26, 112, 118, 119) do not contain information about the number of security staff in specific locations at specific times and therefore CoreCivic's arguments about safety concerns are inapplicable; they should also be unsealed.

## CONCLUSION

For the reasons discussed herein and in Plaintiffs' Motion to Unseal, Plaintiffs respectfully request the Court order the Restricted Documents be unsealed.

| | |
|---|---|
| Dated: June 23, 2023 | Respectfully Submitted: |
| /s/ Meredith B. Stewart<br>Meredith B. Stewart*<br>SOUTHERN POVERTY LAW CENTER<br>201 Saint Charles Avenue, Suite 2000<br>New Orleans, LA 70170<br>Telephone: (504) 486-8982<br>Facsimile: (504) 486-8947<br>meredith.stewart@splcenter.org | Alan B. Howard*<br>Emily B. Cooper*<br>PERKINS COIE LLP<br>1155 Avenue of the Americas<br>22nd Floor<br>New York, NY 10036-2711<br>Telephone: (212) 262-6900<br>Facsimile: (212) 977-1649<br>AHoward@perkinscoie.com<br>ECooper@perkinscoie.com |
| Rebecca M. Cassler (GA Bar No. 487886)<br>SOUTHERN POVERTY LAW CENTER<br>1101 17th Street, NW, Ste, 705<br>Washington, DC 20036<br>Telephone: (404) 521-6700<br>Facsimile: (877) 349-7039<br>rebecca.cassler@splcenter.org | Jessica L. Everett-Garcia*<br>John H. Gray*<br>PERKINS COIE LLP<br>2901 N. Central Avenue, Suite 2000<br>Phoenix, AZ 85012-2788<br>Telephone: (602) 351-8000<br>Facsimile: (602) 648-7000<br>jeverettgarcia@perkinscoie.com<br>jhgray@perkinscoie.com |
| Sharada Jambulpati<br>SOUTHERN POVERTY LAW CENTER<br>150 East Ponce de Leon Avenue<br>Suite 340<br>Decatur, GA 30030<br>Telephone: (404) 521-6700<br>Facsimile: (877) 349-7039<br>sharada.jambulpati@splcenter.org | Jessica Tseng Hasen*<br>PERKINS COIE LLP<br>1201 Third Avenue, Suite 4900<br>Seattle, WA 98101<br>Telephone: (206) 359-3293<br>Facsimile: (206) 359-9000<br>jhasen@perkinscoie.com |
| Azadeh Shahshahani<br>(GA Bar No. 509008)<br>Priyanka Bhatt (GA Bar No. 307315)<br>PROJECT SOUTH<br>9 Gammon Avenue SE<br>Atlanta, GA 30315<br>Telephone: (404) 622-0602<br>Facsimile: (404) 622-4137<br>azadeh@projectsouth.org<br>priyanka@projectsouth.org | |

*Admitted pro hac vice

*Attorneys for Plaintiffs*