**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

| | |
|---|---|
| **WILHEN HILL BARRIENTOS, et al.,** | |
| **Plaintiffs,** | |
| v. | |
| **CORECIVIC, INC.,** | **Civil Action No. 4:18-cv-00070-CDL** |
| **Defendant.** | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56, Wilhen Hill Barrientos, Gonzalo Bermudez Gutiérrez, and Keysler Ramón Urbina Rojas ("Plaintiffs") respond to Defendant CoreCivic, Inc.'s ("CoreCivic") motion for partial summary judgment on Plaintiffs' claims for unjust enrichment and declaratory and injunctive relief. This Court should deny summary judgment on the unjust enrichment claim due to CoreCivic's flagrant misreading of Georgia common law and attempt to relitigate an issue this Court already rejected. Summary judgment is also inappropriate because of the genuine disputes of material fact about Plaintiffs' coerced labor in an immigration detention work program that unjustly enriched CoreCivic.[1]

---

[1] Since the three Plaintiffs are proceeding to trial on their individual Trafficking Victims Protection Act claims following the denial of class certification, Plaintiffs concede that their individual claims for declaratory or injunctive relief are moot because they are no longer in custody at Stewart Detention Center. *See Dunn v. Dunn,* 148 F. Supp. 3d 1329, 1337–38 (M.D. Ala. 2015). However, Plaintiffs do not waive (1) the right to injunctive or declaratory relief as proposed class representatives, (2) the rights of any putative class members to such relief, or (3) the right to appeal the denial of class certification post-judgment. *See U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 404 (1980) (holding that "an action brought on behalf of a class does not become moot upon expiration of the named plaintiff's substantive claim, even though class certification has been denied"); *Deposit Guar. Nat. Bank v. Roper*, 445 U.S. 326, 340 (1980) (similar).

## I.      STATEMENT OF FACTS

### A.  CoreCivic's Business Model at Stewart Detention Center Depends on Forced Labor Through the So-Called "Voluntary" Work Program.

Plaintiffs were detained in U.S. Immigration and Customs Enforcement ("ICE") custody at Stewart Detention Center ("SDC") at various periods between May 2015 and January 2020. ECF Nos. 213-64 ¶ 2 (Hill Barrientos Decl.); 213-79 ¶ 2 (Urbina Rojas Decl.); 213-57 ¶ 2 (Bermudez Gutiérrez Decl.). During that time, CoreCivic owned and operated SDC as an immigration detention center pursuant to an Inter-Governmental Service Agreement ("IGSA") between ICE and Stewart County, Georgia. ECF Nos. 221-3 (2006 IGSA); 221-1 (2006 SDC-CCA Agreement); 221-2 (2011 SDC-CCA Agreement Amendment). The IGSA required CoreCivic to comply with ICE's Performance-Based National Detention Standards ("PBNDS"). ECF Nos. 213-7 at 8 (Jun. 12, 2013 IGSA Modification); 213-7 at 25 (Feb. 13, 2017 IGSA Modification); 2011 PBNDS, https://www.ice.gov/detain/detention-management/2011; 2011 PBNDS-2016 Revisions, https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.  Initially under the IGSA, CoreCivic earned a fixed per diem rate for each person detained at SDC regardless of the amount CoreCivic spent to operate the facility. ECF Nos. 221-3 at 2 (2006 IGSA); 221 at 33:11-14 (B. Brazier Dep.). Starting in 2016, CoreCivic was paid a per diem rate per bed for a guaranteed minimum of 1,600 beds, filled or empty, at SDC, plus an additional per diem rate per bed filled beyond 1,600. ECF No. 221-4 (Feb. 4, 2016 IGSA Modification).

With a fixed revenue from ICE, CoreCivic had to decrease operating expenses at SDC to increase its profit. ECF Nos. 221 at 59:10-60:4 (B. Brazier Dep.); 225 at 108:20-109:18 (CoreCivic 30(b)(6) Dep.). CoreCivic looked to identify areas where it could reduce costs and improve net earnings. ECF Nos. 225 at 108:2-109:18 (CoreCivic 30(b)(6) Dep.), 221 at 59:10-19 (B. Brazier Dep.); CoreCivic 2015 Annual 10-K Report, at 21 https://ir.corecivic.com/static-files/60284e8d-

f98f-40d2-97c1-50d7f9d1afcb (describing an initiative to produce value to stockholders that included an effort "to focus on efforts to contain costs and improve operating efficiencies").

CoreCivic's largest operating expense at SDC was ████████████████████. ECF Nos. 231 at 75:21-76:10 (M. Swinton Dep.) (testifying about a 2018 facility budget report); 225 at 117:5-7 (CoreCivic 30(b)(6) Dep.). Hiring more employees increased SDC's operating expenses, making SDC overall less profitable for CoreCivic. ECF No. 232 at 87:11-23 (C. Peterson Dep.). By utilizing the labor of detained individuals in the so-called "Voluntary Work Program" ("WP"), CoreCivic substantially reduced operating expenses for labor and food-service related costs. *See* ECF Nos. 221 at 185:5-16 (B. Brazier Dep.) (testifying that not having detained workers in the SDC kitchen in May 2020 increased the food service-related costs); 225 at 114:23-117:7 (CoreCivic 30(b)(6) Dep.) (testifying that CoreCivic offered a Facility Bonus Plan, which tied employee bonuses to SDC's reduced expenditures, including labor costs, and increased profits); 213-60 ¶ 27 (S. Schwartz Expert Rep.) (explaining that the Facility Bonus Plan incentivizes completing more facility work through the WP instead of hiring outside employees).

For example, in 2018, CoreCivic's staffing plan for SDC, as incorporated into the IGSA, required only ████ full-time equivalent employee positions. ECF No. 225-10 at 4 (2018 IGSA). Meanwhile, CoreCivic aimed to fill between 326 to 336 WP positions, and the expectation of a set number of detained workers factored into CoreCivic's overall staffing plans for purposes of ensuring its contract with ICE was profitable.  *See, e.g.*, ECF Nos. 225 at 39:15-39:23 (CoreCivic 30(b)(6) Dep.); 216-4 at 4 (2016 SDC Work/Program Plan Guidelines); 218-8 (2018 SDC Work/Program Plan Guidelines); 213-19 at 29-30, Table 3 (D. Schriro Expert Rep.) (showing the number of WP workers was consistent between 2014 and 2020).

CoreCivic claimed to have paid detained persons in the WP at SDC between $1 and $4 per

day for numerous jobs, such as working in the kitchen, laundry, library, or custodial floor crew. ECF Nos. 216-4 at 4 (2016 SDC Work/Program Plan Guidelines); 218-8 (2018 SDC Work/Program Plan Guidelines); *but see* ECF Nos. 213-79 ¶ 28 (Plaintiff Urina Rojas testifying that he was not paid for every shift worked); 250-42 at 11-13 (Hill Barrientos SDC Account Summary, Oct. 3, 2017 to June 19, 2018) (including occasional payments of $5). CoreCivic often ignored the PBNDS directive that detained workers work no more than 8 hours per shift and 40 hours per week. ECF Nos. 230-2 (2016 PBNDS § 5.8); 223 at 69:21-70:2 (M. Moye Dep.) (testifying about kitchen workers who worked 48 hours per week); 213-64 ¶ 20 (Hill Barrientos testifying about working more than eight or twelve hours in a day). CoreCivic also had a practice of paying detained workers with phone cards. ECF Nos. 213-73 (Nov. 6, 2017 email requesting phone cards for Mr. Hill Barrientos and other detained workers as compensation for work); 220 at 121:7-121:16 (F. Hood Dep.) (testifying that detained workers were occasionally compensated with phone cards, extra meals, and commissary items). CoreCivic deposited WP payments directly into detained workers' accounts, which they used to make purchases at the SDC commissary. ECF No. 221 at 145:12-17 (B. Brazier Dep.).

Without the labor of detained workers who were paid mere dollars per day, CoreCivic would have had to utilize employees to perform the WP tasks in addition to the staff's regular responsibilities. *See, e.g.*, ECF Nos. 218-10 (CoreCivic Aug. 1, 2017 email: "Chief Hood is right, if we do not get [WP kitchen] workers then we will be feeding off ourselves" and "We've got to do something or we'll be feeding off all day"); 222 at 103:25-104:9 (T. Lane Dep.) (confirming that if detained kitchen workers did not work, SDC employees would have to perform the work for their normal pay and benefits); 218 at 48:10-20, 49:25-50:6 (D. Blackmon Dep.) (explaining employees "hired off the street" make much more than the detained workers). Otherwise, if the

tasks are not completed, CoreCivic could fall out of compliance with the PBNDS, which sets requirements for food service and sanitation, thereby jeopardizing its contract with ICE. *See, e.g.*, ECF Nos. 225 at 249:5-10 (CoreCivic 30(b)(6) Dep.) ("Q. And if CoreCivic fell below those cleanliness and sanitation standards that it's required to comply with per its contract, it could be found in violation of its contract, correct? A. That's correct, if it fell below the standard, yes."); 219 at 74:16-75:2 (H. Gray Dep.) (testifying that a shortage of detained workers could cause CoreCivic to violate the PBNDS requirement that meals be served no more than 14 hours apart); 229 at 58:8-13 (T. Pollock Dep.) ("Q. [] And when you say that ICE was aware that you had an issue, that issue was having sufficient [detained] workers to maintain the facility and maintain sanitation and get meals prepared and get meals served? A. Yes."); 216-10 (May 18, 2015 Email from SDC Food Service Director stating that the detained worker shortage is causing kitchen sanitation to decline, potentially leading to a failed audit); 223 at 39:7-18 (M. Moye Dep.) ("[T]he voluntary work program is fundamental to the operation of the facility" including "sanitation" and "security"); 219-3 (PBNDS 4.1 Food Service); PBNDS 1.2 Environmental Health and Safety, https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf, at 19 ("Facility cleanliness and sanitation shall be maintained at the highest level.").

To provide food service in the SDC kitchen, CoreCivic contracted with a third-party vendor, Trinity Services Group, Inc. ("Trinity") throughout the time of Plaintiffs' detentions at SDC. ECF No. 233-3 (Trinity CoreCivic 2010 and 2020 Food Service Agreement). Under the contract, CoreCivic paid Trinity a fixed cost per meal, which compensated Trinity for both food costs and labor, allowing Trinity to increase its profit margin if it found ways to reduce food and labor costs. *See* ECF No. 233 at 232:20-233:7, 244:6-21 (Trinity 30(b)(6) Dep.). This price per meal rate that Trinity charged CoreCivic did not incorporate the cost of non-supervisory kitchen

workers because the rate assumed that CoreCivic would provide the kitchen workers at no cost to Trinity. *Id.* at 243:21-245:16 21. Accordingly, Trinity employed only ten staff at SDC, who worked as agents of CoreCivic, to "supervise" the detained workers in food service. ECF Nos. 233-1 at 292:9-19, 295:8-10 (Trinity 30(b)(6) Dep.); 233 at 64:10-68:20 (Trinity 30(b)(6) Dep.). In turn, CoreCivic was contractually required to provide at least 75 detained workers to perform tasks such as "kitchen and cafeteria cleaning and sanitation, food preparation and production, and storeroom functions," and Trinity had the right to bill CoreCivic for additional labor costs incurred due to a detained worker shortage. ECF Nos. 225 at 245:10-17 (CoreCivic 30(b)(6) Dep.); 233-3 at 8, 11-12, 23 (Trinity CoreCivic 2010 and 2020 Food Service Agreement); 219-5 at 2 (Oct. 3, 2017 email emphasizing that the Food Service Agreement "between CorCivic [sic] and Trinity clearly states . . . *detainee workers to be supplied by CoreCivic*." (emphasis in original)). Thus, CoreCivic risked significant monetary loss if the requisite number of detained workers did not show up, but CoreCivic earned substantial profits without having to pay real wages and benefits when detained workers were made to show up.

Just as its profit-oriented business model suggests, the operation of SDC pursuant to the SDC IGSA generated ███████████ in profit per quarter for CoreCivic when Plaintiffs were detained there. *See* ECF Nos. 221-10 at 19-20, 24-25, 29-30 (showing EBITDA and net income available to shareholder for each quarter when Plaintiffs were detained); 231 at 83:19-24 (M. Swinton Dep.) (testifying that EBITDA is a measure of profitability).

**B. CoreCivic Coerced Plaintiffs into Joining and Working in the WP through Deprivation of Food and Basic Necessities, Threats of Discipline and Segregation, and Abuse of Legal Process Impacting Immigration Proceedings or Criminal Prosecution.**

CoreCivic coerced Plaintiffs to work by depriving Plaintiffs of basic necessities and threatening discipline, including segregation, and other adverse consequences if they did not

work.[2] CoreCivic, abdicating its contractual duty to provide individuals in its care with certain personal hygiene items, clothing, and food, *supra* Section I.A, routinely denied the Plaintiffs adequate access to these items. ECF No. 213-19 ¶¶ 135-136 (D. Schriro Expert Rep.). The food served at SDC was "nutritionally inadequate" due to the poor quality, poor nutritional value and insufficient portion sizes which led to detainees "experiencing physical and physiological harm, including hunger, gastrointestinal pain, and weight loss." ECF Nos. 213-99 ¶ 2, 16, 20 (L. Renda Expert Rep.); 219-3 (PBNDS 4.1 Food Service). Plaintiffs had no choice but to work in the WP to "purchas[e] food with [WP] wages in the commissary or receiv[e] extra food as a 'privilege' of working in the kitchen." *Id.* ¶ 24; *see also id.* ¶¶ 17, 21-23. Plaintiffs also worked to purchase personal hygiene items and clean clothes—items CoreCivic was obligated to provide under the PBNDS—to avoid the shame and embarrassment of being unclean and unkempt. ECF No. 213-18 ¶¶ 24, 27-60 (P. Stewart Expert Rep.). CoreCivic threatened and instituted discipline, including segregation, lockdowns, housing transfers, privilege losses, and criminal prosecution, to ensure Plaintiffs continued working. *See* ECF Nos. 213-19 ¶¶ 66, 67 (D. Schriro Expert Rep.) ("The absence of a process by which to quit the [WP] likely results in more detainees being disciplined for refusing to work"); 223 at 214:3-7 (M. Moye Dep.) (noting that "immediate segregation could be a consequence of a walkout" from work); 213-18 ¶¶ 24(a), 27-60 (P. Stewart Expert Rep.) (describing the conditions of SDC segregation and opining that they could cause a detained person

---

[2] The administration of work programs in prisons, jails, and immigration detention centers must be consistent with the U.S. Constitution, which prohibits slavery except "as punishment for crime whereof the party shall have been duly convicted." U.S. Const. amend. XIII, § 1. CoreCivic cannot compel people who are detained pretrial or pending an outcome in *civil* immigration proceedings to work. ECF No. 213-19 ¶ 57 (D. Schriro Expert Rep.). In their motion for partial summary judgment, CoreCivic has not challenged the sufficiency of Plaintiffs' evidence regarding its liability on the Trafficking Victims Protection Act ("TVPA") and unjust enrichment claims. Accordingly, such determinations should be reserved for the jury.

to experience "psychological injuries"); 229 at 144:23-145:10 (T. Pollock Dep.) (SDC Assistant Warden testifying that, per the SDC Handbook, CoreCivic could exercise discretion to refer matters to outside law enforcement). CoreCivic made Plaintiffs aware of these sanctions verbally and in writing in the SDC Handbook. ECF Nos. 213-79 ¶ 3; 213-57 ¶ 3-4; 213-64 ¶ 3; 218-2 (SDC Handbook rev. 2019); 220-23 (SDC Handbook rev. 2017); 233-14 (SDC Handbook rev. 2016).

Plaintiff Hill Barrientos worked in the WP from July 26, 2015 to May 9, 2016 and September 30, 2017 to June 14, 2018. ECF Nos. 250-40 (Hill Barrientos SDC Account Summary – 2015 to 2016); 250-42 (Hill Barrientos SDC Account Summary - 2017 to 2018). Upon arrival at SDC in July 2015, Mr. Hill Barrientos was forced into the WP as he was immediately "assigned to a housing unit for kitchen workers and told that if [he] did not work, [he] would be sent to segregation where [he] would not be allowed to interact with others or go to recreation." ECF Nos. 213-64 ¶ 7 (Hill Barrientos Decl.); 233-19 (July 21, 2015 email confirming Hill Barrientos was placed in a kitchen worker pod). Mr. Hill Barrientos worked because he "was hungry often" and had to purchase basic necessities at the commissary such as undergarments, soap, and phone cards. *Id.* ¶¶ 4-5, 12, 23; ECF Nos. 250-40; 250-42 (Hill Barrientos SDC Account Summaries). Officers "threatened to transfer [him] to segregation if [he] stopped working, called in sick, refused to change shifts as requested, or encouraged others to stop working." *Id.* ¶ 28; Ex. 2 ¶¶ 18-32 (P. Stewart Supp. Expert Rep.). Mr. Hill Barrientos feared that if he stopped working, he would be sent to segregation or transferred to the dangerous "open door housing unit" and his immigration case would be adversely affected. ECF No. 213-64 ¶¶ 13, 18, 26, 29.

Plaintiff Urbina Rojas worked in the WP from June 10, 2015 to June 15, 2016. ECF No. 250-47 (Urbina Rojas SDC Account Summary). He worked to stave off hunger "because CoreCivic would provide detained people who worked with extra food." ECF No. 213-79 ¶ 19, 12

(Urbina Rojas Decl.). He used his meager wages to purchase food and other basic necessities, such as phone cards, deodorant, and clothing, at the commissary. *Id.* ¶ 17; 250-47 (Urbina Rojas SDC Account Summary). Officers threatened and disciplined him with "segregation for refusing to perform a work task beyond [his] regular tasks." *Id.* ¶ 34; Ex. 2 ¶¶ 6-16 (P. Stewart Supp. Expert Rep.). CoreCivic and Trinity staff threatened adverse legal consequences for refusal to work, which Mr. Urbina Rojas understood to mean harm to his immigration case or initiation of criminal proceedings. ECF No. 213-79 ¶ 42. When workers in his housing unit refused to work, he was placed under an "oppressive" lockdown with restricted movement and no access to the phone, TV, or commissary. *Id.* ¶¶ 37-39. After his experience with segregation and lockdowns, he continued to work to avoid experiencing their harms again. *Id.* ¶¶ 35, 38.

Plaintiff Bermudez Gutiérrez worked in the WP from May 16, 2019 to January 8, 2020. ECF No. 250-45 (Bermudez Gutiérrez SDC Account Summary). He worked in the WP "first and foremost, to prevent hunger" and to earn "money to buy necessities like phone time, food, and personal hygiene items in the commissary." ECF No. 213-57 ¶¶ 7, 20 (Bermudez Gutiérrez Decl.). His work supervisors in the kitchen allowed him "to search among the leftovers" and gave him "extra food at the end of a shift, like an apple." *Id.* ¶ 33. He also worked out of fear of "being sent to segregation" which meant losing extra food access and contact with his family. *Id.* ¶ 9; Ex. 2 ¶¶ 33-42 (P. Stewart Supp. Expert Rep.). If he stopped working, he feared being punished with placement in the "open cell" unit which was less safe. ECF No. 213-57 ¶ 37. Without access to extra food as a kitchen worker, he was not sure he "would have survived at SDC" because he "was desperate for extra food." *Id.* ¶¶ 21, 38.

Plaintiffs filed the instant action asserting claims for violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589(a)-(b), 1594(a), 1595, and unjust enrichment under

Georgia law. Following denials of the motion to dismiss and motion for class certification, the Court indicated its "intent[ion] to try the remaining claims." ECF Nos. 38, 285, 296. CoreCivic's motion to continue trial was granted, and on July 17, 2023, it filed its motion for partial summary judgment *only* on Plaintiffs' claims for unjust enrichment, declaratory relief, and injunctive relief. ECF Nos. 298, 299, 304-308.

## II.    LEGAL STANDARD

Summary judgment is only appropriate if the evidence of record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). CoreCivic, as the moving party, bears the initial burden of identifying evidence that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

If CoreCivic meets that burden, Plaintiffs, as the nonmoving party, must assert genuine disputes of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, [and] interrogatory answers[.]" Fed. R. Civ. P. 56(c); *see also Celotex*, 477 U.S. at 324 (noting that the "nonmoving party" need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment").  Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"The court must draw all reasonable inferences in favor of the [Plaintiffs] and may not weigh evidence or make credibility determinations, which are jury functions[.]" *Lewis v. City of Union City*, 934 F.3d 1169, 1179 (11th Cir. 2019) (citation and quotation marks omitted).

## III.    ARGUMENT

### A.  CoreCivic is Not Entitled to Summary Judgment on the Unjust Enrichment Claim.

First, CoreCivic adds an unfounded element to Georgia's unjust enrichment claim to confusingly argue that Plaintiffs' claim fails "as a matter of law" because Plaintiffs never alleged a failed contract claim despite having "no evidence of any type of contractual arrangement between them and CoreCivic." ECF No. 304 at 7-9. Second, CoreCivic raises an argument already dismissed by this Court that "Plaintiffs cannot establish that they reasonably expected to be paid any more than what they received." *Id.* at 10-11. Finally, by misreading Eleventh Circuit and Georgia common law precedent, CoreCivic argues that should Plaintiffs prevail on their unjust enrichment claim, their damages should exclude disgorgement of CoreCivic's profits at SDC. *Id.* at 11-14. As explained below, the Court should reject CoreCivic's three baseless reasons for seeking partial summary judgment on the unjust enrichment claim.

### 1.  Georgia Law Does Not Require Pleading of a Failed Contract When Parties Agree There is No Contract or When Parties Dispute the Contract's Validity and Enforceability.

CoreCivic's argument that Plaintiffs' unjust enrichment claim fails as a matter of law without an allegation of a failed contract, ECF No. 304 at 7-9, is premised on fundamental misunderstandings of applicable law. The Court should reject CoreCivic's argument because Georgia law imposes no alternative pleading requirement of a failed contract claim, particularly where, as here, there is no dispute that there was no contract between the parties. Even where a genuine dispute over the contract's validity exists, Georgia law imposes no alternative pleading requirement of a failed contract claim.

### a.  Georgia's Unjust Enrichment Claim Requires No Legal Contract and the Parties Agree There Is No Contract.

The Georgia Supreme Court made it clear that the equitable concept of "[u]njust

enrichment applies *when as a matter of fact there is no legal contract*, but when the [defendant] has been conferred a benefit by the [plaintiff] an unjust enrichment which the [defendant] equitably ought to return or compensate for." *Tuvim v. United Jewish Cmtys., Inc.,* 680 S.E.2d 827, 829-30 (Ga. 2009) (emphasis added) (quoting *Engram v. Engram,* 463 S.E.2d 12, 15 (Ga. 1995)). *See also Eastside Recovery, LLC v. Calhoun,* No. A23A0615, 2023 WL 4199463, at *4 (Ga. Ct. App. June 26, 2023) (quoting the Georgia Supreme Court's decision in *St. Paul Mercury Ins. Co. v. Meeks*, 508 S.E.2d 646, 648 (Ga. 1998) for the principle that "[u]njust enrichment is an equitable concept and applies when as a matter of fact there is no legal contract"); *Cappuccitti v. DirecTV, Inc.,* 623 F.3d 1118, 1127 (11th Cir. 2010) ("The theory of unjust enrichment [in Georgia] is basically an equitable doctrine that the benefitted party equitably ought to either return or compensate for the conferred benefits when there was no legal contract to pay.") (citation omitted).

Here, the lack of an enforceable contract between the parties is undisputable. Plaintiffs have never argued one exists, and CoreCivic agrees, conceding that Plaintiffs "have no evidence of any type of contractual arrangement between them and CoreCivic." ECF No. 304 at 9.

### b. Georgia's Unjust Enrichment Claim Requires No Pleading of a Failed Contract Even When Parties Dispute the Validity of a Contract.

Despite conceding the nonexistence of a contract between Plaintiffs and CoreCivic, CoreCivic next contends that it is entitled to summary judgment as a matter of law because Plaintiffs failed to plead a breach of contract claim. This contention misapplies Georgia law because no such pleading requirement exists, and the cases cited by CoreCivic are both factually and legally distinguishable from this matter.

The Georgia Supreme Court has never required alternative pleading of a failed contract with an unjust enrichment claim. *See, e.g.*, *St. Paul Mercury*, 508 S.E.2d at 648; *see also* Ga. Const. of 1983, art. VI, § V, Par. III ("[T]he decisions of the Court of Appeals *insofar as not in conflict*

*with those of the Supreme Court* shall bind all courts except the Supreme Court as precedents.")
(emphasis added); *see also* Fed. R. Civ. P. 8(a)(3) (permitting—*not requiring*—alternative
pleading). The Georgia Court of Appeals has only ruled against unjust enrichment claims in which
defendants engaged in tortious conduct or for which other remedies at law exist. This does not
mean that a breach of contract claim must be pleaded, but instead that the unjust enrichment claim,
properly understood, arises from an equitable doctrine (i.e., a conferral of benefit and inequitable
compensation)—not tort law. *See Tidikis v. Network for Medical Commc'n & Research, LLC*, 619
S.E.2d 481, 485 (Ga. Ct. App. 2005) ("[A] claim for unjust enrichment is not a tort[.]").

The Georgia Court of Appeals cases cited by CoreCivic all involve tortious—not quasi-
contractual—conduct. In *Tidikis*, a former executive sued his employer for an unjust enrichment
claim on the premise that his property interests were violated, which the court explained sounded
in tort law, not quasi-contract principles. *Id.* at 483-85. There was also an enforceable employment
contract that the parties did not dispute. *Id*. at 484-85. Thus, the tortious nature of his unjust
enrichment claim and the existence of an undisputed contract precluded any equitable recovery.
The former executive did not allege, for example, that he was induced to continue working for the
company and then went unjustly uncompensated for that work, as the Plaintiffs do here.

Moreover, in *Wachovia Ins. Servs., Inc. v. Fallon*, a former insurance executive violated a
nonsolicitation agreement. 682 S.E.2d 657, 659-60 (Ga. Ct. App. 2009). His former employer
brought several claims against him, including one for unjust enrichment. *Id*. at 665. The unjust
enrichment claim was not pled in the alternative for failure of the non-compete agreement. *Id*.
Instead, the employer's unjust enrichment claim was "predicated upon the taking of client contact
information in the former employees' Blackberries and . . . in taking client brochures and the CD."
*Id*. The court correctly held that the unjust enrichment claim could not be a "separate tort" to

recover for theft or wrongful conduct. *Id.* Moreover, the employer could seek remedies for such conduct under misappropriation claims in the Georgia Trade Secrets Act. *Id.* at 663-64. Unlike in Plaintiffs' case here, there was no quasi-contractual relationship between the parties in *Wachovia* for which there was an uncompensated performance.

In *Tolson Firm, LLC v. Sistrunk*, an associate attorney left a law firm and took eight of its clients with her. 789 S.E.2d 265 (Ga. Ct. App. 2016). The law firm brought an unjust enrichment claim against her premised on the allegations that it had incurred significant advertising and legal expenses on these clients and that the former associate retained the benefit of those expenditures. *Id.* at 271. The law firm's unjust enrichment claim was not based on the failure of any employment agreement, nor did it point to an uncompensated performance it provided to the associate attorney. Again, unlike the Plaintiffs' unjust enrichment claim in this case, the law firm's claim in *Tolson* sounded in tort (e.g., tortious interference with business relations) and was mistakenly labeled unjust enrichment to recover the expenditures it spent on lost business.

The only reason the Georgia Court of Appeals has dismissed stand-alone unjust enrichment claims is because those particular claims, like the cases cited by CoreCivic, have been tortious in nature and did not arise out of any quasi-contractual relationship between the parties for which there was an uncompensated performance.[3] Unlike in *Tidikis*, *Wachovia*, and *Tolson*, which all

---

[3] *See also Collins v. Athens Orthopedic Clinic*, 849 S.E.2d 213, 215-17 (Ga. Ct. App. 2020) (dismissing patient's unjust enrichment claim related to clinic's negligence after a hacker stole patients' personal information from the clinic's servers because it was a tortious action); *Cash v. LG Electronics, Inc.*, 804 S.E.2d 713, 741-42 (Ga. Ct. App. 2017) (dismissing unjust enrichment claim sounding in product liability where plaintiff sued manufacturer after television caused deadly fire); *Gwinnett County v. Netflix, Inc*., 885 S.E.2d 177, 180-181, 187 (Ga. Ct. App. 2023) (dismissing the government entities' unjust enrichment claim against digital streaming providers for failure to obtain franchise licenses pursuant to a state law *because* the claim contained no allegations of the entities' performance or conferral of benefits and the violations of state law carried their own separate causes of action).

involved tortious conduct, Plaintiffs have alleged, and are prepared to show the jury, they were coerced into working for CoreCivic, and that CoreCivic then unjustly retained the benefit of Plaintiffs' performance. Put simply, CoreCivic misapplies Georgia law by insisting that Plaintiffs should have additionally pleaded a failed contract to separately succeed on an unjust enrichment claim. Plaintiffs are not required, however, to bring a breach of contract claim for a contract that never existed, and Georgia Supreme Court precedent is clear that an unjust enrichment claim may only lie where there is no contract. Nonetheless, if CoreCivic attempts to reverse course in its reply brief and argue the existence of a contract between the Parties for the first time, then Plaintiffs are prepared to demonstrate for a jury's determination that CoreCivic's coercive tactics invalidated the enforceability of any purported employment contract.[4]

## B. This Court Already Concluded that Unjust Enrichment Does Not Require an Expectation of Higher Compensation.

CoreCivic next argues that Plaintiffs' unjust enrichment claim should be dismissed because "Plaintiffs cannot establish that they reasonably expected to be paid any more than what they

---

[4] This Court should not entertain any attempt by CoreCivic to backpedal its clear concession that Plaintiffs "have no evidence of any type of contractual arrangement between them and CoreCivic." ECF No. 304 at 9. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."). To the extent that CoreCivic improperly attempts to argue for the first time in its reply that the "Detainee Voluntary Work Program Agreement" that one Plaintiff was forced to sign is an enforceable contract (ECF No. 304-3), Plaintiffs dispute any characterization of this document as a valid legal contract because, as this Court has already ruled, actions resulting from coercion can give rise to an unjust enrichment claim. *Barrientos v. CoreCivic, Inc.*, 332 F. Supp. 3d 1305, 1313 (M.D. Ga. 2018), *aff'd on other grounds*, 951 F.3d 1269 (11th Cir. 2020); *see also Estate of Crook v. Foster*, 775 S.E.2d 286, 287-90 (Ga. Ct. App. 2015); Ga. Code. Ann. § 13-5-6 ("Since the free assent of the parties is essential to a valid contract, duress, either by imprisonment, threats, or other acts, by which the free will of the party is restrained and his consent induced, renders the contract voidable at the election of the injured party."). Thus, "summary judgment should not be granted on that ground where . . . a jury must resolve whether a contract existed between the parties." *Vernon v. Assurance Forensic Accounting*, 774 S.E.2d 197, 212 n.10 (Ga. Ct. App. 2015); *see also Original Appalachian Artworks, Inc. v. Schlaifer Nance & Co.*, 679 F. Supp. 1564, 1579-80 (N.D. Ga. 1987); *Tolson*, 789 S.E.2d at 272.

received." ECF No. 304 at 9-11. This Court previously rejected this very same legal argument when denying CoreCivic's Motion to Dismiss. *See* ECF No. 30-1 at 19-20 (arguing for dismissal of Plaintiffs' unjust enrichment claim because "their allegations belie any expectation of receiving more. . . They do not allege any expectation of receiving more than what they did"). As this Court previously explained:

> The concept of unjust enrichment in law is premised upon the principle that a party cannot induce, accept, or encourage another to furnish or render something of value to such party and avoid payment for the value received." *Vernon v. Assurance Forensic Accounting, LLC,* 774 S.E.2d 197, 212 (Ga. Ct. App. 2015) (quoting *Jones v. White*, 717 S.E.2d 322, 328 (Ga. Ct. App. 2011)) (explaining that for purposes of an unjust enrichment claim conferring a "benefit" means providing "any form of advantage" even if it was not "earned"); *see also Reynolds v. CB&T,* 805 S.E.2d 472, 478-79 (Ga. Ct. App. 2017) (reversing grant of summary judgment on unjust enrichment claim based upon lender inducing borrower to finish construction of home and nevertheless foreclosing on the home when construction complete). *Although most unjust enrichment claims are based on the party being induced into some transaction with a reasonable expectation of receiving something in return, the Georgia courts have recognized that an unjust enrichment claim can be based on allegations of coercion. See Estate of Crook v. Foster*, 775 S.E.2d 286, 287-90 (Ga. Ct. App. 2015) (reversing trial court's grant of summary judgment on unjust enrichment claim where plaintiff claimed defendant coerced her into putting defendant's name on deed).

*Barrientos*, 332 F. Supp. 3d at 1313, *aff'd on other grounds,* 951 F.3d 1269.

CoreCivic does not style this portion of its motion as a motion for reconsideration, nor could it, because any such motion would be untimely.[5] This violation of the local rules is alone a sufficient basis to deny this portion of CoreCivic's motion, which asks the Plaintiffs and the Court to expend time and energy addressing a question that was previously resolved. Moreover, Courts in this district generally grant motions to reconsider a prior order "only . . . if the movant demonstrates that (1) there was an intervening development or change in controlling law, (2) new

---

[5] Local Rule 7.6 requires that motions for reconsideration must be filed within fourteen days after entry of an order.

evidence has been discovered, or (3) the court made a clear error of law or fact." *Brown v. Columbus Consol. Gov't*, No. 4:21-cv-162 (CDL), 2022 WL 3219941, at *1 (M.D. Ga. Aug. 9, 2022) (quoting *Rhodes v. MacDonald*, 670 F. Supp. 2d 1363, 1378 (M.D. Ga. 2009)).

CoreCivic cannot demonstrate a change in controlling law or a clear error in the Court's prior order, nor does its motion relate to newly discovered evidence. Indeed, a "showing of an expectation of compensation is not required" for unjust enrichment claims. *Yoh v. Daniel*, 497 S.E.2d 392, 394–95 (Ga. Ct. App. 1998). CoreCivic confuses Plaintiffs' unjust enrichment claim with quantum meruit, a different equitable claim that Plaintiffs never alleged here, which requires "an implied promise of compensation" as it is "in essence an implied contract." *Id.*; *Sitterli v. Csachi*, 811 S.E.2d 454, 457 (Ga. Ct. App. 2018) (differentiating quantum meruit and unjust enrichment because the later requires acting with the expectation that defendant will be responsible for a cost, i.e., not merely accepting a gift).

CoreCivic also takes issue that Plaintiffs have provided no evidence of "individual-level analysis" because Dr. Steven Schwartz's initial expert report included class-wide damages calculations. ECF No. 304 at 11. However, Plaintiffs have since timely supplemented Dr. Schwartz's expert report to include individualized damages calculations. Ex. 1; Fed. R. Civ. P. 26(e)(2) ("Any additions or changes to this information [included in the expert's report] must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."). Dr. Schwartz utilized evidence in the record regarding the dates and shifts each Plaintiff worked and payment records to set out a methodology and formula to determine how much each Plaintiff would be owed. Ex. 1 ¶¶ 9-25. Therefore, in light of Dr. Schwartz's report and the underlying record evidence he relied upon, there is sufficient evidence for the jury to determine the amount owed to Plaintiffs had CoreCivic paid the Plaintiffs as civilian employees. *See Watson v. Sierra Contracting Corp.*,

485 S.E.2d 563, 570 (Ga. Ct. App. 1997) ("The value of services from the perspective of the recipient is uniquely that of opinion and is for jury determination as to value[.]").

Put simply, given CoreCivic's failure to point to any change in controlling law or any newly discovered evidence, this Court should reject CoreCivic's attempt to relitigate unsupported arguments.

## C. Plaintiffs are Entitled to Disgorgement of Profits for their Unjust Enrichment Claim.

Lastly, CoreCivic argues that should Plaintiffs prevail on their unjust enrichment claims, CoreCivic should only have to "pay a regular employee to perform the same tasks for the same number of hours, and they are not entitled to any portion of CoreCivic's profits at SDC beyond that amount." ECF No. 304 at 11-14. In making this argument, CoreCivic once again misapprehends Georgia and Eleventh Circuit case law.

It is well established that "the remedy for unjust enrichment gives the plaintiff something . . . that the plaintiff did not previously possess." *Restatement (Third) of Restitution and Unjust Enrichment* § 1 cmt. a (Am. L. Inst. 2011). Thus, the defendant must "restore the benefit in question or its traceable product, or else pay money in the amount necessary to eliminate unjust enrichment." *Id.* The Eleventh Circuit, when applying Georgia law, has acknowledged disgorgement as a "species of restitution" that "allows a plaintiff to recover the defendant's 'wrongful gain,' even if that gain exceeds the plaintiff's provable loss." *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1368 (11th Cir. 2021) (citing *Restatement (Third) of Restitution and Unjust Enrichment* § 3 cmt. a (2011) and finding disgorgement inappropriate as a remedy for a breach of contract—as opposed to unjust enrichment—and due to improper jury instructions). Other district courts have similarly recognized disgorgement as a remedy for unjust enrichment. *See, e.g.*, *Beranger v. Harris*, No. 1:18-CV-5054-CAP, 2021 WL 4254940, at *5 (N.D. Ga. Feb.

12, 2021) (applying Georgia law and noting that a "district court has broad equity powers to order the disgorgement of ill-gotten gains" (citation and internal quotation marks omitted)). CoreCivic has cited no authority undermining the Eleventh Circuit's acknowledgement that disgorgement is an available remedy for unjust enrichment claims in Georgia.

Plaintiffs have consistently argued that CoreCivic knowingly benefitted and depended on a captive workforce to maintain SDC and to carry out essential operations such as food service and sanitation. *See supra* Section I.A. Relying on coerced labor from detained workers paid as little as $1 a day to keep up SDC has led to enormous profits, including from substantial savings in labor costs, maintenance of its contract with ICE, and avoiding Trinity's contract fees for labor shortages. *Id.* CoreCivic's retention of this benefit collected directly and indirectly from this undercompensated labor violated principles of justice, equity, and good conscience. *AcryliCon*, 985 F.3d at 1368; *Tuvim*, 680 S.E.2d at 829; *St. Paul Mercury*, 508 S.E.2d at 648. Thus, a jury should decide whether Plaintiffs can recover from CoreCivic all amounts that CoreCivic has wrongfully and improperly obtained, and CoreCivic should be required to disgorge to Plaintiffs the benefits it has unjustly obtained. *Watson,* 485 S.E.2d at 570.[6]

Lastly, CoreCivic argues that because Dr. Schwartz's expert report never mentions disgorgement damages, Plaintiffs cannot present such evidence at trial. ECF No. 304 at 14.[7]

---

[6] CoreCivic superficially and incorrectly attempts to distinguish *Yoh*, 497 S.E.2d at 394-95, a case involving improvements to a home for sale, as limited to instances involving an increase in property value. ECF No. 304 at 13-14. In *Yoh*, the court approved damages in the amount of the *benefit conferred*, which happened to be an increase in the property value, but in no way did it limit the benefit conferred in all unjust enrichment cases to an increase in property value. *See* 497 S.E.2d at 394 ("The unjustly enriched party should pay for its gain.") (citation omitted). Here, the improper gain includes CoreCivic's profits from the WP. *See supra* Section I.

[7] The Court should ignore CoreCivic's improper attempt to renew its terminated motion to exclude Dr. Schwartz's opinions via a footnote in its summary judgment brief. ECF No. 304 at 14, n.2.

However, Plaintiffs need not rely on Schwartz's report or expertise to calculate disgorgement of CoreCivic's profits when evidence exists of CoreCivic's revenues, expenses, profits, and profit margins from the time period when Plaintiffs were forced to work. ECF No. 221-10 at 17-31 (CoreCivic Quarterly Statements). Accordingly, Plaintiffs can point to sufficient evidence that some portion of these funds is attributable to Plaintiffs' coerced work, such that the jury could determine how much disgorgement of CoreCivic's profits would be necessary to remedy the injustice of CoreCivic's conduct. *See White*, 464 S.E.2d at 226 ("[W]here an award of monetary damages is made for unjust enrichment, it must . . . be supported by evidence from which it can be determined to a reasonable certainty that the defendants in fact realized such a gain." (alterations in original) (citation omitted)).

IV. **CONCLUSION**

For the above reasons, this Court should deny CoreCivic's motion for summary judgment on Plaintiffs' unjust enrichment claim due to CoreCivic's gross misunderstanding of Georgia common law and genuine disputes of material fact that pervade the record.

---

Moreover, a jury should decide the value of services rendered to CoreCivic based on Plaintiffs' evidence of CoreCivic's profits. *White v. Arthur Enter., Inc.*, 464 S.E.2d 225, 225-26 (Ga. Ct. App. 1995) (affirming "jury's award of damages" for unjust enrichment because amount "was well within the range of the evidence").

Date: August 7, 2023.

/s/ Sharada Jambulapati
Sharada Jambulapati (GA Bar No. 413477)
SOUTHERN POVERTY LAW CENTER
150 East Ponce de Leon Avenue
Suite 340
Decatur, GA 30030
Telephone: (404) 521-6700
sharada.jambulpati@splcenter.org

Meredith B. Stewart*
SOUTHERN POVERTY LAW CENTER
201 Saint Charles Avenue, Suite 2000
New Orleans, LA 70170
Telephone: (504) 486-8982
Facsimile: (504) 486-8947
meredith.stewart@splcenter.org

Rebecca M. Cassler (GA Bar No. 487886)
SOUTHERN POVERTY LAW CENTER
1101 17th Street, NW, Ste. 705
Washington, DC 20036
Telephone: (404) 521-6700
Facsimile: (877) 349-7039
rebecca.cassler@splcenter.org

Azadeh Shahshahani (GA Bar No. 509008)
Priyanka Bhatt (GA Bar No. 307315)
PROJECT SOUTH
9 Gammon Avenue SE
Atlanta, GA 30315
Telephone: (404) 622-0602
Facsimile: (404) 622-4137
azadeh@projectsouth.org
priyanka@projectsouth.org

Respectfully submitted,

Alan B. Howard*
Emily B. Cooper*
PERKINS COIE LLP
1155 Avenue of the Americas
22nd Floor
New York, NY 10036-2711
Telephone: (212) 262-6900
Facsimile: (212) 977-1649
AHoward@perkinscoie.com
ECooper@perkinscoie.com

Jessica L. Everett-Garcia*
John H. Gray*
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
Telephone: (602) 351-8000
Facsimile: (602) 648-7000
jeverettgarcia@perkinscoie.com
jhgray@perkinscoie.com

Jessica Tseng Hasen*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Telephone: (206) 359-3293
Facsimile: (206) 359-9000
jhasen@perkinscoie.com

Gwyn P. Newsom (GA Bar No. 541450)
GWYN NEWSOM LAW, LLC
P.O. Box 629
Columbus, GA
Telephone: (706) 324-4900
gwyn@gnewsomlaw.com

*Attorneys for Plaintiffs*
*Admitted pro hac vice