

Deposition of:

# 30(b)(6) Marquita Crawford, Vol. II

*August 23, 2021*

In the Matter of:

# Barrientos, Wilhen Hill v. CoreCivic Inc.

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Page 263

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF GEORGIA COLUMBUS DIVISION

_____

WILHEN HILL BARRIENTOS, GONZALO

BERMUDEZ GUTIÉRREZ, and KEYSLER

RAMON URBINA ROJAS, individually

and on behalf of all others

similarly situated,

     Plaintiffs,

  v.                Case No.

CORECIVIC, INC.,          4:18-cv-00070-CDL

     Defendant.

_____

VIDEOCONFERENCE DEPOSITION OF

MARQUITA CRAWFORD VOLUME II

DATE:      Monday, August 23, 2021

TIME:      9:36 a.m.

LOCATION:   Remote Proceeding- GA

           146 CCA Road

           Lumpkin, Georgia, 31815

REPORTED BY:  Daniel Almekinder, Notary Public

JOB No.:     4760608

Page 264

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS WILHEN HILL BARRIENTOS, ET

AL.:

        MEREDITH STEWART, ESQUIRE (by videoconference)

        Southern Poverty Law Center

        233 Peachtree Street Northeast, Suite 2150

        Atlanta, GA, 30303

        meredith.stewart@splcenter.org

        (504) 486-8982


        REBECCA CASSLER, ESQUIRE (by videoconference)

        Southern Poverty Law Center

        P.O. Box 1287

        Decatur ,GA 30031

        rebecca.cassler@splcenter.org


        CAITLIN C.J. SANDLEY, ESQUIRE (by

    videoconference)

        Southern Poverty Law Center

        400 Washington Avenue

        Montgomery, AL 36104-4344

        cj.sandley@splcenter.org

Case 4:18-cv-00070-CDL   Document 383-1   Filed 09/27/22   Page 4 of 300

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

A P P E A R A N C E S (Cont.)

ON BEHALF OF PLAINTIFFS WILHEN HILL BARRIENTOS, ET

AL.(CONT.):

VIDHI BAMZAI, ESQUIRE (by videoconference)

Southern Poverty Law Center

233 Peachtree Street Northeast, Suite 2150

Atlanta, GA, 30303

vidhi.bamzai@splcenter.org


JACKIE ARANDA OSORNO, ESQUIRE (by

videoconference)

Southern Poverty Law Center

233 Peachtree Street Northeast, Suite 2150

Atlanta, GA, 30303

jackie.aranda@splcenter.org


ALAN B. HOWARD, ESQUIRE (by videoconference)

Perkins Coie LLP

1155 Avenue of the Americas, 22nd Floor

New York ,NY 10036

ahoward@perkinscoie.com

A P P E A R A N C E S (Cont.)

ON BEHALF OF PLAINTIFFS WILHEN HILL BARRIENTOS, ET

AL.(CONT.):

    JESSICA L. EVERETT-GARCIA, ESQUIRE (by

videoconference)

    Perkins Coie LLP

    2901 North Central Avenue, Suite 2000

    Phoenix, AZ 85012-2740

    jeverettgarcia@perkinscoie.com


ON BEHALF OF DEFENDANT CORECIVIC, INC.:

    EDEN G. COHEN, ESQUIRE (by videoconference)

    Struck Love Bojanowski & Acedo PLC

    3100 West Ray Road, Suite 300

    Chandler, AZ 85226

    ecohen@strucklove.com


ON BEHALF OF WITNESS TRINITY SERVICES GROUP, LLC:

    JONATHAN T. EDWARDS, ESQUIRE (by videoconference)

    Alston & Bird LLP

    1201 West Peachtree Street

    One Atlantic Center, Suite 4900

    Atlanta, GA 30309

    jonathan.edwards@alston.com

Page 267

A P P E A R A N C E S (Cont.)

ON BEHALF OF WITNESS TRINITY SERVICES GROUP, LLC

(CONT.):

    ALEXANDER CHOSID, ESQUIRE (by videoconference)

    TKC Holdings, Inc.

    1260 Andes Boulevard

    St. Louis, MO 63132

    alex.chosid@tkcholdings.com

ALSO PRESENT:

    Leonora Renda, Plaintiff's Expert (by

videoconference)

    Scott Long, Veritext Observer (by

videoconference)

Page 268

                          I N D E X

EXAMINATION:                                          PAGE

      By Ms. Stewart                                  272


                        E X H I B I T S

  NO.                 DESCRIPTION                     PAGE

  Exhibit 24     Photo of Wilhen Hill Barrientos      280

  Exhibit 25     Photo of Keysler Urbina Rojas        281

  Exhibit 26     Photo of Gonzalo Bermudez            282

  Exhibit 27     E-Mail, 10/14/2014                   314

  Exhibit 28     E-Mail, 7/4/2018                     325

  Exhibit 29     E-Mail, 7/13/2015                    331

  Exhibit 30     E-Mail, 6/19/2018                    337

  Exhibit 31     E-Mail, 8/14/2015                    355

  Exhibit 32     E-Mail, 11/14/2017                   358

  Exhibit 33     E-Mail, 6/18/2014                    361

  Exhibit 34     E-Mail, 2/20/2019                    369

  Exhibit 35     E-Mail, 5/6/2015                     373

  Exhibit 36     E-Mail, 3/29/2018                    377

  Exhibit 37     E-Mail, 5/9/2013                     382

  Exhibit 38     E-Mail, 4/23/2015                    387

  Exhibit 39     E-Mail, 12/23/2015                   403

  Exhibit 40     E-Mail, 10/23/2018                   411

  Exhibit 41     E-Mail, 9/21/2020                    414

  Exhibit 42     Detainee Grievance 001673            420

Page 269

                          E X H I B I T S (Cont.)

   NO.                   DESCRIPTION                          PAGE

   Exhibit 43        Photo of Kitchen Area Bates

                     Number CCBVA0000195884                   449

   Exhibit 44        Photo of Kitchen Area Bates

                     Number CCBVA0000195885                   452

   Exhibit 45        Inmate/Residence Grievance 002204   461

   Exhibit 46        E-Mail, 8/18/2015                         480

   Exhibit 47        Report:  Concerns About ICE

                     Detainee and Care at Detention

                     Facilities                               490

   Exhibit 48        Report:  Adult Detention

                     Oversight 16-047-ISP-ICE                 492


   Exhibits previously marked:

   Exhibit 1         Subpoena to Testify at a

                     Deposition in a Civil Action             275

   Exhibit 4         Voluntary Work Program Policy            306

   Exhibit 10        Interoffice Memorandum, 1/4/2021         432

   Exhibit 18        E-Mail, 7/21/2015                        320


                     (*Exhibits attached.)

Page 270

P R O C E E D I N G S

REPORTER:  Good morning.  My name is Daniel Almekinder; I am the officer assigned by Veritext to take the Zoom record of this proceeding. I am a notary authorized to take acknowledgements and administer oaths in Georgia.  We are now on the record.

This is the deposition of 30(b)(6) designated representative of Trinity Services Group, LLC taken in the matter of Wilhen Hill Barrientos, et al. vs. CoreCivic, Incorporated, Civil Action Number 4:18-CV-00070-CDL at 9:36 a.m. on August 23, 2021, at 146 CCA Road, Lumpkin, Georgia, 31815.

Due to the pandemic and out of concern for public and participant safety, parties agree that I will swear in the witness remotely outside of her presence.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same

manner as a deposition recorded by

stenographic means; and

- shall constitute written stipulation

of such.

At this time will everyone appearing

remotely please identify yourself for the record.

MS. STEWART:  Good morning.  Meredith

Stewart for the plaintiffs.  Also for the plaintiffs

here, Rebecca Cassler, C.J. Sandley, Vidhi Bamzai,

Jackie Aranda Osorio [sic], Alan Howard, Jessica

Everett-Garcia, and Lee Renda.

MR. EDWARDS:  Good morning.  Jonathan

Edwards from Alston & Bird appearing for Trinity

Services Group.  Also on the line with me are Mr.

Alexander Chosid as I previously introduced him.  He's

with Trinity as well.

REPORTER:  Any other counsel before our

witness?  All right, ma'am?

MS. CRAWFORD:  Marquita Crawford,

Trinity Services Group.  Food Service Director.

REPORTER:  Thank you.  Hearing no

objection, I will now swear in the witness.  Ma'am,

please raise your right hand.  State and spell your

name for the record, please.

MS. CRAWFORD:  Marquita Crawford.

Page 272

M-A-R-Q-U-I-T-A. Crawford, C-R-A-W-F-O-R-D.

WHEREUPON,

MARQUITA CRAWFORD,

called as a witness, and having been first duly sworn

to tell the truth, the whole truth and nothing but the

truth, was examined and testified as follows:

REPORTER:  Thank you, ma'am.  Ms.

Stewart, you may proceed when ready.

EXAMINATION

BY MS. STEWART:

Q    Good morning, Ms. Crawford.  As I just

mentioned, my name is Meredith Stewart and I'm one of

the attorneys for the plaintiffs in this matter.

Please state your full name for the record.

A    Marquita Crawford.

Q    And before we get started, are you okay with

me calling you Ms. Crawford, or do you prefer another

name?

A    Ms. Crawford is fine.

Q    Okay.  Thank you.

MS. STEWART:  Counsel, can we agree

that all objections should be reserved except to form

of the question or responsiveness of the answer?

MR. EDWARDS:  Yes.

MS. STEWART:  I believe Ms. Cohen's

Case 4:18-cv-00070-CDL Document 333-1 Filed 09/27/23 Page 12 of 300
30(b)(6) Marquita Crawford, Vol. II      August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 273

microphone isn't working.  I wasn't able to hear an audible yes.

REPORTER:  Ms. Cohen?  All right. Counsel, I didn't hear a response as well, so thank you for that.

MS. STEWART:  Okay.

REPORTER:  Did you want to go off the record to --

MS. STEWART:  Yeah.  Let's go off the record a minute.

REPORTER:  All right.  We are off the record.  The time is 9:39 a.m.

(Off the record.)

REPORTER:  We are back on the record. The time is 9:44 a.m.  You may proceed, Counsel.

MS. STEWART:  I'm going to restate my question to counsel online.  Can we agree that all objections should be reserved except to form of the question or responsiveness of the answer?

MS. COHEN:  Yes.

MR. EDWARDS:  Yes again for Trinity.

MS. COHEN:  On behalf of CoreCivic.

REPORTER:  I'm sorry, ma'am?  Ms. Cohen?

MS. COHEN:  Yes on behalf of CoreCivic.

Page 274

REPORTER:  All right.  And I did not get your introduction during my read-on.  Could you give your name and firm, please?

MS. COHEN:  Yes.  Eden Cohen, Struck Love Bojanowski & Acedo on behalf of CoreCivic.

REPORTER:  Thank you.  Thank you, ma'am.

BY MS. STEWART:

Q    Okay.  And this Rule 30(b)(6) deposition is being taking pursuant to notice under the federal rules for all purposes under the law.  The deposition is a continuation of the Rule 30(b)(6) deposition of Trinity Services Group, Inc. that began on July 14, 2021.

Ms. Crawford, you are giving testimony under oath today.  That means that you have sworn and are obligated to tell the whole truth.  To make sure we get the most accurate and complete answers possible, I'm going to ask that you make sure I finish my question before you answer it.  If there's any part of my question that you don't understand or that you didn't hear, please just ask me for clarification or for me to repeat something if you need it.

Also, as the court reporter mentioned, he is taking down everything everyone says in this Zoom room

30(b)(6) Marquita Crawford, Vol. II     August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 275

unless we're off the record.  So you'll need to make sure that you answer the questions with answers that are clear and the court reporter can record.  So it's important to say yes rather than nodding or saying uh-huh, or say no rather than shaking your head or saying uh-uh.

Your counsel and CoreCivic's counsel may make objections for the record today.  Unless you're instructed not to answer the question, you are to answer my questions as soon as your counsel has completed their objection.

We'll definitely take a few breaks throughout the day, but if you find you need a break sooner than I've called one, just let us know.  The only thing I ask is that if I've asked you a question, please answer it before we take that break.  Okay.  I'm going to go ahead and pull up the first exhibit today.  This exhibit was previously introduced as Exhibit Number 1.

(Exhibit 1 was previously marked for identification.)

Ms. Crawford, are you able to see the document that's on your screen?

A    Yes.

Q    Okay.  Do you recognize this document?

Case 4:18-cv-00070-CDL Document 383-1 Filed 09/27/23 Page 15 of 300
30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 276

A    No.

Q    Okay.  This is the notice of this deposition.  You've never seen this document before?

A    No.

Q    Do you understand that your appearance today is pursuant to a subpoena to testify at a deposition?

A    Yes.

Q    Okay.  And if you could please scroll down to page 4 of Exhibit 1.  Right there.  You will see three topics listed there under the heading "Deposition Topics."  Do you understand that you have been designated Trinity's representative to testify on topics two and three, which are the Stewart-specific topics today?

A    Yes.

Q    Have you seen these topics before today?

A    Yes.

Q    And are you prepared to testify to those topics today?

A    Yes.

Q    Okay.  And I'm deposing you in your capacity as a corporate representative of Trinity Services Group, Inc. and not your individual capacity.  Do you understand that?

A    Yes.

Case 4:18-cv-00070-CDL Document 383-1 Filed 05/27/22 Page 16 of 300
30(b)(6) Marquita Crawford, Vol. II        August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 277

Q    Yet because you're here as a corporate representative, information in your personal knowledge is also in the corporation's knowledge.  Do you understand that?

A    Yes.

Q    And you understand that your testimony is binding on Trinity Services Group, Inc.?

A    Yes.

Q    Throughout this deposition when I ask you questions, I'm referring to the timeframe relevant to this lawsuit, which is April 2008 until the present unless I specify otherwise.  I'm also going to use some abbreviations and shorthand today.  I'm going to let you know what those are in advance.  So can we agree that ICE, I-C-E, stands for US Immigration and Customs Enforcement?

A    Can you repeat that?

Q    Sure.  Can we agree that ICE, I-C-E, stands for US Immigration and Customs Enforcement?

A    Yes.

Q    And can we agree that when we refer to Stewart today, we're referring to Stewart Detention Center in Lumpkin, Georgia?

A    Yes.

Q    And can we agree that when we use the term

Page 278

CoreCivic, that includes CoreCivic's former name, which was Correction Corporations of America?

A    Yes.

Q    And can we agree that we may sometimes use CoreCivic today and CCA -- Corrections Corporations of America -- interchangeably, and when we do, we are referring to the same company?

A    Yes.

Q    And finally, can we agree that when we refer to Trinity today, that includes Trinity Services Group, Inc. and any of its predecessors during the relevant period, including Compass Group USA and Canteen Correctional Services?

A    Yes.

Q    And Ms. Crawford, have you and I met before today?

A    No.

Q    Have you ever been deposed before?

A    No.

Q    This is your first deposition?

A    Yes.

Q    Have you ever given testimony in a legal proceeding before?

A    No.

Q    And do you understand that we're here to

Case 4:18-cv-00070-CDL   Document 333-1   Filed 06/27/23   Page 18 of 300

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 279

discuss the lawsuit filed against CoreCivic in April 2018 by individuals detained that Stewart Detention Center related to the voluntary work program?

A    Yes.

Q    And what do you know about the lawsuit?

A    Nothing at all besides what you told me.  I mean, besides that I'm testifying today about the food service program and the volunteer work program.

Q    When did you first learn about the lawsuit?

A    Two weeks ago.  Three weeks ago.

Q    How did you --

A    I'm sorry.

Q    I'm sorry.  Your answer was three weeks ago?

A    Three.  Three weeks ago.

Q    How did you learn about the lawsuit?

A    From my supervisor, Mr. Peter Velasco.  He informed me about it.

Q    And what did he say to you about the lawsuit?

A    He told me that -- that someone would be contacting me about a matter at Stewart.

Q    Did he say anything else about the lawsuit?

A    No.

Q    Okay.  Do you know a named plaintiff, Wilhen Hill Barrientos?

Page 280

A    Do I know -- no.  I don't.

Q    Okay.  I'm going to go ahead and pull up the next exhibit, which we'll mark Exhibit 24.

(Exhibit 24 was marked for identification.)

Do you recognize this person, Ms. Crawford, in Exhibit 24?

A    I do.

Q    Who is this person?

A    He used to be a kitchen worker.

Q    I'll represent that the picture is of named plaintiff, Wilhen Hill Barrientos.

A    Okay.

Q    Does this picture refresh your recollection of who Wilhen Hill Barrientos is?

A    Yes.

Q    And you recognize him as a kitchen worker at Stewart?

A    Yes.

Q    Do you have --

A    Years ago.

Q    -- anything else?  Oh.  Excuse me.  Go ahead.

A    Years ago.  I don't know the exact timeframe, but he did work in the kitchen.

Case 4:18-cv-00070-CDL Document 333-1 Filed 06/27/23 Page 20 of 300
30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 281

Q    Do you know anything else about him?

A    No.

Q    Did you work with him in the kitchen?

A    Yes.

Q    And when you worked with Wilhen Hill Barrientos in the kitchen, what was your job title?

A    I'm not sure.  I can't recall the year that he was at Stewart.

Q    Okay.  But the year that he was at Stewart, you were employed by Trinity working in the kitchen?

A    Yes.

Q    Okay.  Do you know named plaintiff Keysler Ramon Urbina Rojas?

A    No.

Q    Okay.

A    I can't recall.

Q    I'm going to introduce Exhibit 25.

        (Exhibit 25 was marked for
        identification.)

        MS. STEWART:  Can we pull up Exhibit 25, please?  Oh.  There it is.

BY MS. STEWART:

Q    Ms. Crawford, do you recognize this person in Exhibit 25?

A    No.  I do not recognize him.

Page 282

Q    Okay.  I'll -- go ahead.

A    I don't -- I don't recognize him.  No.

Q    I'll represent to you that the picture is of Keysler Ramon Urbina Rojas, who is a named plaintiff in this matter.  Does the picture refresh your recollection of who it is?

A    No.

Q    And do you know named plaintiff Gonzalo Bermudez Gutierrez?

A    I don't recall.

Q    I'm going to introduce Exhibit 26.

     (Exhibit 26 was marked for

     identification.)

     Okay, Ms. Crawford, do you recognize the person in Exhibit 26?

A    No.

Q    I'll represent that Exhibit 26 is a picture of Gonzalo Bermudez Gutierrez.  Does the picture refresh your recollection of who that is?

A    No.

     MS. STEWART:  Okay.  We can pull that exhibit down.

BY MS. STEWART:

Q    Have you met Mr. Jonathan Edwards before today?

Page 283

A    No.

Q    Have you met Alex Chosid before today?

A    No.

Q    How did you prepare for the deposition today?

A    How did I prepare for it?

Q    Yes.

A    Just basic knowledge of just the kitchen. Things we have in the kitchen. That go on in the kitchen on a daily basis. You know, I really didn't have to prepare for it.

MR. EDWARDS:  Meredith, this is your deposition. I just want to be clear. We've not met in person.

THE WITNESS:  Yeah.

MR. EDWARDS:  Have we talked on the phone?

THE WITNESS:  Yes. Yes. We have.

MR. EDWARDS:  Okay.

BY MS. STEWART:

Q    Okay. So, Ms. Crawford, you've spoken to Mr. Edwards on the phone prior to today?

A    I have. Yes.

Q    Okay. And when did you speak to Mr. Edwards on the phone?

A    About three weeks ago.

Q    How long did you speak?

A    About 30 minutes.  And we've spoken three times on the phone.

Q    A total of three times?

A    Yes.

Q    Okay.  So three weeks ago, you spoke once for 30 minutes with Mr. Edwards.  Was there anyone else on the line during that call?

A    No.

Q    And after that call, you spoke with Mr. Edwards three more times?

A    No.  Twice after that.

Q    Okay.  And in those two calls, were there other people on the phone other than Mr. Edwards?

A    No.

Q    And how long did each of those calls last?

A    About 30 minutes.

Q    Did you review any documents that refreshed your recollection for the deposition today?

A    Can you repeat that?

Q    Did you review any documents to refresh your recollection for the deposition today?

A    No.

Q    Did you talk to any current or former

Trinity employees about the deposition?

A    No.

Q    Did you talk to anyone who doesn't work at Trinity about this deposition?

A    No.

Q    Did you talk to anyone who works or worked for CoreCivic about this deposition?

A    No.

Q    Did you talk with Ms. Eden Cohen about the deposition?

A    No.

Q    Did you talk with anyone from the firm Struck Love about the deposition?

A    No.

Q    And referring back to Exhibit Number 1 that you looked at earlier, which was the notice of the deposition, you testified that you were prepared to testify today on the topics listed here. Specifically, topics two and three.  What efforts did you make to educate yourself on notice topic number two as it related to Stewart Detention Center?

A    Well, this is the area that I work in, and we are required to know about the detainee volunteer program.  And just by my job duties to know about the -- about food service in general.

Q    Okay.  Other than the knowledge you have as a Trinity employee at Stewart in the food service department, did you do anything additional to prepare to testify today on these topics?

A    No.

Q    And did you make any effort to educate yourself on topic number three which relates to grievances and discipline of detained workers in the volunteer work program?

A    No.

Q    And I think you mentioned earlier that it is part of your job to know how the voluntary work program works.  Is that correct?

A    Yes.

Q    Can you tell me what you know about the voluntary work program at Stewart?

A    Is there something specific you want to know about it?

Q    I just want to know generally what you know.

A    The detainees can only work eight hours per shift.  It's a volunteer work program.  They have to perform duties on a daily basis that we assign to them.  And like I said, it's a volunteer program.  They get paid $4 a day.  And they -- they're not allowed to work double shifts.  And that's -- that's

it.

Q    Has your last name changed in the past ten years?

A    Yes.

Q    Was it previously Lyles?

A    Yes.

Q    And what year did it change to Crawford?

A    My anniversary is today, so 2014, I think. I think it was 2014 is when I changed my name.

Q    Congratulations on your anniversary.

A    Thank you.

Q    What is your educational background?

A    I am -- I graduated from high school.  Yeah. Also, I did a year in college.

Q    And do you speak any language other than English?

A    No.

Q    Going back to your last name, did you use the last name Lyles at work later than 2014?

A    Some people still called me by Lyles just because when I started working here, that was my last name.  Yes.  But legally, I'm Crawford.

Q    And did 2014, you changed it with Trinity to Crawford?

A    Yes.

Page 288

Q    Have you ever worked for CoreCivic?

A    No.

Q    And what is your current title at Trinity?

A    Food Service Director.

Q    How long have you held that title?

A    Five years.

Q    And prior to being Food Service Director at Trinity, what were you doing?

A    I was the Assistant Food Service Director.

Q    How long were you Assistant Food Service Director?

A    Two years.

Q    And you were Assistant Food Service Director for Trinity at Stewart?

A    Yes.

Q    And prior to being Assistant Food Service Director at Stewart, what were you doing?

A    I was a Food Service Supervisor for Trinity.

Q    At Stewart?

A    Yes.

Q    How long were you a Food Service Supervisor?

A    Four to five years.

Q    And other than Food Service Director, Assistant Food Service Director, Food Service Supervisor, have you held any other positions at

Case 4:18-cv-00070-CDL Document 383-1 Filed 05/27/22 Page 28 of 300
30(b)(6) Marquita Crawford, Vol. II        August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 289

Trinity?

A    No.

Q    So you have been employed by Trinity at Stewart for approximately 12 years?

A    Yes.  Almost 13.

Q    And what are your duties and responsibilities as Food Service Director?

A    I oversee the food program here.  The purchasing.  The quality of the food.  I direct all of my workers.  Delegate jobs to my supervisors.  And financial reports.

Q    Anything else?

A    Yes.  It's -- it's a lot more, but those are the basics.

Q    And what were your job duties as the Assistant Food Service Director?

A    Some of the same things.  Most of the same things.  Ordering foods.  Making sure food is good. The quality of the food is good.  Food safety.  Doing orientation with the trainees.  Training them.  Those sorts of things.

Q    As the Food Service Director now, do your job duties include orientation and training of detained workers?

A    Yes.

Page 290

Q    And what were your job duties and responsibilities as a Food Service Supervisor?

A    Delegating jobs to the detainee workers. Cleaning the kitchen. Assigning duties. Just completing paperwork. Supervising the line and supervising the production area. And ensuring food safety.

Q    All three positions you've held at Trinity have required you to ensure food quality and safety?

A    Yes.

Q    And all three positions that you've held with Trinity at Stewart have involved interactions with the volunteer work program?

A    Yes.

Q    Is there anyone other than you who has primary responsibility for overseeing Trinity's operations at Stewart?

A    My assistant.

Q    Who is your assistant?

A    Derico Countryman. D-E-R-I-C-O Countryman, C-O-U-N-T-R-Y-M-A-N.

Q    What is Derico's title?

A    He's the Assistant Food Service Director.

Q    How long has he been with Trinity?

A    Three years.

Case 4:18-cv-00070-CDL Document 333-1 Filed 06/27/23 Page 30 of 300
30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 291

Q    Do you know if Derico Countryman used to work for CoreCivic?

A    He did.

Q    Do you know what his position was with CoreCivic?

A    He was a counselor.

Q    Have you worked at any Immigrant Detention Facilities other than Stewart?

A    I have not worked, but I have helped out at other facilities.

Q    What other facilities have you helped out at?

A    Adams County.

Q    Is that located in Louisiana?

A    It's in Mississippi.

Q    Adams County, Mississippi.  How long were you at Adams County?

A    Two weeks.

Q    And what were you doing there?

A    Assisting with the food service program.

Q    Is there a work program at Adams County?

A    It is.

Q    Did your two weeks of work at Adams County involve interactions with the detained workers?

A    Yes.

Page 292

Q    Have you ever worked at a correctional facility?

A    No.  Currently I work at one, but not previously.

Q    My question is more have you ever worked for a correctional facility that houses individuals convicted of crimes?

A    No.

Q    Okay.  I want to ask you some questions about Trinity staffing at Stewart.  How many employees does Trinity employ to work in the Stewart kitchen?

A    We have a staffing pattern of eight Trinity supervisors.

Q    In addition to Food Service Director?

A    In addition to Food Service Director and Assistant Food Service Director.

Q    Okay, Trinity then employs 10 people to work in the kitchen at Stewart?

A    Yes.

Q    Eight Food Service Supervisors, an Assistant Food Service Director, and a Food Service Director. Is that right?

A    That's correct.

Q    And how many Trinity staff work on each shift?

Page 293

A     On each shift?  It depends on what you call a shift.  We have different shifts at different times between 2:00 a.m. and 8:00 p.m.

Q     Are there different shifts for Trinity workers?

A     Different times.  They don't -- they don't come in the same time as the detainees.  So we have a shift that starts at 2:00 a.m., 2:00 to 10:00 a.m., and we have one that's 4:00 to 12:00 p.m., and we have one that's 9:00 to 5:00 p.m.  And then we have one 11:00 to 7:00, and we have a 12:00 to 8:00.

Q     The shifts you just testified about are the shifts that the Trinity staff work on?

A     Trinity staff, yes.

Q     Okay.  And what you're saying is that their shifts are different from the detained workers?

A     From the detained -- yes.

Q     You just listed out five different shifts. How many Trinity workers work on each of those five different shifts?

A     One per shift time.  So ...

Q     So there's one person working 2:00 to 10:00. Correct?

A     Yes.

Q     One Trinity staffer --

Page 294

A    -- people at a time --

Q    Well, go ahead.

A    Yes.  Everyone's time will overlap.  So we have different positions, so we have to have different times coming in.

Q    Are there a certain number of Trinity staff that need to be in the kitchen at any given time?

A    No.

Q    So you all don't say, for example, we need at least two staff people here, you know, at all times during food service hours?

A    No.

Q    So at any given time, there could be one Trinity staff, or there could be all eight Trinity staff?

A    Yes.

Q    And how do you decide how many staff should be present at any moment?

A    The amount of traffic going through the kitchen.  The amount of detainees in the kitchen.  But we always have a kitchen officer.  A kitchen officer is always delegated to the kitchen.

Q    Is the kitchen officer an employee of CoreCivic?

A    CoreCivic.  Yes.

Case 4:18-cv-00070-CDL   Document 333-1   Filed 06/27/23   Page 34 of 300
30(b)(6) Marquita Crawford, Vol. II        August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 295

Q    So there's always at least one kitchen officer in the kitchen?  Correct?

A    Correct.

Q    And depending on the number of detained workers in the kitchen at any given time, that informs how many Trinity staff you need there?

A    Yes.

Q    And that's because the Trinity staff supervise the detained workers?

A    Correct.

Q    Have there been occasions when the total Trinity staff, which we determined earlier was ten people, was less than ten people?

A    What are you asking?  I'm sorry.

Q    I'm asking if there are times when Trinity a short-staffed such that there are --

A    Yes.

Q    -- less than ten people?

A    Yes.

Q    And how often does that happen?

A    It has happened as often as we -- we don't have any workers.  If we don't have the staff, you know, of course, we'll be short-staffed.  And if we are short-staffed, we would have -- we would ask for someone to come in from another facility to help out.

Page 296

Q   Trinity will ask for a Trinity staff person from another facility to help out?

A   Yeah.  We cover what we can, and then if we can't handle it, that's when one of us will be sent in to help out.

Q   Okay.

MS. STEWART:  Can everyone hear me? I'm getting a message that my audio's off.

REPORTER:  We can hear you.  I was just going to mention it sounds like it's a clicking.  Can we go off the record and perhaps fix that?

MS. STEWART:  Yes.

REPORTER:  We are off the record.  The time is 10:14 a.m.

(Off the record.)

REPORTER:  We are back on the record. The time is 10:15 a.m.  You may proceed when ready, Counsel.

BY MS. STEWART:

Q   Ms. Crawford, about how often do you have to request help from Trinity staff at other facilities?

A   In the past, I have requested probably two -- two -- twice we've had people to come in from another facility.  The thing is, like, we never know if we're going to be short-staffed due -- we just

don't know.  But it has been times in the past where we've been short-staffed.  So twice we've had people to come in from another facility to help out.

Q    Twice in the past year, or twice in the past 12 years that you've been at Trinity?

A    Twice in the whole 12 years.

Q    Would you say there's high turnover at Trinity?

A    No.

Q    So Trinity staff tend to stick around for a long time?

A    Yes.

Q    Do your responsibilities as Food Service Director include establishing pay rates for Trinity workers?

A    No.

Q    Do you know how the hourly wages are established?

A    No.

Q    Do you know how the salary wages are established?

A    No.

Q    Are you aware that Stewart is a facility covered by the Service Contract Act?

A    Yes.

Page 298

Q    Do you know when Trinity started paying Service Contract Act wages?

A    I'm not sure.

Q    Do you know if that was in the past year?

A    It's -- no.  Not in the past year.  Before then.

Q    Recently, though?  Like in the past two to three years, or --

A    No.  Longer.

Q    Okay.  Has Trinity been paying Service Contract Act wages since you started 12 years ago?

A    I'm not sure.

Q    Do you know Trinity employees also receive the Service Contract Act mandated benefits?

A    Yes.

Q    And those benefits include paid time off?

A    Yes.

Q    Does Trinity offer any other benefits outside of the Service Contract Act mandated benefits?

A    I'm not sure.

Q    And are Trinity employees entitled to overtime pay for any work performed over 40 hours a week?

A    Yes.

Q    About how often do Trinity employees at

Stewart receive overtime pay?

A    So weekly.

Q    On a weekly basis, Trinity employees at Stewart are working over 40 hours a week?

A    Whenever they -- whenever they work overtime, they receive overtime pay.

Q    How often do they work overtime?

A    Often.  Currently, almost weekly.

Q    And why is it currently almost weekly?

A    Because they work overtime.

Q    Why are there additional hours right now?

A    Because we do not have any detainee workers. Well, we -- we only have a few detainee workers currently due to COVID.  So, therefore, we're covering the duties in the kitchen.  Most of the duties in the kitchen.  Like cooking, and the cleaning, and serving the food.

Q    The COVID pandemic reduced the number of detained workers in the kitchen, so Trinity workers have had to work more hours as a result?

A    Yes.

Q    Have there been other times other than the COVID pandemic when this has occurred?

A    When what has occurred?  A shortage of detainee workers?

Q    A shortage of detainee workers that caused Trinity to have to work overtime?

A    It's possible.  I mean, I can't recall an exact time, but it probably has happened before in the past.

Q    You don't know for sure?

A    No.

Q    So the one time you can think of that that did happen was during COVID.  Correct?

A    Yes.

Q    Are Trinity employees required to be trained?

A    Yes.

Q    One additional question, going back to the overtime question.  Who pays Trinity workers overtime?  Is that Trinity or CoreCivic?

A    Trinity.

Q    Okay.  And you then answered my question that Trinity employees are required to be trained.  Correct?

A    Correct.

Q    Do your responsibilities include providing those trainings?

A    Yes.

Q    And do you responsibilities include

ensuring those trainings take place?

A    Yes.

Q    Does CoreCivic provide any trainings to Trinity staff?

A    Yes.

Q    What trainings does CoreCivic provide?

A    I can't tell you them all off the top of my head, but they provide annual trainings -- that's mandatory.

Q    Can you repeat what you just said?

A    The training is mandatory from CoreCivic. The annual training.  In service.  It's a lot of -- lot of topics that they go over.  Report writing, suicide, PREA --

REPORTER:  I'm sorry, ma'am.  What was the last thing you said after suicide?

THE WITNESS:  PREA.  The Prison Rate Elimination Act.

REPORTER:  Thank you, ma'am.

THE WITNESS:  It's a lot of trainings that they provide us with every year.  CPR.

BY MS. STEWART:

Q    You referenced those trainings as in-service trainings.  Correct?

A    Correct.

Page 302

Q     Does CoreCivic provide any trainings to staff pre-service?

A     Yes.

Q     And what are the pre-service trainings?

A     Basically the same thing.  When you first come in, they give you key control.  They give you a lot of training.  Like I said, I -- I can't tell you all of them off the top of my head, but you receive a lot of training when you first come in.  The first two weeks of employment is training only.  Before you come to the kitchen, you have to do two weeks of service.

Q     SO the pre-service training is over the course of two weeks?

A     For Trinity staff, yes.

Q     Do the trainings that CoreCivic provides cover custodial issues related to the detained population?

A     Custodial issues?  What are custodial issues?

Q     Just dealing with the detained individuals.

A     I'm not sure --

          MS. COHEN:  Objection.  Vague.

BY MS. STEWART:

Q     My question is whether CoreCivic trains Trinity staff on interactions with or management of

Page 303

the detained population.

    A    Yes.

    Q    What do those trainings involve?

    A    They involve, like I said, knowing what to look for for suicide.  If anybody's suicidal.  Knowing how to -- work with detainees that may have disabilities.  Knowing how to just interact with the detainees.  Not talking to them on a personal level, but -- treating everyone with respect and that kind of stuff.  So it's a lot of training that they give us, but I can't just say hey, we get a training on this, this, this, and that.  But we do get trained on how to deal with the detainees on a daily basis.  And we have a way to speak with the detainees.  Even though we don't speak Spanish, they have InterpreTalk.  We get trained on all of that, so like I said, I can't tell you the exact trainings that we give, but they do train us.

    Q    How are you trained to speak with detained people who don't speak English?

    A    They have InterpreTalk.

    Q    What is InterpreTalk?

    A    InterpreTalk is where you can call in and they translate from English to Spanish or whatever language the detainee speaks.

Page 304

Q    InterpreTalk is an interpretation service?

A    It is.

Q    Via phone?

A    Yes.

Q    How often do you use that?

A    I don't have to use it often.

Q    Why is that?

A    Because a lot of guys come in, they speak English that work in the kitchen.

Q    Do other Trinity Staff use InterpreTalk?

A    If they have to.  Everyone is signed up. Everyone is trained to use it.

Q    And about how often do other Trinity staff use it?

A    Most of the detainees that come to the kitchen to work speak English.

Q    So the Trinity staff isn't using the interpretation service that often?

A    No.

Q    Do you know if when Trinity pays its workers overtime, it is able to then collect those payments from CoreCivic?

A    Can you repeat that?  If Trinity?

Q    I'll rephrase.  When Trinity has to pay its workers overtime, can it get that money back from

Case 4:18-cv-00070-CDL   Document 383-1   Filed 09/27/22   Page 44 of 300
30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 305

CoreCivic?

A    I'm not sure.

Q    Are you familiar with the Performance-Based National Detention Standards?

A    I am.

Q    Do Trinity employees receive training on the Performance-Based National Detention Standards?

A    Yes.

Q    And if I say "PBNDS," you understand that I'm referring to the Performance-Based National Detention Standards?

A    Yes.

Q    What sections of the PBNDS are Trinity employees trained on?

A    The food service, definitely.

Q    Anything else?

A    They're trained on all of it, but we -- we perform off the kitchen -- the food service part in the kitchen.

Q    So Trinity staff is trained on the food service section of the PBNDS.  Correct?

A    No.  We're trained on all of it, but we use the PBNDS food service section in the kitchen.

Q    When you say you're trained on all of it, can you elaborate?  What do you mean by that?

Page 306

A    During in-service, they train on the PBNDS for everybody to go over in general.  But we practice, in the kitchen, off of the food service part.  That's something that we -- we use it on a daily basis.  Food service.

Q    During the in-service training by CoreCivic, CoreCivic reviews, in general, the PBNDS provisions with Trinity staff?

A    Yes.

Q    I'm going to pull up an exhibit that was previously introduced as Exhibit 4.

          (Exhibit 4 was previously marked for identification.)

          This is Section 5.8 of the PBNDS.  Are you familiar with this document, Ms. Crawford?

A    Yes.  Yes, I am.

Q    Have you seen this before today?

A    Yes.

Q    Do Trinity staff receive training on Section 5.8?

A    Yes.

Q    And what training do they receive on Section 5.8?

A    The volunteer work program.  They review all of this, every day.  It's in the handbook.  So ...

Case 4:18-cv-00070-CDL   Document 333-1   Filed 06/27/23   Page 46 of 300
30(b)(6) Marquita Crawford, Vol. II     August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 307

Q    And what handbook is this in?

A    The CoreCivic's detainee handbook.  It's in
the handbook.

Q    Do Trinity staff receive a copy of that
handbook?

A    Yes.

Q    Do they receive copies of the PBNDS in
places other than the handbook?

A    Yes.

Q    And when does that happen?

A    In -- when they first come in, it's given to
them as part of their documents that they give to
them.  And we also have it in the office.  And it's
available at all times.

Q    Do Trinity staff receive any verbal
trainings on Section 5.8?

A    Yes.

Q    Did you participate in a training where they
discussed 5.8?

A    Yes.

Q    And what was discussed in that training
about Section 5.8?

A    All of it was discussed.  Everything about
the hours that they can work, their job duties, all --
everything was discussed in the -- in the training.

Q    And during the training that you sat in about Section 5.8, were there any visuals provided? Like a PowerPoint, for example?

A    Yes.  They have a PowerPoint on the -- for the ICE contract volunteer program.

Q    And "they" means CoreCivic?

A    Yes.

Q    So CoreCivic has a PowerPoint related to the training they provide Trinity staff on the volunteer work program?

A    Yes.

Q    Other than that training, are there any other trainings that Trinity staff receive on the voluntary work program?

A    No.

Q    Do Trinity staff receive training on the Trafficking Victim Protection Act?

A    I don't recall that.  No.

Q    Do Trinity staff receive training on human trafficking more generally?

A    No.

Q    Do your responsibilities as Food Service Director include ensuring the kitchen is sufficiently staffed with non-Trinity workers?

A    Can you repeat that?

Q    Sure.  Do your responsibilities as Food Service Director include ensuring the kitchen is sufficiently staffed with non-Trinity workers?

A    No.  I'm not sure what you're asking.  Oh.  So my responsibility is to Trinity.  I hire Trinity staff.  I don't hire the detainee workers, and I simply assign them to their duties.  So I can't hire non-Trinity staff because I'm Trinity.

Q    But my question isn't whether you hire the non-Trinity staff.  My question is whether your job duties include ensuring that there is enough non-Trinity staff in the kitchen each day.

A    Well, you said non-Trinity staff working.  Are you talking about detainee -- detainee workers?

Q    Are there any other non-Trinity staff in the Stewart kitchen other than detained workers?

A    The officers.  I don't -- I don't have anything to do with the officers being hired in the kitchen, either.  But for the detainees, if they don't come to work, then we just call.  We look at the roster.  See who's supposed to be at work, and then we call to the unit to see if they're going to come to work.  If they're not coming to work, then we -- they'll send someone else, but we don't, you know, that's nothing -- I don't do the hiring of the

Page 310

CoreCivic staff.

Q    And how many detained workers do you need for each shift?

A    How many do I need?

Q    Mm-hmm.

A    Twenty-seven.

Q    Twenty-seven per shift?

A    Yes.

Q    Has that number changed over the years?

A    Yes.

Q    Okay.  How has it changed?

A    We've increased it.  We've decreased it. We've just -- it just fluctuates sometimes depending on the detainee population.

Q    Okay.  So the number of detained workers you need in the kitchen fluctuates depending on the number of detained people at Stewart at any given time. Right?

A    Yes.

Q    And is there any correlation between number of detained workers you need in the kitchen and number of total detained people at Stewart?

MR. EDWARDS:  Objection to the form.

MS. COHEN:  Join.

//

Page 311

BY MS. STEWART:

Q    For example, how do you know whether to increase or decrease the number of detained workers you need in the kitchen based on the total population?

A    The thing is, with the -- if the population is very low, there's going to be less work in the kitchen.  And if it's high, it's going to be more work in the kitchen.  And then, also, if the population is low, it means you're going to have less detainee workers to volunteer for the kitchen.  So it fluctuates.

Q    And from your perspective as Trinity Food Service Director, is there any difference to you whether the workers who show up to work in the kitchen are detained workers or any other type of worker?  For example, a paid worker?

A    Is it a difference?

Q    It doesn't make any difference to you?  And I understand this is a hypothetical because what you testified earlier is that all the workers who show up are detained workers.  But from your perspective, do you care whether they're detained workers or any other type of worker who shows up to work in the kitchen?

A    And what other kind of worker are you talking about if it was a -- like a civilian worker?

Case 4:18-cv-00070-CDL   Document 333-1   Filed 09/27/23   Page 51 of 300
30(b)(6) Marquita Crawford, Vol. II        August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 312

Are you asking that?

Q    Yes.

A    No.  It doesn't matter.

Q    It doesn't matter what type of worker shows up just as long as enough workers show up for you to get the meal out?

A    Yes.

Q    And how do you ensure that you have a sufficient number of detained workers showing up for each shift?

A    Well, we don't know until they show up whether we're going to have enough or not.  Once we do the daily check-in and we review the roster, like I said, if we don't have enough workers, if they don't come to work, we can always call to the unit.  Maybe the detainee is in medical.  Maybe they had a court date.  So they won't be able to report to work every day.  So in that case, we would just get someone else to report to work or we will do without if we can.

Q    What is the daily check-in?

A    It's like when they come in to report to the kitchen, we have a checklist.  If they're absent, we mark that they're absent.  We look at them to make sure that they got good hygiene, clean uniform, no fevers or chills, anything, they're in good health

Case 4:18-cv-00070-CDL Document 333-1 Filed 09/27/23 Page 52 of 300
30(b)(6) Marquita Crawford, Vol. II        August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 313

that day.  So that's the daily check-in.

Q    Is the daily check-in form the form 11-1K?

A    It is 11-S-1K.

Q    So it isn't until you fill out that form that you know whether you're going to have the number of detained workers you need for that shift?

A    Correct.

Q    And do you know generally how many detained workers are assigned to work in the kitchen?

A    Well --

Q    Not scheduled, just assigned.

A    Assigned?  Like I said, it depends on the population.  We could have sometimes 120.  It could be 66 one week just depending on who's there, who went home.  Some people get released.  So we never know.  But they update it weekly.  When I say "they," it's the CCA.  They let us know on a weekly basis how many detainees we have hired for the kitchen.

Q    So CoreCivic determines the number of detained workers available to work in the kitchen each week?

A    Yes.

Q    Okay.  I'm going to go ahead and introduce the next exhibit, which I believe is Exhibit 27.

//

Page 314

(Exhibit 27 was marked for

identification.)

Can you see Exhibit 27, Ms. Crawford?

A    I can.

Q    Okay.  So Exhibit 27 is an e-mail.  Are you familiar with the e-mail address listed in the from line, Unit 17720 Stewart Correction?

A    Yes.

Q    My understanding is that Trinity assigns each CoreCivic facility a single e-mail address for Trinity staff to use and that this is the address dedicated to Stewart.  Is that correct?

A    That's correct.

Q    Are you a recipient of e-mails directed to that address?

A    I am currently.  Yes, I am.

Q    As Assistant Food Service Director, did you receive these e-mails?

A    Yes.

Q    And as Assistant --

A    I had -- I had -- I had access to this e-mail, yes.

Q    As a Food Service Supervisor, did you have access to these e-mails?

A    Yes.

Page 315

Q    Do all Trinity staff employed at Stewart have access to this e-mail account?

A    No.

Q    Who doesn't have access to it?

A    The Food Service Supervisors don't.

Q    But when you were a Food Service Supervisor, you did have access to it?

A    No.  I was the Assistant Food Service Director.  I had access before.

Q    Okay.  You testified previously that you were a Food Service Supervisor, so my question for you is when you were a Food Service Supervisor, did you have access to this e-mail account?

A    No.  No.

Q    And when you were a Food Service Supervisor, how did you communicate with CoreCivic staff if you didn't have access to this account?

A    That would be through my -- then, at the time, it would have been the Assistant Director and the Director.

Q    Okay.  So when Trinity staff needs to communicate over e-mail with CoreCivic, and they don't have access to the Trinity account, they share the information with the Assistant Food Service Director or the Food Service Director, who can then send the

e-mail?  Is that right?

A    That's not right.  This e-mail is the unit e-mail.  Unit 17720 is the unit e-mail.  CoreCivic assigns every staff member with a e-mail address when they start working.  Now that will be a CoreCivic's e-mail.  But this is for the kitchen.  This is for the Food Service Director and the Assistant Director.

Q    Okay.

A    We use this --

Q    And when you said that CoreCivic assigns an e-mail address to everyone --

A    Mm-hmm.

Q    -- do you mean CoreCivic assigns an e-mail address to Trinity staff?

A    Yes.  When we start, we have a -- a CoreCivic's e-mail.  So if they needed to contact someone to CoreCivic, they would need to communicate something, they do have access to an e-mail address.

Q    Okay.  So when you were a Food Service Supervisor, you had an e-mail address that was @cca.com?

A    Correct.  Yes.

Q    And all Trinity employees at Stewart are assigned a CoreCivic e-mail address?

A    Yes.

Case 4:18-cv-00070-CDL Document 333-1 Filed 05/27/23 Page 56 of 300
30(b)(6) Marquita Crawford, Vol. II        August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 317

Q    And you communicated over that e-mail address?

A    No.

Q    Why not?

A    I didn't have a need to.

Q    Do you know if other Trinity employees use that e-mail address to communicate?

A    I don't.

Q    Turning back to Exhibit 27, as you can see, this is an e-mail from Luis Marrero, Food Service Director.  Do you know Luis Marrero?

A    I do.

Q    Who is he?

A    A former employee of Trinity.

Q    And he was the Food Service Director?

A    He was.

Q    What was your title when Luis Marrero was the Food Service Director?

A    Assistant Food Service Director.

Q    You worked directly under Luis Marrero?

A    Yes.

Q    Was he your supervisor?

A    Yes.

Q    Is he still employed by Trinity?

A    He is a former employee of Trinity.

Q    Do you know why he left Trinity?

A    No.

Q    And in 2014, when this e-mail was written, what was your job title?

A    My job title was the Assistant Food Service Director.

Q    And this e-mail is written to Harrell Gray. Do you know Harrell Gray?

A    Yes.

Q    Who is he?

A    Harrell Gray was the Assistant Warden at that time for CoreCivic.

Q    Is he still employed by CoreCivic?

A    I'm not sure.

Q    And per the e-mail, which references Ms. Lyles, you helped to determine that 34 individuals were needed for the kitchen shift.  Is that accurate?

A    Yes.  I was trying to get -- yes.  I was -- we was trying to get them to increase the workers -- amount of workers in the kitchen.

Q    You were trying to get CoreCivic to increase the amount of workers?

A    Yes.

Q    Why did you need more workers in the kitchen at that time?

A    Just needed them to make -- just trying to increase them so -- just in case some people don't come to work, we'll have workers on hand.

Q    At this time, in 2014, were you having a problem with shortages of detained workers in the kitchen?

A    No.  Not a problem.  No.  Nothing outside the normal.

Q    So you determined you needed 34 detained workers per shift?

A    Mm-hmm.

REPORTER:  I'm sorry.  Is that a yes?

THE WITNESS:  Yes.

BY MS. STEWART:

Q    And you testified earlier that you now need 27 workers per shift.

A    Yes.

Q    And the decrease is attributed to there being a lower number of detained people at Stewart?

A    Yes.

Q    Is the decrease in the number of detained workers you need per shift due to any other factors?

A    No.

MS. STEWART:  Okay.  We can pull down Exhibit 27, and I'm going to go ahead and mark the

next exhibit for introduction as Exhibit 28.

BY MS. STEWART:

Q    And before that exhibit gets pulled up, Ms.
Crawford, going back to your CoreCivic e-mail address,
did CoreCivic staff communicate with you via that CCA
e-mail address?

A    No.  Stuff like, you know, we have in
service.  Anything scheduled for CoreCivic, it will go
to that e-mail.

Q    So there are some e-mails sent to that
e-mail address?

A    Yes.

Q    Okay.  Hopefully, Exhibit 28 will come up
soon.  Oh, I'm sorry.  This Exhibit is previously
marked Exhibit 18.

(Exhibit 18 was previously marked for
identification.)

The Bates is TRINITYCCBVA -- no.  The Bates
is CCBVA0000006420.  Okay.  Exhibit 18 is now up on
your screen, Ms. Crawford.  It is another e-mail.
I'll give you a second to look at it.  Have you seen
this e-mail before today?

A    I don't recall it.  Can you scroll down some
on it, or can I scroll down and read the rest of it?

Q    You should be able to scroll down or --

Page 321

A    Okay.

Q    -- C.J. can.  Yeah.

A    No.  I can't say that I have.

Q    Okay.  Scrolling back up, you can see that this e-mail was written by Mack Moye [sic].  DO you know who he is?

A    Mack Moye [sic]?

Q    Matthew Moye.  Excuse me.  Matthew Moye.  Do you know who he is?  Yeah.

A    Oh.  Mr. Moye.  Yes.  I do.

Q    Who is he?

A    He's a former -- employee of CoreCivic.

Q    Do you know what job he held at CoreCivic?

A    I don't.

Q    And in his e-mail, he writes about a staffing scale.  120 great, 100 good, 96 this is us today, 92 caution, 80 danger.  Are you familiar with this staffing scale for detained workers?

A    No.

Q    -- have any idea what caution means in the context of the staffing scale?

A    I don't.

Q    You testified earlier that CoreCivic lets you know weekly how many detained workers are available to work in the kitchen, and sometimes that's

Page 322

120 works and sometimes that's 66 works.  Correct?

A    Yes.

Q    Is it possible that this staffing scale corresponds with those numbers?

A    I'm not sure.  I'm -- I'm not familiar with the scale, so I can't tell you that.

Q    Do you know why 80 works would constitute a danger per this e-mail?

A    No.

Q    Do you have any idea?

A    No.

MS. STEWART:  Okay.  We can put that exhibit away.

BY MS. STEWART:

Q    How much of a shortage in detained workers can the kitchen endure and still serve the meal as planned?

A    Well, right now, I'm not sure of an exact number, just -- I can't give you a number to say hey, you know, the kitchen can't go on without such and such.  I don't have an exact number.  Like I said, we really want to try to keep that 27.  Yeah, we did request 24, but definitely, I mean -- really, we really take what we can get.  So it's not akin to saying if I don't have such and such number then the

Case 4:18-cv-00070-CDL   Document 383-1   Filed 09/27/22   Page 62 of 300
30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 323

kitchen's going to fail.  I can't say that -- it

because us being trained as supervisors, we have to

make sure that the kitchen goes on.  Everything goes

as planned.  The meal has to go out.

Q    And if you don't have enough detained

workers, then the meal might not go out?

A    Oh, it's going out.  Yes.

Q    Okay.  At some point, I imagine, you're

expecting 27 detained workers, and less than 27 show

up.  Depending on that number, you have to make the

call about what to do?

A    Yes.

Q    And at what point are you making that car?

Is it 24 workers show up?  20 workers show up?  15

workers show up?  Like, what's the number that makes

you think okay, we need to make some adjustments to

get this meal out?

A    I would say ten.

Q    So only ten workers show up.  At that point,

you have to make the call?

A    Yes.

Q    You can make it work with 20 workers?

A    I can make it work with 20 workers.

Q    And you can make it work with 15 workers?

A    I can.

Q     And when it's at 10 workers, what are the calls you have to make?  What type of adjustments?

A     Paper products.  We try not to use paper products but that's an additional cost.  Satellite feed, and if we have to -- those sorts of things that have to be called.  We would have to get, of course, Trinity staff.  They have to serve the food.  So those would be the -- the kinds of adjustments we have to make.

Q     Do you ever have to make menu substitutions as a result of not having enough detained workers?

A     No.  Do I have to make menu substitutions because we don't have enough workers?

Q     That's my question.  Yes.

A     Not because we don't have enough workers. No.  We'll still try to put the meal out.  But, like, recently due to COVID, we've had to make menu changes, but not substitutions.  We -- we did a menu -- we revised the menu because we don't have workers. Currently, we don't have workers.  So we have had to adjust, but not to make like -- that day, it will be something that we'll know about.  It won't be last minute.  Oh, I can't serve this meal.  Every menu substitution has to be requested 24 hours in advance, and it has to be approved by the Warden or the

Page 325

Assistant Warden.

Q   Oh.  Okay.  What type of menu adjustments do you have to make when there's not enough detained workers?

A   We have a contingency plan that we have to follow, and it's been approved by a dietician.  If we had to go down, like due to a storm, we don't workers.  We don't have lights.  We have a emergency continue plan that's put in place already.  So -- but like I said, normally, we will make this -- we'll make it happen.  The meal will go out.

Q   And during COVID, what type of menu adjustments did you have to make?

A   We had to make -- the dietician and everybody got together and we revised the menu. The -- we have more ready-to-cook items on -- added to the menu.  More prepackaged, individually wrapped items added to the menu.  And all of them are nutritionally sound.  Everything's been approved by the dietician and from CoreCivic and Trinity.

MS. STEWART:  Okay.  I'm going to pull up the next exhibit.  The BATES is CCBVA0000219648. This will be marked Exhibit 28.

(Exhibit 28 was marked for

identification.)

Case 4:18-cv-00070-CDL Document 383-11 Filed 09/27/23 Page 65 of 300

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 326

BY MS. STEWART:

Q     Ms. Crawford, can you see Exhibit 28?

A     I can.

Q     Okay.  And you see this is an e-mail that you sent from the Trinity e-mail account to Harrell Gray?

A     Mm-hmm.

Q     And the e-mail attachment is the 11-1J form.

A     Okay.

Q     And the attachment is titled "Monthly Food Service Report."

A     Mm-hmm.

          REPORTER:  Sorry, ma'am --

BY MS. STEWART:

Q     Do you recall seeing this document?

          REPORTER:  --was that a yes?

          THE WITNESS:  Yes.  I'm sorry.

BY MS. STEWART:

Q     And the attachment is titled "Monthly Food Service Report."  Have you seen this before?

A     I have.

Q     What is this report?

A     The monthly food service report.

Q     As Food Service Director, is it your job to fill it out?

Page 327

A    It is.  Yes.

Q    How often do you fill it out?

A    Monthly.

Q    And do you always send it to CoreCivic?

A    Yes.  It's required that we send it electronically to CoreCivic.

Q    And in this particular instance, you sent it to Harrell Gray, the Assistant Warden.  Is that who you generally send it to?

A    Yes.  And the -- and -- yes.

Q    Do you keep a copy in the kitchen?

A    Yes.

Q    Is it a paper copy or an electronic copy?

A    Paper and electronic.

Q    Okay.  So this document, it appears to track Trinity staff vacancies under vacancies.  Is that correct?

A    That's correct.

Q    And it says you have one vacant position, Food Service Worker, on 9/28/2017, and the length of the vacancy was 279 days.  You see that?

A    Yes.

Q    Okay.  When there is a vacancy for a Food Service Worker position, is it common for it to be open for that length of time?

Page 328

A    Yes.

Q    And why is that?

A    It's because they have to go through a lengthy background check to work at the facility, and a lot of people can't clear the background check.  So it's kind of important to be open for a while.

Q    And how does a vacancy affect the detained worker staffing if at all?

A    It doesn't.

Q    Okay.  Moving down to Inmate Worker Absentee Rate, here it looks like Trinity is tracking the absentee rate of the detained workers.  Correct?

A    Correct.

Q    And why is this tracked?

A    We're required to track it.

Q    Who requires you to track it?

A    Trinity.

Q    Is CoreCivic --

A    And -- and it's on the CoreCivic form, so we have to track it.

Q    CoreCivic requires you to track the detained worker absentee rate?  Is that correct?

A    Yes.

Q    And here, it says on 6/11/2018, when the average absentee rate was 25 percent, action taken,

Case 4:18-cv-00070-CDL   Document 383-1   Filed 09/27/23   Page 68 of 300
30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 329

units were called for any volunteers.  Is that consistent with your experience in the kitchen, that when the absentee rate of detained workers was at 25 percent, you need to call CoreCivic to get more workers?

A    Yes.  That when they're absent, we call in with us, but we do.  We call the unit.  We see if we can get those bodies to the kitchen.

Q    And how many workers have to be missing for you all to call the unit to get more?

A    I call if they don't come to work.  If they're absent on a day, we have to call and see where they are.  Where the workers are.  So I call anyway, but we can still run the kitchen, but I still -- I'm still responsible for calling the unit to see if those guys are going to report to work.

Q    So even if the absentee rate is only one person missing, you're going to call the unit to let them know?

A    Yes.

Q    And why do you do that?

A    I do that because that's what I was trained to do.  That's what -- we -- we're supposed to keep up with the detainee workers to make sure, you know, they -- like I said, they could be anywhere.  They

could put -- be sick.  They could be medical  That's just what we do.  We call to make sure that we have the workers in the kitchen.

Q    CoreCivic requires you to report detained workers who don't show up to work?

A    Yes.

Q    And I think you testified that even one doesn't show up, you're reporting.  Correct?

A    Not reporting?  I'm calling to see if I can get those guys to the kitchen to - -to find out their location.  Yes.

Q    Okay.  So when a worker doesn't show up to work, you're reporting to CoreCivic because CoreCivic requires you to do that, but also because you want that person to show up to the kitchen?

A    Correct.

Q    And what if you call and the worker is unavailable due to an illness, for example?  What happens next?

A    They'll -- if they have a replacement, they'll send a replacement.

MS. STEWART:  Okay.  I'll pull up the next exhibit.  The Bates is CCBVA0000189815.

MR. EDWARDS:  Ms. Stewart?

MS. STEWART:  Sure.  Yeah?

Page 331

MR. EDWARDS:  Is now an okay time for a break?  I know we've been going about an hour and a half.  It's your deposition.

MS. STEWART:  Absolutely.  How long would you like a break?  We can go off the record, Dan.

REPORTER:  We are off the record.  The time is 11:01 a.m.

(Off the record.)

REPORTER:  We are back on the record. The time is 11:11 a.m.  You may proceed when ready, Counsel.

BY MS. STEWART:

Q   Ms. Crawford, you understand that you're still under oath after the break?

A   Yes.

Q   Before we broke, we were about to introduce another exhibit.  The Bates number of that exhibit is CCBVA000189815.  And this is marked as Exhibit 29.

(Exhibit 29 was marked for

identification.)

Ms. Crawford, can you see Exhibit 29?

A   Yes.  I can.

Q   Okay.  And at the very bottom, you'll see that this is an e-mail from the Trinity e-mail address

Page 332

at Stewart written by Luis Marrero.  Correct?

    A   Yes.

    Q   He's writing the e-mail to Harrell Gray and Calvin Blue.  Who is Calvin Blue?

    A   He was the Assistant Warden at Stewart.

    Q   And this e-mail was written in 2015. Correct?

    A   Yes.  That's right.

    Q   And at this time you were Assistant Food Service Director?

    A   Yes.

    Q   And if you look at the third sentence of Mr. Marrero's e-mail at the bottom, he says, "We are still short seven workers, and the noon meal will be delayed.  I'm not sure what needs to happen, but this shortage in workers is hurting the entire facility, especially the kitchen."  Do you recall what Luis Marrero was talking about in this e-mail?

    A   No.  I'm going to read them.  Hold on.

    Q   Sure.

    A   No.  I'm not sure what he's -- why -- I'm not sure of the incident.

    Q   Okay.  But you agree he appears to be talking about a shortage of detained workers?

    A   Yes.

Case 4:18-cv-00070-CDL Document 333-1 Filed 06/27/23 Page 72 of 300
30(b)(6) Marquita Crawford, Vol. II     August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 333

Q   And one of his concerns is that missing seven workers means the noon meal will be delayed?

A   That's what he said.

Q   And he's talking more generally about what he calls "this big problem," which appears to be an ongoing shortage of detained workers.  Do you agree with that?

A   I'm not sure of this incident.  I'm not -- I can't recall when this was going on.

Q   In your time at Trinity, have you experienced shortages of detained workers such like the one he's talking about?

A   Yes.  We have had a shortage in detainee workers.

Q   And have those shortages impacted the meal service?

A   If we don't have enough workers, it will take longer to serve the meal.

Q   And in this case, missing seven workers meant that the meal service would be delayed. Correct?

A   That's --

Q   At least according to Mr. Marrero?

A   According to Mr. Marrero.

Q   And at the bottom of the e-mail, he says,

"I'm trying very hard to keep everyone out of Stewart's business, but our numbers are starting to reflect the shortage.  We are pushing 13 to 14 percent.  Once 15 percent is hit, they expect answers."  So you know what the 13 and 14 percent numbers mean?

A    No.

Q    A few sentences up, he refers to "my chain of command is already asking questions."  Do you know what he means by "chain of command"?

A    No.

Q    Do you report to anyone at Trinity above you?

A    I do.

Q    Who do you report to?

A    Danielle Christmas.

Q    Did Mr. Marrero also report to someone above him?

A    I'm pretty -- yes.  Yes, he did.

Q    Do you recall who he was reporting to in 2015 when this e-mail was written?

A    Michael Leshak.

Q    Could it be that when he's referring to his chain of command, he's referring to Michael Leshak?

A    I'm not sure.

Page 335

Q     Do you have any idea why he would have written to CoreCivic that his chain of command is concerned about the worker shortage?

A     No.

Q     Is it fair to say from this e-mail that Trinity is closely tracking the number of detained workers in the kitchen due to risk of disruptions in the meal service?

A     Trinity does track the absenteeism rate in the kitchen.  We do report it monthly, but we report it weekly.

Q     And in some instances, at least in this e-mail, you report it in real-time to CoreCivic. Correct?

A     He did.

REPORTER:  I'm sorry, ma'am.  Did you say we did or he did?

THE WITNESS:  He did.

REPORTER:  Thank you, ma'am.

BY MS. STEWART:

Q     Have you ever reported it in real-time to CoreCivic like Mr. Marrero did here?

A     Not exactly like he has there, but I have made them aware when we're short.

Q     And the goal of giving that information is

Page 336

so that you can get more detained workers in the kitchen?

    A    Yes.

    Q    And prevent any delays in the meal service?

    A    That's correct.

    Q    You testified earlier that as Food Service Director, you are responsible for tracking the attendance of detained workers in the kitchen. Correct?

    A    Yes.

    Q    And you do that on the 11-1K form.  Correct?

    A    On the 11-1K form.  Yes.

    Q    SO when you realize that the detained workers who were scheduled to work that day didn't show up, what do you?  Can you walk me through your next steps?

    A    If the detainees do not show up to work?

    Q    Yes.  What do you do?

    A    We call the unit and see where the detainees are.  If they're in court and they're going to report to work after court, then we don't need the volunteer. We can just wait until they get there.  If they're in medical and they're going to be in medical for a long time, we can wait on those people to report to work. Now if -- if it's over two hours, yeah, we'll go ahead

and get -- I mean, over an hour, we'll go ahead and get more workers.  But if that person is not going to report to work, we call the unit, see if anyone is available to work, and they send them up to the kitchen.  And then we check those people when they get to the kitchen.  Check them in on the 11-1K form.

MS. STEWART:  Okay.  I'm going to pull up another exhibit.  The Bates number is CCBVA0000198718.  Okay.  This Exhibit is marked 30.

(Exhibit 30 was marked for identification.)

BY MS. STEWART:

Q    Can you see Exhibit 30, Ms. Crawford?

A    Yes.

Q    Okay.  And you'll see it is an e-mail down at the bottom written by you as Food Service Director to Harrell Gray in 2018.  Do you see that at the bottom?

A    I do.

Q    And you write, "FYI, only three workers have reported to work at this time."  Do you see that?

A    Yes.

Q    And why were you reporting that to Harrell Gray?

A    Because only three workers reported to work

Page 338

at that time.  So with three workers, we definitely couldn't do anything with three workers.  So I had to report it to him so it wouldn't interrupt the building schedule.

Q    Okay.  And then he responds to you just up above, "Did you ask the officers their whereabouts?"  Do you see that?

A    Yes.

Q    Did you ask the officers the whereabouts of the other workers that day?

A    Yes.

Q    And what did the officer do in response?

A    I can't recall exactly, but I'm pretty sure the reason why I had to ask -- no.  I'm not sure what they said that day, but it was for me to reach out to the AW.  Evidently, they didn't show to work, so that's why I had to call the Warden -- the Assistant Warden because there was only three workers that came up.

Q    Mm-hmm.

A    Mm-hmm.

Q    Okay.  So this is an instance when you reported missing workers to the Assistant Warden.  I think you testified earlier, and correct me if I'm wrong, but that when you asked about the whereabouts

Case 4:18-cv-00070-CDL   Document 383-1   Filed 09/27/23   Page 78 of 300
30(b)(6) Marquita Crawford, Vol. II        August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 339

of the workers from CoreCivic staff, you usually give it an hour or so for workers who were --

A    For the -- yes.

Q    -- at court to show back up?

A    I didn't give you a -- an exact time, but I know that, like if they didn't respond.  Normally they respond.  They'll tell me where the guys are.  They're keeping track of where the guys are.  Like I said, some could have been in court.  They could have been medical.  But, hey, they're going to come to work.  But on this day, for whatever reason, I reported that only three was at work.  And like I said, we can't -- that is not possible.  I mean, three workers, I mean, they can only wash the dishes and Trinity staff, we have to be on the line.  Then we'd have to use paper products.  So I'm -- like I said, I'm not sure of this incident on what was going on.  Why only three came up, but yeah, I did report it to the Warden.

Q    So on a day when only three workers show up to work, you can't give it an hour or so to see whether other workers show up.  Correct?

A    That's correct.

Q    Because with only three detained workers, you can't get the meal service out?

A    That's correct.

Case 4:18-cv-00070-CDL Document 333-1 Filed 09/27/23 Page 79 of 300
30(b)(6) Marquita Crawford, Vol. II        August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 340

Q    So is this e-mail, Exhibit 30, typical of the process you use to inform CoreCivic when there are not enough detained workers in the kitchen?

A    No.

Q    --typical --

A    -- normally -- normally we would have to just call to the units.  But in an extreme case like this with only three workers, you know, we would notify.  Unless the Warden, you know, specifically said hey, let me know about the workers and all.  But normally, we would just make a phone call to see where the guys are and see if we can get volunteers.

Q    Normally you would just make a phone call to the unit?

A    Yes.

Q    Okay.  And in extreme cases like this one, you'll notify the Assistant Warden or the Warden?

A    Yes.

Q    And just noting at the top, Harrell Gray responded to you "We currently have 21 workers and 2 cooks.  The officer went to the unit and got those."

A    No.  Look, I sent that to AW Gray.

Q    Oh.  Excuse me.  That's right.  You sent that.  So workers eventually did show up after CoreCivic went to get them in the unit.  Is that

30(b)(6) Marquita Crawford, Vol. II        August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 341

correct?

A    Yes.

Q    And so generally, when you inform CoreCivic of a shortage of detained workers, CoreCivic deals with it by going to get more detained workers?

A    Yes.  They can round them up and so they can come.

Q    They go round up more detained workers?

A    Mm-hmm.

REPORTER:  I'm sorry.  Is that a yes?

THE WITNESS:  Yes.  I'm sorry.

REPORTER:  Thank you, ma'am.

THE WITNESS:  Mm-hmm.

BY MS. STEWART:

Q    How often do you have to call the unit to ask for more detained workers generally?

A    I don't have a -- a number of times that I've had to call.

Q    I mean, can you just give me an estimate? Do you have to call like once a shift?  Once a day? Once a week?

A    I'm not sure.  It depends on a lot of things.  Like I said, every day is going to be different in this facility.  You just don't know when you have to call.  So I can't just give you -- I can't

Case 4:18-cv-00070-CDL Document 333-1 Filed 09/27/23 Page 81 of 300

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 342

say every shift, I have to call.  I can't say every week I have to call.  It's going to be different times and different situations.

Q    Would you say it happens several times a week?

A    Depending on the week.

Q    It can happen several times a week?

A    It could, yeah, but it -- it could also happen once a -- once a week.

Q    When you're missing detained workers in the kitchen, have you had any conversations with CoreCivic about addressing the shortage with CoreCivic employees?

A    Can you repeat that?

Q    Sure.

A    Have I had -- go ahead.

Q    Yeah.  Just when you have a shortage of detained workers in the kitchen, have you had any conversations with CoreCivic about filling those shortages with CoreCivic employees?

A    Of course with the counselors, with the unit team.  You know, they have hands-on with the people that they hire.  So of course we're going to talk to the unit team.  We have to communicate about those things.  That's part of my job, trying to, you know,

make sure we communicate with CoreCivic, especially --

Q    About the --

A    -- detained --

Q    -- workers?

A    Yes.

Q    Okay.  My question is a little different.
I'm asking if you ever talk to CoreCivic about filling
temporary labor shortages in the kitchen with
CoreCivic employees or other outside paid employees,
not detained workers.

A    I haven't.

Q    You've never talked to CoreCivic about that?

A    I haven't.

Q    Do you know whether labor shortages in the
kitchen can be fixed with paid employees?

A    I'm not sure.

Q    And I think you mentioned earlier that
during COVID and currently there is an ongoing
shortage of detained workers.  Is that right?

A    That's correct.

Q    And as a result, you have had to make some
adjustments to the meal service?

A    Yes.

Q    And you testified some of those adjustments
include changes to the menu?

Page 344

A    Yes.

Q    And other adjustments include, and correct me if I'm wrong, satellite meal service?

A    Yes.

Q    Was there ever a discussion about filling the labor shortage during COVID with paid employees?

A    I haven't had a discussion about it.  No.

Q    Do you know any reason why the labor shortage couldn't be fixed with paid workers?

A    The reason why it can be fixed with -- no.

Q    I'm just wondering, do you know if it can't be fixed with paid workers?

A    We -- we've never done it before, but --

Q    You've never seen paid workers fill a labor shortage of detained workers in the kitchen at Stewart?

A    No.

Q    During COVID, were there any efforts made to ensure the kitchen workers could still report to work?

REPORTER:  My apologies, Counsel.  Can we go off the record for a moment?

MS. STEWART:  Yes.

REPORTER:  We are off the record.  The time is 11:29 a.m.

(Off the record.)

Page 345

REPORTER:  We are back on the record.
The time is 11:31 a.m.  You may proceed when ready,
Counsel.

MS. STEWART:  Thank you.

BY MS. STEWART:

Q    Ms. Crawford, you mentioned there was a
shortage of detained workers during COVID.  Correct?

A    Yes.

Q    And why is there a shortage?

A    Due to quarantining.  Doing -- due to -- the
workers not wanting to come to work.  So, therefore,
we have a shortage.

Q    Do know why the workers don't want to come
to work?

A    We have a lot of -- I don't know why they
don't want to come to work, but we don't have them.
We don't have the workers right now.

Q    Okay.  Do you know if any efforts were made
to ensure that kitchen workers could still report to
work during COVID?

A    They -- I know that they did their best
trying to get the workers.  We did testing.  Medically
clearing everybody.  Trying to get them separated from
the incoming detainee population.  But unfortunately,
when -- when one tests positive, then the whole unit

has to quarantine.  So, therefore, we didn't have workers.  And that's an ongoing thing.

Q    And when you say "testing," you mean rapid COVID testing?

A    Right.  Yeah.  COVID testing.  And I know that they did -- also did the vaccinations for the detainees also so that we can, you know, try to keep those workers healthy so they can report to work.

Q    Okay.  Co CoreCivic implemented rapid COVID testing and vaccinations as a way to get the detained workers back in the kitchen?

A    Yes.  Make sure we had workers in the kitchen.

Q    At any time during COVID, has CoreCivic supplied paid staff to fill the labor shortage?

A    Their -- CoreCivic staff is helping out in the kitchen.  We -- I give them some training -- the same orientation that I give the detainee workers, and they have been serving in the kitchen.  Working in the kitchen alongside with Trinity staff.

Q    How many CoreCivic staff are working in the kitchen?

A    Five.  Five officers who are assigned to the kitchen to help out.

Q    Are they assigned full-time to the kitchen?

Page 347

A    Yes.

Q    And how long have they been assigned to work in the kitchen?

A    For about several weeks now.

Q    Several weeks.  Like more than six months?

A    No.

Q    Less than --

A    I don't --

Q    -- six months?

A    -- think so.  Less than six months, yes.

Q    Less than three months?

A    Right at -- right at three months maybe.

Q    And you mentioned that the CoreCivic employees working in the kitchen are officers?

A    Yes.

Q    Is there any reason why CoreCivic couldn't directly hire kitchen workers?

A    I'm not sure.

Q    And at any other time since you've been at Stewart other than during COVID has CoreCivic supplied that many employees to fix a labor shortage in the kitchen?

A    No.

Q    Do you know if the CoreCivic officers working in the kitchen were pulled from another post?

A    I'm not sure.

MS. COHEN:  Lack of foundation.

REPORTER:  I'm sorry.  That was lack of foundation, ma'am?

MS. COHEN:  Yes.

REPORTER:  Thank you, ma'am.

BY MS. STEWART:

Q    How many shifts are there at the Stewart kitchen for detained workers?

REPORTER:  My apologies, Counsel.  I'm not sure I got a response to the last question.  I got the objection, but I don't have that response.

MS. STEWART:  Okay.  I can --

MS. COHEN:  Lack of foundation.

MS. STEWART:  Yes.  We heard your objection.  I can reask the question and get an answer.

BY MS. STEWART:

Q    My question for you is whether you know whether the CoreCivic officers working in the kitchen were pulled from other posts.

A    I'm not sure.

Q    How many shifts are there at the Stewart kitchen for detained workers?

A    We currently have two shifts.

Page 349

Q    Have there ever been three shifts?

A    Yes.

Q    Okay.  When were there three shifts?

A    I'm not sure of the exact time.  Maybe a year ago.  Two years ago.

Q    And how long were there three shifts if you recall?

A    It's been off and -- we've had two shifts before and we've had three shifts before.  So it just depends on the facility needs.

Q    Do you increase to three shifts when there's an increase in the detained population?

A    Yes.

Q    Did you shift back down to two shifts recently because the detained population has decreased?

A    Yes.

Q    Are you the person who decides how many shifts there will be for the detained workers?

A    No.

Q    Who decides that?

A    The unit team.

Q    The unit team consists of CoreCivic employees?

A    Yes.

Page 350

Q    Do you have any influence over whether there's two or three shifts?

A    We communicate about the needs and what works best.  Yes.

Q    So would you communicate a need for additional workers to the unit team, and then the unit team would ultimately decide?

A    Yes.

Q    Does Trinity decide which shifts the workers will work on?

A    No.

Q    Who decides that?

A    The unit team.  CCA.

Q    And how long are the shifts?

A    If we have three shifts, it's six hours. Two shifts, eight hours.

Q    And at Stewart, have detained workers ever worked more than eight hours?

A    I'm not sure.  I can't recall, but by policy, they work eight hours.  No more than eight hours.

Q    Okay.  The policy says they can't work more than eight hours.  Correct?

A    Correct.

Q    And you can't recall whether they have

Case 4:18-cv-00070-CDL   Document 383-1   Filed 09/27/23   Page 90 of 300
30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 351

worked more than eight hours?

A     No.  We -- at the end of the shift, we send them back to the unit.  The officer is in charge of the timesheets and everything.  They handle all of -- all of that.  We just assign them to their work groups.  But more than likely, they will work less than eight hours.  Once everything is done in the kitchen, they're allowed to go back to the unit.

Q     Well, what about in instances when the meal service goes over eight hours?  In that case, would they work more than eight hours?

A     The meal service won't go over eight hours.

Q     Has it ever gone over eight hours?

A     No.

Q     You referenced that it is the unit managers who track the detained worker's time.  Correct?

A     No.  The unit team, I said.  I'm not sure if it's the unit manager, the counselors, or whoever's in the unit that's handling the detainee pay.  They track it.  And the kitchen officer, they log it in.  They have a timesheet they log in.  So the unit team does it.

Q     Trinity doesn't have any responsibility with respect to tracking the times the detained workers work?

Page 352

A    No.  On the 11-1K is the time where they report to work.  Not a end time.  But every time they come up, that's the time we log in.

Q    Do you know if time cards have ever been used to track detained worker's time?

A    Yes.  They have been.

Q    And when did the time cards start?

A    I'm not sure the exact date.

Q    Was it in the past year?

A    No.

Q    Was it in the past three years?

A    You said when it stopped or started?

Q    When it started.

A    Probably back in two thousand -- I don't know when it started.  I mean, I think -- no.  When I first started, they had time cards, and the time cards went away.  And then they introduced the time cards again, and then it went away again.  We started to use the OMS tracking system.  Not tracking system, but the log sheet.

Q    And do you know what the cards looked like? The time cards?

A    Yeah.  They were like regular timesheets you would use on a job.  Like the manilla paper timesheets.

Case 4:18-cv-00070-CDL Document 383-11 Filed 06/27/23 Page 92 of 300
30(b)(6) Marquita Crawford, Vol. II    August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 353

Q    Was there like a punch clock that workers would use?

A    It was.  Yes.

Q    And what information did the cards contain?

A    The time that they report to work, the dates, and what time they left work.

Q    Do you know where the time cards were stored?

A    No.  The kitchen officer was responsible for it.

Q    Do you know why CoreCivic periodically has used time cards to track detained worker's time?

A    No.

Q    Do you know if the time cards allow for the in and out time to be electronically reported?

A    Yes.

Q    Do detained --

A    No.

Q    -- worker --

A    No.  When they -- when they use the time -- the punch clock, the time is on there.  But it's not on the -- it's not kept on like a computer log or anything.  It's just a time stamp.

Q    Okay.  So the punch clock physically stamps the time card?

Case 4:18-cv-00070-CDL   Document 333-1   Filed 09/27/23   Page 93 of 300
30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 354

A    Yeah.

Q    But there's no computer reporting that?

A    No.

Q    Okay.  Thanks for clarifying.  Do detained workers ever work more than one shift in a day?

A    No.

Q    Do workers get breaks?

A    Yes.

Q    How many breaks do they get?

A    Well they can have a water break as often as they like, but they -- you know, just let us know, hey, we're going outside to get water.  They can do that.  And a bathroom break is unlimited.  But like an official break, we try to give them two hours after they start working, they go ahead and take a break.

Q    How many breaks do they get per shift?

A    Two.

Q    How long are the breaks?

A    Thirty minutes for the lunch break.  They have 30 minutes to go outside and sit.

Q    How long is the second break?

A    About 15 minutes.

Q    And is there any record of those breaks when they're taken?

A    No.

Page 355

MS. STEWART:  Okay.  I'm going to introduce another exhibit.  The Bates number is CCBVA0000190040.  This is Exhibit Number 31.

(Exhibit 31 was marked for

identification.)

BY MS. STEWART:

Q    Can you see Exhibit 31, Ms. Crawford?

A    I can.  I can.

Q    Okay.  So starting from the bottom, Exhibit 31 is an e-mail from Mr. Droudred Blackmon to various CoreCivic employees.  At the top, it shows that the e-mail that Mr. Blackmon had drafted was forwarded to the Trinity e-mail account at Stewart.  And this was in 2015.

A    Mm-hmm.

REPORTER:  I'm sorry.  Was that a yes, ma'am?

THE WITNESS:  Yes.

REPORTER:  Thank you, ma'am.

BY MS. STEWART:

Q    Did you receive this e-mail?

A    I'm not sure.  Let me -- let me look over it and see.

Q    Okay.  Sure.  Take your time.

A    I don't recall this e-mail.

Case 4:18-cv-00070-CDL Document 333-1 Filed 06/27/23 Page 95 of 300
30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 356

Q    Okay.  Were you reviewing the Trinity e-mail account e-mails in 2015?

A    Yes.

Q    Okay.  Down at the bottom in an e-mail it looks like from Jennifer Fedderick, she's reporting on a town hall meeting with detained workers.

A    Mm-hmm.

Q    And she mentions that there were complaints from the second shift kitchen workers.  And in number one, the first bullet, it says, "Detainees complained that they were working over past their eight hours.  Detainees were explained that due to the amount of detainees present here in the facility, chow may extend past eight hours.  Some situations that occur in the facility may cause chow to run later than usual.  Normal chow should not extend past seven-thirty."  Do you recall this instance when chow was running past eight hours?

A    No.  Chow -- I don't -- no.  I don't recall chow running past eight hours.

Q    So Jennifer Fedderick reporting that detainees were explained that due to the amount of detainees present here in the facility, chow may extend past eight hours, she was incorrect?

A    I'm not sure if she -- mean chow.  Chow is

Case 4:18-cv-00070-CDL Document 333-1 Filed 09/27/23 Page 96 of 300
30(b)(6) Marquita Crawford, Vol. II     August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 357

the amount -- like, the feeding time.  Feeding time does not extend eight hours.

Q     But you agree here she is saying that it does extend past eight hours?

A     That's what she said.

Q     And she also seems to be saying that she explained to detainees that sometimes it runs past eight hours in response to their complaint that they were working over eight hours.  Correct?

A     Yes.  That's what she said.

Q     And your testimony earlier is that you wouldn't really know whether detained workers worked more than eight hours in a shift because you're not tracking when they leave the job.  Correct?

A     That's correct.

Q     So you testified earlier that when not enough detained workers show up to the kitchen, you would inform CoreCivic.  On days when more workers are needed and you let CoreCivic know that, do you know how CoreCivic gets those detained workers who report to the kitchen?

A     No.

Q     Do you know whether CoreCivic provides any incentives to workers to get them to take the kitchen shift?

Page 358

A     No.

MS. STEWART:  Let's pull up the next exhibit.  The Bates is CCBVA0000190337.  I think we have the wrong exhibit up.  There we go.  That's what I wanted.  Okay.  So if you pull up again the document, you'll see that it is an e-mail.

REPORTER:  And for the record, ma'am, this will be Exhibit 32?  Is that right?

MS. STEWART:  Yes.  That's right. Thank you.  Exhibit 32.

(Exhibit 32 was marked for identification.)

BY MS. STEWART:

Q     This is an e-mail chain starting with an e-mail from various CoreCivic employees discussing a document that's attached to the e-mail.  And if you scroll down, you can see what document that is.  It's titled Voluntary Kitchen Work Program.  Have you seen this document before, Ms. Crawford?

A     I do not recall this form.  I can't remember.  I can't remember this form, but let me look at it.

Q     Sure.

A     I can't remember this -- this form, but --

Q     Are you generally familiar with the list of

Case 4:18-cv-00070-CDL   Document 333-11   Filed 09/27/23   Page 98 of 300
30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 359

kitchen rules and guidelines?

A     Yes.  From -- from my orientation.  This --
this is not included in my packet.

Q     But in terms of the content of the document,
the list of kitchen rules and guidelines, you're
familiar, generally, with those rules and guidelines?

A     Yes.  I have those.  Yeah.

Q     Okay.  And are you familiar with CoreCivic's
practice of giving detained workers $5 phone cards for
volunteering to work?

A     I do recall that happening like years and
years ago.  But I -- you know, that -- I don't know
exactly when it was, but I'm not -- when I see this, I
do remember a phone card.  But I don't, you know, I
don't know who issued or how -- why it was issued.
Anything.  I do remember them having phone cards.  I
thought maybe they bought them from like commissaries.
But they used to have phone cards.

Q     Okay.  And do you know whether CoreCivic was
providing phone cards to detained workers who agree to
work?

A     No.

Q     You're not familiar with that practice?

A     No.

Q     Are you familiar with CoreCivic's practices

Page 360

stated here that kitchen workers will not get a phone

card if they only show up to work after Trinity

requested volunteers?

A     No.  This -- this has to be a form that they

had in the unit because I don't have this form.  This

is not a part of my packet.

                MS. STEWART:  Okay.  We can take down

Exhibit 32.

BY MS. STEWART:

Q     Are you familiar with the practice of

allowing detained kitchen workers were to receive

extra food as a benefit of working in the kitchen?

A     That -- they do get extra food.  They eat

the left-over food, the short line.  They do.  But

that's not a -- a put in in writing for them to say

hey, that's -- you're going to get extra food if you

come to the kitchen.  That's just part of working the

kitchen before we were done with everything that's --

we can't utilize the food anymore, yes they are

allowed to eat food during their lunch break.

Q     So there's a general practice of allowing

detained kitchen workers to eat extra food including

the leftovers?

A     Yes.

Q     In your experience, does the extra food

30(b)(6) Marquita Crawford, Vol. II       August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 361

provide an incentive for kitchen workers to work in the kitchen?

A    No.

MS. STEWART:  Okay.  I'll pull up the next exhibit.  The Bates number is CCBVA0000189805.  We'll mark this as Exhibit 33.

(Exhibit 33 was marked for identification.)

BY MS. STEWART:

Q    Can you see Exhibit 33, Ms. Crawford?

A    I can.

Q    Okay.  This is an e-mail from Sandra Lancara Castro, a CoreCivic employee, to other CoreCivic employees reporting on the results of a town hall with kitchen workers in Unit 1F on the first shift.  Have you seen this e-mail before today?

A    No.

Q    Do you generally receive results of town hall meetings --

A    No.

Q    -- as Trinity Food Service Director?  No?  Okay.  If you go down to number six on the first page, you should be able to see that.  It says, "Complain: detainees complain that they used to get double portions of food.  Now they only get double portions

30(b)(6) Marquita Crawford, Vol. II        August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 362

on weekends.  Resolution:  First shift of kitchen workers will receive double portions in the morning. Second shift of the kitchen workers will receive double portion at evening and night."

A    I don't know who made that, but obviously, Ms. Lancara, I don't know why she told them that.  But yeah.  I knew having issue with -- I didn't know of an issue about guys saying they only get double portions on the weekend.

Q    You didn't receive information about this complaint?

A    No.  Not about double portions.  No.

Q    So is it a practice that in addition to getting to eat the leftovers, detained kitchen workers also get double portions of food?

A    No.  Not going through the line.  The short line is in the kitchen.  When they get done eating and the food is there, they are allowed to eat it before we discard it.  If we can't keep it for leftovers, they're allowed to eat food -- eat extra food.

Q    Okay.  Just to clarify, my question is, is it a practice that detained kitchen workers also get double portions of food?

A    No.  No.

Q    And so if that's correct, then you agree

what the detained workers were told in this town hall was incorrect?

MR. EDWARDS:  Objection to form.

MS. COHEN:  Join.

BY MS. STEWART:

Q    You can answer the question, Ms. Crawford.

A    Yes.  That was wrong what they were told in the meeting.

Q    So detained workers were told they would get a double portion, but that was incorrect?

A    I'm not sure -- Yeah.  By this e-mail.  I didn't -- I didn't -- that wasn't something that I discussed with Ms. Lancara.

Q    You referenced something called a short line.  Can you define what that is?

A    Those -- my kitchen workers, when they -- when they eat their -- when it's on their meal period during their break, that's my short line.  My -- my workers in the kitchen when they -- when they eat dinner or lunch or breakfast.

Q    So the short line is describing the line that the kitchen workers go through when they're getting their food?

A    Yes.

Q    On the same Exhibit, Number 33, if we can go

30(b)(6) Marquita Crawford, Vol. II     August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 364

down to the bottom, number ten --

A     Mm-hmm.

Q     It reads, "Complain:  there used to be a clock in the kitchen.  That has been taken out say the detainees so that they don't know when they work past shift end."  Is that accurate that there was a clock in the kitchen that was taken out?

A     No.

Q     Is there currently a clock in the kitchen?

A     It is.

Q     Is it visible to the detained workers?

A     It's -- it wasn't put there for the detained workers.  We have a time clock.  When we updated our time clock -- it's still there, but it's not -- the clock like they used to maybe see, but it's still our time clock.  But we have updated the system.  So that's the clock that they're talking about.

Q     Can the detained workers see the clock in the kitchen?

A     Not -- they can, if they come to -- if they look through the window, they can see it.

Q     Okay.  But the clock --

A     And we -- we have a time clock, and we have a regular clock that's posted in the chow hall.

Q     Okay.  In the kitchen where the kitchen

workers work, there's no clock?

A    No.

Q    If you scroll down to the top of the next page of Exhibit 33, you'll see, "Resolution:  Trinity will hang clock on the wall for detainee view.  If detainee leave the lines before he relive, Trinity" -- before he, I think it's supposed to be he is relieved," Trinity will write disciplinary report on that detainee."  Did Trinity hang clocks on the wall for the detained workers after this issue was raised?

MR. EDWARDS:  Objection.  Overbroad.

THE WITNESS:  Okay.

BY MS. STEWART:

Q    You can answer.

A    We do have a time -- we have -- we do have a clock that's in the kitchen.  Yes.  But it's not in -- it's not on the line.  But they have a clock that's always been in the chow hall.

Q    There's a clock in the chow hall and there's a clock in the office in the kitchen?  Is that correct?

A    Correct.

Q    Did you receive notice of this complaint about the clock?

A    No.

Q     Do you know if anyone at Trinity received notice about this complaint?

A     I'm not sure.

Q     And then it says, "If detainees leave the line before his" -- he is relieved, okay, "Trinity will write disciplinary report on that detainee."  Is that consistent with your practice, that you'll write a disciplinary report if the detained worker leaves their line before their shift is over?

A     No, but if -- if it's an ongoing issue, we will -- we are trained to write a report, you know, and let the unit team know what's going on.  But we don't do anything like disciplinary.  But we'll let them know hey, this detainee, he will not work in his assigned area.

And that is a part of the orientation.  We let them know -- excuse me -- we do let them know that you are only allowed in your work area.  Your assigned work area.  So that's a part of the orientation.  We let them know hey, this is your area.  If you're working here, you can't be over in the cook's area because you work on the line.  Now if it's an ongoing thing, we've had to correct this guy four or five times then yeah, we will write the incident report and send it to the unit.  We'll give it to the officer so

they can turn it in to the unit team.

Q    And what is the incident report?  What form is that?

A    We're doing 51C and -- we'll do 51C and we give it to the officer.

Q    And a detained worker leaving their shift early would warrant an incident report?

A    No.  Not every -- no.  Just leaving the shift early?  Or leaving their assigned area?  Leaving the shift, you know, they -- the officers would have to let them leave out of the kitchen.  When they leave, if they have to go somewhere, if ICE needs to see them, the officer comes up.  Let them know hey, we got -- we're taking him to medical.  We're taking him to this place.  But just to walk out?  No.  They can't just walk and leave the kitchen unannounced.  Yeah.  We would have to do a incident report on -- on something like that because we -- we're responsible for that person while they're in our work area.

Q    Okay.  So if a detained worker leaves their work area --

A    Area.

Q    -- you would write an incident report?

A    Not initially, but if it -- like I said, if it's a ongoing issue, yes.

Case 4:18-cv-00070-CDL   Document 383-1   Filed 06/27/23   Page 107 of 300
30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 368

Q    What is an ongoing issue?

A    Every -- every ten minutes, a detainee, he's walking away from the line.  Not doing anything or, you know, refuse to do anything.  Yes.  Then that would be an incident.

Q    And when you're writing those incident reports, is that pursuant to a CoreCivic policy?

A    Yes.  It is.

Q    And I think you said this, but correct me if I'm wrong, once you write that incident report, you then give it to the kitchen officer for the unit?

A    Yes.

Q    Do you know what happens after the incident report is delivered to the CoreCivic person?

A    I don't -- I don't.

Q    Does Trinity staff ever assist CoreCivic in recruiting detained workers to the kitchen when more workers are needed?

A    I -- yes.  Of course.  Yes.  We will put a sign or something.  A sign-in sheet if they want to volunteer for the work program.

Q    Okay.  Other than putting up a sign-in sheet, does Trinity do anything else to help recruit detained workers to the kitchen?

A    No.

Page 369

                    MS. STEWART:  I'm going to introduce

the next exhibit.  The Bates number is

CCBVA0000190037.  This will be marked as Exhibit 34.

                    (Exhibit 34 was marked for

                    identification.)

BY MS. STEWART:

        Q    Can you see Exhibit 34, Ms. Crawford?

        A    Yes.

        Q    You can see then that this is an e-mail from

Mr. Droudred Blackmon at CoreCivic to various

CoreCivic staff titled Kitchen Workers.  And in the

body of the e-mail, Droudred Blackmon appears to have

pasted a report about what's happening with the

detained workers in the kitchen on this particular

day, which is February 20, 2019.  Have you seen this

e-mail before?

        A    No.  I can't recall it.  I can't -- can you

make it a little bigger so I can read it?

        Q    Sure.

        A    Okay.

        Q    Okay.  I'm curious about the indented

paragraph that starts, "Detainees are reporting to

work late.  They are scheduled to be at work at 3:00

a.m.  They are not reporting until 4:30 and after 5:00

a.m.  This is putting the meals behind every day.

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 370

Myself, Crawford, and the staff have been down to the unit to try and get the detainees to report to work."

A     Mm-hmm.

Q     In this paragraph, is the Crawford referred to you?

A     Yes.

Q     Do you have any idea who likely wrote this report?

A     I can see that it's from Blackmon.  Correct?

Q     The e-mail's from Blackmon, but he appears to have cut and paste an e-mail below.  The indented portion that you see, starting at "Detainees are reporting to work late."

A     Mm-hmm.  I'm not -- I'm not sure who -- in 2019?

Q     Right.

A     I'm not sure where he would have got -- where that came from, but yes.  Now we've had -- I always check on, you know, if -- if my guys don't come, hey, I -- what's going on, you know?  We need to know what's going on.  If I can't reach somebody on the phone, yes, I can walk to the unit and we'll see where my guys are.  So -- but I'm not sure who -- I'm not familiar with this e-mail -- who sent the e-mail.  The original e-mail.

30(b)(6) Marquita Crawford, Vol. II      August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 371

Q    Okay.  So you do go to the unit on occasion to recruit the detained workers to the kitchen?

A    No.  They're already working in the kitchen. I don't have to recruit them.  But -- to see if they're going to come -- actually come to work. Sometimes they'll say yeah, you know, yeah, we already got them up there on the way.  And then if they never come, then I need to see what's going on.  If I can't reach them by phone, I mean, it's just a walk down the hallway.  I can see what's going on.

Q    Okay.  So if you're missing a certain number of workers who are scheduled to work that day, you can go down the hall to the unit and ask where those workers are?

A    Yeah.  I get with my unit team and they'll -- they'll follow up.  They'll follow up and see what's going on.  Yes.

Q    How often do you go to the housing unit to find the workers?

A    It would have to be something extreme.  I'd say -- I don't have an exact number of times that I've been to the unit, but it's not often.

Q    Is it weekly?

A    No.

Q    Is it monthly?

Page 372

A    Not -- not even monthly.  No.

Q    Is it more than a few times a year?

A    More than a few times a year?  I would say -- in this part year I've been twice.

Q    And do other Trinity staff go to the unit to find the detained workers?

A    I'm not sure.

Q    Would you know if they went as a Food Service Director?

A    No.

Q    So Trinity staff can go to the unit without your permission?

A    They don't have to have permission to go anywhere in the building.

Q    Okay.  And so there could be an instance when a Trinity Food Service Supervisor needs more detained workers, and so he or she goes to the unit to find those workers?

A    Yes.

Q    And you wouldn't know whether that happened?

A    No.

MS. STEWART:  Okay.  We can pull down this exhibit and I'm going to go ahead and introduce the next one.  Bates is CCBVA0000196623.  And we'll mark this as Exhibit 35.

Page 373

(Exhibit 35 was marked for
identification.)

BY MS. STEWART:

Q    Ms. Crawford, can you Exhibit 35?

A    Yes.

Q    So this is another e-mail from the Trinity
e-mail account at Stewart to Harrell Gray.

REPORTER:  I'm sorry, ma'am.  Can you
repeat that?

THE WITNESS:  Yes.

REPORTER:  The e-mail -- Oh.  Counsel,
I'm sorry.

THE WITNESS:  Oh.

REPORTER:  E-mail to --

MS. STEWART:  This is another e-mail
from the Trinity e-mail account at Stewart to Mr.
Harrell Gray.

REPORTER:  Thank you.

BY MS. STEWART:

Q    An e-mail written by Luis Marrero, Food
Service Director at Trinity.  It was written in 2015.
Have you seen this e-mail before today, Ms. Crawford?

A    No.  I don't recall it.

Q    Okay.  I'm going to ask you a couple
questions about the paragraph titled Kitchen Workers,

30(b)(6) Marquita Crawford, Vol. II    August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 374

so you can go ahead and review it and let me know when you've finished.

A    I'm done.

Q    Okay.  So in the paragraph titled Kitchen Workers, Luis Marrero writes, "We are all currently battling the low population.  This is causing a problem in the kitchen.  Many kitchen workers are complaining about the shortage."  A little lower, he says, "There are several detainees on a daily basis who refuse to report to work.  This is spreading like wildfire.  The pod officer is not making sure that the scheduled workers report to work.  The unit staff will not hold anyone accountable, and several other things."  Were you aware that Mr. Marrero in 2015 is reporting these issues to CoreCivic?

A    Not this particular issue.  This e-mail I'm not familiar with it.

Q    Were you generally aware of the issues that Marrero was talking about in the e-mail?

A    I'm aware that we -- we have detainee shortages from time to time, yes.

Q    And were you aware that he was concerned that detained workers were refusing to report to work, and that was spreading like wildfire?

A    That's what this e-mail said.  Yes.

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 375

Q    In 2015 is that what was happening?

A    I don't recall.  I mean, like I said, I told you with the detainee population, you know, just helping out, you never know.  And -- and it's possible.

Q    So down further in the paragraph, he says, "Why not be proactive and recruit before sending the workers instead of expecting the Trinity staff to put out the fires?"  Do you feel like Trinity staff has to put out the detained worker shortage fires?

MR. EDWARDS:  Objection to the form.

BY MS. STEWART:

Q    You can answer.

A    I'm not sure what he was talking - -I mean, why he said we had to put out a fire.  Why Trinity had to put out a fire.  I'm not sure what he meant by that, so, you know, I can't agree with him.

Q    Okay.  Then he writes -- oh.  Go ahead.  I cut you off.  What was that?

A    No.  Go ahead.  I'm fine.

Q    Okay.  He says, "One recommendation I have is to review the classification of the level three detainees and see about downgrading them.  That will give us more options to work in the kitchen."  Did you know that Marrero was recommending that

Case 4:18-cv-00070-CDL Document 383-1 Filed 09/27/23 Page 115 of 300

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 376

classifications get downgraded?

A    No.  No.

Q    Had you ever heard of that idea?

A    No.

Q    Do you know if the detained people's classifications got downgraded?

A    No.

Q    Do you know if the detained people's classifications got downgraded in order to produce more kitchen workers?

A    No.

Q    You don't know?

A    I do not know.

Q    Are you generally aware of the classifications of the detained workers in the kitchen?

A    Yes.

Q    Would you know if certain worker's classifications had been downgraded in order to allow them to work in the kitchen?  Is that something you have access to?

A    No.

Q    So you don't know whether this happened or not?

A    I don't.

MS. STEWART:  We can pull down that exhibit.

BY MS. STEWART:

Q    Do detained workers ever perform work unrelated to food service in the kitchen?

A    Unrelated to food service in the kitchen?

Q    Yes.

A    No.  No.

Q    Okay.

A    Hold on.  What -- what do you mean, "unrelated to food service in the kitchen"?  You mean like cleaning and -- all of that is related to -- no. they don't.

MS. STEWART:  Okay.  Let's pull up the next exhibit.  The BATES is CCBVA0000197160.  And this Exhibit will be marked 36.

(Exhibit 36 was marked for identification.)

BY MS. STEWART:

Q    36 is an e-mail with the bottom from you, Ms. Crawford.

A    Mm-hmm.

Q    Looks like it was sent to Mr. Blackmon. I'll give you a minute to --

A    Mm-hmm.

Page 378

Q   -- review the e-mail.

A   Yeah.  That's related -- that's -- when we do our deep cleaning, we're required duty cleaning in the kitchen, and we -- yeah.  They -- they clean.  And they have painted in the kitchen.  Yes.

Q   Okay.  So in this e-mail, you are asking CoreCivic for at least 10 to 15 detained workers to do the deep cleaning and --

A   Mm-hmm.

Q   -- paint detail throughout the kitchen. Correct?

A   Yes.

Q   And it looks like Mr. Blackmon did assign those 10 to 15 detained workers for that detail.

A   Yes.

Q   And how often do you recruit or ask for detained workers for paint details?

A   We do a deep cleaning every six months, so -- well, we haven't painted due to COVID, but yeah. Now they have these -- they already have detainees assigned for the hallways and for the floor details and everything, so that's what these detainees did in the kitchen.

Q   Okay.  Are you saying that the detained workers who were assigned to this detail were already

Page 379

assigned to other jobs in the work program?

A    They -- uh-huh.  They're already a part of the work program, so, I mean, it's just regular work. So that's -- that was what we had for them.  I just needed them there at a certain time, you know, to go ahead and be ready, you know, for that deep cleaning. But -- they weren't recruited just for that job. They're already on the work program.

Q    And you said that you need this detail to happen every six months?

A    Yes.

Q    And that detail includes deep cleaning of the kitchen?

A    Yeah and the cleaning will be done by my workers.  The cleaning will be my kitchen workers.  We won't have the -- see, they'll still be working their hours and they'll be doing a different assignment.

Q    Okay.  But in the e-mail, you're asking for detained workers to perform the deep cleaning. Correct?

A    Correct.

Q    It sounds like every six months, deep cleaning is performed by detained workers.

A    Yes.

Q    And the paint.  The painting of the kitchen

was performed by detained workers?

A    Yes.

Q    How often does the kitchen need to be painted?

A    The kitchen -- I don't -- I don't have a exact number of times the kitchen is painted.  Most of the time, it's just spot painting.  Painting the bathrooms or painting just little areas in the kitchen.

Q    And when painting needs to happen in the kitchen, it's detained workers who do that painting?

A    Yes.

Q    And are there any other maintenance tasks that you request detained workers to perform in the kitchen?

A    No.  I don't -- I don't ask them to perform any maintenance tasks.

Q    Do you agree that painting the kitchen improves the building?

A    Yes.  It's part of my -- the sanitation for my kitchen.  Keeping the walls clean and nice.  Yes.

Q    Do detained workers ever get asked to do a deep cleaning of the hoods in the kitchen?

A    The hoods?  We have someone that comes in to do the vent hoods.  They take them down, and of

Page 381

course, we do the general -- general cleaning of them.

We're responsible for cleaning everything in the

kitchen.  And that's walls, equipment, everything.

Q    When you say "we," who are you talking

about?

A    Trinity staff and the detainee workers.

Q    Okay.  So the detained workers do clean the

hoods as well?

A    Ma'am, the inside of the hoods are cleaned

by a contractor, but the detainee workers do wipe them

down.  Wipe down the insides of the vents, yes.

Q    Thanks for explaining.  I wasn't entirely

clear on that, on the hood issue.

          MS. STEWART:  Let's pull up another

document related to this.  The Bates is

CCBVA0000196623.

          REPORTER:  Did you already introduce

this exhibit, Counsel?

          MS. STEWART:  No.  Waiting for it to

pop up on the screen.  It's going to be introduced as

Exhibit 37.

          REPORTER:  My apologies.  I thought I

had the 196623 already.

          MS. STEWART:  Oh.  Yes.  I'm sorry.

The Bates of this is 196898.

REPORTER:  Okay.

(Exhibit 37 was marked for

identification.)

BY MS. STEWART:

Q     Okay.  Can you see Exhibit 37, Ms. Crawford?

A     Yes.

Q     So you'll see at the bottom there's an e-mail from the Trinity e-mail account at Stewart.  Looks like it was written by Jennifer Fico.

A     Yes.

Q     Do you know Jennifer Fico?

A     I do.

Q     Who is she?

A     She was the Food Service Director.

Q     Is she still with Trinity?

A     No.

Q     All right.  So she was the Food Service Director in 2013.  Correct?

A     Correct.

Q     And what was your title in 2013?

A     2013?  I believe I was the Assistant Director.  Food Service Director.

Q     Okay.

REPORTER:  And my apologies, Counsel.  This is Exhibit 37 for the record.  Correct?

Page 383

MS. STEWART:  Yes.  Exhibit 37.

REPORTER:  Thank you, ma'am.

BY MS. STEWART:

Q    So Jennifer Fico writes in Exhibit 37, the e-mail, "AW Blue would like for us to deep clean our hood system before Monday.  Can you please see if I can get three to five guys on Sunday to meet with Lyles around 3:00 p.m.?  I need to know if this will happen to inform and prepare Lyles."  Do you remember this request for workers to clean the hood?

A    I don't remember this request, but like I said, they do wipe down the vents.  And they have to wipe them down -- after cooking time because the -- the hoods have to be -- taken down and wiped down and run through a dish machine.  Like I said, a contractor comes out and actually sprays cleaning stuff -- hood system.  But what -- on this incident, I don't remember.  I don't recall it.  They do wipe down the vent hoods.

Q    And based on this e-mail, you agree it appears that detained workers were also deep cleaning the hoods?

A    That's what the e-mail says.  Yes.

Q    Do you know who owns the hood that the workers cleaned?

A     No.

Q     And how often does it get cleaned?  How often does it get deep cleaned?

A     Do you know what hood system they're talking about?

Q     I just know what the e-mail says, so --

A     Do you know --

Q     -- you tell me.

A     Okay.  The hood system is a vent -- ventilation system over the pots and pans area.  So when we're cooking food, grease, and everything is in the hood because it's sucking up and out the unit.  So that's the hood vent system.  So what she was requesting is to get them wiped down.

Now the inside of the vent system is something they would have to do in.  The contractor goes in and he cleans the equipment on the inside of the vent hood system.  So when they're saying hood, they're not talking about on a vehicle or anything.  They're talking about the vent hood system in the kitchen.  So like I said, everything in the kitchen has to be cleaned.  We clean everything from the doors, the floors, walls, everything.

Q     Okay.  Thank you for that explanation.  That's helpful.  So when she's requesting a deep

cleaning of the hood system, she's just requesting

that detained workers wipe it down?

A     Yes.

Q     The deep cleaning doesn't involve any other

tasks?

A     No.

MS. STEWART:  Okay.  Let's go off the

record for a minute.

REPORTER:  We are off the record.  The

time is 12:24 p.m.

(Off the record.)

REPORTER:  We are back on the record.

The time is 12:59 p.m.  You may proceed when ready,

Counsel.

MS. STEWART:  Thank you.

BY MS. STEWART:

Q     Ms. Crawford, you understand that you're

still under oath after the lunch break?

A     Yes, ma'am.

Q     Okay.  You testified earlier that Trinity

staff can fill out the 5-1C incident report --

A     Mm-hmm.

Q     -- on detained workers?

A     Yes.

Q     When Trinity staff fills out an incident

report on a detained worker, how is that incident report transmitted to CoreCivic?

A     Given to the kitchen officer, and then the kitchen officer gives it to the necessary staff, or maybe the Captain or someone in the unit.

Q     Is it given to the kitchen officer by hand?

A     Yes.

Q     Is the incident report ever e-mailed to CoreCivic?

A     It could be e-mailed.  Yes.

Q     Is there any reason why it would be e-mailed versus not e-mailed?

A     No.

Q     Is it your responsibility as Food Service Director to get the incident report to CoreCivic?

A     No.  It's everyone's responsibility.  That can be a Food Service Supervisor, Assistant Director, or the Director.

Q     So whoever writes the incident report is responsible for transmitting it?  Is that right?

A     Yes.

Q     Other than filling out the incident reports, does Trinity staff have any role in detained worker discipline?

A     Like -- no.  After we write the report,

Case 4:18-cv-00070-CDL   Document 383-1   Filed 09/27/23   Page 126 of 300

30(b)(6) Marquita Crawford, Vol. II      August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 387

after we do a report, that's all we do.  Just the reports.  We don't discipline them in any kind of way. We can only simply tell what happened.

MS. STEWART:  I'm going to pull up the next exhibit.  The Bates number is CCBVA00000196322. We'll mark this Exhibit 38.

(Exhibit 38 was marked for identification.)

BY MS. STEWART:

Q    Can you see Exhibit 38, Ms. Crawford?

A    Yes.

Q    So scrolling to the bottom, Exhibit 38 is an e-mail thread, and the bottom e-mail is from the Trinity e-mail address at Stewart to Harrell Gray. The e-mail is drafted by Luis Marrero, the Food Service Director at Trinity at that time.  The e-mail was written April 2013.

A    Mm-hmm.

Q    I'll give you a minute to just read the body of the e-mail.  I'm going to ask you some questions about it.

A    Okay.

Q    Have you seen this e-mail before today?

A    I don't recall this e-mail.

Q    In 2015, your title was Assistant Food

30(b)(6) Marquita Crawford, Vol. II    August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 388

Service Director?

A    Yes.

Q    You were an assistant to Luis Marrero?

A    Yes.

Q    Did you two not discuss e-mails about detained workers that you were sending to CoreCivic?

A    We did, but I just don't remember this e-mail from two thousand and -- you said thirteen? No.  2015.  I just don't remember, you know?

Q    Do you recall the incident that Marrero was talking about in the e-mail?

A    No.

Q    Okay.  So in the e-mail, he says, "The first shift kitchen workers are at it again.  Like norm, we asked for three detainees to stay in the back to assist with feeding the first shift workers.  No one wanted to help.  They were told that they will have to wait until 2nd shift workers arrive in order to be fed unless someone else helps out.  Ms. Lyles is in the process of identifying the ringleader who had everyone walk out again."  Are you the Ms. Lyles in the e-mail?

A    Yes.

Q    Do you recall having to identify a ringleader who had everyone walk out?

A    I don't remember the exact -- I don't

Page 389

remember the exact incident, you know, of what was going on when this e-mail was sent.  But I know when he's asking about the three detainees to stay in the back to assist with feeding, that's to feed the short line.  But I don't remember this exact incident.

Q    Do you remember having to look for a worker who was identified as a ringleader who had other workers walk out?

A    I don't know about being identified as a ringleader, but I do know when -- if a detainee is telling everybody not to work, I can, you know, definitely tell who it is, you know, because they'll -- they'll make it known.  But in -- like I said, this incident, I really don't.  I can't tell you that I remember every detail about this situation right here.

Q    Okay.  If you scroll up to the next e-mail in the chain, another e-mail from Luis Marrero, and again, Luis Marrero is e-mailing  Harrell Gray.

A    Mm-hmm.

Q    "Ms. Lyles identified ███████████" with this A-number, "as the ringleader."  Does that refresh your recollection of this incident?

A    No.  Like I said, it was 2015, you know.  That -- you know, I can't just say I know this exact

Page 390

situation right here.

Q    Okay.  I think you testified that in general, though, when a detained worker is telling other workers not to work, you were able to identify the worker who is getting that instruction?

A    Yes.

Q    And how often do you have to do that?  To identify the worker who is giving the instruction?

A    I mean, this situation wouldn't happen a lot, but if -- if I see someone, if I am aware of someone saying, you know, hey, don't come to work, you know, let's go.  Let's walk out.  Then I, of course, I have to report that.  But I'm not -- I can't tell you how often it can happen because I don't -- I don't have an estimate of that.

Q    And the term "ringleader" used by Mr. Marrero in this e-mail, is that a term you're familiar with?

A    I don't know.  Am I familiar with the word "ringleader"?

Q    Yes.

A    Yes, I'm -- I know what the -- the meaning of ringleader is.  Yes.

Q    Is that a term that Trinity staff used to describe workers who tell other workers to walk out?

Case 4:18-cv-00070-CDL   Document 383-1   Filed 06/27/23   Page 130 of 300
30(b)(6) Marquita Crawford, Vol. II      August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 391

A   At least, that's the word that he used.  But that's not common for us to say hey, that's a ringleader.  So ...

Q   Okay.  So when you are identifying a worker who is telling other workers not to work, for example, how do you identify that person?

A   That's the person who is telling people not to report to work.  This detainee said this at this time.  That's how we report it.

Q   And when workers in the kitchen are communicating with each other, what is the primary language they're using?

A   The workers, they will use whatever language -- like we have different cultures in the kitchen, you know?  If they want to say something, you know, that we -- we wouldn't understand, they would say it in their language.  But Mr. Marrero, he did speak several languages, so I'm -- I'm not -- but they do say stuff in English.  A lot of them speak English, and they'll say it, you know.  And if there saying something, they will say even -- you know, if they was talking to a guy, like an African guy or something that understands English, they will say it directly to them.  So they wouldn't always use their primary language.  Most of the time, they use English.

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 392

Q    Okay.  And before I get to my next question,
I think I stated the e-mail was written in 2013, but
it was written in --

A    2015.

Q    -- 2015.  Yes.  As reflected on the exhibit.
And are you required to identify the worker who is
telling other workers not to work?

A    No.

Q    So why do you do that?

A    We are required -- if we have an incident,
we are -- that's part of report taking.  If you have
an incident or something's going on, work stoppage,
you write down your times and the who, what, when's,
and where's.

Q    Does CoreCivic require you to document the
incident?

A    Yes.  They train us to -- to document a lot
of stuff.

Q    Does CoreCivic require you to document an
incident when a worker is encouraging other workers
not to work?

A    Yes.

Q    And does CoreCivic require you to identify
the worker in charge of telling other workers not to
work?

A     No.  Like I said, you have to identify what was said, what was done, the -- the basic things.

Q     My question is, do you have to identify the worker who is telling other workers not to work as part of your report to CoreCivic?

A     Yes.  You would -- you would say whatever happened.  Exactly what happened.  You can't add -- add to or take from it.  So you have to report everything.

Q     So in this instance, in the e-mail, where you were trying to identify and ultimately did identify the ringleader, you were following the CoreCivic policy to do that?

A     I did not -- I didn't send this e-mail, but -- I didn't send this e-mail, but yeah.  I -- evidently, I did tell -- identify the person who said whatever they said or did what they did.  So yes.

Q     Okay.  And my question is, when you did that, you were following a CoreCivic policy?

A     Yes.

Q     And you said that this isn't a common occurrence.  And when you say this, you're talking about work stoppages in the kitchen?

A     Yeah.  Yes.

Q     How often, in your experience, does this

type of incident come up where a detained worker was allegedly telling other workers not to work?

A     Well, since I've been here at CoreCivic, maybe three -- maybe three to four times.

Q     Okay.

A     Yeah.

Q     Three to four times when you identified workers -- or excuse me, three to four times --

A     No.

Q     -- when workers were allegedly telling other workers not to work in the kitchen?

A     When they did.  Yes.

Q     And scrolling up on the e-mail, there is then e-mails exchanged between CoreCivic staff, including Harrell Gray.  Calvin Blue says, "Please get this guy pulled out and locked up."  And another CoreCivic employee, Troy Carey, responds, "Lock him up."  When you were identifying the individual who apparently told the other works to walk out, did you know that CoreCivic would punish that worker?

A     No.  But I -- I know that it's against the policy to cause a work stoppage.  But I didn't know that they said "Lock him up."

Q     Do you know if he was locked up?

A     No.

Q    Do you know what is meant by "locked up"?

A    Do I know what it means by lock up, lock him up?

Q    Yeah.  That's my question.

A    I -- I would hate to speculate, but hey, lock him up, it -- it seems like it's kind of -- no, I don't know.  I can tell you, you know, what I think and what -- what it could mean.  No.  I don't know what it means.

Q    My question is what do you think it means based on your knowledge of Stewart?

A    I'm thinking it could mean for him to be put in segregation for causing a work stoppage.

Q    And do you generally understand that detained workers who are disciplined by CoreCivic in connection with perceived violations of the work program are at risk of being placed in segregation?

MS. COHEN:  Objection.  Foundation.

MR. EDWARDS:  Join.

BY MS. STEWART:

Q    You can answer.

A    Can you repeat the question?

Q    Sure.  Do you understand that detained workers who are disciplined by CoreCivic in connection with the program or perceived violations of the work

program can be at risk of being placed in segregation?

A     Yes.  It -- yes.

Q     Have you ever visited the segregation unit at Stewart?

A     No.

Q     Do you know anything about the conditions for detained workers who are placed in segregation?

A     I know about the food service part.  If they are in segregation, they still have to receive the same amount of food as the general population.

Q     Does Trinity supply the food service to the segregation units?

A     Yes.

Q     Are there any other forms of discipline by CoreCivic that you are aware of --

          MS. COHEN:  Object --

          REPORTER:  I'm sorry.

          MS. STEWART:  I'm sorry.

          REPORTER:  What was the objection?

          MS. STEWART:  What was that?

          MS. COHEN:  Sorry.  Can you finish the question?  My apologies.

          MS. STEWART:  Thank you.

BY MS. STEWART:

Q     Are there other forms of discipline by

Page 397

CoreCivic that you are aware of which detained workers can face for refusing to work?

A    No.

Q    So other than segregation, are you aware of any other punishments the detained workers can face?

A    We don't -- yeah, I don't -- I don't have anything to do with what happens to them after they get written up for the kitchen.  We simply report it and that's it.

Q    I understand.  My question is for whether you're aware of any other punishments other than segregation that detained workers may face --

A    No.

Q    -- for violating the work program?  No?

A    No.

Q    Okay.  Ms. Crawford, I think it might be the delay or we're talking over each other, but if you could just allow me to finish my question before you answer, I think that will help out our court reporter a lot.  Okay.  So you used the phrase "work stoppage." Can you explain to me what you mean by "work stoppage"?  Ms. --

A    Work stoppage?

Q    Yeah.  Did you hear my question?

A    A work stoppage is when the work program is

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 398

interrupted by a detainee or detainees who get with other detainees and come up with a plan of not working, and in so doing that, they interrupt the building schedule.  If they say, hey, you don't go to work, you don't go to work, or even threaten the other guys and make them not come to work, then that's a work stoppage.

Q    Ms. Crawford, I may be seeing the view wrong, but it looks like you're reading something. Are you looking at a document right now?

A    No, ma'am.

Q    Okay.  I just wanted to make sure.  Thank you.  I think he said something like when the detained workers have a plan --

A    Yes.

Q    -- do not work?

A    When they come --

Q    What do you mean by that?

A    When they come up and congregate together and say hey, we're not going to work.  I'm not going to work and you're from my country.  You're not going either, and if you go then this is going to happen to you.  Or we're not going.  No one in the unit is going to work today.  And no one comes to work.  Some don't come because they don't want to come, but some don't

come out of fear of what can happen to them if they do come to work.  And that's when it's a problem.  When they threaten others and make them say hey, you're not going to work today.  That's a work stoppage.

Q    So work stoppages involve a detained worker threatening others if they go to work?

A    Threatening or just -- or just, like I said, planning and getting other guys to say hey, were not going to work.  And, you know, that's -- from my understanding -- from my understanding is a work stoppage.

Q    Where did you get that understanding?

A    Where did I get that understanding?

Q    Yes.

A    The thing is, I don't know where I got that understanding from.  That's just, you know, my take on what -- what it is, and also, you know, by the detainee handbook.  They, you know, mention -- it's in there, no -- that a detainee cannot cause a work stoppage.

Q    So what you're telling me the definition of a work stoppage is what you perceive a work stoppage to be based on your experience?

A    That's the definition of a work stoppage. Getting others not to come to work.  Not to report to

Page 400

work.  Persuading others not to come to work.

Q    Do you receive any documents other than the handbook that define a work stoppage?

A    No.  But we have training.  Like I said earlier, in-service when we come in.  And we talk about these things and what could happen within a facility.

Q    Is the definition of work stoppage that you just shared with me, is that CoreCivic's definition of a work stoppage?

A    Yes.

Q    Okay.  And is that definition provided to you in writing?

A    No.

Q    And how do you know that's CoreCivic's definition of a work stoppage?

A    Because it was discussed.  You know, those are topics that we discuss in training.

Q    And when you're discussing those topics in training, are you receiving anything in writing or a visual in writing discussing a work stoppage?

A    No.

Q    Who at CoreCivic is discussing work stoppages with Trinity staff in trainings?

A    I can't recall the exact -- we have multiple

people that do training for CoreCivic.

Q    Do you know what their titles are?

A    No.

Q    And did your definition of work stoppage, I think you included the other workers are being threatened if they go to work or they're afraid to go to work?

A    Yes.

Q    How do you know when that's the case?

A    Those are things that the detainee will report, you know, once they come to work.  Hey, this is going on and we may not come to work tomorrow, you know, because this is going on.  Those are times -- we always want to keep them safe.  We have to report any kind of incident that's -- when it's brung to us, we have to report it to an officer or Captain or any, you know, any CoreCivic staff that can handle that situation.

Q    So you're saying that occasionally the detained workers will share with you that information?

A    Yes.

Q    And when you get that information, you're required to report it to CoreCivic?

A    Yes.

Q    And how do you generally report it?

Page 402

A     You can report it verbally or you can write a 51C.  Either way, as long as it's reported.

Q     So those type of rumors of work stoppage would warrant a 51C incident report?

A     Yes.

Q     And that incident report would be given to the CoreCivic kitchen officer?

A     Yes.  Or -- to a CoreCivic staff.  It can be someone in the unit team, it can be a Captain or the kitchen officer.  Yes.  But definitely, something like that, when the detainee is being threatened, you will want to give that directly to a Captain or someone who can try to control the situation.

Q     I want to pull up another exhibit, but first, I think the lighting has changed a bit in the afternoon, Ms. Crawford, and I'm having a hard time seeing you.  You're a little bit in shadow.  Is there any way you could kind of toggle your camera so that I can get a better view of you?

A     Does that work for you?

Q     That's a little better.  Yeah.  I just needed more light so I'm not talking to a box.

MS. STEWART:  Okay.  I'm going to introduce the next exhibit.  The Bates is CCBVA0000152053.  We'll mark this as Exhibit 39.

30(b)(6) Marquita Crawford, Vol. II      August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 403

(Exhibit 39 was marked for identification.)

BY MS. STEWART:

Q    Can you see Exhibit 39, Ms. Crawford?

A    Yes.

Q    Okay.  And you'll see this is an e-mail from Gustavo Fernandez to Bill Spivey and the Trinity e-mail account is CC'd.  The subject line is Detainees in Need of Attention.  The e-mail was written in December 2015.  Have you seen this e-mail before?

A    No.

Q    Okay.  In 2015, were you checking the Trinity e-mail account?

A    Yes.

Q    But you don't recall seeing this e-mail when you checking the account?

A    No.

Q    Do you know who Gustavo Fernandez is?

A    Gustavo Fernandez.  I can't recall a Fernandez.  Gustavo Fernandez.

Q    Do you know who Bill Spivey is?

A    Yes.  Bill --

Q    Who is he?

A    -- Spivey was -- he was a Warden that was here at Stewart.

Q    And in your experience as Food Service Director, why would Trinity staff be copied on this communication?

A    I'm not sure.

Q    And have you had a chance to review the body of the e-mail?

A    I'm reviewing it right now.

Q    Okay.  Take your time.

A    Okay.

Q    Okay.  So you agree that the e-mail includes pictures of certain detained workers in the kitchen and a couple sentences about each one about alleged misconduct?  Is that right?

A    Yes.

Q    And the second picture down is of detainee Urbina-Rojas, Keysler, and it says he's a kitchen cook.  And it says "Type of detainee who likes to get people going from time to time and sit back."  Do you have any recollection of Mr. Urbina-Rojas engaging in the conduct referenced in the e-mail?

A    No.

Q    And at the bottom of the e-mail, it says "Some of the biggest challenges is the kitchen officers finding items and not holding them accountable.  Once DR are completed and served, I

would like to know the results."  Do you know what "DR" means there?

A     Yes.  DR is a -- disciplinary report.

Q     In this e-mail, do you think CoreCivic was expecting Trinity to write the disciplinary report?

MS. COHEN:  Objection.  Foundation.

BY MS. STEWART:

Q     You can answer.

A     I'm not sure.

Q     And do you have any idea whether Mr. Urbina-Rojas was discipline for this conduct?

MS. COHEN:  Objection --

THE WITNESS:  I'm not sure.  Oh.

REPORTER:  I'm sorry.  I missed the objection.

MS. COHEN:  Foundation.

REPORTER:  Thank you, ma'am.

BY MS. STEWART:

Q     Generally, in your experience, is the conduct attributed to Mr. Urbina-Rojas including getting people going from time to time and sitting back, is that grounds for an incident report?

A     I don't know -- I don't know detainee Urbina-Rojas.  I don't know what he did.

Q     That's okay.

A    I don't --

Q    My question is just in general whether the conduct that he was allegedly engaged in, you know, getting people going from time to time and sitting back, is that conduct, in your opinion, that warrants an incident report?

A    I don't know what getting people going from time to time is, so I don't -- I don't know.

MS. STEWART:  Okay.  I'm going to pull up another document for you to look at.  The Bates is CCBVA0000197317.

BY MS. STEWART:

Q    And before that e-mail comes up, before the next document comes up, as Assistant Food Service Director, were you informed of detained workers who CoreCivic deemed in need of attention?

A    No.  I don't know -- I -- it --

Q    You can answer.

A    I don't know what "in need of attention" is. I -- I don't know what -- what that e-mail -- what was the basis of that e-mail.  So I couldn't tell you that.  I don't know.

Q    So as Assistant Food Service Director at that time, you don't know what CoreCivic would have meant by detainees in need of attention?

A    No.

Q    Are there other times that you received similar e-mails from CoreCivic with your time at Trinity?

A    Not that I can remember.

Q    So other than that one time, which you don't remember, CoreCivic hasn't informed you about other detained workers who might be in need of more attention?

A    In need of attention?  No.

Q    Does CoreCivic inform you about detained workers who are potentially problematic?

A    No.

Q    Would you want to know whether a detained worker is potentially problematic before you have to work with them in the kitchen?

A    They go through classification.  If -- if they are violent or anything, they can't work in the kitchen.  That's the only thing that -- that I can say I would be concerned about because once they come to work, they come to work.  If they don't have a violent history, then, you know, I'm not digging into whatever they've got going on.  The only thing that matters is how they perform when they come to work.  If they're a good performer, if they are, you know, if they can

come in and do the job, that's the only thing I'm

concerned with.  I -- I can't say I'm looking for this

detainee to do this, or I expect him to do that.

That's not what we do.

MS. STEWART:  Okay.  Actually, I'm

sorry to -- can we pull up the last exhibit again?  I

just have one more question on this front.

BY MS. STEWART:

Q    Ms. Crawford, there's a few other detained

workers mentioned here, and a description of their

alleged conduct.  Top one is "kitchen cook who is

stealing just not yet caught."  Third down is

"detainee acts like he's an angel but word around the

kitchen is that he's a bully in the unit and others

follow him."  Is this the type of information that, as

Assistant Food Service Director you want to know about

detained workers before they work with you in the

kitchen?

A    Before they work with me in the kitchen?

They're already working in the kitchen when they

got -- if they're a kitchen cook.  You know?  And I

don't -- like I said, I don't know the basis of this

e-mail.  I don't know if they did an investigation

and, you know, saw this happen or they talked to the

detainees and they were letting them know.  I just

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 409

don't know, you know, the reason behind this e-mail. I don't know what the conversation was before, you know, to -- to get this e-mail. I -- I just don't know.

Q   Okay. And I think the question I'm asking you is much more simple than that. I understand your testimony is that you don't have knowledge of the incidents in the e-mail. My question for you is, is the type of conduct mentioned in the e-mail -- stealing, bullying -- the type of conduct that as Food Service Director, you'd want to know whether detained workers in the kitchen are engaging in?

A   Yes.

Q   And if detained workers are stealing in the kitchen, is that the type of conduct you would report to CoreCivic?

A   Not first -- first off, I'd try to correct them and go over the orientation and remind them that hey, you know, no stealing. You know, I give them the rules again because of course some of them haven't worked in a kitchen setting. And now, if it's just an ongoing thing where they're going and stealing large amounts of stuff, yes. Then that has to be reported, but the first thing you want to do is try to train them to make -- and -- and document it. You can

document it.  And -- but -- and I keep those incidents on file.  And then, once -- if they do -- do it, just repeatedly doing the same thing and over and over, then that's when a DR has to be completed for that. The incident report is not discipline.  A incident report is just that reporting the incident. Documenting that the incident did happen.

Q    And do you have a role in the DR?

A    Yes.  I can.  I -- I get with the kitchen officer.  Let the kitchen officer know what -- what went on.  Give them the D -- not the -- I mean the 51C to attach to the DR.  And I'm the -- if I'm the reporting officer, then I'm going to sign off on saying hey, I was the reporting person for that.  But the kitchen officer, he'll fill it out and send it over to the unit.  Once it gets to the unit, I do not have any knowledge on whatever they do.  I think they have a board or something that looks into the incident.  But after that, after I report it, that's it.

Q    And do other Trinity staff, can they have that same role as you have in the DR's?

A    Yes.  Yes.

MS. STEWART:  Okay.  We can pull down this exhibit and pull up the next one.

Page 411

REPORTER:  My apologies, Counsel.  The exhibit you just took down and were referencing again was Exhibit 39.  Is that correct?

MS. STEWART:  Yes.

REPORTER:  Okay.  Thank you, ma'am.

MS. STEWART:  The next exhibit is Bates stamp CCBVA0000197317.  This is going to be marked Exhibit 40.

(Exhibit 40 was marked for identification.)

BY MS. STEWART:

Q    Do you see Exhibit 40, Ms. Crawford?

A    Yes.  I do.

Q    Okay.  And Exhibit 40 is an e-mail from you in your role as Food Service Director sent from the Trinity e-mail account to Maurice Johns October 23, 2018.  And the subject is Inmate Workers.  Who is Maurice Johns?

A    He is a unit manager.

Q    He works for CoreCivic?

A    Yes.

Q    And what were you doing in this e-mail?

A    I was reassigning a detainee.  They did not come to work, and we could -- they were not dependable as cooks on the first shift.  And that's how we get

Page 412

the meal prepared.  So I reassigned them to the line because they wasn't coming to work.  So I got people that would come to report to work on time to go -- to be in the cook's area.  And we -- we do reassign detainees to their work areas.  That's -- that's what we do.  We assign the detainees to the right area.  If I have someone who's not performing on the line, they can't keep up with the line, they can be moved over to like pots and pans or sanitation.  So yeah, I reassigned those two detainees.

Q    So you can reassign detained workers who aren't showing up to work?

A    Yes.

Q    And here you reference regular workers. What do regular workers do?  What are their duties?

A    The -- the line workers, someone in pots and pans, table detail, sanitation.

Q    So workers who don't shop to work, they can be reassigned to different positions.  And how often do you do that?

A    As often as needed.  It -- not only if they don't shop to work, but like I said, if they cannot complete the job duties, then they will be moved to another area that better fits them.

Q    And in terms of moving people from cooks to

regular workers, do you do that as a punishment for those two who didn't show up to work?

A    No.  I do it for --

MR. EDWARDS:  Objection to form.

THE WITNESS:  Okay.

BY MS. STEWART:

Q    You can answer.

A    No.

Q    Why not?

A    Why not what?

Q    Well, so your testimony is that you don't view reassigning workers to be regular workers from cooks as a punishment, and my question is why?

A    Why?  Why do I -- why don't I see it as a punishment is what you're asking?

Q    Yes.

A    Because it's not as a punishment.  It's to get the job done.  Get the job completed.  Get the meal out.  So we can stay with the building schedule. It's not a punishment.

Q    Do you know if the detained workers have a preference for the cook position?

A    No.  They don't.  They all get paid the same amount of money to work in the kitchen.

MS. STEWART:  Okay.  Let's pull down

Exhibit 40.  I'm going to pull up the next document.

It's Bates CCBVA0000 -- one second -- 197370.  And

when this exhibit comes up, it will be marked as

Exhibit 41.

                    (Exhibit 41 was marked for

                    identification.)

BY MS. STEWART:

        Q    Okay.  Ms. Crawford, do you see Exhibit 41?

        A    Yes.

        Q    Okay.  And you can see that this is an

e-mail from the Trinity e-mail account at Stewart,

written by Derico Countryman --

        A    Mm-hmm.

        Q    -- to Maurice Johns.  Is that a yes?

        A    Yes.

        Q    And it was written in September 2020.  The

subject is Kitchen Workers.  And in it, Mr. Countryman

writes, "We have two detainees that refused to work on

9/21/20.  Trinity staff member Ms. Williams wrote a

51C on both detainees."  And then Mr. Countryman

provides the name of the detained workers to Maurice

Johns.  When this e-mail was written, you were Food

Service Director.  Correct?

        A    Yes.

        Q    And you were, essentially, Mr. countryman's

boss?

A    Yes.

Q    Have you seen this e-mail before?

A    I can't recall it, but, I mean, it was last year.  No.

Q    Are you aware that Mr. Countryman was drafting this e-mail?

A    No.

Q    Are you aware that Mr. Countryman was reporting detained workers who refused to work to CoreCivic?

A    Yes.

Q    And is that a practice that Trinity staff engage in on a regular basis?

A    That is a failure to complete the job duties.  They were -- if they was at work and they didn't want to complete an assigned duty, then you have, we write a 51C on that.  Yes.

Q    Okay.  And you reporting the workers who refuse to work because that's CoreCivic policy?

A    In my reporting because it's CoreCivic's policy?

Q    I can rephrase.  The reason why you're reporting these two detained workers who refused to work is because CoreCivic has a policy requiring you

to do that?

A    I'm reporting it because they came to work and -- I'm pretty sure it was reported because they came to work and they didn't work.  They failed to work, so hey, yeah.  It's - -we had to report it.  Mr. Countryman had to report it.  Yes.

Q    Okay.  That's my question.  Just that when detained workers refused to work, you're required to report those workers to CoreCivic?

A    Yes.

Q    And with these two individuals, how do you know that they came to work and refused to work versus just didn't show up?

A    I'm not sure.  I mean, I don't ...

Q    Okay.  So you were just assuming when Mr. Countryman writes that the detained individuals refused to work that they showed up and didn't work, but you don't actually know if that's the case?

A    I don't -- I don't know.

Q    If they had not shown up to work, would that have required an incident report be written?

A    No.

Q    Okay.  So incident reports are required when detained workers show up to work but refused to work once they're there?

A    Yes.

Q    And in your opinion, when detained workers refused to work, that can be a problem for Trinity?

A    Yes.

Q    It's an even bigger problem when groups of workers don't want to work?

A    Yes.

Q    And that's a problem because if the workers don't want to work, then the meal service can be impacted?

A    Yes.

Q    And that is also why Trinity is required by CoreCivic to write incident reports on workers who refused work?

MR. EDWARDS:  Objection to the form.

MS. COHEN:  Join.

BY MS. STEWART:

Q    You can answer.

A    I don't know why -- why CoreCivic -- what's the reason behind they want us to write it, but I know why we write it is I know that we want to detainees to come to work.  I know that Trinity wants the detainees going to work so the meal can be put out properly and in a timely manner.

Q    And in terms of the practice of writing up

workers who don't want to work, you apply that across the board to all the kitchen workers?

A     Yes.

Q     You don't, for example, you don't treat any kitchen workers differently with respect --

A     No.

Q     -- to that practice?

A     No.

Q     And you know if the kitchen workers are aware of that practice?  That they can get written up for refusing to work?

A     Every detainee is issued a detainee handbook when they come in.

Q     Okay.  But my question is do you know whether the kitchen workers are aware of the policy other than the detainee handbook?

A     No.  I don't know.  I don't know.

Q     Well, you think that that policy of being written up for refusing to work is in the detained workers handbook?

A     Ma'am?

Q     I'm sorry.  I'll rephrase the question.  I'm trying to understand your testimony, and that is you believe kitchen workers are aware they can get written up for not working because it's in the handbook?

Case 4:18-cv-00070-CDL Document 383-1 Filed 09/27/23 Page 158 of 300
30(b)(6) Marquita Crawford, Vol. II    August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 419

A    I said that.  Yes.  That is in the handbook about the detainee work program.  Everything they need to know about the detainee work program.  They know that if they don't come to work, if they have poor work performance, they can be removed from the roster.  It's in the detainee handbook.  They know what their pay will be.  They know everything from the detainee handbook.

Q    Okay.  And your senses that because all of the detained people received the handbook that they're all aware that these policies exist --

A    Yes.

Q    -- related to discipline?

A    Yes.

Q    Are you generally aware that detained individuals in immigrant detentions have access to a grievance process to make complaints about conditions?

A    Yes.

Q    And what do you know about the grievance process?

A    I know that they have the right to write a grievance.

Q    Do you have any role in the grievance process as Food Service Director?

A    If they have -- if it's a food-service

Page 420

grievance, then I would speak to them or I would reply with the grievance officer, and that's it.  I would be the one if it's something with food service, being that I'm the Director, I would be the one who would have to give the response to their grievance.

Q    Okay.  So you receive copies of grievances that are related to the food service?

A    Well the grievance officer talks to me about it, and I give him my response.

Q    Okay.  So you generally hear about grievances verbally from the grievance officer?

A    Yes.

Q    And you have any role in detained worker grievances that might relate to Trinity employees at Stewart?

A    No.

MS. STEWART:  Okay.  I'm going to pull up the next exhibit.  The Bates is CCBVA000173964.  Will mark this as Exhibit 42.

(Exhibit 42 was marked for identification.)

BY MS. STEWART:

Q    Ms. Crawford, can you see Exhibit 42?

A    Can you -- increase the size of that, please?

Page 421

Q    Sure.  Is that a little better?  It is a multipage exhibit, and I'm going to take you through different pages as we talk about it.  But feel free to take a minute to look through it.  You should be able to scroll as well.  You have that ability now if you need to move the documents up and down to look through various pages.

A    I can't even see my arrow.

REPORTER:  I think you, Ms. Crawford, have to request permission to control.

MS. STEWART:  No.  She shouldn't have to do that.  C.J. should just automatically control, which C.J. Sandley just did.

REPORTER:  Okay.

THE WITNESS:  Well, can you scroll down because I can't.

BY MS. STEWART:

Q    Yeah.  Sure.  We'll just scroll through so you can continue to read.

A    Okay.  I'm done.

Q    Okay.  There's a few more pages, but I think I'll just take right to those pages as I ask you about them so it's clear.  So this is a grievance filed by a named plaintiff in this case, Wilhen Hill Barrientos, against an employee of Trinity named Tiffany Gaines in

2018.

A    Mm-hmm.

REPORTER:  Is that a yes, ma'am?

MS. STEWART:  And --

THE WITNESS:  Yes.

MS. STEWART:  I want to start on what's going to be Bates 173966.  C.J., if you could scroll down to that page.

BY MS. STEWART:

Q    This is the full version of the grievance and just reading a couple sentences.  The first sentence is "The reason of this request is to inform you that a situation I have with one of the Trinity cook staff whose name is Mrs. Gaines."  If you keep scrolling through to the next page, the top sentence that's in handwriting says, "She has threatened me with sending me to segregation when I don't do things the way she tells me.  I work hard and try to do my best."  And the grievance generally continued on describing Ms. Gaines' conduct with respect to Mr. Barrientos.  Have you seen this grievance before today?

A    Yes.

Q    When did you see it?

A    I don't know the exact time, but it's --

30(b)(6) Marquita Crawford, Vol. II    August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 423

it's been a -- years ago, I guess.  Whenever it was
written.  Ms. Edmonds, the grievance officer, she --
she told me about it.  She showed it to me.

MS. STEWART:  Okay.  Let's scroll down
to Bates 173964.  Sorry.  Scroll up.  And in this
e-mail --six four.  I think it's one page up from what
I'm seeing on the screen.  Yeah.  Thanks.

BY MS. STEWART:

Q    Here, Harrell Gray from CoreCivic is asking
for an explanation from Trinity.  Yeah.  Sorry.  He's
sending statements from Trinity staff related to the
grievance to the grievance officer, Ms. Edmonds, which
you just referenced.  And attached, if you scroll down
are a number of statements that Trinity staff had
e-mailed to Mr. Harrell.

And in Bates 173973, sorry to jump around,
but this is a statement from Mr. Countryman related to
the grievance, and at the top, he says, "On May 10,
2018, Ms. Gaines spoke to me and stated that detainee
Hill didn't clean his area when he was cooking.  She
exited the kitchen to retrieve detainee Hill so he
could finish his job."  And then if you scroll to
173975, this appears to be a statement that you
submitted related to the grievance.  Do you recall
submitting this statement?

A     Yes.

Q     And here, you said you had actually spoken to Mr. Hill about his grievance.  Mr. Hill Barrientos about his grievance, and you informed him that assigning and following up on tasks to ensure completion was part of Gaines's job description.

A     Mm-hmm.

REPORTER:  I'm sorry ma'am.  Was that a yes?

THE WITNESS:  Yes.

REPORTER:  Thank you.

THE WITNESS:  Yes.

BY MS. STEWART:

Q     And then if you go back up to the second page of the document, which is Bates 152247, we see the ultimate resolution of the grievance by Ms. Edmonds, the grievance officer.  And it says, "After reviewing incident statements from Trinity staff, it seems as if detainee Hill Barrientos, Wilhen was instructed by Trinity staff Gaines to complete a task, and he refused to comply.  Trinity staff was instructed that professionalism will be portrayed with all staff and detainees."  And it goes on to say "Ms. Gaines was spoken to about the tone and instruction that are given detainees to keep it professional.

Grievance is partially in detainee's favor."  Were you aware of that resolution of the grievance?

A    No.

Q    You never heard about how it was ultimately resolved?

A    No.

Q    And in 2018, you were the Assistant Food Service Director.  Correct?

A    Yes.

Q    Is that common that you don't hear about the resolution of detained individual grievances related to Trinity staff conduct?

A    Yes.

Q    I'm sorry.  In 2018, you were Assistant Food Service Director or Food Service Director?

A    In 2018, I was the Director.

Q    Okay.  Okay.  And you didn't hear about how this was resolved?

A    I don't recall it.

Q    And as stated in the grievance documents, when Ms. Gaines left the kitchen to retrieve Hill Barrientos to order him back to the kitchen to complete his tasks, is that consistent with Trinity's practice when detained workers leave their positions?

MR. EDWARDS:  Objection to the form.

BY MS. STEWART:

Q   You can answer.

A   I'm not sure what -- about what they mean when she left the kitchen.  I -- I can't remember about, you know, her leaving the kitchen, but I'm -- I'm not sure about him leaving the kitchen and her going to get him.

Q   Okay.  And so -- you don't -- recall that specific occurrence, my question for you is whether Ms. Gaines leaving the kitchen to retrieve him is consistent with Trinity practice.

MR. EDWARDS:  Same objection.

BY MS. STEWART:

Q   You can answer.

A   That -- the statement that was written -- left the kitchen, no.  When they're saying "left the kitchen" to me, he was inside the chow hall because he can't leave the kitchen without an officer opening up the door.  So he -- up and went into the chow hall and she told him to come back inside the kitchen.

REPORTER:  My apologies, Counsel.  I think the audio is -- we're having an issue with the audio again.  Can we go off the record?

MS. STEWART:  Yeah.

REPORTER:  We are off the record.  The

30(b)(6) Marquita Crawford, Vol. II     August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 427

time is 1:59 p.m.

(Off the record.)

REPORTER:  We're back on the record. The time is 2:00 p.m.  You may proceed when ready, Counsel.

BY MS. STEWART:

Q   SO, Ms. Crawford, to clarify my question, I'm specifically asking about the sentence in Mr. Countryman's statement, where he says after speaking to Ms. Gaines, she, Ms. Gaines, exited the kitchen to retrieve detainee Hill so he could finish his job. And my question for you is whether the Trinity staff leaving the kitchen to retrieve a detained worker is consistent with Trinity practice.

A   No.

MR. EDWARDS:  Objection to form.

BY MS. STEWART:

Q   You can answer.

A   If he went outside the kitchen and into the chow hall, yes.  You can go in and ask them to come back in to finish his job.  So yes.

Q   Okay.  So if a detained worker leaves the kitchen, a Trinity staff person can --

A   Yeah.  Yeah.  Go back --

Q   If you could just let me finish my question

Page 428

and this is, again, I don't mean to interrupt you, but we got to make sure the record's clear for the reporter. When a detained worker leaves his position in the kitchen, a Trinity staff person can actually leave the kitchen and go retrieve that worker to bring him back?

A    No.

Q    So is what Ms. Gaines said in this instance incorrect?

A    What you are saying is incorrect. That's not the incident. He did not leave the kitchen area, but he left the kitchen and went into the chow hall because they don't have access to just walk out of the kitchen. So he left out of the kitchen and went into the chow hall. Yes, she could go back in and say, sir, can you come back in? Let's finish doing our job. So --

Q    Okay. So Ms. Gaines could leave --

A    --he can't leave --

Q    -- the kitchen -- Ms. Gaines can leave the kitchen into the chow hall to retrieve a detained worker who left his position?

A    Yes.

Q    And Trinity staff can go do that because they are permitted to require detained workers to

finish their work assignment?

MR. EDWARDS:  Was that a question?
Sorry.

MS. STEWART:  Yes.

THE WITNESS:  Oh.  Yes, they can ask the detainee to finish their job.  To complete their job.

BY MS. STEWART:

Q     And if Ms. Gaines had just let Mr. Hill Barrientos leave without finishing his work, would she have been violating a policy?

MS. COHEN:  Objection.  Form.

BY MS. STEWART:

Q     You can answer.

A     Would she have been violating a policy?

Q     Yes.

A     No.  But the job wouldn't have been done.  But she wouldn't -- she would have had to report it -- the incident.

Q     She would have had to report --

A     The incident.

Q     -- the incident to CoreCivic?

A     Yes.

Q     So Mr. Hill Barrientos leaving the kitchen would have warranted a 5-1C be filled out?

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 430

A     Yes.

Q     Do you know if Trinity took any corrective action against Ms. Gaines?

A     No.

Q     No they didn't take corrective action, or you don't know?

A     No.  No corrective action was needed for the incident.

Q     Did Trinity address the allegation in Mr. Hill Barrientos' grievance that Ms. Gaines was threatening to place him in segregation?

A     Yes.  I did ask about this -- that incident.

Q     Explain what you did in response to that allegation.

A     Well I asked was that statement made, and she told me no, that it wasn't, you know, that was never said.  That was something that  -- that the detainee came up with, and she said she did not make that statement.

Q     Do you know if --

A     I asked --

Q     Oh.  Go ahead.

A     I asked if any -- anyone was around when the statement was made, and Mr. Hill said no, that no one was around.  So it was basically hearsay.  So no

Page 431

corrective action was taken, but I did speak to my
staff -- all of my staff -- about professionalism and
making sure that we report what we need to report and
we handle every situation in a professional manner.

Q    Do you know if anyone from CoreCivic
investigated Mr. Hill Barrientos' allegation that Ms.
Gaines threatened to place him in seg?

A    The grievance officer.

Q    Ms. Edmonds?

A    Yes.

Q    In the resolution of the grievance, it
doesn't reference the segregation allegation.  So how
do you know Ms. Edmonds addressed that particular
allegation?

A    Well, I'm not sure, but I -- I wouldn't have
addressed the segregation allegation.  I asked about
it, and he made his statements and that was it.  He
wrote it up in the -- the incident report, so I'm
pretty sure she spoke with him about that.  So -- but
I'm not there when they have their conversation.  I
only know what we discuss.

Q    So you don't know whether anyone from
CoreCivic investigated the segregation allegation?

A    No.

Q    And when you say he wrote it in an incident

report, are you referring to Mr. Hill Barrientos

writing it up in his grievance?

A    Yes.

Q    Do you know if there was any incident report

written up that included mention of the segregation

incident?

A    An incident report?  I only know the -- the

document that you just showed me, I just saw it on

there, so that's how I know.

Q    Is Ms. Gaines still employed by Trinity at

Stewart?

A    Yes.

Q    What is her title?

A    Food Service Supervisor.

Q    You testified earlier -- scratch that.  Do

your job responsibilities as Food Service Director

include training the detained workers in the kitchen?

A    Yes.

MS. STEWART:  I'm going to pull up an

exhibit that's been previously marked Exhibit 10.

(Exhibit 10 was previously marked for

identification.)

BY MS. STEWART:

Q    Okay.  Can you see Exhibit 10, Ms. Crawford?

A    Yes.

Q    So Exhibit 10 is a memo titled Inmate Training - Annual Review, and the memo is from you. Correct?

A    Yes.

Q    And the date is 1/4/2021?

A    Yes.  Yes, it is.

Q    Have you seen this document before?

A    Yes.

Q    And if you scroll down, the document appears to be a packet of detained worker job descriptions at Stewart.  Does that sound right?

A    Yes.

Q    Did you draft these job descriptions?

A    Yes.

Q    Were they drafted in 2021?

A    No, they were not drafted in 2021, but they were reviewed in 2021.

Q    When were they originally drafted?

A    I'm not sure the -- of the exact time -- year.

Q    Were you the one who originally created them?

A    No.

Q    So you updated them in 2021?

A    Yes.  I reviewed them in 2021 and updated.

Q    Okay.  So if we can scroll down to a few more pages.  The Bates that we want to be at is 1660.  This page is titled Trinity Services Group Inmate Worker Kitchen Rules.  Do you see that, Ms. Crawford?

A    Yes.

Q    Okay.  And the page below that if you scroll down is titled Inmate Kitchen Worker Hygiene and Grooming Standards.

A    Mm-hmm.

Q    And the page --

MS. STEWART:  I'm sorry.  Did I --

REPORTER:  My apologies.  Was that a yes, ma'am?

THE WITNESS:  Yes.

REPORTER:  Thank you, ma'am.

BY MS. STEWART:

Q    And the last page is titled Food Safety 101.  Correct?

A    Yes.

Q    Are those three pages that I just referred to you in Exhibit 10 provided to detained workers in the kitchen?

A    Yes.

Q    When are the provided to detained workers?

A    Before they start working.  During the

orientation.

Q    And are there versions of those three documents in other languages?

A    Yes.

Q    Do you know what other languages they're in?

A    It's in French and Spanish.  And then if they need it in another language, we can produce that.

Q    Other than the three trainings referenced in these three pages, are there other trainings provided to detained workers in the kitchen?

A    Yes.

Q    Okay.  What other trainings do the detained workers receive?

A    We -- we have a whole orientation book that we review with the detainee workers.

Q    I'm sorry.  You said you have a whole orientation book?

A    Yes.  We have a notebook -- a book that we go through, and we do on-the-job training.  But in the notebook, it's more in-depth to what, you know, what they'll be doing in the kitchen and on the equipment sign-off.  When we train them to work with each piece of equipment, they sign off on the 11-1E form stating that they understand.

Q    Okay.  So the trainings that you provide in

the orientation are related to the equipment?

A    Equipment in the kitchen.  Food safety.  The kitchen rules and regulations.  All that is provided during the orientation.

Q    Is the orientation book you referenced provided to the detained workers?

A    No.  We review it and we go over it during orientation, but this paperwork is provided to them.  Given to them actually in the handbook.  We go over all of the documents.

Q    Okay.  And you testified earlier that you, as Food Service Director, are responsible for ensuring the food quality.

A    Yes.

Q    Is that correct?

A    Yes.

Q    Okay.  Does Trinity perform its own quality assurance of the food service at Stewart?

A    Yes.

Q    And what is the process for ensuring the quality of the food?

A    We have to sample the food, and we have to provide a sample tray of every meal.

Q    When you say we have to sample the food, you mean the Trinity staff?

A    Yes.

Q    Is it you who samples the food?

A    Any -- any Trinity worker can sample the food.

Q    And when they're sampling, what are they looking for?

A    Taste -- taste, appearance, texture, and that kind of thing.  Making sure the food is served correctly.  Prepared correctly.

Q    And how often is the food sampled?

A    Each meal.  And a CoreCivic employee also samples the food.  Monitors the food.

Q    Which CoreCivic employee?  Do you know that person's title?

A    Yeah.  It would be a Captain or Lieutenant that would come in and do a meal monitor form every meal.

Q    You said that the Captain or Lieutenant filled out a meal monitoring form?

A    They evaluate the meal.  The kitchen officer fills out the form, but the Captain or Lieutenant will come in or the ADO, they'll come in and sample the -- the tray.  Take the temps on it and make sure we're serving the correct portions and that kind of thing.  Those kinds of things.

Page 438

Q    So correct me if I'm wrong, but it sounds like for each meal, a tray is sampled by a Trinity staff, a CoreCivic staff, and the CoreCivic staff person fills out a meal monitoring form after the tray is sampled?

A    Yes.

Q    And the temperature of the food is taken before every meal?

A    Yes.

Q    And what happens if there's some sort of deficiency identified in the sampling process?

A    It would have to be corrected.

Q    And how is it corrected?

A    Well, we really don't have to take those measurements because we follow recipes.  They have recipes that's planned out, and that's what we do. But if the food is --  if they come in and the food is not temp they like, we can pull that pan, get it reheated to the correct temp, and we'll put a new pan on the line.  But that doesn't happen.  We try not to let that happen.  So -- but yeah.  The food is monitored by the Trinity staff and the CoreCivic staff.

Q    What happens if there's a deficiency in the taste of the food?

A    We don't have those.

Q    I thought you said that it was sampled for taste.

A    Yeah.  But -- I know, I'm saying we don't have any.  They come in and -- and if they don't -- it's the difference between not preferring the meal and the recipe not being correct.  So we follow the recipes to ensure that the food is correctly made, prepared.

Q    Yeah.  My question is when the samplers are sampling the food and they identify some type of taste deficiency, what is the process for fixing that deficiency?

A    If they come in and say that they don't -- that the food is not right, then I would come in and I would also sample the food.  So -- but I would have the final say about the food if -- if I know that the recipe's been followed because something like hey, I feel like it needs more salt, no, we can't add in more salt because of the recipe.  So -- but if it was something that -- like burnt, something's burnt, of course, we would discard that item and replace it.

Q    And in terms of the meal monitoring report, who keeps that report?  Is that Trinity or CoreCivic?

A    CoreCivic.  CoreCivic.

Q    Do you happen to know who from CoreCivic keeps that report?

A    No.

Q    And if during the sampling there is a deficiency in the appearance of the food, how is that deficiency addressed?

A    In the appearance?

Q    Right because you testified that the sampling looks at the appearance of the food.

A    Well, if it's something -- if a soup -- if they think the soup is too loose, we can cook more vegetables to add to the soup.  But we would have to stick with the recipe, and I make sure I let them know that hey, this is the recipe for this meal.  But if it can be corrected, I'll correct it.  It just -- I can't just say what I'll do because we have different items on the menu.

Q    How often would you say a deficiency is noted by one of the food samplers?

A    I couldn't say.  Not often.  When I say not often, not even twice per year.

Q    Do you track plate waste?

A    No.

Q    Do you note in any way if food is not being eaten?

A    No.

Q    When is the temperature of the food taken on the lines?

A    On the line?

Q    Mm-hmm.

A    We -- we're required to take the temps of the food three times.  We got a serving -- a holding -- a prepared temp, holding temp, and a serving temp.  Every 30 minutes while the food is on the line, we take the temps.

Q    And what happens if the food is not up to temperature?

A    If the food is not up to temp, we would take -- remove the item from the line, put a new food on the line, make sure it's to temp.  We can reheat the food if necessary -- if it's necessary.

Q    Do you keep temperature logs?

A    Yes.

Q    Do you log the temperature of the food every time you take that temperature?

A    Not every time that we take the temp, but we have -- we're required to keep a -- like I said, we're required to keep a prepared temp, holding temp, and a serving temp.

Q    So what do you log in the temperature logs?

A    I log the prepared temp, the holding temp, and the serving temp.

Q    Every time those three temps are taken, you log it?

A    Yes.

Q    Where are your temperature logs posted?

A    My temperature logs are not posted anywhere, but they are kept in the office on what we call a SHU sheet.  And the -- the other one that we use would be the -- the meal monitor form.

Q    The first one you referred to was a SHU sheet?

A    Mm-hmm.  Special Housing Unit.

Q    Okay.  Okay.  So S-REPORTER:  I'm sorry.  Is that a yes, ma'am?

THE WITNESS:  Yes.  I'm sorry.

BY MS. STEWART:

Q    And S-H-U stands for Special Housing Unit?

A    Yes.

Q    Do you have a specific temperature log for the Special Housing Units?

A    Yes.

Q    And then you said that the other temperature logs are on the meal monitoring forms?

A    Yes, and the productions sheets.

Case 4:18-cv-00070-CDL   Document 383-11   Filed 09/27/23   Page 182 of 300
30(b)(6) Marquita Crawford, Vol. II        August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 443

Q     What are the production sheets?

A     The production sheets are -- it'll be a list of the foods that are being served and to include the diets.  And you will have the amount of food prepared, and then you have your temps.  Your holding, your -- your prep -- prep temp, holding temp, and your serving temp.  Those are on the production sheets.

Q     And the SHU logs, the production sheets, and the meal monitoring forms are all kept in Trinity's office in the kitchen?

A     Yes.

Q     Are they kept in paper form or electronic form?

A     Paper.

Q     And why does the SHU have its own temperature log?

A     Anything being sent out of the kitchen, we have to record the time plated and the discard time. Have two hours to feed the guys the trays -- not the guys, the detainees the trays after we fix them.  So that's why we have to keep them.  When the officer picks up the tray, then we record it.  The kitchen officer signs off on it, and the SHU officer signs off on it.

Q     And are you ever required to provide the

temperature logs to anyone?

A     Yes.

Q     Okay.  Who?

A     We're required to -- when we have an -- a auditor come in, they have to look through those and that'll be ICE, that can be a QA audit.  Any kind of inspection or something that they're asking for it, we need to put ACA files in every lane.

Q     Okay.  So you provide temperature logs in response to audits?  Correct?

A     Yes.

Q     Are there any other times when you provide temperature logs to others?

A     No.

Q     And when someone goes to take the temperature of the food sent to the SHU, does that person take the temp log with them, or do they write it down later when they get back to the office into the log?

A     They sign it and leave it in the kitchen.

Q     And you mentioned earlier, you testified earlier that the food service changed or has changed during COVID.  Was the food delivered to the pods during COVID?

A     Yes.

30(b)(6) Marquita Crawford, Vol. II      August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 445

Q    And how was the food served in the pods?

A    I don't know how it's served in the pods, but when it leaves the kitchen, it's in a hot box.  We send it -- the officer escorts the trays and the drinks to the units, and then they pass them out to each detainee.

Q    And how is the temperature of those food boxes maintained during the satellite feeding during COVID?

A    We have electrical hot boxes that the plug-in.  The food -- it's a food warmer on wheels.

Q    Are you also taking the temperature of those boxes?  Of the food in those boxes?

A    When the plate -- when the food is plated, it's temped.  Before it's plated, it's temped.  The hot box also has a thermometer on it, so place the trays, the hot food, inside of a hot box.  They take it straight to the unit, and they pass them out issuing to the detainees, and they bring the hot box back to the kitchen.

Q    Okay.  So once the food gets to the unit, someone is then plating the food?

A    No.  Passing out -- issuing out the trays.

Q    Okay.  And the temperature is taken of the trays before they're issued out?

A    Yes -- no.  Before they leave the kitchen.

Q    Before they leave the kitchen.  Okay.  How do you receive your stock at the Stewart kitchen?

A    We have weekly deliveries.

Q    Is there a Trinity staff person assigned to receive it?

A    We have a Trinity staff member that takes the temps on it when it comes in.  When it comes, the detainees unload the stock, and that's how we receive it.  But a Trinity staff has to sign for it.

Q    And how is your stock pulled for use?

A    Trinity staff and a detainee.  We do three-day pulls.

Q    And what happens if you run out of food?

A    We don't run out of food.

Q    That never has happened?

A    No.  Run out of food?  We have -- we order ten days out.  So we don't run out of food.

Q    Okay.  So in your experience working at Stewart, you have always had enough stock?  There's never been an instance where you've run out of some type of food stock?

A    You mean like run out completely of food?  That's what you're asking?

Q    So I should clarify.  What happens if you

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 447

run out of a food item?

A    Oh.  We have a substitution log that if we ran out of something, if the truck of the company doesn't have that food item, we would have to make a food substitution like we talked about earlier.

Q    And could you remind me of the process for the food substitution?

A    Yes.  We request that -- we send a notification 24 hours in advance, send it to the Warden, and he's -- he approve it.  Any kind of substitution that we make has to be on the substitution list.  On the approved substitution list.

Q    And how do you ensure someone with a special diet receives the special diet?

A    We have a special diet list.  They come up -- when they come to the window, they bring their ID.  We check their ID with the list.  Whatever they're on the list for, that's what we issue to them.

Q    Who provides the list to you?

A    Medical sends me a list electronically every week.

Q    And do you track the number of special diets that you're serving?

A    Yes.

Q    And how do you track those?

Page 448

A    We have the list, and when they come up, we check off the list.  If they miss consecutive meals, we have to notify medical.

Q    Okay.  So the way you track the number of special diets served each week is to check off names on the list?

A    Oh.  No.  Each week?  No.  I thought you were saying like through the line.  I'm sorry.  If -- every week, we get a -- a special diet list, and so we know how many diets we have in house.  And we have to report it weekly.

Q    You have to report how many special diets you serve weekly?

A    Yes.

Q    And who do you report that to?

A    It's reported to Trinity.

Q    Is there a form that you use?

A    No.

Q    You just send over e-mail the number --

A    It's on --

Q    -- of special diets?

A    No.  No.  It's on -- it's a part of the LEAP report.

Q    Okay.  And what is the LEAP report?

A    It's a report that we have to issue to

Case 4:18-cv-00070-CDL    Document 333-1    Filed 06/27/23    Page 188 of 300
30(b)(6) Marquita Crawford, Vol. II         August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 449

Trinity.  It's about just basic things going on in the facility.

MS. STEWART:  Okay.  Let's go off the record.

REPORTER:  We are off the record.  We are off the record.  The time is 2:29 p.m.

(Off the record.)

REPORTER:  We are back on the record. The time is 2:41 p.m.  You may proceed when ready, Counsel.

MS. STEWART:  Thank you.

BY MS. STEWART:

Q    Ms. Crawford, you understand that you're still under oath after the break?

A    Yes.

MS. STEWART:  I'm going to go ahead and introduce the next Exhibit.  The Bates is CCBVA0000195884.  And this will be marked as Exhibit 43.

(Exhibit 43 was marked for identification.)

BY MS. STEWART:

Q    Ms. Crawford, can you see Exhibit 43?

A    Yes.

Q    Do you recognize what's in this picture?

Page 450

A    Yes.  I do.

Q    Okay.  And what is it?

A    Those are breakfast bags for the detainee population.

Q    What are the contents of the bags?

A    That bag has cereal, a bagel, margarine, a jelly, two PC sugar packets, and a coffee PC packet.

Q    Is the bag rotated?

A    Yes.

Q    How often is it rotated?

A    We use them -- we only make enough for the next morning and that's it.  We make enough a day -- we make bags a day that night before, and they're used the next morning.  Then the next day, we make new bags.

Q    How often are the bags rotated?

A    They're used out every day.

Q    So they're not rotated, they're refreshed?

A    Yes.

Q    Or you're saying you create new ones every day so they're not rotated?

A    Right.  We -- we create new ones every day.

Q    And between the time they're created at night and the next morning when they're used, they're not rotated?

Page 451

A    They're none to rotate.  We make them for the next day going by the midnight census.  Whatever we have in house, that's the amount that we make, and we use them the next morning.  And then the next day, we make new bags to be served for the next morning.

Q    Okay.  I understand.  My question is that before you use them in the morning, they're not rotated?

A    If we use them, it won't be anything to rotate.  Right?

Q    Well, presumably you make the bag at night.  You use it the next morning.  There's what, eight hours between those two moments?  So I'm asking you if the bags are rotated during that time.

A    Yeah.

Q    And it sounds like your answer is no.

A    What we use is for -- any time we put any product in the cooler, we use first in, first out.  So if the -- the first bags that we made will be the first bags that are used.  So yes, they're rotated per se.

Q    First in, first out isn't exactly the same as rotating though, right?

A    It is.

Q    Explain that to me.

Page 452

A    The first thing that you prepare, that'll be the first thing that you use.  So it will keep rotating.  So we bring in these bags today.  They're going to be used tomorrow.  It just goes in a circle, so that is rotating.  But the system that we use is called first in, first out.  That's how we rotate and use products in the cooler.

Q    Okay.  Your system for rotating is called first in, and first out?

A    Yes.

MS. STEWART:  Okay.  Oh.  Okay.  I guess we can pull down Exhibit 43 and we'll go ahead and introduce the next exhibit, which is CCBVA0000195885.  This will be marked Exhibit 44.

(Exhibit 44 was marked for identification.)

BY MS. STEWART:

Q    Do you recognize what this picture depicts?

A    Yes.  That's -- this is my cooler.  The same cooler.

Q    And what is stored in the bin on the floor?

A    The -- nothing's in it currently because we're not prepping anything.  Those are front bins that we use, and they're marked for food prep use only.

Q     And what do you do with the bins for food prep?

A     It would be like a compound salad.  We would like it with a food liner and make our compound salad, and we would store it in there for the next day's use.  But we have to make compound salad a day in advance.

Q     Is this bin rotated?

A     It's used.  And we -- it's a three-day period that we can keep it.

Q     Can you explain that to me?  It's a three-day period that you can keep food in them?

A     Right -- well, no, prep food.  So if we put -- today is the 23rd.  The 23rd is the first day.  So the 23rd, 24th, and 25th, and it has an a.m. and a p.m. time on it.  But yeah, that's a food prep bin, and it's marked for food prep.

Q     Okay.  So you're allowed to keep food in there for prep purposes for three days?

A     Yes.

Q     During those three days, is the bin rotated?

A     Is it rotated?

Q     Yes.

A     It -- it has the food in it that we're going to use.  That we're prepping for a meal.  And it's dated.  It has to have a date.  The item and the prep

date and the discard date on it.  So I don't know what
would be rotating.

Q    -- CoreCivic employees are entitled to a
daily meal.  Is that right?

A    Yes.

Q    And employees who eat those meals have to
sign a form.  Correct?

A    Yes.

Q    Who maintains those forms for Stewart if you
know?

A    They sign in the kitchen for them on the
meal accountability sheet, and then at the end of the
week, I bring them up to the financial administrator.
And she looks at them and we bill for the meals.  So
that's kind of like a receipt for the meals.

Q    The financial administrator works for
CoreCivic?

A    Yes.

Q    Does Trinity maintain the forms?  The meal
sign-off forms?

A    Yeah.  Yes.  Yes.

Q    Where are those forms maintained?

A    In the office, in the kitchen.

Q    And it's your job to collect those forms?

A    Yes.

Q    Do you review the forms?

A    Yes.

Q    Do you have an estimate of how many employees at Stewart eat the meals on an average day?

A    On an average day, probably about five. It's different for different meals.  They -- we have different meals that they would come up for.  So on a daily base, I know we would have five officers that come up on a daily base to come eat a meal.

Q    Do you know how many employees total work at Stewart?

A    No.

Q    Have you eaten a meal at Stewart?

A    Yes.

Q    About how often do you eat meals there?

A    On a daily basis.

Q    How many meals do you eat per day?

A    Two.

Q    And you testified earlier that you verbally receive notice when a detained worker files a grievance related to food service.  Correct?

A    Yes.

Q    And does that notice include grievances related to food quality?

A    Yes.

Q    And do you have any role in detained worker grievances that relate to food quality at Stewart?

A    No.  Besides -- I mean, I respond to them. I respond to the e-mail.  Or I respond to the grievance.  But -- however I get it, I respond to it.

Q    I'm sorry.  You said you respond to the e-mail.  Do you receive notice of food-related grievances over e-mail?

A    I have recently, yes.  We have a new system. Yes.  I have responded by e-mail.  I can respond in person.  I've had -- I have actually responded to a detainee in person with the detainee, you know, talk with them with the grievance officer.  So yes.

Q    What is the --

A    If I --

Q    -- new system --

A    -- one way -- ma'am --

Q    No go ahead.  Go right ahead.

A    No.  Go ahead.

Q    Finish your statement.

A    No.  Go ahead.  I'm fine.  I'm sorry.

Q    I was just following up on something you said.  You said we have a new system, and I was asking you to explain what that new system is.

A    Oh.  I don't know the name of the new

Page 457

system, but I know that we do have a -- a new way

to -- well, the detainees can now send e-mails.

Q    You have a system in place where detained

people can send e-mails to you?

A    Yes.

Q    Do they send it to the Trinity e-mail

account at Stewart?

A    Yes.

Q    And do you know what e-mail account the

detained people use to send those e-mails?

A    I don't.

Q    Do you receive those e-mails?

A    I do.

Q    And when did the system start?

A    Less than a year ago.

Q    And the e-mails you receive from detained

people, are they only about food quality, or can they

be about anything related to Trinity?

A    Anything related to Trinity.

Q    Ms. Crawford, it may just be what I'm

looking at, but it feels like you're looking off the

screen at a document or a device and I just want to

remind you if you could please look into the camera.

A    I'm trying to look into it.  Is that better

for you?

Q    That's actually much better.  Thank you.
And I'm going to repeat my question.  I didn't quite
hear your answer.  The detained workers can e-mail
Trinity directly about only food-related issues, or
can they e-mail you about other issues?

A    Food-related -- anything from the kitchen,
about the kitchen, they can e-mail about that.

Q    And you're responsible for processing those
e-mails?

A    No.  I do not process any e-mails.  They
send them to me and I respond to them.

Q    You respond directly to the detained worker?

A    Not detained worker.  Detainees in general.
Every -- every detainee in the population has that
same access to send -- send e-mails over to any -- not
just to the kitchen, but to anywhere in the facility.
They have tablets that have been issued to them, so
they have access to send over any e-mails.

Q    And about how many e-mails do you receive --

A    I haven't received --

Q    -- with respect to detained people?

A    Not many.  I've only received about three to
four e-mails.

Q    Three or four e-mails in total since the
system --

A    Yes.

Q    -- started?

A    Yeah.  Yes.

Q    And when you respond to those e-mails, you are responding via e-mail?

A    Yes.

Q    Other than responding to those e-mails, have you been involved in food-related grievances filed by detained people at Stewart?

A    Have I been involved in them?

Q    Yes.

A    I mean, are you saying have they written one against the kitchen?  A grievance against the kitchen is what you're asking?

Q    A food-related grievance is what I'm asking. Whether you're involved in food-related grievances.

A    Well if we get a grievance and it has something to do with the kitchen, then the -- the grievance officer will let me know.  But for me being involved in one, am I -- I mean, are you saying am I responding to them?  Or, you know, what are you asking me?

Q    Yeah.  My question is are you involved in the response to food-related grievances?

A    Yes.

Page 460

Q    And is there an official process for you to respond to food-related grievances?

A    Yes.  I have 72 hours to respond to a food service incident.  I mean, a grievance from someone about food service.  Yeah.

Q    And do you have to respond in a certain way? Via e-mail?  Is there a form you fill out?

A    No.  I -- like I said, it can be through e-mail with the grievance officer.  It can be in person with the grievance officer.  You know, if she come down and she ask me about it, and she's writing notes because she -- she's the one that will report back to the detainee with the actual grievance.

Q    Do log anywhere your responses --

A    No.

Q    -- to food-related grievances?

A    No.

Q    And when you respond directly to a detained person's e-mail about a food-related grievance, do you log your response anywhere?

A    It's -- if it's by e-mail then it's kept in the e-mail log.

Q    Do you copy any CoreCivic staff on your --

A    No.

Q    -- e-mail responses?

Case 4:18-cv-00070-CDL Document 383-1 Filed 06/27/23 Page 200 of 300

30(b)(6) Marquita Crawford, Vol. II     August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 461

A     No.

Q     No?  Does CoreCivic staff receive any notice that you respond to detained peoples' e-mails?

A     I'm not sure.

MS. STEWART:  Okay.  I'm going to introduce the next exhibit.  The first page Bates number is CCBVA0000118271.  And we will mark this as exhibit -- I think we're at --

REPORTER:  45 would be next.

MS. STEWART:  45.  Thank you.  Okay.

(Exhibit 45 was marked for identification.)

BY MS. STEWART:

Q     Can you see this Exhibit that we're marking 45?

A     Yes.

Q     Ms. Crawford?

A     Yes.

Q     And this is a multi-page exhibit, and I'll just take you through each page as we review them.  Do you generally recognize this form --

A     I recognize the form.

Q     -- in Exhibit 45?  Okay.  And do you recognize this to be the grievance form that detained people can use to file grievances at Stewart?

Page 462

A    Yes.

Q    And looking at this grievance listed here, Bates 118271, this individual named ███████████ writes, "I have been in this detention center since May 14, 2020, and the food service is really bad."  He goes on to the bottom to say "Please check the menu and make an inspection to kitchen contractor, Trinity Service Group, that doesn't perform the food menu which are published in the schedule."  Had you seen this grievance before today?

A    I'm not sure.

Q    This grievance was written in November 2020. You were Food Service Director then.  Correct?

A    Yes.

Q    As Food Service Director, would you have received this grievance?

A    Yes.  I would have.

Q    You can't recall receiving this particular grievance though?

A    No.

Q    Do you receive actual copies of grievances that relate to the food, like this one?

A    Yes.  Sometimes I -- I will get a copy.

Q    Sometimes you --

A    If it's -- if it's directly dealing with the

Page 463

kitchen, and if I have to respond to it, yes.  Like I said, we can -- she can let me know.  We -- discuss it through e-mail or in person when she would show it to me, but I don't have to keep up with the right here.  This, you know, this is CoreCivic's.  I just provide a response.

Q   So you don't always receive a copy of the actual grievance document?

A   No.

Q   If you scroll down to the grievance's officer's decision, Ms. Edmonds writes, "Nutritional adequacies menus, to include therapeutic special diets and religious diets are reviewed and signed at least annually by qualified nutritionist or dietician to ensure menus meet nationally recognized allowances for basic nutrition for appropriate age groups.  This is not a grievable matter.  Grievance will be returned."  Were you consulted before Ms. Edmonds provided this response to the grievance?

A   Yes.

Q   Do you recall being consulted about this particular response now?

A   Not about this particular one, but I know that I -- I did respond.  I mean, that's my response.  I sent her that about not only this one, but I have,

you know, when -- when they say that the meal is not nutritionally sound, then I let them know hey, it is. You know everything has been approved by a dietician. It's been reviewed and signed on.  Signed off on.  So -- I guess I just don't know --

Q    Does it --

A    I just don't know particular incidents.  Off the top of my head, I can't say yeah, I spoke to this detainee about this.  But yeah.  Ms. Edmonds always -- you know, reach out to me and tell me about the grievances or, you know, e-mail it to me, so -- I do respond to it, but I -- I don't know the end.  You know, what happens in the end.  How they -- whatever they decide on, I have nothing to do with it.

Q    You don't know how the grievance is ultimately resolved?

A    That's right.

Q    And what's written here, you're saying, is your general response to grievances about nutritional adequacy of the food?

A    Yes.

Q    Okay.  Scrolling down to the next grievance in this packet, the last Bates numbers are 118288. This is a grievance written by ████████ January 21, 2021.  And he writes, "In the food menu, it states we

Page 465

are to have dairy drink.  We never get dairy drink.
Ever since last year, 2020, when COVID began and we
stopped going to the dining hall, we do not get dairy
drink when satellite-fed."  Have you seen this
grievance before today?

     A     I remember it somewhat, but I -- yes.

     Q     Okay.  You were informed of this grievance,
then?

     A     Yes.

     Q     If you scroll down, you can see that the
grievance officer, Ms. Edmonds, found after review of
the milestone it was proven that detainee ▓▓▓▓▓▓▓
▓▓▓▓▓▓ accusation about the food service was correct.
Necessary steps were taken to correct the issue.  This
grievance is in detainee's favor."  Do you recall
taking steps to correct the issue that ▓▓▓▓▓▓▓▓
raised related to not being served dairy drink?

     A     Yes.

     Q     And what steps did you take to correct the
issue?

     A     The issue was that the -- the drink was
being issued.  He just didn't get it.  He was -- he
didn't know where to get it from.  We had the setup in
the kitchen, so we put a sign up there on it.  Dairy
drink mix.  The drink was set up in the kitchen.  When

Page 466

they walk through, they're supposed to get the drink if they want it, take it back to the unit with them. But some took it and some didn't.  So we make sure that everyone knew that that items was available, and we started to actually put a cambro of that dairy drink mix in the unit until we got the PC packets.

When we got the PC packets, they were able to issue those PC packets in the breakfast bags.  And so that ensured that everyone got that dairy drink mix, whether they wanted it or not.  Before it was if they wanted it, they could take it with the coffee or the dairy drink mix.  Some would take coffee, some would take dairy drink mix.  So that's how we corrected that issue with the PC packets.

Q    Okay.  The first part of your testimony is that ▮▮▮▮▮ wasn't aware that dairy drink was available when --

A    Yeah.

Q    -- he went to the line, right?

A    Yeah.

Q    Okay.  Well, ▮▮▮▮▮'s complaint is about satellite feeding, so presumably, during this time, the detained people weren't going to the chow hall to eat.  They were getting fed in the units.  Correct?

A    No.  No.  That's not correct.  They were

coming through the chow hall, picking up a bag, and taking it back to the unit with them.  Making a circle.  They couldn't sit in the dining hall at that time.  So they would come up, pick up the trays, and keep moving back to the unit.

Q    Okay.  You previously testified that during COVID, detained people were getting food brought to their units --

A    Yeah, so --

Q    -- so -- okay.

A    -- it's a -- go ahead.  I'm sorry.

Q    No.  I'm just trying to clarify what you're talking about.  So you go ahead.

A    Yeah.  Since no one has been through the COVID thing, we did a couple things when we first started.  No sitting.  Everyone had to walk to the chow hall in the beginning six feet apart.  You walk up, you pick up your tray, you take it back to your unit.  And then we started everyone -- when we started getting more positive cases, they started to push to the food to the unit in the hot box, and then it was issued in the unit.

Q    So in January 2021, earlier this year, were you feeding individuals in the unit?

A    We were, but breakfast -- we -- they were

Page 468

picking up bags through the window.  Coming and picking up food items through the window, taking them back to the unit.

Q    Okay.  Because here, ████████ specifically states that when he was getting satellite-fed, he wasn't getting dairy drink.  My understanding from your previous testimony is satellite feeding means being fed in the unit.

A    Being fed in the unit.  Yes.

Q    Okay.  And so here, he's referring to not getting dairy drink while being satellite-fed, which means while being feed in the unit.

A    I don't -- I don't know what he -- like I said, from what I remember, and I can tell you what I remember, is that when we had the -- we were serving breakfast, they would come up and they would pick up the bags and they would consume the meals in the unit.  Like I said, they would have to come up, fix their drink or their coffee or their milk and take it back to the unit.  Then we ended up serving the PC packets.  Now we're away from the PC packets and we do the cartons of milk.  So different times, different situations.  But he said satellite feeding, but like I don't recall this happening when we were pushing the food down to the unit.

Case 4:18-cv-00070-CDL   Document 383-1   Filed 09/27/23   Page 208 of 300
30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 469

Q    Okay.  And you see the grievance officer's review references milestone.  Do you know what milestone is?

A    I do.

Q    What it is?

A    It's the camera system.

Q    So it seems that based on the grievance officer's review of the camera system, it was proven that ██████'s accusation about the food service was correct.  You see that?  It's down at the bottom of the exhibit as -- there you go.  It's scrolled a little more so you can see it.

A    Yes.  Yes.  I see that.

Q    So do you know which milestone video the grievance officer reviewed?

A    No, ma'am.

Q    But it would make sense if ██████ is complaining about satellite feeding that the milestone video would be video of the detained people getting fed in the units?

A    I'm not sure.

Q    But per your testimony, you noted that for the satellite feeding, eventually, dairy drink was provided.  Correct?  And that's what you mean by the PC packets?

A     Yes.  That's correct.

Q     And providing the PC packets, was that how you remedied this grievance?

A     No.  How I remedied the -- no.  We made sure that we labeled the dairy drink mix and that -- later on, they would make sure that it was taken to that unit along with the coffee so they can decide what they wanted.  And then later, we got the PC packets.  And now we have carton milk.

Q     Okay.  You remedied the grievance by providing dairy drink --

A     Yes.

Q     -- to the units?  And you did that because previously you hadn't been providing dairy drink to the units during satellite feeding?

A     No.  That's not correct.

Q     Okay.  Well --

A     Whatever --

Q     Go ahead.

A     I can't make it make sense to you because you're not here.  But I can only tell you what I know.  I told you I can't - -tell you that I just remember this incident completely, but I know about the situation when it happened.  And from when -- what I remember is that we were feeding -- letting them walk

Page 471

to the chow hall to pick up their trays during this time.  So yeah.

Q    Okay.  I'm just trying to clarify the different things you've said to me, and if I'm wrong, if you'll please explain it.  You're right.  I wasn't there.  But I'm just, you know, trying to understand what happened.  And what you said to me eventually was that you placed the dairy drink labeled on the carts that were provided to the unit.  And I'm trying to confirm that that was the corrective measure you took to remedy this grievance --

A    Yeah.

Q    -- and general issue about lack of dairy drink being brought to the unit.  Is that correct?

A    Yes.

Q    Okay.  We can keep scrolling down to the next document in the packet.  And this document has a different Bates number that's ICE2013FOIA -- F-O-I-A -- 0044500103.  And here, the name of the individual submitting the grievance is redacted.  The grievance is dated October 2013.  And the text of the grievance is referencing food provided by Canteen Food Services.  And the individual states -- lists out what was provided in the meal, but then says "But no bread. When informed of the fact that there was bread missing

in the tray, I was informed that there was no bread listed on the menu for the meal. And when I checked the menu displayed in the unit, it showed that bread was part of the planned meal." Have you seen this grievance before today?

A   Where is it? I'm confused.

Q   Okay. I'm reading in the handwritten portion, and it is a little bit hard to read. But you'll see the first sentence starts "On October, Saturday, the 5th day, 2013. Canteen Food Services." I was just reading through that paragraph that summarized this individual's grievance. And if you need a minute to review it, that's fine. Just let me know when you're ready.

A   I can't make out the last two sentences but -- two lines, but what are you asking me? If I know -- if I've seen this grievance before?

Q   Yes. That's my question.

A   Like I said, I see a lot of grievances. I see a lot of documents on a daily basis, so just to say that I haven't seen it or I have seen it, you know, I'm not sure. I can't remember it. But Edmonds does -- she -- I do have to respond to these food -- these grievances, so ...

Q   Okay. And then if you scroll down, you'll

see the responding staff member's decision, which is the second handwritten paragraph in the document. "Spoke with Trinity staff.  She advised there was an error on the menu and that staff was working strictly by the menu.  She advised the menu had been corrected in the kitchen for her staff to fix the correct meals. Found in favor of inmate due to error on Canteen/Trinity staff paperwork."  How often is there an error on the menu?

A    We don't have errors on the menu.

Q    But you agree here, the grievance officer found that there was, indeed, an error on the menu?

A    Yeah.  But I don't -- that's what it says, but we -- how can the menu be incorrect?  I'm confused.  So I don't know about that.

Q    Okay.  Is your position that the grievance officer's finding is incorrect?

A    Yes.

Q    And that the Trinity whom she spoke with who advised that there was an error on the menu --

A    Well --

Q    -- was also incorrect?

A    -- back -- this is from 2013?

Q    Yes.

A    Oh.

Q     So wait.  My question for you is, is it your position that the Trinity staff whom the grievance officer spoke with and who told the grievance officer that there was an error on the menu is incorrect?

A     I'm not sure.  I don't know who she spoke with.  It's --

Q     And in --

A     -- possible that --

Q     -- 2013 --

A     -- somebody could have did them.

Q     In 2013, you were the Assistant Food Service Director?

A     Mm-mm.

Q     Is that yes?

A     I'm trying to think.  I don't know the exact date. 2013.  It could have been I probably just getting in there or -- I don't know.  Yes.  I was. Two thousand -- October 2013?  Yes.

Q     And during that time, were you aware of what Trinity staff was --

A     Yeah.

Q     -- reporting to the grievance officer about food-related grievances?

A     No.

Q     So you had no knowledge of what that staff

Page 475

was saying about the grievances as --

A     I don't --

Q     -- Assistant Food Service Director?

A     I don't recall.

Q     I'm asking you just in general.  As Assistant Food Service Director, were you aware of what Trinity staff were saying to the grievance officers about food-related grievances?

A     No.

Q     You had no idea?

A     No.

Q     And is that the case today as well?  That you're unaware of what Trinity staff says to grievance officers about food-related grievances?

A     Everyone has -- if the grievance officer comes in and she wants to speak to a Trinity staff about a grievance, it's up to them to give them the correct information about this grievance.  Now, in 2013, I'm not sure, you know, who, you know, what -- what happened or why.  I don't think they were saying that the menu was wrong.  I'm -- I'm reading -- the menu -- it's not possible for the menu to be wrong.  The -- the paper for what they served could have been wrong, but not the menu.  So I don't want to go back and say, you know -- 'cause I'm reading.  It says due

Case 4:18-cv-00070-CDL   Document 383-11   Filed 09/27/23   Page 215 of 300

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 476

to an error on the Canteen Trinity staff paperwork.  I can see that being an issue.  If the paperwork was printed out wrong or it was on the wrong -- if they went with the wrong week, then yeah.  But for a menu to be wrong I can't say that a menu was wrong because we don't make the menus.

Q    So you don't monitor what Trinity staff say to grievance officers about --

A    No.

Q    -- food-related grievances?

A    No.

Q    So Trinity staff can say whatever they want?  You don't know ultimately what they're saying about the grievances?

A    No.  "Kitchen for her staff to fix the correct meals.  Found in favor of the inmate due to error on ..."  I would have to see something, you know, that the Trinity staff wrote about that because this is not -- the -- a menu can't be wrong.  So I can be responding to something, whatever she write, that's not -- that's not correct, so -- a menu being wrong, no.  The paperwork being wrong, serving the wrong week, yeah.  But the menu can't be wrong.

Q    And you're not monitoring Trinity staff responses to the grievance officers --

A    No.

Q    -- for accurateness.  Right?

A    No.

Q    Okay.  Let's scroll down to -- if there is another page in this document, actually.  I'm not sure.  Oh.  Yeah.  There we are.  This is another grievance in the packet.  The name of the individual who submitted the grievance is, again, redacted on this particular grievance.  In the handwritten portion of the grievance --

MS. STEWART:  -- and C.J., perhaps you can make it a little bigger so Ms. Crawford can read it, if possible --

BY MS. STEWART:

Q    -- he says, "Meal number 79, hot cereal, boiled eggs, coffee cake, milk.  This meal was too little food.  There was one empty space on the tray. Why can't this facility provide a complete meal?  It could have been bread, cornbread, et cetera, anything. I brought it to a supervisor's attention, and he informed us that it is what was on the Trinity food menu."  Have you seen this grievance before?  It was submitted in July 2014.

A    I'm not sure.  I can't recall it.

Q    And then if you scroll down to see how the

30(b)(6) Marquita Crawford, Vol. II     August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 478

grievance officer responded to it or resolved it, "Grievance returned to detainee for violation of filing procedures. Also advised detainee that the meals provided by Trinity are approved by DHS/ICE." Were you consulted prior to this response being given?

A     I'm not sure.

Q     Do you know if anyone from Trinity was consulted?

A     I'm not sure, but it's common -- it's procedure for -- if it's a kitchen grievance, then they contact someone in the kitchen. So a supervisor or a manager. They will contact someone in the kitchen if it had anything to do with food service.

So, I mean, you can show me a lot of different grievances from -- for the kitchen and it will be just that I wouldn't be able to say I know exactly when I wrote that; I know who responded to that; I know that situation because I -- I don't. You know, it's a constant thing in here. We -- we rely to a lot of grievances. So I won't be able to say yeah, I know about this one. I know that one. I remember that one. So yeah, if it's -- if it's for food service, then they ask somebody in the food service department to respond to it.

Q     Okay. Are Trinity's meals approved by ICE?

A    Yes.

Q    And how so?

A    How so?

Q    How does ICE approve Trinity's meals?

A    Then menu and -- we have -- they have the -- I don't know the exact procedure, but I know that, you know, this -- we are just contracted out.  They work out all the deep stuff.  We serve the food.  I know that CoreCivic, they approve the menu, and CoreCivic work -- works with ICE or for ICE.  So it's -- it was formulated by a dietician and, you know, a lot of people look at the menu.  So I don't know -- I don't know exactly how they approve it or when they approve it.

Q    How do you know that they do approve it?

A    I don't know.

Q    Do you know why the grievance officer would have told the detained person that in the response to the grievance?

A    No.

Q    Are you familiar with the Office of the Inspector General?

A    No.

Q    Do you know at all what they do?

A    No.

Q    Do you know whether you've communicated with any staff from the Office of Inspector General while employed at Trinity?

A    I don't know.

Q    I'll represent to you that they are an agency of the federal government related to the Department of Homeland Security, and detained people at Stewart can make complaints directly to their hotline about conditions, including food.  Does that at all refresh your recollection about who the Office of Inspector General is?

A    No.

Q    Do you know if you received any complaints about food that were made by detained people at Stewart to the Office of Inspector General?

A    No.  I don't know.

Q    I'm going to pull up a new exhibit to introduce.  The first Bates is DHSOIG0000001 -- underscore -- 00041.  And this exhibit is marked Exhibit 46.

                    (Exhibit 46 was marked for
                    identification.)

          This is a multi-page exhibit, Ms. Crawford. Can you see the first page here on your screen?

A    Yes.

Page 481

Q    And I'll represent to you that this is a
packet of grievances that were submitted to the US
Department of Homeland Security Office of Inspector
General by detained people at Stewart.  Answer
grievances in this packet relate to the food at
Stewart.  Have you ever seen this document before?

A    No.  Not this.

MS. STEWART:  Okay.  Let's scroll down
to the second page of the exhibit, please.

BY MS. STEWART:

Q    The title of the second page is Case Summary
Report.  Below it says Title:  Stewart Detention
Center; ICE; Lumpkin, Georgia.  The date received is
8/13/2015.  And there is some information, names
specifically, that are redacted, but below the
comments paragraph says redacted name "is reporting
Stewart detention center -- claims the detainees were
on their way to chow when they were stopped from being
served.  Says the earlier lunch group had already been
served, went to chow, and discovered worms in the
food.  States the other detainees were then not serve
the food and were waiting to eat without any knowledge
of when they might be fed.  Also claims the breakfast
in the facility is not good in the milk being served
this spoiled.  Says the kitchen itself is very dirty

Case 4:18-cv-00070-CDL   Document 383-1   Filed 09/27/23   Page 221 of 300
30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 482

as well.  States he has written grievances about how dirty the facility is, but nothing has been done about it."  Had you seen or heard about this grievance prior to today?

A     I don't recall.

Q     Have you ever received a grievance related to worms potentially being in the food at Stewart?

A     I haven't had a grievance.  I don't recall grievance, but I remember a detainee saying that worms were in the food.  But we had to pull up a picture of a pinto bean and show them what -- what they were seeing.  And after they -- we show them, then, you know, I didn't hear anything else after then, but it wasn't a worm that was in the food.  It was the embryo from the bean.  So we never had a problem with worms in the food.

Q     Do you recall what year that incident occurred in?

A     I don't.

Q     You have any idea if that is the same incident being complained of in this grievance --

A     I'm not sure.

REPORTER:  I'm sorry, Counsel.  I missed the last thing you said.

MS. STEWART:  I said in 2015.

REPORTER:  Thank you, ma'am.

THE WITNESS:  Excuse me.  I'm not sure.

BY MS. STEWART:

Q    And with respect to this particular grievance submitted to the US government in 2015 about worms in the food, your testimony is that you did not receive this information?

A    I do not recall receiving the information.

Q    And in 2015 you were the Assistant Food Service Director?

A    Yes.

Q    And generally, as Assistant Food Service Director, you testified that you were made aware of grievances that were related to the food?

A    Yes.

Q    So presumably, you should have been made aware of this grievance that was submitted to the Office of the Inspector General?

A    So I'm not recalling this incident or when it happened.  I don't know if this is the same incident I was speaking of earlier with the pinto beans, but I do not recall this incident and I don't know if it was in 2015.

Q    If people detained at Stewart were complaining about worms in the food to the US

Page 484

government, would you want to know about that?

A    Yes.

Q    Okay.  Let's scroll down to the same exhibit, let's scroll down to Bates ending 49.  Okay. Again, this is another Case Summary Report about Stewart Detention Center.  Date received is 8/31/2015. And in the comments section, it says "This complaint is from a voicemail left on 8/29/2015 at 4:25 p.m. The complainant stated he found pieces of rubber in his food on 8/29/2015 in the complainant wants the facility to change the food menu.  The complainant stated this is the second time he has found objects in his food."  Did you receive information about this grievance?

A    I do not remember this incident.

Q    Do you recall ever receiving a grievance related to pieces of rubber found in food?

A    No.

Q    Would you want to know if detained people and Stewart were complaining about finding pieces of rubber and other objects in their food to the US government?

A    Yes.  I would want to know.

Q    Okay.  Let's scroll down to one more page of this exhibit.  The last two Bates numbers are 25.

Page 485

Okay.  And again, this is a Case Summary Report submitted on 7/3/2019.  Individuals' names are redacted in this particular report.  The comments section says, redacted "is a detainee at Stewart Detention Center where he has been for six days.  Claims that since 7/2/2019, detainees have been served undercooked food.  On 7/2/2019 claims that there was blood pouring out of meatballs, and on 7/3/2019 they were served pink, bloodied, bone-in chicken.  Requested a new tray, but the officer working the cart refused to provide him with one.  According to "redacted individual, "if a detainee does not have money on their account, they would starve due to a lack of nutrition provided."  Did you receive this grievance or information about a grievance related to raw meat being served in 2019?

        A    No.

        Q    Have you ever received a grievance related to raw meat being served at Stewart?

        A    I have.  Yes.

        Q    And when was that?  What year?

        A    I'm not sure of the exact date.

        Q    Do you remember what your title was when you received that grievance?

        A    I don't.

Page 486

Q    Was it recently or was it more than five years ago?

A    I'm not sure.

Q    You have no recollection just generally of when you received a grievance about raw meat being served?

A    I don't.

Q    And what corrective action, if any, did you take in response to that grievance?

A    We would check the temp on the food.  When it's reported, we checked the temp on the food and show them.  The officer, again, comes in and they check the meal.  Now if -- if it's not cooked to how they wanted it cooked, then we can explain all sorts of things.  Like we have -- some meat -- we have like a chicken meatball and it's not a dark meat.  And then we steam chicken, so it's a lot of stuff.  People want fried chicken.  They want -- want their meatballs cooked hard.  Some want them cooked soft.  So we only do what we can and we go with the food temps.  If it's cooked to the correct food temp, then we're right.

Q    Did you record the action you took in response to the grievance about raw meat being served?

A    No.

Q    Does Trinity generally record the corrective

action they take in response to food-related grievances?

A    No.

Q    So there's no record of any corrective action that Trinity takes with respect to food-related grievances at all?

A    No.

Q    As Food Service Director, do your job duties include participating on behalf of Trinity in audits of Stewart?

A    Yes.

Q    And what audits do you participate in?

A    We have multiple audits.  QA audits.  We have ACA audits.  We have ICE audits.  We have health inspections.

Q    By the QA audits CoreCivic run audits?

A    Yes.

Q    Does Trinity perform its own audits?

A    Yes.

Q    Do those have a special name or are they just called Trinity audits?

A    We have a DM audit.  A quarterly DM audit. We have self-audits where we have to perform an audit on ourselves.

Q    What does DM stand for?

A     District Manager.

Q     And what role do you play in those audits?

A     On each audit, I would be the person who would go with the inspector to make rounds and answer questions and provide documents for the auditor.

Q     And which of those audits, if any, are preannounced?

A     Preannounced audit would be maybe the -- ACA audit is preannounced.

Q     Any others that you know of?

A     No.

Q     No others are preannounced or you're not sure whether there preannounced or not?

A     They're not preannounced.

Q     Would you always know if an audit was preannounced?

A     Yes.

Q     Do any of those audits, when they come in, review the Trinity temperature logs?

A     Yes.

Q     Which audits?

A     That would be the QA audit.  The DM audits.  Health inspections.  And those of the audits and ask for temps and everything.

Q     Any others other than QA, DM, and health

inspections?

A    No.

Q    And which of the audits review the menus, if any?

A    Each audit except for the PREA audit.

Q    The PREA audit?

A    Yeah.  They don't review media.

Q    Do any of the audits observe meal service?

A    Yes.

Q    Which ones?

A    Every one except for the PREA audit.

Q    And do any of the audits interview detained individuals?

A    Yes.  All of them.  Most of them interview the detainees when they come in.

Q    Most of them interview the detained people?

A    Yes.

Q    Are there some that don't?

A    The health inspector doesn't interview detainees.

Q    Have you, in your time at Trinity, have you been part of any inspections of Stewart Detention Center?

A    Yes.

Q    Which inspections?

Page 490

A    Every inspection of -- since I've been the Assistant -- I've been a part of -- of health inspections, DM audits, kosher audits, QA audits, ACA. Any kind of audit that we have, I'm normally there.

Q    Do you recall an unannounced inspection to Stewart in 2017 conducted by the Department of Homeland Security Office of Inspector General?

A    I don't recall it specifically.

MS. STEWART:  I'm going to pull up the next exhibit, which is the 2017 Office of Inspector General Inspection Report.  This Exhibit we'll mark as 47.

(Exhibit 47 was marked for identification.)

BY MS. STEWART:

Q    Have you seen this document, Ms. Crawford?

A    No.

Q    This is a report by the Office of Inspector General titled Concerns About ICE Detainee Treatment and Care at Detention Facilities.  I'll represent to you that this report stemmed from an unannounced inspection by the Office of Inspector General to six ICE detention facilities, including Stewart, in 2017. Let's scroll down to page 8 of the report.  And at the top of page 8, you should be able to see under the

Case 4:18-cv-00070-CDL Document 383-1 Filed 09/27/23 Page 230 of 300
30(b)(6) Marquita Crawford, Vol. II        August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 491

subheading Potentially Unsafe Food Handling.  And the report states "We observed several problems with food handling and safety at four facilities.  We observed spoiled, wilted, and -- produce and other food in the kitchen, refrigerators, as well as food past its expiration date."

A     That wasn't at Stewart.

Q     And how do you know that?

A     Because we haven't had a finding on an audit.  I know I haven't had that finding, and I've been present for my ICE inspections, and I know we didn't have neither one of those.  I haven't had a finding on my ICE audit in I can't recall how many years.

Q     Is it possible that this finding was made as part of this inspection and you weren't informed of it?

A     When they do a closeout for the audits, then they let us know what findings we have.

Q     This actually isn't an audit.  It's an inspection, and the inspection results are published in this report.  And you testified earlier that you've never seen this report.  Correct?

A     But I know that we haven't had those findings here at Stewart.

Page 492

Q    But you have no knowledge of this particular inspection by the Office of Inspector General in 2017?

A    I don't recall the exact audit you're talking about, but I know I haven't had a finding, so I know that it wasn't Stewart.  Not one.  I haven't had any incidents about frozen meats.  None of that. Expired anything at Stewart.

Q    How do you know you hear about the results of all the inspections conducted at Stewart?

A    When they have a closeout, they report it. And the Warden, when we have our meetings, he would let us know.  But I know -- like I said, I can tell you, I know that we haven't had those findings here at Stewart on any audit.  Any inspection.

MS. STEWART:  Okay.  We can take down this exhibit and pull up the next one, which is Bates WABE-FOIA0000004.  And this exhibit will be marked Exhibit 48.

(Exhibit 48 was marked for identification.)

BY MS. STEWART:

Q    Ms. Crawford, can you see Exhibit 48?

A    Yes.

Q    Have you seen this document before?

A    No.

Case 4:18-cv-00070-CDL   Document 383-1   Filed 09/27/23   Page 232 of 300

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 493

Q    This is a document created by, again, the US Department of Homeland Security Office of Inspector General, and it includes the Chief Inspector's notes of their walk-through at Stewart Detention Center. And the scope of the walk-through, it was in 2016, focused on the control room, intake, segregation, recreation, kitchen, medical, law library, and housing at Stewart.  If you can scroll to page 4.  And you'll see at the bottom of the page, there's a subheading titled Kitchen, where the individual making the walk-through is reporting on what they saw in the kitchen.

And in the third paragraph, it says, "When OIG personnel entered the kitchen, there were a number of hazardous water puddles on the ground.  When inspecting the freezers and refrigerator food storage, few food items were tracked with an expiration date. One set of kosher/halal meals was observed to have expired the previous day.  There is also no mechanism to track how long frozen foods are left out to thaw. The facility, in lieu of tracking expiration dates, relies on a first in, first out system."

A    I can't -- slow down.

Q    Oh.  I'm sorry.  Please.  Yeah.  Take your time to read.

A    Yeah.  We're not required to put an

expiration date --

Q     At this time, I haven't asked you a question yet, so please let me ask a question, and then you can go --

A     Oh.  I heard the pause and I thought you were done.

Q     No problem.  My initial question for you is have you seen or heard of these findings before today?

A     The expiration date, we're not required to put a expiration date on food so that's why it wasn't an expiration date on the box.  We do first in, first out, and as you can see, that's what they have in there.  First in, first out.  So they -- what they were saying, we don't have -- we know when we get it delivered.  But when does frozen food expire?  It's not a date.  So yeah, I -- I am familiar with this right here, but that's not a standard that we has -- have a expiration date on the boxes.

Q     Okay.  I'm going to object to the responsiveness of the answer.  If you could please just listen to the question I'm asking you and answer that question.  My question for you was before today, were you made aware of the findings included in Exhibit 48 that I just read to you?

A     Yes.

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 495

Q    How were you made aware of those findings?

A    I remember that when they came to the facility.  Verbal, but I haven't seen this document that you have presented on the screen.

Q    And you were there the day that the inspectors came to the facility?

A    I'm not sure if I were there -- if I was there on this -- this occasion right here.  When they came out.  I'm not sure if I was present for this one.

Q    Okay.  So how did you hear about these findings?  From who?

A    Probably from my -- my direct assistant of Warden of care.  And I don't even know who it was in 2017, so that's how I would have heard about it.

Q    And in response to these findings, did you take any corrective action?

A    There was no corrective finding.  That -- the one about the expiration dates, like I said, we do first in, first out.  That's what we're required to do here at Stewart.  We don't have to have the expiration date listed on the box.  And on that -- the one set of kosher/halal meals that was expired, that was a meal that should have been discarded from the freezer.  It had a discard date on it.  And it was not served to anyone, but it was in the cooler.  It should have been

discarded the night before.

Q    So you're saying that these findings are incorrect?

A    Yes.  The one with the expiration dates because that's not required.  That's not a requirement.  And yeah.  That's not a requirement for Stewart.

Q    Did you take any corrective action with respect to the puddles on the ground?

A    We clean puddles, and we had a -- I'm pretty sure -- if we have a water puddle, we have a wet floor sign.

Q    Okay.  My question is did you take any corrective action to address the puddles on the ground in response to --

A    Yes.

Q    -- this --

A    Yes.  Cleaned --

Q    -- finding?

A    -- the water.

Q    I'm sorry.  What was your answer?

A    Yes, ma'am.  The -- had a detainee to clean the water to remove --

Q    Okay.  So the --

A    -- it from the floor.

Case 4:18-cv-00070-CDL   Document 383-1   Filed 09/27/23   Page 236 of 300
30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 497

Q    The corrective action you took was to have a detained worker clean up the water?

A    Yes.

Q    And in terms of the finding that there was no mechanism to track how long frozen foods are left out to thaw, did you take any corrective action on that one?

A    No.

Q    Why not?

A    Because we already have a system in place that maybe he didn't understand when he -- when he came out.  We have three day pulls, so we pull the frozen foods from the freezer.  Then we bring them on the inside and we use them first in, first out.  We have three day pulls and we have a pull sheet letting us know when to use these products.

Q    Okay.  So the pull sheet is your system for tracking how long frozen foods have been left out to thaw?

A    Yes.

Q    And what is the pull sheet?

A    A pull sheet is telling us what to pull from the freezer, telling what foods to put out for the three-day pulls.  We would, like, for instance, we would have Monday, Tuesday, and Wednesday set out for

Page 498

the staff to come in and use.  It'll already have the correct poundage of food.  It'll have the exact items they need for that meal.  They would come in, take that for that day and use it, and then we'll replace that meal.  If it was Monday, Tuesday, Wednesday, then we'll put Thursday's up.  So you will always have three days out, pulled, in the facility.  Because we can't thaw anything room temp.  Everything has to be thawed inside of the cooler.

Q    Okay.  Let's scroll down a couple more pages.  On the PDF, it says page 1 of 2.  And this section of the PDF is notes from the government inspector's interview with detained individuals at Stewart.  And at the bottom of the page, the last paragraph, second sentence starts "The detained person reports that as a kitchen worker, he was at times ordered to serve expired or moldy food.  He stated that he identified loaves of bread which were moldy, and the staff simply removed the obviously spoiled slices and continued serving the bread.  He also claims the milk at the facility is bad.  He attributes the serving of expired food to the food being removed from the original packaging with expiration dates."
Do you need another minute to review that before I ask you a question?

A     No.  No.

Q     Did you hear about this particular grievance?

A     This particular grievance?

Q     Well did you hear about this particular finding?

A     Did I hear about this -- I'm not sure about this -- this finding right here, but I know we have had a report about a moldy -- you know, some bread that has been expired.  And we have always correct it. If we do have some -- anything that's not of good quality, we discard it.  And that's how we serve it. We don't -- we don't just send it out the window.  It is discarded.

Q     Okay.  My question is did you hear about this particular finding?

A     No.  No.

Q     And how often do you get grievances about moldy bread?

A     I can't -- I don't know exactly how, but we -- we do respond and we will check it.  If anybody has -- if they have any concerns about food, we always have to look into it.  But I'm not sure.  I'm not familiar with this incident.  I don't remember this incident.

30(b)(6) Marquita Crawford, Vol. II    August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 500

Q    And in order to look into it, you need to hear about the incident first, right?

A    Yes.

Q    Okay.  One more question about this document.

MS. STEWART:  If you could scroll down a couple more pages.  The bottom of the PDF says page 2 of 3.  Yes.  That's it.

BY MS. STEWART:

Q    And I'm looking at paragraph 4, which again is a report on another interview that the government inspector did with a detained person.  And the inspector writes, "When asked about the food, Mr." redacted name "said that the food is horrible.  He said we often do not get what is listed on the menu. Also, everything is burned, and the meats are burned and brown to the point that it is hard to recognize what it is.  Mr. -- said that he is on a special no acid diet and described the process for submitting a request and receiving medical special diet card is easy."  Did you receive any information about this complaint?

A    No.  No.  When asked about -- a no acid diet?  No.  I don't remember this grievance at all. This incident.

Q     And as Food Service Director or Assistant Food Service Director, would you have liked to have known that detained individuals were raising these complaints to government inspectors?

MR. EDWARDS:  Objection to the form.

BY MS. STEWART:

Q     You can answer.

A     Yes.

Q     And you would like to have known so that you could have potentially corrected that?

A     Well, I --

MR. EDWARDS:  Objection to the form.

THE WITNESS:  Okay.

BY MS. STEWART:

Q     Oh.  You can answer.

A     I'm not -- I'm not saying that it wasn't reported.  I just don't recall this incident.  I don't -- like I said, I can keep up with every grievance that goes on here at Stewart.  I never said that they didn't provide me with this information or provide someone with this information.  But I just don't recall this directly.  One, he's saying everything is burned, but the other detainee said nothing's done, cooked completely.  So I'm not sure, you know?

Q    But do you have any recollection if Trinity made any corrective action with respect to these specific complaints?

A    No.

Q    And if Trinity had received information about these complaints, would you expect Trinity to have at least attempted to address them?

A    I'm not saying that we didn't.  I'm not saying that we haven't addressed any of these issues. Every day we try for -- good quality of food.  So if it was brought to our attention, we did address it, but I'm just not -- right now, I'm not remembering this incident.

Q    Okay.  And what you're saying is that Assistant Food Service Director or Food Service Director, you don't know whether Trinity addressed these incidents raised in --

A    Yes.  Yeah.

Q    And is that customary for Trinity to not keep track of incidents raised by government inspector related to the food with respect to whether they corrected them or not?

MR. EDWARDS:  Objection to the form.

BY MS. STEWART:

Q    You can answer.

30(b)(6) Marquita Crawford, Vol. II     August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 503

A    No.

Q    What was your answer?

A    No.

Q    And do you know if Trinity was required to address the issues raised in the inspector's findings?

A    Did I know what?

Q    Do you know whether Trinity was required to address the issues raised in the government inspector's --

A    I don't --

Q    -- reports --

A    I don't know.

Q    And as Food Service Director, or Assistant Food Service Director, is that something that you would normally know about?

A    When we have an incident, we have to do -- we do have to fill out a form.  But I just don't recall these particular incidents that you are asking me about today.  We are required to fill out a corrective action form, but I'm not sure if that form was done or when it was done.

Q    Okay.  And I'm just confirming what your testimony is today, and that is you have no recollection whether Trinity engaged in any corrective action in response to the inspector's findings in

Page 504

Exhibit 49?

        A     That's correct.

                REPORTER:  I'm sorry, ma'am.  Did you say 49?

                MS. STEWART:  Yes.

                REPORTER:  Okay.  I thought we were on 38.  My apologies.

BY MS. STEWART:

        Q     I want to go back to your previous testimony about how many meals you eat at Stewart, and I think you testified that you eat two meals a day.  Correct?

        A     Yes.

        Q     Are the two meals a day that you eat the same meals that the detained workers are served?

        A     Yes.  That's the only meal that we prepare.

        Q     And those are the meals that you eat every day?

        A     Yes.

                MS. STEWART:  Okay.  Let's go off the record for a minute.

                REPORTER:  We are off the record.  The time is 4:02 p.m.

                (Off the record.)

                REPORTER:  We are back on the record. The time is 4:08 p.m.  You may proceed when ready,

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 505

Counsel.

MS. STEWART:  Thank you.  I want to make one correction for the record, and that is the last exhibit I referred to is not Exhibit 49.  It was Exhibit 48.  And on behalf of plaintiffs, I have no further questions for you, Ms. Crawford.  I very much appreciate your time today.  Thank you.

THE WITNESS:  Thank you.

REPORTER:  And was there any follow-up questions, Counsel?

MR. EDWARDS:  None for Trinity Group.

MS. COHEN:  None from CoreCivic.

REPORTER:  All right.  Before we go off the record, I want to ask how would you like to handle signature today, Counsel?

MR. EDWARDS:  We will review and sign.

REPORTER:  Thank you.  And will you be placing an order, Ms. Stewart, or not at this time?

MS. STEWART:  Yes.  We'll place an order for the transcript, please.

REPORTER:  Thank you.  Mr. Edwards, will you be placing an order, or not at this time?

MR. EDWARDS:  Not at this time unless Mr. Chosid requires that we do so.  I think we will wait and determine whether we want a deposition

Case 4:18-cv-00070-CDL Document 383-1 Filed 09/27/23 Page 245 of 300

30(b)(6) Marquita Crawford, Vol. II        August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 506

transcript.

MR. CHOSID:  Yeah.  We can wait on it.

MR. EDWARDS:  Okay.

REPORTER:  Okay.  And then how about you, Ms. Cohen?  Placing an order or not at this time?

MS. COHEN:  Not at this time.  Thank you.

REPORTER:  All right.  Thank you.  And I also want to confirm the exhibits you tendered today were Exhibit 1, 24, 25, 26, 4, 27, 18, 28 through 48, and also Exhibit 10.  We are off the record.  The time is 4:09 p.m.

(Signature Reserved.)

(Whereupon, at 4:09 p.m., the

proceeding was concluded.)

CERTIFICATE OF NOTARY PUBLIC

I, DANIEL ALMEKINDER, the officer before

Case 4:18-cv-00070-CDL Document 383-1 Filed 06/27/23 Page 246 of 300

30(b)(6) Marquita Crawford, Vol. II        August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 507

whom the foregoing proceedings were taken, do hereby

certify that any witness(es) in the foregoing

proceedings, prior to testifying, were duly sworn;

that the proceedings were recorded by me and

thereafter reduced to typewriting by a qualified

transcriptionist; that said digital audio recording of

said proceedings are a true and accurate record to the

best of my knowledge, skills, and ability; that I am

neither counsel for, related to, nor employed by any

of the parties to the action in which this was taken;

and, further, that I am not a relative or employee of

any counsel or attorney employed by the parties

hereto, nor financially or otherwise interested in the

outcome of this action.

                                    Notary Public in and for the

                                              State of Georgia

[X] Review of the transcript was requested.

                    CERTIFICATE OF TRANSCRIBER

          I, NATASCHA WISE, do hereby certify that

Page 508

this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

NATASCHA WISE

Page 509

To: ALEXANDER CHOSID, ESQUIRE

jonathan.edwards@alston.com

September 7, 2021

RE:    Barrientos, Wilhen Hill v. Corecivic Inc.

8/23/2021, Marquita Crawford, Vol. II (#4760608)

The above-referenced transcript is available for

review.

Within the applicable timeframe, the witness should

read the testimony to verify its accuracy. If there are

any changes, the witness should note those with the

reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of

Deponent and Errata and return to the deposing attorney.

Copies should be sent to all counsel, and to Veritext at

litsup-ga@veritext.com

Return completed errata within 30 days from

receipt of testimony.

If the witness fails to do so within the time

allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 510

Barrientos, Wilhen Hill v. Corecivic Inc.

Marquita Crawford, Vol. II (#4760608)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

Marquita Crawford, Vol. II                              Date

Page 511

Barrientos, Wilhen Hill v. Corecivic Inc.

Marquita Crawford, Vol. II (#4760608)

                    ACKNOWLEDGEMENT OF DEPONENT

     I, Marquita Crawford, Vol. II, do hereby declare that I

have read the foregoing transcript, I have made any

corrections, additions, or changes I deemed necessary as

noted above to be appended hereto, and that the same is

a true, correct and complete transcript of the testimony

given by me.


_____    _____

Marquita Crawford, Vol. II                         Date

*If notary is required

                     SUBSCRIBED AND SWORN TO BEFORE ME THIS

                     _____ DAY OF _____, 20____.



                     _____

                     NOTARY PUBLIC

**[& - 2:29]**

Page 1

| & | | 2 | 21 340:20 464:24 |
|---|---|---|---|

**&** 266:13,20 271:13 274:5

**0**

**00041** 480:19
**00070** 263:11 270:12
**001673** 268:25
**002204** 269:7
**0044500103** 471:19

**1**

**1** 269:16 275:19,20 276:9 285:15 498:11 506:10
**1/4/2021** 269:19 433:5
**10** 269:19 292:17 324:1 378:7,14 423:18 432:20,21 432:24 433:1 434:21 506:11
**10/14/2014** 268:10
**10/23/2018** 268:23
**100** 321:16
**10036** 265:20
**101** 434:17
**10:00** 293:8,22
**10:14** 296:14
**10:15** 296:17
**11** 313:3
**11-1e** 435:23
**11-1j** 326:8
**11-1k** 313:2 336:11,12 337:6 352:1
**11/14/2017** 268:15
**1155** 265:19
**118271** 462:3

**118288** 464:23
**11:00** 293:11
**11:01** 331:8
**11:11** 331:11
**11:29** 344:24
**11:31** 345:2
**12** 289:4 297:5,6 298:11
**12/23/2015** 268:22
**120** 313:13 321:16 322:1
**1201** 266:21
**1260** 267:6
**1287** 264:13
**12:00** 293:9,11
**12:24** 385:10
**12:59** 385:13
**13** 289:5 334:3,5
**14** 274:13 334:3,5 462:5
**146** 263:19 270:13
**15** 323:14,24 334:4 354:22 378:7,14
**152247** 424:15
**16-047** 269:13
**1660** 434:2
**173964** 423:5
**173966** 422:7
**173973** 423:16
**173975** 423:23
**17720** 314:7 316:3
**18** 269:20 320:15 320:16,19 506:10
**196623** 381:23
**196898** 381:25
**197370** 414:2
**1:59** 427:1
**1f** 361:15
**1k** 313:3

**2** 340:20 498:11 500:8
**2/20/2019** 268:17
**20** 323:14,22,23 369:15 511:15
**2000** 266:7
**2008** 277:11
**20093** 507:15
**2013** 382:18,20,21 387:17 392:2 471:21 472:10 473:23 474:9,11 474:16,18 475:19
**2014** 287:8,9,19,23 318:3 319:4 477:23
**2015** 332:6 334:21 355:14 356:2 373:21 374:14 375:1 387:25 388:9 389:24 392:4,5 403:10,12 482:25 483:5,9,23
**2016** 493:5
**2017** 490:6,10,23 492:2 495:14
**2018** 279:2 337:17 411:17 422:1 423:19 425:7,14 425:16
**2019** 369:15 370:15 485:16
**2020** 414:16 462:5 462:12 465:2
**2021** 263:16 270:12 274:14 433:15,16,17,24 433:25 464:25 467:23 509:3

**2150** 264:6 265:6 265:13
**22nd** 265:19
**23** 263:16 270:12 411:16
**233** 264:6 265:6,13
**23rd** 453:13,13,14
**24** 268:7 280:3,4,7 322:23 323:14 324:24 447:9 506:10
**24th** 453:14
**25** 268:8 281:17,18 281:21,24 328:25 329:3 484:25 506:10
**25th** 453:14
**26** 268:9 282:11,12 282:15,17 506:10
**26353** 508:12
**27** 268:10 313:24 314:1,3,5 317:9 319:16,25 322:22 323:9,9 506:10
**272** 268:3
**275** 269:17
**279** 327:21
**28** 268:11 320:1,13 325:23,24 326:2 506:10
**280** 268:7
**281** 268:8
**282** 268:9
**29** 268:12 331:19 331:20,22
**2901** 266:7
**2:00** 293:3,8,8,22 427:4
**2:29** 449:6

**[2:41 - 9:44]**

**2:41** 449:9
**2nd** 388:18

**3**

**3** 500:8
**3/29/2018** 268:19
**30** 268:13 270:8
274:9,12 284:3,8
284:18 337:9,10
337:13 340:1
354:20 441:9
509:17
**300** 266:14
**30031** 264:14
**30303** 264:7 265:7
265:14
**30309** 266:23
**306** 269:18
**31** 268:14 355:3,4
355:7,10
**3100** 266:14
**314** 268:10
**31815** 263:20
270:13
**32** 268:15 358:8,10
358:11 360:8
**320** 269:20
**325** 268:11
**33** 268:16 361:6,7
361:10 363:25
365:4
**331** 268:12
**337** 268:13
**34** 268:17 318:16
319:9 369:3,4,7
**35** 268:18 372:25
373:1,4
**355** 268:14
**358** 268:15
**36** 268:19 377:16
377:17,20

**361** 268:16
**36104-4344**
264:21
**369** 268:17
**37** 268:20 381:21
382:2,5,25 383:1,4
**373** 268:18
**377** 268:19
**38** 268:21 387:6,7
387:10,12 504:7
**382** 268:20
**387** 268:21
**39** 268:22 402:25
403:1,4 411:3

**4**

**4** 269:18 276:9
286:24 306:11,12
493:8 500:10
506:10
**4/23/2015** 268:21
**40** 268:23 298:22
299:4 411:8,9,12
411:14 414:1
**400** 264:20
**403** 268:22
**41** 268:24 414:4,5
414:8
**411** 268:23
**414** 268:24
**42** 268:25 420:19
420:20,23
**420** 268:25
**43** 269:3 449:19,20
449:23 452:12
**432** 269:19
**44** 269:5 452:14,15
**449** 269:4
**45** 269:7 461:9,10
461:11,15,23
**452** 269:6

**46** 269:8 480:20,21
**461** 269:7
**47** 269:9 490:12,13
**4760608** 263:22
509:5 510:2 511:2
**48** 269:12 492:18
492:19,22 494:24
505:5 506:10
**480** 269:8
**486-8982** 264:9
**49** 484:4 504:1,4
505:4
**490** 269:11
**4900** 266:22
**492** 269:13
**4:00** 293:9
**4:02** 504:22
**4:08** 504:25
**4:09** 506:12,14
**4:18** 263:11
270:12
**4:25** 484:8
**4:30** 369:24

**5**

**5** 359:9
**5-1c** 385:21
429:25
**5.8** 306:14,20,23
307:16,19,22
308:2
**5/6/2015** 268:18
**5/9/2013** 268:20
**504** 264:9
**51c** 367:4,4 402:2
402:4 410:11
414:20 415:18
**5th** 472:10

**6**

**6** 270:8 274:9,12

**6/11/2018** 328:24
**6/18/2014** 268:16
**6/19/2018** 268:13
**63132** 267:7
**66** 313:14 322:1

**7**

**7** 509:3
**7/13/2015** 268:12
**7/2/2019** 485:6,7
**7/21/2015** 269:20
**7/3/2019** 485:2,8
**7/4/2018** 268:11
**72** 460:3
**79** 477:15
**7:00** 293:11

**8**

**8** 490:24,25
**8/13/2015** 481:14
**8/14/2015** 268:14
**8/18/2015** 269:8
**8/23/2021** 509:5
**8/29/2015** 484:8
484:10
**8/31/2015** 484:6
**80** 321:17 322:7
**85012-2740** 266:8
**85226** 266:15
**8:00** 293:3,11

**9**

**9/21/20** 414:19
**9/21/2020** 268:24
**9/28/2017** 327:20
**92** 321:17
**96** 321:16
**9:00** 293:10
**9:36** 263:17
270:12
**9:39** 273:12
**9:44** 273:15

[a.m. - allegation]                                                    Page 3

| a | | | |
|---|---|---|---|
| **a.m.** 263:17 270:12 273:12,15 293:3,8,8 296:14 296:17 331:8,11 344:24 345:2 369:24,25 453:14 | **accountable** 374:13 404:25 | **additional** 286:3 299:11 300:14 324:4 350:6 | **agency** 480:6 |

**a.m.** 263:17
270:12 273:12,15
293:3,8,8 296:14
296:17 331:8,11
344:24 345:2
369:24,25 453:14
**abbreviations**
277:13
**ability** 421:5 507:8
508:5
**able** 273:1 275:22
304:21 312:17
320:25 361:23
390:4 421:4 466:7
478:16,20 490:25
**absent** 270:18
312:22,23 329:6
329:12
**absentee** 328:10
328:12,22,25
329:3,17
**absenteeism** 335:9
**absolutely** 331:4
**aca** 444:8 487:14
488:8 490:3
**access** 314:21,24
315:2,4,7,9,13,17
315:23 316:18
376:21 419:16
428:13 458:15,18
**account** 315:2,13
315:17,23 326:5
355:13 356:2
373:7,16 382:8
403:8,13,16
411:16 414:11
457:7,9 485:13
**accountability**
454:12

**accountable**
374:13 404:25
**accuracy** 509:9
**accurate** 274:18
318:17 364:6
507:7 508:3
**accurateness**
477:2
**accusation** 465:13
469:9
**acedo** 266:13
274:5
**acid** 500:19,23
**acknowledgement**
511:3
**acknowledgeme...**
270:5
**acknowledgment**
509:12
**act** 297:24 298:2
298:11,14,19
301:18 308:17
**action** 269:17
270:11 328:25
430:3,5,7 431:1
486:8,22 487:1,5
495:16 496:8,14
497:1,6 502:2
503:20,25 507:10
507:14 508:6,10
**acts** 408:13
**actual** 460:13
462:21 463:8
**adams** 291:13,16
291:17,21,23
**add** 393:7,8
439:19 440:12
**added** 325:16,18
**addition** 292:14
292:15 362:13

**additional** 286:3
299:11 300:14
324:4 350:6
**additionally**
270:18
**additions** 511:6
**address** 314:6,10
314:11,15 316:4
316:11,14,18,20
316:24 317:2,7
320:4,6,11 331:25
387:14 430:9
496:14 502:7,11
503:5,8
**addressed** 431:13
431:16 440:6
502:9,16
**addressing** 342:12
**adequacies** 463:12
**adequacy** 464:20
**adjust** 324:21
**adjustments**
323:16 324:2,8
325:2,13 343:22
343:24 344:2
**administer** 270:6
**administrator**
454:13,16
**ado** 437:22
**adult** 269:12
**advance** 277:14
324:24 447:9
453:6
**advised** 473:3,5,20
478:3
**affect** 328:7
**afraid** 401:6
**african** 391:22
**afternoon** 402:16
**age** 463:16

**agency** 480:6
**ago** 279:10,10,13
279:14 280:21,24
284:1,7 298:11
349:5,5 359:12
423:1 457:15
486:2
**agree** 270:15,20
272:21 273:17
277:15,18,21,25
278:4,9 332:23
333:6 357:3
359:20 362:25
375:17 380:18
383:20 404:10
473:11
**ahead** 275:17
280:2,23 282:1
294:2 313:23
319:25 336:25
337:1 342:16
354:15 372:23
374:1 375:18,20
379:6 430:22
449:16 452:12
456:18,18,19,21
467:11,13 470:19
**ahoward** 265:21
**akin** 322:24
**al** 264:3,21 265:3
266:3 270:11
**alan** 265:17
271:10
**alex** 283:2
**alex.chosid** 267:8
**alexander** 267:4
271:15 509:1
**allegation** 430:9
430:14 431:6,12
431:14,16,23

30(b)(6) Marquita Crawford, Vol. II                August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

**[alleged - attach]**                                                            Page 4

| | | | |
|---|---|---|---|
| **alleged** 404:12 408:11 | 279:13 348:17 363:6 365:14 375:13 395:21 397:19 405:8 406:18 413:7 417:18 426:2,14 427:18 429:14 451:16 458:3 481:4 488:4 494:20,21 496:21 501:7,15 502:25 503:2 | **appropriate** 463:16 | 378:13 412:6 |
| **allegedly** 394:2,10 406:3 | | **approve** 447:10 479:4,9,13,13,15 | **assigned** 270:3 313:9,11,12 316:24 346:23,25 347:2 366:15,18 367:9 378:21,25 379:1 415:17 446:5 |
| **allotted** 509:20 | | **approved** 324:25 325:6,19 447:12 464:3 478:4,25 | |
| **allow** 353:14 376:19 397:18 | | | |
| **allowances** 463:15 | | **approximately** 289:4 | **assigning** 290:4 424:5 |
| **allowed** 286:25 351:8 360:20 362:18,20 366:18 453:17 | | **april** 277:11 279:1 387:17 | **assignment** 379:17 429:1 |
| | | **aranda** 265:10 271:10 | **assigns** 314:9 316:4,10,13 |
| **allowing** 360:11 360:21 | **answered** 300:18 | **area** 269:3,5 285:22 290:6 366:15,18,19,20 366:21 367:9,19 367:21,22 384:10 412:4,6,24 423:20 428:11 | **assist** 368:16 388:16 389:4 |
| **almekinder** 263:21 270:3 506:25 507:15 | **answers** 274:18 275:2 334:5 | | **assistant** 288:9,10 288:13,16,24 289:16 290:18,19 290:23 292:16,20 314:17,20 315:8 315:19,24 316:7 317:19 318:5,11 325:1 327:8 332:5 332:9 338:17,23 340:17 382:21 386:17 387:25 388:3 406:14,23 408:16 425:7,14 474:11 475:3,6 483:9,12 490:2 495:12 501:1 502:15 503:13 |
| | **anybody** 499:21 | | |
| | **anybody's** 303:5 | | |
| **alongside** 346:20 | **anymore** 360:19 | | |
| | **anyway** 329:13 | | |
| | **apart** 467:17 | **areas** 380:8 412:5 | |
| | **apologies** 344:20 348:10 381:22 382:24 396:22 411:1 426:21 434:12 504:7 | **arrive** 388:18 | |
| | | **arrow** 421:8 | |
| | | **asked** 275:15 338:25 380:22 388:15 430:15,21 430:23 431:16 494:2 500:13,23 | |
| | **apparently** 394:19 | | |
| | **appearance** 276:5 437:7 440:5,7,9 | **asking** 295:14,15 309:4 312:1 334:9 343:7 378:6 379:18 389:3 409:5 413:15 423:9 427:8 444:7 446:24 451:13 456:23 459:14,15 459:21 472:16 475:5 494:21 503:18 | **assisting** 291:20 |
| | **appearing** 271:5 271:13 | | **assuming** 416:15 |
| | **appears** 327:15 332:23 333:5 369:12 370:10 383:21 423:23 433:9 | | **assurance** 436:18 |
| 287:10 | | | **atlanta** 264:7 265:7,14 266:23 |
| **annual** 301:8,12 433:2 | **appended** 511:7 | | **atlantic** 266:22 |
| **annually** 463:14 | **applicable** 270:24 509:8 | | **attach** 410:12 |
| **answer** 272:23 273:19 274:20 275:2,9,10,16 | **apply** 418:1 | **assign** 286:22 309:7 351:5 | |
| | **appreciate** 505:7 | | |

**[attached - best]**                                                          Page 5

**attached** 269:22
358:16 423:13
509:11
**attachment** 326:8
326:10,19
**attempted** 502:7
**attendance** 336:8
**attention** 403:9
406:16,19,25
407:9,10 477:20
502:11
**attorney** 507:12
508:8 509:13
**attorneys** 272:13
**attributed** 319:18
405:20
**attributes** 498:21
**audible** 273:2
**audio** 426:22,23
507:6 508:1
**audio's** 296:8
**audit** 444:6 487:22
487:22,23 488:3,8
488:9,15,22 489:5
489:5,6,11 490:4
491:10,13,20
492:3,14
**auditor** 444:5
488:5
**audits** 444:10
487:9,12,13,13,14
487:14,16,16,18
487:21,23 488:2,6
488:18,21,22,23
489:3,8,12 490:3,3
490:3 491:18
**august** 263:16
270:12
**authorized** 270:5
**automatically**
421:12

**available** 307:14
313:20 321:25
337:4 466:4,17
509:6
**avenue** 264:20
265:19 266:7
**average** 328:25
455:4,5
**aw** 338:16 340:22
383:5
**aware** 297:23
335:24 374:14,18
374:20,22 376:14
390:10 396:15
397:1,4,11 415:6,9
418:10,15,24
419:11,15 425:2
466:16 474:19
475:6 483:13,17
494:23 495:1
**az** 266:8,15

**b**

**b** 265:17 268:5
269:1 270:8 274:9
274:12
**back** 273:14
285:15 287:18
296:16 300:14
304:25 317:9
320:4 321:4
331:10 339:4
345:1 346:11
349:14 351:3,8
352:14 385:12
388:15 389:4
404:18 405:22
406:5 424:14
425:22 426:20
427:3,21,24 428:6
428:15,16 444:18
445:20 449:8

460:13 466:2
467:2,5,18 468:3
468:19 473:23
475:24 504:9,24
**background**
287:12 328:4,5
**bad** 462:5 498:21
**bag** 450:6,8
451:11 467:1
**bagel** 450:6
**bags** 450:3,5,13,15
450:16 451:5,14
451:19,20 452:3
466:8 468:1,17
**bamzai** 265:4
271:9
**barrientos** 263:4
264:2 265:2 266:2
268:7 270:10
279:25 280:12,15
281:6 421:24
422:21 424:3,19
425:22 429:10,24
430:10 431:6
432:1 509:4 510:1
511:1
**base** 455:8,9
**based** 305:3,7,10
311:4 383:20
395:11 399:23
469:7
**basic** 283:8 393:2
449:1 463:16
**basically** 302:5
430:25
**basics** 289:14
**basis** 283:10
286:22 299:3
303:13 306:4
313:17 374:9
406:21 408:22

415:14 455:16
472:20
**bates** 269:3,5
320:18,18 325:22
330:23 331:18
337:8 355:2 358:3
361:5 369:2
372:24 377:15
381:15,25 387:5
402:24 406:10
411:6 414:2
420:18 422:7
423:5,16 424:15
434:2 449:17
461:6 462:3
464:23 471:18
480:18 484:4,25
492:16
**bathroom** 354:13
**bathrooms** 380:8
**battling** 374:6
**bean** 482:11,15
**beans** 483:22
**began** 274:13
465:2
**beginning** 467:17
**behalf** 263:7 264:2
265:2 266:2,11,18
267:2 273:22,25
274:5 487:9 505:5
**believe** 272:25
313:24 382:21
418:24
**benefit** 360:12
**benefits** 298:14,16
298:18,19
**bermudez** 263:5
268:9 282:9,18
**best** 345:21 350:4
422:19 507:8
508:4

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

**[better - cause]**                                              Page 6

**better** 402:19,21
  412:24 421:1
  457:24 458:1
**big** 333:5
**bigger** 369:18
  417:5 477:12
**biggest** 404:23
**bill** 403:7,21,22
  454:14
**bin** 452:21 453:7
  453:15,20
**binding** 277:7
**bins** 452:23 453:1
**bird** 266:20
  271:13
**bit** 402:15,17
  472:8
**blackmon** 355:10
  355:12 369:10,12
  370:9,10 377:23
  378:13
**blood** 485:8
**bloodied** 485:9
**blue** 332:4,4 383:5
  394:15
**board** 410:18
  418:2
**bodies** 329:8
**body** 369:12
  387:19 404:5
**boiled** 477:16
**bojanowski**
  266:13 274:5
**bone** 485:9
**book** 435:14,17,18
  436:5
**boss** 415:1
**bottom** 331:24
  332:13 333:25
  337:16,18 355:9
  356:4 364:1

377:20 382:7
  387:12,13 404:22
  462:6 469:10
  493:9 498:14
  500:7
**bought** 359:17
**boulevard** 267:6
**box** 264:13 402:22
  445:3,16,17,19
  467:21 494:11
  495:21
**boxes** 445:8,10,13
  445:13 494:18
**bread** 471:24,25
  472:1,3 477:19
  498:18,20 499:9
  499:19
**break** 275:13,16
  331:2,5,15 354:10
  354:13,14,15,19
  354:21 360:20
  363:18 385:18
  449:14
**breakfast** 363:20
  450:3 466:8
  467:25 468:16
  481:23
**breaks** 275:12
  354:7,9,16,18,23
**bring** 428:5
  445:19 447:16
  452:3 454:13
  497:13
**broke** 331:17
**brought** 467:7
  471:14 477:20
  502:11
**brown** 500:17
**brung** 401:15
**building** 338:3
  372:14 380:19

398:4 413:19
**bullet** 356:10
**bully** 408:14
**bullying** 409:10
**burned** 500:16,16
  501:23
**burnt** 439:21,21
**business** 334:2

**c**

**c** 264:1 265:1
  266:1 267:1 270:1
  272:1 277:15,18
  290:20,21
**c.j.** 264:17 271:9
  321:2 421:12,13
  422:7 477:11
**caitlin** 264:17
**cake** 477:16
**call** 284:9,11 293:1
  303:23 309:20,22
  312:15 323:11,20
  329:4,6,7,10,11,12
  329:13,18 330:2
  330:17 336:19
  337:3 338:17
  340:7,11,13
  341:15,18,20,25
  342:1,2 442:8
**called** 272:4
  275:14 287:20
  324:6 329:1
  363:14 452:6,8
  487:21
**calling** 272:17
  329:15 330:9
**calls** 284:14,17
  324:2 333:5
**calvin** 332:4,4
  394:15
**cambro** 466:5

**camera** 402:18
  457:23 469:6,8
**canteen** 278:13
  471:22 472:10
  473:8 476:1
**capacity** 276:21
  276:23
**captain** 386:5
  401:16 402:9,12
  437:15,18,21
**car** 323:13
**card** 353:25
  359:14 360:2
  500:20
**cards** 352:4,7,16
  352:16,17,21,22
  353:4,7,12,14
  359:9,16,18,20
**care** 269:10
  311:22 490:20
  495:13
**carey** 394:17
**cart** 485:10
**carton** 470:9
**cartons** 468:22
**carts** 471:8
**case** 263:10
  312:18 319:2
  333:19 340:7
  351:10 401:9
  416:18 421:24
  475:12 481:11
  484:5 485:1
**cases** 340:16
  467:20
**cassler** 264:11
  271:9
**castro** 361:13
**caught** 408:12
**cause** 356:15
  394:22 399:19

Case 4:18-cv-00070-CDL Document 383-1 Filed 09/27/23 Page 257 of 300

30(b)(6) Marquita Crawford, Vol. II
Barrientos, Wilhen Hill v. CoreCivic Inc.

August 23, 2021

[cause - coffee]

475:25
**caused** 300:1
**causing** 374:6 395:13
**caution** 321:17,20
**cc'd** 403:8
**cca** 263:19 270:13 278:5 313:17 320:5 350:13
**cca.com** 316:21
**ccbva0000** 414:2
**ccbva0000006420** 320:19
**ccbva00000196...** 387:5
**ccbva0000118271** 461:7
**ccbva0000152053** 402:25
**ccbva0000189805** 361:5
**ccbva0000189815** 330:23
**ccbva0000190037** 369:3
**ccbva0000190040** 355:3
**ccbva0000190337** 358:3
**ccbva0000195884** 269:4 449:18
**ccbva0000195885** 269:6 452:14
**ccbva0000196623** 372:24 381:16
**ccbva0000197160** 377:15
**ccbva0000197317** 406:11 411:7
**ccbva0000198718** 337:9

**ccbva0000219648** 325:22
**ccbva000173964** 420:18
**ccbva000189815** 331:19
**cdl** 263:11 270:12
**census** 451:2
**center** 264:5,12,19 265:5,12 266:2 277:23 279:3 285:21 462:4 481:13,17 484: 485:5 489:23 493:4
**central** 266:7
**cereal** 450:6 477:15
**certain** 294:6 371:11 376:18 379:5 404:11 460:6
**certificate** 506:24 507:24
**certified** 270:21
**certify** 507:2,25
**cetera** 477:19
**chain** 334:8,10,24 335:2 358:14 389:18
**challenges** 404:23
**chance** 404:5
**chandler** 266:15
**change** 287:7 484:11 510:4,7,10 510:13,16,19
**changed** 287:2,9 287:23 310:9,11 402:15 444:22,22
**changes** 324:17 343:25 509:10

511:6
**charge** 351:3 392:24
**check** 312:13,20 313:1,2 328:4,5 337:5,6 370:19 447:17 448:2,5 462:6 486:10,13 499:21

**chosid** 267:4 271:15 283:2 505:24 506:2 509:1
**chow** 356:13,15,16 356:17,19,20,23 356:25,25 364:24 365:18,19 426:17 426:19 427:20 428:12,15,21 466:23 467:1,17 471:1 481:18,20
**christmas** 334:16
**circle** 452:4 467:3
**civil** 269:17 270:11
**civilian** 311:25
**cj.sandley** 264:22
**claims** 481:17,23 485:6,7 498:21
**clarification** 274:22

**clarify** 362:21 427:7 446:25 467:12 471:3
**clarifying** 354:4
**classification** 375:22 407:17
**classifications** 376:1,6,9,15,19
**clean** 312:24 378:4 379:12,14,15,19 379:23 380:23 381:1,2 383:16,21 385:1,4
**cleans** 384:17
**clear** 275:3 283:13 328:5 381:13 421:23 428:2
**clearing** 345:23
**clicking** 296:10
**clock** 353:1,21,24 364:4,6,9,13,14,15 364:16,17,18,22 364:23,24 365:1,5 365:16,17,19,20 365:24
**clocks** 365:9
**closely** 335:6
**closeout** 491:18 492:10
**coffee** 450:7 466:11,12 468:19

**[coffee - continued]**                                                  Page 8

| | | | |
|---|---|---|---|
| 470:7 477:16 | 455:7,9,9 460:11 | **complaining** 374:8 | 425:12 |
| **cohen** 266:12 | 467:4 468:16,18 | 469:18 483:25 | **conducted** 490:6 |
| 273:3,20,22,24,25 | 488:18 489:15 | 484:20 | 492:9 |
| 274:4,4 285:9 | 498:1,3 | **complaint** 357:8 | **confirm** 471:10 |
| 302:22 310:24 | **comes** 367:13 | 362:11 365:23 | 506:9 |
| 348:2,5,14 363:4 | 380:24 383:16 | 366:2 466:21 | **confirming** 503:22 |
| 395:18 396:16,21 | 398:24 406:13,14 | 484:7 500:22 | **confused** 472:6 |
| 405:6,12,16 | 414:3 446:8,8 | **complaints** 356:8 | 473:15 |
| 417:16 429:12 | 475:16 486:12 | 419:17 480:8,13 | **congratulations** |
| 505:12 506:5,6 | **coming** 294:5 | 501:4 502:3,6 | 287:10 |
| **cohen's** 272:25 | 309:23 412:2 | **complete** 274:18 | **congregate** 398:19 |
| **coie** 265:18 266:6 | 467:1 468:1 | 412:23 415:15,17 | **connection** 395:16 |
| **collect** 304:21 | **command** 334:9 | 424:20 425:23 | 395:24 |
| 454:24 | 334:10,24 335:2 | 429:6 477:18 | **consecutive** 448:2 |
| **college** 287:14 | **comments** 481:16 | 511:8 | **consistent** 329:2 |
| **columbus** 263:2 | 484:7 485:3 | **completed** 275:11 | 366:7 425:23 |
| **come** 293:7 295:25 | **commissaries** | 404:25 410:4 | 426:11 427:14 |
| 296:23 297:3 | 359:17 | 413:18 509:17 | **consists** 349:23 |
| 302:6,9,10 304:8 | **common** 327:24 | **completely** 446:23 | **constant** 478:19 |
| 304:15 307:11 | 391:2 393:21 | 470:23 501:24 | **constitute** 271:3 |
| 309:20,22 312:15 | 425:10 478:9 | **completing** 290:5 | 322:7 |
| 312:21 319:3 | **communicate** | **completion** 424:6 | **consulted** 463:18 |
| 320:13 329:11 | 315:16,22 316:17 | **comply** 424:21 | 463:21 478:5,8 |
| 339:10 341:7 | 317:7 320:5 | **compound** 453:3,4 | **consume** 468:17 |
| 345:11,13,16 | 342:24 343:1 | 453:6 | **cont** 265:1,3 266:1 |
| 352:3 360:17 | 350:3,5 | **computer** 353:22 | 266:3 267:1,3 |
| 364:20 370:20 | **communicated** | 354:2 | 269:1 |
| 371:5,5,8 390:11 | 317:1 480:1 | **concern** 270:14 | **contact** 316:16 |
| 394:1 398:2,6,17 | **communicating** | **concerned** 335:3 | 478:11,12 |
| 398:19,25,25 | 391:11 | 374:22 407:20 | **contacting** 279:21 |
| 399:1,2,25 400:1,5 | **communication** | 408:2 | **contain** 353:4 |
| 401:11,12 407:20 | 404:3 | **concerns** 269:9 | **content** 359:4 |
| 407:21,24 408:1 | **company** 278:7 | 333:1 490:19 | **contents** 450:5 |
| 411:24 412:3 | 447:3 | 499:22 | **context** 321:21 |
| 417:22 418:13 | **compass** 278:12 | **concluded** 506:15 | **contingency** 325:5 |
| 419:4 426:20 | **complain** 361:23 | **conditions** 396:6 | **continuation** |
| 427:20 428:16 | 361:24 364:3 | 419:17 480:9 | 274:12 |
| 437:16,22,22 | **complainant** | **conduct** 404:20 | **continue** 325:8 |
| 438:17 439:5,14 | 484:9,10,11 | 405:11,20 406:3,5 | 421:19 |
| 439:15 444:5 | **complained** | 408:11 409:9,10 | **continued** 422:19 |
| 447:15,16 448:1 | 356:10 482:21 | 409:15 422:20 | 498:20 |

Case 4:18-cv-00070-CDL Document 383-1 Filed 09/27/23 Page 259 of 300
30(b)(6) Marquita Crawford, Vol. II    August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

[contract - correlation]    Page 9

**contract** 297:24

**cook's** 366:21
 412:4
**cooked** 486:13,14
 486:19,19,21
 501:24
**cooking** 299:16
 383:13 384:11
 423:20
**cooks** 340:21
 411:25 412:25
 413:13
**cooler** 451:18
 452:7,19,20
 495:25 498:9
**copied** 404:2
**copies** 307:7 420:6
 462:21 509:14
**copy** 307:4 327:11
 327:13,13 460:23
 462:23 463:7

**corecivic** 263:11
 266:11 270:11
 273:22,25 274:5
 278:1,5 279:1
 285:7 288:1 291:2
 291:5 294:24,25
 300:16 301:3,6,11
 302:1,15,24
 304:22 305:1
 306:6,7 308:6,8
 310:1 313:19
 314:10 315:16,22
 316:3,10,13,17,24
 318:12,13,21
 320:4,5,8 321:12
 321:13,23 325:20
 327:4,6 328:18,19
 328:21 329:4
 330:4,13,13 335:2
 335:13,22 339:1
 340:2,25 341:3,4
 342:11,12,19,20
 343:1,7,9,12 346:9
 346:14,16,21
 347:13,16,20,24
 348:20 349:23
 353:11 355:11
 357:18,19,20,23
 358:15 359:19
 361:13,13 368:7
 368:14,16 369:10
 369:11 374:15
 378:7 386:2,9,15
 388:6 392:15,19
 392:23 393:5,13
 393:19 394:3,14
 394:17,20 395:15
 395:24 396:15
 397:1 400:23
 401:1,17,23 402:7
 402:8 405:4

406:16,24 407:3,7
 407:11 409:16
 411:20 415:11,20
 415:25 416:9
 417:13,19 423:9
 429:22 431:5,23
 437:11,13 438:3,3
 438:22 439:24,25
 439:25 440:1
 454:3,17 460:23
 461:2 479:9,9
 487:16 505:12
 509:4 510:1 511:1
**corecivic's** 275:7
 278:1 307:2 316:5
 316:16 359:8,25
 400:9,15 415:21
 463:5
**cornbread** 477:19
**corporate** 276:22
 277:1
**corporation's**
 277:3
**corporations**
 278:2,5
**correct** 286:13
 292:23 293:23
 295:2,3,10 300:9
 300:20,21 301:24
 301:25 305:21
 313:7 314:12,13
 316:22 322:1
 327:17,18 328:12
 328:13,22 330:8
 330:16 332:1,7
 333:21 335:14
 336:5,9,11 338:24
 339:21,22,25
 341:1 343:20
 344:2 345:7
 350:23,24 351:16

357:9,14,15
 362:25 365:21,22
 366:23 368:9
 370:9 378:11
 379:20,21 382:18
 382:19,25 409:17
 411:3 414:23
 425:8 433:3
 434:18 436:15
 437:24 438:1,19
 439:7 440:15
 444:10 454:7
 455:21 462:13
 465:13,14,16,19
 466:24,25 469:10
 469:24 470:1,16
 471:14 473:6
 475:18 476:16,21
 486:21 491:23
 498:2 499:10
 504:2,11 511:8
**corrected** 438:12
 438:13 440:15
 466:14 473:5
 501:10 502:22
**correction** 278:2
 314:7 505:3
**correctional**
 278:13 292:1,6
**corrections** 278:5
 511:6
**corrective** 430:2,5
 430:7 431:1
 471:10 486:8,25
 487:4 495:16,17
 496:8,14 497:1,6
 502:2 503:20,24
**correctly** 437:9,9
 439:8
**correlation** 310:20

Case 4:18-cv-00070-CDL Document 383-1 Filed 09/27/23 Page 260 of 300
30(b)(6) Marquita Crawford, Vol. II                    August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

[corresponds - days]                                              Page 10

**corresponds** 322:4
**cost** 324:4
**counsel** 271:17
272:21 273:4,15
273:17 275:7,7,10
296:18 331:12
344:20 345:3
348:10 373:11
381:18 382:24
385:14 411:1
426:21 427:5
449:10 482:23
505:1,10,15 507:9
507:12 508:5,8
509:14
**counselor** 291:6
**counselors** 342:21
351:18
**country** 398:21
**countryman**
290:20,20 291:1
414:12,17,20
415:6,9 416:6,16
423:17
**countryman's**
414:25 427:9
**county** 291:13,16
291:17,21,23
**couple** 373:24
404:12 422:11
467:15 498:10
500:7
**course** 295:23
302:13 324:6
342:21,23 368:19
381:1 390:12
409:20 439:22
**court** 263:1
274:24 275:3
312:16 336:20,21
339:4,9 397:19

**cover** 296:3
302:16
**covered** 297:24
**covering** 299:14
**covid** 299:14,18,23
300:9 324:17
325:12 343:18
344:6,18 345:7,20
346:4,5,9,14
347:20 378:19
444:23,24 445:9
465:2 467:7,15
**cpr** 301:21
**crawford** 263:15
271:19,19,25,25
272:1,3,11,15,17
272:19 274:15
275:22 278:15
280:6 281:23
282:14 283:21
287:7,22,24
296:20 306:15
314:3 320:4,20
326:2 331:14,22
337:13 345:6
355:7 358:19
361:10 363:6
369:7 370:1,4
373:4,22 377:21
382:5 385:17
387:10 397:16
398:8 402:16
403:4 408:9
411:12 414:8
420:23 421:9
427:7 432:24
434:4 449:13,23
457:20 461:17
477:12 480:23
490:16 492:22
505:6 509:5 510:2

510:24 511:2,4,12
**create** 450:20,22
**created** 433:21
450:23 493:1
**crimes** 292:7
**cultures** 391:14
**curious** 369:21
**current** 284:25
288:3
**currently** 292:3
299:8,9,14 314:16
324:20 340:20
343:18 348:25
364:9 374:5
452:22
**custodial** 302:16
302:18,18
**customary** 502:19
**customs** 277:16,19
**cut** 370:11 375:19
**cv** 263:11 270:12

**d**

**d** 268:1 270:1
272:1 290:20
410:11
**daily** 283:10
286:22 303:13
306:4 312:13,20
313:1,2 374:9
454:4 455:8,9,16
472:20
**dairy** 465:1,1,3,17
465:24 466:5,9,12
466:13,16 468:6
468:11 469:23
470:5,11,14 471:8
471:13
**dan** 331:6
**danger** 321:17
322:8

**daniel** 263:21
270:3 506:25
507:15
**danielle** 334:16
**dark** 486:16
**date** 263:16
312:17 352:8
433:5 453:25
454:1,1 474:16
481:13 484:6
485:22 491:6
493:16 494:1,9,10
494:11,16,18
495:21,24 510:24
511:12
**dated** 453:25
471:21
**dates** 353:6 493:20
495:18 496:4
498:23
**day** 275:13 286:24
306:25 309:12
312:18 313:1
324:21 329:12
336:14 338:10,15
339:11,19 341:20
341:23 354:5
369:15,25 371:12
446:13 450:12,13
450:14,17,21,22
451:2,4 453:6,8,11
453:13 455:4,5,17
472:10 493:18
495:5 497:12,15
497:24 498:4
502:10 504:11,13
504:17 511:15
**day's** 453:5
**days** 327:21
357:18 446:18
453:18,20 485:5

**[days - detained]**                                                    Page 11

| | | | |
|---|---|---|---|
| 498:7 509:17 | **delay** 397:17 | **described** 500:19 | 360:11,22 362:14 |
| **deal** 303:13 | **delayed** 332:15 | **describing** 363:21 | 362:22 363:1,9 |
| **dealing** 302:20 | 333:2,20 | 422:20 | 364:11,12,18 |
| 462:25 | **delays** 336:4 | **description** 268:6 | 365:10 366:8 |
| **deals** 341:4 | **delegate** 289:10 | 269:2 408:10 | 367:6,20 368:17 |
| **decatur** 264:14 | **delegated** 294:22 | 424:6 | 368:24 369:14 |
| **december** 403:10 | **delegating** 290:3 | **descriptions** | 371:2 372:6,17 |
| **decide** 294:17 | **delivered** 368:14 | 433:10,13 | 374:23 375:10 |
| 350:7,9 464:14 | 444:23 494:15 | **designated** 270:9 | 376:5,8,15 377:4 |
| 470:7 | **deliveries** 446:4 | 276:12 | 378:7,14,17,24 |
| **decides** 349:18,21 | **department** 286:3 | **detail** 378:10,14 | 379:19,23 380:1 |
| 350:12 | 478:24 480:7 | 378:25 379:9,12 | 380:11,14,22 |
| **decision** 463:11 | 481:3 490:6 493:2 | 389:15 412:17 | 381:7 383:21 |
| 473:1 | **dependable** | **details** 378:17,21 | 385:2,23 386:1,23 |
| **declare** 511:4 | 411:24 | **detained** 279:2 | 388:6 390:3 394:1 |
| **decrease** 311:3 | **depending** 295:4 | 286:8 289:24 | 395:15,23 396:7 |
| 319:18,21 | 310:13,16 313:14 | 291:24 293:16,17 | 397:1,5,12 398:13 |
| **decreased** 310:12 | 323:10 342:6 | 295:4,9 299:19 | 399:5 401:20 |
| 349:16 | **depends** 293:1 | 302:16,20 303:1 | 404:11 406:15 |
| **dedicated** 314:12 | 313:12 341:22 | 303:19 309:16 | 407:8,11,14 408:9 |
| **deemed** 406:16 | 349:10 | 310:2,15,17,21,22 | 408:17 409:11,14 |
| 511:6 | **depicts** 452:18 | 311:3,15,21,22 | 412:11 413:21 |
| **deep** 378:3,8,18 | **deponent** 509:13 | 312:9 313:6,8,20 | 414:21 415:10,24 |
| 379:6,12,19,22 | 511:3 | 319:5,9,19,21 | 416:8,16,24 417:2 |
| 380:23 383:5,21 | **deposed** 278:18 | 321:18,24 322:15 | 418:19 419:10,15 |
| 384:3,25 385:4 | **deposing** 276:21 | 323:5,9 324:11 | 420:13 425:11,24 |
| 479:8 | 509:13 | 325:3 328:7,12,21 | 427:13,22 428:3 |
| **defendant** 263:12 | **deposition** 263:14 | 329:3 330:4 | 428:21,25 432:17 |
| 266:11 | 269:17 270:8 | 332:24 333:6,11 | 433:10 434:21,24 |
| **deficiency** 438:11 | 271:1 274:9,11,12 | 335:6 336:1,8,13 | 435:10,12 436:6 |
| 438:24 439:12,13 | 276:3,6,11 277:9 | 339:23 340:3 | 455:20 456:1 |
| 440:5,6,18 | 278:20 283:4,13 | 341:4,5,8,16 | 457:3,10,16 458:3 |
| **define** 363:15 | 284:20,23 285:1,4 | 342:10,18 343:3 | 458:12,13,21 |
| 400:3 | 285:7,10,13,17 | 343:10,19 344:15 | 459:9 460:18 |
| **definitely** 275:12 | 331:3 505:25 | 345:7 346:10 | 461:3,24 466:23 |
| 305:15 322:23 | **depth** 435:20 | 348:9,24 349:12 | 467:7 469:19 |
| 338:1 389:12 | **derico** 290:20 | 349:15,19 350:17 | 479:18 480:7,14 |
| 402:10 | 291:1 414:12 | 351:16,24 352:5 | 481:4 483:24 |
| **definition** 399:21 | **derico's** 290:22 | 353:12,17 354:4 | 484:19 489:12,16 |
| 399:24 400:8,9,12 | **describe** 390:25 | 356:6 357:12,17 | 497:2 498:13,15 |
| 400:16 401:4 | | 357:20 359:9,20 | 500:12 501:3 |

**[detained - displayed]**                                              Page 12

504:14
**detainee** 268:25
269:10 285:23
290:3 299:12,13
299:25 300:1
303:25 307:2
309:6,14,14
310:14 311:9
312:16 329:24
333:13 345:24
346:18 351:19
365:5,6,9 366:6,14
368:2 374:20
375:3 381:6,10
389:10 391:8
398:1 399:18,19
401:10 402:11
404:15,17 405:23
408:3,13 411:23
418:12,12,16
419:2,3,6,7 423:19
423:21 424:19
427:11 429:6
430:18 435:15
445:6 446:12
450:3 456:12,12
458:14 460:13
464:9 465:12
478:2,3 482:9
485:4,12 490:19
496:22 501:23
**detainee's** 425:1
465:15
**detainees** 286:20
293:7 294:20
303:6,8,13,14
304:15 309:19
313:18 336:17,19
346:7 356:10,12
356:13,22,23
357:7 361:24

364:5 366:4
369:22 370:2,12
374:9 375:23
378:20,22 388:15
389:3 398:1,2
403:8 406:25
408:25 412:5,6,10
414:18,20 417:21
417:22 424:23,25
443:20 445:19
446:9 457:2
458:13 481:17,21
485:6 489:15,20
**detention** 269:10
269:12 277:22
279:2 285:21
291:7 305:4,7,11
462:4 481:12,17
484:6 485:5
489:22 490:20,23
493:4
**detentions** 419:16
**determine** 318:16
505:25
**determined**
295:12 319:9
**determines** 313:19
**device** 457:22
**dhs** 478:4
**dhsoig0000001**
480:18
**diet** 447:14,14,15
448:9 500:19,20
500:24
**dietician** 325:6,14
325:20 463:14
464:3 479:11
**diets** 443:4 447:22
448:5,10,12,21
463:12,13

**difference** 311:13
311:17,18 439:6
**different** 293:2,2,4
293:6,16,18,20
294:4,4 341:24
342:2,3 343:6
379:17 391:14
412:19 421:3
440:16 455:6,6,7
468:22,22 471:4
471:18 478:15
**differently** 418:5
**digging** 407:22
**digital** 507:6 508:1
**dining** 465:3 467:3
**dinner** 363:20
**direct** 289:9
495:12
**directed** 314:14
**directly** 317:20
347:17 391:23
402:12 458:4,12
460:18 462:25
480:8 501:22
**director** 271:20
288:4,7,9,11,13,17
288:23,24 289:7
289:16,22 290:23
292:14,15,16,21
292:21 297:14
308:23 309:2
311:13 314:17
315:9,19,20,24,25
316:7,7 317:11,15
317:18,19 318:6
326:24 332:10
336:7 337:16
361:21 372:9
373:21 382:14,18
382:22,22 386:15
386:17,18 387:16

388:1 404:2
406:15,23 408:16
409:11 411:15
414:23 419:24
420:4 425:8,15,15
425:16 432:16
436:12 462:13,15
474:12 475:3,6
483:10,13 487:8
501:1,2 502:15,16
503:13,14
**dirty** 481:25 482:2
**disabilities** 303:7
**discard** 362:19
439:22 443:18
454:1 495:24
499:12
**discarded** 495:23
496:1 499:14
**disciplinary** 365:8
366:6,8,13 405:3,5
**discipline** 286:8
386:24 387:2
396:14,25 405:11
410:5 419:13
**disciplined** 395:15
395:24
**discovered** 481:20
**discuss** 279:1
388:5 400:18
431:21 463:2
**discussed** 307:19
307:21,23,25
363:13 400:17
**discussing** 358:15
400:19,21,23
**discussion** 344:5,7
**dish** 383:15
**dishes** 339:14
**displayed** 472:3

**[disruptions - eaten]**                                    Page 13

**disruptions** 335:7
**district** 263:1,2
  488:1
**division** 263:2
**dm** 487:22,22,25
  488:22,25 490:3
**document** 275:23
  275:25 276:3
  306:15 326:15
  327:15 358:6,16
  358:17,19 359:4
  381:15 392:15,17
  392:19 398:10
  406:10,14 409:25
  410:1 414:1
  424:15 432:8
  433:7,9 457:22
  463:8 471:17,17
  473:2 477:5 481:6
  490:16 492:24
  493:1 495:3 500:5
**documenting**
  410:7
**documents** 284:19
  284:22 307:12
  400:2 421:6
  425:20 435:3
  436:10 472:20
  488:5
**doing** 288:8,17
  289:19 291:19
  345:10 367:4
  368:3 379:17
  398:3 410:3
  411:22 428:16
  435:21
**door** 426:19
**doors** 384:23
**double** 286:25
  361:24,25 362:2,4
  362:8,12,15,23

  363:10
**downgraded**
  376:1,6,9,19
**downgrading**
  375:23
**dr** 404:25 405:2,3
  410:4,8,12
**dr's** 410:22
**draft** 433:13
**drafted** 355:12
  387:15 433:15,16
  433:18
**drafting** 415:7
**drink** 465:1,1,4,17
  465:21,25,25
  466:1,6,9,12,13,16
  468:6,11,19
  469:23 470:5,11
  470:14 471:8,14
**drinks** 445:5
**droudred** 355:10
  369:10,12
**due** 270:14 296:25
  299:14 319:22
  324:17 325:7
  330:18 335:7
  345:10,10 356:12
  356:22 378:19
  473:7 475:25
  476:16 485:13
**duly** 272:4 507:3
**duties** 285:24
  286:22 289:6,15
  289:23 290:1,4
  299:15,15 307:24
  309:7,11 412:15
  412:23 415:16
  487:8
**duty** 378:3 415:17

**e**

**e** 264:1,1 265:1,1
  266:1,1 267:1,1
  268:1,5,10,11,12
  268:13,14,15,16
  268:17,18,19,20
  268:21,22,23,24
  269:1,8,20 270:1,1
  277:15,18 290:20
  314:5,6,10,14,18
  314:21,24 315:2
  315:13,22 316:1,2
  316:3,3,4,6,11,13
  316:16,18,20,24
  317:1,7,10 318:3,7
  318:15 320:4,6,9
  320:10,11,20,22
  321:5,15 322:8
  326:4,5,8 331:25
  331:25 332:3,6,13
  332:18 333:25
  334:21 335:5,13
  337:15 340:1
  355:10,12,13,21
  355:25 356:1,2,4
  358:6,14,14,16
  361:12,16 363:11
  369:9,12,16
  370:10,11,24,24
  370:25 373:6,7,11
  373:14,15,16,20
  373:22 374:16,19
  374:25 377:20
  378:1,6 379:18
  382:8,8 383:5,20
  383:23 384:6
  386:8,10,11,12
  387:13,13,14,15
  387:16,20,23,24
  388:5,8,11,13,21
  389:2,17,18,19

  390:17 392:2
  393:10,14,15
  394:13,14 403:6,8
  403:9,10,13,15
  404:6,10,20,22
  405:4 406:13,20
  406:21 407:3
  408:23 409:1,3,8,9
  411:14,16,22
  414:11,11,22
  415:3,7 423:6,15
  448:19 456:4,7,8
  456:10 457:2,4,6,9
  457:10,12,16
  458:3,5,7,9,10,15
  458:18,19,23,24
  459:4,5,7 460:7,9
  460:19,21,22,25
  461:3 463:3
  464:11 510:3,3,3
**earlier** 285:16
  286:11 295:12
  311:20 319:15
  321:23 336:6
  338:24 343:17
  357:11,16 385:20
  400:5 432:15
  436:11 444:21,22
  447:5 455:19
  467:23 481:19
  483:21 491:22
**early** 367:7,9
**easy** 500:21
**eat** 360:13,20,22
  362:14,18,20,20
  363:17,19 454:6
  455:4,9,15,17
  466:24 481:22
  504:10,11,13,16
**eaten** 440:25
  455:13

800.808.4958                                    770.343.9696

Case 4:18-cv-00070-CDL Document 383-1 Filed 09/27/23 Page 264 of 300
30(b)(6) Marquita Crawford, Vol. II    August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 14

**[eating - exact]**

eating  362:17
ecohen  266:16
eden  266:12 274:4
  285:9
edmonds  423:2,12
  424:17 431:9,13
  463:11,18 464:9
  465:11 472:22
educate  285:20
  286:6
educational
  287:12
edwards  266:19
  271:12,13 272:24
  273:21 282:24
  283:12,16,19,22
  283:24 284:8,12
  284:15 310:23
  330:24 331:1
  363:3 365:11
  375:11 395:19
  413:4 417:15
  425:25 426:12
  427:16 429:2
  501:5,12 502:23

eight  286:20
  292:12,20 294:14
  350:16,18,20,20
  350:23 351:1,7,10
  351:11,12,13
  356:11,14,18,20
  356:24 357:2,4,8,9
  357:13 451:12

either  309:19
  398:22 402:2
elaborate  305:25
electrical  445:10
electronic  327:13
  327:14 443:12
electronically
  327:6 353:15
  447:20
elimination
  301:18
embryo  482:14
emergency  325:8
employ  292:11
employed  281:10
  289:3 315:1
  317:24 318:13
  432:10 480:3
  507:9,12 508:6,9
employee  286:2
  294:23 317:14,25
  321:12 361:13
  394:17 421:25
  437:11,13 507:11
  508:8
employees  285:1
  292:10 298:13,21
  298:25 299:3
  300:11,19 305:6
  305:14 316:23
  317:6 342:13,20
  343:9,9,15 344:6
  347:14,21 349:24
  355:11 358:15
  361:14 420:14
  454:3,6 455:4,10
employment
  302:10
employs  292:17
empty  477:17

encouraging
  392:20
ended  468:20
endure  322:16
enforcement
  277:16,19
engage  415:14
engaged  406:3
  503:24
engaging  404:19
  409:12
english  287:16
  303:20,24 304:9
  304:16 391:19,19
  391:23,25
ensure  290:9
  312:8 344:19
  345:19 424:5
  439:8 447:13
  463:15
ensured  466:9
ensuring  290:6
  301:1 308:23
  309:2,11 436:12
  436:20
entered  493:13
entire  332:16
entirely  381:12
entitled  298:21
  454:3
equipment  381:3
  384:17 435:21,23
  436:1,2
errata  509:11,13
  509:17
error  473:4,7,9,12
  473:20 474:4
  476:1,17
errors  473:10
es  507:2

escorts  445:4
especially  332:17
  343:1
esquire  264:4,11
  264:17 265:4,10
  265:17 266:4,12
  266:19 267:4
  509:1
essentially  414:25
established  297:18
  297:21
establishing
  297:14
estimate  341:19
  390:15 455:3
et  264:2 265:2
  266:2 270:10
  477:19
evaluate  437:20
evening  362:4
eventually  340:24
  469:23 471:7
everett  266:4
  271:11
everybody  306:2
  325:15 345:23
  389:11
everyone's  294:3
  386:16
everything's
  325:19
evidentiary
  270:25
evidently  338:16
  393:16
exact  280:24 300:4
  303:17 322:18,21
  339:5 349:4 352:8
  371:21 380:6
  388:25 389:1,5,25
  400:25 422:25

**[exact - feed]**                                                    Page 15

| | | | |
|---|---|---|---|
| 433:19 474:15 | 331:22 337:8,9,10 | **expecting** 323:9 | **facility** 292:2,6 |
| 479:6 485:22 | 337:13 340:1 | 375:8 405:5 | 295:25 296:2,24 |
| 492:3 498:2 | 355:2,3,4,7,9 | **experience** 329:2 | 297:3,23 314:10 |
| **exactly** 335:23 | 358:3,4,8,10,11 | 360:25 393:25 | 328:4 332:16 |
| 338:13 359:13 | 360:8 361:5,6,7,10 | 399:23 404:1 | 341:24 349:10 |
| 393:7 451:22 | 363:25 365:4 | 405:19 446:19 | 356:13,15,23 |
| 478:17 479:13 | 369:2,3,4,7 372:23 | **experienced** | 400:7 449:2 |
| 499:20 | 372:25 373:1,4 | 333:11 | 458:16 477:18 |
| **examination** 268:2 | 377:2,15,16,17 | **expert** 267:11 | 481:24 482:2 |
| 272:9 | 381:18,21 382:2,5 | **expiration** 491:6 | 484:11 493:20 |
| **examined** 272:6 | 382:25 383:1,4 | 493:16,20 494:1,9 | 495:3,6 498:7,21 |
| **example** 294:9 | 387:5,6,7,10,12 | 494:10,11,18 | **fact** 471:25 |
| 308:3 311:2,16 | 392:5 402:14,24 | 495:18,20 496:4 | **factors** 319:22 |
| 330:18 391:5 | 402:25 403:1,4 | 498:23 | **fail** 323:1 |
| 418:4 | 408:6 410:25 | **expire** 494:15 | **failed** 416:4 |
| **exchanged** 394:14 | 411:2,3,6,8,9,12 | **expired** 492:7 | **fails** 509:19 |
| **excuse** 280:22 | 411:14 414:1,3,4,5 | 493:18 495:22 | **failure** 415:15 |
| 321:8 340:23 | 414:8 420:18,19 | 498:17,22 499:10 | **fair** 335:5 |
| 366:17 394:8 | 420:20,23 421:2 | **explain** 397:21 | **familiar** 305:3 |
| 483:2 | 432:20,20,21,24 | 430:13 451:25 | 306:15 314:6 |
| **exhibit** 268:7,8,9 | 433:1 434:21 | 453:10 456:24 | 321:17 322:5 |
| 268:10,11,12,13 | 449:17,18,20,23 | 471:5 486:14 | 358:25 359:6,8,23 |
| 268:14,15,16,17 | 452:12,13,14,15 | **explained** 356:12 | 359:25 360:10 |
| 268:18,19,20,21 | 461:6,8,11,14,19 | 356:22 357:7 | 370:24 374:17 |
| 268:22,23,24,25 | 461:23 469:11 | **explaining** 381:12 | 390:17,19 479:21 |
| 269:3,5,7,8,9,12 | 480:17,19,20,21 | **explanation** | 494:16 499:24 |
| 269:16,18,19,20 | 480:23 481:9 | 384:24 423:10 | **favor** 425:1 |
| 275:17,18,19,20 | 484:4,25 490:10 | **extend** 356:14,16 | 465:15 473:7 |
| 276:9 280:3,3,4,7 | 490:11,13 492:16 | 356:24 357:2,4 | 476:16 |
| 281:17,18,20,24 | 492:17,18,19,22 | **extra** 360:12,13,16 | **fear** 399:1 |
| 282:11,12,15,17 | 494:24 504:1 | 360:22,25 362:20 | **february** 369:15 |
| 282:22 285:15 | 505:4,4,5 506:10 | **extreme** 340:7,16 | **fed** 388:18 465:4 |
| 306:10,11,12 | 506:11 | 371:20 | 466:24 468:5,8,9 |
| 313:24,24 314:1,3 | **exhibits** 269:15,22 | | 468:11 469:20 |
| 314:5 317:9 | 506:9 | **f** | 481:23 |
| 319:25 320:1,1,3 | **exist** 419:11 | **f** 272:1 471:19 | **fedderick** 356:5 |
| 320:13,14,15,16 | **exited** 423:21 | **face** 397:2,5,12 | 356:21 |
| 320:19 322:13 | 427:10 | **facilities** 269:11 | **federal** 274:10 |
| 325:22,23,24 | **expect** 334:4 408:3 | 291:8,10,11 | 480:6 |
| 326:2 330:23 | 502:6 | 296:21 490:20,23 | **feed** 324:5 389:4 |
| 331:18,18,19,20 | | 491:3 | 443:19 468:12 |

Case 4:18-cv-00070-CDL   Document 383-1   Filed 09/27/23   Page 266 of 300
30(b)(6) Marquita Crawford, Vol. II                August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

[feeding - food]                                                    Page 16

| | | | |
|---|---|---|---|
| **feeding** 357:1,1 | **finding** 404:24 | **fits** 412:24 | 305:15,18,20,23 |
| 388:16 389:4 | 473:17 484:20 | **five** 288:6,22 | 306:3,4 308:22 |
| 445:8 466:22 | 491:9,10,13,15 | 293:18,19 346:23 | 309:1 311:12 |
| 467:24 468:7,23 | 492:4 495:17 | 346:23 366:23 | 314:17,23 315:5,6 |
| 469:18,23 470:15 | 496:19 497:4 | 383:7 455:5,8 | 315:8,11,12,15,24 |
| 470:25 | 499:6,8,16 | 486:1 | 315:25 316:7,19 |
| **feel** 375:9 421:3 | **findings** 491:19,25 | **fix** 296:11 347:21 | 317:10,15,18,19 |
| 439:19 | 492:13 494:8,23 | 443:20 468:18 | 318:5 324:7 |
| **feels** 457:21 | 495:1,11,15 496:2 | 473:6 476:15 | 326:10,19,23,24 |
| **feet** 467:17 | 503:5,25 | **fixed** 343:15 344:9 | 327:20,23 332:9 |
| **fernandez** 403:7 | **fine** 272:19 375:20 | 344:10,12 | 336:6 337:16 |
| 403:18,19,20,20 | 456:21 472:13 | **fixing** 439:12 | 360:12,13,14,16 |
| **fevers** 312:25 | **finish** 274:19 | **floor** 265:19 | 360:19,20,22,25 |
| **fico** 382:9,11 | 396:21 397:18 | 378:21 452:21 | 361:21,25 362:15 |
| 383:4 | 423:22 427:11,21 | 496:11,25 | 362:18,20,20,23 |
| **file** 410:2 461:25 | 427:25 428:16 | **floors** 384:23 | 363:23 372:8,16 |
| **filed** 279:1 421:23 | 429:1,6 456:20 | **fluctuates** 310:13 | 373:20 377:5,6,11 |
| 459:8 | **finished** 374:2 | 310:16 311:11 | 382:14,17,22 |
| **files** 444:8 455:20 | **finishing** 429:10 | **focused** 493:6 | 384:11 386:14,17 |
| **filing** 478:3 | **fire** 375:15,16 | **foia0000004** | 387:15,25 396:8 |
| **fill** 313:4 326:25 | **fires** 375:9,10 | 492:17 | 396:10,11 404:1 |
| 327:2 344:14 | **firm** 274:3 285:12 | **follow** 325:6 | 406:14,23 408:16 |
| 346:15 385:21 | **first** 272:4 275:17 | 371:16,16 408:15 | 409:10 411:15 |
| 410:15 460:7 | 278:20 279:9 | 438:15 439:7 | 414:22 419:24,25 |
| 503:17,19 | 302:5,9,9 307:11 | 505:9 | 420:3,7 425:7,14 |
| **filled** 429:25 | 352:16 356:10 | **followed** 439:18 | 425:15 432:14,16 |
| 437:19 | 361:15,22 362:1 | **following** 393:12 | 434:17 436:2,12 |
| **filling** 342:19 | 388:13,16 402:15 | 393:19 424:5 | 436:13,18,21,22 |
| 343:7 344:5 | 409:17,17,24 | 456:22 | 436:24 437:2,4,8 |
| 386:22 | 411:25 422:11 | **follows** 272:6 | 437:10,12,12 |
| **fills** 385:25 437:21 | 442:11 451:18,18 | **food** 271:20 279:7 | 438:7,17,17,21,25 |
| 438:4 | 451:19,20,22,22 | 285:25 286:2 | 439:8,11,15,16,17 |
| **final** 439:17 | 452:1,2,6,6,9,9 | 288:4,7,9,10,13,16 | 440:5,9,19,24 |
| **finally** 278:9 | 453:13 461:6 | 288:18,21,23,24 | 441:2,7,9,11,13,14 |
| **financial** 289:11 | 466:15 467:15 | 288:24 289:7,8,9 | 441:16,19 443:4 |
| 454:13,16 | 472:9 480:18,24 | 289:16,18,19,19 | 444:16,22,23 |
| **financially** 507:13 | 493:21,21 494:11 | 289:22 290:2,6,9 | 445:1,7,11,11,13 |
| 508:9 | 494:11,13,13 | 290:23 291:20 | 445:14,17,21,22 |
| **find** 275:13 330:10 | 495:19,19 497:14 | 292:14,15,16,20 | 446:14,15,17,18 |
| 371:19 372:6,18 | 497:14 500:2 | 292:21,21 294:11 | 446:22,23 447:1,4 |
| | | 297:13 299:17 | 447:5,7 452:24 |

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

**[food - go]**                                                    Page 17

453:1,4,11,12,15
453:16,17,23
455:21,24 456:2,7
457:17 458:4,6
459:8,15,16,24
460:2,3,5,16,19
462:5,8,13,15,22
464:20,25 465:13
467:7,21 468:2,25
469:9 471:22,22
472:10,23 474:11
474:23 475:3,6,8
475:14 476:10
477:17,21 478:13
478:22,23 479:8
480:9,14 481:5,21
481:22 482:7,10
482:14,16 483:6,9
483:12,14,25
484:10,11,13,17
484:21 485:7
486:10,11,20,21
487:1,5,8 491:1,2
491:4,5 493:15,16
494:10,15 498:2
498:17,22,22
499:22 500:13,14
501:1,2 502:10,15
502:15,21 503:13
503:14
**foods** 289:18
443:3 493:19
497:5,13,18,23
**foregoing** 507:1,2
508:2 511:5
**form** 272:22
273:18 310:23
313:2,2,4 326:8
328:19 336:11,12
337:6 358:20,21
358:24 360:4,5

363:3 367:2
375:11 413:4
417:15 425:25
427:16 429:12
435:23 437:16,19
437:21 438:4
442:10 443:12,13
448:17 454:7
460:7 461:21,22
461:24 501:5,12
502:23 503:17,20
503:20
**former** 278:1
284:25 317:14,25
321:12
**forms** 396:14,25
442:24 443:9
454:9,19,20,22,24
455:1
**formulated** 479:11
**forwarded** 355:12
**found** 465:11
473:7,12 476:16
484:9,12,17
**foundation** 348:2
348:4,14 395:18
405:6,16
**four** 288:22
366:23 394:4,7,8
423:6 458:23,24
491:3
**free** 421:3
**freezer** 495:23
497:13,23
**freezers** 493:15
**french** 435:6
**fried** 486:18
**front** 408:7 452:23
**frozen** 492:6
493:19 494:15
497:5,13,18

**full** 272:14 346:25
422:10
**further** 375:6
505:6 507:11
508:7
**fyi** 337:20

**g**

**g** 266:12 270:1
**ga** 263:18 264:7,14
265:7,14 266:23
509:15
**gaines** 421:25
422:14,20 423:19
424:20,24 425:21
426:10 427:10,10
428:8,18,20 429:9
430:3,10 431:7
432:10
**gaines's** 424:6
**garcia** 266:4
271:11
**general** 285:25
306:2,7 360:21
381:1,1 390:3
396:10 406:2
458:13 464:19
471:13 475:5
479:22 480:2,11
480:15 481:4
483:18 490:7,11
490:19,22 492:2
493:3
**generally** 286:19
308:20 313:8
327:9 333:4 341:3
341:16 358:25
359:6 361:18
374:18 376:14
395:14 401:25
405:19 419:15
420:10 422:19

461:21 483:12
486:4,25
**georgia** 263:2,20
270:6,13 277:23
481:13 507:17
**getting** 296:8
362:14 363:23
390:5 399:8,25
405:21 406:4,7
466:24 467:7,20
468:5,6,11 469:19
474:17
**give** 274:3 302:6,6
303:10,17 307:12
320:21 322:19
339:1,5,20 341:19
341:25 346:17,18
354:14 366:25
367:5 368:11
375:24 377:24
387:19 402:12
409:19 410:11
420:5,9 475:17
**given** 278:22
294:7,13 295:5
307:11 310:17
386:3,6 402:6
424:25 436:9
478:5 511:9
**gives** 386:4
**giving** 274:15
335:25 359:9
390:8
**go** 273:7,9 275:17
280:2,22 282:1
283:9 294:2
296:11 301:13
306:2 313:23
319:25 320:8
322:20 323:4,6
325:7,11 328:3

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

[go - guys]                                         Page 18

| | | | |
|---|---|---|---|
| 331:5 336:25 | 325:21 329:16,18 | **graduated** 287:13 | 500:24 501:19 |
| 337:1 341:8 | 331:2 332:19 | **gray** 318:7,8,11 | **grievance's** 463:10 |
| 342:16 344:21 | 333:9 336:20,23 | 326:6 327:8 332:3 | **grievances** 286:8 |
| 351:8,12 354:15 | 337:2,7 339:10,17 | 337:17,24 340:19 | 420:6,11,14 |
| 354:20 358:4 | 341:5,23 342:2,23 | 340:22 373:7,17 | 425:11 455:23 |
| 361:22 363:22,25 | 354:12 355:1 | 387:14 389:19 | 456:2,8 459:8,16 |
| 367:12 371:1,13 | 360:16 362:16 | 394:15 423:9 | 459:24 460:2,16 |
| 371:18 372:5,11 | 366:12 369:1 | **grease** 384:11 | 461:25 462:21 |
| 372:13,23 374:1 | 370:20,21 371:5,8 | **great** 321:16 | 464:11,19 472:19 |
| 375:18,20 379:5 | 371:10,17 372:23 | **grievable** 463:17 | 472:24 474:23 |
| 385:7 390:12 | 373:24 381:20 | **grievance** 268:25 | 475:1,8,14 476:10 |
| 398:4,5,22 399:6 | 387:4,20 389:2 | 269:7 419:17,19 | 476:14 478:15,20 |
| 401:6,6 407:17 | 392:12 398:20,20 | 419:22,23 420:1,2 | 481:2,5 482:1 |
| 409:18 412:3 | 398:21,22,23,23 | 420:5,8,11 421:23 | 483:14 487:2,6 |
| 424:14 426:23 | 399:4,9 401:12,13 | 422:10,19,21 | 499:18 |
| 427:20,24 428:5 | 402:23 404:18 | 423:2,12,12,18,24 | **grooming** 434:8 |
| 428:15,24 430:22 | 405:21 406:4,7,9 | 424:3,4,16,17 | **ground** 493:14 |
| 435:19 436:7,9 | 407:23 409:22 | 425:1,2,20 430:10 | 496:9,14 |
| 449:3,16 452:12 | 410:13 411:7 | 431:8,11 432:2 | **grounds** 405:22 |
| 456:18,18,19,21 | 414:1 417:23 | 455:21 456:5,13 | **group** 266:18 |
| 467:11,13 469:11 | 420:17 421:2 | 459:13,15,17,19 | 267:2 270:9 |
| 470:19 475:24 | 422:7 426:7 | 460:4,9,10,13,19 | 271:14,20 274:13 |
| 486:20 488:4 | 432:19 449:1,16 | 461:24 462:2,10 | 276:23 277:7 |
| 494:4 504:9,19 | 451:2 452:4 | 462:12,16,19 | 278:11,12 434:3 |
| 505:13 | 453:23 458:2 | 463:8,17,19 | 462:8 481:19 |
| **goal** 335:25 | 461:5 465:3 | 464:15,22,24 | 505:11 |
| **goes** 323:3,3 | 466:23 480:17 | 465:5,7,11,15 | **groups** 351:6 |
| 351:10 372:17 | 490:9 494:19 | 469:1,7,15 470:3 | 417:5 463:16 |
| 384:17 424:23 | **gonzalo** 263:4 | 470:10 471:11,20 | **guess** 423:1 |
| 444:15 452:4 | 268:9 282:8,18 | 471:21,22 472:5 | 452:12 464:5 |
| 462:6 501:19 | **good** 270:2 271:7 | 472:12,17 473:11 | **guidelines** 359:1,5 |
| **going** 273:16 | 271:12 272:11 | 473:16 474:2,3,22 | 359:6 |
| 274:19 275:17 | 289:18,19 312:24 | 475:7,13,15,17,18 | **gustavo** 403:7,18 |
| 277:12,13 280:2 | 312:25 321:16 | 476:8,25 477:7,8,9 | 403:19,20 |
| 281:17 282:11 | 407:25 481:24 | 477:10,22 478:1,2 | **gutierrez** 282:9,18 |
| 287:18 294:19 | 499:11 502:10 | 478:10 479:17,19 | **gutiérrez** 263:5 |
| 296:10,25 300:14 | **government** 480:6 | 482:3,6,8,9,21 | **guy** 366:23 391:22 |
| 306:10 309:22 | 483:5 484:1,22 | 483:5,17 484:14 | 391:22 394:16 |
| 311:6,7,9 312:12 | 498:12 500:11 | 484:16 485:15,15 | **guys** 304:8 329:16 |
| 313:5,23 319:25 | 501:4 502:20 | 485:18,24 486:5,9 | 330:10 339:7,8 |
| 320:4 323:1,7 | 503:8 | 486:23 499:3,4 | 340:12 362:8 |

Case 4:18-cv-00070-CDL Document 383-1 Filed 06/27/23 Page 269 of 300
30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

[guys - hopefully]                                              Page 19

| h | | | |
|---|---|---|---|
| 370:19,23 383:7 398:6 399:8 443:19,20 | | | |

**h**  268:5 269:1 442:18 510:3
**halal**  493:17 495:22
**half**  331:3
**hall**  356:6 361:14 361:19 363:1 364:24 365:18,19 371:13 426:17,19 427:20 428:12,15 428:21 465:3 466:23 467:1,3,17 471:1
**hallway**  371:10
**hallways**  378:21
**hand**  271:23 319:3 386:6
**handbook**  306:25 307:1,2,3,5,8 399:18 400:3 418:12,16,20,25 419:1,6,8,10 436:9
**handle**  296:4 351:4 401:17 431:4 505:14
**handling**  351:19 491:1,3
**hands**  342:22
**handwriting** 422:16
**handwritten** 472:7 473:2 477:9
**hang**  365:5,9
**happen**  295:20 300:9 307:10 325:11 332:15 342:7,9 379:10

380:10 383:9 390:9,14 398:22 399:1 400:6 408:24 410:7 438:20,21 440:1
**happened**  295:21 300:4 372:20 376:23 387:3 393:7,7 446:16 470:24 471:7 475:20 483:20
**happening**  359:11 369:13 375:1 468:24
**happens**  330:19 342:4 368:13 397:7 438:10,24 441:11 446:14,25 464:13
**hard**  334:1 402:16 422:18 472:8 486:19 500:17
**harrell**  318:7,8,11 326:5 327:8 332:3 337:17,23 340:19 373:7,17 387:14 389:19 394:15 423:9,15
**hate**  395:5
**hazardous**  493:14
**he'll**  410:15
**head**  275:5 301:8 302:8 464:8
**heading**  276:10
**health**  312:25 487:14 488:23,25 489:19 490:2
**healthy**  346:8
**hear**  273:1,4 274:22 296:7,9 397:24 420:10

425:10,17 458:3 482:13 492:8 495:10 499:2,5,7 499:15 500:2
**heard**  348:15 376:3 425:4 482:3 494:5,8 495:14
**hearing**  271:21
**hearsay**  430:25
**held**  288:5,25 290:8,11 321:13
**help**  295:25 296:2 296:5,21 297:3 346:24 368:23 388:17 397:19
**helped**  291:9,11 318:16
**helpful**  384:25
**helping**  346:16 375:4
**helps**  388:19
**hereto**  507:13 508:9 511:7
**hey**  303:11 322:19 339:10 340:10 354:12 360:16 366:14,20 367:13 370:20 390:11 391:2 395:5 398:4 398:20 399:3,8 401:11 409:19 410:14 416:5 439:18 440:14 464:2
**high**  287:13 297:7 311:7
**hill**  263:4 264:2 265:2 266:2 268:7 270:10 279:25 280:12,15 281:5 421:24 423:20,21

424:3,3,19 425:21 427:11 429:9,24 430:10,24 431:6 432:1 509:4 510:1 511:1
**hire**  309:5,6,7,9 342:23 347:17
**hired**  309:18 313:18
**hiring**  309:25
**history**  407:22
**hit**  334:4
**hmm**  310:5 316:12 319:11 326:7,12 338:20,21 341:9 341:13 355:15 356:7 364:2 370:3 370:14 377:22,25 378:9 385:22 387:18 389:20 414:13 422:2 424:7 434:9 441:5 442:13
**hold**  332:19 374:13 377:10
**holding**  404:24 441:8,8,23 442:1 443:5,6
**holdings**  267:5
**home**  313:15
**homeland**  480:7 481:3 490:7 493:2
**hood**  381:13 383:6 383:10,16,24 384:4,9,12,13,18 384:18,20 385:1
**hoods**  380:23,24 380:25 381:8,9 383:14,19,22
**hopefully**  320:13

Case 4:18-cv-00070-CDL Document 383-1 Filed 09/27/23 Page 270 of 300

30(b)(6) Marquita Crawford, Vol. II                    August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

[horrible - individuals]                                        Page 20

| | | | |
|---|---|---|---|
| **horrible** 500:14 | 479:10 481:13 | **immigration** | 309:2,11 343:25 |
| **hot** 445:3,10,16,17 | 487:14 490:19,23 | 277:15,19 | 344:2 432:17 |
| 445:17,19 467:21 | 491:11,13 | **impacted** 333:15 | 443:3 455:23 |
| 477:15 | **ice2013foia** 471:18 | 417:10 | 463:12 487:9 |
| **hotline** 480:9 | **idea** 321:20 | **implemented** | **included** 359:3 |
| **hour** 331:2 337:1 | 322:10 335:1 | 346:9 | 401:5 432:5 |
| 339:2,20 | 370:7 376:3 | **important** 275:4 | 494:23 |
| **hourly** 297:17 | 405:10 475:10 | 328:6 | **includes** 278:1,10 |
| **hours** 286:20 | 482:20 | **improves** 380:19 | 379:12 404:10 |
| 294:11 298:22 | **identification** | **incentive** 361:1 | 493:3 |
| 299:4,11,20 | 275:21 280:5 | **incentives** 357:24 | **including** 278:12 |
| 307:24 324:24 | 281:19 282:13 | **incident** 332:22 | 360:22 394:15 |
| 336:25 350:15,16 | 306:13 314:2 | 333:8 339:17 | 405:20 480:9 |
| 350:18,20,21,23 | 320:17 325:25 | 366:24 367:2,7,17 | 490:23 |
| 351:1,7,10,11,12 | 331:21 337:11 | 367:23 368:5,6,10 | **incoming** 345:24 |
| 351:13 354:14 | 355:5 358:12 | 368:13 383:17 | **incorporated** |
| 356:11,14,18,20 | 361:8 369:5 373:2 | 385:21,25 386:1,8 | 270:11 |
| 356:24 357:2,4,8,9 | 377:18 382:3 | 386:15,19,22 | **incorrect** 356:24 |
| 357:13 379:17 | 387:8 403:2 | 388:10 389:1,5,14 | 363:2,10 428:9,10 |
| 443:19 447:9 | 411:10 414:6 | 389:23 392:10,12 | 473:14,17,22 |
| 451:13 460:3 | 420:21 432:22 | 392:16,20 394:1 | 474:4 496:3 |
| **house** 448:10 | 449:21 452:16 | 401:15 402:4,6 | **increase** 311:3 |
| 451:3 | 461:12 480:22 | 405:22 406:6 | 318:19,21 319:2 |
| **houses** 292:6 | 490:14 492:20 | 410:5,5,6,7,19 | 349:11,12 420:24 |
| **housing** 371:18 | **identified** 389:7,9 | 416:21,23 417:13 | **increased** 310:12 |
| 442:13,18,21 | 389:21 394:7 | 424:18 428:11 | **indented** 369:21 |
| 493:7 | 438:11 498:18 | 429:19,21,22 | 370:11 |
| **howard** 265:17 | **identify** 271:6 | 430:8,12 431:18 | **individual** 276:23 |
| 271:10 | 388:23 390:4,8 | 431:25 432:4,6,7 | 394:18 425:11 |
| **huh** 275:5 379:2 | 391:6 392:6,23 | 460:4 470:23 | 462:3 471:20,23 |
| **human** 308:19 | 393:1,3,11,12,16 | 482:17,21 483:19 | 477:7 485:12 |
| **hurting** 332:16 | 439:11 | 483:21,22 484:15 | 493:10 |
| **hygiene** 312:24 | **identifying** 388:20 | 499:24,25 500:2 | **individual's** |
| 434:7 | 391:4 394:18 | 500:25 501:17 | 472:12 |
| **hypothetical** | **ii** 263:15 509:5 | 502:13 503:16 | **individually** 263:6 |
| 311:19 | 510:2,24 511:2,4 | **incidents** 409:8 | 325:17 |
| **i** | 511:12 | 410:1 464:7 492:6 | **individuals** 279:2 |
| **ice** 269:9,13 | **illness** 330:18 | 502:17,20 503:18 | 292:6 302:20 |
| 277:15,18 308:5 | **imagine** 323:8 | **include** 289:23 | 318:16 416:11,16 |
| 367:12 444:6 | **immigrant** 291:7 | 297:14 298:16 | 419:16 467:24 |
| 478:4,25 479:4,10 | 419:16 | 300:22,25 308:23 | 485:2 489:13 |

**[individuals - job]**                                                    Page 21

498:13 501:3
**influence** 350:1
**inform** 340:2
341:3 357:18
383:9 407:11
422:12
**information** 277:2
315:24 335:25
353:4 362:10
401:20,22 408:15
475:18 481:14
483:7,8 484:13
485:15 500:21
501:20,21 502:5
**informed** 279:17
406:15 407:7
424:4 465:7
471:25 472:1
477:21 491:16
**informs** 295:5
**initial** 494:7
**initially** 367:24
**inmate** 269:7
328:10 411:17
433:1 434:3,7
473:7 476:16
**inside** 381:9
384:15,17 426:17
426:20 445:17
497:14 498:9
**insides** 381:11
**inspecting** 493:15
**inspection** 444:7
462:7 490:1,5,11
490:22 491:16,21
491:21 492:2,14
**inspections** 487:15
488:23 489:1,22
489:25 490:3
491:11 492:9

**inspector** 479:22
480:2,11,15 481:3
483:18 488:4
489:19 490:7,10
490:18,22 492:2
493:2 500:12,13
502:20
**inspector's** 493:3
498:13 503:5,9,25
**inspectors** 495:6
501:4
**instance** 327:7
338:22 356:17
372:15 393:10
428:8 446:21
497:24
**instances** 335:12
351:9
**instructed** 275:9
424:20,22
**instruction** 390:5
390:8 424:24
**intake** 493:6
**intended** 270:23
**interact** 303:7
**interactions**
290:12 291:24
302:25
**interchangeably**
278:6
**interested** 507:13
508:10
**interoffice** 269:19
**interpretalk**
303:15,21,22,23
304:1,10
**interpretation**
304:1,18
**interrupt** 338:3
398:3 428:1

**interrupted** 398:1
**interview** 489:12
489:14,16,19
498:13 500:11
**introduce** 281:17
282:11 313:23
331:17 355:2
369:1 372:23
381:17 402:24
449:17 452:13
461:6 480:18
**introduced** 271:15
275:18 306:11
352:17 381:20
**introduction**
274:2 320:1
**investigated** 431:6
431:23
**investigation**
408:23
**involve** 291:24
303:3,4 385:4
399:5
**involved** 290:12
459:8,10,16,20,23
**isp** 269:13
**issue** 362:7,8
365:10 366:10
367:25 368:1
374:16 381:13
426:22 447:18
448:25 465:14,16
465:20,21 466:8
466:14 471:13
476:2
**issued** 359:15,15
418:12 445:25
458:17 465:22
467:22
**issues** 302:16,18
302:19 374:15,18

458:4,5 502:9
503:5,8
**issuing** 445:19,23
**it'll** 443:2 498:1,2
**item** 439:22
441:14 447:1,4
453:25
**items** 325:16,18
404:24 440:16
466:4 468:2
493:16 498:2

**j**

**jackie** 265:10
271:10
**jackie.aranda**
265:15
**january** 464:24
467:23
**jelly** 450:7
**jennifer** 356:5,21
382:9,11 383:4
**jessica** 266:4
271:10
**jeverettgarcia**
266:9
**job** 263:22 281:6
285:24 286:12
289:15,23 290:1
307:24 309:10
318:4,5 321:13
326:24 342:25
352:24 357:14
379:7 408:1
412:23 413:18,18
415:15 423:22
424:6 427:11,21
428:17 429:6,7,17
432:16 433:10,13
435:19 454:24
487:8

30(b)(6) Marquita Crawford, Vol. II     August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

**[jobs - know]**      Page 22

**jobs** 289:10 290:3 379:1

**johns** 411:16,18 414:14,22

**join** 310:24 363:4 395:19 417:16

**jonathan** 266:19

[blacked out]

410:1 412:8 422:14 424:25 441:17,22,23 443:21 452:2 453:9,11,17 463:4 467:5 471:16 501:18 502:20

**keeping** 339:8 380:21

**keeps** 439:24 440:2

**kept** 353:22 442:8 443:9,12 460:21

**key** 302:6

**keysler** 263:5 268:8 281:12 282:4 404:16

**kind** 303:9 311:24 328:6 387:2 395:6 401:15 402:18 437:8,24 444:6 447:10 454:15

490:4

**kinds** 324:8 437:25

**kitchen** 269:3,5 280:10,17,25 281:3,6,10 283:8,9 283:10 290:4 292:11,18 294:7 294:20,20,21,21 294:22,23 295:1,2 295:5 299:15,16 299:19 302:11 304:9,16 305:18 305:19,23 306:3 308:23 309:2,12 309:16,19 310:16 310:21 311:4,7,8 311:10,14,23 312:22 313:9,18 313:20 316:6 318:17,20,24 319:6 321:25 322:16,20 323:3 327:11 329:2,8,14 330:3,10,15 332:17 335:7,10 336:2,8 337:5,6 340:3 342:11,18 343:8,15 344:15 344:19 345:19 346:11,13,17,19 346:20,22,24,25 347:3,14,17,22,25 348:9,20,24 351:8 351:20 353:9 356:9 357:17,21 357:24 358:18 359:1,5 360:1,11 360:12,17,18,22 361:1,2,15 362:1,3 362:14,17,22

363:16,19,22 364:4,7,9,19,25,25 365:16,20 367:11 367:16 368:11,17 368:24 369:11,14 371:2,3 373:25 374:4,7,7 375:24 376:10,16,20 377:5,6,11 378:4,5 378:10,23 379:13 379:15,25 380:3,5 380:6,9,11,15,18 380:21,23 381:3 384:21,21 386:3,4 386:6 388:14 391:10,15 393:23 394:11 397:8 402:7,10 404:11 404:16,23 407:16 407:19 408:11,14 408:18,19,20,21 409:12,15,21 410:9,10,15 413:24 414:17 418:2,5,9,15,24 423:21 425:21,22 426:4,5,6,10,16,17 426:18,20 427:10 427:13,19,23 428:4,5,11,12,14 428:14,20,21 429:24 432:17 434:4,7,22 435:10 435:21 436:2,3 437:20 443:10,17 443:22 444:20 445:3,20 446:1,2,3 454:11,23 458:6,7 458:16 459:13,13 459:18 462:7 463:1 465:24,25

473:6 476:15 478:10,11,13,15 481:25 491:5 493:7,10,11,13 498:16

**kitchen's** 323:1

**knew** 362:7 466:4

**know** 275:14 277:14 279:5,24 280:1,24 281:1,12 282:8 283:10 285:23,24 286:12 286:15,17,19,19 291:1,4 294:10 295:23 296:24 297:1,17,20 298:1 298:4,13 300:6 304:20 309:24 311:2 312:11 313:5,8,15,17 317:6,11 318:1,8 320:7 321:6,9,13 321:24 322:7,20 324:22 329:19,24 331:2 334:5,9 339:6 340:8,9,10 341:24 342:22,25 343:14 344:8,11 345:13,15,18,21 346:5,7 347:24 348:19 352:4,15 352:21 353:7,11 353:14 354:11,11 357:12,19,19,23 359:12,12,14,15 359:19 362:5,6,7 364:5 366:1,11,12 366:14,17,17,20 367:10,13 368:4 368:13 370:19,20 370:21 371:6

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

**[know - listed]**                                        Page 23

372:8,20 374:1
375:3,4,17,25
376:5,8,12,13,18
376:23 379:5,6
382:11 383:8,24
384:4,6,7 388:9
389:1,2,9,10,11,12
389:24,25,25
390:11,12,19,22
391:15,16,20,21
394:20,21,22,24
395:1,2,7,7,8
396:6,8 399:9,15
399:16,17,18
400:15,17 401:2,9
401:11,13,17
403:18,21 405:1,1
405:23,23,24
406:3,7,8,17,19,20
406:22,24 407:14
407:22,25 408:16
408:21,22,23,24
408:25 409:1,1,2,3
409:4,11,19,19
410:10 413:21
416:12,18,19
417:19,20,21,22
418:9,14,17,17
419:3,3,6,7,19,21
422:25 426:5
430:2,6,16,20
431:5,13,21,22
432:4,7,9 435:5,20
437:13 439:4,17
440:1,13 445:2
448:10 454:1,10
455:8,10 456:12
456:25 457:1,9
459:19,21 460:10
463:2,5,23 464:1,2
464:3,5,7,10,11,12

464:13,15 465:23
468:13 469:2,14
470:21,23 471:6
472:14,17,22
473:15 474:5,15
474:17 475:19,19
475:25 476:13,18
478:7,16,17,18,19
478:21,21 479:6,6
479:7,8,11,12,13
479:15,16,17,24
480:1,4,13,16
482:13 483:20,23
484:1,19,23
488:10,15 491:8
491:10,11,19,24
492:4,5,8,12,12,13
494:14 495:13
497:16 499:8,9,20
501:25 502:16
503:4,6,7,12,15
**knowing** 303:4,5,7
**knowledge** 277:2
277:3 283:8 286:1
395:11 409:7
410:17 474:25
481:22 492:1
507:8 508:4
**known** 389:13
501:3,9
**kosher** 490:3
493:17 495:22

**l**

**l** 266:4
**labeled** 470:5
471:8
**labor** 343:8,14
344:6,8,14 346:15
347:21
**lack** 348:2,3,14
471:13 485:14

**lancara** 361:12
362:6 363:13
**lane** 444:8
**language** 287:15
303:25 391:12,14
391:17,25 435:7
**languages** 391:18
435:3,5
**large** 409:22
**late** 369:23 370:13
**law** 264:5,12,19
265:5,12 274:11
493:7
**laws** 270:25
**lawsuit** 277:11
279:1,5,9,15,19,22
**leap** 448:22,24
**learn** 279:9,15
**leave** 357:14 365:6
366:4 367:11,12
367:16 425:24
426:18 428:5,11
428:18,19,20
429:10 444:20
446:1,2
**leaves** 366:8
367:20 427:22
428:3 445:3
**leaving** 367:6,8,9
367:9 426:5,6,10
427:13 429:24
**lee** 271:11
**left** 318:1 353:6
360:14 425:21
426:4,16,16
428:12,14,22
484:8 493:19
497:5,18
**leftovers** 360:23
362:14,19

**legal** 278:22
509:23
**legally** 287:22
**length** 327:20,25
**lengthy** 328:4
**leonora** 267:11
**leshak** 334:22,24
**letting** 408:25
470:25 497:15
**level** 303:8 375:22
**library** 493:7
**lieu** 493:20
**lieutenant** 437:15
437:18,21
**light** 402:22
**lighting** 402:15
**lights** 325:8
**liked** 501:2
**likes** 404:17
**line** 271:14 284:9
290:5 314:7
339:15 360:14
362:16,17 363:15
363:18,21,21
365:17 366:5,9,22
368:3 389:5 403:8
412:1,7,8,16
438:20 441:4,10
441:14,15 448:8
466:19 510:4,7,10
510:13,16,19
**liner** 453:4
**lines** 365:6 441:3
472:16
**list** 358:25 359:5
443:2 447:12,12
447:15,17,18,19
447:20 448:1,2,6,9
**listed** 276:10
285:18 293:18
314:6 462:2 472:2

[listed - mailed]                                    Page 24

495:21 500:15
**listen** 494:21
**lists** 471:23
**litsup** 509:15
**little** 343:6 369:18
374:8 380:8
402:17,21 421:1
469:12 472:8
477:12,17
**llc** 266:18 267:2
270:10
**llp** 265:18 266:6
266:20
**loaves** 498:18
**located** 291:14
**location** 263:18
330:11
**lock** 394:17,23
395:2,2,6
**locked** 394:16,24
395:1
**log** 351:20,21
352:3,20 353:22
441:19,25 442:1,4
442:20 443:16
444:17,19 447:2
460:14,20,22
**logs** 441:17,25
442:6,7,24 443:8
444:1,9,13 488:19
**long** 267:13 284:2
284:17 288:5,10
288:21 290:24
291:16 297:11
312:5 331:4
336:23 347:2
349:6 350:14
354:18,21 402:2
493:19 497:5,18
**longer** 298:9
333:18

**look** 303:5 309:20
312:23 320:21
332:12 340:22
355:22 358:21
364:21 389:6
406:10 421:4,6
444:5 457:23,24
479:12 499:23
500:1
**looked** 285:16
352:21
**looking** 398:10
408:2 437:6
457:21,21 462:2
500:10
**looks** 328:11 356:5
377:23 378:13
382:9 398:9
410:18 440:9
454:14
**loose** 440:11
**lot** 289:13 301:12
301:13,20 302:7,9
303:10 304:8
328:5 341:22
345:15 390:10
391:19 392:17
397:20 472:19,20
478:14,20 479:11
486:17
**louis** 267:7
**louisiana** 291:14
**love** 266:13 274:5
285:13
**low** 311:6,9 374:6
**lower** 319:19
374:8
**luis** 317:10,11,17
317:20 332:1,17
373:20 374:5
387:15 388:3

389:18,19
**lumpkin** 263:20
270:13 277:23
481:13
**lunch** 354:19
360:20 363:20
385:18 481:19
**lyles** 287:5,19,20
318:16 383:8,9
388:19,21 389:21

**m**

**m** 272:1 290:21
**ma'am** 271:18,22
272:7 273:23
274:7 301:15,19
326:13 335:16,19
341:12 348:4,6
355:17,19 358:7
373:8 381:9 383:2
385:19 398:11
405:17 411:5
418:21 422:3
424:8 434:13,15
442:15 456:17
469:16 483:1
496:22 504:3
**machine** 383:15
**mack** 321:5,7
**mail** 268:10,11,12
268:13,14,15,16
268:17,18,19,20
268:21,22,23,24
269:8,20 314:5,6
314:10,22 315:2
315:13,22 316:1,2
316:3,3,4,6,11,13
316:16,18,20,24
317:1,7,10 318:3,7
318:15 320:4,6,9
320:11,20,22
321:5,15 322:8

326:4,5,8 331:25
331:25 332:3,6,13
332:18 333:25
334:21 335:5,13
337:15 340:1
355:10,12,13,21
355:25 356:1,4
358:6,14,15,16
361:12,16 363:11
369:9,12,16
370:11,24,24,25
373:6,7,11,14,15
373:16,20,22
374:16,19,25
377:20 378:1,6
379:18 382:8,8
383:5,20,23 384:6
387:13,13,14,15
387:16,20,23,24
388:8,11,13,21
389:2,17,18
390:17 392:2
393:10,14,15
394:13 403:6,8,9
403:10,13,15
404:6,10,20,22
405:4 406:13,20
406:21 408:23
409:1,3,8,9 411:14
411:16,22 414:11
414:11,22 415:3,7
423:6 448:19
456:4,7,8,10 457:6
457:9 458:3,5,7
459:5 460:7,9,19
460:21,22,25
463:3 464:11
**mail's** 370:10
**mailed** 386:8,10
386:11,12 423:15

Case 4:18-cv-00070-CDL Document 383-1 Filed 09/27/23 Page 275 of 300
30(b)(6) Marquita Crawford, Vol. II August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

Page 25

[mailing█████████

mailing 389:19
mails 314:14,18,24
  320:10 356:2
  388:5 394:14
  407:3 457:2,4,10
  457:12,16 458:9
  458:10,15,18,19
  458:23,24 459:4,7
  461:3
maintain 454:19
maintained 445:8
  454:22
maintains 454:9
maintenance
  380:13,17
making 289:18
  323:13 374:11
  431:3 437:8 467:2
  493:10
management
  302:25
manager 351:18
  411:19 478:12
  488:1
managers 351:15
mandated 298:14
  298:19
mandatory 301:9
  301:11
manilla 352:24
manner 271:1
  417:24 431:4
margarine 450:6
mark 280:3
  312:23 319:25
  361:6 372:25
  387:6 402:25
  420:19 461:7
  490:11
marked 269:15
  275:20 280:4

281:18 282:12
306:12 314:1
320:15,16 325:23
325:24 331:19,20
337:9,10 355:4
358:11 361:7
369:3,4 373:1
377:16,17 382:2
387:7 403:1 411:7
411:9 414:3,5
420:20 432:20,21
449:18,20 452:14
452:15,24 453:16
461:11 480:19,21
490:13 492:17,19
marking 461:14
marquita 263:15
  271:19,25 272:3
  272:15 509:5
  510:2,24 511:2,4
  511:12
marrero 317:10
  317:11,17,20
  332:1,18 333:23
  333:24 334:17
  335:22 373:20
  374:5,14,19
  375:25 387:15
  388:3,10 389:18
  389:19 390:17
  391:17
marrero's 332:13
matter 270:10
  272:13 279:21
  282:5 312:3,4
  463:17
matters 407:23
matthew 321:8,8
maurice 411:16,18
  414:14,21

meal 312:6 322:16
  323:4,6,17 324:16
  324:23 325:11
  332:14 333:2,15
  333:18,20 335:8
  336:4 339:24
  343:22 344:3
  351:9,12 363:17
  412:1 413:19
  417:9,23 436:23
  437:11,16,17,19
  437:20 438:2,4,8
  439:6,23 440:14
  442:10,24 443:9
  453:24 454:4,12
  454:19 455:9,13
  464:1 471:24
  472:2,4 477:15,16
  477:18 486:13
  489:8 495:22
  498:3,5 504:15
meals 369:25
  448:2 454:6,14,15
  455:4,6,7,15,17
  468:17 473:6
  476:16 478:4,25
  479:4 493:17
  495:22 504:10,11
  504:13,14,16
mean 279:7 30
  305:25 316:13
  322:23 334:6
  337:1 339:13,1
  341:19 346:3
  352:15 356:25
  371:9 375:2,14
  377:10,11 379:
  390:9 395:8,12
  397:21 398:18
  410:11 415:4
  416:14 426:3

428:1 436:25
  446:23 456:3
  459:12,20 460:4
  463:24 469:24
  478:14
meaning 390:22
means 271:2
  274:16 308:6
  311:9 321:20
  333:2 334:10
  395:2,9,10 405:2
  468:7,12
meant 333:20
  375:16 395:1
  406:25
measure 471:10
measurements
  438:15
meat 485:16,19
  486:5,15,16,23
meatball 486:16
meatballs 485:8
  486:18
meats 492:6
  500:16
mechanism
  493:18 497:5
media 489:7

**[        need]**

**mention** 296:10
  399:18 432:5
**mentioned** 272:12
  274:24 286:11
  343:17 345:6
  347:13 408:10
  409:9 444:21
**mentions** 356:8
**menu** 324:10,12
  324:17,18,19,23
  325:2,12,15,17,18
  343:25 440:17
  462:6,8 464:25
  472:2,3 473:4,5,5
  473:9,10,12,14,20
  474:4 475:21,22
  475:22,24 476:4,5
  476:19,21,23
  477:22 479:5,9,12
  484:11 500:15
**menus** 463:12,15
  476:6 489:3
**meredith** 264:4
  271:7 272:12
  283:12
**meredith.stewart**
  264:8
**message** 296:8
**met** 278:15 282:24
  283:2,13
**michael** 334:22,24

**microphone** 273:1
**middle** 263:2
**midnight** 451:2
**milestone** 465:12
  469:2,3,14,18
**milk** 468:19,22
  470:9 477:16
  481:24 498:21
**minute** 273:10
  324:23 377:24
  385:8 387:19
  421:4 472:13
  498:24 504:20
**minutes** 284:3,8
  284:18 354:19,20
  354:22 368:2
  441:9
**misconduct**
  404:13
**missed** 405:14
  482:24
**missing** 329:9,18
  333:1,19 338:23
  342:10 371:11
  471:25
**mississippi** 291:15
  291:16
**mix** 465:25 466:6
  466:10,12,13
  470:5
**mm** 310:5 316:12
  319:11 326:7,12
  338:20,21 341:9
  341:13 355:15
  356:7 364:2 370:3
  370:14 377:22,25
  378:9 385:22
  387:18 389:20
  414:13 422:2
  424:7 434:9 441:5
  442:13 474:13,13

**mo** 267:7
**moldy** 498:17,18
  499:9,19
**moment** 294:18
  344:21
**moments** 451:13
**monday** 263:16
  383:6 497:25
  498:5
**money** 304:25
  413:24 485:13
**monitor** 437:16
  442:10 476:7
**monitored** 438:22
**monitoring** 437:19
  438:4 439:23
  442:24 443:9
  476:24
**monitors** 437:12
**montgomery**
  264:21
**monthly** 326:10
  326:19,23 327:3
  335:10 371:25
  372:1
**months** 347:5,9,10
  347:11,12 378:18
  379:10,22
**morning** 270:2
  271:7,12 272:11
  362:2 450:12,14
  450:24 451:4,5,7
  451:12
**move** 421:6
**moved** 412:8,23
**moving** 328:10
  412:25 467:5
**moye** 321:5,7,8,8
  321:10
**multi** 461:19
  480:23

**multipage** 421:2
**multiple** 400:25
  487:13

**n**

**n** 264:1 265:1
  266:1 267:1 268:1
  270:1 290:21,21
**name** 270:2
  271:24 272:12,14
  272:18 274:3
  278:1 287:2,9,18
  287:19,22 414:21
  422:14 456:25
  471:19 477:7
  481:16 487:20
  500:14
**named** 279:24
  280:11 281:12
  282:4,8 421:24,25
  462:3
**names** 448:5
  481:14 485:2
**natascha** 507:25
  508:13
**national** 305:4,7
  305:10
**nationally** 463:15
**necessary** 386:4
  441:16,16 465:14
  511:6
**need** 274:23 275:1
  275:13 294:7,9
  295:6 310:2,4,16
  310:21 311:4
  313:6 316:17
  317:5 318:24
  319:15,22 323:16
  329:4 336:21
  350:5 370:20
  371:8 379:9 380:3
  383:8 403:9

**[need - officer]**

406:16,19,25
407:8,10 419:2
421:6 431:3 435:7
444:8 472:13
498:3,24 500:1
**needed** 316:16
318:17 319:1,9
357:19 368:18
379:5 402:22
412:21 430:7
**needs** 315:21
332:15 349:10
350:3 367:12
372:16 380:10
439:19
**neither** 491:12
507:9 508:5
**never** 276:3
296:24 313:15
343:12 344:13,14
371:7 375:4 425:4
430:17 446:16,21
465:1 482:15
491:23 501:19
**new** 265:20 438:19
441:14 450:14,20
450:22 451:5
456:9,16,23,24,25
457:1 480:17
485:10
**nice** 380:21
**night** 362:4 450:13
450:24 451:11
496:1
**nodding** 275:4
**non** 308:24 309:3
309:8,10,12,13,15
**noon** 332:14 333:2
**norm** 388:14
**normal** 319:8
356:16

**normally** 325:10
339:6 340:6,6,11
340:13 490:4
503:15
**north** 266:7
**northeast** 264:6
265:6,13
**notary** 263:21
270:5 506:24
507:16 511:13,19
**note** 440:24
509:10
**notebook** 435:18
435:20
**noted** 440:19
469:22 511:7
**notes** 460:12 493:3
498:12
**nothing's** 452:22
501:24
**notice** 274:10
276:2 285:16,20
365:23 366:2
455:20,23 456:7
461:2
**notification** 447:9
**notify** 340:9,17
448:3
**noting** 340:19
**november** 462:12
**number** 269:4,6
270:11 275:19
285:15,20 286:7
294:6 295:4
299:18 310:9,15
310:16,20,21
311:3 312:9 313:5
313:19 319:19,21
322:19,19,21,25
323:10,15 331:18
335:6 337:8

341:17 355:2,3
356:9 361:5,22
363:25 364:1
369:2 371:11,21
380:6 387:5
389:22 423:14
447:22 448:4,19
461:7 471:18
477:15 493:13
**numbers** 322:4
334:2,6 464:23
484:25
**nutrition** 463:16
485:14
**nutritional** 463:11
464:19
**nutritionally**
325:19 464:2
**nutritionist**
463:14
**ny** 265:20

**o**

**o** 270:1 272:1
290:20,21 471:19
**oath** 274:16
331:15 385:18
449:14
**oaths** 270:6
**object** 396:16
494:19
**objection** 270:18
271:22 275:11
302:22 310:23
348:12,16 363:3
365:11 375:11
395:18 396:19
405:6,12,15 413:4
417:15 425:25
426:12 427:16
429:12 501:5,12
502:23

**objections** 272:22
273:18 275:8
**objects** 484:12,21
**obligated** 274:17
**observe** 489:8
**observed** 491:2,3
493:17
**observer** 267:13
**obviously** 362:5
498:19
**occasion** 371:1
495:8
**occasionally**
401:19
**occasions** 295:11
**occur** 356:14
**occurred** 299:23
299:24 482:18
**occurrence** 393:22
426:9
**october** 411:16
471:21 472:9
474:18
**offer** 298:18
**office** 307:13
365:20 442:8
443:10 444:18
454:23 479:21
480:2,10,15 481:3
483:18 490:7,10
490:18,22 492:2
493:2
**officer** 270:3
294:21,21,23
295:2 338:12
340:21 351:3,20
353:9 366:25
367:5,13 368:11
374:11 386:3,4,6
401:16 402:7,10
410:10,10,13,15

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

**[officer - overlap]**                                    Page 28

420:2,8,11 423:2
423:12 424:17
426:18 431:8
437:20 443:21,23
443:23 445:4
456:13 459:19
460:9,10 465:11
469:15 473:11
474:3,3,22 475:15
478:1 479:17
485:10 486:12
506:25
**officer's** 463:11
469:1,8 473:17
**officers** 309:17,18
338:6,9 346:23
347:14,24 348:20
367:10 404:24
455:8 475:8,14
476:8,25
**official** 354:14
460:1
**oh** 280:22 281:21
309:4 320:14
321:10 323:7
324:23 325:2
340:23 373:11,13
375:18 381:24
405:13 429:5
430:22 447:2
448:7 452:11
456:25 473:25
477:6 493:23
494:5 501:15
**oig** 493:13
**okay** 272:16,20
273:6 274:9
275:16,25 276:2,8
276:21 279:24
280:2,13 281:9,12
281:15 282:1,14

282:21 283:19,21
283:24 284:7,14
286:1 292:9,17
293:15 296:6
298:10 300:18
310:11,15 313:23
314:5 315:10,21
316:8,19 319:24
320:13,19 321:1,4
322:12 323:8,16
325:2,21 326:4,9
327:15,23 328:10
330:12,22 331:1
331:24 332:23
337:7,9,15 338:5
338:22 340:16
343:6 345:18
346:9 348:13
349:3 350:22
353:24 354:4
355:1,9,24 356:1,4
358:5 359:8,19
360:7 361:4,12,22
362:21 364:22,25
365:12 366:5
367:20 368:22
369:20,21 371:1
371:11 372:15,22
373:24 374:4
375:18,21 377:9
377:14 378:6,24
379:18 381:7
382:1,5,23 384:9
384:24 385:7,20
387:22 388:13
389:17 390:2
391:4 392:1
393:18 394:5
397:16,20 398:12
400:12 402:23
403:6,12 404:8,9

404:10 405:25
406:9 408:5 409:5
410:24 411:5,14
413:5,25 414:8,10
415:19 416:7,15
416:23 418:14
419:9 420:6,10,17
421:14,20,21
423:4 425:17,17
426:8 427:22
428:18 432:24
434:1,6 435:12,25
436:11,17 442:14
442:14 444:3,9
445:21,24 446:2
446:19 448:4,24
449:3 450:2 451:6
452:8,11,11
453:17 461:5,10
461:23 464:22
465:7 466:15,21
467:6,10 468:4,10
469:1 470:10,17
471:3,16 472:7,25
473:16 477:4
478:25 481:8
484:3,4,24 485:1
492:15 494:19
495:10 496:13,24
497:17 498:10
499:15 500:4
501:13 502:14
503:22 504:6,19
506:3,4
**oms** 352:19
**once** 284:7 312:12
334:4 341:20,20
341:21 342:9,9
351:7 368:10
401:11 404:25
407:20 410:2,16

416:25 445:21
**ones** 450:20,22
489:10
**ongoing** 333:6
343:18 346:2
366:10,22 367:25
368:1 409:22
**online** 273:17
**open** 327:25 328:6
**opening** 426:18
**operations** 290:17
**opinion** 406:5
417:2
**options** 375:24
**order** 376:9,19
388:18 425:22
446:17 500:1
505:18,20,22
506:5
**ordered** 498:17
**ordering** 289:18
**orientation** 289:20
289:23 346:18
359:2 366:16,19
409:18 435:1,14
435:17 436:1,4,5,8
**original** 370:25
498:23
**originally** 433:18
433:21
**osorio** 271:10
**osorno** 265:10
**outcome** 507:14
508:10
**outside** 270:16
298:19 319:7
343:9 354:12,20
427:19
**overbroad** 365:11
**overlap** 294:3

30(b)(6) Marquita Crawford, Vol. II                          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

**[oversee - performing]**                                    Page 29

oversee 289:8
overseeing 290:16
oversight 269:13
overtime 298:22
  299:1,6,6,7,10
  300:2,15,15
  304:21,25
owns 383:24

**p**

p 264:1,1 265:1,1
  266:1,1 267:1,1
  270:1
p.m. 293:3,9,10
  383:8 385:10,13
  427:1,4 449:6,9
  453:15 484:8
  504:22,25 506:12
  506:14
p.o. 264:13
packaging 498:23
packet 359:3
  360:6 433:10
  450:7 464:23
  471:17 477:7
  481:2,5
packets 450:7
  466:6,7,8,14
  468:20,21 469:25
  470:2,8
page 268:2,6 269:2
  276:9 361:22
  365:4 422:8,15
  423:6 424:15
  434:3,6,10,17
  461:6,19,20 477:5
  480:23,24 481:9
  481:11 484:24
  490:24,25 493:8,9
  498:11,14 500:7
  510:4,7,10,13,16
  510:19

pages 421:3,7,21
  421:22 434:2,20
  435:9 498:11
  500:7
paid 286:24
  298:16 311:16
  343:9,15 344:6,9
  344:12,14 346:15
  413:23
paint 378:10,17
  379:25
painted 378:5,19
  380:4,6
painting 379:25
  380:7,7,8,10,11,18
pan 438:18,19
pandemic 270:14
  299:18,23
pans 384:10 412:9
  412:17
paper 324:3,3
  327:13,14 339:15
  352:24 443:12,14
  475:23
paperwork 290:5
  436:8 473:8 476:1
  476:2,22
paragraph 369:22
  370:4 373:25
  374:4 375:6
  472:11 473:2
  481:16 493:12
  498:15 500:10
part 274:20
  286:12 305:18
  306:3 307:12
  342:25 360:6,17
  366:16,19 372:4
  379:2 380:20
  392:11 393:5
  396:8 424:6

448:22 466:15
  472:4 489:22
  490:2 491:16
partially 425:1
participant 270:15
participate 307:18
  487:12
participating
  487:9
particular 327:7
  369:14 374:16
  431:13 462:18
  463:22,23 464:7
  477:9 483:4 485:3
  492:1 499:2,4,5,16
  503:18
parties 270:15,19
  507:10,12 508:6,9
pass 445:5,18
passing 445:23
paste 370:11
pasted 369:13
pattern 292:12
pause 494:5
pay 297:14 298:22
  299:1,6 304:24
  351:19 419:7
paying 298:1,10
payments 304:21
pays 300:15
  304:20
pbnds 305:9,13,21
  305:23 306:1,7,14
  307:7
pc 450:7,7 466:6,7
  466:8,14 468:20
  468:21 469:25
  470:2,8
pdf 498:11,12
  500:7

peachtree 264:6
  265:6,13 266:21
people 284:15
  287:20 292:17
  294:1,10 295:13
  295:13,18 296:23
  297:2 303:20
  310:17,22 313:15
  319:2,19 328:5
  336:24 337:5
  342:22 391:7
  401:1 404:18
  405:21 406:4,7
  412:2,25 419:10
  457:4,10,17
  458:21 459:9
  461:25 466:23
  467:7 469:19
  479:12 480:7,14
  481:4 483:24
  484:19 486:17
  489:16
people's 376:5,8
peoples 461:3
perceive 399:22
perceived 395:16
  395:25
percent 328:25
  329:4 334:4,4,5
perform 286:22
  305:18 377:4
  379:19 380:14,16
  407:24 436:17
  462:8 487:18,23
performance
  305:3,7,10 419:5
performed 298:22
  379:23 380:1
performer 407:25
performing 412:7

Case 4:18-cv-00070-CDL Document 383-1 Filed 06/27/23 Page 280 of 300
30(b)(6) Marquita Crawford, Vol. II            August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

[period - practice]                                    Page 30

| | | | |
|---|---|---|---|
| **period** 278:12 363:17 453:9,11 | 371:9 | **planned** 322:17 323:4 438:16 472:4 | 458:14 |
| **periodically** 353:11 | **photo** 268:7,8,9 269:3,5 | **planning** 399:8 | **portion** 362:4 363:10 370:12 472:8 477:9 |
| **perkins** 265:18 266:6 | **phrase** 397:20 | **plate** 440:22 445:14 | **portions** 361:25 361:25 362:2,8,12 362:15,23 437:24 |
| **perkinscoie.com** 265:21 266:9 | **physically** 353:24 | **plated** 443:18 445:14,15 | **portrayed** 424:22 |
| **permission** 372:12 372:13 421:10 | **pick** 467:4,18 468:16 471:1 | **plating** 445:22 | **position** 291:4 327:19,24 413:22 428:3,22 473:16 474:2 |
| **permitted** 270:23 428:25 | **picking** 467:1 468:1,2 | **play** 488:2 | **positions** 288:25 290:8,11 294:4 412:19 425:24 |
| **person** 280:6,9 281:23 282:15 283:14 293:22 296:1 329:18 330:15 337:2 349:18 367:19 368:14 391:6,7 393:16 410:14 427:23 428:4 438:4 444:17 446:5 456:11,12 460:10 463:3 479:18 488:3 498:15 500:12 | **picks** 443:22 | **plc** 266:13 | **positive** 345:25 467:20 |
| | **picture** 280:11,14 282:3,5,17,18 404:15 449:25 452:18 482:10 | **please** 271:6,23,24 272:14 274:3,22 275:16 276:8 281:21 383:6 394:15 420:25 457:23 462:6 471:5 481:9 493:23 494:3,20 505:20 | **possible** 274:18 300:3 322:3 339:13 375:5 474:8 475:22 477:13 491:15 |
| | **pictures** 404:11 | **plug** 445:10 | **post** 347:25 |
| | **piece** 435:22 | **pod** 374:11 | **posted** 364:24 442:6,7 |
| | **pieces** 484:9,17,20 | **pods** 444:23 445:1 445:2 | **posts** 348:21 |
| | **pink** 485:9 | **point** 323:8,13,19 500:17 | **potentially** 407:12 407:15 482:7 491:1 501:10 |
| | **pinto** 482:11 483:21 | **policies** 419:11 | **pots** 384:10 412:9 412:16 |
| **person's** 437:14 460:19 | **place** 301:1 325:9 367:15 430:11 431:7 445:16 457:3 497:10 505:19 | **policy** 269:18 350:20,22 368:7 393:13,19 394:22 415:20,22,25 418:15,18 429:11 429:15 | **poundage** 498:2 |
| **personal** 277:2 303:8 | **placed** 395:17 396:1,7 471:8 | **poor** 419:4 | **pouring** 485:8 |
| | **places** 307:8 | **pop** 381:20 | **poverty** 264:5,12 264:19 265:5,12 |
| **personnel** 493:13 | **placing** 505:18,22 506:5 | **population** 302:17 303:1 310:14 311:4,5,8 313:13 345:24 349:12,15 374:6 375:3 396:10 450:4 | **powerpoint** 308:3 308:4,8 |
| **perspective** 311:12,21 | **plaintiff** 279:24 280:12 281:12 282:4,8 421:24 | | |
| **persuading** 400:1 | **plaintiff's** 267:11 | | **practice** 306:2 359:9,23 360:10 360:21 362:13,22 366:7 415:13 |
| **peter** 279:16 | **plaintiffs** 263:9 264:2 265:2 266:2 271:8,8 272:13 505:5 | | |
| **phoenix** 266:8 | | | |
| **phone** 283:17,22 283:25 284:4,15 304:3 340:11,13 359:9,14,16,18,20 360:1 370:22 | **plan** 325:5,9 398:2 398:14 | | |

**[practice - pull]**    Page 31

| | | | |
|---|---|---|---|
| 417:25 418:7,10 425:24 426:11 427:14 | **pretty** 334:19 338:13 416:3 431:19 496:10 | **proceeding** 263:18 270:4,22 278:23 506:15 508:2 | **provide** 301:3,6,8 301:21 302:1 308:9 361:1 |
| **practices** 359:25 | **prevent** 336:4 | **proceedings** 507:1 507:3,4,7 508:4 | 435:25 436:23 443:25 444:9,12 |
| **pre** 302:2,4,12 | **previous** 468:7 493:18 504:9 | **process** 340:2 388:20 419:17,20 | 463:5 477:18 485:11 488:5 |
| **prea** 301:14,17 489:5,6,11 | **previously** 269:15 271:15 275:18,20 | 419:24 436:20 438:11 439:12 | 501:20,21 |
| **preannounced** 488:7,8,9,12,13,14 488:16 | 287:5 292:4 306:11,12 315:10 | 447:6 458:10 460:1 500:19 | **provided** 308:2 400:12 434:21,24 |
| **predecessors** 278:11 | 320:14,16 432:20 432:21 467:6 | **processing** 458:8 | 435:9 436:3,6,8 463:18 469:24 |
| **prefer** 272:17 | 470:14 | **produce** 376:9 435:7 491:4 | 471:9,22,24 478:4 485:14 |
| **preference** 413:22 | **primary** 290:16 391:11,24 | **produced** 270:21 | **provides** 302:15 357:23 414:21 |
| **preferring** 439:6 | **printed** 476:3 | **product** 451:18 | 447:19 |
| **prep** 443:6,6 452:24 453:2,12 453:15,16,18,25 | **prior** 283:22 288:7 288:16 478:5 482:3 507:3 | **production** 290:6 443:1,2,7,8 | **providing** 300:22 359:20 470:2,11 470:14 |
| **prepackaged** 325:17 | **prison** 301:17 | **productions** 442:25 | **provisions** 306:7 |
| **prepare** 283:4,6 283:11 286:3 383:9 452:1 504:15 | **proactive** 375:7 | **products** 324:3,4 339:16 452:7 497:16 | **public** 263:21 270:15 506:24 507:16 511:19 |
| | **probably** 296:22 300:4 352:14 455:5 474:16 495:12 | **professional** 424:25 431:4 | |
| **prepared** 276:18 285:17 412:1 437:9 439:9 441:8 441:23 442:1 443:4 508:1 | **problem** 319:5,7 333:5 374:7 399:2 417:3,5,8 482:15 494:7 | **professionalism** 424:22 431:2 | **published** 462:9 491:21 |
| | | **program** 269:18 279:3,8,8 285:24 | **puddle** 496:11 |
| **prepping** 452:23 453:24 | **problematic** 407:12,15 | 286:9,13,16,21,23 289:8 290:13 | **puddles** 493:14 496:9,10,14 |
| **presence** 270:17 | **problems** 491:2 | 291:20,21 306:24 308:5,10,14 | **pull** 275:17 280:2 281:20 282:21 |
| **present** 267:10 277:11 294:18 356:13,23 491:11 495:9 | **procedural** 270:24 | 358:18 368:21 379:1,3,8 395:17 | 306:10 319:24 325:21 330:22 |
| | **procedure** 478:10 479:6 | 395:25 396:1 397:14,25 419:2,3 | 337:7 358:2,5 361:4 372:22 |
| | **procedures** 478:3 | **properly** 417:23 | 377:1,14 381:14 387:4 402:14 |
| **presented** 495:4 | **proceed** 272:8 273:15 296:17 | **protection** 308:17 | 406:9 408:6 |
| **presumably** 451:11 466:22 483:16 | 331:11 345:2 385:13 427:4 449:9 504:25 | **proven** 465:12 469:8 | 410:24,25 413:25 414:1 420:17 432:19 438:18 |

30(b)(6) Marquita Crawford, Vol. II     August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

**[pull - recall]**                          Page 32

452:12 480:17 482:10 490:9 492:16 497:12,15 497:17,21,22,22
**pulled** 320:3 347:25 348:21 394:16 446:11 498:7
**pulls** 446:13 497:12,15,24
**punch** 353:1,21,24
**punish** 394:20
**punishment** 413:1 413:13,15,17,20
**punishments** 397:5,11
**purchasing** 289:9
**purposes** 274:11 453:18
**pursuant** 274:10 276:6 368:7
**push** 467:20
**pushing** 334:3 468:24
**put** 322:12 324:16 325:9 330:1 360:15 364:12 368:19 375:8,10 375:15,16 395:12 417:23 438:19 441:14 444:8 451:17 453:13 465:24 466:5 493:25 494:10 497:23 498:6
**putting** 368:22 369:25

**q**

**qa** 444:6 487:13 487:16 488:22,25 490:3

**qualified** 463:14 507:5
**quality** 289:9,19 290:9 436:13,17 436:21 455:24 456:2 457:17 499:12 502:10
**quarantine** 346:1
**quarantining** 345:10
**quarterly** 487:22
**question** 272:23 273:17,19 274:20 274:21 275:9,15 292:5 300:14,15 300:18 302:24 309:9,10 315:11 324:14 343:6 348:11,16,19 362:21 363:6 392:1 393:3,18 395:4,10,22 396:22 397:10,18 397:24 406:2 408:7 409:5,8 413:13 416:7 418:14,22 426:9 427:7,12,25 429:2 439:10 451:6 458:2 459:23 472:18 474:1 494:2,3,7,21,22,22 496:13 498:25 499:15 500:4
**questions** 275:2,10 277:10 292:9 334:9 373:25 387:20 488:5 505:6,10
**quite** 458:2

**r**

**r** 264:1 265:1 266:1 267:1 270:1 272:1,1,1 290:20 290:21 510:3,3
**raise** 271:23
**raised** 365:10 465:17 502:17,20 503:5,8
**raising** 501:3
**ramon** 263:6 281:13 282:4
**ran** 447:3
**rapid** 346:3,9
**rate** 301:17 328:11 328:12,22,25 329:3,17 335:9
**rates** 297:14
**raw** 485:16,19 486:5,23
**ray** 266:14
**reach** 338:15 370:21 371:9 464:10
**read** 274:2 320:24 332:19 369:18 387:19 421:19 472:8 477:12 493:24 494:24 509:9 511:5
**reading** 398:9 422:11 472:7,11 475:21,25
**reads** 364:3
**ready** 272:8 296:17 325:16 331:11 345:2 379:6 385:13 427:4 449:9 472:14 504:25

**real** 335:13,21
**realize** 336:13
**really** 283:10 322:22,23,24 357:12 389:14 438:14 462:5
**reask** 348:16
**reason** 338:14 339:11 344:8,10 347:16 386:11 409:1 415:23 417:20 422:12 509:11 510:6,9,12 510:15,18,21
**reassign** 412:4,11
**reassigned** 412:1 412:10,19
**reassigning** 411:23 413:12
**rebecca** 264:11 271:9
**rebecca.cassler** 264:15
**recall** 281:7,16 282:10 300:3 308:18 320:23 326:15 332:17 333:9 334:20 338:13 349:7 350:19,25 355:25 356:17,19 358:20 359:11 369:17 373:23 375:2 383:18 387:24 388:10,23 400:25 403:15,19 415:4 423:24 425:19 426:8 462:18 463:21 465:15 468:24 475:4 477:24 482:5,8,17

**[recall - relative]**           Page 33

483:8,22 484:16
490:5,8 491:13
492:3 501:17,22
503:18
**recalling** 483:19
**receipt** 454:15
509:18
**receive** 298:13
299:1,6 302:8
305:6 306:19,22
307:4,7,15 308:13
308:16,19 314:18
355:21 360:11
361:18 362:2,3,10
365:23 396:9
400:2 420:6
435:13 446:3,6,9
455:20 456:7
457:12,16 458:19
461:2 462:21
463:7 483:7
484:13 485:14
500:21
**received** 366:1
407:2 419:10
458:20,22 462:16
480:13 481:13
482:6 484:6
485:18,24 486:5
502:5
**receives** 447:14
**receiving** 400:20
462:18 483:8
484:16 500:20
**recipe** 439:7,20
440:13,14
**recipe's** 439:18
**recipes** 438:15,16
439:8
**recipient** 314:14

**recognize** 275:25
280:6,17 281:23
281:25 282:2,14
449:25 452:18
461:21,22,24
500:17
**recognized** 463:15
**recollection**
280:14 282:6,19
284:20,23 389:23
404:19 480:10
486:4 502:1
503:24
**recommendation**
375:21
**recommending**
375:25
**record** 270:4,7,19
271:6,24 272:14
273:8,10,12,13,14
275:1,3,8 296:11
296:13,15,16
331:5,7,9,10
344:21,23,25
345:1 354:23
358:7 382:25
385:8,9,11,12
426:23,25 427:2,3
443:18,22 449:4,5
449:6,7,8 486:22
486:25 487:4
504:20,21,23,24
505:3,14 506:11
507:7 508:3
**record's** 428:2
**recorded** 271:1
507:4
**recording** 270:21
507:6 508:2
**recreation** 493:7

**recruit** 368:23
371:2,4 375:7
378:16
**recruited** 379:7
**recruiting** 368:17
**redacted** 471:20
477:8 481:15,16
485:3,4,12 500:14
**reduced** 299:18
507:5
**refer** 277:21 278:9
**reference** 412:14
431:12
**referenced** 301:23
351:15 363:14
404:20 423:13
435:8 436:5 509:6
**references** 318:15
469:2
**referencing** 411:2
471:22
**referred** 370:4
434:20 442:11
505:4
**referring** 277:10
277:22 278:7
285:15 305:10
334:23,24 432:1
468:10
**refers** 334:8
**reflect** 334:3
**reflected** 392:5
**refresh** 280:14
282:5,19 284:22
389:23 480:10
**refreshed** 284:19
450:18
**refrigerator**
493:15
**refrigerators**
491:5

**refuse** 368:4
374:10 415:20
**refused** 414:18
415:10,24 416:8
416:12,17,24
417:3,14 424:21
485:11
**refusing** 374:23
397:2 418:11,19
**regular** 352:23
364:24 379:3
412:14,15 413:1
413:12 415:14
**regulations** 436:3
**reheat** 441:15
**reheated** 438:19
**relate** 420:14
456:2 462:22
481:5
**related** 279:3
285:21 302:16
308:8 377:12
378:2 381:15
419:13 420:7
423:11,17,24
425:11 436:1
455:21,24 456:7
457:18,19 458:4,6
459:8,15,16,24
460:2,16,19
465:17 474:23
475:8,14 476:10
480:6 482:6
483:14 484:17
485:15,18 487:1,5
502:21 507:9
508:5
**relates** 286:7
**relative** 507:11
508:8

**[released - required]**                                            Page 34

| | | | |
|---|---|---|---|
| **released** 313:15 | 373:9 395:22 | 448:24,25 460:12 | **reporting** 330:8,9 |
| **relevant** 277:10 | 458:2 | 481:12 484:5 | 330:13 334:20 |
| 278:12 | **repeatedly** 410:3 | 485:1,3 490:11,18 | 337:23 354:2 |
| **relies** 493:21 | **rephrase** 304:24 | 490:21,24 491:2 | 356:5,21 361:14 |
| **relieved** 365:8 | 415:23 418:22 | 491:22,23 492:10 | 369:22,24 370:13 |
| 366:5 | **replace** 439:22 | 499:9 500:11 | 374:15 410:6,13 |
| **religious** 463:13 | 498:4 | **reported** 263:21 | 410:14 415:10,19 |
| **relive** 365:6 | **replacement** | 335:21 337:21,25 | 415:21,24 416:2 |
| **rely** 478:19 | 330:20,21 | 338:23 339:11 | 474:22 481:16 |
| **remedied** 470:3,4 | **reply** 420:1 | 353:15 402:2 | 493:11 |
| 470:10 | **report** 269:9,12 | 409:23 416:3 | **reports** 289:11 |
| **remedy** 471:11 | 301:13 312:17,19 | 448:16 486:11 | 368:7 386:22 |
| **remember** 358:21 | 312:21 326:11,20 | 501:17 | 387:2 416:23 |
| 358:21,24 359:14 | 326:22,23 329:16 | **reporter** 270:2 | 417:13 498:16 |
| 359:16 383:9,11 | 330:4 334:12,15 | 271:17,21 272:7 | 503:11 |
| 383:18 388:7,9,25 | 334:17 335:10,10 | 273:3,7,11,14,23 | **represent** 280:11 |
| 389:1,5,6,15 407:5 | 335:13 336:20,24 | 274:1,6,24 275:3 | 282:3,17 480:5 |
| 407:7 426:4 465:6 | 337:3 338:3 | 296:9,13,16 | 481:1 490:20 |
| 468:14,15 470:22 | 339:18 344:19 | 301:15,19 319:12 | **representative** |
| 470:25 472:22 | 345:19 346:8 | 326:13,16 331:7 | 270:9 276:12,22 |
| 478:21 482:9 | 352:2 353:5 | 331:10 335:16,19 | 277:2 |
| 484:15 485:23 | 357:20 365:8 | 341:10,12 344:20 | **request** 296:21 |
| 495:2 499:24 | 366:6,8,11,24 | 344:23 345:1 | 322:23 380:14 |
| 500:24 | 367:2,7,17,23 | 348:3,6,10 355:16 | 383:10,11 421:10 |
| **remembering** | 368:10,14 369:13 | 355:19 358:7 | 422:12 447:8 |
| 502:12 | 370:2,8 374:10,12 | 373:8,11,14,18 | 500:20 |
| **remind** 409:18 | 374:23 385:21 | 381:17,22 382:1 | **requested** 296:22 |
| 447:6 457:23 | 386:1,2,8,15,19,25 | 382:24 383:2 | 324:24 360:3 |
| **remote** 263:18 | 387:1 390:13 | 385:9,12 396:17 | 485:10 507:19 |
| **remotely** 270:16 | 391:8,9 392:11 | 396:19 397:19 | **requesting** 384:14 |
| 271:6 | 393:5,8 397:8 | 405:14,17 411:1,5 | 384:25 385:1 |
| **remove** 441:14 | 399:25 401:11,14 | 421:9,14 422:3 | **require** 392:15,19 |
| 496:23 | 401:16,23,25 | 424:8,11 426:21 | 392:23 428:25 |
| **removed** 419:5 | 402:1,4,6 405:3,5 | 426:25 427:3 | **required** 285:23 |
| 498:19,22 | 405:22 406:6 | 428:3 434:12,15 | 290:9 300:11,19 |
| **renda** 267:11 | 409:15 410:5,6,19 | 442:14 449:5,8 | 327:5 328:15 |
| 271:11 | 412:3 416:5,6,9,21 | 461:9 482:23 | 378:3 392:6,10 |
| **repeat** 274:23 | 429:18,20 431:3,3 | 483:1 504:3,6,21 | 401:23 416:8,21 |
| 277:17 284:21 | 431:18 432:1,4,7 | 504:24 505:9,13 | 416:23 417:12 |
| 301:10 304:23 | 439:23,24 440:2 | 505:17,21 506:4,8 | 441:6,22,23 |
| 308:25 342:14 | 448:11,12,15,23 | | 443:25 444:4 |

Veritext Legal Solutions

**[required - run]**

493:25 494:9
495:19 496:5
503:4,7,19 511:13
**requirement**
496:6,6
**requires** 328:16
328:21 330:4,14
505:24
**requiring** 415:25
**reserved** 272:22
273:18 506:13
**residence** 269:7
**resolution** 362:1
365:4 424:16
425:2,11 431:11
**resolved** 425:5,18
464:16 478:1
**respect** 303:9
351:24 418:5
422:20 458:21
483:4 487:5 496:9
502:2,21
**respond** 339:6,7
456:3,4,4,5,6,10
458:11,12 459:4
460:2,3,6,18 461:3
463:1,24 464:12
472:23 478:24
499:21
**responded** 340:20
456:10,11 478:1
478:17
**responding** 459:5
459:7,21 473:1
476:20
**responds** 338:5
394:17
**response** 273:4
338:12 348:11,12
357:8 420:5,9
430:13 444:10

459:24 460:20
463:6,19,22,24
464:19 478:5
479:18 486:9,23
487:1 495:15
496:15 503:25
**responses** 460:14
460:25 476:25
**responsibilities**
289:7 290:2
297:13 300:22,25
308:22 309:1
432:16
**responsibility**
290:16 309:5
351:23 386:14,16
**responsible**
329:15 336:7
353:9 367:18
381:2 386:20
436:12 458:8
**responsiveness**
272:23 273:19
494:20
**rest** 320:24
**restate** 273:16
**result** 299:20
324:11 343:21
**results** 361:14,18
405:1 491:21
492:8
**retrieve** 423:21
425:21 426:10
427:11,13 428:5
428:21
**return** 509:13,17
**returned** 463:17
478:2
**review** 284:19,22
306:24 312:13
374:1 375:22

378:1 404:5 433:2
435:15 436:7
455:1 461:20
465:11 469:2,8
472:13 488:19
489:3,7 498:24
505:16 507:19
509:7
**reviewed** 433:17
433:25 463:13
464:4 469:15
**reviewing** 356:1
404:7 424:18
**reviews** 306:7
**revised** 324:19
325:15
**right** 271:18,23
273:3,11 274:1
276:9 292:22
299:11 310:18
316:1,2 322:18
332:8 340:23
343:19 345:17
346:5 347:12,12
358:8,9 370:16
382:17 386:20
389:16 390:1
398:10 404:7,13
412:6 419:21
421:22 433:11
439:15 440:8
450:22 451:10,23
453:12 454:4
456:18 463:4
464:17 466:19
471:5 477:2
486:21 494:17
495:8 499:8 500:2
502:12 505:13
506:8

**ringleader** 388:20
388:24 389:7,10
389:22 390:16,20
390:23 391:3
393:12
**risk** 335:7 395:17
396:1
**road** 263:19
266:14 270:13
**rojas** 263:6 268:8
281:13 282:4
404:16,19 405:11
405:20,24
**role** 386:23 410:8
410:22 411:15
419:23 420:13
456:1 488:2
**room** 274:25
493:6 498:8
**roster** 309:21
312:13 419:5
**rotate** 451:1,10
452:6
**rotated** 450:8,10
450:16,18,21,25
451:8,14,20 453:7
453:20,21
**rotating** 451:23
452:3,5,8 454:2
**round** 341:6,8
**rounds** 488:4
**rubber** 484:9,17
484:21
**rule** 274:9,12
**rules** 270:25
274:11 359:1,5,6
409:20 434:4
436:3
**rumors** 402:3
**run** 329:14 356:15
383:15 446:14,15

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

[run - seen]                                                    Page 36

| | | | |
|---|---|---|---|
| 446:17,18,21,23 447:1 487:16 | **saw** 408:24 432:8 493:11 | 374:12 | **see** 275:22 276:9 309:21,22 314:3 |
| **running** 356:18,20 | **saying** 275:4,6 | **school** 287:13 | 317:9 321:4 326:2 |
| **runs** 357:7 | 293:15 322:25 | **scope** 493:5 | 326:4 327:21 |
| **s** | 357:3,6 362:8 | **scott** 267:13 | 329:7,12,15 330:9 |
| **s** 264:1 265:1 | 378:24 384:18 | **scratch** 432:15 | 331:22,24 336:19 |
| 266:1 267:1 268:5 | 390:11 391:20 | **screen** 275:23 | 337:3,13,15,17,21 |
| 269:1 270:1 313:3 | 401:19 410:14 | 320:20 381:20 | 338:7 339:20 |
| 442:14,18 510:3 | 426:16 428:10 | 423:7 457:22 | 340:11,12 355:7 |
| **safe** 401:14 | 439:4 448:8 | 480:24 495:4 | 355:23 358:6,17 |
| **safety** 270:15 | 450:20 459:12,20 | **scroll** 276:8 | 359:13 361:10,23 |
| 289:19 290:7,9 | 464:18 475:1,7,20 | 320:23,24,25 | 364:15,18,21 |
| 434:17 436:2 | 476:13 482:9 | 358:17 365:3 | 365:4 367:13 |
| 491:3 | 494:14 496:2 | 389:17 421:5,15 | 369:7,9 370:9,12 |
| **salad** 453:3,4,6 | 501:16,22 502:8,9 | 421:18 422:7 | 370:22 371:4,8,10 |
| **salary** 297:20 | 502:14 | 423:4,5,13,22 | 371:17 375:23 |
| **salt** 439:19,20 | **says** 274:25 | 433:9 434:1,6 | 379:16 382:5,7 |
| **sample** 436:22,23 | 327:19 328:24 | 463:10 465:10 | 383:6 387:10 |
| 436:24 437:3,22 | 332:13 333:25 | 472:25 477:4,25 | 390:10 403:4,6 |
| 439:16 | 350:22 356:10 | 481:8 484:3,4,24 | 411:12 413:14 |
| **sampled** 437:10 | 361:23 366:4 | 490:24 493:8 | 414:8,10 420:23 |
| 438:2,5 439:2 | 374:9 375:6,21 | 498:10 500:6 | 421:8 422:24 |
| **samplers** 439:10 | 383:23 384:6 | **scrolled** 469:11 | 424:15 432:24 |
| 440:19 | 388:13 394:15 | **scrolling** 321:4 | 434:4 449:23 |
| **samples** 437:2,12 | 404:16,17,22 | 387:12 394:13 | 461:14 465:10 |
| **sampling** 437:5 | 422:16 423:18 | 422:15 464:22 | 469:1,10,12,13 |
| 438:11 439:11 | 424:17 427:9 | 471:16 | 472:9,19,20 473:1 |
| 440:4,9 | 471:24 473:13 | **se** 451:21 | 476:2,17 477:25 |
| **sandley** 264:17 | 475:13,25 477:15 | **second** 320:21 | 480:24 490:25 |
| 271:9 421:13 | 481:12,16,19,25 | 354:21 356:9 | 492:22 493:9 |
| **sandra** 361:12 | 484:7 485:4 | 362:3 404:15 | 494:12 |
| **sanitation** 380:20 | 493:12 498:11 | 414:2 424:14 | **seeing** 326:15 |
| 412:9,17 | 500:7 | 473:2 481:9,11 | 398:8 402:17 |
| **sat** 308:1 | **scale** 321:16,18,21 | 484:12 498:15 | 403:15 423:7 |
| **satellite** 324:4 | 322:3,6 | **section** 305:21,23 | 482:12 |
| 344:3 445:8 465:4 | **schedule** 338:4 | 306:14,19,22 | **seen** 276:3,16 |
| 466:22 468:5,7,11 | 398:4 413:19 | 307:16,22 308:2 | 306:17 320:21 |
| 468:23 469:18,23 | 462:9 | 484:7 485:4 | 326:20 344:14 |
| 470:15 | **scheduled** 313:11 | 498:12 | 358:18 361:16 |
| **saturday** 472:10 | 320:8 336:14 | **sections** 305:13 | 369:15 373:22 |
| | 369:23 371:12 | **security** 480:7 | 387:23 403:10 |
| | | 481:3 490:7 493:2 | |

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

**[seen - short]**                                                    Page 37

415:3 422:21
433:7 462:9 465:4
472:4,17,21,21
477:22 481:6
482:3 490:16
491:23 492:24
494:8 495:3
**seg** 431:7
**segregation**
395:13,17 396:1,3
396:7,9,12 397:4
397:12 422:17
430:11 431:12,16
431:23 432:5
493:6
**self** 487:23
**send** 309:24
315:25 327:4,5,9
330:21 337:4
351:2 366:25
393:14,15 410:15
445:4 447:8,9
448:19 457:2,4,6
457:10 458:11,15
458:15,18 499:13
**sending** 375:7
388:6 422:17
423:11
**sends** 447:20
**sense** 469:17
470:20
**senses** 419:9
**sent** 296:4 320:10
326:5 327:7
340:22,23 370:24
377:23 389:2
411:15 443:17
444:16 463:25
509:14
**sentence** 332:12
422:12,15 427:8

472:9 498:15
**sentences** 334:8
404:12 422:11
472:15
**separated** 345:23
**september** 414:16
509:3
**serve** 322:16 324:7
324:23 333:18
448:13 479:8
481:21 498:17
499:12
**served** 404:25
437:8 443:3 445:1
445:2 448:5 451:5
465:17 475:23
481:19,20,24
485:6,9,16,19
486:6,23 495:24
504:14
**service** 271:20
279:8 285:25
286:2 288:4,7,9,10
288:13,16,18,21
288:23,24,24
289:7,16,22 290:2
290:23 291:20
292:14,15,16,20
292:21,21 294:11
297:13,24 298:2
298:10,14,19
301:12,23 302:2,4
302:11,12 304:1
304:18 305:15,18
305:21,23 306:1,3
306:5,6 308:22
309:2 311:13
314:17,23 315:5,6
315:8,11,12,15,24
315:25 316:7,19
317:10,15,18,19

318:5 320:8
326:11,20,23,24
327:20,24 332:10
333:16,20 335:8
336:4,6 337:16
339:24 343:22
344:3 351:10,12
361:21 372:9,16
373:21 377:5,6,11
382:14,17,22
386:14,17 387:16
388:1 396:8,11
400:5 404:1
406:14,23 408:16
409:11 411:15
414:23 417:9
419:24,25 420:3,7
425:8,15,15
432:14,16 436:12
436:18 444:22
455:21 460:4,5
462:5,8,13,15
465:13 469:9
474:11 475:3,6
478:13,23,23
483:10,12 487:8
489:8 501:1,2
502:15,15 503:13
503:14
**services** 266:18
267:2 270:9
271:14,20 274:13
276:22 277:7
278:10,13 434:3
471:23 472:10
**serving** 299:16
346:19 437:24
441:7,9,24 442:2
443:6 447:23
468:15,20 476:22
498:20,22

**set** 465:25 493:17
495:21 497:25
**setting** 409:21
**setup** 465:23
**seven** 310:6,7
332:14 333:2,19
356:17
**shadow** 402:17
**shaking** 275:5
**share** 315:23
401:20
**shared** 400:9
**sheet** 352:20
368:20,23 442:9
442:12 454:12
497:15,17,21,22
509:11
**sheets** 442:25
443:1,2,7,8
**shift** 286:21
292:25 293:1,2,8
293:21 310:3,7
312:10 313:6
318:17 319:10,16
319:22 341:20
342:1 349:14
351:2 354:5,16
356:9 357:13,25
361:15 362:1,3
364:6 366:9 367:6
367:9,10 388:14
388:16,18 411:25
**shifts** 286:25
293:2,4,12,13,16
293:18,20 348:8
348:23,25 349:1,3
349:6,8,9,11,14,19
350:2,9,14,15,16
**shop** 412:18,22
**short** 295:16,23,24
296:25 297:2

[short - sprays]                                                    Page 38

| | | | |
|---|---|---|---|
| 332:14 335:24 360:14 362:16 363:14,18,21 389:4 | **sign** 368:20,20,22 410:13 435:22,23 444:20 446:10 454:7,11,20 465:24 496:12 505:16 509:12 | **slices** 498:20 | **space** 477:17 |
| | | **slow** 493:22 | **spanish** 303:15,24 435:6 |
| | | **soft** 486:19 | |
| | | **solutions** 509:23 | **speak** 283:24 284:2 287:15 303:14,15,19,20 304:8,16 391:18 391:19 420:1 431:1 475:16 |
| **shortage** 299:24 300:1 322:15 332:16,24 333:6 333:13 334:3 335:3 341:4 342:12,17 343:19 344:6,9,15 345:7,9 345:12 346:15 347:21 374:8 375:10 | | **somebody** 370:21 474:10 478:23 | |
| | **signature** 505:15 506:13 507:15 508:12 | **something's** 392:12 439:21 | |
| | | **somewhat** 465:6 | |
| | **signed** 304:11 463:13 464:4,4 509:20 | **soon** 275:10 320:14 | **speaking** 427:9 483:21 |
| | | **sooner** 275:14 | **speaks** 303:25 |
| | **signs** 443:23,23 | **sorry** 273:23 279:12,13 295:14 301:15 319:12 320:14 326:13,17 335:16 341:10,11 348:3 355:16 373:8,12 381:24 396:17,18,21 405:14 408:6 418:22 423:5,10 423:16 424:8 425:14 429:3 434:11 435:16 442:14,16 448:8 456:6,21 467:11 482:23 493:23 496:21 504:3 | **special** 442:13,18 442:21 447:13,14 447:15,22 448:5,9 448:12,21 463:12 487:20 500:18,20 |
| **shortages** 319:5 333:11,15 342:20 343:8,14 374:21 | **similar** 407:3 | | |
| | **similarly** 263:8 | | |
| | **simple** 409:6 | | **specific** 276:13 286:17 426:9 442:20 502:3 |
| | **simply** 309:7 387:3 397:8 498:19 | | |
| **shorthand** 277:13 | | | **specifically** 285:19 340:9 427:8 468:4 481:15 490:8 |
| **show** 311:14,20 312:5,11 323:9,14 323:14,15,19 330:5,8,12,15 336:15,17 338:16 339:4,19,21 340:24 357:17 360:2 413:2 416:13,24 463:3 478:14 482:11,12 486:12 | **single** 314:10 | | |
| | **sir** 428:16 | | **specify** 277:12 |
| | **sit** 354:20 404:18 467:3 | | **speculate** 395:5 |
| | | | **spell** 271:23 |
| | **sitting** 405:21 406:4 467:16 | | **spivey** 403:7,21,24 |
| | | | **splcenter.org** 264:8,15,22 265:8 265:15 |
| | **situated** 263:8 | | |
| | **situation** 389:15 390:1,9 401:18 402:13 422:13 431:4 470:24 478:18 | **sort** 438:10 | |
| | | **sorts** 289:21 324:5 486:14 | **spoiled** 481:25 491:4 498:19 |
| **showed** 416:17 423:3 432:8 472:3 | | | |
| **showing** 312:9 412:12 | | **sound** 325:19 433:11 464:2 | **spoke** 284:7,11 423:19 431:19 464:8 473:3,19 474:3,5 |
| | **situations** 342:3 356:14 468:23 | | |
| **shown** 416:20 | **six** 347:5,9,10 350:15 361:22 378:18 379:10,22 423:6 467:17 485:5 490:22 | **sounds** 296:10 379:22 438:1 451:16 | |
| **shows** 311:23 312:4 355:11 | | | **spoken** 283:21 284:3 424:2,24 |
| **shu** 442:8,11 443:8 443:15,23 444:16 | | **soup** 440:10,11,12 | |
| | **size** 420:24 | **southern** 264:5,12 264:19 265:5,12 | **spot** 380:7 |
| **sic** 271:10 321:5,7 | | | |
| **sick** 330:1 | **skills** 507:8 508:4 | | **sprays** 383:16 |

30(b)(6) Marquita Crawford, Vol. II          August 23, 2021

Barrientos, Wilhen Hill v. CoreCivic Inc.

**[spreading - stewart]**                                    Page 39

| | | | |
|---|---|---|---|
| **spreading** 374:10 374:24 | **staffed** 295:16,23 295:24 296:25 297:2 308:24 309:3 | 427:9 430:15,19 430:24 456:20 | 326:1,14,18 330:22,24,25 |
| **st** 267:7 | | **statements** 423:11 423:14 424:18 431:17 | 331:4,13 332:1,5 335:20 337:7,12 |
| **staff** 292:24 293:13,14 294:6 294:10,14,15,17 295:6,8,12,22 296:1,21 297:10 301:4 302:2,14,25 304:10,13,17 305:20 306:8,19 307:4,15 308:9,13 308:16,19 309:6,8 309:10,12,13,15 310:1 314:11 315:1,16,21 316:4 316:14 320:5 324:7 327:16 339:1,14 346:15 346:16,20,21 368:16 369:11 370:1 372:5,11 374:12 375:8,9 381:6 385:21,25 386:4,23 390:24 394:14 400:24 401:17 402:8 404:2 410:21 414:19 415:13 422:14 423:11,14 424:18,20,21,23 425:12 427:12,23 428:4,24 431:2,2 436:25 438:3,3,3 438:22,23 446:5,7 446:10,12 460:23 461:2 473:1,3,4,6 473:8 474:2,20,25 475:7,13,16 476:1 476:7,12,15,18,24 480:2 498:1,19 | **staffer** 293:25 | **states** 263:1 464:25 468:5 471:23 481:21 482:1 491:2 | 341:14 344:16,22 345:4,5 347:20 348:7,8,13,15,18 348:23 350:17 355:1,6,13,20 358:2,9,13 360:7,9 361:4,9 363:5 365:13 369:1,6 372:22 373:3,7,15 373:16,19 375:12 377:1,3,14,19 381:14,19,24 382:4,8 383:1,3 385:7,15,16 387:4 387:9,14 395:11 395:20 396:4,18 396:20,23,24 402:23 403:3,25 405:7,18 406:9,12 408:5,8 410:24 411:4,6,11 413:6 413:25 414:7,11 417:17 420:15,17 420:22 421:11,17 422:4,6,9 423:4,8 424:13 426:1,13 426:24 427:6,17 429:4,8,13 432:11 432:19,23 433:11 434:11,16 436:18 442:17 446:3,20 449:3,11,12,16,22 452:11,17 454:9 455:4,11,13 456:2 457:7 459:9 461:5 461:10,13,25 477:11,14 480:8 |
| | **staffing** 292:10,12 321:16,18,21 322:3 328:8 | | |
| | **stamp** 353:23 411:7 | **stating** 435:23 | |
| | **stamps** 353:24 | **stay** 388:15 389:3 413:19 | |
| | **stand** 487:25 | **stealing** 408:12 409:10,14,19,22 | |
| | **standard** 494:17 | | |
| | **standards** 305:4,7 305:11 434:8 | **steam** 486:17 | |
| | **stands** 277:15,18 442:18 | **stemmed** 490:21 | |
| | **start** 316:5,15 352:7 354:15 422:6 434:25 457:14 | **stenographic** 271:2 | |
| | | **steps** 336:16 465:14,16,19 | |
| | **started** 272:16 287:21 298:1,11 352:12,13,15,16 352:18 459:2 466:5 467:16,19 467:19,20 | **stewart** 264:4 268:3 271:7,8 272:8,10,12,21,25 273:6,9,16 274:8 276:13 277:22,22 279:2,21 280:18 281:8,9,20,22 282:21,23 283:20 285:21 286:2,16 288:14,17,19 289:4 290:12,17 291:8 292:10,11 292:18 296:7,12 296:19 297:23 299:1,4 301:22 302:23 309:16 310:17,22 311:1 314:7,12 315:1 316:23 319:14,19 319:24 320:2 322:12,14 325:21 | |
| | **starting** 334:2 355:9 358:14 370:12 | | |
| | **starts** 293:8 369:22 472:9 498:15 | | |
| | **starve** 485:13 | | |
| | **state** 271:23 272:14 507:17 | | |
| | **stated** 360:1 392:2 423:19 425:20 484:9,12 498:17 | | |
| | **statement** 423:17 423:23,25 426:15 | | |

**[stewart - table]**

480:15 481:4,6,8
481:10,12,17
482:7,25 483:3,24
484:6,20 485:4,19
487:10 489:22
490:6,9,15,23
491:7,25 492:5,7,9
492:14,15,21
493:4,8 495:20
496:7 498:14
500:6,9 501:6,14
501:19 502:24
504:5,8,10,19
505:2,18,19
**stewart's** 334:2
**stick** 297:10
440:13
**stipulation** 271:3
**stock** 446:3,9,11
446:20,22
**stoppage** 392:12
394:22 395:13
397:20,22,23,25
398:7 399:4,11,20
399:22,22,24
400:3,8,10,16,21
401:4 402:3
**stoppages** 393:23
399:5 400:24
**stopped** 352:12
465:3 481:18
**storage** 493:15
**store** 453:5
**stored** 353:8
452:21
**storm** 325:7
**straight** 445:18
**street** 264:6 265:6
265:13 266:21
**strictly** 473:4

**struck** 266:13
274:4 285:13
**strucklove.com**
266:16
**stuff** 303:10 320:7
383:16 391:19
392:18 409:23
479:8 486:17
**subheading** 491:1
493:9
**subject** 403:8
411:17 414:17
**submitted** 423:24
477:8,23 481:2
483:5,17 485:2
**submitting** 423:25
471:20 500:19
**subpoena** 269:16
276:6
**subscribed** 511:14
**substitution**
324:24 447:2,5,7
447:11,12,12
**substitutions**
324:10,12,18
**sucking** 384:12
**sufficient** 312:9
**sufficiently** 308:23
309:3
**sugar** 450:7
**suicidal** 303:5
**suicide** 301:14,16
303:5
**suite** 264:6 265:6
265:13 266:7,14
266:22
**summarized**
472:12
**summary** 481:11
484:5 485:1

**sunday** 383:7
**supervise** 295:9
**supervising** 290:5
290:6
**supervisor** 279:16
288:18,21,25
290:2 314:23
315:6,11,12,15
316:20 317:22
372:16 386:17
432:14 478:11
**supervisor's**
477:20
**supervisors**
289:10 292:13,20
315:5 323:2
**supplied** 346:15
347:20
**supply** 396:11
**supposed** 309:21
329:23 365:7
466:1
**sure** 274:17,19
275:2 277:18
281:7 289:18
298:3,12,20 300:6
302:21 305:2
309:1,4 312:24
318:14 322:5,18
323:3 329:24
330:2,25 332:15
332:20,21,22
333:8 334:25
338:13,14 339:16
341:22 342:15
343:1,16 346:12
347:18 348:1,11
348:22 349:4
350:19 351:17
352:8 355:22,24
356:25 358:23

363:11 366:3
369:19 370:14,17
370:23 372:7
374:11 375:14,16
395:23 398:12
404:4 405:9,13
416:3,14 421:1,18
426:3,6 428:2
431:3,15,19
433:19 437:8,23
440:13 441:15
461:4 462:11
466:3 469:21
470:4,6 472:22
474:5 475:19
477:6,24 478:6,9
482:22 483:2
485:22 486:3
488:13 495:7,9
496:11 499:7,23
501:24 503:20
**swear** 270:16
271:22
**sworn** 270:19
272:4 274:16
507:3 511:14
**system** 352:19,19
364:16 383:6,17
384:4,9,10,13,15
384:18,20 385:1
452:5,8 456:9,16
456:23,24 457:1,3
457:14 458:25
469:6,8 493:21
497:10,17

                    **t**

**t** 266:19 268:5
269:1 272:1
290:21 510:3,3
**table** 412:17

[tablets - thing]                                                      Page 41

tablets 458:17
take 270:4,5
  275:12,16 301:1
  322:24 333:18
  354:15 355:24
  357:24 360:7
  380:25 393:8
  399:16 404:8
  421:2,4,22 430:5
  437:23 438:14
  441:6,10,14,20,21
  444:15,17 445:17
  461:20 465:19
  466:2,11,12,13
  467:18 468:19
  486:9 487:1
  492:15 493:23
  495:16 496:8,13
  497:6 498:3
taken 270:10
  328:25 354:24
  364:4,7 383:14
  431:1 438:7 441:2
  442:3 445:24
  465:14 470:6
  507:1,10 508:7
takes 446:7 487:5
talk 284:25 285:3
  285:6,9,12 342:23
  343:7 400:5 421:3
  456:12
talked 283:16
  343:12 408:24
  447:5
talking 303:8
  309:14 311:25
  332:18,24 333:4
  333:12 364:17
  374:19 375:14
  381:4 384:4,19,20
  388:11 391:22

393:22 397:17
402:22 467:13
492:4
talks 420:8
task 424:20
tasks 380:13,17
  385:5 424:5
  425:23
taste 437:7,7
  438:25 439:3,11
team 342:22,24
  349:22,23 350:6,7
  350:13 351:17,21
  366:12 367:1
  371:15 402:9
tell 272:5 274:17
  286:15 301:7
  302:7 303:16
  322:6 339:7 384:8
  387:3 389:12,14
  390:13,25 393:16
  395:7 406:21
  464:10 468:14
  470:21,22 492:12
telling 389:11
  390:3 391:5,7
  392:7,24 393:4
  394:2,10 399:21
  497:22,23
tells 422:18
temp 438:18,19
  441:8,8,9,13,15,21
  441:23,23,24
  442:1,1,2 443:6,6
  443:7 444:17
  486:10,11,21
  498:8
temped 445:15,15
temperature
  438:7 441:2,12,17
  441:19,20,25

442:6,7,20,23
443:16 444:1,9,13
444:16 445:7,12
445:24 488:19
temporary 343:8
temps 437:23
  441:6,10 442:3
  443:5 446:8
  486:20 488:24
ten 287:2 295:12
  295:13,18 323:18
  323:19 364:1
  368:2 446:18
tend 297:10
tendered 506:9
term 277:25
  390:16,17,24
terms 359:4
  412:25 417:25
  439:23 497:4
testified 272:6
  285:17 293:12
  311:20 315:10
  319:15 321:23
  330:7 336:6
  338:24 343:24
  357:16 385:20
  390:2 432:15
  436:11 440:8
  444:21 455:19
  467:6 483:13
  491:22 504:11
testify 269:16
  276:6,12,18
  285:18 286:4
testifying 279:7
  507:3
testimony 274:15
  277:6 278:22
  357:11 409:7
  413:11 418:23

466:15 468:7
469:22 483:6
503:23 504:9
509:9,18 511:8
testing 345:22
  346:3,4,5,10
tests 345:25
text 471:21
texture 437:7
thank 271:21
  272:7,20 273:4
  274:6,6 287:11
  301:19 335:19
  341:12 345:4
  348:6 355:19
  358:10 373:18
  383:2 384:24
  385:15 396:23
  398:12 405:17
  411:5 424:11
  434:15 449:11
  458:1 461:10
  483:1 505:2,7,8,17
  505:21 506:6,8
thanks 354:4
  381:12 423:7
thaw 493:19 497:6
  497:19 498:8
thawed 498:9
therapeutic
  463:12
thermometer
  445:16
thing 275:15
  296:24 301:16
  302:5 311:5 346:2
  366:23 399:15
  407:19,23 408:1
  409:22,24 410:3
  437:8,24 452:1,2
  467:15 478:19

**[thing - told]**          Page 42

482:24

**things** 283:9 289:17,18,21 324:5 341:23 342:25 374:14 393:2 400:6 401:10 422:17 437:25 449:1 467:15 471:4 486:15

**think** 286:11 287:8,9 300:8 323:16 330:7 338:24 343:17 347:10 352:15 358:3 365:7 368:9 390:2 392:2 395:7 395:10 397:16,19 398:13 401:5 402:15 405:4 409:5 410:17 418:18 421:9,21 423:6 426:22 440:11 461:8 474:15 475:20 504:10 505:24

**thinking** 395:12

**third** 332:12 408:12 493:12

**thirteen** 388:8

**thirty** 354:19 356:17

**thought** 359:17 381:22 439:2 448:7 494:5 504:6

**thousand** 352:14 388:8 474:18

**thread** 387:13

**threaten** 398:5 399:3

**threatened** 401:6 402:11 422:16 431:7

**threatening** 399:6 399:7 430:11

**three** 276:10,13 279:10,13,14,14 284:1,3,5,7,12 285:19 286:7 290:8,11,25 298:8 337:20,25 338:1,2 338:18 339:12,13 339:17,19,23 340:8 347:11,12 349:1,3,6,9,11 350:2,15 352:11 375:22 383:7 388:15 389:3 394:4,4,7,8 434:20 435:2,8,9 441:7 442:3 446:13 453:8,11,18,20 458:22,24 497:12 497:15,24 498:7

**thursday's** 498:6

**tiffany** 421:25

**time** 263:17 271:5 273:12,15 293:7 293:21 294:1,3,7 294:13 295:5 296:14,17 297:11 298:16 300:4,8 310:17 315:19 318:12,25 319:4 327:25 331:1,8,11 332:9 333:10 335:13,21 336:24 337:21 338:1 339:5 344:24 345:2 346:14,25 347:19 349:4

351:16 352:1,2,2,3 352:4,5,7,16,16,17 352:22 353:5,6,7 353:12,12,14,15 353:20,21,23,25 355:24 357:1,1 364:13,14,16,23 365:15 374:21,21 379:5 380:7 383:13 385:10,13 387:16 391:9,25 402:16 404:8,18 404:18 405:21,21 406:4,4,8,8,24 407:3,6 412:3 422:25 427:1,4 433:19 441:20,21 442:3 443:18,18 449:6,9 450:23 451:14,17 453:15 466:22 467:4 471:2 474:19 484:12 489:21 493:24 494:2 504:22,25 505:7 505:18,22,23 506:5,6,11 509:19

**timeframe** 277:10 280:25 509:8

**timely** 417:24

**times** 284:4,5,12 293:2,6 294:5,10 295:15 297:1 299:22 307:14 341:17 342:2,4,7 351:24 366:24 371:21 372:2,3 380:6 392:13 394:4,7,8 401:13 407:2 441:7 444:12 468:22

498:16

**timesheet** 351:21

**timesheets** 351:4 352:23,25

**title** 281:6 288:3,5 290:22 317:17 318:4,5 382:20 387:25 432:13 437:14 481:11,12 485:23

**titled** 326:10,19 358:18 369:11 373:25 374:4 433:1 434:3,7,17 490:19 493:10

**titles** 401:2

**tkc** 267:5

**tkcholdings.com** 267:8

**today** 274:16 275:8,18 276:5,14 276:16,19 277:13 277:22 278:5,10 278:16 279:7 282:25 283:2,5,22 284:20,23 285:18 286:4 287:8 306:17 320:22 321:17 361:16 373:22 387:23 398:24 399:4 422:22 452:3 453:13 462:10 465:5 472:5 475:12 482:4 494:8,22 503:19 503:23 505:7,15 506:9

**toggle** 402:18

**told** 279:6,20 362:6 363:1,7,9

Case 4:18-cv-00070-CDL   Document 383-1   Filed 06/27/23   Page 293 of 300
30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

[told - trinity]                                                    Page 43

| | | | |
|---|---|---|---|
| 375:2 388:17 | **train**  303:18 306:1 | **tray**  436:23 | 315:1,21,23 |
| 394:19 423:3 | 392:17 409:24 | 437:23 438:2,4 | 316:14,23 317:6 |
| 426:20 430:16 | 435:22 | 443:22 467:18 | 317:14,24,25 |
| 470:22 474:3 | **trained**  300:12,19 | 472:1 477:17 | 318:1 324:7 |
| 479:18 | 303:12,16,19 | 485:10 | 325:20 326:5 |
| **tomorrow**  401:12 | 304:12 305:14,17 | **trays**  443:19,20 | 327:16 328:11,17 |
| 452:4 | 305:20,22,24 | 445:4,17,23,25 | 331:25 333:10 |
| **tone**  424:24 | 323:2 329:22 | 467:4 471:1 | 334:12 335:6,9 |
| **top**  301:7 302:8 | 366:11 | **treat**  418:4 | 339:14 346:20 |
| 340:19 355:11 | **trainees**  289:20 | **treating**  303:9 | 350:9 351:23 |
| 365:3 408:11 | **training**  289:20,23 | **treatment**  490:19 | 355:13 356:1 |
| 422:15 423:18 | 301:11,12 302:7,9 | **trinity**  266:18 | 360:2 361:21 |
| 464:8 490:25 | 302:10,12 303:10 | 267:2 270:9 | 365:4,6,8,9 366:1 |
| **topic**  285:20 286:7 | 303:11 305:6 | 271:13,16,20 | 366:5 368:16,23 |
| **topics**  276:10,11 | 306:6,19,22 | 273:21 274:13 | 372:5,11,16 373:6 |
| 276:13,14,16,19 | 307:18,21,25 | 276:22 277:7 | 373:16,21 375:8,9 |
| 285:18,19 286:4 | 308:1,9,12,16,19 | 278:10,10 281:10 | 375:15 381:6 |
| 301:13 400:18,19 | 346:17 400:4,18 | 285:1,4 286:2 | 382:8,15 385:20 |
| **total**  284:5 295:11 | 400:20 401:1 | 287:23 288:3,8,14 | 385:25 386:23 |
| 310:22 311:4 | 432:17 433:2 | 288:18 289:1,3 | 387:14,16 390:24 |
| 455:10 458:24 | 435:19 | 290:8,12,24 | 396:11 400:24 |
| **town**  356:6 361:14 | **trainings**  300:23 | 292:10,11,12,17 | 403:7,13 404:2 |
| 361:18 363:1 | 301:1,3,6,8,20,23 | 292:24 293:4,13 | 405:5 407:4 |
| **track**  327:15 | 301:24 302:1,4,15 | 293:14,19,25 | 410:21 411:16 |
| 328:15,16,20,21 | 303:3,17 307:16 | 294:6,14,14 295:6 | 414:11,19 415:13 |
| 335:9 339:8 | 308:13 400:24 | 295:8,12,15 296:1 | 417:3,12,22 |
| 351:16,19 352:5 | 435:8,9,12,25 | 296:1,21 297:5,8 | 420:14 421:25 |
| 353:12 440:22 | **trains**  302:24 | 297:10,14 298:1 | 422:13 423:10,11 |
| 447:22,25 448:4 | **transcriber** | 298:10,13,18,21 | 423:14 424:18,20 |
| 493:19 497:5 | 507:24 | 298:25 299:3,19 | 424:21 425:12 |
| 502:20 | **transcript**  270:21 | 300:2,11,15,16,17 | 426:11 427:12,14 |
| **tracked**  328:14 | 505:20 506:1 | 300:19 301:4 | 427:23 428:4,24 |
| 493:16 | 507:19 508:1,3 | 302:14,25 304:10 | 430:2,9 432:10 |
| **tracking**  328:11 | 509:6,20 511:5,8 | 304:13,17,20,23 | 434:3 436:17,25 |
| 335:6 336:7 | **transcriptionist** | 304:24 305:6,13 | 437:3 438:2,22 |
| 351:24 352:19,19 | 507:6 | 305:20 306:8,19 | 439:24 446:5,7,10 |
| 357:14 493:20 | **translate**  303:24 | 307:4,15 308:9,13 | 446:12 448:16 |
| 497:18 | **transmitted**  386:2 | 308:16,19,24 | 449:1 454:19 |
| **traffic**  294:19 | **transmitting** | 309:3,5,5,8,8,10 | 457:6,18,19 458:4 |
| **trafficking**  308:17 | 386:20 | 309:12,13,15 | 462:7 473:3,8,19 |
| 308:20 | | 311:12 314:9,11 | 474:2,20 475:7,13 |

**[trinity - use]**                                          Page 44

475:16 476:1,7,12 476:18,24 477:21 478:4,7 480:3 486:25 487:5,9,18 487:21 488:19 489:21 502:1,5,6 502:16,19 503:4,7 503:24 505:11

**trinity's** 276:12 290:16 425:23 443:9 478:25 479:4

**trinityccbva** 320:18

**troy** 394:17

**truck** 447:3

**true** 507:7 508:3 511:8

**truth** 272:5,5,6 274:17

**try** 322:22 324:3 324:16 346:7 354:14 370:2 402:13 409:17,24 422:18 438:20 502:10

**trying** 318:18,19 318:21 319:1 334:1 342:25 345:22,23 393:11 418:23 457:24 467:12 471:3,6,9 474:15

**tuesday** 497:25 498:5

**turn** 367:1

**turning** 317:9

**turnover** 297:7

**twenty** 310:6,7

**twice** 284:13 296:23 297:2,4,4,6

372:4 440:21

**two** 276:13 279:10 284:14 285:19,21 288:12 291:18,23 294:10 296:23,23 298:7 302:9,11,13 336:25 348:25 349:5,8,14 350:2 350:16 352:14 354:14,17 388:5,8 412:10 413:2 414:18 415:24 416:11 443:19 450:7 451:13 455:18 472:15,16 474:18 484:25 504:11,13

**type** 311:15,23 312:4 324:2 325:2 325:12 394:1 402:3 404:17 408:15 409:9,10 409:15 439:11 446:22

**typewriting** 507:5

**typical** 340:1,5

**u**

**u** 272:1 290:21 442:18

**uh** 275:5,6,6 379:2

**ultimate** 424:16

**ultimately** 350:7 393:11 425:4 464:16 476:13

**unannounced** 367:16 490:5,21

**unavailable** 330:18

**unaware** 475:13

**undercooked** 485:7

**underscore** 480:19

**understand** 270:20 274:21 276:5,11,24 277:4 277:6 278:25 305:9 311:19 331:14 385:17 391:16 395:14,23 397:10 409:6 418:23 435:24 449:13 451:6 471:6 497:11

**understanding** 314:9 399:10,10 399:12,13,16 468:6

**understands** 391:23

**unfortunately** 345:24

**uniform** 312:24

**unit** 309:22 312:15 314:7 316:2,3,3 329:7,10,15,18 336:19 337:3 340:14,21,25 341:15 342:21,24 345:25 349:22,23 350:6,6,13 351:3,8 351:15,17,18,19 351:21 360:5 361:15 366:12,25 367:1 368:11 370:2,22 371:1,13 371:15,18,22 372:5,11,17 374:12 384:12 386:5 396:3 398:23 402:9 408:14 410:16,16 411:19 442:13,18

445:18,21 466:2,6 467:2,5,19,21,22 467:24 468:3,8,9 468:12,17,20,25 470:7 471:9,14 472:3

**united** 263:1

**units** 329:1 340:7 396:12 442:21 445:5 466:24 467:8 469:20 470:13,15

**unlimited** 354:13

**unload** 446:9

**unrelated** 377:5,6 377:11

**unsafe** 491:1

**update** 313:16

**updated** 364:13,16 433:24,25

**urbina** 263:6 268:8 281:13 282:4 404:16,19 405:11,20,24

**usa** 278:12

**use** 277:12,25 278:4 287:18 304:5,6,10,12,14 305:22 306:4 314:11 316:9 317:6 324:3 339:15 340:2 352:18,24 353:2 353:20 391:13,24 391:25 442:9 446:11 448:17 450:11 451:4,7,9 451:12,17,18 452:2,5,7,24,24 453:5,24 457:10 461:25 497:14,16

Case 4:18-cv-00070-CDL Document 383-1 Filed 06/27/23 Page 295 of 300
30(b)(6) Marquita Crawford, Vol. II    August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

[use - week]                                                    Page 45

498:1,4
uses 270:23
usual 356:16
usually 339:1
utilize 360:19

**v**

v 263:10 509:4
  510:1 511:1
vacancies 327:16
  327:16
vacancy 327:21,23
  328:7
vacant 327:19
vaccinations 346:6
  346:10
vague 302:22
various 355:10
  358:15 369:10
  421:7
vegetables 440:12
vehicle 384:19
velasco 279:16
vent 380:25
  383:19 384:9,13
  384:15,18,20
ventilation 384:10
vents 381:11
  383:12
verbal 307:15
  495:3
verbally 402:1
  420:11 455:19
verify 509:9
veritext 267:13
  270:4 509:14,23
veritext.com
  509:15
version 422:10
versions 435:2
versus 386:12
  416:12

victim 308:17
video 469:14,19,19
videoconference
  263:14 264:4,11
  264:18 265:4,11
  265:17 266:5,12
  266:19 267:4,12
  267:14
vidhi 265:4 271:9
vidhi.bamzai
  265:8
view 365:5 398:8
  402:19 413:12
violating 397:14
  429:11,15
violation 478:2
violations 395:16
  395:25
violent 407:18,21
visible 364:11
visited 396:3
visual 400:21
visuals 308:2
voicemail 484:8
vol 509:5 510:2,24
  511:2,4,12
volume 263:15
voluntary 269:18
  279:3 286:12,16
  308:14 358:18
volunteer 279:8
  285:23 286:9,21
  286:23 290:13
  306:24 308:5,9
  311:10 336:21
  368:21
volunteering
  359:10
volunteers 329:1
  340:12 360:3

vs 270:11

**w**

w 272:1
wabe 492:17
wages 297:17,20
  298:2,11
wait 336:22,24
  388:18 474:1
  505:25 506:2
waiting 381:19
  481:22
walk 336:15
  367:15,16 370:22
  371:9 388:21,24
  389:8 390:12,25
  394:19 428:13
  466:1 467:16,17
  470:25 493:4,5,10
walking 368:3
wall 365:5,9
walls 380:21 381:3
  384:23
want 273:7 283:13
  286:17,19 292:9
  322:22 330:14
  345:13,16 368:20
  391:15 398:25
  401:14 402:12,14
  407:14 408:16
  409:11,24 415:17
  417:6,9,20,21
  418:1 422:6 434:2
  457:22 466:2
  475:24 476:12
  484:1,19,23
  486:17,18,18,19
  504:9 505:2,14,25
  506:9
wanted 358:5
  388:17 398:12
  466:10,11 470:8

486:14
wanting 345:11
wants 417:22
  475:16 484:10
warden 318:11
  324:25 325:1
  327:8 332:5
  338:17,18,23
  339:18 340:9,17
  340:17 403:24
  447:10 492:11
  495:13
warmer 445:11
warrant 367:7
  402:4
warranted 429:25
warrants 406:5
wash 339:14
washington
  264:20
waste 440:22
water 354:10,12
  493:14 496:11,20
  496:23 497:2
way 303:14 346:10
  371:7 387:2 402:2
  402:18 422:18
  440:24 448:4
  456:17 457:1
  460:6 481:18
we've 283:13
  284:3 296:23
  297:2,2 310:12,12
  310:13 324:17
  331:2 344:13
  349:8,9 366:23
  370:18
wednesday 497:25
  498:5
week 298:23 299:4
  313:14,21 341:21

Case 4:18-cv-00070-CDL   Document 383-1   Filed 09/27/23   Page 296 of 300
30(b)(6) Marquita Crawford, Vol. II                August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

[week - worker's]                                                    Page 46

| | | | |
|---|---|---|---|
| 342:2,5,6,7,9 | **wipe** 381:10,11 | 313:9,20 319:3 | 408:17,19 411:24 |
| 447:21 448:5,7,9 | 383:12,13,18 | 321:25 323:22,23 | 412:2,3,5,12,18,22 |
| 454:13 476:4,23 | 385:2 | 323:24 328:4 | 413:2,24 414:18 |
| **weekend** 362:9 | **wiped** 383:14 | 329:11,16 330:5 | 415:10,16,20,25 |
| **weekends** 362:1 | 384:14 | 330:13 336:14,17 | 416:2,4,4,5,8,12 |
| **weekly** 299:2,3,8,9 | **wise** 507:25 | 336:21,24 337:3,4 | 416:12,17,17,20 |
| 313:16,17 321:24 | 508:13 | 337:21,25 338:16 | 416:24,24 417:3,6 |
| 335:11 371:23 | **witness** 266:18 | 339:10,12,20 | 417:9,14,22,23 |
| 446:4 448:11,13 | 267:2 270:16,19 | 344:19 345:11,14 | 418:1,11,19 419:2 |
| **weeks** 279:10,10 | 270:20 271:18,22 | 345:16,20 346:8 | 419:3,4,5 422:18 |
| 279:13,14 284:1,7 | 272:4 283:15,18 | 347:2 350:10,20 | 429:1,10 435:22 |
| 291:18,23 302:10 | 301:17,20 319:13 | 350:22 351:5,6,11 | 455:10 479:7,10 |
| 302:11,13 347:4,5 | 326:17 335:18 | 351:25 352:2 | **worked** 281:5 |
| **went** 313:14 | 341:11,13 355:18 | 353:5,6 354:5 | 285:6 288:1 291:7 |
| 340:21,25 352:17 | 365:12 373:10,13 | 358:18 359:10,21 | 291:9 292:1,5 |
| 352:18 372:8 | 405:13 413:5 | 360:2 361:1 364:5 | 317:20 350:18 |
| 410:11 426:19 | 421:15 422:5 | 365:1 366:14,18 | 351:1 357:12 |
| 427:19 428:12,14 | 424:10,12 429:5 | 366:19,22 367:19 | 409:21 |
| 466:19 476:4 | 434:14 442:16 | 367:21 368:21 | **worker** 280:10,17 |
| 481:20 | 483:2 501:13 | 369:23,23 370:2 | 311:15,16,23,24 |
| **west** 266:14,21 | 505:8 507:2 509:8 | 370:13 371:5,12 | 311:25 312:4 |
| **wet** 496:11 | 509:10,12,19 | 374:10,12,23 | 327:20,24 328:8 |
| **wheels** 445:11 | **wondering** 344:11 | 375:24 376:20 | 328:10,22 330:12 |
| **when's** 392:13 | **word** 390:19 391:1 | 377:4 379:1,3,3,8 | 330:17 335:3 |
| **whereabouts** | 408:13 | 389:11 390:4,11 | 353:19 366:8 |
| 338:6,9,25 | **work** 269:18 279:3 | 391:5,8 392:7,12 | 367:6,20 375:10 |
| **whoever's** 351:18 | 279:8 280:25 | 392:21,25 393:4 | 386:1,23 389:6 |
| **wildfire** 374:11,24 | 281:3 285:3,22 | 393:23 394:2,11 | 390:3,5,8 391:4 |
| **wilhen** 263:4 | 286:9,12,16,20,21 | 394:22 395:13,16 | 392:6,20,24 393:4 |
| 264:2 265:2 266:2 | 286:25 287:19 | 395:25 397:2,14 | 394:1,20 399:5 |
| 268:7 270:10 | 290:13 291:2,21 | 397:20,21,23,25 | 407:15 420:13 |
| 279:24 280:12,15 | 291:23 292:3,11 | 397:25 398:5,5,6,7 | 427:13,22 428:3,5 |
| 281:5 421:24 | 292:17,24 293:13 | 398:16,20,21,24 | 428:22 433:10 |
| 424:19 509:4 | 293:19 298:22 | 398:24 399:2,4,4,5 | 434:4,7 437:3 |
| 510:1 511:1 | 299:5,7,10,20 | 399:6,9,10,19,22 | 455:20 456:1 |
| **williams** 414:19 | 300:2 303:6 304:9 | 399:22,24,25 | 458:12,13 497:2 |
| **wilted** 491:4 | 304:16 306:24 | 400:1,1,3,8,10,16 | 498:16 |
| **window** 364:21 | 307:24 308:10,14 | 400:21,23 401:4,6 | **worker's** 351:16 |
| 447:16 468:1,2 | 309:20,21,23,23 | 401:7,11,12 402:3 | 352:5 353:12 |
| 499:13 | 311:6,7,14,23 | 402:20 407:16,18 | 376:18 |
| | 312:15,17,19 | 407:21,21,24 | |

Case 4:18-cv-00070-CDL Document 383-1 Filed 09/27/23 Page 297 of 300
30(b)(6) Marquita Crawford, Vol. II          August 23, 2021
Barrientos, Wilhen Hill v. CoreCivic Inc.

[workers - yeah]                                                    Page 47

| | | | |
|---|---|---|---|
| **workers** 286:8 289:10,24 290:3 291:24 293:5,16 293:19 295:5,9,22 297:15 299:12,13 299:19,19,25 300:1,15 304:20 304:25 308:24 309:3,6,14,16 310:2,15,21 311:3 311:10,14,15,20 311:21,22 312:5,9 312:14 313:6,9,20 318:19,20,22,24 319:3,5,10,16,22 321:18,24 322:15 323:6,9,14,14,15 323:19,22,23,24 324:1,11,13,15,19 324:20 325:4,7 328:12 329:3,5,9 329:13,24 330:3,5 332:14,16,24 333:2,6,11,14,17 333:19 335:7 336:1,8,14 337:2 337:20,25 338:1,2 338:10,18,23 339:1,2,13,19,21 339:23 340:3,8,10 340:20,24 341:4,5 341:8,16 342:10 342:18 343:4,10 343:19 344:9,12 344:14,15,19 345:7,11,13,17,19 345:22 346:2,8,11 346:12,18 347:17 348:9,24 349:19 350:6,9,17 351:24 353:1 354:5,7 | 356:6,9 357:12,17 357:18,20,24 359:9,20 360:1,11 360:22 361:1,15 362:2,3,14,22 363:1,9,16,19,22 364:11,13,18 365:1,10 368:17 368:18,24 369:11 369:14 371:2,12 371:14,19 372:6 372:17,18 373:25 374:5,7,12,23 375:8 376:10,15 377:4 378:7,14,17 378:25 379:15,15 379:19,23 380:1 380:11,14,22 381:6,7,10 383:10 383:21,25 385:2 385:23 388:6,14 388:16,18 389:8 390:4,25,25 391:5 391:10,13 392:7 392:20,24 393:4 394:2,8,10,11 395:15,24 396:7 397:1,5,12 398:14 401:5,20 404:11 406:15 407:8,12 408:10,17 409:12 409:14 411:17 412:11,14,15,16 412:18 413:1,12 413:12,21 414:17 414:21 415:10,19 415:24 416:8,9,24 417:2,6,8,13 418:1 418:2,5,9,15,20,24 425:24 428:25 432:17 434:21,24 | 435:10,13,15 436:6 458:3 504:14<br>**working** 273:1 281:10 287:21 293:22 299:4 309:13 316:5 346:19,21 347:14 347:25 348:20 354:15 356:11 357:9 360:12,17 366:21 371:3 379:16 398:3 408:20 418:25 434:25 446:19 473:4 485:10<br>**works** 285:6 286:13 322:1,1,7 350:4 394:19 411:20 454:16 479:10<br>**worm** 482:14<br>**worms** 481:20 482:7,9,15 483:6 483:25<br>**wrapped** 325:17<br>**write** 337:20 365:8 366:6,7,11,24 367:23 368:10 386:25 392:13 402:1 405:5 415:18 417:13,20 417:21 419:21 444:17 476:20<br>**writes** 321:15 374:5 375:18 383:4 386:19 414:18 416:16 462:4 463:11 464:25 500:13 | **writing** 301:13 332:3 360:15 368:6 400:13,20 400:21 417:25 432:2 460:11<br>**written** 271:3 318:3,7 321:5 332:1,6 334:21 335:2 337:16 373:20,21 382:9 387:17 392:2,3 397:8 403:9 414:12,16,22 416:21 418:10,19 418:24 423:2 426:15 432:5 459:12 462:12 464:18,24 482:1<br>**wrong** 338:25 344:3 358:4 363:7 368:10 398:9 438:1 471:4 475:21,22,24 476:3,3,4,5,5,19 476:21,22,22,23<br>**wrote** 370:7 414:19 431:18,25 476:18 478:17 |

| x |
|:---:|
| **x** 268:1,5 269:1 507:19 |

| y |
|:---:|
| **y** 290:21 |

**yeah** 273:9 283:15 287:13 296:3 321:2,9 322:22 330:25 336:25 339:18 342:8,17 346:5 352:23 354:1 359:7 362:7

**[yeah - zoom]**

| | **z** |
|---|---|
| 363:11 366:24 367:16 371:6,6,15 378:2,4,19 379:14 393:15,24 394:6 395:4 397:6,24 402:21 412:9 416:5 421:18 423:7,10 426:24 427:24,24 437:15 438:21 439:4,10 451:15 453:15 454:21 459:3,23 460:5 464:8,9 466:18,20 467:9 467:14 471:2,12 473:13 474:21 476:4,23 477:6 478:20,22 489:7 493:23,25 494:16 496:6 502:18 506:2 | **zoom**   270:4 274:25 |
| **year**   281:7,9 287:7 287:14 297:4 298:4,5 301:21 349:5 352:9 372:2 372:3,4 415:5 433:20 440:21 457:15 465:2 467:23 482:17 485:21 | |
| **years**   280:21,24 287:3 288:6,12,22 289:4 290:25 297:5,6 298:8,11 310:9 349:5 352:11 359:11,12 423:1 486:2 491:14 | |
| **york**   265:20 | |
| **you're**   476:24 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.