1

2           IN THE UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF GEORGIA
3                 COLUMBUS DIVISION

4        Civil Action File No. 4:18-cv-00070-CDL

5    _____

6    WILHEN HILL BARRIENTOS, et al.,

7            Plaintiffs,

8        vs.                     REDACTED VERSION of [225] filed in
                                 compliance with Order [342]
9    CORECIVIC, INC.,

10           Defendant.
     _____

11

12

13

14               REMOTE DEPOSITION OF
                   RUSSELL WASHBURN
15

16                  Lumpkin, Georgia

17            Wednesday, December 1, 2021

18

19

20

21

22

23

24   Court Reporter:  Michelle M. Boudreaux-Phillips, RPR

25                 TSG Job No. 201678

Page 2

```
1
2
3
4
5
6              December 1, 2021
7              10:01 a.m.
8
9
10      Remote deposition of RUSSELL WASHBURN,
11   conducted at the location of the witness in
12   Lumpkin, Georgia, pursuant to Agreement,
13   before Michelle M. Boudreaux-Phillips, a
14   Registered Professional Reporter in the State
15   of Georgia.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2                      APPEARANCES
3                      (Via Zoom)
4
5   On behalf of the Plaintiffs:
6       ALAN HOWARD, Esq.
        Perkins Coie LLP
7       1155 Avenue of the Americas
        22nd Floor
8       New York, New York 10036
9
10      CAITLIN SANDLEY, Esq.
        Southern Poverty Law Center
11      400 Washington Avenue
        Montgomery, Alabama 36104
12
13
14  On behalf of the Defendant:
15      JACOB B. LEE, Esq.
        Struck Love Bojanowski & Acedo
16      3100 West Ray Road
        Suite 300
17      Chandler, Arizona 85226
18
19
    Also Present:  Jackie Aranda Osorno, Esq.
20                 Meredith Stewart, Esq.
21
22
23
24
25
```

Page 4

```
1
2                       INDEX
3                    EXAMINATIONS
4    By Mr. Howard ........................... 9
5    By Ms. Sandley .......................... 118
6
7                      - - -
                      EXHIBITS
8
    Exhibit                                   Page
9
    Exhibit 1 ............................... 31
10     Fourth Revised Notice of Rule 30(b)(6)
       Deposition and Request for Documents
11
    Exhibit 2 ............................... 55
12     CoreCivic 2020 Annual Report, Form 10-K
13  Exhibit 3 ............................... 64
       Amendment of Solicitation/Modification of
14     Contract, Effective Date 2/4/2016
       [CCBVA0000000439, etc.]
15
    Exhibit 4 ............................... 75
16     Amendment of Solicitation/Modification of
       Contract, Dated 6/30/2006 [STEW0000050, etc.]
17
    Exhibit 5 ............................... 85
18     May 15, 2015 email chain
       [CCBVA0000196534, etc.]
19
    Exhibit 6 ............................... 113
20     2/29/2016 email with attachments to
       Charlie Peterson from Rhonda Williams
21     [CCBVA0000258426, etc.]
22  Exhibit 7 ............................... 121
       August/September 2017 email chain with
23     attachments [ICE Barrientos 0024518, etc.]
24  Exhibit 8 ............................... 123
       May 23, 2006 letter to Anthony Gomez from
25     John Patterson [CCBVA0000004714, etc.]
```

Page 5

```
1
2                   INDEX (Cont'd)
3
    Exhibit                                   Page
4
    Exhibit 9 ............................... 129
5      Amendment of Solicitation/Modification of
       Contract, Dated 6/30/2006
6      [CCBVA0000105880, etc.]
7   Exhibit 10 .............................. 132
       Amendment of Solicitation/Modification of
8      Contract, Dated 6/30/2006
       [CCBVA0000244533, etc.]
9
    Exhibit 11 .............................. 135
10     Spreadsheet [CCBVA280792]
11  Exhibit 12 .............................. 148
       Corrections Corporation of America Prison
12     Inmate Telephone Agreement (with recovered
       expenses) [SECURUS_000095, etc.]
13
    Exhibit 13 .............................. 157
14     April 2019 email chain [CCBVA0000196130, etc.]
15  Exhibit 14 .............................. 161
       July 31, 2019 Memorandum for Nathalie Asher
16     from Waldemar Rodriguez (with attachment)
       [CCBVA0000006239, etc.]
17
    Exhibit 15 .............................. 162
18     ICE Uniform Corrective Action Plan
       (ODO Reviews), April 2-4, 2019
19     [CCBVA0000150697, etc.]
20  Exhibit 16 .............................. 169
       May 9, 2019 letter to Tae Johnson from
21     Lynn Cahill-Masching [CCBVA0000006060, etc.]
22  Exhibit 17 .............................. 184
       American Correctional Association
23     Accreditation Report, October 19, 2018
       [CCBVA0000150628, etc.]
24
25
```

Page 6

INDEX (Cont'd)

Exhibit                                              Page

Exhibit 18 ..................................... 190
   2013 CCA QA Audit Tool - Confidential
   [CCBVA0000274977, etc.]

Exhibit 19 ..................................... 203
   Performance-Based National Detention Standards
   2011 [CCBVA0000003317, etc.]

Exhibit 20 ..................................... 215
   Chapter 19, Resident Work Program, Effective
   Date August 16, 2017 [CCBVA0000003947, etc.]

Exhibit 21 ..................................... 215
   Detainee Voluntary Work Program Agreement,
   11/1/2012 [CCBVA0000004627]

Exhibit 22 ..................................... 217
   Chapter 18, Classification, Effective Date
   November 17, 2017 [CCBVA0000003918, etc.]

Exhibit 23 ..................................... 218
   Stewart Detention Center Work/Program Plan
   Guidelines [CCBVA0000118618, etc.]

Exhibit 24 ..................................... 233
   ERO, U.S. Immigration and Customs Enforcement,
   Enforcement and Removal Operations, COVID-19
   Pandemic Response Requirements, April 10, 2020

Exhibit 25 ..................................... 234
   ERO, U.S. Immigration and Customs Enforcement,
   Enforcement and Removal Operations, COVID-19
   Pandemic Response Requirements, October 19,
   2021

Exhibit 26 ..................................... 237
   8/27/2014 email with attachments to
   All Wardens from John Gimesh
   [CCBVA0000218703, etc.]

Page 7

INDEX (Cont'd)

Exhibit                                              Page

Exhibit 27 ..................................... 259
   Detainee Handbook Supplement, Stewart
   Detention Center [CCBVA0000000244, etc.]

Exhibit 28 ..................................... 267
   Post Orders, Facility Effective Date
   March 31, 2017 [CCBVA0000106421, etc.]

Exhibit 29 ..................................... 278
   9/5/2015 email chain
   [ICE-Barrientos 0012201, etc.]

Exhibit 30 ..................................... 286
   10/13/2015 email with attachments to
   Bill Spivey from John Gimesh
   [CCBVA0000218192, etc.]

Exhibit 31 ..................................... 290
   CCA, Food Service Operations, Effective Date
   March 11, 2011 [CCBVA0000016052, etc.]

Exhibit 32 ..................................... 292
   Trinity Services Group, Stewart Correctional
   Facility 17720 CC, Dated 8/31/2020
   [CCBVA0000118425, etc.]

Exhibit 33 ..................................... 297
   10/9/2015 email chain with attachments
   [CCBVA0000196386, etc.]

Exhibit 34 ..................................... 300
   June 18, 2014 letter to Shelton Richardson
   from Calvin Blue [CCBVA0000207174, etc.]

Exhibit 35 ..................................... 306
   Detainee Grievance, Dated Submitted 4/23/2018
   [CCBVA0000217504]

Exhibit 36 ..................................... 308
   Inmate/Resident Grievance [PLS_0001625, etc.]

Page 8

INDEX (Cont'd)

Exhibit                                              Page

Exhibit 37 ..................................... 311
   Queja De Residente, Fecha 11/02/2020
   [CCBVA0000118271, etc.]

Exhibit 38 ..................................... 319
   CoreCivic Record Retention Schedule, Effective
   Date January 1, 2016 [CCBVA0000105921, etc.]

Exhibit 39 ..................................... 320
   Request for Records Disposition Authority,
   Date Received 3/10/11

Exhibit 40 ..................................... 333
   Stewart Detention Center, 24 Hour Routine for
   General Population, Revised Date March 6, 2019
   [CCBVA0000004652, etc.]

Page 9

```
 1              RUSSELL WASHBURN
 2         THE COURT REPORTER:  All parties to this
 3    deposition are appearing remotely and have
 4    agreed to the witness being sworn in
 5    remotely.  Due to the nature of remote
 6    reporting, please pause briefly before
 7    speaking to ensure all parties are heard
 8    completely.
 9         Counsel, please state your appearance.
10         MR. HOWARD:  Alan Howard of Perkins Coie
11    for the plaintiffs.
12         MR. LEE:  And Jacob Lee for CoreCivic.
13              RUSSELL WASHBURN,
14    being first duly sworn, was examined and testified as
15    follows:
16              EXAMINATION
17    BY MR. HOWARD:
18    Q    Good morning, Mr. Washburn.
19    A    Good morning.
20    Q    My name, again, is Alan Howard.  I'm an
21    attorney sitting in New York City on behalf of the
22    plaintiffs.  My colleague, CJ Sandley, will be asking
23    you some questions as well, but I'm batting leadoff
24    today.
25         First, let me ask you, have you ever given a
```

RUSSELL WASHBURN

2  deposition before?

3      A    Yes, sir, I have.

4      Q    And how many times?

5      A    I don't know the exact number.  I would say

6  six or seven.

7      Q    And do all of these relate to your work at

8  CoreCivic?

9      A    Yes, sir.

10     Q    Can you tell me generally the types of

11 matters that you've given depositions in?

12     A    The majority of them were inmate or detainee

13 cases.  I know one was on a religious case.  Another

14 one was on a PREA, which is Prison Rape Elimination

15 Act, case.  The one staff one that I can remember is I

16 think -- I believe it was a wrongful termination that

17 the claim was for.  Outside of that, I can't recall any

18 other specifics.

19     Q    Have you given deposition testimony in any

20 case since you've came to Stewart?

21     A    Yes.

22     Q    What did that involve?

23     A    Those are the two case.  They were not

24 Stewart cases, but they were from my previous facility,

25 but I was at Stewart.

RUSSELL WASHBURN

2      Q    Understood.  So you've not given any

3  testimony, deposition testimony, involving your

4  activities at Stewart; is that correct?

5      A    I don't believe so, no, sir.

6      Q    How about any legal proceedings involving

7  activities at Stewart, have you been involved in any of

8  those?

9      A    Yes.  When I first arrived, it was relative

10 to the COVID, onset of COVID, and those types of

11 things.  It was a conversation with a judge.  I'm not

12 sure if they were doing it -- like I said, I was

13 probably here two or three weeks, and I had to get on a

14 call and then speak with a judge, so I couldn't really

15 tell you what that was all about.  It was just more

16 about the COVID and social distancing and those types

17 of things.

18     Q    Understood.  It's been challenging times

19 since your arrival, I gather?

20     A    Since day one.  I came in right at the onset

21 of COVID, so yes, sir.

22     Q    Let me just give you some ground rules,

23 you're familiar with it, but just as to how we'll

24 proceed today, in particular in a remote environment.

25          As the court reporter said, it's very

RUSSELL WASHBURN

2  important to have a pause to make sure I finish my

3  question before you begin answering, and I'll try not

4  to interrupt you as well.  If I do on occasion, please

5  just let me know and continue your answer.

6      A    Yes, sir.

7      Q    It's also important to have verbal responses,

8  as opposed to nods of the head, so the court reporter

9  can take down all your testimony.

10     A    Yes, sir.

11     Q    If you don't understand one of my questions,

12 please let me know and I'll rephrase it.  And if you

13 don't hear one of my questions completely, let me know

14 and I'll repeat it.

15     A    Understood.

16     Q    So any time you want to take a break, please

17 just let me know and I will accommodate you.

18     A    Yes, sir.

19     Q    One other thing -- you're probably aware of

20 this too -- from time to time your counsel may make

21 objections to questions that Ms. Sandley or I pose to

22 you.  And unless your counsel, Mr. Lee, gives you an

23 instruction not to answer the question, after he's

24 completed his objection, the expectation is you will

25 give an answer, okay?

RUSSELL WASHBURN

2      A    Understood.

3      Q    A question we ask of all witnesses, are you

4  taking any medication or is there any other reason you

5  can't give your best testimony today?

6      A    No, there's no reason.

7      Q    Terrific.

8          So you understand you're here to give

9  testimony on behalf of CoreCivic as CoreCivic's

10 designated witness on a variety of topics relating to a

11 lawsuit filed against CoreCivic in April 2018 relating

12 to detainees at the Stewart Detention Center in a

13 voluntary work program, correct?

14     A    Yes, sir.

15     Q    When did you first learn about the lawsuit

16 itself?

17     A    Let's see.  I arrived in April of 2020,

18 April 1st.  I can't pinpoint the exact date.  It would

19 have been sometime shortly thereafter, but to recall a

20 specific date, I really can't.  I know it probably came

21 by way of a request for documents, but even that, it

22 would be specification.  I suspect that's probably when

23 I became aware, when there was a request for documents

24 pertaining to this specific case

25     Q    And that was after you'd already started as

                    RUSSELL WASHBURN
1                   RUSSELL WASHBURN
2    warden at Stewart in April of 2020?
3        A    Yes, sir.
4        Q    Did you have any conversation, as part of the
5    onboarding process coming in as the warden at Stewart,
6    with anyone about the lawsuit?
7        A    No, not prior to the request for documents.
8        Q    Other than the request for documents, did you
9    have any conversations -- and I'm not going to ask for
10   content yet -- with anyone about the lawsuit?
11       A    Outside of my lawyers or attorneys?
12       Q    Well, put aside -- outside of your
13   preparation for this deposition, from the time you
14   joined Stewart, you came onboard as warden at Stewart
15   in April of 2020, up until you started preparing for
16   this deposition, did you have any conversations with
17   anyone about the lawsuit?
18       A    Yeah, I was -- I had conversations with the
19   attorneys as they were requesting specific documents,
20   and that conversation would have been more specifically
21   to the types of documents that they were requesting for
22   this lawsuit.
23       Q    Other than the lawyers requesting documents
24   for the lawsuit, did you have any substantive
25   conversations with anyone about the allegations in the

1                   RUSSELL WASHBURN
2    lawsuit?
3        A    No, sir.
4        Q    And is that true up and until the time where
5    you came to Stewart as warden after this lawsuit
6        A    Yes, sir.
7        Q    When did you start preparing for this
8    deposition?
9        A    I guess it would be about three weeks ago.  I
10   started reviewing documentation and having
11   conversations with our lawyers.
12       Q    So just to clarify, from April of 2020, when
13   you came to Stewart as the warden after this lawsuit
14   had already been filed, up until, say, October of 2021,
15   you've had no substantive conversations with anyone
16   about the allegations of the case?
17            MR. LEE:  Object to form.
18            THE WITNESS:  Specific to the
19       allegations, no.
20       Q    (By Mr. Howard)  Did you ever read the
21   complaint in the case before you started preparing for
22   the deposition?
23       A    No.
24       Q    Did anyone tell you that there was requested
25   remedy of injunctive relief involving conduct of

1                   RUSSELL WASHBURN
2    CoreCivic at Stewart pending when you came to Stewart
3    as warden?
4            MR. LEE:  Object to form.
5            And I'll remind the witness to not
6        answer to the extent that would require
7        discussing conversations with counsel, either
8        outside or internally at CoreCivic.
9            THE WITNESS:  No, other than with my
10       attorneys.
11       Q    (By Mr. Howard)  And you told me what the
12   context -- what the content of your conversations with
13   your attorneys was before.
14            So is it fair to say that you, as the warden
15   coming into Stewart in April of 2020 up until present,
16   have taken no specific steps to determine for yourself
17   whether the allegations in the complaint are true or
18   not true and whether any measures should be taken by
19   CoreCivic at Stewart with respect to the allegations in
20   the complaint?
21            MR. LEE:  Object to form and foundation.
22            THE WITNESS:  Maybe I don't understand
23       the -- could you rephrase the question or
24       clarify the question?
25            MR. HOWARD:  Sure.

1                   RUSSELL WASHBURN
2        Q    (By Mr. Howard)  You've told me you haven't
3    read the complaint, that you didn't have substantive
4    conversations about the allegations in the complaint,
5    so I'm just asking the natural follow-up.
6            Is it fair to say, then, that you yourself, as
7    warden at Stewart, have not taken steps to determine
8    for yourself the truth of the allegations in the
9    complaint?
10           MR. LEE:  Object to form.
11           THE WITNESS:  No, that would not be
12       true.  You know, as the warden, I'm
13       responsible for making sure that we're in
14       compliance with the PBNDS standards, the 5.8,
15       which is specific to this case.  So being
16       knowledgeable of the requirements for this
17       particular program would be an expectation
18       regardless of this case or not.
19       Q    (By Mr. Howard)  But other than being
20   responsible for being in compliance with PBNDS, do you
21   even know what the allegations of the complaint are
22   beyond that?
23           MR. LEE:  Object to form.
24           THE WITNESS:  My understanding of the
25       allegation is that people are being -- the

Page 18

RUSSELL WASHBURN

1
2    detainees were being forced to work.  That's
3    my understanding of the case.
4        Q    (By Mr. Howard)  That's your complete, full
5    understanding of the case?
6        A    Yes.
7        Q    And is it your view, then, that if you, as
8    warden, assure that CoreCivic is operating at Stewart
9    within the parameters of the PBNDS, that is a complete
10   defense to the allegations in the complaint?
11           MR. LEE:  Object to form and calls for a
12       legal conclusion.  I didn't object to some of
13       the earlier questions as background, but
14       we're kind of getting into Warden Washburn's
15       personal opinions, which is beyond the scope
16       of the 30(b)(6) notice.
17       Q    (By Mr. Howard)  You may answer.
18       A    If you could -- give me the question one more
19   time.  I apologize.
20           MR. HOWARD:  Yeah.  Michelle, could you
21       please read that back.
22           (Record read.)
23           MR. LEE:  Object to form.  Beyond the
24       scope.
25           THE WITNESS:  My answer would be my

Page 19

RUSSELL WASHBURN

1
2    responsibility is, yes, to ensure that we're
3    operating in full compliance with the PBNDS
4    standards and the policies that are
5    applicable, so yes.
6        Q    (By Mr. Howard)  When you say "the policies
7    that are applicable," what policies are you referring
8    to?
9        A    All of our policies, the 19-100, which is the
10   policy that we have here at Stewart specific to the
11   voluntary work program, and then, of course, the PBNDS
12   standard, which is 5.8.
13       Q    Now, other than those policies that you just
14   mentioned, are there any other policies or procedures
15   that CoreCivic has established with respect to how it
16   is going to operate the work program at Stewart?
17       A    No.  I believe those are the primary two
18   policies that govern the voluntary work program.
19       Q    Okay, but you're familiar with the PBNDS and
20   Policy 19-100?
21       A    Yes, sir.
22       Q    And there's nothing in those standards which
23   dictates what jobs at Stewart CoreCivic can have
24   detainees perform or not, correct?
25           MR. LEE:  Object to form.

Page 20

RUSSELL WASHBURN

1
2           THE WITNESS:  No, not in those two
3       policies, that I'm aware of.  18-100, I
4       believe, has the outline of specific jobs
5       that are available here at Stewart, but
6       19-100 and PBNDS standards do not have a list
7       of jobs.
8        Q    (By Mr. Howard)  So tell me, for purposes of
9    determining what jobs at Stewart would be available for
10   detainees, who determines that?
11       A    It would rest with the facility.
12       Q    And who at the facility determines that?
13       A    It would be -- the ultimate would be the
14   warden's final approval, but it would be established in
15   a committee of the unit team members, the chief of
16   security, the chief of unit management, assistant
17   wardens, warden, you know, as far as the approval
18   process.  But any person really could make a
19   recommendation or a request, and then those would have
20   to go through the evaluation piece to ensure that
21   there's not any life safety/security issues that may be
22   concerning for whatever the role or the jobs they're
23   requesting to be added.
24       Q    Got it.  And that process has taken place
25   under your supervision since you've been warden?

Page 21

RUSSELL WASHBURN

1
2        A    No, we've not added or deleted any positions
3    that were not already in existence upon my arrival.
4    And I've looked at the particular ones that have been
5    used and approved, and I have no concerns or issues
6    with those.
7        Q    Okay.  And you've looked at those as part of
8    the process of preparing for the deposition or as part
9    of your job as warden?
10       A    Both.
11       Q    And is it fair to say that was an entirely
12   CoreCivic-driven process, in other words, it was
13   totally up to CoreCivic to decide, you know, what kinds
14   of jobs detainees would fill, how many of those jobs
15   detainees would fill at Stewart; is that correct?
16           MR. LEE:  Object to form.
17           THE WITNESS:  I would say yes, but I
18       would suspect that we would also -- and,
19       again, because I have not added or deleted
20       any job titles since my arrival, I would
21       suspect -- and I would certainly engage ICE
22       into the conversation before I either took
23       away or added any new jobs, but I don't know
24       that there's a requirement for us to do
25       that.

Page 22

RUSSELL WASHBURN

2    Q    (By Mr. Howard)  And do you know for sure
3  whether your predecessor wardens or committees of unit
4  management, et cetera, as you described them, did that
5  for any particular jobs, or are you just making an
6  assumption?
7    A    Yeah.
8         MR. LEE:  Objection.
9         THE WITNESS:  Sorry.  I can't speculate
10   what they did or did not do before my
11   arrival.
12   Q    (By Mr. Howard)  Now, with respect to pay for
13 detained workers, the standards set a floor, a minimum,
14 that you're required to pay detainees, correct?
15   A    That is correct.  One dollar.
16   Q    One dollar per day?
17   A    That's correct.
18   Q    But, in fact, CoreCivic has paid some workers
19 more than $1 per day, up to, for example, $4 per day
20 for kitchen workers, right?
21   A    That's correct.  We do not currently have any
22 positions that pay the minimum.
23   Q    What's the minimum amount that you pay at
24 Stewart currently?
25   A    Two dollars.

Page 23

RUSSELL WASHBURN

2    Q    And do some people make $3?  Like, is there
3  2, 3, and 4, or is it 2 or 4?
4    A    Yes, it's either one or two positions.  I'd
5  have to look at the document.  I think -- it's either
6  18.1 or 18-100.  I apologize, I can't remember that,
7  but I know it's a CC form, but it's either one or two
8  positions that are at $3, and there's a handful that
9  are at $4.
10   Q    And that was CoreCivic's decision to pay some
11 workers $2 and other workers $4, correct?
12   A    Yes.
13   Q    ICE didn't dictate that?
14   A    No.  What's in the standards is the dollar,
15 and that's what ICE dictates, is the dollar.
16   Q    And CoreCivic has the discretion to pay more
17 than a dollar?
18   A    Yes, we do.
19        MR. LEE:  Form.
20        THE WITNESS:  Sorry.
21   Q    (By Mr. Howard)  You could pay the detainees
22 minimum wage if you wanted to, right?
23   A    There is no maximum level that has been
24 established.
25   Q    That's totally within CoreCivic's discretion?

Page 24

RUSSELL WASHBURN

2    A    Yes, it is.
3    Q    Now, it's also CoreCivic's determination as
4  to how you are going to recruit workers to participate
5  in the program, correct?
6    A    Yes.  I think I understand the question.
7  Through the classification process and meeting certain
8  criteria for job placements, yes.
9    Q    And CoreCivic will determine whether or not
10 to provide incentives to get detainees to participate
11 in the work program, correct?
12   A    Can you clarify "incentives"?
13   Q    Sure.  There are -- for example, giving more
14 pay to kitchen workers to incentivize detainees to work
15 in the kitchen or putting kitchen workers in separate
16 housing with extra perks, things like that.
17   A    Yes, sir, that is within CoreCivic's ability.
18   Q    And CoreCivic has done that?
19   A    Yes.
20   Q    For example, one incentive has been to
21 provide certain workers with phone cards as incentives
22 for extra work; is that correct?
23   A    I don't recall since I've been here if we've
24 done that.  I can't say for sure that we have not.  I
25 don't recall that we have specifically here at Stewart.

Page 25

RUSSELL WASHBURN

2    Q    There's some documentation to that effect,
3  but I take it that among the documents you reviewed in
4  preparation for this testimony today, you did not see
5  those?
6    A    I don't recall those documents.
7    Q    CoreCivic determines the shifts that detained
8  workers will work, correct?
9    A    Yes.
10   Q    CoreCivic determines when detained workers
11 commit an offense relating to the work program that
12 merits discipline, correct?
13        MR. LEE:  Object to form.
14        THE WITNESS:  No, because we do not
15   discipline specifically for the voluntary
16   work program.
17   Q    (By Mr. Howard)  CoreCivic has never
18 disciplined anyone for acts relating to the work
19 program, like, for example, not showing up for work?
20        MR. LEE:  Object to form.
21        THE WITNESS:  Again, I can't respond for
22   every facility without looking at their
23   documents.  Or if you have documents, I
24   certainly can take a look at that and answer
25   more clearly to that.  But to my knowledge,

RUSSELL WASHBURN

1
2      specifically, not that I'm aware of.
3      Q    (By Mr. Howard)  Well, I understand you might
4  not have personal knowledge of this happening at
5  Stewart, and I can show you documents, but let me ask,
6  going back to your designation as a 30(b)(6)
7  representative of the company, CoreCivic, what, if
8  anything, did you do to educate yourself as to whether
9  any discipline had ever been applied to detainees
10  relating to the work program at Stewart over the last
11  10 years?
12          MR. LEE:  Object to form.
13          THE WITNESS:  I read through the
14      documents that were provided by counsel, but
15      to say I recall/remember every -- specifics
16      in all those documents, I can't.
17      Q    (By Mr. Howard)  So you did mention that you
18  reviewed documents, those that were provided by
19  counsel.  Can you tell me the volume of those
20  documents?
21      A    No.  I mean, I can tell you types of
22  documents I reviewed, but the number, I reviewed some
23  invoices, some budgets that were provided, pay sheets
24  for detainees, previous depositions from other
25  individuals that have already been deposed -- bear with

RUSSELL WASHBURN

1
2  me; I'm working through -- contract amendments and
3  changes, the contract itself.  I'm sure there were
4  others.  It's a pretty lengthy list of documents that I
5  went through.
6      Q    And these were all documents that counsel
7  chose for you to review, or did you make any requests
8  to see certain documents that you made to counsel?
9      A    No.  These were all provided by counsel.
10      Q    And selected by counsel, correct?
11      A    That's correct.
12          MR. LEE:  Object to form.
13          THE WITNESS:  I'm sorry.
14      Q    (By Mr. Howard)  Were there emails among the
15  documents that you reviewed?
16      A    There were some emails, yes.
17      Q    Can you recall any in particular?
18      A    No, sir.  Again, if you're able to show them
19  to me, we can talk through them.
20      Q    You mentioned that you did review depositions
21  taken in this case.  Can you recall which deponents,
22  which witnesses?
23      A    Jackie Norman's, Terrence Lane, Bethany --
24  it's now Braizer, but Norman, Mike Swinton.  Those are
25  the four I can recall off the top of my head.

RUSSELL WASHBURN

1
2      Q    Were you provided with the exhibits to those
3  transcripts as well?
4      A    Yes, I believe so.
5      Q    Did you review those?
6      A    Some.  I won't say all.
7      Q    You mentioned also you've had, obviously,
8  discussions with counsel.  Have you had any in-person
9  meetings with counsel in preparation for the
10  deposition?
11      A    No, sir.
12      Q    Were your meetings by Zoom or by phone?
13      A    By phone.
14      Q    How many times did you speak with counsel in
15  preparation for the deposition?
16      A    Once by phone.  Yeah, once by phone.  I think
17  we exchanged a couple of emails, and that was more to
18  say some documents have been uploaded for review-type
19  communications.
20      Q    So once by phone?
21      A    Yes, sir.
22      Q    And for how long did you speak?
23      A    Between an hour and a half, two hours.
24      Q    How long ago was that?
25      A    Yesterday.

RUSSELL WASHBURN

1
2      Q    So just prior to yesterday, you had no
3  substantive conversations with counsel concerning this
4  deposition or your preparation for this deposition?
5      A    No, outside of, you know, document requests
6  that had occurred, you know, prior to.
7      Q    Earlier in the case.  I'm talking now just
8  about your preparation work for this deposition.
9  Counsel sent you some documents and transcripts that
10  you reviewed?
11      A    Correct.
12      Q    And yesterday you had an hour-and-a-half to
13  two-hour call?
14      A    Yes, sir, that's correct.
15      Q    Did you speak to any other -- I take it that
16  the counsel is Mr. Lee?
17      A    Yes.
18      Q    Other than Mr. Lee, have you spoken to any
19  other person in preparation for this deposition today?
20      A    No.
21      Q    For example, you didn't call up any of the
22  other witnesses who gave testimony to ask them for
23  clarification or questions about things they talked
24  about?
25      A    No.

**Page 30**

RUSSELL WASHBURN

2  Q   I mean, some of those witnesses you
3  mentioned, I know I took the deposition of Mr. Swinton,
4  and he talked about giving phone cards for incentives.
5  We just talked a moment ago whether you were aware that
6  happened to your knowledge, you said no, but did you
7  recall seeing that in Mr. Swinton's deposition?
8       MR. LEE:  Object to form.
9       THE WITNESS:  Again, to remember every
10      item -- they were pretty extensive
11      depositions, on all of them, so to say that I
12      remember verbatim what all the questions and
13      the responses were, I can't do that, and I'm
14      not sure that any person could.
15  Q   (By Mr. Howard)  Well -- and you say you
16  still haven't -- did you read the complaint in this
17  action or any of the other pleadings, the court
18  filings, in connection with your preparation for this
19  deposition?
20  A   No, I don't believe so.
21      MR. HOWARD:  Jackie, can you pull up for
22      me the 30(b)(6) notice.
23      Please bear with us, Mr. Washburn.  The
24      process here -- one of my colleagues pulls up
25      and shares the screen, but there's a process

**Page 31**

RUSSELL WASHBURN

2  she has to go through about marking it as an
3  exhibit to your deposition.  It takes a
4  minute or two.
5       THE WITNESS:  Understood.
6       (Exhibit 1 marked for identification.)
7  Q   (By Mr. Howard)  We've marked as Exhibit 1 to
8  your deposition a document entitled "Fourth Revised
9  Notice of Rule 30(b)(6) Deposition and Request for
10  Documents."
11      I'll have Jackie scroll through this and get
12  to the topics for the deposition, but my first question
13  is whether you've seen this document before.
14  A   Yes, sir, I have seen this document.  Yes.
15  Q   Okay.  And this was a document provided by
16  counsel to you?
17  A   Yes, sir.
18  Q   When was this document provided to you?
19  A   To say when it specifically was uploaded in
20  that SharePoint area that legal -- or counsel was
21  putting these documents, I don't know that I can answer
22  that.  I know we spent a good amount of time yesterday
23  going through this document with counsel.
24  Q   So was yesterday the first time you went
25  through this document and reviewed it with counsel?

**Page 32**

RUSSELL WASHBURN

2       MR. LEE:  Object to form.
3       THE WITNESS:  In depth, yes, sir.
4  Q   (By Mr. Howard)  When you say "in depth," was
5  there a prior time when you did so less in depth?
6  A   I'm sure there was over that couple-week
7  period of time from the time it was uploaded.  I would
8  have looked at it, yes.
9  Q   And did you have an understanding, when it
10  was provided to you, that you would be the designated
11  person to talk to -- talk on behalf of CoreCivic about
12  all of these topics?
13  A   Yes.
14  Q   And I take it you certainly didn't have
15  personal knowledge of all of these topics or subtopics,
16  did you?
17  A   No.
18  Q   So other than reviewing the documents that
19  counsel provided to you, what steps, if any, did you
20  take to educate yourself about the topics as to which
21  you do not have personal knowledge?
22  A   Again, reviewing the documents provided by
23  counsel and then the discussions with counsel.
24  Q   Nothing else?
25  A   No.

**Page 33**

RUSSELL WASHBURN

2  Q   You didn't speak to anybody else at CoreCivic
3  who might have personal knowledge as to some of these
4  topics?
5  A   No, sir.
6  Q   You didn't speak to any of your
7  predecessors/wardens at Stewart?
8  A   No, sir.
9  Q   You didn't speak to any of the other
10  deponents in this case?
11  A   No, sir.
12  Q   Did you speak to anybody at CoreCivic
13  corporate about any of these topics?
14  A   Outside of counsel, no.
15  Q   You spoke to internal CoreCivic counsel in
16  Nashville, is that right, or are you speaking now just
17  about Mr. Lee?
18  A   No.  One of the -- we refer to is as FSC,
19  Facility Support Center.  One of our attorneys was on
20  the call yesterday for a brief period of time, and
21  although I didn't have any direct communication with
22  Ms. Williams, she was on the call for at least a
23  portion of that call.
24  Q   And she's an attorney at FSC?
25  A   Yes.

Page 34

RUSSELL WASHBURN

2  Q   And was -- I don't want to get into the
3  specifics of your conversation, obviously, with an
4  in-house attorney; however, I would like to know
5  whether conversations with Ms. Williams were intended
6  to educate you on topics on this notice.
7       MR. LEE:  Form and foundation.
8       THE WITNESS:  I'm sorry, sir, I thought
9  you had more.
10      MR. HOWARD:  No.  I thought I might have
11 as well, but I just left it at that.
12      Q   (By Mr. Howard)  Was any of the conversation
13 with Ms. Williams designed to educate you as to topics
14 on Exhibit 1?
15      MR. LEE:  Form and foundation.
16      THE WITNESS:  Yes.
17      Q   (By Mr. Howard)  Which topics?  Do you recall
18 specifically?
19      A   If you scroll -- if you're able to scroll, I
20 can tell you the topic number.  It was relative to
21 contracts, but I'm not sure of the exact title, so if
22 you can scroll through, I can tell you.
23      Q   Okay.  So that would be Topic 6?
24      A   Well, if you can go to it, I'll tell you for
25 sure.

Page 35

RUSSELL WASHBURN

2  Q   (Complies with request.)
3  A   No, I don't believe that was the right one.
4  Q   Maybe 7?
5  A   And it could be 6.  I just read through it.
6  I apologize.  I should have read through it first
7  before I -- but we can look at 7.  It may have been,
8  actually, both.
9  Q   Well, let's stick on 6 for a minute.
10 A   Okay.
11 Q   I take it you personally were not involved in
12 negotiation of the intergovernmental services agreement
13 between Stewart and ICE, correct?
14 A   No, I was not.
15 Q   Or any of the modifications to that
16 agreement?
17 A   No, I was not.
18 Q   So I'm going to be asking you a series of
19 questions today about how that contract was negotiated
20 and about details about the modifications.
21      Are you prepared, based on your discussions
22 with Ms. Williams, to answer those questions?
23 A   Without hearing the questions, I don't know
24 that I could say whether I could or do could not
25 respond.

Page 36

RUSSELL WASHBURN

2  Q   Let's throw one out for example.  Are you
3  familiar with the various processes by which CoreCivic
4  can obtain government contracts, for example, bidding
5  process versus other processes?
6       MR. LEE:  Object to form.  Exceeds the
7  scope.
8       THE WITNESS:  To some degree, yes.  I
9  won't say I'm a subject-matter expert in that
10 regard; but, yes, I know that we do respond
11 to RFPs, requests for proposals, that are
12 sent out.  Of course, that's collectively
13 established and evaluated through appropriate
14 subject-matter experts, or SMEs, as we refer
15 to them, at our Facility Support Center that
16 starts that process to determine whether or
17 not we want to actively bid on that request
18 for proposal or not.
19 Q   (By Mr. Howard)  Do you know whether the
20 Stewart Detention Center contract with ICE was one that
21 CoreCivic bid for or obtained in some other way?
22 A   No, I do not know.
23 Q   So -- well, in the bidding process -- have
24 you been involved in the bidding process before for
25 contracts for CoreCivic?

Page 37

RUSSELL WASHBURN

2  A   Yes.  I mean, I've provided some information
3  relative to operations and have assisted with
4  determining appropriate staffing pattern levels if we
5  were to assume a contract or operate a facility.  So in
6  that regards, yes.
7  Q   Okay.  And all of that is important for
8  CoreCivic to assess in order to make a competitive bid,
9  a bid that will cover all of CoreCivic's costs but be
10 as competitive as possible, because you want to get
11 awarded the contract, right?
12      MR. LEE:  Object to form.  Exceeds
13 scope.
14      THE WITNESS:  Yes, all that information
15 would be necessary in order to determine what
16 would be the appropriate bid or offer for
17 that particular bid, yes.
18 Q   (By Mr. Howard)  And for any of the
19 facilities for which you did that bid, did those
20 include detention centers or just correctional
21 facilities?
22      MR. LEE:  Object to form.  Exceeds the
23 scope.
24      THE WITNESS:  All of my involvement
25 prior has been with other jails and prison

Page 38

RUSSELL WASHBURN

1       systems, correctional facilities.
2       Q    (By Mr. Howard)  Okay, but do you know
3   whether CoreCivic did the same assessment of its
4   operational needs and staffing at Stewart Detention
5   Center when negotiating for the bid -- for the contract
6   with ICE for Stewart?
7       A    Yes, we would have had to complete that
8   process.  That is our process internally, is to collect
9   all of the appropriate data so that we can collectively
10  determine the appropriate response to the request for
11  proposal.
12      Q    But even if it wasn't a request for proposal,
13  if it was just an intergovernmental services agreement
14  being negotiated in terms of things like the day rates
15  that would be paid, it would be important for CoreCivic
16  to assess what its costs would be in operating the
17  facility to negotiate a contract that would assure that
18  CoreCivic would get a profit, correct?
19      A    Yes.  We would have to know all of the costs
20  in order to enter into that agreement, yes.
21      Q    And one of the major costs for operating a
22  facility like Stewart is labor cost, right?
23      A    Yes.  I think that's common for virtually any
24  employer, yes.

Page 39

RUSSELL WASHBURN

1       Q    But would you say it's the highest cost of
2   operation of Stewart?
3       A    Yes.
4       Q    And that labor cost involves, you know, all
5   the jobs performed at Stewart, right?
6       A    Yes.
7            MR. LEE:  Object to form.
8       Q    (By Mr. Howard)  So that would include the
9   CoreCivic employees being hired to perform certain jobs
10  and the detainees who are performing certain jobs as
11  part of the work program, correct?
12           MR. LEE:  Object to form.
13           THE WITNESS:  Yes, it would.
14      Q    (By Mr. Howard)  And so in order to negotiate
15  a profitable contract with ICE for CoreCivic, CoreCivic
16  would have to assess how it was going to staff the
17  Stewart Detention Center with employees and with
18  detainee labor and determine how much that was going to
19  cost so that you could set an appropriate rate, day
20  rate, correct?
21           MR. LEE:  Form.
22           THE WITNESS:  Yes.
23      Q    (By Mr. Howard)  So do you know who did that
24  and how that was done at CoreCivic when you entered

Page 40

RUSSELL WASHBURN

1   into the original contract for the Stewart Detention
2   Center?
3       A    No, I would not know the who specifically.  I
4   think we're back in 2007, 2008, sometime in that time
5   frame, so I wouldn't know the who.
6       Q    Okay.  Well, how about the how?  What
7   calculations were made, in terms of how many jobs would
8   be filled by CoreCivic employees and how many would be
9   filled by detainees, when determining the cost -- the
10  labor cost of operation of Stewart in order to
11  negotiate an appropriate day rate in that contract?
12           MR. LEE:  Object to form.
13           THE WITNESS:  There's a lot of things
14      that go into consideration when you're
15      establishing what's the appropriate staffing.
16      Physical plant has a lot to do with staffing
17      needs.  Each plant may be a little different,
18      which may drive for additional staff versus
19      another design or build, different type
20      facility.  So that plays a big part.  And
21      then really assessing how many staff do we
22      need to provide and meet the contractual and
23      the standard requirement or policy
24      requirements are collective of all.

Page 41

RUSSELL WASHBURN

1       Q    (By Mr. Howard)  Okay, and I'm asking how
2   that was done for Stewart and what determinations were
3   made in connection with that staffing about what jobs
4   would be performed by CoreCivic employees versus what
5   jobs would be performed by detainees?
6            MR. LEE:  Object to form.
7            THE WITNESS:  I don't know that I
8       follow.  I felt I did respond when I was
9       talking about the physical plant and how many
10      staff that you would need for each specific
11      area of the facility in order to provide.
12           It's also an assessment of, you know,
13      what post is required to be 24 hours a day,
14      seven days a week versus what post would be
15      considered detail posts that may only cover a
16      five-day workweek for, you know, 40 hours a
17      week.
18           So, I mean, there's a lot of things that
19      go into consideration.  And then, again, the
20      contract requirements will have a big part
21      if -- those staffing elements and staffing
22      needs.
23           The primary focus is really more of
24      employees, not necessarily the detainee work

Page 42

RUSSELL WASHBURN

1                 RUSSELL WASHBURN
2 program or inmate work programs that are in
3 existence, because none of those are
4 permanent or ones that you can rely upon
5 because it's classification-driven. It's, in
6 this case, those who would want to volunteer
7 versus in a prison where they would
8 potentially be required to work or a
9 different contract.
10         So contract, physical plants, all of
11 those things would have been taken into
12 consideration, policies and procedures would
13 have been taken into consideration when
14 determining what is the appropriate staffing
15 pattern or levels for the Stewart Detention
16 Center.
17        MR. HOWARD: Okay. I appreciate all
18 that. I think you're missing the point of my
19 question, so let me try again.
20     Q   (By Mr. Howard) In order to negotiate a
21 contract with ICE that will pay CoreCivic all of its
22 costs, plus a profit -- because you're in business to
23 make money, you're a for-profit company, right?
24     A   We are, yes.
25     Q   So you would never knowingly negotiate a

Page 43

RUSSELL WASHBURN

1 contract where CoreCivic would lose money or even break
2 even, correct?
3     A   No, we would not.
4     Q   So if you were negotiating a contract for
5 Stewart because CoreCivic wanted to operate the Stewart
6 Detention Center, CoreCivic wanted to operate that
7 Stewart Detention Center at a profit, right?
8     A   Yes. We would have been working towards
9 meeting that profit margin, yes.
10     Q   And the primary price point, if you will, for
11 the ICE contract is the day rate that ICE would pay
12 CoreCivic per detainee per day, correct?
13     A   That's correct.
14     Q   And that's roughly now about 60-something
15 dollars; is that right?
16     A   67.84, I believe is the current rate, and
17 then 64 of that, I believe, goes to Stewart
18 County.
19     Q   So your net day rate for each detainee, and
20 we'll get into this in a little bit more detail, is
21 66 -- was it 66.85?
22     A   Eighty-four, I believe.
23     Q   Eighty-four, yeah.
24     Now, the original rate was a little bit

Page 44

RUSSELL WASHBURN

1 lower, but that original rate had to be negotiated by
2 CoreCivic knowing that amount of money per
3 detainee would cover all of CoreCivic's costs and
4 provide a profit, right?
5     A   Yes. We would not have entered into a
6 contract without such.
7     Q   And you know that labor would be the largest
8 cost that you would need to cover with that day rate,
9 correct?
10     A   Yes.
11     Q   And so you would have to make an
12 assessment -- CcoreCivic would have had to make an
13 assessment as to how much their labor costs would be to
14 operate the Stewart Detention Center before entering
15 into that contract?
16     A   Yes. Based on the staffing pattern, yes.
17     Q   Correct. And one component, a large
18 component, of that labor cost would be CoreCivic
19 employees, right?
20     A   Yes, that would be the largest. Yes.
21     Q   And that's because you're paying all the
22 CoreCivic employees at least minimum wage, if not more,
23 correct?
24     A   That's correct.

Page 45

RUSSELL WASHBURN

1     Q   But my question is, did you -- did CoreCivic,
2 when it was figuring out its labor costs to negotiate
3 that day rate in your original ICE contract, assume
4 that every single job would be performed by a CoreCivic
5 employee and assess the cost on the basis of that, or
6 was there an assumption made that at least some of the
7 jobs would be performed by detainees at a much lesser
8 wage, the dollar to four dollars a day, than the
9 CoreCivic employees were earning?
10     MR. LEE: Object to form.
11     THE WITNESS: Yeah, again, I don't know
12 that I've been privy to specific inmate or
13 detainee -- how that impacts the per diem
14 rate. To say that we wouldn't have known or
15 entered into -- knowing typically what types
16 of jobs were performed by inmate or detainee
17 labor, I'm sure we would have taken that into
18 factor.
19     How that specifically impacts the per
20 diem rate one way or the other, I don't know
21 that I'm capable of saying -- responding to
22 that right here and now.
23     Q   (By Mr. Howard) And you're not able to say
24 how many detainee laborers, how many detainee workers,

RUSSELL WASHBURN

1   and in what jobs CoreCivic assumed would be -- let me
2   rephrase that.
3        You can't say how many detainee jobs
4   CoreCivic -- detain -- I'm having problems this
5   morning.  I might need another cup of coffee.
6        A   It's early.
7        Q   It's not that early here.  I don't have that
8   excuse.
9        You can't say how many jobs CoreCivic assumed
10  would be performed by detainees when it negotiated the
11  original day rate in the ICE contract?
12       MR. LEE:  Object to form.
13       THE WITNESS:  No, I could not because I
14  wasn't a part of those discussions, nor do I
15  recall reviewing anything as such.
16       Q   (By Mr. Howard)  Is it fair to say that to
17  the extent CoreCivic negotiated a day rate based on a
18  certain level of labor costs based on jobs being
19  performed by paid CoreCivic employees, and then some of
20  those jobs that CoreCivic assumed would be performed by
21  CoreCivic employees end up getting performed by
22  detainees at a dollar to four dollars a day, then
23  CoreCivic would be saving money in terms of labor
24  costs, correct?
25

RUSSELL WASHBURN

1        MR. LEE:  Object to form, and really
2   getting beyond the scope here of what my
3   conversations with Ms. Sandley were about
4   what this topic was going to be, that it was
5   going to be more about general processes and
6   not specific negotiations as to how the
7   contract was performed.
8        MR. HOWARD:  I think this was pretty
9   general.  But you can answer if you're
10  able.
11       THE WITNESS:  I might need you to
12  clarify --
13       MR. HOWARD:  Sure.
14       THE WITNESS:  -- what you're asking me.
15       MR. HOWARD:  Sure.
16       Q   (By Mr. Howard)  So we've established that
17  CoreCivic does an assessment of what its labor costs
18  are going to be when negotiating the day rate in the
19  ICE contract, correct?
20       A   Correct.
21       Q   And one of the factors in the assessment of
22  labor costs is how many CoreCivic employees that you're
23  paying minimum wage or more are going to be hired to
24  operate Stewart, correct?
25

RUSSELL WASHBURN

1        A   That's correct.
2        Q   And if it ends up, after you negotiate the
3   contract and get a price that will cover you for those
4   costs, you don't hire as many people at Stewart as
5   CoreCivic employees, but you use more detainees for a
6   dollar to four dollars a day, then your labor costs are
7   lower and you're making more money; is that fair to
8   say?
9        MR. LEE:  Object to form.
10       THE WITNESS:  No, I don't necessarily
11  say that's a hundred percent accurate in that
12  statement.  And I'll say we have to plan our
13  facilities because you cannot -- you can't
14  operate a facility with the assumption that
15  inmate labor, detainee labor is always going
16  to be available.
17       You're going to have various incidents,
18  in this case COVID, where we've ran virtually
19  with limited detainees actually working,
20  things that cause the facilities to be locked
21  down.
22       So you can't go into it with the mindset
23  that these are always going to be there
24  because they're not a reliable means of
25

RUSSELL WASHBURN

1   accomplishing tasks that occur within
2   correctional or detention or county jail
3   facilities.  It has to be able to operate and
4   continue to operate with or without inmate or
5   detainee labor.
6        I don't know if that makes sense or not,
7   but...
8        Q   (By Mr. Howard)  Well, I understand what
9   you're saying.  So are you telling me that CoreCivic
10  has hired enough full-time employees to fully operate
11  the Stewart Detention Center facility safely and
12  securely, keep it clean, if not a single detainee were
13  to participate in the voluntary work program?  You
14  currently have on staff enough CoreCivic full-time
15  employees to do that on an ongoing basis?
16       MR. LEE:  Object to form.
17       THE WITNESS:  Yeah, again, I can say for
18  specific to Stewart, we've been operating
19  that way, primarily since COVID started, with
20  a number of cohort quarantine pods,
21  inabilities for detainees to physically work
22  based on restrictions on the COVID protocols
23  and rules.  We have primarily been operating
24  our facility with no -- limited to no

```
 1                 RUSSELL WASHBURN
 2    detainee labor.
 3       Q    (By Mr. Howard)  Well, I want to set aside
 4    COVID right now because that -- first of all, your
 5    population was decreased substantially during the COVID
 6    era, correct?
 7       A    Yeah, my population today is around 1100.
 8       Q    And Stewart has operated during the relevant
 9    time period here, since 2008, with as many as 1966
10    detainees housed there, correct?
11       A    Yes.
12       Q    And also meal service has been totally
13    different since COVID, correct?  There's no common
14    dining hall facility?
15       A    Not exclusively.  We at times ran the chow
16    hall, and then at times we've not ran the chow hall, so
17    I won't say a hundred percent.
18       Q    And, by the way, the population has been as
19    low as 2- to 300 during COVID, correct?
20       A    That's correct.
21       Q    So let's talk about the pre-COVID time
22    period, the period 2008 through 2019.
23            Is it your testimony that CoreCivic engaged
24    sufficient full-time CoreCivic employees to fully
25    operate Stewart Detention Center in a safe and secure
```

```
 1                 RUSSELL WASHBURN
 2    and clean fashion if not a single detainee participated
 3    in the voluntary work program?
 4       A    Yeah, I strongly believe we could operate and
 5    could have operated our facilities without detainees.
 6    Again, would it have been as clean as it may have been?
 7    There may have been some things that we would have
 8    dropped.  But to say that we couldn't operate it, I
 9    don't know that would be an accurate statement.
10       Q    For example, there are at various times up to
11    170 porters cleaning the facility or detainees?
12            MR. LEE:  Object to form.
13            THE WITNESS:  Yes.  Primarily cleaning
14       within their assigned housing area, yes.
15       Q    (By Mr. Howard)  And 92 kitchen workers,
16    correct?
17            MR. LEE:  Object to form.
18            THE WITNESS:  Are you asking me to
19       confirm that number or --
20            MR. HOWARD:  Yeah.
21            MR. LEE:  Object to form.
22            THE WITNESS:  Again, if you show me a
23       document, I would say that that's probably
24       close, yes.  But, again, to say that that's
25       the accurate number, I'd have to look at the
```

```
 1                 RUSSELL WASHBURN
 2    documents to say that for certain.
 3       Q    (By Mr. Howard)  We'll look at documents,
 4    I'll represent to you, but it would be your testimony
 5    that if none of those 92 detainees chose to work in the
 6    voluntary work program and there were no other
 7    detainees to take those positions, CoreCivic had 92
 8    staff members available to prepare and serve meals and
 9    clean and do all the work kitchen workers did?
10            MR. LEE:  Object to form.
11            THE WITNESS:  Again, could we perform
12       the vital tasks of the day-to-day operations?
13       Yes.  I think we've proven that again
14       currently.  But to say that it would be at
15       the same level of degree, you know, again
16       sanitation-wise and that, I don't know that
17       anyone could make that argument.
18       Q    (By Mr. Howard)  By the way, could you just
19    briefly tell us, we have this for the record, your
20    employment history at CoreCivic before coming to
21    Stewart Detention Center?
22       A    Yes.  You want me to go all the way back from
23    when I started?
24       Q    Yes, please.
25       A    Okay.  It will be a minute.  So I started in
```

```
 1                 RUSSELL WASHBURN
 2    July of 1996, started out as a correctional officer in
 3    the Hernando County Jail, which was located in central
 4    Florida.  Worked through various ranks while there.  I
 5    was a correctional officer, I was an assistant shift
 6    supervisor, a lieutenant, a unit manager, a training
 7    manager.
 8            From there I transferred -- promotion to
 9    David L. Moss Criminal Justice Center in Tulsa,
10    Oklahoma, where I assumed the role of chief of
11    security.  From there I did a lateral transfer back to
12    Florida, which was Gadsden Correctional Facility in the
13    northern part of Florida, again as the chief of
14    security.  I was there for a period of time, promoted
15    to assistant warden at that facility.
16            And then I did a lateral transfer back to the
17    Hernando County Jail, and then ultimately was promoted
18    to warden while at the Hernando County Jail.  And then
19    I moved to the Citrus County Detention Center in
20    Lecanto, Florida, neighboring county, again still with
21    CoreCivic, as a warden.  Was there for, I guess, about
22    six and a half years.
23            Did a lateral transfer to Trousdale Turner,
24    which is located in Hartsville, Tennessee.  And then I
25    did a lateral transfer as warden to Stewart Detention
```

RUSSELL WASHBURN

1                RUSSELL WASHBURN
2  Center in April of 2020.  And I hope I --
3     Q    And to whom do you report now as warden of
4  Stewart Detention Center?
5     A    Charles Keeton, K-E-E-T-O-N.  He is the
6  managing director.
7     Q    Managing director for what?
8     A    Our Division II.
9     Q    And what does Division II comprise?
10    A    I believe there's seven facilities -- or six
11  now, six total facilities.
12    Q    Those are all ICE detention centers?
13    A    Yes, I do think that some of them are ICE and
14  house marshals; and one of them, I know for sure, maybe
15  two of them, have a little small county jail attached
16  to them as well.
17    Q    And is Mr. Keeton at the FSC?
18    A    Yes.
19    Q    By the way, just to again complete the
20  record, what is your educational background?  You have
21  a background in corrections?
22    A    Yes.  I went through high school, and then I
23  went through the accredited academy in the state of
24  Florida, so I'm a certified officer in the state of
25  Florida.  Assumed some college credits through that

RUSSELL WASHBURN

1                RUSSELL WASHBURN
2  process, but did not go any further, so I do not have a
3  current degree.
4     Q    And did you have employment before
5  CoreCivic --
6     A    I --
7     Q    -- or was that your first job?
8     A    No, no, that wasn't my first job.  I did
9  construction-type work prior to, but that was the days
10  that I was in high school, so...
11    Q    Okay.  Don't need to go there.
12    A    I'm sorry.  Full-time outside of high school
13  has been CoreCivic, yes, sir.
14    Q    So you're a career CoreCivic guy?
15    A    Yes, sir.  Working on my 26th year.
16    Q    Congratulations.
17    A    Thank you.
18        MR. HOWARD:  Can we pull up the
19  CoreCivic 2020 annual report, please.
20        (Discussion off the record.)
21        (Exhibit 2 marked for identification.)
22    Q    (By Mr. Howard)  Have you seen the CoreCivic
23  2020 annual report?
24    A    Yes, I have.
25    Q    Let's go to page 21, if we can.  At the

RUSSELL WASHBURN

1                RUSSELL WASHBURN
2  bottom of page 21, there's a reference to Stewart
3  Detention Center.
4     A    Yes, sir, I see it.
5     Q    ICE as a primary customer?
6     A    Yes, sir.
7     Q    And the term of the contract is indefinite;
8  do you see that?
9     A    Yes.
10    Q    Does that give you an indication of the
11  process by which the ICE contract with Stewart was
12  awarded?  It wasn't necessarily a bid process?
13        MR. LEE:  Object to form.
14    Q    (By Mr. Howard)  Or do you know?
15    A    I don't know or else I don't understand your
16  question.
17    Q    Well, the fact that there's no set term that
18  the contract expires, is that consistent with a certain
19  type of contracting process with CoreCivic facilities
20  with ICE?
21        MR. LEE:  Object to form and beyond the
22  scope.
23        THE WITNESS:  I think I understood your
24  question, the first to say would that negate
25  the bidding process?

RUSSELL WASHBURN

1                RUSSELL WASHBURN
2        MR. HOWARD:  Right.
3        THE WITNESS:  Not to my knowledge, it
4  would not.
5     Q    (By Mr. Howard)  Under the category "Design
6  Capacity," you see it says 1,752?
7     A    Yes.
8     Q    What is that a reference to?
9     A    That's the contract that staffing -- staffing
10  levels.
11    Q    What do you mean by that?
12    A    It's not the total number of beds that we
13  have at the facility.  That's the number that, in this
14  case, ICE, the partner, has communicated that their
15  desire is to potentially utilize up to seventeen
16  fifty-two -- one thousand seven hundred and fifty-two
17  beds.
18    Q    And that's set to your staffing levels?
19    A    Yes, it would.  I mean, that would drive how
20  we would staff the facility, yes.
21    Q    And if the population goes above 1752, do you
22  hire additional staff?
23    A    We would evaluate that, yes, to determine if
24  there's a need for additional staff, yes.
25    Q    And if you evaluate and determine there's a

RUSSELL WASHBURN

2  need for additional staff, does that then require you
3  to go back to ICE to get approval for that?
4      A    Yes, because we would also negotiate that
5  per diem rate adjustment to -- for the additional staff
6  that were necessary based on the number that they're
7  now asking us to potentially house.
8      Q    Are you aware that that's happened over time?
9      A    Yes.
10     Q    So when -- we were talking earlier about a
11 negotiation of the day rate, per diem rate.  And
12 CoreCivic makes an assessment of its costs, including
13 its labor costs, and that assessment is based on the
14 notion of the costs associated with housing 1752
15 people?
16     A    Yes.  I'm sorry, I thought you had more to
17 the question.  I apologize.
18     Q    No, I'm stopping there.
19          And then to the extent that ICE says, "We
20 want you to house more than 1752 people," then you have
21 to make an evaluation if your labor costs are going to
22 go up, and then you could appeal to ICE to increase the
23 day rate, correct?
24          MR. LEE:  Object to form.
25          THE WITNESS:  That is correct.  But if I

RUSSELL WASHBURN

2  could clarify briefly, and if I'm going too
3  far, you just tell me.  We're actually --
4  1600 is the contracted staffing amount that's
5  currently there.  Although we have our --
6  there's two separate staffing patterns that
7  are established.  There's a 1600-bed, which
8  is what we're currently contracted with ICE,
9  is a guarantee of 1600, and then -- but we
10 operate off the staffing pattern of 1,752,
11 which is more staff, although that's not
12 currently what we're -- that's not in the per
13 diem rate.  So we actually are hiring more
14 staff than what we're actually being paid
15 for.  I hope that makes sense.
16          MR. HOWARD:  It does.  I'm going to get
17 to the modification and the minimum in a
18 moment.
19          THE WITNESS:  Okay.
20     Q    (By Mr. Howard)  But the notion here, though,
21 is since you're paid a per diem rate, that -- and,
22 again, just for the record, that means you're paid by
23 ICE a certain amount of money for each detainee for
24 each day the detainee is housed at Stewart, correct?
25     A    Yes, sir, that is correct.

RUSSELL WASHBURN

2      Q    So the higher the number of detainees you're
3  housing, the more money ICE pays you, correct?
4      A    Yes.  Again, if it requires a staffing
5  element change, it's going to have additional cost to
6  us, yes.
7      Q    Well, certainly you're familiar with the
8  difference between fixed costs and variable costs,
9  correct?
10     A    I am, yes, sir.
11     Q    And fixed costs are costs that don't change
12 no matter how many people you're housing now?
13     A    Correct.
14     Q    And variable costs are costs that vary
15 depending upon how many people you're housing, correct?
16     A    That's correct.
17     Q    And you're saying that to some extent,
18 staffing can be variable in that if that cost increases
19 because you have to add staff because you're housing
20 more people, then you can go to ICE to get a higher
21 rate to cover that increased cost, correct?
22     A    Yes, sir.
23     Q    To the extent you have fixed costs that do
24 not increase no matter how many people you house there,
25 then housing more people will put more money to

RUSSELL WASHBURN

2  CoreCivic's bottom line, correct?
3      A    Can you give me an example of what you're
4  classifying as a fixed cost?
5      Q    Well, you tell me.  What are the fixed costs?
6  You're the warden there.  Tell me what are your fixed
7  costs.
8      A    Well, again, there's not too many things that
9  would qualify when you talk about adding more people.
10 Virtually, a lot of things are going to shift.  You're
11 going to have additional food costs, you're going to
12 have additional clothing costs, you're going to have
13 higher utility usage.  Quite frankly, there's going to
14 be very limited items that would say it's a fixed cost.
15          Just as -- an example I can give to you is
16 that we have a -- we have railboxes that we have on
17 site for storage of records, and we know what that cost
18 is going to be every single month.  That wouldn't
19 really change.  And, again, that could because, again,
20 you could produce more records and now we need more
21 space to place, you know, additional records.
22          So I would say that there's more variable
23 costs, and all costs are going to go up as you increase
24 your population.
25     Q    But there are fixed costs.  For example,

RUSSELL WASHBURN

1  you're a fixed cost?
2
3      A    Yes.
4      Q    Stewart only needs one warden whether you
5  have two detainees there or 2,000, correct?
6      A    That's correct, yes.
7      Q    So your salary is a fixed cost.  And I assume
8  there are other people in the management structure at
9  Stewart who you would characterize the same way,
10  correct?
11     A    Yes.  I think we have currently 30 or 32
12  staff members that would be an exempt employee or
13  classified as an exempt employee.
14     Q    And how many nonexempt employees do you have?
15     A    Today -- are you asking about staffing
16  pattern or what we physically have?
17     Q    Well, physically have today.
18     A    Nonexempt -- and, again, I can't give you an
19  exact number, but we're in that 350 to 360 -- somewhere
20  between 350 and 360 mark outside -- that are hourly.
21     Q    So that's the thing, the nonexempt are
22  hourly, the exempt are salary?
23     A    That's correct, yes, sir.
24     Q    Okay.  And how does that 350 to 360 vary from
25  the staffing plan?

RUSSELL WASHBURN

1
2      A    The budget of staffing pattern is -- I don't
3  know if you have a staffing pattern you could pull up
4  or not, but my memory, I believe it's 430, 435.  Again,
5  without looking at the exact document, I believe that's
6  right.
7      Q    And that 430 to 435 is based on housing how
8  many residents?
9      A    1600.
10     Q    And when -- at times when the population has
11  been higher than 1600, has CoreCivic employed more than
12  430 nonexempt hourly workers?
13     A    I would have to review their records at that
14  time.  It has not been over that since I've been here,
15  so I'd have to go back and review those individual
16  records for that period.
17     Q    Okay.  Do you know what the highest number of
18  detainees at any one time has been at Stewart?
19     A    I do not.  I heard -- I mean, I heard you
20  reference 1966, I think, earlier, but outside of that,
21  no.
22     Q    Do you know what the average number of
23  detainees held at Stewart was in 2019, the year before
24  the pandemic?
25     A    I do not.

RUSSELL WASHBURN

1
2      Q    Do you know the maximum number of detainees
3  held at Stewart in 2019?
4      A    You're asking me for design capacity or --
5      Q    No, just the actual physical number.
6      A    Oh.  No, sir, I do not.
7      Q    Now, you mentioned the 1600 minimum.  When
8  did that go into effect?
9      A    It was before my time.  Again, I'd have to go
10  back to look at the records to see when that
11  modification or when that change occurred to give you a
12  specific date or time frame.
13         MR. HOWARD:  Let's pull that up, then.
14  Let's look at -- so February 2016
15  modification.  For the record, this is
16  CCBVA439.
17         (Exhibit 3 marked for identification.)
18         MR. HOWARD:  So we've marked for the
19         record as Exhibit No. 3 a modification of
20         contract effective February 4th, 2016.
21     Q    (By Mr. Howard)  Is this one of the documents
22  you reviewed in preparation for the deposition?
23     A    I believe so, yes, sir.
24         MR. HOWARD:  If we scroll down -- stop
25         there.

RUSSELL WASHBURN

1
2      Q    (By Mr. Howard)  You see down -- the item
3  number 0006, "Detention Guard Services, Tier 1,
4  Guaranteed Minimum, Beds 1 through 1600."  Do you know
5  whether, prior to this modification, there was a
6  guaranteed minimum by ICE in the contract with
7  CoreCivic for Stewart?
8      A    I do not know.  Without going through each
9  one of the different modifications, I do not know.
10     Q    Well, I'd be interested to know -- I'm not
11  sure if you'll be able to answer this either, is --
12  let's take a step back.
13         You understand that a guaranteed minimum
14  means that even if the population falls below 1600,
15  CoreCivic will be paid by ICE as if 1600 detainees were
16  housed at Stewart, correct?
17     A    That's correct.
18     Q    And they would be paid the day rate of
19  $62.48, less $1 per detainee for Stewart County, for
20  1600 detainees even if there were only 2- or 300
21  detainees, correct?
22     A    That's correct.
23     Q    And that's a good thing for CoreCivic, right,
24  that -- because in times like you've been going through
25  where you've got, you know, only 1100 detainees now and

RUSSELL WASHBURN

1    have had as low as 2- to 300, to continue to get paid
2    as if you have 1600 detainees there, that's a pretty
3    good deal for CoreCivic, right?
4        MR. LEE:  Object to form.
5        THE WITNESS:  Yeah, I mean, certainly it
6    is good for that component of.  I will tell
7    you more often than not, specifically with
8    COVID, we're operating as if all the units
9    are open anyway, with the amount of cohorts
10   and things of that nature that take place.
11       So I don't know that there was any
12   savings specifically in, like, staffing and
13   things of that nature because we were
14   still -- and still today even, below the
15   1100, we're operating virtually every housing
16   unit and every pod as if all those beds were
17   filled.
18       Q    (By Mr. Howard)  Well, you told me that the
19   nonexempt hourlies dropped from 430, which is what you
20   would have if you had 1600 people, down to 350 or 360,
21   so that's 70 employees less that you don't have to pay,
22   right?
23       A    Yeah, that one --
24       MR. LEE:  Object to form.

RUSSELL WASHBURN

1        THE WITNESS:  I'm sorry.
2        That's not -- that reduction didn't
3    occur because of the reduction in population.
4    CoreCivic and Stewart Detention are not
5    unique in the labor market of today.  We're
6    still and have been and continue to actively
7    recruit to fill every one of those positions,
8    and we'll fill every one of those positions
9    regardless as to whether or not we have 200
10   or 1900.
11       Q    (By Mr. Howard)  And you've got -- you've
12   told me about all the other variable costs before, like
13   food.  If you only have to feed 2- to 300 detainees, it
14   costs you less than feeding 1600, or do you buy food
15   for 1600 and not use it?
16       A    No.
17       MR. LEE:  Object to form.
18       THE WITNESS:  I'm sorry.
19       No, we would not buy food just to throw
20   it away and be a waste of that, no.
21       Q    (By Mr. Howard)  So that's one of the
22   variable costs that has gone down with the population
23   being reduced while you still get paid the minimum
24   amount, correct?

RUSSELL WASHBURN

1        A    There's a food cost that goes down, but we
2    actually have a contract with a third party to provide
3    our services, so there's -- actually, if you look at my
4    budget today, I'm -- even then, I was paying higher
5    because the rate for the contractor, we still have to
6    make them whole, so we actually pay more per meal per
7    day per detainee when we have a lower number.
8        Q    But as a total cost, are you paying more to
9    Trinity now for food than you were paying when you had
10   1600 detainees or less?
11       A    Again, since I've been here, we haven't have
12   had 1600, but I can tell you that I'm paying more
13   today, and even back when I had 3- and 400, than when I
14   had a thousand.
15       Q    Do you know whether you're paying more since
16   you've been there to Trinity than your predecessors
17   were paying when there were 1600 detainees or more
18   housed at Stewart?
19       MR. LEE:  Object to form.  Exceeds the
20   scope.
21       THE WITNESS:  I can't answer.  Without
22   looking at their financial records at the
23   time that they were here, I can't answer
24   that.

RUSSELL WASHBURN

1        Q    (By Mr. Howard)  To the extent that this 1600
2    minimum was new to the contract in 2016 and gave
3    CoreCivic a benefit, do you know what, if anything,
4    CoreCivic gave as a concession to ICE in order to get
5    that minimum?
6        A    Yes.  I think if you scroll past -- I think
7    it's probably 0005.  I think that was also in
8    conjunction with the renovation and the 30,000 square
9    feet of module office space for ICE staff that was put
10   in place at that time.  That was part of that
11   discussion and that negotiation.
12       Q    So you would put in the square foot -- 30,000
13   square feet of modular space for ICE staff in return
14   for the minimum?
15       A    Yes.  And then it, of course, talks about the
16   total facility capacity of 1966 beds.  So the
17   information that's contained within there would have
18   all been factored into that per diem rate adjustment.
19       Q    Okay.  We're going to get to the per diem
20   rate adjustment --
21       A    I'm sorry.
22       Q    -- in the next sentence, but I'm asking
23   specifically to the extent the minimum was something
24   new and provided kind of a new benefit, not just

Page 70

RUSSELL WASHBURN

1    increase of the per diem rate, but actually setting a
2    floor, minimum guarantee to CoreCivic, what you gave in
3    return for that, and you pointed to the modular space
4    you built for ICE.  Is there anything else?
5         A    Again, all the items that are listed there
6    where it says "Provider providing the following" and
7    each one of those items listed there in this exhibit.
8         Q    So the recreational upgrades of new fencing,
9    existing sidewalk, the basketball courts, and two new
10   inmate toilets and new recreation yard lighting, that's
11   what you gave to ICE in return for the minimum?
12        A    Yes.  Based off of this document here, yes.
13        Q    Anything else?
14        A    Nothing that I would be aware of.
15        Q    Now, going down again to the 1600 minimum, I
16   mentioned it before, but I just want to confirm it's
17   correct, the bed day rate of 62.48 is what ICE pays in
18   total and from which Stewart County takes its cut,
19   correct?
20        A    Yes.
21        Q    And as of 2016, was Stewart County's cut $1
22   per detainee?
23        A    I don't believe it was a dollar at that time.
24   I think it was less than.  85 cents, I believe, if

Page 71

RUSSELL WASHBURN

1    memory serves me correct from the records I reviewed,
2    might have been accurate at that particular time.
3         Q    All right, so the balance of roughly, you
4    know, $61.70 or so, that would go to CoreCivic,
5    correct?
6         A    Yes.
7         Q    And did the funds flow through Stewart
8    County, like ICE would pay Stewart County, they would
9    take their share and then pass along the bulk of the
10   money to CoreCivic?
11        A    Yes, it would go through as -- they're the
12   primary contractor with ICE, so it would go to -- I
13   believe that's been the relationship since day one of
14   operation.
15        Q    The invoices go directly from CoreCivic to
16   ICE, though, correct?
17        A    That's correct.
18        Q    Now, today the Stewart County cut is a
19   dollar; is that right?
20        A    Yes, sir.
21        Q    All right.  So I did some math based on a
22   dollar coming out.  So let's just use that, because
23   it's more conservative, and say that according to the
24   modification here in Exhibit 3, that CoreCivic receives

Page 72

RUSSELL WASHBURN

1    a minimum of $61.48 for 1600 detainees even if the
2    number of detainees at Stewart is less than that.  Is
3    that a correct starting point for the math?
4         A    That's correct.
5         Q    So if I were to multiply 1600 times $61.48, I
6    get $98,368.  Is that the amount that CoreCivic has
7    been receiving as a daily minimum from ICE during your
8    tenure as warden?
9         A    I'll trust your math and say yes.
10        Q    And if you trust my math again, multiplying
11   that by 365 -- I didn't even put in the leap year day
12   in your first year of 2020 -- that comes out to
13   $35,904,320 per year.
14        Q    So in the first 12 months that you were
15   warden, did CoreCivic receive close to $36 million from
16   ICE for its regularly housed detainees?
17        A    Are you asking me for 2016 or for 2020?
18        Q    No, no, no.  2020, because the -- well,
19   actually the day rate went up.  I'm sorry, you're
20   right.  So in 2016, would that have been the correct
21   math calculation to do?
22        A    Yes.  Based on the math, yes.
23        Q    Okay.  Now, this modification also set forth
24   a tiered rate.  So there's a Tier 2, where if you go

Page 73

RUSSELL WASHBURN

1    above the guaranteed minimum, the day rate comes down
2    to 61.85 for beds 1601 to 1750, correct?
3         A    That's correct.
4         Q    And then on the next page, I think you'll see
5    a third tier, which is if you go from 1751 up to 1956,
6    it's $40 a day, correct?
7         A    That's correct.
8         Q    Do you know how all that was negotiated in
9    terms of determining fixed costs and variable costs and
10   what the cost to CoreCivic would be, for example, for
11   increasing to above 1750 detainees?
12             MR. LEE:  Object to form.  Beyond the
13        scope.
14             THE WITNESS:  I mean, I was not directly
15        involved, obviously, with these discussions
16        during that period of time, but much of what
17        we already talked about would have been
18        factored in, meaning what are the variable
19        things that could see a potential increase,
20        what would that increase look like, and where
21        would that per diem need to be in order to
22        make it appropriate for us to enter into that
23        contract.
24        Q    (By Mr. Howard)  And as we talked about,

Page 74

RUSSELL WASHBURN

1  CoreCivic would not enter into a contract with
2  financial terms where you would lose money or break
3  even, correct?
4      A    Not that I'm aware of, no.
5      Q    And what I'd like to know is -- scrolling
6  back -- for the Tier 2, for beds 1601 to 1750, at that
7  bed day rate of 61.85 or net $61, what is the profit
8  margin to CoreCivic from that bed rate?
9      A    At that time -- I don't know what it would
10  have been at that particular period of time.
11      Q    All right, so we'll get to the rates that are
12  in effect now, and I'll be asking the same question.
13          Same thing, for the $40 rate, that tier, do
14  you know what the profit margin is there?
15      A    Yes.  I think it averages about 28 percent.
16      Q    That $40 rate for beds 1751 and above is
17  still in effect today, correct?
18      A    Yes.
19      Q    And you're telling me that at that $40 rate,
20  which is net $39 per detainee per day to CoreCivic, you
21  have a 28 percent profit margin?
22      A    Again, I have not been to that number, just
23  by budget projections, which is established on that
24  1600.  So I'd have to get the budget sheet and then

Page 75

RUSSELL WASHBURN

1  look at those numbers and how they would adjust.  I can
2  only answer for what the current budget has in place.
3      Q    Okay.  And it would be 28 percent profit
4  margin?
5      A    I believe that's what we're averaging, yes.
6          MR. HOWARD:  Well, let's take a look at
7  the current modification so we can talk in
8  terms of the current numbers.  And if we
9  could pull up STEW0050, the September 2020
10  modification.
11          THE WITNESS:  And I don't need it now,
12  but maybe in the next 15 minutes or so for a
13  restroom break.
14          MR. HOWARD:  Why don't we do it now
15  while she's pulling up the document.
16          THE WITNESS:  I'm good.  I just don't
17  want to interrupt the train of thought, so...
18          (Exhibit 4 marked for identification.)
19      Q    (By Mr. Howard)  All right, so I'm showing
20  you now Exhibit 4.  This is another modification of the
21  ICE contract.  And, again, the date of this is -- I'm
22  sorry, it's not -- up there -- we can scroll down.  I
23  believe it's September 25th, 2020.  Yeah, that's the
24  date it was signed by Joseph Williams.  By the way, do

Page 76

RUSSELL WASHBURN

1  you know who Joseph Williams is?
2      A    I believe he's with the commission here in
3  Stewart County.
4      Q    Okay.  And if we scroll down, this talks
5  about annual cost impacts, namely the increase in wages
6  and benefits due to new wage determination for
7  nonmedical personnel, and that's led to a day rate
8  increase under the contract with ICE?
9      A    Yes, sir.
10      Q    So this goes back to what we were talking
11  about before, that if wages go up or staff needs go up,
12  then you can apply to get those costs covered by an
13  increase in the day wage -- day rate?
14      A    When you say "apply," that's actually just an
15  automatic process because the federal government, when
16  they adjust -- they're the ones who adjust the -- and
17  determine the appropriate wage determination.  So
18  it's -- we don't request for it or apply for it.  It's
19  an automatic process that's built in.
20      Q    Understood.  So it's a little bit different
21  when it works because you're getting a higher day rate
22  because of wages increased to the current staff you
23  already have versus having to hire more staff?
24      A    Correct.

Page 77

RUSSELL WASHBURN

1      Q    Now, are there any expenses that CoreCivic
2  incurs operating Stewart that are compensated by the
3  government separate from the day rate?  Now -- and I'm
4  not talking about the transportation and some of those
5  line items we'll look at in the billing statement, but
6  I'm talking about if you have a capital improvement you
7  need to make or there's some other kind of expense
8  affecting the operation of Stewart.  Is that something
9  that you can get compensated by ICE, or is everything
10  through day rate?
11      A    No, I think -- I believe it would go through
12  day rate.  For example, if they were to ask us to
13  construct a new section for a purpose for them, then we
14  would negotiate the per diem rate and it would be
15  covered through that particular element.  I do believe
16  they do have an mechanism to where they can pay
17  directly.  I believe they utilize that -- again, this
18  was before my time, so I'd have to research for
19  accuracy, but I do believe they paid for the
20  construction of the courtrooms that were specifically
21  for the ICE and federal judges.
22      Q    So here, if we look down, No. 3 -- I'm going
23  to come back to No. 2 -- actually, I'm sorry.  Go back
24  up to the top.  I guess it's -- so the bed day rate has

RUSSELL WASHBURN

1
2  now been increased based on the wage increases to
3  67.84.  That was what you referred to before as the
4  current Tier 1 bed day rate?
5       A    That's correct, yes, sir.
6       Q    And so that 67.84 is for the first 1600.
7  That applies to the minimum, correct?
8       A    That is correct.
9       Q    So the net to CoreCivic is 66.84, correct?
10      A    That's correct.
11      Q    And CoreCivic currently receives from ICE
12  through Stewart County $66.84 for 1600 detainees, even
13  though since you've been there you've housed as few as
14  200 to 300?
15      A    That's correct.
16      Q    And doing my math again -- I used the same
17  calculator, so if you'll assume it's working correctly
18  again -- 66.84 times 1600 is $106,944 per day.
19           Is that consistent with your general
20  understanding of how much ICE is paying CoreCivic for
21  the minimum guarantee, 1600 detainees?
22      A    Yes, sir.  That would be the math formula,
23  yes.
24      Q    And that comes out to over $39 million per
25  year guaranteed minimum from ICE to Stewart?

RUSSELL WASHBURN

1
2       A    Yes, sir.  Yes, with your math, that would be
3  right.
4       Q    And CoreCivic has received at least this
5  amount every day since you've been warden from ICE?
6       Q    Can you clarify the amount you're saying
7  every day?
8       Q    That 106,944.
9       A    Yes.
10           MR. LEE:  Object to form.
11           THE WITNESS:  I'm sorry.
12      Q    (By Mr. Howard)  Now, I think you told me
13  it's never been above 1600 since you've been there?
14      A    It has not.
15      Q    But if it were to go above 1600, then
16  would -- what would be the tier -- like between 1601
17  and 1750, would the Tier 2 rate still be the same rate
18  as the prior modification we looked at from 2016?
19      A    Unless there was a change in the agreement,
20  then yes.  Now, if there's a change that would adjust
21  those, then obviously it would be that particular rate.
22  I don't recall ever seeing a change that would change
23  those different tier level rates.
24      Q    Okay, so -- and the $40 rate above 1750, you
25  believe is still in effect?

RUSSELL WASHBURN

1
2       A    It would be in effect unless there was a
3  contract modification to that agreement.
4       Q    And so if there were to come a day when there
5  would be more than 1600 detainees, in the math, would
6  you just be adding the number of additional detainees
7  times the applicable day rate for their tier?
8       A    Yes, sir.
9       Q    And I believe you said that currently there's
10  a 28 percent profit margin.  Which of the three rates
11  does that 28 percent margin apply to, or is that a
12  blended total margin?
13      A    No.  The budgets are built on that 1600, so
14  it would be at that 1600.
15      Q    And do you know whether -- in periods before
16  you arrived at Stewart and Stewart was housing more
17  than 1600 detainees, whether the profit margins would
18  increase or decrease with the additional detainees?
19           MR. LEE:  Object to form.
20           THE WITNESS:  Without reviewing those
21      financial records for that period, I don't
22      know that I could answer that.
23      Q    (By Mr. Howard)  Looking at No. 2 on
24  Exhibit -- I guess it's Exhibit 4, the 2020
25  modification, there's a discussion of increases in

RUSSELL WASHBURN

1
2  wages for medical service personnel leading to an
3  increase in the day rate for medical services.  What is
4  the medical services per diem?
5       A    Well, it's 22.26 per inmate per day, based on
6  this modification.
7       Q    Understood.  And this is in addition to the
8  67.84 guaranteed minimum for 1600?
9       A    That's correct.
10      Q    And how is this determined?  Like, this day
11  rate applies to whom?
12      A    I don't know that I understand the question.
13      Q    So the 67.84 applies to how many detainees
14  you have housed in Stewart with a guaranteed minimum of
15  1600.  In addition, you're getting paid a 22.26 per
16  diem rate times something.  What is that something?
17      A    It would be the same.  That 67.84 is all the
18  costs for that 1600 minus medical.  The 22.26 is your
19  specific medical cost per inmate per day, so the same
20  math would apply.
21      Q    So the 22.26 is in addition to the 67.84?
22      A    That's correct.
23      Q    So this 22.26, does that also apply to a 1600
24  minimum?
25      A    Yes, I believe it does.

Page 82

RUSSELL WASHBURN

1
2    Q    When did CoreCivic -- well, did ICE always
3  pay a medical service per diem on top of the regular
4  day rate from the time this contract was entered into?
5    A    I would say no because ICE actually -- IHSC
6  operated their medical department.  CoreCivic did not
7  operate.  I believe that transition occurred in 2018.
8  So it would have been somewhere around that time frame,
9  I would suspect.  Again, I can't tell you the
10 relationship between IHSC -- they wouldn't have paid it
11 to us because we were not providing medical services.
12    Q    And when did CoreCivic first start providing
13 the medical services at Stewart?
14        MR. LEE:  Object to form.
15        THE WITNESS:  Prior to my time, but I
16     believe it was 2018.  November of 2018, I
17     believe is accurate, but I'd have to go back
18     and look at the records to confirm.
19    Q    (By Mr. Howard)  Now, this additional day
20 rate for the provision of medical services, does that
21 also include a profit margin?
22        MR. LEE:  Object to form.
23        THE WITNESS:  I would assume yes; but,
24     again, that would be an assumption.  I'd have
25     to go back and look at the records.

Page 83

RUSSELL WASHBURN

1
2    Q    (By Mr. Howard)  Okay, your assumption is,
3  again, like the regular day rate, that day rate would
4  be negotiated in a way so CoreCivic would not lose
5  money or break even, but would make money on providing
6  medical services for the detainees, correct?
7    A    Correct.
8    Q    And if my math is right, $22.26 -- by the
9  way, does Stewart get a dollar out of this 22.26, or
10 does that all come to CoreCivic?
11    A    I believe that -- all through to CoreCivic.
12    Q    And that 22.26 times a 1600 minimum means
13 $35,616 per day in addition to the 106,944 per day to
14 CoreCivic under the regular day rate, correct?
15    A    Yes, sir.  Using your math, yes, sir.
16    Q    Okay.  And for a year, I have it come out to
17 $12,999,840.  Is that roughly consistent with your
18 understanding how much you're being paid for the
19 medical per diem per year by ICE?
20    A    Yes, sir, I would say that's -- again, using
21 the basic form of the math, yes.
22    Q    All right.  And if you add that figure to the
23 $39,034,560 for the minimum ICE payments for the day
24 rate, you get a total of 52,034,400 per year.
25        Is that consistent with your understanding of

Page 84

RUSSELL WASHBURN

1
2  what ICE is paying CoreCivic for the regular day rate
3  plus the medical services day rate per year for
4  operation of the Stewart Detention Center?
5    A    Yes.
6    Q    And if you apply a profit margin of 28
7  percent to that figure, you get a profit that CoreCivic
8  is earning at Stewart Detention Center of fourteen
9  million five hundred sixty-nine dollars and six hundred
10 and thirty-two cents per year.
11        Is that consistent with your understanding of
12 the profits being earned by CoreCivic at Stewart
13 Detention Center currently?
14    A    Yes.  That would be within the range, yes.
15        MR. HOWARD:  Okay, we can take a break.
16     Thank you.
17        (Recess taken.)
18    Q    (By Mr. Howard)  Mr. Washburn, I just want to
19 follow up on one series of questions from earlier this
20 morning.  My colleague, Ms. Sandley, is going to cover
21 the topic of discipline with you in more detail, but
22 you had mentioned not being aware of any discipline
23 with respect to the work program.  And I just wanted to
24 show one email because it covers that subject, then
25 another.

Page 85

RUSSELL WASHBURN

1
2        MR. HOWARD:  Can we have CCBVA196534,
3     Jackie, please.
4        (Exhibit 5 marked for identification.)
5    Q    (By Mr. Howard)  This has been marked as
6  Exhibit 5.  It's a series of emails from May of 2015,
7  including a Mr. Jason Ellis.
8        Before I scroll down, get into the content of
9  emails, do you know Mr. Ellis?
10    A    Yes.  Jason Ellis is a managing director and
11 at that time would have been the managing director
12 oversighting the warden at Stewart Detention Center.
13    Q    So he would have been the person at FSC to
14 whom the warden of Stewart Detention Center would have
15 reported?
16    A    Yes, sir.  At that time, yes.
17    Q    And this involves detainee work details.  And
18 I apologize again because you don't have a physical
19 copy, but I'm going to ask my colleague to scroll to
20 the bottom and then work her way back so you can kind
21 of see the chain of emails.  It's not that long.
22    A    Okay.
23    Q    But it starts with a May 15, 2015 email from
24 Troy Carey to Harrell Gray regarding detainee work
25 details.  And as you go through it, one of the first

RUSSELL WASHBURN

1  questions I'm going to ask you is if you've seen this
2  document before as part of your deposition preparation
3  or at any other time.
4       A    I can't recall if this -- again, I reviewed
5  so many documents -- I can't recall if this one was in
6  that email thread or not.
7       Q    All right.  When you've read this page, if
8  you could let us know and then we'll scroll down.
9       A    Okay, I'm good to scroll.
10            Okay.
11            Okay.
12      Q    Now that you've seen the content of the
13 entire thing, is this something that is familiar to
14 you?
15      A    I believe I have reviewed this document.
16      Q    Okay.  And do you gain an understanding as
17 to, first and foremost, why Mr. Ellis, as a managing
18 director at FSC, was getting involved in issues
19 relating to detainees refusing to work?
20           MR. LEE:  Object to foundation.
21           THE WITNESS:  Again, I can't speculate
22      as to why this specific communication
23      occurred, but it's not non-routine for the
24      managing director to be made aware of those

RUSSELL WASHBURN

1  types of issues inside of facilities because
2  there could be other underlying factors that
3  could have operational impacts to the
4  facility.
5       Q    (By Mr. Howard)  When you say these "kinds of
6  issues," are you referring there to including detainees
7  refusing to work in the work program?
8            MR. LEE:  Object to form.  Misstates the
9       document.
10           THE WITNESS:  It could be.  And the
11      reality of it is, again, what's the cause of
12      that, I mean, is there a bigger issue?
13      Q    (By Mr. Howard)  So it would be a concern to
14 CoreCivic, if there was an underlying issue, to be able
15 to address it so that workers would show up to work,
16 right?
17           MR. LEE:  Object to form.
18           THE WITNESS:  To address it to resolve
19      whatever concern or issue there may be.  Work
20      stoppage may not necessarily be a concern or
21      issue with being a part of the voluntary work
22      program.  It could be an issue because
23      they're dissatisfied with something else, and
24      so they would have to address whatever that

RUSSELL WASHBURN

1  is that's causing them to not want to
2  participate in the voluntary work program.
3       Q    (By Mr. Howard)  It could also be they just
4  didn't want to go to work?
5            MR. LEE:  Foundation.
6            THE WITNESS:  Again, it could be; but,
7       again, I think we're just speculating what
8       the driving force was in this particular
9       situation.
10      Q    (By Mr. Howard)  But you're saying, then, it
11 was -- you say not non-routine.  Another way of saying
12 that is it was routine for someone at CoreCivic FSC to
13 get involved with issues like this that affect the
14 operations of Stewart?
15           MR. LEE:  Object to form.
16           THE WITNESS:  Again, to keep the
17      managing director aware of the day-to-day
18      operations, that is routine.
19      Q    (By Mr. Howard)  And what authority, if any,
20 did the managing director at FSC have for addressing or
21 resolving issues like this?
22      A    They would address it through the leadership
23 team here at the facility.  They personally would not
24 have addressed the issue.  But, again, there would be a

RUSSELL WASHBURN

1  means of mentoring, coaching, directing, those types of
2  things, but the actual application of whatever decision
3  is made to apply would be at the leadership level at
4  the facility.
5       Q    And when you refer to the leadership team or
6  the leadership level, what is that comprised of at
7  Stewart?
8       A    Warden, assistant wardens, and chiefs, and
9  then to be specific, chief of security, chief of unit
10 management, assistant warden of operations, and
11 assistant warden of programs.
12      Q    Excellent.  Thank you.
13           Now, when Mr. Ellis says, "Can you find out
14 why they did not go to work, what we are doing to hold
15 them accountable, and if any other detainees from this
16 unit are scheduled to work in food service and other
17 areas of the facility later today," do you have an
18 understanding of why Mr. Ellis would be asking whether
19 these detainees who did not go to work would be held
20 accountable?
21           MR. LEE:  Foundation.
22           THE WITNESS:  Again, you know,
23      accountable is pretty open-ended and what his
24      intent was there.  Obviously, we'd have to

RUSSELL WASHBURN

1  
2     ask him that specific as to what his meaning  
3     was behind that particular word, but it could  
4     be as simple as removal from the work  
5     program, which the standard allows.  
6     Q   (By Mr. Howard)  But you don't know what he's  
7  meaning and you, in reviewing these documents, did not  
8  speak to Mr. Ellis about what he meant here; is that  
9  right?  
10     MR. LEE:  Object to form.  
11     THE WITNESS:  I did not speak to  
12    Mr. Ellis concerning this, no.  
13     Q   (By Mr. Howard)  Now, with respect to  
14  Mr. Ellis's general supervision that you described  
15  earlier on issues like this and being kept informed and  
16  then his coaching, et cetera, did any of that involve  
17  any kind of official regularly scheduled meetings with  
18  anyone in leadership at Stewart?  
19     A   Are you asking as a routine set communication  
20  period?  Is that --  
21     Q   I'm just now kind of shifting and pivoting to  
22  asking about the structure and the reporting policies  
23  and practices between the leadership team at Stewart  
24  and the managing director at FSC.  
25     A   Okay.

RUSSELL WASHBURN

1  
2     MR. LEE:  Object to form.  Exceeds the  
3  scope.  
4     THE WITNESS:  I'm good to answer?  
5     MR. HOWARD:  You are.  
6     THE WITNESS:  So there is -- one,  
7  there's no set standard.  I mean, there's  
8  going to be days that you may talk to the  
9  managing director multiple times in a single  
10  day.  There may be days that you don't talk  
11  to the managing director at all and you have  
12  communications via emails.  
13     More often than not, the managing  
14  directors have designated either weekly or  
15  biweekly calls with each of the wardens in  
16  their particular division that occurs.  
17     The managing director visits the  
18  facilities.  Again, there's no prescribed  
19  schedule that they are given that says that  
20  you must go X amount of times in a month or a  
21  quarter or anything of that nature that I'm  
22  aware of.  They're always available 24 hours  
23  a day, seven days a week in the event that we  
24  need to report something or seek any level of  
25  assistance.

RUSSELL WASHBURN

1  
2     Q   (By Mr. Howard)  And is there a set agenda  
3  for these weekly or biweekly calls, or is it really the  
4  issues of the day?  
5     A   No, there's prescribed agendas that typically  
6  you report out on, and a lot of times it's general  
7  information.  Example, in-service percentages, where  
8  your facility stands as far as completing annual  
9  training, any significant incidents that you may have  
10  had since the prior calls, any lessons learned from  
11  those types of incidents, population counts, and those  
12  types of information.  
13     Q   Are written records kept of these calls?  
14     A   I believe so, yes.  
15     Q   Who keeps those?  
16     A   I believe the administrative support staff  
17  member for the managing directors.  In this case, for  
18  this facility is Linda Dixon, I believe, out of the  
19  Facility Support Center.  
20     Q   And does Ms. Dixon attend the calls and take  
21  notes, or is she keeping a record based on notes kept  
22  by the current managing director?  
23     A   I believe each prospective facility sends in  
24  their information to Ms. Dixon, and she compiles all of  
25  the reports together.

RUSSELL WASHBURN

1  
2     Q   So you send a written report in addition to  
3  reporting it orally on the call?  
4     A   That's correct.  
5     Q   And is that done weekly or biweekly?  
6     A   Managing directors -- in my case today, it's  
7  biweekly.  And since I've been here, it's been  
8  biweekly.  But the managing directors will establish  
9  those either to be weekly or biweekly based on their  
10  individual expectations.  
11     Q   And do you know if your predecessor sent in  
12  weekly or biweekly written reports to their managing  
13  director?  
14     MR. LEE:  Object to form.  Exceeds the  
15  scope.  
16     THE WITNESS:  I would believe so.  I  
17  mean, as far back as I can remember, all the  
18  facilities I've been to, it's been a common  
19  practice between managing directors and  
20  divisions, so I think it's safe to say yes.  
21     Q   (By Mr. Howard)  Do you know -- and is that  
22  sent to the managing director and then the  
23  administrative support person, in this case  
24  Linda Dixon, handles that -- or would it go directly to  
25  Linda Dixon as the custodian of those reports?

RUSSELL WASHBURN

1
2      MR. LEE:  Object to form.  Beyond the
3  scope.
4      THE WITNESS:  Again, the process would
5  be we would send it to her and then cc it to
6  the appropriate managing director.
7      Q    (By Mr. Howard)  And do you know how long
8  Linda Dixon has been in the role of administrative
9  support to the managing director overseeing Stewart?
10     A    I do not, not without asking her.
11     MR. LEE:  Exceeds the scope.
12     THE WITNESS:  Sorry.
13     Q    (By Mr. Howard)  Do you know any of her
14  predecessors?
15     MR. LEE:  Same objection.
16     THE WITNESS:  Again, I know the
17  individuals in the roles, but whether or not
18  they were providing that support service for
19  Stewart specifically, I don't.
20     Q    (By Mr. Howard)  And you mentioned also
21  that -- the visits to the facility by the managing
22  directors.  And Mr. Keeton is currently the managing
23  director with authority at FSC for Stewart, correct?
24     A    As of today, yes, sir.
25     Q    Has he been in that role since you became the

RUSSELL WASHBURN

1
2  warden at Stewart?
3      A    No.  Mr. Keeton assumed -- let me look at a
4  calendar.  I believe it was in August that Jason Ellis
5  and him switched.  But, again, I'd have to go back and
6  look, but I believe August is the right time frame
7  where they transitioned from Jason Ellis as the
8  managing director to Charles Keeton.
9      Q    Is that August 2020?
10     A    No, August of this year, 2021.  I'm sorry.
11     Q    So between April 2020, when you became
12  warden, and August 2020 [sic], when Mr. Ellis
13  transitioned out of the role of managing director over
14  Stewart, how many times did Mr. Ellis visit Stewart?
15     A    And I think you said August 2020.
16     Q    I meant August 2021.  Thank you.
17     A    Okay.  I want to make sure I'm accurate.  I'd
18  say four or five.  I don't know specific.
19     Q    And during those times, would he meet with
20  you and the leadership team?
21     A    Yes.
22     Q    Were there written records kept of those
23  meetings?
24     A    No.
25     Q    Were there specific agendas, or was this kind

RUSSELL WASHBURN

1
2  of a -- again, an ad hoc, whatever --
3      A    No specific agendas.  On some of those
4  visits, he was here in conjunction with, like, the ODO
5  audit that may have been on site.  He would be here as
6  a support mechanism for that, if necessary, but no
7  established agenda for any one of those.  It would just
8  be an inspection of the facility and meet with the
9  leadership of the facility.
10     Q    Was -- were any of those visits something
11  other than routine; that is, there was a specific event
12  that prompted Mr. Ellis to visit when he had no prior
13  plans to do so?
14     MR. LEE:  Object to form and foundation.
15  Beyond the scope of the notice.
16     THE WITNESS:  Not that I can recall
17  since I've been here, no.
18     Q    (By Mr. Howard)  And since August 2021, has
19  Mr. Keeton visited Stewart?
20     A    He has.
21     Q    How many times?
22     A    I believe twice.  Him and Mr. Ellis visited
23  together as part of that transitional process during
24  that transitional time and one other time since then.
25     Q    And was the other time a routine visit, or

RUSSELL WASHBURN

1
2  was it prompted by some event?
3      A    There was no --
4      MR. LEE:  Foundation, beyond the scope.
5      THE WITNESS:  No event.  We had a
6  scheduled inspection that he wanted to be a
7  part of.
8      Q    (By Mr. Howard)  An inspection by which
9  authority?
10     A    I think -- again, I'd have to go back and
11  look to make certain.  I believe it was a CRCL group,
12  civil rights/civil liberties group, that came.
13     Q    Other than the managing director, Mr. Keeton,
14  and Mr. Ellis before him, do you, as the warden at
15  Stewart, report to anyone else senior to you at
16  CoreCivic?
17     A    Not directly.  He is my immediate supervisor.
18     Q    Do you have any kind of dotted-line reporting
19  relationship with anyone else?
20     A    No.  I mean, there's others within the
21  Facility Support Center that obviously outrank me and
22  are above my rank, you know, various vice presidents,
23  other managing directors for various other departments,
24  but the actual reporting structure would be the warden,
25  managing director, vice president of operations.

RUSSELL WASHBURN

1
2     Q    Are there any other members of your senior
3  team or anyone else at Stewart who reports directly to
4  someone in a supervising capacity at FSC, or do they
5  all report up through you?
6     A    They would all report through me.  Some of
7  the -- like, human resources manager, business manager,
8  they have some dotted lines to the SMEs and the
9  regional individuals for the business office or for the
10  human resource department, but those would be dotted
11  lines.  The direct report would be to -- from me.  So I
12  handle their -- you know, their performance
13  evaluations, their requests for leave, things of that
14  nature.
15     Q    Is there -- what is the structure for -- in
16  terms of setting or changing existing policies,
17  CoreCivic policies, as they relate to Stewart?  Like,
18  you alluded to a couple of policies before, 18 policy,
19  the 19-100 [sic].  These have been set and they're in
20  place, but they get modified from time to time; is that
21  right?
22        MR. LEE:  Object to form.  Beyond the
23  scope.
24        THE WITNESS:  They do.  And I just want
25  to clarify, are you asking specifically for

RUSSELL WASHBURN

1
2  Stewart or as CoreCivic as a whole?
3        MR. HOWARD:  For Stewart.
4        THE WITNESS:  Okay, for Stewart --
5        MR. LEE:  Same objections.
6        THE WITNESS:  Sorry.
7        It's pretty consistent even outside --
8  the process is that we would do an internal
9  evaluation with the appropriate staff that
10  would be affected by that policy here at the
11  facility, recommend any changes through our
12  quality assurance manager.
13        Then it would in turn go to the Facility
14  Support Center so that it can be vetted and
15  evaluated for approval.  Once approved, from
16  there, the customer would get that -- an
17  opportunity to review to advise of any
18  concerns or any issues or objection to the
19  change.
20        And if there is none, then we would then
21  communicate the change to staff and determine
22  an appropriate effective date for it to be
23  applied at the facility.
24     Q    (By Mr. Howard)  And then the implementation
25  of the change and the monitoring that's put into

RUSSELL WASHBURN

1
2  practice, is that done at the facility level?
3        MR. LEE:  Object to form, beyond the
4  scope.
5        THE WITNESS:  It definitely would be at
6  the facility level.  In some cases, there may
7  be some oversight through the subject-matter
8  experts, depending on what that policy is
9  that required change, but certainly at the
10  facility level for the quality assurance
11  department and the leadership team and the
12  supervisory staff here at the facility.
13     Q    (By Mr. Howard)  And when you say some other
14  oversight of subject-matter experts, are those at FSC?
15     A    Yes.
16        MR. LEE:  Same objections.
17        THE WITNESS:  The individuals I used as
18  a reference before, regional directors for
19  the human resources department, the medical
20  departments or, you know, the business
21  office.
22     Q    (By Mr. Howard)  For example, you mentioned
23  before the policy relating to the work program.  Is
24  there a subject-matter expert on the work program at
25  FSC?

RUSSELL WASHBURN

1
2        MR. LEE:  Object to form.
3        THE WITNESS:  Not that I'm aware of, no,
4  not specifically.
5     Q    (By Mr. Howard)  So is there any supervision,
6  as you characterized it, at the FSC level about the
7  implementation and execution of the work program at
8  Stewart?
9     A    Sorry, you have the policies and then you
10  have the audits that take place.  You have ODO audit,
11  the Nakamoto audit, the CRCL group that comes in, ACA.
12  I mean, there's just a variety of different mechanisms
13  for measuring for full compliance to standards,
14  policies, contract, all the above.
15     Q    I'm assuming the audit process -- and I think
16  Ms. Sandley is going to get into that some with you,
17  but I'm asking at the FSC level -- you mentioned there
18  are no subject-matter experts per se. -- is there
19  anyone who's got a responsibility of monitoring the
20  execution of that program?
21        MR. LEE:  Object.
22        THE WITNESS:  CoreCivic has its own --
23  I'm sorry.
24        CoreCivic has its own also internal
25  audit process where they come and they

RUSSELL WASHBURN

1  RUSSELL WASHBURN
2  actually do audits to ensure that our
3  operation is in line with policies and post
4  orders, contract, and various other
5  standards.
6      Q    (By Mr. Howard) And these are people who
7  come from FSC?
8      A    Yes, sir.
9      Q    And kind of what's their subject-matter
10 expertise, if you will?
11     A    Two teams that are comprised -- we have a
12 team lead, you have subject-matter experts that are in
13 the area of programs, food service, security, safety,
14 medical. They typically are five-member teams that
15 come. And they're unannounced, so they just show up
16 and perform that review. And it's at least annually,
17 sometimes more than if there's a need to do that more
18 than once. But a minimum of once a year, they're going
19 to show up unannounced and perform those reviews.
20     Q    And do they perform -- do they provide you,
21 as warden, with a written report of their findings?
22     A    They do.
23     Q    And so once a year, so how many times has
24 that happened since you've been there in April of 2020?
25     A    Once in 2020 and then we've had ours in 2021

RUSSELL WASHBURN

1  RUSSELL WASHBURN
2  already this year.
3      Q    So you've had two since you've been there?
4      A    Yes, sir, for the CoreCivic audit. Now, I've
5  had -- I can go back and look, but I've had a large
6  number of Nakamoto, ODO, OIDO. I'm learning all these
7  acronyms that -- I'm trying to keep up with them.
8  We've had a large number of audits from those outside
9  parties since I've arrived.
10     Q    And they all provide you with written
11 reports, correct?
12     A    Yes, sir, they do.
13     Q    And when there are recommendations in those
14 reports, is it the responsibility of you and your
15 senior team or anyone at FSC with respect to
16 implementing those recommendations?
17     A    Well, we'll evaluate the recommendations
18 first and foremost, and then we have to create -- for
19 any finding, we have to create what's known as a CAP,
20 which is a corrective action plan. That correction
21 action plan would then be developed. It's kind of the
22 similar/same process as to the policy.
23          Once that has been drafted, we send that to
24 the policy and procedure department at our Facility
25 Support Center. They vet it and verify that it meets

RUSSELL WASHBURN

1  RUSSELL WASHBURN
2  all elements of the policy, that it satisfies resolving
3  whatever that concern is that was cited, and then --
4  we'll ultimately then provide it to -- if it's a
5  partner-based audit, such as ODO, Nakamoto, we have to
6  then provide that to ICE for their review prior to it
7  being submitted back to the appropriate auditing
8  authority.
9      Q    Okay. I want to switch gears now to the
10 budgeting process. And you referred earlier to being
11 familiar with the budget that's in place for
12 Stewart under your direction as warden. Is that budget
13 set initially at the corporate level at FSC?
14     A    It is. I mean, it's a -- I think it's a
15 starting point that's established that goes out. It's
16 typically -- the budgeting process, kind of the
17 evaluation of the upcoming budget, typically starts
18 around July/August period of time.
19          And more often than not, those budgets are
20 really kind of built history-based. There's an
21 assessment to look at what was the utilization from
22 this period of time to this period of time, and that's
23 where the budget really starts at.
24          Now, if there are things that we need to be
25 discussing or anomalies that maybe were not in

RUSSELL WASHBURN

1  RUSSELL WASHBURN
2  existence during that period of time that was looked at
3  and forecasted -- I'll give an example. Let's say we
4  received a notification from the electric company that
5  they're anticipating a certain increase in rates.
6  Well, that wouldn't have been captured in history, but
7  we could communicate that the electric company says
8  there's going to be a 10 percent increase, so we know
9  we've got to increase the dollar amount to meet
10 whatever that increase may look like in the future.
11     Q    And the budgets, you know, have separate line
12 items for, first of all, revenues, correct?
13     A    Yes, sir, they do.
14     Q    And the largest portion of the revenues that
15 are in the budget for Stewart are those per diem rates
16 and then the additional medical per diem rates pursuant
17 to the ICE contracts and the modifications, correct?
18     A    That is correct.
19     Q    What other sources of revenue are there that
20 go into the budget?
21          MR. LEE: Object to form.
22          THE WITNESS: You have the -- for
23     accounting purposes and tracking purposes,
24     you have the commissary budget that's in
25     there. But, again, all of the commissary

Page 106

RUSSELL WASHBURN

1    funds, for lack of a better term, is kind of
2    a nonprofit portion because CoreCivic doesn't
3    see any value or return on that commissary
4    side.  That's -- a hundred percent goes back
5    to the detainee population for purchasing of
6    goods like recreational equipment and
7    televisions and various other things for
8    them.  So it has to be for the sole benefit
9    of the detainee population.  So although you
10   see that in the budget, it's a zero netted
11   for -- CoreCivic can't profit and doesn't
12   profit from those commissary revenues that
13   are put into the budget or you see in the
14   budget.
15        Q    (By Mr. Howard)  All right, Ms. Sandley is
16   going to cover the commissary issues, but is there a
17   separate account maintained for money that comes --
18   that's paid for commissary items?
19        A    Yes.
20        Q    And then, as you said, that money gets
21   expended in some way.  Do you know what the current
22   balance is of that account?
23        A    I can get it.  I don't know what it is off
24   the top of my head, though.

Page 107

RUSSELL WASHBURN

1        Q    And do you know approximately how much money
2    in profits, that is, money taken into the commissary
3    above what you have to pay for the goods sold in the
4    commissary, are on an annual basis?
5         MR. LEE:  Object to form.
6         THE WITNESS:  I don't.
7        Q    (By Mr. Howard)  So aside from the commissary
8    which you mentioned and Ms. Sandley will cover, are
9    there other sources of revenue beyond what ICE is
10   paying for the day rates?  Plus I think there's, you
11   know, ICE payments for transportation and things like
12   that.
13        A    Outside of those, no, I don't -- for this
14   facility, no, I don't think there is.  No.
15        Q    Okay.  And then there are also some line
16   items for costs, correct?
17        A    That's correct.
18        Q    And we talked about labor costs, and that's
19   the largest cost item in the budget for Stewart?
20        A    Correct.  Staffing and salaries, yes.
21        Q    And then you've got -- you've got basically a
22   process in the budget where you determine what your net
23   revenues are, your revenues less your costs, right?
24        A    That's correct.

Page 108

RUSSELL WASHBURN

1        Q    And those will increase if you can reduce
2    costs or increase revenues, simple accounting?
3        A    Yeah, I think it's simple business.  Yes.
4        Q    Okay.  And as part of the budgeting process,
5    does CoreCivic look to identify areas where it can, you
6    know, improve its bottom line, that is, make more
7    money?
8         MR. LEE:  Object to form.  Beyond the
9         scope.
10        THE WITNESS:  The answer, I mean, for us
11        to -- as a business practice, do we look for
12        opportunities to be able to provide the same
13        level of service without compromising safety
14        and security and still yield a savings, the
15        answer to that question would be yes, but it
16        would not be at the compromise of the safety
17        and security of the facility.
18        MR. HOWARD:  Absolutely.
19        Q    (By Mr. Howard)  And the -- certainly the
20   revenue, at least in this time when you're perpetually
21   below the 1600 minimum, is pretty much tapped, there
22   aren't going to be ways for you to really increase your
23   revenue, correct?
24        A    Yeah, no, not to increase it, that's correct.

Page 109

RUSSELL WASHBURN

1        Q    So there would be focus to improve your net
2    earnings on cost items, correct?
3         MR. LEE:  Object to form.  Beyond the
4         scope.
5         THE WITNESS:  Again, I think I -- I
6         mean, kind of the same --
7         MR. HOWARD:  Same answer, right?
8         THE WITNESS:  Yeah, I think -- yeah.
9        Q    (By Mr. Howard)  If you can reduce your costs
10   while maintaining the security and safety and the
11   conditions of the facility, you'll do that because it
12   will mean more money for CoreCivic?
13        MR. LEE:  Object to form, asked and
14        answered, beyond the scope.
15        Q    (By Mr. Howard)  You can answer again.  I'm
16   sorry.
17        A    I'm sorry.  Same answer.  Sorry.
18        Q    Okay.  Now, when you get the budget from FSC,
19   who at CoreCivic, at Stewart, examines the line items
20   to determine "this is too high, this is too low, or
21   maybe we can save money here," does that kind of line
22   item inspection, if anyone?
23        A    We do.  It would be, of course, the business
24   manager here at the facility, the assistant warden,

RUSSELL WASHBURN

1    RUSSELL WASHBURN
2  chief of securities, myself. The health service
3  administrator typically would look at it specifically
4  for the medical component of. You know, some of the
5  area leaders, their specific line items, if it's
6  applicable to them, would have an opportunity to look
7  at it as well, offer any type of anomalies that they
8  may be looking at or potentially forecasting that would
9  have not been captured in the previous history that was
10 reviewed when establishing the budget.
11       Q   Now, we were talking about the budget and
12 ways to improve the net earnings. Another term of
13 accounting art is EBITDA. Are you familiar with that
14 term?
15       A   Earnings before interest, taxes, and
16 depreciation, correct?
17       Q   Yeah. And that basically is your revenues
18 less your costs.
19           Is it correct that the exempt salaried
20 employees of CoreCivic at Stewart receive annual
21 bonuses as part of their compensation?
22           MR. LEE: Object to form. Beyond the
23 scope.
24           THE WITNESS: Yes, we are eligible.
25       Q   (By Mr. Howard) And are you familiar with

RUSSELL WASHBURN

1    RUSSELL WASHBURN
2  how those bonuses are determined, whether they will be
3  paid and the amount of the bonuses?
4           MR. LEE: Same objection.
5           THE WITNESS: Yeah, they're designed
6           with performance goals. Each facilities'
7           goals typically are different based on
8           facility needs or challenges, but that's a
9           component of. It's percentage-based, you
10          know, for making all the goals or only making
11          one of the goals, and it's based on the
12          outcome of those particular goals.
13       Q   (By Mr. Howard) And do you know whether the
14 goals for Stewart Detention Center for the payment of
15 bonuses to exempt employees at Stewart have been
16 financial in nature, that is, the financial performance
17 of the Stewart Detention Center?
18           MR. LEE: Beyond the scope.
19           THE WITNESS: I think I understand the
20          question. You're asking were they given a
21          bonus and a financial -- is that --
22           MR. HOWARD: No, my question is -- FSC
23          determines the bonuses that they're going to
24          pay to employees at the centers like Stewart,
25          correct?

RUSSELL WASHBURN

1    RUSSELL WASHBURN
2           THE WITNESS: Yes, it's based on the
3           formula and a program that's established
4           company-wide, yes.
5       Q   (By Mr. Howard) And are you familiar with
6  bonus programs that have been applied to Stewart which
7  pay bonuses based on levels of EBITDA, levels of the
8  earnings of the facility?
9           MR. LEE: Object to form. Beyond the
10          scope.
11          THE WITNESS: I will tell you, and I
12          speak specifically for Stewart, all of the
13          goals weren't necessarily attached to the
14          actual financial outcome.
15          I'll give an example. One was the -- to
16          meet a percentage of turnover rate is to have
17          less than this in a turnover rate. Another
18          one was to have 10 percent or less of the
19          findings from any audit, partner audit or
20          internal audit, from the previous year.
21          So they're more performance-based than
22          they are, really, financial. Now, not to say
23          that there's not a component in the financial
24          that takes -- is taken into consideration,
25          because there is.

RUSSELL WASHBURN

1    RUSSELL WASHBURN
2           So you may only make -- you may not make
3           any of the three goals, and so -- but if
4           you're financially performing well, there
5           could be a percentage that's applied under
6           what's called a discretionary pay at that
7           point, but the primary goals are not -- more
8           often than not are not connected to the
9           financial result of the facility. It's more
10          about operational performance.
11          MR. HOWARD: Okay. Can we just call up
12          one more document, and then I'm going to turn
13          it over to Ms. Sandley. This is CCBVA258426,
14          a February 29th, 2016 email regarding the
15          2016 facility bonus plan.
16          (Exhibit 6 marked for identification.)
17       Q   (By Mr. Howard) While she's pulling that up,
18 did you review any of the bonus plan documents in
19 preparation for the deposition today?
20       A   I don't recall -- I don't think any of those
21 were a part of, but -- I don't believe so.
22       Q   And, as I said, this is from February of 2016
23 and it talks about a 2016 facility bonus plan with
24 bonus grades 1 through 4. I don't know if you can see
25 that under the paragraph labeled No. 1.

```
                RUSSELL WASHBURN
1
2     A    I can.
3     Q    Okay.  And then -- by the way, when bonus
4  plans are established by FSC, the employees who are
5  eligible at Stewart are aware of the plan, are they
6  not?
7     A    Yes, they are.
8     Q    So they know what they have to do in order to
9  achieve a bonus?  It doesn't come as a surprise at the
10 end?
11    A    That is correct.
12    Q    So at the beginning of the year, they say,
13 "Look, if we do XYZ, we're in line for a bonus," so
14 they're incentivized to do whatever it is the XYZ lays
15 out as the goals for the bonus, correct?
16    A    That's correct.
17    Q    And let's take a look at the attachment to
18 this bonus plan for 2016 facilities.
19         (Interruption in the proceedings.)
20         MR. HOWARD:  Hold on one second.  Take a
21         look at that, and then I'll ask some
22         questions.
23    Q    (By Mr. Howard)  So this facility bonus plan,
24 grades 1 through 4, has grade levels that are based
25 entirely on facility EBITDA and operating expenses as
```

```
                RUSSELL WASHBURN
1
2  well as a customized facility operational metric.  Do
3  you see that?
4     A    Yes.
5     Q    So facility EBITDA, that's the earnings, you
6  know, revenue less expenses we were talking about
7  before, correct?
8     A    That's correct.
9     Q    And the higher that EBITDA, the higher the
10 grade for the bonus, correct?
11    A    To that█ percent.
12    Q    Yes.
13    A    Yes.
14    Q    And then operating expenses is a separate
15 criteria.  And I think if you scroll down, you see that
16 reducing operating expenses also contributes to a
17 higher bonus level, correct?
18    A    That's correct.
19    Q    And these are financial performance metrics
20 that, if achieved, allow exempt employees, the 32
21 exempt employees, I believe you said, at Stewart to
22 make more compensation?
23    A    Correct.  That is a component of the plan,
24 yes.
25    Q    And, for example, "Facility EBITDA," it says,
```

```
                RUSSELL WASHBURN
1
2  "Facility EBITDA will be calculated on a sliding scale
3  to reward facilities for attaining higher levels of
4  EBITDA."
5         So these bonuses are rewards to management of
6  Stewart if you are able to achieve higher levels of
7  earnings, correct?
8     A    Yes.  Based on this plan, yes.
9     Q    And this plan was in effect at 2016.  Do you
10 know how many years the bonus plans for the facilities,
11 including Stewart, included EBITDA as a performance
12 goal?
13         MR. LEE:  Object to form.
14         THE WITNESS:  I would say for sure the
15         period of this case.  As far back as I can
16         remember, that's been a part.
17         Now, this specific plan, I'm sure it's
18         modified over the course of time, but there
19         has been a plan for bonuses for a period
20         of -- at least for the period of this case.
21    Q    (By Mr. Howard)  And a plan that included
22 as -- a reward for facilities for attaining higher
23 levels of EBITDA, correct?
24    A    Yes.
25    Q    And, similarly, the plan rewards facilities
```

```
                RUSSELL WASHBURN
1
2  for attaining lower levels of expenditures, correct,
3  looking at No. 2?
4     A    Yes.  For the operating expenses, yes.
5     Q    And the largest operating expense is labor,
6  correct?
7     A    That is correct.
8     Q    All right.
9         MR. HOWARD:  I have no more questions,
10         Mr. Washburn.  I'm going to turn you now over
11         to Ms. Sandley, but I do want to thank you
12         for your patience with me, especially when I
13         had some awkward questions, and you're a
14         veteran of this process.  I hope I didn't
15         waste your time.
16         THE WITNESS:  Not at all.
17         MR. HOWARD:  Thank you.
18         THE WITNESS:  Thank you.
19         MS. SANDLEY:  Hi, Warden Washburn.  I'm
20         CJ Sandley.  I believe we met during the site
21         inspection in this case.  It's good to see
22         you again.
23         THE WITNESS:  I thought you looked
24         familiar, so -- thank you.
25         MS. SANDLEY:  Well, you're stuck with me
```

Page 118

RUSSELL WASHBURN

```
1                    RUSSELL WASHBURN
2        for the rest of this deposition, so thanks
3        for being flexible with us.
4                    EXAMINATION
5   BY MS. SANDLEY:
6        Q    I want to start -- I know you talked a little
7   bit about staffing plans with Mr. Howard, and I want to
8   go back to that.  You testified earlier that there are
9   two separate staffing plans for Stewart; is that right?
10       A    That's correct.
11       Q    There's one based on a population of 1600?
12       A    Yes.
13       Q    And one based on a population of 1752?
14       A    Yes, ma'am.
15       Q    Are those staffing plans written?
16       A    They are.
17       Q    Do you have copies of them?
18       A    I do.
19       Q    Did you review them before this deposition
20  today?
21       A    Yes, because that's the staffing pattern that
22  we're operating off and we have been operating off
23  since my arrival.
24       Q    Okay.  And is CoreCivic required under the
25  IGSA to comply with the staffing pattern?
```

Page 119

RUSSELL WASHBURN

```
1                    RUSSELL WASHBURN
2        A    Yes.
3        Q    Is it required to comply with the 1600 or the
4   1752?
5        A    The 1600.  And for explanation so you can
6   kind of understand the difference between the two, 1600
7   is the contracted staffing pattern.  The 1752 is the
8   budgeted staffing pattern, and that's what we hire to.
9   The accountability from the customer, in this case ICE,
10  it can be applied for the 1600-bed staffing pattern;
11  but, again, we hire to the 1752, which is my budgeted
12  staffing pattern.  Hopefully that's helpful.
13       Q    Yeah, it is.
14            Has CoreCivic always been required under the
15  IGSA to comply with the staffing pattern?
16       A    As far as my knowledge, yes, but I'd have to
17  go back and obviously review each record between 2008
18  to today, but I believe so, yes.
19       Q    Okay.  Is there a certain percentage of the
20  required positions that CoreCivic is required to have
21  filled in order to be in compliance with the contract?
22       A    All of them.  That's based on the contract
23  staffing pattern.
24       Q    Okay.  So it's your understanding that the
25  compliance rate is 100 percent?
```

Page 120

RUSSELL WASHBURN

```
1                    RUSSELL WASHBURN
2        A    That's correct, yes.  That's the expectation
3   of the partner, yes.
4        Q    Okay.  Has CoreCivic ever been penalized for
5   failing to comply with the staffing pattern under the
6   contract?
7        A    Here specifically at Stewart?
8        Q    Yes.
9        A    Certainly not since my arrival.  I'd have to
10  go back and look at the records to speak prior to, so
11  I'm just not -- I'd have to look at the records to
12  answer the rest of that.
13       Q    Okay.  And nothing that you saw in your
14  preparation for this deposition today indicated that
15  one way or the other?
16       A    I don't believe so, no, ma'am.
17       Q    Okay.  Is there a contractual limit on how
18  long a vacancy can go unfilled before CoreCivic gets
19  penalized under the contract?
20       A    Not in this specific contract.  Some of our
21  others, but I don't believe there is anything
22  specifically in this contract.  It's the established
23  minimum and here's the expectation.
24            MS. SANDLEY:  Okay.  Let's look at
25  Exhibit No. 7.  The Bates number is ICE
```

Page 121

RUSSELL WASHBURN

```
1                    RUSSELL WASHBURN
2   Barrientos 0024518.
3            (Exhibit 7 marked for identification.)
4        Q    (By Ms. Sandley)  All right, and this is an
5   email thread.  Let's go to the first email in this
6   thread that's on page 2.
7            All right, so this is an email from Cornell
8   House, who appears to be someone at ICE, to Natasha
9   Metcalf.  Who is Natasha Metcalf.
10       A    Natasha is a vice president with Facility
11  Support Center.
12       Q    Okay.  And is she someone who has or had
13  responsibilities relating to Stewart?
14       A    Yes.  With all of our contracts as a company.
15       Q    Okay.  And Mr. House writes, "We will not be
16  taking any further action against the attached CDR
17  17-0001 at this time."
18            CDR stands for contract deficiency report?
19       A    Yes, ma'am.
20       Q    Okay.  And that's a notification from ICE to
21  CoreCivic that CoreCivic is not complying with the
22  IGSA, right?
23       A    That's correct.
24       Q    Did ICE issue a CDR relating to staffing at
25  Stewart?
```

RUSSELL WASHBURN

1
2    A    You're talking about from this email or --
3    Q    To your knowledge.
4    A    I mean, based on what I'm reading here, it
5 would imply that, as such, yes.
6    Q    Okay, but this is the first you're learning
7 about that?
8    A    I mean, I know that CDRs have been generated
9 in the past.  What each of those CDRs were for, I'd
10 have to go back and obviously look at those.
11    Q    Do you know what any of the CDRs generated in
12 the past relating to Stewart have been about?
13    MR. LEE:  Object to form.
14    THE WITNESS:  Again, just a handful.  I
15    know that there was a CDR generated for, I
16    believe, a suicide that may have occurred or
17    a death that occurred here at the facility.
18    The CDR, I believe, was connected to security
19    watches or security rounds from that.
20        Again, to list them all, I'd have to go
21    back and review, but I know those for sure --
22    or that one for sure.
23    MS. SANDLEY:  Okay.
24    Q    (By Ms. Sandley)  All right, and looking back
25 at this email, Mr. House writes, "As we've discussed,

---

RUSSELL WASHBURN

1
2 we would like to incorporate a staffing plan into the
3 contract.  Attached is the cost statement/staffing plan
4 you provided back in March."
5        So does this email refresh your recollection
6 or knowledge about whether there was a staffing plan in
7 place under the contract at Stewart before 2017?
8    A    Based on this email, it would suggest that
9 there was not.  But, again, without reviewing the
10 records to their entirety, I would read this as there
11 may not have been one prior to that date.
12    MS. SANDLEY:  Okay, let's take a look at
13    Exhibit 8.  It's CCBVA4714.
14    (Exhibit 8 marked for identification.)
15    Q    (By Ms. Sandley)  Okay, and this is a letter
16 that appears to be from ICE to the Stewart County Board
17 of Commissioners.  Do you see that?
18    A    Yes, ma'am.
19    Q    And it's from May 23rd, 2006?
20    A    Yes.
21    Q    Okay.  And we're going to scroll down a
22 little bit.
23        All right, do you see where it says "Proposed
24 Staffing Plan to include number and description of
25 positions and staffing allocation by shift"?

---

RUSSELL WASHBURN

1
2    A    Yes.
3    Q    In preparing for this deposition today, did
4 you review any staffing plans that were incorporated
5 into the original IGSA for Stewart Detention Center?
6    A    I reviewed some staffing plans, several of
7 them.  It probably was back to that point, but I'd have
8 to refer back to those to see the actual dates on them.
9 There was a multitude of staffing plans that I looked
10 at.
11    Q    Okay.  And when you say "a multitude," about
12 how many?
13    A    Seven or eight.  Maybe a little more.
14    Q    Okay.
15    MS. SANDLEY:  We can take this exhibit
16    down, Jackie.  And let's pull back up Exhibit
17    7.
18    Q    (By Ms. Sandley)  All right, so this is --
19 we're going back to the email where ICE had issued a
20 CDR about staffing and asked -- and attached -- let's
21 actually look at the email.  It's on page 2.  Mr. House
22 attaches what he describes as the cost
23 statement/staffing plan provided by CoreCivic in March
24 2017.  Do you see that?
25    A    I do.

---

RUSSELL WASHBURN

1
2    Q    Okay.  Let's look at page 5 of this document.
3        All right, so according to Mr. House's email,
4 this is the staffing plan proposed by CoreCivic for
5 Stewart in 2017, and we're going to look at the "Type
6 of Position" and "Number of Position" columns.  Do you
7 see those?
8    A    I do.
9    Q    Okay.  Do you see the "Detention Officer"
10 row?
11    A    I do, yes, ma'am.
12    Q    Okay.  So in March 2017, CoreCivic, according
13 to this document, proposed 271 detention officers at
14 Stewart?
15    A    Yes, I see that.
16    Q    Do you have any idea how many detention
17 officers were employed at Stewart before 2017?
18    A    Without looking at the records, no.
19    Q    Okay.  And then scrolling down a little bit
20 to "Senior Detention Officer," CoreCivic proposed 18.
21 Do you see that?
22    A    I do, yes, ma'am.
23    Q    Okay.  And then -- we're jumping around, I
24 apologize -- janitors, CoreCivic proposed 0.5.  Do you
25 see that?

---

Page 126

RUSSELL WASHBURN

1
2  A    I do, yes, ma'am.
3  Q    And do you read that to mean one half-time
4  janitor?
5  A    Yes, part time.
6  Q    Okay.  Stewart -- is one part-time janitor
7  enough to clean the whole facility of Stewart?
8  A    Again, this is not a typical -- I mean, this
9  is a budgetary review.  It depends on how many days
10 you're covering because that .5, you know, if you're
11 covering seven days a week, you know, for 40 hours,
12 that 0.5 could be more than.
13       I suspect, just based off of this, it's
14 probably one person part time, but -- based on the
15 overall salary, I would suggest that, but we actually
16 have -- the janitor service is really provided for the
17 outside building where ICE -- the construction.  So the
18 janitorial services that are being provided primarily
19 are over in that particular location.  So in that case,
20 yes.
21 Q    Okay.  So the janitors paid by CoreCivic
22 primarily only clean the portion of the facility that
23 is the ICE offices and ICE courtroom; is that right?
24 A    Right, outside of the secured parameters.
25 Now, they do also clean and have been cleaning, since

Page 127

RUSSELL WASHBURN

1
2  COVID, other areas in addition to, but -- but yes.
3  Q    Prior to COVID, the rest of the facility was
4  cleaned almost entirely by detained workers, right?
5  A    I'm sorry, you broke up.
6  Q    Prior to COVID, the rest of the facility was
7  cleaned almost entirely by detained workers?
8       MR. LEE:  Object to form.
9       THE WITNESS:  No, I would say, I mean,
10      staff -- staff and detainee workers would
11      have been providing that service.  Example, a
12      control room, a detainee is not able to go
13      inside of a control room, so that service
14      would have been provided and cleaned by the
15      actual officers that are assigned.
16      So I won't say exclusively.  There were
17      certainly janitorial services being performed
18      by detainees, but not exclusively.
19      MS. SANDLEY:  Okay.
20 Q    (By Ms. Sandley)  This staffing plan, if you
21 know, is -- is it based on a 1600 population?
22 A    As part of the contract -- again, what is the
23 date on this email?
24      MS. SANDLEY:  Let's look at page 2,
25      Jackie.

Page 128

RUSSELL WASHBURN

1
2       THE WITNESS:  I see the 2017.
3       MS. SANDLEY:  Yeah.
4       THE WITNESS:  So I believe the 1600 or
5       the expansion was in 2016, so I think it's
6       safe to say that, yes, this would be based
7       off of a 1600 guarantee.
8       MS. SANDLEY:  Okay.  And let's go back
9       to page 5.
10 Q    (By Ms. Sandley)  All right, so looking at
11 "Maintenance," this staffing pattern allows for one
12 maintenance supervisor.  Do you see that?
13 A    Yes, I do.
14 Q    And four maintenance workers?
15 A    I do.
16 Q    Do you see any food-service staff included in
17 this staffing plan?
18 A    No, because they're contracted, so they would
19 be under a separate contract for us.  They would not be
20 on our staffing plan.  They would be through the
21 contract between us and Trinity.
22 Q    Okay.  All right.
23       Do you know if this specific staffing plan
24 was incorporated into the Stewart IGSA?
25 A    Based off of the documents I reviewed in this

Page 129

RUSSELL WASHBURN

1
2  email, I would say yes.
3       MS. SANDLEY:  Okay, let's look at the
4       next exhibit, CCBVA105880.
5       (Exhibit 9 marked for identification.)
6  Q    (By Ms. Sandley)  All right, and this is a
7  modification to the Stewart IGSA, correct?
8  A    Yes.
9  Q    Let's scroll down a little bit so we can see
10 the signature date.
11      Okay.  And it appears to be dated -- or
12 signed February 6, 2018.  Do you see that.
13 A    Yes.  It's hard to make out the 2018, but I
14 believe that's what it says.
15 Q    Okay.  Let's go to page 7 of this document.
16      All right.  And this is a staffing plan,
17 correct?
18 A    It's, yes, part of a staffing plan, yes.
19 Q    Part of a staffing plan.  And this one calls
20 for █████ detention officers.  Do you see that?
21 A    I do.
22 Q    That's ████████ the 271 we saw in the
23 previous proposed staffing plan we looked at, correct?
24 A    That's correct.
25 Q    Do you know why ████████████████████

RUSSELL WASHBURN

2  A   No, I don't.  I don't know when this
3  particular staffing plan or if this is the one that
4  actually made it to because it's ████████ the one
5  we're operating off of today, so I'm not sure.
6  Q   Okay.  Can we scroll up to page 6.
7      All right.  And this is another part of the
8  staffing plan, right?
9  A   Yes, it is.
10 Q   I want to ask you about that "Relief Factor"
11 column.  Some of these positions are a 1.0 relief
12 factor, correct?
13 A   That's correct.
14 Q   And some of them are more than 1, correct?
15 A   That's correct.
16 Q   And there's one -- the janitor is .5, right?
17 A   Is that on this page?  Yeah, part time, one,
18 yes.
19 Q   Okay.  How does CoreCivic calculate shift
20 relief factors?
21 A   What's taken into consideration for relief
22 factor, I mean, it's based on the hours, the number of
23 shifts that have to be covered, again, the number of
24 hours that have to be covered in order to come up with
25 the equation to allow -- to have an appropriate level

RUSSELL WASHBURN

2  of coverage, those same numbers of coverage that's on
3  the staffing pattern, in addition to giving people
4  vacation time, training times, things of that nature.
5  Q   Okay.  So the factors taken into
6  consideration in calculating the shift relief factor
7  are time off, right?
8  A   Correct.
9  Q   Training time?
10 A   Correct.  The number of -- I'm sorry.
11 Q   No, go ahead.  You can list them out for me.
12 A   The number of hours that that post has to be
13 covered, you know, whether that's a
14 24-hour-7-day-a-week post, and then the number that's
15 expected.  So if you're looking at detention officer of
16 housing on that very first block, ██████████████
17 ██████████████████████████████████████████████████
18 ████████████████████████████████████  So that formula gives you
19 ████████████████████████████████████  So that formula gives you
20 that total number that you would need.
21      And in this case, you can see out to the far
22 right, ████████  So you have to have ████████ order
23 to make sure you have ████████████ 24 hours a
24 day, seven days a week.
25 Q   Okay.  Generally, are the positions with

RUSSELL WASHBURN

2  relief factors greater than one positions that require
3  24/7 coverage?
4  A   For the most part, yes.  Some, you know, will
5  just be a first and a second shift, you know, either at
6  five days or seven days, and that's going to change
7  that -- that formula or that math to come up with that
8  total staff that's necessary to fulfill that staffing
9  pattern.
10 Q   Okay.
11     MS. SANDLEY:  All right, we can take
12 this exhibit down.  Let's look at the next
13 exhibit, No. 9 [sic], CCBVA244539 [sic].  All
14 right.
15     (Exhibit 10 marked for identification.)
16     MS. SANDLEY:  And, Jackie, is this
17 Exhibit 10?  I'm sorry if I messed up the
18 numbers.  All right, this is 10.
19 Q   (By Ms. Sandley)  Okay, let's scroll down --
20 this is, again, another modification to the contract,
21 right, Warden?
22 A   Yes, sir.  I mean yes, ma'am.  Sorry.
23 Q   That's okay.
24     Let's scroll down to the signature date.  And
25 it looks like next to the contracting officer's

RUSSELL WASHBURN

2  signature, there's a date there after April 24th, 2019.
3  Do you see that?
4  A   I do.  The electronic stamp there, it looks
5  like?
6  Q   Yes.
7  A   Yes, ma'am.
8  Q   Okay.  Let's scroll down to page 5.
9      All right.  And this is another staffing
10 pattern, right?
11 A   It is, yes.
12 Q   And looking at the "Maintenance" section
13 here, there is one janitor position and one part-time
14 janitor position.  Do you see that?
15 A   I do.
16 Q   Do you know why one janitor was added?
17 A   I don't.  They were in place before I got
18 here, so to answer why it was added or when, I'm not
19 sure.
20 Q   Okay.  Let's look at the next page.  Do you
21 see where, in the "Position Summary" section, it says
22 "food service contract staff"?  Do you see that?
23 A   I do.
24 Q   Do you know at what point the food service
25 staff was incorporated into the staffing plan under the

RUSSELL WASHBURN

1
2  IGSA?
3      A    I don't.  It was in place when I arrived.
4      Q    Okay.  But seeing it here now, would it be
5  your understanding that because the food service staff
6  was included in the staffing plan attached to the IGSA,
7  CoreCivic is required to ensure that there are at least
8  six food service staff at Stewart?
9      A    Yes.
10     Q    And then staffing ratios here, do you see
11 those?
12     A    I do, yes, ma'am.
13     Q    Are those based on a 1600 population as well?
14     A    Yes.  Any time you see -- on any of our
15 staffing patterns, when you see that 1600 in the
16 left-hand corner, if that number was different, then
17 that would be reflected that that -- that would -- a
18 change to base.  So I had 1752.  Instead of saying
19 1600, it says 1752 there.
20     Q    Got it.  Okay.
21          MS. SANDLEY:  All right, we can take
22     this down.
23     Q    (By Ms. Sandley)  The staffing patterns that
24 are in place currently at Stewart, do you know when
25 they were created?

RUSSELL WASHBURN

1
2      A    No, ma'am.  They've been in place since my
3  arrival, so I don't -- I'm sure they were created with
4  the 1600 around that 2016 time frame; but it appears,
5  obviously, there were some adjustments to that between
6  that time and whenever the last one that was changed
7  and modified before I got here.
8      Q    Okay.  Does CoreCivic submit regular staffing
9  reports about Stewart to ICE?
10     A    Yes.  Each month.
11     Q    And who prepares those?
12     A    The human resource manager.
13     Q    Okay.  Do you review them before they're
14 submitted?
15     A    Not regularly, no.
16          MS. SANDLEY:  Let's take a look at
17     Exhibit 11, CCBVA280792.
18          (Exhibit 11 marked for identification.)
19     Q    (By Ms. Sandley)  And is this one of those
20 monthly staffing reports submitted to ICE?
21     A    It's hard to tell with all the redacted.  It
22 appears so, yes.
23     Q    Okay, we're going to look at the first tab of
24 this document.  It's called "Staff Report."  And is
25 this -- so is this tab generally a list of all the

RUSSELL WASHBURN

1
2  staff currently at Stewart?
3      A    Yes, it's an active number of employees and
4  which employees are physically working at the facility.
5      Q    Okay.  And let's take a look at the next tab.
6  While we pull that up, these staffing reports, are they
7  measuring against the 1600 population staffing plan or
8  the 1752?
9      A    I'll say they should be.  I will tell you
10 when I first came, there was some confusion, so I don't
11 know where that started where staff were reporting from
12 the 1752 staffing pattern and not the 1600 contracted
13 staffing pattern.  I'm not sure when that confusion
14 started, so I can't say.  This is April 2021.  This one
15 should be from the 1600 for sure, but I do know prior
16 to my arrival and the period during the time I was
17 here, the staff were utilizing the wrong staffing
18 pattern and were reporting off of that higher number of
19 staff above and beyond what the contract required.
20     Q    Okay.  But these reports should be reporting
21 based on the 1600 staffing pattern; is that right?
22     A    Correct.  This April 2021 for sure was based
23 off of 1600.
24     Q    Okay.  I'm sorry to go back to that first
25 tab, and we don't have to pull that up again, but that

RUSSELL WASHBURN

1
2  was the tab that listed all of the employees currently
3  at Stewart, right?
4      A    Yes.  Well, I mean, the titles.
5      Q    And presumably, under the "Name" column,
6  their names and their employee numbers under that
7  column?
8      A    This would be the formatted form, yes, ma'am.
9      Q    Okay.  If this report is reporting based on
10 the 1600 population staffing pattern, are there
11 employees at Stewart who are not included in this tab?
12          MR. LEE:  Object to form.
13          THE WITNESS:  Are you asking me if
14     there's people who are working that would not
15     be on this report?
16          MS. SANDLEY:  Correct.
17          THE WITNESS:  Not that I'm aware of,
18     no.
19          MS. SANDLEY:  Let's look at the next
20     tab.
21     Q    (By Ms. Sandley)  Okay, and this tab lists
22 vacant positions; is that correct?
23     A    It does, yes.
24     Q    Okay.  And on this report, some of those
25 vacant positions, like accounting clerk, mail room

Page 138

RUSSELL WASHBURN

1  clerk, had been vacant for quite some time, correct?

2  A   That's correct.

3  Q   Have they been filled now?

4  A   Some of them, in fact, maybe -- minus

5  administrative clerk because it seems like we always

6  have an administrative clerk position that leaves or

7  comes and goes, mail room, yes, secretary, yes,

8  accounting clerk, yes, that administrative clerk part

9  time, yes, and the chaplain, yes.  The administrative

10 clerk, like I said, at any given time, we could have

11 one or two of those open because, again, those staff

12 come and go.

13 Q   Okay.  And this portion of the report also

14 lists pending hires?

15 A   Yes.

16 Q   How long does the hiring process at CoreCivic

17 typically take?

18 A   It varies.  It's depending on the individual.

19 The background that ICE completes can be pretty

20 extensive, so I would say the least I've seen is four

21 weeks, but I've seen it to 12 weeks.

22 Q   And let's look at the totals at the bottom.

23     All right, the column that says "Allocated,"

24 do you see that?

---

Page 139

RUSSELL WASHBURN

1  A   Yes, ma'am, I do.

2  Q   What does "allocated" mean?

3  A   That's the number of positions approved.

4  Q   Under the 1600 population staffing plan?

5  A   I believe that number -- I'm not sure if

6  that's accurate or not.

7  Q   You're not sure if ████ is the number of

8  approved positions under the 1600 population staffing

9  plan?

10 A   Right.  I'd have to go back and look at that.

11 That staffing plan you had up, if we could look at

12 that, that could tell us that number.

13 Q   Okay, that's all right, but it's your general

14 understanding that this should reflect the number --

15 the total number of staff in the 1600 population

16 staffing plan?

17 A   Yes, ma'am.

18 Q   Okay.  And then the "Current" column, does

19 that reflect the number of filled positions?

20 A   Yes, it would.

21 Q   All right.  And then on this report, there

22 were ██ vacancies.  Do you see that?

23 A   I do.

24 Q   Okay.  Can you explain to me how there were

---

Page 140

RUSSELL WASHBURN

1  currently ██ filled positions and ██ vacancies, but

2  there were only ██ allocated positions?

3  A   No.  As I said, I'm not sure that ██ is an

4  accurate number.

5  Q   Okay.  Would you expect the number in the

6  "Current" column and the number in the "Vacancy" column

7  to add up to the number in the "Allocated" column?

8  A   Yes.

9  Q   Okay.  What does "Pending Eqip" mean?

10 A   That's the background clearance.  Eqip is

11 what they -- that's what's referencing the background

12 clearance that ICE completes.

13 Q   What does "Pending Hire" and "Cleared" mean?

14 A   It means that they've been cleared and

15 they're waiting to be -- until the next available

16 pre-service orientation class would be scheduled to

17 start.  So they've been cleared through -- they

18 received their final EOD from ICE, which is their

19 background approval, but now we're waiting for the

20 scheduled class to start.

21 Q   Okay.  And this report indicates that in

22 April 2021, Stewart was staffed at ██ percent?

23 A   Staffing percentage, yes, that's what the

24 numbers are there.

---

Page 141

RUSSELL WASHBURN

1  Q   Okay.  And that's counting the Eqip hires but

2  not the pending hires, correct?

3  A   I'd have to see what the formula is in the

4  spreadsheet, but I would assume that would be accurate,

5  yes.

6  Q   I'm asking based on that asterisk there right

7  under this portion of the --

8  A   Yes.

9  Q   The staffing vacancies by position are not

10 included in this report, correct?

11 A   The staffing vacancy -- not by position, no.

12 Q   Okay.  So Stewart or CoreCivic doesn't report

13 to ICE how many detention officer vacancies there are,

14 correct?

15 A   I believe we do.

16 Q   Where would that information be?

17 A   It would be in the reports that go out to --

18 from HR.  I'm pretty sure we report the total number of

19 vacancies.  Can you scroll back up?

20 Q   Sure, yeah.

21 A   Yeah.  Again, not on this report, but I do

22 believe there's a different report that goes to them.

23 I'm not a hundred percent, but I'd have to verify that.

24 Q   Okay.

Page 142

```
1                    RUSSELL WASHBURN
2       A    But we do report all vacancies.
3       Q    Okay.  Is there another report that goes out
4  about staffing to ICE?
5       A    I'd have to verify with HR just to confirm,
6  but it's to my understanding that we do report all of
7  our vacancies.
8       Q    All right.
9            MS. SANDLEY:  Let's take this exhibit
10  down.
11       Q    (By Ms. Sandley)  Does CoreCivic report how
12  much overtime staff are working to ICE?
13       A    Not that I'm aware of, no.
14       Q    Is that information collected anywhere?
15       A    Are you asking for a dollar amount or for
16  hours?
17       Q    Well, let's start with hours.  Are the hours
18  of overtime work each month collected anywhere?
19       A    Yes, all of our hourly employees clock in and
20  clock out, so the -- Kronos would maintain and keep
21  that information, the number of hours of each person
22  and how many hours of overtime they worked.
23       Q    How often does staff at Stewart work overtime
24  right now?
25       A    By person or --
```

Page 143

```
1                    RUSSELL WASHBURN
2       Q    Is it typical to have staff working overtime
3  every day at Stewart?
4       A    Oh, yes.
5       Q    Okay.  What happens if Stewart is
6  short-staffed in intake?
7            MR. LEE:  Object to form.
8            THE WITNESS:  We would overtime to cover
9       that vacancy for call-offs or, you know,
10       somebody calls in sick, then we would use
11       overtime to offset that and cover that.
12       Q    (By Ms. Sandley)  Okay, and same thing in the
13  chow hall, for example, you would use overtime to cover
14  that?
15       A    That's correct.
16       Q    Okay.  Has CoreCivic ever increased staffing
17  at Stewart without seeking a modification to the IGSA?
18       A    If I --
19            MR. LEE:  Object to form.
20            THE WITNESS:  I'm sorry.
21            MR. LEE:  Go ahead.
22            THE WITNESS:  Yeah, I mean, the 1752,
23       we're not compensated for that 1752 staffing
24       pattern, which is our budgeted staffing
25       pattern.  That's the one that we hire to as
```

Page 144

```
1                    RUSSELL WASHBURN
2       the higher and greater band, but it's not
3       captured into that per diem rate because the
4       1600 contract is the one that we actually are
5       paid for.
6       Q    (By Ms. Sandley)  Generally, comparing the
7  1600 to 1752 staffing plans, where are the differences?
8  So, for example, are there more detention officers in
9  the 1752?
10       A    There is.  I'd have to go back and look at
11  the number.  That's the biggest variance, is in the
12  detention officers.  And like an example, you saw there
13  was only a maintenance supervisor and four workers.  We
14  have an assistant maintenance supervisor as well that's
15  not captured in there.  So there's a few others, but
16  primarily in security is where you're going to see the
17  big difference.
18       Q    Okay.  And are there more supervisor-level
19  positions in the 1752?
20       A    I believe so in medical.  There might be one
21  additional clinical supervisor that's not captured and
22  maybe even one assistant because we have two assistant
23  HSAs.  I'd have to go back and again look at the
24  staffing pattern, but -- to see if it calls for two or
25  one, but we actually have two.  For some reason, I
```

Page 145

```
1                    RUSSELL WASHBURN
2  think the 1600 only requires one.
3       Q    Okay.  So setting aside medical, the majority
4  of the increase in the 1752 staffing plan as compared
5  to the 1600 is in --
6       A    Security, that's the bulk.
7       Q    -- security and nonsupervisory positions; is
8  that right?
9       A    That's correct, hourly staff.
10       Q    Got it.  Okay.
11            Who currently provides the phone services at
12  Stewart?
13       A    Talton, if I said that correctly.
14       Q    And when did they start providing phone
15  services at Stewart?
16       A    I'm not sure.  That contract is directly with
17  ICE.  It's not our contract.  It was in place when I
18  arrived, but I believe they had Securus, I think, is
19  what I understood prior to.  But when that transition
20  occurred, I'm not a hundred percent.
21       Q    Did you review the Securus contract in
22  preparing for this deposition today?
23       A    No.
24       Q    Okay.  People detained at Stewart have to pay
25  for personal phone calls; is that right?
```

RUSSELL WASHBURN

2   A    That's correct.

3   Q    Do you know what the current phone rates are?

4   A    I don't.

5   Q    Are they documented anywhere?

6   A    Again, presumably in that contract, I would

7  believe those should be a negotiated and contracted

8  rate, but I'd have to review that, obviously, to see --

9  to confirm that.

10   Q    Are the rates made available to detained

11  people at Stewart?

12   A    I believe they are.  There's so many

13  documents posted in housing units, as you know.  I want

14  to say yes, but I'd have to go down there and confirm

15  that, but I believe I do recall flipping through there

16  and seeing a rated schedule in there, but I'd have to

17  confirm it.

18   Q    CoreCivic sells phone time through the

19  commissary, correct?

20   A    Correct.  We sell phone cards, yes, ma'am.

21   Q    And is there a markup on those phone cards?

22   A    I don't believe there is, and even if there

23  was, a hundred percent of those funds stay in the

24  commissary detainee welfare account, so CoreCivic would

25  not -- actually would not be able to benefit from

RUSSELL WASHBURN

2  anything from commissary, whether it's phone time,

3  phone cards, or items off of their -- in fact, I think

4  it's Modification 27 that states that we can't benefit

5  from those.

6   Q    Okay.  But you don't know right now whether

7  currently the cost of phone cards is marked up from

8  what the phone rates are under the Talton contract?

9       MR. LEE:  Object to form.

10       THE WITNESS:  I do not believe that they

11       are, but I can't say without -- 100 percent,

12       but I don't believe they are.

13       MS. SANDLEY:  Okay.

14   Q    (By Ms. Sandley)  CoreCivic received

15  commission on phone time under the Securus contract; is

16  that correct?

17   A    It's in our budgeted numbers; but, again,

18  that's one we don't benefit from.  That goes directly

19  to ICE or to -- not even to the welfare account.  It

20  goes directly to ICE.  So although for accounting

21  purposes, you see it in our financials, in our numbers,

22  but 100 percent of that funds -- and that's in that

23  modification.  I think it's 27.  There's so many of

24  them.  It clearly shows that that money has to go to

25  ICE.

RUSSELL WASHBURN

2   Q    And was that true under the Securus contract?

3   A    Again, I'd be speculating to say.  That was

4  before my time.  It's been Talton since I arrived.

5       MS. SANDLEY:  I'm just going to object

6       for the record.  This is related to Topic 7

7       under the 30(b)(6) notice.  That clearly

8       indicates the Securus contract was to be

9       covered today.

10       MR. LEE:  It doesn't.  I would refer you

11       back to our objections both in negotiating

12       this and to the RFPs where we objected to the

13       relevance of that Securus contract, which is

14       why it was never produced in this case.

15       MS. SANDLEY:  That was not something

16       that was raised in our conferral with Rachel,

17       Jacob.

18       Let's look at Exhibit No. 11 [sic].  The

19       Bates is SECURUS_95.

20       (Exhibit 12 marked for identification.)

21   Q    (By Ms. Sandley)  Okay, Warden Washburn, I

22  know you testified earlier you did not review this

23  document.  I'll represent to you that this is the

24  Securus contract produced to us by Securus, okay?

25   A    All right.

RUSSELL WASHBURN

2   Q    And we're going to take a look at page 56.

3       MR. LEE:  Counsel, can we get this

4       dropped in the chat before you start asking

5       questions.  I'd like to be able to review it

6       contemporaneously.

7       MS. SANDLEY:  (Complies with request.)

8       MR. LEE:  Thank you.

9       MS. SANDLEY:  All right.

10   Q    (By Ms. Sandley)  And, Warden Washburn,

11  this --

12       MS. SANDLEY:  Let's actually scroll up

13       to the previous page, Jackie.  All right.

14   Q    (By Ms. Sandley)  Warden Washburn, do you see

15  there where it says "Customer Facilities and

16  Compensation"?

17   A    Yes, ma'am.  I do, yes.

18   Q    Okay.  And it says, "The commission

19  percentage identified below shall be effective May 1,

20  2011."  Do you see that?

21   A    I do, yes, ma'am.

22   Q    Okay.  And let's scroll down to the next

23  page.

24       Okay.  And this is the commission rate

25  structure set out in this contract.  Does this refresh

RUSSELL WASHBURN

1    your recollection at all about whether CoreCivic
2    received commission on phone calls made under the
3    Securus contract?
4         A    I really would need to see the whole
5    contract.  It's hard from this part.  It's got so much
6    redaction.  There's obviously a revenue range and a
7    commission rate that's clearly there, and it appears
8    that this specific contract, I believe at the top,
9    CoreCivic, Corrections Corporation of America at the
10   time -- so it suggests that, yes.  But, again, without
11   seeing that whole contract, it would be difficult for
12   me to confirm definitively.
13        Q    Okay.
14             MS. SANDLEY:  Jackie, we can take this
15        down.
16        Q    (By Ms. Sandley)  How do people detained at
17   Stewart pay for phone calls?
18        A    They have money placed on their books,
19   whether they have money, whether they're working here
20   and they earn money, they can apply it there, family
21   members send their money into Western Union, put their
22   money on their account so they can buy either phone
23   time or specific -- I'll stick to phone time.  That was
24   the question.  So they can -- either money is being

RUSSELL WASHBURN

1    sent in from family members, loved ones, or their work
2    that they're performing here and being paid for under
3    the voluntary work program.  Those funds can be put in
4    there, and it's electronically transmitted that way.
5         Q    Okay.  So if a person detained at Stewart
6    does not have any money coming into their account from
7    the outside, from family members or friends, the only
8    way they can purchase phone time is by working and
9    earning money; is that correct?
10             MR. LEE:  Object to form.
11             THE WITNESS:  As far as purchasing, yes.
12        But I will tell you Talton actually now
13        offers/provides 13 ten-minute calls that are
14        free, and those are replenished, I believe,
15        monthly.  In addition, any of the detainees
16        can request through their case management
17        staff, unit management staff, for assistance
18        to utilize a phone, a facility phone, and
19        make a phone call that way.
20        Q    (By Ms. Sandley)  Those free calls provided
21   by Talton, was that something that was implemented
22   after COVID-19 became an issue at ICE detention
23   facilities?
24        A    Yes, ma'am.  It was sometime after April

RUSSELL WASHBURN

1    2020.  I'm not sure exactly when they put that in.  It
2    was really a mechanism because of visitation
3    restrictions.  And then, of course, that was prior to
4    the tablets.  And, of course, they still exist today,
5    the free phone calls, but they also have tablets where
6    they can communicate as well.
7         Q    Okay.  And people have to -- people detained
8    at Stewart have to pay for certain services and
9    programs on the tablets too, right?
10        A    Primarily visitation.  You know, to generate
11   a medical request, a grievance, those things are not
12   things that they have to pay for.  They can actually
13   get on those, send emails to prospective staff inside
14   the facility.  Those aren't a cost to the detainee
15   either.
16        Q    Okay.  And when you say "visitation," you're
17   referring to, like, video calls on the tablets?
18        A    Yes, ma'am, video visitation.
19        Q    Okay.  How are you doing, Warden?  Do you
20   need a break?
21        A    No, I think I'm good, unless anybody else
22   needs one.
23        Q    Let's keep going.
24             You testified earlier with Mr. Howard that a

RUSSELL WASHBURN

1    number of DHS entities have conducted audits at
2    Stewart, right?
3         A    Yes, ma'am.
4         Q    Does the Office of Detention Oversight
5    conduct audits at Stewart?
6         A    Yes, ma'am.
7         Q    And do they contract with a third party to
8    conduct those audits?
9         A    I think in part.  I think they do have
10   Creative -- I might be confused.  I think it is
11   Creative Corrections.  They might actually provide some
12   assistance to Nakamoto too, but I know for sure -- I
13   believe it's Creative Corrections with ODO, but they
14   also have some of their -- I believe some of their own
15   staff in addition to.
16        Q    Okay.  And when ODO conducts audits at
17   Stewart, what set of standards are they auditing for
18   compliance with?
19        A    The PBNDS standards is what they're using for
20   their basis.  Now, when they come, they have specific
21   standards that they're looking at.  For example, we had
22   one in October, so they looked at a set of standards in
23   October.  When they come again -- typically it's around
24   six months, every six months they're coming, give or

Page 154

RUSSELL WASHBURN

1  take -- they'll look at a different set of standards in
2  that next audit. Now, it may be some of the same, but
3  there will be also some different ones because it
4  rotates the standards. And, quite frankly, we don't
5  know which standards they're going to be looking at, so
6  it's a surprise when they get here.
7      Q   And ODO conducts on-site inspections, right?
8      A   Well, they were since this past one, yes.
9  Prior to that, they were all remote, and that was
10 because of the COVID protocols that were in there. So
11 they did remote evaluations, but this last one that
12 occurred in October, they were physically on site.
13     Q   Okay. So in a typical non-COVID ODO audit,
14 apart from them coming on site, do they review
15 documents?
16     A   Do they review documents prior to getting on
17 site?
18     Q   Yes.
19     A   Yes, for both. They review prior to because
20 they do have to upload to a SharePoint specific
21 documents that they want, that they've requested, but
22 then in addition to -- but really the on-site more so
23 was a thing -- when they were here, they reviewed more
24 documents physically while they were here as opposed to

Page 155

RUSSELL WASHBURN

1  uploading.
2      Now, the virtual, we had a large amount of
3  documents that there was a request and we had to
4  upload, so that was a hundred percent done prior to or
5  in conjunction with.
6      Q   Okay. And when ODO is on site, do they
7  interview detained people?
8      A   Yes, detainees and staff.
9      Q   Okay. And by "staff," you mean CoreCivic
10 staff?
11     A   I believe both, ICE staff and CoreCivic staff
12 and detainees. And for the record, they actually did
13 those interviews even when they were remote.
14     Q   Did they do them by video?
15     A   Yes, ma'am.
16     Q   Okay. If ODO finds Stewart to be not in
17 compliance with a PBNDS standard, what happens then?
18 Is there a consequence?
19     A   It could be. It could result in a CDR.
20 That's really for ICE to evaluate and make that
21 determination as to whether or not they're going to
22 issue a CDR. But for all, we would develop a
23 corrective action plan and go through that same process
24 as I described earlier for the facility, you know, us

Page 156

RUSSELL WASHBURN

1  looking for mechanisms to prevent reoccurrence for the
2  future.
3      Q   Okay. And if there's a corrective action
4  plan developed in response to an ODO noncompliance
5  finding, does ODO conduct a re-audit?
6      A   I think they have done some reassessments
7  on -- I don't know that it's a set requirement, but
8  since I've been here, I do believe that they have come
9  back and looked at some of the follow-ups. And, again,
10 I apologize, I get confused between CRCL groups that
11 have been here, the Nakamotos and the ODOs, but I think
12 ODO does periodically, whether they physically come or
13 ask for supporting documents to demonstrate compliance,
14 I believe we have done that.
15     Q   Okay. How much notice do you typically get
16 for an ODO audit?
17     A   That varies. There's not a set. I think the
18 last time we were notified, it was like maybe a week
19 before, but I've seen it as two or three weeks out,
20 four weeks. I don't think I've seen anything further
21 out than a four-week, but more often than not, it's
22 less than that.
23     Q   Okay.
24         MS. SANDLEY: Let's take a look at

Page 157

RUSSELL WASHBURN

1      Exhibit 13, CCBVA196130.
2          (Exhibit 13 marked for identification.)
3      Q   (By Ms. Sandley) All right, this is an email
4  thread that appears to be between John Bretz and
5  Michael Donahue. Michael Donahue is a warden at
6  Stewart, right?
7      A   Yes, ma'am, he's the previous warden prior to
8  me.
9      Q   Okay. And those other folks listed in the cc
10 block were also CoreCivic employees at Stewart,
11 correct?
12     A   Yes, ma'am.
13     Q   Okay. Let's look at the first email in this
14 thread. It's at the bottom of page 1. Okay, and it
15 starts --
16         MS. SANDLEY: Sorry, Jackie, just so we
17     can see the "From" and "To."
18     Q   (By Ms. Sandley) Is this from -- Douglas
19 Nagel, do you know who that is?
20     A   No, ma'am, I do not.
21     Q   All right. And it's to a bunch of people at
22 ICE, correct?
23     A   Yes, ma'am.
24     Q   Okay. And let's look at page 3.

Page 158

RUSSELL WASHBURN

2  Okay, can you take a -- just take a minute to
3  read this report about this detained person,
4  ████████
5  A  Is there anything above where it says
6  "Detainees are released"?  Is this the whole piece of
7  that other than -- I thought I saw something, but maybe
8  that was just from the -- all right, maybe -- oh, wait
9  a minute.  Oh, it's a bleed-over from the previous
10 page.  So I need to start from "Detainees"?  Is that
11 where I need to start?
12 Q  No.  The name ████████
13 A  All right.
14    Okay.
15 Q  All right.  The issue raised here in this
16 email appears to be that this person's scheduled law
17 library time sometimes overlapped with their work
18 schedule; is that right?
19 A  Yes, ma'am.
20 Q  Okay.  And that when he went to work late
21 after going to the law library, his pay was docked.  Do
22 you agree?
23 A  That's what's in the email, yes, ma'am.
24 Q  Okay.  Do detained people have control over
25 the law library schedule at Stewart?

Page 159

RUSSELL WASHBURN

2  A  No.
3  Q  That schedule is set by Stewart staff?
4  A  That's correct.
5  Q  And all detained people are entitled access
6  to the law library, correct?
7  A  Absolutely, yes, ma'am.
8  Q  Work program participants are paid by the
9  day, right?
10 A  That's correct.
11 Q  They're not paid by the hour, correct?
12 A  That's correct.
13 Q  Okay.  So when a detained person's pay is
14 docked because they're late to work, do you have any
15 idea if that means they just weren't paid for the day
16 or if they were paid less than what their day rate
17 might have been?  Have you ever seen that before?
18 A  I have.  And I would say to this that if a
19 staff member did this, it would be an error.  There's
20 not a protocol that would take monies away from
21 somebody who was attending the law library or
22 established program.  So, to me, this would be a
23 one-off and potentially be a re-education opportunity
24 for an employee.
25    Again, I don't know what the outcome of this

Page 160

RUSSELL WASHBURN

2  was, did they remedy it, did they give him his money
3  back, did they even ever take money.  I don't know.
4  But, to me, this would be an example of an employee who
5  applies something that they just weren't authorized to
6  apply.
7  Q  What would have been a possible solution to
8  this issue?
9  A  I mean, we could have done a number of
10 things.  I mean, we could have evaluated the building
11 schedule, we could have evaluated the law library
12 schedule for that particular area in which the kitchen
13 workers were coming out of and make an adjustment
14 there.  But the outcome shouldn't have been that, you
15 know, we take monies away from somebody, if we did.
16 You know, I'm assuming, based on this, that maybe that
17 was originally, but I don't know what the final outcome
18 was.  That wouldn't have been the occurrence, but there
19 are some other adjustments that could have been made as
20 opposed to going down the path that it appears that
21 this person at least was speculated to be going down.
22 Q  Okay.  So the law library schedule could have
23 been adjusted?
24 A  It could have.  The work schedule could have
25 been adjusted.  I mean, it all depends -- you know, I

Page 161

RUSSELL WASHBURN

2  don't know -- at that time, were all the detainees
3  coming out of the same location?  So it may have been a
4  simple adjustment of law library access hours for that
5  particular group.  But even with that being said, if
6  somebody has got an upcoming case and they need
7  additional time, we would afford them that time to get
8  to the law library and certainly wouldn't take monies
9  away from them for not.
10 Q  Okay.
11    MS. SANDLEY:  Let's take a look at
12 Exhibit 14.  It's CCBVA6239.
13    (Exhibit 14 marked for identification.)
14 Q  (By Ms. Sandley)  And, Warden, this is an ODO
15 report dated July 31, 2019, correct?
16 A  Yes, ma'am, it is.
17 Q  Have you seen this before?
18 A  I believe I have, yes.
19 Q  Okay.  Let's go to page 15.
20    Okay.  Warden, do you see where it says under
21 "Food Service," "ODO observed detainees cleaning
22 cafeteria tables during the lunch meal on the first day
23 of the inspection and observed improper
24 cleaning/sanitizing techniques; tables were not
25 adequately cleaned and sanitized during and after meal

RUSSELL WASHBURN

1    RUSSELL WASHBURN
2   service"?  Do you see that?
3        A    Yes, ma'am, I do.
4        Q    Okay.  And written here it says, "Corrective
5   Action:  Prior to the completion of the inspection,
6   corrective action plan was initiated by food service
7   staff who instructed detainees in proper cleaning and
8   sanitation procedures.  ODO observed proper cleaning
9   during the remainder of the inspection."  Do you see
10  that?
11       A    Yes, ma'am, I do.
12       Q    And the food service staff would be Trinity
13  staff, right?
14       A    That's correct.
15       Q    Okay.  So according to this ODO report, the
16  tables in the cafeteria were not being adequately
17  cleaned and the solution was to instruct detained
18  workers on how to clean them better; do you agree?
19       A    Yes, ma'am.  That's the way it's written here
20  in the report, yes, ma'am.
21       Q    Okay.
22            MS. SANDLEY:  And let's look at the next
23       exhibit, No. 15, CCBVA150697.
24            (Exhibit 15 marked for identification.)
25       Q    (By Ms. Sandley)  Okay.  And, Warden

1    RUSSELL WASHBURN
2   Washburn, is this one of those corrective action plans
3   we were talking about earlier?
4        A    Yes, ma'am.  And ICE refers to them as UCAP,
5   which is a Uniform Corrective Action Plan.  CoreCivic
6   [indiscernible] as CAP, Correction Action Plan, so...
7        Q    Okay.  ICE loves acronyms, right?
8        A    Yes, ma'am.  So do we, though.
9            (Discussion off the record.)
10       Q    (By Ms. Sandley)  Let's look at page 2 of
11  this document.  And who creates these CAPs?
12       A    It would be facility staff.  Typically the
13  person that the deficiency falls in or the department
14  would initiate the UCAP, in this case.  Then it is
15  presented to the appropriate leadership, whether that
16  be the chief of security, chief of unit management,
17  assistant wardens, as well as quality assurance
18  manager, and then ultimately to me for review and final
19  approval before we submit to our Facility Support
20  Center, which then does another complete review process
21  and then ultimately, once approved, submits to ICE.
22       Q    Okay.  All right.  And the first deficiency
23  listed here is, "Sanitation in housing units, hold
24  rooms, and the dining area was inadequate."  Do you see
25  that?

1    RUSSELL WASHBURN
2        A    Yes, ma'am, I do.
3        Q    Okay.  And it says under "Corrections Made,"
4   "During the August 2019 town hall meetings with the
5   detainees, unit teams clarified sanitation expectations
6   in the units."
7            So with regard to the sanitation in the
8   units, according to this CAP, the corrective action was
9   to clarify sanitation expectations with detainees?
10       A    Yes, ma'am.  And that's consistent with the
11  PBNDS standards, if you look at 5.8, where it talks
12  about the persons are responsible for keeping their
13  living areas sanitized and cleaned.
14       Q    Okay.  And it doesn't say that there was any
15  clarification regarding unit sanitation made with
16  CoreCivic staff, correct?
17       A    Not in this corrective action plan, no.
18       Q    Okay.  And let's look at the next page.  It
19  goes on to say -- at the very end of this column, it
20  says "Additional workers."  Do you see that?
21       A    The "As noted" -- yes, "Additional workers
22  have been..."
23       Q    Okay.  So it says, "Additional workers have
24  been assigned and trained to properly clean and
25  sanitize the dining areas."  And it could be that this

1    RUSSELL WASHBURN
2   is related to that -- the tables in the chow hall issue
3   that we saw in the previous exhibit we looked at,
4   right?
5        A    It could be.  Can we scroll back up?  Does it
6   have a number or anything to the left that typically
7   would associate it with the finding?  So it's under the
8   Environmental Health and Safety standards.  I hate to
9   ask you, but if we'd flip back just to confirm that it
10  is under the Environmental Health and Safety.  I didn't
11  look at that when I last -- the actual report.
12       Q    It's okay.  Let's look at the sentence before
13  that.  It says, "As noted on the ODO report, dining
14  room sanitation was corrected during the inspection."
15  Do you see that?
16       A    Yes, ma'am, I do.
17       Q    Okay.  So the corrective action to the dining
18  room sanitation issue was that additional detained
19  workers were assigned to clean the dining areas; is
20  that correct?
21       A    That's what is stated in the UCAP yes, ma'am.
22       Q    Okay.  And the UCAP doesn't say anything
23  about instructing CoreCivic staff on properly cleaning
24  the dining areas, correct?
25       A    Not in that section.  I mean, it does talk

RUSSELL WASHBURN

1
2  about above that where managers will be responsible for
3  ensuring the issues notated on the forms are addressed.
4      Q    Okay, but that's in relation to the intake
5  and discharge areas, correct?
6      A    Yes.  On two pages, it's hard --
7      Q    I know.
8      A    It appears -- related to this corrective
9  action, it appears there's a couple issues that they
10 were addressing in this corrective -- I don't believe
11 that first part is relative to the kitchen.  It doesn't
12 appear to be.
13     Q    Right.  So that's talking about the housing
14 units, correct?
15     A    Right.
16     Q    Okay.  And then let's scroll down.  That next
17 paragraph or chunk is talking about intake/discharge,
18 correct?
19     A    Yes, ma'am.  Okay.
20     Q    And then the third one is talking about the
21 dining room?
22     A    Yes.
23     Q    All right.  So under the dining room, it
24 doesn't say anything about CoreCivic staff being
25 instructed on properly cleaning the dining areas,

RUSSELL WASHBURN

1
2  correct?
3      A    It does not.
4      Q    And it doesn't say anything about adding
5  additional Trinity or CoreCivic staff to clean the
6  dining areas, correct?
7      A    It does not.
8           MS. SANDLEY:  Okay, let's take this
9  down.
10     Q    (By Ms. Sandley)  ICE's Enforcement and
11 Removal Operations also audits Stewart, correct?
12     A    Yes.
13     Q    And they're known as ERO?
14     A    Yes, ma'am.
15     Q    ERO contracts with a company called Nakamoto
16 to conduct those audits, correct?
17     A    Yes, ma'am.
18     Q    Okay.  And is there anything significantly
19 different from the ODO -- between the ODO audits and
20 the Nakamoto audits?
21     A    There's really not --
22           MR. LEE:  Form.
23           THE WITNESS:  I'm sorry.
24           There's really not a lot of differences.
25 I mean, they're both auditing to ICE PBNDS

RUSSELL WASHBURN

1
2       standards, so there's really not a lot of
3  difference.
4      Q    (By Ms. Sandley)  Okay, so generally the same
5  process, correct?
6      A    Yes, ma'am.
7      Q    And they're auditing to PBNDS standards,
8  correct?
9      A    Correct.  And they also interview staff, ICE
10 staff, as well as detainees while they're here on site.
11     Q    Okay.  And apart from during COVID, Nakamoto
12 does on-site inspections?
13     A    Yes.  The last one we had was actually
14 physically on site.
15     Q    Okay.  And does Nakamoto interview staff?
16     A    Yes.
17     Q    Does Nakamoto interview detained people?
18     A    Yes.
19     Q    Okay.  Do you know about how much notice you
20 typically get for Nakamoto audits?
21     A    I think it's about the same.  There's not,
22 you know, a lead time in the notifications.  What I've
23 also found is that they change pretty frequently too,
24 either coming sooner or coming late, so they do change
25 from time to time from the original date that was

RUSSELL WASHBURN

1
2  provided.
3      Q    Okay.
4           MS. SANDLEY:  Let's look at Exhibit
5  16, CCBVA4060.
6           (Exhibit 16 marked for identification.)
7      Q    (By Ms. Sandley)  All right, and this is a
8  Nakamoto audit report, correct?
9      A    It is, yes, ma'am.
10     Q    It's dated May 9th, 2019?
11     A    Yes.
12     Q    Let's look at page 2.
13          Okay, so Nakamoto reports that Stewart was
14 found to meet standards in all applicable areas in
15 2018; is that right?
16     A    Yes.
17     Q    And then in 2019, Nakamoto reports Stewart
18 met standards in 39 -- in all of the applicable areas,
19 correct?
20     A    Yes, ma'am.
21     Q    Okay.  And it goes on to say right under
22 those tables that "The inspection team identified four
23 deficient components in the following four standards."
24          What's the difference between being found
25 deficient by Nakamoto and not meeting the standard?

RUSSELL WASHBURN

1    RUSSELL WASHBURN
2         MR. LEE:  Form and foundation.
3         THE WITNESS:  I don't know if there is a
4    difference.  I'd be curious if there was --
5    if they audited them twice in 2019.  I don't
6    know.  But if there was a deficiency, they
7    should be under that category "Does Not Meet
8    Standards" unless there was a previous 2019
9    in front of this one and they're referencing
10   that.  And, again, I'd have to go back and
11   look to see if they actually had two
12   Nakamotos in that single year.
13        MS. SANDLEY:  Okay.
14        THE WITNESS:  Or it could be just an
15   error in the report.
16        MS. SANDLEY:  Right.
17   Q    (By Ms. Sandley)  Let's look at page 4.  And
18   do Nakamoto reports typically include the inspection
19   worksheet?
20   A    Yes.
21   Q    And is that the tool that Nakamoto uses when
22   it's conducting the audit?
23   A    Yes, ma'am.
24   Q    To your understanding, does the inspection
25   worksheet include everything that Nakamoto is looking

RUSSELL WASHBURN

1    at in the course of the audit?
2    A    I believe it does.  Like I said, it's pretty
3    thick.  It's about as thick as a phone book usually, so
4    I would say it includes everything.
5    Q    Okay.  Well, speaking of thick as a phone
6    book, let's look at page 145 of this document.
7         Okay.  And we're going to scroll down to
8    where the work program standard starts.  It might be --
9    there we go, 146.
10        So this is the portion of the inspection
11   worksheet related to PBNDS Standard 5.8 about the
12   voluntary work program, correct?
13   A    Yes, ma'am, it is.
14   Q    Okay.  Under Component 1, where it says,
15   "Detainees who are physically and mentally able to work
16   shall be provided the opportunity to participate in a
17   voluntary work program."
18        So in this audit, Nakamoto found that Stewart
19   was meeting this standard, correct?
20   A    Correct.
21   Q    And there are no remarks here?
22   A    Correct.
23   Q    Do you know how Nakamoto assesses compliance
24   with this component?

RUSSELL WASHBURN

1    RUSSELL WASHBURN
2    A    Through review of documentation, through
3    review of, of course, the standard, and then through
4    personal observations as well as interviews.
5    Q    What kinds of documents would Nakamoto look
6    at to assess compliance with the standard?
7    A    The work packets that each of the detainees
8    has to complete and, as well, staff have to complete
9    for the voluntary work program.  There's a good number
10   of individual documents.  You know, it would also be
11   some medical documents if there was food service, make
12   sure that they were cleared medically to work in that
13   kind of area.  I don't have the packet right in front
14   of me.
15        There's several forms, several documents that
16   a person -- it has to originate with the detainee
17   requesting to go to work, and then there's other
18   documents for classification that they have to look at
19   as well.
20   Q    Okay.  Let's look at Component 7.  It says,
21   "Detainees who participate in the volunteer work
22   program are required to work according to a fixed
23   schedule that does not exceed 8 hours daily, 40 hours
24   weekly."
25        And Nakamoto found Stewart to be compliant on

RUSSELL WASHBURN

1    RUSSELL WASHBURN
2    this component, right?
3    A    Correct.
4    Q    And there are no remarks, correct?
5    A    That's correct.
6    Q    How does Nakamoto assess compliance with this
7    component?
8    A    Looking at the actual work schedules, looking
9    at the pay sheets for the detainees, and then, of
10   course, through detainee interviews for those who are
11   working on specific assignments.  So whenever they
12   come, they routinely do talk to the kitchen workers,
13   the laundry workers, and those individuals that are in
14   those prospective work areas.  So through review of
15   documents as well actual interviews with the
16   population.
17   Q    Which documents would show how many hours per
18   day detained workers are working?
19   A    There's a work schedule, I believe, that is
20   put out, and they actually have their actual work hours
21   and their schedule.
22   Q    So the schedule would show how many hours
23   detained workers are scheduled to work, right?
24   A    Correct.
25   Q    Is there a document that would show how many

RUSSELL WASHBURN

1  hours detained workers actually worked?
2      A    I don't know that we have a process for
3  tracking.  I don't know that we don't.  I'd have to go
4  back and actually look at that piece, but I'm not sure
5  that we do have an actual sign-in/sign-out kind of a
6  system.
7      Q    Is that something that you've ever looked at
8  since you've been warden at Stewart, how many hours per
9  day detained workers are working?
10     A    Not to say that I've looked at and measured
11 to see if we had a component.  I looked at the
12 schedules to ensure that we're not scheduling those to
13 work in excess of what the standard allows.  And I will
14 say more often than not, they're not working even close
15 to these hours, for a variety of reasons.  You know,
16 prisons and detention centers are not always routine
17 and can't always happen at the right time, but I would
18 say more often than not, they're well below that 40
19 hours per week.
20     Q    How do you know that?
21     A    Just simply being in the building and doing
22 this for the last 26 years, there's no doubt in my mind
23 that if they were, when I'm standing there at the chow
24 hall or going into those locations, the population

RUSSELL WASHBURN

1  would tell me if they were being required to do
2  something that's outside the standards.  They have
3  grievance opportunities that they can file that they're
4  being required to do things that's outside of the
5  requirements of the standards.  And all of these rules
6  and regulations are clearly shown to the detainees.
7          So, again, just my pure experience, the
8  population would tell me if we were doing things
9  outside the scope of the standard.
10     Q    Okay.  But there's no documentation that
11 you're aware of that would show how many hours per day
12 detained workers are working, right?
13     A    I don't want to certify that there's not, not
14 that I personally inspected, so -- I certainly will,
15 but not that I'm -- not that I'm a hundred -- I can't
16 say exclusively there's not.
17     Q    Okay.  Let's look at Component 8.  "Detainees
18 shall receive monetary compensation for work completed
19 in accordance with the facility's standard policy of at
20 least $1 per day."
21          Nakamoto found that Stewart was in compliance
22 with this, correct?
23     A    Yes, ma'am.
24     Q    And the notes say, "Detainees are compensated

RUSSELL WASHBURN

1  $1 to $4 a day for their work.  The pay rate is
2  determined by the job assignment."
3          How does Nakamoto assess whether detained
4  workers are, in fact, compensated for their work?
5      A    Through the business office and they actually
6  inspect payment records to ensure that the detainees
7  are receiving their monies.
8      Q    Okay.  And those payment records reflect
9  money deposited on detained workers' accounts, correct?
10     A    That's correct.
11     Q    They do not reflect any payment made in the
12 form of phone cards, correct?
13     A    No, it would not show that.
14     Q    And the payment records show who was paid,
15 correct?
16     A    Yes.  The payment records would show those
17 who -- for the dollar amount that were physically
18 applied with currency, yes.
19     Q    Does Nakamoto do anything to figure out if
20 there were people who were not paid?
21     A    I don't know that -- no, not that I'm aware
22 of.  I mean, they have the -- who's approved to work
23 and they have that list of individuals, and so they
24 randomly select those individuals that are on those

RUSSELL WASHBURN

1  approved work site schedules.  To what degree they go
2  and how many they look at, I don't know.  It really
3  kind of depends on the auditor, I would assume.
4      Q    They randomly select them to audit their
5  detention files?
6      A    Yes.
7      Q    Okay, and their pay records?
8      A    Yes, they give us the -- "This is the ones
9  that I want to look at."
10     Q    Okay.  Do you remember about how many
11 detained workers' files Nakamoto audits?
12     A    No, ma'am, because I'm not necessarily with
13 each and every one of the auditors.  My staff would be
14 with them, so I don't know.  And I don't know that
15 there's a set expectation for them either.  I'm not
16 saying that there's not, but I'm just not aware if
17 there is.
18     Q    Okay.  Let's scroll through.  I want you to
19 take a look at the rest of this audit tool for
20 Standard 5.8.
21     A    Are you wanting me to read the whole thing?
22 Because it scrolled pretty fast.
23     Q    Yeah, we can scroll up if we need to.
24     A    That's good there.

RUSSELL WASHBURN

```
 2    Q    Okay.
 3    A    Okay.
 4    Q    Is there a component in this audit tool --
 5  well, let's scroll down.  I want to be sure you see the
 6  end of it.
 7    A    Okay.
 8    Q    Okay.
 9    A    Okay.
10    Q    Is there a component in this audit tool that
11  looks at whether detained people are threatened with
12  discipline if they refuse to work?
13    A    Not that I read in the standard, no.
14    Q    And is there a component in this audit tool
15  that looks at whether detained people work because they
16  need money to buy food?
17    MR. LEE:  Object to form.
18    THE WITNESS:  No.  But, again, we're not
19    privy to the interviews, and so it very well
20    could be a part of the actual in-person
21    interviews that take place between the
22    auditor and detainee.  I'm not saying that it
23    is, but it very well could be a component of
24    that dialogue.
25    Q    (By Ms. Sandley)  Okay, but Nakamoto is only
```

RUSSELL WASHBURN

```
 2  auditing for compliance or not with the components
 3  listed in this worksheet, right?
 4    MR. LEE:  Object to form.
 5    THE WITNESS:  They're auditing to the
 6    standard, and the standard clearly states
 7    that it's a voluntary work program.
 8    Q    (By Ms. Sandley)  Okay, but Nakamoto has
 9  broken down the standard into -- for its auditing
10  purposes, into the components that we just looked at,
11  right?
12    MR. LEE:  Form and foundation.
13    THE WITNESS:  As far as the actual
14    indicators, yes, you're accurate in your
15    statement.
16    Q    (By Ms. Sandley)  Okay, and there's not an
17  indicator that looks at whether detained people are
18  working because they need money to buy food, right?
19    A    No.  Not in the indicators, no.
20    Q    Okay.  There's not an indicator that relates
21  to how CoreCivic recruits workers, correct?
22    A    No.
23    Q    And there's not an indicator that looks at
24  what types of jobs detained workers are doing, correct?
25    MR. LEE:  Objection to form.
```

RUSSELL WASHBURN

```
 2    THE WITNESS:  No.
 3    Q    (By Ms. Sandley)  And there's not an
 4  indicator that looks at how many detained workers are
 5  being used at Stewart, right?
 6    MR. LEE:  Object to form.
 7    THE WITNESS:  No.
 8    MS. SANDLEY:  Okay.  All right, Warden,
 9  I have a few more audit questions for you.
10  We can keep going with audits and break after
11  that.  Are you good with that?
12    THE WITNESS:  I'm good, yes, ma'am.
13    MS. SANDLEY:  Okay, let's take this
14  exhibit down.
15    Q    (By Ms. Sandley)  Stewart is also audited and
16  accredited by the American Correctional Association,
17  right?
18    A    Yes, ma'am.
19    Q    And how often does ACA assess accreditation
20  for Stewart?
21    A    Every three years.
22    Q    Okay.  And is ACA's audit and accreditation
23  process significantly different from the ODO and the
24  Nakamoto audits?
25    A    They audit to standards that are national
```

RUSSELL WASHBURN

```
 2  standards, national detention standards, you know, for
 3  detention facilities across -- so there's some
 4  differences, but, of course, many of the actual
 5  individual standards are supported by policy or by
 6  PBNDS standards to prove the standard, along with any
 7  documentation that would be necessary to demonstrate
 8  compliance with.
 9      And, of course, those files -- I guess the
10  biggest difference is they're auditing over a
11  three-year period, where ODO or Nakamoto would be
12  auditing from the date of the end of their previous
13  review.  So it's significantly -- so there's a
14  significant higher amount of documents and time that
15  they're evaluating versus the ODO, Nakamoto, and others
16  that would be doing either annual, semiannual, or in
17  some cases quarterly reviews.
18    Q    Okay.  And you said ACA audits to standards.
19  That's a different set of standards than the PBNDS,
20  correct?
21    A    Yes, ma'am.  There are national standards
22  that have been built for detention centers and
23  facilities.
24    Q    Okay.  The ACA standards that apply to
25  Stewart, are they -- do they also apply to jails?
```

Page 182

RUSSELL WASHBURN

1     A    Some could. Not to say that they all would.
2   Some may be nonapplicable in those locations, just as
3   there's not applicable standards that to apply to
4   Stewart, you know, so the audit committee -- I mean, of
5   course, the facility looks at that and determines
6   whether or not they believe it to be applicable versus
7   nonapplicable. But during the audit process, the ACA
8   auditors could deem a file that we've said "Hey, it's
9   not applicable" to be applicable or vice versa.
10         So they are the final authority as to whether
11  or not it should be classified as applicable versus
12  nonapplicable or mandatory standard versus a
13  nonmandatory standard. I'm probably hurting your brain
14  with all that, but that --
15    Q    That's all right. Let me see if we can break
16  it down.
17         So the ACA standards that ACA uses to
18  accredit Stewart are not necessarily tailored to
19  immigration detention centers, right?
20    MR. LEE: Foundation.
21    THE WITNESS: No, the actual standard is
22         not, but the documents to prove the standard
23         or compliance to the standard would come from
24         ICE standards or policies that have been

Page 183

RUSSELL WASHBURN

1   approved through ICE that are applicable to
2   Stewart.
3     Q    (By Ms. Sandley) Okay, and then there's some
4   flexibility during the accreditation process for
5   determining whether or not a particular standard
6   applies at Stewart; is that correct?
7     A    That's correct, but the final authority rests
8   not with the facility or with me. It rests with ACA.
9     Q    Okay. And when ACA finds that Stewart is not
10  in compliance with one of its standards, is there a
11  corrective action process?
12    A    There is. Part of that is that myself, as
13  well as the QA manager, we would actually have to
14  attend a panel hearing of ACA-trained individuals that
15  are not part of the audit. They reviewed the audit
16  and they reviewed whatever those standards that were
17  found to be noncompliant, and those can only be a
18  nonmandatory standard. You can't be ACA-accredited and
19  have a mandatory standard that you weren't compliant
20  with. That will stop the process right there.
21         So we're only talking about those standards
22  that ACA has defined as nonmandatory. And so we go
23  through that process. I would then submit either -- a
24  rebuttal, if we disagreed with the finding, and give

Page 184

RUSSELL WASHBURN

1   that committee the reason for the rebuttal. They would
2   then evaluate whether or not they would accept that
3   rebuttal, apply a waiver, or accept the corrective
4   action plan that we have prepared for that particular
5   standard.
6          So there are several ways that that can come
7   about. Or the committee can look at it and say that
8   the auditing committee was off base and they were wrong
9   and it's not noncompliant, it's compliant, based on the
10  information that they have, so...
11    Q    Okay. About how much notice do you get for
12  ACA audits?
13    A    ACA is a little longer. I would say -- we
14  know a roundabout time frame just from our previous
15  audit, but the actual -- the week they're going to be
16  here, I would say we probably know about three or four
17  months, maybe five months before they're physically
18  going to be on site. But, again, we pretty much know
19  the standard time that our audit is going to fall just
20  because that's the cycle of ACA.
21    Q    Okay.
22    MS. SANDLEY: Let's look at Exhibit 17,
23    CCBVA150628.
24         (Exhibit 17 marked for identification.)

Page 185

RUSSELL WASHBURN

1     Q    (By Ms. Sandley) And while we're pulling
2   this up, was Stewart re-accredited by ACA this year?
3     A    Last.
4     Q    Last year.
5     A    Time flies. It had to be last year because I
6   just got here last year. So, yes, last year.
7     Q    You've had an ACA audit under your tenure at
8   Stewart?
9     A    Yes, ma'am. Yes, ma'am.
10    Q    Okay. And this is an ACA accreditation
11  report, correct?
12    A    Yes, ma'am.
13    Q    Let's scroll down a little bit so we can see
14  the date. I think it's on the next page.
15    A    2018.
16    Q    Yeah. And let's go to page 47.
17         Okay. Do you see where it says "Standard
18  5C-07"?
19    A    Yes, ma'am.
20    Q    And that's referring to one of those ACA
21  standards, correct?
22    A    That's correct.
23    Q    And it says, "The facility can require all
24  sentenced inmates to work if they are not assigned to

Page 186

RUSSELL WASHBURN

```
 1    programs," right?
 2        A    That's correct.
 3        Q    Okay.  And that's a standard that applies in
 4    criminal punishment facilities, correct?
 5        A    That's correct.
 6        Q    Okay.  CoreCivic is not permitted to require
 7    people detained at Stewart to work?
 8        A    Correct, as it states there in the findings.
 9        Q    Yeah, okay.  How did ACA determine that
10    detained people at Stewart are not required to work?
11        A    They would have reviewed the -- of course,
12    the standards, the 5.8 standards, as well as any
13    policies associated with -- you know, and our work
14    program.  I mean, it's a voluntary work program, so
15    they would have visited and looked at, and they also
16    interview staff and detainees alike.
17        Q    Okay.  And this finding says, "The detainees
18    are not required to participate in a mandatory work
19    program per CoreCivic's contract with ICE and PBNDS
20    standards," correct?
21        A    Yes, ma'am.
22        Q    And it doesn't mention that that finding was
23    based on any interviews with detained people, right?
24        A    It does not in the standard, no.
25
```

Page 187

RUSSELL WASHBURN

```
 1        Q    Okay.
 2        MS. SANDLEY:  Okay, let's take this
 3    exhibit down.
 4        Q    (By Ms. Sandley)  I know you talked some with
 5    Mr. Howard about CoreCivic's internal quality assurance
 6    process.  I want to ask you a little bit more about
 7    that.  Does the FSC audit Stewart?
 8        A    Yes, ma'am.
 9        Q    How often do they audit?
10        A    At least annually.
11        Q    Okay.  And who does those audits?
12        A    It's the -- we actually have designated audit
13    teams.  That's their exclusive job role, is to conduct
14    unannounced audits at all of our sites annually.
15        Q    Okay.  Are there specific people at FSC who
16    are assigned to audit Stewart?
17        A    Well, I mean, it's the same -- I think
18    there's ten people total.  It's usually five-member
19    teams.  There's team leads, and the two teams pretty
20    much stay together.  Sometimes they'll intermix if
21    somebody is on leave or whatever; but for the most
22    part, those teams stay together.  And they go through
23    training there at FSC on various contracts and those
24    types of things as well.
25
```

Page 188

RUSSELL WASHBURN

```
 1        Q    Okay.  And then does Stewart -- is it
 2    typically the same team of five people who come to
 3    Stewart year after year?
 4        A    More often than not.  You may have the
 5    one-off change, like I said, if somebody is on vacation
 6    or ill or whatever and they have to take somebody from
 7    the other team, whether it's for safety or whether it's
 8    for the team lead or security.  But more often than not
 9    it's pretty much, traditionally, the same people.
10        Q    Okay.  When FSC audits Stewart, is it
11    auditing for compliance with certain standards?
12        A    Yes.
13        Q    Which standards?
14        A    It's more customer-based, so a lot of it's
15    PBNDS standards.  If you look at our policies, and I
16    know you've seen them, you see there's a lot of
17    reference to PBNDS standards -- it's not specific to
18    Stewart -- they're auditing us to those standards.
19        Q    Does FSC also audit for compliance with
20    CoreCivic standards?
21        A    Yes.  Yeah, yeah, because all of our --
22    essentially our HR components, for example, are going
23    to be -- for hiring practices and vacation time, that's
24    going to be 100 percent exclusive -- specific to
25
```

Page 189

RUSSELL WASHBURN

```
 1    CoreCivic.  But, yes, they would be auditing to
 2    CoreCivic policy and ICE standards, ACA.  They're also
 3    going to look at ACA files while they're here to make
 4    sure that we're moving -- keeping/maintaining
 5    compliance consistently and not just waiting until the
 6    third year to try to get everything put together.  So
 7    they look at a lot of things while they're here.
 8        Q    So FSC comes on site to Stewart during the
 9    course of their audit?
10        A    Yes, ma'am.
11        Q    And do they review documents on site?
12        A    A lot of them, yes, ma'am.
13        Q    Do they review documents beforehand?
14        A    I'm sure they -- yeah, in fact, I know they
15    do because some of them are computer documents that
16    they have access to specifically, to, like, HR
17    documents, medical, looking in our medical --
18    electronic medical records.  I'll get it out.  So some
19    of those reviews are done prior to their arrival.
20        Q    Okay.  Do they interview staff?
21        A    They do.
22        Q    Do they interview detained people?
23        A    They do.
24        Q    About how much notice do you get of FSC
25
```

Page 190

RUSSELL WASHBURN

audits?

A    When they show up on my doorstep.

Q    Okay.  So no advanced notice?

A    No.  I mean, we -- they do tell us, like, what half of the year, but that's all you'll really know.  Other than that, they show up on a Monday morning or a Tuesday morning and "Surprise, we're here" and it's time to do the audit.

Q    And is there a corrective action plan process for FSC audits?

A    Yes, ma'am, and it's really exactly the same minus we don't send it to the partner.

Q    Okay.  Does FSC conduct a re-audit to evaluate that the corrective action plan has been implemented?

A    No, not unless there's an absolute need to do so, but typically not.  What they're going to be looking at, obviously, from year to year -- repeat findings are not something that is, I'll say, desirable.

MS. SANDLEY:  Okay.  Let's look at Exhibit 18, CCBVA274977.

(Exhibit 18 marked for identification.)

Q    (By Ms. Sandley)  Okay, and is this an

Page 191

RUSSELL WASHBURN

example of the audit tool that the FSC uses for its audits at Stewart?

A    Back then, yes, ma'am.

Q    Okay.  I know this is before your time at Stewart, but you were a warden in 2013, right?

A    Yes, ma'am.

Q    Okay.  And there were, I assume, FSC audits at your facility too, correct?

A    Yes, ma'am.

Q    Okay.

A    Yeah, I'm very familiar with the document.  It's not what is in existence today.  It's pretty old.

Q    Understood.

Let's look at page 157.

Okay, and this is the "Food Service" section of this audit tool, correct?

A    Yes, ma'am.

Q    All right.  So under the first indicator, it says, "Review the LEAP spreadsheet."  What's the LEAP spreadsheet?

A    I'm sorry, where are you -- oh, I see it.  "Review the LEAP spreadsheet."  I'm not sure what that acronym stands for.  I'm sure it's some food service form, but I'm not sure what that is.

Page 192

RUSSELL WASHBURN

Q    And this is to evaluate inmate work attendance?

A    Yes.  "Review the LEAP spreadsheet."  Again, I'm sure it's some kind of sign-in/sign-out tracking document that they would have had back then.  But, again, that's pure speculation.  I'd have to go back and look and see what that LEAP stands for.

Q    Does the FSC audit tool still include an indicator for inmate work attendance?

A    I think it does, but I'd have to go back and look.  I believe -- and I'm not sure about attendance.  I know it's got some things about work programs, things of that nature.  But many of those, you know, specifically around requirements, would be N/A for us.

Q    And this says, "If the average is over 15 percent, ask to see documentation to CCA pertaining to this subject," and then it gives some examples.  It says, "Ask to see DR."  Is a DR a disciplinary report?

A    It would be, yes.

Q    Okay.  And then it says, "If no communication, results in NP."  What does NP stand for?

A    I'm not sure.

Q    Okay.  The choices in the "Answer" column here, there's five, right?  Can you tell me what each

Page 193

RUSSELL WASHBURN

of those --

A    Yeah.  Satisfactory, Needs Improvement, Nonperforming, N/A is Nonapplicable, and NSD is -- I'm not sure what NSD is.

Q    Okay.

A    Not scored, maybe, deficient.  I don't know.  I'm guessing there, so...

Q    Okay.  So according to this audit tool, if there's no documentation of communication relating to an inmate absentee rate exceeding 15 percent, a facility can be found nonperforming; is that correct?

A    Or needs improvement.

Q    Needs improvement?

A    Yeah, there's a needs improvement or nonperforming.  Now, if they never did it, if this standard is applicable -- and, again, this is just -- it looks like the generic form.  I'm not sure how, in 2013, they scored Stewart specific.  It very well could be an N/A.

Q    Okay.  And it says here, "If no communication, results in NP."

A    Yeah, and I'm not sure what that NP references.

Q    Okay.  Could it be the NP in the "Answer"

RUSSELL WASHBURN

1    column?

2    A    It could be, yes, again, if this standard is

3    applicable.

4    Q    The next one is -- did you review any of

5    these FSC audits in preparing for this deposition

6    today?

7    A    I looked briefly over the FSC ones. I spent

8    more time on the partner, ODO, Nakamoto. I did scan

9    through briefly, yes.

10    Q    Okay. So looking at the next indicator,

11    "Inmate work schedule," this only relates to kitchen

12    worker schedules, right?

13    A    Yes.

14    Q    Okay. Does the FSC still look at kitchen

15    worker schedules?

16    A    Yes. At applicable facilities, yes, they

17    would.

18    Q    Do they look at the kitchen worker schedules

19    at Stewart?

20    A    I think they look at schedules just to make

21    sure we have them to make sure that, again, it's

22    consistent with what's allowable in the standard, the

23    PBNDS standard.

24    Q    Okay. Let's look at page 158.

RUSSELL WASHBURN

1    Okay, so we're still in the food section, and

2    I'm looking at Indicator 08-A-09. It says, "Production

3    records contain completed pre-meal taste assessment."

4    What are production records?

5    A    It's the -- contain pre-meal -- "production

6    records contain." So we're required -- leadership is

7    required to conduct meal samples and tests and check

8    temperatures and things of that nature prior to the --

9    every meal going out, so -- and when I'm the

10    administrative duty officer, and we rotate week to

11    week, I'm also required to do a minimum of two of those

12    meal monitoring forms in addition to.

13    Q    Okay.

14    A    So we actually write what's on the menu, we

15    verify the amount that the dietitian has said that that

16    person should receive is what is actually being

17    provided, and then we test the quality, as well as

18    temperature, to ensure that the temperature regulations

19    are in compliance.

20    Q    So when you read production records here, do

21    you mean that to mean meal monitoring forms?

22    A    Yes, ma'am.

23    Q    Okay. We're going to go to page 171 of this

24    document.

RUSSELL WASHBURN

1    Okay, and we're going to look at Item 1371,

2    so let's scroll down.

3    Okay. Do you see where it says, "Annual

4    warden review of work/program assignment plan"?

5    A    Yes, ma'am.

6    Q    Is there a work/program assignment plan at

7    Stewart?

8    A    There is.

9    Q    Okay. And do you review it annually?

10    A    I do.

11    Q    How does FSC evaluate whether you reviewed

12    the work/program assignment plan?

13    A    It would be through this process here.

14    Q    How does FSC know whether you reviewed it or

15    not?

16    A    I'm required to document and sign that I've

17    completed it and update that document each year.

18    Q    Okay. So there should be a version of the

19    work program plan for every year that the work program

20    has existed?

21    A    There should be, yes, ma'am.

22    Q    Okay. Let's look at the next page. Looking

23    at Item 1374, "Work programs limitations for high

24    custody," it says, "ICAS high custody inmates" -- what

RUSSELL WASHBURN

1    does ICAS stand for?

2    A    Inmate classification -- it's classification

3    system. I don't remember what the A is. Inmate

4    classification assignment system maybe. I'm not a

5    hundred percent, but it's our classification system.

6    Q    Okay. And going down to Item 1376,

7    "Appropriate inmate work/program assignments," and it

8    says, "Inmates are appropriately assigned work/program

9    assignments according to Categories 1, 2, and 3."

10    How does FSC evaluate compliance with this

11    indicator?

12    A    Looking at classification. They would just

13    look at those who are cleared to work in what areas as

14    far as their schedules and who's assigned. And then

15    they would look at the ICAS, which is the

16    classification system, the classification report that's

17    maintained in the detention file, to confirm that that

18    person is, one, appropriately classified and then, two,

19    appropriately working in the area in which the 18-2CC

20    authorizes.

21    Q    Okay. So FSC looks at classification

22    records?

23    A    Yes, ma'am.

24    Q    And are classification records at Stewart

RUSSELL WASHBURN

1    RUSSELL WASHBURN
2    maintained by the classification supervisor?
3        A    Correct.  They're in the detention file.
4        Q    Okay.  And the classification supervisor is
5    responsible for maintaining detention files at Stewart,
6    right?
7        A    Yes, ma'am.
8        Q    Okay.  Let's go back to page 1 and look at
9    the table of contents.  And I know you said earlier
10   you're generally familiar with this audit tool from
11   years of doing audits at CoreCivic.  If there were
12   going to be other indicators relating to the work
13   program at Stewart, which section would they be in?
14       MR. LEE:  Object to form.
15       THE WITNESS:  The only place it really
16       would fit would be 9 and 10, Classification
17       Unit Management and/or Inmate Programs and
18       Services.
19       MS. SANDLEY:  Okay.
20       Q    (By Ms. Sandley)  Let's jump back to page
21   171.  And I want to scroll through 9 and 10, and I want
22   you to tell me if you see an indicator relating to the
23   work program that we haven't already talked about.
24       A    No.
25       Q    Let's keep scrolling.

RUSSELL WASHBURN

1    RUSSELL WASHBURN
2        A    No.  1376, "Appropriate inmate
3    work/program" -- [indiscernible] talking about.  I'm
4    sorry.
5        Q    That's okay.
6        A    So no other ones we haven't talked about.
7        Q    Okay, let's scroll down.
8            Any here?
9        A    No, ma'am.  I'm sorry.
10       Q    It's okay.  Let's keep scrolling.  I think
11   the programs...
12       A    I do not see any there.
13           Okay.  No, nothing there.
14       Q    All right.  We don't need to keep scrolling,
15   but I want to ask you this:  When FSC does its facility
16   audits, it uses this audit tool or an audit tool like
17   it to conduct those audits, right?
18       A    That's correct.
19       Q    And this audit tool reflects all of the
20   compliance indicators that FSC is looking at in the
21   course of the audit, correct?
22       A    That is correct.
23       MR. LEE:  Object to form.
24       THE WITNESS:  Sorry.
25       MS. SANDLEY:  Let's take this exhibit

RUSSELL WASHBURN

1    RUSSELL WASHBURN
2        down.
3        Q    (By Ms. Sandley)  Besides the yearly FSC
4    audits, are there any other quality assurance
5    mechanisms in place at Stewart?
6        A    From an outside, like FSC coming, or
7    internal?
8        Q    Internal.
9        A    Yeah, internal, I mean, we do self audits and
10   self evaluation on a regular basis.  The quality
11   assurance manager assists with that process to make
12   sure that we're in compliance with, you know, all the
13   standards, whether ODO, Nakamoto, CoreCivic audits,
14   whatever audit is coming.  So we do internal reviews on
15   a continual basis.
16       Q    Are there audit tools for the self audits?
17       A    No.  Typically, we use the instruments to
18   measure.  You know, the [indiscernible] we just looked
19   at, we would use those because those are the guiding
20   instruments that we're going to be measured on.
21       Q    Okay.  So when Stewart conducts a self audit,
22   it uses the FSC audit tool to do that self audit?
23       A    Yes.  I mean, we have like a monthly security
24   audit that goes -- that's a little bit different, but a
25   lot of the same indicators or standards are applied to

RUSSELL WASHBURN

1    RUSSELL WASHBURN
2    that as well.  So there's quite a few internal review
3    processes, I guess I should say.
4        Q    Okay.
5        MS. SANDLEY:  All right, we're done with
6        audits, or at least I am.  Let's take a
7        break.  I know we're well past lunch time for
8        you, Warden.  Do you want a little bit longer
9        break?
10       THE WITNESS:  I'm good if the group's
11       good.
12       (Discussion off the record.)
13       (Lunch recess taken.)
14       MR. LEE:  CJ, real quick before you jump
15       back into your questioning, I did just want
16       to state for the record, regarding the issue
17       of the Securus contract, we did object to
18       Topic 7 in Rachel Love's April 12th and May
19       10th letters, including that the inmate
20       telephone services contract is not relevant
21       and that the rates are irrelevant, as is
22       testimony as to how the rates were
23       determined.
24           I know the parties then agreed, as
25       memorialized in the May 28th letter from

Page 202

RUSSELL WASHBURN

1
2 Ms. Love, to wait until we got an order on
3 the motion to compel to discuss it further.
4 But the emails dated September 16th and
5 September 21st of 2021, while they addressed
6 Topic 7, they didn't specifically discuss the
7 Securus contract again. So I just wanted to
8 make clear for the record we did object to
9 that topic and specifically to that
10 contract.
11      MS. SANDLEY: Okay. Well, we kept that
12 topic in the notice, including the fourth
13 revised notice, and didn't hear again from
14 you-all after the motion to compel was
15 granted, so...
16      MR. LEE: It was the same topic that had
17 been in there before, so it's our position
18 that the objections had been made.
19      MS. SANDLEY: All right. Understood.
20      Q  (By Ms. Sandley)  Warden Washburn, you
21 understand you're still under oath, right?
22      A  Yes, ma'am.
23      Q  Okay. You're familiar with PBNDS
24 Section 5.8, correct?
25      A  Yes, ma'am.

Page 203

RUSSELL WASHBURN

1
2      Q  That's the voluntary work program section?
3      A  Yes, ma'am.
4      Q  Okay. Let's pull it up. It's going to be
5 Exhibit 19, and it's CCBVA3317.
6      (Exhibit 19 marked for identification.)
7      Q  (By Ms. Sandley)  While we're pulling that
8 up, Warden, do you agree that PBNDS requires the work
9 program at Stewart to be voluntary?
10      A  Yes, ma'am.
11      Q  Scroll down so you can see the top of this
12 document.
13      Okay. This is the PBNDS 2011 version,
14 correct, Warden?
15      A  Yes, ma'am.
16      Q  Okay. Let's go to PDF page 385. This is the
17 voluntary work program section?
18      A  Yes.
19      Q  Okay. And do you agree that this section
20 applies to Stewart?
21      A  Yes.
22      Q  And are all CoreCivic staff at Stewart
23 expected to comply with this?
24      A  Yes.
25      Q  Okay. I want to look at Section V(H), or

Page 204

RUSSELL WASHBURN

1
2 5(H).
3      Okay. You see where it says, "Unexcused
4 absences from work or unsatisfactory work performance
5 may result in removal from the voluntary work program"?
6      A  Yes, ma'am, I do.
7      Q  All right. According to CoreCivic's
8 understanding, how many unexcused absences can result
9 in -- could result in removal from the work program?
10      A  I don't know that we have an established
11 number per se. I mean, the way the standard -- I mean,
12 obviously, any unexcused absence could be interpreted
13 here. I mean, that's not our position. We have not,
14 to my knowledge, removed anyone for missing a day or
15 two. It would be those that would be really considered
16 to be excessive.
17      Q  So it's in CoreCivic's discretion to
18 determine how many unexcused absences justify removal
19 from the work program?
20      A  Yes, ma'am.
21      Q  And it's in CoreCivic's discretion to
22 determine what an unexcused absence is?
23      A  That's correct.
24      Q  Okay. If a detainee is removed from the work
25 program, is that documented?

Page 205

RUSSELL WASHBURN

1
2      A  Yes.
3      Q  How is it documented?
4      A  There's a form that they have to actually
5 fill out, and I believe it's placed in the detention
6 file, I believe.
7      Q  So there's a specific form for removing
8 someone from the work program?
9      A  I believe so, yes.
10      Q  Do you know how long that form has existed?
11      A  I don't.
12      Q  Do you know if it's existed the entire period
13 of this -- that applies to this case?
14      A  I don't.
15      Q  Could someone's removal from the work program
16 be documented on a different form?
17      A  Not that I'm aware of.
18      Q  Okay. Let's look at 5(I). Do you see where
19 it says, "In SPCs, CDFs, and dedicated IGSAs, a
20 detainee may participate in only one work detail per
21 day"?
22      A  Yes, I do see it.
23      Q  Stewart's a dedicated IGSA, correct?
24      A  That's correct.
25      Q  Okay. So according to the PBNDS, people in

Page 206

RUSSELL WASHBURN

1                   RUSSELL WASHBURN
2 the work program can only participate in one work
3 detail per day?
4    A   Correct.
5    Q   Do you agree that it would be a violation of
6 the PBNDS for people in the work program to participate
7 in more than one work detail in a day?
8    A   Yes, based on the standard.
9    Q   Let's go down to "Compensation," K.  You
10 talked about this a little bit with Mr. Howard.  PBNDS
11 sets a compensation floor for the work program, right?
12   A   Correct.  It's $1.
13   Q   One dollar.  And CoreCivic has the discretion
14 to pay more than $1, correct?
15   A   Correct.  But as far as the per diem
16 reimbursed, it would be just for that $1.
17   Q   Can you explain what you mean by that?
18   A   Meaning by the standard, anything -- the only
19 thing that could potentially be captured in the per
20 diem rate would be that $1.  So if CoreCivic elects to
21 pay greater than the $1, that's that at CoreCivic's
22 expense.
23   Q   How is the work program compensation factored
24 into the per diem rate?
25   A   It would be considered during the negotiation

Page 207

RUSSELL WASHBURN

1                   RUSSELL WASHBURN
2 phase as part of a payment requirement.  We would use
3 that $1 as that assessment.
4    Q   Do you know if the work program pay at
5 Stewart was factored into the per diem rate?
6    A   Again, I wasn't part of the initial
7 negotiations.  I will say historically those things are
8 factored in, when we know about them, during the
9 negotiation period.
10   Q   Do you know if the work program pay is
11 currently factored into the per diem rate?
12   A   Again, not being here during the initial
13 negotiations, I can't say.  But if it was factored in
14 at the beginning, then yes, it would be there today.
15   Q   If the per diem -- if the -- if detained
16 worker pay was factored into the per diem rate, would
17 that be documented somewhere?
18   A   Again --
19      MR. LEE:  Objection.  Exceeds the
20   scope.
21      THE WITNESS:  Yeah, I'm not sure whether
22   it would or would not or whether we would
23   just have had the knowledge of the standard
24   requirement when we were exploring and
25   putting together the bid.

Page 208

RUSSELL WASHBURN

1                   RUSSELL WASHBURN
2      MS. SANDLEY:  Okay.
3    Q   (By Ms. Sandley)  So it's possible that
4 CoreCivic took that into account but didn't indicate
5 whether or not its bid to ICE factored in detained
6 worker pay?
7      MR. LEE:  Object to form.  Exceeds the
8   scope.
9      THE WITNESS:  It could.  And, again, I
10   don't even know whether or not this was in
11   the standard in 2006 or '7, whenever the
12   negotiations were in place.
13      MS. SANDLEY:  Okay.
14   Q   (By Ms. Sandley)  When CoreCivic -- let me
15 back up.
16      CoreCivic submits monthly billing statements,
17 correct?
18   A   Yes, we do.
19   Q   Those monthly billing statements don't
20 include a line item for detained worker pay, correct?
21   A   It does not.
22   Q   Does CoreCivic at any point report to ICE how
23 much it's paying detained workers?
24   A   I don't know if we report.  You know, you
25 have ICE staff here, you have the detention service

Page 209

RUSSELL WASHBURN

1                   RUSSELL WASHBURN
2 management group that's here reviewing during audits.
3 I was -- the local staff that's here, I would say yes,
4 they're aware, but there's no reporting requirement.
5    Q   Okay.  And do you see where it says, "The
6 facility shall have an established system that ensures
7 detainees receive the pay owed them before being
8 transferred or released"?
9    A   What section are you under?
10   Q   Still under "Compensation."  Sorry.
11   A   Sorry.  Okay.  Yes, I do.
12   Q   Okay.  Do you agree that there have been
13 instances when detained people were not paid for the
14 last shift they worked before they were transferred or
15 released?
16      MR. LEE:  Object to form.
17      THE WITNESS:  I'm sure we've had those
18   issues, and we remedy them as we become aware
19   of them and correct that and retrain or apply
20   action, corrective action, if necessary.
21   Q   (By Ms. Sandley)  Are you aware that
22 CoreCivic has at times accumulated thousands of dollars
23 of detained worker wage that were not paid because the
24 worker was transferred or released?
25      MR. LEE:  Object to form.

Page 210

RUSSELL WASHBURN

1
2     THE WITNESS:  No, I'm not aware of that.
3     Q    (By Ms. Sandley)  Let's look at Section L.  I
4  think we need to scroll down to the next page.
5     Do you see where it says, "When a detainee is
6  removed from a work detail, the facility administrator
7  shall place written documentation of the circumstances
8  and reasons in the detainee detention file."
9     A    Yes.
10     Q    Okay.  How does CoreCivic interpret "written
11  documentation"?
12     A    That would be the form that I referenced, the
13  removal from the job placement.
14     Q    Okay.  And those are placed in the detention
15  files at Stewart?
16     A    Yes, ma'am, I believe they are.
17     Q    Okay.  Have incident reports ever been used
18  to document a detained worker's removal from the work
19  program?
20     A    Can you define "incident reports"?
21     Q    51C forms.
22     A    I'm sure a 51C has maybe been generated from
23  staff, but to document their actual removal, they
24  should not have been.
25     Q    Okay.  Do you -- have disciplinary reports

Page 211

RUSSELL WASHBURN

1
2  ever been used at Stewart to document a detained
3  worker's removal from the work program?
4     A    Not that I'm aware of.  The only circumstance
5  that I can see potentially is if somebody was
6  charged -- like, for example, theft while working in a
7  location.  They may have been removed from that area
8  because, obviously, they committed a theft charge.  Not
9  anything to do with the work program, but they
10  committed an infraction while at that particular
11  location.
12     Q    Is there a form number for the work program
13  removal form that you referenced?
14     A    I'm not sure.  I'd have to look.
15     Q    And I just want to confirm, you don't know
16  how old that form is or how long it's existed?
17     A    I do not.
18     Q    Okay.
19     MS. SANDLEY:  Let's take this exhibit
20  down.
21     Q    (By Ms. Sandley)  PBNDS Section 5.8 does not
22  address recruitment of people in the work program,
23  correct?
24     A    It does not.
25     Q    Does CoreCivic have any policies governing

Page 212

RUSSELL WASHBURN

1
2  recruitment of people in the work program?
3     A    Not that I'm aware of.
4     Q    Are there any other requirements for
5  operating the work program other than those in the
6  PBNDS that ICE establishes?
7     A    No.
8     MR. LEE:  Objection.
9     THE WITNESS:  I'm sorry.
10     No.
11     Q    (By Ms. Sandley)  Okay, so ICE requires
12  CoreCivic to operate a voluntary work program, correct?
13     A    Correct, based on the PBNDS standards.
14     Q    Okay.  But other than those guidelines in the
15  PBNDS, CoreCivic has discretion to structure and
16  operate the work program, correct?
17     A    As long as it meets the intent and the
18  requirements of the standard, yes.
19     Q    All right.  So, for example, CoreCivic
20  determines how many detained workers will work in each
21  job at Stewart?
22     A    Correct.
23     Q    CoreCivic determines what types of jobs can
24  be performed by detained workers?
25     A    Correct.

Page 213

RUSSELL WASHBURN

1
2     Q    And CoreCivic determines how much to pay
3  detained workers above the $1 floor set in the PBNDS?
4     A    Yes.  Above the $1, yes.
5     Q    CoreCivic determines whether to offer other
6  incentives to encourage people to work?
7     A    Yes.
8     Q    CoreCivic determines whether to pay detained
9  workers with phone cards?
10     A    Can you repeat the question for me?
11     Q    Sure.
12     CoreCivic determines whether it's going to
13  pay detained workers with phone cards?
14     MR. LEE:  Object to form.
15     THE WITNESS:  The answer to that is --
16     whether or not CoreCivic chooses to provide
17     them in addition to the pay in which they
18     would have received, the answer to that
19     question is yes.  They would not be paid with
20     a phone card in lieu of the established daily
21     rate.
22     Q    (By Ms. Sandley)  If a detained worker is
23  paid with a phone card in lieu of the established daily
24  rate, is that a violation of PBNDS?
25     A    Yes, because you'd have to go show the dollar

Page 214

RUSSELL WASHBURN

1    amount that you're paying in currency.
2        Q    CoreCivic determines the shifts that detained
3    workers work?
4        A    Yes.
5        Q    And for kitchen workers, does Trinity have a
6    role in determining the shifts?
7        A    No more than telling us, you know, really
8    what time the kitchen needs to open or what time it
9    really should be scheduling to close in order to
10   provide all three meals.  So it's really about what
11   time they're going to open the kitchen and what time
12   they anticipate closing the kitchen.  Outside of that,
13   that's really their only roles, telling us the kitchen
14   hours.
15       Q    Okay.  And CoreCivic determines how workers
16   will be recruited for the work program?
17       A    Correct.
18       Q    Did -- CoreCivic also determines when
19   detained workers commit an offense that merits
20   discipline?
21       A    Yeah.  I mean, really, ICE staff could as
22   well.  But, yeah, any employee, whether ICE staff or
23   CoreCivic staff, could take disciplinary action against
24   a detainee who's violated some type of facility rule.

Page 215

RUSSELL WASHBURN

1        Q    Okay.  Let's take a look at Exhibit 20,
2    CCBVA3947.
3            (Exhibit 20 marked for identification.)
4        Q    (By Ms. Sandley)  Okay, and this is
5    Policy 19-100, correct?
6        A    Yes, ma'am.
7        Q    CoreCivic's resident work program policy,
8    correct?
9        A    Correct.
10       Q    And this applies at Stewart, right?
11       A    That's correct.
12       Q    And we can scroll through it if you need us
13   to, but does this policy generally mirror the PBNDS
14   section we just looked at?
15       A    Yes, ma'am.
16       Q    Okay.  And are all CoreCivic staff at Stewart
17   expected to comply with this policy?
18       A    Yes, ma'am.
19       Q    Let's look at the next exhibit.  It will be
20   21, CCBVA4627.
21           (Exhibit 21 marked for identification.)
22       Q    (By Ms. Sandley)  This is the detainee
23   voluntary work program agreement, correct?
24       A    Yes, ma'am.

Page 216

RUSSELL WASHBURN

1        Q    Is this form used at Stewart?
2        A    Yes, I believe it is.
3        Q    Okay.  And here it says, "Compensation will
4    be from $1 to $3 per day."
5            Stewart currently pays people up to $4 per
6    day, right?
7        A    Yes, ma'am.  For a few positions, yes.
8        Q    Okay.  So fair to -- has this form been
9    modified over time?
10       A    It does not appear it's been updated.
11       Q    Well, it's possible this is an out-of-date
12   form, so I think I'm asking do you know if there's a
13   more recent form?
14       A    I don't know, but it's equally possible it
15   just hasn't been updated to reflect that new rate.
16       Q    Okay.  This form does not mention the PBNDS
17   limit to one work detail per day, does it?
18       A    It does not.
19       Q    Okay.  And let's take this form down.
20           How -- are detained workers at Stewart
21   informed of how to quit the work program?
22       A    I'm not sure if it's referenced in the
23   detainee handbook or not.  I believe it is, but I'm
24   not -- I can't remember off the top of my head.  I'd

Page 217

RUSSELL WASHBURN

1    have to go back and look and see if it's actually in
2    the handbook.
3        Q    If detained workers were informed about how
4    to quit the work program, would you expect that
5    information to be in the handbook?
6        MR. LEE:  Object to form.
7        THE WITNESS:  Not to say -- it's not
8            required to be in the handbook, but if it
9            would exist anywhere, it should be in the
10           handbook, if it was going to exist.  I mean,
11           I think most people know how to quit doing
12           something without being told how to do so.
13       Q    (By Ms. Sandley)  Do you know if anyone tells
14   people in the work program how they can quit if they
15   want to?
16       A    I do not know.
17       Q    Okay.  Let's look at the next exhibit,
18   Exhibit 22, and this is CCBVA3918.
19           (Exhibit 22 marked for identification.)
20       Q    (By Ms. Sandley)  Okay, and this is
21   Policy 18-100, correct?
22       A    Yes, ma'am.
23       Q    And this applies at Stewart?
24       A    Yes, it does.

Page 218

RUSSELL WASHBURN

2    Q   And all CoreCivic staff are expected to
3  comply with Policy 18-100?
4    A   Yes, ma'am.
5    Q   All right, let's look at page 10.  We're
6  looking under "Reporting Requirements."
7        It says, "A monthly report will be provided
8  to the FSC quality assurance department to monitor
9  significant fluctuations in custody classification
10  levels."
11        Does Stewart provide a monthly report to FSC
12  on custody classification levels?
13    A   We do.
14    Q   Does this policy require any kind of
15  reporting about work program staffing levels?
16    A   No.
17    Q   Do you know if Stewart provides regular
18  reports to FSC about work program staffing levels?
19    A   Not that I'm aware of.
20        MS. SANDLEY:  Let's take this exhibit
21  down and look at CBEVA118618.
22        (Exhibit 23 marked for identification.)
23    Q   (By Ms. Sandley)  All right.  And this is
24  Policy 18-100CC, correct?
25    A   Yes, ma'am.

Page 219

RUSSELL WASHBURN

2    Q   That's the Stewart work/program plan
3  guidelines; is that right?
4    A   That's correct.
5    Q   And is this the plan that you testified
6  earlier the warden is required to review and sign off
7  on annually?
8    A   Yes, ma'am, I believe this is the right one.
9  That should be further down.  I think it's got the
10  actual job locations, and then it requires my signature
11  below it --
12    Q   Yeah, let's --
13    A   -- if I was recalling the policy correctly.
14    Q   Let's go to the last page.
15    A   Yes, ma'am.
16    Q   Okay.  And that's your signature at the
17  bottom there?
18    A   Yes, ma'am.
19    Q   This one is dated February 24, 2021, right?
20    A   Yes, ma'am.
21    Q   Has there been an updated version of this
22  since then?
23    A   No, ma'am.
24    Q   Okay.  So this is the policy currently in
25  effect at Stewart?

Page 220

RUSSELL WASHBURN

2    A   Yes, ma'am.
3    Q   How are the wages in this document
4  established?
5    A   [Indiscernible] and how do we get to there?
6    Q   For all of the positions, how is the wage
7  set?
8    A   Typically, we look at the need and what kind
9  of incentives that we would want to put, also look at
10  the type of work that the persons would be performing;
11  and, you know, working in the kitchen is certainly a
12  little more stringent than, you know, mopping a floor
13  in a day room and housing unit.
14        So those factors are taken into consideration
15  when looking at what type of incentives do we want to
16  put into the programs to give people those
17  opportunities and reward them for taking on some of
18  those -- a little more challenging roles within the
19  facility.
20    Q   When you say you look at the need when
21  determining the rate of pay, do you mean the number of
22  workers needed for a particular position?
23    A   Yes, ma'am, the ones that we'd like -- the
24  number we'd like to see, yeah.
25    Q   Okay.  And would you pay -- tell me how that

Page 221

RUSSELL WASHBURN

2  impacts the rate of pay.
3    A   I don't know that I understand the question.
4  I'm sorry.
5    Q   You said you took the need into account in
6  setting the rate of pay, so how -- how does the need
7  and the number of workers you'd like to see for a
8  particular position -- would you pay more if you need
9  more workers for that position?
10    A   You could, but it would also, like I said, be
11  factored into the type of work.  That's probably the
12  biggest, would be the demand.  You know, sometimes
13  you're looking for a little more specialty type, you
14  know, specific -- let's say in the kitchen, you know,
15  not everybody can cook, so you may be looking for
16  somebody to be able to perform that.
17        So those types of things, to me -- most
18  anybody you can put a broom in their hand, you can put
19  a mop in their hand, you can put a rag in their hand
20  and direct them how to clean, but not everybody is the
21  appropriate persons for working in a food-service area,
22  nor do they want to work.  They have to go through
23  medical screenings and things of that nature that are a
24  little different than some of those other roles.
25        So looking at those types of requirements,

Page 222

RUSSELL WASHBURN

1    it's going to be a little more stringent than these
2    other jobs, and what's going to incentivize somebody to
3    take that versus just give me the broom or the mop and
4    I'll be good to go.
5
6        Q    Which other jobs besides the kitchen are more
7    specialized?
8        A    Barber, you know, finding somebody that --
9    with me, I don't care, anybody can cut my hair, but
10    that's not the case for everybody, so you certainly
11    want -- you want to make sure somebody has got some
12    level of ability and experience in doing that and then
13    certainly meeting all the -- the ability to meet all of
14    the hygiene requirements and the sanitation
15    requirements in between the barbering services and
16    things of that.
17        Q    And what about the administration porter, why
18    does that one pay $4 a day?
19        A    Again, that's -- you know, really we look at
20    the classification, so it's because they're coming into
21    an area that's really, in essence, unsecured. Not too
22    many people meet the qualifications. And in a
23    facility, quite frankly, that's probably one of the
24    hardest to recruit for because sometimes those folks
25    are labeled -- either they're pressured to try to bring

Page 223

RUSSELL WASHBURN

1    stuff into the facility, so a lot of them just simply
2    don't want those pressures and they choose not to do
3    that, because they do have access to things that the
4    other population would not have access to, so it's a
5    little pressure on them from their peers.
6        Q    And the admin porters report to your
7    secretary, correct?
8        A    Yes, ma'am.
9        Q    Okay. And do they clean your office?
10        A    They'll clean the administration area,
11    they'll vacuum, but as far as cleaning my desk and
12    things, I'll do that myself, but they'll vacuum and
13    wipe down like doorjambs and things of that nature.
14        Q    And they take the trash out in the admin
15    area?
16        A    Yes, ma'am. I think I've had one in the 18
17    months I've been here.
18        Q    One trash taking out?
19        A    No, one worker, one or two workers.
20        Q    Understood. Okay.
21        Does the FSC approve Policy 18-100CC?
22        A    No, they don't have to approve it. I mean,
23    the policy itself is approved through FSC, but the
24    actual 18-100CC is not approved by FSC.
25

Page 224

RUSSELL WASHBURN

1
2        Q    Can you explain that a little bit more?
3        A    The actual 18-100, the policy itself, is
4    approved; and language and what's in the policy, that
5    doesn't -- I don't have the authority to change that
6    policy without going through the approval process.
7        Q    Uh-huh.
8        A    This attachment to the policy does not
9    require an approval from FSC annually, just it requires
10    my approval. The policy requires me to approve this
11    attachment and this plan.
12        Q    If you revise this policy and you approve it,
13    do you provide the new revision to FSC?
14        MR. LEE:  Form.
15        THE WITNESS:  I'm not sure if this is
16    uploaded, one of the documents that's
17    uploaded or not. I'd have to check with the
18    quality assurance manager. I don't believe
19    so, but that's speculation.
20        MS. SANDLEY:  Okay.
21        Q    (By Ms. Sandley)  We talked a little bit
22    earlier about the shift relief factor that's built into
23    the Stewart staffing plan.
24        Is there any kind of calculation like that,
25    like a shift relief factor, that's built into the

Page 225

RUSSELL WASHBURN

1    determination of how many workers are needed at
2    Stewart?
3
4        A    There's not.
5        MR. LEE:  Object to form.
6        THE WITNESS:  I'm sorry.
7        There's not. We set the number that we
8    would like to see, our maximum number that we
9    would allow to volunteer to work in those
10    specific areas. But as far as any type of
11    established relief factor, there's not.
12        MS. SANDLEY:  Okay.
13        Q    (By Ms. Sandley)  And this version of
14    18-100CC calls for 140 kitchen workers over two shifts,
15    correct?
16        MR. LEE:  Object to form.
17        THE WITNESS:  No. What this form -- I
18    mean, there's 140 that -- the max that we'd
19    ever allow to volunteer and to be assigned to
20    the kitchen. I don't believe we'll ever get
21    to that 140, but that's just a max number.
22        Anything -- so let's say that we met
23    that perfect world and there was 140
24    volunteers that want to work in the kitchen
25    and we had people requesting beyond that,

Page 226

RUSSELL WASHBURN

1       they would have to go on a waiting list.  Not
2  to say that we would work that many.  That's
3  just what we identified to say that's the max
4  number that we would allow to volunteer to
5  work for those specific areas.
6       Q    (By Ms. Sandley)  And if you met that perfect
7  world, as you say, how would the 140 be split over two
8  shifts per day seven days per week?
9       A    We split them up, you know, as much as we
10  could.  I mean, obviously we wouldn't have larger
11  numbers -- I would say -- I'm trying to remember what
12  the number was the kitchen gave me; but, I mean, on an
13  average shift, I believe if everything was full and
14  where it needed to be, it's like 30.
15       And, again, trying to find that balance
16  because we have now males and females, and then we do
17  allow Level 2s to work in the kitchen, but we don't
18  allow them to work with Level 1s.  So you have to do it
19  really by classification, by gender, and provide that
20  equal access as much as possible.
21       So we may have to shorten hours.  The
22  schedule may be scheduled on an eight-hour rotation,
23  and we may have to build schedules that would be on a
24  four-hour or a six-hour rotation to allow any of those

Page 227

RUSSELL WASHBURN

1  who would like to work the opportunity to do so.
2  Again, that's in the perfect world if we had the max
3  numbers.
4       Q    Does the PBNDS require Stewart to provide
5  equal access to kitchen jobs for Level 2 detained
6  people?
7       A    For Level 2?
8       Q    Right.  You testified, I believe, that
9  Level 2 people are allowed to work in the kitchen,
10  right?
11       A    They are, yes.  No, there's nothing really
12  that -- now, the ACA standards, there's some things
13  about providing equal access when you house opposite
14  classifications and genders.  So there's an ACA
15  standard, and forgive me, I'm not sure of the standard
16  number, but there is a standard that talks about equal
17  access to not only work programs, but other types of
18  services and programs that are offered throughout the
19  facilities.
20       Q    Okay.  You testified that Stewart doesn't
21  currently have 140 kitchen workers, right?
22       A    No, not even close.
23       Q    Okay.  And is that -- are you familiar with
24  the number of kitchen workers at Stewart prior to

Page 228

RUSSELL WASHBURN

1  COVID-19?
2       A    Just -- I mean, I looked at some records, but
3  to say I can draw what those numbers were, no.  I did
4  look at some records.  I had some people on it, yes.
5       Q    What do you mean you had some people on it?
6       A    I mean larger numbers than what I've ever
7  seen since I've been here.  To get me to say what those
8  numbers were, whether it was 50 or 60 or 70, I couldn't
9  draw that without looking at the report again.
10       Q    Okay.
11       MS. SANDLEY:  Let's take this exhibit
12  down.
13       Q    (By Ms. Sandley)  And you became warden at
14  Stewart right around the time COVID-19 arrived in the
15  United States, right?
16       A    The lucky month of.  I guess when it really
17  started is -- April 2020 is when I first got here,
18  so...
19       Q    And did COVID-19 impact work program staffing
20  at Stewart?
21       A    It did.
22       Q    How?
23       A    It limited the abilities for the detainees to
24  volunteer because of either being in a quarantined pod,

Page 229

RUSSELL WASHBURN

1  which is -- more often than not is what occurs.
2  Somebody tested positive -- this was early on.  We
3  didn't have the requirement to isolate all of the
4  detainees upon arrival for 14 days.  That came later.
5  But as people tested positive, we had to shelter in
6  place, basically, and keep them isolated away from the
7  rest of the population.
8       So if there happened to be kitchen workers in
9  there or laundry workers or wherever, they couldn't
10  leave there.  The ones that were probably the least
11  impacted are those that were assigned to do in-dorm
12  assignments because they could still work inside of
13  their building and inside of their pod because they
14  were still around the same people that they were
15  already quarantined with.  But outside of that, it's
16  been very challenging.  I mean, I would say for the
17  last eight to ten months, if we had three people
18  assigned to the kitchen, we were lucky.
19       Q    So the need to quarantine and isolate people
20  to prevent the spread of COVID impacted the number of
21  people who were available to work in the work program,
22  correct?
23       A    It did and it still is currently.
24       Q    Okay.  Have work program shortages caused

Page 230

RUSSELL WASHBURN

1                RUSSELL WASHBURN
2  CoreCivic staff to have to work overtime?
3      A    Yes.
4      Q    Has CoreCivic brought in more staff to fill
5  the need left by lower work program numbers?
6      A    No, we haven't had that need.  I know that
7  Trinity brought in a few folks to help in the kitchen,
8  a couple, but [indiscernible] here and there.  We
9  reassigned some staff and, of course, ran overtime to
10 help cover in those areas that were needed.  And same
11 thing with, like, laundry services.  I think they have
12 not had a worker in there for longer than even what the
13 kitchen has experienced.  It's just been delivered by
14 staff throughout the performance -- or throughout,
15 really, the COVID period, it's been intermittent for
16 the most part.
17     Q    So when staff are doing the laundry at
18 Stewart, are they doing that on overtime?
19     A    Either straight time or overtime.  I would
20 say it's probably -- sometimes it's going to be
21 overtime, sometimes it will be straight time.  We have
22 a dedicated officer that works in laundry.  But she may
23 have to, you know, keep a few additional hours to
24 facilitate the laundry, but I would say for laundry,
25 probably, for the most part, it's done at regular rate.

Page 231

RUSSELL WASHBURN

1                RUSSELL WASHBURN
2      Q    Is that dedicated officer doing the laundry
3  by herself?
4      A    Yes.
5      Q    Okay.  And the Stewart population decreased
6  significantly during COVID-19, correct?
7      A    Last year, yes, ma'am.
8      Q    It dropped to as low as 2-, 300?
9      A    Yeah, it was between -- we never went below
10 200, but I would say 250-ish to 300.
11     Q    Okay.  And the 1752 population staffing plan,
12 was that still in effect when the Stewart population
13 dropped --
14     A    Yes, ma'am.
15     Q    -- to 300?
16     A    Yes, ma'am.
17     Q    Okay.  Did that allow CoreCivic to cover some
18 of those duties that were ordinarily performed by
19 detained workers?
20     A    Yes.  There was some, obviously, shift of
21 assignments to perform some of those functions that's
22 typically been handled by detainees.
23     Q    Are you familiar with ICE's pandemic response
24 requirements?
25     A    The PRR, yes, ma'am.

Page 232

RUSSELL WASHBURN

1                RUSSELL WASHBURN
2      Q    Okay.  That was my next question.  Can we
3  call them the PRR for short?
4      A    Yes, we can.
5      Q    All right.  And what are the PRR?
6      MR. LEE:  Object to form.  Exceeds the
7      scope of the notice.
8      THE WITNESS:  It's ICE's pandemic
9      response requirements for the COVID -- due to
10     COVID-19.
11     Q    (By Ms. Sandley)  And there have been several
12 versions of the PRR released since the beginning of the
13 pandemic, correct?
14     A    Yes, ma'am.
15     MR. LEE:  Object to form.  Exceeds the
16     scope.
17     Q    (By Ms. Sandley)  Is Stewart expected to
18 comply with PRR?
19     A    Yes, we are required to comply --
20     MR. LEE:  Object to form.  Exceeds the
21     scope.  Counsel, there's nothing in the
22     notice about the PRR.
23     MS. SANDLEY:  There is something in the
24     notice about ICE policies relating to the
25     work program and policies in effect at

Page 233

RUSSELL WASHBURN

1                RUSSELL WASHBURN
2  Stewart relating to the work program.
3      MR. LEE:  Okay, but you're asking about
4      COVID policies.
5      MS. SANDLEY:  I'm about to get there,
6      Jacob, if you give me one second.
7      Let's pull up Exhibit 24.
8      (Exhibit 24 marked for identification.)
9      Q    (By Ms. Sandley)  This is Version 1 of the
10 PRR dated April 10, 2020.
11     Okay, this is the PRR we were just
12 discussing, right, Warden Washburn?
13     A    Yes, ma'am.
14     Q    Okay.  And you can see at the bottom there
15 where it says Version 1?
16     A    Yes, ma'am.
17     Q    Okay.  Let's go to page 13.  And this says,
18 "Consider suspending work" -- sorry, that's work
19 release.
20     MS. SANDLEY:  Jackie, I'm looking for
21     the portion that says, "Facilities are
22     encouraged to..."
23     There it is.  I see it.
24     Q    (By Ms. Sandley)  Warden, do you see -- it's
25 the bullet point right before the arrows.  It says,

Page 234

```
RUSSELL WASHBURN
1
2    "Facilities are encouraged to prohibit or, at a
3    minimum, significantly adopt restricted visitation
4    programs, and to suspend all volunteer work assignments
5    for detainees assigned to food service, and other
6    assignments where applicable."  Do you see that?
7        A    I do see it.
8        Q    Did Stewart suspend all volunteer work
9    assignments for detained people assigned to food
10   service?
11       A    We did not.
12       Q    Did Stewart suspend work assignments for
13   other detained worker assignments at Stewart?
14       A    We did not.
15       Q    Okay.  And then let's go to the next exhibit.
16            (Exhibit 25 marked for identification.)
17       Q    (By Ms. Sandley)  This is actually going to
18   be PRR Version 7.  And while we pull this up, do you
19   know which version of the PRR is currently in effect?
20       A    10/19, the one dated 10/19, I believe.
21       Q    All right.  And this is Exhibit 25.  Let's
22   scroll down so you can see the date.  So this is the
23   10/19/2021 version of the PRR?
24       A    Yes, ma'am.
25       Q    And this is currently in effect at Stewart?
```

Page 235

```
RUSSELL WASHBURN
1
2        A    Yes, ma'am.
3        Q    Okay, let's go to PDF page 37.
4            Warden, do you see where we've highlighted
5    it says, "Facilities are required to suspend all
6    volunteer work program assignments for detainees
7    assigned to food service and other VWP assignments,
8    where applicable, that require individuals to interact
9    with each other at distances of less than six feet.
10   Any detainee participating in a VWP assignment is
11   required to wear appropriate PPE for the position at
12   all times (e.g., disposable gloves, masks, goggles).
13   Detainees in isolation or quarantine may not be
14   assigned to a VWP detail"?
15           Are people -- are detained people at Stewart
16   currently working in the kitchen?
17       A    Yes.
18       Q    Are detained people at Stewart currently
19   working in jobs that require interaction at less than 6
20   feet?
21       A    I mean, I would say at times they're probably
22   less than 6 feet.
23       Q    Who's been doing the barbering at Stewart
24   since April 2020?
25       A    Detainees.
```

Page 236

```
RUSSELL WASHBURN
1
2        Q    And would you agree that barbering requires
3    interaction at less than 6 feet?
4        A    Yes.  And I will say, too, that the detainee
5    barber and the detainee receiving the barbering service
6    wear applicable and required PPE.
7        Q    Okay.
8            MS. SANDLEY:  Let's take this exhibit
9    down.
10       Q    (By Ms. Sandley)  Is the typical kitchen
11   shift at Stewart between 6 and 10 hours?
12       A    Between 6 a.m. and 10 p.m. or --
13       Q    No, between 6 and 10 hours long.
14       A    As far as the shifts?
15       Q    Uh-huh.
16       A    We don't have any shifts that go into 10
17   hours.
18       Q    How long are shifts in the kitchen typically?
19       A    I think they're scheduled, I believe -- and I
20   have to look back at the schedule -- I believe eight
21   hours.  Certainly less than eight hours.  Eight hours
22   or less.
23       Q    Okay.  And do you know how long kitchen
24   shifts were prior to your time at Stewart?
25       A    Not without looking at the record.
```

Page 237

```
RUSSELL WASHBURN
1
2        Q    Okay.  And are detained people at Stewart
3    informed about what their work schedules are for the
4    week?
5        A    Yes.  Once they accept the position and
6    volunteer for it, then yes, they're told what their
7    work schedule will be.
8        Q    Are work schedules written and posted
9    anywhere?
10       A    Again, I believe they're -- the schedules are
11   posted in the units.  Again, I'd have to go look --
12   there's, like, so much documentation there -- to
13   confirm it, but I do believe we do post them.  And I
14   know that they're certainly posted in the work
15   location, but I also believe they are posted in the
16   units, but I'd have to confirm that.
17       Q    Okay.  Let's look at the next exhibit,
18   CCBVA218703, and this will be Exhibit 26.
19            (Exhibit 26 marked for identification.)
20       Q    (By Ms. Sandley)  All right, this is an email
21   to -- from John Gimesh to all wardens at --
22   ████████████.  Do you see that?
23       A    I do.
24       Q    Who is John Gimesh?
25       A    John Gimesh, he's no longer.  He was our -- I
```

Page 238

RUSSELL WASHBURN

1  believe his title was food service director from
2  Facility Support Center.
3      Q   Okay.  So he worked in the FSC?
4      A   Yes, ma'am.
5      Q   And the ██████████ email address,
6  are you familiar with that?
7      A   Yes, I am.
8      Q   Does it go to all the CoreCivic wardens?
9      A   It would have.
10     Q   Okay.  And then Sue Huffman at Trinity
11  Services Group is copied on this.  Do you know who Sue
12  is?
13     A   I don't know her title.  She's like a
14  regional supervisor for Trinity.
15     Q   Okay.  Now, Mr. Gimesh writes, "Our company
16  average is 7 percent of scheduled inmates do not report
17  to work.  I have been asked recently by several
18  facilities how to address this matter."
19         Fair to say, based on this email, that FSC
20  was taking an interest in how many detained people were
21  not reporting to work?
22         MR. LEE:  Object to form.
23         THE WITNESS:  Based on the email.  I
24     mean, whether they were concerned about it or
25

Page 239

RUSSELL WASHBURN

1  not, I mean, I don't know.  I mean, he's
2  obviously reporting some statistical data.
3      Q   (By Ms. Sandley)  Mr. Gimesh writes -- well,
4  let me withdraw that.
5         That wardens-all email address, that goes to
6  both ICE facility wardens and criminal prison wardens,
7  correct?
8      A   Correct.  It would go to all wardens that
9  were in the distribution.  I mean, unless somebody was
10  new and hadn't been updated, it would typically go to
11  all wardens within the CoreCivic facilities.
12     Q   Okay.  Let's look at -- well, Mr. Gimesh
13  writes, "I am attaching some tools that have been used
14  to improve this situation over the years, jointly
15  created by Trinity and CCA."
16         So let's scroll down and look at the
17  attachments, the next page.  Do you recall receiving
18  this email?
19     A   Back in 2014, no, ma'am.
20     Q   Were you a warden in 2014?
21     A   I was.  I've been a warden since 2008.
22     Q   Okay.  And we're going to look at B --
23  b(iii).  So (b) says "Review current process."  And it
24  says, "Stance on volunteer workers."  Do you know what
25

Page 240

RUSSELL WASHBURN

1  that could mean?
2      A   I don't want to speculate what his intent
3  was.
4      Q   Okay.  What is Stewart's stance on volunteer
5  workers?
6      A   In what regard?
7      Q   If you were asked by someone at FSC what is
8  Stewart's stance on volunteer workers, what would you
9  say?
10         MR. LEE:  Object to form.
11         THE WITNESS:  I would say we follow the
12     PBNDS standards with regards to how we manage
13     the workforce.
14         MS. SANDLEY:  Okay.
15     Q   (By Ms. Sandley)  Let's look near the bottom
16  of this page.  It says, "Review with AW current process
17  on how to enforce inmates arriving to work on time,"
18  and it goes on to say, "Call-out/wake-up call."
19         Does Stewart have a call-out/wake-up call
20  process?
21     A   I mean, not other than a supervisor making
22  the note -- call out for the individuals to report to
23  their scheduled work, and then the assigned officers
24  would go in and tell them, you know, it's wake up time

Page 241

RUSSELL WASHBURN

1  or see who's going to work, who's not going to work
2  kind of thing.  But to say we have a set time and it's
3  at -- it's when the supervisor makes notification
4  that -- we'll use the kitchen as an example, that the
5  kitchen is ready to receive the workers who wish to
6  come to work.
7      Q   Okay.  So when you say "supervisor," you mean
8  the supervisor for that particular job position?
9      A   More often than not, it's typically shift
10  captain or the shift lieutenant who gets the
11  communication from the Trinity staff that they're ready
12  for their worker to report.
13     Q   Okay.  And then does the supervisor call down
14  to the unit?
15     A   Either the supervisor or central control.  It
16  wouldn't necessarily come from the shift captain or
17  lieutenant.  It may be from central calling the units
18  to prepare their individuals who are designated to go
19  to work.
20     Q   Okay.  And then detention officers wake up
21  the people who are scheduled to work for that shift?
22     A   That's correct.  Obviously, if they're not
23  already awake, but yes.
24     Q   Okay.  And let's scroll down a little bit to
25

RUSSELL WASHBURN

2  the next page.

3        Okay, so by little Roman numeral 3, it says,
4  "Who documents inmates for failing to show to work
5  late?"  Who does this at Stewart?
6        MR. LEE:  Object to form.
7        THE WITNESS:  I mean, who documents the
8    detainees?  It would be the area work --
9    whoever is in charge of that particular area,
10   whether it's laundry or -- the area
11   supervisor that would document if they didn't
12   report.
13   Q    (By Ms. Sandley)  And would the area
14  supervisor document whether they were late to work?
15   A    Honestly, I don't know that we track that
16  because it's really hard to because it's not like they
17  have a key to let themselves out.  They're dependent
18  upon us to let them out, you know.  Now, if somebody
19  was beyond the time and everybody else in that pod made
20  it out, they may.  I don't know that we have a set
21  standard for what is late versus not late.
22   Q    Okay.  Let's look at page 4.  Okay, so this
23  is another one of the tools Mr. Gimesh attached to his
24  email.  Let's zoom in.
25   A    Thank you.

RUSSELL WASHBURN

2   Q    Does this chart reflect the steps taken if a
3  detained worker at Stewart does not report to work in
4  the kitchen?
5   A    No, I won't say that this has been applied
6  here.  It's certainly not in place today.  I can't
7  speak prior to; but, no, it's not defined like that
8  here.
9   Q    Are there certain parts of it that aren't
10  defined like that at Stewart?
11   A    It's specifically to the time.  I mean, it's
12  got really regimented times in there.
13   Q    Okay.
14   A    We don't really have any time frames that
15  have been established.
16   Q    So apart from the 20-minute time frames
17  there, does this generally show the steps that are
18  taken if a detained worker doesn't report to work?
19   A    Not really.  I mean, there's not a whole lot
20  of steps in it.  I mean, it's -- really don't define, in
21  my opinion, a real process.  It's got -- it's a
22  pretty graph, but I don't know that it really has a
23  defined process.  You know, the reality is calling down
24  and waking them up, "Are you going to go?  Do you want
25  to go?"  If they don't go, just moving on.  I mean, we

RUSSELL WASHBURN

2  don't really have a defined, like I said, process.

3   Q    If a detained worker doesn't report to work
4  and a detention officer in their unit wakes them up,
5  tries to get them to come to work, and that doesn't
6  work, is a supervisor notified?
7   A    Not typically, no, I mean, because, again,
8  you can't -- there's really no sense in wasting a whole
9  lot of resources for a voluntary program.
10   Q    Is that true even when the kitchen is
11  short-staffed?
12   A    Yeah, again, whether they're short-staffed or
13  not, I mean, it's not -- we can't force people to work
14  and we don't.
15   Q    Sorry, I meant is it true that a supervisor
16  isn't always notified even when the kitchen is
17  short-staffed?
18   A    Yeah, they would be notified because then it
19  would become on them to either augment or replace with
20  staff inside the facility or -- and that would really
21  be the only options that they would have, is to engage
22  staff to assist with the preparation and delivery of
23  food.
24   Q    Okay.
25        MS. SANDLEY:  Let's take this exhibit

RUSSELL WASHBURN

2    down.
3   Q    (By Ms. Sandley)  Warden, are you familiar
4  with the Trinity contract?
5   A    I won't say I'm fluent.  I have seen it, yes,
6  but I won't say I'm fluent.
7   Q    Did you review it in preparing for this
8  deposition?
9   A    Briefly, yeah.
10   Q    The Trinity contract requires CoreCivic to
11  provide a specific number of kitchen workers in the
12  kitchen, correct?
13   A    I believe so, yes.
14   Q    Okay.  And then CoreCivic in turn sets the
15  number of kitchen workers in that Policy 18-100CC that
16  we looked at earlier, correct?
17   A    Yes, ma'am.
18        MR. LEE:  Object to form.
19        THE WITNESS:  Sorry.
20   Q    (By Ms. Sandley)  And does CoreCivic set that
21  number of kitchen workers in Policy 18-100CC to help
22  ensure that it meets the number of kitchen workers it's
23  required to provide under the Trinity contract?
24        MR. LEE:  Object to form.
25        THE WITNESS:  That's factored in.  I

RUSSELL WASHBURN

1                RUSSELL WASHBURN
2   mean, I won't say it's exclusive, but it is
3   factored in.
4      Q   (By Ms. Sandley)  Because CoreCivic could be
5   penalized under the Trinity contract if it doesn't
6   provide the number of kitchen workers required,
7   correct?
8      A   I don't know that there's a penalty ability.
9      Q   You don't know if there's a penalty ability?
10     A   Yeah, I don't know if -- I don't believe
11  there is, but I'm not a hundred percent either.
12     Q   Okay.  Well, I'll represent to you that other
13  witnesses in this case have testified that there is a
14  penalty ability.
15     A   Okay.
16        MR. LEE:  Do you have a copy of the
17  contract you want to show him, Counsel?
18        MS. SANDLEY:  No, we're good.
19     Q   (By Ms. Sandley)  Are CoreCivic staff who are
20  assigned to other areas of the facility ever required
21  to work in the kitchen?
22     A   One more time.  Which staff?
23     Q   CoreCivic staff.
24     A   Oh, yes, ma'am.
25     Q   Okay.  And when that happens, does anyone

RUSSELL WASHBURN

1                RUSSELL WASHBURN
2   cover their ordinary post?
3      A   Overtime.  As I said, we would cover with
4   overtime to cover those posts.  So, yes, we would not
5   vacate a post that's required to move them to the
6   kitchen.  We would schedule overtime staff to be in
7   addition to.
8      Q   Okay.  Because you can't expect someone to
9   work two jobs at one time, correct?
10     A   Correct.
11     Q   Okay.  Has CoreCivic ever considered hiring
12  more employees to work in the kitchen?
13        MR. LEE:  Object to form.
14        THE WITNESS:  It's a broad question.
15  Stewart specific --
16        MS. SANDLEY:  Yeah.
17        THE WITNESS:  -- across the company?
18  Not that I'm aware of for Stewart, no
19        MS. SANDLEY:  Okay.
20     Q   (By Ms. Sandley)  Detained workers at Stewart
21  wax and buff the floors, right?
22     A   They have, yes.
23     Q   Okay.  And why do the floors need to be waxed
24  and buffed?
25     A   To, really, just create a sanitary

RUSSELL WASHBURN

1                RUSSELL WASHBURN
2   environment.
3      Q   Okay.  And detained workers at Stewart paint
4   the facility, correct?
5      A   They have, yes.
6      Q   Okay.  And why does the facility need to be
7   repainted from time to time?
8      A   Again, to create and to ensure that the
9   environment that people are living in is conducive to
10  such.
11     Q   Detained workers clean and dust the facility?
12     A   They have, in addition -- again, staff on all
13  of those in addition to, so yes.
14     Q   If Stewart never waxed and buffed the floors,
15  never repainted, never cleaned and dusted, is it your
16  understanding that ICE would continue to contract with
17  CoreCivic to operate Stewart?
18        MR. LEE:  Object to form and foundation.
19        THE WITNESS:  I mean, the answer is that
20     we wouldn't allow that.  I mean, that would
21     fall below our standards, but ACA standards
22     and many of the other standards that we're
23     measured on require us to maintain a level of
24     sanitation.  So CoreCivic as a whole, me as
25     the warden, certainly, would not allow the

RUSSELL WASHBURN

1                RUSSELL WASHBURN
2   facility to fall to that level.  So I can't
3   answer that question because I wouldn't allow
4   it to get there.
5      Q   (By Ms. Sandley)  And if CoreCivic fell below
6   those cleanliness and sanitation standards that it's
7   required to comply with per its contract, it could be
8   found in violation of its contract, correct?
9      A   That's correct, if it fell below the
10  standard, yes.
11     Q   Okay.  Is there any portion of PBNDS that
12  prohibits CoreCivic staff from performing barbering?
13     A   I don't believe so.
14     Q   Have CoreCivic staff ever barbered at
15  Stewart?
16        MR. LEE:  Object to form.
17        THE WITNESS:  Not since I've been here.
18     I don't recall ever reading of such.
19        MS. SANDLEY:  Okay.
20     Q   (By Ms. Sandley)  CoreCivic has in the past
21  paid detained workers to assist other detained people
22  with disabilities at Stewart, correct?
23     A   I don't know if that's correct or not.  I
24  believe we have a process in place, but I don't know
25  whether we have or -- actually have or have not.  I'd

RUSSELL WASHBURN

1                RUSSELL WASHBURN
2 have to look at the record.
3     Q    What is the process that's in place?
4     A    I mean, you have to -- one, a person has to
5 volunteer; and, two, both individuals have to agree
6 that they're okay with a detainee helper, if you will.
7         So one, it's not forced; and both parties, in
8 this case, would have to agree the person who needs the
9 assistance and that they would also have to be approved
10 by medical in order to provide that assistance.
11     Q    When that happens, are those people typically
12 assigned to the same cell if they're in a cell dorm?
13     A    Again, classification -- they have to be
14 classification appropriate to even have the
15 interaction. So in the event that we have that case,
16 yes, we would look at that.
17     Q    Are there any measures in place in that
18 process to ensure that the person hired to assist a
19 detained person with a disability doesn't work more
20 than 40 hours per week?
21     A    I don't know. There's not an actual
22 schedule, especially if they're living together. So I
23 don't know that there would be a system in place for
24 that as far as if they were actually living together,
25 providing that assistance.

1                RUSSELL WASHBURN
2     Q    Okay. One of the witnesses in this case
3 previously testified that the FSC sets detained worker
4 wages at Stewart. Is that correct?
5         MR. LEE: Object to form.
6         THE WITNESS: I don't know where that
7     came from. No.
8         MS. SANDLEY: Okay.
9     Q    (By Ms. Sandley) So that's left up to
10 Stewart staff?
11     A    Correct. Typically -- I mean, obviously if
12 we're going to increase, I would have a discussion with
13 the managing director, in my case now, Charles Keeton,
14 and that's really more of an FYI, make sure that he
15 understood why we were doing what we were doing and
16 moving that process, but there's no requirement for
17 approval that I'm aware of.
18     Q    Okay. But if, in the course of that
19 conversation with a managing director, he didn't agree
20 with that, he could tell you not to do it, correct?
21     A    Yeah, I mean, as my supervisor, he certainly
22 could. I've never experienced that, but he certainly
23 could.
24     Q    Okay. Are you aware that CoreCivic has in
25 the past provided incentives other than daily pay to

1                RUSSELL WASHBURN
2 detained workers?
3         MR. LEE: Object to form.
4         THE WITNESS: Provided in place of or in
5     addition to?
6         MS. SANDLEY: Let's start with in
7     addition to.
8         THE WITNESS: Am I aware that that has
9     been provided in the past in addition to,
10     yes.
11         MS. SANDLEY: Okay.
12     Q    (By Ms. Sandley) And those other incentives
13 have included extra food?
14     A    Yes.
15     Q    And they've included phone time?
16     A    I was not aware until earlier in the day you
17 said that -- I think it was Mr. Swinton testified
18 during his time, that's what he did, so...
19     Q    And they've included extra video games and
20 movies in the designated worker housing units, correct?
21     A    I would say yes. I mean, that's pretty
22 standard, yeah, so...
23     Q    And the practice of offering incentives, that
24 you're aware of, applied generally to all the detained
25 workers at Stewart?

1                RUSSELL WASHBURN
2     A    Yes.
3     Q    Were you aware of the practice of CoreCivic
4 providing phone cards to detained workers in lieu of
5 pay before today?
6     A    No.
7     Q    What does a $10 phone card cost CoreCivic?
8     A    I'd have to look -- they don't cost, I
9 wouldn't say, CoreCivic anything. We actually sell it
10 for Talton. So I wouldn't say it costs us anything.
11 I'd have to look at the actual sheet, but I don't
12 believe we pay anything, because the cards are not
13 ours.
14     Q    Okay. All right, how are you doing, Warden?
15 Do you need a break?
16     A    I'm good.
17     Q    Okay. Well, let's move on to rules,
18 discipline.
19         There are rules for detained people at
20 Stewart, right?
21     A    Yes, ma'am.
22     Q    And who makes the rules?
23     A    Some of it is PBNDS standards. You have the
24 rule infractions. I think all of our sanctions are
25 from the PBNDS standards. I don't believe we have

RUSSELL WASHBURN

1 anything that's not applicable to or from the PBNDS
2 standards.
3 Q    So PBNDS sets out specific disciplinary
4 offenses, correct?
5 A    Correct, yes.
6 Q    And those are -- are there -- I just want to
7 be sure I understand your testimony. You're not aware
8 of any other rules at Stewart for which people could be
9 disciplined apart from what's in the PBNDS, correct?
10 A    Correct.
11 Q    Okay. And are the rules at Stewart
12 communicated to detained people?
13 A    Yes.
14 Q    How?
15 A    That is in the detainee handbook.
16 Q    Any other way they're informed about the
17 rules?
18 A    Verbally, you know, through staff during the
19 intake process, the unit team's interactions on a, you
20 know, regular basis with the detainees. Because part
21 of that process, especially if there's somebody who's
22 limited in English proficiency, of course the handbook
23 is provided in the appropriate language, but through
24 interactions with staff as well.
25

RUSSELL WASHBURN

1 Q    Did you review any handbooks from prior to
2 your time at Stewart in preparing for this deposition?
3 A    I don't believe I did.
4 Q    Did you review the detention standards that
5 were in place prior to the PBNDS 2011 standards in
6 preparing for this deposition?
7 A    No, ma'am.
8 Q    Do you know whether the rules that have been
9 in place at Stewart since it began operating have
10 changed significantly?
11 A    I don't. I mean, I'm sure we produced it, it
12 would be in the records that we produced to you, but I
13 can't sit here and tell you that today.
14 Q    What happens when a detained person at
15 Stewart breaks a rule?
16 A    It depends on the type of rule. Obviously,
17 if it's something minor, staff are encouraged to try to
18 informally address that behavior and correct it with
19 the detainee. But if it's something that you've either
20 addressed multiple times or it's something of a
21 significant nature, then they would generate the
22 disciplinary report on that particular detainee,
23 utilizing the appropriate offense code and title, and
24 then ultimately turn that over to the supervisor.
25

RUSSELL WASHBURN

1 The supervisor then would make a determination of what
2 is the appropriate course of action.
3      The majority of ours are administrative in
4 nature, do not require a person to be placed into
5 restricted housing pending that disciplinary. But in
6 some cases, they are.
7      For example, two guys that are actively
8 aggressive and fighting, they're more likely going to
9 be placed into restrictive housing and administrative
10 confinement pending the resolution of that
11 disciplinary. And more often than not, it's a cool-off
12 period for the two guys to get their heads back
13 together and get out of segregation.
14      But from there, the disciplinary would be
15 served to the detainee. They would be advised of the
16 charges in the appropriate language. And they document
17 if the person does not speak English, what language and
18 the operator provided that service for them, and
19 then they're given a copy of the disciplinary as well.
20      And then ultimately they're scheduled and set
21 for a hearing with a disciplinary hearing staff. And
22 then they'll actually do the hearing and, again, use
23 the LanguageLine if necessary to communicate the
24 outcome of that hearing.
25

RUSSELL WASHBURN

1 Q    Disciplinary reports -- you referred to those
2 just now -- are those also called write-ups?
3 A    Yeah, disciplinary reports, write-ups, DRs,
4 yes, ma'am.
5 Q    Okay. And you referred to both restrictive
6 housing and segregation. Are those terms
7 interchangeable at Stewart?
8 A    Really, restrictive housing is the term that
9 we have. It's bad habits of segregation, but
10 restrictive housing.
11 Q    People used to call it segregation, right?
12 A    Yes, ma'am.
13 Q    And sometimes people still call it that,
14 right?
15 A    Old habits are hard to kick, but yes.
16 Q    Yeah.
17      Okay. Stewart has a disciplinary policy,
18 correct?
19 A    Correct.
20 Q    It's Policy 15-100?
21 A    Yes, ma'am.
22 Q    That's a CoreCivic policy?
23 A    Correct.
24 Q    And that policy is created by the FSC?
25

Page 258

RUSSELL WASHBURN

2   A   Correct.
3   Q   And it applies to all CoreCivic staff at
4   Stewart?
5   A   It does, yes.
6   Q   Does CoreCivic have to notify ICE of the
7   results of disciplinary proceedings?
8   A   Not the results, no.
9   Q   Does CoreCivic have to notify ICE if someone
10  is sent to disciplinary segregation?
11  A   Yes.
12  Q   Is that notification to ICE required just
13  once, or is there a periodic notification as long as
14  that person is in segregation?
15  A   We make notification, but they actually
16  participate in the weekly restrictive housing committee
17  reviews.  So they go through every person that's
18  currently residing in restrictive housing, discuss them
19  individually, and then are part of the discussion about
20  what's the appropriate method for either releasing the
21  person, continuing them in restrictive housing, as well
22  as mental health is involved with that committee as
23  well.  So we're evaluating them exclusively not only
24  for security side, but the medical side, and having ICE
25  involved in that conversation, and that happens every

Page 259

RUSSELL WASHBURN

1   Wednesday at 10:30.
3   Q   Okay.  Why is mental health involved in the
4   weekly segregation reviews?
5   A   Just to make sure we're on track and
6   providing -- you know, if there's somebody at risk,
7   specifically if there's someone that maybe is in
8   restrictive housing who has had suicidal ideations in
9   the past or, you know, just being in a restricted area,
10  we want to make sure that they're clinically okay, and
11  if there's not, that we're taking the appropriate
12  medical actions to address whatever issues that they
13  may be having.
14  Q   All right, let's take a look at Exhibit 27,
15  CCBVA244.
16       (Exhibit 27 marked for identification.)
17  Q   (By Ms. Sandley)  All right, and this is the
18  Stewart handbook, correct?
19  A   Yes.  It's an excerpt of, but I don't know
20  what the date is on that one.
21  Q   Let's scroll down so you can see the date.
22  There we go.
23       Do you see that "Revised" at the bottom
24  there?
25  A   Yes.

Page 260

RUSSELL WASHBURN

2   Q   So it looks like April 2019?
3   A   It's been revised since then, I believe.
4   Q   Okay.  So you believe there's a different
5   version in place currently?
6   A   Yes, ma'am.
7   Q   Do you know if the revisions from version to
8   version to the Stewart handbook are typically
9   significant?
10  A   There was quite a few changes, if memory
11  serves me correct, that we went through the process,
12  and it's been since I've been here, so I would
13  certainly say there's a revised handbook, I believe.
14  Q   Okay.  The handbook, is it provided to every
15  detained person at Stewart?
16  A   Yes.
17  Q   Is it provided at intake?
18  A   Yes, it is.
19  Q   Can they get a copy of the handbook at any
20  other time?
21  A   I mean, if they've lost theirs or it was
22  damaged, then they can request it from their unit team
23  members, case manager, unit manager --
24  Q   Is the --
25  A   I'm sorry.

Page 261

RUSSELL WASHBURN

2   Q   Sorry.  Is the handbook or portions of the
3   handbook posted in the housing units at Stewart?
4   A   I believe they are.  I think there is
5   sections of it that are posted.
6   Q   Is the handbook translated into other
7   languages?
8   A   Yes.  I believe we have it in nine different
9   languages now.
10  Q   Okay.  Do you know which ones?
11  A   Not all.  I mean, I know we have, obviously,
12  English, Spanish, Punjabi, Arabic, Russian, French.  I
13  can't remember them all.  I can certainly provide that.
14  I don't remember them all.
15  Q   And is the decision to translate the handbook
16  into another language that it hasn't been translated
17  into already based on who is housed at Stewart?
18  A   Yes.
19  Q   Okay.  And at what point would you decide
20  "Oh, we need to get the handbook translated to this
21  other language"?
22  A   We really just look at the numbers.  I don't
23  know if we have a set number.  Obviously, if we have
24  one person, it would be challenging to do that because
25  there's, specifically, so many dialects of different

Page 262

```
                    RUSSELL WASHBURN
1
2    languages.  If we have one or two individuals, we'd use
3    the LanguageLine to provide that assistance to it for
4    us.  But there's no set number that I'm aware of that
5    says if you have X amount that speak this specific
6    language -- in fact, we exceed PBNDS standard
7    requirements for the number of translations that we
8    actually physically have.
9        Q    Does the FSC approve the Stewart handbook?
10       A    No.
11       Q    Is the FSC provided a copy of the handbook
12   when it's revised?
13       A    I don't believe so.
14       Q    So the managing director doesn't have a copy
15   of the current Stewart handbook?
16       A    I don't believe he would.
17       Q    Let's look at page 32 of this document.
18            Okay, and this is the discipline section of
19   the handbook, right?
20       A    Yes, it is.
21       Q    Okay.  And let's scroll down to where the --
22   if that's the start -- there we go.
23            So this portion of the handbook lists rule
24   violations for which detained people can be sanctioned,
25   correct?
```

Page 263

```
                    RUSSELL WASHBURN
1
2        A    Yes, ma'am.
3        Q    And are these all of the offenses that are in
4    the PBNDS?
5        A    I believe they are.
6        Q    Are there any offenses in here that aren't in
7    the PBNDS?
8        A    I do not believe there is.
9        Q    And the handbook also lists the possible
10   sanctions for each rule violation?
11       A    Yes.
12       Q    So every detained person at Stewart is made
13   aware of the rules and the possible sanctions for
14   violating them, correct?
15       A    Correct.
16       Q    Are the sanctions listed here consistent with
17   the PBNDS?
18       A    Yes, I believe they're directly from the
19   PBNDS.
20       Q    Okay.  And they include segregation, correct?
21       A    Yes.
22       Q    Loss of commissary?
23       A    Yes.
24       Q    Loss of visits?
25       A    When we have visits, yes.
```

Page 264

```
                    RUSSELL WASHBURN
1
2        Q    And loss of phone calls?
3        A    I believe so, yes.
4            MS. SANDLEY:  Let's scroll down, Jackie,
5    to the next page.  Can we scroll down more.
6    Okay.
7        Q    (By Ms. Sandley)  And here in the "High
8    Offense Category," loss of job is a possible sanction?
9        A    Yes.
10       Q    Do you see that?
11       A    Where are -- yes, loss of job, I see it.
12       Q    Is that sanction listed as a possible
13   sanction in the PBNDS?
14       A    Yes, I believe it is.
15       Q    The sanctions listed here -- let's look at
16   the disciplinary segregation, for example.  It says up
17   to 30 days.  So that's up to CoreCivic's discretion on
18   how many days of segregation are imposed as the
19   sanction, correct?
20       A    Correct.  And then ICE is a part of that
21   review every seven days and certainly -- say we need to
22   release a person, they have the ability to require us
23   to release them.
24       Q    And then loss of privileges, is that
25   typically imposed for a set number of days?
```

Page 265

```
                    RUSSELL WASHBURN
1
2        A    Yes, ma'am.  You know, to be consistent, the
3    disciplinary hearing officer would have, you know,
4    previous disciplinaries of that nature and what that
5    looked like, so we're consistent.
6        Q    PBNDS doesn't define any of the offenses
7    listed here beyond the text we see here, correct?
8        A    Not that I'm aware of.
9        Q    So it's up to CoreCivic staff to identify
10   instances of these offenses, correct?
11       A    I don't think I understand.  You're asking me
12   which would be the appropriate --
13       Q    Uh-huh.
14       A    -- category to apply -- then, yes, we would
15   evaluate the infraction and then apply it to the most
16   applicable rule violation.
17       Q    Okay.  And, for example, with the work
18   stoppage offense, PBNDS doesn't define work stoppage,
19   right?
20       A    That's correct.
21       Q    So that's up to CoreCivic to define work
22   stoppage, right?
23       A    Correct.
24       Q    And to determine whether a specific incident
25   qualifies as a work stoppage, correct?
```

RUSSELL WASHBURN

1    RUSSELL WASHBURN
2    A    That's correct.
3    Q    Okay.  And the handbook itself also doesn't
4    define any of these offenses beyond what's written
5    here, correct?
6    A    No.  That's what we're looking at, is the
7    handbook.
8    Q    Okay.  Does the CoreCivic discipline policy
9    define any of these offenses further?
10   A    I do not believe so, no.
11   Q    Are CoreCivic staff at Stewart trained on how
12   to identify certain rule violations?
13         MR. LEE:  Object to form.
14         THE WITNESS:  They're educated on the
15         standard and they're educated on the policy,
16         and so to that degree, yes.  To say that
17         they're given every scenario and this is the
18         appropriate code, I don't know that you could
19         do a training on that.
20   Q    (By Ms. Sandley)  So there is not a training
21   provided to CoreCivic staff where they walk through
22   scenarios or hypotheticals and learn to define the
23   offenses that way; is that correct?
24         MR. LEE:  Object to form.
25         THE WITNESS:  We have disciplinary

RUSSELL WASHBURN

1    training.  And, like I said, it's a highlight
2    of the curriculum, the policies, and the
3    standards, but not specific to every
4    scenario, no.
5         MS. SANDLEY:  Okay.
6    Q    (By Ms. Sandley)  And CoreCivic staff are
7    expected to implement the discipline policy uniformly
8    across the facility, right?
9    A    That's correct.
10   Q    And as far as CoreCivic knows, that's what's
11   happening at Stewart; is that right?
12   A    That's correct.
13   Q    Let's look at the next exhibit, No. 28,
14   CCBVA106421.
15         (Exhibit 28 marked for identification.)
16   Q    (By Ms. Sandley)  Okay, and this is the food
17   service post order from Stewart, correct?
18   A    I don't see anything.
19   Q    Oh, sorry.
20   A    Oh, there we go.  It kicked off for some
21   reason on my end.  Sorry.  Yes, it is.
22   Q    Okay.  And this one is effective January
23   30 -- oh, sorry, at Stewart March 31, 2017.
24         Do you know if this is the post order

RUSSELL WASHBURN

1    currently in effect at Stewart?
2    A    I believe it is.  I mean, it's time for
3    review, but yes, I believe it is.
4    Q    The FSC creates post orders?
5    A    Yes.
6    Q    And are all officers assigned to a post
7    required to follow the post order for their post?
8    A    Yes.
9         MS. SANDLEY:  All right, we can take
10        this exhibit down.
11   Q    (By Ms. Sandley)  Are you aware that there
12   have been instances at Stewart when detained people
13   were disciplined for refusing to work?
14         MR. LEE:  Object to form.
15         THE WITNESS:  In what period of time?
16         MS. SANDLEY:  During the relevant period
17         for this case.
18         THE WITNESS:  Without seeing the
19         document, no.
20   Q    (By Ms. Sandley)  You're not aware?
21   A    No.
22   Q    Okay.  Are you aware that people detained at
23   Stewart have been disciplined for asking for the pay
24   they were promised?

RUSSELL WASHBURN

1         MR. LEE:  Object to form.
2         THE WITNESS:  No, I'm not aware of that.
3    Q    (By Ms. Sandley)  Stewart's segregation unit
4    is a cell unit, correct?
5    A    Yes.
6    Q    And it's Unit 7?
7    A    7 Alpha, correct, yes.
8    Q    Okay.  And it includes both administrative
9    segregation and disciplinary segregation?
10   A    Yes.
11   Q    And people on suicide or mental health watch
12   are also sometimes housed in Unit 7 Alpha, correct?
13   A    Yes, ma'am, they are.
14   Q    And individuals housed in segregation at
15   Stewart are locked in their cells unless they're
16   specifically allowed out for a certain activity,
17   correct?
18   A    That's correct.
19         MR. LEE:  Object to form.
20   Q    (By Ms. Sandley)  And those activities
21   include recreation?
22   A    Yes.
23   Q    They include medical care?
24   A    Yes.

Page 270

```
1                 RUSSELL WASHBURN
2     Q    Legal visits?
3     A    Yes.
4     Q    Limited visitation?
5     A    They have tablets now, so they can do,
6  obviously, visitation within their cell or -- so yes.
7     Q    Is in-person visitation allowed right now at
8  Stewart?
9     A    No, ma'am.
10    Q    Okay.  Do you know if before COVID people in
11 segregation at Stewart were allowed limited in-person
12 visitation?
13    A    I do not know.  I mean, just across
14 CoreCivic, typically inmates and detainees are allowed,
15 they have designated times for appropriate visits.
16    Q    Are there any other activities that people in
17 segregation are allowed out of their cells for?
18    A    They do allow them out to watch movies for
19 administrative or the ones that may be down there that
20 are for a medical purpose.
21         Now, if they're on suicide watch, they
22 wouldn't be allowed out.  They would be under direct
23 supervision, meaning if we had somebody in that
24 particular cell, there would be an officer sitting
25 directly outside of that cell 24/7 keeping a constant
```

Page 271

```
1                 RUSSELL WASHBURN
2  observation on them.  And they're a threat, obviously,
3  to themselves, so we would follow the direction of
4  mental health as far as what activities that they would
5  be allowed out of cell for and doing those things.
6  But, yeah, we do have a table in the day room that they
7  do allow them -- not disciplinary, but the
8  administrative to come out.
9     Q    So people in disciplinary segregation are not
10 allowed out of their cell to sit in the table in the
11 day room, correct?
12    A    That's correct.
13    Q    They're not allowed out of their cells to
14 watch movies, correct?
15    A    That's correct.  Now, still, the movies are
16 shown and they can watch through their window, but not
17 actually physically go out and sit in the day room.
18    Q    Do you know about how many hours per week
19 people in administrative segregation are allowed out of
20 their cells to watch movies?
21    A    Not specific to movies, no.
22    Q    Is there a policy requiring that?
23    A    No.
24    Q    Okay.  Is it up to the officer assigned to
25 segregation to decide?
```

Page 272

```
1                 RUSSELL WASHBURN
2     A    As far as what, coming out to watch TV?
3     Q    Uh-huh.
4     A    Yes.  Yes.  Now, there is expectations and
5  standards for showers and recreation and out-of-cell
6  time for that period, but not specifically to watch TV.
7     Q    Okay.  That was where I was going to go next.
8  The recreation in segregation is limited to one hour
9  five days per week; is that right?
10    A    That's what the standard is, but we offer two
11 hours to everybody.
12    Q    Okay.  To everybody in disciplinary
13 segregation?
14    A    Disciplinary or administrative.
15    Q    Okay, and that's -- and is it still limited
16 to five days per week?
17    A    Yes, it is.
18    Q    Okay.  Do people get that two hours a day
19 every day?
20    A    Yes.
21    Q    And that amount of recreation time, is that
22 less than what is offered in general population?
23    A    Not currently under the COVID protocols.
24 Each are offered at least one hour out of -- for
25 recreation for the general housing currently because of
```

Page 273

```
1                 RUSSELL WASHBURN
2  the number of quarantine pods, cohort pods, and the
3  requirement to keep everybody separated and still
4  access those yards.
5     Q    Before COVID, would two hours per day of
6  recreation time five days a week have been less than
7  what is offered in general population?
8     A    Yes, it would have been less than.
9     Q    Okay.  And the property that people detained
10 in segregation are allowed to have is limited, correct?
11    A    For disciplinary, yes.  For administrative,
12 no.
13    Q    The items people in segregation can purchase
14 in commissary are limited, correct?
15    A    Again, for administrative, I don't believe
16 so.  Disciplinary, yes, but not for administrative.
17    Q    And phone access in segregation is limited,
18 correct?
19    A    For disciplinary.
20    Q    Okay, so it's less than what they would have
21 in the general population, correct?
22    A    Correct.
23    Q    And what is law library access in segregation
24 like at Stewart?
25    A    Well, we have a law library in restrictive
```

Page 274

RUSSELL WASHBURN

1                 RUSSELL WASHBURN
2 housing, and so really it's kind of unimpeded.  So
3 they -- officers -- there's no requirement to say you
4 can only go once a day or whether you can go 10 times a
5 day.  And that's the reason that we have it in
6 restrictive housing, to allow that access as necessary.
7     Q   Is the law library in segregation a room?
8     A   Yes.
9     Q   Okay.  Could two people in disciplinary
10 segregation be in the law library together?
11    A   No.
12    Q   And, then, people in the segregation at
13 Stewart shower three times a week, correct?
14    A   For disciplinary -- we pretty much offer it
15 for administrative, I think, daily; but for
16 disciplinary, I think that's correct.
17    Q   And people in general population can shower
18 every day if they choose to, correct?
19    A   That's correct.
20       MS. SANDLEY:  All right, why don't we
21    take a quick 10-minute break.  Is that okay
22    with you, Warden?
23       THE WITNESS:  Works for me.  I'll run
24    out to the restroom.  Thank you.
25       (Recess taken.)

Page 275

RUSSELL WASHBURN

1                 RUSSELL WASHBURN
2    Q   (By Ms. Sandley)  All right, Warden Washburn,
3 we're going to move on to food now, okay?
4    A   Okay.
5    Q   I hope you got a snack on the break.
6       Is CoreCivic for responsible for ensuring
7 that people detained at Stewart are provided
8 nutritionally adequate food?
9    A   Yes.
10    Q   And who at CoreCivic is responsible for
11 overseeing the provision of food services at Stewart?
12    A   The assistant warden of operations, as far as
13 CoreCivic goes, is the direct oversight and then
14 obviously through me -- or to me, but Trinity food
15 service also have a food service supervisor and an
16 assistant shift supervisor that's here at the facility.
17 And then they have their headquarters, for lack of
18 understanding what they call themselves, leadership as
19 well that would oversight the food service manager.
20    Q   And who at CoreCivic is responsible for
21 overseeing the Trinity contract?
22    A   Mr. Musil [phonetic], I believe, is the last
23 name.
24    Q   Is he a person who works in the FSC?
25    A   He is.  He replaced the John Gimesh that we

Page 276

RUSSELL WASHBURN

1                 RUSSELL WASHBURN
2 referenced earlier.  He's -- I think there's been
3 several others between Gimesh and him, but he's in that
4 role, so I guess he'd be the director.
5    Q   Okay.  Does CoreCivic exercise oversight over
6 Trinity's food services at Stewart?
7    A   At all of the CoreCivic sites, yes.
8    Q   And what does that look like at Stewart?
9    A   In what regard?
10    Q   How does CoreCivic exercise oversight over
11 Trinity's provision of food services at Stewart?
12    A   Got you.  So, I mean, through audit
13 mechanisms, part of the operational audit is measuring
14 the policies and the standards that are applicable
15 there.  Communications with Trinity on a regular basis,
16 as well as the assistant warden of operations -- or,
17 I'm sorry, assistant warden of programs.
18    Q   So the audit tool developed by FSC that we
19 looked at earlier, is that one of the ways --
20    A   Yes, ma'am.
21    Q   -- CoreCivic exercises oversight over
22 Trinity?
23    A   Yes.
24    Q   Who creates the menus at Stewart?
25    A   They are produced by Trinity and approved by

Page 277

RUSSELL WASHBURN

1                 RUSSELL WASHBURN
2 a licensed dietitian.
3    Q   Does CoreCivic have to approve the menus?
4    A   Yes.
5    Q   Is that someone at CoreCivic FSC?
6    A   FSC approves and I also sign as the approval
7 once FSC has agreed and signed off on it and the
8 dietitian as well.
9    Q   Has the Trinity dietitian ever visited
10 Stewart?
11    A   Not since -- not that I'm aware of since I've
12 been here.  I can't speak from the duration of, but not
13 since I've been here that I can recall.
14    Q   Okay.  And has CoreCivic ever refused to give
15 final approval to Trinity menus?
16    A   Not that I'm --
17       MR. LEE:  Object.
18       THE WITNESS:  Sorry.
19       Not that I'm aware of.
20    Q   (By Ms. Sandley)  Has CoreCivic ever sent
21 menus back for revision?
22       MR. LEE:  Object to form.
23       THE WITNESS:  Can you specify -- what do
24    you mean by "revision"?
25    Q   (By Ms. Sandley)  Has CoreCivic ever asked

Page 278

```
RUSSELL WASHBURN
1                    RUSSELL WASHBURN
2    Trinity to change a menu before it was implemented?
3         MR. LEE:  Object to form.
4         THE WITNESS:  No, I mean -- I mean,
5    there's been recommendations and suggestions
6    to change menu items, specifically if you've
7    got a specific meal or item on the menu that
8    is not necessarily popular amongst the
9    population.  You know, you have those
10   conversations that occur locally.  But,
11   again, it has to go through that approval
12   process, it has to go through the dietitian
13   before you can just simply remove an item and
14   replace it with a different item.
15        MS. SANDLEY:  Okay.
16   Q    (By Ms. Sandley)  So when an item is changed
17   on the menu, that has to be approved by FSC, correct?
18   A    That's correct.
19   Q    Are menus also approved by ICE?
20   A    Yes.  I don't know that they require it.  I
21   can tell you that I've sent the menu to ICE to ensure
22   that they had no concerns with it, but as far as -- I
23   don't believe there's a requirement.
24        (Exhibit 29 marked for identification.)
25        MS. SANDLEY:  Let's look at Exhibit 29.
```

Page 279

```
1                    RUSSELL WASHBURN
2         And this is Bates number ICE-Barrientos 12202
3    [sic].  Let's go to the next page.  Sorry,
4    Jackie, can you scroll up to see who this
5    email is sent to.
6    Q    (By Ms. Sandley)  All right, so this is -- do
7    you know who any of these people are in the "From,"
8    "Sent," "To," "cc" lines?
9    A    I know John Bretz.  That's the only one I
10   know on the list up there.
11   Q    Okay.  And he's someone who works for ICE,
12   correct?
13   A    He no longer works for ICE, but he did when I
14   arrived.
15   Q    Okay.  And I'm looking at where it says
16   "SDC Situation Report."  This is dated September 5th,
17   2015, right?
18   A    Correct.
19   Q    Okay.  Do you -- I want to scroll down.  This
20   is in the first bullet point, sort of towards the end
21   of that paragraph.
22        It says, "AW Blue informed me that detainees
23   would start receiving boiled eggs twice a week with
24   breakfast next week, and that they were working to
25   improve the taste of some of the food items such as
```

Page 280

```
1                    RUSSELL WASHBURN
2    oatmeal served for breakfast."  Do you see that?
3    A    Yes, I do.
4    Q    And AW Blue was a CoreCivic employee at
5    Stewart, correct?
6    A    That's correct.
7    Q    Do you know if there was a time at Stewart
8    when detained people didn't receive eggs for breakfast?
9    A    I do not know without looking back at the
10   record.
11   Q    Okay.
12        MR. LEE:  Object to form.
13        MS. SANDLEY:  Jackie, can we scroll down
14   a little more.  Okay.
15   Q    (By Ms. Sandley)  And then do you see the
16   bullet point where it says, "Detainees made complaints
17   about food services, no milk, no eggs, and commissary"?
18   A    I do.
19   Q    Do you know if there was a time at Stewart
20   when detained people weren't provided milk?
21   A    Not without looking at the record.
22        MS. SANDLEY:  All right, let's take this
23   exhibit down.  We'll also be sure to drop it
24   in the chat.  Sorry about that, Jacob.
25   Q    (By Ms. Sandley)  Who determines the caloric
```

Page 281

```
1                    RUSSELL WASHBURN
2    intake for the menus set at Stewart?
3    A    The licensed dietitian.
4    Q    Okay.  And do you know if that caloric intake
5    amount has decreased in the last two years?
6    A    I don't know, no.
7    Q    And the FSC would have to approve any change
8    in that caloric intake, correct?
9    A    That's correct.
10   Q    You talked earlier about meal monitoring
11   forms, correct?
12   A    Yes.
13   Q    Who all at Stewart completes meal monitoring
14   forms?
15   A    All of the administrative duty staff, which
16   would be inclusive of the warden, assistant wardens,
17   chief of security, chief of unit management, assistant
18   chief of security, shift supervisors, unit managers,
19   and assistant shift supervisors.
20   Q    And are those people trained on how to
21   complete the meal monitoring forms?
22   A    Yes.
23   Q    How are they trained?
24   A    They're trained through on-the-job training
25   and supervisor training that they undertake.  So they
```

Page 282

RUSSELL WASHBURN

1 physically take them to the kitchen, walk them through
2 the process of what they're looking for, how to measure
3 for compliance, whether it's recipe adherence to
4 temperature requirements.
5        The form also contains what the requirements
6 are as far as hot foods, what is the temperature
7 required to be, what are the cold food temperatures,
8 and it's right on the bottom of the form, so they can
9 tell whether or not it's within the appropriate range.
10       And then they also talk about the sanitation
11 of the line to ensure that it's kept clean at all
12 times, that they're temping the pans, as one pan runs
13 out, that before they start serving out the next pan,
14 it's re-temped to verify that it's at the required temp
15 before they continue -- continue the line. If there's
16 any issues with the food production or process, to stop
17 it until that --
18       MS. SANDLEY: Warden, I think we lost
19    you for just a second.
20       Michelle, did you get all that?
21       THE WITNESS: It jumped, so -- sorry.
22       (Discussion off the record.)
23    Q    (By Ms. Sandley) If something is found to be
24 noncompliant by a staff person completing a meal

Page 283

RUSSELL WASHBURN

1 monitoring form, is corrective action required to be
2 taken?
3    A    Depending on what the issue is. There's
4 certain criteria that -- what we call a food service
5 incident report that would be completed. It would then
6 be sent to the food service manager and Trinity, and
7 then they would be required to do a corrective action
8 plan on that particular issue.
9        Now, again, if it was a simple thing, that
10 the food in the container didn't temp out at that given
11 second and it was resolved, you know, by putting it
12 back into either the warmer or putting it back into the
13 cooler, nothing was served, then that wouldn't be a
14 food service complaint. But if we run out of food or
15 run out of a product and then they have to cook more
16 and there's a 15-minute delay, that can result in a
17 food service incident report being filed.
18    Q    What types of -- all right, so a delay could
19 result in an incident report being filed, correct?
20    A    It could, yes.
21    Q    Okay. What other types of incidents?
22    A    Again, if there was -- trying to do an
23 unapproved substitution for an item, then -- you know,
24 you go in and you find the menu says you're providing

Page 284

RUSSELL WASHBURN

1 these specific products and we find that we're serving
2 Jell-O in place of cookies and that wasn't
3 pre-approved, then that could result in an incident
4 report.
5    Q    What if a detained person finds a foreign
6 object in their food, should that result in an incident
7 report?
8       MR. LEE: Object to form.
9       THE WITNESS: It could. Obviously it
10    would have to be verified that there was a
11    product in there or something in the food;
12    but, yes, it could result in one.
13    Q    (By Ms. Sandley) Would it necessarily have
14 to result in an incident report?
15       MR. LEE: Object to form.
16       THE WITNESS: Not necessarily. I'll
17    give an example. If you've got dried beans,
18    there's a chance that you may find
19    a rock or a piece of rock sometimes in dried
20    beans. If it was, you know,
21    [indiscernible] -- if it was something that
22    was potentially deliberately placed into the
23    food, then there could be one that would
24    result in that.

Page 285

RUSSELL WASHBURN

1    Q    (By Ms. Sandley) So only if an object is
2 deliberately placed in food is a food incident report
3 completed?
4       MR. LEE: Object to form.
5       THE WITNESS: I won't say only. I mean,
6    each situation is going to be different, but
7    there's not anything that I'm aware of that
8    says if these specific items are found in
9    food, you must do a food service incident
10    report.
11       MS. SANDLEY: Okay.
12    Q    (By Ms. Sandley) And where are those forms
13 maintained?
14    A    They're part of our policy. I believe it's
15 11 dash -- it's a letter -- 11-1(I), I think, is the
16 food service incident report, but it's part of our 11-1
17 policy.
18    Q    Okay. Who keeps the completed incident
19 report forms?
20    A    The assistant warden of programs would
21 maintain the original; and then, again, the copy would
22 go to the food service manager, as well as to Trinity
23 leadership, and they would be required then to do a
24 corrective action plan to address whatever that

RUSSELL WASHBURN

1    RUSSELL WASHBURN
2  situation may be.
3      Q    Okay.
4           MS. SANDLEY:  Let's look at the next
5    exhibit, Exhibit 30, and it's CCBVA218211
6    [sic].
7           (Exhibit 30 marked for identification.)
8      Q    (By Ms. Sandley)  Okay, this is an email from
9  John Gimesh to Bill Spivey.  Do you see that?
10     A    Yes.
11     Q    Okay.  Do you know who Bill Spivey is?
12     A    Bill Spivey was a previous warden here at
13 Stewart.
14     Q    Okay.  And this email has several
15 attachments, and the subject line is "Meal Monitoring."
16 Do you see that?
17     A    I do.
18     Q    Okay.  Let's look at one of the attachments,
19 PDF page 8.  Have you seen this document before?
20     A    It looks familiar, yes.
21     Q    Is this the training on meal monitoring
22 that's currently provided at Stewart?
23     A    I believe so, yes.
24     Q    And who receives this training?
25     A    It would be any of the supervisors and

RUSSELL WASHBURN

1    RUSSELL WASHBURN
2  managers.
3      Q    Okay.
4      A    Well, not any managers.  Security supervisors
5  and managers.
6      Q    Let's look at the next page.  We're going to
7  look at No. 11.
8           All right, it says, "Get a completed tray
9  from the serving line.  Taste food in any area, other
10 except on the main line."
11          And then I'm looking at the third bullet
12 point.  It says, "Record your evaluation on monitoring
13 form and any comments you may have and review with
14 person in charge of the kitchen supervisor."
15          Who is the person in charge of the kitchen
16 supervisor?
17     A    It depends on the time.  It would be Trinity
18 staff, you know, during day shift, that may be the
19 actual food service supervisor that actually supervises
20 and the staff in the kitchen, meaning Trinity staff.
21 But after hours, like early in the morning, 2 or 3
22 o'clock in the morning, it may be the actual food
23 service worker, Trinity staff member, that you have to
24 address any concerns that you may have.
25     Q    Okay, let's go to the next page.  This page

RUSSELL WASHBURN

1    RUSSELL WASHBURN
2  lists -- at the top, a list in optional exercise.
3      A    Uh-huh.
4      Q    Is this -- you can take a minute to read it.
5  Is this done at Stewart?
6      A    Yes.  That's kind of what I was talking
7  about, when we take them into the kitchen and we walk
8  them through the proper techniques and methods, those
9  things would be talked about, you know, how should you
10 handle, those are all scenario-based and talking
11 through that.  So I won't say we hit every bullet
12 that's listed out here, but yes.
13     Q    Okay.  And have there been incidents that
14 you're aware of when meal service at Stewart was
15 stopped or delayed to address one of those issues?
16     A    I would say if it -- the ones I'm aware of,
17 it would be a temperature issue, either below
18 temperature or above temperature, depending on the
19 product, until that item could be replaced with a
20 product that is within the required temperature.
21     Q    Okay.  And then the next section of this --
22 let's scroll down -- "Observing Meal Service."  Yeah,
23 and I'm looking at the "At This Facility" section
24 that's on the next page.  And it says, "Your facility
25 may require you to do any combination of these tasks

RUSSELL WASHBURN

1    RUSSELL WASHBURN
2  weekly and provide a report on the outcomes."
3           What on these -- what on this list is Stewart
4  required to do?
5      A    We look at the three-day pulls, the recipes;
6  of course, check hair nets and gloves daily, hand
7  washing.  The AW of operations obviously monitors the
8  deep-cleaning schedule.  Really, all of these things
9  that we...
10     Q    Is a section of the kitchen QA audit
11 completed weekly?
12     A    No.  That's probably the only component that
13 I'm looking at that's not physically completed weekly.
14     Q    And what about --
15     A    And some of -- I'm sorry.
16     Q    No, I'm sorry.  You finish.
17     A    And some of these things are done, like I
18 said, daily, like checking the hair nets and the gloves
19 and those type things.  That's stuff that's all
20 monitored and checked daily.
21     Q    Okay.  And is every one of these things that
22 you said is completed documented?
23     A    To say we document everything that we do, no,
24 I wouldn't say that they are.
25     Q    Okay.

Page 290

RUSSELL WASHBURN

1
2     MS. SANDLEY:  Let's take this exhibit
3   down.  And I want to look at Exhibit
4   CCBVA106052, the food service policy.
5     (Exhibit 31 marked for identification.)
6   Q   (By Ms. Sandley)  All right, and this is the
7   food service policy for Stewart, correct?
8   A   Yes, ma'am.
9   Q   Do you know if there's a more recent version
10  of this policy currently in effect?
11  A   I do not know without looking at our
12  directory, but I'm going to assume this is the most
13  current.
14  Q   And are all CoreCivic staff expected to
15  comply with this policy?
16  A   Yes.
17  Q   Are all Trinity staff expected to comply with
18  this policy?
19  A   Yes.
20  Q   Let's look at PDF page 11.  I'm looking at
21  K(3).  It says, "Food shall not be withheld, nor the
22  standard menu varied, as a disciplinary sanction for an
23  individual inmate/resident.  This does not preclude
24  rewarding groups of inmates/residents with special
25  foods in return for special services under special

Page 291

RUSSELL WASHBURN

1
2   circumstances."
3     What are special services that might permit
4   using food as a reward at Stewart?
5   A   I don't know that those special services -- I
6   mean, it can be -- how that's truly defined, I can tell
7   you what -- you know, we've done it here in the past
8   where, really, just as an incentive to -- an
9   appreciation for them volunteering to work in various
10  areas.  And, again, that's in addition to, not in
11  replace of the monies that are required to be paid
12  based on the approved amount per the area they're
13  working in.
14    So that's how we would typically use it.  You
15  know, if we did -- you know, on holidays, we do a big
16  meal.  So the process would be a little bit harder on
17  them and be a little more demanding.  So we may reward
18  them with some food or some other kind of special item
19  as a token of appreciation for all their hard work and
20  getting the product out in a safe and timely manner.
21  Q   Okay.  So apart from providing extra food to
22  detained workers to show appreciation, as you said, and
23  then on occasions when workers are doing extra work to
24  prepare holiday meals, are there any other special
25  circumstances when food is used as a reward at Stewart?

Page 292

RUSSELL WASHBURN

1
2   A   Not that I'm aware of, no.
3   Q   Okay.
4     MS. SANDLEY:  We can take this exhibit
5   down.  Let's look at Exhibit 32, CCBVA118425.
6     (Exhibit 32 marked for identification.)
7   Q   (By Ms. Sandley)  All right, and what is this
8   document, Warden?
9   A   This is the menu.
10  Q   Is this the menu currently in effect?
11  A   It's hard to see.  It's pretty blurry, but I
12  think so.
13  Q   Would it help if we zoom in so you can see
14  the food items?
15  A   Maybe, if it doesn't distort the -- it looks
16  like it, though.  Yes, I believe it is.
17  Q   Okay.  And that's your signature at the
18  bottom?
19  A   Yes, ma'am.
20  Q   And it's dated 8/31/2020, right?
21  A   You know what, no, this is not the current
22  menu.
23  Q   Okay.  So there's been an updated menu since
24  this one?
25  A   Yes, ma'am.

Page 293

RUSSELL WASHBURN

1
2   Q   Okay.  And do you see at the bottom the line
3   that says "Dietary Consultant"?
4   A   Yes.
5   Q   And the approval date next to that is
6   9/25/2019?
7   A   Yes.
8   Q   Why was there almost a year in between when
9   the dietary consultant and you signed this document?
10  A   On this one, I would say there was no changes
11  since that initial one and this was -- I'm sure was
12  brought me for updated signature.
13  Q   Okay.  So you updated your signature, but the
14  dietary consultant did not, correct?
15  A   Right.  Because they would have to sign it
16  and update it if there were any changes to any of the
17  individual menus or meals.
18  Q   Does the menu ever change at Stewart when the
19  population changes?
20    MR. LEE:  Object to form.
21    THE WITNESS:  No.  I mean, that wouldn't
22  drive a change for that.
23  Q   (By Ms. Sandley)  And is this -- we can
24  scroll up so you can see the top -- is this the regular
25  diet menu for Stewart?

Page 294

RUSSELL WASHBURN

1
2    A    Yes, it's regular.
3    Q    Okay.  And I'm looking at the first row in
4  the "Breakfast" row.  We can zoom in a little bit.
5    So on Monday, there's "Dairy Drink" listed.
6  Do you see that?
7    A    Yes.
8    Q    What's dairy drink?
9    A    It would be milk.
10    Q    On Sunday, "Milk" is listed, correct?
11    A    Yes.
12    Q    Okay.  Are milk and dairy drink different?
13    A    I wouldn't see how.  To my knowledge, we've
14  never provided anything other than milk as a dairy
15  product, so I don't know of any other product.  Why
16  would we call one -- differently on one versus the
17  other, I'm not sure.
18    Q    Currently, your testimony is Stewart provides
19  milk every morning for --
20    A    Yes.  Yes.
21    Q    Do you know if there have been times where
22  that was not the case at Stewart?
23    A    I know that with COVID, we've had some issues
24  with delivery where they were delayed.  I don't know
25  that they didn't ultimately get it.  I just don't know

Page 295

RUSSELL WASHBURN

1
2  that it was at the -- right at the scheduled time that
3  we would typically do breakfast.  So I know just a few
4  weeks ago that we literally had to wait for the truck
5  to get here because they were an hour and a half
6  delayed.
7    MR. LEE:  Late objection to form.
8    Q    (By Ms. Sandley)  But you don't know whether,
9  prior to your time at Stewart, there was instances when
10  Stewart didn't provide milk every day for breakfast, do
11  you?
12    A    No, I would not --
13    MR. LEE:  Object to form.  And are you
14  asking if he personally knows or if CoreCivic
15  knows?
16    MS. SANDLEY:  I'm asking if he
17  personally knows.
18    THE WITNESS:  I do not, not without
19  reviewing the records.
20    MS. SANDLEY:  Okay.
21    Q    (By Ms. Sandley)  Does CoreCivic know if
22  there were times when milk was not provided every day
23  at Stewart for breakfast?
24    A    No.  Again, if there was, that could have
25  resulted in a food service incident report because that

Page 296

RUSSELL WASHBURN

1
2  would have been a variance from the menu.
3    Q    Okay, but you don't know what dairy drink is,
4  correct?
5    A    No.
6    Q    Okay.  And you don't know why dairy drink and
7  milk are both listed on this menu, correct?
8    A    I do not.
9    Q    All right.  And I want to look at the second
10  row.  We can zoom out so we can see all the days.
11  There are jalapeño peppers provided two different days
12  for lunch.  Do you see that?
13    A    I do.
14    Q    All right.  Fair to say there are some people
15  at Stewart who don't like jalapeño peppers because
16  they're too spicy?
17    MR. LEE:  Form, foundation.
18    THE WITNESS:  I think that's fair to say
19  of society as a whole, yes.
20    Q    (By Ms. Sandley)  Have you heard complaints
21  about food at Stewart being too spicy?
22    A    No.
23    Q    Is CoreCivic aware that detained --
24    MS. SANDLEY:  We can take this down.
25    Q    (By Ms. Sandley)  Is CoreCivic aware that

Page 297

RUSSELL WASHBURN

1
2  detained people have raised complaints relating to food
3  service at Stewart?
4    A    Yes.
5    Q    And those complaints have related to the
6  sanitation in the kitchen?
7    A    I believe there has been some complaints
8  regarding that, yes.
9    Q    And there have been complaints about the
10  quality of the food at Stewart?
11    A    There has, yes.
12    Q    And there have been complaints about the
13  amount of food, correct?
14    A    There has, yes.
15    MS. SANDLEY:  Let's look at Exhibit 33,
16  CCBVA196386.
17    (Exhibit 33 marked for identification.)
18    Q    (By Ms. Sandley)  All right, and this is
19  another email from John Gimesh, correct?
20    A    Yes, ma'am.
21    Q    And it's to Calvin Blue, who worked at
22  Stewart, correct?
23    A    That's correct.
24    Q    And Harrell Gray, who also worked at Stewart,
25  correct?

Page 298

RUSSELL WASHBURN

2  A   That's correct.
3  Q   And Jason Ellis, who was the managing
4 director, correct?
5  A   Correct.
6  Q   And Mr. Gimesh writes in the first email,
7 "Jason, I spoke" -- oh, sorry, let's scroll down to the
8 bottom of the thread.
9      "Jason, I spoke with Mr. Blue about inmates
10 claiming the portion sizes. My recommendation is that
11 the captain and ADO complete the email monitoring form
12 for each meal." That might be a typo. Could be meal
13 monitoring form, right?
14      MR. LEE: Foundation.
15      THE WITNESS: Where it says "This is our
16    best method," is that what you're asking?
17      MS. SANDLEY: I'm asking about where it
18    says "email monitoring form."
19      THE WITNESS: Oh, yes, I would assume
20    that's what they're referencing.
21      MS. SANDLEY: Okay.
22  Q   (By Ms. Sandley) And, "This is our best
23 method to document that we are serving what is required
24 by menu. It covers ports sizes and taste of meal."
25      So fair to say, based on this email,

Page 299

RUSSELL WASHBURN

2 Mr. Gimesh was aware that detained people were
3 complaining of portion sizes at Stewart, correct?
4      MR. LEE: Foundation.
5      THE WITNESS: Yeah. Based on the email
6    here, yes.
7      MS. SANDLEY: Okay.
8  Q   (By Ms. Sandley) And in the next email,
9 Mr. Blue's reply right above this, he said -- you
10 replied to the warden and FSD Marrero. That's the food
11 service director, correct?
12  A   On this email, I would say yes. I don't know
13 that name or this person, but it looks like -- FSD is a
14 reference to food service director, so I would say yes.
15  Q   Okay. So he says, "Warden Gray/FSD Marrero
16 is working on the menu to see what items that can be
17 looked at instead of potatoes like adding pasta to some
18 of the meals and removing the potatoes."
19      Fair to say there was a concern here about
20 Stewart serving too many potatoes?
21      MR. LEE: Form and foundation.
22      THE WITNESS: I don't know if it was too
23    many or what the issue was. It appears there
24    was a concern with potatoes, but what the
25    specifics to the concern of potatoes, I don't

Page 300

RUSSELL WASHBURN

2    know that this email clearly illustrates
3    that.
4  Q   (By Ms. Sandley) Do you know if the menus at
5 Stewart were ever modified to reduce the amount of
6 potatoes served?
7      MR. LEE: Object to form. Again, him
8    personally?
9      MS. SANDLEY: As the CoreCivic
10    designee.
11      THE WITNESS: I do not know, but, I
12    mean, the records would reflect whether it
13    was or was not.
14      MS. SANDLEY: All right, let's take this
15    exhibit down. Let's look at Exhibit 34,
16    CCBVA207174.
17      (Exhibit 34 marked for identification.)
18  Q   (By Ms. Sandley) All right, this is a memo
19 from Shelton Richardson, who was the warden at Stewart,
20 correct?
21  A   He was at that time, yes.
22  Q   I'm sorry. I misspoke. It's from Calvin
23 Blue to Shelton Richardson, correct?
24  A   That's correct.
25  Q   And I'm looking at the last paragraph on the

Page 301

RUSSELL WASHBURN

2 first page. It says, "A meeting was held with Jack
3 Wilder, Trinity Services, and FSC John Gimesh
4 concerning the food complaints from the detainees.
5 FSC, SDC, and Trinity are in the process of modifying
6 the menu by adding more cultural sensitive
7 products/meals and adding more training to the Trinity
8 staff on food preparation."
9      So fair to say that FSC was involved in
10 conversations about modifying the menu at Stewart to
11 add more culturally sensitive products and meals?
12  A   Based on this document, yes.
13  Q   And FSC was aware of the need to add more
14 training for Trinity staff on food preparation?
15      MR. LEE: Object to form.
16      THE WITNESS: You said FSC was -- can
17    you repeat the question?
18      MS. SANDLEY: Yeah, was aware of the
19    need to add more training for Trinity staff
20    on food preparation.
21      MR. LEE: Object to form.
22      THE WITNESS: There was communication
23    from the assistant warden that some
24    additional training may be necessary. To say
25    that they agree or concur, I don't know.

```
 1                RUSSELL WASHBURN
 2        MS. SANDLEY:  Okay.
 3     Q   (By Ms. Sandley)  Do you know if culturally
 4  sensitive products or meals were added to the menu at
 5  Stewart?
 6        MR. LEE:  Object to form.
 7        THE WITNESS:  I can say they exist
 8     today.  And, again, the menus would show what
 9     those modifications were that would support
10     that.
11     Q   (By Ms. Sandley)  What types of -- which --
12  what meals are -- sorry, let me withdraw that and start
13  over.
14        Which items on the current menu at Stewart
15  are culturally sensitive?
16     A   I would say what you pointed out with the
17  jalapeños, the Hispanic population requested and those
18  items were added.
19        Having a variety of different meals to
20  accommodate the different cultures, such as Spanish
21  rice, typical -- traditional American foods are on
22  there.  So there is a variety of foods that are
23  offered.  I won't say that it serves all cultures, but
24  it's pretty rounded.
25     Q   Okay, so you named jalapeño peppers, Spanish
```

```
 1                RUSSELL WASHBURN
 2  rice, and American food.  Are there any other items on
 3  the current Stewart menu that are culturally sensitive?
 4     A   I'm sure there are.  I'm trying to recall
 5  from memory the actual menu items verbatim off of it.
 6  I'd have to look at the menu.
 7     Q   Okay.  Are there any issues -- withdrawn.
 8        Let me ask this:  There is a grievance
 9  process at Stewart, correct?
10     A   Yes, ma'am, there is.
11     Q   And there's a policy relating to the
12  grievance process, correct?
13     A   Correct, in addition to the PBNDS standards.
14     Q   And the grievance policy at Stewart is
15  created by the FSC, right?
16     A   Yes, ma'am.
17     Q   And all CoreCivic staff at Stewart are
18  required to follow it, correct?
19     A   That's correct.
20     Q   So can detained people file grievances about
21  food service issues?
22     A   Yes.
23     Q   Are there any issues relating to food service
24  that are not grievable?
25     A   Nothing I can think of off the top of my
```

```
 1                RUSSELL WASHBURN
 2  head.  I mean, I guess grieving the dietitian to say
 3  that it's not the appropriate caloric intake may not
 4  be, but I don't even know that we would reject even
 5  that.  I mean, we would provide a response, but
 6  challenging something that a licensed professional has
 7  authorized without -- that may be.  But, again, I think
 8  we would process that even without that, so I can't
 9  think of anything off the top of my head.
10     Q   Let's take a look -- well, let me ask you
11  this:  If CoreCivic received a number of grievances
12  about, for example, the caloric levels at Stewart,
13  would that prompt CoreCivic to do any follow-up with
14  Trinity about the menu?
15     A   Absolutely.
16        MR. LEE:  Object to form.
17        THE WITNESS:  Yeah, absolutely we would.
18     Just -- we would look into it with them and
19     have the discussion and then ensure that
20     it's, you know, reevaluated if necessary.
21        I personally meet with the grievance
22     coordinator, along with my assistant wardens
23     and medical/health service administrator and
24     the chief of security and chief of unit
25     management every Friday to discuss grievances
```

```
 1                RUSSELL WASHBURN
 2  and any trends in grievances and then
 3  ultimately how we're addressing those
 4  particular issues.
 5        So not just isolated to food.  We have a
 6  process in place that we would look into
 7  whether it was a trend of issues or a
 8  significant type issue or something that
 9  warranted a higher level of evaluation.
10     Q   (By Ms. Sandley)  How many grievances about
11  the nutritional adequacy of the food would it take to
12  prompt CoreCivic to address that with Trinity?
13     A   It could be one, depending on the nature of
14  the concern.
15     Q   Okay, but I want to make sure I understood
16  your testimony earlier.  It could also be that a
17  grievance about nutritional adequacy is found to be not
18  grievable, correct?
19     A   Again, if they're challenging something to
20  say that they disagree or they don't believe the
21  dietitian was right, that very well could be.  But,
22  again, I don't know that we would not process --
23  there's nothing that says that if you grieved the
24  dietitian, that it can't be processed.
25     Q   Okay.
```

RUSSELL WASHBURN

1

2      MS. SANDLEY:  Let's take a look at

3   Exhibit 35, CCBVA217504.

4      (Exhibit 35 marked for identification.)

5      Q    (By Ms. Sandley)  Okay, this is a grievance,

6   correct?

7      A    It is, yes.

8      Q    All right, and let's scroll down.

9           Okay, this is from 2018.  I don't expect you

10  to have seen this, but I want to ask you a few

11  questions about it.  So take a minute to read this, if

12  you will.

13     A    Okay.

14     Q    Were there any aspects of the staff -- well,

15  let me start over.

16          If the allegations in this grievance were

17  true, were any of the staff responses inappropriate?

18          MR. LEE:  Object to form.

19          THE WITNESS:  If this allegation is

20      true, then the answer to that is yes, there

21      would be certainly some inappropriateness

22      amongst the staff members.

23     Q    (By Ms. Sandley)  Which of the alleged staff

24  responses would have been inappropriate?

25     A    I think both to a degree.  More importantly,

RUSSELL WASHBURN

1

2   the Trinity staff member who allegedly, I think,

3   flicked it off and continued to try to serve.  So that

4   would be the most egregious.  I do think that the

5   officer had an obligation at that point to immediately

6   report to the supervisor the issue, again, if this is

7   proven to be true.

8      Q    So if roaches are found in food, should the

9   food be thrown away?

10     A    Absolutely.

11     Q    Okay.  And what about the part at the end

12  here where it says, "Officer Parker said I could not

13  work in the kitchen since I told people" -- I don't

14  know if this was supposed to say "about" -- "told

15  people of this situation."  Was that appropriate?

16     A    No, if true, it would not be appropriate.

17     Q    Okay.  And would that have been a violation

18  of CoreCivic policy?

19     A    Yes.

20     Q    Okay.  How should this grievance have been

21  investigated?

22     A    At first, the immediate notification should

23  have went to the shift supervisor, who could have then

24  immediately responded to the location to determine the

25  validity of the complaint.  And then, of course, if

RUSSELL WASHBURN

1

2   proven, the food service incident report should have

3   been generated at that given moment.  Of course, you

4   already talked about the food should have been

5   discarded as potentially contaminated by this insect.

6   That would have obviously had to have been discarded

7   and taken care of and then potentially corrective

8   action, formal corrective action, against the two

9   individuals who responded in that way.

10     Q    Okay.  And if a food service incident report

11  had been generated, which CoreCivic staff member would

12  have been responsible for ensuring that corrective

13  action was taken?

14     A    The assistant warden of programs.  And then,

15  obviously, we have a contract with pest control.  You

16  know, we would have also had our safety manager make

17  contact with those individuals to coordinate the

18  spraying of that area if necessary.

19     Q    Okay.

20          MS. SANDLEY:  Let's take this exhibit

21      down and let's look at the next one.  It's

22      Bates PLS_1625.  This will be Exhibit 36.

23          (Exhibit 36 marked for identification.)

24     Q    (By Ms. Sandley)  All right, so this is

25  another grievance, and let's scroll down so you can see

RUSSELL WASHBURN

1

2   the content.  Portions of this are redacted.

3           All right, so take a minute to read this for

4   me.

5      A    Okay.

6      Q    Okay.  So this grievant was complaining that

7   the meal was too small, correct?

8      A    Yes.

9      Q    And that there was one empty space on a tray

10  with five spaces, correct?

11     A    That's correct.

12     Q    Okay.  And let's scroll down so we can see

13  the staff response.

14          So it says, "Grievance returned to detainee

15  for violation of filing procedures."

16          What are the -- what -- do you have any idea

17  what that means?

18     A    I don't.  I mean, there's things within the

19  standard in the policy -- you know, if the detainee is

20  filing, you know, multiple grievances, you know, a

21  certain number.  To suggest what they were meaning

22  here, I don't know.

23     Q    Okay.  And it says, "Also advised detainee

24  that meals provided by Trinity are approved by

25  DHS-ICE."  Is that true?

Page 310

RUSSELL WASHBURN

2    A    It would be the dietitian and CoreCivic.

3    Q    Okay. How are complaints about food portion
4  size at Stewart investigated?

5    A    Well, I mean, we have -- that's the purpose
6  of us having the meal monitoring for every meal, not
7  just for one meal, but for every meal. It's done by
8  supervisory personnel to ensure that the meal that
9  they're providing -- there is no expectation that every
10  slot on the food tray is filled each time.

11        It's -- whatever the amount of product that's
12  approved on the menu is what's measured, and the amount
13  that's -- and quantity that's required to be delivered,
14  whether it's beans or pasta or rice, that's what's
15  measured. It's not based on the slots on the tray.

16    Q    Okay. Did CoreCivic staff receive training
17  on meal -- on food portion sizes?

18    A    The supervisors, again, through that
19  evaluation piece and then the meal monitoring training
20  that we do with them, they're trained on it, yes.

21    Q    Do they receive training on, like, the
22  different sizes of ladles that are used in the kitchen?

23    A    Yes. And there's actually a legend on the
24  bottom of that same form that will tell them a number.
25  Four spoodle represents a quarter cup or a half a cup.

Page 311

RUSSELL WASHBURN

2  So they can use that legend on the bottom of that meal
3  monitoring form. That will help them. Even if they
4  forget, they can use that legend at the bottom of that
5  form.

6    Q    Okay.

7        MS. SANDLEY: And let's take this
8        exhibit down and let's look at the next one,
9        Exhibit 37, 118271 -- sorry, CCBVA118271.

10        (Exhibit 37 marked for identification.)

11    Q    (By Ms. Sandley) All right, so this is
12  another grievance form, correct?

13    A    Yes, it is.

14    Q    All right. And let's scroll down so we can
15  see it.

16        Okay, so this person writes, "The food
17  service is really bad. The food menu doesn't has [sic]
18  the minimum nutritious fats and calories that a human
19  being needs to be healthy. Please check the menu and
20  make an inspection to kitchen contractor Trinity
21  Services Group that doesn't perform the food menu which
22  are published in the schedule." Do you see that?

23    A    I do.

24    Q    And let's scroll down to the response.

25        So the response is, "Nutritional adequacy of

Page 312

RUSSELL WASHBURN

2  menus, to include therapeutic/special diets and
3  religious diets, are reviewed and signed at least
4  annually by a qualified nutritionist or dietitian to
5  ensure menus meet nationally recommended allowances for
6  basic nutrition for appropriate age groups. This is
7  not a grievable matter. Grievance will be returned."

8        Is that response consistent with CoreCivic
9  policy?

10    A    It would be.

11    Q    So neither the food quality allegations in
12  this grievance nor the nutritional adequacy allegations
13  are grievable matters?

14    A    Well, if you can scroll back up, I -- I would
15  have missed the quality. I know that they were saying
16  the diets were not therapeutically appropriate.

17    Q    I'm referring to "The food service is really
18  bad."

19    A    That doesn't -- "food service is really bad."
20  That's not saying specifically what is it that they're
21  referring to. The bulk and the way I interpret this
22  grievance is that it's primarily driven that this
23  person does not agree that the menu meets the minimum
24  nutritious facts and calories.

25    Q    Okay. Is the quality of the food at Stewart

Page 313

RUSSELL WASHBURN

2  a grievable matter?

3    A    Yes, if it's concerning the quality of it,
4  undercooked, the taste, those types of things.

5    Q    Okay.

6        MS. SANDLEY: Let's take this exhibit
7        down.

8    Q    (By Ms. Sandley) So if someone who is
9  detained at Stewart is hungry, how can they get food?

10        MR. LEE: Object to form.

11        THE WITNESS: Obviously, we provide
12        three meals a day. We do offer commissary
13        that they can buy snacks and various items
14        from. If they have money in their account,
15        then they can purchase food from there. If
16        not, it's provided through the chow.

17    Q    (By Ms. Sandley) So if someone gets hungry
18  in between meal times, they can eat food purchased at
19  the commissary?

20    A    Yes, if they have the funds and they purchase
21  those items, yes, ma'am.

22    Q    And people who don't have funds being
23  deposited in their account from the outside by family
24  and friends would have to work in order to have funds
25  on their account, correct?

RUSSELL WASHBURN

1
2    MR. LEE:  Object to form.
3    THE WITNESS:  Yeah, I mean, that would
4    really be -- if they didn't have someone
5    providing them with money, then there would
6    be an outlet for them to work and secure
7    funding, yes.
8    Q   (By Ms. Sandley)  Fair to say that the food
9    items are consistently some of the top sellers in the
10   Stewart commissary?
11   A   Yes.  That's the bulk of the items, so yes, I
12   think that's fair.
13   Q   Okay.  And who determines what items are sold
14   in the Stewart commissary?
15   A   We're provided with a list of approved items
16   that we can select from.  And I'll tell you we
17   periodically poll the population to determine whether
18   or not the -- and we also look at sales.  I mean, if we
19   have a product that just doesn't sell, there's no sense
20   in continuing that.  So we would solicit feedback from
21   the population as to things that they would like to see
22   on commissary.  And as long as there's not a security
23   or safety threat by providing those items, then we
24   would approve them.
25   Q   Okay.  So who provides the list of approved

RUSSELL WASHBURN

1
2    items?
3    A   It comes from our Facility Support Center.
4    Ms. Lazier [phonetic] would provide that.
5    Q   Okay.  And who sets the prices of commissary
6    items at Stewart?
7    A   They're established out of FSC and with
8    our -- Keefe, our vendor.  And primarily it's usually
9    used as a 30 percent markup, and it's pretty consistent
10   to what you would see at, like, a convenience store as
11   to how that pricing is established.
12   Q   Okay.  And I believe you testified earlier a
13   little bit about the commissary profits, and I want to
14   make sure I understand that.
15       So the money that is made off commissary
16   sales goes into a separate account, correct?
17   A   That's correct.
18   Q   And the money in that separate commissary
19   account is used to pay for CoreCivic employees who
20   staff the commissary, correct?
21   A   Correct.
22   Q   If CoreCivic didn't make any profit on the
23   commissary, would CoreCivic still pay those employees?
24   A   Absolutely.
25   Q   And then other money in that account is used

RUSSELL WASHBURN

1
2    to buy recreation equipment, correct?
3    A   Correct.  Things that have a sole benefit for
4    the detainee population.
5    Q   Okay.  If CoreCivic didn't make any profit
6    off the commissary, would it still buy balls for the
7    basketball court?
8    A   Yes.
9    Q   Why?
10   A   Because, again, it's making sure that
11   detainees have an outlet to reduce idleness, to
12   encourage them to get out of their housing unit for
13   fresh air.  I mean, it's just a quality-of-life factor
14   that we would want to make sure is sustained.
15   Q   Is reducing idleness also important for
16   maintaining the safety and security at the facility?
17   A   It is.
18   Q   And CoreCivic is required to provide
19   recreation under the PBNDS, correct?
20   A   That's correct.
21   Q   Okay.  What other purchases are made with the
22   commissary account funds?
23   A   TVs, for leisure TVs, the game stations that
24   are solely for the detainee population that stay in the
25   housing units, the ice coolers that stay within the

RUSSELL WASHBURN

1
2    units for the detainees to utilize to have fresh ice.
3    I'm sure there's some other products.  Those are the
4    ones I can just think of off the top of my head.
5    Q   And I believe you testified earlier you
6    didn't know how much money is currently in the
7    commissary account?
8    A   I do not, not without getting with my
9    business manager.
10   Q   Okay.  Do you have any idea if, on a
11   quarterly basis, CoreCivic is spending the majority of
12   the profits made from commissary?
13   A   Not without looking at the records, no, I
14   don't.  Can't say that one way or the other.
15   Q   Okay.  Does anyone ever look on a regular
16   basis to see how much money is sitting in that account?
17   A   The business manager monitors and manages
18   that.  We also have an annual audit from an outside
19   independent source that audits that as well.
20   Q   Has there ever been a time when the auditor
21   or anyone else told Stewart to spend some of the money
22   in that account?
23   A   Not that I'm --
24       MR. LEE:  Object to form.
25       THE WITNESS:  Not that I'm aware of.

Page 318

```
                RUSSELL WASHBURN
1
2        MS. SANDLEY:  All right.
3     Q    (By Ms. Sandley)  Do you know if that account
4  earns interest?
5     A    I believe it does, but I'm not certain.
6     Q    Is it a bank account?
7     A    I believe it is.
8     Q    Do you know which bank?
9     A    I don't.
10    Q    Is it an account that's managed by the FSC?
11    A    I believe so, yes.
12    Q    Okay.  All right.  CoreCivic has a document
13 retention policy, correct?
14    A    We do, yes.
15    Q    And it applies to all CoreCivic staff at
16 Stewart?
17    A    It does.
18    Q    And it's created by the FSC?
19    A    It is, yes.
20    Q    Okay.  Did you review that policy in
21 preparing for this deposition today?
22    A    Yes.  And you're referencing Policy 1-15,
23 correct?
24    Q    Yes.
25    A    Yes.
```

Page 319

```
                RUSSELL WASHBURN
1
2     Q    What is the time frame for maintaining
3  detention files at Stewart?
4     A    You're testing my memory.  I believe it's
5  three years.  There's a scale in that policy, but I
6  believe it's three years.
7     Q    That's all right.  I don't want you to guess.
8  Let's look at the policy.
9     A    All right.
10        (Exhibit 38 marked for identification.)
11    Q    (By Ms. Sandley)  Exhibit 38, and it's
12 CCBVA105921.
13        All right, and is this the record retention
14 schedule for Stewart?
15    A    Yes, it is.
16    Q    Okay.  And this is Policy 1-15B, correct?
17    A    It references this attachment, so -- but 1-15
18 is the policy, yes.
19    Q    Okay.  Let's scroll down slowly to where we
20 get to "Inmate/Resident Files."  I apologize, I didn't
21 write down what page that's on.  Actually, I did.  It's
22 page 2.  There we go.
23    A    Yes.
24    Q    So the retention period for inmate/resident
25 files is three years, correct?
```

Page 320

```
                RUSSELL WASHBURN
1
2     A    Correct.
3     Q    And that's from the time of release or
4  transfer, correct?
5     A    That's correct.
6     Q    And inmate/resident files are also known as
7  detention files, right?
8     A    That's correct.
9     Q    And PBNDS requires CoreCivic to keep
10 detention files, correct?
11    A    That's correct.
12    Q    Let's look -- let's take this down and look
13 at the next exhibit, DHS/ICE records schedules.
14        (Exhibit 39 marked for identification.)
15        MS. SANDLEY:  Okay.
16    Q    (By Ms. Sandley)  Have you ever seen this
17 document before?
18    A    I don't believe I have.
19    Q    Let's scroll down to the next page.  Have you
20 seen this before?
21    A    I don't believe so.
22    Q    Okay.  We want to look at the -- under
23 "Detention Case Files," where it says, "The required
24 content of the file includes the detainee
25 summary/transfer forms," and then it lists some other
```

Page 321

```
                RUSSELL WASHBURN
1
2  documents.  Do you see that?
3     A    I do.
4     Q    Would you agree that the information listed
5  here is information that's included in detention files
6  kept at Stewart?
7     A    Yes.
8     Q    Okay.  And do you see next to "Disposition"
9  where this says "Destroy six years after the file
10 cutoff"?
11    A    I do.
12    Q    Okay, but CoreCivic's policy for retaining
13 detention files is only three years, correct?
14    A    Correct.  And that policy would have been
15 approved from ICE.
16        MR. LEE:  And I'm going to object to
17    form.  I don't know that this has ever been
18    disclosed in this case.  I don't see any
19    Bates numbers on it.  So I'm just objecting
20    on that basis.
21        MS. SANDLEY:  Okay.  Well, I don't think
22    that's a form objection, Jacob, but
23    understood and it will produced.
24        All right, we can take this down.
25    Q    (By Ms. Sandley)  Do you know, Warden
```

Page 322

RUSSELL WASHBURN

1
2  Washburn, if CoreCivic's retention policy was approved
3  by ICE?
4      A    Yes.  I mean, all of our policies are
5  presented to ICE, so I would say that, yes, it should
6  have been approved and I would say yes it has.
7      Q    Do you know if the Stewart retention policy
8  has been approved by ICE since you've been at Stewart?
9      A    No, I'm sure -- I'm saying it was not because
10  I don't know there's been a change to it that would
11  require a resubmission to them for review and approval.
12      Q    Okay.  And there's a process at Stewart for
13  routine document destruction, correct?
14      A    There is, yes.
15      Q    Can you explain that process to me?
16      A    Typically it's in November when we have those
17  files that meet the policy destruction dates that's
18  outlined in Policy 1-15 on that B form that we were
19  just looking at.  They would then -- we would
20  coordinate with a shredding vendor who would come out
21  on the prescribed day, and said files would then be
22  placed into that shred -- I think it's a shred truck,
23  for lack of better words, and those items would be
24  discarded in that fashion.
25          Then the records coordinator would then

Page 323

RUSSELL WASHBURN

1
2  complete the 1-15 form that needs to be completed for
3  the annual records cleanout, and then I would sign off
4  that that was completed.
5      Q    Okay.  Does the form for the annual records
6  cleanout include all of the records that are to be
7  destroyed?
8      A    It does not.
9      Q    What kind of information does it include?
10      A    It just really certifies that the record
11  cleanout occurred annually as prescribed.
12      Q    Okay.  And then I think you referenced the
13  shred truck.  Where does that go?
14      A    I couldn't answer that question here today.
15      Q    Okay.  Does it go to the FSC?
16      A    No, no, no.  These items are actually
17  physically shredded here.  So it's the vendor that
18  would remove those items and discard it however it is
19  that they discard their products.
20      Q    Okay.  Understood.
21          Is there a point in that process where you,
22  as the warden, are informed of which documents are
23  being destroyed?
24      A    No.  Not on specific documents, no.  Just
25  that any of the ones that are outside of the -- are

Page 324

RUSSELL WASHBURN

1
2  within the parameters of the policy.
3      Q    Okay.  And that annual document destruction,
4  does it typically happen in November?
5      A    It does typically, yes.
6      Q    Does the FSC have any role in documentation
7  destruction?
8      A    Not the -- other than the policy and
9  establishment of the policy, no.
10      Q    Okay.  And were Stewart staff informed that
11  documents related to this lawsuit should not be
12  destroyed?
13      A    Some of the staff, yes.
14      Q    Which staff were informed?
15      A    The administration, the warden, assistant
16  wardens, chiefs for sure.  Outside of that, I don't
17  know who else the distribution would have went to, the
18  publication.
19      Q    And were you informed that documents
20  shouldn't be destroyed?
21      A    Yes.
22      Q    Were you informed once?
23      A    To say how many times, I don't know, but at
24  least once, yes.
25      Q    Was it more than once?

Page 325

RUSSELL WASHBURN

1
2      A    It could have been, yes.
3      Q    Do you know when?
4      A    Sometime after April of 2020.  I don't know
5  when specifically I became aware of the retention or
6  the preservation requirement.
7      Q    Okay.  Do you know if any procedures have
8  been put in place at Stewart to ensure documents
9  related to this lawsuit aren't destroyed?
10      A    Yes.  There is now.  There was a break in
11  communications that resulted in some of those files
12  inadvertently being destroyed that were under that
13  preservation.  You know, we own that.  But since then,
14  we have established, one, making sure that all of the
15  individuals that need to be notified have been
16  notified.  We've also put postings in those locations
17  that -- "Do Not Destroy" and have isolated them to
18  specific containers that we're storing those records
19  and -- clearly posted "Do Not Destroy" signs out there,
20  but more importantly, communicated to everybody that
21  needs to have had the communication.
22      Q    Who's everybody who needs to have had the
23  communication?
24      A    Anyone that would be dealing with any of the
25  level of the record destruction, and that's -- the

Page 326

```
                    RUSSELL WASHBURN
1
2    classification coordinator is the designated records
3    coordinator by the policy, as well as the business
4    manager, who would then also be coordinating the shred
5    truck to come to the facility.
6       Q    Okay.
7       A    And we have since -- and I will say we
8    postponed the shred truck, so it did not occur in
9    November, to allow additional time to make sure that
10   the records that are being shred do not fall under the
11   preservation of this case or any other case and that
12   only ones that are legitimately within the policy
13   parameters.
14      Q    Who's the shredding vendor?
15      A    I don't know.
16      Q    What types of documents does CoreCivic
17   consider to be related to this lawsuit for preservation
18   purposes?
19      A    Obviously detention files, disciplinaries,
20   grievances, anything relative to job -- the voluntary
21   work program, whether it's the sheet -- the forms that
22   they have to fill out to get the job. Really any form
23   that could be tied to the voluntary work program would
24   be considered that, so any requests, any emails, any
25   documents of such.
```

Page 327

```
                    RUSSELL WASHBURN
1
2       Q    Who's currently the classification
3    supervisor?
4       A    Ms. Crocker.
5       Q    What's her first name?
6       A    You're going to test me.  Tatiana, I believe.
7    I know it's T.  I think it's Tatiana.
8       Q    And how long has she been in that position?
9       A    Since Ms. Drew left.  I'd say less than a
10   year, somewhere in that -- maybe right at a year.
11      Q    Has she been told not to destroy documents
12   related to this lawsuit?
13      A    She absolutely has.
14      Q    When was she first told?
15      A    I don't -- I can't recall the date, but I can
16   tell you she's the one that posted all of the postings
17   in all of those locations.  So, yes, her and her entire
18   team know those records and which ones should not be
19   destroyed at this point.
20      Q    Okay.  And Ms. Drew was a classification
21   supervisor before that, before Ms. Crocker, correct?
22      A    Yeah.  The actual title is classification
23   coordinator.  That's what's on the staffing pattern,
24   but yes.
25      Q    Okay.  And she had been in the classification
```

Page 328

```
                    RUSSELL WASHBURN
1
2    coordinator role for a numbers of years, correct?
3       A    Yes, ma'am, before my time.  It could have
4    been the whole time.  I don't know.
5       Q    Was she classification coordinator before
6    this lawsuit was filed?
7       A    I believe so, yes.
8       Q    Okay.  And was she told not to destroy
9    documents related to this lawsuit?
10      A    I know I personally did not tell her.  Now,
11   whether or not the two previous wardens that would have
12   been here during that period of time told her, I can't
13   say, you know, one way or the other on that.
14      Q    Okay.  The classification coordinator is
15   responsible for approving people for participation in
16   the work program, correct?
17      A    She's a part of -- that position is part of
18   the process, but not the final approver, no.
19      Q    Is there a jobs committee at Stewart?
20      A    Yes.  I mean, it would be comprised of the
21   unit team members, the location area supervisor, the
22   classification team, and then, of course, the chief of
23   unit management would be a part of that, and then
24   ultimately myself and the assistant warden also have to
25   review and sign off on the job placement.
```

Page 329

```
                    RUSSELL WASHBURN
1
2       Q    Okay.  So the classification coordinator's on
3    the job committee, correct?
4       A    That's correct.
5       Q    All right.  Fair to say the classification
6    coordinator has multiple responsibilities relating to
7    the work program at Stewart?
8       A    Yes.
9            MS. SANDLEY:  All right, I think we're
10      going to go into tomorrow, and I'm at a
11      stopping point.  We've got 10 minutes left.
12      We can use them or we can pick back up
13      tomorrow.  I'll leave it to you, Warden, and
14      Mr. Lee to let me know what you prefer.
15           THE WITNESS:  I'm fine either way.  I'll
16      defer to Mr. Lee as to what he wants to do,
17      but I'm fine either way.
18           MR. LEE:  If there are topics you've got
19      that you want to cover in the next 10
20      minutes, might as well.  We're here.  You
21      tell me.
22           MS. SANDLEY:  That's fine.  Let's keep
23      going.
24      Q    (By Ms. Sandley)  Warden Washburn, my
25   understanding, based on other testimony in this case,
```

RUSSELL WASHBURN

1 and correct me if I'm wrong, is that CoreCivic doesn't
2 offer any educational program at Stewart?
3 A   We do not currently, no.
4 Q   Okay.  Do you know if CoreCivic has ever
5 offered educational programming at Stewart?
6 A   I can't say yes or no one way or the other
7 for the entire duration.  I don't believe so, but
8 that's a guess.
9 Q   Okay.  When detained people are not at
10 recreation or medical or visitation or court, what can
11 they do with their time?
12 MR. LEE:  Object to form.
13 THE WITNESS:  There's other leisure
14 opportunities also that exist within their
15 assigned housing areas.  Like I talked about
16 earlier, we have televisions and we actually
17 have four TVs.  We have ones that are
18 dedicated to Spanish and some of the other
19 languages.  We have the PlayStations that
20 they can use to play games.  Those are all
21 out in the day room.  We have traditional
22 board games and cards that they can utilize
23 in that area.
24 The day rooms are relatively large.  I

RUSSELL WASHBURN

1 mean, you can walk in the day rooms as well
2 for exercise if you so choose to do that.
3 Really kind of what exists within the housing
4 units outside the traditional recreation
5 services.
6 Q   (By Ms. Sandley)  Are detained people
7 provided radios at Stewart?
8 A   Yes.
9 Q   Are those provided for free?
10 A   Yes.
11 Q   Are detained people provided headphones?
12 A   Yes.
13 Q   Are those free?
14 A   Yes.
15 Q   Are they provided batteries for the radios?
16 A   Yes.
17 Q   Are those free?
18 A   Yes.
19 Q   Are headphones and batteries also sold in the
20 commissary?
21 A   I believe so.  I think maybe a little bit
22 better quality ones, you know, that are provided; but,
23 yes, I do believe that they are on there.
24 Q   Okay.  And are the -- do you have to use a

RUSSELL WASHBURN

1 headset to listen to the televisions in the housing
2 units at Stewart?
3 A   You do, yes.
4 Q   Okay.  So people have to have the radio and
5 the headphones in order to hear the audio on the
6 televisions in their units, correct?
7 A   And that's why we issue it to them, yes.
8 Q   Okay.  Are there games in the housing units?
9 A   Yes.
10 Q   Are there books in the housing units?
11 A   Yes.
12 Q   Are games and books purchased with commissary
13 proceeds?
14 A   Games, yes.  Again, to say books are, I don't
15 recall signing any purchase requests since I've been
16 here to buy additional books, so -- but I would say
17 that they probably are, yes.
18 Q   So books aren't purchased frequently, fair to
19 say?
20 A   We also accept donations too, so we'll get
21 donations from, you know, churches, civic groups, those
22 types of things as well too.  So not to say we
23 haven't -- I take that back.  We have bought some
24 books.  We started a program where they can check out

RUSSELL WASHBURN

1 children's books and record so they can send it to
2 their kids at home.  So we have bought some of those
3 kinds of books since I've been here, and we may have
4 bought others.  I just don't recall signing a purchase
5 order for books.
6 Q   Okay.
7 MS. SANDLEY:  Let's look at Exhibit 40,
8 CCBVA4652.
9 (Exhibit 40 marked for identification.)
10 MS. SANDLEY:  Okay.
11 Q   (By Ms. Sandley)  What is this document?
12 A   It's the 24-hour building schedule.
13 Q   Okay.  And this one is dated March 6, 2019.
14 Do you know if this is the one that's currently
15 approved?
16 A   No, it is not.  I believe we have a more
17 current one.
18 Q   Okay.  Well, I want to just walk through this
19 one and ask you a few questions about some of the terms
20 that are used.  We're going to jump around a little
21 bit, but let's start with the entries about food.
22 So let's look at the 3 a.m. entry.  It says,
23 "Commence first-shift workers to food service."  What
24 does that mean?

RUSSELL WASHBURN

1
2      A    It means that's the time that they would
3  start the -- be woken up to report for work.
4      Q    Okay.  And let me back up.  This routine,
5  would you consider this to be policy at Stewart?
6      A    It's a guide.  I wouldn't necessarily say
7  it's a policy.  There's a lot of moving parts inside of
8  a detention facility and a prison.  So our best efforts
9  are to follow this as much as possible, but
10  understanding that we're going to get out of schedule
11  pretty routinely, but the efforts are to try to stay as
12  close to that schedule as we can.  So I wouldn't
13  necessarily call it -- reference it as a policy, more
14  as a schedule.
15      Q    Okay.  Are CoreCivic staff at Stewart
16  expected to make their best efforts to comply with this
17  schedule?
18      A    Yes.
19      Q    Okay.  All right, so going back to that
20  3 a.m. time, so that's when the first shift of
21  work-program kitchen workers are supposed to report to
22  work; is that right?
23      A    That's correct.
24      Q    And then it says breakfast service for
25  general population starts at 4 a.m.  So I just want to

RUSSELL WASHBURN

1
2  make sure I'm understanding.  The kitchen workers
3  report at 3 a.m. and then meal service starts at
4  4 a.m.; is that correct?
5      A    That's correct.
6      Q    Okay.  And according to this schedule, people
7  in general population eat breakfast from 4 a.m. to
8  5:45 a.m.?
9      A    Again, give or take some fluctuation to that,
10  yes.
11      Q    Okay, but where it says at 5:45, "Secure
12  morning meal general population," does that mean the
13  meal is over?
14      A    Again, if everything goes according to plan,
15  then yes, that would be.  Somewhere in that vicinity
16  that the meal would be over.
17      Q    Okay.  Do you see anywhere on this schedule
18  that indicates when the first-shift kitchen workers are
19  supposed to return to their units?
20      A    Not that's outlined on the schedule, no,
21  other than where -- well, no, that's shift change for
22  the facility.  So that's 0600.  No, I do not.
23      Q    Okay.  We can scroll down just a little bit
24  more.
25          Do you see anything here about first-shift

RUSSELL WASHBURN

1
2  workers returning to their units?
3      A    No.  But I'll say this, is that's the reason
4  we have the actual work schedule.  Because, again, that
5  could change a little more frequently than what this
6  would change, based on numbers, classifications,
7  genders.  That could change a little more frequently
8  than what we would want to see the building schedule
9  change.  So that would be captured, actually, on that
10  work schedule.
11      Q    Okay.  And then looking at the 8:45 a.m.
12  entry, "Second-shift kitchen workers," is that when
13  generally second-shift kitchen workers are supposed to
14  report to work?
15      A    I believe so, at least with this schedule.
16  I'm not sure that's the same time today.
17      Q    Okay.  And then 10:15 a.m., "Commence noon
18  meal for general population," so that's when lunch
19  service starts, correct?
20      A    Yes, ma'am.
21      Q    And then lunch ends, according to this
22  document, at noon?
23      A    Somewhere in that area, yes.  Typically, it's
24  beyond noon, but yes.
25      Q    Okay, but that 12 p.m. entry that says

RUSSELL WASHBURN

1
2  "Secure noon meal general population" indicates that's
3  when the lunch meal is supposed to end, correct?
4      A    Correct.
5      Q    And then let's look at that 12:15 p.m. entry
6  that says, "Secure kitchen trash disposal upon
7  completion."  Who takes the kitchen trash out?
8      A    When we have detainees who meet
9  classification, it could be detainees; but, quite
10  frankly, it's more frequently staff.
11      Q    Okay.  And are the detained people who take
12  the trash out kitchen workers?
13      A    Yes, or hallway workers.  Again, it's
14  classification-driven and those who are approved to go
15  out onto the back dock to dispose of trash, but it
16  could be either the kitchen workers that are approved
17  or the hallway workers.
18          MS. SANDLEY:  All right, we've hit
19  6 o'clock your time, so why don't we stop for the
20  day.
21          THE WITNESS:  I'm not mad at you.  I
22  just want to get up.
23          MS. SANDLEY:  I understand.
24          Jacob, anything we need to talk about
25  before we break for the day?

Page 338

```
 1          RUSSELL WASHBURN
 2  MR. LEE:  I don't think so.
 3  (Deposition concluded at 6:00 p.m.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 339

```
 1
 2              C E R T I F I C A T E
 3
 4  STATE OF GEORGIA
 5  COUNTY OF COBB
 6
 7          I, MICHELLE M. BOUDREAUX-PHILLIPS, do hereby
 8  certify that RUSSELL WASHBURN, the witness whose
 9  deposition is hereinbefore set forth, was duly sworn by
10  me and that such deposition is a true record of the
11  testimony given by such witness.
12
13          I further certify that I am not related to
14  any of the parties to this action by blood or marriage
15  and that I am in no way interested in the outcome of
16  this matter.
17
18          IN WITNESS WHEREOF, I have hereunto set my
19  hand this 13th day of December 2021.
20
21  _____
22          MICHELLE M. BOUDREAUX-PHILLIPS, RPR
23
24
25
```

Page 340

```
 1
 2          ERRATA SHEET FOR THE TRANSCRIPT OF:
 3  Case Name:  Wilhen Hill Barrientos vs. CoreCivic
 4  Deposition Date:  December 1, 2021
 5  Deponent:  Russell Washburn
 6  Pg.  Ln.  Now Reads      Should Read     Reason
 7  ____ ____ _____   _____    _____
 8  ____ ____ _____   _____    _____
 9  ____ ____ _____   _____    _____
10  ____ ____ _____   _____    _____
11  ____ ____ _____   _____    _____
12  ____ ____ _____   _____    _____
13  ____ ____ _____   _____    _____
14  ____ ____ _____   _____    _____
15  ____ ____ _____   _____    _____
16  ____ ____ _____   _____    _____
17  ____ ____ _____   _____    _____
18  ____ ____ _____   _____    _____
19
20          _____
                Signature of Deponent
21
22
    SUBSCRIBED AND SWORN BEFORE ME
23  THIS _____ DAY OF _____ 20___.
24  _____
    (SIGNATURE OF NOTARY PUBLIC)
25  MY COMMISSION EXPIRES:_____
```

## $

**$1** 22:19 65:19 70:22 175:21 176:2 206:12, 14,16,20,21 207:3 213:3,4 216:5

**$10** 253:7

**$106,944** 78:18

**$12,999,840** 83:17

**$2** 23:11

**$22.26** 83:8

**$3** 23:2,8 216:5

**$35,616** 83:13

**$35,904,320** 72:14

**$36** 72:16

**$39** 74:21 78:24

**$39,034,560** 83:23

**$4** 22:19 23:9,11 176:2 216:6 222:18

**$40** 73:7 74:14,17,20 79:24

**$61** 74:8

**$61.48** 72:2,6

**$61.70** 71:5

**$62.48** 65:19

**$66.84** 78:12

**$98,368** 72:7

## (

**(b)** 239:24

## 0

**0.5** 125:24 126:12

**0005** 69:8

**0006** 65:3

**0024518** 121:2

**0600** 335:22

**08-A-09** 195:3

## 1

**1** 31:6,7 34:14 65:3,4 78:4 113:24,25 114:24 130:14 149:19 157:15 171:15 197:10 198:8 233:9,15

**1,752** 57:6 59:10

**1-15** 318:22 319:17 322:18 323:2

**1-15B** 319:16

**1.0** 130:11

**1.70** 131:19

**10** 26:11 105:8 112:18 132:15,17,18 198:16,21 218:5 233:10 236:11,12,13, 16 274:4 329:11,19

**10-minute** 274:21

**10/19** 234:20

**10/19/2021** 234:23

**100** 119:25 147:11,22 188:25

**106,944** 79:8 83:13

**107** 140:23

**10:15** 336:17

**10:30** 259:2

**10th** 201:19

**11** 135:17,18 148:18 285:16 287:7 290:20

**11-1** 285:17

**11-1(I)** 285:16

**1100** 50:7 65:25 66:16

**118271** 311:9

**12** 72:15 138:22 148:20 336:25

**12202** 279:2

**12:15** 337:5

**12th** 201:18

**13** 151:14 157:2,3 233:17

**1371** 196:2

**1374** 196:24

**1376** 197:7 199:2

**14** 161:12,13 229:5

**140** 225:14,18,21,23 226:8 227:22

**145** 171:7

**146** 171:10

**15** 75:13 85:23 161:19 162:23,24 192:16 193:11

**15-100** 257:21

**15-minute** 283:17

**157** 191:15

**158** 194:25

**16** 169:5,6

**1600** 59:4,9 63:9,11 64:7 65:4,14,15,20 66:3,21 67:15,16 68:11,13,18 69:2 70:16 72:2,6 74:25 78:6,12,18,21 79:13, 15 80:5,13,14,17 81:8,15,18,23 83:12 108:22 118:11 119:3, 5,6 127:21 128:4,7 134:13,15,19 135:4 136:7,12,15,21,23 137:10 139:5,9,16 144:4,7 145:2,5

**1600-bed** 59:7 119:10

**1601** 73:3 74:7 79:16

**16th** 202:4

**17** 184:23,25

**17-0001** 121:17

**170** 51:11

**171** 195:24 198:21

**1750** 73:3,12 74:7 79:17,24

**1751** 73:6 74:17

**1752** 57:21 58:14,20 118:13 119:4,7,11 134:18,19 136:8,12 143:22,23 144:7,9,19 145:4 231:11

**18** 98:18 125:20 190:23,24 223:17

**18-100** 20:3 23:6 217:22 218:3 224:3

**18-100CC** 218:24 223:22,25 225:14 245:15,21

**18-2CC** 197:20

**18.1** 23:6

**19** 203:5,6

**19-100** 19:9,20 20:6 98:19 215:6

**1900** 67:11

**1956** 73:6

**1966** 50:9 63:20 69:17

**1996** 53:2

**1s** 226:19

**1st** 13:18

## 2

**2** 23:3 55:21 72:25 74:7 77:24 79:17 80:23 117:3 121:6 124:21 127:24 163:10 169:12 197:10 227:6,8,10 287:21 319:22

**2,000** 62:5

**2-** 50:19 65:20 66:2 67:14 231:8

**20** 215:2,4

**20-minute** 243:16

**200** 67:10 78:14 231:10

**2006** 123:19 208:11

**2007** 40:5

**2008** 40:5 50:9,22

**119:17** 239:22

**2011** 149:20 203:13 255:6

**2013** 191:6 193:19

**2014** 239:20,21

**2015** 85:6,23 279:17

**2016** 64:14,20 69:3 70:22 72:18,21 79:18 113:14,15,22,23 114:18 116:9 128:5 135:4

**2017** 123:7 124:24 125:5,12,17 128:2 267:24

**2018** 13:11 82:7,16 129:12,13 169:15 185:16 306:9

**2019** 50:22 63:23 64:3 133:2 161:15 164:4 169:10,17 170:5,8 260:2 333:14

**2020** 13:17 14:2,15 15:12 16:15 54:2 55:19,23 72:13,18,19 75:10,24 80:24 95:9, 11,12,15 102:24,25 152:2 228:18 233:10 235:24 325:4

**2021** 15:14 95:10,16 96:18 102:25 136:14, 22 140:23 202:5 219:19

**21** 55:25 56:2 215:21, 22

**21st** 202:5

**22** 217:19,20

**22.26** 81:5,15,18,21, 23 83:9,12

**23** 218:22

**236** 129:20

**23rd** 123:19

**24** 41:14 91:22 131:23 219:19 233:7, 8

**24-hour** 333:13

**24-hour-7-day-a-week** 131:14

**24/7** 132:3 270:25

**24th** 133:2

**25** 234:16,21

**250-ish** 231:10

**25th** 75:24

**26** 131:22 174:23 237:18,19

**26th** 55:15

**27** 147:4,23 259:14, 16

**271** 125:13 129:22

**28** 74:16,22 75:4 80:10,11 84:6 267:14,16

**28th** 201:25

**29** 278:24,25

**29th** 113:14

**2s** 226:18

**3**

**3** 23:3 64:17,19 71:25 77:23 157:25 197:10 242:3 287:21 333:23 334:20 335:3

**3-** 68:14

**30** 62:11 226:15 264:17 267:24 286:5, 7 315:9

**30(b)(6)** 18:16 26:6 30:22 31:9 148:7

**30,000** 69:9,13

**300** 50:19 65:20 66:2 67:14 78:14 231:8, 10,15

**31** 161:15 267:24 290:5

**32** 62:11 115:20 262:17 292:5,6

**33** 297:15,17

**338** 140:2

**34** 300:15,17

**342.5** 139:8 140:3,4

**35** 306:3,4

**350** 62:19,20,24 66:21

**36** 308:22,23

**360** 62:19,20,24 66:21

**365** 72:12

**37** 235:3 311:9,10

**38** 319:10,11

**385** 203:16

**39** 169:18 320:14

**4**

**4** 23:3 75:19,21 80:24 113:24 114:24 170:17 242:22 334:25 335:4,7

**40** 41:17 126:11 172:23 174:19 250:20 333:8,10

**400** 68:14

**430** 63:4,7,12 66:20

**435** 63:4,7

**45** 139:23 140:2

**47** 185:17

**4th** 64:20

**5**

**5** 85:4,6 115:11 125:2 126:10 128:9 130:16 133:8

**5(H)** 204:2

**5(I)** 205:18

**5.8** 17:14 19:12 164:11 171:12 177:21 186:13 202:24 211:21

**50** 228:9

**51C** 210:21,22

**52,034,400** 83:24

**56** 149:2

**5:45** 335:8,11

**5C-07** 185:19

**5th** 279:16

**6**

**6** 34:23 35:5,9 113:16 129:12 130:6 235:19, 22 236:3,11,12,13 333:14 337:19

**60** 228:9

**60-something** 43:15

**61.85** 73:3 74:8

**62.48** 70:18

**66** 43:22

**66.84** 78:9,18

**66.85** 43:22

**67.84** 43:17 78:3,6 81:8,13,17,21

**6:00** 338:3

**7**

**7** 35:4,7 120:25 121:3 124:17 129:15 148:6 172:20 201:18 202:6 208:11 234:18 238:17 269:7,8,13

**70** 66:22 228:9

**8**

**8** 123:13,14 172:23 175:18 286:19

**8/31/2020** 292:20

**80** 131:18

**85** 70:25

**8:45** 336:11

**9**

**9** 129:5 132:13 198:16,21

**9/25/2019** 293:6

**92** 51:15 52:5,7

**9th** 169:10

**A**

**a.m.** 236:12 333:23 334:20,25 335:3,4,7, 8 336:11,17

**abilities** 228:24

**ability** 24:17 222:12, 13 246:8,9,14 264:22

**absence** 204:12,22

**absences** 204:4,8,18

**absentee** 193:11

**absolute** 190:17

**absolutely** 108:19 159:7 304:15,17 307:10 315:24 327:13

**ACA** 101:11 180:19 181:18,24 182:8,18 183:9,10,23 184:13, 14,21 185:3,8,11,21 186:10 189:3,4 227:13,15 248:21

**ACA's** 180:22

**ACA-ACCREDITED** 183:19

**ACA-TRAINED** 183:15

**academy** 54:23

**accept** 184:3,4 237:5 332:21

**access** 159:5 161:4 189:17 223:4,5 226:21 227:6,14,18 273:4,17,23 274:6

**accommodate** 12:17 302:20

**accomplishing** 49:2

**accordance** 175:20

**account** 106:18,23 146:24 147:19 150:23 151:7 208:4 221:5 313:14,23,25 315:16,19,25 316:22 317:7,16,22 318:3,6, 10

**accountability** 119:9

**accountable** 89:16, 21,24

**accounting** 105:23 108:3 110:13 137:25 138:9 147:20

**accounts** 176:10

**accredit** 182:19

**accreditation** 180:19,22 183:5 185:11

**accredited** 54:23 180:16

**accumulated** 209:22

**accuracy** 77:20

**accurate** 48:12 51:9, 25 71:3 82:17 95:17 139:7 140:5 141:5 179:14

**achieve** 114:9 116:6

**achieved** 115:20

**acronym** 191:24

**acronyms** 103:7 163:7

**Act** 10:15

**action** 30:17 103:20, 21 121:16 155:24 156:4 162:5,6 163:2, 5,6 164:8,17 165:17 166:9 183:12 184:5 190:10,15 209:20 214:24 256:3 283:2,8 285:25 308:8,13

**actions** 259:12

**active** 136:3

**actively** 36:17 67:7 256:8

**activities** 11:4,7 269:21 270:16 271:4

**activity** 269:17

**acts** 25:18

**actual** 64:5 89:3 97:24 112:14 124:8 127:15 165:11 173:8, 15,20 174:6 178:20 179:13 181:4 182:22 184:16 210:23 219:10 223:25 224:3 250:21 253:11 287:19,22 303:5 327:22 336:4

**ad** 96:2

**add** 60:19 83:22 140:8 301:11,13,19

**added** 20:23 21:2,19, 23 133:16,18 302:4, 18

**adding** 61:9 80:6 167:4 299:17 301:6,7

**addition** 81:7,15,21 83:13 93:2 127:2 131:3 151:16 153:16 154:23 195:13 213:17 247:7 248:12, 13 252:5,7,9 291:10 303:13

**additional** 40:19 57:22,24 58:2,5 60:5 61:11,12,21 80:6,18 82:19 105:16 144:21 161:7 164:20,21,23 165:18 167:5 230:23 301:24 326:9 332:17

**address** 87:16,19,25 88:23 211:22 238:6, 19 239:6 255:19 259:12 285:25 287:24 288:15 305:12

**addressed** 88:25 166:3 202:5 255:21

**addressing** 88:21 166:10 305:3

**adequacy** 305:11,17 311:25 312:12

**adequate** 275:8

**adequately** 161:25 162:16

**adherence** 282:4

**adjust** 75:2 76:17 79:20

**adjusted** 160:23,25

**adjustment** 58:5 69:19,21 160:13 161:4

**adjustments** 135:5 160:19

**admin** 223:7,15

**administration** 222:17 223:11 324:15

**administrative** 92:16 93:23 94:8 138:6,7,9,10 195:11 256:4,10 269:9 270:19 271:8,19 272:14 273:11,15,16 274:15 281:15

**administrator** 110:3 210:6 304:23

**ADO** 298:11

**adopt** 234:3

**advanced** 190:4

**advise** 99:17

**advised** 256:16 309:23

**affect** 88:14

**affected** 99:10

**affecting** 77:9

**afford** 161:7

**age** 312:6

**agenda** 92:2 96:7

**agendas** 92:5 95:25 96:3

**aggressive** 256:9

**agree** 158:22 162:18 203:8,19 206:5 209:12 236:2 250:5,8 251:19 301:25 312:23 321:4

**agreed** 9:4 201:24 277:7

**agreement** 35:12,16 38:14,21 79:19 80:3 215:24

**ahead** 131:11 143:21

**air** 316:13

**Alan** 9:10,20

**alike** 186:17

**allegation** 17:25 306:19

**allegations** 14:25 15:16,19 16:17,19 17:4,8,21 18:10 306:16 312:11,12

**alleged** 306:23

**allegedly** 307:2

**allocated** 138:24 139:3 140:3,8

**allocation** 123:25

**allowable** 194:23

**allowances** 312:5

**allowed** 227:10 269:17 270:7,11,14, 17,22 271:5,10,13,19 273:10

**alluded** 98:18

**Alpha** 269:8,13

**amendments** 27:2

**America** 150:10

**American** 180:16 302:21 303:2

**amount** 22:23 31:22 44:3 59:4,23 66:10 67:25 72:7 79:5,6 91:20 105:9 111:3 142:15 155:3 176:18 181:14 195:16 214:2 262:5 272:21 281:5 291:12 297:13 300:5

**310:11,12

**and/or** 198:17

**annual** 55:19,23 76:6 92:8 107:5 110:20 181:16 196:4 317:18 323:3,5 324:3

**annually** 102:16 187:11,15 196:10 219:7 224:9 312:4 323:11

**anomalies** 104:25 110:7

**answering** 12:3

**anticipate** 214:13

**anticipating** 105:5

**apologize** 18:19 23:6 35:6 58:17 85:18 125:24 156:11 319:20

**appeal** 58:22

**appearance** 9:9

**appearing** 9:3

**appears** 121:8 123:16 129:11 135:4, 22 150:8 157:5 158:16 160:20 166:8, 9 299:23

**applicable** 19:5,7 80:7 110:6 169:14,18 182:4,7,10,12 183:2 193:17 194:4,17 234:6 235:8 236:6 254:2 265:16 276:14

**application** 89:3

**applied** 26:9 99:23 112:6 113:5 119:10 176:19 200:25 243:5 252:24

**applies** 78:7 81:11, 13 160:5 183:7 186:4 203:20 205:13 215:11 217:24 258:3 318:15

**apply** 76:13,15,19 80:11 81:20,23 84:6 89:4 150:21 160:6 181:24,25 182:4

**184:4 209:19 265:14, 15**

**appreciation** 291:9, 19,22

**appropriately** 197:9,19,20

**approval** 20:14,17 58:3 99:15 140:20 163:19 224:6,9,10 251:17 277:6,15 278:11 293:5 322:11

**approve** 223:22,23 224:10,12 262:9 277:3 281:7 314:24

**approved** 21:5 99:15 139:4,9 163:21 176:23 177:2 183:2 223:24,25 224:4 250:9 276:25 278:17, 19 291:12 309:24 310:12 314:15,25 321:15 322:2,6,8 333:16 337:14,16

**approver** 328:18

**approves** 277:6

**approving** 328:15

**approximately** 107:2

**April** 13:11,17,18 14:2,15 15:12 16:15 54:2 95:11 102:24 133:2 136:14,22 140:23 151:25 201:18 228:18 233:10 235:24 260:2 325:4

**Arabic** 261:12

**area** 31:20 41:12 51:14 102:13 110:5 160:12 163:24 172:13 197:20 211:7 221:21 222:21 223:11,16 242:8,9, 10,13 259:9 287:9 291:12 308:18 328:21 330:24 336:23

**areas** 89:18 108:6 127:2 164:13,25

165:19,24 166:5,25 167:6 169:14,18 173:14 197:14 225:10 226:6 230:10 246:20 291:10 330:16

**argument** 52:17

**arrival** 11:19 21:3,20 22:11 118:23 120:9 135:3 136:16 189:20 229:5

**arrived** 11:9 13:17 80:16 103:9 134:3 145:18 148:4 228:15 279:14

**arriving** 240:18

**arrows** 233:25

**art** 110:13

**aspects** 306:14

**assess** 37:8 38:17 39:17 45:6 172:6 173:6 176:4 180:19

**assesses** 171:24

**assessing** 40:22

**assessment** 38:4 41:13 44:13,14 47:18,22 58:12,13 104:21 195:4 207:3

**assigned** 51:14 127:15 164:24 165:19 185:25 187:17 197:9,15 225:19 229:12,19 234:5,9 235:7,14 240:24 246:20 250:12 268:7 271:24 330:16

**assignment** 176:3 196:5,7,13 197:5 235:10

**assignments** 173:11 197:8,10 229:13 231:21 234:4, 6,9,12,13 235:6,7

**assist** 244:22 249:21 250:18

**assistance** 91:25 151:18 153:13 250:9,

10,25 262:3

**assistant** 20:16 53:5,15 89:9,11,12 109:25 144:14,22 163:17 275:12,16 276:16,17 281:16,17, 19 285:21 301:23 304:22 308:14 324:15 328:24

**assisted** 37:3

**assists** 200:11

**associate** 165:7

**Association** 180:16

**assume** 37:5 45:4 62:7 78:17 82:23 141:5 177:4 191:8 290:12 298:19

**assumed** 46:2,10,21 53:10 54:25 95:3

**assuming** 101:15 160:16

**assumption** 22:6 45:7 48:15 82:24 83:2

**assurance** 99:12 100:10 163:17 187:6 200:4,11 218:8 224:18

**assure** 18:8 38:18

**asterisk** 141:7

**attached** 54:15 112:13 121:16 123:3 124:20 134:6 242:23

**attaches** 124:22

**attaching** 239:14

**attachment** 114:17 224:8,11 319:17

**attachments** 239:18 286:15,18

**attaining** 116:3,22 117:2

**attend** 92:20 183:15

**attendance** 192:3, 10,12

**attending** 159:21

**attorney** 9:21 33:24 34:4

**attorneys** 14:11,19 16:10,13 33:19

**audio** 332:6

**audit** 96:5 101:10,11, 15,25 103:4 104:5 112:19,20 154:3,14 156:17 169:8 170:22 171:2,19 177:5,20 178:4,10,14 180:9, 22,25 182:5,8 183:16 184:16,20 185:8 187:8,10,13,17 188:20 189:10 190:9 191:2,17 192:9 193:9 198:10 199:16,19,21 200:14,16,21,22,24 276:12,13,18 289:10 317:18

**audited** 170:5 180:15

**auditing** 104:7 153:18 167:25 168:7 179:2,5,9 181:10,12 184:9 188:12,19 189:2

**auditor** 177:4 178:22 317:20

**auditors** 177:14 182:9

**audits** 101:10 102:2 103:8 153:2,6,9,17 167:11,16,19,20 168:20 177:12 180:10,24 181:18 184:13 187:12,15 188:11 190:2,11 191:3,8 194:6 198:11 199:16,17 200:4,9, 13,16 201:6 209:2 317:19

**augment** 244:19

**August** 95:4,6,9,10, 12,15,16 96:18 164:4

**authority** 88:20 94:23 97:9 104:8 182:11 183:8 224:5

**authorized** 160:5 304:7

**authorizes** 197:21

**automatic** 76:16,20

**average** 63:22 192:16 226:14 238:17

**averages** 74:16

**averaging** 75:6

**AW** 240:17 279:22 280:4 289:7

**awake** 241:24

**awarded** 37:11 56:12

**aware** 12:19 13:23 20:3 26:2 30:5 58:8 70:15 74:5 84:22 86:25 88:18 91:22 101:3 114:5 137:17 142:13 175:12 176:22 177:17 205:17 209:4,18,21 210:2 211:4 212:3 218:19 247:18 251:17,24 252:8,16, 24 253:3 254:8 262:4 263:13 265:8 268:12, 21,23 269:3 277:11, 19 285:8 288:14,16 292:2 296:23,25 299:2 301:13,18 317:25 325:5

**awkward** 117:13

---

**B**

**b(iii)** 239:24

**back** 18:21 26:6 40:5 52:22 53:11,16 58:3 63:15 64:10 65:12 68:14 74:7 76:11 77:24 82:17,25 85:20 93:17 95:5 97:10 103:5 104:7 106:5 116:15 118:8 119:17 120:10 122:10,21,24 123:4 124:7,8,16,19 128:8 136:24 139:11 141:20 144:10,23 148:11 156:10 160:3 165:5,9 170:10 174:5 191:4 192:6,7,11 198:8,20 201:15

**background** 18:13 54:20,21 138:20 140:11,12,20

**bad** 257:10 311:17 312:18,19

**balance** 71:4 106:23 226:16

**balls** 316:6

**band** 144:2

**bank** 318:6,8

**barber** 222:8 236:5

**barbered** 249:14

**barbering** 222:15 235:23 236:2,5 249:12

**Barrientos** 121:2

**base** 134:18 184:9

**based** 35:21 44:17 46:18,19 49:23 58:6, 13 63:7 70:13 71:22 72:23 78:2 81:5 92:21 93:9 111:7,11 112:2,7 114:24 116:8 118:11,13 119:22 122:4 123:8 126:13, 14 127:21 128:6,25 130:22 134:13 136:21,22 137:9 141:7 160:16 184:10 186:24 206:8 212:13 238:20,24 261:17 291:12 298:25 299:5 301:12 310:15 329:25 336:6

**basic** 83:21 312:6

**basically** 107:22 110:17 229:7

**basis** 45:6 49:16 107:5 153:21 200:10, 15 254:21 276:15 317:11,16 321:20

**basketball** 70:10 316:7

**Bates** 120:25 148:19 279:2 308:22 321:19

**batteries** 331:16,20

**batting** 9:23

**beans** 284:18,21 310:14

**bear** 26:25 30:23

**bed** 70:18 74:8,9 77:25 78:4

**beds** 57:12,17 65:4 66:17 69:17 73:3 74:7,17

**began** 255:10

**begin** 12:3

**beginning** 114:12 207:14 232:12

**behalf** 9:21 13:9 32:11

**behavior** 255:19

**benefit** 69:4,25 106:9 146:25 147:4,18 316:3

**benefits** 76:7

**Bethany** 27:23

**bid** 36:17,21 37:8,9, 16,17,19 38:6 56:12 207:25 208:5

**bidding** 36:4,23,24 56:25

**big** 40:21 41:21 144:17 291:15

**bigger** 87:13

**biggest** 144:11 181:10 221:12

**Bill** 286:9,11,12

**billing** 77:6 208:16, 19

**bit** 43:21,25 76:21 118:7 123:22 125:19 129:9 185:14 187:7 200:24 201:8 206:10 224:2,21 241:25

**291:16 294:4 315:13 331:22 333:22 335:23**

**biweekly** 91:15 92:3 93:5,7,8,9,12

**bleed-over** 158:9

**blended** 80:12

**block** 131:16 157:11

**Blue** 279:22 280:4 297:21 298:9 300:23

**Blue's** 299:9

**blurry** 292:11

**board** 123:16 330:23

**boiled** 279:23

**bonus** 111:21 112:6 113:15,18,23,24 114:3,9,13,15,18,23 115:10,17 116:10

**bonuses** 110:21 111:2,3,15,23 112:7 116:5,19

**book** 171:4,7

**books** 150:19 332:11,13,15,17,19, 25 333:2,4,6

**bottom** 56:2 61:2 85:20 108:7 138:23 157:15 219:17 233:14 240:16 259:23 282:9 292:18 293:2 298:8 310:24 311:2,4

**bought** 332:24 333:3,5

**brain** 182:14

**Braizer** 27:24

**break** 12:16 43:2 74:3 75:14 83:5 84:15 152:21 180:10 182:16 201:7,9 253:15 274:21 275:5 325:10 337:25

**breakfast** 279:24 280:2,8 294:4 295:3, 10,23 334:24 335:7

**breaks** 255:16

**Bretz** 157:5 279:9

**briefly** 9:6 52:19 59:2 194:8,10 245:9

**bring** 222:25

**broad** 247:14

**broke** 127:5

**broken** 179:9

**broom** 221:18 222:4

**brought** 230:4,7 293:12

**budget** 63:2 68:5 74:24,25 75:3 104:11,12,17,23 105:15,20,24 106:11, 14,15 107:20,23 109:19 110:10,11

**budgetary** 126:9

**budgeted** 119:8,11 143:24 147:17

**budgeting** 104:10, 16 108:5

**budgets** 26:23 80:13 104:19 105:11

**buff** 247:21

**buffed** 247:24 248:14

**build** 40:20 226:24

**building** 126:17 160:10 174:22 229:14 333:13 336:8

**built** 70:5 76:20 80:13 104:20 181:22 224:22,25

**bulk** 71:10 145:6 312:21 314:11

**bullet** 233:25 279:20 280:16 287:11 288:11

**bunch** 157:22

**business** 42:22 98:7,9 100:20 108:4, 12 109:24 176:6 317:9,17 326:3

**buy** 67:15,20 150:23 178:16 179:18 313:13 316:2,6 332:17

---

**C**

**cafeteria** 161:22 162:16

**calculate** 130:19

**calculated** 116:2

**calculating** 131:6

**calculation** 72:22 224:24

**calculations** 40:8

**calculator** 78:17

**calendar** 95:4

**call** 11:14 29:13,21 33:20,22,23 93:3 113:11 151:20 232:3 240:19,20,23 241:14 257:12,14 275:18 283:5 294:16 334:13

**call-offs** 143:9

**call-out/wake-up** 240:19,20

**called** 113:6 135:24 167:15 257:3

**calling** 241:18 243:23

**calls** 18:11 91:15 92:3,10,13,20 129:19 143:10 144:24 145:25 150:3,18 151:14,21 152:6,18 225:14 264:2

**caloric** 280:25 281:4, 8 304:3,12

**calories** 311:18 312:24

**Calvin** 297:21 300:22

**CAP** 103:19 163:6 164:8

**capable** 45:22

**capacity** 57:6 64:4

**69:17 98:4**

**capital** 77:7

**CAPS** 163:11

**captain** 241:11,17 298:11

**captured** 105:6 110:9 144:3,15,21 206:19 336:9

**card** 213:20,23 253:7

**cards** 24:21 30:4 146:20,21 147:3,7 176:13 213:9,13 253:4,12 330:23

**care** 222:9 269:24 308:7

**career** 55:14

**Carey** 85:24

**case** 10:13,15,20,23 13:24 15:16,21 17:15,18 18:3,5 27:21 29:7 33:10 42:6 48:19 57:14 92:17 93:6,23 116:15,20 117:21 119:9 126:19 131:21 148:14 151:17 161:6 163:14 205:13 222:10 246:13 250:8, 15 251:2,13 260:23 268:18 294:22 320:23 321:18 326:11 329:25

**cases** 10:13,24 100:6 181:17 256:7

**Categories** 197:10

**category** 57:5 170:7 264:8 265:14

**caused** 229:25

**causing** 88:2

**CCA** 192:17 239:16

**CCBVA105880** 129:4

**CCBVA105921** 319:12

**CCBVA106052** 290:4

CCBVA106421 267:15

CCBVA118271 311:9

CCBVA118425 292:5

CCBVA118618 218:21

CCBVA150628 184:24

CCBVA150697 162:23

CCBVA196130 157:2

CCBVA196386 297:16

CCBVA196534 85:2

CCBVA207174 300:16

CCBVA217504 306:3

CCBVA218211 286:5

CCBVA218703 237:18

CCBVA244 259:15

CCBVA244539 132:13

CCBVA258426 113:13

CCBVA274977 190:23

CCBVA280792 135:17

CCBVA3317 203:5

CCBVA3918 217:19

CCBVA3947 215:3

CCBVA439 64:16

CCBVA4627 215:21

CCBVA4652 333:9

CCBVA4714 123:13

CCBVA6060 169:5

CCBVA6239 161:12

Ccorecivic 44:13

CDFS 205:19

CDR 121:16,18,24 122:15,18 124:20 155:20,23

CDRS 122:8,9,11

cell 250:12 269:5 270:6,24,25 271:5,10

cells 269:16 270:17 271:13,20

Center 13:12 33:19 36:15,20 38:6 39:18 40:3 42:16 43:7,8 44:15 49:12 50:25 52:21 53:9,19 54:2,4 56:3 84:4,8,13 85:12, 14 92:19 97:21 99:14 103:25 111:14,17 121:11 124:5 163:20 238:3 315:3

centers 37:20 54:12 111:24 174:17 181:22 182:20

central 53:3 241:16, 18

cents 70:25 84:10

certified 54:24

certifies 323:10

certify 175:14

cetera 22:4 90:16

chain 85:21

challenges 111:8

challenging 11:18 220:18 229:17 261:24 304:6 305:19

chance 284:19

change 60:5,11 61:19 64:11 79:19, 20,22 99:19,21,25 100:9 132:6 134:18 168:23,24 188:6 224:5 278:2,6 281:7 293:18,22 322:10 335:21 336:5,6,7,9

changed 135:6 255:11 278:16

changing 98:16

chaplain 138:10

characterize 62:9

characterized 101:6

charge 211:8 242:9 287:14,15

charged 211:6

charges 256:17

Charles 54:5 95:8 251:13

chart 243:2

chat 149:4 280:24

check 195:8 224:17 289:6 311:19 332:25

checked 289:20

checking 289:18

chief 20:15,16 53:10, 13 89:10 110:2 163:16 281:17,18 304:24 328:22

chiefs 89:9 324:16

children's 333:2

choices 192:24

choose 223:3 274:18 331:3

chooses 213:16

chose 27:7 52:5

chow 50:15,16 143:13 165:2 174:24 313:16

chunk 166:17

churches 332:22

circumstance 211:4

circumstances 210:7 291:2,25

cited 104:3

Citrus 53:19

City 9:21

civic 332:22

civil 97:12

CJ 9:22 117:20 201:14

claim 10:17

claiming 298:10

clarification 29:23 164:15

clarified 164:5

clarify 15:12 16:24 24:12 47:13 59:2 79:6 98:25 164:9

class 140:17,21

classification 24:7 172:18 197:3,5,6,13, 17,22,25 198:2,4,16 218:9,12 222:20 226:20 250:13,14 326:2 327:2,20,22,25 328:5,14,22 329:2,5 337:9

classification-driven 42:5 337:14

classifications 227:15 336:6

classified 62:13 182:12 197:19

classifying 61:4

clean 49:13 51:2,6 52:9 126:7,22,25 162:18 164:24 165:19 167:5 221:20 223:10,11 248:11 282:12

cleaned 127:4,7,14 161:25 162:17 164:13 248:15

cleaning 51:11,13 126:25 161:21 162:7, 8 165:23 166:25 223:12

cleaning/sanitizing 161:24

cleanliness 249:6

cleanout 323:3,6,11

clear 202:8

clearance 140:11,13

cleared 140:14,15,18 172:12 197:14

clerk 137:25 138:2,6, 7,9,11

clinical 144:21

clinically 259:10

clock 142:19,20

close 51:24 72:16 174:15 214:10 227:23 334:12

closing 214:13

clothing 61:12

coaching 89:2 90:16

code 255:24 266:18

coffee 46:6

cohort 49:21 273:2

cohorts 66:10

Coie 9:10

cold 282:8

colleague 9:22 84:20 85:19

colleagues 30:24

collect 38:9

collected 142:14,18

collective 40:25

collectively 36:12 38:10

college 54:25

column 130:11 137:5,7 138:24 139:19 140:7,8 164:19 192:24 194:2

columns 125:6

combination 288:25

Commence 333:24 336:17

comments 287:13

commissary 105:24,25 106:4,13,

17,19 107:3,5,8
146:19,24 147:2
263:22 273:14
280:17 313:12,19
314:10,14,22 315:5,
13,15,18,20,23
316:6,22 317:7,12
331:21 332:13

**commission** 76:3
147:15 149:18,24
150:3,8

**Commissioners**
123:17

**commit** 25:11 214:20

**committed** 211:8,10

**committee** 20:15
182:5 184:2,8,9
258:16,22 328:19
329:3

**committees** 22:3

**common** 38:24
50:13 93:18

**communicate** 99:21
105:7 152:7 256:24

**communicated**
57:14 254:13 325:20

**communication**
33:21 86:23 90:19
192:22 193:10,22
241:12 301:22
325:21,23

**communications**
28:19 91:12 276:15
325:11

**company** 26:7 42:23
105:4,7 121:14
167:15 238:16
247:17

**company-wide**
112:4

**compared** 145:4

**comparing** 144:6

**compel** 202:3,14

**compensated** 77:3,
10 143:23 175:25
176:5

**compensation**
110:21 115:22
149:16 175:19 206:9,
11,23 209:10 216:4

**competitive** 37:8,10

**compiles** 92:24

**complaining** 299:3
309:6

**complaint** 15:21
16:17,20 17:3,4,9,21
18:10 30:16 283:15
307:25

**complaints** 280:16
296:20 297:2,5,7,9,
12 301:4 310:3

**complete** 18:4,9
38:8 54:19 163:20
172:8 281:21 298:11
323:2

**completed** 12:24
175:19 195:4 196:18
283:6 285:4,19 287:8
289:11,13,22 323:2,4

**completely** 9:8
12:13

**completes** 138:20
140:13 281:13

**completing** 92:8
282:25

**completion** 162:5
337:7

**compliance** 17:14,
20 19:3 101:13
119:21,25 153:19
155:18 156:14
171:24 172:6 173:6
175:22 179:2 181:8
182:24 183:11
188:12,20 189:6
195:20 197:11
199:20 200:12 282:4

**compliant** 172:25
183:20 184:10

**complies** 35:2 149:7

**comply** 118:25
119:3,15 120:5
203:23 215:18 218:3
232:18,19 249:7

290:15,17 334:16

**complying** 121:21

**component** 44:18,
19 66:7 110:4 111:9
112:23 115:23
171:15,25 172:20
173:2,7 174:12
175:18 178:4,10,14,
23 289:12

**components** 169:23
179:2,10 188:23

**comprise** 54:9

**comprised** 89:7
102:11 328:20

**compromise** 108:17

**compromising**
108:14

**computer** 189:16

**concern** 87:14,20,21
104:3 299:19,24,25
305:14

**concerned** 238:25

**concerns** 21:5 99:18
278:22 287:24

**concession** 69:5

**concluded** 338:3

**conclusion** 18:12

**concur** 301:25

**conditions** 109:12

**conducive** 248:9

**conduct** 15:25
153:6,9 156:6 167:16
187:14 190:14 195:8
199:17

**conducted** 153:2

**conducting** 170:22

**conducts** 153:17
154:8 200:21

**conferral** 148:16

**confinement** 256:11

**confirm** 51:19 70:17
82:18 142:5 146:9,
14,17 150:13 165:9

197:18 211:15
237:13,16

**confused** 153:11
156:11

**confusion** 136:10,13

**Congratulations**
55:16

**conjunction** 69:9
96:4 155:6

**connected** 113:8
122:18

**connection** 30:18
41:4

**consequence**
155:19

**conservative** 71:24

**consideration** 40:15
41:20 42:12,13
112:24 130:21 131:6
220:14

**considered** 41:16
204:15 206:25
247:11 326:24

**consistent** 56:18
78:19 83:17,25 84:11
99:7 164:10 194:23
263:16 265:2,5 312:8
315:9

**consistently** 189:6
314:9

**constant** 270:25

**construct** 77:14

**construction** 77:21
126:17

**construction-type**
55:9

**consultant** 293:3,9,
14

**contact** 308:17

**contained** 69:18

**container** 283:11

**containers** 325:18

**contaminated** 308:5

**contemporaneousl
y** 149:6

**content** 14:10 16:12
85:8 86:13 309:2
320:24

**contents** 198:9

**context** 16:12

**continual** 200:15

**continue** 12:5 49:5
66:2 67:7 248:16
282:16

**continued** 307:3

**continuing** 258:21
314:20

**contract** 27:2,3
35:19 36:20 37:5,11
38:6,18 39:16 40:2,
12 41:21 42:9,10,21
43:2,5,12 44:7,16
45:4 46:12 47:8,20
48:4 56:7,11,18 57:9
64:20 65:6 68:3 69:3
73:24 74:2 75:22
76:9 80:3 82:4
101:14 102:4 119:21,
22 120:6,19,20,22
121:18 123:3,7
127:22 128:19,21
132:20 133:22
136:19 144:4 145:16,
17,21 146:6 147:8,15
148:2,8,13,24 149:25
150:4,6,9,12 153:8
186:20 201:17,20
202:7,10 245:4,10,23
246:5,17 248:16
249:7,8 275:21
308:15

**contracted** 59:4,8
119:7 128:18 136:12
146:7

**contracting** 56:19
132:25

**contractor** 68:6
71:13 311:20

**contracts** 34:21
36:4,25 105:17
121:14 167:15
187:24

**contractual** 40:23
120:17

**contributes** 115:16

**control** 127:12,13
158:24 241:16
308:15

**convenience** 315:10

**conversation** 11:11
14:4,20 21:22 34:3,
12 251:19 258:25

**conversations** 14:9,
16,18,25 15:11,15
16:7,12 17:4 29:3
34:5 47:4 278:10
301:10

**cook** 221:15 283:16

**cookies** 284:3

**cool-off** 256:12

**cooler** 283:14

**coolers** 316:25

**coordinate** 308:17
322:20

**coordinating** 326:4

**coordinator** 304:22
322:25 326:2,3
327:23 328:2,5,14
329:6

**coordinator's** 329:2

**copied** 238:12

**copies** 118:17

**copy** 85:19 246:16
256:20 260:19
262:11,14 285:22

**Corecivic** 9:12 10:8
13:9,11 16:2,8,19
18:8 19:15,23 21:13
22:18 23:16 24:9,18
25:7,10,17 26:7
32:11 33:2,12,15
36:3,21,25 37:8 38:4,
16,19 39:10,16,25
40:9 41:5 42:21 43:2,
6,7,13 44:3,19,23
45:2,5,10 46:2,5,10,
18,20,21,22,24
47:18,23 48:6 49:10,
15 50:23,24 52:7,20

53:21 55:5,13,14,19,
22 56:19 58:12 63:11
65:7,15,23 66:4 67:5
69:4,5 70:3 71:5,11,
16,25 72:7,16 73:11
74:2,9,21 77:2 78:9,
11,20 79:4 82:2,6,12
83:4,10,11,14 84:2,7,
12 87:15 88:13 97:16
98:17 99:2 101:22,24
103:4 106:3,12 108:6
109:13,20 110:20
118:24 119:14,20
120:4,18 121:21
124:23 125:4,12,20,
24 126:21 130:19
134:7 135:8 138:17
141:13 142:11
143:16 146:18,24
147:14 150:2,10
155:10,12 157:11
163:5 164:16 165:23
166:24 167:5 179:21
186:7 188:21 189:2,3
198:11 200:13
203:22 206:13,20
208:4,14,16,22
209:22 210:10
211:25 212:12,15,19,
23 213:2,5,8,12,16
214:3,16,19,24
215:17 218:2 230:2,4
231:17 238:9 239:12
245:10,14,20 246:4,
19,23 247:11 248:17,
24 249:5,12,14,20
251:24 253:3,7,9
257:23 258:3,6,9
265:9,21 266:8,11,21
267:7,11 270:14
275:6,10,13,20
276:5,7,10,21 277:3,
5,14,20,25 280:4
290:14 295:14,21
296:23,25 300:9
303:17 304:11,13
305:12 307:18
308:11 310:2,16
312:8 315:19,22,23
316:5,18 317:11
318:12,15 320:9
326:16 330:2,5
334:15

**Corecivic's** 13:9
23:10,25 24:3,17
37:9 44:4 61:2

186:20 187:6 204:7,
17,21 206:21 215:8
264:17 321:12 322:2

**Corecivic-driven**
21:12

**Cornell** 121:7

**corner** 134:16

**corporate** 33:13
104:13

**Corporation** 150:10

**correct** 11:4 13:13
19:24 21:15 22:14,
15,17,21 23:11 24:5,
11,22 25:8,12 27:10,
11 29:11,14 35:13
38:19 39:12,21 43:3,
13,14 44:10,18,24,25
46:25 47:20,21,25
48:2 50:6,10,13,19,
20 51:16 58:23,25
59:24,25 60:3,9,13,
15,16,21 62:5,6,
10,23 65:16,17,21,22
67:25 70:18,20 71:2,
6,17,18 72:4,5,21
73:3,4,7,8 74:4,18
76:25 78:5,7,8,9,10,
15 81:9,22 83:6,7,14
93:4 94:23 103:11
105:12,17,18 107:17,
18,21,25 108:24,25
109:3 110:16,19
111:25 114:11,15,16
115:7,8,10,17,18,23
116:7,23 117:2,6,7
118:10 120:2 121:23
129:7,17,23,24
130:12,13,14,15
131:8,10 136:22
137:16,22 138:2,3
141:3,11,15 143:15
145:9 146:2,19,20
147:16 151:10
157:12,23 159:4,6,
10,11,12 161:15
162:14 164:16
165:20,24 166:5,14,
18 167:2,6,11,16
168:5,8,9 169:8,19
171:13,20,21,23
173:3,4,5,24 175:23
176:10,11,13,16
179:21,24 181:20

183:7,8 185:12,22,23
186:3,5,6,9,21 191:9,
17 193:12 198:3
199:18,21,22 202:24
203:14 204:23
205:23,24 206:4,12,
14,15 208:17,20
209:19 211:23
212:12,13,16,22,25
214:18 215:6,9,10,
12,24 217:22 218:24
219:4 223:8 225:15
229:23 231:6 232:13
239:8,9 241:23
245:12,16 246:7
247:9,10 248:4
249:8,9,22,23 251:4,
11,20 252:20 254:5,
6,10,11 255:19
257:19,20,24 258:2
259:18 260:11
262:25 263:14,15,20
264:19,20 265:7,10,
20,23,25 266:2,5,23
267:10,13,18 269:5,
8,13,18,19 271:11,
12,14,15 273:10,14,
18,21,22 274:13,16,
18,19 278:17,18
279:12,18 280:5,6
281:8,9,11 283:20
290:7 293:14 294:10
296:4,7 297:13,19,
22,23,25 298:2,4,5
299:3,11 300:20,23,
24 303:9,12,13,18,19
305:18 306:6 309:7,
10,11 311:12 313:25
315:16,17,20,21
316:2,3,19,20
318:13,23 319:16,25
320:2,4,5,8,10,11
321:13,14 322:13
327:21 328:2,16
329:3,4 330:2 332:7
334:23 335:4,5
336:19 337:3,4

**corrected** 165:14

**correction** 103:20
163:6

**correctional** 37:20
38:2 49:3 53:2,5,12
180:16

**corrections** 54:21
150:10 153:12,14
164:3

**corrective** 103:20
155:24 156:4 162:4,6
163:2,5 164:8,17
165:17 166:8,10
183:12 184:4 190:10,
15 209:20 283:2,8
285:25 308:7,8,12

**correctly** 78:17
145:13 219:13

**cost** 38:23 39:2,5,20
40:10,11 44:9,19
45:6 60:5,18,21 61:4,
14,17 62:2,7 68:2,9
73:11 76:6 81:19
107:20 109:3 123:3
124:22 147:7 152:15
253:7,8

**costs** 37:9 38:17,20,
22 42:22 44:4,14
45:3 46:19,25 47:18,
23 48:5,7 58:12,13,
14,21 60:8,11,14,23
61:5,7,11,12,23,25
67:13,15,23 73:10
76:13 81:18 107:17,
19,24 108:3 109:10
110:18 253:10

**counsel** 9:9 12:20,22
16:7 26:14,19 27:6,8,
9,10 28:8,9,14 29:3,
9,16 31:16,20,23,25
32:19,23 33:14,15
149:3 232:21 246:17

**counting** 141:2

**counts** 92:11

**county** 43:19 49:3
53:3,17,18,19,20
54:15 65:19 70:19
71:9,19 76:4 78:12
123:16

**County's** 70:22

**couple** 28:17 98:18
166:9 230:8

**couple-week** 32:6

**court** 9:2 11:25 12:8
30:17 316:7 330:11

Index: courtroom..detail

**courtroom** 126:23

**courtrooms** 77:21

**courts** 70:10

**cover** 37:9 41:16 44:4,9 48:4 60:21 84:20 106:17 107:9 143:8,11,13 230:10 231:17 247:2,3,4 329:19

**coverage** 131:2 132:3

**covered** 76:13 77:16 130:23,24 131:13 148:9

**covering** 126:10,11

**covers** 84:24 298:24

**COVID** 11:10,16,21 48:19 49:20,23 50:4, 5,13,19 66:9 127:2,3, 6 154:11 168:11 229:21 230:15 232:9 233:4 270:10 272:23 273:5 294:23

**COVID-19** 151:23 228:2,15,20 231:6 232:10

**CRCL** 97:11 101:11 156:11

**create** 103:18,19 247:25 248:8

**created** 134:25 135:3 239:16 257:25 303:15 318:18

**creates** 163:11 268:5 276:24

**Creative** 153:11,12, 14

**credits** 54:25

**criminal** 53:9 186:5 239:7

**criteria** 24:8 115:15 283:5

**Crocker** 327:4,21

**cultural** 301:6

**culturally** 301:11 302:3,15 303:3

**cultures** 302:20,23

**cup** 46:6 310:25

**curious** 170:4

**currency** 176:19 214:2

**current** 43:17 55:3 75:3,8,9 76:23 78:4 92:22 106:22 139:19 140:7 146:3 239:24 240:17 262:15 290:13 292:21 302:14 303:3 333:18

**curriculum** 267:3

**custodian** 93:25

**custody** 196:25 218:9,12

**customer** 56:5 99:16 119:9 149:15

**customer-based** 188:15

**customized** 115:2

**cut** 70:19,22 71:19 222:9

**cutoff** 321:10

**cycle** 184:21

---

**D**

**daily** 72:8 172:23 213:20,23 251:25 274:15 289:6,18,20

**dairy** 294:5,8,12,14 296:3,6

**damaged** 260:22

**dash** 285:16

**data** 38:10 239:3

**date** 13:18,20 64:12 75:22,25 99:22 123:11 127:23 129:10 132:24 133:2 168:25 181:12 185:15 234:22 259:20,21 293:5 327:15

**dated** 129:11 161:15

**dates** 124:8 322:17

**David** 53:9

**day** 11:20 22:16,19 38:15 39:20 40:12 41:14 43:12,13,20 44:9 45:4,9 46:12,18, 23 47:19 48:7 58:11, 23 59:24 65:18 68:8 70:18 71:14 72:12,20 73:2,7 74:8,21 76:8, 14,22 77:4,11,13,25 78:4,18 79:5,7 80:4,7 81:3,5,10,19 82:4,19 83:3,13,14,23 84:2,3 91:10,23 92:4 107:11 131:24 143:3 159:9, 15,16 161:22 173:18 174:10 175:12,21 176:2 204:14 205:21 206:3,7 216:5,7,18 220:13 222:18 226:9 252:16 271:6,11,17 272:18,19 273:5 274:4,5,18 287:18 295:10,22 313:12 322:21 330:22,25 331:2 337:20,25

**day-to-day** 52:12 88:18

**days** 41:15 55:9 91:8, 10,23 126:9,11 131:24 132:6 226:9 229:5 264:17,18,21, 25 272:9,16 273:6 296:10,11

**deal** 66:4

**dealing** 325:24

**death** 122:17

**decide** 21:13 261:19 271:25

**decision** 23:10 89:3 261:15

**decrease** 80:18

**decreased** 50:5 231:5 281:5

**dedicated** 205:19,23 230:22 231:2 330:19

**deem** 182:9

**deep-cleaning** 289:8

**defense** 18:10

**defer** 329:16

**deficiency** 121:18 163:13,22 170:6

**deficient** 169:23,25 193:7

**define** 210:20 243:20 265:6,18,21 266:4,9, 22

**defined** 183:23 243:7,10,23 244:2 291:6

**definitively** 150:13

**degree** 36:8 52:15 55:3 177:2 266:16 306:25

**delay** 283:17,19

**delayed** 288:15 294:24 295:6

**deleted** 21:2,19

**deliberately** 284:23 285:3

**delivered** 230:13 310:13

**delivery** 244:22 294:24

**demand** 221:12

**demanding** 291:17

**demonstrate** 156:14 181:7

**department** 82:6 98:10 100:11,19 103:24 163:13 218:8

**departments** 97:23 100:20

**dependent** 242:17

**depending** 60:15 100:8 138:19 283:4 288:18 305:13

**depends** 126:9 160:25 177:4 255:17 287:17

**deponents** 27:21 33:10

**deposed** 26:25

**deposited** 176:10 313:23

**deposition** 9:3 10:2, 19 11:3 14:13,16 15:5,8,22 21:8 28:10, 15 29:4,8,19 30:3,7, 19 31:3,8,9,12 64:22 86:3 113:19 118:2,19 120:14 124:3 145:22 194:6 245:8 255:3,7 318:21 338:3

**depositions** 10:11 26:24 27:20 30:11

**depreciation** 110:16

**depth** 32:3,4,5

**describes** 124:22

**description** 123:24

**design** 40:20 57:5 64:4

**designated** 13:10 32:10 91:14 187:13 241:19 252:20 270:15 326:2

**designation** 26:6

**designed** 34:13 111:5

**designee** 300:10

**desirable** 190:21

**desire** 57:15

**desk** 223:12

**destroy** 321:9 325:17,19 327:11 328:8

**destroyed** 323:7,23 324:12,20 325:9,12 327:19

**destruction** 322:13, 17 324:3,7 325:25

**detail** 41:16 43:21

84:21 205:20 206:3,7 210:6 216:18 235:14

**details** 35:20 85:17, 25

**detain** 46:5

**detained** 22:13 25:7, 10 127:4,7 145:24 146:10 150:17 151:6 152:8 155:8 158:3,24 159:5,13 162:17 165:18 168:17 173:18,23 174:2,10 175:13 176:4,10 177:12 178:11,15 179:17,24 180:4 186:8,11,24 189:23 207:15 208:5,20,23 209:13,23 210:18 211:2 212:20,24 213:3,8,13,22 214:3, 20 216:21 217:4 227:6 231:19 234:9, 13 235:15,18 237:2 238:21 243:3,18 244:3 247:20 248:3, 11 249:21 250:19 251:3 252:2,24 253:4,19 254:13 255:15 260:15 262:24 263:12 268:13,23 273:9 275:7 280:8,20 284:6 291:22 296:23 297:2 299:2 303:20 313:9 330:10 331:7,12 337:11

**detainee** 10:12 39:19 41:25 43:13,20 44:4 45:14,17,25 46:4 48:16 49:6,13 50:2 51:2 59:23,24 65:19 68:8 70:23 74:21 85:17,24 106:6,10 127:10,12 146:24 152:15 172:16 173:10 178:22 204:24 205:20 210:5, 8 214:25 215:23 216:24 235:10 236:4, 5 250:6 254:16 255:20,23 256:16 309:14,19,23 316:4, 24 320:24

**detainees** 13:12 18:2 19:24 20:10 21:14,15 22:14 23:21 24:10,14 26:9,24 39:11 40:10 41:6 45:8 46:11,23 48:6, 20 49:22 50:10 51:5, 11 52:5,7 60:2 62:5 63:18,23 64:2 65:15, 20,21,25 66:3 67:14 68:11,18 72:2,3,17 73:12 78:12,21 80:5, 6,17,18 81:13 83:6 86:20 87:7 89:16,20 127:18 151:16 155:9, 13 158:6,10 161:2,21 162:7 164:5,9 168:10 171:16 172:7,21 173:9 175:7,18,25 176:7 186:17,18 209:7 228:24 229:5 231:22 234:5 235:6, 13,25 242:8 254:21 270:14 279:22 280:16 301:4 316:11 317:2 337:8,9

**detention** 13:12 36:20 37:20 38:5 39:18 40:2 42:15 43:7,8 44:15 49:3,12 50:25 52:21 53:19,25 54:4,12 56:3 65:3 67:5 84:4,8,13 85:12, 14 111:14,17 124:5 125:9,13,16,20 129:20 131:15 141:14 144:8,12 151:23 153:5 174:17 177:6 181:2,3,22 182:20 197:18 198:3, 5 205:5 208:25 210:8,14 241:21 244:4 255:5 319:3 320:7,10,23 321:5,13 326:19 334:8

**determination** 24:3 76:7,18 155:22 225:2 256:2

**determinations** 41:3

**determine** 16:16 17:7 24:9 36:16 37:15 38:11 39:19 57:23,25 76:18 99:21

107:23 109:21 186:10 204:18,22 265:24 307:24 314:17

**determined** 81:10 111:2 176:3 201:23

**determines** 20:10, 12 25:7,10 111:23 182:6 212:20,23 213:2,5,8,12 214:3, 16,19 280:25 314:13

**determining** 20:9 37:4 40:10 42:14 73:10 183:6 214:7 220:21

**develop** 155:23

**developed** 103:21 156:5 276:18

**DHS** 153:2

**DHS-ICE** 309:25

**DHS/ICE** 320:13

**dialects** 261:25

**dialogue** 178:24

**dictate** 23:13

**dictates** 19:23 23:15

**diem** 45:14,21 58:5, 11 59:13,21 69:19,20 70:2 73:22 77:15 81:4,16 82:3 83:19 105:15,16 144:3 206:15,20,24 207:5, 11,15,16

**diet** 293:25

**dietary** 293:3,9,14

**dietitian** 195:16 277:2,8,9 278:12 281:3 304:2 305:21, 24 310:2 312:4

**diets** 312:2,3,16

**difference** 60:8 119:6 144:17 168:3 169:24 170:4 181:10

**differences** 144:7 167:24 181:4

**differently** 294:16

**difficult** 150:12

**dining** 50:14 163:24 164:25 165:13,17,19, 24 166:21,23,25 167:6

**direct** 33:21 98:11 221:20 270:22 275:13

**directing** 89:2

**direction** 104:12 271:3

**directly** 71:16 73:15 77:18 93:24 97:17 98:3 145:16 147:18, 20 263:18 270:25

**director** 54:6,7 85:10,11 86:19,25 88:18,21 90:24 91:9, 11,17 92:22 93:13,22 94:6,9,23 95:8,13 97:13,25 238:2 251:13,19 262:14 276:4 298:4 299:11, 14

**directors** 91:14 92:17 93:6,8,19 94:22 97:23 100:18

**directory** 290:12

**disabilities** 249:22

**disability** 250:19

**disagree** 305:20

**disagreed** 183:25

**discard** 323:18,19

**discarded** 308:5,6 322:24

**discharge** 166:5

**disciplinaries** 265:4 326:19

**disciplinary** 192:19 210:25 214:24 254:4 255:23 256:6,12,15, 20,22 257:2,4,18 258:7,10 264:16 265:3 266:25 269:10 271:7,9 272:12,14 273:11,16,19 274:9, 14,16 290:22

**discipline** 25:12,15 26:9 84:21,22 178:12 214:21 253:18 262:18 266:8 267:8

**disciplined** 25:18 254:10 268:14,24

**disclosed** 321:18

**discretion** 23:16,25 204:17,21 206:13 212:15 264:17

**discretionary** 113:6

**discuss** 202:3,6 258:18 304:25

**discussed** 122:25

**discussing** 16:7 104:25 233:12

**discussion** 55:20 69:12 80:25 163:9 201:12 251:12 258:19 282:23 304:19

**discussions** 28:8 32:23 35:21 46:15 73:16

**disposable** 235:12

**disposal** 337:6

**dispose** 337:15

**Disposition** 321:8

**dissatisfied** 87:24

**distances** 235:9

**distancing** 11:16

**distort** 292:15

**distribution** 239:10 324:17

**division** 54:8,9 91:16

**divisions** 93:20

**Dixon** 92:18,20,24 93:24,25 94:8

**dock** 337:15

**docked** 158:21 159:14

**document** 23:5 29:5 31:8,13,14,15,18,23,

25 51:23 63:5 70:13 75:16 86:3,16 87:10 113:12 125:2,13 129:15 135:24 148:23 163:11 171:7 173:25 191:12 192:6 195:25 196:17,18 203:12 210:18,23 211:2 220:3 242:11, 14 256:17 262:17 268:20 286:19 289:23 292:8 293:9 298:23 301:12 318:12 320:17 322:13 324:3 333:12 336:22

**documentation** 15:10 25:2 172:2 175:11 181:7 192:17 193:10 210:7,11 237:12 324:6

**documented** 146:5 204:25 205:3,16 207:17 289:22

**documents** 13:21, 23 14:7,8,19,21,23 25:3,6,23 26:5,14,16, 18,20,22 27:4,6,8,15 28:18 29:9 31:10,21 32:18,22 52:2,3 64:21 86:6 90:7 113:18 128:25 146:13 154:16,17,22, 25 155:4 156:14 172:5,10,11,15,18 173:15,17 181:14 182:23 189:12,14,16, 18 224:16 242:4,7 321:2 323:22,24 324:11,19 325:8 326:16,25 327:11 328:9

**dollar** 22:15,16 23:14,15,17 43:18 45:9 46:23 48:7 70:24 71:20,23 83:9 105:9 142:15 176:18 206:13 213:25

**dollars** 22:25 43:16 45:9 46:23 48:7 84:9 209:22

**Donahue** 157:6

**donations** 332:21,22

**doorjambs** 223:14

**doorstep** 190:3

**dorm** 250:12

**dotted** 98:8,10

**dotted-line** 97:18

**doubt** 174:23

**Douglas** 157:19

**drafted** 103:23

**draw** 228:4,10

**Drew** 327:9,20

**dried** 284:18,20

**drink** 294:5,8,12 296:3,6

**drive** 40:19 57:19 293:22

**driven** 312:22

**driving** 88:9

**drop** 280:23

**dropped** 51:8 66:20 129:25 149:4 231:8, 13

**DRS** 257:4

**due** 9:5 76:7 232:9

**duly** 9:14

**duration** 277:12 330:8

**dust** 248:11

**dusted** 248:15

**duties** 231:18

**duty** 195:11 281:15

---

**E**

**e.g** 235:12

**earlier** 18:13 29:7 58:10 63:20 84:19 90:15 104:10 118:8 148:22 152:25 155:25 163:3 198:9 219:6 224:22 245:16 252:16 276:2,19

281:10 305:16 315:12 317:5 330:17

**early** 46:7,8 229:3 287:21

**earn** 150:21

**earned** 84:12

**earning** 45:10 84:8 151:10

**earnings** 109:3 110:12,15 112:8 115:5 116:7

**earns** 318:4

**eat** 313:18 335:7

**EBITDA** 110:13 112:7 114:25 115:5, 9,25 116:2,4,11,23

**educate** 26:8 32:20 34:6,13

**educated** 266:14,15

**educational** 54:20 330:3,6

**effect** 25:2 64:8 74:13,18 79:25 80:2 116:9 219:25 231:12 232:25 234:19,25 268:2 290:10 292:10

**effective** 64:20 99:22 149:19 267:23

**efforts** 334:8,11,16

**eggs** 279:23 280:8, 17

**egregious** 307:4

**eight-hour** 226:23

**Eighty-four** 43:23, 24

**electric** 105:4,7

**electronic** 133:4 189:19

**electronically** 151:5

**elects** 206:20

**element** 60:5 77:16

**elements** 41:22 104:2

**eligible** 110:24 114:5

**Elimination** 10:14

**Ellis** 85:7,9,10 86:18 89:14,19 90:8,12 95:4,7,12,14 96:12, 22 97:14 298:3

**Ellis's** 90:14

**email** 84:24 85:23 86:7 113:14 121:5,7 122:2,25 123:5,8 124:19,21 125:3 127:23 129:2 157:4, 14 158:16,23 237:20 238:6,20,24 239:6,19 242:24 279:5 286:8, 14 297:19 298:6,11, 18,25 299:5,8,12 300:2

**emails** 27:14,16 28:17 85:6,9,21 91:12 152:14 202:4 326:24

**employed** 63:11 125:17

**employee** 45:6 62:12,13 137:6 159:24 160:4 214:23 280:4

**employees** 39:10,18 40:9 41:5,25 44:20, 23 45:10 46:20,22 47:23 48:6 49:11,16 50:24 62:14 66:22 110:20 111:15,24 114:4 115:20,21 136:3,4 137:2,11 142:19 157:11 247:12 315:19,23

**employer** 38:25

**employment** 52:20 55:4

**empty** 309:9

**encourage** 213:6 316:12

**encouraged** 233:22 234:2 255:18

**end** 46:22 114:10 164:19 178:6 181:12 267:22 279:20

307:11 337:3

**ends** 48:3 336:21

**enforce** 240:18

**Enforcement** 167:10

**engage** 21:21 244:21

**engaged** 50:23

**English** 254:23 256:18 261:12

**ensure** 9:7 19:2 20:20 102:2 134:7 174:13 176:7 195:19 245:22 248:8 250:18 278:21 282:12 304:19 310:8 312:5 325:8

**ensures** 209:6

**ensuring** 166:3 275:6 308:12

**enter** 38:21 73:23 74:2

**entered** 39:25 44:6 45:16 82:4

**entering** 44:15

**entire** 86:14 205:12 327:17 330:8

**entirety** 123:10

**entities** 153:2

**entitled** 31:8 159:5

**entries** 333:22

**entry** 333:23 336:12, 25 337:5

**environment** 11:24 248:2,9

**Environmental** 165:8,10

**EOD** 140:19

**Eqip** 140:10,11 141:2

**equal** 226:21 227:6, 14,17

**equally** 216:15

**equation** 130:25



**feeding** 67:15

**feet** 69:10,14 235:9, 20,22 236:3

**fell** 249:5,9

**felt** 41:9

**females** 226:17

**fencing** 70:9

**fifty-two** 57:16

**fighting** 256:9

**figure** 83:22 84:7 176:20

**figuring** 45:3

**file** 175:4 182:9 197:18 198:3 205:6 210:8 303:20 320:24 321:9

**filed** 13:11 15:14 283:18,20 328:6

**files** 177:6,12 181:9 189:4 198:5 210:15 319:3,20,25 320:6,7, 10,23 321:5,13 322:17,21 325:11 326:19

**filing** 309:15,20

**filings** 30:18

**fill** 21:14,15 67:8,9 205:5 230:4 326:2

**filled** 40:9,10 66:18 119:21 138:4 139:20 140:2 310:10

**final** 20:14 140:19 160:17 163:18 182:11 183:8 277:15 328:18

**financial** 68:23 74:3 80:21 111:16,21 112:14,22,23 113:9 115:19

**financially** 113:4

**financials** 147:21

**find** 89:14 226:16 283:25 284:2,19

**finding** 103:19 156:6

165:7 183:25 186:18, 23 222:8

**findings** 102:21 112:19 186:9 190:20

**finds** 155:17 183:10 284:6

**fine** 329:15,17,22

**finish** 12:2 289:16

**first-shift** 333:24 335:18,25

**fit** 198:16

**five-day** 41:17

**five-member** 102:14 187:19

**fixed** 60:8,11,23 61:4,5,6,14,25 62:2,7 73:10 172:22

**flexibility** 183:5

**flexible** 118:3

**flicked** 307:3

**flies** 185:6

**flip** 165:9

**flipping** 146:15

**floor** 22:13 70:3 206:11 213:3 220:12

**floors** 247:21,23 248:14

**Florida** 53:4,12,13, 20 54:24,25

**flow** 71:8

**fluctuation** 335:9

**fluctuations** 218:9

**fluent** 245:5,6

**focus** 41:24 109:2

**folks** 157:10 222:24 230:7

**follow** 41:9 84:19 240:12 268:8 271:3 303:18 334:9

**follow-up** 17:5 304:13

**follow-ups** 156:10

**food** 61:11 67:14,15, 20 68:2,10 89:17 102:13 133:22,24 134:5,8 161:21 162:6,12 172:11 178:16 179:18 191:16,24 195:2 234:5,9 235:7 238:2 244:23 252:13 267:17 275:3,8,11, 14,15,19 276:6,11 279:25 280:17 282:8, 13,17 283:5,7,11,15, 18 284:7,12,24 285:3,10,17,23 287:9,19,22 290:4,7, 21 291:4,18,21,25 292:14 295:25 296:21 297:2,10,13 299:10,14 301:4,8, 14,20 303:2,21,23 305:5,11 307:8,9 308:2,4,10 310:3,10, 17 311:16,17,21 312:11,17,19,25 313:9,15,18 314:8 333:22,24

**food-service** 128:16 221:21

**foods** 282:7 290:25 302:21,22

**foot** 69:13

**for-profit** 42:23

**force** 88:9 244:13

**forced** 18:2 250:7

**forecasted** 105:3

**forecasting** 110:8

**foreign** 284:6

**foremost** 86:18 103:18

**forget** 311:4

**forgive** 227:16

**form** 15:17 16:4,21 17:10,23 18:11,23 19:25 21:16 23:7,19 25:13,20 26:12 27:12 30:8 32:2 34:7,15 36:6 37:12,22 39:8,

13,22 40:13 41:7 45:11 46:13 47:2 48:10 49:17 51:12, 17,21 52:10 56:13,21 58:24 66:5,25 67:18 68:20 73:13 79:10 80:19 82:14,22 83:21 87:9,18 88:16 90:10 91:2 93:14 94:2 96:14 98:22 100:3 101:2 105:21 107:6 108:9 109:4,14 110:22 112:9 116:13 122:13 127:8 137:8, 12 143:7,19 147:9 151:11 167:22 170:2 176:13 178:17 179:4, 12,25 180:6 191:25 193:18 198:14 199:23 205:4,7,10,16 208:7 209:16,25 210:12 211:12,13,16 213:14 216:2,9,13, 14,17,20 217:7 224:14 225:5,16,17 232:6,15,20 238:23 240:11 242:6 245:18, 24 247:13 248:18 249:16 251:5 252:3 266:13,24 268:15 269:2,20 277:22 278:3 280:12 282:6,9 283:2 284:9,16 285:5 287:13 293:20 295:7, 13 296:17 298:11,13, 18 299:21 300:7 301:15,21 302:6 304:16 306:18 310:24 311:3,5,12 313:10 314:2 317:24 321:17,22 322:18 323:2,5 326:22 330:13

**formal** 308:8

**formatted** 137:8

**forms** 166:3 172:15 195:13,22 210:21 281:11,14,21 285:13, 20 320:25 326:21

**formula** 78:22 112:3 131:19 132:7 141:4

**found** 168:23 169:14, 24 171:19 172:25

175:22 183:18 193:12 249:8 282:24 285:9 305:17 307:8

**foundation** 16:21 34:7,15 86:21 88:6 89:22 96:14 97:4 170:2 179:12 182:21 248:18 296:17 298:14 299:4,21

**four-hour** 226:25

**four-week** 156:22

**fourteen** 84:8

**fourth** 31:8 202:12

**frame** 40:6 64:12 82:8 95:6 135:4 184:15 319:2

**frames** 243:14,16

**frankly** 61:13 154:5 222:23 337:10

**free** 151:15,21 152:6 331:10,14,18

**French** 261:12

**frequently** 168:23 332:19 336:5,7 337:10

**fresh** 316:13 317:2

**Friday** 304:25

**friends** 151:8 313:24

**front** 170:9 172:13

**FSC** 33:18,24 54:17 85:13 86:19 88:13,21 90:24 94:23 98:4 100:14,25 101:6,17 102:7 103:15 104:13 109:19 111:22 114:4 187:8,16,24 188:11, 20 189:9,25 190:11, 14 191:2,8 192:9 194:6,8,15 196:12,15 197:11,22 199:15,20 200:3,6,22 218:8,11, 18 223:22,24,25 224:9,13 238:4,20 240:8 251:3 257:25 262:9,11 268:5 275:24 276:18 277:5, 6,7 278:17 281:7 301:3,5,9,13,16

303:15 315:7 318:10, 18 323:15 324:6

**FSD** 299:10,13

**fulfill** 132:8

**full** 18:4 19:3 101:13 226:14

**full-time** 49:11,15 50:24 55:12

**fully** 49:11 50:24

**functions** 231:21

**funding** 314:7

**funds** 71:8 106:2 146:23 147:22 151:4 313:20,22,24 316:22

**future** 105:10 156:3

**FYI** 251:14

---

### G

**Gadsden** 53:12

**gain** 86:17

**game** 316:23

**games** 252:19 330:21,23 332:9,13, 15

**gather** 11:19

**gave** 29:22 69:3,5 70:3,12 226:13

**gears** 104:9

**gender** 226:20

**genders** 227:15 336:7

**general** 47:6,10 78:19 90:14 92:6 139:14 272:22,25 273:7,21 274:17 334:25 335:7,12 336:18 337:2

**generally** 10:10 131:25 135:25 144:6 168:4 198:10 215:14 243:17 252:24 336:13

**generate** 152:11

255:22

**generated** 122:8,11, 15 210:22 308:3,11

**generic** 193:18

**get all** 282:21

**Gimesh** 237:21,24, 25 238:16 239:4,13 242:23 275:25 276:3 286:9 297:19 298:6 299:2 301:3

**give** 11:22 12:25 13:5,8 18:18 56:10 61:3,15 62:18 64:11 105:3 112:15 153:25 160:2 177:9 183:25 220:16 222:4 233:6 277:14 284:18 335:9

**giving** 24:13 30:4 131:3

**gloves** 235:12 289:6, 18

**goal** 116:12

**goals** 111:6,7,10,11, 12,14 112:13 113:3,7 114:15

**goggles** 235:12

**good** 9:18,19 31:22 65:23 66:4,7 75:17 86:10 91:4 117:21 152:22 172:19 177:25 180:11,12 201:10,11 222:5 246:18 253:16

**goods** 106:7 107:4

**govern** 19:18

**governing** 211:25

**government** 36:4 76:16 77:4

**grade** 114:24 115:10

**grades** 113:24 114:24

**granted** 202:15

**graph** 243:22

**Gray** 85:24 297:24

**Gray/fsd** 299:15

**greater** 132:2 144:2 206:21

**grievable** 303:24 305:18 312:7,13 313:2

**grievance** 152:12 175:4 303:8,12,14 304:21 305:17 306:5, 16 307:20 308:25 309:14 311:12 312:7, 12,22

**grievances** 303:20 304:11,25 305:2,10 309:20 326:20

**grievant** 309:6

**grieved** 305:23

**grieving** 304:2

**ground** 11:22

**group** 97:11,12 101:11 161:5 209:2 238:12 311:21

**group's** 201:10

**groups** 156:11 290:24 312:6 332:22

**guarantee** 59:9 70:3 78:21 128:7

**guaranteed** 65:4,6, 13 73:2 78:25 81:8, 14

**Guard** 65:3

**guess** 15:9 53:21 77:25 80:24 181:9 201:3 228:17 276:4 304:2 319:7 330:9

**guessing** 193:8

**guide** 334:6

**guidelines** 212:14 219:3

**guiding** 200:19

**guy** 55:14

**guys** 256:8,13

---

### H

**habits** 257:10,16

**hair** 222:9 289:6,18

**half** 28:23 53:22 190:6 295:5 310:25

**half-time** 126:3

**hall** 50:14,16 143:13 164:4 165:2 174:25

**hallway** 337:13,17

**hand** 221:18,19 289:6

**handbook** 216:24 217:3,6,9,11 254:16, 23 259:18 260:8,13, 14,19 261:2,3,6,15, 20 262:9,11,15,19,23 263:9 266:3,7

**handbooks** 255:2

**handful** 23:8 122:14

**handle** 98:12 288:10

**handled** 231:22

**handles** 93:24

**happen** 174:18 324:4

**happened** 30:6 58:8 102:24 229:9

**happening** 26:4 267:12

**hard** 129:13 135:21 150:6 166:6 242:16 257:16 291:19 292:11

**harder** 291:16

**hardest** 222:24

**Harrell** 85:24 297:24

**Hartsville** 53:24

**hate** 165:8

**head** 12:8 27:25 106:25 216:25 304:2, 9 317:4

**headphones** 331:11,20 332:6

**headquarters** 275:17

**heads** 256:13

**headset** 332:2

**health** 110:2 165:8, 10 258:22 259:3 269:12 271:4

**healthy** 311:19

**hear** 12:13 202:13 332:6

**heard** 9:7 63:19 296:20

**hearing** 35:23 183:15 256:22,23,25 265:3

**held** 63:23 64:3 89:20 301:2

**helper** 250:6

**helpful** 119:12

**Hernando** 53:3,17, 18

**Hey** 182:9

**high** 54:22 55:10,12 109:21 196:24,25 264:7

**higher** 60:2,20 61:13 63:11 68:5 76:22 115:9,17 116:3,6,22 136:18 144:2 181:14 305:9

**highest** 39:2 63:17

**highlight** 267:2

**highlighted** 235:4

**hire** 48:5 57:22 76:24 119:8,11 140:14 143:25

**hired** 39:10 47:24 49:11 250:18

**hires** 138:15 141:2,3

**hiring** 59:13 138:17 188:24 247:11

**Hispanic** 302:17

**historically** 207:7

**history** 52:20 105:6 110:9

**history-based** 104:20

**hit** 288:11 337:18

**hoc** 96:2

**hold** 89:15 114:20
163:23

**holiday** 291:24

**holidays** 291:15

**home** 333:3

**Honestly** 242:15

**hope** 54:2 59:15
117:14 275:5

**hot** 282:7

**hour** 28:23 159:11
272:8,24 295:5

**hour-and-a-half**
29:12

**hourlies** 66:20

**hourly** 62:20,22
63:12 142:19 145:9

**hours** 28:23 41:14,17
91:22 126:11 130:22,
24 131:12,18,23
142:16,17,21,22
161:4 172:23 173:17,
20,22 174:2,9,16,20
175:12 214:15
226:22 230:23
236:11,13,17,21
250:20 271:18
272:11,18 273:5
287:21

**house** 54:14 58:7,20
60:24 121:8,15
122:25 124:21
227:14

**House's** 125:3

**housed** 50:10 59:24
65:16 68:19 72:17
78:13 81:14 261:17
269:13,15

**housing** 24:16 51:14
58:14 60:3,12,15,19,
25 63:7 66:16 80:16
131:16 146:13
163:23 166:13
220:13 252:20 256:6,
10 257:7,9,11
258:16,18,21 259:8

261:3 272:25 274:2,6
316:12,25 330:16
331:4 332:2,9,11

**Howard** 9:10,17,20
15:20 16:11,25 17:2,
19 18:4,17,20 19:6
20:8 22:2,12 23:21
25:17 26:3,17 27:14
30:15,21 31:7 32:4
34:10,12,17 36:19
37:18 38:3 39:9,15,
24 41:2 42:17,20
45:24 46:17 47:9,14,
16,17 49:9 50:3
51:15,20 52:3,18
55:18,22 56:14 57:2,
5 59:16,20 64:13,18,
21,24 65:2 66:19
67:12,22 69:2 73:25
75:7,15,20 79:12
80:23 82:19 83:2
84:15,18 85:2,5 87:6,
14 88:4,11,20 90:6,
13 91:5 92:2 93:21
94:7,13,20 96:18
97:8 99:3,24 100:13,
22 101:5 102:6
106:16 107:8 108:19,
20 109:8,10,16
110:25 111:13,22
112:5 113:11,17
114:20,23 116:21
117:9,17 118:7
152:25 187:6 206:10

**HR** 141:19 142:5
188:23 189:17

**HSAS** 144:23

**Huffman** 238:11

**human** 98:7,10
100:19 135:12
311:18

**hundred** 48:12 50:17
57:16 84:9 106:5
141:24 145:20
146:23 155:5 175:16
197:6 246:11

**hungry** 313:9,17

**hurting** 182:14

**hygiene** 222:14

**hypotheticals**
266:22

**I**

**ICAS** 196:25 197:2,
16

**ice** 21:21 23:13,15
35:13 36:20 38:7
39:16 42:21 43:12
45:4 46:12 47:20
54:12,13 56:5,11,20
57:14 58:3,19,22
59:8,23 60:3,20 65:6,
15 69:5,10,14 70:5,
12,18 71:9,13,17
72:8,17 75:22 76:9
77:17 78:11,20,25
79:5 82:2,5 83:19,23
84:2 104:6 105:17
107:10,12 119:9
120:25 121:8,20,24
123:16 124:19
126:17,23 135:9,20
138:20 140:13,19
141:14 142:4,12
145:17 147:19,20,25
151:23 155:12,21
157:23 163:4,7,21
167:25 168:9 182:25
183:2 186:20 189:3
208:5,22,25 212:6,11
214:22,23 232:24
239:7 248:16 258:6,
9,12,24 264:20
278:19,21 279:11,13
316:25 317:2 321:15
322:3,5,8

**ICE's** 167:10 231:23
232:8

**ICE-BARRIENTOS**
279:2

**idea** 125:16 159:15
309:16 317:10

**ideations** 259:8

**identification** 31:6
55:21 64:17 75:19
85:4 113:16 121:3
123:14 129:5 132:15
135:18 148:20 157:3
161:13 162:24 169:6
184:25 190:24 203:6
215:4,22 217:20
218:22 233:8 234:16
237:19 259:16

267:16 278:24 286:7
290:5 292:6 297:17
300:17 306:4 308:23
311:10 319:10
320:14 333:10

**identified** 149:19
169:22 226:4

**identify** 108:6 265:9
266:12

**idleness** 316:11,15

**IGSA** 118:25 119:15
121:22 124:5 128:24
129:7 134:2,6 143:17
205:23

**IGSAS** 205:19

**IHSC** 82:5,10

**II** 54:8,9

**ill** 188:7

**illustrates** 300:2

**immediately** 307:5,
24

**immigration** 182:20

**impact** 228:20

**impacted** 229:12,21

**impacts** 45:14,20
76:6 87:4 221:2

**implement** 267:8

**implementation**
99:24 101:7

**implemented**
151:22 190:16 278:2

**implementing**
103:16

**imply** 122:5

**important** 12:2,7
37:7 38:16 316:15

**importantly** 306:25
325:20

**imposed** 264:18,25

**improper** 161:23

**improve** 108:7 109:2
110:12 239:15
279:25

**improvement** 77:7
193:3,13,14,15

**in-dorm** 229:12

**in-house** 34:4

**in-person** 28:8
178:20 270:7,11

**in-service** 92:7

**inabilities** 49:22

**inadequate** 163:24

**inadvertently**
325:12

**inappropriate**
306:17,24

**inappropriateness**
306:21

**incentive** 24:20
291:8

**incentives** 24:10,12,
21 30:4 213:6 220:9,
15 251:25 252:12,23

**incentivize** 24:14
222:3

**incentivized** 114:14

**incident** 210:17,20
265:24 283:6,18,20
284:4,7,15 285:3,10,
17,19 295:25 308:2,
10

**incidents** 48:18
92:9,11 283:22
288:13

**include** 37:20 39:9
82:21 123:24 170:18,
25 192:9 208:20
263:20 269:22,24
312:2 323:6,9

**included** 116:11,21
128:16 134:6 137:11
141:11 252:13,15,19
321:5

**includes** 171:5 269:9
320:24

**including** 58:12 85:7
87:7 116:11 201:19
202:12

**inclusive** 281:16

**incorporate** 123:2

**incorporated** 124:4 128:24 133:25

**increase** 58:22 60:24 61:23 70:2 73:20,21 76:6,9,14 80:18 81:3 105:5,8,9,10 108:2,3, 23,25 145:4 251:12

**increased** 60:21 76:23 78:2 143:16

**increases** 60:18 78:2 80:25

**increasing** 73:12

**incurs** 77:3

**indefinite** 56:7

**independent** 317:19

**indication** 56:10

**indicator** 179:17,20, 23 180:4 191:19 192:10 194:11 195:3 197:12 198:22

**indicators** 179:14,19 198:12 199:20 200:25

**indiscernible** 163:6 199:3 200:18 220:5 230:8 284:22

**individual** 63:15 93:10 138:19 172:10 181:5 290:23 293:17

**individually** 258:19

**individuals** 26:25 94:17 98:9 100:17 173:13 176:24,25 183:15 235:8 240:23 241:19 250:5 262:2 269:15 308:9,17 325:15

**informally** 255:19

**information** 37:2,14 69:18 92:7,12,24 141:17 142:14,21 184:11 217:6 321:4,5 323:9

**informed** 90:15

**216:22 217:4 237:3 254:17 279:22 323:22 324:10,14,19, 22**

**infraction** 211:10 265:15

**infractions** 253:24

**initial** 207:6,12 293:11

**initially** 104:13

**initiate** 163:14

**initiated** 162:6

**injunctive** 15:25

**inmate** 10:12 42:2 45:13,17 48:16 49:5 70:11 81:5,19 192:2, 10 193:11 194:12 197:3,4,8 198:17 199:2 201:19

**inmate/resident** 290:23 319:20,24 320:6

**inmates** 185:25 196:25 197:9 238:17 240:18 242:4 270:14 298:9

**inmates/residents** 290:24

**insect** 308:5

**inside** 87:2 127:13 152:14 229:13,14 244:20 334:7

**inspect** 176:7

**inspected** 175:15

**inspection** 96:8 97:6,8 109:23 117:21 161:23 162:5,9 165:14 169:22 170:18,24 171:11 311:20

**inspections** 154:8 168:12

**instances** 209:13 265:10 268:13 295:9

**instruct** 162:17

**instructed** 162:7 166:25

**instructing** 165:23

**instruction** 12:23

**instruments** 200:17, 20

**intake** 143:6 166:4 254:20 260:17 281:2, 4,8 304:3

**intake/discharge** 166:17

**intended** 34:5

**intent** 89:25 212:17 240:3

**interact** 235:8

**interaction** 235:19 236:3 250:15

**interactions** 254:20, 25

**interchangeable** 257:8

**interest** 110:15 238:21 318:4

**interested** 65:10

**intergovernmental** 35:12 38:14

**intermittent** 230:15

**intermix** 187:21

**internal** 33:15 99:8 101:24 112:20 187:6 200:7,8,9,14 201:2

**internally** 16:8 38:9

**interpret** 210:10 312:21

**interpreted** 204:12

**interrupt** 12:4 75:18

**interruption** 114:19

**interview** 155:8 168:9,15,17 186:17 189:21,23

**interviews** 155:14 172:4 173:10,15 178:19,21 186:24

**investigated** 307:21 310:4

**invoices** 26:23 71:16

**involve** 10:22 90:16

**involved** 11:7 35:11 36:24 73:16 86:19 88:14 258:22,25 259:3 301:9

**involvement** 37:24

**involves** 39:5 85:17

**involving** 11:3,6 15:25

**irrelevant** 201:21

**isolate** 229:4,20

**isolated** 229:7 305:5 325:17

**isolation** 235:13

**issue** 87:13,15,20,22, 23 88:25 121:24 151:23 155:23 158:15 160:8 165:2, 18 201:16 283:4,9 288:17 299:23 305:8 307:6 332:8

**issued** 124:19

**issues** 20:21 21:5 86:19 87:2,7 88:14, 22 90:15 92:4 99:18 106:17 166:3,9 209:18 259:12 282:17 288:15 294:23 303:7,21,23 305:4,7

**item** 30:10 65:2 107:20 109:23 196:2, 24 197:7 208:20 278:7,13,14,16 283:24 288:19 291:18

**items** 61:14 70:6,8 77:6 105:12 106:19 107:17 109:3,20 110:5 147:3 273:13 278:6 279:25 285:9 292:14 299:16 302:14,18 303:2,5 313:13,21 314:9,11, 13,15,23 315:2,6

**322:23 323:16,18**

**J**

**Jack** 301:2

**Jackie** 27:23 30:21 31:11 85:3 124:16 127:25 132:16 149:13 150:15 157:17 233:20 264:4 279:4 280:13

**Jacob** 9:12 148:17 233:6 280:24 321:22 337:24

**jail** 49:3 53:3,17,18 54:15

**jails** 37:25 181:25

**jalapeño** 296:11,15 302:25

**jalapeños** 302:17

**janitor** 126:4,6,16 130:16 133:13,14,16

**janitorial** 126:18 127:17

**janitors** 125:24 126:21

**January** 267:23

**Jason** 85:7,10 95:4,7 298:3,7,9

**Jell-o** 284:3

**job** 21:9,20 24:8 45:5 55:7,8 176:3 187:14 210:13 212:21 219:10 241:9 264:8, 11 326:20,22 328:25 329:3

**jobs** 19:23 20:4,7,9, 22 21:14,23 22:5 39:6,10,11 40:8 41:4, 6 45:8,17 46:2,4,10, 19,21 179:24 212:23 222:3,6 227:6 235:19 247:9 328:19

**John** 157:5 237:21, 24,25 275:25 279:9 286:9 297:19 301:3

**joined** 14:14

**jointly** 239:15

**Joseph** 75:25 76:2

**judge** 11:11,14

**judges** 77:22

**July** 53:2 161:15

**July/august** 104:18

**jump** 198:20 201:14 333:21

**jumped** 282:22

**jumping** 125:23

**Justice** 53:9

**justify** 204:18

**K**

**K(3)** 290:21

**K-E-E-T-O-N** 54:5

**Keefe** 315:8

**keeping** 92:21 164:12 270:25

**keeping/maintaining** 189:5

**Keeton** 54:5,17 94:22 95:3,8 96:19 97:13 251:13

**key** 242:17

**kick** 257:16

**kicked** 267:21

**kids** 333:3

**kind** 18:14 69:25 77:8 85:20 90:17,21 95:25 97:18 102:9 103:21 104:11,16,20 106:2 109:7,22 119:6 172:13 174:6 177:4 192:5 218:14 220:8 224:24 241:3 274:2 288:6 291:18 323:9 331:4

**kinds** 21:13 87:6 172:5 333:4

**kitchen** 22:20 24:14,

15 51:15 52:9 160:12 166:11 173:12 194:12,15,19 214:6, 9,12,13,14 220:11 221:14 222:6 225:14, 20,24 226:13,18 227:6,10,22,25 229:9,19 230:7,13 235:16 236:10,18,23 241:5,6 243:4 244:10,16 245:11,12, 15,21,22 246:6,21 247:6,12 282:2 287:14,15,20 288:7 289:10 297:6 307:13 310:22 311:20 334:21 335:2,18 336:12,13 337:6,7, 12,16

**knowing** 44:3 45:16

**knowingly** 42:25

**knowledge** 25:25 26:4 30:6 32:15,21 33:3 57:3 119:16 122:3 123:6 204:14 207:23 294:13

**knowledgeable** 17:16

**Kronos** 142:20

**L**

**labeled** 113:25 222:25

**labor** 38:23 39:5,19 40:11 44:8,14,19 45:3,18 46:19,24 47:18,23 48:7,16 49:6 50:2 58:13,21 67:6 107:19 117:5

**laborers** 45:25

**lack** 106:2 275:17 322:23

**ladles** 310:22

**Lane** 27:23

**language** 224:4 254:24 256:17,18 261:16,21 262:6

**Languageline** 256:24 262:3

**languages** 261:7,9 262:2 330:20

**large** 44:18 103:5,8 155:3 330:25

**larger** 226:11 228:7

**largest** 44:8,21 105:14 107:20 117:5

**late** 158:20 159:14 168:24 242:5,14,21 295:7

**lateral** 53:11,16,23, 25

**laundry** 173:13 229:10 230:11,17,22, 24 231:2 242:10

**law** 158:16,21,25 159:6,21 160:11,22 161:4,8 273:23,25 274:7,10

**lawsuit** 13:11,15 14:6,10,17,22,24 15:2,13 324:11 325:9 326:17 327:12 328:6, 9

**lawyers** 14:11,23 15:11

**lays** 114:14

**Lazier** 315:4

**lead** 102:12 168:22 188:9

**leaders** 110:5

**leadership** 88:23 89:4,6,7 90:18,23 95:20 96:9 100:11 163:15 195:7 275:18 285:24

**leading** 81:2

**leadoff** 9:23

**leads** 187:20

**leap** 72:12 191:20,23 192:4,8

**learn** 13:15 266:22

**learned** 92:10

**learning** 103:6 122:6

**leave** 98:13 187:22 229:11 329:13

**leaves** 138:7

**Lecanto** 53:20

**led** 76:8

**Lee** 9:12 12:22 15:17 16:4,21 17:10,23 18:11,23 19:25 21:16 22:8 23:19 25:13,20 26:12 27:12 29:16,18 30:8 32:2 33:17 34:7, 15 36:6 37:12,22 39:8,13,22 40:13 41:7 45:11 46:13 47:2 48:10 49:17 51:12,17,21 52:10 56:13,21 58:24 66:5, 25 67:18 68:20 73:13 79:10 80:19 82:14,22 86:21 87:9,18 88:6, 16 89:22 90:10 91:2 93:14 94:2,11,15 96:14 97:4 98:22 99:5 100:3,16 101:2, 21 105:21 107:6 108:9 109:4,14 110:22 111:4,18 112:9 116:13 122:13 127:8 137:12 143:7, 19,21 147:9 148:10 149:3,8 151:11 167:22 170:2 178:17 179:4,12,25 180:6 182:21 198:14 199:23 201:14 202:16 207:19 208:7 209:16,25 212:8 213:14 217:7 224:14 225:5,16 232:6,15,20 233:3 238:23 240:11 242:6 245:18,24 246:16 247:13 248:18 249:16 251:5 252:3 266:13,24 268:15 269:2,20 277:17,22 278:3 280:12 284:9,16 285:5 293:20 295:7, 13 296:17 298:14 299:4,21 300:7 301:15,21 302:6 304:16 306:18

313:10 314:2 317:24 321:16 329:14,16,18 330:13 338:2

**left** 34:11 165:6 230:5 251:9 327:9 329:11

**left-hand** 134:16

**legal** 11:6 18:12 31:20 270:2

**legend** 310:23 311:2, 4

**legitimately** 326:12

**leisure** 316:23 330:14

**lengthy** 27:4

**lesser** 45:8

**lessons** 92:10

**letter** 123:15 201:25 285:16

**letters** 201:19

**level** 23:23 46:19 52:15 79:23 89:4,7 91:24 100:2,6,10 101:6,17 104:13 108:14 115:17 130:25 222:12 226:18,19 227:6,8,10 248:23 249:2 305:9 325:25

**levels** 37:4 42:15 57:10,18 112:7 114:24 116:3,6,23 117:2 218:10,12,15, 18 304:12

**liberties** 97:12

**library** 158:17,21,25 159:6,21 160:11,22 161:4,8 273:23,25 274:7,10

**licensed** 277:2 281:3 304:6

**lieu** 213:20,23 253:4

**lieutenant** 53:6 241:11,18

**life** 20:21

**lighting** 70:11

**limit** 120:17 216:18

**limitations** 196:24

**limited** 48:20 49:25 61:14 228:24 254:23 270:4,11 272:8,15 273:10,14,17

**Linda** 92:18 93:24,25 94:8

**lines** 98:8,11 279:8

**list** 20:6 27:4 122:20 131:11 135:25 176:24 226:2 279:10 288:2 289:3 314:15, 25

**listed** 70:6,8 137:2 157:10 163:23 179:3 263:16 264:12,15 265:7 288:12 294:5, 10 296:7 321:4

**listen** 332:2

**lists** 137:21 138:15 262:23 263:9 288:2 320:25

**literally** 295:4

**living** 164:13 248:9 250:22,24

**local** 209:3

**locally** 278:10

**located** 53:3,24

**location** 126:19 161:3 211:7,11 237:15 307:24 328:21

**locations** 174:25 182:3 219:10 325:16 327:17

**locked** 48:21 269:16

**long** 28:22,24 85:21 94:7 120:18 138:17 205:10 211:16 212:17 236:13,18,23 258:13 314:22 327:8

**longer** 184:14 201:8 230:12 237:25 279:13

**looked** 21:4,7 32:8

**79**:18 105:2 117:23 124:9 129:23 153:23 156:10 165:3 174:8, 11,12 179:10 186:16 194:8 200:18 215:15 228:3 245:16 265:5 276:19 299:17

**lose** 43:2 74:3 83:4

**loss** 263:22,24 264:2, 8,11,24

**lost** 260:21 282:19

**lot** 40:14,17 41:19 61:10 92:6 167:24 168:2 188:15,17 189:8,13 200:25 223:2 243:19 244:9 334:7

**Love** 202:2

**Love's** 201:18

**loved** 151:2

**loves** 163:7

**low** 50:19 66:2 109:21 231:8

**lower** 44:2 48:8 68:8 117:2 230:5

**lucky** 228:17 229:19

**lunch** 161:22 201:7, 13 296:12 336:18,21 337:3

---

**M**

**mad** 337:21

**made** 27:8 40:8 41:4 45:7 86:25 89:4 130:4 146:10 150:3 160:19 164:3,15 176:12 202:18 242:19 263:12 280:16 315:15 316:21 317:12

**mail** 137:25 138:8

**main** 287:10

**maintain** 142:20 248:23 285:22

**maintained** 106:18

**197**:18 198:2 285:14

**maintaining** 109:11 198:5 316:16 319:2

**maintenance** 128:11,12,14 133:12 144:13,14

**major** 38:22

**majority** 10:12 145:3 256:4 317:11

**make** 12:2,20 20:18 23:2 27:7 37:8 42:23 44:12,13 52:17 58:21 68:7 73:23 77:8 83:5 95:17 97:11 108:7 113:2 115:22 129:13 131:23 151:20 155:21 160:13 172:11 189:4 194:21, 22 200:11 202:8 222:11 251:14 256:2 258:15 259:5,10 305:15 308:16 311:20 315:14,22 316:5,14 326:9 334:16 335:2

**makes** 49:7 58:12 59:15 241:4 253:22

**making** 17:13 22:5 48:8 111:10 240:22 316:10 325:14

**males** 226:17

**manage** 240:13

**managed** 318:10

**management** 20:16 22:4 62:8 89:11 116:5 151:17,18 163:16 198:17 209:2 281:17 304:25 328:23

**manager** 53:6,7 98:7 99:12 109:25 135:12 163:18 183:14 200:11 224:18 260:23 275:19 283:7 285:23 308:16 317:9, 17 326:4

**managers** 166:2 281:18 287:2,4,5

**manages** 317:17

**managing** 54:6,7 85:10,11 86:18,25 88:18,21 90:24 91:9, 11,13,17 92:17,22 93:6,8,12,19,22 94:6, 9,21,22 95:8,13 97:13,23,25 251:13, 19 262:14 298:3

**mandatory** 182:13 183:20 186:19

**manner** 291:20

**March** 123:4 124:23 125:12 267:24 333:14

**margin** 43:10 74:9, 15,22 75:5 80:10,11, 12 82:21 84:6

**margins** 80:17

**mark** 62:20

**marked** 31:6,7 55:21 64:17,18 75:19 85:4, 5 113:16 121:3 123:14 129:5 132:15 135:18 147:7 148:20 157:3 161:13 162:24 169:6 184:25 190:24 203:6 215:4,22 217:20 218:22 233:8 234:16 237:19 259:16 267:16 278:24 286:7 290:5 292:6 297:17 300:17 306:4 308:23 311:10 319:10 320:14 333:10

**market** 67:6

**marking** 31:2

**markup** 146:21 315:9

**Marrero** 299:10,15

**marshals** 54:14

**masks** 235:12

**math** 71:22 72:4,10, 11,22,23 78:16,22 79:2 80:5 81:20 83:8, 15,21 132:7

**matter** 60:12,24 238:19 312:7 313:2

**matters** 10:11 312:13

**max** 225:18,21 226:4 227:3

**maximum** 23:23 64:2 225:8

**meal** 50:12 68:7 161:22,25 195:8,10, 13,22 278:7 281:10, 13,21 282:25 286:15, 21 288:14,22 291:16 298:12,24 309:7 310:6,7,8,17,19 311:2 313:18 335:3, 12,13,16 336:18 337:2,3

**meals** 52:8 214:11 291:24 293:17 299:18 301:11 302:4, 12,19 309:24 313:12

**meaning** 73:19 90:2, 7 206:18 270:23 287:20 309:21

**means** 48:25 59:22 65:14 83:12 89:2 140:15 159:15 309:17 334:2

**meant** 90:8 95:16 244:15

**measure** 200:18 282:3

**measured** 174:11 200:20 248:23 310:12,15

**measures** 16:18 250:17

**measuring** 101:13 136:7 276:13

**mechanism** 77:17 96:6 152:3

**mechanisms** 101:12 156:2 200:5 276:13

**medical** 81:2,3,4,18, 19 82:3,6,11,13,20 83:6,19 84:3 100:19 102:14 105:16 110:4

144:20 145:3 152:12
172:11 189:18,19
221:23 250:10
258:24 259:12
269:24 270:20
330:11

**medical/health**
304:23

**medically** 172:12

**medication** 13:4

**meet** 40:23 95:19
96:8 105:9 112:16
169:14 170:7 222:22
304:21 312:5 322:17
337:8

**meet all** 222:13

**meeting** 24:7 43:10
169:25 171:20
222:13 301:2

**meetings** 28:9,12
90:17 95:23 164:4

**meets** 103:25 212:17
245:22 312:23

**member** 92:17
159:19 287:23 307:2
308:11

**members** 20:15 52:8
62:12 98:2 150:22
151:2,8 260:23
306:22 328:21

**memo** 300:18

**memorialized**
201:25

**memory** 63:4 71:2
260:10 303:5 319:4

**mental** 258:22 259:3
269:12 271:4

**mentally** 171:16

**mention** 26:17
186:23 216:17

**mentioned** 19:14
27:20 28:7 30:3 64:7
70:17 84:22 94:20
100:22 101:17 107:9

**mentoring** 89:2

**menu** 195:15 278:2,

6,7,17,21 283:25
290:22 292:9,10,22,
23 293:18,25 296:2,7
298:24 299:16 301:6,
10 302:4,14 303:3,5,
6 304:14 310:12
311:17,19,21 312:23

**menus** 276:24 277:3,
15,21 278:19 281:2
293:17 300:4 302:8
312:2,5

**merits** 25:12 214:20

**messed** 132:17

**met** 117:20 169:18
225:22 226:7

**Metcalf** 121:9

**method** 258:20
298:16,23

**methods** 288:8

**metric** 115:2

**metrics** 115:19

**Michael** 157:6

**Michelle** 18:20
282:21

**Mike** 27:24

**milk** 280:17,20 294:9,
10,12,14,19 295:10,
22 296:7

**million** 72:16 78:24
84:9

**mind** 174:23

**mindset** 48:23

**minimum** 22:13,22,
23 23:22 44:23 47:24
59:17 64:7 65:4,6,13
67:24 69:3,6,15,24
70:3,12,16 72:2,8
73:2 78:7,21,25 81:8,
14,24 83:12,23
102:18 108:22
120:23 195:12 234:3
311:18 312:23

**minor** 255:18

**minus** 81:18 138:5
190:13

**minute** 31:4 35:9
52:25 158:2,9 288:4
306:11 309:3

**minutes** 75:13
329:11,20

**mirror** 215:14

**missed** 312:15

**missing** 42:18
204:14

**misspoke** 300:22

**Misstates** 87:9

**modification** 59:17
64:11,15,19 65:5
71:25 72:24 75:8,11,
21 79:18 80:3,25
81:6 129:7 132:20
143:17 147:4,23

**modifications**
35:15,20 65:9 105:17
302:9

**modified** 98:20
116:18 135:7 216:10
300:5

**modifying** 301:5,10

**modular** 69:14 70:4

**module** 69:10

**moment** 30:5 59:18
308:3

**Monday** 190:7 294:5

**monetary** 175:19

**money** 42:23 43:2
44:3 46:24 48:8
59:23 60:3,25 71:11
74:3 83:5 106:18,21
107:2,3 108:8
109:13,22 147:24
150:19,20,21,22,23,
25 151:7,10 160:2,3
176:10 178:16
179:18 313:14 314:5
315:15,18,25 317:6,
16,21

**monies** 159:20
160:15 161:8 176:8
291:11

**monitor** 218:8

**monitored** 289:20

**monitoring** 99:25
101:19 195:13,22
281:10,13,21 283:2
286:15,21 287:12
298:11,13,18 310:6,
19 311:3

**monitors** 289:7
317:17

**month** 61:18 91:20
135:10 142:18
228:17

**monthly** 135:20
151:16 200:23
208:16,19 218:7,11

**months** 72:15
153:25 184:18
223:18 229:18

**mop** 221:19 222:4

**mopping** 220:12

**morning** 9:18,19
46:6 84:20 190:8
287:21,22 294:19
335:12

**Moss** 53:9

**motion** 202:3,14

**move** 247:5 253:17
275:3

**moved** 53:19

**movies** 252:20
270:18 271:14,15,20,
21

**moving** 189:5 243:25
251:16 334:7

**multiple** 91:9 255:21
309:20 329:6

**multiply** 72:6

**multiplying** 72:11

**multitude** 124:9,11

**Musil** 275:22

---

**N**

**N/a** 192:15 193:4,20

**Nagel** 157:20

**Nakamoto** 101:11
103:6 104:5 153:13
167:15,20 168:11,15,
17,20 169:8,13,17,25
24 172:5,25 173:6
175:22 176:4,20
177:12 178:25 179:8
180:24 181:11,15
194:9 200:13

**Nakamotos** 156:12
170:12

**named** 302:25

**names** 137:6

**Nashville** 33:16

**Natasha** 121:8,9,10

**national** 180:25
181:2,21

**nationally** 312:5

**natural** 17:5

**nature** 9:5 66:11,14
91:21 98:14 111:16
131:4 192:14 195:9
221:23 223:14
255:22 256:5 265:4
305:13

**necessarily** 41:25
48:11 56:12 87:21
112:13 177:13
182:19 241:17 278:8
284:14,17 334:6,13

**needed** 220:22 225:2
226:15 230:10

**negate** 56:24

**negotiate** 38:18
39:15 40:12 42:20,25
45:3 48:3 58:4 77:15

**negotiated** 35:19
38:15 44:2 46:11,18
73:9 83:4 146:7

**negotiating** 38:6
43:5 47:19 148:11

**negotiation** 35:12
58:11 69:12 206:25
207:9

66:9,16 77:3 114:25
115:14,16 117:4,5
118:22 130:5 212:5
255:10

**operation** 39:3 40:11
71:15 77:9 84:4
102:3

**operational** 38:5
87:4 113:10 115:2
276:13

**operations** 37:3
52:12 88:15,19 89:11
97:25 167:11 275:12
276:16 289:7

**operator** 256:19

**opinion** 243:21

**opinions** 18:15

**opportunities**
108:13 175:4 220:17
330:15

**opportunity** 99:17
110:6 159:23 171:17
227:2

**opposed** 12:8
154:25 160:20

**opposite** 227:14

**optional** 288:2

**options** 244:21

**orally** 93:3

**order** 37:8,15 38:21
39:15 40:11 41:12
42:20 69:5 73:22
114:8 119:21 130:24
131:22 202:2 214:10
250:10 267:18,25
268:8 313:24 332:6
333:6

**orders** 102:4 268:5

**ordinarily** 231:18

**ordinary** 247:2

**orientation** 140:17

**original** 40:2 43:25
44:2 45:4 46:12
124:5 168:25 285:22

**originally** 160:17

**originate** 172:16

**out-of-cell** 272:5

**out-of-date** 216:12

**outcome** 111:12
112:14 159:25
160:14,17 256:25

**outcomes** 289:2

**outlet** 314:6 316:11

**outline** 20:4

**outlined** 322:18
335:20

**outrank** 97:21

**overlapped** 158:17

**overseeing** 94:9
275:11,21

**oversight** 100:7,14
153:5 275:13,19
276:5,10,21

**oversighting** 85:12

**overtime** 142:12,18,
22,23 143:2,8,11,13
230:2,9,18,19,21
247:3,4,6

**owed** 209:7

───────────

**P**

**p.m.** 236:12 336:25
337:5 338:3

**packet** 172:13

**packets** 172:7

**pages** 166:6

**paid** 22:18 38:16
46:20 59:14,21,22
65:15,18 66:2 67:24
77:20 81:15 82:10
83:18 106:19 111:3
126:21 144:5 151:3
159:8,11,15,16
176:15,21 209:13,23
213:19,23 249:21
291:11

**paint** 248:3

**pan** 282:13,14

**pandemic** 63:24
231:23 232:8,13

**panel** 183:15

**paragraph** 113:25
166:17 279:21
300:25

**parameters** 18:9
126:24 324:2 326:13

**Parker** 307:12

**part** 14:4 21:7,8
39:12 40:21 41:21
46:15 53:13 69:11
86:3 87:22 96:23
97:7 108:5 110:21
113:21 116:16 126:5,
14 127:22 129:18,19
130:7,17 132:4 138:9
150:6 153:10 166:11
178:20 183:13,16
187:23 207:2,6
230:16,25 254:21
258:19 264:20
276:13 285:15,17
307:11 328:17,23

**part-time** 126:6
133:13

**participants** 159:8

**participate** 24:4,10
49:14 88:3 171:17
172:21 186:19
205:20 206:2,6
258:16

**participated** 51:2

**participating** 235:10

**participation** 328:15

**parties** 9:2,7 103:9
201:24 250:7

**partner** 57:14 112:19
120:3 190:13 194:9

**partner-based**
104:5

**parts** 243:9 334:7

**party** 68:3 153:8

**pass** 71:10

**past** 69:7 122:9,12
154:9 201:7 249:20
251:25 252:9 259:9

291:7

**pasta** 299:17 310:14

**path** 160:20

**patience** 117:12

**pattern** 37:4 42:15
44:17 59:10 62:16
63:2,3 118:21,25
119:7,8,10,12,15,23
120:5 128:11 131:3
132:9 133:10 136:12,
13,18,21 137:10
143:24,25 144:24
327:23

**patterns** 59:6
134:15,23

**pause** 9:6 12:2

**pay** 22:12,14,22,23
23:10,16,21 24:14
26:23 42:21 43:12
66:22 68:7 71:9
77:17 82:3 107:4
111:24 112:7 113:6
145:24 150:18 152:9,
13 158:21 159:13
173:9 176:2 177:8
206:14,21 207:4,10,
16 208:6,20 209:7
213:2,8,13,17
220:21,25 221:2,6,8
222:18 251:25 253:5,
12 268:24 315:19,23

**paying** 44:22 47:24
68:5,9,10,13,16,18
78:20 84:2 107:11
208:23 214:2

**payment** 111:14
176:7,9,12,15,17
207:2

**payments** 83:23
107:12

**pays** 60:3 70:18
216:6

**PBNDS** 17:14,20
18:9 19:3,11,19 20:6
153:20 155:18
164:11 167:25 168:7
171:12 181:6,19
186:20 188:16,18
194:24 202:23 203:8,
13 205:25 206:6,10

211:21 212:6,13,15
213:3,24 215:14
216:17 227:5 240:13
249:11 253:23,25
254:2,4,10 255:6
262:6 263:4,7,17,19
264:13 265:6,18
303:13 316:19 320:9

**PDF** 203:16 235:3
286:19 290:20

**peers** 223:6

**penalized** 120:4,19
246:5

**penalty** 246:8,9,14

**pending** 16:2 138:15
140:10,14 141:3
256:6,11

**people** 17:25 23:2
48:5 58:15,20 60:12,
15,20,24,25 61:9
62:8 66:21 102:6
131:3 137:14 145:24
146:11 150:17 152:8
155:8 157:22 158:24
159:5 168:17 176:21
178:11,15 179:17
186:8,11,24 187:16,
19 188:3,10 189:23
205:25 206:6 209:13
211:22 212:2 213:6
216:6 217:12,15
220:16 222:22
225:25 227:7,10
228:5,6 229:6,15,18,
20,22 234:9 235:15,
18 237:2 238:21
241:22 244:13 248:9
249:21 250:11
253:19 254:9,13
257:12,14 262:24
268:13,23 269:12
270:10,16 271:9,19
272:18 273:9,13
274:9,12,17 275:7
279:7 280:8,20
281:20 296:14 297:2
299:2 303:20 307:13,
15 313:22 328:15
330:10 331:7,12
332:5 335:6 337:11

**peppers** 296:11,15
302:25

**percent** 48:12 50:17 74:16,22 75:4 80:10, 11 84:7 105:8 106:5 112:18 115:11 119:25 140:23 141:24 145:20 146:23 147:11,22 155:5 188:25 192:17 193:11 197:6 238:17 246:11 315:9

**percentage** 112:16 113:5 119:19 140:24 149:19

**percentage-based** 111:9

**percentages** 92:7

**perfect** 225:23 226:7 227:3

**perform** 19:24 39:10 52:11 102:16,19,20 221:16 231:21 311:21

**performance** 98:12 111:6,16 113:10 115:19 116:11 204:4 230:14

**performance-based** 112:21

**performed** 39:6 41:5,6 45:5,8,17 46:11,20,21,22 47:8 127:17 212:24 231:18

**performing** 39:11 113:4 151:3 220:10 249:12

**period** 32:7 33:20 50:9,22 53:14 63:16 73:17 74:11 80:21 90:20 104:18,22 105:2 116:15,19,20 136:16 181:11 205:12 207:9 230:15 256:13 268:16,17 272:6 319:24 328:12

**periodic** 258:13

**periodically** 156:13 314:17

**periods** 80:15

**Perkins** 9:10

**perks** 24:16

**permanent** 42:4

**permit** 291:3

**permitted** 186:7

**perpetually** 108:21

**person** 20:18 29:19 30:14 32:11 85:13 93:23 126:14 142:21, 25 151:6 158:3 160:21 163:13 172:16 195:17 197:19 250:4,8,18,19 255:15 256:5,18 258:14,17,21 260:15 261:24 263:12 264:22 275:24 282:25 284:6 287:14, 15 299:13 311:16 312:23

**person's** 158:16 159:13

**personal** 18:15 26:4 32:15,21 33:3 145:25 172:4

**personally** 35:11 88:24 175:15 295:14, 17 300:8 304:21 328:10

**personnel** 76:8 81:2 310:8

**persons** 164:12 220:10 221:21

**pertaining** 13:24 192:17

**pest** 308:15

**phase** 207:2

**phone** 24:21 28:12, 13,16,20 30:4 145:11,14,25 146:3, 18,20,21 147:2,3,7,8, 15 150:3,18,23,24 151:9,19,20 152:6 171:4,6 176:13 213:9,13,20,23 252:15 253:4,7 264:2 273:17

**phonetic** 275:22 315:4

**physical** 40:17 41:10 42:10 64:5 85:18

**physically** 49:22 62:16,17 136:4 154:13,25 156:13 168:14 171:16 176:18 184:18 262:8 271:17 282:2 289:13 323:17

**pick** 329:12

**piece** 20:20 158:6 174:5 284:20 310:19

**pinpoint** 13:18

**pivoting** 90:21

**place** 20:24 61:21 66:11 69:11 75:3 98:20 101:10 104:11 123:7 133:17 134:3, 24 135:2 145:17 178:21 198:15 200:5 208:12 210:7 229:7 243:6 249:24 250:3, 17,23 252:4 255:6,10 260:5 284:3 305:6 325:8

**placement** 210:13 328:25

**placements** 24:8

**plaintiffs** 9:11,22

**plan** 48:13 62:25 103:20,21 113:15,18, 23 114:5,18,23 115:23 116:8,9,17, 19,21,25 123:2,3,6, 24 124:23 125:4 127:20 128:17,20,23 129:16,18,19,23 130:3,8 133:25 134:6 136:7 139:5,10,12,17 145:4 155:24 156:5 162:6 163:5,6 164:17 184:5 190:10,15 196:5,7,13,20 219:2, 5 224:11,23 231:11 283:9 285:25 335:14

**plans** 96:13 114:4 116:10 118:7,9,15 124:4,6,9 144:7

163:2

**plant** 40:17,18 41:10

**plants** 42:10

**play** 330:21

**plays** 40:21

**Playstations** 330:20

**pleadings** 30:17

**PLS_1625** 308:22

**pod** 66:17 228:25 229:14 242:19

**pods** 49:21 273:2

**point** 42:18 43:11 72:4 104:15 113:7 124:7 133:24 208:22 233:25 261:19 279:20 280:16 287:12 307:5 323:21 327:19 329:11

**pointed** 70:4 302:16

**policies** 19:4,6,7,9, 13,14,18 20:3 42:12 90:22 98:16,17,18 101:9,14 102:3 182:25 186:14 188:16 211:25 232:24,25 233:4 267:3 276:14 322:4

**policy** 19:10,20 40:24 98:18 99:10 100:8,23 103:22,24 104:2 175:20 181:5 189:3 215:6,8,14,18 217:22 218:3,14,24 219:13,24 222:23,24 224:3,4,6,8,10,12 245:15,21 257:18,21, 23,25 266:8,15 267:8 271:22 285:15,18 290:4,7,10,15,18 303:11,14 307:18 309:19 312:9 318:13, 20,22 319:5,8,16,18 321:12,14 322:2,7, 17,18 324:2,8,9 326:3,12 334:5,7,13

**poll** 314:17

**popular** 278:8

**population** 50:5,7, 18 57:21 61:24 63:10 65:14 67:4,23 92:11 106:6,10 118:11,13 127:21 134:13 136:7 137:10 139:5,9,16 173:16 174:25 175:9 223:5 229:8 231:5, 11,12 272:22 273:7, 21 274:17 278:9 293:19 302:17 314:17,21 316:4,24 334:25 335:7,12 336:18 337:2

**porter** 222:17

**porters** 51:11 223:7

**portion** 33:23 105:14 106:3 126:22 138:14 141:8 171:11 233:21 249:11 262:23 298:10 299:3 310:3, 17

**portions** 261:2 309:2

**ports** 298:24

**pose** 12:21

**position** 125:6 133:13,14,21 138:7 141:10,12 202:17 204:13 220:22 221:8, 9 235:11 237:5 241:9 327:8 328:17

**positions** 21:2 22:22 23:4,8 52:7 67:8,9 119:20 123:25 130:11 131:25 132:2 137:22,25 139:4,9,20 140:2,3 144:19 145:7 216:8 220:6

**positive** 229:3,6

**post** 41:14,15 102:3 131:12,14 237:13 247:2,5 267:18,25 268:5,7,8

**posted** 146:13 237:8, 11,14,15 261:3,5 325:19 327:16

**postings** 325:16 327:16

**postponed** 326:8

**posts** 41:16 247:4

**potatoes** 299:17,18, 20,24,25 300:6

**potential** 73:20

**potentially** 42:8 57:15 58:7 110:8 159:23 206:19 211:5 284:23 308:5,7

**PPE** 235:11 236:6

**practice** 93:19 100:2 108:12 252:23 253:3

**practices** 90:23 188:24

**pre-approved** 284:4

**pre-covid** 50:21

**pre-meal** 195:4,6

**pre-service** 140:17

**PREA** 10:14

**preclude** 290:23

**predecessor** 22:3 93:11

**predecessors** 68:17 94:14

**predecessors/ wardens** 33:7

**prefer** 329:14

**preparation** 14:13 25:4 28:9,15 29:4,8, 19 30:18 64:22 86:3 113:19 120:14 244:22 301:8,14,20

**prepare** 52:8 241:19 291:24

**prepared** 35:21 184:5

**prepares** 135:11

**preparing** 14:15 15:5,7,21 21:8 124:3 145:22 194:6 245:7 255:3,7 318:21

**prescribed** 91:18 92:5 322:21 323:11

**present** 16:15

**presented** 163:15 322:5

**preservation** 325:6, 13 326:11,17

**president** 97:25 121:10

**presidents** 97:22

**pressure** 223:6

**pressured** 222:25

**pressures** 223:3

**pretty** 27:4 30:10 47:9 66:3 89:24 99:7 108:22 138:20 141:19 168:23 171:3 177:23 184:19 187:20 188:10 191:13 243:22 252:21 274:14 292:11 302:24 315:9 334:11

**prevent** 156:2 229:21

**previous** 10:24 26:24 110:9 112:20 129:23 149:13 157:8 158:9 165:3 170:8 181:12 184:15 265:4 286:12 328:11

**previously** 251:3

**price** 43:11 48:4

**prices** 315:5

**pricing** 315:11

**primarily** 49:20,24 51:13 126:18,22 144:16 152:11 312:22 315:8

**primary** 19:17 41:24 43:11 56:5 71:13 113:7

**prior** 14:7 29:2,6 32:5 37:25 55:9 65:5 79:18 82:15 92:10 96:12 104:6 120:10 123:11 127:3,6 136:15 145:19 152:4 154:10,17,20 155:5 157:8 162:5 189:20 195:9 227:25 236:24

**presented** 243:7 255:2,6 295:9

**prison** 10:14 37:25 42:7 239:7 334:8

**prisons** 174:17

**privileges** 264:24

**privy** 45:13 178:19

**problems** 46:5

**procedure** 103:24

**procedures** 19:14 42:12 162:8 309:15 325:7

**proceed** 11:24

**proceedings** 11:6 114:19 258:7

**proceeds** 332:14

**process** 14:5 20:18, 24 21:8,12 24:7 30:24,25 36:5,16,23, 24 38:9 55:2 56:11, 12,19,25 76:16,20 94:4 96:23 99:8 101:15,25 103:22 104:10,16 107:23 108:5 117:14 138:17 155:24 163:20 168:5 174:3 180:23 182:8 183:5,12,21,24 187:7 190:10 196:14 200:11 224:6 239:24 240:17,21 243:21,23 244:2 249:24 250:3, 18 251:16 254:20,22 260:11 278:12 282:3, 17 291:16 301:5 303:9,12 304:8 305:6,22 322:12,15 323:21 328:18

**processed** 305:24

**processes** 36:3,5 47:6 201:3

**produce** 61:20

**produced** 148:14,24 255:12,13 276:25 321:23

**product** 283:16 284:12 288:19,20 291:20 294:15 310:11 314:19

**production** 195:3,5, 6,21 282:17

**products** 284:2 301:11 302:4 317:3 323:19

**products/meals** 301:7

**professional** 304:6

**proficiency** 254:23

**profit** 38:19 42:22 43:8,10 44:5 74:8,15, 22 75:4 80:10,17 82:21 84:6,7 106:12, 13 315:22 316:5

**profitable** 39:16

**profits** 84:12 107:3 315:13 317:12

**program** 13:13 17:17 19:11,16,18 24:5,11 25:11,16,19 26:10 39:12 42:2 49:14 51:3 52:6 84:23 87:8, 23 88:3 90:5 100:23, 24 101:7,20 112:3 151:4 159:8,22 171:9,13,18 172:9,22 179:7 186:15,20 196:20 198:13,23 203:2,9,17 204:5,9, 19,25 205:8,15 206:2,6,11,23 207:4, 10 210:19 211:3,9, 12,22 212:2,5,12,16 214:17 215:8,24 216:22 217:5,15 218:15,18 228:20 229:22,25 230:5 232:25 233:2 235:6 244:9 326:21,23 328:16 329:7 330:3 332:25

**programming** 330:6

**programs** 42:2 89:12 102:13 112:6 152:10 186:2 192:13 196:24 198:17 199:11 220:16 227:18,19 234:4 276:17 285:21 308:14

**prohibit** 234:2

**prohibits** 249:12

**projections** 74:24

**promised** 268:25

**promoted** 53:14,17

**promotion** 53:8

**prompt** 304:13 305:12

**prompted** 96:12 97:2

**proper** 162:7,8 288:8

**properly** 164:24 165:23 166:25

**property** 273:9

**proposal** 36:18 38:12,13

**proposals** 36:11

**proposed** 123:23 125:4,13,20,24 129:23

**prospective** 92:23 152:14 173:14

**protocol** 159:20

**protocols** 49:23 154:11 272:23

**prove** 181:6 182:23

**proven** 52:13 307:7 308:2

**provide** 24:10,21 40:23 41:12 44:5 68:3 102:20 103:10 104:4,6 108:13 153:12 213:16 214:11 218:11 224:13 226:20 227:5 245:11,23 246:6 250:10 261:13 262:3 289:2 295:10 304:5 313:11 315:4 316:18

**provided** 26:14,18, 23 27:9 28:2 31:15, 18 32:10,19,22 37:2 69:25 123:4 124:23 126:16,18 127:14 151:21 169:2 171:17 195:18 218:7 251:25

252:4,9 254:24
256:19 260:14,17
262:11 266:21 275:7
280:20 286:22
294:14 295:22
296:11 309:24
313:16 314:15 331:8,
10,12,16,23

**Provider** 70:7

**providing** 70:7
82:11,12 83:5 94:18
127:11 145:14
227:14 250:25 253:4
259:6 283:25 291:21
310:9 314:5,23

**provision** 82:20
275:11 276:11

**PRR** 231:25 232:3,5,
12,18,22 233:10,11
234:18,19,23

**publication** 324:18

**published** 311:22

**pull** 30:21 55:18 63:3
64:13 75:10 124:16
136:6,25 203:4 233:7
234:18

**pulling** 75:16 113:17
185:2 203:7

**pulls** 30:24 289:5

**punishment** 186:5

**Punjabi** 261:12

**purchase** 151:9
273:13 313:15,20
332:16 333:5

**purchased** 313:18
332:13,19

**purchases** 316:21

**purchasing** 106:6
151:12

**pure** 175:8 192:7

**purpose** 77:14
270:20 310:5

**purposes** 20:8
105:23 147:21
179:10 326:18

**pursuant** 105:16

**put** 14:12 60:25
69:10,13 72:12 99:25
106:14 150:22 151:4
152:2 173:20 189:7
220:9,16 221:18,19
325:8,16

**putting** 24:15 31:21
207:25 283:12,13

---

**Q**

**QA** 183:14 289:10

**qualifications**
222:22

**qualified** 312:4

**qualifies** 265:25

**qualify** 61:9

**quality** 99:12 100:10
163:17 187:6 195:18
200:4,10 218:8
224:18 297:10
312:11,15,25 313:3
331:23

**quality-of-life**
316:13

**quantity** 310:13

**quarantine** 49:21
229:20 235:13 273:2

**quarantined** 228:25
229:16

**quarter** 91:21 310:25

**quarterly** 181:17
317:11

**question** 12:3,23
13:3 16:23,24 18:18
24:6 31:12 42:19
45:2 56:16,24 58:17
74:13 81:12 108:16
111:20,22 150:25
213:10,19 221:3
232:2 247:14 249:3
301:17 323:14

**questioning** 201:15

**questions** 9:23
12:11,13,21 18:13
29:23 30:12 35:19,
22,23 84:19 86:2

114:22 117:9,13
149:5 180:9 306:11
333:20

**quick** 201:14 274:21

**quit** 216:22 217:5,12,
15

---

**R**

**Rachel** 148:16
201:18

**radio** 332:5

**radios** 331:8,16

**rag** 221:19

**railboxes** 61:16

**raised** 148:16 158:15
297:2

**ran** 48:19 50:15,16
230:9

**randomly** 176:25
177:5

**range** 84:14 150:7
282:10

**rank** 97:22

**ranks** 53:4

**Rape** 10:14

**rate** 39:20,21 40:12
43:12,17,20,25 44:2,
9 45:4,15,21 46:12,
18 47:19 58:5,11,23
59:13,21 60:21 65:18
68:6 69:19,21 70:2,
18 72:20,25 73:2
74:8,9,14,17,20 76:8,
14,22 77:4,11,13,15,
25 78:4 79:17,21,24
80:7 81:3,11,16 82:4,
20 83:3,14,24 84:2,3
112:16,17 119:25
144:3 146:8 149:24
150:8 159:16 176:2
193:11 206:20,24
207:5,11,16 213:21,
24 216:16 220:21
221:2,6 230:25

**rated** 146:16

**rates** 38:15 74:12
79:23 80:10 105:5,
15,16 107:11 146:3,
10 147:8 201:21,22

**ratios** 134:10

**re-accredited** 185:3

**re-audit** 156:6
190:14

**re-education** 159:23

**re-temped** 282:15

**read** 15:20 17:3
18:21,22 26:13 30:16
35:5,6 86:8 123:10
126:3 158:3 177:22
178:13 195:21 288:4
306:11 309:3

**reading** 122:4
249:18

**ready** 241:6,12

**real** 201:14 243:21

**reality** 87:12 243:23

**reason** 13:4,6 144:25
184:2 267:22 274:5
336:3

**reasons** 174:16
210:8

**reassessments**
156:7

**reassigned** 230:9

**rebuttal** 183:25
184:2,4

**recall** 10:17 13:19
24:23,25 25:6 27:17,
21,25 30:7 34:17
46:16 79:22 86:5,6
96:16 113:20 146:15
239:18 249:18
277:13 303:4 327:15
332:16 333:5

**recall/remember**
26:15

**recalling** 219:13

**receive** 72:16 110:20
175:19 195:17 209:7
241:6 280:8 310:16,
21

**received** 79:4 105:4
140:19 147:14 150:3
213:18 304:11

**receives** 71:25 78:11
286:24

**receiving** 72:8 176:8
236:5 239:18 279:23

**recent** 216:14 290:9

**recently** 238:18

**recess** 84:17 201:13
274:25

**recipe** 282:4

**recipes** 289:5

**recollection** 123:5
150:2

**recommend** 99:11

**recommendation**
20:19 298:10

**recommendations**
103:13,16,17 278:5

**recommended**
312:5

**record** 18:22 52:19
54:20 55:20 59:22
64:15,19 92:21
119:17 148:6 155:13
163:9 201:12,16
202:8 236:25 250:2
280:10,21 282:23
287:12 319:13
323:10 325:25 333:2

**records** 61:17,20,21
63:13,16 64:10 68:23
71:2 80:21 82:18,25
92:13 95:22 120:10,
11 123:10 125:18
176:7,9,15,17 177:8
189:19 195:4,5,7,21
197:23,25 228:3,5
255:13 295:19
300:12 317:13
320:13 322:25 323:3,
5,6 325:18 326:2,10
327:18

**recreation** 70:11
269:22 272:5,8,21,25
273:6 316:2,19
330:11 331:5

recreational 70:9
106:7

recruit 24:4 67:8
222:24

recruited 214:17

recruitment 211:22
212:2

recruits 179:21

redacted 135:21
309:2

redaction 150:7

reduce 108:2 109:10
300:5 316:11

reduced 67:24

reducing 115:16
316:15

reduction 67:3,4

reevaluated 304:20

refer 33:18 36:14
89:6 124:8 148:10

reference 56:2 57:8
63:20 100:18 188:18
299:14 334:13

referenced 210:12
211:13 216:23 276:2
323:12

references 193:24
319:17

referencing 140:12
170:9 298:20 318:22

referred 78:3 104:10
257:2,6

referring 19:7 87:7
152:18 185:21
312:17,21

refers 163:4

reflect 139:15,20
176:9,12 216:16
243:2 300:12

reflected 134:17

reflects 199:19

refresh 123:5 149:25

refuse 178:12

refused 277:14

refusing 86:20 87:8
268:14

regard 36:10 164:7
240:7 276:9

regimented 243:12

regional 98:9 100:18
238:15

regular 82:3 83:3,14
84:2 135:8 200:10
218:17 230:25
254:21 276:15
293:24 294:2 317:15

regularly 72:17
90:17 135:15

regulations 175:7
195:19

reimbursed 206:16

reject 304:4

relate 10:7 98:17

related 148:6 165:2
166:8 171:12 297:5
324:11 325:9 326:17
327:12 328:9

relates 179:20
194:12

relating 13:10,11
25:11,18 26:10 86:20
100:23 121:13,24
122:12 193:10
198:12,22 232:24
233:2 297:2 303:11,
23 329:6

relation 166:4

relationship 71:14
82:10 97:19

relative 11:9 34:20
37:3 166:11 326:20

release 233:19
264:22,23 320:3

released 158:6
209:8,15,24 232:12

releasing 258:20

relevance 148:13

relevant 50:8 201:20

268:17

reliable 48:25

relief 15:25 130:10,
11,20,21 131:6,19
132:2 224:22,25
225:11

religious 10:13
312:3

rely 42:4

remainder 162:9

remarks 171:22
173:4

remedy 15:25 160:2
209:18

remember 10:15
23:6 30:9,12 93:17
116:16 177:11 197:4
216:25 226:12
261:13,14

remind 16:5

remote 9:5 11:24
154:10,12 155:14

remotely 9:3,5

removal 90:4 167:11
204:5,9,18 205:15
210:13,18,23 211:3,
13

remove 278:13
323:18

removed 204:14,24
210:6 211:7

removing 205:7
299:18

renovation 69:9

reoccurrence 156:2

repainted 248:7,15

repeat 12:14 190:19
213:10 301:17

rephrase 12:12
16:23 46:3

replace 244:19
278:14 291:11

replaced 275:25
288:19

replenished 151:15

replied 299:10

reply 299:9

report 54:3 55:19,23
91:24 92:6 93:2
97:15 98:5,6,11
102:21 121:18
135:24 137:9,15,24
138:14 139:22
140:22 141:11,13,19,
22,23 142:2,3,6,11
158:3 161:15 162:15,
20 165:11,13 169:8
170:15 185:12
192:19 197:17
208:22,24 218:7,11
223:7 228:10 238:17
240:23 241:13
242:12 243:3,18
244:3 255:23 279:16
283:6,18,20 284:5,8,
15 285:3,11,17,20
289:2 295:25 307:6
308:2,10 334:3,21
335:3 336:14

reported 85:15

reporter 9:2 11:25
12:8

reporting 9:6 90:22
93:3 97:18,24
136:11,18,20 137:9
209:4 218:6,15
238:22 239:3

reports 92:25 93:12,
25 98:3 103:11,14
135:9,20 136:6,20
141:18 169:13,17
170:18 210:17,20,25
218:18 257:2,4

represent 52:4
148:23 246:12

representative 26:7

represents 310:25

request 13:21,23
14:7,8 20:19 31:9
35:2 36:17 38:11,13
76:19 149:7 151:17
152:12 155:4 260:22

requested 15:24
154:22 302:17

requesting 14:19,
21,23 20:23 172:17
225:25

requests 27:7 29:5
36:11 98:13 326:24
332:16

require 16:6 58:2
132:2 185:24 186:7
218:14 224:9 227:5
235:8,19 248:23
256:5 264:22 278:20
288:25 322:11

required 22:14 41:14
42:8 100:9 118:24
119:3,14,20 134:7
136:19 172:22 175:2,
5 186:11,19 195:7,8,
12 196:17 217:9
219:6 232:19 235:5,
11 236:6 245:23
246:6,20 247:5 249:7
258:12 268:8 282:8,
15 283:2,8 285:24
288:20 289:4 291:11
298:23 303:18
310:13 316:18
320:23

requirement 21:24
40:24 156:8 207:2,24
209:4 229:4 251:16
273:3 274:3 278:23
325:6

requirements 17:16
40:25 41:21 175:6
192:15 212:4,18
218:6 221:25 222:14,
15 231:24 232:9
262:7 282:5,6

requires 60:4 145:2
203:8 212:11 219:10
224:9,10 236:2
245:10 320:9

requiring 271:22

research 77:19

resident 215:8

residents 63:8

residing 258:18

resolution 256:11

resolve 87:19

resolved 283:12

resolving 88:22
104:2

resource 98:10
135:12

resources 98:7
100:19 244:9

respect 16:19 19:15
22:12 84:23 90:13
103:15

respond 25:21 35:25
36:10 41:9

responded 307:24
308:9

responding 45:22

response 38:11
156:5 231:23 232:9
304:5 309:13 311:24,
25 312:8

responses 12:7
30:13 306:17,24

responsibilities
121:13 329:6

responsibility 19:2
101:19 103:14

responsible 17:13,
20 164:12 166:2
198:5 275:6,10,20
308:12 328:15

rest 20:11 118:2
120:12 127:3,6
177:20 229:8

restricted 234:3
256:6 259:9

restrictions 49:23
152:4

restrictive 256:10
257:6,9,11 258:16,
18,21 259:8 273:25
274:6

restroom 75:14
274:24

rests 183:8,9

resubmission
322:11

result 113:9 155:20
204:5,8,9 283:17,20
284:4,7,13,15,25

resulted 295:25
325:11

results 192:22
193:22 258:7,8

retaining 321:12

retention 318:13
319:13,24 322:2,7
325:5

retrain 209:19

return 69:14 70:4,12
106:4 290:25 335:19

returned 309:14
312:7

returning 336:2

revenue 105:19
107:10 108:21,24
115:6 150:7

revenues 105:12,14
106:13 107:24 108:3
110:17

review 27:7,20 28:5
63:13,15 99:17
102:16 104:6 113:18
118:19 119:17
122:21 124:4 126:9
135:13 145:21 146:8
148:22 149:5 154:15,
17,20 163:18,20
172:2,3 173:14
181:13 189:12,14
191:20,23 192:4
194:5 196:5,10 201:2
219:6 239:24 240:17
245:7 255:2,5 264:21
268:4 287:13 318:20
322:11 328:25

review-type 28:18

reviewed 25:3 26:18,
22 27:15 29:10 31:25
64:22 71:2 86:5,16
110:10 124:6 128:25
154:24 183:16,17
186:12 196:12,15
312:3

reviewing 15:10
32:18,22 46:16 80:20

90:7 123:9 209:2
295:19

reviews 102:19
181:17 189:20
200:14 258:17 259:4

revise 224:12

revised 31:8 202:13
259:23 260:3,13
262:12

revision 224:13
277:21,24

revisions 260:7

reward 116:3,22
220:17 291:4,17,25

rewarding 290:24

rewards 116:5,25

RFPS 36:11 148:12

rice 302:21 303:2
310:14

Richardson 300:19,
23

rights/civil 97:12

risk 259:6

roaches 307:8

rock 284:20

role 20:22 53:10
94:8,25 95:13 187:14
214:7 276:4 324:6
328:2

roles 94:17 214:14
220:18 221:24

Roman 242:3

room 127:12,13
137:25 138:8 165:14,
18 166:21,23 220:13
271:6,11,17 274:7
330:22

rooms 163:24 330:25
331:2

rotate 195:11

rotates 154:5

rotation 226:23,25

roughly 43:15 71:4

83:17

roundabout 184:15

rounded 302:24

rounds 122:19

routine 88:13,19
90:19 96:11,25
174:17 322:13 334:4

routinely 173:12
334:11

row 125:10 294:3,4
296:10

rule 31:9 214:25
253:24 255:16,17
262:23 263:10
265:16 266:12

rules 11:22 49:24
175:6 253:17,19,22
254:9,12,18 255:9
263:13

run 274:23 283:15,16

runs 282:13

RUSSELL 9:1,13
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1

116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1 274:1
275:1 276:1 277:1
278:1 279:1 280:1
281:1 282:1 283:1

284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1

**Russian** 261:12

**S**

**safe** 50:25 93:20 128:6 291:20

**safely** 49:12

**safety** 102:13 108:14,17 109:11 165:8,10 188:8 308:16 314:23 316:16

**safety/security** 20:21

**salaried** 110:19

**salaries** 107:21

**salary** 62:7,22 126:15

**sales** 314:18 315:16

**samples** 195:8

**sanction** 264:8,12, 13,19 290:22

**sanctioned** 262:24

**sanctions** 253:24 263:10,13,16 264:15

**Sandley** 9:22 12:21 47:4 84:20 101:16 106:16 107:9 113:13 117:11,19,20,25

118:5 120:24 121:4 122:23,24 123:12,15 124:15,18 127:19,20, 24 128:3,8,10 129:3, 6 132:11,16,19 134:21,23 135:16,19 137:16,19,21 142:9, 11 143:12 144:6 147:13,14 148:5,15, 21 149:7,9,10,12,14 150:15,17 151:21 156:25 157:4,17,19 161:11,14 162:22,25 163:10 167:8,10 168:4 169:4,7 170:13,16,17 178:25 179:8,16 180:3,8,13, 15 183:4 184:23 185:2 187:3,5 190:22,25 198:19,20 199:25 200:3 201:5 202:11,19,20 203:7 208:2,3,13,14 209:21 210:3 211:19,21 212:11 213:22 215:5, 23 217:14,21 218:20, 23 224:20,21 225:12, 13 226:7 228:12,14 232:11,17,23 233:5, 9,20,24 234:17 236:8,10 237:20 239:4 240:15,16 242:13 244:25 245:3, 20 246:4,18,19 247:16,19,20 249:5, 19,20 251:8,9 252:6, 11,12 259:17 264:4,7 266:20 267:6,7,17 268:10,12,17,21 269:4,21 274:20 275:2 277:20,25 278:15,16,25 279:6 280:13,15,22,25 282:19,24 284:14 285:2,12,13 286:4,8 290:2,6 292:4,7 293:23 295:8,16,20, 21 296:20,24,25 297:15,18 298:17,21, 22 299:7,8 300:4,9, 14,18 301:18 302:2, 3,11 305:10 306:2,5, 23 308:20,24 311:7, 11 313:6,8,17 314:8 318:2,3 319:11 320:15,16 321:21,25

329:9,22,24 331:7 333:8,11,12 337:18, 23

**sanitary** 247:25

**sanitation** 162:8 163:23 164:5,7,9,15 165:14,18 222:14 248:24 249:6 282:11 297:6

**sanitation-wise** 52:16

**sanitize** 164:25

**sanitized** 161:25 164:13

**Satisfactory** 193:3

**satisfies** 104:2

**save** 109:22

**saving** 46:24

**savings** 66:13 108:15

**scale** 116:2 319:5

**scan** 194:9

**scenario** 266:17 267:5

**scenario-based** 288:10

**scenarios** 266:22

**schedule** 91:19 146:16 158:18,25 159:3 160:11,12,22, 24 172:23 173:19,21, 22 194:12 226:23 236:20 237:7 247:6 250:22 289:8 311:22 319:14 333:13 334:10,12,14,17 335:6,17,20 336:4,8, 10,15

**scheduled** 89:17 90:17 97:6 140:17,21 158:16 173:23 226:23 236:19 238:17 240:24 241:22 256:21 295:2

**schedules** 173:8 174:13 177:2 194:13, 16,19,21 197:15

226:24 237:3,8,10 320:13

**scheduling** 174:13 214:10

**school** 54:22 55:10, 12

**scope** 18:15,24 36:7 37:13,23 47:3 56:22 68:21 73:14 91:3 93:15 94:3,11 96:15 97:4 98:23 100:4 108:10 109:5,15 110:23 111:18 112:10 175:10 207:20 208:8 232:7, 16,21

**scored** 193:7,19

**screen** 30:25

**screenings** 221:23

**scroll** 31:11 34:19,22 64:24 69:7 75:23 76:5 85:8,19 86:9,10 115:15 123:21 129:9 130:6 132:19,24 133:8 141:20 149:12, 22 165:5 166:16 171:8 177:19,24 178:5 185:14 196:3 198:21 199:7 203:11 210:4 215:13 234:22 239:17 241:25 259:21 262:21 264:4, 5 279:4,19 280:13 288:22 293:24 298:7 306:8 308:25 309:12 311:14,24 312:14 319:19 320:19 335:23

**scrolled** 177:23

**scrolling** 74:6 125:19 198:25 199:10,14

**SDC** 279:16 301:5

**second-shift** 336:12,13

**secretary** 138:8 223:8

**section** 77:14 133:12,21 165:25

191:16 195:2 198:13 202:24 203:2,17,19, 25 209:9 210:3 211:21 215:15 262:18 288:21,23 289:10

**sections** 261:5

**secure** 50:25 314:6 335:11 337:2,6

**secured** 126:24

**securely** 49:13

**securities** 110:2

**security** 20:16 53:11,14 89:10 102:13 108:15,18 109:11 122:18,19 144:16 145:6,7 163:16 188:9 200:23 258:24 281:17,18 287:4 304:24 314:22 316:16

**Securus** 145:18,21 147:15 148:2,8,13,24 150:4 201:17 202:7

**SECURUS_95** 148:19

**seek** 91:24

**seeking** 143:17

**segregation** 256:14 257:7,10,12 258:10, 14 259:4 263:20 264:16,18 269:4,10, 15 270:11,17 271:9, 19,25 272:8,13 273:10,13,17,23 274:7,10,12

**select** 176:25 177:5 314:16

**selected** 27:10

**sell** 146:20 253:9 314:19

**sellers** 314:9

**sells** 146:18

**semiannual** 181:16

**send** 93:2 94:5 103:23 150:22 152:14 190:13 333:2

**sends** 92:23

**senior** 97:15 98:2 103:15 125:20

**sense** 49:7 59:15 244:8 314:19

**sensitive** 301:6,11 302:4,15 303:3

**sentence** 69:23 165:12

**sentenced** 185:25

**separate** 24:15 59:6 77:4 105:11 106:18 115:14 118:9 128:19 315:16,18

**separated** 273:3

**September** 75:10,24 202:4,5 279:16

**series** 35:18 84:19 85:6

**serve** 52:8 307:3

**served** 256:16 280:2 283:14 300:6

**serves** 71:2 260:11 302:23

**service** 50:12 81:2 82:3 89:17 94:18 102:13 108:14 110:2 126:16 127:11,13 133:22,24 134:5,8 161:21 162:2,6,12 172:11 191:16,24 208:25 234:5,10 235:7 236:5 238:2 256:19 267:18 275:15,19 283:5,7, 15,18 285:10,17,23 287:19,23 288:14,22 290:4,7 295:25 297:3 299:11,14 303:21,23 304:23 308:2,10 311:17 312:17,19 333:24 334:24 335:3 336:19

**services** 35:12 38:14 65:3 68:4 81:3,4 82:11,13,20 83:6 84:3 126:18 127:17 145:11,15 152:9 198:18 201:20

**serving** 282:14 284:2 287:9 298:23 299:20

**set** 22:13 39:20 50:3 56:17 57:18 72:24 90:19 91:7 92:2 98:19 104:13 149:25 153:18,23 154:2 156:8,18 159:3 177:16 181:19 213:3 220:7 225:7 241:3 242:20 245:20 256:21 261:23 262:4 264:25 281:2

**sets** 206:11 245:14 251:3 254:4 315:5

**setting** 70:2 98:16 145:3 221:6

**seventeen** 57:15

**share** 71:10

**Sharepoint** 31:20 154:21

**shares** 30:25

**sheet** 74:25 253:11 326:21

**sheets** 26:23 173:9

**shelter** 229:6

**Shelton** 300:19,23

**shift** 53:5 61:10 123:25 130:19 131:6, 17,18 132:5 209:14 224:22,25 226:14 231:20 236:11 241:10,11,17,22 275:16 281:18,19 287:18 307:23 334:20 335:21

**shifting** 90:21

**shifts** 25:7 130:23 214:3,7 225:14 226:9 236:14,16,18,24

**short** 232:3

**short-staffed** 143:6

**244**:11,12,17

**shortages** 229:25

**shorten** 226:22

**shortly** 13:19

**show** 26:5 27:18 51:22 84:24 87:16 102:15,19 173:17,22, 25 175:12 176:14,15, 17 190:3,7 213:25 242:4 243:17 246:17 291:22 302:8

**shower** 274:13,17

**showers** 272:5

**showing** 25:19 75:20

**shown** 175:7 271:16

**shows** 131:16 147:24

**shred** 322:22 323:13 326:4,8,10

**shredded** 323:17

**shredding** 322:20 326:14

**sic** 95:12 98:19 132:13 148:18 279:3 286:6 311:17

**sick** 143:10

**side** 106:5 258:24

**sidewalk** 70:10

**sign** 196:17 219:6 277:6 293:15 323:3 328:25

**sign-in/sign-out** 174:6 192:5

**signature** 129:10 132:24 133:2 219:10, 16 292:17 293:12,13

**signed** 75:25 129:12 277:7 293:9 312:3

**significant** 92:9 181:14 218:9 255:22 260:9 305:8

**significantly** 167:18 180:23 181:13 231:6 234:3 255:11

**signing** 332:16 333:5

**signs** 325:19

**similar/same** 103:22

**similarly** 116:25

**simple** 90:4 108:3,4 161:4 283:10

**simply** 174:22 223:2 278:13

**single** 45:5 49:13 51:2 61:18 91:9 170:12

**sir** 10:3,9 11:5,21 12:6,10,18 13:14 14:3 15:3,6 19:21 24:17 27:18 28:11,21 29:14 31:14,17 32:3 33:5,8,11 34:8 55:13, 15 56:4,6 59:25 60:10,22 62:23 64:6, 23 71:21 76:10 78:5, 22 79:2 80:8 83:15, 20 85:16 94:24 102:8 103:4,12 105:13 132:22

**sit** 255:14 271:10,17

**site** 61:17 96:5 117:20 154:13,15,18 155:7 168:10,14 177:2 184:19 189:9, 12

**sites** 187:15 276:7

**sitting** 9:21 270:24 317:16

**situation** 88:10 239:15 279:16 285:7 286:2 307:15

**six-hour** 226:25

**sixty-nine** 84:9

**size** 310:4

**sizes** 298:10,24 299:3 310:17,22

**sliding** 116:2

**slot** 310:10

**slots** 310:15

**slowly** 319:19

**small** 54:15 309:7

**SMES** 36:14 98:8

**snack** 275:5

**snacks** 313:13

**social** 11:16

**society** 296:19

**sold** 107:4 314:13 331:20

**sole** 106:9 316:3

**solely** 316:24

**solicit** 314:20

**solution** 160:7 162:17

**someone's** 205:15

**sooner** 168:24

**sort** 279:20

**source** 317:19

**sources** 105:19 107:10

**space** 61:21 69:10, 14 70:4 309:9

**spaces** 309:10

**Spanish** 261:12 302:20,25 330:19

**SPCS** 205:19

**speak** 11:14 28:14, 22 29:15 33:2,6,9,12 90:8,11 112:12 120:10 243:7 256:18 262:5 277:12

**speaking** 9:7 33:16 171:6

**special** 290:24,25 291:3,5,18,24

**specialized** 222:7

**specialty** 221:13

**specific** 13:20,24 14:19 15:18 16:16 17:15 19:10 20:4 41:11 45:13 47:7 49:19 64:12 81:1 86:23 89:10 90:2 95:18,25 96:3,11

110:5 116:17 120:20 128:23 150:9,24 153:21 154:21 173:11 187:16 188:18,25 193:19 205:7 221:14 225:10 226:6 245:11 247:15 254:4 262:5 265:24 267:4 271:21 278:7 284:2 285:9 323:24 325:18

specifically 14:20 24:25 25:15 26:2 31:19 34:18 40:4 45:20 66:8,13 69:24 77:21 94:19 98:25 101:4 110:3 112:12 120:7,22 189:17 192:15 202:6,9 243:11 259:7 261:25 269:17 272:6 278:6 312:20 325:5

specification 13:22

specifics 10:18 26:15 34:3 299:25

speculate 22:9 86:22 240:3

speculated 160:21

speculating 88:8 148:3

speculation 192:7 224:19

spend 317:21

spending 317:11

spent 31:22 194:8

spicy 296:16,21

Spivey 286:9,11,12

split 226:8,10

spoke 33:15 298:7,9

spoken 29:18

spoodle 310:25

spraying 308:18

spread 229:21

spreadsheet 141:5 191:20,21,23 192:4

square 69:9,13,14

staff 10:15 39:17 40:19,22 41:11 49:15 52:8 57:20,22,24 58:2,5 59:11,14 60:19 62:12 69:10,14 76:12,23,24 92:16 99:9,21 100:12 127:10 128:16 131:22 132:8 133:22, 25 134:5,8 135:24 136:2,11,17,19 138:12 139:16 142:12,23 143:2 145:9 151:18 152:14 153:16 155:9,10,11, 12 159:3,19 162:7, 12,13 163:12 164:16 165:23 166:24 167:5 168:9,10,15 172:8 177:14 186:17 189:21 203:22 208:25 209:3 210:23 214:22,23,24 215:17 218:2 230:2,4,9,14, 17 241:12 244:20,22 246:19,22,23 247:6 248:12 249:12,14 251:10 254:19,25 255:18 256:22 258:3 265:9 266:11,21 267:7 281:15 282:25 287:18,20,23 290:14, 17 301:8,14,19 303:17 306:14,17,22, 23 307:2 308:11 309:13 310:16 315:20 318:15 324:10,13,14 334:15 337:10

staffed 140:23

staffing 37:4 38:5 40:16,17 41:4,22 42:14 44:17 57:9,18 59:4,6,10 60:4,18 62:15,25 63:2,3 66:13 107:21 118:7, 9,15,21,25 119:7,8, 10,12,15,23 120:5 121:24 123:2,6,24,25 124:4,6,9,20 125:4 127:20 128:11,17,20, 23 129:16,18,19,23 130:3,8 131:3 132:8

133:9,25 134:6,10, 15,23 135:8,20 136:6,7,12,13,17,21 137:10 139:5,9,12,17 140:24 141:10,12 142:4 143:16,23,24 144:7,24 145:4 218:15,18 224:23 228:20 231:11 327:23

stamp 133:4

stance 239:25 240:5, 9

stand 192:22 197:2

standard 19:12 40:24 90:5 91:7 155:18 169:25 171:9, 12,20 172:3,6 174:14 175:10,20 177:21 178:13 179:6,9 181:6 182:13,14,22,23,24 183:6,19,20 184:6,20 185:18 186:4,25 193:17 194:3,23,24 204:11 206:8,18 207:23 208:11 212:18 227:16,17 242:21 249:10 252:22 262:6 266:15 272:10 290:22 309:19

standards 17:14 19:4,22 20:6 22:13 23:14 101:13 102:5 153:18,20,22,23 154:2,5,6 164:11 165:8 168:2,7 169:14,18,23 170:8 175:3,6 180:25 181:2,5,6,18,19,21, 24 182:4,18,25 183:11,17,22 185:22 186:13,21 188:12,14, 16,18,19,21 189:3 200:13,25 212:13 227:13 240:13 248:21,22 249:6 253:23,25 254:3 255:5,6 267:4 272:5 276:14 303:13

standing 174:24

stands 92:8 121:18

191:24 192:8

start 15:7 82:12 118:6 140:18,21 142:17 145:14 149:4 158:10,11 252:6 262:22 279:23 282:14 302:12 306:15 333:22 334:3

started 13:25 14:15 15:5,10,21 49:20 52:23,25 53:2 136:11,14 228:18 332:25

starting 72:4 104:15

starts 36:16 85:23 104:17,23 157:16 171:9 334:25 335:3 336:19

state 9:9 54:23,24 201:16

stated 165:21

statement 48:13 51:9 77:6 179:15

statement/staffing 123:3 124:23

statements 208:16, 19

states 147:4 179:6 186:9 228:16

stations 316:23

statistical 239:3

stay 146:23 187:21, 23 316:24,25 334:11

step 65:12

steps 16:16 17:7 32:19 243:2,17,20

STEW0050 75:10

Stewart 10:20,24,25 11:4,7 13:12 14:2,5, 14 15:13 16:2,15,19 17:7 18:8 19:10,16, 23 20:5,9 21:15 22:24 24:25 26:5,10 33:7 35:13 36:20 38:5,7,23 39:3,6,18 40:2,11 41:3 42:15 43:6,8,18 44:15

47:25 48:5 49:12,19 50:8,25 52:21 53:25 54:4 56:2,11 59:24 62:4,9 63:18,23 64:3 65:7,16,19 67:5 68:19 70:19,22 71:8, 9,19 72:3 76:4 77:3,9 78:12,25 80:16 81:14 82:13 83:9 84:4,8,12 85:12,14 88:15 89:8 90:18,23 94:9,19,23 95:2,14 96:19 97:15 98:3,17 99:2,3,4 101:8 104:12 105:15 107:20 109:20 110:20 111:14,15,17, 24 112:6,12 114:5 115:21 116:6,11 118:9 120:7 121:13, 25 122:12 123:7,16 124:5 125:5,14,17 126:6,7 128:24 129:7 134:8,24 135:9 136:2 137:3,11 140:23 141:13 142:23 143:3, 5,17 145:12,15,24 146:11 150:18 151:6 152:9 153:3,6,18 155:17 157:7,11 158:25 159:3 167:11 169:13,17 171:19 172:25 174:9 175:22 180:5,15,20 181:25 182:5,19 183:3,7,10 185:3,9 186:8,11 187:8,17 188:2,4,11, 19 189:9 191:3,6 193:19 194:20 196:8 197:25 198:5,13 200:5,21 203:9,20,22 207:5 210:15 211:2 212:21 215:11,17 216:2,6,21 217:24 218:11,17 219:2,25 224:23 225:3 227:5, 21,25 228:15,21 230:18 231:5,12 232:17 233:2 234:8, 12,13,25 235:15,18, 23 236:11,24 237:2 240:20 242:5 243:3, 10 247:15,18,20 248:3,14,17 249:15, 22 251:4,10 252:25 253:20 254:9,12 255:3,10,16 257:8,18

258:4 259:18 260:8, 15 261:3,17 262:9,15 263:12 266:11 267:12,18,24 268:2, 13,24 269:16 270:8, 11 273:24 274:13 275:7,11 276:6,8,11, 24 277:10 280:5,7,19 281:2,13 286:13,22 288:5,14 289:3 290:7 291:4,25 293:18,25 294:18,22 295:9,10, 23 296:15,21 297:3, 10,22,24 299:3,20 300:5,19 301:10 302:5,14 303:3,9,14, 17 304:12 310:4 312:25 313:9 314:10, 14 315:6 317:21 318:16 319:3,14 321:6 322:7,8,12 324:10 325:8 328:19 329:7 330:3,6 331:8 332:3 334:5,15

**Stewart's** 205:23 240:5,9 269:4

**stick** 35:9 150:24

**stop** 64:24 183:21 282:17 337:19

**stoppage** 87:21 265:18,22,25

**stopped** 288:15

**stopping** 58:18 329:11

**storage** 61:17

**store** 315:10

**storing** 325:18

**straight** 230:19,21

**stringent** 220:12 222:2

**strongly** 51:4

**structure** 62:8 90:22 97:24 98:15 149:25 212:15

**stuck** 117:25

**stuff** 223:2 289:19

**subject** 84:24 192:18 286:15

**subject-matter** 36:9,14 100:7,14,24 101:18 102:9,12

**submit** 135:8 163:19 183:24

**submits** 163:21 208:16

**submitted** 104:7 135:14,20

**substantially** 50:5

**substantive** 14:24 15:15 17:3 29:3

**substitution** 283:24

**subtopics** 32:15

**Sue** 238:11,12

**sufficient** 50:24

**suggest** 123:8 126:15 309:21

**suggestions** 278:5

**suggests** 150:11

**suicidal** 259:8

**suicide** 122:16 269:12 270:21

**Summary** 133:21

**summary/transfer** 320:25

**Sunday** 294:10

**supervises** 287:19

**supervising** 98:4

**supervision** 20:25 90:14 101:5 270:23

**supervisor** 53:6 97:17 128:12 144:13, 14,21 198:2,4 238:15 240:22 241:4,8,9,14, 16 242:11,14 244:6, 15 251:21 255:25 256:2 275:15,16 281:25 287:14,16,19 307:6,23 327:3,21 328:21

**supervisor-level** 144:18

**supervisors** 281:18, 19 286:25 287:4 310:18

**supervisory** 100:12 310:8

**support** 33:19 36:15 92:16,19 93:23 94:9, 18 96:6 97:21 99:14 103:25 121:11 163:19 238:3 302:9 315:3

**supported** 181:5

**supporting** 156:14

**supposed** 307:14 334:21 335:19 336:13 337:3

**surprise** 114:9 154:7 190:8

**suspect** 13:22 21:18, 21 82:9 126:13

**suspend** 234:4,8,12 235:5

**suspending** 233:18

**sustained** 316:14

**Swinton** 27:24 30:3 252:17

**Swinton's** 30:7

**switch** 104:9

**switched** 95:5

**sworn** 9:4,14

**system** 174:7 197:4, 5,6,17 209:6 250:23

**systems** 38:2

**T**

**tab** 135:23,25 136:5, 25 137:2,11,20,21

**table** 198:9 271:6,10

**tables** 161:22,24 162:16 165:2 169:22

**tablets** 152:5,6,10,18 270:5

**tailored** 182:19

**takes** 31:3 70:19 112:24 337:7

**taking** 13:4 121:16 220:17 223:19 238:21 259:11

**talk** 27:19 32:11 50:21 61:9 75:8 91:8, 10 165:25 173:12 282:11 337:24

**talked** 29:23 30:4,5 73:18,25 107:19 118:6 187:5 198:23 199:6 206:10 224:21 281:10 288:9 308:4 330:16

**talking** 29:7 41:10 58:10 76:11 77:5,7 110:11 115:6 122:2 163:3 166:13,17,20 183:22 199:3 288:6, 10

**talks** 69:16 76:5 113:23 164:11 227:17

**Talton** 145:13 147:8 148:4 151:13,22 253:10

**tapped** 108:22

**tasks** 49:2 52:12 288:25

**taste** 195:4 279:25 287:9 298:24 313:4

**Tatiana** 327:6,7

**taxes** 110:15

**team** 20:15 88:24 89:6 90:23 95:20 98:3 100:11 102:12 103:15 169:22 187:20 188:3,8,9 260:22 327:18 328:21,22

**team's** 254:20

**teams** 102:11,14 164:5 187:14,20,23

**techniques** 161:24 288:8

**telephone** 201:20

**televisions** 106:8 330:17 332:2,7

**telling** 49:10 74:20 214:8,14

**tells** 217:14

**temp** 282:15 283:11

**temperature** 195:19 282:5,7 288:17,18,20

**temperatures** 195:9 282:8

**temping** 282:13

**ten** 187:19 229:18

**ten-minute** 151:14

**Tennessee** 53:24

**tenure** 72:9 185:8

**term** 56:7,17 106:2 110:12,14 257:9

**termination** 10:16

**terms** 38:15 40:8 46:24 73:10 74:3 75:9 98:16 257:7 333:20

**Terrence** 27:23

**Terrific** 13:7

**test** 195:18 327:6

**tested** 229:3,6

**testified** 9:14 118:8 148:22 152:25 219:5 227:9,21 246:13 251:3 252:17 315:12 317:5

**testimony** 10:19 11:3 12:9 13:5,9 25:4 29:22 50:23 52:4 201:22 254:8 294:18 305:16 329:25

**testing** 319:4

**tests** 195:8

**text** 265:7

**theft** 211:6,8

**therapeutic/special** 312:2

**therapeutically** 312:16

**thick** 171:4,6

**thing** 12:19 62:21 65:23 74:14 86:14 143:12 154:24 177:22 206:19 230:11 241:3 283:10

**things** 11:11,17 24:16 29:23 38:15 40:14 41:19 42:11 48:21 51:7 61:8,10 66:11,14 73:20 89:3 98:13 104:24 106:8 107:12 131:4 152:12, 13 160:10 175:5,9 187:25 189:8 192:13 195:9 207:7 221:17, 23 222:16 223:4,13, 14 227:13 271:5 288:9 289:8,17,19,21 309:18 313:4 314:21 316:3 332:23

**thirty-two** 84:10

**thought** 34:8,10 58:16 75:18 117:23 158:7

**thousand** 57:16 68:15

**thousands** 209:22

**thread** 86:7 121:5,6 157:5,15 298:8

**threat** 271:2 314:23

**threatened** 178:11

**three-day** 289:5

**three-year** 181:11

**throw** 36:2 67:20

**thrown** 307:9

**tied** 326:23

**tier** 65:3 72:25 73:6 74:7,14 78:4 79:16, 17,23 80:7

**tiered** 72:25

**time** 12:16,20 14:13 15:4 18:19 31:22,24 32:5,7 33:20 40:5 50:9,21 53:14 58:8

63:14,18 64:9,12 68:24 69:11 70:24 71:3 73:17 74:10,11 77:19 82:4,8,15 85:11,16 86:4 95:6 96:24,25 98:20 104:18,22 105:2 108:21 116:18 117:15 121:17 126:5, 14 130:17 131:4,7,9 134:14 135:4,6 136:16 138:2,10,11 146:18 147:2,15 148:4 150:11,24 151:9 156:19 158:17 161:2,7 168:22,25 174:18 181:14 184:15,20 185:6 188:24 190:9 191:5 194:9 201:7 214:9,12 216:10 228:15 230:19,21 236:24 240:18,25 241:3 242:19 243:11,14,16 246:22 247:9 248:7 252:15,18 255:3 260:20 268:3,16 272:6,21 273:6 280:7,19 287:17 295:2,9 300:21 310:10 317:20 319:2 320:3 326:9 328:3,4, 12 330:12 334:2,20 336:16 337:19

**timely** 291:20

**times** 10:4 11:18 28:14 50:15,16 51:10 63:10 65:24 72:6 78:18 80:7 81:16 83:12 91:9,20 92:6 95:14,19 96:21 102:23 131:4 209:22 235:12,21 243:12 255:21 270:15 274:4, 13 282:13 294:21 295:22 313:18 324:23

**title** 34:21 238:2,14 255:24 327:22

**titles** 21:20 137:4

**today** 9:24 11:24 13:5 25:4 29:19 35:19 50:7 62:15,17

66:15 67:6 68:5,14 71:19 74:18 89:18 93:6 94:24 113:19 118:20 119:18 120:14 124:3 130:5 145:22 148:9 152:5 191:13 194:7 207:14 243:6 253:5 255:14 302:8 318:21 323:14 336:16

**toilets** 70:11

**token** 291:19

**told** 16:11 17:2 66:19 67:13 79:12 217:13 237:6 307:13,14 317:21 327:11,14 328:8,12

**tomorrow** 329:10,13

**tool** 170:21 177:20 178:4,10,14 191:2,17 192:9 193:9 198:10 199:16,19 200:22 276:18

**tools** 200:16 239:14 242:23

**top** 27:25 77:25 82:3 106:25 150:9 203:11 216:25 288:2 293:24 303:25 304:9 314:9 317:4

**topic** 34:20,23 47:5 84:21 148:6 201:18 202:6,9,12,16

**topics** 13:10 31:12 32:12,15,20 33:4,13 34:6,13,17 329:18

**total** 54:11 57:12 68:9 69:17 70:19 80:12 83:24 131:20 132:8 139:16 141:19 187:19

**totally** 21:13 23:25 50:12

**totals** 138:23

**town** 164:4

**track** 242:15 259:5

**tracking** 105:23 174:4 192:5

**traditional** 302:21 330:22 331:5

**traditionally** 188:10

**train** 75:18

**trained** 164:24 266:11 281:20,23,24 310:20

**training** 53:6 92:9 131:4,9 187:24 266:19,20 267:2 281:24,25 286:21,24 301:7,14,19,24 310:16,19,21

**transcripts** 28:3 29:9

**transfer** 53:11,16,23, 25 320:4

**transferred** 53:8 209:8,14,24

**transition** 82:7 145:19

**transitional** 96:23, 24

**transitioned** 95:7,13

**translate** 261:15

**translated** 261:6,16, 20

**translations** 262:7

**transmitted** 151:5

**transportation** 77:5 107:12

**trash** 223:15,19 337:6,7,12,15

**tray** 287:8 309:9 310:10,15

**trend** 305:7

**trends** 305:2

**Trinity** 68:10,17 128:21 162:12 167:5 214:6 230:7 238:11, 15 239:16 241:12 245:4,10,23 246:5 275:14,21 276:15,22, 25 277:9,15 278:2 283:7 285:23 287:17, 20,23 290:17 301:3,

5,7,14,19 304:14 305:12 307:2 309:24 311:20

**Trinity's** 276:6,11

**Trousdale** 53:23

**Troy** 85:24

**truck** 295:4 322:22 323:13 326:5,8

**true** 15:4 16:17,18 17:12 148:2 244:10, 15 306:17,20 307:7, 16 309:25

**trust** 72:10,11

**truth** 17:8

**Tuesday** 190:8

**Tulsa** 53:9

**turn** 99:13 113:12 117:10 245:14 255:25

**Turner** 53:23

**turnover** 112:16,17

**TV** 272:2,6

**TVS** 316:23 330:18

**two-hour** 29:13

**type** 40:20 56:19 110:7 125:5 214:25 220:10,15 221:11,13 225:10 255:17 289:19 305:8

**types** 10:10 11:10,16 14:21 26:21 45:16 87:2 89:2 92:11,12 179:24 187:25 212:23 221:17,25 227:18 283:19,22 302:11 313:4 326:16 332:23

**typical** 126:8 143:2 154:14 236:10 302:21

**typically** 45:16 92:5 102:14 104:16,17 110:3 111:7 138:18 153:24 156:16 163:12 165:6 168:20 170:18 188:3 190:18

200:17 220:8 231:22
236:18 239:11
241:10 244:7 250:11
251:11 260:8 264:25
270:14 291:14 295:3
322:16 324:4,5
336:23

**typo** 298:12

**U**

**UCAP** 163:4,14
165:21,22

**Uh-huh** 224:7 236:15
265:13 272:3 288:3

**ultimate** 20:13

**ultimately** 53:17
104:4 163:18,21
255:25 256:21
294:25 305:3 328:24

**unannounced**
102:15,19 187:15

**unapproved** 283:24

**undercooked** 313:4

**underlying** 87:3,15

**understand** 12:11
13:8 16:22 24:6 26:3
49:9 56:15 65:13
81:12 111:19 119:6
202:21 221:3 254:8
265:11 315:14
337:23

**understanding**
17:24 18:3,5 32:9
78:20 83:18,25 84:11
86:17 89:19 119:24
134:5 139:15 142:6
170:24 204:8 248:16
275:18 329:25
334:10 335:2

**understood** 11:2,18
12:15 13:2 31:5
56:23 76:21 81:7
145:19 191:14
202:19 223:21
251:15 305:15
321:23 323:20

**undertake** 281:25

**unexcused** 204:3,8,
12,18,22

**unfilled** 120:18

**Uniform** 163:5

**uniformly** 267:8

**unimpeded** 274:2

**Union** 150:22

**unique** 67:6

**unit** 20:15,16 22:3
53:6 66:17 89:10,17
151:18 163:16 164:5,
15 198:17 220:13
241:15 244:4 254:20
260:22,23 269:4,5,7,
13 281:17,18 304:24
316:12 328:21,23

**United** 228:16

**units** 66:9 146:13
163:23 164:6,8
166:14 237:11,16
241:18 252:20 261:3
316:25 317:2 331:5
332:3,7,9,11 335:19
336:2

**unsatisfactory**
204:4

**unsecured** 222:21

**upcoming** 104:17
161:6

**update** 196:18
293:16

**updated** 216:11,16
219:21 239:11
292:23 293:12,13

**upgrades** 70:9

**upload** 154:21 155:5

**uploaded** 28:18
31:19 32:7 224:16,17

**uploading** 155:2

**usage** 61:13

**utility** 61:13

**utilization** 104:21

**utilize** 57:15 77:18
151:19 317:2 330:23

**utilizing** 136:17
255:24

**V**

**V(h)** 203:25

**vacancies** 139:23
140:2 141:10,14,20
142:2,7

**vacancy** 120:18
140:7 141:12 143:9

**vacant** 137:22,25
138:2

**vacate** 247:5

**vacation** 131:4
188:6,24

**vacuum** 223:12,13

**validity** 307:25

**variable** 60:8,14,18
61:22 67:13,23
73:10,19

**variance** 144:11
296:2

**varied** 290:22

**varies** 138:19 156:18

**variety** 13:10 101:12
174:16 302:19,22

**vary** 60:14 62:24

**vendor** 315:8 322:20
323:17 326:14

**verbal** 12:7

**Verbally** 254:19

**verbatim** 30:12
303:5

**verified** 284:11

**verify** 103:25 141:24
142:5 195:16 282:15

**versa** 182:10

**version** 196:19
203:13 219:21
225:13 233:9,15
234:18,19,23 260:5,
7,8 290:9

**versions** 232:12

**versus** 36:5 40:19
41:5,15 42:7 76:24
181:15 182:7,12,13
222:4 242:21 294:16

**vet** 103:25

**veteran** 117:14

**vetted** 99:14

**vice** 97:22,25 121:10
182:10

**vicinity** 335:15

**video** 152:18,19
155:15 252:19

**view** 18:7

**violated** 214:25

**violating** 263:14

**violation** 206:5
213:24 249:8 263:10
265:16 307:17
309:15

**violations** 262:24
266:12

**virtual** 155:3

**virtually** 38:24 48:19
61:10 66:16

**visit** 95:14 96:12,25

**visitation** 152:3,11,
17,19 234:3 270:4,6,
7,12 330:11

**visited** 96:19,22
186:16 277:9

**visits** 91:17 94:21
96:4,10 263:24,25
270:2,15

**vital** 52:12

**volume** 26:19

**voluntary** 13:13
19:11,18 25:15 49:14
51:3 52:6 87:22 88:3
151:4 171:13,18
172:9 179:7 186:15
203:2,9,17 204:5
212:12 215:24 244:9
326:20,23

**volunteer** 42:6
172:21 225:9,19
226:5 228:25 234:4,8
235:6 237:6 239:25
240:5,9 250:5

**volunteering** 291:9

**volunteers** 225:24

**VWP** 235:7,10,14

**W**

**wage** 23:22 44:23
45:9 47:24 76:7,14,
18 78:2 209:23 220:6

**wages** 76:6,12,23
81:2 220:3 251:4

**wait** 158:8 202:2
295:4

**waiting** 140:16,20
189:6 226:2

**waiver** 184:4

**wake** 240:25 241:21

**wakes** 244:4

**waking** 243:24

**walk** 266:21 282:2
288:7 331:2 333:19

**wanted** 23:22 43:6,7
84:23 97:6 202:7

**wanting** 177:22

**warden** 14:2,5,14
15:13 16:3,14 17:7,
12 18:8,14 20:17,25
21:9 53:15,18,21,25
54:3 61:6 62:4 72:9,
16 79:5 85:12,14
89:9,11,12 95:2,12
97:14,24 102:21
104:12 109:25
117:19 132:21
148:21 149:10,14
152:20 157:6,8
161:14,20 162:25
174:9 180:8 191:6
196:5 201:8 202:20
203:8,14 219:6
228:14 233:12,24
235:4 239:21,22
245:3 248:25 253:14

334:21 335:2,18
336:2,12,13 337:12,
13,16,17

**workers'** 176:10
177:12

**workforce** 240:14

**working** 27:2 43:9
48:20 55:15 78:17
136:4 137:14 142:12
143:2 150:20 151:9
173:11,18 174:10,15
175:13 179:18
197:20 211:6 220:11
221:21 235:16,19
279:24 291:13
299:16

**works** 76:22 230:22
274:23 275:24
279:11,13

**worksheet** 170:19,
25 171:12 179:3

**workweek** 41:17

**world** 225:23 226:8
227:3

**write** 195:15 319:21

**write-ups** 257:3,4

**writes** 121:15 122:25
238:16 239:4,14
298:6 311:16

**written** 92:13 93:2,12
95:22 102:21 103:10
118:15 162:4,19
210:7,10 237:8 266:4

**wrong** 136:17 184:9
330:2

**wrongful** 10:16

---

**X**

---

**XYZ** 114:13,14

---

**Y**

---

**yard** 70:11

**yards** 273:4

**year** 55:15 63:23
72:12,13,14 78:25

83:16,19,24 84:3,10
95:10 102:18,23
103:2 112:20 114:12
170:12 185:3,5,6,7
188:4 189:7 190:6,19
196:18,20 231:7
293:8 327:10

**yearly** 200:3

**years** 26:11 53:22
116:10 174:23
180:21 198:11
239:15 281:5 319:5,
6,25 321:9,13 328:2

**yesterday** 28:25
29:2,12 31:22,24
33:20

**yield** 108:15

**York** 9:21

**you-all** 202:14

---

**Z**

---

**zoom** 28:12 242:24
292:13 294:4 296:10